UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 )  |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) Case No. 18-50757 ) (Request for Joint Administration ) Pending) |
| Debtors. | ) ) Hon. Judge Alan M. Koschik ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) GRANT ADMINISTRATIVE EXPENSE PRIORITY TO ALL UNDISPUTED OBLIGATIONS FOR GOODS AND SERVICES ORDERED PREPETITION AND DELIVERED POSTPETITION AND SATISFY SUCH OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS, AND (B) PAY PREPETITION CLAIMS OF SHIPPERS, WAREHOUSEMEN, AND MATERIALMEN**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), authorizing the Debtors to: (a) grant administrative expense priority to all undisputed obligations for goods and services ordered prepetition and delivered to the Debtors at the final destination postpetition (the "Outstanding Orders") and satisfy such obligations in the ordinary course of business; and (b) pay prepetition claims of Shippers, Warehousemen, and Materialmen (each as defined in this Motion, and collectively, the "Claimants") in the ordinary course of business. In support of this Motion,[2] the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Donald R. Schneider in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the *Declaration of*

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the Northern District of Ohio (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363, 503 and 506 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4. On March 31, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Court has not appointed a trustee and the Office of the United States Trustee for the Northern District of Ohio (the "US Trustee") has not yet formed any official committees in these chapter 11 cases.

5. Non-Debtor FirstEnergy Corp. ("FE Corp."), an Ohio corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of FE Corp.'s non-Debtor affiliates (collectively, "FirstEnergy" or "FirstEnergy Group"). Debtor FirstEnergy Solutions Corp. ("FES"), an Ohio corporation, is the parent company for Debtors FE Aircraft Leasing Corp. ("FEALC"), an Ohio corporation, FirstEnergy Generation, LLC ("FG"), an Ohio

---

*Charles Moore in Support of the Debtors' Critical Vendor Motion; Shippers, Warehousemen, and Materialmen Motion; Intercompany Agreements Motion; and Cash Management Motion*, filed contemporaneously herewith.

limited liability company, and FirstEnergy Nuclear Generation, LLC ("NG"), an Ohio limited liability company. Debtor FG is the parent company for Debtors FirstEnergy Generation Mansfield Unit 1 Corp. ("FGMUC"), an Ohio corporation, and Norton Energy Storage L.L.C. ("NES"), a Delaware limited liability company.[3] Debtor FirstEnergy Nuclear Operating Company ("FENOC"), an Ohio corporation, is an affiliate of FES and a direct subsidiary of FE Corp. As of March 15, 2018, FirstEnergy Group has 15,513 employees, where 3,076 are employed by the Debtors, including 57 by FES, 686 by FG, and 2,333 by FENOC. FEALC, FGMUC, NES, and NG do not have any employees.

6. FES sells power and provides energy-related products and services to retail and wholesale customers primarily in Illinois, Maryland, Michigan, New Jersey, Ohio, and Pennsylvania. FG owns and operates three fossil generation plants[4], two in Ohio and one in Pennsylvania.[5] FG sells the entire output from its plants of 5,440 megawatts ("MWs") and 86 MWs purchased from the Forked River Power Plant ("Forked River") to FES pursuant to a power purchase agreement ("PPA"). Additionally, FG operates the Bay Shore fossil generation plant where certain of the assets are owned by non-Debtor Bay Shore Power Company ("Bay Shore") and the other assets are owned by FG. NG owns three nuclear generation plants, two in Ohio and one in Pennsylvania.[6] Pursuant to a PPA, NG sells the entire output from its plants of 4,048 MWs to FES. FGMUC is a party to a PPA whereby it sells the entire output from Unit 1 of

---

[3] FG also owns a 99% limited partnership interest in Nautica Phase 2 Limited Partnership, which has $10 million in outstanding debt.

[4] FG also owns a steam turbine and combustion turbine at the Bay Shore Power Plant in Oregon, OH and a combustion turbine at the Eastlake Plant in Eastlake, OH.

[5] FG owns and operates the W. H. Sammis Plant in Stratton, OH, which is composed of seven units and the West Lorain Plant in Lorain, OH, which is composed of six units that run on heating oil. FG operates the entire Bruce Mansfield Plant in Shippingport, PA, where it owns two of the three units. FG owns approximately 6.17% of Unit 1 of the Bruce Mansfield Plant while approximately 93.83% of Unit 1 is under a leasehold interest.

