**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**AKRON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) Case No. 18-50757 |
|  | ) (Request for Joint Administration |
| Debtors. | ) Pending) |
|  | ) |
|  | ) Hon. Judge Alan M. Koschik |
|  | ) |

**MOTION FOR ENTRY OF**
**AN ORDER AUTHORIZING FIRSTENERGY SOLUTIONS CORP. AND**
**FIRSTENERGY GENERATION, LLC TO REJECT**
**A CERTAIN MULTI-PARTY INTERCOMPANY POWER PURCHASE AGREEMENT**
**WITH THE OHIO VALLEY ELECTRIC CORPORATION**
<u>**AS OF THE PETITION DATE**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

# TABLE OF CONTENTS

Page

Jurisdiction and Venue .................................................................................................... 1

Relief Requested ............................................................................................................. 1

Background ...................................................................................................................... 2

    I.   Overview of the Debtors' Business Operations ................................................. 4

    II.  The OVEC Intercompany Power Purchase Agreement ..................................... 5

Basis for Relief ................................................................................................................ 6

    A.   Rejection of the OVEC ICPA is a Proper Exercise of the Debtors' Business Judgment ..................................................................................... 8

    B.   This Court Should Grant the Requested Relief *Nunc Pro Tunc* ................................... 12

Reservation of Rights .................................................................................................... 14

Notice ............................................................................................................................ 14

Conclusion .................................................................................................................... 16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Albrechts Ohio Inns, Inc.*,
  152 B.R. 496 (Bankr. S.D. Ohio 1993)................................................................8

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
  280 F.3d 648 (6th Cir. 2002) ...........................................................................6

*In re Enron Corp.*,
  No. 01 B 16034, 2006 WL 898033 (Bankr. S.D.N.Y. Mar. 24, 2006).....................11

*EOP-Colonnade of Dall. LP v. Faulkner (In re Stonebridge Techs., Inc.)*,
  430 F.3d 260 (5th Cir. 2005) ..........................................................................13

*In re Fashion Two Twenty, Inc.*,
  16 B.R. 784 (Bankr. N.D. Ohio 1982) ............................................................8, 9

*In re Fleishman*,
  138 B.R. 641 (Bankr. D. Mass. 1992) ................................................................7

*Grp. of Instl. Inv'rs v. Chi., M., St. P. & Pac. R.R. Co.*,
  318 U.S. 523 (1943)........................................................................................11

*In re HQ Glob. Holdings*,
  290 B.R. 507 (Bankr. D. Del. 2003) ..................................................................9

*Leasing Serv. Corp. v. First Tenn. Bank N.A.*,
  826 F.2d 434 (6th Cir. 1987) ............................................................................7

*In re Level Propane Gases, Inc.*,
  297 B.R. 503 (Bankr. N.D. Ohio 2003), *aff'd*, No. 02-16172, 2007 WL
  1821723 (N.D. Ohio June 22, 2007)...................................................................9

*Cal. ex rel. Lockyer v. FERC*,
  383 F.3d 1006 (9th Cir. 2004) .........................................................................11

*Midway Motor Lodge of Elk Grove v. Innkeepers Telemgmt. & Equip. Corp.*,
  54 F.3d 406 (7th Cir. 1995) ..............................................................................7

*In re Mirant Corp.,* 318 B.R. 100, 107-08 *(N.D. Tex. 2004)*........................................11

*Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*,
  378 F.3d 511 (5th Cir. 2004) ...........................................................10, 11, 12, 13

ii

*In re Murexco Petrol., Inc.*,
  15 F.3d 60 (5th Cir. 1994) ...................................................................................6

*In re N. Am. Royalties, Inc.*,
  276 B.R. 860 (Bankr. E.D. Tenn. 2002) ...............................................................7

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513 (1984)...........................................................................7, 8, 10, 11

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
  4 F.3d 1095 (2d Cir. 1993)................................................................................8, 9

*Osprey-Troy Officentre, LLC v. World All. Fin. Corp.*,
  502 F. App'x 455 (6th Cir. 2012) ..........................................................................7

