# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 18-50757 |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | (Request for Joint Administration |
| | ) | Pending) |
| Debtors. | ) | |
| | ) | Hon. Judge Alan M. Koschik |
| | ) | |

## DECLARATION OF DONALD R. SCHNEIDER
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................6

**Part I.** Debtors' Business Operations and Capital Structure ........................................14

**Part II.** The Events Leading to the Chapter 11 Cases ................................................32

**Part III.** Summary of First Day Motions ...................................................................49

A.  *Motion of FirstEnergy Solutions Corp., et. al., for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "*Joint Administration Motion*")* .................................................................................................49

B.  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees (the "*Taxes Motion*")* ........................................50

C.  *Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "*Utilities Motion*")* .....................53

D.  *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue Their Prepetition Insurance Program and (II) Authorizing the Debtors to Pay Any Prepetition Premiums and Related Obligations (the "*Insurance Motion*")* ......................55

E.  *Debtors' Motion to Approve Continued Surety Bond Program (the "*Surety Bond Motion*")* ........................................................................................................58

F.  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen (the "*Shippers, Warehousemen, and Materialmen Motion*")* ................................................................60

G.  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims (the "*Critical Vendor Motion*")* .........................62

H.  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Employee and Retiree Medical and Other Benefits, (C) Continue to Participate in FE Corp.'s Employee Compensation, Welfare, Retiree Benefit and Pension Plans and Programs, and (D) Continue to Participate in FE Corp.'s Workers' Compensation Program and Modify the Automatic Stay With Respect Thereto (the "*Employee Wages and Benefits Motion*")* ................................68

I.  *Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and to Perform Under Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, and (III) Establish Procedures for Notifying Customers in the Debtors' Chapter 11 Cases (the "*Customer Programs Motion*")* .............................................................................116

J.  *Debtors' Motion for Entry of Interim and Final Orders Authorizing FirstEnergy Solutions Corp. to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder,*

2

and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements (the "Hedging and Trading Motion").............................................................................................................128

K.    Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Business Accounts and Business Forms, and (III) Continue using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions; (C) Granting Postpetition Intercompany Claims Administrative Expense Priority; and (D) Granting Related Relief (the "Cash Management Motion")....................................133

L.    Motion of Debtors for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Intercompany and Shared Services Agreements (the "Intercompany Agreements Motion")...................................................141

M.    Debtors' Motion for an Order Extending Time to File Schedules and Statements (the "Schedules Motion") ................................................................................155

N.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (II) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (III) Granting Related Relief (the "Creditor Matrix Motion") ................................................................................155

O.    Application of Debtors for Appointment of Prime Clerk LLC as Claims, Noticing and Solicitation Agent Nunc Pro Tunc to the Petition Date (the "Claims and Noticing Agent Motion") ................................................................................158

P.    Debtors' Motion to Approve Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members (the "Interim Compensation Motion")..........................................................................159

Q.    Debtors' Motion to Authorize: (I) The Establishment of Omnibus Hearing Dates; and (II) Certain Case Management Procedures (the "Case Management Motion") ......161

R.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business (the "Ordinary Course Professionals Motion")....................................................................162

18-50757-amk   Doc 55   FILED 04/01/18   ENTERED 04/01/18 16:06:01   Page 3 of 165

## <u>EXHIBITS</u>

**Exhibit A:** FirstEnergy Corp. Organization Chart

**Exhibit B:** Market Factors

**Exhibit C:** FirstEnergy Solutions Corp. Business Diagram

**Exhibit D:** Process Support Agreement

**Exhibit E:** Standstill Agreement

I, Donald R. Schneider, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1.      I am the President and Chairman of the Board of FirstEnergy Solutions Corp. ("FES"), a corporation organized under the laws of the State of Ohio and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I am also a Director of FirstEnergy Nuclear Operating Company ("FENOC"), FirstEnergy Generation, LLC ("FG"), FirstEnergy Nuclear Generation, LLC ("NG"), FirstEnergy Generation Mansfield Unit 1 Corp. ("FGMUC"), and FE Aircraft Leasing Corp. ("FEALC").  I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records.

2.      I have worked for an affiliate of FirstEnergy Corp. ("FE Corp.") since 1982 in a variety of positions.  I have been an officer of FES since 2009 and a director since 2016.  Except as otherwise indicated in this declaration (this "First Day Declaration"), all facts set forth in this declaration are based upon my personal knowledge of the Debtors' businesses, operations, and related financial information gathered from my review of their books and records, relevant documents, and information supplied to me by members of the Debtors' management team and advisors.  I am over the age of 18 and authorized by the Debtors' Boards of Directors and Managers (as applicable) to submit this First Day Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this First Day Declaration.

3.      To familiarize the Court with the Debtors and the relief they are seeking on the first day of these chapter 11 cases, this First Day Declaration begins with a Preliminary Statement, which provides an overview of the Debtors and their non-Debtor affiliates (collectively, "FirstEnergy" or "FirstEnergy Group"), the facts and circumstances surrounding

5

these chapter 11 cases, and the Debtors' anticipated restructuring.  This First Day Declaration is then organized as follows:

- **Part I** describes the Debtors' corporate structure and capital structure;

- **Part II** describes the events that led to the commencement of these chapter 11 cases; and

- **Part III** provides an overview of the relief requested in the First Day Motions (as defined herein).[2]

## Preliminary Statement

4.    The Debtors own and/or operate multiple fossil and nuclear power generating facilities throughout Ohio and Pennsylvania in addition to providing other services that support the various facilities.  The Debtors are headquartered in Akron, Ohio and employ 3,076 individuals.  The Debtors are direct or indirect subsidiaries of non-Debtor FE Corp., a public utility holding company with power generation, transmission and distribution subsidiaries.  The Debtors participate in the unregulated generation business[3] (as opposed to the regulated utility business of their parent, FE Corp. and certain of its affiliates), which generates electricity and provides energy-related products and services to retail and wholesale customers.

5.    As explained in more detail below, the Debtors face significant liquidity concerns.  Contributing to the liquidity concerns, there has been a well-documented and rapid expansion in natural gas supplies which has caused electricity prices to plummet, and has consequently reduced the Debtors' profits from power sales.  At the same time, the cost of upgrading and

---

[2] The Debtors have also filed motions seeking authorization to reject certain executory contracts and leases.  Two motions seek to reject certain unprofitable executory long-term power purchase agreements (the "OVEC / Renewable Contract Rejection Motions").  A related adversary proceeding was initiated against the Federal Energy Regulatory Commission ("FERC") seeking to confirm and protect this Court's jurisdiction over the OVEC / Renewable Contract Rejection Motions (the "FERC Adversary").  In the FERC Adversary, the Debtors are seeking a temporary restraining order and preliminary injunction.

[3] The use of the term "unregulated" refers to businesses that are not based on cost-of-service rate regulation, where revenues and profits are generally stable and largely determined by regulatory authority.  However, as explained below, these "unregulated" businesses nevertheless operate in a regulated environment, including in wholesale electricity markets subject to federal regulation and oversight.

maintaining the Debtors' facilities to comply with additional environmental regulations has required significant capital expenditures. The Debtors also have significant ongoing interest payment requirements under their outstanding debt obligations and face maturities on certain of these obligations in the next twelve months, as well as significant lease payments due under certain sale-leaseback arrangements related to one of their power facilities.

6. The Debtors' significant debt obligations, along with their lease payments, increased operational costs, reduced revenues, and obligations under long-term executory power purchase agreements, prompted the Debtors to file these chapter 11 cases to preserve their available capital while they effectuate an operational and balance sheet restructuring.

## A. Power Industry Background

### i. Production and Sale of Electricity

7. Due to the United States' dependence on electricity for everything from heating and air conditioning homes to charging the newest mobile phone, the electricity market is a critical economic engine that generates $386.5 billion in annual revenue[4] and supports 387,000 jobs.[5]

8. Electricity is generated in multiple ways, including burning fossil fuels or the use of nuclear power or renewable resources. Production of electricity is usually quantified as a megawatt ("MW"), or a megawatt hour ("MWh"), where one MWh is generally enough power to light 750 to 1,000 homes for an hour.[6] MWhs are sold in the wholesale electricity market which

---

[4] U.S. Energy Information Administration, Electric Power Annual 2016, December 2017, available at: www.eia.gov/electricity/annual/pdf/epa.pdf.

[5] U.S. Department of Labor, Bureau of Labor Statistics, May 2016 National Industry-Specific Occupational Employment and Wage Estimates, NAICS 221100 – Electric Power Generation, Transmission and Distribution, available at: http://bls.gov/oes/current/naics4_221100.htm.

[6] Electric Power Supply Association, available at: https://www.epsa.org/industry/primer.

is open to power generators connected to a grid, as discussed in greater detail below.[7]  Because the electrical grid is interstate in nature, FERC, a federal agency, regulates the wholesale power market.

9.      Delivering electricity to end-use consumers is more complicated than it is with other commodities for two key reasons.  First, electricity cannot be stored in significant quantities, which means it must be produced as, and only when, needed in real time.  This means that electricity supply and demand must be constantly balanced.  Second, electricity follows the path of least resistance on the transmission system, meaning it does not always flow over a pre-determined transmission path.

10.     FERC rules have encouraged the formation of regional transmission organizations ("RTOs") and independent system operators ("ISOs") to coordinate, control, and monitor the electric transmission systems owned by electric utilities and to administer wholesale markets for buying and selling electricity.  These independent, FERC-regulated organizations control transmission operations twenty-four hours a day, ensuring that electricity moves reliably and efficiently across their systems to meet customer demand.  RTOs and ISOs have been formed in several regions across the country, including the Mid-Atlantic and Midwest.

11.     RTOs and ISOs also administer auctions, or markets, for the wholesale sale of electricity.  Many RTOs operate two principal types of markets: "energy markets" and "capacity markets."  The energy market operates as a spot market in which electric generators sell, and load serving entities ("LSEs") (such as regulated utilities and competitive retail suppliers) buy, electricity through a uniform price auction.  Specifically, electric generators place offers with the RTO for a particular time period, typically a day or hour ahead, indicating the minimum price at

---

[7] An electrical grid is an interconnected network for delivering electricity from suppliers to consumers.  It consists of generation facilities that produce electricity, high voltage transmission lines that carry the power to demand centers, and distribution lines that connect to individual customers.

which they are willing to dispatch and sell specified quantities of energy at a specific time. The RTO then commits electricity from the electric generators, from the lowest to the highest offer, until all of the LSEs' demand is met. All of the electricity that is committed is paid the same energy price by the RTO/ISO, which is set at the price offered by the last unit of electricity needed to meet total demand (i.e., the marginal unit).[8] If demand is low or if there is a significant supply of low-cost producers, the resulting market clearing price is lower. In these circumstances, higher-cost producers are less profitable, may generate less electricity or none at all, and may even be required to sell power at a loss in some periods due to operational constraints that limit flexibility to quickly change production levels in response to price changes.

12.     In the capacity market, generators do not sell electricity itself, but rather the ability and commitment to produce electricity when necessary. Capacity markets are intended to promote grid reliability by procuring, often several years in advance, the appropriate amount of capacity needed to meet predicted energy demand. An RTO or ISO conducts a capacity auction to determine the set of resources that is needed to meet annual demand and the price those needed resources will be paid for committing to make their generation facilities available. The generators that "clear" the capacity auction receive a commitment to be available to produce electricity during the corresponding "delivery year," which is typically about three years in the future. This commitment involves a requirement to offer the contracted generation capacity into the energy market each day during the delivery year.

13.     Finally, RTOs and ISOs purchase various "ancillary services" needed to reliably operate the electric grid. Certain of these ancillary services are purchased through markets administered by the RTO or ISO or at rates set by the RTO or ISO's tariffs (which are approved

---

[8] In the event there are transmission constraints, and/or differences in the losses from injection or withdrawal of power by location, prices can differ by location.

by FERC).  As discussed above, the grid is required to maintain an exact level of supply and demand, and various ancillary services are needed to achieve this balance, down to the second.

14.     The RTO or ISO acts as the counterparty in all of these wholesale market transactions.  In other words, wholesale generators do not sell their energy, capacity, and ancillary services directly to LSEs; rather, these generators sell these products to the RTO/ISO itself, and LSEs purchase the same products from the RTO/ISO.  LSEs in turn sell the energy they purchase from the RTO/ISO to the retail customers they serve.[9]

15.     RTOs facilitate these wholesale transactions and the electricity industry relies on them to ensure that customers have reliable access to power and to determine the appropriate prices for electricity.  FES conducts all of its business operations in the RTOs overseen by PJM Interconnection LLC ("PJM"), which covers Ohio and Pennsylvania, along with a number of other states (the "PJM Region"),[10] and the Midcontinent Independent System Operations ("MISO").[11]

16.     Not all states have deregulated their electric industries.  If a retail customer is located in a state that has not deregulated the retail electric industry, such as West Virginia, the retail customer must purchase traditional "bundled" electric service, generally comprised of generation, transmission and distribution services, from its local electric utility.  In such a case, the local utility is the LSE.  In states, such as Ohio, where the generation component of electric service has been rendered competitive, a customer can either obtain a similar "bundled" service

---

[9] In some cases, generators sell their capacity and/or spot power to other generators, who bid/sell such power and capacity to the RTO or ISO along with their own generation and capacity.  The OVEC / Renewable Contract Rejection Motions deal with contracts such as these, whereby other unregulated generators sell power and capacity (and certain renewable energy credits) to FES.

[10] The PJM Region covers parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia.

[11] MISO covers parts of Arkansas, Illinois, Indiana, Iowa, Kentucky, Louisiana, Michigan, Minnesota, Missouri, Mississippi, Montana, North Dakota, South Dakota, Texas, Wisconsin, and Manitoba, Canada.

from its local utility, such as Ohio Edison Company ("OE"), who is obligated to provide such service as the default provider,[12] or alternatively, the customer can select a non-utility generation supplier, such as FES, who will provide the generation service at a competitive price, while the local utility continues to provide the transmission and distribution components of the service through regulated rates.

### ii. Market Factors

17.     Driven largely by weather and diurnal factors, like other commodities, electricity prices are a function of supply and demand. Demand for electricity can be unpredictable and can fluctuate significantly, which has a similar effect on the price of electricity. Wholesale prices for electricity demonstrate similar volatility, both when viewed over the course of a month and over the course of a day. Over time, economic factors can affect the power markets, such as the economic downturn in 2008 and 2009. As shown in **Exhibit B**, these factors, when paired with market dysfunction, improvements in energy efficiency and an increase in supply of natural gas and renewable generation, have continued to place downward pressure on electricity prices and the value of certain generation resources such as coal burning and nuclear generating units.

18.     Historically, especially in the PJM and MISO regions, the United States' growing demand for electricity was met by the construction of additional coal burning or nuclear fueled power plants because coal and nuclear fuel were viewed as cheap and abundant resources. At the time these plants were being constructed, the country was facing an oil crisis, prompting federal legislation that prohibited for some period the construction of gas and oil fired power plants, except in limited circumstances. After construction of these coal and nuclear units was complete, several events transpired that have challenged the economic competitiveness of coal and nuclear

---

[12] This default electric service is known as the Provider of Last Resort ("POLR") service.

11

plants over time.  First, both federal and state authorities have enacted significant environmental regulations limiting pollution from the burning of coal, such as the Clean Air Act.  Compliance with these new regulations has led to increased costs for the energy producers that rely on coal. Second, the federal government removed restrictions on the use of natural gas.  Third, the significant increase in the availability of cheap natural gas due to fracking has given gas-fired generation an advantage.  This has had a profound impact on companies that rely on coal and nuclear power, such as FG and NG.

**B.  The Debtors' Role in the Electricity Market**

19.    FES participates in both the generation wholesale and retail markets.  Through its subsidiaries, FES owns and operates multiple power generation facilities and sells the power generated by these facilities to PJM through the wholesale energy, capacity, and ancillary services markets.  FES is a party to power purchase agreements ("PPAs") with its subsidiaries, FG and NG, whereby it purchases all of the energy produced by FG and NG.  The power generated by the plants operated by FG and NG is transmitted at the generation point to the grid. FG, a direct subsidiary of FES, primarily owns and/or operates four fossil generation plants throughout Ohio and Pennsylvania, which produce electricity using coal, oil and natural gas, or petroleum coke.  Another FES subsidiary, NG, owns three nuclear generation facilities located in Ohio and Pennsylvania.[13]  This power is sold from NG to FES (just as FG sells its power to FES), pursuant to a PPA, and then by FES into PJM.

20.    FES also operates in the retail market, where different LSEs or utilities purchase electricity from the PJM or MISO markets and then resell it to the end user.  Under this deregulated model, FES is a retail provider and serves as an LSE in the wholesale market, buying

---

[13] One nuclear generation facility, Beaver Valley, has two separate units.

power through the RTO/ISO and selling it to end users who have chosen to take service from FES rather than the incumbent franchised utility.[14]

21.     Additionally, FES participates in POLR auctions.  Through POLR auctions, FES bids to provide generation, through its generation subsidiaries, for utilities, who in turn sell to the end user.  FES makes excess power available to certain providers in the POLR competitive bidding process, including non-Debtor affiliates[15] and other third-party utilities.

22.     FENOC, a subsidiary of FE Corp., operates the three nuclear generation facilities owned by NG pursuant to the FirstEnergy Nuclear Operating Company Master Nuclear Operating Agreement (the "Master Nuclear Operating Agreement") in accordance with the Nuclear Regulatory Commission ("NRC") licenses for the facilities.  Under the Master Nuclear Operating Agreement, FENOC provides staff and personnel to operate the nuclear generation facilities, performs necessary maintenance, manages and schedules deliveries of nuclear fuel, handles spent fuel, and processes disposal of radioactive waste.

23.     The Debtors' businesses have not rebounded from the significant decrease in electricity demand which occurred during the economic downturn 2008.  This reduction in demand was further exacerbated through legislation requiring the implementation of energy efficiency measures.  This decrease in demand when paired with excess generation supply in the PJM Region, has resulted in a period of protracted low energy and capacity prices.  Additionally, the substantial increase in the supply of natural gas, which has caused a significant reduction in natural gas prices, and the growth of renewable energy producers, has resulted in a substantially

---

[14] FES is in the process of marketing its retail business for sale (the "Retail Book Sale").  In relation to the Retail Book Sale, the Debtors anticipate filing a motion in the future to approve bid procedures and enter into a stalking horse asset purchase agreement.

[15] The non-Debtor affiliates include OE, The Toledo Edison Company ("TE"), Potomac Edison, Metropolitan Edison Company ("Met-Ed"), Pennsylvania Power Company ("PennPower"), Pennsylvania Electric Company ("Penelec"), The Cleveland Electric Illuminating Company, The Potomac Edison Company, and Jersey Central Power & Light Company ("JCP&L").

lower wholesale price of electricity in the PJM market. As a result of those decreases, and the factors generally rendering coal and nuclear plants less competitive, the revenue from FG and NG's generation assets has substantially declined.

24. From 2012 to 2015, FES focused on cost reductions and responded to these market developments through asset sales or deactivations of generation facilities. However, energy and capacity market prices have remained low and appear poised to remain low for some time, as evidenced by the significantly depressed capacity prices from the 2020/2021 PJM Base Residual Auction ("BRA") in May of 2017,[16] as well as the current forward pricing and the long term fundamental view on energy and capacity prices.

25. In its Form 10-Q filed with the Securities and Exchange Commission ("SEC") in November 2016, FE Corp. announced its long-term strategy to be a fully-regulated utility and as such had begun a strategic review of its competitive generation business with a target to implement strategic options of the next 12–18 months.

## Part I.
## Debtors' Business Operations and Capital Structure

### A. Overview of FirstEnergy's Corporate Structure

26. Each of the Debtors is a direct or indirect subsidiary of non-Debtor FE Corp. FE Corp. is also the ultimate parent company to multiple other non-Debtor entities. These non-Debtor entities include the regulated distribution and transmission utility businesses, regulated generation business, and non-Debtor FirstEnergy Service Company ("FESC"), which provides various intercompany services to the Debtors, as well as FE Corp. and its non-Debtor subsidiaries.

---

[16] The clearing price in the 2020/2021 PJM BRA in May 2017 was $76.53 per megawatt-day for the bulk of the region, a decline from $100 per megawatt-day for the 2019/2020 PJM BRA that took place in May 2016.

14

27.     The following chart is a simplified representation of FirstEnergy's corporate structure for the relevant entities:[17]



28.     As of December 31, 2017, FES reported total assets, liabilities, and capitalization of approximately $5.5 billion, and FENOC reported total assets, liabilities, and capitalization of approximately $900 million.   For the year ending December 31, 2017, FES's consolidated revenues were approximately $3.1 billion, and FENOC's consolidated revenues were approximately $660 million.

## B.  Debtors' Business Operations

### i.     FES

29.     FES was organized under the laws of the State of Ohio in 1997.  FES sells power and provides energy-related products and services to retail and wholesale customers in the PJM and MISO regions by purchasing the entire output of power from FG and NG and additional power from third parties under PPAs.  FES's corporate group is comprised of: (a) FG, the owner and operator of the fossil generation plants; (b) FG's subsidiaries, including FGMUC and NES;

---

[17] <u>Exhibit A</u> contains a full corporate structure chart of FirstEnergy. * designates a non-Debtor entity.

(c) NG, the owner of the nuclear generation plants; and (d) FEALC. FES employs 57 individuals.

30.     In addition to purchasing the electricity produced by its subsidiaries, discussed below, FES also purchases 110 MWs of capacity pursuant to a PPA with the Ohio Valley Electric Company ("OVEC")[18] and approximately 496 MWs of capacity pursuant to PPAs with third-party renewable wind and solar power producers.

**ii.    FG**

31.     FG was organized under the laws of the State of Ohio in 2000. FG employs 686 individuals. FG owns three fossil generation plants, two in Ohio and one in Pennsylvania. FG owns and operates the coal powered W.H. Sammis Plant in Stratton, OH, which is composed of seven units and five Electro-Motive Diesels ("EMDs") and has a net demonstrated capacity ("Net Demonstrated Capacity") of 2,223 MWs along with the natural gas and oil powered West Lorain Plant in Lorain, OH, which is composed of six units and has a Net Demonstrated Capacity of 546 MWs of electricity.     Additionally, FG owns two of the three units and approximately 6% of Unit 1 at the coal powered Bruce Mansfield Plant in Shippingport, PA, which is composed of three units and has a Net Demonstrated Capacity of 2,490 MWs. The remainder of Unit 1 is owned by third parties and leased by FG under a sale-leaseback arrangement, discussed in detail below.

---

[18] OVEC is jointly owned by several electrical utilities and operates two fossil generation plants, one in Indiana and one in Ohio. OVEC is owned jointly by: American Electric Power; Buckeye Power Generating; Dayton Power and Light Company; Duke Energy Ohio; LG&E and KU Energy; FirstEnergy; Vectren South; and Peninsula Generating Cooperative.

16



32.     FG owns a steam turbine at the Bay Shore Power Plant in Oregon, OH, which has Net Demonstrated Capacity of 136 MWs and is powered by steam purchased from non-Debtor affiliate Bay Shore Power Company ("Bay Shore") pursuant to a PPA.  In addition, FG owns a combustion turbine at Bay Shore, which has a Net Demonstrated Capacity of 17 MWs.   FG operates and manages the entire Bay Shore plant and provides services to Bay Shore under a contract with fixed monthly charges.  FG also owns certain real estate at the Bay Shore facility.

33.     FG also owns a combustion turbine at the Eastlake Plant in Eastlake, OH.  The Eastlake Plant is now retired, but the combustion turbine has a Net Demonstrated Capacity of 29 MWs.

34. FG sells the entire output from its plants, as well as the 86 MWs it purchases pursuant to a PPA with the Forked River Power Plant ("Forked River"),[19] to FES. FES in turn sells the power to retail and wholesale customers on the retail market.

35. FG maintains contracts with vendors that are critical to its ongoing operations (the "Critical Vendors").[20] These Critical Vendors include, for example, specialized vendors that are integrated (the "Integrated Services Vendors") into the generation and retail business operations. These Integrated Services Vendors, among other tasks, maintain certifications, permits, or licenses as required by state or federal laws and regulations and are experienced in conducting business in situations where they are aware of the risk posed by the nature of FG's facilities, such as exposure to high speed rotating equipment, toxic substances, and high voltage electricity. Other Critical Vendors include vendors who provide critical goods (the "Critical Goods Vendors"), such as specific replacement parts for turbines, transformers, and other equipment used in FG's electricity generation. This equipment is generally based on patented designs available only from the manufacturer or that is made or provided to FG's exact specifications.

36. FG also maintains contracts to purchase the fuel necessary to produce its electricity demands. It currently has coal contracts with various terms to acquire approximately 8 million tons of coal for 2018, and other coal contracts extending well beyond.

37. FG is the lessee under a sale-leaseback transaction (such transaction, the "Mansfield Sale-Leaseback Transaction") related to Unit 1 of the Bruce Mansfield Plant, pursuant to which FG makes semi-annual lease payments to six lessor trusts that are the nominal owners/lessors in the Mansfield Sale-Leaseback Transaction. The lessor trusts' purchase of the interest in Unit 1 of the Bruce Mansfield Plant was funded by equity investments from certain

---

[19] This agreement is scheduled to end on April 17, 2018.
[20] Critical Vendors are described in greater detail in the Critical Vendor Motion (as defined herein).

owner participants (the "<u>Owner Participants</u>"), which are the equity owners of the lessor trusts. In connection with the Mansfield Sale-Leaseback Transaction, the lessor trusts issued notes secured by, *inter alia*, the lessor trusts' interests in Unit 1 of the Bruce Mansfield Plant to pass-through trusts that issued and sold pass-through trust certificates to public debt holders. The Mansfield Sale-Leaseback covers approximately 94% of Unit 1 of the Bruce Mansfield Plant. Concurrently with the commencement of these chapter 11 cases, the Debtors have sought to reject certain of the agreements executed in connection with the Mansfield Sale-Leaseback Transaction *nunc pro tunc* to the Petition Date. Such rejection, if approved, will give rise to certain claims in favor of the counterparties to the lease agreements. The nature and amount of those claims are subject to dispute among the parties.



(Bruce Mansfield Plant)

## 1. FGMUC

38.     FGMUC is a subsidiary of FG and was organized under the laws of Ohio in 2007. FG owns Units 2 and 3 of the Bruce Mansfield Plant,[21] and operates all three units pursuant to an operating agreement, which generally provides that FG will operate and dispatch the Bruce

---

[21] FG also owns approximately 6% of Unit 1 of the Bruce Mansfield Plant, pursuant to the Mansfield Sale-Leaseback Transaction, discussed above.

Mansfield Plant according to PJM criteria. Separately, FG has assigned its leasehold interests in the Mansfield Sale-Leaseback Transaction to FGMUC. FGMUC and FG are parties to a PPA pursuant to which FGMUC sells the entire output from Unit 1 of the Bruce Mansfield Plant to FG. Under the PPA, FG has agreed to purchase the entire output as well as to arrange for all transmission, generation costs, losses, and related services at and from the specified delivery point. FGMUC does not have any employees.

## 2. NES

39. NES is a subsidiary of FG and was organized under the laws of Delaware in 1999.[22] NES is a non-operating entity that owns 92 acres of surface property in Norton, OH, and the rights to use the Norton Mine (formerly known as the Barberton Mine) for compressed air storage. NES also does not have any employees.

### iii. NG

40. NG was organized under the laws of Ohio in 2005. NG owns three nuclear generation plants, composed of two units at the Beaver Valley Power Station in Shippingport, PA, the Davis-Besse Nuclear Power Station in Oak Harbor, OH, and the Perry Nuclear Power Plant in Perry, OH. NG's nuclear plants have a Net Demonstrated Capacity of 4,048 MWs. NG and FES are parties to a PPA, whereby NG sells the entire output from its nuclear generation facilities to FES. NG does not have any employees and the nuclear generation facilities are operated by FENOC, pursuant to the Master Nuclear Operating Agreement.

---

[22] FG also owns 99% limited partnership interest in Nautica Phase 2 Limited Partnership, which has $10 million in outstanding debt.



41.     In 1987, non-Debtors OE and TE entered into sale-leaseback transactions with respect to undivided interests in the Beaver Valley Power Station Unit 2 ("Beaver Valley 2"), representing approximately 40% of the output of the plant. The owner/lessors under the Beaver Valley 2 sale-leaseback transactions were a series of third-party entities owned and controlled by certain equity investors. NG was not initially a party to the sale-leaseback transactions. Over time, NG acquired all of the equity interests in the owner/lessors under the Beaver Valley 2 sale-leaseback transaction. In June 2014, OE elected to repurchase the last 2.6% of the outstanding ownership interests for approximately $38 million in total, and assigned its rights arising from

21

such election to NG. On June 1, 2017, the lease under the sale-leaseback transaction expired on its own terms and NG made the payment with respect to this repurchase election.[23]

42. Additionally, the NRC mandates that every nuclear power plant in the United States is required to set aside sufficient funds to decommission the plant when it reaches the end of its useful life. The NRC estimates costs for decommissioning a nuclear power reactor to range from $280 - $612 million, depending on many factors, including the timing and sequence of the various stages of the program, type of reactor or facility, location of the facility, radioactive waste burial costs, and plans for spent fuel storage. Pursuant to this mandate, NG has obligations to fund four separate nuclear decommissioning trusts ("NDTs"), one for each unit. As of December 31, 2017, the NDTs contained approximately $1.856 billion.

43. The following table summarizes the current operating license expiration for NG's nuclear facilities in service:

| Station | In-Service Date | Current License Expiration |
|---|---|---|
| Beaver Valley Unit 1 | 1976 | 2036 |
| Beaver Valley Unit 2 | 1987 | 2047 |
| Perry | 1986 | 2026[24] |
| Davis-Besse | 1977 | 2037 |

---

[23] A similar sale-leaseback transaction was entered into with respect to the Perry Nuclear Power Plant, where OE was lessee under the applicable lease documents. Such sale-leaseback transaction expired on its own terms on May 30, 2016.

[24] Perry is capable of filing for a license renewal that would add 20 years to the operating license, resulting in a license expiration of 2046.

### iv.   FENOC

44.    FENOC was organized under the laws of Ohio in 1998.  FENOC is an affiliate of FES and a direct subsidiary of FE Corp.  Pursuant to the Master Nuclear Operating Agreement and NRC requirements, FENOC operates the four nuclear generation units owned by NG discussed above.  FENOC also provides additional services for non-Debtors Penelec, Met-Ed, and JCP&L with respect to Three Mile Island, Unit 2, which is deactivated.  FENOC provides engineering, supervisory, operating, maintenance, and other services that may be required to operate and maintain the nuclear facilities.  FENOC renders these services to non-Debtors at cost and then charges are paid by the direct charge method through non-Debtor FESC, described in detail below.  FENOC has 2,333 employees.

45.    FENOC maintains contracts with many Critical Vendors.  Along with also having Integrated Services Vendors and Critical Goods Vendors, NG has vendors that are critical to the operation of the nuclear plants (the "Nuclear Plant Vendors").  These Nuclear Plant Vendors are critical to the nuclear plant operations due to the risks associated with nuclear power and as a matter of public safety.  The Nuclear Plant Vendors provide goods and services that may include general operations, maintenance, repairs, inspections, refurbishments, fuel and parts, disposal services, quality control and assurance, physical plant security, and cyber security.  FENOC also has contracts to purchase the fuel necessary to produce its electricity demands.

### v.   FEALC

46.    FEALC is a subsidiary of FES and was organized under the laws of Ohio in 2008. FEALC owns one airplane which it leases to non-Debtor FESC.  FEALC does not have any employees.

### vi.    FESC

47.     Non-Debtor FESC is a direct subsidiary of non-Debtor FE Corp. and an affiliate of FES and FENOC.  FESC provides vital shared services, such as payroll and procurement for the Debtors, as well as non-Debtor FE Corp. and its non-Debtor subsidiaries.  The services are integral to the Debtors' business operations, and also generate significant cost savings for the various entities.

48.     FESC provides the shared services to FES, its subsidiaries, and FENOC under two separate shared services agreements (respectively, the "FES Shared Services Agreement" and the "FENOC Shared Services Agreement", and collectively, the "Shared Services Agreements") and administers the cash management system.  Services are provided under the Shared Services Agreements and are billed at cost.  In 2018, shared services are expected to cost approximately $135.1 million for FES and $34.3 million for FENOC.

49.     The shared services include, among other things, certain:

- legal functions;

- human resources functions;

- treasury functions;

- enterprise and market risk management functions;

- controller functions;

- federal, state, and local tax services;

- financial planning functions;

- strategy and business development functions;

- information technology and infrastructure services;

- external affairs, including political and regulatory advocacy;

- investor and media relations;

- corporate secretarial, security, compliance, and ethics issues;

- internal auditing and Sarbanes-Oxley compliance;

- supply chain services;

- business services administration;

- facility design and construction and real estate management; and

- generation support services, including fleet engineering, operations and outage support.

50.     As described in greater detail in the Cash Management Motion (as defined herein), to facilitate the efficient operation of their businesses, the Debtors use an integrated, centralized cash management system (the "Cash Management System").  The Cash Management System facilitates cash monitoring, forecasting, and reporting, and enables the Debtors to maintain necessary oversight of the related bank accounts.  Prior to the Petition Date, the Debtors participated in the non-utility money pool administered by FESC (the "Non-Utility Money Pool"), which also included FE Corp. and FESC as participants.  On March 16, 2018, the Debtors exited the Non-Utility Money Pool and formed a new money pool (the "FES Money Pool") solely for use by the Debtors with FESC as the administrator.  The balances due and owing at the time of exit to FE Corp. and the other participants who were lenders in the Non-Utility Money Pool from the participants who were borrowers in the Non-Utility Money Pool were memorialized in promissory notes.

51.     The Debtors use an FESC deposit account (the "Deposit Account") to deposit funds that are used to pre-fund disbursements.  In advance of the funding of disbursements, funds are transferred from the Deposit Account to the FESC main cash concentration account

25

(the "<u>Main Cash Concentration Account</u>") in order to fund disbursements to third parties and payments under various agreements made between FirstEnergy entities (the "<u>Intercompany Agreements</u>"), which disbursements are then made by FESC.  The Cash Management System is overseen by the personnel in the Debtors' finance function, as well as personnel employed by FESC (collectively, the "<u>Finance Group</u>").  The Finance Group monitors the bank accounts and manages the proper collection and disbursement of funds, and the allocation of credits and debits owed through the Main Cash Concentration Account.

