UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | Case No. 18-50757 |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) | Hon. Judge Alan M. Koschik |
|  | ) |  |

**LIMITED OBJECTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
ASSUMPTION OF THE ASSET PURCHASE AGREEMENT FOR THE SALE
OF THE BAY SHORE FACILITIES AND RELATED ASSETS; (II) AUTHORIZING
THE SALE OF CERTAIN ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL
LIENS, CLAIMS AND INTERESTS, OTHER THAN PERMITTED LIENS
PURSUANT TO THE ASSET PURCHASE AGREEMENT; (III) APPROVING
THE PURCHASE PRICE ALLOCATION AGREEMENT AMONG THE SELLERS;
(IV) AUTHORIZING THE DEBTORS' ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES ACCORDING
TO CERTAIN PROCEDURES; AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned jointly administered chapter 11 cases hereby submits this limited objection (the "Limited Objection") to the *Debtors' Motion for Entry of an Order (I) Authorizing the Assumption of the Asset Purchase Agreement for the Sale of the Bay Shore Facilities and Related Assets; (II) Authorizing the Sale of Certain Assets of the Debtors Free and Clear of All Liens,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186), Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is 341 White Pond Dr., Akron, OH 44320.

*Claims and Interests, Other than Permitted Liens Pursuant to the Asset Purchase Agreement; (III) Approving the Purchase Price Allocation Agreement Among the Sellers; (IV) Authorizing the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases According to Certain Procedures; and (V) Granting Related Relief* [Docket No. 525] (the "Motion").[2] In support of the Limited Objection, the Committee: (i) incorporates herein by reference the *Declaration of Adam Schlesinger in Support of the Limited Objection* (the "Schlesinger Declaration") filed contemporaneously herewith; and (ii) respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Prior to the commencement of these Cases, it appears that the Debtors' ultimate parent, FirstEnergy Corp. ("FEC"), operated the Debtors without regard to corporate boundaries, legal separateness, and independent fiduciary duties. As the Court is aware, the Committee is analyzing an array of dubious prepetition transactions that appear to have been orchestrated by non-debtor FEC to the detriment of one or more of the Debtors. FEC's pervasive influence may not have terminated as of the Petition Date. Indeed, the Committee is concerned that FEC is continuing to influence these Cases to favor FEC and its non-debtor affiliates. The Committee's objection to the relief sought in the Motion highlights a narrative that the Committee anticipates will be prevalent as it proceeds with the investigation of the prepetition relationship among FEC and its affiliated entities.

2. In the matter at bar, FEC determined that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ to Debtor FirstEnergy Generation, LLC ("FG" or the "Debtor-Seller") for the

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

sale of the jointly owned assets and orchestrated the hiring of a consultant who conveniently concluded that the appropriate sale proceeds allocation methodology was the one that ███ ███████████ away from the Debtor-Seller.[3] For the reasons set out below, such methodology is neither justified nor supportable.

3. The Committee does not oppose the proposed sale of the Bay Shore Facilities on the terms set forth in the APA. However, in addition to seeking authority to consummate the sale, the Debtor-Seller is seeking approval of an agreement (the "Allocation Agreement") that allocates sale proceeds between the two sellers, FG and FEC's indirect non-debtor subsidiary Bay Shore Power Company ("BSPC" or the "Non-Debtor Seller"). The Allocation Agreement provides that just thirteen percent (13%) of the value from the sale will be received by the Debtor-Seller, while eighty-seven percent (87%) of the value will go to the Non-Debtor Seller. The proposed result is tantamount to the Debtor-Seller seeking authority to sell estate assets for less than their value. The proposed allocation, and the manner by which it was determined, directly implicates the Committee's concerns regarding FEC's wrongful influence over the Debtors' restructuring to the detriment of the Debtors' estates.

4. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

---

[3] The consultant was engaged by FirstEnergy Service Company ("FESC"), a non-debtor affiliate of FEC, ostensibly on behalf of its affiliates, BSPC and FG (each as defined herein).

3

█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████.[4]

5. To justify the desired result, FEC (through yet another of its non-debtor affiliates, FESC) then commissioned a report (the "Navigant Report") from Navigant Consulting, Inc. ("Navigant"), purportedly on behalf of both the Debtor-Seller and the Non-Debtor Seller. █
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████.

6. There are several glaring flaws with the ████████████████ methodology adopted by Navigant. █████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

---

[4] Indeed, this conduct may give rise to causes of action for breach of fiduciary duties or for a fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code or state law, and demonstrates the very conflict of interest the Committee suspects may taint numerous intercompany transactions being investigated in these cases.

