| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 18-50757 |
| FIRSTENERGY SOLUTIONS CORP., et al. | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Hon. Alan M. Koschik |

## OHIO VALLEY ELECTRIC CORPORATION'S MEMORANDUM IN SUPPORT OF APPLICATION OF THE APPROPRIATE STANDARD TO REJECTION MOTION

Ohio Valley Electric Corporation ("OVEC") hereby files this memorandum (the "Memorandum") in support of the appropriate standard under 11 U.S.C. § 365(a) for this Court's ruling on the *Motion for Entry of an Order Authorizing FirstEnergy Solutions Corp. and FirstEnergy Generation, LLC to Reject a Certain Multi-Party Intercompany Power Purchase Agreement With the Ohio Valley Electric Corporation as of the Petition Date* [Docket No. 44] (the "Rejection Motion"), which seeks the rejection of the Inter-Company Power Agreement (the "ICPA") to which FirstEnergy Solutions Corporation ("FES") and OVEC are party. In support of this Memorandum, OVEC respectfully states as follows.

## PRELIMINARY STATEMENT

1. On the same day that they filed the Rejection Motion, the Debtors initiated an adversary proceeding (the "Adversary Proceeding"), in which they sought preliminary and permanent injunctive relief and a declaratory judgment "that the rejection power is unaffected by the Federal Power Act." Apr. 2, 2018 Hr'g Tr. at 30:18-21. On May 11, 2018, the Court granted the relief requested by the Debtors, issuing the *Preliminary Injunction Against the Federal Energy Regulatory Commission* [Adv. Proc. Docket No. 114] (the "Preliminary Injunction") and the *Memorandum Decision Supporting Order Granting Preliminary Injunction* [Adv. Proc. Docket

No. 125] (the "<u>PI Memorandum Decision</u>"; together with the Preliminary Injunction, the "<u>Preliminary Injunction Order</u>").  The Preliminary Injunction Order enjoined the Federal Energy Regulatory Commission ("<u>FERC</u>") from exercising its exclusive authority under the Federal Power Act (the "<u>FPA</u>") to even consider whether the proposed rejection of the ICPA implicates the public interest in the "transmission of electric energy in interstate commerce."  16 U.S.C. § 824(a).

2.      In its Preliminary Injunction Order, the Court resolved what it characterized as the "central legal question" of whether the rejection of the ICPA constituted a modification or abrogation of a filed rate contract, which would have triggered the FPA and required FERC to approve the modification or abrogation under that statute, separate from and independent of this Court's determination of whether rejection of the ICPA satisfies the business judgment standard under 11 U.S.C. § 365.  PI Memorandum Decision at 32.  The Court held that the FPA ***did not*** apply to the proposed rejection of the ICPA—a ruling that OVEC is appealing and from which it is seeking permission for direct appeal to the United States Court of Appeals for the Sixth Circuit.

3.      The only logical implication of the Court's findings and conclusions in the Preliminary Injunction Order is that this Court's consideration of the Rejection Motion is limited to whether the Debtors have satisfied their burden under the business judgment standard governing rejection of executory contracts in bankruptcy cases.  Nevertheless, at the Court's request, OVEC hereby files this Memorandum regarding whether the Court should consider a heightened standard at the rejection hearing.  For the following reasons, given the Court's prior ruling, the Court should limit its analysis to the business judgment standard.

4.      ***First***, the public interest standard is not a free-floating standard that applies in any case, before any court, to any dispute involving interstate wholesale electricity.  Rather, the public

interest standard emanates from the FPA's recognition that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest." 16 U.S.C. § 824(a). Because this Court has determined that the FPA does not apply to the rejection of the ICPA, there is no public interest for the Court to consider. Instead, the Court should adjudicate the Rejection Motion under the business judgment standard normally applicable in rejection proceedings under 11 U.S.C. § 365(a). In addition, because the Debtors obtained a preliminary injunction against FERC by arguing that the FPA does not apply, they are judicially estopped from asserting that the FPA's standard nevertheless applies.

5. **Second**, the FPA entrusts FERC, and only FERC, with conducting the sensitive, complex public interest analysis. Congress gave FERC the exclusive authority to perform such duties because of the agency's deep subject-matter expertise and deliberative process. This Court cannot usurp FERC's jurisdiction, in direct contravention of Congress' conferral of exclusive jurisdiction to conduct the public interest review on the agency, which is subject only to deferential reconsideration by a court of appeals.

6. **Third**, the Court cannot now apply the heightened standard of review set forth in *In re Mirant Corp,* 378 F.3d 511, 525 (5th Cir. 2004)—where the Fifth Circuit stated that "upon remand, the district court should consider applying a more rigorous standard to the rejection" of the power purchase agreement the debtor sought to reject. Unlike in *Mirant*, this Court has determined that the FPA has no bearing here, so the reasoning supporting the Fifth Circuit's application of a heightened standard is inapplicable in light of this Court's findings in the Preliminary Injunction Order.

7. **Fourth**, if, despite OVEC's arguments, the Court decides to apply a heightened standard of review, it must allow FERC to conduct a complete review proceeding and must give

3

at least as much weight to FERC's eventual findings as a court of appeals would in its review of agency action under FPA, along the lines of what the district court did on remand in *In re Mirant Corp.*, 318 B.R. 100 (N.D. Tex. 2004). Such an approach would require, at a minimum, this Court to lift the injunction on FERC and to affirmatively permit the agency to conduct its own full-fledged public interest review. Otherwise, FERC will not be in a position to assess and opine on where the public interest under the FPA lies. Even that, however, is unsupported by statute and infringes on FERC's independent regulatory authority.

## BACKGROUND

### A.     Overview Of The ICPA.

8.     OVEC is an investor-owned utility that operates two coal-fired power plants in Cheshire, Ohio and Madison, Indiana (the "Power Stations"), the operation and funding of which is governed by the ICPA. *See generally* ICPA. OVEC, FES, and 12 other power companies and cooperatives (each, a "Sponsor") are currently parties to the ICPA, which differs materially from bilateral power purchase agreements ("PPAs"), under which Debtors typically take and pay for power. *See id.* Under the ICPA, OVEC must make power available to each Sponsor in proportion to their respective "Power Participation Ratio[s]." ICPA §§ 1.0117, 4.02. In turn, each Sponsor is responsible for a proportionate share of the Power Stations' fixed and operating costs. *See id.* §§ 4.03, 7.01, 7.02, 7.03, 8.04. Sponsors similarly share in the costs of the Plants' eventual decommissioning, which will include, for example, "remedial action required by regulatory authorities, and any other costs incurred in putting the facilities in a condition necessary to protect health or the environment." *Id.* § 5.03(f). The ICPA's payment obligations are shared severally by the Sponsors, not joint and severally. *See id.* § 9.11. Thus, if a Sponsor defaults on a payment, non-defaulting Sponsors are not required to cover the shortfall. *See id.* §§ 11.01, 11.02.

