**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | Case No. 18-50757 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | Hon. Judge Alan M. Koschik |
| | ) | |

**DEBTORS' OMNIBUS REPLY TO OPPOSITIONS TO DEBTORS' MOTION TO
REJECT A CERTAIN MULTI-PARTY INTERCOMPANY POWER PURCHASE
AGREEMENT WITH THE OHIO VALLEY ELECTRIC CORPORATION AS OF THE
PETITION DATE AND DEBTORS' MOTION TO REJECT
<u>CERTAIN ENERGY CONTRACTS AS OF THE PETITION DATE</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186), case no. 18-50757; and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

REPLY ................................................................................................................2

    I.      Rejection Of The Executory PPAs Is A Proper Exercise Of The Debtors' Business Judgment ......................................................................................2

            A.    This Court Should Apply The Traditional Business Judgment Standard When Deciding Whether The Debtors Can Reject The Executory PPAs..............................................................................3

            B.    OVEC's Estoppel Argument Is A Non-Sequitur ............................8

    II.     The Consent Decree Entered Into By the Environmental Protection Agency And A Non-Debtor Affiliate Of FES Is Irrelevant ....................9

    III.    MD Solar's Remaining Arguments Are Unavailing .............................10

            A.    Contractual Prerequisites to Termination Are Irrelevant ..............10

            B.    PURPA Does Not Require FES To Obtain FERC Approval To Reject The MD Solar PPA ..........................................................11

                i.     *The MD Solar PPA Is Not A PURPA Contract* ..............................11

                ii.    *FES Is Not Required To Obtain FERC Approval To Reject A PURPA Contract Under Section 365 Of The Bankruptcy Code* ..............................................................................13

    IV.    The Debtors Are Entitled To *Nunc Pro Tunc* Relief .............................14

            A.    The Debtors Acted Immediately to Reject the PPAs ................17

            B.    The Objectors Will Not Suffer Any Prejudice .........................20

            C.    Bankruptcy Code Section 562 Is Not Relevant And Does Not Preclude *Nunc Pro Tunc* Relief................................................21

CONCLUSION....................................................................................................23

18-50757-amk    Doc 795    FILED 06/22/18    ENTERED 06/22/18 15:51:36    Page 2 of 27

FirstEnergy Solutions Corp. ("FES") and FirstEnergy Generation, LLC ("FG" and together with FES, "Movants"), debtors in the above-captioned chapter 11 cases (together with their affiliated debtors, the "Debtors"), file this reply in further support of (i) the *Motion for Entry of an Order Authorizing FirstEnergy Solutions Corp. and FirstEnergy Generation, LLC to Reject a Certain Multi-Party Intercompany Power Purchase Agreement with the Ohio Valley Electric Corporation as of the Petition Date* (the "OVEC ICPA Rejection Motion") Dkt. No. 44, and (ii) the *Motion for Entry of an Order Authorizing FirstEnergy Solutions Corp. and FirstEnergy Generation, LLC to Reject Certain Energy Contracts as of the Petition Date*, Dkt. No. 45 (the "PPA Rejection Motion" and together with the OVEC ICPA Rejection Motion, the "Rejection Motions"),[2] and respectfully state as follows:

## INTRODUCTION

1.     Movants file this reply to objections filed by certain counterparties to the Executory PPAs and other allegedly interested parties (collectively, the "Objections").[3]  The Rejection Motions present a straightforward question for this Court to answer: does the Debtors' rejection of the Executory PPAs qualify as a sound exercise of their business judgment?  Rather than addressing that straightforward question, each of the Objections instead raises issues that are wholly extrinsic to the analysis this Court needs to conduct pursuant to section 365 of the Bankruptcy Code.

---

[2] Capitalized terms not defined herein are defined in the Rejection Motions.

[3] The Objections include oppositions to the Rejection Motions and supplemental memoranda filed in further support thereof by Krayn Wind LLC ("Krayn"), the Ohio Valley Electric Corporation ("OVEC"), Duke Energy Ohio, Inc. ("Duke"), Maryland Solar Holdings, Inc., assignee of Maryland Solar LLC (collectively, "MD Solar"), and the Office of the Ohio Consumers' Counsel (the "OCC," and together with Krayn, OVEC, Duke and MD Solar, the "Objectors").

1

2. Each of the Objections fails to state any legitimate reason why the Debtors' decision to reject the Executory PPAs is not a valid and reasonable exercise of their business judgment. The Objectors are transparent in their reason for avoiding the only relevant question in these contested matters: the counterparties to the Executory PPAs are disappointed that the Bankruptcy Code empowers the Debtors to reject their contracts, resulting in unsecured claims against FES, rather than forcing the Debtors to continue to perform under the Executory PPAs and permitting the Objectors to be made whole at the expense of other creditors. Further, circumstances here warrant *nunc pro tunc* relief as the Debtors' estates stand to lose over $7 million unless the Court approves retroactive relief, while Objectors stand to gain a windfall.

3. As set forth below: (1) the appropriate standard for assessing the Rejection Motions is the traditional business judgment standard; (2) PURPA and the contract-based defenses raised by certain of the Objectors are legally inapplicable; and (3) Movants are entitled to *nunc pro tunc* relief.[4]

## **REPLY**

## I. **REJECTION OF THE EXECUTORY PPAS IS A PROPER EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT**

4. As this Court correctly observed in its order granting Movants' request for a preliminary injunction in the adversary proceeding, "Bankruptcy Code Section 365(a) allows chapter 11 debtors-in-possession to reject burdensome contracts, in the sound exercise of their business judgment . . . ." *In re FirstEnergy Sols. Corp.*, 2018 WL 2315916, at *13 (Bankr. N.D.

