**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 18-50757 |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | Hon. Judge Alan M. Koschik |
| | ) | |

**DECLARATION OF CHARLES M. MOORE IN SUPPORT OF THE**
**DEBTORS' MOTION TO APPROVE SETTLEMENT AMONG THE DEBTORS,**
**NON-DEBTOR AFFILIATES AND CERTAIN OTHER SETTLEMENT PARTIES**
**PURSUANT TO 11 U.S.C. §§ 105, 363, 365 AND 502 AND RULE 9019 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE**

I, Charles M. Moore, hereby declare under penalty of perjury:

1.     I am a Managing Director of Alvarez & Marsal North America, LLC ("A&M"), a

financial consulting firm that provides global leadership, problem solving and value creation for

companies across industries and around the world.  A&M was engaged as a financial advisor by

the Debtors[2] on November 16, 2016, and I was appointed as Chief Restructuring Officer

("CRO") by the FES and FENOC Boards of Directors (the "Board") effective as of the Petition

Date.  In my role as CRO, and prior to my appointment to that role as part of the A&M team

acting as financial advisor to the Debtors, I worked with the Debtors' senior management on the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage LLC. (6928), case no. 18-50764.  The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion (as defined below).

1

operational and financial outlook for the Debtors' businesses and formulation of various restructuring alternatives. I am familiar with the claims that have been or may be asserted between the Debtors, on the one hand, and the FE Non-Debtor Parties, on the other. I am familiar with the terms and conditions of the settlement agreement among the Debtors, the FE Non-Debtor Parties, the Supporting Creditors (as defined in the Motion) and the Committee (the "Settlement Agreement") and further described in the *Motion of Debtors to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties Pursuant to 11 U.S.C. §§ 105, 363, 365 And 502 And Rule 9019 of The Federal Rules of Bankruptcy Procedure* (the "Motion"). I submit this declaration (this "Declaration") in support of the Motion.

2.      Unless otherwise indicated, I have personal knowledge of all facts in this Declaration, understand the Debtors' operations and unique business and restructuring challenges, have reviewed and analyzed information supplied to me by the Debtors' officers and advisors, and was actively involved in the negotiations between the parties to the Settlement Agreement. If called upon to testify, I could and would testify competently to the facts set forth herein.

### Background and Qualifications

3.      I received my bachelor's degree and MBA from Michigan State University and am a Certified Public Accountant, a Certified Turnaround Professional, and am certified in Financial Forensics. Prior to joining A&M, I was a Senior Managing Director at Conway MacKenzie, Inc., served as Chief Financial Officer for Horizon Technology Group, and began my career in the middle market consulting group at Deloitte & Touche.

4.      I have nearly twenty-five years of experience providing turnaround consulting and advisory services to organizations in a variety of industries. I have substantial knowledge and

experience serving in senior management positions and as a restructuring advisor in large reorganizations and in assisting troubled companies with stabilizing their financial condition, analyzing their operations, and developing an appropriate business plan to accomplish the necessary restructuring of their operations and finances. I have served as CRO, for, among others, The Budd Company, Cynergy Data, and National Real Estate Information Services. Additionally, I served as Chief Restructuring Advisor to Greektown Casino-Hotel during its chapter 11 proceeding and as Lead Operational Restructuring Advisor to the City of Detroit during its chapter 9 proceeding. I have experience working with companies in a variety of industries, including energy, automotive, manufacturing, hospitality, and gaming.

### **Summary**

5.      I believe that the relief requested in the Motion is in the best interests of the Debtors, their estates, and all parties in interest. As set forth more fully in the Motion and as detailed in this Declaration, the Settlement Agreement provides at least $1.1 billion in value to the Debtors' estates, essential concessions to assist the business during the transition and separation phase and substantial value provided by the waiver of all prepetition claims and certain postpetition claims against the Debtors' estates. The operational and financial terms included in the Settlement Agreement provide significant benefits to the Debtors and their creditors as the Debtors pursue a reorganization on a standalone basis from the FE Non-Debtor Parties. The terms of the Settlement Agreement also eliminate the distraction and expense of prolonged litigation concerning potential claims against and by the Debtors.

6.      Accordingly, and as further detailed below, I believe that the relief requested in the Motion is reasonable and justified by the benefits to be obtained via the Settlement Agreement.

3

**The Retention of Willkie Farr & Gallagher LLP and Opportune LLP**

7.        On February 28, 2017, an Intercompany Investigation Committee, composed of Independent Directors of the boards of FES and FENOC, was created.  The Intercompany Investigation Committee was charged with conducting an investigation (the "Company Investigation") into the historical intercompany relationships and transactions between the Debtors, on the one hand, and FE Corp. and its subsidiaries, including Allegheny Energy Supply Company, LLC ("AE Supply") and FirstEnergy Service Company ("FESC," and collectively with FE Corp. and FE Corp.'s other non-Debtor subsidiaries, the "FE Non-Debtor Parties"), on the other.  Also, in February 2017, Willkie Farr & Gallagher LLP ("Willkie Farr") was retained as counsel to the Intercompany Investigation Committee, and in April 2017 Willkie Farr in turn retained Opportune LLP ("Opportune") as financial consultant, focused on conducting a solvency analysis of the Debtors as it might relate to the validity of claims or causes of action the Debtors would have against the FE Non-Debtor Parties.