[6] NG owns the Beaver Valley Nuclear Power Station, composed of two units, in Shippingport, PA, the Davis-Besse Nuclear Power Station in Oak Harbor, OH, and the Perry Nuclear Power Plant in Perry, OH, each consisting of one unit.

3

the Bruce Mansfield Plant to FG, and then FG sells it to FES. FES purchases 108 MWs pursuant to a PPA with the Ohio Valley Electric Corporation ("OVEC"). FES also purchases approximately 496 MWs from third party renewable wind and solar power producers under PPAs. Pursuant to a Master Nuclear Operating Agreement, FENOC operates the three nuclear generation plants, composed of four units, owned by NG. In addition, FENOC performs services for non-Debtors Pennsylvania Electric Company ("Penelec"), Metropolitan Edison Company ("Met-Ed"), and Jersey Central Power & Light Company ("JCP&L") with respect to Three Mile Island, Unit 2, which is deactivated. FEALC owns an airplane that it leases to non-Debtor FirstEnergy Service Company ("FESC"), a subsidiary of FE Corp. and an affiliate of FES and FENOC. In addition, NES owns 92 acres of surface property and rights to a compressed air generation project in connection with a limestone mine located in Norton, Ohio, formerly known as the Barberton Mine.

7. In the aggregate, the Debtors have approximately $3.8 billion of funded indebtedness. FES has approximately $1.5 billion of funded indebtedness, including (a) a $700 million secured revolving credit facility;[7] (b) approximately $332 million of 6.05% unsecured notes due 2021; (c) approximately $363 million of 6.80% unsecured notes due 2039; and (d) a $150 million revolving credit note with Allegheny Energy Supply Company, LLC ("AES") under which $102 million is currently outstanding and is due on April 2, 2018. FG has approximately $1.0 billion of funded indebtedness, including (a) approximately $328 million of secured fixed-rate pollution control revenue notes ("PCNs") that support tax-exempt pollution

---

[7] The secured revolving credit facility is $500 million for general purposes (of which $500 million has been drawn) and $200 million for surety support (of which $200 million has been drawn). The secured revolving credit facility is secured by first mortgage bonds issued by FG and by NG, which are in turn secured by a first lien security interest granted by FG and NG, as applicable, on substantially all of their respective property, plant and equipment used and useful in the generation and production of electric energy, including the plants referenced above.

control revenue bonds ("PCRBs")[8] and (b) approximately $677 million of unsecured fixed-rate PCNs that support additional tax-exempt PCRBs. Additionally, FG is the lessee under a sale-leaseback transaction related to Unit 1 of the Bruce Mansfield Plant,[9] pursuant to which FG makes semi-annual payments to the six lessor trusts in that transaction. FES guarantees the payment obligations of FG under the Unit 1 of Bruce Mansfield sale-leaseback transaction. In connection with the Unit 1 of Bruce Mansfield Plant sale-leaseback transaction, the lessor trusts issued notes secured by, *inter alia*, the leases and related interests in said Unit 1 to a pass-through trust that issued and sold pass-through trust certificates publicly, of which approximately $769 million in aggregate principal amount remains outstanding. NG has approximately $1.1 billion of funded indebtedness, including (a) approximately $285 million of secured PCNs that support tax-exempt PCRBs[10] and (b) approximately $842 million of unsecured PCNs that support additional tax-exempt PCRBs. Additionally, FEALC has approximately $240,000 of outstanding debt in an aircraft leasing loan owed to FES. FES's debt obligations are generally guaranteed by its subsidiaries, FG and NG, and FES guarantees the debt obligations of FG and NG. As of December 31, 2017, FES reported total assets, liabilities, and capitalization of approximately $5.5 billion and FENOC reported total assets, liabilities, and capitalization of approximately $900 million. FES's total revenue for the year ended December 31, 2017, was approximately $3.1 billion.

---

[8] These PCRBs are issued by various Ohio and/or Pennsylvania state authorities. The secured PCNs are secured by first mortgage bonds issued by FG which are in turn secured by a first lien security interest granted by FG on substantially all of its property, plant and equipment used and useful in the generation and production of electric energy, including the plants referenced above.