*Pa. Water & Power Co. v. Fed. Power Comm'n*,
  343 U.S. 414 (1952)..............................................................................................11

*Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*,
  392 F.3d 1064 (9th Cir. 2004) ......................................................................13, 14

*In re Pesce Baking Co., Inc.*,
  43 B.R. 949 (Bankr. N.D. Ohio 1984) ...................................................................9

*Phar-Mor, Inc. v. Strouss Bldg. Assocs.*,
  204 B.R. 948 (N.D. Ohio 1997)..........................................................................8, 9

*In re QSL Medina, Inc.*,
  No. 15-52722 (AMK) (Bankr. N.D. Ohio Dec. 15, 2015), ECF No. 105 ............13

*In re Richendollar*,
  No. 04-70774, 2007 WL 1039065 (Bankr. N.D. Ohio Mar. 31, 2007) ...................8

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
  872 F.2d 36 (3d Cir. 1989)......................................................................................9

*Stewart Title Guar. Co. v. Old Republic Nat'l Title Co.*,
  83 F.3d 735 (5th Cir. 1996) ....................................................................................6

*Summit Land Co. v. Allen (In re Summit Land Co.)*,
  13 B.R. 310 (Bankr. D. Utah 1981) ........................................................................9

*Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. # 1 (In re Thinking Machs.
  Corp.)*,
  67 F.3d 1021 (1st Cir. 1995).............................................................................13, 14

*In re Trans World Airlines, Inc.*,
  261 B.R. 103 (Bankr. D. Del. 2001) .....................................................................11

iii

*Westbury Real Estate Ventures, Inc. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.),*
  194 B.R. 555 (Bankr. S.D.N.Y. 1996) ...................................................................7

**Statutes**

11 U.S.C. § 105 ...........................................................................................12, 13

11 U.S.C. § 365 ...............................................................................................7, 8

11 U.S.C. § 1107 ..............................................................................................1, 2

11 U.S.C. § 1108 ..............................................................................................1, 2

16 U.S.C. § 824 ..................................................................................................10

28 U.S.C. §§ 157 and 1334 ...................................................................................1

28 U.S.C. §§ 1408 and 1409 .................................................................................1

**Other Authorities**

3 Collier on Bankruptcy § 365.09[1] (15th ed. 2006) ............................................8

Fed. R. of Bankr. P. 1007(d) ...............................................................................15

Fed. R. of Bankr. P. 1015(b) .................................................................................2

Fed. R. of Bankr. P. 2002, 6006 and 9014 .............................................................1

FirstEnergy Solutions Corp. ("FES") and FirstEnergy Generation, LLC ("FG," and together with FES, "Movants"), debtors in the above-captioned chapter 11 cases (together with their affiliated debtors, the "Debtors"), file this motion (the "Motion") for an order, substantially in the form attached hereto as Exhibit A (the "Order"), authorizing the Debtors to reject a certain multi-party intercompany power purchase agreement. In support of the Motion, the Movants incorporate by reference the *Declaration of Donald R. Schneider in Support of Chapter 11 Petitions and First Day Motions* (the "Schneider First Day Declaration"),[1] the *Declaration of Kevin T. Warvell in Support of the Motion to Reject* (the "Warvell Declaration"), the *Declaration of Judah L. Rose in Support of the Motion to Reject* (the "Rose Declaration"), and the *Declaration of David Gerhardt in Support of the Motion to Reject* (the "Gerhardt Declaration"). The Movants respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Northern District of Ohio (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are sections 105(a), 365, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure.

## RELIEF REQUESTED

4.      By this Motion, the Movants seek to reject an extraordinarily burdensome executory power purchase agreement, effective as of the Petition Date (defined below). During

---

[1] Capitalized terms not defined herein are defined in the First Day Declaration.

2017 this contract—combined with nine[2] other power purchase agreements the Movants separately seek to reject—accounted for just approximately 3% of the power FES bought and sold into the wholesale market. Yet movants are losing approximately $12 million per year, and are expected to lose $268 million over the remaining 22 years left on the OVEC ICPA (defined below).