52.    Because, in most cases, the individual Debtors do not have their own payment systems, FESC acts as an administrator and makes cash transactions on behalf of the Debtors via the Main Cash Concentration Account.  Such transfers are recorded in the individual Debtors' balances by FESC.  Funds deposited in the Main Cash Concentration Account by the Debtors as a prepayment are then used by FESC to, among other things, fund payroll for the Debtors' employees, pay for goods and services provided to the Debtors by third parties, satisfy amounts owed pursuant to the Intercompany Agreements, and otherwise pay certain of the Debtors' operating expenses.

**C.  Debtors' Regulatory Environment**

53.    The Debtors' business operations are subject to significant regulation and oversight.  The regulators that are most material to the Debtors' business operations are identified in the following chart:

| Agency or Entity | Area(s) of Authority |
|---|---|
| Commodity Futures Trading Commission (the "<u>CFTC</u>") | • Future market derivatives and over-the-counter derivatives (including interest rate swaps and commodity swaps) |
| Environmental Protection Agency (the "<u>EPA</u>") | • Air and water quality<br>• Solid waste disposal |
| Equal Employment Opportunity Commission (the | • Labor relations |

| | |
|---|---|
| "EEOC") | |
| Federal Communications Commission (the "FCC") | • Wireless radio licenses for emergency radio communication |
| FERC | • FERC has nationwide electricity reliability authority and authority for the setting of just and reasonable rates in wholesale power markets throughout most of the country |
| Institute of Nuclear Power Operations (the "INPO") | • An industry organization that establishes performance objectives, criteria and guidelines for the nuclear power industry and conducts regular evaluations |
| MISO | • Provides oversight of FERC approved tariffs governing wholesale electricity transactions in the MISO market |
| North American Electric Reliability Corporation (the "NERC") | • National electricity grid reliability standards |
| Nuclear Regulatory Commission (the "NRC") | • The NRC has authority to issue nuclear operating licenses, inspect nuclear power facilities, and regulate use of the nuclear decommissioning trust funds<br>• The NRC regulates nuclear waste disposal from civilian power reactors. |
| Occupational Safety and Health Administration (the "OSHA") | • Workplace safety |
| Ohio Environmental Protection Agency (the "Ohio EPA") | • State oversight of air, land, and water management programs, all aspects of environmental protection, and mining regulation |
| Pennsylvania Department of Environmental Protection (the "Pennsylvania DEP") | • State oversight of air and water quality and solid waste disposal |
| Pennsylvania Public Utility Commission (the "PPUC") | • Wide-ranging oversight over the Pennsylvania utilities market, including, among other things, ensuring customer protection and regulating the rates and services |
| Public Utility Commission of Ohio (the "PUCO") | • Regulates utility services including electric and natural gas companies |
| PJM | • Provides oversight of FERC approved tariffs governing wholesale electricity transactions in the PJM market |
| SEC | • Federal oversight and enforcement of federal securities laws and regulates the securities industry |
| U.S. Department of Energy (the "DOE") | • Federal oversight of policies regarding energy |
| U.S. Department of Labor (the "DOL") | • Federal oversight of policies regarding occupational safety, wage and hour standards, unemployment insurance benefits, |

| | reemployment services, and economic statistics |
|---|---|

54.    Pursuant to 28 U.S.C. § 959(b), the Debtors intend to comply with all applicable regulatory requirements, including all requirements related to or associated with safety, health, and environmental law compliance, during these chapter 11 cases, including, but not limited to compliance with the Clean Air Act, Clean Water Act, the Atomic Energy Act, and the Toxic Substance Control Act.   In addition, the Debtors will seek all necessary regulatory approvals, if any, from state and federal regulatory authorities, in connection with the Debtors' business operations and any proposed plan of reorganization.   Specifically, the Debtors intend to comply with staffing and related requirements of the NRC that drive the level of required staff at the nuclear power plants.   The NRC requirements include minimum shift staffing requirements for licensed control room operators,[25] maintenance, emergency planning,[26] and other areas.   The Debtors also intend to operate their generation facilities in compliance with FERC and NERC-approved electric reliability standards.

55.    As discussed above, the Debtors maintain the NDTs required by the NRC.   The Debtors have funded the four applicable NDTs, as well as maintained private nuclear insurance for injury and property damage arising out of nuclear incidents.   Currently, the NDTs are funded to satisfy the NRC's funding assurance requirements.[27]   For some plants, the Debtors rely on one of the NRC's decommissioning options, the deferred dismantling/safe storage (known as "SAFSTOR") method of decommissioning as allowed by such NRC regulations.   Under SAFSTOR, a nuclear facility is maintained and monitored in a condition that allows the

---

[25] *See* 10 C.F.R. 50.54(m).

[26] *See* 10 C.F.R. 50.47(b)(2).

[27] *See* 10 C.F.R. 50.75.

radioactivity to decay and decommissioning fund assets to grow, reducing long-term decommissioning risk.

56.     Moreover, to the extent the Debtors maintain insurance for their regulatory compliance obligations, the Debtors intend to continue such insurance in the ordinary course of business.  The Debtors also intend to continue paying any required fees for environmental and safety permits and licenses, including fees for hazardous material licenses and environmental permits, and to continue to comply with all regulatory requirements pertaining to the disposal of hazardous substances.

## D.  Debtors' Capital Structure

### i.     FES Debt

57.     FES has approximately $1.5 billion of funded indebtedness.  That amount includes approximately $700 million of a secured revolving credit facility provided by FE Corp.,[28] $332 million in outstanding principal amount of 6.05% unsecured notes due 2021, and $363 million in outstanding principal amount of 6.80% of unsecured notes due 2039.  FES also has a $150 million credit facility with non-Debtor Allegheny Energy Supply Company, LLC ("AES"), under which $102 million is currently due and owing on April 2, 2018.

### ii.    FG and NG Debt

58.     FG has approximately $1 billion of funded indebtedness.  That amount includes $328 million in outstanding principal amount of secured fixed-rate pollution control revenue notes ("PCNs") that support tax-exempt pollution control revenue bonds ("PCRBs") and $677

---

[28] The secured revolving credit facility is $500 million for general purposes (of which $500 million has been drawn) and $200 million for surety support (of which $200 million has been drawn).  The secured revolving credit facility is secured by first mortgage bonds issued by FG and NG, which are in turn secured by a first lien security interest granted by FG and NG, as applicable, on substantially all of their respective property, plant, and equipment used and useful in the generation and production of electric energy, including the plants referenced above.  The secured revolving credit facility is also guaranteed by FG and NG.

million in outstanding principal amount of unsecured fixed-rate PCNs that support additional tax-exempt PCRBs.  The PCRBs are issued by various Ohio and Pennsylvania state authorities and the secured PCNs are secured by first mortgage bonds issued by FG which are in turn secured by a first lien security interest granted by FG on substantially all of its property, plant, and equipment used in the generation and production of electricity.

59.     As discussed above, FG is also the lessee under a sale-leaseback transaction related to Unit 1 of the Bruce Mansfield Plant pursuant to which FG makes semi-annual lease payments to the six lessor trusts.  FES guarantees the payment obligations of FG under the six leases of the Unit 1 of Bruce Mansfield sale-leaseback transaction.  In connection with the Mansfield Sale-Leaseback Transaction, the lessor trusts issued notes secured by, *inter alia*, the owner/lessors' interests in Unit 1 to a pass-through trust that issued and sold pass-through trust certificates publicly, of which $769 million in aggregate principal amount remains outstanding.

60.     Pursuant to the Mansfield Sale-Leaseback Transaction, FG agreed to indemnify the owners, the lessors, the owner trustee, the indenture trustee, the pass-through trustee, and their respective affiliates (the "Tax Indemnitees") under tax indemnity agreements (the "Tax Indemnity Agreements").    The Tax Indemnity Agreements generally indemnify the Tax Indemnitees in the event any party suffers a loss of the tax benefits or has taxes imposed as a result of the transactions contemplated by the Mansfield Sale-Leaseback Transaction.  Similar to FG's payment obligations under the facility lease, FES has agreed to guarantee FG's obligations under the Tax Indemnity Agreements.

61.     NG has approximately $1.1 billion of funded indebtedness.  That number includes $285 million of secured PCNs that support tax-exempt PCRBs and $842 million of unsecured PCNs that support additional tax-exempt PCRBs.    The secured PCNs are secured by first

mortgage bonds issued by NG which are in turn secured by a first lien security interest granted by NG on substantially all of its property, plant, and equipment used and useful in the generation and production of electricity.

### iii.  Other Debt

62.     As of January 31, 2018, FEALC had approximately $240,000 of outstanding debt in an aircraft leasing loan owed to FES.

### iv.  Guarantees

63.     On March 26, 2007, FG and NG each entered into downstream guarantees with FES, and FES entered into upstream guarantees with FG and NG. The downstream and upstream guarantees covered the following identical enumerated categories of outstanding indebtedness: (a) all obligations of the entity for borrowed money, or with respect to deposits or advances of any kind, or for the deferred purchase price or property or services, excluding, however, trade accounts payable incurred in the ordinary course of business; (b) all obligations of the entity evidenced by bonds, debentures, notes, or similar instruments; (c) all obligations of the entity upon which interest charges are customarily paid; (d) all obligations under leases that shall have been or should be, in accordance with generally accepted accounting principles in the United States, in effect from time to time, recorded as capital leases in respect of which the entity is liable as lessee; (e) reimbursement obligations of the entity (whether contingent or otherwise) in respect of letters of credit, bankers' acceptances, surety or other bonds and similar instruments; and (f) obligations of the entity under direct or indirect guarantees in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to above. These guarantees do not include (x) indebtedness that provides that such indebtedness is

31

not entitled to the benefits of the guaranty and (y) any indebtedness owing to any FE Corp. subsidiary.

## Part II.
## The Events Leading to the Chapter 11 Cases

### A. History of the Debtors

64.     Non-Debtor FE Corp., the ultimate parent company of each of the Debtors in these chapter 11 cases, is a public utility holding company headquartered in Akron, Ohio. FE Corp. had its beginning through the merger of OE and the former Centerior Energy Corporation in 1997. Subsequent to the completion of the merger, FE Corp. was the 11th largest investor-owned electric system in the nation, based on annual electric sales of 64 million MWhs.

65.     In 2001, FE Corp. doubled its revenue (to more than $12 billion) and its customers served (to more than 4.3 million) when it merged with the former GPU, Inc. ("GPU"), a company that served 2.1 million customers in Pennsylvania and New Jersey.

66.     A decade after the GPU merger, in 2011, FE Corp. completed another merger with the former Allegheny Energy, Inc. ("AE"), a company that served 1.6 million customers in Pennsylvania, West Virginia, Maryland and Virginia. The AE merger more than doubled the size of FE Corp.'s coal fired fleet and provided significant market expansion opportunities.

67.     Non-Debtor AES was organized under the laws of the State of Delaware in 1999. AES provided energy-related products and services to Debtor FES until the termination of the relevant PPA in April 2017.[29] AES, together with FES and its subsidiaries, comprises FE Corp.'s competitive energy services ("CES") reportable operating segment.

68.     FE Corp. is both a secured creditor and an unsecured creditor of FES and is expected to play an active role in the Debtors' chapter 11 cases. FE Corp. is owed $700 million

---

[29] FES also purchased power from AES in the month of March 2018 for a set amount of MWh per day. That contract has ended and FES has fully paid AES for those MWhs.

on account of the secured revolving credit facility and approximately $4.4 million in unsecured debt obligations. In addition, FE Corp., FESC, and other non-Debtor affiliates are parties to various intercompany agreements with the Debtors and FE Corp. has guaranteed certain other obligations of the Debtors. As described below in more detail, the Debtors' First Day Motions (as defined herein) seek approval of relief relating to Intercompany Agreements which will maintain the Debtors' ties with FE Corp., FESC, and other non-Debtor affiliates in certain significant respects during the pendency of these chapter 11 cases.

**B. Impairments to the Value of the Debtors' Business**

69. In July 2016, as part of an ongoing process to evaluate its overall generation business, FE Corp. and FES filed an 8-K with the SEC, announcing their intent to exit the 136 MW Bay Shore Unit 1 generating station by October 2020 and to deactivate Units 1-4 of the W.H. Sammis generating station totaling 720 MWs by May 2020, resulting in a $647 million ($517 million at FES) non-cash pre-tax impairment charge in the second quarter of 2016.

70. Furthermore, in a November 2016 8-K and 10-Q filed with the SEC, FE Corp. announced that it had begun a strategic review of its competitive operations as it transitions to a fully regulated utility with a target to implement its exit from competitive operations by mid-2018. FE Corp. indicated its plan to exit the merchant generation business through exploring various strategic options and if there was a lack of viable strategies, a bankruptcy filing of FES and certain of its subsidiaries may become necessary. In part because of this announcement, Moody's downgraded the credit rating of FES to Caa1.

71. In their Form 10-K released on February 21, 2017, FE Corp. and FES reported that, due to the stress of weak energy prices, inadequate results from recent capacity auctions and poor demand forecasts that have lowered the value of the business, the competitive business

33

continued to be managed conservatively. The CES segment's contract sales were expected to decline from 53 million MWhs in 2016 to 40-45 million MWhs in 2017 and to 35-40 million MWhs in 2018. While the reduced contract sales will decrease potential collateral requirements, market price volatility may significantly impact the competitive generation businesses' financial results due to the increased exposure to the wholesale spot market.

72. Additionally, as a result of FE Corp.'s targeted exit from competitive operations by mid-2018, significantly before the end of certain long-lived assets' original useful lives, CES recorded a non-cash pre-tax impairment charge of $9.2 billion ($8 billion at FES) in the fourth quarter of 2016 to reduce the carrying value of certain assets to their estimated value, including long-lived assets, such as generating plants and nuclear fuel, as well as other assets such as materials and supplies. Further, as reported in its Form 10-K on February 20, 2018, FES concluded that its nuclear facilities would likely be either deactivated or sold before the end of their estimated useful lives, FES recorded a pre-tax charge of $2.0 billion in the fourth quarter of 2017 to fully impair the nuclear facilities, including the generating plants and nuclear fuel as well as to reserve against the value of materials and supplies inventory and to increase its asset retirement obligation.

### C. Regulatory and Legislative Developments

#### i. NRC Matters

73. Under NRC regulations, nuclear operators are subject to rigorous nuclear safety requirements, including certain financial assurance provisions. Notably, the NRC requires that nuclear power plant licensees must ensure that adequate funds will be available to decommission their facilities at the expiration of their licenses. The NRC has established a minimum amount of funding that must be accumulated and set aside for each reactor using a formula set forth in its

34

regulations. As of December 31, 2017, there was approximately $1.856 billion accumulated in NDTs pursuant to NRC requirements, as discussed above. The values of NDTs fluctuate based on market conditions.

74.     NRC regulations also require that nuclear operators provide assurance of funding for independent spent fuel storage installation facilities. NG has funded a $10 million supplemental trust since 2016 to support the decommissioning of the spent fuel storage facilities.

75.     Since May 2016, FES has provided a parental financial support agreement to NG of up to $400 million. FES is required to maintain the parental financial support agreement by the NRC. The NRC relies on such parental support agreements to provide additional assurance that merchant nuclear plants, including NG's nuclear units, have the necessary financial resources available to maintain safe operations, particularly in the event of an unplanned outage lasting six months or more.

###      ii.     FERC Matter: Ohio ESP IV PPA

76.     On August 4, 2014, FE Corp.'s Ohio Companies filed an application with the PUCO seeking approval of their Electric Security Plan IV ("ESP IV"), which included a proposed rider retail rate stability provision (the "Rider RRS"), which would flow through to customers either charges or credits representing the net result of the price paid to FES through an eight-year FERC-jurisdictional PPA (the "ESP IV PPA") against the revenues received from selling such output into the PJM markets.[30] On March 31, 2016, the PUCO issued an Opinion and Order adopting and approving the Ohio Companies' stipulated ESP IV with modifications. FES and the Ohio Companies entered into the ESP IV PPA on April 1, 2016.

---

[30] This PPA only applied to the Sammis Power Plant, Davis-Besse Nuclear Plant, and FES's OVEC obligations.

77.     On January 27, 2016, certain parties filed a complaint with FERC against FES and the Ohio Companies requesting FERC review the ESP IV PPA under Section 205 of the Federal Power Act.    On April 27, 2016, FERC issued an order granting the complaint, prohibiting any transactions under the ESP IV PPA pending authorization by FERC, and directing FES to submit the ESP IV PPA for FERC review if the parties desired to transact under the agreement.    In so doing, FERC essentially eliminated the possibility of FES receiving generation support PPAs, which would have provided much-needed income and cash flow support to FES.

78.     FES and the Ohio Companies did not file the ESP IV PPA for FERC review but rather agreed to suspend the ESP IV PPA. FES and the Ohio Companies subsequently advised FERC of this course of action.[31]

### iii.  **Other Federal Developments**

79.     In April 2017, Secretary of Energy Rick Perry (the "<u>Secretary</u>") directed DOE staff to conduct a study and issue a report exploring critical issues central to protecting the long-term reliability of the electric grid.   Specifically, the Secretary directed staff to analyze, among other things, (1) the extent to which regulatory burdens and other federal/state policies are responsible for the premature retirement of "baseload" generation resources (e.g., coal and nuclear generating stations), and (2) whether the wholesale electricity markets are adequately compensating grid resilience attributes such as "on-site fuel" (i.e., having sufficient quantities of fuel located on the site of the plant).

---

[31] On January 19, 2017, FERC issued an order accepting compliance filings by FES, its subsidiaries, and the Ohio Companies updating their respective market-based rate tariffs to clarify that affiliate sales restrictions under the tariffs apply to the ESP IV PPA, and also that the ESP IV PPA does not affect certain other waivers of its affiliate restrictions rules FERC previously granted these entities.

80.     DOE staff issued its report on August 23, 2017.  The report concluded that baseload generation retirements have occurred for a number of reasons, with low natural gas prices being a predominant cause.  It did not mandate any specific action with respect to the compensation for generation resources, but it encouraged FERC to consider how to appropriately compensate market participants for services that are necessary to support grid resilience.

81.     On September 29, 2017, the Secretary submitted a Notice of Proposed Rulemaking to FERC for consideration (the "NOPR").  The NOPR directed FERC to consider adopting a new rule that would require PJM and certain other RTOs to set wholesale prices for certain eligible generation resources at levels that would provide full recovery of costs and a return on equity.  Eligibility would have required, among other things, having (1) a 90-day fuel supply on-site and (2) the ability to provide "essential reliability services."  After reviewing extensive stakeholder comments, FERC issued an order on January 8, 2018, declining to adopt the rule proposed in the DOE NOPR.  FERC concluded that the record did not support taking the action proposed in the NOPR and terminated the NOPR proceeding.  FERC contemporaneously initiated a new proceeding to further examine resiliency issues in PJM and other RTO/ISO markets.  At FERC's direction, each RTO/ISO submitted a compliance filing on March 9, 2018, responding to FERC inquiries related to the resilience of the electric grid.  Parties may file reply comments by May 9, 2018.

82.     On March 29, 2018, FES submitted to the Secretary a Request for Emergency Order Pursuant to Federal Power Act Section 202(c).  FES requested that the Secretary find that an emergency condition exists in the PJM region and issue a Section 202(c) order directing that certain existing nuclear and coal-fired generators in the PJM region enter into contracts with PJM

that provide for recovery of costs through cost-based rates.  The Secretary has not yet responded to the Request.

### iv.    State Developments

83.    In April 2017, legislation was introduced before the Ohio General Assembly that would create a zero-emission nuclear ("ZEN") credit to compensate nuclear power plants for environmental, energy security, and other attributes benefitting the state and its retail customers. The April 2017 legislation provided for ZEN credits to last up to 16 years.  The Ohio House Public Utilities Committee held hearings but did not advance the April 2017 legislation.   In October 2017, new legislation was introduced before the Ohio General Assembly providing for a similar ZEN program.  The new legislation provided for an approximately 12-year lifespan for the program.  The new legislation is pending with the Ohio House and Senate Public Utilities Committees.

84.    Similar ZEN-type programs have been implemented in Illinois and New York. Opponents of the Illinois and New York programs filed lawsuits in federal district courts in both states arguing, among other things, that the programs are preempted by FERC's exclusive jurisdiction under the Federal Power Act.  Both the federal district court in Illinois and New York dismissed the lawsuits last year, finding that the states had authority to implement the programs. Both decisions have been appealed to their respective federal circuit courts and the appeals remain pending.

### D.  Rail Arbitration

### i.    Arbitration Proceeding with BNSF and CSX

85.    On August 3, 2015, FG submitted to the American Arbitration Association ("AAA") in New York, New York, a demand for arbitration and statement of claim against BNSF

38

Railway Company ("BNSF") and CSX Transportation, Inc. ("CSX"), seeking a declaration that the Mercury and Air Toxics Standards ("MATS") constituted a force majeure event that excused FG's performance under its coal transportation contract with these parties. Specifically, the dispute arises from a contract for the transportation by BNSF and CSX of a minimum of 3.5 million tons of coal annually through 2025 to certain coal-fired power plants owned by FG in Ohio. The arbitration panel issued a decision on April 12, 2017, finding that FG's performance under the contract was not excused by force majeure and that it breached and repudiated the contract.

86.     On April 27, 2017, BNSF, CSX, FE Corp., and FG (the "BNSF-CSX Settlement Parties") entered into a term sheet setting forth the material terms and conditions of a settlement and directing the BNSF-CSX Settlement Parties to enter into a settlement agreement (the "BNSF-CSX Settlement Agreement"). On May 1, 2017, the BNSF-CSX Settlement Parties executed the BNSF-CSX Settlement Agreement where FG agreed to pay BNSF and CSX $109,000,000 in cash, in three installments. The first installment of $37,000,000 was paid on May 1, 2017. The second installment of $36,000,000 is to be paid on or before May 1, 2018 and the third installment of $36,000,000 is to be paid on or before May 1, 2019. The BNSF-CSX Settlement Agreement has been guaranteed by FE Corp., whereby FE Corp. has guaranteed the payment of the entire amount payable by FG under the BNSF-CSX Settlement Agreement.

**ii.     Arbitration Proceeding with BNSF and NS**

87.     On December 22, 2016, FG received a demand for arbitration and statement of claim from BNSF and Norfolk Southern Corporation ("NS"), who are the counterparties to a coal transportation contract covering the delivery of 2.5 million tons annually through 2025, for FG's coal-fired Bay Shore Units 2-4, deactivated on or about September 1, 2012, as a result of

the EPA's MATS and for FG's W.H. Sammis Plant. The demand for arbitration was submitted to the AAA office in Washington, D.C. against FG alleging, among other things, that FG breached the contract in 2015 and 2016 and breached and repudiated the contract for years 2017-2025.

88.     The counterparties are seeking, among other things, contractually specified liquidated damages through 2025, a declaratory judgment that FG's claim of force majeure is invalid, and a declaratory judgment that allocation of the Minimum Volume Requirements (as defined in the relevant contract) between the Bay Shore units and the W.H. Sammis Plant is invalid. FG intends to vigorously assert its position in this arbitration proceeding. The arbitration hearing is set to commence on June 18, 2018. If it were ultimately determined that the force majeure provisions or other defenses do not excuse the delivery shortfalls, the damages assessed against FG could be substantial.[32] The parties have exchanged settlement proposals to resolve all claims related to this proceeding, however, discussions were terminated prior to the petition date.

### E.  Negotiations with Creditor Groups

89.     Prior to the Petition Date, the Debtors commenced discussions with various creditors, including, without limitation, (i) an ad hoc group of certain holders of the Debtors' PCN debt and certain other notes (the "Ad Hoc Noteholder Group") and (ii) an ad hoc group of certain holders of pass-through certificates issued in connection with the sale-leaseback transaction for Unit 1 of the Bruce Mansfield Plant (the "Mansfield Certificateholders Group",

---

[32] With regard to both coal transportation agreements referenced in this section, FG paid approximately $70 million in the aggregate in liquidated damages to settle delivery shortfalls in 2014 related to its deactivated plants to account for full liquidated damages under the agreements for such year related to the plant deactivations. Liquidated damages for the period 2015-2025 remain in the NS arbitration.

together with the Ad Hoc Noteholder Group, the "Creditor Groups").[33]   The legal and financial advisors to the Creditor Groups and, recently certain individual members of the Creditor Groups, entered into non-disclosure agreements with the Debtors,[34] and over the past seven months, the advisors for the Creditor Groups have conducted substantial due diligence on the Debtors' operations, financial condition, and long term business plan, including having access to a data room populated by the Debtors and attending numerous diligence sessions relating to various topics of interest.  The Debtors have had discussions with the advisors for the Creditor Groups regarding various issues arising in connection with the Debtors' operations, including the sale of the assets owned by FG at Bay Shore, the Debtors' 2018 compensation plans, and the damage to the Bruce Mansfield Plant described below and, more recently, with certain individual members of the Creditor Groups who have signed non-disclosure agreements.   The advisors for the Creditor Groups, the Debtors and FE Corp. have engaged in discussions prior to the Debtors' chapter 11 filing about process and restructuring alternatives.   Additionally, more recently, the Debtors and their advisors engaged in discussions regarding the Debtors' chapter 11 filing and restructuring process with certain other stakeholders and their respective advisors, including certain indenture trustees and MetLife Capital, Limited Partners ("MetLife"), as owner participant under the Bruce Mansfield Sale-Leaseback Transaction.

90.     On March 30, 2018, the Debtors entered into an agreement (the "Process Support Agreement")[35]  with (a) certain members of the Ad Hoc Noteholder Group, (b) certain members of the Mansfield Certificateholders Group, (c) MetLife in its capacity as owner participant of 5

---

[33] The Ad Hoc Noteholder Group is represented by Kramer Levin Naftalis & Frankel LLP as legal counsel and GLC Advisors & Co., LLC as financial advisor.  The Mansfield Certificateholders Group is represented by O'Melveny & Myers LLP and Latham & Watkins LLP as legal counsel and Guggenheim Partners, LLC as financial advisor.

[34] The non-disclosure agreements with the individual members of the Creditor Groups contain a cleansing provision whereby all confidential information received by such parties will be subject to public disclosure.  That date is no later than April 2, 2018.

[35] A copy of the Process Support Agreement is attached hereto as **Exhibit D**.

41

of the 6 owner-lessor trusts under the Bruce Mansfield Sale-Leaseback Transaction, (d) U.S. Bank Trust National Association, in its capacity as owner trustee of 5 of the 6 owner-lessor trusts under the Bruce Mansfield Sale-Leaseback Transaction and (e) Wilmington Savings Fund Society, FSB, solely in its capacity as indenture trustee for certain notes and certificates issued in connection with the Bruce Mansfield Sale-Leaseback Transaction. The Process Support Agreement sets forth certain agreements and understandings with respect to the Debtors' and the Creditor Groups' conduct during the chapter 11 cases, including ensuring the Creditor Groups' support for the Debtors' First Day Motions (as defined herein), working cooperatively on the implementation of the Debtors' employee retention and severance programs, establishing a protocol for reorganization efforts relating to the Debtors' nuclear assets and potential sale processes for the Debtors' fossil and retail book assets, and confirming the payment of certain professional fees. The Process Support Agreement also incorporates a protocol (the "Mansfield Issues Protocol") that establishes a process for resolving certain claims arising from the rejection of the Mansfield Unit 1 lease documents, as well as processes for consultation and cooperation with respect to the operation of Mansfield Unit 1 pending disposition of the Mansfield plant during the chapter 11 cases and the insurance issues arising from the January 10, 2018 fire at the Mansfield plant (discussed below).

91. The purpose of the Process Support Agreement is to help guide the Debtors and the Creditor Groups through these chapter 11 cases by ensuring the support and cooperation of key stakeholders in these chapter 11 cases. The Process Support Agreement will also provide a framework for the Debtors to continue negotiations with their stakeholders around a plan designed to maximize recoveries for all creditors and preserve the value of the Debtors' business.

92.     Relatedly, on March 30, 2018 the Debtors entered into a protocol (the "Intercompany Protocol") and an agreement (the "Standstill Agreement")[36] with FE Corp. and the Creditor Groups to establish a process for coordinated and orderly discovery regarding claims between the Debtors, on the one hand, and FE Corp. and its affiliates on the other hand, and the resolution of such claims.  Under the Standstill Agreement, the parties agree to not seek the appointment of an examiner or otherwise commence litigation with respect to intercompany claims while the Standstill Agreement and the Intercompany Protocol remain in place.  The Intercompany Protocol also creates a mechanism for the applicable parties to consensually resolve claims and/or engage in mediation.

93.     The Debtors anticipate filing motions to authorize the Debtors to assume the Process Support Agreement and the Standstill Agreement in the coming days.

**F.  Bruce Mansfield Event**

94.     On January 10, 2018, a fire damaged the scrubber, stack, and other plant property and systems associated with Bruce Mansfield Units 1 and 2.  The event arose during a scheduled maintenance outage of Unit 1.  The fires were controlled and extinguished with the help of local fire departments, and there were no major injuries to plant personnel or the response team.  Unit 3 was offline during the event and was unaffected.

95.     Following the event, FES and FG assembled a group (the "Mansfield Recovery Team") composed of individuals from operations, insurance groups, senior management, legal advisors, and other FES advisors.  The Mansfield Recovery Team has started a structural analysis of Units 1 and 2, mobilized a supply chain team, engaged experts to evaluate essential equipment, reached out to the Pennsylvania Department of Environmental Protection, and taken

---

[36] A copy of the Standstill Agreement is attached hereto as **Exhibit E**.

43

appropriate steps to prepare a claim and pursue recovery from applicable insurance policies. Plant personnel are evaluating the extent of damage to the plant. At this time, management is unable to estimate the financial effects of the fire on Mansfield Units 1 and 2.

### G. Permanent Shutdown and Defueling of Nuclear Units in Advance of Decommissioning

96.    A nuclear power plant licensee is required to notify the NRC when it decides to permanently shut down a nuclear power plant in advance of facility decommissioning. Notifying the NRC of a permanent shutdown is a two-part process. First, once an NRC licensee decides to "permanently cease operations," it must submit a written certification to the NRC within 30 days of making this determination, and inform the NRC of the expected shutdown date. On March 28, 2018, FES notified PJM on behalf of NG and FENOC notified the NRC regarding the Debtors' decision to permanently cease operations and deactivate their four nuclear power units. In accordance with NRC regulations, FENOC will submit a written certification to the NRC regarding such decision within 30 days. The written certification initiates part one of the NRC permanent shutdown notification process. NG and FENOC are targeting June 1, 2020,[37] June 1, 2021,[38] and October 31, 2021,[39] respectively, as the dates by which the nuclear power units will shut down.

97.    Second, when nuclear fuel is permanently removed from the reactor vessel after permanent shutdown, an NRC licensee must submit another written certification to the NRC that the reactor has been permanently defueled. Under the NRC's regulation in 10 C.F.R. 50.82, this second certification effectively surrenders the licensee's authority to operate the reactor or load fuel into the reactor vessel. Accordingly, when all of the nuclear fuel is permanently removed

---

[37] For the Davis-Besse Nuclear Power Station
[38] For the Perry Nuclear Power Plant and Unit 1 of the Beaver Valley Nuclear Power Station
[39] For Unit 2 of the Beaver Valley Nuclear Power Station

from each of the four nuclear power units' reactor vessels, FENOC will submit the second written certification to the NRC for each unit.

98.     Prior to filing the second certification, FENOC maintains the ability to withdraw the first certification of permanent shutdown if circumstances change. In addition, the first certification does not by itself affect FENOC's or NG's licenses or the NRC requirements relating to the nuclear power units.

99.     Although filing of the first shutdown notice does not change the NRC license requirements, it does trigger certain NRC requirements related to decommissioning planning. Within two years of shutting down, licensees must submit a Post-Shutdown Decommissioning Activities Report to the NRC, and site-specific decommissioning cost estimate.

100.     FENOC is beginning to undertake the necessary steps to prepare for facility shutdown and defueling, and to commence facility decommissioning. These steps include implementing a retention plan to maintain plant staffing, preparing regulatory filings to help reduce operations and maintenance requirements, planning for optimal use of nuclear fuel and reducing future orders, submitting any necessary notices related to participation in power markets, and interacting with state and local officials and other stakeholders, including unions.

101.     In connection with the announced deactivation of the Debtors' four nuclear power units, on March 28, 2018, the FENOC Board approved a FENOC key employee retention plan (the "2018 FENOC KERP") for certain FENOC non-represented employees[40] to ensure that FENOC will be able to retain key employees through the defueling process.[41] These key

---

[40] FENOC will engage in negotiations with its unions with respect to the shutdown process and the impact on FENOC's represented employees.

[41] For a description of the 2018 FENOC KERP, please see the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (a) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (b) Pay and Honor Employee and Retiree Medical and Other Benefits, (c) Continue to Participate in FE*

45

employees must be retained in order to ensure that FENOC can continue to meet NRC license and/or health and safety requirements. The Debtors will seek Court approval of the 2018 FENOC KERP in the near future.

## H. Cash Position and Liquidity Developments

102.     In the months leading up to the date of the filing of these chapter 11 cases (the "Petition Date"), the Debtors faced several significant constraints on their liquidity. As of December 31, 2017, FES has unsecured debt ratings of Ca at Moody's, C at S&P and C at Fitch. These ratings, together with its negative outlook from each of the rating agencies, have posed issues related to its ability to hedge the generation business with retail sales and wholesale sales due to collateral requirements that otherwise reduce available liquidity.

103.     FES has approximately $516 million of PCNs subject to automatic puts or maturing between April and December 2018 and has approximately $1.3 billion of PCNs subject to automatic puts or maturing between 2019 and 2021. Additionally, FES has approximately $100 million of unsecured debt maturing in April 2018 and $300 million of unsecured debt maturing in 2021. Based on its current senior unsecured debt rating and current capital structure, as well as the forecasted decline in wholesale forward market prices over the next few years, FES would be unable to refinance, even on a secured basis, these debt maturities, further stressing its anticipated liquidity.