4



7. Likewise, the Committee has not received a satisfactory explanation as to why it should be comfortable with an allocation of sale proceeds based upon an inappropriate methodology that favors a non-debtor to the detriment of the Debtor-Seller's estate. Put simply, the Motion is emblematic of the Committee's concern regarding the undue influence that FEC apparently continues to wield over the Debtors' restructuring. Accordingly, the Committee requests that the Court deny the Motion absent an appropriate determination of the value of the Debtor-Seller's interest in the Bay Shore Facilities.

## LIMITED OBJECTION

8. The Committee does not object to the sale of the Bay Shore Facilities on the terms set forth in the APA. The Committee is satisfied that the transaction with the purchaser reflects reasonable value for the Bay Shore Facilities, and that the terms of the APA are appropriate. The

---

5 ███████████████████████████████████████████

Committee objects, however, to the Debtor-Seller's request for approval of the proposed allocation of sale proceeds.

9. The Committee submits that the terms of the Allocation Agreement would result in an unjustifiable transfer of value from the Debtor-Seller to the Non-Debtor Seller.  The ████████████████ methodology completely disregards the fact that, ██████████████████████████, the Debtor-Seller owns approximately ████████████████████████████████████████████████ ████.[6] The Committee objects to approval of the Allocation Agreement because the result of its approval would be property of the estate being conveyed at a deep discount for the benefit of FEC.

### I. Bankruptcy Rule 9019 Is Not the Applicable Standard.

10. As a threshold matter, the Debtor-Seller curiously seeks approval of the Allocation Agreement under Bankruptcy Rule 9019, rather than authorization to assume it under section 365 of the Bankruptcy Code. The Debtor-Seller and the Non-Debtor Seller negotiated and entered into the Allocation Agreement prepetition. *See* Schneider Decl. ¶¶ 8, 10; Allocation Agreement (APA, Ex. F). Thus, unless properly assumed pursuant to section 365, the Allocation Agreement is not binding on the Debtor-Seller. However, the standard the Debtor-Seller would need to satisfy in connection with the assumption of a prepetition executory contract under

---

[6] 

section 365 of the Bankruptcy Code is higher than that under Bankruptcy Rule 9019—even without the heightened scrutiny applicable to "related party transactions" such as the Allocation Agreement. The Debtor-Seller's decision to seek approval of the Allocation Agreement pursuant to Bankruptcy Rule 9019(a) casts doubt on whether the Debtor-Seller believes that it can satisfy this standard.

11. To take advantage of the much lower standard of Bankruptcy Rule 9019, the Debtor-Seller styles the approval of the Allocation Agreement as a "compromise or settlement." The artificiality of this procedural posture is revealed by the fact that the Debtor-Seller fails to identify what precisely is being "settled" by the Allocation Agreement, or what the Debtor-Seller's estate can expect to lose if no "settlement" is reached. At most, the Motion includes the vaguest of references to "issues related to the allocation of the Sale Proceeds." Mot. ¶ 49. Thus, even had Bankruptcy Rule 9019 been the appropriate standard (though it is not), the Court and the Committee simply lack sufficient information to determine whether the proposed agreement actually constitutes a "settlement," or whether such "settlement" is appropriate under Bankruptcy Rule 9019. *See In re Novak*, 383 B.R. 660, 675 (Bankr. W.D. Mich. 2008) ("At a minimum. . . [the] motion should describe . . . the issue that is in dispute . . . . In addition, the motion should include for comparison some estimate as to what the estate could expect as the outcome if no settlement was reached and the matter went to trial instead.").

II. **Entry Into the Allocation Agreement Does Not Constitute a Sound Exercise of the Debtor's Business Judgment.**

12. To obtain authorization to assume an executory contract under section 365 of the Bankruptcy Code, a debtor, at a very minimum, must demonstrate that such assumption represents a sound exercise of its business judgment. *See Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.*, 776 F.3d 411, 417 (6th Cir. 2015); *see also In re Structurlite Plastics Corp.*, 86 B.R.

922, 925 n.4 (Bankr. S.D. Ohio 1988) ("In order to assume an executory contract under § 365, a debtor must satisfy the 'business judgment' test—*i.e.,* it must be established that assumption represents a sound business judgment on the part of the debtor.").

13. Due to the fact that the Allocation Agreement is a transaction between affiliates, however, the Debtor-Seller should be required to satisfy the heightened standard of entire fairness of the transaction. *See In re Innkeepers USA Tr.*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010) (denying a debtor's motion to assume a plan support agreement and suggesting a higher standard of scrutiny in order to prove due care and good faith in the debtor's decision to assume because of the related party transaction aspect); *see also In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (transactions benefiting insiders are not "per se prohibited, 'but [they] are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse'"); *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001) ("Insider transactions are more closely scrutinized, not because the insider relationship makes them inherently wrong, but because insiders 'usually have greater opportunities for . . . inequitable conduct.'") (internal citations omitted).