4

## B. The FERC Proceeding And The Related Adversary Proceeding.

9. On March 26, 2018, OVEC initiated an action (the "FERC Proceeding") before FERC, seeking a finding that FES's anticipated rejection of the ICPA would amount to a termination of its purchase obligation in violation of the FPA and the ICPA's express terms. *See Ohio Valley Electric Corp. v. FirstEnergy Solutions Corp.*, Complaint, Docket No. EL18-135 (Mar. 26, 2018) (the "FERC Complaint"). On April 1, 2018 (the "Petition Date"), the same date the Rejection Motion was filed, FES and FG filed an Adversary Proceeding *FirstEnergy Solutions Corp. v. Federal Energy Regulatory Commission*, Case No. 18-05021 (Bankr. N.D. Ohio). In the Adversary Proceeding, FES and FEG sought and obtained an *ex parte* temporary restraining order [Adv. Proc. Docket No. 11] (the "TRO"), enjoining FERC from conducting the FERC Proceeding or initiating one of its own.[1] *See* TRO at 4.

10. Before and after the issuance of the TRO, numerous interested parties moved to intervene in the FERC Proceeding and raised a wide variety of substantive positions regarding rejection, as summarized in the chart attached as Appendix A to OVEC's *Opposition to Preliminary Injunction Motion* [Adv. Proc. Docket No. 84] (the "PI Opposition"). The publicly filed motions highlight the broad significance of the ICPA's proposed rejection, which is about far more than potential creditor recoveries.[2] The National Rural Electric Cooperative Association, an organization representing more than 900 member-owned, not-for-profit rural electric utilities, similarly noted the "immense importance" of the FERC Proceeding to its members, including, for

---

[1] Although FEG has participated in the Adversary Proceeding and filed the Rejection Motion together with FES, FEG assigned all interested in the ICPA to FES, and FES agreed to assume all liabilities and obligations under the ICPA, through Assignment and Assumption Agreements executed on February 27, 2014.

[2] Those motions to intervene and comments are attached to the *Declaration of Mark McKane, P.C.* [Adv. Proc. Docket No. 84-2] as Exhibits C through Q, and are incorporated hereby.

5

example, that "[c]ost shortfalls resulting from FirstEnergy's rejection of the contract" would have an "adverse effect on OVEC's credit rating and borrowing costs," which, "particularly in the case of rural electric cooperatives whose customers are their owners, will be passed on in their entirety to consumers." *See Declaration of Mark McKane, P.C.* [Adv. Proc. Docket No. 84-2], Ex. F at 7-8. The Ohio Consumers' Counsel, the authorized representative of approximately 4.5 million Ohio residential utility customers, stated that granting OVEC's complaint in the FERC Proceeding "will protect Ohio's monopoly consumers from funding additional and unnecessary subsidies for OVEC's power plants," and that to "release FES of its obligations to pay for 4.85% of OVEC's two aging coal plants would be significantly worse for other Ohio monopoly consumers than requiring FES to honor its contractual obligations." *Id.*, Ex. Q. at 1-2. .

11. FES and FEG also filed *Plaintiffs'* Ex Parte *Motion for Temporary Restraining Order and Preliminary Injunction Against Federal Energy Regulatory Commission* [Adv. Proc. Docket No. 3] and the accompanying *Memorandum of Law in Support of the Motion* [Adv. Proc. Docket No. 4] (together, the "PI Motion"). OVEC filed its PI Opposition on April 30, 2018, along with various other defendants and intervenors, including FERC.[3] This Court held a hearing on the PI Motion on May 11, 2018, following which it issued an oral ruling granting the PI Motion, as well as the PI Memorandum Decision. The Preliminary Injunction Order bars FERC "from taking any action or asserting any jurisdiction that would interfere with [the Debtors'] right to seek authority to reject [the Inter-Company Power Agreement] pursuant to [11 U.S.C. § 365(a)]." PI Memorandum Decision at 12.

---

[3] OVEC incorporates all of the arguments set forth in the PI Opposition as if stated herein.

C.    **Appellate Proceedings.**

12.    On May 31, 2018, OVEC filed the *Notice of Appeal* [Adv. Proc. Docket No. 127], the *Motion to Certify Preliminary Injunction Order for Direct Appeal to the United States Court of Appeals for the Sixth Circuit* [Adv. Proc. Docket No. 129] (the "Certification Motion"), and the *Motion to Appeal the Preliminary Injunction Order as of Right, or In the Alternative, Requesting Leave* [Adv. Proc. Docket No. 131]. On June 13, 2018, the Court issued an order granting the Certification Motion [Adv. Proc. Docket No. 146].

D.    **Rejection Proceedings.**

13.    On April 1, 2018, the Debtors filed the Rejection Motion, seeking the authority to reject the ICPA as of the Petition Date, and a related motion to reject nine PPAs as of the Petition Date [Docket No. 45] (the "Energy Rejection Motion"). The Debtors filed three declarations in support of the Rejection Motion: (1) the *Expert Declaration of Judah L. Rose* [Docket No. 46] (the "Rose Declaration"); (2) the *Declaration of Kevin T. Warvell* [Docket No. 47] (the "Warvell Declaration"); and (3) the *Expert Declaration of David Gerhardt* [Docket No. 48] (the "Gerhardt Declaration"). Numerous parties in interest filed oppositions to the Rejection Motions, including OVEC [Docket No. 652] (the "Rejection Opposition"), Duke Energy Ohio, Inc. [Docket No. 649], North Allegheny Wind, LLC [Docket No. 650], the Ohio Consumers' Counsel (the "OCC") [Docket No. 651], and Krayn Wind LLC ("Krayn") [Docket No. 653]. Discovery concerning the Rejection Motions is ongoing.

14.    On June 8, 2018, the Court conducted a status conference on the Rejection Motions, during which it set a deadline of June 15, 2018 at 4 p.m. EDT for contract counter-parties to file briefs regarding the applicable standard to be applied to the Rejection Motions, and scheduled a hearing on the rejection standard issue on June 26, 2018 at 1:30 p.m. EDT.

## ARGUMENT

**I.     THE COURT'S CONCLUSION IN THE PRELIMINARY INJUNCTION ORDER THAT THE FPA DOES NOT APPLY TO THE REJECTION OF THE ICPA LIMITS ITS REVIEW TO THE BUSINESS JUDGMENT STANDARD.**

15.     As a threshold matter, OVEC reiterates all of the core arguments set forth in its PI Opposition, which are now subject to appeal to the Sixth Circuit: (1) the provisions set forth in the ICPA constitute a filed rate; (2) the filed rate cannot be unilaterally modified or abrogated absent a FERC determination that such changes are required in the public interest under the FPA and the *Mobile-Sierra* doctrine; (3) FERC exercises exclusive jurisdiction over the public interest determination; and (4) this Court and FERC share concurrent jurisdiction over the rejection of wholesale power agreements like the ICPA.  *See* PI Opp'n ¶¶ 10–28.  OVEC is in no way conceding that the rejection of the ICPA can or should be effectuated solely based on the Court's consideration of the Debtors' motion to reject the ICPA, and continues to assert—as it will on appeal—that the ICPA may be rejected only after ***both*** this Court's application of the business judgment standard under 11 U.S.C. § 365 ***and*** FERC's public interest review under the FPA.[4]

16.     Given the Court's findings and conclusions in the Preliminary Injunction Order, and the Debtors' and the Court's stated intentions to proceed with the rejection proceedings while the appeal of the Preliminary Injunction Order is pending, at this time the Court should limit its

---

[4]  *See In re Boston Generating, LLC*, No. 10Civ. 6528, 2010 WL 4616243 at *1 (S.D.N.Y. Nov. 12, 2010) ("In order to reject the contract, the Debtors must also obtain a ruling from FERC that abrogation of the contract does not contravene the public interest."); *In re Calpine Corp.*, 337 B.R. 27, 36 (S.D.N.Y. 2006) (finding that FERC had jurisdiction over debtor's proposed rejection of wholesale power agreements); *In re NRG Energy, Inc.*, No. 03 Civ 3754, 2003 WL 21507685, at *4 (S.D.N.Y. June 30, 2003) (finding that question of whether debtor "may cease performance of the [wholesale power agreement] given the FPA requirements adopted by Congress to protect wholesale power customers" was one "that is squarely FERC's regulatory responsibility"); *In re Mirant Corp.*, 318 B.R. 100, 108 (N.D. Tex. 2004) (recognizing on remand that before authorizing any rejection, FERC must be afforded the right to "engage in appropriate inquiry to enable it to evaluate the effect that such rejection would have on the public interest" in a separate proceeding, to which the bankruptcy or district court must give due credit).