---

[4] North Allegheny Wind, LLC ("North Allegheny") filed an objection to the PPA Rejection Motion but subsequently, the Debtors and North Allegheny reached a settlement and filed a stipulation regarding rejection of the North Allegheny PPA that was approved by the Court. *See* Order Granting Debtors' Mot. Approve Stip. Between Debtors & North Allegheny Wind, LLC Regarding Rejection Certain Energy Contracts, Dkt. No. 770. As such, no response is included with respect to arguments previously raised by North Allegheny.

18-50757-amk    Doc 795    FILED 06/22/18    ENTERED 06/22/18 15:51:36    Page 4 of 27

Ohio May 18, 2018).  As explained in considerable detail in the Movants' Rejection Motions, the traditional business judgment standard is the appropriate legal framework for this Court to use when deciding whether the Debtors can reject the Executory PPAs.  "Unless a separate provision of the Bankruptcy Code provides a non-debtor party with specific protection, the interests of the debtor and its estate are paramount; adverse effects on the non-debtor contract party arising from the decision to assume or reject are irrelevant."  *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 71 (Bankr. S.D.N.Y. 2016).  As long as rejection of an executory contract "will be advantageous to the estate" a court should only withhold approval of the debtor's decision to reject the contract in cases of "bad faith, whim, or caprice."  *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987).

> ### A. This Court Should Apply The Traditional Business Judgment Standard When Deciding Whether The Debtors Can Reject The Executory PPAs

5. The Debtors, three of the five Objectors, and the Official Committee of Unsecured Creditors (the "UCC")[5] all agree that this Court should apply the business judgment standard to the Rejection Motions.  The Rejection Motions contemplate the quintessential exercise of a debtor's well-considered power to reject burdensome contracts under the Bankruptcy Code—a power that is "essential" to the primary goal of chapter 11.  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 550 (1984).  The Debtors agree with the Court's conclusion that the Rejection Motions are not governed by the Federal Power Act (the "FPA"), and further agree with OVEC that "the filed rate and *Mobile-Sierra* doctrines are inapplicable" as well. Ohio Valley Elec. Corp.'s Mem. Supp. Appl. Appropriate Standard Rejection Mot. ¶ 23 ("OVEC Add'l Mem."), Dkt. No.761.  The Debtors' rejection of the Executory PPAs constitutes a breach

---

[5] *See* Official Comm. Unsecured Creditors' Reply Mem. Law Supp. Mot. Prelim. Inj. at 12, Adversary Proceeding, No. 18-05021, Dkt. No. 110.

of the relevant contract, and does not involve an assessment of the "reasonableness" of the wholesale rate the Debtors pay for power or change, without liability, the terms of the contracts. *See In re FirstEnergy Sols. Corp.*, 2018 WL 2315916, at \*17 ("This Court holds that rejection, including the attendant cessation of performance, does not intrude on FERC's jurisdiction over filed rates.").[6]

6.       MD Solar is the only Executory PPA counterparty persisting in the argument that this Court should apply "a more rigorous standard than the business judgment standard." Opp'n by MD Solar to Debtors' Mot. Reject Certain Energy Contracts at 6 ("<u>MD Solar Opp'n</u>"), Dkt. No. 643.  Specifically, MD Solar claims that Movants must establish "that the equities balance in favor of allowing FES to reject and terminate the PPA." *Id.* at 2.  In support of this assertion, MD Solar relies solely on the Fifth Circuit's *dicta* in *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511 (5th Cir. 2004).  As Movants have argued previously, the heightened standard suggested by the Fifth Circuit in *Mirant* does not apply here.  MD Solar fails to articulate the contours of the heightened standard it invokes, or how rejection of the MD Solar contract would harm the public interest, stating only that "FES's rejection of the PPA would impose a substantial burden upon MD Solar." MD Solar Opp'n at 6.  MD Solar is far from unique in that regard.  Like many other parties in interest, MD Solar took on the credit risk associated with entering a long term contract with FES.  A debtor's rejection—or breach—of an executory contract often imposes a "substantial burden" on the contractual counterparty.  But any such "burden" is irrelevant to whether the debtor may reject that contact pursuant to section 365,

---

[6] OVEC continues to insist, in contradiction to the Court's preliminary injunction ruling in the Adversary Proceeding, that rejection would somehow operate to change the rates and terms of the OVEC ICPA in contravention of the FPA.  *See* OVEC Add'l Mem. ¶¶ 17-21.

4

and instead is a function of one of the central tenets of the Bankruptcy Code—putting similarly situated unsecured creditors on equal footing vis-à-vis the debtor and its estate.

7.    The OCC also argues that this Court should apply a stricter standard than business judgment to the OVEC ICPA Rejection Motion.[7]  Without explanation and without citing any relevant authority, the OCC claims that applying the traditional business judgment standard would somehow render meaningless the words "subject to the court's approval" in section 365. OCC's Obj. at 4 ("OCC Opp'n"), Dkt. No. 651.  Courts asked to balance equities in connection with rejection have roundly rejected this contention.  *Borman's, Inc. v. Allied Supermarkets, Inc.*, 706 F.2d 187, 189 (6th Cir. 1983); *Matter of Federated Dep't Stores, Inc.*, 131 B.R. 808, 812 (S.D. Ohio 1991).  Instead, the OCC urges this Court to follow *Mirant* and "consider not only the Debtor's financial interests but also the higher rates that a couple million Ohio consumers could pay for electricity."  OCC Opp'n at 7.  MD Solar and the OCC's position that this Court should apply something other than the traditional business judgment standard is without merit, and rebutted by the substantial weight of authority cited by the Movants in their Rejection Motions applying the business judgment standard to rejection motions.  The Fifth Circuit's *dicta* in *Mirant* does not overturn decades of Sixth Circuit and national judicial authority applying the

---

[7] Movants reserve the right to object to OCC's bankruptcy standing in advance of the final hearing.  As neither a creditor nor a debtor, the OCC is not a party entitled to enforce obligations under the Bankruptcy Code.  *See In re Rice*, 462 B.R. 651, 656 (B.A.P. 6th Cir. 2011) (citing *In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983))*.  "Although the term 'party in interest' is broader than the term 'creditor,' it does not encompass entities that are merely 'concerned' with the results of a debtor's bankruptcy proceedings." *In re Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (party was not a "party in interest" with respect to debtor's rejection of an unrelated option contract); *see also In re Remington Park Owners Ass'n, Inc.*, 548 B.R. 108 (Bankr. E.D. Va. 2016) (nonparty to Chapter 7 debtor's executory agreement did not have standing to move for relief from order authorizing trustee to assume and assign agreement).  Further, the court's ruling on the appropriate standard may impact the question of whether OCC should be deemed a party in interest.