8.        A&M worked closely with Willkie Farr and Opportune to analyze the potential claims that the Debtors may have against the FE Non-Debtor Parties, and the valuation of such claims.  A&M, Willkie Farr, and Opportune provided regular updates to the Board and the Intercompany Investigation Committee.

9.        Willkie Farr's investigation into intercompany transactions was extensive and comprehensive, covering virtually all intercompany arrangements and transactions between the Debtors and the FE Non-Debtor Parties and considering a wide range of legal theories under which the Debtors or their creditors could bring claims against the FE Non-Debtor Parties on account thereof.  Over the course of its initial investigation leading up to the Petition Date, Willkie Farr received and reviewed approximately 25,000 documents provided by the FE Non-Debtor Parties and conducted interviews of eleven FES personnel and four FE Corp. personnel

4

related to the claims and causes of action being investigated. Willkie Farr also had frequent, but less formal, discussions with FES personnel concerning various matters relevant to their investigation, and they also had frequent discussions with members of my team concerning the due diligence and investigatory work A&M was performing. Willkie Farr also hosted diligence sessions with the advisors to the Supporting Creditors.

10. In September 2017, Willkie Farr presented to the Board the results of its investigation to date and its preliminary conclusions concerning the potential claims and causes of action the Debtors or their creditors could bring against the FE Non-Debtor Parties, and the likelihood of success of each.

11. In November 2017, Opportune presented its preliminary solvency analysis and conclusions to the FES Board. Based on that presentation, I understand that depending on the asserted date of insolvency for the various Debtors, certain of the claims and causes of action would have a higher or lower likelihood of success on the merits.

12. Following the September and November presentations, based on continuing updates from Willkie Farr, I understand that Willkie Farr continued its investigation in the months leading up to the Petition Date. Willkie Farr issued a preliminary Report on Intercompany Transactions on March 30, 2018 (the "Willkie Report"), analyzing potential causes of action arising from the intercompany transactions and relationships, and evaluating whether those claims could survive a motion to dismiss. An initial draft of the Willkie Report was presented to the Intercompany Investigation Committee in December 2017 and to the full Board in January 2018.

13. The Willkie Report included Willkie Farr's analysis of approximately thirty specific intercompany transactions, including those in connection with (i) the Non-Utility Money

5

Pool and Cash Management System, (ii) the Shared Services Agreements, (iii) the Intercompany Income Tax Allocation Agreements, (iv) the Pension Plan, (v) dividends paid by FES to FE Corp. and equity investments from FE Corp. to FES, (vi) transactions between AE Supply and FES, including associated power purchase agreements, FES's operation of facilities owned by AE Supply, AE Supply's sale of coal to FES and the AE Supply-FES Intercompany Note (as defined herein), (vii) the termination of the Existing Credit Facility and its replacement with the FE-FES Secured Facility; (viii) prepetition asset sales and sale-leaseback transactions, (ix) aircraft leasing, (x) the announced closures of the Bay Shore Power Plant and certain units at the W.H. Sammis Power Plant, (xi) shared "dispatch" of power bidding and generation between the Debtors and the FE Non-Debtor Parties, and (xii) other intercompany transactions and arrangements, including other power sale and purchase agreements and operating agreements.

14.     Based on my review of the Willkie Report and my discussions with Willkie Farr, I understand that Willkie Farr organized the potential transactions into three categories: (a) transactions that gave rise to at least one claim that was likely to survive a motion to dismiss, (b) transactions that did not give rise to any claim likely to survive a motion to dismiss, and (c) transactions for which Willkie Farr believed it needed additional information to make any determination regarding the viability of potential claims. Of the potential claims, those for actual fraudulent transfer, constructive fraudulent transfer, debt recharacterization, and equitable subordination concerning certain intercompany transactions between FES the FE Non-Debtor Parties were characterized as most likely to survive a motion to dismiss. Willkie Farr also identified potential alternative theories of liability, i.e. corporate veil piercing, alter ego, or substantive consolidation, through which FE Non-Debtor Parties could be held liable for the obligations of the Debtors.