[9] There are three units at the Bruce Mansfield Plant and the lease covers approximately 93.83% of Unit 1.

[10] The secured PCNs are secured by first mortgage bonds issued by NG which are in turn secured by a first lien security interest granted by NG on substantially all of its property, plant and equipment used and useful in the generation and production of electric energy, including the plants referenced above.

## I. Outstanding Orders

8. The Debtors' suppliers may be concerned that they will be rendered general unsecured creditors, rather than administrative claimants, with respect to goods and services ordered before the Petition Date for delivery or provision after the Petition Date. As a result, suppliers may refuse to ship or transport such goods (or recall such shipments) or provide services with respect to Outstanding Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court permitting the Debtors to meet their obligations under the Outstanding Orders even though the Outstanding Orders are entitled to administrative expense priority under section 503(b) of the Bankruptcy Code. Thus, the Debtors seek to affirm that the Outstanding Orders are entitled to administrative priority and to pay such Outstanding Orders in the ordinary course of business to avoid any unnecessary disruption to business operations and administrative costs associated with reissuing purchase orders or seeking additional relief.

## II. Claims of Shippers, Warehousemen, and Materialmen

### A. Shippers

9. The Debtors' ability to produce and deliver energy in a timely manner depends on their timely receipt of raw materials, parts, equipment, supplies, fuel, and components that are important to the Debtors' business operations. To that end, the Debtors rely upon certain professional common carriers, shippers, truckers, logistics management companies, rail carriers, and certain other third-party service providers to ship, transport, and deliver goods (the "Shippers"). Under certain state and federal laws, including Ohio and Pennsylvania, the Shippers could potentially assert possessory liens over goods currently in their possession for amounts the Debtors owe to the Shippers. *See* 49 U.S.C. § 80109 (providing for uniform shipper liens with

respect to interstate shipments using common carriers); OHIO REV. CODE ANN. § 1307.307 (LexisNexis 2017); 13 PA. CONS. STAT. § 7307 (2016). The value of the goods being shipped do not necessarily exceed the amounts owed to the Shippers, but an inability to acquire these materials or parts from the Shippers could result in serious disruption to the Debtors' operations. Timely delivery of these items is therefore vital to the operation of the Debtors' businesses.

10. The Debtors estimate that, as of the Petition Date, they owe approximately $1.3 million on account of shipping and logistics charges for goods ordered prepetition, all of which will become due and owing during the Interim Period (defined herein).

**B. Warehousemen**

11. To store certain of the same materials and parts transported by the Shippers, the Debtors use offsite storage space with certain warehouse facilities (collectively, the "<u>Warehousemen</u>"). For example, the Debtors have entered into several contracts to store certain nuclear equipment that requires storage specifications, including precise temperature and humidity controls, which is involved in nuclear power generation and other activities. Under certain state laws, including Ohio and Pennsylvania, the Warehousemen may be able to assert possessory liens against the warehoused property for amounts owed to the Warehousemen. OHIO REV. CODE ANN. § 1307.209 (LexisNexis 2017); 13 PA. CONS. STAT. § 7209 (2016). The availability of these warehoused goods and materials are similarly important to the continued operation of the Debtors' businesses, and the amount due to the Warehousemen is significantly less than the value of the goods being stored.

12. The Debtors estimate that, as of the Petition Date, they owe approximately $600,000 on account of Warehousemen claims, $0 of which will become due and owing during the Interim Period (defined herein).

### C. Materialmen

13. The Debtors' energy production depends upon third-party contractors, mechanics, machinists, and repairmen that repair, fabricate, or perform other services on certain parts, equipment, and other materials used in the Debtors' facilities (the "<u>Materialmen</u>").

14. Under certain state laws, including Ohio and Pennsylvania, the Materialmen could potentially assert possessory liens against the Debtors and their property for amounts that the Debtors owe and may refuse to return the Debtors' property until they are paid for their services. OHIO REV. CODE ANN. § 1311.02 (LexisNexis 2017); 49 PA. CONS. STAT. § 1301 (2016). The value of the property is greater than the amount of the Materialmens' claim for services rendered.