5. The Movants further request that the Court grant the relief requested in this Motion without a further hearing on a final basis if no objection is timely filed and served. If any objection(s) to the Motion is timely and properly filed and served with respect to the multi-party intercompany power purchase agreement, the parties shall attempt to reach a consensual resolution of the objection. If the parties are unable to so resolve any objection, the Debtors request that the Court hear such objection at the final hearing on this Motion.

6. The Movants further request that the Court set the deadline by which time the counterparty to the executory power purchase agreement must file a proof of claim relating to the rejection of the executory power purchase agreement as the later of (a) the claims bar date established in the Debtors' chapter 11 cases and (b) thirty (30) days after the entry of an order granting the relief sought in the instant motion.

## BACKGROUND

7. On March 31, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have requested joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Court has

---

[2] This includes eight "renewable" energy bundled power purchase agreements and one nonrenewable power purchase agreement.

2

not appointed a trustee and the Office of the United States Trustee for the Northern District of Ohio (the "US Trustee") has not yet formed any official committees in these chapter 11 cases.

8.      Non-Debtor FirstEnergy Corp. ("FE Corp."), an Ohio corporation, is the ultimate parent company for each of the Debtors in these chapter 11 cases and certain of FE Corp.'s non-Debtor affiliates (collectively, "FirstEnergy" or "FirstEnergy Group").  Debtor FirstEnergy Solutions Corp. ("FES"), an Ohio corporation, is the parent company for Debtors FE Aircraft Leasing Corp. ("FEALC"), an Ohio corporation, FirstEnergy Generation, LLC ("FG"), an Ohio limited liability company, and FirstEnergy Nuclear Generation, LLC ("NG"), an Ohio limited liability company.  Debtor FG is the parent company for Debtors FirstEnergy Generation Mansfield Unit 1 Corp. ("FGMUC"), an Ohio corporation, and Norton Energy Storage L.L.C. ("NES"), a Delaware limited liability company.[3]

9.      FES sells power and provides energy-related products and services to retail and wholesale customers primarily in Illinois, Maryland, Michigan, New Jersey, Ohio, and Pennsylvania.

10.      FG owns and operates three fossil generation plants[4], two in Ohio and one in Pennsylvania.[5]  Additionally, FG operates the fossil generation plant owned by non-Debtor Bay Shore Power Company.

---

[3] FG also owns a 99% limited partnership interest in Nautica Phase 2 Limited Partnership, which has $10 million in outstanding debt.

[4] FG also owns a steam turbine and combustion turbine at the Bay Shore Power Plant in Oregon, OH and a combustion turbine at the Eastlake Plant in Eastlake, OH.

[5] FG owns and operates the W.H. Sammis Plant in Stratton, OH, which is composed of seven units and the West Lorain Plant in Lorain, OH, which is composed of six units that run on heating oil.  FG operates the entire Bruce Mansfield Plant in Shippingport, PA, where it owns two of the three units.  FG owns approximately 6.17% of Unit 1 of the Bruce Mansfield Plant while approximately 93.83% of Unit 1 is under a leasehold interest.

3

11.     A detailed description of the Debtors' business, capital structure, and the events leading to the chapter 11 cases is fully set forth in the Schneider First Day Declaration filed contemporaneously herewith and incorporated by reference as if fully set forth herein.

## I.     Overview of the Debtors' Business Operations

12.     FES offers energy-related products and services to retail and wholesale customers (the "Customers").  FES provides energy products and services to retail Customers under various provider-of-last-resort ("POLR"), shopping, competitive-bid and non-affiliated contractual obligations.  FES also participates in deregulated energy markets in Ohio, Pennsylvania, Maryland, Michigan, New Jersey and Illinois, competing to: (1) provide retail generation service directly to end users; (2) provide wholesale generation service to utilities, municipalities and co-operatives, which, in turn, resell to end users; and (3) sell power and capacity in the wholesale market.