104.     On December 6, 2016, FE Corp. and certain subsidiaries entered into new syndicated credit facilities and concurrently terminated existing syndicated credit facilities that were to expire in March 2019. Specifically, FES and AES terminated an unsecured $1.5 billion credit facility with certain third-party financial institutions (commitments of $900 million and

_Corp.'s Employee Compensation, Welfare, Retiree Benefit and Pension Plans and Programs and (d) Continue to Participate in FE Corp.'s Workers' Compensation Program and Modify the Automatic Stay with Respect Thereto._

$600 million for FES and AES, respectively) and FES entered into a new, two-year secured credit facility with FE Corp. (the "FE-FES Secured Facility"). Pursuant to the FE-FES Secured Facility, FE Corp. provided (i) a committed line of credit to FES of up to $500 million and (ii) additional credit support of up to $200 million which were ultimately used to cover a $169 million surety with respect to Little Blue Run and a $31 million surety bond with respect to Hatfield, with both surety bonds benefiting the Pennsylvania Department of Environmental Protection, as designated in writing to FE Corp.[42]

105.    In connection with the cancellation of the prior FES/AES facility and entry into the new FE-FES Secured Facility, certain commitments and amendments associated with shared services and operational matters were made. First, FE Corp. reaffirmed its obligations under the Tax Allocation Agreement (as defined below). Second, amendments were made to the FES Shared Services Agreement to prevent termination until the earlier of December 31, 2018, or a change in control of FES or its subsidiaries. Third, amendments were made to the Fifth Amended and Restated Non-Utility Money Pool Agreement (the "Non-Utility Money Pool Agreement") to provide FES, FENOC, FG, and NG continued access to the Non-Utility Money Pool until the earlier of the establishment of a new money pool or December 31, 2018.

106.    On March 9, 2018, FES drew down $500 million under the FE-FES Secured Facility. On March 16, 2018, the Debtors exited the Non-Utility Money Pool and established the FES Money Pool. As of the Petition Date, FES had $554.4 million of cash on hand, and FENOC had $6.3 million of cash on hand.[43]

---

[42] Little Blue Run and Hatfield are landfill sites where the waste by-product of FG's coal powered plants was deposited. FG has certain remediation obligations with respect to those sites and has outstanding surety bonds with respect to such obligations.

[43] The Debtors also had $1.9 million in the Deposit Account (as defined herein) as of the Petition Date.

47

### I.  Financial Outlook and Business Strategy Moving Forward

107.    As a result of their strained financial condition, the Debtors considered a variety of potential strategic alternatives, including but not limited to: (i) legislative or regulatory solutions to increase revenue for generation assets, (ii) asset sales, (iii) plant deactivations, (iv) out-of-court debt restructuring transactions with creditors, and (v) chapter 11 bankruptcy protection.

108.    Together with their professionals, the Debtors reviewed and evaluated the benefits and costs associated with various restructuring scenarios. In doing so, the Debtors created detailed financial projections for use by advisors and creditor constituencies.  The Debtors' financial viability analysis involved the creation of multiple business plans accounting for a range of restructuring scenarios.

109.    After undergoing a comprehensive review of options to manage their current financial situation and their liquidity constraints, and having fully considered possible alternatives, the Debtors ultimately decided to file voluntary chapter 11 petitions with the Court to avail themselves of protections under the Bankruptcy Code.

110.    At this time, the Debtors believe they have the ability to pursue a dual-path exit from chapter 11 in which they have the option to pursue a creditor supported chapter 11 plan of reorganization while maintaining the option of pursuing merger and acquisition ("M&A") efforts for some or all of the assets owned by the Debtors.  Accordingly, the Debtors will utilize all available tools in chapter 11 to stabilize their business operations and will continue to engage with various stakeholder constituencies as they work toward a value-maximizing solution that most benefits the Debtors' estates and, by extension, their creditors.

48

111.    The Debtors have requested a variety of relief in "first day" motions and applications (the "First Day Motions"), filed concurrently herewith, to ensure a smooth transition into chapter 11.  I am generally familiar with the contents of each of the First Day Motions, and I believe that the relief sought therein, including the ability to make certain essential payments and otherwise continue their business operations, is necessary to permit continued efficient operations of the Debtors' businesses.

112.    In my opinion, approval of the relief requested in the First Day Motions will minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization. Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

**A.  *Motion of FirstEnergy Solutions Corp., et. al., for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases* (the "Joint Administration Motion")**

113.    The Debtors seek entry of an order directing joint administration of their related chapter 11 cases.  The Debtors also request that a docket entry be entered on the docket of each of the Debtors' cases other than the case of FES. The proposed docket entry reads:

> a.    An order (the "Joint Administration Order") has been entered into in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure directing the joint administration of the chapter 11 cases of FirstEnergy Solutions Corp.; FE Aircraft Leasing Corp.; FirstEnergy Generation, LLC; FirstEnergy Generation Mansfield Unit 1 Corp.; FirstEnergy Nuclear Generation, LLC; FirstEnergy Nuclear Operating Company; and Norton Energy Storage L.L.C.  The docket in Case No. 18-50757 should be consulted for all matters affecting this case.

114. The seven Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. As discussed above in Section I, the Debtors have highly integrated operations. As such, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will affect each and every Debtor. In addition, joint administration will reduce fees and costs by avoiding duplicative filings and objections. Joint administration will also allow the Office of the United States Trustee for the Northern District of Ohio and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Based on the foregoing, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

## Motions Concerning Operations

**B.** ***Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees* (the "<u>Taxes Motion</u>")**

115. The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to (a) continue negotiating and paying all Taxes and Fees (each as defined and discussed herein) accrued in the ordinary course of business on a postpetition basis by paying FESC, who remits the funds to the Taxing and Regulatory Authorities (as defined below); and (b) pay for all outstanding prepetition obligations accrued in the ordinary course of business on account of Taxes and Fees by paying FESC who remits the funds to the Taxing and Regulatory Authorities (as defined below).

116. In the ordinary course of business, the Debtors (a) incur and/or collect taxes, including sales, use, property, and miscellaneous taxes in the operation of their businesses (collectively, the "<u>Taxes</u>"); (b) incur business license fees, permit fees and other assessments and

50

charges (collectively, the "Fees") necessary to operate their businesses; and (c) make payments to FESC who in turn will remit such Taxes and Fees to various taxing, licensing, administrative, and governmental or similar authorities (collectively, the "Taxing Authorities," the "Regulatory Authorities," and, collectively, the "Taxing and Regulatory Authorities") on behalf of the Debtors.

117.    The Taxes that the Debtors typically incur fall into the following categories: (a) state and city income Taxes (the "State and City Income Taxes"); (b) sales and use Taxes (the "Sales and Use Taxes"); (c) real and personal property Taxes (the "Real and Personal Property Taxes"); (d) state and federal excise Taxes (the "State and Federal Excise Taxes"); and (e) federal income Taxes (the "Federal Income Taxes"). The Debtors estimate that their total prepetition State and City Income Taxes liability is approximately $0. In an average month, the Debtors incur an obligation of approximately $285,000 in Sales and Use Taxes to the Taxing Authorities. The Debtors estimate that approximately $339,000 in Sales and Use Taxes have accrued and remain unpaid as of the Petition Date, all of which will become due and owing during the Interim Period.[44] Approximately 47 tax jurisdictions where the Debtors' business operations are located possess the authority to levy property Taxes against the Debtor's real and personal property. The Debtors owe approximately $1,400,000 million in Real and Personal Property Taxes in the average month. The Debtors estimate that approximately $19,100,000 in Real and Personal Property Taxes have accrued and remain unpaid as of the Petition Date. Approximately $854,000 of these Taxes will become due and owing during the Interim Period. The Debtors also incur an assortment of State and Federal Excise Taxes. In an average month, the Debtors incur an obligation of approximately $1,300,000 in State and Federal Excise Taxes. The Debtors

---

[44] The Interim Period is the period between the Petition Date and entry of a final order (the "Interim Period").

estimate that approximately $4,300,000 in State and Federal Excise Taxes have accrued and remain unpaid as of the Petition Date. The Debtors estimate that none of the State and Federal Excise Taxes will become due and owing during the Interim Period. For each of the above Taxes, the Debtors pay FESC, who remits the Taxes to the Taxing Authorities.

118. Finally, the Debtors are parties to an intercompany tax allocation agreement with FE Corp. and its affiliates (the "Tax Allocation Agreement"). Under the terms of the Tax Allocation Agreement, an annual estimate is made of the Federal Income Taxes owed to the United States Government by each member of the consolidated tax group.[45] Such amount is paid to FESC on a quarterly basis and then in the following year there is a true up of the amount of Federal Income Taxes owed by each member of the consolidated tax group. FES has substantial net operation losses ("NOLs") and, under the terms of the Tax Allocation Agreement, is compensated in cash on a quarterly basis for the use of its NOLs along with other members of the consolidated tax group who have usable NOLs. There are no amounts which will become due and owing during the Interim Period, but FES has been informed by FESC that FES received an overpayment in 2017 for its NOLs, which overpayment could be as much as $48 million.

119. The Debtors must also obtain and maintain various business licenses, permits, and certificates and pay corresponding Fees in certain jurisdictions in which they operate. These Fees include: (a) state regulatory Fees (the "State Regulatory Fees"); (b) city and county regulatory Fees (the "City and County Regulatory Fees"); (c) nuclear agency Fees (the "Nuclear Agency Fees"); (d) vehicle Fees (the "Vehicle Fees"); and, (e) Department of Homeland Security Fees (the "Department of Homeland Security Fees," and altogether the "Regulatory License Fees"). The Debtors estimate that approximately $5,600,000 in Regulatory License Fees have

---

[45] Additionally, in Virginia and West Virginia, the Debtors use this allocation method to pay their state income taxes.

accrued and remain unpaid during the Interim Period. The Debtors estimate that approximately $3,600,000 in Regulatory License Fees will become due and owing during the Interim Period. The above-described fees are paid by the Debtors in the ordinary course of business by paying FESC who remits the Regulatory License Fees to the Regulatory Authorities.

120.     The Debtors' payment of Taxes and Fees is justified because certain of the Taxes and Fees are not property of the estate, pursuant to Section 541(d) of the Bankruptcy Code. The Debtors seek to pay Taxes and Fees to, among other things, forestall the Taxing and Regulatory Authorities from taking actions that might interfere with administration of the chapter 11 cases, which may include asserting liens on the Debtors' property, assessing penalties and/or significant interest on past-due taxes, or commencing personal liability actions against directors, officers, and other key employees. The Taxing and Regulatory Authorities could audit the Debtors or prevent the Debtors from continuing their businesses, which, even if unsuccessful, would unnecessarily divert the Debtors' attention away from the reorganization process. The Taxing and Regulatory Authorities could also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates. Further, any regulatory dispute or delinquency that affects the Debtors' ability to conduct business could have wide-ranging and adverse effects on the Debtors' operations as a whole. Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

C. ***Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services*** (the "<u>**Utilities Motion**</u>")

121.     The Debtors seek entry of an interim and final order: (a) determining that the Utility Providers (as defined below) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Proposed Adequate

Assurance (as defined below); (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Proposed Adequate Assurance; and (d) determining the Debtors are not required to provide additional adequate assurance.

122.    The Debtors, in connection with their business operations, incur utility expenses for electric, gas, water, telephone, internet, waste disposal and similar services (the "Utility Services") in the ordinary course of business from approximately 38 utility providers (the "Utility Providers").  The Utility Providers that deliver Utility Services to the Debtors as of the Petition Date are identified in Exhibit C attached to the Utilities Motion (the "Utility Service List").

123.    On average, the Debtors spend approximately $1.3 million monthly on Utility Services pursuant to approximately 140 separate accounts.[46] As of the Petition Date, the Debtors estimate that approximately $500,000 in utility costs have accrued and remain outstanding. The Debtors do not owe any past due amounts to the Utility Providers.

124.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business by paying FESC, which will remit payment to the Utility Providers. The Debtors expect that cash from operations and cash on hand will be sufficient to pay postpetition obligations related to their Utility Services. The Debtors propose to deposit $645,000 (the "Adequate Assurance Deposit") into a newly-created, segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within 20 days of the Petition Date.  The amount of the Adequate Assurance Deposit equals the estimated aggregate amount for two

---

[46] Of the $1.3 million of monthly Utility Services, approximately $0.9 million is on account of Utility Services rendered by the Non-Debtor Affiliate Utility Providers.

54

months of Utility Services for Utility Providers (excluding non-Debtor affiliate Utility Providers), calculated as a historical average over the past 12 months.

125.    The Adequate Assurance Deposit will be held for the benefit of Utility Providers during the pendency of these chapter 11 cases (excluding non-Debtor affiliate Utility Providers), provided that to the extent any Utility Provider receives any other form of adequate assurance payment, the Debtors may reduce the Adequate Assurance Deposit maintained in the Adequate Assurance Account by such amount.  The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future Utility Services in the ordinary course of business, any other prepetition or postpetition value provided by the Debtors to the Utility Providers, and other relief granted by the Court in favor of the Utility Providers (together, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance.

126.    If, however, a Utility Provider believes additional adequate assurance is required, the Debtors propose that such Utility Provider may request additional adequate assurance pursuant to the procedures set forth in the Utilities Motion.

127.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations, and any disruption in Utility Services would harm the Debtors' operations, revenues and cash flows, to the detriment of the Debtors' reorganization efforts and, ultimately, of recoveries to creditors.  Based on the foregoing, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

D.  ***Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue Their Prepetition Insurance Program and (II) Authorizing the Debtors to Pay Any Prepetition Premiums and Related Obligations* (the "Insurance Motion")**

128.    In the ordinary course of their operations, the Debtors maintain an insurance program (the "Insurance Program") that provides millions in dollars in coverage for, among other things, workers' compensation, directors and officers liability, fiduciary, crime, umbrella

55

and excess liability and various other liability, property, pollution and automobile insurance policies with respect to the Debtors' operations, described in part below (each, a "Policy" and collectively, the "Policies"). The Insurance Program comprises Policies obtained from many different insurance carriers (the "Carriers"). Consistent with historical practice, the Debtors intend to pay all insurance obligations (the "Insurance Obligations") by paying FESC, which will remit payment to the parties to which the Insurance Obligations are due or by paying the Carriers and/or the Brokers (as defined in the Insurance Motion) directly for the Policies. In the ordinary course of business, the Debtors' Insurance Obligations have been paid by FESC under the Shared Services Agreements and each Debtor pays FESC as part of the monthly shared services invoice for an allocated portion of the insurance costs. In addition, the Debtors have paid directly for a few of the Policies.

129.    The Debtors pay premiums to procure and maintain the Insurance Program that are fixed at the beginning of the policy year and are paid in one upfront, annual payment or in installments, depending on the Policy and whether the premiums are financed.    In the ordinary course of business, FESC, on behalf of the Debtors, pays the premiums either directly to Carriers and Brokers (as defined below) or through certain premium financing agreements (the "Premium Financing Agreements"), which allow the Debtors to spread payments over the course of the Policies instead of paying the entire premium in full upfront.[47]

130.    For 2018, the Debtors' share of the overall insurance cost estimates is $14,381,203. Prior to the Petition Date, in 2018, the Debtors renewed 25 of their Policies, (collectively, the "Renewed Policies"). In connection with the renewal of the Renewed Policies, the Debtors have a year to date allocation of $7,783,818 on account of annual premiums. One of

---

[47] Currently, none of the Debtors are parties to any Premium Financing Agreements.

the Policies will expire in the time period between April 1 and June 2018, and, as applicable, will need to be renewed. The Policy, an aviation insurance policy with Global Aerospace, Inc., will involve an annual premium payment of $108,900, which will need to be made during the Interim Period. The Debtors, through FESC, will need to make the annual premium payments at the time of renewal.

131. The Debtors' Insurance Program is managed through two insurance brokers, Aon Risk Services Northeast, Inc. ("Aon Risk Services"), Marsh LLC ("Marsh"), and JLT Group ("JLT"), and collectively, the "Brokers"). The Brokers assist FirstEnergy Group in determining the appropriate type and amount of insurance coverage for their businesses and assets and then negotiate with insurance companies to procure the optimal policies. The premiums are generally paid to the Brokers who then remit such payments to the Carriers. The Brokers are paid fees at the time of each renewal ("Broker Fees") and such fees are typically included in any financing when that payment is authorized in the ordinary course of business. As of the Petition Date, the Debtors have paid $202,056 in Broker Fees. The Debtors have no outstanding obligations with regards to Brokers Fees. However, the Debtors anticipate paying $288,192.50 for Brokers Fees for anticipated renewals through the remainder of 2018.

132. The Debtors seek to make payments required to continue their Insurance Program, including payment of any prepetition premiums, deductibles or other obligations, whether to the Carriers, the Brokers or FESC, and to continue postpetition their practice of paying brokerage fees and premiums to the Brokers and any other broker or agent engaged by the Debtors by paying FESC who remits the payments to such parties. Failure to pay premiums, related fees, deductibles, claims or other obligations under the Insurance Program could result in one or more of the Carriers increasing future premiums, declining to renew policies or refusing to enter into

57

new policies.  Moreover, if the policies lapse, the Debtors risk exposure to substantial liability at a later date to the detriment of all parties-in-interest.  Finally, in many cases, the coverage provided by the Policies is required by various regulations (including nuclear insurance requirements), laws and contracts (including credit agreements) that govern the Debtors' business conduct under applicable non-bankruptcy law.  Based on the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**E.  *Debtors' Motion to Approve Continued Surety Bond Program* (the "<u>Surety Bond Motion</u>")**

133.    The Debtors request interim and final orders authorizing the Debtors to continue and renew, in their sole discretion, their Surety Bond Program (as defined below) on an uninterrupted basis, including the maintenance and posting of collateral in accordance with applicable agreements.

134.    In the ordinary course of their businesses, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies (the "<u>Surety Bond Program</u>"). These include, without limitation: (a) obligations owed to municipalities; (b) obligations related to environmental regulatory agencies; and (c) obligations relating to obtaining permits or licenses.  Often, statutes or ordinances require the Debtors to post surety bonds to secure such obligations.  Failure to provide, maintain or timely replace these surety bonds would prevent the Debtors from undertaking essential functions related to their energy production operations.

135.    As of the Petition Date, the Debtors have approximately $223 million in outstanding surety bonds.  The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to a surety.  Unlike an insurance policy, if a

58

surety incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the principal. The Debtors are party to 14 master indemnity agreements that set forth the sureties' rights to recover from the Debtors (the "Surety Indemnity Agreements"). Pursuant to the Surety Indemnity Agreements, the Debtors agree to indemnify each surety from any loss, cost, or expense which the surety may incur on account of the issuance of any bonds on behalf of the Debtors.

136.    The premiums for the surety bonds are generally determined on an annual basis and are paid by the Debtors when the bonds are issued and annually. In the twelve months preceding the Petition Date, premiums for the Debtors' surety bonds totaled approximately $4.0 million. The Debtors estimate that no premium payments will be due during the period between the Petition Date and entry of the Final Order (the "Interim Period") but are seeking interim relief in case they are required to perform obligations under the Surety Indemnity Agreements during the Interim Period, including the posting of collateral.

137.    To continue their business operations during the reorganization process, the Debtors must be able to provide financial assurances to local governments, regulatory agencies, and other third parties. And, this in turn requires the Debtors to maintain the existing Surety Bond Program, and potentially to acquire additional bonding capacity as needed in the ordinary course of their business. Based on the foregoing, I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**F. *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business, and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen* (the "Shippers, Warehousemen, and Materialmen Motion")**

138.     The Debtors seek entry of interim and final orders authorizing the Debtors to: (a) grant administrative expense priority to all undisputed obligations for goods and services ordered prepetition and delivered to the Debtors at the final destination postpetition and satisfy such obligations in the ordinary course of business; and (b) pay prepetition claims of shippers, warehousemen, and materialmen (the "Shippers, Warehousemen, and Materialmen") in the ordinary course of business.[48]

139.     **Shippers**.  The Debtors' ability to produce and deliver energy in a timely manner depends on their timely receipt of raw materials, parts, equipment, supplies, fuel, and components that are important to the Debtors' business operations.  The Debtors rely on certain professional common carriers, shippers, truckers, logistics management companies, rail carriers, and certain other third-party service providers to ship, transport, and deliver goods.  Proposed counsel for the Debtors has advised me that the Shippers could potentially assert possessory liens over goods currently in their possession for amounts the Debtors owe to the Shippers under applicable state law.  The Debtors estimate that, as of the Petition Date, they owe approximately $1.3 million on account of shipping and logistics charges for goods ordered prepetition, all of which will become due and owing during the Interim Period.  The value of the goods being shipped do not necessarily exceed the amounts owed to the Shippers, but an inability to acquire

---

[48] In support of the Shippers, Warehousemen, and Materialmen Motion, the Debtors also submitted the *Declaration of Charles Moore in Support of the Debtors' Critical Vendor Motion; Shippers, Warehousemen, and Materialmen Motion; Intercompany Agreements Motion; and Cash Management Motion.*

these materials or parts from the Shippers could result in serious disruption to the Debtor's operations.

140. **Warehousemen.** To store certain of the same materials and parts transported by the Shippers, the Debtors use offsite storage space with certain warehouse facilities. Proposed counsel for the Debtors has advised me that, under certain state laws, the Warehousemen may be able to assert possessory liens against the warehoused property for amounts owed to the Warehousemen. The availability of these warehoused goods and materials are similarly important to the continued operation of the Debtors' businesses, and the amount due to the Warehousemen is significantly less than the value of the goods being stored. The Debtors estimate that, as of the Petition Date, they owe approximately $600,000 on account of Warehousemen claims, $0 of which will become due and owing during the Interim Period.

141. **Materialmen.** The Debtors' energy production depends upon third-party contractors, mechanics, machinists, and repairmen that repair, fabricate, or perform other services on certain parts, equipment, and other materials used in the Debtors' facilities. Proposed counsel for the Debtors has advised me that, under certain state laws, the Materialmen could potentially assert possessory liens against the Debtors and their property for amounts that the Debtors owe and may in accordance with applicable state law refuse to return the Debtors' property until they are paid for their services. The value of the property is greater than the amount of the Materialmens' claim for services rendered. The Debtors estimate that, as of the Petition Date, they owe approximately $2.6 million on account of outstanding prepetition invoices of the Materialmen, of which approximately $500,000 will become due and owing during the Interim Period.

18-50757-amk    Doc 55    FILED 04/01/18    ENTERED 04/01/18 16:06:01    Page 61 of 165

142.     Claimants may have perfected liens against certain of the Debtors' goods, equipment, and facilities, or may be able to perfect such liens postpetition.  The Debtors' ability to continue their operations in the aftermath of their commencement of these chapter 11 cases will largely depend upon the continued provision of the vital goods and services provided, even in the absence of such liens.  Accordingly, the Debtors seek to prevent the breakdown of their supply and maintenance network and the disruption of their customer base by requesting authority to pay Shippers, Warehousemen, and Materialmen as, in their business judgment, the Debtors determine is necessary and appropriate to: (a) obtain release of important or valuable goods, tooling, or equipment that may be subject to possessory liens and (b) maintain a reliable, efficient, continuous, and timely receipt of goods and services.[49]  Based on the foregoing, I believe that the relief requested in the Shippers, Warehousemen, and Materialmen Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**G. _Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Critical Vendor Claims_ (the "<u>Critical Vendor Motion</u>")**

143.     The Debtors seek entry of interim and final orders (together, the "<u>Critical Vendor Orders</u>") authorizing the Debtors to pay, in the ordinary course of business, certain prepetition claims held by Critical Vendors that are essential to the Debtors' ongoing business operations.[50]

144.     The Debtors purchase goods and services from more than 3,000 third-party vendors.  These third-party vendors provide a host of goods and services that are important to the

---

[49] The Debtors will provide the U.S. Trustee and counsel to any official committee of unsecured creditors appointed in these cases with a summary each calendar month of all payments made on account of Outstanding Orders (as defined in the Shippers, Warehousemen, and Materialmen Motion) or any payments made to any Shippers, Warehousemen, and Materialmen within five (5) business days after each month end.

[50] In support of the Critical Vendor Motion, the Debtors also submitted the _Declaration of Charles Moore in Support of the Debtors' Critical Vendor Motion; Shippers, Warehousemen, and Materialmen Motion; Intercompany Agreements Motion; and Cash Management Motion._

continued and uninterrupted operation of the Debtors' businesses. The Debtors estimate that they owe approximately $185 million to their third-party vendors as of the Petition Date.

145. The Debtors formed task groups led by senior management, one with respect to nuclear operations and one with respect to fossil operations, which included members of the Debtors' management involved in finance, commodity, and plant operations, members of Alvarez and Marsal, and members of the supply chain group from FESC. These two task groups spent significant time and effort reviewing the accounts payable and vendor lists for the nuclear operations and fossil operations, respectively. In order to determine which of those vendors are critical to the continued and uninterrupted operation of the Debtors' businesses, the two task groups examined each of the vendor relationships with the following criteria in mind:

> (a) whether a particular vendor is a sole source supplier or service provider;

> (b) whether the services provided by the vendor are so vital, or the vendors' operations are so commingled with the Debtors' business, that even the briefest disruption would cause significant harm to the Debtors' operations, which could cause an immediate risk to employees or the public safety;

> (c) whether the Debtors would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe;

> (d) whether the Debtors' inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor is located;

> (e) whether a vendor meeting the foregoing criteria is able or likely to refuse providing essential products or services to the Debtors if their prepetition balances are not paid; and

> (f) whether the business relationship between the Debtors and the supplier is governed by a contract.

146. Applying these criteria, the two task groups identified which vendors in their opinion are Critical Vendors. The Debtors estimate that they owe approximately $52 million to the Critical Vendors on account of goods and services delivered before the Petition Date. These

amounts represent approximately 28% of the Debtors' outstanding trade debt and approximately 1.3% of the Debtors' total funded indebtedness as of the Petition Date.

147.    In addition, FG and FENOC routinely schedule shutdowns of their generating units for inspection, maintenance and refueling (an "Outage").  Outages are regularly scheduled well in advance and the work to be performed on the generating units is critical to their ongoing operations. [51]

148.    FENOC has established an Outage schedule for the various nuclear power stations for the period 2018 – 2022 (the "Nuclear Refueling Outages").  The following Nuclear Refueling Outages are schedule during 2018: Davis-Besse from March 3, 2018 – April 2, 2018, Beaver Valley 1 from April 15, 2018 – May 14, 2018, and Beaver Valley 2 from October 21, 2018 – November 25, 2018.   The following Nuclear Refueling Outages are scheduled during 2019: Perry from March 9, 2019 – April 8, 2019 and Beaver Valley 1 from October 13, 2019 – November 9, 2019.   The following Nuclear Refueling Outages are scheduled during 2020: Davis-Besse from February 29, 2020 – April 1, 2020 and Beaver Valley 2 from April 12, 2020 – May 17, 2020.  The following Nuclear Refueling Outages are scheduled during 2021: Perry from March 6, 2021 – April 5, 2021, Beaver Valley 1 from April 11, 2021 – May 12, 2021, and Beaver Valley 2 from October 3, 2021 – November 7, 2021.  The following Nuclear Refueling Outages are scheduled during 2022: Davis-Besse from March 5, 2022 – April 19, 2022 and Beaver Valley 1 from October 9, 2022 – November 7, 2022.

149.    FG has established an Outage schedule for the various fossil generation stations for the period 2018 – 2019 (the "Fossil Outages").  The following Fossil Outages are planned for 2018: Sammis unit 7 from March 31, 2018 – May 15, 2018, Bay Shore unit 1 from May 11, 2018

---

[51] The scheduled dates for the Outages are subject to minor adjustments.

– May 21, 2018, Mansfield unit 3 from September 8, 2018 – November 3, 2018, and Sammis unit 6 from September 29, 2018 – November 10, 2018. The following Fossil Outages are planned for 2019: Bay Shore unit 1 from March 23, 2019 – May 27, 2019 and Mansfield unit 1 from September 7, 2019 – October 25, 2019.

150. The Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their businesses. The Debtors will use their commercially reasonable efforts to condition payment of Critical Vendors' Claims upon each Critical Vendor's agreement to continue supplying goods and services on terms that are acceptable to the Debtors in light of customary industry practices.[52]

151. The Critical Vendors generally fall into one of the following five categories: (a) vendors that provide goods and services related to planned maintenance outages; (b) vendors that provide services and related goods that are highly specialized and/or closely integrated with the Debtors' business operations and customer relationships; (c) sole source or geographically limited providers of critical goods; (d) vendors that provide goods and services related to regulatory compliance obligations; and (e) vendors that provide goods and services related to the Debtors' nuclear power plants.

152. **Outage Vendors.** In preparation for and during planned outages, the Debtors schedule maintenance, repairs, replacements, upgrades, refueling, refurbishing, and stress-testing

---

[52] The Debtors have agreed to maintain a matrix summarizing (a) the name of each Critical Vendor that receives a payment (or payments) pursuant to the Critical Vendor Orders; (b) the total amount paid to each Critical Vendor pursuant to the Critical Vendor Orders; and (c) the nature of the goods and/or services provided by each Critical Vendor to whom a payment under the Critical Vendor Orders is made (the "Critical Vendor Summary"). The Debtors will provide the Critical Vendor Summary each calendar month to the U.S. Trustee and counsel to any official committee of unsecured creditors appointed in these cases within five (5) business days of each month end and, upon reasonable written request by such parties, any executed Vendor Agreement. The Debtors request that this agreement to disclose payments be conditioned on the execution of a confidentiality agreement by any recipient of a Critical Vendor Summary and/or Vendor Agreements. The Debtors also request that the Debtors not be required to disclose any information that the Debtors deem to be proprietary or competitive in nature to any competitor or any individual member of any committee.

on their generation assets with vendors (the "Outage Vendors"), all in an effort to ensure that their assets are in optimal condition before peak electricity season begins and out of service for the least amount of time as possible. Any delay in goods and services from the Outage Vendors would likely extend a planned outage at significant cost to the Debtors' estates and/or unfavorably affect the operational reliability of the Debtors' generation assets. Additionally, certain of the Outage Vendors may not be subject to executory contracts and thus could refuse to continue doing business with the Debtors if they are not paid their prepetition claims.

153. **Specialized and Integrated Services Vendors.** The Debtors rely on specialized labor services and other services that are closely integrated with the Debtors' generation and retail business operations provided by certain Critical Vendors, (the "Specialized and Integrated Services Vendors"). In certain cases, the Debtors can only obtain services from Integrated Services Vendors who have certifications, permits, or licenses as required by state or federal laws and regulations, or where risks posed by the nature of the facilities require Integrated Services Vendors. Further, the Integrated Services Vendors have specific experiential knowledge about the Debtors' business operations, facilities, and customer demands that cannot be replaced. Finally, the Debtors believe that some of the Integrated Services Vendors will refuse to provide postpetition services to the Debtors if all or a portion of their prepetition claims are not satisfied.

154. **Critical Goods Vendors.** The Debtors rely on a number of Critical Vendors to supply essential raw materials, fuels, specialized replacement parts and supplies, operations consumables, and certain other goods and services required to operate the Debtors' plants and continue their business operations ("Critical Goods"). In many cases, there is no alternative provider for certain Critical Goods. In other cases, alternative suppliers cannot supply the required Critical Goods in sufficient quantity, quality, or reliability, or they are unable to supply

66

the required Critical Goods on a cost-efficient and timely basis in the appropriate geographic areas.

155.    **Regulatory Compliance Vendors.**   The Debtors rely on a number of Critical Vendors to assist the Debtors in complying with applicable governmental laws and regulations, (the "Regulatory Compliance Vendors").   For example, the Debtors rely on certain vendors to remove regulated waste and chemicals from the Debtors' facilities for proper disposal and vendors who perform emissions testing and other critical compliance activities.   Other vendors ensure the Debtors' compliance with requirements under applicable permits and regulations related to the Debtors' generation, wholesale, and retail activities and related services.   The Debtors believe that some of the Regulatory Compliance Vendors may refuse to perform postpetition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable governmental laws and regulations, and regulatory consequences that could result from even temporary noncompliance could have meaningful negative results for the Debtors.

156.    **Nuclear Plant Vendors.**   Certain Critical Vendors provide goods and services related to the Debtors' nuclear generation units at Davis-Besse, Perry, and Beaver Valley (the "Nuclear Plant Vendors").   These goods and services may include general operations, maintenance, repairs, inspections, refurbishments, fuel and parts, disposal services, quality control and assurance, physical plant security, and cyber security.   It is critical to both the Debtors' business, and as a matter of public safety, that the Debtors be permitted to pay the claims of Nuclear Plant Vendors as necessary to avoid complications, disruptions, or increased safety risks in the operation of their nuclear assets.   The Debtors' nuclear operations are subject to extensive oversight from the Nuclear Regulatory Commission and other regulatory bodies.

Operational difficulties with respect to the Debtors' current nuclear assets could have significant regulatory consequences for those assets. Based on the foregoing, I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**H.** ***Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Employee and Retiree Medical and Other Benefits, (C) Continue to Participate in FE Corp.'s Employee Compensation, Welfare, Retiree Benefit and Pension Plans and Programs, and (D) Continue to Participate in FE Corp.'s Workers' Compensation Program and Modify the Automatic Stay With Respect Thereto*** **(the "<u>Employee Wages and Benefits Motion</u>")**

157. The Debtors seek entry of interim and final Orders authorizing, but not directing, the Debtors to: (a) pay FESC for certain prepetition wages, salaries, reimbursable Employee (as defined below) expenses, and other compensation; (b) fund and/or reimburse FESC, as applicable, for paying and honoring Employee and retiree medical and other benefits (each as described in sub-clauses (a) and (b) defined herein, and collectively, the "<u>Employee Obligations</u>"); (c) continue to participate in Employee compensation, welfare, retiree benefit and pension plans and programs (each as defined herein, and collectively, the "<u>Employee Programs</u>") of FE Corp., and to continue the FES STIP (as defined below) and the FENOC STIP (as defined below), in the ordinary course of business on a postpetition basis and in a manner consistent with prepetition policies, and (d) continue to participate in FE Corp.'s workers' compensation program and modify the automatic stay with respect thereto.[53]

158. As of March 15, 2018, FirstEnergy employs 15,513 individuals. Of that number, the Debtors employ 3,076 employees (collectively, the "<u>Employees</u>"), including 57 by FES, 686

---

[53] In support of the Employee Wages and Benefits Motion, the Debtors also submitted the *Declaration of Brian L. Cumberland in Support of the Debtors' Employee Wages and Benefits Motion*.

by FG and 2,333 by FENOC. The large majority of the regular Employees are full-time, with the exception of one Employee who works part-time at FENOC.[54]

159.    As of March 15, 2018, 1,386 of the Debtors' Employees (the "Represented Employees") are represented by three labor unions: the International Brotherhood of Electrical Workers (the "IBEW"), the Utility Workers Union of America ("UWUA"), and the Office and Professional Employees International Union ("OPEIU", and together with the IBEW and the UWUA, the "Unions"). The Debtors are party to ten collective bargaining agreements that cover the Represented Employees (collectively, the "CBAs"):[55] six CBAs are entered into by Debtor entities that exclusively cover Represented Employees, three CBAs are entered into by both Debtor and non-Debtor entities and cover both Represented Employees and non-Debtor employees, and one CBA is entered into by a Debtor entity but covers both Represented Employees and non-Debtor employees.  More than half (i.e., 1,690) of the Debtors' Employees are not represented by Unions (the "Non-Represented Employees").