14. For the reasons set forth below, the Committee believes that the Allocation Agreement fails to provide to the Debtor-Seller the value to which it is entitled and, thus, should not be approved, regardless of whether the business judgment standard or the entire fairness standard applies.

   *i. The Navigant Report*

15. On July 28, 2017, non-debtor FESC engaged Navigant to provide an opinion as to the value of the Bay Shore Facilities, including the allocation of the sale proceeds between the Non-Debtor Seller and the Debtor-Seller. The result was the Navigant Report, dated as of

8

August 22, 2017. █████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

    16.    █████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████.

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

    17.    █████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████ █████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

---

7   ███████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████.

9

18-50757-amk    Doc 756    FILED 06/14/18    ENTERED 06/14/18 18:14:14    Page 9 of 19



18.

19.

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████

██████████████████████████ █

20. ████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████.

      *ii. There Is No Support for the Conclusion that the ████████ ████████ Approach Is the Best Approach*

21. ████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████

█████████████████████████████████████

████████████████████████████

███████████████████████

22. ████████████████████████████

████████████████████████████

---

[8] █████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████

11

[Redacted]

23. [Redacted]

24. [Redacted]



███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
█████████████████████████████████████

        *iii.*    *The Navigant Report's* ██████████████ *Is Also Flawed*

27. The Committee submits that an analysis based on the value of the sellers' respective net tangible assets provides a more objective and fair basis for allocating the sale proceeds. Schlesinger Decl. ¶ 29. ████████████████████████████████████████████████████████████████████████████████████

28. The Committee's investment banker, PJT Partners LP ("PJT"),[9] considers book value as a reasonable proxy for the replacement cost of the Bay Shore Facilities' tangible assets for the purpose of the appropriate allocation of aggregate value. Schlesinger Decl. ¶ 29. ████████████████, PJT utilized net book value ██████████████████ which reflects the accumulated cost of purchasing and maintaining the assets over time, as adjusted for depreciation. Netting out depreciation not only accounts for historical investment, but also for the value degradation resulting from wear and tear over the useful life of the asset. *Id.*

29. ████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████████

---

[9] An order approving the *Application of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing the Employment and Retention of PJT Partners LP as Investment Banker, Effective as of April 16, 2018* was entered on June 12, 2018 [Docket No. 744].

14

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

30.     Thus, the Committee submits that the Allocation Agreement would effectively and improperly transfer significant value from the Debtor-Seller's estate and creditors to a non-debtor. In light of the foregoing, the Allocation Agreement does not reflect the Debtor-Seller's sound business judgment and, as such, fails to meet the standard required for approval under section 365 of the Bankruptcy Code.

### III. The Allocation Agreement Does Not Represent a Fair and Equitable Settlement Pursuant to Bankruptcy Rule 9019.

31.     As set forth above, the Debtor-Seller should have moved under section 365 of the Bankruptcy Code, rather than under Bankruptcy Rule 9019(a), with respect to the relief sought in connection with the Allocation Agreement. Even if the Court were to determine that review under Bankruptcy Rule 9019(a) is appropriate, however, the purported "settlement" does not even satisfy the minimal requirements of Bankruptcy Rule 9019(a).

32.     Under Bankruptcy Rule 9019(a), to be approved, a settlement must fall above the lowest point in the range of reasonableness. *See In re Junk*, 566 B.R. 897, 912 (Bankr. S.D. Ohio 2017) ("courts must canvass the issues in order to determine whether the settlement falls below the lowest point in the range of reasonableness"). Approval of a settlement requires the

---

[10]     The Allocation Agreement provides that there will be a $7.7 million escrow funded from the Non-Debtor Seller's share of proceeds before being released back to the Non-Debtor Seller (fifty percent (50%) one year from closing, fifty percent (50%) September 2020). Allocation Agreement (APA, Ex. F). Even assuming that no portion of the escrow is ultimately released, this would only increase the Debtor-Seller's allocation of the sale proceeds to sixteen percent (16%). *See* Schlesinger Decl. fn 4.

15

"informed, independent judgment of the bankruptcy court." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (citing *Nat'l Surety Co. v. Coriell*, 289 U.S. 426, 436 (1933)).