8

review of the Rejection Motion to 11 U.S.C. § 365(a)'s business judgment standard, as the Debtors urged in their PI Motion. *See* PI Motion at 2 ("In contrast, in rejection proceedings, the bankruptcy court simply determines whether the debtor has properly exercised its business judgment in seeking to cease performing—and thereby breaching—an executory agreement."). To avoid ambiguity about the Court's ruling on the appropriate standard to be applied to the Rejection Motion, OVEC requests that the Court adopt in full its findings of fact and conclusions of law in the Preliminary Injunction Order, which should preclude consideration of the public interest standard under the FPA in its entirety.

### A. The Public Interest Standard Arises From And Is Inextricably Intertwined With The FPA.

17. The public interest standard is not a floating standard to be freely applied by any court or agency before which interstate wholesale electricity issues are raised. The public interest standard arises directly from the FPA itself, which is premised on the fundamental notion that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest," and that "Federal regulation of matters relating to . . . the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest." 16 U.S.C. § 824(a).

18. The public interest standard of review is implemented through the filed rate and *Mobile-Sierra* doctrines, both of which are likewise rooted in the FPA. The "filed rate doctrine" provides that "[s]o long as the filed rate is not changed in the manner provided by the *[Federal Power] Act* it is to be treated as though it were a statute, binding upon the seller and the purchaser alike," *Nw. Pub. Serv. Co. v. Montana-Dakota Util. Co.*, 181 F. 2d 19, 22 (8th Cir. 1950) (emphasis added), *aff'd*, *Montana-Dakota Util. Co.* v. *Nw. Pub. Serv. Co.*, 351 U.S. 246 (1951). The doctrine "is not limited to 'rates' *per se*," *Nantahala Power & Light Co v. Thornburg*, 476 U.S. 953, 966

9

(1986), and encompasses the terms and conditions of service, such as "FERC-approved cost allocations between affiliated energy companies," *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 41-42 (2003), as well as alterations to "the duration of [wholesale power contracts]," *In re Calpine Corp.*, 337 B.R. 27, 36 (S.D.N.Y. 2006) (citing *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 822 (1968)). The *Mobile-Sierra* doctrine, established by the Supreme Court in *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956), and *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956), allows for contracting parties who "adopt the *Mobile-Sierra* standard of review" to "abrogate or modify the contract only if required by the public interest" ***under the FPA***. *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 254 (D.C. Cir. 2007) (internal quotations and citations omitted).

19.     Even outside the *Mobile-Sierra* context, when a wholesale purchaser seeks to change the prices it pays under a contract with a supplier or to shorten its contract term with that supplier, FERC must weigh whether the existing rates, terms and conditions remain just and reasonable and, even if not, whether the changes sought by the customer would be just and reasonable, *i.e.*, in the public interest. In such cases, FERC has ruled that it is not enough under the FPA to show that the contract terms are not currently competitive. *French Broad Elec. Membership Corp. v. Carolina Power & Light Co.*, 92 FERC ¶ 61,283 (2000). Rather, "the proper time frame in determining the justness and reasonableness of long-term, fixed-rate contracts is over the 'life-of-the-contract' rather than on a 'snapshot' in time basis." *Id.* at 61,967. The Commission has "recognized that the benefits and the burdens of a long-term contract must be viewed over the full term of the contract." *Id.* FERC will deny relief where the evidence shows that, over the lifetime of the contract, the customer has benefitted or will benefit. *Id.*

20.     The FPA's public interest standard is wholly independent from the general public interest principles that bankruptcy courts may otherwise consider in the context of general federal litigation—for example, in the context of a motion for injunctive relief, where a court must query "whether the public interest would be served by the issuance of an injunction," *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (internal quotes and citation omitted), or a motion for a stay pending appeal, where a court must assess "the public interest in granting the stay," *In re Akron Thermal, Ltd. P'ship*, 414 B.R. 193, 201 (N.D. Ohio 2009). The public interest analysis embodied in the filed rate and *Mobile-Sierra* doctrines is necessary only in circumstances where the FPA is expressly invoked or implicated, absent which there is no basis to undertake such a review.

**B.      The Court's Determination That The FPA Does Not Apply To The Rejection Of The ICPA Forecloses Application Of The Public Interest Standard.**

21.     In its PI Opposition, OVEC asserted—as it does today—that because the proposed rejection of the ICPA constitutes a unilateral modification of its terms, the Debtors must comply with the FPA, and with the filed rate and *Mobile-Sierra* doctrines, by obtaining a ruling from FERC that continued performance under the ICPA "seriously harms the public interest" in order to effectuate such rejection (in addition to obtaining authority to reject from this Court under the Bankruptcy Code). *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*, 554 U.S. 527, 530, 541 (2008) (citation omitted). The Court, however, determined that rejection of the ICPA does not implicate the FPA. That determination renders the FPA's public interest standard inapplicable, and the Court should therefore adjudicate the Rejection Motion under the business judgment standard normally applicable in rejection proceedings under 11 U.S.C. § 365(a), and only that standard.

11

22. The Preliminary Injunction Order embraced the following "central legal question": if "this Court authorizes a debtor to reject a filed rate contract, and the debtor ceases performance on it, has the debtor 'changed,' 'abrogated,' or otherwise modified the contract (the 'rate') itself, violating the doctrine that gives such contracts the force of regulations committed to FERC's jurisdiction?" PI Memorandum Decision at 32–33. The Court's answer to that question was an unequivocal "no," and the Court found that the FPA did not apply at all to the proposed rejection of the ICPA. Specifically, the Court held that the "filed rate doctrine, the Federal Power Act, and FERC's regulatory authority are not offended by, and do not preempt, the Bankruptcy Court's exclusive jurisdiction over motions to reject power contracts[.]" *Id.* at 31. The Court instead concluded that "rejection, including the attendant cessation of performance, does not intrude on FERC's jurisdiction over filed rates," and that "***bankruptcy law*** controls the rights and remedies relevant to the Rejection Motion[.]" *Id.* at 33–34 (emphasis added).