18-50757-amk    Doc 795    FILED 06/22/18    ENTERED 06/22/18 15:51:36    Page 7 of 27

business judgment standard to a debtor's decision to reject an executory contract pursuant to section 365. *See In re Mirant Corp.*, 378 F.3d at 525. Rather, the Fifth Circuit merely noted the general public interest principles underlying FERC's work and the filed-rate doctrine when it suggested that a court could "consider" assessing other factors when adjudicating a debtor's rejection motion—in a case in which FERC was participating. *See id.*

8. FERC apparently agrees with this position. FERC—the regulatory body charged with conducting its own public interest analysis in the case of unilateral abrogation, modification, or termination of FERC-regulated contracts—has voluntarily chosen not to appear in these contested matters.

9. The *Mirant* court's statement was influenced by the U.S. Supreme Court's ruling in *Bildisco*, in which the Supreme Court endorsed a nominally higher standard than the business judgment standard for the rejection of collective bargaining agreements. 465 U.S. at 525-26.

10. Even the heightened standard articulated in *Bildisco* has been narrowly applied, and certainly has no application here, where the driving force behind the Objectors' contentions is private economic interest. "Courts interpreting *Bildisco* have consistently limited the heightened scrutiny to the protection of national public interest such as public safety, health or welfare." *In re Caribbean Petroleum Corp.*, 444 B.R. 263, 268–69 (Bankr. D. Del. 2010). Courts have regularly found that the financial interests of private counterparties, their customers, and their communities, do not implicate the kind of exigencies that warrant diminishing a debtor's core right to reject burdensome executory contracts. *See In re Noranda Aluminum, Inc.*, 549 B.R. 725, 729 (Bankr. E.D. Mo. 2016) (contract counterparties' objection to rejection "to enable its own survival in no way presents a public interest that would merit a heightened standard for rejection."); *In re Old Carco LLC*, 406 B.R. 180, 192 (Bankr. S.D.N.Y. 2009) ("The

6

Court is sympathetic to the impact of the rejections on the dealers and their customers and communities, but such sympathy does not permit the Court to deviate from well-established law and 'balance the equities' instead of applying the business judgment standard."); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 425 (Bankr. N.D. Tex. 2009) ("Whether through contract rejections or plant closings, contraction of a debtor's business will often have a harmful effect for one or more local economies.").

11.     Moreover, not a single Objector has seriously contested or otherwise alleged facts that would make the rejection of the OVEC, Krayn, and MD Solar PPAs a matter of regulatory concern under the FPA.  As purchasers of a tiny amount of power and RECs that they do not need, Debtors' rejection of the Executory PPAs will have no impact on grid reliability or the availability of power—and no Objector has alleged otherwise.  *See, e.g.*, PPA Rejection Motion ¶¶ 19-21; OVEC Rejection Motion ¶ 17.  Thus, the Court need not determine whether under other facts and circumstances a higher standard might apply.  It need only decide that, under these facts and circumstances, the proper standard is business judgment.

12.     The Objectors' motives are purely economic.  Indeed, this Court has already observed that the "obvious and dominant purpose" of the defendants and intervenor-defendants in the Adversary Proceeding is to gain a "pecuniary advantage to certain private parties vis-à-vis other creditors of the [Debtors'] estates, contrary to the Bankruptcy Code's priorities."  *In re FirstEnergy Sols. Corp.*, 2018 WL 2315916, at *9-10.[8]

---

[8] Contrary to OVEC's claim, the district court in Mirant did not say (in *dicta* or otherwise) that it would lift the injunction to let FERC undertake independent proceedings outside the bankruptcy court; rather, the district court stated only that it would give FERC the "opportunity to participate as a party in interest . . . and would afford the FERC an opportunity to engage in appropriate inquiry to enable it to evaluate the effect that such a rejection would have on the public interest."

7

13.     Both MD Solar and the OCC fail to identify any legitimate threat to public safety, health, or welfare that would result from Movants' rejection of the Executory PPAs. The OCC's mere conjecture that rejection of the OVEC ICPA in particular could harm consumers is (a) unsupported by any evidence and, (b) does nothing to show that consumers would be charged the "unjust or excessive rates" that concerned the district court in *Mirant*. 318 B.R. at 108. Rather, as this Court recognized at the preliminary injunction hearing, the true nature of the Objections is transparent and purely economic: if Movants are permitted to reject the Executory PPAs, the objecting counterparties will suffer damages.[9] The appropriate relief under the Bankruptcy Code for those monetary damages is not to deny rejection, but rather to permit the damaged counterparties to file a claim for rejection damages. *See* 11 U.S.C. § 502(g).

## B.     OVEC's Estoppel Argument Is A Non-Sequitur

14.     Movants have consistently argued for the application of the traditional business judgment standard[10] and do not take a different position here. OVEC's argument that Movants are judicially estopped from arguing that a heightened standard applies to rejection is a non-sequitur.

---

*See In re Mirant Corp.*, 318 B.R. 100, 108 (N.D. Tex. 2004), *aff'd*, 197 F. App'x 285 (5th Cir. 2006).