6

15.     In particular, I understand that Willkie Farr concluded that the Debtors could bring viable avoidance actions concerning various intercompany agreements and transactions in which FES could be said to have provided significant benefits to the FE Non-Debtor Parties for less than adequate consideration and to the detriment of FES's creditors.  These potential claims include, among others: (a) FES's purchases of power from affiliate AE Supply at prices that included up to 100% of FES's anticipated retail margin, an amount that, Willkie Farr concluded in an arm's length transaction, would have been retained by FES as its profit from the sale of power to its customers; (b) replacement of the Existing Credit Facility with the FE-FES Secured Facility, which arguably left FES with at least $200 million less in available liquidity and resulted in previously unsecured liabilities being secured by liens on the hard assets of FirstEnergy Generation, LLC ("FG") and FirstEnergy Nuclear Generation LLC ("NG"); and (c) the Debtors' 2015 payment of a $70 million dividend to FE Corp.  I understand that each of these transactions could be characterized as having provided the FE Non-Debtor Parties with a benefit at the expense of FES for less than reasonable consideration.  I further understand that, depending on the asserted date of insolvency for the various Debtors, certain of the claims and causes of action would have a higher or lower likelihood of success on the merits.

16.     In addition, I understand that Willkie Farr concluded that certain claims that could be asserted by the FE Non-Debtor Parties as creditors of the Debtors could potentially be vulnerable to equitable subordination on the basis that the conduct of the FE Non-Debtor Parties harmed the Debtors and their creditors.  I understand that equitable subordination of the FE Non-Debtor Parties' claims against certain of the Debtors could be sought with respect to the following categories of claims: (i) FE Corp.'s claims against FES, FG and NG for $700 million owed under the FE-FES Secured Revolving Credit Facility; (ii) $102 million owed to AE Supply

7

under a $150 million revolving, unsecured line of credit extended in June 2016 and memorialized by a note (the "AE Supply and FES Intercompany Note"); and (iii) various other claims, including those arising under theories of contribution or subrogation related to various liabilities of the Debtors that have been guaranteed or supported by the FE Non-Debtor Parties. If successful, equitable subordination would result in the FE Non-Debtor Parties' claims being subordinated to the priority level of equity, increasing the recoveries for the Debtors' other secured and unsecured creditors.

17. In addition, I understand that Willkie Farr concluded that the Debtors could seek to recharacterize the $102 million obligation under the AE Supply and FES Intercompany Note as an equity contribution, rather than a debt obligation. If successful, the $102 million obligation would be categorized as equity for purposes of distributions under any chapter 11 plan of reorganization, again to the benefit of the Debtors' other creditors.

18. Finally, I understand that Willkie Farr concluded that the FE Non-Debtor Parties could potentially be held liable for certain obligations of the Debtors under a veil piercing/alter ego theory. Such a theory would be based on allegations that the FE Non-Debtor Parties controlled the Debtors, that such control was used to perpetrate a fraud, an illegal act, or a similarly unlawful act by extracting value from FES and its subsidiaries for the benefit of the FE Non-Debtor Parties, and that these actions harmed the Debtors and their creditors.

19. Despite the conclusion reached in the Company Investigation that certain claims and causes of action would be likely to survive a motion to dismiss, I also understand, based on my experience as a restructuring professional and involvement in countless restructurings, that the claims and theories of liability the Debtors could assert against the FE Non-Debtor Parties are each exceedingly complex and fact-intensive, requiring lengthy, time consuming, and

8

expensive discovery (in addition to that already taken) and litigation, and subject the Debtors to significant litigation risk. Additionally, it is my understanding that the FE Non-Debtor Parties vigorously dispute that any of the foregoing potential claims have merit, and, therefore, would likely require such complex and time-consuming litigation to occur.

### The Standstill Agreement and the Intercompany Protocol

20. Beginning in August 2017, and continuing through early 2018, FES, through its advisors, engaged with various creditor groups in anticipation of a restructuring. I worked closely with the Board, the Debtors' management and the Debtors' other advisors and participated in creditor group meetings in an effort to reach agreements that could avoid litigation and create an orderly restructuring process.

21. On March 30, 2018, the Debtors entered into an agreement with FE Corp. and certain creditors (the "Standstill Agreement") and a related protocol (the "Intercompany Protocol"), which provided procedures for the Debtors and their creditors to investigate, evaluate, and attempt to negotiate a proposed resolution of claims between the Debtors and the FE Non-Debtor Parties in a fair, timely, and orderly manner. The parties agreed to non-binding mediation of the disputes and provided that no Standstill Party would seek the appointment of a trustee or examiner relating to the Intercompany Claims or commence litigation with respect to intercompany claims while the Standstill Agreement and the Intercompany Protocol remain in place. Upon entry into the Standstill Agreement and Intercompany Protocol, the Debtors provided the Supporting Creditors with a copy of the Willkie Report. Following its formation, the official committee of unsecured creditors (the "Committee") became a party to the Intercompany Protocol and the Standstill Agreement, and the Bankruptcy Court ultimately approved both agreements.

## The Agreement in Principle

22.    On April 23, 2018, FE Corp. announced that it had reached an agreement in principle with certain Supporting Creditors (the "Agreement in Principle").  The Agreement in Principle set forth proposed terms of settlement of the claims subject to the Company Investigation.

23.    On April 23, 2018, the Debtors' advisors presented to the Board the terms of the Agreement in Principle.  The Agreement in Principle contemplated that FE Corp. and the Supporting Creditors would negotiate with the Debtors and the Committee over the terms of a final settlement to be reached no later than June 15, 2018, a deadline that was later extended to August 1, 2018.