15. The Debtors estimate that, as of the Petition Date, they owe approximately $2.6 million on account of outstanding prepetition invoices of the Materialmen, of which approximately $500,000 million will become due and owing during the Interim Period (defined herein).

### III. Proposed Treatment of Claimants

16. Under the state laws described above, the Claimants may have perfected liens against certain of the Debtors' goods, equipment, and facilities, or may be able to perfect such liens postpetition. As stated in the First Day Declaration, the Debtors' ability to continue their operations in the aftermath of their commencement of these Chapter 11 cases will largely depend upon the continued provision of the vital goods and services provided by the Claimants, even in the absence of such liens. Accordingly, by this Motion, the Debtors seek to prevent the breakdown of their supply and maintenance network and the disruption of their customer base by requesting authority to pay Claimants as, in their business judgment, the Debtors determine are necessary and appropriate to (a) obtain release of important or valuable goods, tooling, or

equipment that may be subject to possessory liens and (b) maintain a reliable, efficient, continuous, and timely receipt of goods and services. The Debtors propose to pay such claims, when, in the Debtors' sole discretion, a Claimant could unduly disrupt the Debtors' businesses, notwithstanding the Debtors' belief that such action would violate the automatic stay, and regardless of whether a Claimant has a perfected lien. Importantly, amounts owed to the Claimants represent only approximately 2% of the Debtors' outstanding trade debt, and less than 0.1% of the Debtors' total funded indebtedness, as of the Petition Date.[11]

17. Further, the Debtors seek the authority, but not the direction, to condition payment to Claimants upon their agreement to continue supplying goods and services to the Debtors postpetition on normal and customary trade terms, practices, and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, availability, and other applicable terms and programs), that were most favorable to the Debtors and that were in effect within three months before the Petition Date, or such other trade terms that are acceptable to the Debtors (the "Customary Trade Terms"). The Debtors request that they reserve the right to adjust normal trade terms with any such Claimant according to the facts and circumstances of such relationship.[12]

### RELIEF REQUESTED

18. By this Motion, the Debtors seek entry of Interim and Final Orders authorizing, but not directing, the Debtors to: (a) grant administrative expense priority to the Outstanding

---

[11] The Debtors concurrently filed the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims* (the "Critical Vendor Motion"). None of the claims referred to in this Motion are duplicative to the claims being sought in the Critical Vendor Motion.

[12] Additionally, the Debtors request that if a supplier or vendor accepts payment pursuant to the Interim Order and/or the Final Order and thereafter does not continue to provide goods or services on Customary Trade Terms that (a) any such payment shall be deemed, in the Debtors' sole discretion, to be an improper postpetition transfer, and, therefore, recoverable by the Debtors in cash upon written request; and (b) upon recovery of the payment by the Debtor, the amount owed to such Claimant shall be reinstated as if the payment had not been made.

9

Orders and satisfy such obligations in the ordinary course of business; and (b) pay prepetition claims of the Claimants in the ordinary course of business in an aggregate amount not to exceed $1.8 million during the period between the Petition Date (as defined herein) and entry of the Final Order (the "<u>Interim Period</u>")[13], by paying FESC who, in turn, is authorized to remit the payments to the Claimants or by paying the Claimants, and, pursuant to the Final Order, in an aggregate amount not to exceed $4.5 million.

19. The Debtors also request that the Court: (a) schedule a final hearing as soon as practicable after the 21st day following the Petition Date to consider approval of this Motion on a final basis (the "<u>Final Hearing</u>"); and (b) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks dated after the Petition Date presented for payment and all electronic payment requests made after the Petition Date related to the Claimants.

<u>**BASIS FOR RELIEF**</u>

I. **The Court Should Confirm That Outstanding Orders Are Administrative Expense Priority Claims and That Payment Is Authorized**

20. Pursuant to section 503(b) of the Bankruptcy Code, most obligations that arise in connection with the postpetition delivery of goods and services, including goods and services ordered prepetition, are in fact administrative expense priority claims because they benefit the estate postpetition. Thus, the granting of the relief sought in this Motion with respect to the Outstanding Orders will not provide the suppliers with any greater priority than they otherwise would have if the relief requested in this Motion was not granted, and will not prejudice any other party in interest.

21. Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide the suppliers with assurance of such

---

[13] Unless stated otherwise, estimated amounts that the Debtors expect will come due during the Interim Period are based on the 30-day period after the Petition Date.

administrative priority. The attendant disruption to the continuous and timely flow of goods and services to the Debtors could result in substantial delays in the Debtors' operations. Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

22. Courts in this jurisdiction, as well as others, have approved relief similar to the relief requested in this Motion for debtors seeking the authority and discretion to pay claims arising from prepetition orders that are delivered to the debtors postpetition. *See, e.g.*, *In re M&M Drying, Ltd.*, No. 08-64058 (RK) (Bankr. N.D. Ohio Dec. 2, 2008) [Docket No. 41]; *In re NexPak Corp.*, No. 04-63816 (RK) (Bankr. N.D. Ohio July 19, 2004) [Docket No. 48]; *In re Summitville Tiles, Inc.*, No. 03-46341 (WTB) (Bankr. N.D. Ohio Dec. 12, 2003) [Docket No. 21]; *In re Antioch Company*, No. 08-35741 (GRH) (Bankr. S.D. Ohio Nov. 14, 2008) [Docket No. 71]; *In re Longview Power*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 4, 2013) [Docket No. 97].

**II.     Payment of the Claimants Is Warranted**

23. Courts generally recognize that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business. *See, e.g., In re Wings of Medina Liquidation, Inc.* (f/k/a *In re QSL of Medina, Inc.*), No. 15-52722 (AMK) (Bankr. N.D. Ohio Dec. 15, 2015) [Docket No. 109] (authorizing payment of prepetition claims of certain critical vendors); *In re Meridian Auto. Sys.-Composite Operations, Inc.*, 372 B.R. 710, 714 (Bankr. D. Del. 2007) (granting the debtor authority to pay prepetition obligations owed to certain critical vendors); *In re Payless Cashways, Inc.*, 268 B.R. 543, 547-48 (Bankr. W.D. Mo. 2001) (authorizing payment of prepetition obligations to obtain delivery of lumber that was critical to the debtor's survival); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (Bankr. D. Del. 1999)

(noting that debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (authorizing immediate payment of prepetition claims to vendors who supplied tools essential to the debtors' manufacturing operations). Courts have relied on several legal bases in approving such relief.[14]

24. Courts generally recognize that debtors may pay prepetition claims under section 363(b) of the Bankruptcy Code where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors." *See, e.g., In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting debtor authority to pay prepetition wages); *Armstrong World Indus. Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.),* 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay prepetition claims of suppliers who were potential lien claimants).

25. Courts also recognize that payments to prepetition creditors are appropriate pursuant to section 105(a) of the Bankruptcy Code under the "doctrine of necessity" or the "necessity of payment" rule where such payments are necessary to the continued operation of the debtor's business. *See, e.g., In re Wings of Medina Liquidation, Inc.* (f/k/a *In re QSL of Medina, Inc.*), No. 15-52722 (AMK) (Bankr. N.D. Ohio Dec. 15, 2015) [Docket No. 109] (authorizing payment of prepetition obligations pursuant to Bankruptcy Code section 105(a)); *Ionosphere Clubs*, 98 B.R. at 175 (approving the use of equitable powers to authorize the payment of prepetition debts needed to facilitate the debtor's business and stating that doing so "is not a

---

[14] In *Czyzewski v. Jevic Holding Corp.*, the Supreme Court acknowledged that there are bankruptcy-related justifications for some priority-violating distributions, such as approving critical vendor orders that allow payment of essential suppliers' prepetition invoices. The Supreme Court found that in doing so, "these courts have usually found that the distributions at issue would 'enable a successful reorganization and make even the disfavored creditors better off.'" 137 S. Ct. 973, 985 (2017) (*quoting In re Kmart Corp.*, 359 F. 3d 866, 872 (7th Cir. 2004)).

12

novel concept"); *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor); *Friedman's Inc. v. Roth Staffing Cos.* (*In re Friedman's, Inc.*), No. 09-50364, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[M]ost courts will allow such payments [of prepetition claims] under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business"). The rationale for the necessity of payment rule– the rehabilitation of a debtor in reorganization cases– is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization.").