13.     FES, along with its non-debtor, unregulated generation affiliate, Allegheny Energy Supply Company, LLC ("AE Supply"), constitutes FirstEnergy's Competitive Energy Services ("CES") segment.  Of FirstEnergy's three reportable operating segments, only the CES segment contains Debtor entities.[6]  The CES segment's operating results are derived primarily from electric generation sales less the related costs of electricity generation, including fuel, purchased power and net transmission and ancillary costs and capacity costs charged by regional

---

[6] FirstEnergy's Regulated Distribution segment distributes electricity to approximately six million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York through FirstEnergy's ten non-debtor operating companies. FirstEnergy's Regulated Transmission segment transmits electricity through transmission facilities owned and operated by American Transmission Systems, Incorporated and Trans-Allegheny Interstate Line Company, and certain of FirstEnergy's utilities. FirstEnergy derives its revenue for its Regulated Transmission segment primarily from transmission services provided to load-serving entities pursuant to the PJM Open Access Transmission Tariff.

4

transmission organizations (each, a "RTO") to deliver energy to the CES segment's Customers, as well as other operating and maintenance costs.

14.     FES is party to various contracts (the "RTO Agreements") with RTOs, specifically PJM Interconnection, L.L.C. ("PJM") and the Midcontinent Independent System Operator, Inc. ("MISO").  RTOs are responsible for coordinating, controlling and monitoring a regional high-voltage transmission grid.  They administer markets to ensure safe and reliable operation and delivery of electricity.  On a real-time basis, the RTO ensures that sufficient generation capacity exists to meet Customers' needs.  Through the RTO Agreements, FES has made commitments to use good utility practices to assist the RTOs in meeting their operational commitments.  Additionally, RTOs require payment and collateral obligations pursuant to the RTO Agreements.  FES collects fees for its generation and pays the RTOs for expenses incurred in serving its Customers.  In the event of an energy shortage or capacity failure in the region, PJM or the relevant RTO will pay power providers to remain in operation either by actively producing power or remaining available to offer capacity.  As a result of the role RTOs play in administering markets, no reliability concern (and therefore no issue for consumers) is implicated by a breach of the executory power purchase agreements.  The counterparties can resell the energy, bring a claim for damages and, in the unlikely event that a breach results in the shutdown of a counterparty, the relevant RTO would step in to prevent a shortage.  Since no reliability issue would result from the rejection of the executory power purchase agreements, they are truly no different from any long-term money losing contract.

II.     **The OVEC Intercompany Power Purchase Agreement**

15.     FG is a party to a multi-party intercompany power purchase agreement (the "OVEC ICPA,") pursuant to which FES and several other power companies "sponsor" and

5

purchase power generated by fossil fuel from the Ohio Valley Electric Corporation ("OVEC"). The OVEC ICPA obligates FG to purchase 4.85% of the power that OVEC's fossil-fuel plants generate at an uneconomic rate until either the year 2040 or until OVEC ceases to operate. Based on current expectations, FG will lose approximately $268 million on an undiscounted basis over the remaining term of the OVEC ICPA.

16.     The Movants can operate their businesses without the OVEC ICPA.

17.     None of the Debtors' Customers—or any consumer for that matter—will go without power or capacity if the Movants are permitted to reject the OVEC ICPA.  In 2017, the power generated under the OVEC ICPA totaled 0.6 TWh—just 0.1% of the total 767 TWh generated from all power plants selling in PJM.  Further, OVEC will be able to sell its power generated for FG to other wholesale purchasers or into the regional wholesale electric spot markets (in this case, the markets operated by PJM).

## BASIS FOR RELIEF

18.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Co*., 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petrol., Inc*., 15 F.3d 60, 62 (5th Cir. 1994)).  Bankruptcy courts have broad authority and considerable discretion under this provision.  *See Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 656 (6th Cir. 2002).