---

[54] FENOC employs ten paid, full-time student workers and 17 full-time, temporary Employees.

[55] The Debtors' CBAs include the following: (i) Agreement Between FirstEnergy Nuclear Operating Company and International Brotherhood of Electrical Workers, Local Union 29 ("Local 29"), executed September 15, 2014; (ii) Agreement Between FirstEnergy Nuclear Operating Company and International Brotherhood of Electrical Workers, Local Union 29 (Maintenance Planners) ("Local 29MP"), executed July 1, 2015; (iii) Agreement Between The Toledo Edison Company, FirstEnergy Nuclear Operating Company, FirstEnergy Generation, LLC, and FirstEnergy Service Company and International Brotherhood of Electrical Workers, AFL CIO, Local Union 245 ("Local 245"), dated November 5, 2015; (iv) Agreement Between First Generation LLC and International Brotherhood of Electrical Workers, Local 272 ("Local 272"), effective May 19, 2017; (v) Agreement Between FirstEnergy Generation, LLC and FirstEnergy Nuclear Operating Company and International Brotherhood of Electrical Workers, Local Union 1413 ("Local 1413"), executed August 25, 2016; (vi) Agreement Between Cleveland Electric Illuminating Co., FirstEnergy Service Company, FirstEnergy Nuclear Operating Company, and FirstEnergy Generation, LLC and Utility Workers Union of America, AFL CIO, Local Union 270 ("Local 270"), effective September 27, 2017; (vii) Agreement Between FirstEnergy Nuclear Operating Company and Utility Workers Union of America, AFL CIO, Local Union 270, Perry Technicians ("Local 270PT"), dated March 4, 2016; (viii) Agreement between FirstEnergy Generation Corp. and Utility Workers Union of America, Local 350-351 ("Local 350-351"), executed September 17, 2014 and effective July 1, 2015; (ix) Agreement Between FirstEnergy Generation Corp. and Utility Workers Union of America (A.F.L. – C.I.O.) Local Union 457 ("Local 457") – W. H. Sammis, dated 2015 – 2020; and (x) Agreement between the Toledo Edison Company, FirstEnergy Nuclear Operating Company, First Generation LLC, and FirstEnergy Service Company and Office & Professional Employees International Union Local 19 ("Local 19"), executed March 4, 2016.  On October 31, 2016, FENOC executed final stipulations of contract extension that shall constitute new Local 29 and Local 29MP CBAs, effective as of October 1, 2018 and March 1, 2019, respectively.

160.    The Debtors pay 1,647 Employees on an hourly basis and 1,429 Employees are salaried Employees. Of the hourly Employees, 832 are paid on a weekly basis and 815 are paid on a bi-weekly basis. All of the salaried Employees are paid on a bi-weekly basis. The Debtors have seven Employees who they believe constitute "insiders" as the term is defined in section 101(31) of the Bankruptcy Code (each, an "Insider" and collectively, the "Insiders").[56] The Debtors also make use of approximately 1,050 non-Employee independent workers (the "Contracted Workers") on average each month.

161.    **Salary and Wages**. The Debtors generally are current on all of their payroll obligations to the Employees. That said, as of the Petition Date, certain prepetition salary and wages obligations (the "Salary and Wages Obligations") have accrued and remain unpaid (the "Unpaid Salary/Wages"). Certain of the Debtors' Employees are compensated on an hourly basis and may be entitled to prepetition amounts on account of wages that have accrued but remain unpaid as of the Petition Date. Additionally, certain of the Debtors' Employees are compensated by way of an annual salary on a weekly basis. On average, the Debtors pay approximately $2.063 million on a weekly basis and approximately $14.438 million on a bi-weekly basis on account of Salary and Wages Obligations.  As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $16.500 million on account of Unpaid Salary/Wages, approximately $16.500 million of which will become due and owing within the period between the Petition Date and entry of the final order (the "Interim Period"). Pursuant to an interim order, the Debtors seek authority, but not direction, to continue to pay Salary and Wages Obligations in the ordinary course of business on a postpetition basis, and to remit to FESC any Unpaid Salary/Wages accrued in the ordinary course of business that come due during the Interim

---

[56] The following seven executives are considered to be "insiders" as defined by the Bankruptcy Code: Donald Schneider, Donald Moul, Paul Harden, Kevin Warvell, Peter Kotsenas, James Mellody and Raymond Lieb.

70

Period, up to $12,850 per eligible Employee (approximately $16.500 million in the aggregate), and FESC will pay the Debtors' Employees such Unpaid Salary/Wages. Pursuant to a final order, the Debtors seek authority, but not direction, to continue to pay Salary and Wages Obligations in the ordinary course of business on a postpetition basis and to pay to FESC all Unpaid Salary/Wages owed to Employees, including amounts owed to Employees above $12,850 (if any), and FESC will pay the Debtors' Employees for such Unpaid Salary/Wages.[57]

162.     **Nuclear Bonuses and Premiums.** For certain specialized positions at nuclear plants, the Debtors compensate the Employees working in these positions with premium payments and/or bonuses (the "Nuclear Bonuses and Premiums") in addition to their regular salary. FENOC has offered the Nuclear Bonuses and Premiums since 2005, and it is the Debtors' understanding that the vast majority of nuclear sites operated by other employers offer programs similar to the Nuclear Bonuses and Premiums for their employees.[58] Highly skilled workers holding certain licenses and/or certifications are required for various positions at nuclear plants; accordingly, competition is high among employers for such highly skilled nuclear workers.

163.     Employees may become eligible for premium payments in connection with special certifications or licenses that are required by the NRC. The Debtors must maintain a minimum number of licensed and certified personnel to operate each of its nuclear plants to comply with their technical specifications. Proper staffing of highly skilled Employees at a nuclear plant is of paramount importance. For example, the Debtors must maintain an around-the-clock emergency response organization with a full team on-call at all times and must regularly staff technical teams around the clock to promptly resolve equipment issues. Without

---

[57] The Debtors do not believe that they owe any individual Employee more than $12,850 at this time, but seek such relief in the Final Order out of an abundance of caution.

[58] FirstEnergy participates in an annual nuclear industry survey regarding compensation as part of its annual benchmarking analysis.

proper staffing of positions requiring special licenses and certifications, the Debtors could be required to put their plants in a lower mode of operation (i.e., shutdown). The highly trained and qualified individuals needed for important positions in the nuclear industry are in short supply and the market is ripe with opportunities. Moreover, many positions at each plant require special licensing tailored to a particular plant, and it can take years to train new talent to adequately perform these important roles.

164.    Accordingly, the Debtors maintain premium payment programs for those Employees who have earned and maintained the following credentials: (i) a senior reactor operator ("SRO") license to operate a nuclear plant and direct its activities in accordance with all NRC and site regulations, (ii) a reactor operator ("RO") license to operate a nuclear reactor's controls and (iii) a shift engineer ("SE") certification required to provide technical and engineering advice for safe plant operations as a shift technical advisor ("STA").[59] The NRC, which issues the foregoing credentials, requires that SRO licenses or RO licenses be held by any Employee who staffs the role of an SRO or RO, respectively, in the Debtors' nuclear plants, and further requires that SE certifications be held by any Employee who staffs the role of an STA.

165.    Premium amounts are determined after an assessment of whether the eligible Employee is deemed to be "active" or "inactive" in the respective position for which he or she is licensed or certified based on the amount of time he or she spends serving in the role each quarter.[60] Employees who are active SRO license holders are paid a premium of $1,300 per month and inactive SRO license holders are paid a premium of $550 per month (the "SRO

---

[59] SE certifications require reduced coursework and testing requirements as compared to SRO and RO licenses.

[60] An "active" license or certification holder is an Employee who stands a regular control room watch for a minimum of seven 8-hour shifts per quarter or five 12-hour shifts per quarter, whereas an "inactive" certification or license holder is not a regular control room watch stander and does not meet the foregoing watch requirements.

72

License Premiums").[61] Non-Represented Employees who are active RO license holders are paid a premium of $850 per month and inactive RO license holders are paid a premium of $350 per month (the "RO License Premiums").[62] Employees who are active STAs are paid a premium of $575 per month and inactive STAs are paid a premium of $395 per month (the "SE Certification Premiums").[63] Employees who are appropriately licensed but no longer perform the specific duties of an SRO or RO may be eligible for reduced premium continuation payments (one year at 75% of the Employee's last premium rate received and one year at 50% of the Employee's last premium rate received) for a maximum of two years (the "License Premium Continuations", together with the SRO License Premiums, the RO License Premiums and the SE Certification Premiums, the "NRC License/Certification Premiums") at the discretion of the director of site operations.

166. As of the Petition Date, 137 Employees currently receive SRO License Premiums, 79 Employees currently receive RO License Premiums, one Employee currently receives an SE Certification Premium and 18 Employees currently receive License Premium Continuations. No amounts are due and outstanding to FESC on account of the NRC License/Certification Premiums as of the Petition Date (the "Unpaid NRC License/Certification Premiums").

167. Employees who possess SRO licenses, RO licenses and/or SE certifications benefit the Debtors' operations with their expertise regarding safe nuclear operations and are required by the NRC. Accordingly, the Debtors are seeking relief pursuant to an interim order to pay any Unpaid NRC License/Certification Premiums that become due and payable during the

---

[61] License premium payments are paid retroactively to the first of the month following confirmation of the individual's license or certification by the manager of site operations.

[62] Represented Employees who hold RO licenses receive an hourly equivalent in both cases.

[63] License premium payments are paid retroactively to the first of the month following confirmation of the individual's license or certification by the manager of site operations.

Interim Period, and relief pursuant to a final order to pay all Unpaid NRC License/Certification Premiums.[64]

168.    **Certified Nuclear Instructor Premiums.** Employees who are certified nuclear instructors (each, a "Certified Nuclear Instructor") are eligible to receive monthly premium payments of $800 if they (a) hold a SRO license or an SRO certification, (b) meet all applicable requirements of the Debtors' license operator program and instructor training program and (c) perform all classroom, simulator or other instructor duties required by nuclear training management (the "Unit Instructor Premiums"). Premium payments of $1,200 per month are made to the 15 Certified Nuclear Instructors who meet the above criteria for both Unit 1 and Unit 2 at Beaver Valley (the "Dual-Unit Instructor Premiums"). Certified Nuclear Instructors receiving premiums who voluntarily transfer to other positions may continue to receive prorated Instructor Premiums or Dual Unit Instructor Premiums (the "Instructor Premium Continuations, and together with the Unit Instructor Premiums and the Dual-Unit Instructor Premiums, the "Certified Nuclear Instructor Premiums"), as applicable, for one year with the approval of a manager.[65] As of the Petition Date, 23 Employees currently receive Unit Instructor Premiums, 15 Employees currently receive Dual-Unit Instructor Premiums and one Employee currently receives an Instructor Premium Continuation. No amounts are due and outstanding to FESC on account of the Certified Nuclear Instructor Premiums as of the Petition Date (the "Unpaid Certified Nuclear Instructor Premiums"). The Certified Nuclear Instructors help equip the Debtors' workforce with critical knowledge and expertise. Accordingly, the Debtors are seeking relief pursuant to an interim order to pay any Unpaid Certified Nuclear Instructor Premiums that

---

[64] The Debtors will pay FESC all amounts on account of the Nuclear Bonuses and Premiums, and FESC will remit such payments to Employees.

[65] Certified nuclear instructors who receive SRO/RO License Premiums are ineligible for the Certified Nuclear Instructor Premiums, and vice versa.

become due and payable during the Interim Period and relief pursuant to a final order to pay all Unpaid Certified Nuclear Instructor Premiums. [66]

169. **SRO/RO Initial License Class Bonuses.** Employees are eligible for a bonus as an incentive for obtaining an RO license or an SRO license and for utilizing such license for the benefit of the Debtors' businesses. Employees who successfully complete their first SRO license class at a FENOC-operated plant and pass the NRC's SRO license exam for the designated nuclear power plant are eligible to receive a one-time payment of $10,000 (the "SRO Initial License Class Bonuses"). Similarly, Employees who successfully complete their first RO license class at a FENOC-operated plant as a Non-Represented Employee and pass the NRC's RO license exam for the designated nuclear power plant are eligible to receive a one-time payment of $5,000 (the "RO Initial License Class Bonuses", and together with the SRO Initial License Class Performance Bonuses", the "SRO/RO Initial License Class Bonuses"). The SRO/RO Initial License Class Bonuses are paid by FESC, on behalf of the Debtors, as soon as administratively possible upon documentation of the Employee's receipt of an SRO license. In exchange for the SRO License Bonus, an Employee agrees to perform in the capacity and location so designated by the Debtors for a minimum of two years from receipt of the SRO license. As of the Petition Date, the Debtors estimate that no amounts are due and outstanding to FESC on account of the SRO License Bonus Plan (the "Unpaid SRO/RO Initial License Class Bonuses"). The SRO/RO Initial License Class Bonuses, along with other programs for SROs and ROs, are primarily designed to incentivize Employees' pursuit and maintenance of licenses required by the NRC to safely operate the Debtors' nuclear plants. Accordingly, the Debtors are seeking relief pursuant to an interim order to pay any Unpaid SRO/RO Initial License Class Bonuses that become due

---

[66] The Debtors will pay FESC all amounts on account of the Nuclear Instructor Premiums, and FESC will remit such payments to Employees.

and payable during the Interim Period and relief pursuant to a final order to pay all Unpaid SRO/RO Initial License Class Bonuses.[67]

170. **SRO/RO Annual Requalification Bonuses.** Employees who hold SRO licenses and RO licenses are eligible for an annual requalification bonus in connection with the maintenance of their licenses with the NRC. SRO license holders who meet certain performance criteria on the first requalification attempt are paid a bonus of up to $3,500 (the "SRO Annual Requalification Bonuses"). Similarly, RO license holders who meet certain performance criteria on the first requalification attempt are paid a bonus of up to $2,000 (the "RO Annual Requalification Bonuses", and together with the SRO Annual Requalification Bonuses, the "SRO/RO Annual Requalification Bonuses"). In 2017, 105 Employees received SRO Annual Requalification Bonuses and 16 Employees received RO Annual Requalification Bonuses. As of the Petition Date, the Debtors estimate that no amounts are due and outstanding to FESC on account of the SRO/RO Annual Requalification Bonuses (the "Unpaid SRO/RO Annual Requalification Bonuses"). The requisite study and training associated with earning and keeping SRO licenses and RO licenses are critical to the safety and efficiency of the Debtors' nuclear operations. Accordingly, the Debtors are seeking relief pursuant to an interim order to pay any Unpaid SRO/RO Annual Requalification Bonuses that become due and payable during the Interim Period and relief pursuant to a final order to pay all Unpaid SRO/RO Annual Requalification Bonuses.[68]

171. **FES Sales Incentive Plan.** Fifteen of the Debtors' non-Insider Employees who work in a customer-facing sales capacity at FES earn commission payments (the

---

[67] The Debtors will pay FESC all amounts on account of the SRO/RO Initial License Class Bonuses, and FESC will remit such payments to Employees.

[68] The Debtors will pay FESC all amounts on account of the SRO/RO Annual Requalification Bonuses, and FESC will remit such payments to Employees.

"Commissions") from a performance-based plan (the "Sales Incentive Plan"). The Debtors have historically used this plan to drive sales efforts and motivate those Employees who have made significant individual and team contributions to FES's sales efforts. These Employees are highly marketable given the fiercely competitive retail market, and failure to compensate such Employees in accordance with prepetition practices could result in the departure of Employees with valuable knowledge and skills. Importantly, none of the Employees who are eligible to participate in and receive Commissions from the Sales Incentive Plan are Insiders. Instead, these Employees work on Commissions earned through their efforts from interfacing with the Debtors' diverse customer base. These Employees are eligible to receive Commissions in their paychecks on a monthly basis, and, as a result, there may be prepetition amounts that have accrued but remain unpaid. Participating Employees are paid Commissions on a monthly basis based on monthly volumes (based on MWh) from customers with eligible contracts. Additionally, Employees that are no longer participating in the Sales Incentive Plan due to employment status changes may be owed final payments of Unpaid Commissions (as defined below) in accordance with the provisions contained in the Sales Incentive Plan. As of February 28, 2018, the Debtors estimate that approximately $44,000 is due and outstanding on account of the Sales Incentive Plan in 2018, approximately $44,000 of which will become due and payable during the Interim Period (the "Unpaid Commissions"). The Employees who participate in the Sales Incentive Plan possess significant knowledge regarding FES and the Debtors' industry, as well as have strong relationships with FES's customer base. Accordingly, the Debtors are seeking relief pursuant to an interim order to pay any Unpaid Commissions that become due and payable during the Interim Period and relief pursuant to a final order to pay all Unpaid Commissions.[69]

---

[69] The Debtors will pay FESC any amounts due on account of Unpaid Commissions and FESC will remit such payments to Employees.

77

172.  **The STIPs.** FE Corp. maintains a short-term annual incentive program (the "FE Corp. STIP") in which participants are eligible for annual bonus awards based on the achievement of certain financial, safety and operational goals known as Key Performance Indicators ("KPIs").[70] Prior to 2017, all of the Debtors' Employees participated in the FE Corp. STIP, along with all of the Employees of FE Corp. and its non-debtor subsidiaries.

173.  FE Corp. STIP awards are calculated based on the annual achievement of KPIs and modified according to the STIP pool of funds available. Under the FE Corp. STIP, each KPI has a threshold, target and stretch level of achievement.[71] Award payouts for individual FE Corp. STIP participants are determined by multiplying the participant's total percentage achievement of the KPIs by the applicable incentive target opportunity, the latter of which is calculated by multiplying the participant's end-of-year base salary and STIP target percentage. Awards are then calculated based on applied KPI weightings.  FE Corp. STIP awards for each program year are paid no later than March 15th of the following year.[72]

174.  In 2017, FES and FENOC created two short-term annual incentive programs (the "FES STIP" and the "FENOC STIP", respectively, and collectively with the FE Corp. STIP, the "STIPs") in which most of the Debtors' Employees, other than the Represented Employees, now

---

[70] Represented Employees who currently participate in the FE Corp. STIP are assigned the same metrics applied in the FES STIP (defined below) or the FENOC STIP (defined below), as applicable. However, for Represented Employees, FE Corp. must first meet threshold Regulated Distribution & Regulated Transmission Operating Earnings, including the cost of the FE Corp. STIP, before funds are paid. If the pool of funds available is not sufficient to pay the full FE Corp. STIP as earned, a uniform reduction will be applied to the payout of all KPIs.

[71] Threshold payout is determined as 50% of the target payout and stretch payout is determined as 150% of the target payout.

[72] Upon death, disability, retirement, involuntary termination, sale or shutdown, FE Corp. STIP awards are pro-rated at their actual value. In connection with a sale or shutdown, a pro-rated STIP payment will be made based on actual performance if the Employee has accepted a job offer from the purchasing entity or receives Severance Benefits (defined below) under the existing Severance Program (defined below). Upon termination for cause or voluntary termination, the FE Corp. STIP award is forfeited.

participate.[73] The FES STIP and the FENOC STIP retain a similar construct to the FE Corp. STIP, but evaluate performance based on KPIs that are tailored to FES and/or FENOC goals, as applicable. The Debtors' Represented Employees remain contractually eligible to participate in the FE Corp. STIP pursuant to the terms of their CBAs, but will be evaluated based on the FES STIP and/or FENOC STIP KPIs, as applicable. Approximately 1,363 Represented Employees currently participate in the FE Corp. STIP at a target 2018 annual cost of $6.4 million.

175. Non-Represented Employees of FES and FG are eligible to participate in the FES STIP. Performance goals for the FES STIP consist of the following KPIs: (i) Business Unit Safety (Occupational Safety and Health Administration ("OSHA") Incident Rate);[74] (ii) Business Unit Safety (Days Away/Restricted or Job Transfer ("DART") Rate);[75] (iii) Environmental Excursions;[76] (iv) Capital Spend;[77] and (v) Generation Performance.[78] Each KPI has a threshold, target and stretch levels of achievement.[79] If threshold performance is not achieved for a KPI, no

---

[73] Non-Represented FES and FG Employees participate in the FES STIP, and Non-Represented FENOC Employees participate in the FENOC STIP. Approximately 109 management-level Employees participate in the 2018 FES AIP (as defined below) or the 2018 FENOC AIP (as defined below). The Debtors intend to seek approval to continue these incentive compensation programs and to continue to participate in the 2016-2018 FE Corp. LTIP, along with approval of key employee retention plans and other retention arrangements, in a subsequent motion.

[74] Depending on the business unit, this KPI measures the FES/Competitive FES Fossil/FENOC OSHA rate or the Competitive FES Fossil OSHA rate. OSHA recordable incidents are accidents that result in medical treatment, or at least one day of lost time or restricted duty excluding the day of injury, or an employee fatality.

[75] Depending on the business unit, this KPI measures the FES/Competitive FES Fossil/FENOC DART rate or the Competitive FES Fossil DART rate. DART cases are work-related injuries or illnesses that result in at least one day of lost time, or transfer of restriction excluding the day of the injury. DART cases exclude fatal and medical treatment-only injuries.

[76] This KPI measures the number of excursion incidents, which include all regulatory reportable air emissions, water discharges, or other unauthorized releases from fossil and nuclear sites that exceed the allowable limitations, conditions, or deadlines established in the facilities' environmental permits.

[77] This KPI measures cost owner operations and maintenance and capital spend by FES and its generation plants and support groups.

[78] This KPI measures the nuclear unit capability factor, which is the ratio of the nuclear energy generation produced over a refuel cycle to the reference energy generation (potential energy generation) over the same time period, expressed as a percentage.

[79] Special rules exist with respect to Business Unit Safety KPIs. First, in the event that a life-changing event occurs within specified business units, Employees would see a 5% reduction in their total STIP award payout. Second, if an Employee fatality occurs (other than a "no fault event") during the relevant year, no Employee participating in the STIPs will receive a payout of the appropriate Business Unit Safety KPI.

payout will be awarded for such KPI. FES STIP awards, which will be calculated based on the performance period achievement of the KPIs, will be paid no later than March 15, 2019.[80] Approximately 219 Non-Represented Employees currently participate in the FES STIP at a target 2018 annual cost of $2.7 million.

176.     Non-Represented Employees of FENOC are eligible to participate in the FENOC STIP. Performance goals for the FENOC STIP consist of the following KPIs: (i) Business Unit Safety (OSHA Incident Rate);[81] (ii) Business Unit Safety (DART Rate);[82] (iii) Environmental Excursions;[83] (iv) Capital Spend;[84] and (v) Generation Performance.[85] Each KPI has a threshold, target and stretch levels of achievement.[86] If threshold performance is not achieved for a KPI, no payout will be awarded for such KPI.  FENOC STIP awards, which will be calculated based on the performance period achievement of the KPIs, will be paid no later than March 15, 2019.[87] Approximately 1,352 Non-Represented Employees currently participate in the FENOC STIP at a target 2018 annual cost of $19.0 million.

177.     In 2017, the STIPs had 3,218 participants with a total payout of $50.1 million. For the employees who did not participate in the LTIPs (as defined below), the total 2017 payout on

---

[80] FES STIP award payouts are determined by multiplying the total percentage achievement of the FES safety, operational and financial KPIs by the applicable STIP target opportunity. The incentive target opportunity is determined by multiplying the Employee's base salary effective on December 31, 2017 and his/her FES STIP target percentage(s). Threshold payout is determined as 50 percent of the target payout and stretch payout is determined as 150 percent of the target payout. Awards are then based on applied KPI weightings.

[81] This KPI measures the FENOC OSHA rate.

[82] This KPI measures the FENOC DART rate.

[83] This KPI measures the number of excursion incidents, as in the case of the FES STIP.

[84] This KPI measures cost owner operations and maintenance and capital spend by FES and its generation plants and support groups, as in the case of the FES STIP.

[85] This KPI measures the nuclear unit capability factor, as in the case of the FES STIP.

[86] The same special rules exist with respect to Business Unit Safety KPIs in the FENOC STIP as in the FES STIP.

[87] FENOC STIP award payouts are determined by multiplying the total percentage achievement of the FENOC safety, operational and financial KPIs by the applicable STIP target opportunity. The incentive target opportunity is determined by multiplying the Employee's base salary effective on December 31, 2017 and his/her FENOC STIP target percentage(s). Threshold payout is determined as 50% of the target payout and stretch payout is determined as 150% of the target payout. Awards are then calculated based on applied KPI weightings.

account of the STIPs was $41.3 million. The total combined target cost for the STIPs in 2018 will be approximately $28.1 million. The Debtors will pay FESC for the Employee bonuses earned through the STIPs, and FESC will remit to the Employees the bonuses earned.

178.    The Debtors believe that the STIPs will incentivize strong Employee performance by tying accomplishment of critical goals with bonus awards, thereby maximizing the value of the Debtors' businesses for all parties in interest. Accordingly, the Debtors are seeking authority pursuant to a final order to continue the FES STIP (with respect to Non-Represented FES Employees) and the FENOC STIP (with respect to Non-Represented FENOC Employees), continue participation in the FE Corp. STIP (with respect to Represented FES and FENOC Employees) and pay FESC for any amounts payable under the STIPs.[88]

179.    **Contracted Labor.** Each month, through various contracts, an average of approximately 1,050 Contracted Workers[89] conduct a range of important services for the Debtors.[90] The Debtors utilize the work of Contracted Workers on a contingent basis, project basis or through service contracts. The Contracted Workers perform a variety of administrative, accounting, legal, finance, maintenance, management support, security and other related tasks. The Contracted Workers provide key expertise for operations and maintenance projects in addition to carrying out routine administrative tasks.  On behalf of the Debtors, FESC engages Contracted Workers through managed service providers such as Pontoon Solutions, Inc. ("Pontoon").   For the labor provided by certain of the Contracted Workers, Pontoon pays

---

[88]  The Debtors will pay FESC all amounts on account of the STIPs and FESC will remit such payments to Employees.

[89]  None of the Contracted Workers are Employees of the Debtors and none of the Contracted Workers are Insiders. The 1,050 Contracted Workers comprise, on average, 972 non-Employee workers hired through various vendors to work in connection with routinely scheduled Outages and 78 non-Employee workers hired to perform other services.

[90]  Depending on the nature of the work and the expertise or skill set necessary for that work, contingent or project Contracted Workers could be independent contractors if they meet the IRS regulations to be classified as independent contractors.   Otherwise, Contracted Workers are the employees of the supplier, not independent contractors.

Zempleo, Inc. ("Zempleo"), who in turn pays the Contracted Workers. In addition, sometimes the Debtors engage workers directly on a contract basis and FESC pays Zempleo, who in turn pays such Contracted Workers. FESC, on behalf of the Debtors, pays the Pontoon and Zempleo invoices, which are spread via cost center to appropriate business units. Contracted Workers are also hired through statements of work ("SOWs") or purchase orders ("POs") for assignments of a project nature or where the Debtors elect to outsource as a recurring service and the invoices for such Contracted Workers are paid by FESC. In the ordinary course of business, FESC executes SOWs or POs on behalf of the Debtors.[91]

180.    On average, the Debtors pay FESC approximately $576,000 per month for compensation owing to the Contracted Workers, excluding compensation owing to the Contracted Workers who are Outage Vendors or work for Outage Vendors (collectively, the "Contracted Worker Fees")[92]. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $1.1 million in Contracted Worker Fees for services provided before the Petition Date (collectively, the "Unpaid Contracted Worker Fees").

181.    The Contracted Workers' skills, knowledge and understanding with respect to the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' business. In addition, many of the Contracted Workers may suffer financial hardship without immediate payment for their services. Pursuant to an interim order, the Debtors seek authority, but not direction, to continue to pay the Contracted Worker Fees in the ordinary course of business on a postpetition basis, and to remit to FESC any Unpaid Contracted Worker Fees accrued in the ordinary course of business, and FESC will pay the

---

[91] Certain SOWs or POs may involve Contracted Workers that work at Debtor and non-Debtor entities.

[92] Amounts owing to Contracted Workers hired in connection with the Outages are not included in the calculation of aggregate average Contracted Worker Fees to the extent that they would be duplicative of amounts due to Outage Vendors as defined in the Critical Vendors Motion.

Debtors' Contracted Workers for such amounts. Pursuant to a final order, the Debtors seek authority, but not direction, to continue to pay the Contracted Worker Fees in the ordinary course of business on a postpetition basis and to pay to FESC all Unpaid Contracted Worker Fees owed to Contracted Workers and to provide FESC with authority and direction to pay the Debtors' Contracted Workers for such amounts, as directed by the Debtors.

182.    **Independent Director Fees.** The FES Board of Directors (the "FES Board") is comprised of two Insider directors[93] (the "FES Insider Directors") and two independent directors[94] (the "FES Independent Directors") who attend regular and special Board meetings, consider and analyze critical issues and vote on important strategic decisions that FES faces. The FES Independent Directors receive the following payments for their services (the "FES Independent Director Fees and Expense Reimbursement"): (i) an annual payment of $400,000, paid in equal quarterly installments, in arrears; and (ii) reimbursement for reasonable expenses incurred in connection with meetings attended in person, paid quarterly, in arrears. FES pays FESC, who then remits the FES Independent Director Fees and Expense Reimbursement to the FES Independent Directors.

183.    The FENOC Board of Directors (the "FENOC Board") is comprised of two Insider directors[95] (the "FENOC Insider Directors") and two independent directors[96] (the "FENOC Independent Directors", and together with the FES Independent Directors, the "Independent Directors") who attend regular and scheduled Board meetings, consider and

---

[93] The FES Insider Directors are Donald Schneider and Donald Moul. The FES Insider Directors receive no compensation for their service as directors.

[94] The FES Independent Directors are John Blickle and James Boland. The FES Board has selected a third independent director, Joseph M. Gingo, whose duties officially commence on April 9, 2018.

[95] The FENOC Insider Directors are Donald Schneider and Donald Moul. The FENOC Insider Directors receive no compensation for their service as directors.

[96] The FENOC Independent Directors are John Blickle and James Boland. The FENOC Board has selected a third independent director, Joseph M. Gingo, whose duties officially commence on April 9, 2018.

analyze critical issues and vote on important strategic decisions that FENOC faces. The FENOC Independent Directors receive reimbursement for reasonable expenses incurred in connection with meetings attended in person, paid quarterly, in arrears (the "FENOC Expense Reimbursement", and together with the FES Independent Director Fees and Expense Reimbursement, the "Independent Director Fees").[97] FENOC pays FESC, who then remits the FENOC Expense Reimbursement to the FENOC Independent Directors.

184. The Debtors believe that the Independent Directors' collective skills, knowledge, and understanding of the Debtors' operations and infrastructure are critical to the successful reorganization of the Debtors' businesses. As of the Petition Date, approximately $0 has accrued and remains outstanding on account of the Independent Director Fees (collectively, the "Unpaid Independent Director Fees"). Pursuant to the Final Order, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any Unpaid Independent Director Fees owed as of the Petition Date and to continue to pay the Independent Directors' fees and expenses in the ordinary course of business on a postpetition basis.[98]

185. **Reimbursable Expenses.** Employees are reimbursed for approved, legitimate expenses incurred on behalf of the Debtors in the scope of their employment that are paid with personal credit cards or cash (collectively, "Reimbursable Expenses"). Reimbursable Expenses include transportation, lodging, meal, entertainment and other reasonable business expenses incurred as a function of the Employee's position with the Debtors. Reimbursable Expenses are often incurred by Employees who must travel as part of their responsibilities, including in their roles as FES directors or FENOC directors. After documentation is submitted and certain approvals are received, in accordance with internal policies and procedures, the Debtors fund

---

[97] The FENOC Independent Directors are not paid additional compensation for serving on the Board of FENOC.

[98] The Debtors will pay FESC all amounts on account of the Independent Director Fees and FESC will remit such payments to Employees.

FESC and FESC makes payments via direct deposit on account of the Reimbursable Expenses to Employees in the ordinary course of business (the "Reimbursement Process").

186.　　The Debtors pay on average approximately $470,000 per month on account of Reimbursable Expenses, which are paid in arrears. The Debtors seek authority to fund FESC for such Reimbursable Expenses that have accrued and become due and payable as of the Petition Date (the "Unpaid Reimbursable Expenses"). Pursuant to a final order, the Debtors seek authority to fund FESC for all Unpaid Reimbursable Expenses and to provide FESC with authority to pay all Unpaid Reimbursable Expenses to the Employees as directed by the Debtors.

187.　　The Debtors' internal Employee reimbursement policy imposes a number of internal controls to ensure reimbursement requests are properly reviewed. Among other things (a) Employees submitting expense reports must document all costs and provide the business justification of each, and (b) supervisors can only approve reimbursement requests after ensuring the accuracy of the report, the appropriateness of the expenses, and the complete documentation of receipts. Moreover, the Employees incur the Unpaid Reimbursable Expenses on the Debtors' behalf and with the understanding that they will be reimbursed.  If the Debtors did not provide for the prompt reimbursement of the Employees, the Employees would be unwilling to incur such costs in the first instance for the benefit of the Debtors' businesses, which would disrupt the Debtors' operations. Pursuant to an interim order, the Debtors seek authorization, but not direction, to pay Unpaid Reimbursable Expenses in an amount not to exceed $1.5 million in the aggregate, and continue to pay Reimbursable Expenses in the ordinary course of business on a postpetition basis. Pursuant to a final order, the Debtors seek authorization, but not direction, to pay FESC on account of the Unpaid Reimbursable Expenses and to continue paying FESC on account of the Reimbursable Expenses in the ordinary course of business on a postpetition basis.