33. The Debtor-Seller acknowledged that "the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and ***all other factors relevant* to a *full and fair assessment of the wisdom of the proposed compromise***." *Id.* (emphasis added); *see also* Mot. ¶ 47. Nonetheless, the Debtor-Seller has put forth no evidence supporting approval of the "compromise" purportedly reflected in the Allocation Agreement. Not only did they fail to identify any issue that is purportedly being settled, they likewise provided no information on the risks to the Debtor-Seller's estate from any potential litigation avoided.

34. Courts have considered the following factors in determining whether to approve a settlement: (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views. *See Bard v. Sicherman (In re Bard)*, 49 F. App'x 528, 530 (6th Cir. 2002) (upholding the bankruptcy court's approval of a settlement after considering each of the relevant factors).

35. The fourth factor identified above – the paramount interest of creditors – recognizes that, in the bankruptcy context, the creditors' opinions are critical. *See Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995) (noting that a bankruptcy court "may not ignore" creditors' overwhelming opposition to a

16

settlement). Deference to the views of creditors is even more imperative when a settlement is reached with an insider, as is the case here. *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (holding that a closer scrutiny of insider agreements should be added to the factors used to determine whether a settlement is fair and reasonable). Here, the Committee, on behalf of the Debtors' unsecured creditors, is voicing strong opposition to the proposed "settlement," thus implicating the "paramount interest of creditors" factor.

36. Aside from the substantive flaws in the Navigant Report identified above, it is not entirely clear which entity gave Navigant its instructions at which times and what the nature of those instructions were. These questions are particularly pressing in light of the statements in the ████████████████████████████████████████████████████████████████████ The Committee also has questions as to whether the Allocation Agreement was negotiated at arm's-length.[11] Indeed, the fact that the Debtor-Seller is seeking approval of the Allocation Agreement in its current form is emblematic of the greater concerns that the Committee has previously expressed – namely, FEC's improper influence over the Debtors' restructuring efforts to the detriment of the Debtors' estates and for the benefit of insiders.

37. Given the Committee's concerns, the "paramount interests of creditors" test articulated by the Sixth Circuit in *In re Bard* weighs heavily in favor of denying the Debtor-

---

[11] Notably, the e-mail address in the Allocation Agreement's notice provision for both the Non-Debtor Seller and the Debtor-Seller is that of the same individual apparently employed by FEC.

17

Seller's request for approval of the Allocation Agreement pursuant to Bankruptcy Rule 9019. Accordingly, the Committee submits that, even were the Court to find that Bankruptcy Rule 9019(a) is the applicable standard for review here, the record before the Court is insufficient for there to be a determination that Bankruptcy Rule 9019 is satisfied.

38. Based on all of the foregoing, the Debtor-Seller has failed to satisfy *any* standard for approval of the Allocation Agreement: Not only does the Allocation Agreement fail to satisfy the business judgment or entire fairness standards under section 365 of the Bankruptcy Code, it also fails to rise above the "lowest point in the range of reasonableness" to justify approval under Bankruptcy Rule 9019. As such, approval of the Motion must be denied, absent an appropriate allocation of the sale proceeds as between the Debtor-Seller and the Non-Debtor Seller.

## RESERVATION OF RIGHTS

39. The Committee has not yet had the opportunity to obtain any formal discovery regarding the Allocation Agreement. This Limited Objection is without prejudice to, and the Committee hereby fully reserves its rights to raise additional arguments in respect of the Allocation Agreement and to seek other appropriate relief if the circumstances warrant.

18-50757-amk    Doc 756    FILED 06/14/18    ENTERED 06/14/18 18:14:14    Page 18 of 19

## **CONCLUSION**

For the reasons set forth herein, approval of the Motion should be denied to the extent the Allocation Agreement is not modified as set forth herein.

Dated: June 14, 2018

By: /s/ *Christopher B. Wick*
Lawrence E. Oscar (0022696)
Daniel A. DeMarco (0038920)
Christopher B. Wick (0073126)
Rocco I. Debitetto (0073878)
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone: (216) 621-0150
Facsimile: (216) 241-2824
Email: leoscar@hahnlaw.com
dademarco@hahnlaw.com
cwick@hahnlaw.com
ridebitetto@hahnlaw.com

- and –

MILBANK, TWEED, HADLEY & M$^C$CLOY LLP

Dennis F. Dunne (admitted *pro hac vice*)
Evan R. Fleck (admitted *pro hac vice*)
Tyson M. Lomazow (*pro hac vice* pending)
28 Liberty Street
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 822-5219
Email: ddunne@milbank.com
efleck@milbank.com
tlomazow@milbank.com

Aaron Renenger (admitted *pro hac vice*)
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7505
Facsimile: (202) 263-7505
Email: arenenger@milbank.com

*Counsel to the Official Committee of Unsecured Creditors of FirstEnergy Solutions Corp., et al.*