23. If the FPA does not apply to the rejection of the ICPA, the filed rate and *Mobile-Sierra* doctrines are inapplicable as well; if the filed rate and *Mobile-Sierra* doctrines are inapplicable, so too is the public interest standard of review. Indeed, applying a public interest standard at this stage would be flatly inconsistent with the Court's holding that the rejection of the ICPA does not implicate, and should not be limited in any way by, the FPA or FERC's jurisdiction at all. *See id.* That holding, in addition to the question of the appropriate governing law and standards to be applied to the proposed rejection of executory contracts governed by the FPA, comprise the core legal issues to be resolved in the appellate proceedings. Departing from that holding now not only would be logically incoherent, but also would muddy the existing appellate record. For the sake of consistency and clarity, the Court should adopt the findings and conclusions

in the Preliminary Injunction Order in full in its forthcoming ruling on the standard issue, and should limit its review of the Rejection Motion to business judgment under 11 U.S.C. § 365.[5]

24.     Moreover, the Court's analysis on whether the FPA was implicated by the Rejection Motion also turned on whether there was a specific statutory exception in 11 U.S.C. § 365 to the rejection of FERC-regulated contracts.  The Court found none.  *See* PI Memorandum Decision at 27 ("Congress has not provided any exception to rejection of regulated power contracts pursuant to Section 365(a).").  Thus, under the logic of the Court's Preliminary Injunction Order, absent such a statutory exception, there should be no reason to depart from the general rule that bankruptcy courts decide whether to approve rejection under a business judgment standard.  *See, e.g.*, *Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1099 (2d Cir. 1993); *In re C&W Mining Co.*, 38 B.R. 496, 500 (Bankr. N.D. Ohio 1984) ("Generally courts have conferred approval if the proposed rejection [of an executory contract] meets the 'business judgment' test.").  Given its Preliminary Injunction Order, this Court has no basis for importing any judicial gloss on the statutory standard, so the business judgment standard is the only standard available to this Court.[6]

---

[5]   To reiterate, in OVEC's view, the Bankruptcy Code is not the only statute that governs the ICPA.  The Bankruptcy Court has jurisdiction over the rejection motion, under a business judgment standard, while FERC has jurisdiction over the modification or abrogation of the ICPA, under a public interest standard.

[6]   OVEC also respectfully requests that the Court note OVEC's express reservation of rights regarding the propriety of the Court's application of the business judgment standard to the Rejection Motion, in particular OVEC's continued assertion that FERC and this Court exercise concurrent jurisdiction over the rejection of the ICPA, and that rejection can be effectuated only after this Court approves rejection under the Bankruptcy Code's business judgment standard *and* FERC approves rejection under the FPA's public interest standard.  Moreover, to the extent that this Court determines that the rejection of the ICPA is governed by some standard other than business judgment, OVEC will continue to contest, and expressly reserves its rights to contest, rejection under that alternative standard.

### C. The Debtors Are Judicially Estopped From Arguing For The Court To Apply The Public Interest Standard.

25. The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another case." *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420, 424 (6th Cir. 2005) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). Judicial estoppel "preserve[s] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (quotations omitted). Whether described as "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too," judicial estoppel bars the Debtors from arguing for the Court's application of the public interest standard here—a position directly contrary to Debtors' repeated assertions in the Adversary Proceeding that this Court, and this Court alone, has jurisdiction to authorize rejection of the ICPA under the Bankruptcy Code. *Reynolds v. Comm.r*, 861 F.2d 469, 472 (6th Cir. 1988) (citations omitted).

26. The Debtors sought and obtained both a temporary restraining order and a preliminary injunction enjoining FERC from performing its regulatory duties under the FPA based on two core claims: (1) this Court exercises "***exclusive jurisdiction*** to administer the reorganization of Debtors' estates and to grant relief, including the relief sought by Plaintiffs' Rejection Motions . . . authorized under chapter 11 of the United States Code," PI Mot. at 1 (emphasis added); and (2) that the public interest under the FPA is "***irrelevant in bankruptcy***," and, by extension, to the proposed rejection of the ICPA, May 11, 2018 Hr'g Tr. at 36:10-14 (emphasis added). Since the outset of these chapter 11 cases, the Debtors have argued against both FERC's exercise of authority under the FPA and the application of the public interest standard to

14

the proposed rejection of the ICPA, asserting time and time again in both its written filings[7] and at oral argument[8] that there is "*no exception*" to the Court's rejection powers under 11 U.S.C. § 365(a) "for power purchase agreements, and there is *no exception* in the Code to rejection for anything related to FERC," May 11, 2018 Hr'g Tr. at 21:17-23 (emphasis added).

27.     Indeed, in the Debtors' own words, they "filed an adversary proceeding against FERC to protect Your Honor's jurisdiction over those rejection motions," and "asked for declaratory judgment to settle the jurisdictional question, so to speak, that the rejection power is *unaffected by the Federal Power Act, if we are allowed to reject*." Apr. 2, 2018 Hr'g Tr. at 30:16-21. The Court granted the Debtors' request when it concluded in the Preliminary Injunction Order that "bankruptcy law controls the rights and remedies relevant to the Rejection Motion[.]" PI Memorandum Decision at 34. As set forth above, the Court's holding that the "filed rate doctrine, the Federal Power Act, and FERC's regulatory authority are not offended by, and do not preempt, the Bankruptcy Court's exclusive jurisdiction over motions to reject power contracts," *id.* at 31—

---

[7] *See Complaint for Declaratory Judgment, Preliminary and Permanent Injunction Against the Federal Energy Regulatory Commission* [Adv. Proc. Docket No. 1] (the "Adversary Complaint") ¶ 7 ("It is equally unsupportable to suggest that Bankruptcy Code section 365 reflects an unspoken congressional intent to exclude wholesale power agreements from the bankruptcy courts' jurisdiction under section 365—particularly when the Code specifically denotes the types of contracts that are excluded."), ¶ 6 ("Here, that is an easy judicial task, as the Federal Power Act does not give FERC exclusive authority over the breach of a wholesale power agreement, or provide anything whatsoever concerning the treatment of wholesale power contracts in bankruptcy."); PI Motion at 15 ("Congress therefore provided that this Court is the exclusive forum in which to decide the Debtors' rights under section 365 of the Bankruptcy Code."), 18 ("[T]he FPA does not give FERC authority over rejection or the breach of a wholesale power agreement in bankruptcy, while section 365 contains no exception to the debtor's ability to reject 'any' executory contract for wholesale power contracts.").

[8] *See* Apr. 2, 2018 Hr'g Tr. at 18:7-13 ("And, important to today's proceedings, as Your Honor knows from the briefing, is that this section of the Code says that the debtors can reject any executory contract or unexpired lease of the debtor. There's no exception on the face of this for long-term power contracts, contracts within the scope of FERC's regulatory powers, or any sort of exception."); May 11, 2018 Hr'g Tr. at 36:2-8 ("Nevertheless, if FERC, in its expertise, thinks that an existing rate has become so inimical to the public interest, that FERC should allow a solvent party to change the rates that it promised it would buy or sell at, or terminate the contract, we'll give FERC that power, but it will be an awfully high standard. *What that has to do with rejection is lost on the debtors for sure, Your Honor*." (emphasis added)).

precisely the relief sought by the Debtors—precludes the application of the FPA's public interest standard. The Debtors cannot now reverse course and argue that the Court should apply such a standard, notwithstanding its acceptance of the Debtors' arguments that the FPA does not govern the proposed rejection of the ICPA.