[9] "And doesn't compelling FirstEnergy to continue to perform, let's call it specific performance, call it something else -- isn't that, by preventing contract damages to OVEC, isn't that essentially treating OVEC with 100 cents on the dollar by avoiding damage claims instead of giving them damage claims that are going to be discounted in bankruptcy to their unhappiness?" May 11, 2018 Hr'g Tr. 92:3-9.

[10] *See* PPA Rejection Motion ¶ 27 ("The 'business judgment' standard applies to determine whether the rejection of an executory contract or unexpired lease should be authorized."); *id.* ¶¶ 29, 33-34; *see also* June 8, 2018 Status Conf. Tr. at 25:11-12 ("[W]e did not read that decision to affirmatively set out the Court's ruling on the standard issue."); 21:24-25 ("Whether we're under business judgment or some other standard . . . .").

## II. THE CONSENT DECREE ENTERED INTO BY THE ENVIRONMENTAL PROTECTION AGENCY AND A NON-DEBTOR AFFILIATE OF FES IS IRRELEVANT

15.     The terms of a consent decree, dated March 18, 2005, entered into by the Environmental Protection Agency ("EPA") and a non-debtor affiliate of FES (the "Consent Decree"), are irrelevant to whether Movants can reject the Executory PPAs. *See* Obj. and Reservation of Rights of Krayn Wind LLC ¶-10 ("Krayn Opp'n"). Neither the Debtors, nor Krayn (which raised that argument in its objection), are parties to that Consent Decree. Rather, FES's entry into three of the Executory PPAs, including the Krayn PPA, satisfied certain obligations of a non-debtor FES affiliate, Ohio Edison Company, under the Consent Decree to enter contracts for 93 MW of renewable power.

16.     Nothing in the Consent Decree or the Krayn PPA prevents the Debtors from rejecting the Krayn PPA. Indeed, Krayn fails to argue: (1) that the Movants' rejection of the Executory PPAs would violate any term of the Consent Decree; (2) how the Consent Decree imposes any liability on the Debtors; or (3) how Krayn has standing to enforce the Consent Decree. Notably, the EPA—the entity with the power to enforce the Consent Decree—has not objected to rejection of the Krayn PPA, despite being fully aware of the Debtors' bankruptcy proceeding. Rather, the EPA has recognized that the obligations under the Consent Decree, to the extent any remain outstanding, are ***solely obligations of non-Debtor parties***. Specifically, the EPA chose to file limited objections to the Debtors' motions to approve stipulations related to the rejection of other PPAs entered into to satisfy the Consent Decree. *See* Dkt. Nos. 472, 660. In its limited objections, the EPA's only concern was that nothing in the relevant stipulations impacted the rights or obligations of non-Debtor parties under the Consent Decree. *See, e.g.*, U.S. Limited Obj. and Reservation of Rights ¶ 8, Dkt. No. 660. In its objection, the EPA provided protective language to resolve its objection. *Id.* ¶¶ 11-12. With respect to the details of

9

the stipulations, the EPA stated: "The United States defers to the Court as to whether such payments are a sound exercise of the Debtors' business judgment." *Id.* ¶ 9. The EPA further stated correctly that the parties to the PPA are not parties to the consent decree. *See id.* ¶ 10.

17.    While Krayn would like this Court to determine that the Consent Decree somehow insulates its contract from rejection, or somehow makes its position different from that of the other Executory PPA counterparties, there is simply no support for those assertions.

## III.    MD SOLAR'S REMAINING ARGUMENTS ARE UNAVAILING

### A.    Contractual Prerequisites to Termination Are Irrelevant

18.    MD Solar, like any counterparty to an executory contract, cannot validly object to the Debtors exercising their business judgment to reject the Executory PPAs by relying on contractual prerequisites to contract termination. For example, MD Solar claims rejection would violate certain provisions of its PPA. MD Solar Opp'n at 4-5. MD Solar's argument, in short, is that the Debtors are not permitted to reject the MD Solar PPA because rejection would constitute a breach of that PPA. As explained in detail in the Debtors' opening brief, MD Solar's remedy for the Debtors breaching the MD Solar PPA is not to prevent rejection; rather, it is to make a claim in bankruptcy for rejection damages. MD Solar errs by conflating breach and termination.[11] "Rejection is independent of the contract terms." *In re N. Am. Royalties, Inc.*, 276 B.R. 860, 865 (Bankr. E.D. Tenn. 2002). In the context of a rejection under section 365, contract counterparties cannot seek to enforce specific provisions of the Executory PPAs to blunt the rejection power because, as this Court has explained, "[r]ejection has exactly the same effect [as] breach." *In re FirstEnergy Sols. Corp.*, 2018 WL 2315916, at *17 (internal citations omitted).

---

[11] MD Solar argues that "FES may not *reject and terminate* the PPA" without abiding by the contract terms. MD Solar Opp'n at 4 (emphasis added). This argument ignores the differences between rejection and termination.

**B.     PURPA Does Not Require FES To Obtain FERC Approval To Reject The MD Solar PPA**

19.     MD Solar  also claims that this Court cannot approve Movants' rejection of the MD Solar PPA because FES must comply with allegedly applicable provisions of the Public Utility Regulatory Policies Act ("PURPA"), including seeking authorization from FERC.  MD Solar's argument is without merit for numerous reasons.  MD Solar's PPA is *not* a contract subject to PURPA and, even if it were, a debtor is not required to obtain FERC approval to reject a PURPA contract under PURPA or section 365 of the Bankruptcy Code.  Nor did FERC itself even raise PURPA in opposition to the preliminary injunction in the Adversary Proceeding, the case in which FERC's authority over the MD Solar PPA was litigated.