24.    Thereafter, the Debtors, and the Committee determined that it was necessary in the carrying out of their fiduciary duties to continue and complete their respective investigations, and, if appropriate, negotiate for further consideration for the Debtors' estates prior to agreeing to any settlement with the FE Non-Debtor Parties.

25.    The Debtors provided the Willkie Report to the advisors to the Committee, and also provided the underlying discovery materials to the advisors for both the Committee and the Supporting Creditors.  Willkie Farr, on behalf of the Intercompany Investigation Committee, and the Committee propounded further discovery requests, ultimately receiving and reviewing almost 200,000 documents (including those received as part of the Company Investigation prior to the Petition Date).  Willkie Farr and the Committee also conducted an additional nine depositions of the FE Non-Debtor Parties' personnel, three interviews of the Debtors' personnel, and one interview of the Independent Directors in order to finalize their investigations into potential claims and causes of action.  Although the investigations of the Debtors and the Committee transpired concurrently, those investigations were independent of one another.

26.     Per the Agreement in Principle, FE Corp. agreed to (i) pay the Debtors, for distribution to creditors under a plan of reorganization, $225 million, less the cash attributable to the restoration of approximately $88 million setoff under the Intercompany Income Tax Allocation Agreement taken by the FE Non-Debtor Parties at the time the Debtors exited the Non-Utility Money Pool, (ii) issue to the Debtors, for distribution to creditors under a plan of reorganization, unsecured notes (the "New FE Notes") in the principal amount of $628 million, less the amount, if any, of cash paid by FE Corp. to the Debtors under the Intercompany Income Tax Allocation Agreement for the tax benefits related to the sale or deactivation, prior to or on the effective date of a plan, of all or any portion of a nuclear or fossil plant, excluding the West Lorain Power Plant, (iii) contribute to the Debtors the Pleasants Power Plant currently owned by an FE Non-Debtor Party, and (iv) waive certain specified claims held by the FE Non-Debtor Parties against the Debtors.  The Agreement in Principle also provided that FE Corp. would receive warrants for equity in the reorganized Debtors which would be exercisable under certain terms and conditions.  The Debtors have calculated that the Agreement in Principle represented approximately $853 million in value to the Debtors' estates, in addition to value to be derived from the claims waivers incorporated therein.

## Further Negotiations

27.     The discovery undertaken in connection with the Company Investigation and further discovery pursuant to the Standstill Agreement set the stage for the negotiation of the Settlement Agreement.  Among other things, it allowed the Debtors and the Committee to develop an understanding of the value of the claims that the Debtors were being asked to release in connection with any settlement with the FE Non-Debtor Parties.

28.     The Settlement Agreement was the product of extensive negotiations, which took place over the course of almost a month leading up to the August 1, 2018 termination deadline for the Agreement in Principle.

29.     In mid-July, the Debtors' management and advisors circulated a term sheet, which served as a starting point for further negotiations toward a settlement amongst the Debtors, FE Corp., the Supporting Creditors, and the Committee. The parties engaged in vigorous negotiation, numerous in-person and telephone meetings, and delivered and discussed numerous proposals and counter-proposals.

30.     On July 23rd and 24th, the Debtors, the Committee, and FE Corp., and their respective counsel and advisors conducted two lengthy working sessions in Akron, Ohio. Additional discussions took place in the following days, and further teleconferences took place amongst representatives of the Supporting Creditors, the Committee, FE Corp., and the Debtors. I was present for, and integrally involved in, almost all of these meetings and discussions.

31.     These efforts resulted in the Settlement Agreement, which substantially increased the value being derived by the Debtors' estates and materially improved upon the terms of the Agreement in Principle.

32.     In the paragraphs below, I summarize the consideration the Debtors and constituencies will receive pursuant to the various components of the Settlement Agreement and discuss the ways in which such consideration will benefit the Debtors' estates.

## TERMS OF THE SETTLEMENT AGREEMENT[3]

### A. **Cash Payment and Notes**

33.     In addition to other consideration, FE Corp. has agreed to provide the Debtors with approximately $853 million in cash and debt instruments in exchange for the narrowly tailored released set forth in the Settlement Agreement.

*Cash Payment*

34.     On the Plan Effective Date, FE Corp. will make a cash payment of $225 million (the "Cash Payment") to the Debtors, which shall not be subject to setoff or reduction.  The Debtors may distribute the Cash Payment to their creditors under a plan of reorganization or liquidation.  The agreement to make the Cash Payment without setoff was a heavily bargained-for material improvement from the Agreement in Principle, which contemplated a cash payment of $225 million, less approximately $88 million for the restoration of a setoff under the Intercompany Income Tax Allocation Agreement taken by FE Non-Debtor Parties when the Debtors exited the Non-Utility Money Pool.