26. Payment of the Claimants is within the Debtors' sound business judgment, essential to the Debtors' business operations, and will preserve and maximize the value of the Debtors' estates. Although the Court has the authority to order the Claimants to turn over any goods in the Claimants' possession, those Claimants that have valid liens may be entitled to adequate protection of their liens pursuant to section 363(e) of the Bankruptcy Code. Moreover, the Claimants may have liens on goods that are more valuable than the claims being asserted by the Claimants. Such Claimants will therefore be entitled to payment in full on account of their claims and paying such claims in the ordinary course of business changes only the timing, rather than the amount, of payments that such Claimants will receive. Finally, the Claimants may be unwilling to release the goods in their possession, or may attempt to exercise "self-help" remedies, to secure payment of their claims. Although the Debtors believe such actions would violate the automatic stay, the violation would cause a delay to the Debtors' business operations. As stated in the First Day Declaration, any delay caused by such actions would unnecessarily

disrupt the Debtors' business operations to the detriment of the Debtors, their estates, and their creditors. Thus, the Debtors should be permitted, in their discretion, to pay the Claimants.

27. It is not uncommon for courts to authorize the payment of prepetition claims where such payment is essential to the continued operations of the debtor, and in particular claims of shippers, warehousemen, materialmen, or other comparable vendors. *See, e.g., In re Flower Factory, Inc.*, No. 11-60406 (RK) (Bankr. N.D. Ohio Feb. 18, 2011) [Docket No. 55] (authorizing payment of prepetition claims of shippers); *In re Summitville Tiles, Inc.*, No. 03-46341 (WTB) (Bankr. N.D. Ohio Dec. 12, 2003) [Docket No. 21] (authorizing payment of prepetition obligations relating to shipment and warehousing of goods and supplies); *In re MI 2009 Inc.* (f/k/a *In re Milacron Inc.*), No. 09-11235 (JVA) (Bankr. S.D. Ohio Mar. 11, 2009) [Docket No. 52] (authorizing debtor to pay prepetition claims of shippers and warehousemen in the ordinary course of business); *In re CWC Liquidation Inc.* (f/k/a *In re Coldwater Creek Inc.*), No. 14-10867 (BLS) (Bankr. D. Del. Apr. 14, 2014) [Docket No. 78] (authorizing debtor to pay prepetition shipping claims); *In re FBI Wind Down, Inc.* (f/k/a *In re Furniture Brands Int'l Inc.*), No. 13-12329 (CSS) (Bankr. D. Del. Sept. 9, 2013) [Docket No. 75] (authorizing payment of prepetition shipping and delivery charges, import obligations and mechanic's lien charges).

### III. Cause Exists to Authorize the Debtors' and FESC's Financial Institutions to Honor Checks and Electronic Fund Transfers.

28. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations. Under the Debtors' existing cash management system[15], FESC, as payment agent for the Debtors, issues all checks and electronic fund transfers payable for Outstanding Orders and

---

[15] *See* Motion of Debtors for Entry of Interim and Final Orders (a) Authorizing Debtors to (i) continue using their existing cash management system and (ii) maintain existing business accounts and business forms; (b) authorizing continued intercompany transactions; (c) granting postpetition intercompany claims administrative expense priority; and (d) related relief for additional detail.

to Claimants. The Debtors have implemented appropriate mechanisms to ensure that payments will not be made on account of obligations incurred before the Petition Date, other than those authorized by the Court, and will continue to work closely with the applicable banks, FESC and the Debtors' finance group to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval. FESC can readily identify checks or wire transfer requests as relating to an authorized payment of Outstanding Orders or payments to the Claimants. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors or FESC, to receive, process, honor, and pay any and all checks dated after the Petition Date or wire transfer requests made after the Petition Date in respect of the relief requested in this Motion. To the extent that any such checks or electronic funds transfers payable for Outstanding Orders or to Claimants are cancelled or voided by any financial institution, the Debtors and FESC are authorized to issue replacement checks and electronic funds transfers for such payments.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

29. Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re WorldSpace, Inc.*, No. 08-12412, 2008 WL 8153639, at *2 (Bankr. D. Del. Oct. 20, 2008) (granting emergency motions for post-petition financing, adequate protection, and modification of the stay where the court found that the relief was necessary to

15

18-50757-amk    Doc 8    FILED 04/01/18    ENTERED 04/01/18 03:13:17    Page 15 of 20

avoid irreparable harm to the debtors and their estates because such relief was essential for the continued operations of the debtors' businesses); *In re New World Pasta Co.*, No. 04-02817, 2004 WL 5651052, at *5 (Bankr. M.D. Pa. July 9, 2004) (same); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (finding that "immediate and irreparable harm" exists where loss of the business threatens ability to reorganize).