19.     The Supreme Court has recognized that "the authority to reject an executory contract" is not merely incidental, but rather it "is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations

6

that can impede a successful reorganization." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984). Courts have similarly held that "[t]he right of a debtor in possession to reject certain contracts is fundamental to the bankruptcy system because it provides a mechanism through which severe financial burdens may be lifted while the debtor attempts to reorganize." *Westbury Real Estate Ventures, Inc. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.l (Bankr. S.D.N.Y. 1996). Rejection of an executory contract under 11 U.S.C. § 365(a) constitutes a breach of the contract—not a modification or termination. *Osprey-Troy Officentre, LLC v. World All. Fin. Corp.*, 502 F. App'x 455, 456-57 (6th Cir. 2012); *see also In re N. Am. Royalties, Inc.*, 276 B.R. 860, 865 (Bankr. E.D. Tenn. 2002) ("Rejection is independent of the contract terms.").

20. Rejection is "vital" and "fundamental," because in many cases, the debtor could not emerge from bankruptcy as a going concern if it were forced to specifically perform under burdensome executory contracts. *Leasing Serv. Corp. v. First Tenn. Bank N.A.*, 826 F.2d 434, 436 (6th Cir. 1987) ("Rejection denies the right of the contracting creditor to require the bankrupt estate to specifically perform..."); *see also Midway Motor Lodge of Elk Grove v. Innkeepers Telemgmt. & Equip. Corp.*, 54 F.3d 406, 407 (7th Cir. 1995) ("Rejection avoids specific performance, but the debtor assumes a financial obligation equivalent to damages for breach of contract."); *Bradlees Stores*, 194 B.R. at 558 ("Specific performance should not be permitted where the remedy would in effect do what section 365 meant to avoid, that is, impose burdensome contracts on the debtors.") (quoting *In re Fleishman*, 138 B.R. 641, 648 (Bankr. D. Mass. 1992)).

21. The Bankruptcy Code permits the debtor to breach the burdensome contracts, transforming those obligations into a pre-petition claim for damages, which may be satisfied and

7

discharged together with all claims against the estate.  *See* 11 U.S.C. § 365(g); *see also In re Richendollar*, No. 04-70774, 2007 WL 1039065 (Bankr. N.D. Ohio Mar. 31, 2007) ("The purpose of section 365(g) is to make clear that, under the doctrine of relation back, the other party to a contract that has not been assumed Section 365(g) is simply a general unsecured creditor.") (quoting 3 Collier on Bankruptcy § 365.09[1] (15th ed. 2006).

22.     Rejection thereby allows for ratable treatment of a debtors' unsecured lenders/creditors and its counterparties on executory contracts.  *In re Albrechts Ohio Inns, Inc.*, 152 B.R. 496, 501–02 (Bankr. S.D. Ohio 1993) (noting the business judgment rule is satisfied for rejection purposes where "rejection will result in benefit to the debtor's general unsecured creditors").  Here, ensuring ratable treatment amongst such parties is essential to an equitable outcome.  Requiring the Debtors to perform the remaining up to 22 years of the OVEC ICPA (as opposed to rejection), thereby paying OVEC in full, would be incredibly unfair and inequitable.

**A.     Rejection of the OVEC ICPA is a Proper Exercise of the Debtors' Business Judgment**

23.     The "business judgment" standard applies to determine whether the rejection of an executory contract or unexpired lease should be authorized.  *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993); *see also Bildisco*, 465 U.S. at 524 (acknowledging that business judgment is the "traditional" standard for rejection of executory contracts); *Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 951-52 (N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor."); *In re Fashion Two Twenty, Inc*., 16 B.R. 784, 787 (Bankr. N.D. Ohio 1982) (adopting the business judgment standard as "the proper standard" to determine a motion for rejection).

8

24.     Rejection of an executory contract is appropriate where such rejection would benefit the estate. *See In re Orion Pictures Corp.*, 4 F.3d at 1098-99; *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re HQ Glob. Holdings*, 290 B.R. 507, 511 (Bankr. D. Del. 2003); *In re Pesce Baking Co., Inc.*, 43 B.R. 949, 956 (Bankr. N.D. Ohio 1984).