85

Additionally, the Debtors seek to provide FESC with the authority and direction to pay the Reimbursable Expenses to the Employees as directed by the Debtors.

188.    **Deductions and Withholdings.** The Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). In addition, the Debtors are required by applicable statutory authority to pay Social Security and Medicare taxes, and based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). On average, the Debtors fund FESC and FESC remits $12.4 million per month in Payroll Taxes to the appropriate authorities on behalf of the Debtors and their Employees.  As of the Petition Date, the Debtors estimate that approximately $4.6 million in Payroll Taxes have accrued and remain unpaid (the "Unpaid Payroll Taxes"), all of which will become due and owing to various taxing authorities within the Interim Period.  Since the Debtors are statutorily obligated to pay Payroll Taxes, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to pay FESC for the Unpaid Payroll Taxes and continue remitting Payroll Taxes to FESC, who remits the Unpaid Payroll Taxes to the applicable taxing authorities, in the ordinary course of business on a postpetition basis.

189.    Employees may elect to make donations via a payroll deduction to the FirstEnergy Corp. Political Action Committee and/or the United Way Program (the "Political/Charitable Deductions"). Each month, FESC remits an average of approximately $31,078 of Political/Charitable Deductions to the designated third-party charities.  As of the

86

Petition Date, the Debtors estimate that that they owe approximately $14,936 for Political/Charitable Deductions that the Debtors must fund FESC to enable FESC to transfer to the appropriate third party charities (the "Unpaid Political/Charitable Deductions"), all of which will become due and owing within the Interim Period. The Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to fund FESC for the Unpaid Political/Charitable Deductions and continue to direct FESC to pay the Political/Charitable Deductions in the ordinary course of business on a postpetition basis. Additionally, FESC is required to withhold Union initiation fees, dues, assessments and/or other service charges from the paychecks of Represented Employees, and typically remits such dues on a monthly basis to the Unions (collectively, the "Union Deductions").[99] The Debtors fund FESC and FESC remits approximately $68,000 per month in Union Deductions to the Unions.

190.    As of the Petition Date, the Debtors estimate they have approximately $50,000 in Union Deductions that they have not yet paid (the "Unpaid Union Deductions"), all of which will become due and owing during the Interim Period. Accordingly, pursuant to the Interim Order and the Final Order, the Debtors seek authority, but not direction, to fund FESC for the Unpaid Union Deductions remitted to the Unions in the ordinary course of business on a postpetition basis.

191.    Finally, in addition to the Political/Charitable Deductions and the Union Deductions, FESC routinely deducts certain amounts from Employees' paychecks during each applicable payroll period on account of miscellaneous items, including garnishments, child support, and other similar deductions (collectively, the "Miscellaneous Deductions"). On average, the Debtors pay FESC approximately $145,000 per month on account of the

---

[99] The Debtors are not required to make any contributions to the Unions.

Miscellaneous Deductions. As of the Petition Date, the Debtors estimate that approximately $62,000 in Miscellaneous Deductions that are remitted by FESC have not yet been reimbursed by the Debtors (the "Unpaid Miscellaneous Deductions"), all of which will become due and owing within the Interim Period. The Debtors seek authorization—but not direction—pursuant to an interim order and a final order, to reimburse FESC for the Unpaid Miscellaneous Deductions remitted to the appropriate parties and continue funding FESC for the Miscellaneous Deductions in the ordinary course of business on a postpetition basis.

192. **Employee Benefit Programs.** The Debtors offer Employees the opportunity to participate in various welfare plans programs maintained by FE Corp., including, medical, dental, and vision plans, life insurance, short-term disability and long-term disability, and other plans and programs as described below (collectively, the "Employee Benefit Programs"). In each instance, the Debtors fund and/or reimburse, as applicable, and FESC makes any necessary employer payments to the appropriate third parties in connection with the Employee Benefit Programs.

193. As described below, the Debtors offer Employees who work more than 20 hours per week the opportunity to participate in a number of FE Corp. health benefit plans, including medical, dental, and vision plans (collectively, the "Health Benefit Plans").[100]

194. Eligible Employees and their dependents may elect to receive medical benefits through one of several medical plan options administered by FE Corp. (collectively, the

---

[100] Five of the Unions, consistent with their rights under their CBAs, have currently opted out of the Health Benefit Plans, including UWUA Local 270, 457 and IBEW Locals 29, 29MP, 272, 1413. Based on enrollment data as of January 1, 2018, the projected aggregate 2018 annual cost for these Represented Employees' healthcare is $11,339,065.56. More specifically, the projected 2018 annual healthcare costs break down as follows: Local 1413: $1,334,272.68; Local 29: $3,762,647.72; Local 29MP: $58,506.14; Local 457: $2,628,190.24; Local 272: $2,365,441.00; and Local 270: $138,220.42 for FG (Eastlake) Employees and $1,051,787.36 for FENOC (Perry) Employees. The Debtors seek authority to reimburse FESC for any prepetition amounts due to these Unions on account of the healthcare costs of Represented Employees, including provisions of subsidies for Represented Employees' healthcare under the Union healthcare plans, and to continue to do so in the ordinary course of business on a postpetition basis.

"Medical Insurance Plans"). Most Employees can choose one of the following Medical Insurance Plans: (i) the Base Preferred Provider Organization ("PPO") Plan, (ii) the Consumer High Deductible Health Plan ("HDHP"), and (ii) the Enhanced HDHP. Approximately 2,100 eligible Employees of the Debtors and 3,200 dependents of eligible Employees of the Debtors are covered under the Medical Insurance Plans. The Debtors' monthly cost to provide the Medical Insurance Plans on behalf of their Employees is approximately $3.478 million, of which approximately $1.118 million is funded by payments through payroll deductions from participating eligible Employees. In addition, certain of the Debtors' Employees have health savings accounts (each, an "HSA") for which the Debtors make employer contributions on an annual basis as described below.[101]

195.    Eligible Employees of the Debtors and their dependents may receive discounted basic vision care through the basic FE Corp. vision plan (the "Basic Vision Plan") if they are enrolled in one of the Medical Insurance Plans. The Basic Vision Plan provides basic vision coverage that includes discounts on eye examinations, lenses and frames. Approximately 2,800 eligible Employees of the Debtors and 3,800 dependents of eligible Employees of the Debtors participate in the Basic Vision Plan at no cost to eligible Employees or to the Debtors. Eligible Employees of the Debtors may elect to participate in the supplemental FE Corp. vision plan (the "Supplemental Vision Plan"). The Supplemental Vision Plan's average annual cost of approximately $902,000 is fully funded by payroll deductions from participating eligible Employees.

---

[101] Employees automatically get an HSA if enrolled in either the Consumer HDHP or the Enhanced HDHP. Certain Retirees, but no Employees, have health reimbursement accounts.

196.    Eligible Employees of the Debtors and their dependents may elect to participate in optional FE Corp. dental plans provided through Delta Dental Plan of Ohio, Inc.[102]  Both the basic dental coverage or "plus" dental coverage options (the "Dental Plans") are fully funded by payroll deductions from participating eligible Employees. Approximately 2,400 eligible Employees of the Debtors and 3,900 dependents of eligible Employees of the Debtors are enrolled in the Dental Plans.  The Dental Plans' average monthly cost of approximately $155,000 is fully funded by payroll deductions from participating eligible Employees.

197.    Overall, the Debtors fund through FESC approximately 85% of the costs associated with the Health Benefit Plans for the Debtors' Employees, approximately 75% of the costs associated with the Health Benefit Plans for dependents, and the Debtors' Employees fund the remainder. The Debtors estimate that they fund and/or reimburse, as applicable, FESC in an aggregate amount of approximately $3.478 million each month on account of administrative fees, premiums, and claims under the Health Benefit Plans (collectively, the "Health Benefit Amounts"). The Debtors estimate that, as of the Petition Date, they owe approximately $3.478 million on account of the Health Benefit Amounts (the "Unpaid Health Benefit Amounts"), all of which will become due and owing within the Interim Period.

198.    The Health Benefit Plans are customary for most large companies, and consequently, Employees and their dependents have come to rely on the Health Benefit Plans. Without the Health Benefit Plans, Employees would be forced to obtain potentially prohibitively expensive out-of-pocket coverage, which could adversely affect Employee morale or result in increased absenteeism due to reduced access to medical care. The Debtors seek authorization— but not direction—pursuant to an interim order and a final order, to pay the Unpaid Health

---

[102] Employees of Beaver Valley Nuclear Power Station who belong to Local 29 have a dental plan through United Concordia.

Benefit Amounts and continue to participate in the Health Benefit Plans in the ordinary course of business on a postpetition basis.

199. **HSAs.** In connection with the Consumer HDHP and the Enhanced HDHP, Employees may opt to participate in the FE Corp. HSA plan administered by HealthEquity, Inc. The HSA allows Employees to save funds on a pre-tax basis, which may be used to pay qualified medical, dental, vision and prescription expenses that they or their dependents have incurred and are not covered by the Health Benefit Plans. As described below, the Debtors contribute either $500 or $1,000 annually to the HSAs of Employees enrolled in a HDHP. Additionally, Employees may also make their own contributions to HSAs (the "HSA Amounts") through payroll deductions. As of the Petition Date, the Debtors believe they owe approximately $0 in reimbursement on account of Employee HSA contributions (the "Unpaid HSA Amounts"). Pursuant to an interim order and a final order, the Debtors seek authority, but not direction, to pay the Unpaid HSA Amounts and to permit Employees to continue participating in the HSA in the ordinary course of business on a postpetition basis.

200. **Health Care Contributions.** The Debtors make certain annual payments in order to help Employees save now for future health care expenses (the "Health Care Contributions") during the first quarter of each year. If an Employee enrolls in the Consumer HDHP or the Enhanced HDHP, the Debtors contribute either $500 (for individual coverage) or $1,000 (for two-person/family coverage) to the Employee's HSA. If an Employee enrolls in the PPO Plan, the Debtors contribute either $500 (for individual coverage) or $1,000 (for two-person/family coverage) to the Employee's Savings Plan (as defined below). If an Employee has waived

91

Medical Insurance Plan coverage for the year, the Debtors make a $500 contribution to the Employee's Savings Plan.[103]

201.    The Debtors have already paid Health Care Contributions for 2018 on behalf of participating Employees in an aggregate amount of approximately $2.12 million.[104] Accordingly, as of the Petition Date, the Debtors believe they owe approximately $0 in reimbursement on account of the Health Care Contributions (the "Unpaid Health Care Contributions"). Pursuant to an interim order and a final order, the Debtors seek authority, but not direction, to pay any Unpaid Health Care Contributions and to continue paying Health Care Contributions in the ordinary course of business on a postpetition basis.

202.    **Flexible Spending Accounts.** The Debtors offer Employees who work more than 20 hours per week the ability to contribute a portion of their pre-tax compensation to FE Corp.-maintained flexible spending accounts ("FSAs") administered by WageWorks Company. Employees may use the FSAs to pay for certain out-of-pocket health care and dependent care expenses (the "Flexible Spending Program"). A healthcare FSA allows Employees to save funds on a pre-tax basis and use them to pay certain medical, dental, vision and prescription drug expenses incurred which are not covered by the Health Benefit Plans or other coverage the Employee may have.  A dependent care FSA allows Employees to save funds on a pre-tax basis and use them to pay qualified dependent care expenses, such as daycare and elder care, which allows Employees (and their spouses, as applicable) to work or attend school full time.

203.    Approximately 730 Employees of the Debtors participate in the Flexible Spending Program. At the beginning of each year, participating Employees elect to contribute amounts up

---

[103] Employees may also receive the Health Care Contribution as a taxable cash option in lieu of a Savings Plan contribution if they elect to do so during the open enrollment period.

[104] The 2018 Health Care Contributions comprised approximately $1.061 million in Savings Plan contributions, $17,000 in HSA contributions and $216,000 in cash contributions.

to $2,600 on behalf of themselves by deducting such amounts from their paychecks. Similarly, Employees may elect to contribute amounts of up to $5,000 for dependent care FSA on behalf of themselves by deducting such amounts from their paychecks. All FSA amounts were available for distribution in January 2018 and are deducted from Employees' paychecks throughout the year.

204.    As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Flexible Spending Program.[105] Pursuant to an interim order and a final order, the Debtors seek authority, but not direction, to continue to participate in the Flexible Spending Program in the ordinary course of business on a postpetition basis.

205.    **Life Insurance.** FE Corp. provides non-contributory pre-retirement basic life insurance for Employees who are eligible to retire (the "Life Insurance"). Basic Life Insurance coverage is equal to one times annual base pay rounded to the nearest dollar up to $2.5 million and is provided at no cost to Employees on the first day of the month following employment.[106] The Basic Life Insurance coverage and related administration costs the Debtors approximately $35,171 per month (the "Life Insurance Amounts"). As of the Petition Date, the Debtors estimate that there are approximately $35,171 in prepetition amounts to be funded to FESC on account of the Life Insurance Amounts, all of which will become due and owing within the Interim Period (the "Unpaid Life Insurance Amounts").

206.    Many Employees' long-term planning consists solely of the life insurance coverage they receive as a benefit of their employment.  The Debtors believe that continuing life insurance coverage is essential to maintaining Employee morale and protecting Employee

---

[105] Any amounts owed by the Debtors to FESC would be on account of deductions from Employees' pay, as the Debtors do not contribute to Employees' FSAs.

[106] Approximately 946 Represented Employees do not participate in the Basic Life Insurance program because they made a one-time, irrevocable election to continue participating in previously offered life insurance programs that are funded entirely through after-tax payroll deductions.

93

families from the impact of a catastrophic event. Thus, the Debtors seek authorization—but not direction—pursuant to the Interim Order and the Final Order, to pay the Unpaid Life Insurance Amounts and to continue to participate in the Life Insurance program and the Personal Excess Liability Life Insurance program in the ordinary course of business on a postpetition basis.

207.    Five executive-level Employees currently have coverage under FE Corp.'s personal excess liability insurance (the "Personal Excess Liability Insurance"). The Personal Excess Liability Insurance is an umbrella liability coverage plan that protects covered Employees for up to $5 million in damages. The personal Excess Liability Insurance's coverage and related administration costs the Debtors approximately $2,915 annually (the "Personal Excess Liability Insurance Amounts"). As of the Petition Date, the Debtors estimate that there is approximately $0 in prepetition amounts to be funded to FESC on account of the Personal Excess Liability Life Insurance Amounts (the "Unpaid Personal Excess Liability Insurance Amounts").

208.    The Debtors believe that continuing to participate in the Personal Excess Liability Insurance Amounts is necessary to protect its most visible Employees and their families from the events of significant financial loss in the event of a serious accident. Thus, the Debtors seek authorization pursuant to the Interim Order and the Final Order, to pay the Unpaid Personal Excess Liability Amounts and to continue to participate in the Personal Excess Liability in the ordinary course of business on a postpetition basis.

209.    FE Corp. provides insurance coverage for the Debtors' Employees which covers them during business travel on behalf of FirstEnergy (the "Business Travel-Accident Insurance Plan"). The Business Travel-Accident Insurance Plan provides insurance protection in the event of an Employees' death, loss of limb or vision, speech or hearing, or permanent and total

disability resulting from certain transportation accidents.[107]   At no cost to the Employee, the coverage provides up to four times annual base pay, with a minimum benefit payable of $50,000 and a maximum benefit payable of $2.5 million (the "Business Travel-Accident Insurance Benefits"). On average, the Business Travel-Accident Insurance Plan coverage and related administration costs the Debtors approximately $50,000 per year.

210.    As of the Petition Date, the Debtors estimate that there are approximately $0 in prepetition amounts to be funded to FESC on account of the Business Travel-Accident Insurance Benefits, all of which will become due and owing within the Interim Period (the "Unpaid Business Travel-Accident Insurance Benefits"). Business travel is critical to the Debtors' ongoing operations, and the Debtors believe that continuing to participate in the Business Travel-Accident Insurance Plan is necessary to protect Employees and their families from the risk of injury or worse in potential transportation accidents. Thus, the Debtors seek authorization pursuant to an interim order and a final order, to pay the Unpaid Business Travel-Accident Insurance Benefits and to continue to participate in FE Corp.'s Business Travel-Accident Insurance Plan in the ordinary course of business on a postpetition basis.

211.    **Disability Plans.** When unable to perform their jobs due to a non-work related illness or accident, the Debtors' Non-Represented Employees are eligible to receive pay for up to the first six months of a disability under FE Corp.'s self-funded, uninsured short-term disability benefits plan (the "Short-Term Disability Plan"), which is administered by Sedgwick Claims Management Services, Inc. ("Sedgwick"), a third-party claims administrator. In lieu of Short-Term Disability Plan Benefits, Represented Employees receive Sick Time (as defined below)

---

[107] Transportation accidents covered include the following: accidents that occur while an Employee is a passenger in a public conveyance, taxi, bus and commercial aircraft or in an aircraft leased or owned by FirstEnergy; accidents that occur while an Employee is driving or riding as a passenger in a FirstEnergy vehicle, private car or truck; and accidents in which an Employee is struck by a public conveyance or automobile.  Among other exceptions, the Business Travel-Accident Insurance Plan does not pay benefits for losses due to commuting to and from work.

95

pursuant to the terms of their CBAs. Short-term disability benefits begin after an Employee has been out of work on account of a disability for seven consecutive calendar days and has provided appropriate medical documentation (the "Short-Term Disability Benefits").[108] An Employee eligible for Short-Term Disability Benefits receives full or partial pay for up to a specified number of days, based on the years of service the Employee has as of December 31st of the current year, as follows:

| Short-Term Disability Benefits[109] | | |
|---|---|---|
| Years of Service | No. of Days at Full Base Pay | No. of Days at 75% Base Pay[110] |
| 0-4 | 30 | 100 |
| 5-13 | 60 | 70 |
| 14+ | 130 | 0 |

212. The Debtors pay Short-Term Disability Benefits owed to the Employees and FESC remits such amounts to the Employees. As of the Petition Date, the Debtors estimate they owe approximately $7,000 on account of the Short-Term Disability Benefits (the "Unpaid Short-Term Disability Benefits"), all of which will become due and owing in the Interim Period.

213. The long-term disability plans maintained by FE Corp. (the "Long-Term Disability Plan", and together with the Short-Term Disability Plan, the "Disability Plans") provide benefits coverage for eligible Employees who are unable to work because of a disability (the "Long Term Disability Benefits"). For most Employees, Long Term Disability Benefits are equal to 50% of an Employee's base earnings in effect at the start of the disability, which may be

---

[108] Short-Term Disability Benefits eligibility may be available on the first day following an inpatient hospitalization or an accident, or if the absence is determined to be a critical illness.

[109] This table is not intended to illustrate guaranteed days off, as Short-Term Disability Benefits are not entitlements or vested benefits or considered accrued.

[110] There is no maximum or minimum weekly payment amounts for Short-Term Disability Benefits. The maximum Short-Term Disability Benefits period is 26 weeks of full base pay from the date benefits began; however, if a disabled Represented Employee's Long-Term Disability Benefits application is pending at the end of the 26-week maximum, up to an additional eight weeks of Short-Term Disability benefits at 75% base pay will be provided and offset from the approved Long-Term Disability Benefits.

received after the Employee is on disability for a period longer than six months.[111]  Coverage is provided automatically to eligible Employees at no cost to them, and Employees can elect to supplement the Long-Term Disability Benefits as described below.

214.    On average, the Debtors reimburse FESC approximately $1.45 million each year on account of the Long-Term Disability Benefits. As of the Petition Date, the Debtors estimate that they are obligated to fund approximately $119,000 on account of the Long-Term Disability benefits (the "Unpaid Long-Term Disability Benefits"), all of which will become due and owing in the Interim Period.

215.    The vast majority of Employees rely on Disability Plans as their sole form of wage-loss relief. Thus, Employees will suffer substantial losses if they are not permitted to receive Disability Benefits. Accordingly, the Debtors seek authorization, pursuant to an interim order and a final order, to pay the Unpaid Short-Term Disability Benefits and the Unpaid Long-Term Disability Benefits and to continue to participate in FE Corp.'s Disability Benefits program in the ordinary course of business on a postpetition basis.

216.    **Supplemental Insurance.** Full-time Employees may purchase supplemental insurance coverage for life,[112] dependent life insurance,[113] accidental death & dismemberment[114], and long-term disability[115] policies (for themselves and their dependents) through FE Corp. plans

---

[111] Represented Employees who belong to Local 29 or Local 270 have a long-term disability plan that involves a 12-month elimination period.  Such Employees receive 122 months of sick pay per the terms of their respective CBAs, and, after satisfying the 12-month elimination period, they become eligible for Long-Term Disability Benefits.  For members of Local 29 and Local 270, the base level of the Long-Term Disability Benefits equals 50% but these Employees are eligible to purchase supplemental Long-Term Disability Benefits at a rate of 0.321 per $100 of annual base salary for an additional 16 2/3% of coverage.

[112] Employees may purchase supplemental life coverage from one to 10 times of their annual base salary.

[113] Dependent life insurance can be used to cover children up to age 19, or up to age 25 if full-time students.

[114] Employees may purchase accidental death and dismemberment coverage from one to 10 times of their annual base salary, up to a $3 million maximum.

[115] Employees have the option to buy additional coverage by electing supplemental Long-Term Disability at a rate of 0.321 per $100 of annual base salary. Supplemental Long-Term Disability coverage allows Employees to purchase an additional 16 2/3% disability income coverage which, when combined with basic Long-Term Disability

(the "Supplemental Insurance").[116]   The Debtors' monthly cost to provide the Supplemental Insurance on behalf of the Employees (approximately $500,000) is fully funded by deductions from paychecks of participating eligible Employees. The Debtors seek authorization—but not direction—pursuant to an interim order and a final order, to (a) continue to participate in FE Corp.'s Supplemental Insurance coverage in the ordinary course of business on a postpetition basis and (b) pay any amounts due to FESC on account of the Employees' deductions relating to the Supplemental Insurance.

217.   **The Savings Plan.** FE Corp. maintains a retirement savings plan (the "Savings Plan") that permits regular full-time or part-time Employees to contribute on a before tax-basis or an after-tax basis, including contributions to a Roth 401(k) account (the "401(k) Plan").  As of the Petition Date, 3,052 of the Debtors' Employees participate in the Savings Plan. Employees may contribute from 1% to 75% of their base pay to the Savings Plan to either their before-tax account, their after-tax account, or their 401(k) Plan account.[117]   In addition to making contributions to their Savings Plan account, all Employees have the option to take out a loan from their 401(k) Plan account. FESC deducts certain amounts from such Employees' paychecks and remits those amounts for repayment of such loans.

218.   The Debtors also have a limited matching program under the Savings Plan (the "Savings Plan Matching Obligation").  Specifically, the Debtors match 50% of an Employee's contributions, up to 6% of the Employee's salary, funded with shares of FE Corp.

coverage, will provide for total benefits equal to 66 2/3% of base earnings. The benefit is based on base earnings in effect as of the start of the disability.

[116] Additionally, the Debtors participate in FE Corp.'s voluntary benefits program through Mercer Voluntary Benefits ("Mercer").  Employees are able have a payroll deduction if they sign up for voluntary benefits but the policy is directly with Mercer and not with FirstEnergy. Voluntary benefits programs include:  auto and home insurance, critical care insurance, accident insurance, identity theft protection, pet insurance and employee discounts.

[117] Two additional Savings Plan accounts containing contributions made prior to 1987 exist but are frozen for contributions.

stock every pay period. The Debtors anticipate that approximately $11.13 million will be spent in 2018 on account of the Savings Plan Matching Obligation. As of the Petition Date, the Debtors estimate that they owe approximately $400,000 in reimbursements to FESC on account of the Savings Plan Matching Obligation (the "Unpaid Savings Plan Matching Obligation"), all of which will become due and owing within the Interim Period.[118]

219.     Many Employees' retirement savings consist of the Savings Plan, and many Employees choose to participate in the Savings Plan because of the Savings Plan Matching Obligation provision. Thus, the Debtors believe that continuing the Savings Plan, including the 401(k) Plan and the Savings Plan Matching Obligation, is essential to maintaining Employee morale and protecting Employee expectations. Accordingly, pursuant to an interim order and a final order, the Debtors seek the authority, but not direction, to (a) continue participating in the Savings Plan in the ordinary course of business on a postpetition basis, (b) pay the Unpaid Savings Plan Matching Obligation in the ordinary course of business (approximately $400,000 in the aggregate), and (c) remit any Employee contributions to the Savings Plan to FESC in the ordinary course of business.

220.     **Workers' Compensation.** The Debtors provide workers' compensation insurance for their Employees and certain of their Contracted Workers[119] through participation in FE Corp.'s workers' compensation program (the "Workers' Compensation Program") at the level required by statute for each state in which the Debtors have Employees.[120] FE Corp., through its

---

[118] Administrative fees associated with the Savings Plan fall under the "special items" that are allocated across FirstEnergy entities under the Shared Services Agreements.

[119] FirstEnergy has arranged for the Beaver Valley Nuclear Power Station, Davis-Besse Nuclear Power Station and the Perry Nuclear Power Plant to be insured under a consolidated owner-controlled insurance program (the "OCIP"). The OCIP is an insurance program that insures eligible and enrolled Contracted Workers and other owner-designated parties for work performed at the covered plants. With the exception of Day & Zimmermann NPS, Inc. and Bechtel Power Corporation, the Contracted Workers are excluded from this OCIP.

[120] The states of Maryland, New Jersey, Ohio, Pennsylvania and West Virginia require workers' compensation coverage for all Employees.

Workers' Compensation Program, participates in each state's respective workers' compensation system as a self-insured employer and is therefore responsible for paying its own workers' compensation claims.

221.    The Workers' Compensation Program provides medical benefits for allowed conditions and disability compensation for Employees and Contracted Workers whose work-related, documented disabilities result in the loss of eight or more calendar days of work. If an Employee dies as a result of a work-related injury or occupational disease, the Workers' Compensation Program provides a moderate allowance for funeral expenses and may provide compensation to the deceased Employee's or Contracted Worker's dependents.[121] Sedgwick manages claims on account of the Workers' Compensation Program (the "Workers' Compensation Claims"). FESC pays Sedgwick an average of $33,600 monthly for claims management fees and an average of $8,840 monthly for takeover Workers' Compensation Claims.[122] In total, FESC pays Sedgwick approximately $510,000 annually on account of the Workers' Compensation Program. As of January 31, 2018, the Debtors estimate that their current

---

[121] Rules regarding workers' compensation benefits in the event of a work-related death vary pursuant to state law. In most cases, if the Employee or Contracted Worker was married, workers' compensation benefits go to the spouse of the Employee or Contracted Worker until the spouse's remarriage or death. If there are dependent children of the Employee or Contracted Worker, then the spouse of the Employee or Contracted Worker receives a portion of workers' compensation benefits and the dependent children of the Employee or Contracted Worker also receive a portion of workers' compensation benefits. If the Employee or Contracted Worker was unmarried and had dependent children, workers' compensation benefits go to the dependent children of the Employee or Contracted Worker. If the Employee or Contracted Worker was unmarried and had no dependent children, no workers' compensation benefits are paid.

[122] Administration of Workers' Compensation Program was transitioned to Sedgwick effective November 1, 2016. However, many Workers' Compensation Claims were open well before that date and remain open. As all claims were transitioned to Sedgwick, these fees are the account management fees for those older claims specifically. A takeover Workers' Compensation Claim means any claim opened prior to November 1, 2016. The only difference therefore is the date on which the injury occurred.

liability on account of the Workers' Compensation Program is approximately $3.13 million (collectively, the "Unpaid Workers' Compensation Program Amounts").[123]

222.    For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their statutory obligations, the Debtors, through the services provided by FESC and third party professionals, must continue to assess, determine, and adjudicate Workers' Compensation Claims during these chapter 11 cases. In addition, to the extent any of the Employees or Contracted Workers asserts claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees and Contracted Workers to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

223.    Because the Debtors are statutorily obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Thus, pursuant to an interim order, the Debtors seek authority, but not direction, to: (a) continue participating in the Workers' Compensation Program in the ordinary course of business on a postpetition basis; (b) fund FESC for all Unpaid Workers' Compensation Program Amounts incurred in the ordinary course of business payable during the Interim Period; and (c) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program. Pursuant to a final order, the Debtors seek (a) substantially the same relief as requested in an interim order and (b) to fund all Workers' Compensation Claims in the ordinary course of business.

---

[123] The Debtors do not know exactly how much of the Unpaid Workers' Compensation Program Amounts will become due and payable within the next 30 days. Accordingly, out of an abundance of caution, the Debtors seek authority to pay all known Unpaid Workers' Compensation Program Amounts in the Interim Period.

224.    **PTO**. The Debtors participate in FE Corp.'s paid time-off ("PTO") program.[124]
Effective as of January 1, 2016, the PTO program provides full-time, Non-Represented
Employees with a set number of annual PTO days, which can be used for personal days, vacation
and occasional sick time. Non-Represented Employees will receive their entire PTO entitlement
on January 1 of each calendar year, in accordance with the chart below:

| Years of Service Completed in Current Year | PTO Allocation (in days)[125] |
|---|---|
| 0-4 years | 19 |
| 5-13 years | 24 |
| 14-23 years | 29 |
| 24+ years | 34 |

225.    Prior to 2009, all full-time Non-Represented Employees had the ability to carry
over unused vacation for a specific calendar year into a banked vacation account (the "Banked
Vacation").    Additionally, Non-Represented Employees may have a frozen vacation account
containing vacation they banked prior to December 31, 2003 (the "Frozen Vacation", and
together with the Banked Vacation, the "Banked/Frozen Vacation").    Effective as of January 1,
2009, Non-Represented Employees are no longer eligible to carry over unused vacation for that
calendar year or subsequent calendar years into a banked or frozen vacation account.    Today, if
Non-Represented Employees are unable to use all PTO days in a given year, they may defer up
to 80 hours of PTOs into the following year, which must be used during that subsequent year or
are forfeited (the "Deferred PTO Days").

---

[124] PTO benefits vary significantly between Non-Represented Employees and Represented Employees. Represented
Employees' PTO benefits are determined by the terms and conditions outlined in their respective CBAs.

[125] This chart applies to full-time Non-Represented Employees.    Part-time Non-Represented Employees who are
regularly scheduled to complete at least 1,000 hours of service in the calendar year may be eligible to receive pro-
rated PTO based on average hours worked per year.

226. If a Non-Represented Employee dies or terminates employment, unused Banked Vacation and Frozen Vacation as of the last date of employment will be paid at the December 31, 2008 pay rate in a lump sum in the final paycheck. However, unused PTO days and Deferred PTO Days are not paid to Non-Represented Employees upon any such separation of employment. As of February 25, 2018, the aggregate amount of Banked/Frozen Vacation benefits due to 766 Non-Represented Employees is estimated to be approximately $9.344 million.

227. In addition to the foregoing, Non-Represented Employees generally receive the following eight paid holidays (the "Holidays"): New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Day after Thanksgiving, Christmas Eve and Christmas Day.[126]

228. The Debtors' CBAs provide Represented Employees with two main types of PTO: paid vacation time ("Vacation") and paid absence days ("PADs").[127] The amount of Vacation and PADs available to Represented Employees and the rates at which such Vacation and PADs accrue is determined by a Represented Employee's length of employment, with Represented Employees receiving between one (1) and six (6) weeks of Vacation and between one (1) and five (5) days of PADs annually. Vacation and PADs are generally paid at a Represented Employee's regular hourly rate of pay for all regularly-scheduled hours the Represented Employee would have worked during such time off.

---

[126] There is an adjustment if a Holiday falls on a weekend which gives an additional PTO day to every Employee.

[127] The PTO of Represented Employees is governed by their CBAs, which in certain circumstances incorporate terms and conditions from FirstEnergy policies, including those outlined in the FirstEnergy employee compensation and benefits handbook (the "FirstEnergy Employee Handbook"). The policies outlined in the current FirstEnergy Employee Handbook are not applicable to Represented Employees, unless the parties negotiate for it, or certain provisions of it, to apply. Depending on when the applicable CBA was negotiated, an old version or the current version of the FirstEnergy Employee Handbook policy may apply. Each of the CBAs, except for that of Local 1413, provides for Vacation and PADs. Represented Employees in Local 1413 (which Union's CBA does not include any Vacation policy), are covered by the old 2011 FirstEnergy Employee Handbook policy in which Employees received PADs and vacation paid absence days ("VPADs") paid on whole years of service.

103

229.     Ordinarily, the Debtors' Non-Represented Employees may not carry forward unused Vacation or PADs into the next calendar year; however, the majority of the Debtors' CBAs provide that Represented Employees may carry over some Vacation and/or PADs, which is typically capped at 80 hours. Any accrued but unused Vacation for the current year (and any permitted carry over from the prior year) will generally be paid out in a Represented Employee's final paycheck upon separation from employment. PADs are not paid out upon separation from employment.

230.     Represented Employees who are members of certain Unions have also been eligible in the past to "bank" unused Vacation time, subject to restrictions as to the amount of time that could be banked in a given year and a cap on the total amount of Vacation time that could be banked at any given time. The cap was generally set at 480 hours, with Represented Employees of Local 457 eligible to bank up to 1,000 hours. Under all of the Debtors' CBAs, except the Local 350-351 and Local 457 CBAs, the Vacation banks are frozen, such that Represented Employees are no longer eligible to bank new unused Vacation time, but Represented Employees may still use existing Banked Vacation time. Represented Employees who are members of Local 350-351 and Local 457 are still eligible to bank unused Vacation time. Represented Employees who still retain banked Vacation time include members of Local 29MP, Local 245, Local 272, Local 1413, Local 270, Local 270PT, Local 350-351, and Local 457. Banked Vacation time may be used for PTO by Represented Employees during employment. Any unused Banked Vacation time will be paid in a Represented Employee's final paycheck upon separation from employment.[128]  As of February 25, 2018, the aggregate amount

---

[128] The rate at which Banked Vacation time is paid out to Represented Employees, whether at the time of use for PTO or upon separation of employment, including upon death, is governed by the terms of the applicable CBA, as follows: (i) for members of Local 29MP, Local 245, and Local 1413, Represented Employees are paid at their regular rate that was in effect as of December 31, 2008; (ii) for members of Local 272, Represented Employees are

of Banked Vacation benefits due to 388 Represented Employees is estimated to be approximately $2.1 million.