28.    All three of the factors that courts consider in determining whether judicial estoppel should apply—"(1) 'a party's later position must be clearly inconsistent with its earlier position'; (2) 'whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding[] would create the perception that either the first or the second court was misled'; and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing part if not estopped'"—have been satisfied here. *Lewis*, 141 F. App'x at 425 (quoting *New Hampshire*, 532 U.S. at 751)). Any argument by the Debtors that the Court should now apply the FPA and its public interest standard would plainly be inconsistent with Debtors' previous assertions in the Adversary Proceeding. The Court's application of the public interest standard to the Rejection Motion would create an inconsistency in its rulings, supporting the perception that it was misled in enjoining FERC in the Adversary Proceeding. Finally, the Debtors would benefit from, and OVEC would be prejudiced by, the abrupt reversal of the Debtors' position, as the Debtors presumably would attempt to later argue on appeal (albeit erroneously) that any errors in the Preliminary Injunction Order are potentially rendered harmless by virtue of the Court's consideration of the public interest standard in the rejection proceedings.[9]

---

[9]  That would not be the only inconsistency in the positions taken by the Debtors thus far in these chapter 11 proceedings. The Debtors' attempts to expedite the resolution of the Rejection Motion directly conflict with their attempts to shoehorn complicated and fact-intensive *nunc pro tunc* issues into the preliminary rejection hearing, particularly where, as here, the ICPA constitutes a forward contract within the meaning of 11 U.S.C. § 101(25) and therefore cannot be retroactively rejected. Under 11 U.S.C. § 562(a)(1), forward contracts such as the ICPA may be rejected only

16

29.     This is precisely the type of gamesmanship that the doctrine of judicial estoppel was intended to prevent, and the Debtors should be barred from arguing for the Court's application of the public interest standard to the Rejection Motion. *See White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 477-80 (6th Cir. 2010) (creditor judicially estopped from litigating harassment claim filed with the Equal Employment Opportunity Commission, where creditor omitted any reference to such claim in initial bankruptcy filing, and bankruptcy court "adopted the contrary position as a preliminary matter"); *Mirando v. U.S. Dep't of Treasury*, 766 F.3d 540, 546-47 (6th Cir. 2014) (taxpayer judicially estopped from pursuing tax refund claim, based on position that was "clearly inconsistent with his position" in a previous criminal case).

## II.     FERC HAS EXCLUSIVE JURISDICTION TO WEIGH THE PUBLIC INTEREST UNDER THE FPA.

30.     Even if this Court's decision did not foreclose consideration of the public interest under the FPA, the FPA itself precludes this Court from assessing where that interest lies. FERC— and FERC alone—has the exclusive authority under the FPA to perform a public interest analysis in the first instance. *See generally Defendant Federal Energy* Regulatory *Commission's Opposition to the Plaintiffs' Motion for a Preliminary Injunction* [Adv. Proc. Docket No. 85] (the "FERC PI Opposition"). FERC is vested under the FPA with the exclusive authority to regulate rates for interstate transmission and wholesale sales of electric energy, and it is empowered to establish rules and regulations governing such rates. *See* 16 U.S.C. §§ 824, 824d, 824e; *Sierra*, 350 U.S. at 355 ("[T]he purpose of the power given [FERC under the FPA] is the protection of the public interest.").

31.     Under the filed rate and *Mobile-Sierra* doctrines, that exclusive authority extends to the consideration of whether the modification or abrogation of a filed rate comports with the

_____

as of the date from which rejection damages are measured—here, the "date of such rejection."

17

public interest. The case law is unequivocal: the "**Commission** is to evaluate all factors bearing on the public interest," not federal courts before which issues relating to the FPA are raised. *See Tenn. Gas Pipeline Co.*, 40 FERC ¶ 63,008, at 65,072 (1987); *see also Wis. Pub. Power, Inc.*, 493 F.3d at 254 ("**FERC** may abrogate or modify the contract only if required by the public interest."); *Morgan Stanley*, 554 U.S. at 530, 541 (presumption that filed rates are just and reasonable "may be overcome only if **FERC** concludes that the contract seriously harms the public interest.").

32.     FERC has accordingly developed an efficient process to evaluate and consider the highly-technical evidence and complex legal, scientific, and economic principles involved in determining just and reasonable electricity rates, and courts routinely recognize FERC's competence and expertise in administering the FPA and in applying its standards to the wholesale energy agreements falling within its jurisdiction. *See, e.g.*, *Arcadia, Ohio v. Ohio Power Co.*, 498 U.S. 73, 87-88 (1990) (Congress "entrusted the administration of the FPA to . . . FERC as the agency with the proper technical expertise required to regulate energy transmission."); *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010) ("[I]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission[.]"); *Louisiana Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 392 (D.C. Cir. 2008) (the FPA "calls upon FERC to make fact-intensive judgment calls on the basis of its superior technical expertise"); *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 644 (1972) ("[F]actual questions [are] within the . . . competence of an administrative agency . . . , and when resolution of that question depends on 'engineering and scientific' considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis.").

33.     For that reason, courts "afford great deference to [FERC] in its rate decisions[,]" as reflected in the FPA's provisions insulating FERC's orders from collateral attack by federal or

state courts, as the Debtors are attempting to do here. *Morgan Stanley*, 554 U.S. at 532. The FPA vests jurisdiction over challenges to FERC orders in the federal courts of appeals, which provide the "specific, complete[,] and ***exclusive*** mode for judicial review of the Commission's orders." *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958) (emphasis added); *see also* 16 U.S.C. §825*l*(b) ("Any party to a [FERC] proceeding . . . aggrieved by an order issued by the Commission . . . may obtain review of such order in the United States court of appeals[.]"). The FPA "necessarily preclude[s] *de novo* litigation between the parties of all issues inhering in the controversy" resolved by FERC order. *City of Tacoma*, 357 U.S. at 335-36. In other words, "***[e]xclusive means exclusive***," no exceptions. *Am. Energy Corp. v. Rockies Express Pipeline, LLC*, 622 F.3d 602, 605 (6th Cir. 2010) (emphasis added). When a court of appeals reviews FERC's actions, moreover, the court applies a deferential standard of review. *See, e.g.*, *PSEG Energy Res. & Trade LLC v. FERC,* 665 F.3d 203, 207-08 (D.C. Cir. 2011) (assessing FERC's orders "to determine whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'" (quoting 5 U.S.C. § 706(2)(A))).

34. FERC has carefully crafted procedures to ensure it has the information it needs to apply its expertise. FERC has liberal intervention, *see* 18 CFR § 385.214(c), and permits broad discovery by any party, *id.* § 385.402(a), including depositions, *see id.* § 385.403; data requests, interrogatories, and requests for the production of documents, *see id.* § 385.406; requests for admission, *see id.* § 385.408; subpoenas, *see id.* § 385.409, and motions to quash or compel discovery. *See id.* § 385.410. Congress conferred exclusive jurisdiction on FERC to conduct the FPA's public interest review because of the agency's deep expertise and highly reticulated procedures. That exclusive grant of authority precludes this Court from trying to apply a public interest standard to the Rejection Motion in FERC's stead.