### i.     *The MD Solar PPA Is Not A PURPA Contract*

20.     The MD Solar PPA is not a PURPA contract.  Congress enacted PURPA in 1978 as part of an initiative to promote independent power generation.  *See FERC v. Mississippi*, 456 U.S. 742, 750 (1982).  PURPA gives an energy-generating "qualifying facility" ("QF") the right (but not an obligation) to sell their energy to their interconnected electric utility at rates that do not exceed the utility's incremental cost of energy, which is generally referred to as the utility's "avoided cost."  16 U.S.C. § 824a-3(a), (b); 18 C.F.R. § 292.304.  An interconnected utility's obligation to purchase energy from a QF is referred to as the utility's "mandatory purchase provision."  *See Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 402-03 (5th Cir. 2014).

21.     While MD Solar may be a QF under PURPA—and thus exempted from various regulatory obligations, *see* 16 U.S.C. § 824a-3(e); 18 C.F.R. §§ 292.601, 292.602—it does not follow that every contract with MD Solar is necessarily a PURPA-governed contract because "FERC regulations specifically contemplate voluntary agreements outside of PURPA's umbrella."  *See Freehold Cogeneration Assocs., L.P. v. Bd. of Regulatory Comm'rs*, 44 F.3d

11

1178, 1193 (1995) (citing 18 C.F.R. § 292.301(b)). Instead, QFs can enter into contracts that are not subject to PURPA or sell into wholesale spot markets like PJM Interconnection. *See id*. That is precisely what MD Solar did here.

22.     First, the MD Solar PPA *never* mentions PURPA. It *never* mentions any of the terms and conditions that would normally appear in a PURPA contract. Beyond making no reference to PURPA itself, the contract is silent on a variety of items typically found in a PURPA contract, including: (i) the prerequisite fact that MD Solar is an eligible QF; (ii) the purchaser's incremental or "avoided cost" rate; or (iii) the satisfaction of any mandatory purchase obligation of FES. In fact, the contract explicitly mentions the FPA as the governing law, not PURPA. *See* MD Solar PPA § 19.10, Dkt. No. 643-2. At its core, the MD Solar PPA unambiguously provides that it is an ordinary wholesale electricity contract, not a PURPA contract.

23.     In response, MD Solar can only muster the baseless assumption—unsupported by any declarations—that the reference to the FPA "apparently was a drafting error, as the agreement is instead subject to PURPA." MD Solar Opp'n at 4, n.6. MD Solar's blanket claim erroneously presumes that any power sale by a QF is necessarily "pursuant to PURPA." As explained above, QFs have the option of selling under PURPA contracts, outside PURPA under negotiated contracts, or into the wholesale market.

24.     In any event, MD Solar's objection does not contain any support for its claim that the MD Solar PPA contains a "drafting error." The MD Solar PPA is governed by New York law. Under New York law, courts first look to the "four corners" of a contract to determine its meaning because the plain language of the contract is the best indication of the parties' intent. *See Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2016) ("Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four

12

corners of the contract . . . The best evidence of what parties to a written agreement intend is what they say in their writing . . . a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") (quoting *Greenfield v. Philles Records*, 780 N.E.2d 166 (N.Y. 2002)).

25.     MD Solar's objection does not contain any legitimate basis to presume that the MD Solar PPA contains a drafting error and that the parties actually intended the MD Solar PPA to be a PURPA contract. Quite the contrary: the contracting parties' failure to include key relevant terms (or even mention PURPA) indicates the parties' clear intention to enter into a wholesale power contract outside of PURPA.[12]

      **ii.**     ***FES Is Not Required To Obtain FERC Approval To Reject A PURPA Contract Under Section 365 Of The Bankruptcy Code***

26.     Even if the MD Solar PPA were a PURPA-governed contract, FES is not required to seek FERC approval to reject a PURPA contract under section 365 of the Bankruptcy Code. MD Solar fails to cite any authority suggesting that PURPA contracts carry a special status granting them immunity from a debtor's right to reject executory contracts pursuant to section 365 of the Bankruptcy Code. PURPA can be a basis for establishing contracts between independent power producers and traditional electric utilities, but it does not make such contracts immune from breach, in bankruptcy or otherwise.

_____

[12] MD Solar's claim that the MD Solar PPA was "intended to comply with FES's commitments under the State of Maryland Public Service Commission Order No. 83788" is inapposite. *See* MD Solar Opp'n at 3. That order addressed non-debtor FirstEnergy Corp.'s 2011 merger with Allegheny Energy and in any event makes no reference to PURPA. *See In re FirstEnergy Corp.*, 2011 WL 722020 (Md.P.S.C. Jan. 18, 2011). MD Solar's claim that the PPA was "intended to comply" with the order further undermines its argument—if the MD Solar PPA were in fact a PURPA contract, then, pursuant to PURPA's mandatory purchase obligation, FES would have been obligated to enter the agreement, regardless of the Maryland Public Service Commission Order.

## IV.    THE DEBTORS ARE ENTITLED TO *NUNC PRO TUNC* RELIEF

27.    Rejection of the Executory PPAs *nunc pro tunc* to the Petition Date is appropriate under the facts and circumstances of these cases. Adoption of the Objectors' position that rejection should only be effective as of the date of court approval would be inequitable and would cause over $7 million in damages to the Debtors' estates, while providing a windfall to the Objectors, solely because those parties are less willing than similarly situated contract counterparties to resolve these matters expeditiously.