*New FE Notes*

35.     Further, on the Plan Effective Date, FE Corp. will issue unsecured notes (the "New FE Notes") to the Debtors in the principal amount of $628 million, subject to an adjustment for cash payments received by the Debtors under the Intercompany Income Tax Allocation Agreement prior to the Plan Effective Date for tax benefits related to the sale or deactivation of a nuclear or fossil plant, excluding the West Lorain Power Plant.  Additionally, on the Plan Effective Date, FE Corp. will make an upfront payment to the Debtors in an amount equal to the difference, if any, between the $628 million principal amount of the New FE Notes

---

[3] This section details my best understanding of the terms of the Settlement Agreement at the time of the drafting of this Declaration.  The description of the terms of the Settlement Agreement contained herein are subject to revision, in their entirety, by the actual terms set forth in the finalized Settlement Agreement.

13

and the market price of the New FE Notes. The amount of this upfront payment will be determined pursuant to a calculation set forth in more detail in the Settlement Agreement.

36.     The maturity date of the New FE Notes will be December 31, 2022. The New FE Notes will rank equally and ratably in right of payment with FE Corp.'s outstanding long-term unsecured and senior notes. The New FE Notes will be issued to the Debtors, and the Debtors may distribute the New FE Notes to their creditors under a plan of reorganization or liquidation.

37.     Both the Cash Payment and the issuance to the Debtors of the New FE Notes represent direct and substantial transfers of value to the Debtors' estates in consideration for the releases being granted to the FE Non-Debtor Parties under the Settlement Agreement. The additional liquidity increases the Debtors' options for their businesses as they transition to standalone businesses in a challenging marketplace.

B. **Tax Matters**

38.     The Settlement Agreement will also provide significant value to the Debtors through various intercompany tax arrangements and agreements. First, FE Corp. and the Debtors will continue to perform under the Intercompany Income Tax Allocation Agreement with respect to all periods or portions thereof ending on or before the Plan Effective Date. As described in great detail in the *Motion of Debtors for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Intercompany and Shared Services Agreements* (ECF No. 12) (the "Shared Services Motion"), FE Corp. compensates the Debtors for the use of their tax attributes pursuant to certain terms and conditions set forth in the Intercompany Income Tax Allocation Agreement. The Debtors expect that continued compliance with the agreement will result in additional cash being paid by the FE Non-Debtor Parties to the Debtors on or prior to the Plan Effective Date.

14

39.     Additionally, on the Plan Effective Date, FE Corp. will waive any claims it has against the Debtors for a purported overpayment made to the Debtors for tax year 2017, and will reverse the prepayment of approximately $88 million worth of tax attributes that FE Corp. used to setoff certain amounts in the Non-Utility Money Pool just prior to the Debtors' exit from the Non-Utility Money Pool on March 16, 2018 related to Q1 and Q2 2018 estimated payments under the Intercompany Income Tax Allocation Agreement.   FE Corp. will also guarantee a payment to the Debtors of at least $66 million for the purchase of tax attributes under the Intercompany Income Tax Allocation Agreement for tax year 2018.

40.     Further, FE Corp. has agreed that it will not take a worthless stock deduction in respect of a date prior to the Plan Effective Date, which action could otherwise reduce the value of the Debtors' available tax attributes and harm the Debtors' estates.   FE Corp. and the Debtors will coordinate in developing an exit strategy that minimizes adverse tax consequences to the reorganized Debtors and their stakeholders, and FE Corp. has agreed to cooperate with reasonable tax diligence inquiries from the Debtors and the Supporting Creditors regarding historical intercompany tax issues and tax consequences of different chapter 11 exit structures, including in connection with the Sale Processes.

C.   **Pleasants Power Plant Asset Transfer**

41.     Another direct source of value being provided to the Debtors relates to the Pleasants Power Plant, currently owned by one of the FE Non-Debtor Parties, AE Supply.   On or prior to the Plan Effective Date, AE Supply will transfer all of its right, title and interest in the Pleasants Power Plant and related assets (except for the McElroy's Run Impoundment) to the Debtors.   If the Plan Effective Date does not occur prior to January 1, 2019 (the "Transfer Date"), the Debtors will accept the transfer of actual or beneficial ownership of the Pleasants

15

Power Plant.  The Debtors and AE Supply may agree to a Transfer Date that is earlier than January 1, 2019.

42.     AE Supply and the Debtors shall enter into an asset transfer agreement with respect to the Pleasants Power Plant (the "Pleasants Purchase Agreement"), which shall contain terms and conditions that are customary for the purchase and sale of supercritical coal-fired power plants between merchant generators.  The obligation of the Debtors to enter into the Pleasants Purchase Agreement is subject to completion of due diligence of the Pleasants Power Plant to the reasonable satisfaction of the Debtors, with such diligence to be completed no later than August 26, 2018.  From the Settlement Effective Date through the Pleasants Closing Date, AE Supply will give the Debtors, the Committee, and the Supporting Parties and their representatives reasonable access at reasonable times to the Pleasants Power Plant and books, records and personnel of the FE Non-Debtor Parties related thereto and permit the Debtors, the Committee, and the Supporting Parties and their representatives to make such inspections of the Pleasants Power Plant as they may from time to time reasonably request (including any investigation of the environmental condition of the properties, including access and information necessary for environmental site assessments in accordance with relevant ASTM standards).  If the Debtors inform AE Supply that they do not intend to enter into the Pleasants Purchase Agreement, AE Supply shall use commercially reasonable efforts to sell the Pleasants Power Plant to a third party, with the net proceeds of such sale to be paid over to the Debtors.