30. As described above, prompt payment of Outstanding Orders and payment to Claimants is necessary to avoid the immediate and irreparable harm that would result from delayed provision of the raw material and services and for return of the Debtors' property needed to operate the Debtors' business. As set forth in this Motion, the failure to pay Outstanding Orders and the Claimants could disrupt the Debtors operations, jeopardize key customer relationships, and undermine the Debtors' efforts to reorganize. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support the relief set forth in the Interim Order on the terms described herein. Courts in this jurisdiction have routinely approved relief similar to the relief requested in this Motion. *See, e.g.*, *Wings of Medina Liquidation, Inc. f/k/a QSL of Medina, Inc.*, No. 15-52722 (AMK) (Bankr. N.D. Ohio, Nov. 18, 2015) [Docket No. 31] (determining that 6003(b) was satisfied in connection with the payment of prepetition critical vendor claims); *In re South Franklin Circle*, No. 12-17804 (PMC) (Bankr. N.D. Ohio, Oct. 26, 2012) [Docket Nos. 49 & 55] (determining that 6003(b) was satisfied in connection with the payment of both prepetition employee wage claims and critical vendor claims).

### WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

31. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

32. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

33. No trustee, examiner or official committee has been appointed in the Debtors' chapter 11 cases. Notice of this Motion has been served on the following parties and/or their counsel, if known, via facsimile, overnight delivery, e-mail, and/or hand delivery: (a) the Office of the U.S. Trustee for the Northern District of Ohio; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Bank of New York Mellon Trust Company, N.A., in its capacity as indenture trustee under various indenture agreements; (d) counsel to UMB Bank, National Association, in its capacity as indenture trustee, paying agent, and collateral trustee under various

indenture agreements, including, without limitation, certain pollution control revenue bond indentures and certain first mortgage bond indentures, and trust agreements; (e) counsel to Wilmington Savings Fund Society, FSB, in its capacity as indenture trustee and pass through trustee under various indenture agreements and trust agreements in connection with the Bruce Mansfield Unit 1 sale-leaseback; (f) counsel to the Ad Hoc Group of Holders of the 6.85% Pass Through Certificates due 2034; (g) counsel to the ad hoc group of certain holders of (i) pollution control revenue bonds supported by notes issued by FG and NG and (ii) certain unsecured notes issued by FES (collectively, the "Ad Hoc Noteholder Group"); (h) counsel to FirstEnergy Corp.; (i) counsel to MetLife Capital, Limited Partnership; (j) the District Director of the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Office of the United States Attorney for the Northern District of Ohio; (m) the United States Environmental Protection Agency; (n) the Nuclear Regulatory Commission; (o) the United States Department of Energy; (p) the Federal Energy Regulatory Commission; (q) the Office of the Attorney General for Ohio; (r) the Office of the Attorney General for Pennsylvania; (s) the Office of the Attorney General for Illinois; (t) the Office of the Attorney General for Maryland; (u) the Office of the Attorney General for Michigan; (v) the Office of the Attorney General for New Jersey; (w) the National Association of Attorneys; and (x) all Shippers, Warehousemen, and Materialmen who have filed UCC statements. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

34. No prior request for the relief sought in this Motion has been made to this or any other court.

18-50757-amk    Doc 8    FILED 04/01/18    ENTERED 04/01/18 03:13:17    Page 18 of 20

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: April 1, 2018                              **Respectfully submitted,**

*/s/ Marc B. Merklin*
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (*pro hac vice* admission pending)
Lisa Beckerman (*pro hac vice* admission pending)
Brad Kahn (*pro hac vice* admission pending)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

- and -

Scott Alberino (*pro hac vice* admission pending)
Kate Doorley (*pro hac vice* admission pending)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Proposed Counsel for Debtors
and Debtors in Possession*