25.     Thus, upon finding that FG has exercised their sound business judgment in determining that rejection of the OVEC ICPA is in the best interests of the Debtors, their creditors and all parties in interest, the Court should approve the rejection under section 365(a) of the Bankruptcy Code. *See, e.g., In re Level Propane Gases, Inc.*, 297 B.R. 503, 509 (Bankr. N.D. Ohio 2003) (granting rejection where debtors "set forth a sound business judgment"), *aff'd*, No. 02-16172, 2007 WL 1821723 (N.D. Ohio June 22, 2007); *In re Fashion Two Twenty, Inc.*, 16 B.R. at 787 (same). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract. *See, e.g., Phar-Mor, Inc.*, 204 B.R. at 952 ("Courts should generally defer to a debtor's decision whether to reject an executory contract."); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

26.     Here, the OVEC ICPA Rejection Motion clearly reflects the sound exercise of the Debtors' business judgment. Under the OVEC ICPA, which is wholly unnecessary for FG's business, the Debtors are today paying more than double the market value of capacity and power, and are expected to for the remaining life of this executory contract. As discussed more fully in the Warvell Declaration, the Debtors and ICF conducted an analysis of the potential business

9

impact of continuing to perform under the OVEC ICPA and determined that such performance would serve to decimate the Debtors' finances, to the tune of $268 million. The Debtors, assisted by financial advisors at Alvarez & Marsal and energy industry consultants at ICF International, have concluded that without rejection of the OVEC ICPA the Debtors' ability to reorganize would be jeopardized and their estates would be irreparably damaged.

27. The U.S. Court of Appeals for the Fifth Circuit has suggested that rejection of a FERC-regulated contract under section 365 should be subject to a more rigorous standard than the business judgment standard because of the "public interest" in the "transmission and sale of electricity," including "the continuity of electrical service to the customers of public utilities," that is recognized in the Federal Power Act ("FPA"). *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 525 (5th Cir. 2004) (citing 16 U.S.C. § 824(a)). While the Fifth Circuit correctly decided the core jurisdictional issue (*i.e.*, that FERC-regulated contracts could be rejected in bankruptcy), its suggestion that the bankruptcy court should apply a heightened standard is wrong as a matter of law—especially in the circumstances now before the Court. Moreover, even if the standard outlined in *Mirant* was deemed applicable here, the Movants would easily satisfy it.

28. The Fifth Circuit suggested that a debtor should be required to show that the contract "burdens the estate, that after careful scrutiny, the equities balance in favor of rejecting th[e] power contract, and that rejection of the contract would further the Chapter 11 goal of permitting the successful rehabilitation of debtors." *Id.* (citing *Bildisco*, 465 U.S. at 526-27).

29. There is no basis to apply a more rigorous standard than the business judgment standard to the OVEC ICPA. As explained above, the business judgment standard has long governed the rejection of executory contracts, except in a rare circumstance dictated by

10

Congressional intent that is not found in the FPA. In *Mirant*, the Fifth Circuit suggested without any basis in precedent that a more rigorous standard should apply to wholesale power contracts by analogizing those contracts to collective bargaining agreements subject to National Labor Relations Board regulation, which the Supreme Court held should be subject to more rigorous scrutiny because of the "special nature of a collective bargaining contract." *In re Mirant Corp.*, 378 F.3d at 524-25 (quoting *Bildisco*, 465 U.S. at 524). In *Bildisco*, however, appellate courts had applied different variations of a heightened standard prior to Congress's enactment of section 365(a), and the Court determined that "Congress intended" a higher standard to apply to collective bargaining contracts. *Bildisco*, 465 U.S. at 525-26. There is no evidence that Congress intended a more rigorous standard to apply to wholesale power contracts. And it is not sufficient to state that FERC-regulated contracts are important—so are many contracts in many important areas of the economy subject to federal regulation that are nonetheless governed by the business judgment standard. *See, e.g.*, *Grp. of Instl. Inv'rs v. Chi., M., St. P. & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) (railroad); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001) (aviation); *In re Enron Corp.*, No. 01 B 16034, 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006) (telecom).