231.    Represented Employees are also eligible to receive paid time off for non-occupational illnesses and injuries ("Sick Time") in accordance with plans that vary by CBA. The amount of Sick Time available generally depends on the Represented Employees' length of employment, and ranges from a minimum of five full days' pay for Sick Time up to a maximum of 12 months' full pay for Sick Time. Sick Time is generally paid at the Represented Employee's regular hourly rate of pay for all regularly-scheduled hours the Employee would have worked during such time missed from work. Sick Time is not cumulative from year-to-year, and is not paid out upon separation from employment. In the event of an industrial accident, for which Sick Time is inapplicable, Represented Employees may also be eligible to receive up to five days' full pay if they are unable to work, followed by pay at a rate that is the difference between (a) 50% of the Represented Employee's base pay, and (b) the amount the Represented Employee would receive from workers' compensation, for up to a maximum of 2,080 hours.

232.    In addition to the foregoing, Represented Employees generally receive PTO for the following:  holidays (ranging from seven to nine recognized, paid holidays); bereavement leave (ranging from one to four days off, depending on relation to the deceased); service for jury duty and to provide witness testimony (for all regularly-scheduled hours missed by the Represented Employee in performing such service); and rest periods following overtime shifts that last for 16 or more hours in any 24-hour period (generally up to eight hours of PTO, but, for certain Represented Employees, up to ten hours of PTO).

---

paid at their regular rate that was in effect as of December 31, 2015; and (iii) for members of Local 270, Local 270PT, Local 350-351, and Local 457, Represented Employees are paid at their regular rate that is in effect at the time Banked Vacation is taken or paid.

233.     The Debtors believe that the continuation of the PTO policies for both Non-Represented Employees and Represented Employees in accordance with prior practice (subject to the limitations described below), is essential to maintaining Employee morale during these chapter 11 cases. The Debtors submit that support of their Employees' work/life balance will aid Employee performance and retention during this critical time.  Further, the policies are broad-based programs upon which all Employees have come to depend.

234.     Accordingly, pursuant to the Interim Order, the Debtors seek authority, but not direction, to (a) continue participating in FE Corp.'s PTO program for the benefit of Non-Represented Employees; (b) continue honoring the terms of their CBAs with respect to the PTO afforded to Represented Employees; and (c) fund FESC for the cost of the PTO benefits offered to Employees in the ordinary course of business payable during the Interim Period, up to $12,850 per eligible Employee; *provided however*, that amounts payable on account of the Banked/Frozen Vacation will not be paid upon separation of employment during the Interim Period.  The Debtors seek the same relief in a final order, but additionally seek to pay FESC for any amounts owing in connection with PTO benefits without respect to the priority cap of $12,850 and for all amounts payable on account of the Banked/Frozen Vacation, including amounts payable upon separation of employment.

235.     **Retiree Benefits.** Prior to 2014, FE Corp. sponsored benefit plans for former employees of the Debtors and other affiliates who retired from such entities (the "Retirees"). Generally, the medical coverage offered to the Retirees (the "Retiree Medical Benefits") differed based on the specific plan in which a Retiree chose to participate, and participant costs differ based on the chosen plan, whether the Retiree's dependents were covered by the chosen plan, and the Retiree's years of service and associated rate band.  Through the Retiree Medical

Benefits, Retirees were provided health care and prescription drug coverage if they were under the age of 65, and were provided subsidy payments to obtain their own health care and prescription drug coverage if they were over the age of 65.

236.    FE Corp. discontinued this plan in 2014, and no longer provides Retiree Medical Benefits; provided, however, that certain Retirees who were represented by Unions ("Represented Retirees") (i) may have been grandfathered under prior CBAs to continue to participate in this plan, based on their date of retirement, and thus continue to receive such health care coverage or subsidies;[129] (ii) may remain eligible for retiree health care coverage or subsidies under their current CBA until such time that a successor CBA is negotiated and executed; or (iii) retired under the FE Corp.'s Voluntary Enhanced Retirement Option ("VERO") program or under the terms of a CBA that provided benefits under a Union-sponsored retiree health care plan that was distinct from FE Corp.'s aforementioned plan and, thus, receive retiree health care benefits under different terms and conditions.

237.    On average, the Debtors pay approximately $140,000 each month to FESC for costs on account of the Retiree Medical Benefits and FESC remits such funds to Retirees, FE Corp. and healthcare plans maintained by the Unions, as applicable. As of the Petition Date, the Debtors estimate that they owe approximately $140,000 to FESC on account of unpaid Retiree Medical Benefits (the "Unpaid Retiree Medical Benefits").

238.    In addition to the health care coverage and/or subsidies of the Retiree Medical Benefits, approximately 3,370 Retirees are also eligible for life insurance benefits (the "Retiree Life Insurance Benefits") of various amounts.[130] On average, the Debtors pay approximately

---

[129] In addition, 52 of the Debtors' Non-Represented Retirees were grandfathered into certain Retiree Medical Benefits.

[130] Most of the Retirees who are eligible for Retiree Life Insurance Benefits receive such benefits in the amount of $10,000. Approximately 750 Retirees are eligible for a larger amount, ranging from $10,147 to $462,574.

$137,000 each month to FESC on account of Retiree Life Insurance Benefits, which FESC remits to FE Corp. As of the Petition Date, the Debtors estimate that they owe approximately $137,000 to FESC on account of unpaid Retiree Life Insurance Benefits (the "Unpaid Retiree Life Insurance Benefits").

239. The Debtors believe that it is important that they continue to provide Retiree Medical Benefits and Retiree Life Insurance Benefits to reassure all Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors.[131] The Debtors seek authorization—but not direction—pursuant to an interim order and a final order, to pay the Unpaid Retiree Medical Benefits and the Unpaid Retiree Life Insurance Benefits, and to continue providing the Retiree Medical Benefits and the Retiree Life Insurance Benefits in the ordinary course of business on a postpetition basis.

240. **Pensions.** The Debtors' Employees participate in the FE Corp. single-employer defined benefit pension plan (the "FE Corp. Master Pension Plan") and a number of non-qualified pension plans designed for certain executives (the "Non-Qualified Plans" and together with the FE Corp. Pension Plan, the "Pension Plans"). Approximately 45,000[132] FirstEnergy employees (and/or their beneficiaries), including thousands of the Debtors' Employees and/or their beneficiaries, participate in the FE Corp. Master Pension Plan, which is insured by the Pension Benefit Guaranty Corp. Under the FE Corp. Master Pension Plan, a participating Employee's pension is based on earnings, the length of time the Employee worked for an FE Corp. affiliate, and the Employee's age at retirement. The Debtors pay their allocated share of

---

[131] The Debtors are also obligated under section 1114(e) of the Bankruptcy Code to timely pay retiree benefits.

[132] Of this population, approximately 16,000 individuals are active FirstEnergy employees entitled to a future benefit, approximately 20,000 are FE Corp. Master Pension Plan participants who are currently receiving benefits, approximately 5,000 are retired or terminated FE Corp. Master Pension Plan participants eligible for a future benefit and approximately 4,000 are beneficiaries who were collecting a benefit on behalf of a deceased participant in the FE Corp. Master Pension Plan.

the cost of the Plan through annual contribution payments (each, an "FE Corp. Master Pension Plan Contribution") to FESC, which remits such payments to FE Corp. on behalf of the Debtors. As of January 31, 2018, the FE Corp. Master Pension Plan was underfunded by approximately $924 million on a termination basis. The Debtors do not anticipate making any further FE Corp. Master Pension Plan Contribution payments in 2018 because FE Corp. contributed $1.25 billion to the FE Corp. Master Pension Plan in January 2018 and the Debtors have already reimbursed FE Corp. for their FE Corp. Master Pension Plan Contribution in connection therewith.

241.    In the ordinary course of business, the Debtors also make monthly payments for accrued pension service costs (the "FE Corp. Master Pension Plan Accrued Service Costs") to FESC.  Each monthly FE Corp. Master Pension Plan Accrued Service Costs payment comprises one-twelfth of an annual beginning-of-year actuarial forecast.  As of the Petition Date, the Debtors owe FESC approximately $0 million on account of the FE Corp. Master Pension Plan Accrued Service Costs.

242.    In the ordinary course of business, the Debtors also make monthly payments for accrued pension finance costs (the "FE Corp. Master Pension Plan Accrued Finance Costs") to FESC.  Like in the case of the FE Corp. Master Pension Plan Accrued Service Costs, the FE Corp. Master Pension Plan Accrued Finance Costs payments are each one-twelfth of the total forecasted amount as the beginning of the calendar year.  As of the Petition Date, the Debtors owe FESC approximately $0 million on account of the FE Corp. Master Pension Plan Accrued Finance Costs.

243.    Current and former Employees of the Debtors participate in various Non-Qualified Plans.  Approximately 191 Employees of the Debtors participate in the Executive Deferred Compensation Plan (the "EDCP") with respect to voluntary deferral of their

compensation and approximately 292 Employees participate in the EDCP with respect to the supplemental pension benefit (the "<u>Supplemental Pension</u>"), approximately three Employees of the Debtors participate in the Supplemental Executive Retirement Plan (the "<u>SERP</u>") and approximately two Employees of the Debtors participate in the Cash Balance Restoration Plan (the "<u>CBRP</u>"). As of February 28, 2018, the Debtors owed Employees participating in the EDCP an estimated amount of approximately $62.52 million in voluntarily deferred compensation. As of April 1, 2018, current annualized annuities with respect to the Supplemental Pension total approximately $2.4 million and current annualized annuities with respect to the SERP total approximately $135,422. The CBRP has not yet vested, so the total amount owed to its participating Employees by the Debtors is not determinable at this time. Benefits under the Non-Qualified Plans are payable as lifetime annuities with the same annuity options as offered under the FE Corp. Master Pension Plan.

244. The Debtors pay accrued benefits (the "<u>Non-Qualified Plan Accrued Benefits</u>") on account of the Non-Qualified Plans, which are calculated in January and booked accordingly, to FESC on a monthly basis on the first of the month.[133] As of the Petition Date, the Debtors owe FESC $361,600 on account of the Non-Qualified Plan Accrued Benefits, all of which will become due and owing within the Interim Period.

245. The Debtors plan to continue to make any and all contributions on account of the Pension Plans (the "<u>Plan Obligations</u>") as required by applicable law and various contractual obligations, including under their CBAs. Pursuant to an interim order and a final order, the Debtors seek authority, but not direction, to pay FESC for all Pension Plan Obligations accrued

---

[133] Benefit payments under the Non-Qualified Plans are made monthly on the first of the month through FirstEnergy's in-house corporate pension payment system. Benefit payments under the Non-Qualified Plans are initially charged to FESC, and these payments are then allocated back to the Debtors using allocation factors, based upon expected distributions, provided annually by M Benefit Solutions, a consulting firm that specializes in nonqualified retirement plan services.

110

in the ordinary course of business (whether incurred prepetition or postpetition) and to continue participating in the Pension Plans in the ordinary course of business on a postpetition basis.

246. **Severance Program.** The Debtors participate in a severance program maintained by FE Corp. for the benefit of their Non-Represented Employees and Represented Employees who are permitted to participate under the terms of their CBA comprised of: (i) a general severance plan for all eligible Employees who do not fall under FE Corp.'s compensation tiers one through four (the "Employee Severance Plan"); and (ii) a severance plan for the 24 executive Employees who are in FE Corp.'s compensation tiers two through four (the "Executive Severance Plan", and together with the Employee Severance Plan, the "Severance Program"). Under the Severance Program, Employees are offered severance benefits (the "Severance Benefits") after they have a qualified separation from the Debtors due to the closing or sale of a facility, corporate restructuring, merger, acquisition, reduction in workforce or job elimination.[134] The Debtors pay amounts due on account of the Severance Benefits to FESC, who then remits such amounts to Employees and/or other appropriate parties. Under the Severance Program, Employees receive severance payments as a lump sum as soon as administratively practicable after the Employee's separation, but in no case will it be paid later than two and a half months after the separation occurs.

247. Under the Severance Program, Employees who do not fall under compensation tiers one through five are offered severance payments valued at one and one-half weeks of base pay for each full year of service, subject to a six week minimum and a 52 week maximum, after

---

[134] No Severance Benefits will be offered in the event of voluntary resignation, discharge or demotion for misconduct, violation of company policy, poor job performance or absenteeism, failure to return from leave of absence or, in connection with a sale, continued employment with a buyer.

a qualified separation.[135] Employees who fall under compensation tier five receive a minimum and maximum of 12 weeks of base pay and 52 weeks of base pay, respectively. Employees who fall under compensation tiers two through four that fall under compensation tiers two through four are offered severance payments valued at three weeks of base pay for each year of service, subject to a 26 week (compensation tier four) or 52 week (compensation tiers two and three) minimum and a 65 week (compensation tier four) or 104 week (compensation tiers two and three) maximum, after a qualified separation.

248.    Under the Severance Program, participating Employees are also eligible for the following additional benefits: (i) continuation of health and dental benefits under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") at the active employee rate for the same number of weeks that severance pay is received, (ii) behavioral health counseling services through FE Corp.'s work/life employee assistance program for six months, (iii) career transition services at FE Corp.'s discretion and (iv) for Employees who fall under compensation tiers five and above,  a training stipend reimbursement of up to $3,000 for the cost of education and training for new career preparation.[136]

249.    Payments under the Severance Program are not due and payable until termination. As a basis for comparison, between the years of 2013 and 2017, the Debtors paid FESC an average of $2.4 million per year on account of Severance Benefits. As of the Petition Date, no

---

[135] A full-time Employee's base week of pay shall be calculated as 40 hours per week paid at the Employee's base rate of pay, and a part-time Employee's base week of pay shall be calculated as 20 hours per week at the Employee's hourly rate of pay.
[136] A part-time Employee's training stipend reimbursement limit is $1,500.

former Employees are receiving Severance Benefits and no cash amounts remain outstanding on account of the Severance Program.[137]

250.    The Debtors believe that it is important that they fulfill their obligations under the Severance Program to reassure all Employees that the Debtors intend to honor their obligations to Employees—both during and after their tenure with the Debtors—including those Severance Benefits obligations incurred postpetition under the Severance Program. Accordingly, pursuant to an interim order, the Debtors are seeking authorization to continue to participate in the Severance Program and to continue to provide Severance Benefits to Employees.[138]  Pursuant to a final order, in addition to the relief sought in an interim order, the Debtors are seeking to continue to provide Severance Benefits to the Insiders[139]  under the Severance Program, subject to the cap as provided in section 503(c)(2) of the Bankruptcy Code.[140]

251.    **Miscellaneous Employee Programs**. In addition to the foregoing, the Debtors participate in additional FE Corp. programs (the "Miscellaneous Employee Programs"). In the case of each of the following Miscellaneous Employee Programs, the Debtors reimburse FESC for all amounts spent on behalf of their Employees.

252.    Employees may receive reimbursement of up to $5,000 to offset expenses incurred in the successful adoption of a child (the "Adoption Assistance Program").  Reasonable and necessary adoption fees include, but are not limited to: (i) court costs; (ii) attorney fees; and

---

[137] The maximum amount payable by the Debtors with respect to all of the Employees who are eligible for severance payments under the Severance Program would be $149.6 million, plus costs related to the continuation of COBRA coverage, outplacement services, retiree benefits, and training.

[138] The Debtors are not seeking authorization to continue to provide Severance Benefits to Insiders in the Interim Order.

[139] The following seven Insiders participate in the Severance Program: Donald Schneider, Donald Moul, Paul Harden, Kevin Warvell, Peter Kotsenas, James Mellody and Raymond Lieb.

[140] Section 503(c)(2) prohibits severance payments to an insider unless the payment (1) is part of a program that is generally applicable to full-time employees and (2) falls within statutory limits (i.e., the amount does not exceed 10 times the mean severance payment given to non-management employees in the same calendar year). 11 U.S.C. § 503(c)(2).

(iii) traveling expenses. As of the Petition Date, the Debtors estimate that they owe approximately $0 on account of the Adoption Assistance Program (the "Unpaid Adoption Assistance Amounts").

253. Employees may also receive reimbursement of up to $5,250 per year on account of satisfactorily completed, for-credit courses of study (the "Educational Assistance Program"). Approved degree programs generally fall into business and technology areas, and degree programs must be accredited by a U.S. regional body. Employees receive 90% reimbursement for "A" course letter grades, 80% reimbursement for "B" course letter grades and 70% reimbursement for "C" course letter grades or courses with no letter grades. As of the Petition Date, the Debtors estimate that they owe $157,700 (reimbursed amount in 2017) on account of the Educational Assistance Program (the "Unpaid Educational Assistance").[141]

254. Employees may also receive reimbursement for non-credit courses completed to fulfill requirements for recertification or relicensing of professional accreditations (the "Continuing Education Assistance Program"). Employees may receive 100% reimbursement for courses that qualify under the Continuing Education and Licensing Renewal Program, up to a maximum of $1,500 per course. As of the Petition Date, the Debtors estimate that they owe approximately $0 to FESC for payments made on account of the Continuing Education and Licensing Renewal Program (the "Unpaid Continuing Education Assistance").

255. All Employees and spouses who are covered by one of the Medical Insurance Plans are eligible to participate in FE Corp.'s voluntary HealthyLiving wellness program (the "Wellness Program"). Through the Wellness Program, which is free for Employees and spouses, Employees can earn up to $600 annually and spouses can earn up to $200 annually based upon

---

[141] Two hundred sixty-six Employees participated in the Educational Assistance Program in 2017.

participation in the program, which encourages healthy lifestyle choices. Administration of the Wellness Program costs the Debtors approximately $8800 per month. As of the Petition Date, the Debtors estimate that they owe approximately $0 to FESC on account of the Wellness Program (the "Unpaid Wellness Program Amounts").

256.    All Employees and their household dependents are eligible for the Life Resources EAP, which is a counseling program that provides confidential support and information to Employees about pressing work and family issues. The services of the Life Resources EAP are available at no cost to Employees, and administration of the Life Resources EAP costs the Debtors approximately $3900 per month based upon the current census. As of the Petition Date, the Debtors estimate that they owe approximately $0 on account of the Life Resources EAP (the "Unpaid Life Resources EAP Amounts").

257.    Pursuant to an interim order and a final order, the Debtors seek authority, but not direction, to (a) continue participating in the Miscellaneous Employee Programs, and (b) fund FESC for all amounts paid on behalf of Employees in connection with the Miscellaneous Employee Programs.

258.    **Unions.** As explained above, the wages, benefits and rights of the 1,373 Represented Employees are governed pursuant to the terms of 10 CBAs with the IBEW, the UWUA and the OPEIU. The CBAs constitute legally binding contracts that result from arms' length negotiations between the Unions and the Debtors. Accordingly, the Debtors seek authority, but not direction, to continue honoring the CBAs in the ordinary course of business on a postpetition basis.

259.    The Employees are critical to the success of the Debtors' operations. Failure to satisfy the Debtors' obligations with respect to their Employees in the ordinary course of

business during these chapter 11 cases will jeopardize Employee loyalty and trust, possibly causing Employees to seek alternative employment and disrupting the Debtors' operations. In addition, the Employees rely on their compensation, benefits, and reimbursement of expenses to pay their living expenses and the effect could be financially devastating if the Debtors do not pay them in the ordinary course of business. Based on the foregoing, I believe that the relief requested in the Employee Wages and Benefits Motion is in the best interests of the Debtors, their estates and all parties in interest and should be approved.

I. ***Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Maintain and Administer Customer Programs and to Perform Under Customer Agreements, (II) Honor Prepetition Obligations Related Thereto, and (III) Establish Procedures for Notifying Customers in the Debtors' Chapter 11 Cases* (the "<u>Customer Programs Motion</u>")**

260.    The Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) maintain and administer all of their Customer Programs and to perform under the Customer Agreements (each as defined below) in the ordinary course of business, (ii) honor all commitments owing on account of all of the Customer Programs and Customer Agreements, and (iii) establish the Customer Noticing Procedures (as defined below) to provide notice to Customers (as defined below) of certain events during the chapter 11 cases. Consistent with historical practice, the Debtors intend to pay all payments related to the Customer Programs by paying FESC, which will remit payment to Customers and other appropriate parties.

261.    **The Debtors' Customers.**  FES offers energy-related products and services to retail and wholesale customers (the "<u>Customers</u>"). FES provides energy products and services to Customers under various POLR, shopping, competitive-bid and non-affiliated contractual obligations. FES participates in deregulated energy markets in Ohio, Pennsylvania, Maryland, Michigan, New Jersey and Illinois, competing to: (1) provide retail generation service directly to

end users; (2) provide wholesale generation service to utilities, municipalities and co-operatives, which, in turn, resell to end users; and (3) sell in the wholesale market.

262.     As set forth in **Exhibit C**, FES supplies electricity to end-use Customers through operating (a) a large, competitive power generation fleet and (b) a retail business. FES is a leading competitive retail electric supplier that has a strong position within PJM and MISO. FES provides services through six sales channels:

     a.  Large Commercial & Industrial ("LCI");

     b.  Medium Commercial & Industrial ("MCI");

     c.  Governmental Aggregation ("Gov Agg");

     d.  POLR and Structured Transactions ("POLR/Structured");

     e.  Muni & Co-op ("M&C"); and

     f.  Mass Market ("MM").

263.     As of March 12, 2018, FES served approximately 926,000 Customers in 22 utility services territories across Illinois, Maryland, Michigan, Ohio, Pennsylvania and New Jersey.

264.     **Overview of General Billing Practices.** The large majority of Customer billing is performed by non-FES entities.  The Debtors are seeking to continue their Customer Billing Practices and to pay any amounts owed to electric distribution companies ("EDCs") and other parties with respect to such billing practices.  Approximately 99.9 percent of FES Customer accounts are billed by the EDCs that transmit and deliver the electricity to FES Customers in a given service area. Approximately 0.01 percent of FES Customer accounts are billed directly by FES. Of FES Customer accounts billed by the EDCs, 75 percent are billed by FE affiliate EDCs and the rest are billed by non-affiliate EDCs.

265. The EDCs provide Customer usage data to FES. EDCs may charge FES fees for research, historical usage and switching services. Generally, FES receives payments based on Customer usage after the EDCs bill Customers under FES contracts. Accordingly, FES typically incurs the costs associated with Customer usage well before payments from the Customers are received.

266. EDCs remit consolidated billed Customer payments, largely via bank transfers, on a daily basis directly to the FES receipts account (the "Receipts Account") solely designated for FES receipts. EDCs send documents regarding payment and remittance advice to FES through an electronic data interchange ("EDI"). Each transaction involving EDI documents has two purposes: (i) initiating a money transfer to the FES Receipts Account, and (ii) providing information to FES that describes the purpose of the associated payment for crediting the Customer's account.

267. **The Customer Agreements.** FES's agreements with Customers (collectively, the "Customer Agreements") generally fall into six categories, based on sales channel. As of March 12, 2018, FES is party to approximately 2,200 Customer Agreements and offers in total, representing approximately 36.3 TWh of estimated delivered power and approximately $1.748 billion in estimated revenue during the 2018 calendar year.

268. To provide assurances to current and prospective Customers that FES will continue to perform under the Customer Agreements and provide the same level of competitive and innovative service on par with their prepetition performance, the Debtors seek authority to continue to (a) honor any and all obligations under the prepetition Customer Agreements, (b) honor and continue to perform under the Customer Agreements on a postpetition basis, and (c) negotiate with Customers, including the authority to (i) modify, amend, and extend existing

118

Customer Agreements and (ii) settle any Customer claims arising from or related to the Customer Agreements and other Customer Programs, all in the ordinary course of business, consistent with their past practice. Additionally, in an abundance of caution, the Debtors seek authority pursuant to the Order to continue to enter into new contracts and enroll new Customers after the Petition Date, in the ordinary course of business, consistent with their past practice.

269. **The Debtors' RTO Obligations.** As explained above, FES is a party to agreements with two RTOs. Under the terms of their contracts with PJM and MISO, FES may owe certain amounts to the RTOs (the "RTO Obligations"). In addition, as of March 15, 2018, PJM holds approximately $12.8 million of FES-posted cash collateral as security and MISO holds approximately $12.2 million of FES-posted cash collateral as security.

270. FES receives weekly and monthly invoices from PJM through which various credits and charges are settled on a weekly and monthly basis, respectively. Each line item of a PJM invoice falls under one of eight categories: (i) ancillary; (ii) capacity; (iii) congestion; (iv) energy; (v) FTR/ARR (each defined below); (vi) losses; (vii) transmission; or (viii) miscellaneous. FES is generally a net receiver of revenues from PJM. PJM invoices are settled weekly and monthly, as applicable.

271. FES receives two types of invoices from MISO. MISO's "Day 1" invoices, which are billed monthly, include transmission and remittance charges. MISO's "Day 2" invoices, which are billed weekly, include line-item charges that fall under the following seven categories: (i) administrative, (ii) ancillary; (iii) capacity; (iv) energy; (v) FTR/ARR (each defined below); (vi) losses; and (vii) miscellaneous. FES is generally a net payer of charges to MISO. On a monthly basis, FES pays an average of approximately $4 million on account of RTO Obligations to MISO.

119

272.     As explained above, the invoices that FES receives from PJM and MISO have various components and include certain customary charges (the "Customary Charges") that PJM or MISO, as applicable, offset against revenues owed to FES under its various contracts with the RTOs (the "RTO Agreements").  The Debtors seek authorization to permit PJM and MISO to continue to offset the Customary Charges against revenues owed to FES through the weekly invoices rendered by PJM and MISO, whether or not such Customary Charges were incurred prepetition or postpetition, in the ordinary course.

273.     With respect to PJM's weekly invoices, such invoices include revenues related to Auction Revenue Rights ("ARRs") which are allocated annually by PJM among PJM market participants, including FES, and allow holders to receive an allocation of revenues from the PJM annual auction of Financial Transmission Rights ("FTRs").[142] The PJM weekly invoices also include the value as of the invoice date of any FTRs owned by FES, calculated based upon prices determined from the auction it was acquired from, whether such value is positive or negative as of such date. In the ordinary course of FES's business, it purchases and sells FTRs at the annual and monthly auctions conducted by PJM. FTRs are used by FES to hedge against transmission congestion costs which is one component of locational marginal pricing of electricity.[143] Out of an abundance of caution, the Debtors seek authority for FES to continue from and after the Petition Date to purchase and/or sell FTRs in the ordinary course of FES's business.

274.     As of the Petition Date, the Debtors believe that FES owes $0 to PJM and owes approximately $4.3 million to MISO pursuant to the RTO Agreements. The Debtors seek authority for FES to pay prepetition RTO Obligations and to perform under its existing RTO

---

[142]FTRs are financial instruments that entitle holders to a stream of revenues or charges based on the hourly day-ahead energy market congestion price differences across an applicable path.

[143]As a general rule, FES sells FTRs when they are no longer needed, e.g., when a Customer leaves a geographic location and therefore FES no longer provides services in that particular area.

120

Agreements in the ordinary course. Payment of any RTO Obligations is essential to the Debtors' ongoing business operations because the RTOs provide a critical service to FES. Indeed, without the services of the RTOs, FES could not otherwise deliver electricity to its Customers, and the failure to pay any RTO Obligations could obstruct FES's ability to sell generation into the RTOs' administered markets.

275.    **The Debtors' Customer Programs.** Due to the competitive space in which FES competes, FES employs a number of programs and incurs certain other obligations and commitments to Customers in order to develop existing Customer loyalty and attract new Customers while operating in competitive environments (collectively, as discussed in the Customer Programs Motion, the "Customer Programs").  For the avoidance of doubt, the Customer Programs are the Cash-Back Rewards Program, the Block Billing Program, the Budget Billing Program, the Fee Waivers, the Customer Deposits and Customer Credits, the Customer Partners, the Renewable Energy Obligations, the Grant Obligations, the Rebate Program, the Customer Incidents, and the Other Customer Obligations (each, as defined below).  To the extent the Debtors owe any obligations in connection with the Customer Programs, the Debtors satisfy such obligations by paying FESC, which remits payment to the Customers and other appropriate parties.

276.    Continuing the Customer Programs in the ordinary course is essential to the Debtors' successful transition into chapter 11. In order to preserve value, the Debtors must promptly assure their Customers that the Customer Programs will continue uninterrupted. Maintenance of the Customer Programs is needed to garner Customer confidence and help the Debtors preserve market share in a highly competitive industry. The following describes Customer Programs that the Debtors actively use to cultivate Customer satisfaction and loyalty:

a. **Cash-Back Rewards Program.** FES offers a cash-back loyalty rewards program (the "Cash-Back Rewards Program"). The Cash-Back Rewards Program, serving approximately 2,400 residential Customers pursuant to contracts that expire on December 31, 2019, is a Customer loyalty program that makes recurring annual cash payments to participating Customers. The average annual cash-back payment is $30, resulting in a total annual payout of approximately $70,000. The cash-back payment is due to the Customer no later than 90 days after year end, as long as a Customer remains active through their December meter read. WireCard North America issues the cash-back cards and charges $1 per card as a processing fee. The Debtors estimate that they pay approximately $70,000 each year on account of the Cash-Back Rewards Program. As of the Petition Date, the Debtors estimate that the total amount due under the Cash-Back Rewards Program will be approximately $17,500. The Debtors seek authority to honor all prepetition obligations with respect to the Cash-Back Rewards Program in the ordinary course of business and to continue the Cash-Back Rewards Program on a postpetition basis, consistent with their past practice.

b. **Block Billing Program.** Four LCI Customers buy a monthly kWh block and are credited the difference between the total block amount and the actual metered load at the end of the month (the "Block Billing Program"). Ten accounts, representing $40 million in annual revenues, utilize the Block Billing Program.The amount owed to the Customers participating in the Block Billing Program varies during the year. As of March 9, 2018, the Debtors estimate that they owe an aggregate amount of approximately $0 worth of prepaid amounts on account of the Block Billing Program. The Debtors seek authority to honor all prepetition obligations with respect to the Block Billing Program in the ordinary course of business and to continue the Block Billing Program on a postpetition basis, consistent with their past practice.

c. **Budget Billing Program.** FES offers residential Customers the option to pay their bills based on their average usage on a rolling basis, rather than a bill based on their actual usage in the preceding month (the "Budget Billing Program"). Budget Billing programs are used by ten to fifteen percent of residential Customers. Generally, EDCs that provide Budget Billing Programs control the accounts receivable, and FES gets paid accordingly based on normal payment hierarchy rules. Where certain EDCs do not provide a type of average monthly billing for Gov Agg communities, FES handles calculations needed to include approximately 900 additional Customers in the Budget Billing Programs. Approximately 820 FES Customers participate in the Budget Billing Program, and the amount owed to Customers varies widely during the year, ranging from approximately $0 to approximately $600. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately

122

$30,000 worth of prepaid amounts on account of the Budget Billing Program. The Debtors seek authority to honor all prepetition obligations with respect to the Budget Billing Program in the ordinary course of business and to continue the Budget Billing Program on a postpetition basis, consistent with their past practice.

d.  **Fee Waivers.** In the ordinary course of business, the Debtors apply fees to Customers' bills as penalties for late payment or for premature account cancellation.  Late fees typically constitute 1.5% of the applicable bill's total, and cancellation fees average $48 per account. From time to time, Customers will request that these late fees or cancellation fees be waived. Depending on the circumstances, the Debtors will elect to remove late fees or cancellation fees (the "Fee Waivers") when they deem a Fee Waiver will incent a Customer to maintain or renew their relationship with FES. The Debtors estimate that they granted approximately $5,000 in Fee Waivers in the first three months of 2018. The Debtors seek authority to honor all prepetition obligations with respect to the Fee Waivers in the ordinary course of business and to continue to grant Fee Waivers on a postpetition basis, consistent with their past practice.

e.  **Customer Deposits and Customer Credits.** Based on Customers' utility payment data and history, the Debtors request that certain Customers pay cash deposits (the "Customer Deposits") or post letters of credit (each, an "LOC"). FES currently holds deposits from three LCI Customers in the aggregate amount of approximately $433,000.  FES does not apply the deposits to Customer accounts. Instead, the deposits are held in a general ledger and only applied if needed. Otherwise, deposits are returned to Customers at the end of the contract. To the extent a Customer has posted an LOC, FES has the right to require a renewal of such LOC or to determine that the LOC is no longer required. As of the Petition Date, the Debtors estimate that they hold an aggregate amount of approximately $433,000 in cash on account of the Customer Deposits. In addition to returned Customer Deposits that are credited to Customers' electricity bills, the Debtors also treat overpayments, billing adjustments and prepayments (other than through the Budget Billing Program) as credits to the Customers' accounts (the "Customer Credits"). Based on historical data from the last twelve months, the Debtors estimate that the amount of Customer Credits due to overpayment, unapplied amounts and billing adjustments fluctuate from $0 to approximately $50,000 throughout the year on an individual Customer basis. If a Customer discontinues service with the Debtors or is an inactive Customer and has outstanding Customer Deposits or Customer Credits, the Debtors will direct FESC to issue a refund check to the Customer or otherwise credit a Customer's credit card for the appropriate amount, which amount the Debtors will pre-fund to FESC. The Debtors estimate that approximately two percent of the Customer Credits will result in a customer refund. As of the Petition Date,

123

the Debtors estimate that they hold an aggregate amount of approximately $1 million on account of the Customer Credits. The Debtors seek authority to honor all prepetition obligations with respect to the Customer Deposits and Customer Credits in the ordinary course of business and to continue to honor the Customer Deposits and Customer Credits on a postpetition basis, consistent with their past practice.

f.    **Customer Partners.** The Debtors use the assistance of third parties, including printing services, collection agencies, and auditing services (collectively, the "<u>Customer Partners</u>") to cultivate, maximize and develop Customer relationships. The Debtors estimate that the total obligation to Customer Partners is approximately $8.6 million annually. As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $793,000 in unpaid fees to Customer Partners. The Debtors seek authority to honor all prepetition obligations with respect to the Customer Partners in the ordinary course of business, and to continue to honor existing agreements with Customer Partners and to enter into new agreements with Customer Partners on a postpetition basis, consistent with their past practice.

g.    **Renewable Energy Obligations**. Pursuant to Customer Agreements with certain Customers, FES has an obligation to meet various state and/or Customer-specific renewable requirements (the "<u>Renewable Energy Obligations</u>"). To satisfy the Renewable Energy Obligations, the Debtors must demonstrate that FES has retired the appropriate type and quantity of renewable energy certificates ("<u>RECs</u>") in the GATS or APX systems (as described in the Customer Programs Motion). Pursuant to one LCI Agreement that expires in June 2018, the Debtors also must purchase RECs from certain Customers that buy power from FES. On average, FES purchases approximately 1,100 RECs from Customers each year at a price that is contractually tied to the sales of power to these Customers. FES acquires RECs through a combination of (i) wholesale market purchases, (ii) long-term, off-take agreements from wind and solar facilities and (iii) claims of certain renewable attributes from some of FES's generating stations. The RECs are placed in inventory and tracked through the GATS and APX systems as RECs are retired to meet the obligations. The Debtors estimate that Renewable Energy Obligations cost approximately $24.7 million annually. As of the Petition Date, the Debtors estimate that they owe approximately $13.5 million on account of Renewable Energy Obligations. The Debtors seek authority to honor all prepetition obligations with respect to the Renewable Energy Obligations in the ordinary course of business, and to continue to honor existing Renewable Energy Obligations, consistent with their past practice.

h.    **Grant Obligations**. FES pays grants to municipalities that take part in Gov Agg relationships (the "<u>Grant Obligations</u>"). These grants take the

form of one-time fees or earned grants based on the lifetime of the relevant Customer Agreement. As of the Petition Date, the Debtors estimate that they owe $0 on account of the unpaid Grant Obligations which are currently due and owing. The Debtors respectfully submit that it is critically important for FES's brand to honor the Grant Obligations in the ordinary course of business. Not doing so would severely harm FES's reputation and the future value of its retail business. In addition, FES has one annual sponsorship payment of approximately $55,000. The Debtors seek authority to continue to enter into new Grant Obligations and annual sponsorships in connection with the Customer Agreements and to pay the unpaid Grant Obligations and the annual sponsorships postpetition in the ordinary course of business.

i.   **Rebate Program**. FES offers rebates (the "Rebate Programs") to certain Customers. FES has 27 active net metered accounts in Illinois, Maryland and New Jersey. Financial compensation is provided to New Jersey Customers only.  As of the Petition Date, there are an estimated 10,000 total banked kilowatt hours. Assuming an average locational marginal pricing rate of $0.04, the total amount that could be paid out in April 2018 is $400. Additionally, FES has a Customer Agreement with an LCI Customer that generates more than it consumes (generating 45,000 MWh while consuming only 15,000 MWh monthly). Due to a change in the EDC's net metering tariff, effective as of June 1, 2017, FES passes through the credit back to this LCI Customer. The monthly average amount of cash outlay on account of the credit is approximately $500,000. The Debtors estimate that the Rebate Programs will require payments of approximately $6 million in 2018.  As of the Petition Date, the Debtors estimate that they owe approximately $500,000 on account of the Rebate Programs.  The Debtors seek authority to honor all prepetition obligations with respect to the Rebate Programs, in the ordinary course of business, and to honor the Rebate Programs on a postpetition basis, consistent with past practice.

j.   **Customer Incidents**. The Customer Programs occasionally give rise to customer complaints and claims (the "Customer Incidents"). To ensure continuing excellent service and customer satisfaction, the Debtors employ certain measures to address any service-related issues and to resolve and settle the Customer Incidents in the ordinary course of business.  As of the Petition Date, the Debtors believe that they owe $0 on account of the Customer Incidents. The Debtors seek authority, but not direction, to honor all prepetition obligations with respect to the Customer Incidents in the ordinary course of business and to continue to settle, resolve, and honor the Customer Incidents on a postpetition basis, consistent with their past practice.

k. **Other Customer Obligations**. From time to time, FES or FESC (on behalf of FES) enters into Customer Agreements that give rise to other types of Customer Obligations (the "Other Customer Obligations"). For example, one LCI Customer is party to a Customer Agreement that provides for capacity, transmission and volume true-ups. Such true-ups function to adjust the Customer's billing to reflect changes in the Customer's Peak Load Contribution each year. As of the Petition Date, the Debtors estimate that they owe $0 on account of the Other Customer Obligations. The Debtors seek authority pursuant to the Order to honor all prepetition Other Customer Obligations and to continue to honor the Other Customer Obligations postpetition, consistent with their past practice, and with respect to current and new Customers.

l. **Customer Collateral**. FES has posted cash collateral as security in connection with FES's obligations to Customers under certain Customer Agreements (the "Customer Collateral"). The Customer Collateral includes approximately $12.7 million of collateral posted with respect to nine LCI Customers, approximately $4.0 million of collateral posted with respect to thirteen Gov Agg Customers, and approximately $14.4 million of collateral posted with respect to three POLR/Structured Customers. The Debtors seek authority pursuant to the Order to honor all prepetition obligations with respect to the Customer Collateral and to post additional Customer Collateral in the ordinary course of business, consistent with their past practice, and with respect to current and new Customers.