## III.  THERE IS NO BASIS TO APPLY THE FIFTH CIRCUIT'S *MIRANT* STANDARD OF REVIEW TO THE REJECTION MOTION.

35.     Notwithstanding the foregoing, OVEC anticipates that certain parties in interest may argue for the Court's application of the heightened standard of review suggested in *In re Mirant Corp,* 378 F.3d 511, 525 (5th Cir. 2004), where the Fifth Circuit stated that "upon remand, the district court should consider applying a more rigorous standard to the rejection" of the PPA the debtor sought to reject.[10]   The Fifth Circuit then left it to the district court to determine the proper procedures for applying a more rigorous standard on remand.[11]   *See id.*; *see also* Part IV (describing the district court's approach on remand).   Even if this Court ostensibly reached the same conclusion as the Fifth Circuit on the ultimate issue of whether a debtor must independently

---

[10]   The Bankruptcy Code contains no provision permitting the district court to apply a more rigorous standard in rejection proceedings, nor does the FPA permit a district court (or a bankruptcy court, which is a unit of the district court) to conduct a public interest review.  For this and other reasons explained in earlier filings, OVEC continues to assert that *Mirant* was also wrongly decided.  *See, e.g.*, PI Opposition at 10-11 n.3, 20.

[11]   The Fifth Circuit stated in full:

> Therefore, upon remand, the district court should consider applying a more rigorous standard to the rejection of the Back–to–Back Agreement. If the district court decides that a more rigorous standard is required, then it might adopt a standard by which it would authorize rejection of an executory power contract only if the debtor can show that it "burdens the estate, [ ] that, after careful scrutiny, the equities balance in favor of rejecting" that power contract, and that rejection of the contract would further the Chapter 11 goal of permitting the successful rehabilitation of debtors. *See [NLRB v.] Bildisco,* 465 U.S. [513] at 526–27[, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)]. When considering these issues, the courts should carefully scrutinize the impact of rejection upon the public interest and should, *inter alia,* ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers. *Cf. id.* at 527[, 104 S.Ct. 1188] (requiring the bankruptcy court to balance the interests of the debtor, the creditors and the employees when determining what constitutes a successful rehabilitation). The bankruptcy court has already indicated that it would include FERC as a party in interest for all purposes in this case under 11 U.S.C. § 1109(b) and Fed. R. Bankr. P. 2018. We presume that the district court would also welcome FERC's participation, if this case is not referred back to the bankruptcy court. Therefore, FERC will be able to assist the court in balancing these equities.

*Id.* at 525-26.

20

obtain FERC approval to reject a FERC-regulated executory contract in bankruptcy, *see In re Mirant Corp.* at 522, the findings of fact and conclusions of law set forth in the Preliminary Injunction Order materially differ from those in *Mirant*, thereby precluding this Court from conducting a public interest analysis. *Mirant* is accordingly inapposite, and there is no basis for the Court to "scrutinize the impact of rejection upon the public interest" in ruling on the Rejection Motion. *Id.* at 525.

36. In *Mirant*, the Fifth Circuit concluded that the debtor's proposed rejection of a PPA did not amount to a collateral attack on the filed rate, based on its determination that "[w]hile the FPA does preempt breach of contract claims that challenge a filed rate, district courts are permitted to grant relief in situations where the breach of contract claim is based upon another rationale." *Id.* at 519. In reaching that conclusion, the Fifth Circuit interpreted "filed rate" literally, *i.e.*, to mean the contractual rate at which wholesale electricity was bought and sold—the same interpretation that was previously applied in *Gulf States Utils. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1471-73 (5th Cir. 1987) (claim alleging breach of contract resulting in "'change[s] in *capacity*' . . . would not be preempted by the FPA"). In other words, the debtor, relying on what it claimed was controlling Fifth Circuit precedent, sought to reject the power purchase agreement on grounds that, in its view, did not change the "filed rate." The Fifth Circuit agreed with the debtor, concluding that the proposed rejection triggered neither the filed rate doctrine nor FERC's "exclusive authority to change a filed rate." *In re Mirant Corp.*, 378 F.3d at 518.

37. Putting to the side, for these purposes only, whether *Mirant* was correctly decided (OVEC still maintains it was not), this Court's findings in the Preliminary Injunction Order fundamentally diverge from those supporting the *Mirant* decision. This Court's determination that the proposed rejection of the ICPA did not amount to a collateral attack on a filed rate was not

21

premised on the Fifth Circuit's narrow reading of the term "filed rate." Indeed, the Court agreed with OVEC that: (1) "FERC's plenary and exclusive jurisdiction over wholesale power rates, terms, and conditions of service is embodied in the 'filed rate doctrine,'" PI Memorandum Decision at 31; (2) "the filed rate doctrine is not limited to 'rates' per se," and encompasses "the entirety of a rate schedule including contractual provisions, methodologies for allocating costs, restrictions on availability of the schedule as well as quantity and price terms," *id.* at 31-32 (quoting *Tenn. Gas Pipeline Co. v. FERC*, 860 F.2d 446, 447 n.1 (D.C. Cir. 1988); and (3) under the *Mobile-Sierra* doctrine, filed rates are presumptively binding upon sellers and purchasers, which presumption "may be overcome only if FERC concludes that the contract seriously harms the public interest," *id.* at 32 (quoting *Morgan Stanley*, 554 U.S. at 530).

38.    Instead, the Court concluded that rejection would have **no impact at all** on the ICPA's filed rate, because it would not "change," "abrogate," or "modify" its terms.[12]  PI Memorandum Decision at 32.  Based on the Court's express findings in the Preliminary Injunction Order, the "cessation of performance" under the ICPA does not implicate either the filed rate doctrine or the FPA, and it is to be treated for the purposes of rejection as any other executory contract: "The ICPA is in the public record, but it reads and performs like a contract, not a regulation; the PPAs are not filed in the record but they also read in all material respects like contracts, because they are." *Id.* at 30-31, 33.

39.    In holding that "bankruptcy law controls the rights and remedies relevant to the Rejection Motion" and enjoining FERC from exercising its exclusive jurisdiction to perform a public interest review, *id.* at 34, this Court went well beyond what the Fifth Circuit decided in

---

[12]  Even the Fifth Circuit, relying on a constrained interpretation of what constitutes a "filed rate," did not go so far, finding that the debtor's rejection of the PPA "would . . . have an indirect effect upon the filed rate."  *In re Mirant Corp.*, 378 F.3d at 519-20.

22

*Mirant*. While the Fifth Circuit recognized the FPA's role due to the "the public interest inherent in the transmission and sale of electricity," *Mirant*, 378 F.3d at 525, this Court determined that the FPA does not apply at all. Indeed, by enjoining FERC, the Court has expressly prevented FERC from determining whether rejection of a contract amounts to a modification of its terms, *i.e.*, a modification of the filed rate. There is accordingly no basis for the Court to apply the heightened rejection standard in *Mirant*, as the Court's explicit findings in the Preliminary Injunction Motion render that standard inapplicable.