28.    Contrary to the Objectors' assertions, the Sixth Circuit has expressly recognized that a bankruptcy court may grant *nunc pro tunc* relief when the circumstances so warrant—and did not limit such power to any one category of relief. *See Mitan v. Duval (In re Mitan)*, 573 F.3d 237, 244–45 (6th Cir. 2009). Indeed, courts in the Sixth Circuit—including courts in the Northern District of Ohio—have routinely ordered the retroactive rejection of executory contracts *nunc pro tunc* to the respective motion's filing date or some other earlier date. *See, e.g.*, *In re Coshocton County Mem'l Hosp. Ass'n*, No. 16-51552 (Bankr. N.D. Ohio Dec. 22, 2016), Dkt. No. 322 (authorizing rejection of certain executory contracts and unexpired leases *nunc pro tunc* to the motion's filing date); *In re Contech U.S., LLC*, No. 09-42392 (Bankr. E.D. Mich. June 29, 2009) Dkt. No. 645 (same); *In re Concord Steel, Inc.*, No. 09-43448 (Bankr. N.D. Ohio Jan. 31, 2012) Dkt. No. 175 (same); *In re Recticel North America, Inc.*, No. 09-73411 (Bankr. E.D. Mich. Nov. 25, 2009) Dkt. No. 147 (authorizing rejection of contracts *nunc pro tunc* to the petition date); *In re Forum Health*, No. 09-40795 (Bankr. N.D. Ohio Sept. 14, 2009) Dkt. No. 472 (authorizing and deeming the rejection of a contract as of thirty (30) days prior to the entry of the order); *In re Bucyrus Community Hospital, Inc.*, No. 10-61078 (Bankr. N.D. Ohio June 2, 2010) Dkt. No. 204 (rejecting contracts and relieving debtors from any liability as of seventy-five (75) days prior to the entry of the order).

14

29.     The Debtors filed the Rejection Motions on April 1, 2018, substantially concurrent with the filing of their voluntary petitions for chapter 11 protection. The Debtors seek to reject the Executory PPAs because they provide for the sale of energy, capacity and, in some cases, RECs, to the Debtors at significantly above-market rates, causing the Debtors to lose millions of dollars each month. The Debtors provided sufficient notice to the Objectors of their intent to reject the Executory PPAs effective as of the Petition Date, and have been consistently seeking to expedite the resolution of these issues and work with the contract counterparties to mitigate any damages. Indeed, almost immediately after this Court issued its initial temporary restraining order against FERC on April 2, 2018, FES sent letters to nearly all of the contract counterparties informing them of the Debtors' Rejection Motions and seeking to engage in discussions regarding the transition of the generating units and the mitigation of any damages arising under the Executory PPAs. The Objectors wrongly assert that *nunc pro tunc* relief is unavailable here because the Debtors are unable to simply turn off the power being provided, and in turn, sold into the PJM market. PJM will not allow the Debtors to cease selling without a Court order authorizing rejection. However, the Debtors have made clear that they are willing to pay the Objectors all funds received from PJM for the generation provided since the Petition Date—mitigating any potential damage to the Objectors. Accordingly, the balance of the equities weighs heavily in favor of permitting the Debtors to reject the Executory PPAs as of the Petition Date.

30.     Courts may approve *nunc pro tunc* rejection of executory contracts and unexpired leases based on their "equitable power" under section 105(a) of the Bankruptcy Code. *See Pac. Shores Dev. LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1069 (9th Cir. 2004) ("'[T]he approving court has the equitable power, in suitable cases, to order a rejection to operate

15

retroactively.'" (quoting *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. # 1 (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1028 (1st Cir. 1995))); *see also In re Mitan*, 573 F.3d at 244 (discussing bankruptcy court's power generally to grant *nunc pro tunc* relief); *In re Stonebridge Techs., Inc.*, 430 F.3d 260, 273 (5th Cir. 2005) (noting that "most courts have held that lease rejection may be retroactively applied."); *In re GCP CT School Acquisition, LLC*, 429 B.R. 817, 832 (BAP 1st Cir. 2010) ("[W]e conclude that the bankruptcy court had the equitable authority under *Thinking Machines* to establish a retroactive rejection date."); *In re Rupari Holding Corp.*, 2017 WL 5903498, at *6 (Bankr. D. Del. Nov. 28, 2017) ("[C]ourts have held that bankruptcy courts may exercise their equitable powers in granting such a retroactive order when doing so promotes the purposes of Section 365(a)."); *In re Manis Lumber Co.*, 430 B.R. 269, 277 (Bankr. N.D. Ga. 2009) ("Given the foregoing understanding of the purposes of § 365(d)(3), it follows that a bankruptcy court has the equitable discretion to order that rejection operates retroactively when appropriate to effect its fundamental objectives."); *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996) ("[W]here the equities of a case warrant, the court has the power to grant the rejection retroactively.").

31.     To approve a rejection *nunc pro tunc*, a court must "balance the equities" and conclude that they weigh in favor of the debtor. *See In re Chi-Chi's, Inc.*, 305 B.R. 396 (Bankr. D. Del. 2004); *BP Energy Co. v. Bethlehem Steel Corp.*, 2002 WL 31548723, at *4 (S.D.N.Y. Nov. 15, 2002). Although there is no standard test for approving *nunc pro tunc* requests pertaining to unexpired leases or executory contracts, courts have relied on various factors that have "justified retroactive rejection," including, but not limited to: (1) whether the debtor acted immediately by filing the motion to reject and set the motion for hearing; and (2) whether the non-debtor counterparty would suffer prejudice as a result of the retroactive rejection. *See In re*

*At Home Corp.*, 392 F.3d at 1073 (affirming bankruptcy court's *nunc pro tunc* relief that was based, in part, on the debtor having "moved for rejection of the leases immediately upon filing its bankruptcy petition"); *In re GCP CT School Acquisition, LLC*, 429 B.R. at 830-31 (finding that "sufficient and reasonable notice" gave the bankruptcy court "equitable authority . . . to establish a retroactive rejection date."); *In re Rupari Holding Corp.*, 2017 WL 5903498, at *6 (approving *nunc pro tunc* relief where the court considered, among other things, that the "Debtors assert[ed] that neither the Debtors nor the counterparties to the [contracts] will suffer prejudice as a result of the retroactive rejection."). Here, the balance of the equities warrants retroactive relief and the Court should approve the rejection of the Executory PPAs *nunc pro tunc* to the Petition Date.