43.     In addition to transferring the economic value of the plant, AE Supply agrees that it will perform the maintenance outage for Unit 1 scheduled for the fall 2018 at the Pleasants Power Plant (the "Outage"), and will bear a portion of the costs of such Outage.  Specifically, AE Supply shall pay the first $11 million of costs related to the Outage, with any excess costs, up to

an aggregate of $25 million (inclusive of the $11 million referenced above), to be shared equally by AE Supply and the Debtors. As a result of this agreement, AE Supply would pay up to $18 million of the costs of the Outage. The Outage would be beneficial to the Debtors as the asset would be more valuable at the Transfer Date once these expenditures have been made to improve operating performance.

44. AE Supply agrees to retain all of its liabilities under environmental laws (excluding any post-transfer changes thereto) with respect to its ownership and operation of the Pleasants Power Plant to the extent that such liabilities are based on facts and circumstances occurring prior to the Transfer Date. The Pleasants Purchase Agreement will also provide that AE Supply will retain all of its ownership interests in the McElroy's Run Impoundment, and will include as an exhibit an agreement to provide for the Debtors' access to the McElroy's Run Impoundment. AE Supply shall also retain all of its liabilities with respect to coal supply contracts for the Pleasants Power Plant entered into by AE Supply prior to the Transfer Date.

45. In the event that the Debtors decide to pursue a sale of the Pleasants Power Plant to a third party prior to the Transfer Date, AE Supply and FE Corp. agree to cooperate with the Debtors in connection with any such sale.

46. FE Corp. has further agreed to (i) fully guaranty the indemnity obligations of AE Supply to the Pleasants Purchaser under the Pleasants Purchase Agreement with respect to AE Supply's obligations under the Settlement Agreement solely with respect to McElroy's Run Impoundment through the closure and remediation of the McElroy's Run Impoundment; and (ii) provide a guarantee in an amount equal to $15 million with respect to the indemnity obligations of AE Supply to the Pleasants Purchaser under the Pleasants Purchase Agreement with respect to other retained environmental liabilities (excluding the McElroy's Run

17

Impoundment) until the third anniversary of the Pleasants Closing Date. The FE Corp. guarantees will be assignable by the Pleasants Purchaser to a subsequent owner of the Pleasants Power Plant.

47. The Debtors currently own and operate two coal-fired power plants—the Bruce Mansfield Power Plant and the W.H. Sammis Power Plant. The possibility of adding another coal-fired power station into the portfolio for the reorganized business would add size and purchasing power to enhance the value to the Debtors' enterprise. In my experience and opinion, with the uncertain financial outlook of the Pleasants Power Plant, it is difficult to assign a value to this asset. FE Corp. disclosed the book value of the plant is approximately $67 million as of March 31, 2018.[4]

D. **Business Separation and Support**

48. As previously noted, a significant benefit of the Settlement Agreement to the Debtors' estates is that it will permit the Debtors to pursue a reorganization as a standalone business, separated from the FE Non-Debtor Parties and their businesses. In consideration for the releases granted under the Settlement Agreement, the FE Non-Debtor Parties will support and cooperate with the Debtors' business separation and restructuring efforts, which support and cooperation, while difficult to quantify, will be integral to the Debtors' ability to emerge from bankruptcy in an orderly, value maximizing manner.

*Separation Agreement and Business Separation Committee*

49. Under the Settlement Agreement, the FE Non-Debtor Parties have agreed to enter into an agreement governing the terms of the separation of the Debtors' businesses and operations from the FE Non-Debtor Parties' businesses and operations (the "Separation

---

[4] FE Corp. earnings presentation for Q1 2018 published on April 23, 2018.

18

Agreement"). The Separation Agreement will establish a process for the Debtors' transition to a standalone business including the following:

- FE Corp., FESC and the Debtors, in consultation with the Supporting Parties and the Committee will agree on the terms of a maintenance agreement, pursuant to which FESC will continue to provide the Debtors with those services necessary to maintain the Debtors' plant substations;

- The FE Non-Debtor Parties will agree, subject to applicable regulations and required consents, to assume any leasehold interests and permitting requirements with the State of Ohio with respect to the ATSI breakwater project at the Eastlake Facility;

- Subject to applicable regulations and requirement consents, Ohio Edison will transfer to FG all properties at Hollow Rock related to the W.H. Sammis Power Plant that are still in the name of Ohio Edison, and FG will transfer the North Park permit to Ohio Edison;

- The FE Non-Debtor Parties and the Debtors will enter into good faith negotiations on the terms and conditions of leases, easements, rights of way or other property rights for any properties necessary for the Debtors, or reorganized Debtors, as applicable, to continue to conduct their operations in the ordinary course of business;

- The FE Non-Debtor Parties will respond to reasonable information requests from the Debtors and in connection with the Debtors' planning activities to operate their businesses on a standalone basis; and

- The FE Non-Debtor Parties will, upon the request of the Debtors, cooperate in good faith and document any other arrangements that the Debtors reasonably determine are necessary to operate on a standalone basis.