30.     It is even more doubtful that Congress could have intended a more rigorous standard to apply to rejections by electricity *customers* (such as FES and FG as purchasers under the OVEC ICPA) given that the FPA was enacted to protect such customers, not regulate them— much less force them to continue purchasing electric service they neither need, want, or can afford. *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) ("A major purpose of the whole [Federal Power] Act is to protect power consumers against excessive prices."); *Cal. ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1017 (9th Cir. 2004) (describing

11

"protecting consumers" as the FPA's "primary purpose"). In sum, there is no heightened or otherwise different bankruptcy-related standard applying to wholesale electric contracts. Nothing in the text of the FPA states or implies such a standard. No Supreme Court case suggests such a standard. And no case actually *applies* such a standard, as *Mirant* was decided on other grounds on remand.

31. Even if the Court determined that the heightened standard suggested by the Fifth Circuit should apply, however, Debtors would clearly meet it. The OVEC ICPA is extremely burdensome to Debtors' estates, and the cost of continuing to perform under it would threaten the viability of Debtors' restructuring efforts. And importantly, the public interest in "continuity of electrical service" is not implicated by rejection of the OVEC ICPA because rejection would not "cause any disruption in the supply of electricity to other public utilities or to consumers." *In re Mirant*, 378 F.3d at 525. As noted above, FES and FG are not electric suppliers under the OVEC ICPA; they are customers. Their rejection of the OVEC ICPA therefore will not cause any "disruption in the supply of electricity" because FES and FG do not supply electricity under these contracts in the first instance. Put simply, no customers will have their power supply threatened as a result of the Movants' rejection of the OVEC ICPA.

32. Rejection of the OVEC ICPA will relieve the Movants of the near term losses of approximately $12 million on an annual average basis (2018 to 2023) and will eliminate the approximately $268 million in continuing losses over the remaining life of the contracts. Rejection of the OVEC ICPA is thus a sound exercise of the Movants' business judgment and will benefit the Debtors' estates and their creditors.

**B.      This Court Should Grant the Requested Relief *Nunc Pro Tunc***

33. The Movants request that the Court deem the rejection, if granted, to have retroactive effect to the date of the filing of this Motion on April 1, 2018. Under section 105 of

12

the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is necessary to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). This includes a grant of *nunc pro tunc* relief on a debtor's motion to reject a lease, when such relief is equitable. *EOP-Colonnade of Dall. LP v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 273 (5th Cir. 2005) (noting that "most courts have held that lease rejection may be retroactively applied"); *Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1071-72 (9th Cir. 2004) (affirming bankruptcy court's exercise of its equitable authority to approve retroactive rejection under section 365); *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. # 1 (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1028 (1st Cir. 1995) (recognizing that bankruptcy courts have discretion to approve rejection retroactive under section 365 "when the balance of the equities preponderates in favor of such remediation"); *see also In re QSL Medina, Inc.*, No. 15-52722 (AMK) (Bankr. N.D. Ohio Dec. 15, 2015), ECF No. 105 (authorizing rejection effective as of the petition date).

34. Courts determine whether retroactive effect is appropriate on a case-by case basis. *See In re Thinking Machs. Corp.*, 67 F.3d at 1029 n.9 ("[W]e eschew any attempt to spell out the range of circumstances that might justify the use of a bankruptcy court's equitable powers in this fashion. That exercise is best handled on a case-by-case basis.").

35. Here, equitable considerations support the retroactive rejection of the OVEC ICPA effective as of the Petition Date. First, the Court's decision whether to grant rejection on a *nunc pro tunc* basis has potentially significant consequences to the Debtors' estates. Performance under unprofitable, non-essential contracts such as the OVEC ICPA, for any period of time, even for a few months at a loss of about $1 million per month in the near term, will hamper the Debtors' efforts to maximize value and pursue a successful emergence from chapter

13

11. The Movants' continued performance under the OVEC ICPA would pose a substantial threat to a successful restructuring of the Debtors.