277. **Procedures for Providing Customers with Notice.** While the Debtors intend to keep Customers apprised of events in these chapter 11 cases that could potentially involve Customers' interests, the Debtors also recognize that the extensive list of Customers involved in a complex restructuring will require certain noticing limitations in order to avoid unnecessary expense and burden to the estates. The Debtors seek approval of noticing procedures for current Customers as described in the Customer Programs Motion (the "Customer Noticing Procedures") so that they may efficiently and cost-effectively deliver notices to Customers (the "Customer Notices") and simplify the chapter 11 process for Customers.

278. Accordingly, the Debtors propose that service of Customer Notices be limited to only those Customers that may already be included as parties on the General Service List,[144] with the exception of the following:

a. Any notices regarding the time fixed for filing of proofs of claims pursuant to Rule 3003 of the Bankruptcy Rules;

b. The filing of a Section 363 sale motion pursuant to which a contract affecting a particular customer may be assigned;

c. The filing of a motion to assume, assign or reject a contract affecting a particular customer;

d. The filing of an objection with respect to a proof of claim filed by a particular customer;

e. Any notices regarding a hearing on confirmation of a plan of reorganization;

f. The filing of a notice of confirmation of a plan of reorganization;

g. The filing of a motion to convert the Debtors' cases into a case under chapter 7 of the Bankruptcy Code; or

h. Any notice of conversion of the Debtors' cases into a case under chapter 7 of the Bankruptcy Code.

In the scenarios set forth in sections (a) through (h) above, the Debtors propose that affected Customers be noticed electronically (to the extent such Customers have been billed by the Debtors in this manner historically and the Debtors have such email addresses) or in the alternative, by regular U.S. Mail.

279. The Debtors believe that the Customer Noticing Procedures are appropriate here because the provision of notice of all matters in these chapter 11 cases to all Customers who might otherwise be entitled to notice could delay the restructuring process and result in unjustifiable expense and burden to the estates. Without approval of the Customer Noticing

---

[144]The term "General Service List" has the meaning as defined in the Debtors' motion for approval of case management procedures (the "Case Management Motion") that was filed concurrently with this Motion.

Procedures, the Debtors believe that the default notice obligations would impose an enormous burden on the Debtors' estate with little – if any – added benefit to creditors or Customers. Accordingly, the Debtors respectfully submit that the Customer Noticing Procedures are adequate and sufficient under the circumstances of these chapter 11 cases.

280. The Customer Programs are critical to the Debtors' continued operations because they are necessary to maintain the confidence and goodwill of the Debtors' Customers. The Debtors must act strategically to retain Customer support needed to garner revenues and increased cash flow. Failure to honor the Customer Programs could materially impair business operations and frustrate reorganization efforts. Based on the foregoing, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates and all parties in interest and should be approved.

**J. Debtors' Motion for Entry of Interim and Final Orders Authorizing FirstEnergy Solutions Corp. to (A) Continue Performing Under Prepetition Hedging and Trading Arrangements, (B) Pledge Collateral and Honor Obligations Thereunder, and (C) Enter Into and Perform Under Trading Continuation Agreements and New Postpetition Hedging and Trading Arrangements (the "Hedging and Trading Motion")**

281. The Debtors seek an interim and final order authorizing FES to: (a) continue performing under its hedging and trading arrangements and to honor, pay, and/or otherwise satisfy any and all obligations thereunder, including prepetition obligations (the "Prepetition Hedging and Trading Arrangements"), in a manner consistent with prepetition practices; (b) enter into trading continuation agreements and new postpetition hedging and trading arrangements in the ordinary course of business; and (c) pledge collateral in the form of cash, letters of credit,

and, in certain circumstances, liens, on account of the prepetition and postpetition hedging and trading arrangements. [145]

282.    The Debtors engage in hedging and trading activities by entering into contracts with various counterparties to hedge their exposure to risks, including price and delivery risk, with respect to electricity within established risk management policies.  These hedging and trading activities are vital to the success of the Debtor's businesses and directly affect the ability of the Debtors to operate by mitigating the volatility from changes in overall wholesale revenues and costs.  The Debtors utilize financial derivatives that hedge price risks.  To provide governance and control over hedging operations, FES has adopted certain risk management policies to ensure that hedging and trading arrangements are closely monitored and in the best interests of all the company's stakeholders.

283.    FES has approximately 9 active Prepetition Hedging and Trading Arrangements as of the Petition Date.  The Hedging and Trading Arrangements generally fall into the following categories: (a) over-the-counter transactions, and (b) the Broker Arrangement (as defined below).

284.    **Over-the-Counter Transactions.**  FES enters into over-the-counter financial transactions related to electricity directly with third parties ("OTC Counterparties"), including transactions that are subject to the standard terms and conditions of the International Swaps and Derivatives Association Inc. documentation (the "OTC Agreements").  In conjunction with industry standards, FES is required on a regular basis to post collateral for certain OTC Agreements to provide OTC Counterparties with assurance that obligations under the contracts will be met.  As of the Petition Date, FES is a party to OTC Agreements with active positions involving approximately 9 OTC Counterparties. Many of the OTC Arrangements have defined

---

[145] In support of the Hedging and Trading Motions, the Debtors submitted the *Declaration of Kevin Warvell in Support of the Debtors' Hedging and Trading Motion*.

triggers, such as credit ratings or financial performance ratios, which permit an OTC Counterparty to request additional collateral from FES upon changes to those triggers. Further, some OTC Agreements give the OTC Counterparty the right to request additional collateral in the event that it has reasonable grounds to believe that FES's creditworthiness or performance under the applicable OTC Agreement has become unsatisfactory. Gross liability exposure of approximately $2.3 million is secured by $3 million cash collateral held by third parties.

285. **The Broker Arrangement.** FES is a party to a broker arrangement (the "Broker Arrangement") with a clearing broker (the "Clearing Broker") to clear futures related to the purchase and sale of electricity. The Clearing Broker has broad discretion under its Broker Arrangement to: (a) terminate its agreement with FES; (b) refuse to enter into future transactions for the benefit of FES; and (c) cancel or liquidate FES's open positions. As is common in the Debtors' industry, the Broker Arrangement requires the Debtors to fully-collateralize any mark-to-market deficit the Debtors have with the Clearing Broker on a daily basis.

286. As is typical in the industries that have wholesale trading markets, an entity that participates in those markets must maintain an acceptable level of creditworthiness or provide acceptable credit support, generally in the form of guarantees, letters of credit, cash, prepayments, or other forms of collateral. In the ordinary course of business, FES posts collateral to and receives collateral from counterparties to Hedging and Trading Arrangements. Specifically, FES provides credit support relating to the following Prepetition Hedging and Trading Arrangements.

287. As a general matter, the amount of credit support required under a Hedging and Trading Arrangement is subject to daily recalculation and posting requirements. On any given day, with respect to any Hedging and Trading Arrangement, additional collateral may be required

of FES or posted collateral may be returned to FES.  In many instances, a counterparty to a Hedging and Trading Arrangement is required to post collateral with FES to secure such counterparty's performance.  Generally, a failure by FES or a counterparty to post or return credit support within the contractually required time period is an event of default under the applicable Hedging and Trading Arrangement.

288.    The most significant component of collateral requirements under most Hedging and Trading Arrangements is fairly straightforward – each party is required to post collateral equal to the amount of the counterparty's "exposure," minus collateral already posted and any applicable credit threshold.  While "exposure" can be calculated in a variety of ways under the Hedging and Trading Arrangements, "exposure" generally means an amount equal to the difference between the contract price and the market price times the volume of commodity remaining under the transaction, plus any amounts due for performance, goods, and service already provided for which payment has not yet been made (the "Commodity Exposure Calculations").  Stated differently, the key component of exposure is the net amount one party would owe to the other in the event of a default under a Hedging and Trading Arrangement.

289.    To the extent the parties have posted collateral under the Hedging and Trading Arrangement, the party receiving such performance assurance collateral would subtract the value of such collateral from their Commodity Exposure Calculation, while the party delivering the collateral would add the value of the collateral to their calculation.  These accounts, together with the Commodity Exposure Calculation are usually calculated daily, with collateral either being posted or returned, by one party to the other, as applicable for the outstanding exposures.

290.    A failure by FES to post credit support within the contractually required time period, which could be as little as a few hours after notice from the counterparty, would be

18-50757-amk    Doc 55    FILED 04/01/18    ENTERED 04/01/18 16:06:01    Page 131 of 165

considered a default under the applicable Hedging and Trading Arrangement. The counterparty would have the right to terminate and liquidate the applicable Hedging and Trading Arrangement, creating risks to the generation and retail businesses. Therefore, the ability of FES to continue to meet its collateral obligations during the Interim Period to maintain the protections afforded by the Hedging and Trading Arrangements is critical. The Debtors will lose this value opportunity if counterparties to Prepetition Hedging and Trading Arrangements terminate the Prepetition Hedging and Trading Arrangements or take other adverse action in response to FES's inability to meet postpetition obligations. In addition, the Debtors' market activities – specifically their ability to mitigate price and delivery risks associated with electricity – may be adversely affected if the Debtors are not authorized to maintain the Prepetition Hedging and Trading Arrangements in the ordinary course of business. Ultimately, these circumstances could have a negative effect on the overall value of the Debtors' business.

291. FES has several risk management policies (the "Risk Management Policies") currently in place to mitigate exposure to commodity price fluctuations. FES's Risk Management Policies are reviewed annually with the Audit Committee of the FE Corp. Board of Directors and the FES Board and creates a complementary framework with a Wholesale Risk Management Policy and a Retail Risk Management Policy. Under FES's Risk Management Policies, discretionary and propriety trading is prohibited; only hedging transactions are permitted. All counterparties must be pre-approved and credit and concentration limits must be followed. Any hedging transaction requires the approval of FES management and any hedging transaction over $2 million up to $5 million requires the approval of the FES Review Committee

("FESRC"), which meets weekly to get approvals.  If the hedging transaction is $5 million or larger, it requires FES Board approval.[146]

292.    The continuation of the Hedging and Trading Activities, at all times subject to the Risk Management Policies, is key to maximizing the value of the Debtors' estates.  Through the establishment of a defined risk governance structure, the creation of parameters for transaction governance, and the imposition of valuation and risk parameters and reporting processes applicable to all Hedging Transactions, the Debtors ensure that such transactions are closely scrutinized and in the best interest of the Debtors and all parties in interest.  Based on the foregoing, I believe that the relief requested in the Hedging and Trading Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**K.    *Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Continue Using Their Existing Cash Management System, (II) Maintain Existing Business Accounts and Business Forms, and (III) Continue using Certain Investment Accounts; (B) Authorizing Continued Intercompany Transactions; (C) Granting Postpetition Intercompany Claims Administrative Expense Priority; and (D) Granting Related Relief* (the "Cash Management Motion")**

293.    To facilitate the efficient operation of their businesses, the Debtors use an integrated, centralized Cash Management System to collect, transfer, and disburse funds generated by their operations and obtained from their secured borrowings.    The Cash Management System facilitates cash monitoring, forecasting, and reporting, and enables the Debtors to maintain necessary oversight of the related bank accounts (collectively, the "Bank Accounts")[147] held by the Debtors, or in the case of the FES Receipts Account (as defined

---

[146] FES is in the process of revising its Risk Management Policies and expects that the revised Risk Management Policies will be adopted within the next few weeks.    Specifically, the new Risk Management Policies will remove FE Corp. Board approval for transactions greater than $500,000,000 and FirstEnergy Risk Policy Committee approval for transactions greater than $60,000,000.

[147] As discussed below, the FES Receipts Account, the Deposit Account, the AP Check Disbursement Account, the Payroll Check Disbursement Account and the Main Cash Concentration Account are held in the name of non-Debtor FESC.

herein), the Deposit Account (as defined herein) and the Main Cash Concentration Account (as defined herein), FESC, that are maintained with banks (collectively, the "<u>Banks</u>") as reflected on the diagram of the Cash Management System attached to the Cash Management Motion.[148]

294.    The Cash Management System is similar to those commonly employed by businesses comparable to those of the Debtors.  Large businesses use integrated systems to help control funds, ensure cash availability for each of the Debtors, and reduce administrative expenses by facilitating the movement of funds among multiple entities.[149]  Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.

295.    The Cash Management System is overseen by the personnel in the Debtors' Finance Group and FESC.  The Finance Group monitors the Bank Accounts and manages the proper collection and disbursement of funds, and the allocation of credits and debits owed through the FES Money Pool.

296.    The Debtors and FESC maintain robust controls relating to the Cash Management System.  The Finance Group tracks receipts and disbursements through the Cash Management System on a daily basis, and members of the Finance Group prepare daily reporting summarizing this activity.  The Debtors hold weekly cash management meetings where FES executives further review the reasonableness of the reported activity and ensure, postpetition, that there is adequate liquidity in the Main Cash Concentration Account and the Deposit Account.

---

[148] In support of the Cash Management Motion, the Debtors also submitted the *Declaration of Charles Moore in Support of the Debtors' Critical Vendor Motion; Shippers, Warehousemen, and Materialmen Motion; Intercompany Agreements Motion; and Cash Management Motion.*

[149] *See, e.g.*, *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. April 29, 2014) [Docket No. 37] (describing similar complex cash management system maintained by a debtor in the same industry); *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill. Dec. 17, 2012) [Docket No. 8] (describing similar complex cash management system maintained by a debtor in the same industry).

297.    As further controls, various levels of required authorizations are determined by the size and type of the disbursement, and the Finance Group prepares regular reconciliations that are reviewed internally.  The FES finance department has implemented a process to review every transaction, including payments under the Intercompany Transactions (as defined herein), prior to payments being made.  These procedures ensure that the Banks only process and honor payments that the Debtors have expressly authorized.

298.    **The Bank Accounts.** The Cash Management System is specifically tailored to meet the operating needs of the Debtors by enabling the participants to effectively and centrally control and monitor corporate funds, ensure cash availability and liquidity, invest excess cash, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances and related information.  These controls are critical to the operation of the Debtors' businesses given the significant volume of transactions managed through the Cash Management System.

299.    Historically, FES and the other Debtors participated in the Non-Utility Money Pool, which was a money pool arrangement with FE Corp.'s other non-utility subsidiaries pursuant to the Non-Utility Money Pool Agreement.  Prior to the Petition Date, the Debtors made certain changes to the Cash Management System in order to provide the Debtors with greater control over their receipts and disbursements, including changes to enable FESC to segregate the Debtors' funds from funds belonging to non-Debtors.  The Debtors are seeking to maintain their current Cash Management System, including continuing use of the Debtors' funds in the Deposit Account, the AP Check Disbursement Account, the Payroll Check Disbursement Account, the Payroll Direct Deposit Account, and in the Main Cash Concentration Account to fund disbursements to third parties and payments under Intercompany Transactions (as defined

herein) and to authorize FESC to make such payments on the Debtors' behalf using the Debtors' funds. Maintaining the prepetition Cash Management System, as modified, will minimize disruption to the Debtors' operations and the time and money that would be necessary to develop a completely new cash management system.

300. FESC, one of FE Corp.'s non-Debtor affiliates, maintains a Main Cash Concentration Account with JPM,[150] an accounts payable check disbursement account (the "AP Check Disbursement Account") and two payroll accounts (the "Payroll Check Disbursement Account" and the "Payroll Direct Deposit Account") with JPM and maintains the Deposit Account and FES Receipts Account[151] on behalf of FES and its subsidiaries, and FENOC, as applicable, with JP Morgan Chase Bank ("JPM"). Substantially all of the third party operating and collateral receipts related to FES and its subsidiaries are deposited directly into the FES Receipts Account.[152] At the end of each day, available funds deposited in the FES Receipts Account are swept into the FES Account (as defined below) to ensure that the Debtors maintain control over their receipts. Receipts related to Intercompany Transactions owed to FES and its subsidiaries are transferred into the FES Account from the Main Cash Concentration Account upon the request of the Debtors. FENOC operating and collateral receipts from affiliates and

---

[150] FE Corp. maintains three separate money pools, one for the non-utility entities and one for the regulated utility entities, and one for the Debtors. Prior to the Petition Date, the Debtors participated in the money pool for the non-utility entities, however, the Debtors ceased participating in the non-utility money pool on March 16, 2018. The Debtors entered into a new money pool agreement dated March 16, 2018 by and among the Debtors and FESC as the administrative agent (the "FES Money Pool Agreement"). No funds belonging to Non-Debtors are deposited into the FES Receipts Account or the Deposit Account. However, as discussed herein, the Main Cash Concentration Account contains funds from accounts related to FE Corp.'s Non-Debtor non-regulated utility affiliates and accounts related to the other Non-Debtor non-utility entities. The Debtors also transfer funds to the Deposit Account and Main Cash Concentration Account as necessary to allow FESC to make disbursements on behalf of the Debtors.

[151] The Debtors also have certain additional accounts that are not currently utilized as part of the Cash Management System described herein. One of these accounts is the adequate assurance deposit account established pursuant to the *Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services*.

[152] When receipts are deposited into the FES Receipts Account, a corresponding entry is made in the accounting records of the corresponding Debtor. By continuing to utilize the FES Receipts Account, the Debtors will ensure that they are able to accurately track incoming funds.

136

third parties are deposited into the Main Cash Concentration Account and are then transferred into the FENOC Account.

301. Debtor FES maintains a Bank Account (the "FES Account") at JPM. The FES Account is a general concentration and disbursement account that is used to hold the Debtors' receipts and the proceeds of the Debtors' secured borrowings. The FES Account holds approximately $554.4 million as of the Petition Date. FES may transfer funds from the FES Account to the Deposit Account as working capital to pre-fund disbursements to be made by FESC on their behalf. For payments to third parties, FESC subsequently funds the AP Check Disbursement Account, the Payroll Check Disbursement Account or the Payroll Direct Deposit Account, as applicable.

302. Debtor FENOC maintains a Bank Account at JPM (the "FENOC Account"). Similar to the FES Account, the FENOC Account is a general receipts and disbursements account that currently holds approximately $6.3 million as of the Petition Date. Substantially all of FENOC's collections are derived from services rendered to the Debtors and certain of FE Corp.'s non-Debtor affiliates plus collateral receipts in connection with hedging activity, which are recorded in the FES Money Pool and subsequently remitted to the FENOC Account from the Main Cash Concentration Account. Similar to FES, FENOC uses FESC as payment agent for substantially all of its payment obligations through the Main Cash Concentration Account, AP Check Disbursement Account, Payroll Check Disbursement Account, and Payroll Direct Deposit Account.

303. Because, in most cases, the individual Debtors do not have their own payment systems, FESC acts as a payment agent and makes cash transactions on behalf of the Debtors via the Main Cash Concentration Account. Such transfers are recorded in the individual Debtors'

balances by FESC. The Deposit Account held a balance of $1.9 million as of the Petition Date. Funds advanced by the Debtors to fund necessary disbursements from the Main Cash Concentration Account are held in the Deposit Account and then transferred to the Main Cash Concentration Account as payments come due. Funds deposited in the Main Cash Concentration Account are used to, among other things, fund payroll for the Debtors' employees, pay for goods and services provided to the Debtors by third parties, satisfy amounts owed pursuant to the Intercompany Transactions, and otherwise pay certain of the Debtors' operating expenses.[153]

304. The Debtors no longer have the ability to borrow funds from the Non-Utility Money Pool as was their practice prior to March 16, 2018. With the exception of certain third party supplier payments[154], no non-Debtors, including, but not limited to, FESC and FE Corp., will pre-fund or otherwise advance any amounts to be paid on behalf of any Debtors from their cash balance in the Main Cash Concentration Account, and no amounts will be paid from the Main Cash Concentration Account on behalf of the Debtors absent sufficient funds from the Debtors being available. Accordingly the Debtors will ensure that sufficient funds are always available in the Deposit Account or the Main Cash Concentration Account to fund any necessary disbursements on behalf of the Debtors whether from receipts and revenues collected from third parties or affiliates, or from the proceeds of FES's secured borrowings. To the extent the Debtors determine that the Deposit Account or the Main Cash Concentration Account hold more of the Debtors' funds than are necessary to fund disbursements, the Debtors have the ability to

---

[153] FESC provides a number of these services pursuant to Shared Services Agreements, as discussed in greater detail herein and in the *Motion of Debtors for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Intercompany and Shared Services Agreements* filed contemporaneously herewith.

[154] Certain third party suppliers provide goods and/or services to multiple FE Corp. entities, including Debtors and non-Debtors. FESC pays invoices from these third party suppliers when due and then allocates the amount owed by each Debtor or non-Debtor entity as part of a month-end true up. Postpetition, FESC will continue to pay this limited category of invoices in advance of the monthly accounting allocation.

request that funds be transferred from the Deposit Account or the Main Cash Concentration Account into the FES Account or FENOC Account, as applicable.[155]

305. **The Funds Flow.** Proceeds from FES's secured borrowings or receipts from third parties deposited in the FES Account can be manually transferred from the FES Account to the Deposit Account, and then to the Main Cash Concentration Account to fund certain payments through the AP Check Disbursement Account, Payroll Check Disbursement Account or Payroll Direct Deposit Account.

306. Funds owed to FENOC from the Intercompany Transactions are transferred directly the FENOC Account from the Main Cash Concentration Account. Disbursements owed by FENOC are paid out of the Main Cash Concentration Account from funds advanced by FENOC. FENOC advances funds by transferring the required amounts from the FENOC Account to the Deposit Account, and then said funds are transferred from the Deposit Account to the Main Cash Concentration Account as necessary as payment come due. The majority of FENOC's available funds originate from payments it receives from FES via the Main Cash Concentration Account on a monthly basis in accordance with the Master Nuclear Operating Agreement. FENOC also receives funds directly from the FENOC Account for miscellaneous amounts that FES receives from time to time on behalf of FENOC or as otherwise needed through intercompany loans.

307. The vast majority of the Debtors' third-party receipts are deposited directly into the FES Receipts Account and then swept daily into the FES Account. Funds can then be manually transferred by the Debtors, as necessary, from the FES Account into the Deposit Account and the Debtors can subsequently request funds be transferred to the Main Cash

---

[155] To the extent that the Debtors and FESC have a disagreement over any requested transfer of the Debtors' funds, the Debtors acknowledge that FESC may not complete the requested transfer until such disagreement is resolved.

Concentration Account. From the Main Cash Concentration Account, FESC, on behalf of the Debtors, processes and pays (a) the vast majority of the Debtors' vendor invoices, (b) employee payroll, and (c) other obligations of the Debtors and amounts owed to the Debtors, including under the Intercompany Transactions, in the ordinary course of business. Funds for such payments are drawn from the Main Cash Concentration Account, the Payroll Check Disbursement Account, and the AP Check Disbursement Account and the Debtors' net cash balance in the Main Cash Concentration Account is reduced commensurately, and recorded, as applicable in the relevant Debtor's books and records. As discussed above, FES and FENOC will pre-fund any such payments by ensuring sufficient funds are transferred to the Deposit Account and that such funds will be transferred to the Main Cash Concentration Account as needed to satisfy payment obligations. As noted above, to the extent the Debtors determine that the Deposit Account or the Main Cash Concentration Account hold more of the Debtors' funds than are necessary to fund disbursements, the Debtors have the ability to request funds be transferred from the Deposit Account or the Main Cash Concentration Account into the FES Account, FENOC Account, or the Deposit Account, as applicable.

308. Requiring the Debtors to open new bank accounts and to adopt a new, segmented cash management system at this critical stage of the chapter 11 cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of the Debtors' businesses. Importantly, the Cash Management System and use of the FES Money Pool provide the Debtors with the ability to track and control funds, ensure cash availability, and reduce administrative costs though a centralized method of coordinating the collection and movement of funds. As a practical matter, because of the Debtors' corporate and financial structure, it would be extremely difficult and expensive to establish and maintain a separate cash

management system and separate bank accounts for each Debtor and to separate the Debtors from the FES Money Pool. In particular, the Debtors would have to develop an entirely new receipts and revenue collection and disbursement systems. Absent the relief requested in the Cash Management Motion, the Debtors' operations could grind to a halt, needlessly destroying the value of their business enterprise. Based on the foregoing, I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

L. ***Motion of Debtors for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Intercompany and Shared Services Agreements (the "Intercompany Agreements Motion")***

309. The Debtors receive certain necessary management, administrative, corporate, and support services from non-Debtor affiliates, including FESC and, in turn, provide services to their Debtor affiliates and certain of FE Corp.'s non-Debtor affiliates in the ordinary course of business pursuant to the Intercompany Agreements (as defined above). The Debtors are also parties to certain sale/leaseback transactions, support and financing arrangements, and power sales and purchase agreements with certain Debtor affiliates and FE Corp.'s non-Debtor affiliates. The Debtors' Employees participate in various compensation, health and welfare plans and programs, a qualified defined benefit pension plan, several non-qualified pension plans, severance programs, and a 401(k) plan maintained by FE Corp.[156]

310. **Shared Services Agreements.** The Debtors receive necessary corporate and administrative services from FESC pursuant to the Shared Services Agreements. Under the Shared Services Agreements, FESC provides essential centralized administrative and back-office

---

[156] In support of the Intercompany Agreements Motion, the Debtors also submitted the *Declaration of Charles Moore in Support of the Debtors' Critical Vendor Motion; Shippers, Warehousemen, and Materialmen Motion; Intercompany Agreements Motion; and Cash Management Motion.*

services to the Debtors and employs corporate-level employees to provide such services to the Debtors (the "Shared Services").[157]  The Shared Services include, but are not limited to

- human resources services, including with respect to employee compensation and benefits, workers' compensation and disability management, training, employment services, human resources information systems-related services, diversity management services, and medical wellness programs;

- corporate and Chief Information Officer services including information technology, flight operations, and corporate security services;

- controller services, including labor and benefits for FES controllers (including tax, accounting, reporting, accounts receivable and accounts payable employees), depreciation and amortization costs charged to the Debtors, and audit fees;

- legal services, including governmental affairs support and legal case management in areas such as nuclear, human resources, employee benefits, tax, international, non-utility regulatory, environmental, real estate, and corporate matters;

- external affairs and communications services, including expenses related to advertising and communications, market policy, and lobbying;

- corporate real estate and records management services, including facility rent, certain capital projects, records management, mail services, and other facility maintenance;

- supply chain services, including labor and overhead associated with purchasing, freight, labor, and other logistical functions;

- generation support services, including fleet engineering, operations and outage support;

- environmental services, including environmental affairs, reporting and performance, environmental projects, environmental controls and monitoring, and environmental permitting and compliance; and

- corporate affairs and community involvement services, including direct community involvement initiatives, consulting services for local communities, and direct financial contributions to local communities.[158]

---

[157] FESC also provides the Shared Services to FE Corp.'s non-Debtor affiliates.  Costs for the Shared Services are allocated among the Debtors and the non-Debtor affiliates as described below.

[158] Additionally, certain of the Debtors' employees have access to FESC-owned credit cards for certain business-related expenses (the "P-Cards").  Charges to the P-Cards are paid directly by FESC payable on a one-month lag and FESC is then reimbursed by the Debtors.   Prior to the Petition Date, the Debtors deposited $700,000 with FESC which equates to two months of P-Card usage.  The Debtors are seeking permission in this Motion to pay March P-

142

FESC provides the Shared Services "at cost," and does not charge the Debtors any premium or markup for the services. FESC employs approximately 4,800 employees and enters into thousands of contractual arrangements with third parties (such as vendors, customers, contractors, and suppliers) as agent for and on behalf of the Debtors.

311.     Under the Shared Services Agreements, FESC bills the Debtors directly for all costs that can be attributed solely to the Debtors. Direct costs associated with the Shared Services are billed to each Debtor on a pass-through basis. FESC also calculates each Debtor's individual share of the costs attributable to the Shared Services, which cannot be directly charged to the Debtors, using the following methodologies, as applicable: (a) costs for services performed by FESC for the benefit of all FE Corp. subsidiaries, including the Debtors, are allocated 5% to FE Corp. and the remaining 95% to FE Corp.'s subsidiaries using multiple factors unique to the utility and non-utility entities;[159] (b) indirect costs benefitting both utility and non-utility subsidiaries[160] are allocated first in proportion to FE Corp.'s proportionate equity basis in its utility versus non-utility subsidiaries and second based on the total assets of the particular subsidiary; (c) for costs and services driven by all participating Debtor and non-Debtor affiliates'

---

Card charges by allowing FESC to offset such charges against the deposit. The balance of the deposit will remain in place as security. Continued access to the P-Cards is critical to avoid disruption to the Debtors' ordinary course business operations and, accordingly, the Debtors are seeking to continue reimbursing FESC for amounts charged to the P-Cards and otherwise continue to perform in the ordinary course of business.

[159] The Multiple Factor – Utility is calculated for each participating entity based on the average of its percentage share of the following: (a) gross transmission and/or distribution plan; (b) operating and maintenance expense excluding purchased power and fuel costs; and (c) transmission and/or distribution revenues, excluding transactions with affiliates. The Multiple Factor – Non-Utility is calculated by determining the entity's proportionate share of the relevant costs based on the total assets of the non-utility entity, including the generating assets under operating leases to the utility entities.