IV.  **IF THIS COURT WERE TO APPLY AN ALTERNATIVE STANDARD OF REVIEW, IT WOULD NEED TO ALLOW FERC TO CONDUCT A FULL PROCEEDING TO DETERMINE WHERE THE PUBLIC INTEREST LIES, TO WHICH THE COURT MUST DEFER.**

40.  To the extent the Court were to determine that applying a standard of review to the Rejection Motion other than a business judgment standard is appropriate, the Court would need to permit FERC to conduct a full public interest inquiry and analysis in accordance with the agency's standard procedures, and afford at least as much deference to the agency's findings and conclusions as FERC is typically entitled under the FPA's judicial review provisions. FERC does not assess the public interest in a vacuum; it does so through a proceeding that FERC is currently precluded from undertaking. Even in *Mirant*—the only decision in which a court has applied a more stringent standard than business judgment—the district court, on remand from the Fifth Circuit, allowed FERC to conduct a full proceeding and issue a ruling that the district court accorded substantial deference. *See In re Mirant Corp.*, 318 B.R. 100 (N.D. Tex. 2004). While the approach taken by the *Mirant* remand court falls short of what the FPA requires, because FERC has exclusive jurisdiction over the public interest review, *see* PI Opposition at 10-11 n.3, 20, that court's ruling on remand does make clear that the only way FERC can provide a court with its

23

views on the public interest under the FPA is by conducting a full, public proceeding in which it assesses where the public interest lies.

**A.    Were The Court To Apply A Heightened Standard Of Review, It Would Need To Give FERC A Fulsome Opportunity To Conduct Its Own Public Interest Analysis And Give Full Weight To FERC's Determinations.**

41.    Were this Court decide to apply a public interest standard, the first step would be to lift the injunction on FERC—not just so that FERC can be "invited to participate" in the rejection hearing—but so that the agency can conduct a public interest review.  After all, FERC cannot provide this Court with its view on where the public interest lies if it is precluded from holding the full proceedings necessary to make that determination.  Accordingly, simply modifying the preliminary injunction to invite FERC to submit a brief in a few weeks is wholly insufficient.  Indeed, it is unclear whether and to what extent FERC would even agree to participate in the rejection proceeding, given its assertion that this Court lacksf jurisdiction to conduct a public interest review, and the fact that FERC is not a party in the rejection proceeding.  *See* FERC PI Opp'n at 9-12.  Moreover, permitting FERC only to submit a filing, just like any other interested party, offends the agency's jurisdiction and the FPA's mandate.  FERC's interest is not in a particular result, but rather in its ability to conduct a full and fair hearing and apply its expertise to determine the public interest.

42.    Were the Court to decide that a public interest review is necessary, FERC would need to be given full leeway to exercise its FPA-conferred jurisdiction and comply with its congressionally mandated duties.  Given that FERC is not participating in this proceeding, the Court would need to affirmatively request FERC's participation, allow and encourage the agency to conduct a full public interest review, and afford FERC's eventual determination the same substantial weight in the rejection proceedings that the agency would receive if reviewed by a court of appeals.

24

43. The district court's actions on remand *Mirant* are instructive. On remand, the district court carefully weighed the Fifth Circuit's guidance in assessing what a heightened standard of review should entail, and the means by which to implement such a review:

> To be entitled to an order authorizing rejection of the Back–to–Back Agreement, Debtors must prove that it burdens the bankrupt estates, that, after careful scrutiny and giving significant weight to comments and findings of the FERC relative to the effect such a rejection would have on the public interest inherent in the transmission and sale of electricity in interstate commerce, the equities balance in favor of rejecting the Back–to–Back Agreement, and that rejection of the Back–to–Back Agreement would further the Chapter 11 goal of permitting the successful rehabilitation of Debtors.
>
> …
>
> ***If rejection would compromise the public interest in any respect, it would not be authorized unless Debtors show that they cannot reorganize without the rejection.***

*In re Mirant Corp.*, 318 B.R. at 108 (emphasis added). The district court's approach in *Mirant*, even if insufficiently protective of FERC's exclusive jurisdiction, at least gave FERC sufficient time and an opportunity to conduct a full public interest proceeding and gave all interested parties the opportunity to exercise their due process rights and weigh in on FERC's decision.

44. Even then, soliciting the agency's participation and even a full hearing, without more, risks the possibility that FERC's work would be for naught. To address that concern, this Court would, like the district court in *Mirant*, need to give "significant weight" to FERC's conclusions. 318 B.R. at 108. The FPA safeguards FERC's efforts and expertise by subjecting its determination to judicial review only in the courts of appeals, *see* 16 U.S.C. §825l(b), and only under a deferential standard, *see, e.g.*, *PSEG Energy Res. & Trade LLC,* 665 F.3d at 207-08. If the Court applies a public interest standard and reviews FERC's regulatory determinations—to reiterate, a power found in no statute—this Court should apply the same deferential standards of review as the court of appeals would typically apply. If FERC finds that the rejection of the ICPA

25

impairs the public interest, that should end the inquiry, "unless Debtors show that they cannot reorganize without the rejection." *In re Mirant Corp.*, 318 B.R. at 108.[13]

45.     Were it to apply the *Mirant* remand court's approach, this Court would need to comply with both the Fifth Circuit and district court *Mirant* decisions—which must be read together as a whole—while giving weight to FERC's authority (even if not exclusive jurisdiction) under the FPA, the rights of all interested parties, including third party intervenors like the OCC and the National Rural Electric Cooperative Association and all of their respective constituents, and the Debtors' rights under 11 U.S.C. § 365.

**B.     There Is No Basis For The Court To Oversee Its Own Truncated, Modified Public Interest Standard Review Without FERC.**

46.     Should any parties in interest advocate for a truncated public interest review to be overseen by the Court alone, without the benefit of a full FERC evaluation of the public interest standard under the FPA, the Court should decline the invitation to wade into such a procedural and substantive morass. *See* FERC PI Opp'n at 10, n.4 ("Thus, to the extent that Debtors seek review of a FERC order, this Court lacks jurisdiction."). Under that approach, the Court would essentially have to step into the shoes of FERC and conduct a public interest hearing involving the participation of all of the interested parties who have filed motions to intervene in the FERC Proceeding, extensive discovery, and the testimony of numerous fact and expert witnesses, touching on subjects ranging from the impact to the electrical utility grid to plant decommissioning costs—all in a matter of weeks, according to the schedule suggested by the Debtors during meet

---

[13] Of course, even if this Court were to permit FERC to assume the most expansive role short of assuming concurrent jurisdiction, thorny challenges would remain. Under what authority would FERC have jurisdiction to issue subpoenas or compel testimony, as it typically would in a proceeding before it, *see* 18 CFR §§ 385.409, 385.410 Would the parties have only the option, but not the obligation, to participate in and present evidence in the FERC proceeding? The only way to avoid these and other challenges is for FERC to assume concurrent jurisdiction and conduct its own public interest proceeding.

and confer discussions. Such an approach is untenable, particularly given this Court's lack of expertise on the nation's wholesale power markets, and this Court should reject any invitation into those unprecedented waters.

47. As an initial matter, by undertaking its own accelerated public interest standard review without FERC's assistance, the Court would be creating yet another split of authority, diverging from all of the other courts that have considered these issues. There is no guidance for what such a proceeding might look like, how long it should last, the scope of discovery, which parties may participate, or the likely outcome of the inevitable appeal of the Court's ultimate ruling on the Rejection Motion. The Court should reject any argument in favor of this approach, which amounts to an invitation into the unknown, requiring this Court to break new ground and make new law—yet another position that would be inconsistent with those already espoused by the Debtors in the Adversary Proceeding. *See* May 11, 2018 Hr'g Tr. at 37:9-11 ("That's a legislative function, it's not a judicial function to create another exception . . . that is not in the Code.").