### A.     The Debtors Acted Immediately to Reject the PPAs

32.     First, *nunc pro tunc* relief may be granted when the debtor has timely given notice of its unequivocal intention to reject an executory contract or lease as of a certain date. *See In re Amber's Stores*, 193 B.R. at 827 (approving retroactive rejection where the debtor served the rejection motion "as soon as possible"); *see also In re Fleming Co.*, 304 B.R. 85, 96 (Bankr. D. Del. 2003) ("To grant *nunc pro tunc* rejection, the Debtors must have stated an unequivocal intent to reject the leases."); *In re Joseph C. Spiess Co.*, 145 B.R. 597, 606 (Bankr. N.D. Ill. 1992) ("[R]ejection of a lease should be retroactive to the date that the trustee takes affirmative steps to reject said lease such as serving notice of a motion to reject."); *In re Mid Region Petroleum, Inc.*, 111 B.R. 968, 970 (Bankr. N.D. Okla. 1990) ("[T]he effective date of rejection was the date the Trustee gave unequivocal notice to [the counterparty] of his intent to reject.").[13]

---

[13] If there is a delay between the filing of the motion and the hearing, courts will also look to see if the delay was due in part to factors outside of the Debtors' control. *See In re At Home Corp.*, 392 F.3d at 1073.

33.     Here, the Debtors filed the Rejection Motions as soon as practicable following the

Petition Date.  In fact, the Rejection Motions were filed on April 1, 2018, less than 24 hours

following the filing of the Debtors' voluntary petitions, and the Debtors noticed the hearing on

the Rejection Motions for April 26, 2018.  *See* Notice of Mot. and Hearing Schedule, Dkt. Nos.

186, 187.  The delay in holding a hearing on the Rejection Motions has been caused by factors

outside the Debtors' control including, the request of two PPA counterparties (including MD

Solar) and OVEC to delay any briefing, let alone a hearing, on the Rejection Motions until this

Court ruled on the Debtors' request for a preliminary injunction against FERC in the Adversary

Proceeding

34.     The procedural history between the Petition Date and the filing of this Reply is

relevant to the Court's review of the request for *nunc pro tunc relief*.  First, on April 12, 2018,

following discussions between the Debtors and OVEC regarding the procedural posture of the

Rejection Motions following entry of a temporary restraining order against FERC, the Debtors

filed the *Amended Notice of Motion for entry of an Order Authorizing FirstEnergy Solutions*

*Corp. and FirstEnergy Generation, LLC to Reject a Certain Multi-Party Intercompany Power*

*Purchase Agreement with the Ohio Valley Electric Corporation as of the Petition Date*, Dkt. No.

281, postponing a hearing on the OVEC ICPA Rejection Motion pending the Court's ruling on

the Debtors' request for a preliminary injunction against FERC, for purposes of judicial

efficiency.  On April 15, 2018, North Allegheny filed a motion seeking an adjournment of the

PPA Rejection Motion pending the Court's decision on the preliminary injunction, *see* Dkt. No.

294, and MD Solar, one of the remaining Objectors, filed a joinder to such request, *see* Dkt. No.

304.  At the hearing on this motion to adjourn, the Debtors sought to set the objection deadline

for the Rejection Motions shortly after the preliminary injunction hearing, arguing that "delay is

18

actually prejudicial to the Debtors' needs here." Apr.16, 2018 Hr'g Tr. at 19:9-10. The Court, at that same hearing, understood the urgency of the Debtors' request for *nunc pro tunc* relief, and indicated to the Executory PPA counterparties that they must be ready to move quickly following the Court's hearing on the preliminary injunction in the Adversary Proceeding, to the extent such injunction were to be granted. *Id.* at 31:7-24. The Court also noted that the parties should be working in the interim to mitigate any potential damages arising from rejection of the Executory PPAs and that failure to do so would impact the Court's review of the Debtors' request for retroactive relief. *Id.* at 27:12-22.

35. Following the May 11, 2018 preliminary injunction ruling, at status conferences on May 14, 2018 and June 8, 2018, the Debtors consistently advocated for an expeditious timeline for a hearing on the Rejection Motions. At each turn, the Objectors sought longer timelines and a later hearing on the Rejection Motions. Despite the delay, the Debtors have acted in a manner consistent with the intent to reject the Executory PPAs as soon as possible. Indeed, following the Petition Date, FES sent letters to a number of the Executory PPA counterparties seeking to engage on efforts to mitigate damages and, in some cases, resolve the rejections altogether.[14] As the Court is aware, for six of the Executory PPAs, the Debtors were successful in reaching consensual resolutions of the Rejection Motion. The Debtors have sought to reject these uneconomic contracts as quickly as they can, and all parties have been on notice since the first day of these cases of the Debtors' intent to reject these agreements.

---

[14] These mitigation efforts also took the form of agreements with certain of the Executory PPA counterparties to bid capacity related to the renewable generation units into the most recent PJM Base Residual Auction for delivery years 2021-22.

## B.    The Objectors Will Not Suffer Any Prejudice

36.    Courts have approved *nunc pro tunc* relief where the non-debtor counterparties do not suffer prejudice.  *See In re Rupari Holding Corp.*, 2017 WL 5903498, at *6 (approving *nunc pro tunc* relief where, among other things, the rejected employment contracts placed burdens on both the non-debtor counterparties and the debtor); *In re Amber's Stone*, 193 B.R. at 827 (finding that the "debtor should not be permanently penalized by the time lag between filing a motion and the entry of an order by the court" where the debtors "had turned over the keys and vacated the premises pre-petition."); *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d at 608-09 (finding that the non-debtor's ability to mitigate the risk by reletting the property was a factor that "weighs in favor of granting retroactive relief."); *but see In re Chi-Chi's*, 305 B.R. at 399 (finding that retroactive relief was not appropriate where the debtors remained on the premises).