50.     The Settlement Agreement further provides that a Business Separation Committee will be appointed, consisting of representatives from the Debtors and the FE Non-Debtor Parties. The Business Separation Committee will be responsible for (i) determining, reviewing, and addressing issues that arise related to the further separation of the Debtors and their businesses and operations from the FE Non-Debtor Parties; (ii) determining, reviewing and addressing any issues related to the terms and conditions of leases, easements, rights of way, or other property rights for any of the properties necessary for the Debtors, the Reorganized Debtors or the FE Non-Debtor Parties, to conduct their operations in the ordinary course of business; (iii) managing and responding to any reasonable information requests from the Debtors in connection with the

19

Debtors' planning activities to operate their businesses on a standalone basis; and (iv) implementing the further separation of the Debtors and their businesses from the FE Non-Debtor Parties.

51.     The establishment of the Business Separation Committee and commitment of the FE Non-Debtor Parties to enter into the Separation Agreement will greatly assist the Debtors in their efforts to emerge as a standalone business.   As noted herein, the Debtors' historical operations were highly intertwined with the businesses and operations of the FE Non-Debtor Parties, to a degree where it would be difficult, if not impossible to set forth every lease, easement or service that needed to be separated.   Establishing the Business Separation Committee will enable both the Debtors and the FE Non-Debtor Parties to address matters related to the separation in an orderly and consistent fashion, which will inure to the benefit of all parties.

*Sale Process Support*

52.     In connection with the sale of the Debtors' Retail Book Assets (the "Retail Sale"), FE Corp. and FESC reaffirm their commitments contained in the July 12, 2018 letter agreement by and among FE Corp., FESC, and FES concerning the sale of the Bay Shore Power Plant to Walleye Power and the sale of FES's competitive retail electricity services business to Exelon Generation Company, LLC or another bidder.  Among other things, FE Corp. agrees to be bound, for a period of two years, by the non-competition and non-solicitation provisions set forth in the stalking horse asset purchase agreement between FES and Exelon Generation Company, LLC, as well as any non-competition and/or non-solicitation provisions requested by alternate bidders (provided that such provisions are not materially less favorable to FE Corp.).   FE Corp. also agrees to provide certain services in connection with the conduct and operation of FES's

20

competitive retail electricity services business to a buyer in the Retail Sale from the consummation of the Retail Sale through March 31, 2019 or such shorter period as shall be designated by the applicable buyer.

53.     FE Corp. also agrees to the use of the "FirstEnergy" name for 12 months following closing of the Retail Sale transaction by the applicable buyer.

54.     In addition, FE Corp. will cooperate with the Debtors in their efforts to maximize value realized from any sale process by agreeing, among other things, to (i) participate in any ancillary transactions reasonably necessary to consummate the transactions contemplated by the sales process; (ii) assist in obtaining the required consents, waivers, or approvals related to the contemplated transactions, and (iii) make FE Corp. and FESC personnel available to facilitate diligence related to the sales process.

55.     In my experience and opinion, FE Corp.'s agreements to support any sale processes undertaken by the Debtors will assist the Debtors in maximizing value for the Debtors' assets.  A successful Retail Sale will allow the Debtors to focus on the reorganization process and path forward for the remaining operating assets of the standalone business.

*Shared Services Agreement*

56.     As described in the Shared Services Motion, the Debtors rely on certain FE Non-Debtor Parties to provide corporate and other overhead services necessary to the operation of the Debtors' businesses.  As of the Petition Date, the FE Non-Debtor Parties agreed to provide such Shared Services to the Debtors through December 31, 2018.  If the FE Non-Debtor Parties stopped providing Shared Services by that date, the Debtors would be forced to expend considerable amounts of money and human resources to develop an organization to perform these required Shared Services to allow the Debtors to continue to operate, and the FE Non-

Debtor Parties would likely force the Debtors to pay for Shared Services that they may not ultimately need depending on the Debtors' future restructuring activities.

57.     Pursuant to the Settlement Agreement, the Debtors, FE Corp. and FESC agree to enter into an amended and restated shared services agreement (the "Amended SSA") that will extend the period through which the Debtors may purchase Shared Services from the FE Non-Debtor Parties through June 30, 2020 (formerly due to expire on December 31, 2018). Additionally, the Amended SSA will provide the Debtors with the flexibility to reduce or terminate the types of Shared Services being provided to the Debtors depending on future requirements.