36.     Finally, the Movants have not delayed in seeking to reject the OVEC ICPA, but moved for rejection immediately upon filing for chapter 11 relief. These facts support granting retroactive relief. *In re At Home Corp.*, 392 F.3d at 1072-73 (granting retroactive effect in part because debtor filed its motion on the first day of the case and scheduled the hearing for the "earliest practicable date"). There is no legitimate basis for delaying rejection, and OVEC will suffer no material prejudice from a grant of retroactive relief.

## RESERVATION OF RIGHTS

37.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to the relief granted in the Order is intended or should be construed as: (a) an admission as to the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to 11 U.S.C. § 365; or (f) a waiver or limitation of any of Debtors' rights under the Bankruptcy Code or any other applicable law.

## NOTICE

38.     No trustee, examiner or official committee has been appointed in the Debtors' chapter 11 cases. Notice of this Motion has been served on the following parties and/or their counsel, if known, via facsimile, overnight delivery, regular U.S. Mail, e-mail, and/or hand delivery: (a) the Office of the U.S. Trustee for the Northern District of Ohio; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Bank of New York Mellon Trust

Company, N.A., in its capacity as indenture trustee under various indenture agreements; (d) counsel to UMB Bank, National Association, in its capacity as indenture trustee, paying agent, and collateral trustee under various indenture agreements, including, without limitation, certain pollution control revenue bond indentures and certain first mortgage bond indentures, and trust agreements; (e) counsel to Wilmington Savings Fund Society, FSB, in its capacity as indenture trustee and pass through trustee under various indenture agreements and trust agreements in connection with the Bruce Mansfield Unit 1 sale-leaseback; (f) counsel to the Ad Hoc Group of Holders of the 6.85% Pass Through Certificates due 2034; (g) counsel to the ad hoc group of certain holders of (i) pollution control revenue bonds supported by notes issued by FG and NG and (ii) certain unsecured notes issued by FES (collectively, the "Ad Hoc Noteholder Group"); (h) counsel to FirstEnergy Corp.; (i) counsel to MetLife Capital, Limited Partnership; (j) the District Director of the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Office of the United States Attorney for the Northern District of Ohio; (m) the United States Environmental Protection Agency; (n) the Nuclear Regulatory Commission; (o) the United States Department of Energy; (p) the Federal Energy Regulatory Commission; (q) the Office of the Attorney General for Ohio; (r) the Office of the Attorney General for Pennsylvania; (s) the Office of the Attorney General for Illinois; (t) the Office of the Attorney General for Maryland; (u) the Office of the Attorney General for Michigan; (v) the Office of the Attorney General for New Jersey; (w) the National Association of Attorneys General; and (x) the Ohio Valley Electric Corporation. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

15

## <u>CONCLUSION</u>

WHEREFORE, the Movants respectfully request that the Court enter an order granting the relief requested by this Motion and such further relief as may be just and necessary under the circumstances.

16

Dated:    April 1, 2018                    Respectfully submitted,

/s/ Marc B. Merklin
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
John C. Fairweather (0018216)
Kate M. Bradley (0074206)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
jfairweather@brouse.com
kbradley@brouse.com

 - and -


**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (*pro hac vice* admission pending)
David Zensky (*pro hac vice* admission pending)
Lisa Beckerman (*pro hac vice* admission pending)
Brian Carney (*pro hac vice* admission pending)
Brad Kahn (*pro hac vice* admission pending)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
dzensky@akingump.com
lbeckerman@akingump.com
bcarney@akingump.com
bkahn@akingump.com

      - and -


Scott Alberino (*pro hac vice* admission pending)
David Applebaum (*pro hac vice* admission pending)
Todd Brecher (*pro hac vice* admission pending)
Kate Doorley (*pro hac vice* admission pending)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
dapplebaum@akingump.com
tbrecher@akingump.com
kdoorley@akingump.com

*Proposed Counsel for Debtors
and Debtors in Possession*

17