[160] FE Corp. owns both a regulated distribution, transmission, and generation portfolio, which entities' operations are governed by various state and federal regulations, as well as an unregulated generation portfolio. For the purposes of the various shared services provided to FE Corp. affiliates, the regulated entities are considered to be a different grouping, separate from the affiliates considered to be unregulated, as required by the regulatory schemes under which the regulated entities operate. All of the Debtors are unregulated entities and are considered by FE Corp. to be in the "non-utility" group.

employees,[161] each Debtor and non-Debtor affiliate is charged based on its percentage of total participating employees;[162] (d) costs of products and services benefiting participating employees of both utility and non-utility subsidiaries of FE Corp. are allocated first in proportion to FE Corp.'s equity basis in each subsidiary and second based on the particular subsidiary's percentage of total participating employees; (e) costs of products and services driven by the number of utility distribution customers are allocated using the number of utility distribution customers for the business unit divided by the total number of utility customers; and (f) environmental costs are assessed proportionally to each entity's total direct environmental charges as compared to all entities' direct environmental charges. FESC bills the Debtors on a monthly basis for the Shared Services and reflect such charges on the ledger for the applicable Debtor. On average, the Debtors pay approximately $15 million per month under the Shared Services Agreements. In 2017, the total net amount reimbursed to FESC by the Debtors on account of the Shared Services was approximately $174 million. In 2018, Shared Services are expected to cost approximately $150 million for FES and $53 million for FENOC. As of the Petition Date, approximately $30 million was due and owing on account of the Shared Services, however, the Debtors are not seeking authorization to pay any such prepetition amounts which will come due in the period between the Petition date and entry of the proposed Final Order (the "Interim Period").[163]

---

[161] Some of the employees who perform corporate services on behalf of the Debtors are employed by FESC. Those employees of FESC split their time among numerous entities, including the Debtors. These shared employees track their time, which is then directly charged as used. Pension and other similar charges are assessed using the Debtors' proportion of participating employees in accordance with the methodology discussed above.

[162] By way of example, pension costs would be calculated by dividing the number of eligible pension plan participants employed by a particular Debtor by the number equal to all eligible pension plan participants across the FE Corp. corporate group.

[163] The Debtors are, however, seeking authorization to pay prepetition amounts owed on account of Shared Services on a final basis.

312.     Separately from the Shared Services provided under the Shared Services Agreements, FESC makes direct payments for expenses attributable to the Debtors, including wages and salaries for the Debtors' employees; certain of the Debtors' health and welfare benefits for their employees; pension-related obligations; amounts due to the Debtors' customers and vendors; amounts due to shippers, warehousemen and other entities potentially holding liens; amounts due under the Debtors' customer programs; amounts owed to the Debtors' utility providers; amounts due to taxing authorities and regulatory authorities on account of taxes and fees; amounts due related to the Debtors' surety bonds and hedging obligations; amounts due on account of the Debtors' insurance; capital expenditures; certain trade and vendor expenses; and real property-related expenses (collectively, the "Direct Expenses"). The process by which the Debtors fund the Direct Expenses and other amounts owed pursuant to the Intercompany Agreements is discussed in greater detail above.

313.     The Shared Services Agreements have historically led to economies of scale and a more efficient use of resources, providing for the efficient administration of necessary services across the Debtors' and FE Corp.'s entire corporate structure (as opposed to each subsidiary being required to perform these functions on their own or to pay a third party to perform these functions on their behalf). The management, administrative, and support services that the Debtors receive pursuant to the Shared Services Agreements have historically been of an integrated nature and have generally been performed more effectively and efficiently for all entities in the corporate structure, rather than for the Debtors alone. Thus, continued access to, and performance under, the Shared Services Agreements will enable the Debtors to stabilize operations following the commencement of these chapter 11 cases and avoid a need to shift focus at this stage of the cases to locate alternative providers of these services. FESC provides

145

numerous services and functions to the Debtors that would be nearly impossible and prohibitively expensive for the Debtors to replace.[164]  For example, the Debtors do not have their own computer systems or information technology support.  Nor do the Debtors have their own human resources departments, complete finance functions, or their own treasury or accounting functions to track accounts payable, accounts receivable and similar items.  The Debtors would be utterly incapable of operating their businesses in any form, let alone in a "business-as-usual" manner, absent the Shared Services provided under the Shared Services Agreements.  Under the Intercompany Agreements Motion, the Debtors are seeking authorization, on a final basis,  to continue paying all amounts that are or will become due and owing under the Shared Services Agreements, including amounts attributable to the prepetition period on account of prepetition amounts owed under the Shared Services Agreements which are not otherwise authorized under a separate "first day" motion.  The Debtors are also seeking authorization to continue performing under the Shared Services Agreements postpetition in the ordinary course of business.

314.    **Tax Allocation Agreement.** The Debtors are part of a consolidated tax group with FE Corp. and certain non-Debtor affiliates pursuant to the terms of the Tax Allocation Agreement.  Historically, the Tax Allocation Agreement has been an efficient means of managing the Debtors', and non-Debtor affiliates', tax liabilities and utilization of tax attributes on a consolidated basis, and greatly facilitates the Debtors' accounting, tax reporting, and payment obligations.

315.    Under the terms of the Tax Allocation Agreement, an annual estimate is made of the Federal Income Taxes by each member of the consolidated tax group.  Such amount is paid to FESC on a quarterly basis and then in the following year, FESC performs a true up of the amount

---

[164] The Debtors estimate that replacing the Shared Services currently provided by FESC would cost the estates hundreds of millions of dollars.

of Federal Income Taxes owed by each member of the consolidated tax group. Debtor FES has substantial NOLs and, under the terms of the Tax Allocation Agreement, is compensated in cash on a quarterly basis for the use of its NOLs along with other members of the consolidated tax group who have usable NOLs. State income taxes owed to Virginia and West Virginia are also paid on behalf of the consolidated tax group. Amounts owed on account of the State Income Taxes are calculated and allocated applying the same methodology utilized to calculate the Federal Income Taxes.

316. The Debtors are seeking authorization to continue performing under the Tax Allocation Agreement postpetition in the ordinary course of business.

317. **FES Agreements.** FES has entered into PPAs with FG and NG pursuant to which FES has agreed to purchase all generation output, capacity, and ancillary output produced or otherwise acquired by FG and NG. FES subsequently makes such generation and ancillary output available for sale on the open market and utilizes the purchased capacity to fulfill amounts bid into the PJM Capacity Auction. FG owns and operates four (4) fossil fuel plants on behalf of the Debtors and NG owns three (3) nuclear generation plants, which are operated by FENOC. Generation output, capacity, and ancillary output are purchased in total from FG and NG under the Power Purchase Agreements at a rate based on a calculated return on plant assets.[165] Amounts owed by FES pursuant to the Power Purchase Agreements are processed through the FES Money Pool with a one-month lag and average $88 million per month to FG and $ 103 million per month to NG. Pursuant to this Motion, the Debtors are seeking authorization to continue performing under the Power Purchase Agreements postpetition in the ordinary course of business. As of the Petition Date, FG was owed approximately $72 million under the Power

---

[165] Specifically, the Debtors utilize a formula to determine the pricing of capacity, which pricing is calculated based on a combination of operation and maintenance expense, depreciation and amortization, and a calculated rate of return on the plant investment equal to a certain percentage of the investment base.

147

Purchase Agreements and NG was owed approximately $114 million. Under the Intercompany Agreements Motion, FES seeks authorization to continue to process all amounts owed to FG and NG under the Power Purchase Agreements, including the approximately $72 million owed to FG and $114 million owed to NG that has accrued prepetition and to continue performing under the Power Purchase Agreements postpetition in the ordinary course of business.

318.    FES also sells power to certain non-Debtor affiliates[166] as a POLR provider pursuant to various agreements (the "POLR Agreements"). FES offers to supply POLR load through a competitive bidding process that the regulated utilities arrange and monitor to ensure that the bidding processes are competitive. While FES determines how it wants to participate in the POLR auctions (*i.e.,* what pricing it will offer), it is the regulated utilities' auction process that determines the results of the auction and how much of the POLR load, if any, and price that FES and other competitive suppliers "win." Payments from these sales are typically received at month-end with a one-month lag. The Debtors average $30 million per month in receipts from these power sales. By this Motion, the Debtors are seeking authorization to continue performing under the POLR Agreements postpetition in the ordinary course of business.[167]

319.    In connection with applications for initial operating licenses or license renewals to operate nuclear power plants, the NRC requires evidence that the applicant is financially qualified. FES and NG entered into the Nuclear Support Agreement dated May 2, 2016 whereby FES agreed to provide NG with such funds as NG may need to pay operating expenses related to

---

[166] Other non-Debtor affiliates include Ohio Edison Company, The Toledo Edison Company, West Penn Power Company, The Potomac Edison Company, Metropolitan Edison Company, Pennsylvania Power Company, Pennsylvania Electric Company, The Cleveland Electric Illuminating Company, and Jersey Central Power & Light Company.

[167] FES and AES are also parties to an Amended and Restated Agency Agreement dated as of March 6, 2012 and as subsequently amended. Pursuant to the Amended and Restated Agency Agreement, FES provides AES with certain services related to AES's generation portfolio, including offering, scheduling, and coordinating settlement functions with PJM Interconnection L.L.C. AES pays FES $25,000 per month for the services provided under the Amended and Restated Agency Agreement.

148

the safe operation of the nuclear facilities and protection of public health and safety and to ensure safe closing procedures, in accordance with the financial assurance for safe operations requirements imposed by the NRC, in the event of a shutdown or extended outage at any of the nuclear facilities owned by NG.[168]  FES's obligations under the Nuclear Support Agreement shall not exceed $400 million.  FES has never been requested to provide funding to NG under the Nuclear Support Agreement.  The Debtors seek authorization for FES to continue performing its obligations under the Nuclear Support Agreement postpetition, to the extent requested by NG to do so.

320.  **FG Agreements.** FG operates the entire Mansfield Plant, where it owns the entirety of two of the three units and approximately 6% of the remaining unit.  FG is the lessee under a sale-leaseback transaction related to Unit 1 of Mansfield.[169]  FG has assigned its leasehold interests in the Mansfield Sale-Leaseback Transaction to FGMUC.  FG is party to that certain Bruce Mansfield Units 1, 2, and 3 Operating Agreement, originally entered into on June 1, 1976, and as amended on January 1, 2001 and July 1, 2007 (the "Mansfield Operating Agreement") pursuant to which FG operates Mansfield, and which generally provides that FG will operate and dispatch[170] Mansfield.  Separately, FG and FGMUC are parties to a power purchase agreement (the "Mansfield Power Purchase Agreement") pursuant to which FGMUC sells the entire output from Unit 1 of Mansfield to FG, which subsequently sells the output to

---

[168] The Nuclear Support Agreement is available to provide additional assurance to the NRC of the availability of funds in the event of an unanticipated plant shutdown.

[169] Pursuant to the Mansfield Lease Agreement, FG makes semi-annual payments to six lessor trusts that are nominal owners/lessors in the Mansfield Sale-Leaseback Transaction.  The lessor trusts' purchase of the interest in Unit 1 of the Bruce Mansfield Plant was funded by equity investments from certain Owner Participants, which are the equity owners of the lessor trusts.  In connection with the Mansfield Sale-Leaseback Transaction, the lessor trusts issued notes secured by, *inter alia*, the leases and related interests in Unit 1 to pass-through trusts that issued and sold pass-through trust certificates publicly.  The Mansfield Sale-Leaseback Transaction covers approximately 94% of Unit 1.  As noted above, the remaining 6% of Mansfield Unit 1 is owned by FG.

[170] "Dispatching" a power facility, such as Mansfield, means to generate electricity from the facility according to demand.  The amount of electricity produced may also be increased or decreased to match demand.

FES pursuant to a Power Purchase Agreement. Specifically, under the Mansfield Power Purchase Agreement, FGMUC agreed to make available all generation output, capacity, and ancillary output from Mansfield Unit 1, and FG agreed to purchase all such output as well as to arrange for all transmission, cogeneration costs, losses, and related services at and from the specified delivery point. Amounts owed under the Mansfield Power Purchase Agreement total approximately $191 million annually. Under the Intercompany Agreements Motion, FG seeks authorization to continue to process all amounts owed to FGMUC under the Mansfield Power Purchase Agreement, including the approximately $8.4 million owed to FGMUC that accrued prepetition. The Debtors are not seeking authorization to pay any amounts due under the Mansfield Lease Agreement.[171]

321. FG is also party to an operating agreement with non-Debtor affiliate Bay Shore Power Company, to operate a boiler at Bay Shore Unit 1 (the "Bay Shore Operating Agreement") as well as party to a steam purchase agreement originally dated March 1, 1998 (the "Bay Shore Steam Purchase Agreement") pursuant to which FG, as successor to Toledo Edison, purchases the steam produced by Bay Shore Unit 1.[172] The Bay Shore Operating Agreement has both fixed and variable cost components, each of which is set annually. Bay Shore pays FG approximately $600,000 on a monthly basis under the Bay Shore Operating Agreement. FG spends approximately $2.1 million on a monthly basis under the Bay Shore Steam Purchase Agreement. Approximately $1.6 million is outstanding under the Bay Shore Steam Purchase Agreement as of the Petition Date. By this Motion, the Debtors seek authorization to pay all amounts outstanding under the Bay Shore Steam Purchase Agreement. The Debtors further seek authorization to

---

[171] The Debtors have filed a motion contemporaneously herewith seeking authorization to reject the Mansfield Lease Agreement.

[172] FG and Bay Shore Power Company entered into an asset purchase agreement dated as of March 9, 2018 (the "Bay Shore APA") to sell substantially all of the Bay Shore assets to Walleye Energy, LLC. The Debtors will file a separate motion seeking Court approval of the Bay Shore asset sale and the Bay Shore APA.

continue performing under the Bay Shore Operating Agreement and the Bay Shore Steam Purchase Agreement postpetition in the ordinary course of business.

322.    Finally, FG is party to a ground lease with non-Debtor affiliate American Transmission Systems, Inc. ("ATSI") related to a synchronous condenser at ATSI's Eastlake facility. FG receives payments on account of the lease on a yearly basis in the amount of $90,000. The 2018 lease payment was made to FG prepetition. Separate from the ground lease, FG also receives payments as a reimbursement for equipment that FG operates at the facility. These payments average $11,000 per month. By this Motion, the Debtors are seeking to continue performing under the ATSI lease postpetition in the ordinary course of business.

323.    **FENOC Agreements.** The NRC requires that the owners of nuclear power generation facilities be separate from the companies that operate the facilities. With regard to the Debtors, NG owns the nuclear generation facilities and FENOC is the operating entity for the facilities. Accordingly, FENOC is party to a Master Nuclear Operating Agreement dated as of December 16, 2005 with NG, pursuant to which FENOC operates nuclear facilities on behalf of NG.[173] Under the Master Nuclear Operating Agreement, FENOC provides staff and personnel to operate the facilities, performs necessary maintenance, manages and schedules deliveries of nuclear fuel, handles spent fuel, and processes disposal of radioactive waste. FENOC's services under the Master Nuclear Operating Agreement are billed on the first week of each month, with a one-month lag, and averaged $75 million per month in 2017.[174] The Debtors estimate that approximately $105 million is owed prepetition on account of the Master Nuclear Operating

---

[173] These facilities include Beaver Valley Power Station Units 1 and 2, Davis-Besse Unit 1, and Perry Unit 1. In addition, FENOC operates nuclear facilities for certain additional Non-Debtor affiliates of FE Corp. under separate agreements.

[174] Prepetition, FES has advanced $40 million in the form of intercompany loans such that FENOC can pay its employees and vendors on a timely basis, given the time lag in the reimbursement process under the Master Nuclear Operating Agreement. As part of the Cash Management Motion, to the extent that postpetition further loans are needed, FENOC will be able to borrow such funds resulting in a postpetition intercompany claim.

Agreement, all of which will be due in the Interim Period. By this Motion, NG seeks authorization to pay all amounts owed to FENOC under the Master Nuclear Operating Agreement, including the approximately $105 million owed on account of prepetition amounts. The Debtors further seek authorization to continue performing under the Master Nuclear Operating Agreement postpetition in the ordinary course of business.

324. **Aircraft Leases.** Debtor FEALC owns one airplane which it leases to FESC. FES also owns one airplane which it leases to FESC (collectively, the "Airplane Lease Agreements").[175] FESC pays FES and FEALC for the use of these airplanes. Pursuant to the Airplane Lease Agreements, FESC maintains, services, inspects, tests, overhauls and repairs the airplanes. FEALC and FES are also parties to an aircraft leasing loan, which FEALC utilized to acquire the aircraft, and subsequently prepetition as a revolving unsecured line of credit to finance costs associated with the ownership of the aircraft (the "Airplane Loan Agreement").[176] By this Motion, the Debtors seek authorization to continue leasing the planes to FESC pursuant to the Airplane Lease Agreements.

325. **Additional Real Estate.** Certain of the Debtors occupy space in facilities owned by other Debtors or by FE Corp. or certain of FE Corp.'s non-Debtor affiliates, including space owned by FE Properties, West Pennsylvania Power Company, Jersey Central Power & Light Company, and Monongahela Power Company. The Debtors are at-will tenants for these spaces. Allocated rent for these facilities averaged approximately $300,000 per month in 2017.

---

[175] Prior to the Petition Date, FEALC and FES entered into asset purchase agreements to sell the airplanes "as is, where is" to FE for $19.9 million and $5.6 million. The Debtors will be filing a separate motion with the Court seeking approval of the sale of the aircraft. The Airplane Lease Agreements will be terminated upon the closing of the sale.

[176] Prepetition, FEALC owed FES approximately $240,000 under the Airplane Loan Agreement. The Debtors are not seeking authorization to pay amounts owed under the Airplane Loan Agreement and FES shall not be authorized to set off any amounts owed to FEALC against this balance, unless specifically authorized by another order of the Court. To the extent that FEALC requires any additional funds postpetition to finance costs associated with the ownership of the aircraft, under the terms set forth in the Cash Management Motion, FEALC will be able to borrow such funds resulting in a postpetition intercompany claim.

Approximately $300,000 is outstanding for allocated rent as of the Petition Date. Debtor FES is also listed as a co-tenant on the lease for FE Corp.'s corporate headquarters in downtown Akron, Ohio (the "FE Headquarters Lease").[177]

326. **Other Agreements.** The Debtors are party to a number of other intercompany agreements and arrangements, including, but not limited to, upstream and downstream guarantees of indebtedness among FES, FG, and NG, and a secured credit facility issued by FE Corp. The Debtors are not seeking any relief in this Motion with respect to these additional agreements.

327. The Debtors' continued performance under the Shared Services Agreements is in the sound business judgment of the Debtors because they enable the Debtors to obtain important services in a more efficient manner than if the Debtors provided such services themselves. The Shared Services Agreements provide economies of scale to the Debtors, which are generally required to pay for such services based on their allocable share. If the Debtors were not permitted to continue performance under the Shared Services Agreements, the Debtors would be forced to try and replicate services that are nearly impossible and would be prohibitively expensive for the Debtors to replace.[178] Absent the Shared Services being provided under the Shared Services Agreements, the Debtors would be utterly incapable of operating their businesses in any form, let alone in a "business-as-usual" manner. This outcome would prevent the Debtors from stabilizing their operations, force the Debtors to expend significant amounts of estate funds attempting to replicate services currently provided by FESC, severely impede the

---

[177] The Debtors are FE are attempting to negotiate with the landlord to remove FES from the FE Headquarters Lease. Non-Debtor Ohio Edison Tower LLC pays all of the monthly rent due under the FE Headquarters Lease as FES does not occupy space at the corporate headquarters building. However, FES is jointly and severally liable under the FE Headquarters Lease.

[178] The Debtors estimate that replacing the Shared Services currently provided by FESC would cost the estates hundreds of millions of dollars.

Debtors' restructuring goals, and lead to an attendant substantial loss of value to the Debtors' estates.

328.    The Debtors' continued performance under the Tax Allocation Agreement is in the sound business judgment of the Debtors because the Tax Allocation Agreement provides the Debtors with significant efficiencies by allowing the Debtors to participate in a consolidated tax group, and provides the Debtors with value in exchange for the consolidated group's use of the Debtors' NOLs.  If the Debtors ceased performing under the Tax Allocation Agreement, each individual Debtor would likely be required to file its own state and federal tax returns, which would be an inefficient use of estate resources.  Further, the Tax Allocation Agreement allows the Debtors to take advantage of the tax attributes of their Debtor and non-Debtor affiliates, which benefits would be unavailable if the Debtors ceased performing.

329.    The Debtors' continued performance under the Nuclear Support Agreement and the Master Nuclear Operating Agreement allows the Debtors to continue operating their nuclear generation facilities and to remain in compliance with the requirements imposed by the NRC and other regulators.  Absent such support, the Debtors would be unable to continue operating their plants and facilities to the detriment of their businesses and parties in interest.

330.    The decision to continue providing services under the various operating and power purchase and sale agreements is also in the sound business judgment of the Debtors because they are essential to the continued operation of the relevant plants and projects, which plants and projects generate revenue for the Debtors and their affiliates, and ensure the Debtors' continued abilities to operate their businesses in a cost-efficient manner.  Based on the foregoing, I believe that the relief requested in the Intercompany Agreements Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

**Procedural Motions**

**M. *Debtors' Motion for an Order Extending Time to File Schedules and Statements* (the "Schedules Motion")**

331.    The Debtors seek an order authorizing an extension of time within which the Debtors must file their schedule of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") to forty-five (45) days following the Petition Date, subject to the Debtors' right to request further extension(s) of time, if necessary.  Pursuant to Bankruptcy Code sections 105(a) and 521 and Bankruptcy Rule 1007(c), the bankruptcy court has discretion to grant an extension in connection with the filing of the Debtors' Schedules and Statements "for cause shown."  Fed. R. Bankr. P. 1007(c).

332.    Given the size and complexity of the Debtors' businesses, a significant amount of time and effort on the part of the Debtors and their advisors is required to collect, review and assemble voluminous amounts of data.  The Debtors recognize the importance of the Schedules and Statements in these chapter 11 cases and intend to complete the Schedules and Statements as quickly and as accurately as possible.  Based on the foregoing, I believe that the relief requested in the Schedules Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**N. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (II) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases, and (III) Granting Related Relief* (the "Creditor Matrix Motion")**

333.    The Debtors seek entry of an order (i) authorizing the Debtors to (a) prepare a consolidated list of creditors in lieu of submitting a formatted mailing matrix and (b) file a consolidated list of the Debtors' fifty largest unsecured creditors; (ii) approving the form and

manner of notifying creditors of commencement of these chapter 11 cases; and (iii) granting related relief.

334. **Request for Authority to Prepare a Consolidated List of Creditors in Lieu of Submitting Separate Mailing Matrices for Each Debtor.** The Debtors submit that authorization to maintain a single, consolidated list of their creditors in electronic format, in lieu of filing a separate creditor matrix for each Debtor, is warranted because it will contribute to the just, speedy and most economically efficient determination of these chapter 11 cases.

335. Allowing the Debtors to prepare, but not file, the consolidated list of creditors in the format currently maintained by the Debtors in the ordinary course of their business is in the best interest of the Debtors and of their estates. There are thousands of creditors and parties-in-interest in these chapter 11 cases. The Debtors maintain lists of the names and addresses of all such entities on various computer software programs that permit the Debtors, or a third-party service provider on the Debtors' behalf, to provide mailings or notices for each such entity. It would be difficult and time-consuming for the Debtors to produce a separate creditor matrix on a non-consolidated basis. The Debtors respectfully submit that allowing the Debtors to identify their creditors in the format currently maintained in the ordinary course of the Debtors' businesses would reduce the costs and risk associated with preparing and filing separate matrices for each Debtor while furthering the efficient administration of these chapter 11 cases.

336. Concurrently with the filing of the Creditor Matrix Motion, the Debtors are seeking to retain Prime Clerk LLC as their claims and noticing agent (the "Proposed Claims and Noticing Agent"). If this application is granted, the Proposed Claims and Noticing Agent will, among other things, assist with the consolidation of the Debtors' computer records into a creditor database and complete the mailing of notices to the parties in such database.

156

337.	The Debtors, working with the Proposed Claims and Noticing Agent, are prepared to make the consolidated list of creditors available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the Court.

338.	**Request for Authority to File a Consolidated List of the Debtors' Fifty Largest Creditors.**  The Debtors submit that the compilation of separate top 20 creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources. Further, the Debtors believe that a single, consolidated list of the Debtors' 50 largest unsecured, non-insider creditors will aid the United States Trustee for the Northern District of Ohio ("U.S. Trustee") in its efforts to communicate with these creditors.  As such, the Debtors believe that filing a single consolidated list of the 50 largest unsecured creditors in these chapter 11 cases is appropriate.  Filing separate lists of creditors for each Debtor would be unduly expensive, time consuming, and administratively burdensome.  These chapter 11 cases involve hundreds of creditors, and segregating each debtor's records into a single-debtor matrix would detract efforts and attention better focused on ensuring a smooth transition into chapter 11 with minimal disruptions to the Debtors' businesses.

339.	**Request for Authority to Mail Initial Notices to Creditors.**  The Debtors request that the Proposed Claims and Noticing Agent undertake all mailings directed by the Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the Notice of Commencement of these chapter 11 cases, and any other correspondence that the Debtors may wish to send creditors.  The Proposed Claims and Noticing Agent's assistance with the mailing and preparation of creditor notices will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.

157

340.    Based on the foregoing, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

O.  ***Application of Debtors for Appointment of Prime Clerk LLC as Claims, Noticing and Solicitation Agent Nunc Pro Tunc to the Petition Date* (the "<u>Claims and Noticing Agent Motion</u>")**

341.    The Debtors request entry of an order (the "<u>Retention Order</u>") appointing Prime Clerk LLC ("<u>Prime Clerk</u>") as claims, noticing and solicitation agent in the Debtors' chapter 11 cases.  As Claims and Noticing Agent, Prime Clerk will, among other tasks, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases.  The Debtors submit that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  The terms of Prime Clerk's retention are set forth in the Engagement Agreement (the "<u>Engagement Agreement</u>") included in the Claims and Noticing Agent Motion.

342.    Prime Clerk is comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of both the Debtors' estates and their creditors.  Further, by appointing Prime Clerk as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices and the processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims.  Prior to the Petition Date, the Debtors provided Prime Clerk a retainer in the amount of $50,000.

343.     Prime Clerk has reviewed its electronic database to determine whether it has any relationships with the creditors and parties in interest provided by the Debtors, and, except as disclosed in the Claims and Noticing Agent Motion, has represented that it neither holds nor represents any interest materially adverse to the Debtors' estates in connection with any matter on which it would be employed.

344.     In view of the number of anticipated claimants and the complexity of the Debtors' businesses, as well as the experience of Prime Clerk's professionals in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of chapter 11 cases, I believe that the appointment of Prime Clerk as claims and noticing agent is in the best interests of the Debtors, their estates, their creditors, and all parties in interest and should be approved.

**P.** ***Debtors' Motion to Approve Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members* (the "Interim Compensation Motion")**

345.     The Debtors request entry of an order establishing an orderly, regular process for the allowance of payment of compensation and reimbursement of expenses for attorneys and other professionals who are retained pursuant to section 327 and 1003 of the Bankruptcy Code and are required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.  In addition, the Debtors request entry of an order approving procedures for reimbursement of reasonable out-of-pocket expenses incurred by members of any official committee appointed in these chapter 11 cases (each, a "Committee") by the Office of the United States Trustee for the Northern District of Ohio.  Implementation of compensation procedures will provide an efficient structure for disbursing compensation.

159

346. The Debtors seek authorization to retain and employ various professionals (the "Debtors' Professionals"), including but not limited to: (1) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, 44th Floor, New York, NY 10036-6745; (2) Brouse McDowell LPA, 388 South Main St., Suite 500, Akron, OH 44311; (3) Hogan Lovells US LLP, Columbia Square, 555 Thirteenth Street, NW, Washington, DC 20004; (4) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099; (5) Quinn Emmanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010; (6) Stark & Knoll Co., L.P.A., 3475 Ridgewood Road, Akron, OH 44333; (7) Lazard Fréres & Co. LLC, 190 S. LaSalle Street, 31st Floor, Chicago, IL 60603; (8) ICF Resources, LLC, 9300 Lee Highway, Fairfax, VA 22031; (9) KPMG LLP, Aon Center, Suite 5500, 200 E. Randolph Street, Chicago, IL 60601; and (10) Sitrick and Company, 7 Times Square, Suite 2600, New York NY 10036. To the extent necessary, the Debtors may seek to retain additional professionals during these chapter 11 cases. Additionally, any Committee likely will retain counsel and other professionals to represent them in connection with these chapter 11 cases (together with the Debtors' Professionals, the "Professionals").

347. The Debtors propose procedures to govern the payment and reimbursement of expenses of the Professionals and Committee members in these chapter 11 cases (the "Compensation Procedures") as set forth in the Interim Compensation Motion.

348. The Debtors further request that the Court limit service of interim and final fee applications to a limited number of parties (the "Notice Parties"). Courts regularly have entered orders establishing professional compensation procedures providing for interim compensation and expense reimbursement on a monthly basis. Specifically, Courts have determined that interim compensation procedures are appropriate to avoid having the professionals fund the

160

debtors' reorganization proceedings by waiting every four months to file. I believe that implementing the Compensation Procedures is in the best interests of the Debtors, their estates, their creditors, and all parties in interest and should be approved.

**Q.** ***Debtors' Motion to Authorize: (I) The Establishment of Omnibus Hearing Dates; and (II) Certain Case Management Procedures* (the "<u>Case Management Motion</u>")**

349. The Debtors request entry of an order establishing omnibus hearing dates and certain case management procedures. The Debtors submit that by establishing these case management procedures at the outset of these chapter 11 cases, the administration of these chapter 11 cases will be simplified and the cost associated therewith will be dramatically reduced for all parties in interest.

350. Because of the number of creditors and other parties in interest in the cases, the Debtors believe that burdensome expense and unnecessary delay will result unless certain procedures for copying and noticing, setting omnibus hearings and motion practice are implemented. The approval of these procedures will streamline the administration of the cases and, among other things, establish procedures for ensuring that all parties in interest in the cases follow certain guidelines of practice and procedure before this Court. By scheduling regular omnibus hearings in advance (the "<u>Omnibus Hearings</u>"), parties in interest (and certainly the Debtors) will be better able to plan for and attend hearings. This will reduce the need for emergency hearings and requests for expedited relief, and foster consensual resolution of important matters. Moreover, by directing that notices be mailed only to a shortened mailing list and those creditors who file with the Court a request that they receive such notices, all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to such matters. Concomitantly, a shortened mailing list will significantly reduce the substantial administrative and financial burden that

161

would otherwise be placed on the Debtors' respective estates and those creditors and parties in interest who file documents in the cases. Similarly, allowing electronic service of documents according to the requested procedures will further reduce the administrative and financial burden of these cases on the Debtors' respective estates, as well as on other serving parties, and will in many cases allow for more expedient service of documents. Based on the foregoing, I believe that the relief requested in the Case Management Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**R.** ***Debtors' Motion for Entry of an Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business* (the "<u>Ordinary Course Professionals Motion</u>")**

351.    The Debtors seek entry of an order authorizing, but not directing, the Debtors to employ and compensate professionals utilized in the ordinary course of business (the "<u>Ordinary Course Professionals</u>" or the "<u>OCPs</u>").

352.    **The OCPs.** FESC employs various OCPs who perform services either solely for one of the Debtors, for multiple Debtors, or for one or more Debtor and one or more non-Debtor. Under the Shared Services Agreements that the Debtors have with FESC, if services are provided by an OCP for multiple Debtors or for one or more Debtor and one or more non-Debtor, the costs of the services rendered by the OCP are apportioned among such users of the services in accordance with the terms of the shared services agreements and each of the Debtors pays FESC for such costs as part of the monthly shared services invoice. In addition, the Debtors directly employ various OCPs who provide services for one or more of the Debtors. The Debtors pay those OCPs by paying FESC who remits the payment to the OCPs on the Debtors' behalf.

353.    Approximately 50 OCPs, consisting of various law firms, attorneys, accountants, and consultants, perform services for one or more of the Debtors in the ordinary course of their businesses. The OCPs provide services to the Debtors in a variety of matters unrelated to these

162

chapter 11 cases, including specialized legal advice and business advisory services relating to, among other things, arbitration, commercial, environmental, financial, litigation, tax and regulatory matters.

354. **The Compensation Procedures.** The Debtors have outlined a set of Compensation Procedures (the "Compensation Procedures"), which set forth a streamlined process for retention and compensation of the OCPs postpetition. In brief, the Compensation Procedures will permit the Debtors to continue to use the services of the OCPs upon the filing of a declaration of disinterestedness, and a reasonable objection period for certain parties, including the U.S. Trustee. As stated above, the Debtors intend to pay fees and disbursements owed to the OCPs in the ordinary course of business by paying FESC, which will remit payment to the OCPs and/or by funding the direct costs of the OCPs by paying FESC who will remit payments to the OCPs on the Debtors' behalf.

355. The Compensation Procedures further provide that the Debtors and FESC shall be authorized to pay, without formal application to the Court by any OCP, 100% of the fees and disbursements with respect to each of the OCPs retained pursuant to these procedures (including the filing of a declaration of disinterestedness) upon the OCP's submission to the Debtors and FESC, as applicable, of an appropriate invoice setting forth in reasonable detail the nature of the services rendered and expenses incurred after the Petition Date; *provided, however*, that while these chapter 11 cases are pending, the fees of each OCP, excluding costs and disbursements, may not exceed a total of $100,000 (the "OCP Cap") per month on average over a rolling three-month period for services rendered to one or more of the Debtors. To the extent an OCP seeks compensation in excess of the applicable OCP Cap (the "Excess Fees"), the OCP shall submit a Notice of Fees in Excess of the OCP Cap (the "Notice of Excess Fees") and an invoice setting

forth, in reasonable detail, the nature of the services rendered and disbursements actually incurred. Interested parties shall then have 15 days to object to the Notice of Excess Fees. If after 15 days no objection is filed, the Excess Fees shall be deemed approved, and the OCP may be paid 100% of its fees and 100% of its expenses without the need to file a fee application.

356. The Debtors believe that the continued employment and compensation of the OCPs is in the best interests of their estates, creditors, and other parties in interest. The OCPs possess valuable knowledge, expertise and familiarity with the Debtors and their operations. In order to ensure continued representation by the OCPs on an ongoing basis, the Debtors need to be able to meet their payment obligations to FESC relating to the OCPs on a regular basis. Based on the foregoing, I believe that the relief requested in the Ordinary Course Professionals Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 31, 2018

Respectfully submitted,

Donald R. Schneider
President and Chairman of the Board
FirstEnergy Solutions Corp.