48. While there is no precedent for how a bankruptcy court might conduct a public interest review under the FPA, FERC procedures and case law provide insight into the complexity of such an analysis. But, under the Preliminary Injunction Order, this Court would have to navigate this complexity alone, for FERC is not a party to the rejection proceedings and has indicated no interest in participating in the rejection hearings.

49. There have also already been 14 motions to intervene and comments filed in the FERC Proceeding by a number of interested third parties, all of whom would ordinarily be entitled to participate in the FERC Proceedings as parties. *See* 18 CFR § 385.214(c) (movants are automatically granted party status if no objection to timely motion to intervene is filed within 15 days). The Debtors have already indicated that they may challenge the OCC's standing to

27

participate in these proceedings, and the Court must resolve any standing objections before even reaching the merits of a public interest review.[14]  *See* June 8, 2018 Hr'g Tr. at 59:1-5.

50.     Should FERC determine that the case before it presents disputed issues of material fact, it would convene an evidentiary hearing[15] where all of these would-be intervenors, as well as FERC's own trial staff, OVEC, and the Debtors, would be entitled to take discovery "of any matter, not privileged, that is relevant to the subject matter" of the FERC Proceeding.  18 CFR § 385.402(a).  The scope of discovery under FERC's procedures, like the relevant Bankruptcy Rules, include depositions, *see id.* § 385.403, data requests, interrogatories, and requests for the production of documents, *see id.* § 385.406, requests for admission, *see id.* § 385.408, and subpoenas, *see id.* § 385.409.  All of these parties are likewise entitled to move to quash or compel discovery, *see id.* § 385.410, and this Court must resolve these discovery disputes to undertake its own public interest analysis.

51.     Even if the number of disputed factual issues was limited—which they are not— any evidentiary hearing necessarily contemplates significant expert discovery and testimony.  *See id.* § 385.402(c).  By law, FERC must consider "each of the pertinent factors," whether it is presiding over an evidentiary hearing or conducting a general rulemaking proceeding.  *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968); *see also Mobil Oil Corp. v. FPC,* 417 US 283, 308 (1974); *Ky. Utils., Co, v. FERC*, 766 F.2d 239, 252 (6th Cir. 1985).  Indeed, a public interest analysis touches on a wide range of complex and highly-technical legal, scientific, and economic principles, all of which are likely to be the subject of expert testimony.  *See Ky. Utils.,*

---

[14]    By contrast, a state commission that has filed a timely motion to intervene in a FERC proceeding is admitted as a party as a matter of right.  *See* 18 CFR § 385.214(a)(2).  State consumer advocate offices (like the OCC) have been construed to be state commissions for the purposes of 18 CFR § 385.214(a)(2).

[15]  *See Williams Gas Pipelines Central Inc.*, 95 FERC ¶ 61,028, 61,186 (2001).

766 F.2d at 242 ("The necessity for prior administrative consideration of an issue is apparent where, as here, its decision calls for the application of technical knowledge, and experience not usually possessed by judges. The Federal Power Commission is an administrative agency the decisions of which involve those difficult problems of policy, accounting, economics and special knowledge that go into public utility ratemaking." (quoting *Fed. Power Comm'n v. Colo. Interstate Gas Co.*, 348 U.S. 492, 500-501 (1955))).

52.     This includes experts on issues including, but not limited to, the economics of modifying the ICPA's filed rate, the impact to the electrical grid, environmental effects, civil and electrical engineering, rate-setting procedures, depreciation, rates of return under wholesale power contracts, and even the decommissioning of power plants like those operated by OVEC. *See Portland Nat. Gas Transmission Sys.,* 137 FERC ¶ 63,018, PP 30-872 (2011) (describing testimony of over 25 witnesses). The wide-ranging scope of expert testimony that must be presented, considered, and evaluated is similarly reflected in the length of public interest proceedings conducted before FERC, which often involve week-long evidentiary hearings and regularly take over a year to complete.[16]

53.     The burden on the Court to conduct all of these issues would be exacerbated further by the Preliminary Injunction Order, which currently bars FERC from participating in the rejection proceedings at all. The Court would be deprived of FERC's significant expertise in the complex legal, scientific, and economic principles involved in ensuring the reliable provision of energy at

---

[16]  *See Pacific Gas & Electric Co.,* 156 FERC ¶ 61,238 (2016) (order setting for hearing a rate increase issued on September 30, 2016); "Joint Motion to Extend Procedural Schedule," *Pacific Gas & Electric Co.,* Docket No. ER16-2320-002 (filed Feb. 1, 2018) at p. 2 (noting that the hearing in the proceeding was held from January 9 to January 30, 2018, 31 witnesses were cross-examined resulting in an approximately 2,000 page transcript); "Order of Chief Judge Extending Initial Decision Due Date," *Pacific Gas & Electric Co.,* Docket No. ER16-2320-002 (issued Apr. 11, 2018) (extending due date of initial decision until Oct. 1, 2018, which upon issuance is subject to review by the Commission after the filing of briefs on exceptions and briefs opposing exceptions).

just and reasonable rates—as well as the specialized staff that the agency retains specifically for this purpose.  *See Sacramento Mun. Util. Dist.*, 616 F.3d at 528; *La. Pub. Serv. Comm'n*, 522 F.3d at 392.  Even were the Court to modify the preliminary injunction to permit FERC to participate in a public interest review as a party in interest, it is unclear whether and to what extent FERC will do so, given its assertion that this Court lacks jurisdiction to conduct a public interest review in the first instance.  *See* FERC PI Opp'n at 9-12. Accordingly, OVEC reaffirms all of its objections to the Court's application of a heightened standard of review to the Rejection Motion given the Court's Preliminary Injunction Order.

## **CONCLUSION**

For all of the reasons stated herein, OVEC respectfully requests that the Court limit its review of the Rejection Motion to the business judgment standard under 11 U.S.C. § 365.

Dated: June 15, 2018

/s/ Mark McKane, P.C.

David R. Seligman, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:   marc.kieselstein@kirkland.com
           david.seligman@kirkland.com

Mark McKane, P.C. (admitted *pro hac vice*)
Michael P. Esser (admitted *pro hac vice*)
Kevin K. Chang (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:       (415) 439-1500
Email:   mark.mckane@kirkland.com
           michael.esser@kirkland.com
           kevin.chang@kirkland.com

Erin E. Murphy
Subash Iyer
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
655 Fifteenth Street, N.W.
Washington, District of Columbia 20005
Telephone:      (202) 879-5000
Facsimile:       (202) 879-5200
Email:   megan.wold@kirkland.com

Matthew Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:   matthew.fagen@kirkland.com

*Counsel to Ohio Valley Electric Corporation*

31

## CERTIFICATE OF SERVICE

I, Mark McKane, certify that on June 15, 2018, a true and correct copy of *Ohio Valley Electric Corporation's Memorandum in Support of Application of the Appropriate Standard to Rejection Motion* was served via the Court's Electronic Case Filing System on those entities and individuals who are listed on the Court's Electronic Mail Notice List.

*/s/ Mark McKane, P.C.*
Mark McKane, P.C.