37.    Here, there would be little prejudice to the Objectors.  Indeed, the Debtors have offered to pay each of the Objectors all revenue from the sale of power to PJM from the Petition Date through the date on which the Executory PPAs are finally transitioned to the Objectors.  Thus, the Objectors will receive the same rate that they would have received had the contracts been transitioned to the Objectors on the Petition Date and the Objectors were able to bid these units into the PJM market themselves.  By making such payments, the Debtors will mitigate the damages borne by the Objectors while also limiting the harm to the Debtors' estates.

38.    In addition, because PJM has taken the position that the Debtors cannot transition the accounts to the Objectors absent an order from this Court approving the rejection of the Executory PPAs, the Debtors have been unable to cease taking power pursuant to the Executory PPAs.  As discussed above, the Debtors have put all of such revenue from the sale of power to PJM into an escrow account and have offered to pay each of the Objectors their relevant amount.

20

39.     By contrast, failure to grant *nunc pro tunc* relief would result in significant harm to the Debtors' estates.  If *nunc pro tunc* relief is not granted, the Debtors may be required to pay the full contract price of the Executory PPAs (the "Contract Rate") for the electricity until such rejection date.  Since the Petition Date, the Contract Rate for the Objectors' Executory PPAs is approximately 70% higher, on a weighted average basis, than the market rate the Debtors receive from PJM for the sale of such electricity.  The Contract Rate under the MD Solar PPA alone is more than *four times* the market rate during the postpetition period.  If the Debtors were required to continue to pay the Contract Rate through the end of July 2018, it would cause a loss of approximately $7.17 million to the Debtors' estates.  On the other hand, had the Objectors been able to resell the electricity to another party during such period, they would have done so at the market rate.  Therefore, failure to obtain *nunc pro tunc* relief would provide a windfall for the Objectors at the expense of the creditors and other parties in interest in these chapter 11 Cases.  Accordingly, for the reasons set forth above, *nunc pro tunc* relief is appropriate in these circumstances.

C.     **Bankruptcy Code Section 562 Is Not Relevant And Does Not Preclude *Nunc Pro Tunc* Relief**

40.     MD Solar also argues that because its Executory PPA is a "forward contract" pursuant to Bankruptcy Code section 101(25) and MD Solar is a "forward contract merchant" under Bankruptcy Code section 101(26), Bankruptcy Code section 562 prevents the retroactive rejection of the MD Solar PPA.  Section 562(a) states that where a forward contract is rejected under section 365 or terminated, liquidated or accelerated by the counterpary, damages under the contract are to be measured as of the earlier of the (1) date of such rejection or (2) the date or dates of the liquidation, termination or acceleration of the agreement.  *See* 11 U.S.C. §562(a).

21

41.     MD Solar's argument fails for a number of reasons.  First, MD Solar has not demonstrated that it is a "forward contract merchant" and the inclusion of a conclusory term in the contract that states a party is a "forward contract merchant" is not determinative of the issue. *See In re Mirant Corp.*, 303 B.R. 319, 327 (Bankr. N.D. Tex. 2003) (finding that parties could not contract into a status not provided for under the Bankruptcy Code, including that the parties were "forward contract merchants.").

42.     Second, MD Solar's invocation of section 562(a) ignores the fact that such provision has the limited purpose of providing a mechanism for calculating prepetition damage claims, and does not implicate a debtor's ability to reject a forward contract on a retroactive basis.  This interpretation is supported by the companion provision in section 502(g)(2), which provides that a claim for damages calculated pursuant to section 562 is treated "as if such claim had arisen before the date of the filing of the petition."  11 U.S.C. §502(g)(2) (emphasis added); *see Conway Hosp., Inc. v. Lehman Bros. Holdings, Inc.*, 531 B.R. 339, 344 (S.D.N.Y. 2015) ("Treating §502(g)(2) claims as prepetition claims comports with the recognition that 'contract-based bankruptcy claims . . arise at the time the contract is executed,' and thus, 'a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim.'" (quoting *In re Bradlees Stores, Inc.* 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003))).  Accordingly, MD Solar's argument that section 562 may prevent *nunc pro tunc* relief would have the improper effect of elevating a general unsecured prepetition claim to a postpetition administrative claim.

43.     Third, if MD Solar has been convinced of its status as a "forward contract merchant" since the Petition Date, it has been sitting on its purported rights to terminate or accelerate the contract and liquidate its collateral for several months.  Pursuant to section 12.7 of the PPA, both parties have a duty to mitigate any damages and agree to use commercially

22

reasonable efforts to minimize any damages it may incur as a result of the other party's non-performance. MD Solar has unreasonably delayed by not immediately effectuating its alleged right to terminate the PPA, resulting in a substantially higher damages claim. The Court should not reward that delay by permitting MD Solar to use section 562(a) as a shield against retroactive rejection of the PPA.

## **CONCLUSION**

44. For all of the foregoing reasons, Movants respectfully request that the Court approve the Rejection Motions *nunc pro tunc* to the Petition Date.

Dated: June 22, 2018                  Respectfully submitted,

*/s/ John C. Fairweather*
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
Kate M. Bradley (0074206)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
jfairweather@brouse.com
ldelgrosso@brouse.com
kbradley@brouse.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (*pro hac vice*)
David Zensky (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Brian Carney (*pro hac vice*)
Brad Kahn (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
dzensky@akingump.com
lbeckerman@akingump.com
bcarney@akingump.com
bkahn@akingump.com

- and -

Scott Alberino (*pro hac vice*)
David Applebaum (*pro hac vice*)
Todd Brecher (*pro hac vice*)
Kate Doorley (*pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000

24

Facsimile: (202) 887-4288
salberino@akingump.com
dapplebaum@akingump.com
tbrecher@akingump.com
kdoorley@akingump.com

*Counsel for Debtors*
*and Debtors in Possession*