58.     The FE Non-Debtor Parties agree to provide the Debtors with a credit in the amount of up to $112.5 million for certain charges incurred for Shared Services provided from the Petition Date through December 31, 2018.  This credit has dollar for dollar value to the Debtors given the post-petition administrative expense status that would otherwise be afforded to these charges.  FESC has also agreed to waive its $21 million claim for the outstanding amounts owed by the Debtors for Shared Services provided prior to the Petition Date.

59.     Continued access to, and performance under, the Shared Services Agreements will enable the Debtors to maintain stable operations following the Settlement Effective Date and to continue to take advantage of these benefits following reorganization, while also providing the Debtors the time and flexibility to develop internal services and functions or locate alternative providers of these services, as the Debtors' management deem appropriate.

60.     In addition, as a result of the extensions reflected in the Amended SSA and the credit for postpetition services, the Debtors estimate that they will realize cash savings of approximately $134 million, including pre- and post-petition amounts.  This will increase the

liquidity available to the reorganized business or for any potential distributions to the creditors of the estates.

### *Employee Matters*

61.     FE Corp. has reaffirmed its commitment to fund certain obligations relating to programs for the Debtors' employees and agreed to fund certain additional obligations, which additional commitments provide an estimated value of approximately $18 million over the concessions in the Agreement in Principle (as valued by FE Corp.), in addition to the other difficult-to-quantity but important benefits described below.

62.     For example, from the Plan Effective Date, FE Corp. will pay, subject to certain terms and conditions, certain employee-associated expenses under applicable employee plan documents, including but not limited to obligations arising under FE Corp.'s tax-qualified pension plan, FE Corp.'s deferred compensation plans, FE Corp.'s retiree group life insurance plan, FE Corp.'s guarantee of earned banked or frozen vacation benefits, and certain retiree medical claims arising under certain FE Corp.-sponsored health care plans and/or collective bargaining agreements pertaining to the Debtors' employees.

63.     The aforementioned employee programs, which are customary in the Debtors' industry, have been historically offered to the Debtors' employees in the ordinary course of business and are also offered to eligible employees of FE Non-Debtor Parties.  Failure to fund benefits on which the Debtors' employees have grown to rely for their personal and financial security creates the potential for distress and distraction among the Debtors' workforce, as well as the risk that the Debtors' employees might pursue employment with FE Non-Debtor Parties and/or other employers in the industry that generally offer such benefits.  Accordingly, the continued performance of these employee programs will redound to the benefit of Debtors by

23

improving employee morale, reducing attrition, and assist with facilitating a transition of the business. In my experience and opinion, the foregoing commitments relating to employee matters by FE Corp. constitute a valuable contribution toward the Debtors' goal of maintaining a stable, focused, and productive workforce at a critical time in these chapter 11 cases for the benefit of the Debtors' estates.

E. **Waiver of Claims**

64.     The FE Non-Debtor Parties have agreed to waive any and all prepetition claims against the Debtors, certain postpetition claims against the Debtors, as well as all employee-related claims (whether pre- or postpetition, or post-Plan Effective Date) against the Debtors, in consideration for the releases contained in the Settlement Agreement.

65.     Among the claims being waived by the FE Non-Debtor Parties include, but are not limited to:

- prepetition claims for balances owed by the Debtors under the Non-Utility Money Pool of approximately $4 million;

- claims (both prepetition and postpetition) arising under the $700 million secured revolving credit facility provided by FE Corp. to FES, as borrower, and FG and NG, as guarantors, which credit facility was fully drawn or utilized as of the Petition Date;

- claims (both prepetition and postpetition) arising from FE Corp.'s guarantee of FG's obligations under a prepetition settlement with BNSF and CSX relating to a rail transportation contract dispute in an amount of approximately $72 million;

- claims (both prepetition and postpetition) arising under an unsecured revolving credit note issued in favor of AES in an outstanding principal amount of approximately $102 million; and

- claims arising from FE Corp.'s ownership interests in Mansfield 2007 Trust F, including any tax or other indemnity claims arising from the rejection of the Mansfield Unit 1 lease documents, which claim FE Corp. has asserted in the amount of approximately $58 million.

- claims arising from the FE Non-Debtor Parties' past performance under certain employee benefit plans that apply to the Debtors' employees.

24

66.     Finally, relative to the Agreement in Principle, in the Settlement Agreement, FE Corp. will not be entitled to any warrants which would be exercisable under certain terms and conditions, and which would have entitled FE Corp. to share in creditor recoveries above a certain threshold (the "Penny Warrants").  As such, FE Corp. will accordingly not have any economic stake in the reorganized Debtors, consistent with the Debtors' reorganization on a standalone basis.

## Conclusion

67.     In conclusion, having fully reviewed the terms of the Settlement Agreement, and in light of my familiarity with the Debtors' business and plan for reorganization, I believe the approval of the Settlement Agreement is in the best interests of the Debtors, their creditors, employees, and other stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 26, 2018                          /s/ *Charles M. Moore*
                                                    Charles M. Moore
                                                    Alvarez & Marsal North America, LLC