# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FIRSTENERGY SOLUTIONS CORP., *et al.*[1] | ) | Case No. 18-50757 |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | Hon. Judge Alan M. Koschik |
|  | ) |  |

## OBJECTION TO DEBTORS' MOTION TO APPROVE SETTLEMENT AMONG THE DEBTORS, NON-DEBTOR AFFILIATES AND CERTAIN OTHER SETTLEMENT PARTIES

The Environmental Law & Policy Center (ELPC), Ohio Citizen Action (OCA), Ohio Environmental Council (OEC) and the Environmental Defense Fund (EDF) (collectively, the "Citizen Organizations" or the "Objectors" and, where appropriate, with the Debtors and Non-Debtors, the "Parties") object to the *Motion of Debtors to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties...* [D.I. 1224] (the "Motion"). Filed on August 26, 2018, the Motion is scheduled for hearing on September 25, 2018. In support of the Objection, the Citizen Organizations state that the Motion is premature, at best, and that the Motion, Settlement Agreement and the supporting declaration provide incomplete, insufficient and, in part, contradictory information.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Drive, Akron, OH 44320.

**SUMMARY**

The Motion and Settlement Agreement propose the Debtors' virtually complete separation from their non-Debtor affiliates, including the ultimate parent company, FirstEnergy Corp. The Motion is intended to eliminate FirstEnergy Corp.'s financial responsibilities and liabilities to the Debtors. The Debtors own and operate three nuclear power plants, subject to the public interest oversight of the Nuclear Regulatory Commission (NRC). There are statutory and regulatory requirements, prospective and retrospective, that the parent company FirstEnergy and the Debtors maintain funds sufficient to operate and decommission those nuclear power plants safely, fully and efficiently.

Before the bankruptcy filing in this Court, the ELPC filed a petition with the NRC raising issues concerning FirstEnergy's obligations and the decommissioning trust fund requirements and potential shortfalls. In response, the NRC has just begun re-evaluating the adequacy of the reserve funds the Debtors have dedicated to decommissioning. The NRC can require—as it has required in the past—FirstEnergy Corp., the parent company, or an affiliated company whether Debtor or not, to set aside additional funds and to obtain financial guarantees for decommissioning costs. The Objectors are involved in the NRC petition process pursuant to a stipulated order from this Court lifting the automatic stay here for just that purpose.

In their recitals, mutual releases and waivers, the Motion and Settlement Agreement do not address the question of nuclear decommissioning or fossil fuel remediation. They do not address the ability of Debtor or non-Debtor, separately or together, to satisfy their obligations under federal law. Nowhere do the Settlement Agreement and Motion even refer to the NRC and the potential liability inherent in the petition brought by the Citizen Organizations and now underway. Moreover, the Debtors' own statements call into question the "value" of the Pleasants Power Plant being transferred to them by FirstEnergy. Until that NRC proceeding concludes,

2

establishing the Parties' respective liabilities, the Court does not have information sufficient to determine the propriety of the Settlement Agreement, even under the business judgment standards of Bankruptcy Rule 9019.

## RELEVANT BACKGROUND

1.      On March 31, 2018 (the "Petition Date"), FirstEnergy Solutions Corp. ("FES") and its affiliated debtors and debtors in possession (collectively, the "Debtors") commenced voluntary cases under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court").  FirstEnergy Corp. ("FE") is not a Debtor.

2.      FirstEnergy, though a non-Debtor, owns all of the Debtors:  FES, FirstEnergy Nuclear Generation, LLC ("NG") and FirstEnergy Nuclear Operating Company ("FENOC"), each a Debtor.  The Debtors own and operate three nuclear power plants:  Davis-Besse, Perry and Beaver Valley Units 1 and 2—four separately-licensed units in all.  All are subject to regulation and oversight under federal and state law.

3.      In operating their business as debtors in possession, the Debtors repeatedly have acknowledged that they remain "subject to compliance with numerous federal and state regulatory regimes, including but not limited to the Clean Air Act, Clean Water Act, the Atomic Energy Act…and various similar state statutes and regulations, and applicable proceedings thereunder…."  *See*, *e.g.*, *Stipulation and Agreed Order by and Among the Debtors and...* [the Citizen Organizations] *Regarding Relief From the Automatic Stay* [D.I. 754 at 2].

4.      On March 27, 2018, pre-petition here, the ELPC filed a petition (the "NRC Petition") with the Nuclear Regulatory Commission under 10 C.F.R. § 2.206 and, in response to that petition, the NRC provided an opportunity to address the NRC Petition Review Board (the "PRB") at a hearing on June 19, 2018.  The NRC Petition is attached as **Exhibit A**.

3

5.     The NRC Petition alleges, among other things, that the Debtors "are violating the financial assurance requirements in the Atomic Energy Act because they have insufficient funds set aside for decommissioning costs" pursuant to 42 U.S.C. § 2201(x)(1).  That statute requires the NRC to ensure that licensees provide "an adequate bond, surety, or other financial arrangement…for the decontamination, decommissioning and reclamation of [nuclear] sites, structures and equipment…."  *See also* 10 C.F.R. § 50.75(a).  That includes the highly radioactive materials and spent nuclear fuel rods that are the inevitable by-products of nuclear power generation.

6.     On June 14, 2018, the Bankruptcy Court entered a *Stipulation and Agreed Order Among the Debtors and...* [the Citizen Organizations] *Regarding Relief from the Automatic Stay* [D.I. 754] (the "Stipulated Order") that expressly permitted the Citizen Organizations "to participate" in the PRB hearing, notwithstanding any possible application of the automatic stay under 11 U.S.C. § 362.  On June 19, 2018, the Citizen Organizations presented their testimony to the PRB at its invitation and pursuant to the Stipulated Order.

7.     On August 2, 2018, the PRB made an initial determination accepting the NRC Petition and agreeing to review the Debtors' compliance with the decommissioning requirements of federal law.  The PRB accepted the petition for review in its entirety.

8.     Based on the Second Stipulated Order, like the first, the Parties agreed as of August 20, 2018 that the automatic stay would again be "modified without further proceedings to allow the continued participation of the Citizen Organizations before the NRC to the extent there are further activities with regards to this Petition under 10 C.F.R. 2.206…."  *Second Stipulation and Agreed Order by and Among the Debtors* [and the Citizen Organizations]...*Regarding Relief From the Automatic Stay* [D.I. 1178].  The same order also modified the automatic stay "to the

4

extent any participation by the Citizen Organizations in the OVEC State Regulatory Proceedings could be considered subject to the Automatic Stay….” *Id.*

9.     On August 27, 2018, the NRC in a letter confirmed that the NRC's Petition Review Board “has determined that [ELPC's] petition meets the acceptance criteria for review…and has made an initial recommendation to accept [its] petition for review under the NRC's 10 C.F.R. § 2.206 process.” A copy of the letter is attached as **Exhibit B** (without NRC enclosures).

10.     That review process is underway and, according to the NRC letter, will be completed within a “reasonable time.” Pursuant to the NRC's Management Directive 8.11, the NRC has until December 25, 2018, to issue a decision with respect to the NRC Petition, which then is subject to further comment for 45 days before the issuance of a final decision.

## DECOMMISSIONING AND REMEDIATION OBLIGATIONS

11.     The NRC permits licensees to meet their decommissioning obligations under federal law either through a dedicated trust fund or through parental guarantees or both. *See* 10 C.F.R. § 50.75(e)(1). Historically, NG and FENOC have relied on decommissioning trusts and parental guarantees from FE and FES to meet their decommissioning obligations.

A.     In 2014, for example, FE reported that FES had guaranteed $155 million for decommissioning costs. It also reported that FE and FES guaranteed $23 million for decommissioning spent fuel storage facilities at the plants. FirstEnergy Corp. Quarterly Report (Form 10-Q) (Sept. 30, 2014) at 48.

B.     By 2016, the guarantees reported by FE had declined to $24.5 million, limited to spent fuel storage costs. In addition, FE noted that “FES no longer maintains investment grade credit ratings…” and, accordingly, “NG plans to fund a supplemental trust in lieu of a parental guarantee….” FirstEnergy Corp. Quarterly Report (Form 10-Q) (Sept. 30, 2016) at 45.

C.     Whether or not the NRC previously has approved—or will approve—the Debtors' exclusive reliance on trust funds, the financial condition of the Debtors that led to the Chapter 11 petition also led, at least in part, to the NRC Petition filed by the Objectors.

5

12. In a report publicly filed with the U.S. Securities and Exchange Commission (SEC), FirstEnergy Corp. has acknowledged that: "Under NRC regulations, FirstEnergy must ensure that adequate funds will be available to decommission its nuclear facilities. As of December 31, 2017, FirstEnergy had approximately $2.7 billion (FES $1.9 billion) invested in external trusts to be used for the decommissioning and environmental remediation of its nuclear generating facilities." FirstEnergy Corp. Annual Report (Form 10-K) (Dec. 31, 2017) at 18.

13. FE repeatedly has acknowledged as well its corporate obligation to underwrite any shortfall in the decommissioning funds maintained by its affiliates. In its third quarter 2017 filing, for example, FE told the SEC that if "the value of the [decommissioning] trusts declines by a material amount, [FirstEnergy's] funding obligation to the trusts could materially increase." FirstEnergy Corp. Annual Report (Form 10-K) (Dec. 31, 2017) at 35.

14. FE's corporate responsibilities extend as well to the Debtors' fossil fuel plants. It is a guarantor for $169 million of FES surety bonds as part of a consent decree for coal ash cleanup connected with the Bruce Mansfield coal plant. First Energy Corp. Quarterly Report (10-Q) (June 30, 2017) at 40. The parent also provides surety for environmental obligations for the Sammis coal plant. *Id.*

15. The Motion does not discuss any of these obligations or their potential transfer to the Debtors or their sufficiency under federal law.

### DEBTORS' REPRESENTATIONS AND OMISSIONS

16. The Motion emphasizes the pre- and post-petition investigation and analysis of potential inter-company claims, including fraudulent conveyance claims. *E.g.*, Motion ¶¶ 2, 21, 22. It provides as well a summary of potential defenses to those claims. *Id.*, ¶¶ 29-38. The Debtor and non-Debtor Parties balanced those claims and defenses, the Motion asserts, to reach the compromises embodied in the Settlement Agreement.

6

*Decommissioning Costs*

17.     FirstEnergy may well contend that it no longer provides any financial guarantees to any Debtors for any decommissioning or remediation costs.  *Supra* ¶ 11.  However, left unstated in the Motion's recitation of "viable actual and constructive fraudulent transfer claims" is any reference to the asserted withdrawal or transfer of the FE's parental decommissioning guarantees to FES or its affiliates—whether or not any such withdrawal or transfer occurred with regulatory approval.

18.     It is certainly possible that the pending NRC proceeding may conclude that the Debtors, in fact, have sufficient trust funds, standing alone, to meet those obligations.  Alternatively, the NRC may conclude that the trust funds are insufficient, leaving the Debtors no choice but to obtain parental guarantees or to supplement the trust funds already set aside.  Either outcome could substantially affect the Settlement Agreement and, not incidentally, the feasibility of any proposed plan of reorganization.

**Support Agreement**

19.     In the litany of potential claims, the Motion notes the "transfer from FE Corp. to FES of liability under a $400 million [operational] support agreement related to certain nuclear support obligations of NG."  Motion ¶ 23 at 13.  That commitment apparently arose in 2005, lasting 10 years until the FE, the parent, first attempted to eliminate its commitment by shifting it to FES.  According to the Motion, any transfer falls within the statutory periods for claims and could "support viable actual and constructive fraudulent transfer claims…."  *Id*.  So does any withdrawal or transfer of parental guarantees for decommissioning costs, reported as recently as 2016, or for fossil fuel remediation.

20.     Nowhere else in the Motion, including the discussion of "Defenses to Avoidance Actions," is the $400 million support agreement mentioned.  Moreover, nowhere at all does the

7

Motion note the issue of decommissioning or remediation costs or the potential fraudulent conveyance claims for FE's asserted rescission or transfer of those parental guarantees.

21.     While the Debtors now maintain that FES—and not FE—provides the $400 million support guarantee to NG, they also note: "The NRC typically relies on such parental support agreements to provide additional assurance that U.S. merchant nuclear plants, including NG's nuclear units, have the necessary financial resources to maintain safe operations…." FirstEnergy Corp. Quarterly Report (Form 10-Q) (Sept. 30, 2017) at 46. The $400 million support agreement liability, assuming its asserted transfer from a solvent FE to an insolvent FES, affects directly or indirectly the Debtors' ability to meet their decommissioning obligations.

22.     The NRC still has not approved the transfer of that $400 million parental support agreement for each of the four nuclear power plant units. Each of the Debtors' nuclear operating licenses contains a Support Agreement condition: NG "shall take no action to cause FirstEnergy or its successors and assigns to void, cancel, or modify the Support Agreement without the prior written consent of the NRC staff." As Debtors post-petition, FES, NG and FENOC cannot unilaterally modify the Support Agreement without written approval from the NRC *and* the Bankruptcy Court. "In any case where the Commission has approved proof of financial protection filed by a licensee[,] the licensee shall not substitute one type of financial protection for another type without first obtaining the written approval of the Commission." Nuclear Regulatory Comm'n, *Order Approving Direct Transfer of License re: Perry Nuclear Power Plant, Safety Evaluation by the Office of Nuclear Reactor Regulation for Direct Transfer of Leased Interest from the Ohio Edison Company to FirstEnergy Nuclear Generation, LLC* (April 15, 2016) at 6.

8

23.　　On June 30, 2015, within the four-year challenge period identified by the Debtors, NG requested consent from the NRC to assume the leased interests in the Perry Nuclear Power Plant from the Ohio Edison Company. *See* Motion ¶ 23, p. 13 n.11. After the transfer, NG and FENOC would be Perry's owner and operator, respectively. NG also asked the NRC to change its license, terminating its support agreement with FE and entering a new $400 million financial support agreement with FES. In response, the NRC concluded that the Debtors—then—had "reasonable assurance of generating the revenue necessary to adequately cover its operation costs" and that NG "has access to additional capital" through FES. *Order Approving Direct Transfer of License re: Perry Nuclear Power Plant*, *supra* ¶ 22, at 6.

24.　　On June 24, 2016, the Debtors asked the NRC to approve the transfer to it of Toledo Edison Company's leased interest in Beaver Valley Unit 2. In approving this transfer, the NRC acknowledged the FES financial support agreement for Perry, but the NRC explicitly noted that "additional access to cash as necessary through corporate parent FE, as needed, provides additional evidence of reasonable assurance that funds will be available to cover estimated costs." Nuclear Regulatory Comm'n, *Order Approving Direct Transfer of License re: Beaver Valley Power Station Unit 2, Safety Evaluation by the Office of Nuclear Reactor Regulation for Direct Transfer of Leased Interest from the Ohio Edison Company to FirstEnergy Nuclear Generation, LLC* (April 14, 2017) at 6.

25.　　On May 18, 2017, the Debtors asked the NRC to approve amendments to the Beaver Valley Unit 1 and Davis-Besse operating licenses to transfer the $400 million support agreement from FE to FES. The Debtors requested approval by May 31, 2018. On March 31, 2018, however, FES filed for bankruptcy without having obtained the NRC's approval. *See* Letter from FirstEnergy Nuclear Operating Co. to U.S. Nuclear Regulatory Comm'n., Admin.

License Amendment Request to Reflect a Change in the Entity Providing a $400 Million Support Agreement (May 18, 2017) at 1.

26.     On August 23, 2018, again post-petition, the Debtors again asked the NRC to approve amendments to the Beaver Valley Unit 1 and Davis-Besse operating licenses. Yet the NRC has still not issued written approval to permit the Debtors to substitute the FE support agreement for a support agreement from FES—assuming the NRC has the statutory authority to approve a support agreement from a company in bankruptcy, let alone without the Bankruptcy Court's approval.

**INSUFFICIENT DISCLOSURE**

27.     The standard of review for Rule 9019 motions is not in doubt or in dispute. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968) ("*TMT Trailer*"). But there must be a factual basis for the application of that "fair and equitable" and "best interests of the estate test."

A.     The Bankruptcy Court necessarily will consider all of the "factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Id*. at 424. That requires "detailed enough findings" to permit a reviewing court to determine that the proper factors were considered. 10 *Collier on Bankruptcy* ¶ 9019.02 (Richard Levin & Henry J. Sommer eds., 16th ed. 2018).

B.     While the *TMT Trailer* decision, cited in the Motion's Rule 9019 discussion, is a Bankruptcy Act confirmation case, it contains this passage: "There can be no informed and independent judgment [by the court] as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary…." 390 U.S. at 424.

C.     The U.S. Court of Appeals for this circuit, in an appeal from a decision by the district court here, relied on *TMT Trailer* as well as a range of other decisions emphasizing both the responsibility to review and the discretion to review settlements vested in the bankruptcy court. *In re Bard*, 49 F. App'x 528 (6th Cir. 2002) (*per curiam*). The discretion and the responsibility are complementary. Both require sufficiently complete information to support any proposed settlement.

D. The Debtors themselves acknowledge this requirement: the Court "need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement." Motion ¶ 54, p. 36.

28. With respect to the Debtors' nuclear plant decommissioning and coal plant environmental clean-up and remediation obligations, and FE's retrospective and prospective responsibility for them, the Court does not have those "facts necessary." There has been no discussion, not even disclosure, of the decommissioning and remediation obligations of both Debtors and non-Debtors or the status of parental guarantees, transferred or not, especially those subject within four years to challenge. No analysis. No accounting.

29. Moreover, while the Motion recites the consideration being paid by FE in return for the release and waivers by the Debtors, it does not address the application of the cash and notes—specifically, whether any amounts would be, could be, or—in the NRC's determination—*should* be set aside to meet the decommissioning responsibilities imposed by federal law. To the contrary, the declaration supporting the Motion states that the "additional liquidity" flowing from the Settlement Agreement "increases the Debtors' options for the businesses as they transition to stand-alone businesses in a challenging marketplace." Decl. of Charles Moore ¶ 37, p. 14.

30. The Debtors assert that "[i]mportantly, neither the Settlement Agreement nor this Motion seeks to allocate [the] value or consideration being provided…between and among the Debtors' estates or their creditor constituencies…," leaving any allocation to a plan of reorganization. Motion ¶ 76, p. 48.

31. But the Debtors and their creditor constituencies are not the only parties interested in allocation. So, too, is the NRC and, ultimately the public that could well suffer the financial

and other consequences of a decommissioning or remediation deficit—all of the "other stakeholders," in the phrase used by the Moore Declaration in its conclusion.

32. The $1 billion in cumulative consideration proposed to be paid in settlement by the non-Debtors and the allocation of it by the Debtors each may be directly affected by the financial assurance requirements of federal law and the pending NRC proceedings.

33. The Motion's silence on the decommissioning obligations and pre-petition liability transfers of Debtors and non-Debtors alike—with the complementary uncertainty—is not limited to their nuclear power plants. "Among the primary benefits" of the Settlement, according to the Motion, is "the value of the [coal-powered] Pleasants Power Plant [in West Virginia] …which will be provided to the Debtors either through the transfer of ownership of the plant or through the contribution of the net cash proceeds of the sale of such plant by the FE Non-Debtor Parties…."  Motion at 4.

34. The large Pleasant coal plant is owned by Allegheny Energy, an FE subsidiary. FE has publicly announced that the Pleasant power plant will be "deactivated" by January 2019.

35. To try to meet the business judgment standards for this aspect of the transaction, the Motion relies on the Moore Declaration's statement that the coal plant transfer will give FES the synergistic benefits of combining Pleasants in West Virginia with the W.H. Sammis and Bruce Mansfield coal plants in Ohio.  Moore Decl. ¶¶ 41, 47.  The declaration states that "another coal-fired power station…would add size and purchasing power to enhance the value to the Debtors' enterprise."  (According to the Declaration, the Pleasants Power Plant has a book value of $67 million.  *Id*. ¶ 47.)  Yet, three days after filing the Moore Declaration, the Debtors announced the shut-down of the Sammis and Mansfield plants.  *See FirstEnergy submits plans to*

*close Mansfield, Sammis coal plants* (Aug. 30, 2018), http://ieefa.org/firstenergy-submits-plans-to-close-mansfield-sammis-coal-plants/.

36.     If the Debtors' transfer of this coal-fired plant is to be a "primary benefit" of the Settlement, enhancing "value," the Court needs more information than the Motion provides— especially in the face of an apparent contradiction that goes to the heart of the transaction. Shuttered plants provide neither "size [nor] purchasing power," especially when the Debtors' fossil-fueled plants "face the insurmountable challenge of a market that does not sufficiently value…[them]." *Id.*

37.     While a Rule 9019 motion is not the place for a mini-trial, *TMT Trailer*, 390 U.S. at 424, the Court should defer a decision on the Motion until there is a satisfactory explanation for such critical components of the transaction.  In return for the releases, waivers, and other consideration, the Debtors are getting from the non-Debtors $228 million in cash, $628 million in new unsecured notes issued by FE, and "the value of the Pleasants Power Plant."  Motion, p. 4.  The contradictory statements by FE, at the least, call into question that "value," especially in light of the environmental clean-up and remediation costs associated with a large coal plant shutdown.

## CONCLUSION/RELIEF REQUESTED

Federal law imposes liability for decommissioning and remediation on the Debtors and, potentially and as it has in the past, on the non-Debtor parent corporation.  The amount of that liability is significant and, at this point, undetermined.  So is the potential effect on the tax-paying public.  The Court, the Parties, and the public deserve more certainty and more information than the Motion provides.  Until they have that information and certainty, the Motion is, at best, premature.

For the reasons stated above, the Court should deny the Settlement Motion. In the alternative, the Court should:

--Defer a decision with respect to the Motion until the conclusion of the PRB proceeding or until the Debtors are able to demonstrate compliance with the decommissioning provisions of federal law for their nuclear facilities and with their fossil fuel remediation obligations; or

--Require that any settlement agreement maintain the corporate affiliation between the Debtors and non-Debtors for the purpose of complying with statutory decommissioning and remediation mandates.

Dated: September 17, 2018.       Respectfully submitted,
Madison, Wisconsin

*/s/ Brady C. Williamson*
Brady C. Williamson
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701-2719
Telephone: (608) 284-2654
Facsimile: (608) 257-0609
E-mail: bwilliam@gklaw.com
*Attorneys for Environmental Law & Policy Center*

*/s/ Margrethe Kearney*
Howard A. Learner
Margrethe Kearney
Andrene Dabaghi
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, Illinois 60601
Telephone: (312) 673-6500
E-mails: HLearner@elpc.org
         MKearney@elpc.org
         ADabaghi@elpc.org
*Attorneys for Environmental Law & Policy Center,*
*Ohio Citizen Action, Ohio Environmental Council*
*and Environmental Defense Fund*

19484344.1

14

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FIRSTENERGY SOLUTIONS CORP., *et al.*[1] | ) | Case No. 18-50757 |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | Hon. Judge Alan M. Koschik |
|  | ) |  |

## CERTIFICATE OF SERVICE

I, Brady C. Williamson, hereby certify that on September 17, 2018, I caused a true and correct copy of the foregoing *Objection to Debtors' Motion to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties* to be filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties on the Electronic Mail Notice List. Parties may access this filing through the Court's system.

Dated: September 17, 2018.
Madison, Wisconsin

Respectfully submitted,

*/s/ Brady C. Williamson*
Brady C. Williamson
*Attorneys for Environmental Law & Policy Center*

19512823.1

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Drive, Akron, OH 44320.

# EXHIBIT A



# ENVIRONMENTAL LAW & POLICY CENTER
## Protecting the Midwest's Environment and Natural Heritage

March 27, 2018

Mr. Victor M. McCree
Executive Director for Operations
U.S. Nuclear Regulatory Commission
Washington, DC 20555-0001

Submitted electronically to *Petition.Resource@nrc.gov*

RE:    *Citizen Complaint and Request for Enforcement Action Regarding FirstEnergy Nuclear Facility Operations in Ohio and Pennsylvania*

Dear Mr. McCree,

Pursuant to 10 CFR § 2.206, the Environmental Law & Policy Center[1] ("ELPC") submits this Petition to the U.S. Nuclear Regulatory Commission ("NRC") requesting enforcement action against First Energy Corp. ("FE"), First Energy Solutions ("FES"), FirstEnergy Nuclear Generation ("NG") and FirstEnergy Nuclear Operating Company ("FENOC") for failure to comply with nuclear decommissioning funding requirements under 42 U.S.C.A. § 2201(x)(1) for the Davis-Besse, Perry and Beaver Valley Units 1 and 2 nuclear plants located in Ohio and Pennsylvania ("the Nuclear Plants"). FE is the parent company of FES and FENOC, which are wholly-owned subsidiaries. The Nuclear Plants are owned by NG, which is, in turn a wholly-owned subsidiary of FES, and are operated by FENOC. *See* Attachment 1 (Organizational Chart). FENOC and NG are the licensees for the Nuclear Plants.

FE is the ultimate parent company guarantor for the Nuclear Plants. FE states in its recent Form 10-K report filing to the United States Securities and Exchange Commission as follows: "Under NRC regulations, FirstEnergy must ensure that adequate funds will be available to decommission its nuclear facilities. As of December 31, 2017, FirstEnergy had approximately $2.7 billion (FES $1.9 billion) invested in external trusts to be used for the decommissioning and environmental remediation of its nuclear generating facilities." FirstEnergy Corp. Annual Report (Form 10-K) (Feb. 20, 2018) at 18,

---

[1] ELPC is a public interest environmental legal advocacy and eco-business innovation organization working throughout the Midwest states to improve environmental quality and protect natural resources in the Midwest on behalf of our organization, members and clients. ELPC works to avoid risks and injuries to public health, clean water, clean air and landscapes in ways that are good for the environment and good for the economy.

35 East Wacker Drive, Suite 1600 • Chicago, Illinois 60601
(312) 673-6500 • www.ELPC.org

Harry Drucker, Chairperson • Howard A. Learner, Executive Director
Chicago, IL • Columbus, OH • Des Moines, IA • Duluth, MN • Grand Rapids, MI • Indianapolis, IN
Jamestown, SD • Madison, WI • Minneapolis/St. Paul, MN • Sioux Falls, SD • Washington, D.C.


*Printed on recycled paper*

https://www.sec.gov/Archives/edgar/data/1031296/000103129618000015/fe-12312017x10k.htm.

As licensees, NG and FENOC are violating financial assurance requirements in the Atomic Energy Act because they have insufficient funds set aside for decommissioning costs. Licensees are legally responsible under the Atomic Energy Act, 42 U.S.C.A. § 2201(x)(1), and NRC regulations, 10 CFR § 50.75, for demonstrating the availability of funds to decommission their nuclear facilities. NG and FENOC have historically relied on two means of providing this financial assurance: (1) nuclear decommissioning trusts; and (2) parent company guarantees. The existing decommissioning trusts for Beaver Valley Units 1 and 2 and Perry contain insufficient funds to decommission those three plants. When properly estimated, the same might be the case with the Davis-Besse nuclear plant. Due to the rapidly deteriorating financial condition of NG's parent company FES, as well as the financial circumstances of parent company FE, it is clear that NG and FENOC can no longer rely on parent company guarantees. As a result, NG and FENOC are not currently providing reasonable assurance of decommissioning funding in violation of 42 U.S.C.A. § 2201(x)(1) and 10 CFR § 50.75(a). Importantly, since these nuclear plants are merchant plants, as more fully explained below, FE cannot request that the public utilities commissions require retail ratepayers to pay rate increases to support financial shortfalls for the merchant nuclear plants' decommissioning costs.

FES is on the verge of bankruptcy, and it is highly likely that NG and FENOC will file as well. *See* Attachments 2–6. FE CEO Chuck Jones recently stated that he would be "shocked" if FES did not file for bankruptcy by the end of March. Attachment 3 at 1. In FES Form 10-K Report filed on Feb. 20, 2018, the company's independent auditor, Pricewaterhouse Coopers LLP, noted that "FirstEnergy Solution Corp.'s current financial position and the challenging market conditions impacting liquidity raise substantial doubt about its ability to continue as a going concern." FES Annual Report (Form 10-K) (Feb. 20, 2018) at 119. In addition to its $515 million of maturing debt, FES' precarious financial position is evidenced by its senior unsecured debt rating, capital structure and long-term cash flow projections. FES' Form 10-K Report admits that "these obligations and their impact to liquidity raise <u>substantial doubt about FES' ability to meet its obligations</u> as they come due over the next twelve months and, as such, its ability to continue as a going concern." *Id.* at 4 (emphasis added).

FE, FES, NG and FENOC are no longer demonstrating, as they must, that they meet the standards for providing reasonable financial assurances for decommissioning, decontaminating and restoring the nuclear reactors and plant sites. Licensees NG and FENOC and the parent companies FE and FES should not now be allowed to place taxpayers at risk of bearing costs for decommissioning, decontaminating, and restoring reactor sites, and the risks that the nuclear plants' decommissioning and site clean ups will be deferred and delayed. In light of FES, NG and FENOC's impending bankruptcy proceedings, and FE's rapidly deteriorating financial situation, in order to ensure compliance with federal laws and regulations, ELPC requests that the NRC give this petition immediate consideration and promptly issue Demands for Information and Notices of Violation to licensees NG and FENOC and parent companies FE and FES.

## 1. NG and FENOC's Nuclear Plants are in Violation of Financial Assurance Requirements Under 42 U.S.C.A. § 2201(x)(1) and 10 CFR § 50.75

As directed by the Atomic Energy Act, the NRC has established requirements to ensure that licensees provide "an adequate bond, surety, or other financial arrangement . . . to permit the completion of all requirements established by the Commission for the decontamination, decommissioning, and reclamation of sites, structures, and equipment . . . ." 42 U.S.C.A. § 2201(x)(1). These requirements specify that licensees provide "reasonable assurance that funds will be available for the decommissioning process." 10 CFR § 50.75(a). Licensees NG and FENOC have consistently struggled to prove reasonable assurance of funding for decommissioning their nuclear plants. They have historically relied on two means to secure financial assurance of decommissioning funding: nuclear decommissioning trusts ("Trusts"); and (2) parent company guarantees ("Parent Guarantees").

NG and FENOC do not have sufficient funds in Trusts to meet financial assurance requirements under 42 U.S.C.A. § 2201(x)(1) and 10 CFR § 50.75. The external trusts for Beaver Valley Units 1 and 2 and Perry are insufficient to cover the estimated decommissioning costs at each of these facilities. NG and FENOC's most recent estimates from March 2017, compiled in the table below, demonstrate a $350 million shortfall in decommissioning funds available in external trust funds for Beaver Valley Units 1 and 2, Davis-Besse, and Perry. *See* ML17083B221.

| Facility | Estimated Decommissioning Cost (March 2017) | Amount Accumulated in External Trust Funds (March 2017) | Total Shortfall |
|----------|-----------|-----------|-----------|
| Beaver Valley Unit 1 | $481,892,880 | $286,595,306 | $195,297,574 |
| Beaver Valley Unit 2 | $481,892,880 | $378,702,702 | $103,190,178 |
| Davis-Besse | $467,414,486 | $552,423,474 | *-$85,008,988* |
| Perry | $651,915,000 | $515,467,559 | $136,447,441 |
| **TOTAL** | $2,083,115,246 | $1,733,189,041 | **$349,926,205** |

FE's shortfalls are even greater when considering its decommissioning responsibilities for Three Mile Island Unit 2 ("TMI-2"), licensed by GPU Nuclear—a wholly owned subsidiary of FirstEnergy Corp. FE Quarterly Report (Form 10-Q) (Nov. 4, 2016) at 45. TMI-2 requires nearly $1.2 billion for decommissioning, although as of March 2017, only $778 million has accumulated in its decommissioning trust fund. *See* ML17083B223 at 6. According to its own DFS Reports, FE's estimated decommissioning cost for all five of its nuclear units (Beaver Valley Units 1 and 2, Davis-Besse, Perry, and TMI-2), as of March 2017, totals $3,318 million, bringing its total shortfall to $806 million. *See* ML17083B221 (costs for Beaver Valley Units 1 and 2, Davis-Besse and Perry) and ML17083B223 (costs for TMI-2).

3

FE's actual decommissioning costs and corresponding shortfalls are likely to be much greater than those reported by NG and FENOC. For example, the respected Callan Institute's 2017 Nuclear Decommissioning Funding Study, which includes TMI-2, specifies $5,260 million in estimated decommissioning costs, bringing the total shortfall to $2,749 million. *See* THE CALLAN INSTITUTE, 2017 Nuclear Decommissioning Funding Study 5 (Dec. 31, 2016), https://www.callan.com/wp-content/uploads/2017/09/Callan-2017-NDT-Survey.pdf. These estimated shortfalls are nearly 3.5 times the size of those reported by FENOC and NG in March 2017. The Callan Report generated its calculations using the same sources: DFS reports, 10-K filings and NRC website data as of December 2016. *Compare id.* at 5 *with* ML17083B221; ML17083B223.

In addition to these shortfalls, FE, FES, NG and FENOC are not currently funding the decommissioning trusts. As confirmed by their SEC reports, neither FES nor parent company FE made any contributions during 2017. FES Annual Report (Form 10-K) (Feb. 20, 2018) at 88, 114. Furthermore, nearly 70% of the decommissioning trust funds reported by FE are held by nearly-bankrupt FES. In December 31, 2017, parent company FE reported $2,678 million in external funds, of which $1,856 million was held by FES. FES Annual Report (Form 10-K) (Feb. 20, 2018) at 181.

In addition to the higher costs and larger shortfalls identified by the Callan Report, FE's shortfalls reported in March 2017 are also likely understated due to the formula NG and FENOC used to calculate their cost estimates. The licensees estimated their decommissioning costs for Beaver Valley Unit 2, Davis-Besse, and Perry using the NRC formula as opposed to a site-specific formula. *See* ML17083B221at 10, 12, 15. The NRC formula is only designed to estimate a "bulk" of the costs—a term that the NRC has failed to define, but likely represents less than the full costs of decommissioning. GA0-12-258, Nuclear Regulation - NRC's Oversight of Nuclear Power Reactors' Decommissioning Funds Could Be Further Strengthened 13 (2014), https://www.gao.gov/assets/590/589923.pdf.

A 2014 GAO report explained that "without changes to the NRC formula, it is possible that the NRC formula estimates *could be significantly less than* the licensees' site-specific cost estimates . . . ." *Id.* at 14 (emphasis added). For example, in the case of Three Mile Island-2, the site-specific cost was nearly three times that of the formula's estimate. *See* ML17083B223 at 3, 6. Given that Beaver Valley 2, Davis-Besse and Perry all used the NRC formula, it is likely that the actual costs of decommissioning will be higher than anticipated, thereby making the shortfalls in decommissioning funds even greater.

Despite its weakening financial position, FE is the actual parent guarantor for the nuclear plants owned and operated by NG and FENOC. *See* FirstEnergy Corp. Annual Report (Form 10-K) (Feb. 20, 2018) at 18. FE has historically played this role; when NG and FENOC needed to take out large parent guarantees between 2011 and 2013 to remedy decommissioning shortfalls for Beaver Valley Unit 1 and Perry, FE was the guarantor. *See* ML113640029 at 4 (citing $95 million parental guaranty from FE dated December 19, 2011); ML12363A037 at 4 (citing $95.5 million parental guaranty from FE dated December 17, 2012); ML13169A262 at 7 (citing $125 million parental guaranty from FE dated June 11, 2013).

4

The financial condition of FE raises serious concerns about its ability to issue the types of guarantees that it has in the past. FE recently represented to the Public Utilities Commission of Ohio ("PUCO") that it needs a financial bailout and special rates in order to retain its financial integrity and solvency. *See In the Matter of the Application of Ohio Edison Company, the Cleveland Electric Illuminating Company, and the Toledo Edison Company for Authority to Provide for a Standard Service Offer Pursuant to R.C. 4928.143 In the Form of an Electric Security Plan*, Case No. 14-1297-EL-SSO, Order at 23 (Pub. Util. Comm'n of Ohio Aug. 16, 2017). In these proceedings, FE admitted to its risk of credit downgrade to below investment grade. *Id.* at 23 ("FirstEnergy states there is sufficient evidence in the record, including intervenor testimony, showing that the credit ratings of FirstEnergy Corp. and the Companies falling to a non-investment grade rating is a matter of concern . . . ."). The company also acknowledged that "Moody's and S&P had both recently issued negative outlooks on FirstEnergy Corp. and expressed concern with its financial health moving forward . . . ." *Id.*

FES is on the verge of filing for bankruptcy. The NRC may only approve a company's use of Parent Guarantees as reasonable assurance of its availability of decommissioning funds if the parent company passes the financial test outlined under 10 CFR Part 30, Appendix A. 10 CFR § 50.75(e)(1)(iii)(B). To pass the financial test, the parent company must meet all criteria under either Paragraph A.1 or A.2 (referred hereafter as "Tests A.1 and A.2"). FES fails these financial tests and therefore cannot provide Parent Guarantees for NG. Accordingly, FE must demonstrate how it will provide the funds required by its parent guaranty.

## Financial Test A.1

FES cannot pass Test A.1 based on the financials reported in its most recent 10-K. Under Financial Test A.1, FES must have two of the following three ratios: (1) A ratio of total liabilities to total net worth less than 2.0; **(2) a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1**; and **(3) a ratio of current assets to current liabilities greater than 1.5**. Appendix A, A.1(i). Even in its dire financial condition, FES manages to meet the first ratio requirement, but it cannot establish the ratios required under (2) and (3).

FES cannot establish the second ratio requirement because its ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities is not greater than 0.1. The ratio of FES' sum of net income (-$2,391M) plus depreciation, depletion and amortization ($333M) to total liabilities ($24M) equals -85.75 million. FES cannot establish the third ratio requirement because the ratio of its current assets ($796M) to current liabilities ($1,254M) is only .635 – not greater than the 1.5 required. FES fails Test A.1 because it cannot meet two of the three ratio requirements.

## Financial Test A.2

FES cannot pass Financial Test A.2 on account of its poor credit ratings. A threshold requirement for meeting Test A.2 is that the parent company have a current rating for its most recent uninsured, uncollateralized, and unencumbered bond issuance of AAA, AA, A, or BBB

(including adjustments of + and –) as issued by Standard and Poor's or Aaa, Aa, A, or Baa (including adjustment of 1, 2, or 3) as issued by Moody's. Appendix A, A.2(i). FES' credit ratings have been downgraded to CCC- (Standard and Poor) and Ca (Moody's)—both far below the required ratings under Appendix A, A.2(i). Since FES cannot pass the financial test under Tests A.1 or A.2, the company's reliance on a poorly described $400 million support agreement violates the law.

Recognizing FES' inability to meet the applicable financial tests, in December 2016, FENOC notified the NRC to terminate existing Parent Guarantees from FES for the independent spent fuel storage installations (ISFSIs) for Beaver Valley, Davis-Besse, and Perry nuclear plants because FES could no longer satisfy the financial test criteria for decommissioning ISFSIs pursuant to 10 CFR § 72.30(e). *See* ML17251A061 at 1 (terminating all Parent Guarantees for the ISFSIs at these facilities). The FES Parent Guaranty test for decommissioning ISFSIs, Appendix A to 10 CFR Part 30, is the same test for decommissioning the main power reactors under 10 CFR § 50.75.

There is a $500 million credit line from FE to FES, and this credit line can be drawn out: "Due to FES' financial condition, there is a substantial risk that it may be necessary for FES and FENOC to seek protection under U.S. bankruptcy laws. . . . [I]t is expected that prior to the commencement of any such proceeding, FES will fully draw down its $500 million secured credit facility from FE, which FE would likely fund by borrowing under its bank facility." FES Annual Report (Form 10-K) (Feb. 20, 2018) at 28. If FES funds are exhausted in bankruptcy, FE will therefore be obligated to secure the full amount of NG and FENOC's underfunded decommissioning costs. According to a March 16, 2018 Moody's report, FES appears to have already drawn out this credit line. *See* MOODY'S *Issuer Comment: FirstEnergy Solutions' Credit Facility Now Fully Drawn* (March 16, 2018), https://www.moodys.com/MdcAccessDeniedCh.aspx?lang=en&cy=global&Source=https%3a% 2f%2fwww.moodys.com%2fviewresearchdoc.aspx%3fdocid%3dPBC_1116777%26lang%3den %26cy%3dglobal.

In its most recent 10-K report, FES cites to a general FES "parental support agreement to NG of up to $400 million" designated for FES to satisfy its nuclear support obligations. FES Annual Report (Form 10-K) (Feb. 20, 2018) at 18. If FENOC and NG intend to rely on this "parental support agreement" to meet decommissioning funding obligations, they are in violation of financial assurance requirements. FES does not meet the requirements under either test, and therefore cannot provide *any* Parent Guarantees to NG of any dollar amount – let alone this $400 million guaranty.

## 2. These Nuclear Plants are Merchant Plants, and FE Cannot Rely on Rate Increases Forced on Retail Ratepayers to Meet Its Decommissioning Funding Shortfalls

FE cannot charge retail ratepayers to meet nuclear decommissioning obligations. The Nuclear Plants operate as merchant plants in Ohio's deregulated, competitive market, and the time has long passed for FE to collect decommissioning costs as transitional revenue. On June 22, 1999, the Ohio General Assembly passed legislation requiring the restructuring of Ohio's electric utility industry and providing for retail competition with regard to the generation

6

component of electric service. Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962. This legislation became effective on October 5, 1999, and required each electric utility – including FirstEnergy – to file a transition plan with the Public Utilities Commission of Ohio ("PUCO") for the company's provision of retail electric service in Ohio following deregulation. R.C. 4928.31. The legislature anticipated that utilities would have "transition costs," which are costs incurred by the utility before retail competition began that would not be recoverable through market-based rates. *See FirstEnergy Corp. v. Pub. Util. Comm.*, 768 N.E.2d 648 (Ohio 2002), R.C. 4928.37 and 4928.39.

The law thus provided each electric utility with a limited opportunity "to receive transition revenues that may assist it in making the transition to a fully competitive retail electric generation market." R.C. 4928.37. Utilities had until December 31, 2005, to receive generation transition revenue. R.C. 4928.01(A)(26); 4928.38 and 4928.40(A). After that date, Ohio law is clear that "*the utility shall be fully on its own in the competitive market*. The commission *shall not authorize* the receipt of transition revenues or any equivalent revenues by an electric utility," with certain exceptions not applicable here. R.C. 4928.38 (emphasis added). The Ohio Supreme Court upheld this clear language prohibiting recovery of transition costs after December 31, 2005, and it has flatly rejected utility attempts to recover from customers anything that is "the equivalent of transition revenues." *See In re Application of Columbus S. Power Co*., 147 Ohio St.3d 439 (2016) (overturning the Commission's approval of an AEP "Retail Stability Rider" used to recover deferred capacity costs and to maintain AEP's financial integrity).

FE's financial condition does not justify an exception from the prohibition on recovery of decommissioning funds past the bar date for transition revenue recovery. While PUCO concluded that FE's first transition plan filing would not conform to the requirements of Ohio law, FE eventually did file a transition plan that was approved by PUCO. *In re FirstEnergy Corp.*, 2000 WL 1791792 at *60-61 (Pub. Util. Comm'n of Ohio July 19, 2000). FE sought and PUCO granted *inclusion of decommissioning costs for nuclear generating facilities in FirstEnergy's authorized transition costs*. *Id.* at *54. These costs were to be recovered on a jurisdictional basis between January 1, 2001 and December 31, 2005. *Id.* FE has already recovered from Ohio retail ratepayers the maximum amount of decommissioning costs allowable under Ohio law.

### 3. NG and FENOC Should Not Be Allowed to Defer Their Financial Obligations through SAFSTOR.

Even if NG and FENOC use SAFSTOR as a way to defer actual payment of decommissioning costs, they still may lack the necessary funds. In light of NG and FENOC's precarious financial situations, the NRC should investigate whether NG and FENOC should be required to reevaluate use of SAFSTOR. FENOC and NG have calculated decommissioning cost estimates based on a period of SAFSTOR for at least one of their plants, Beaver Valley Unit 1, and have clarified that "FENOC has not made a final determination on the nuclear decommissioning approach for any of the listed nuclear units." ML17083B221 at 1, 6.

Although licensees may select their decommissioning option, NRC regulations require the licensee to reevaluate its selection if the option (a) includes activities that would endanger the

7

health and safety of the public by being outside of the NRC's health and safety regulations; or (b) will result in a significant impact to the environment. NRC Regulatory Guide 1.202, ML050230008 at 1.202-3. If a bankrupt company cannot immediately decommission its nuclear plants because it lacks the financial resources to do so, it cannot reasonably be expected to invest the resources necessary to safeguard intact or partially dismantled nuclear structures for an indefinite number of years. As cited by NRC guidance document NUREG-0586, the time gap between cessation of operations and decommissioning can result in a shortage of personnel familiar with the facility and requires ongoing maintenance, security, and surveillance. *See* ML023470304 at 3-20. A bankrupt company placing its nuclear plants in a period of SAFSTOR lacks the resources to implement these necessary maintenance, security, and surveillance measures.

NG and FENOC should not be allowed to defer decommissioning responsibilities simply because they failed to allocate sufficient funds towards decommissioning. In this situation, SAFSTOR amounts to an improper management approach.

* * * * * * * * * * * * * *

For the foregoing reasons, licensees NG and FENOC and parent companies FE and FES are in violation of the Atomic Energy Act and 10 CFR 50.75 because: (1) their decommissioning trust amounts are insufficient on their own to provide reasonable assurance of funding and parent companies FE and FES are in perilous financial positions; (2) FE cannot force retail ratepayers to pay for the decommissioning trust fund shortfalls; and (3) the costs, including SAFSTOR costs, may still be much higher than expected due to significantly higher shortfalls as reported by the Callan Institute and recognized flaws in the NRC's cost estimate formula. ELPC respectfully requests that the NRC take the following actions:

## **Demands for Information**

(1) Promptly issue a Demand for Information to FE, FES, NG and FENOC requesting site-specific decommissioning funding plans for the Beaver Valley 2, Davis-Besse, and Perry nuclear plants;

(2) Promptly issue a Demand for Information to FE, FES, NG and FENOC regarding their reliance on external trust funds from FE and FES to satisfy their decommissioning financial obligations;

(3) Promptly issue a Demand for Information to FE, FES, NG and FENOC regarding their continued reliance on Parent Guarantees from FE to satisfy decommissioning funding obligations, including the ability of FE to satisfy the Parent Guaranty financial test under Appendix A to 10 CFR Part 30;

(4) Promptly issue a Demand for Information to FES, NG and FENOC to the extent that they are relying on Parent Guarantees from FES to satisfy decommissioning funding obligations,

8

including the ability of FES to satisfy the Parent Guaranty financial test under Appendix A to 10 CFR Part 30;

(5) Promptly issue a Demand for Information to FE, FES, NG and FENOC regarding their proposed investment and financial contribution plans to make up the current decommissioning shortfall; and

(6) Promptly issue a Demand for Information to FE and FES, respectively, regarding each of their commitments to guarantee NG and FENOC's decommissioning shortfall in the event of bankruptcy.

## Notice of Violation and Penalties

(1) Promptly issue a Notice of Violation against FE, FES, NG and FENOC for operating nuclear facilities without sufficient decommissioning funds in violation of 42 U.S.C.A. § 2201(x)(1) and 10 CFR § 50.75;

(2) Promptly issue civil penalties against FE, FES, NG and FENOC for operating nuclear facilities without sufficient decommissioning funds in violation of 42 U.S.C.A. § 2201(x)(1) and 10 CFR § 50.75; and

(3) Promptly issue an Order to suspend NG and FENOC's licenses for Beaver Valley Units 1 and 2, Davis-Besse, and Perry nuclear plants.

ELPC also urges the NRC to prohibit NG and FENOC from placing their nuclear facilities into SAFSTOR for purely financial reasons. In addition, ELPC requests that this Petition be given immediate emergency consideration in light of FE's and FES' rapidly deteriorating financial conditions.

Thank you for your consideration.

Respectfully submitted,

Margrethe Kearney
Andrene Dabaghi
Environmental Law & Policy Center
35 E. Wacker Drive, Ste. 1600
Chicago, IL 60601
(312) 673-6500
mkearney@elpc.org
adabaghi@elpc.org

9

# EXHIBIT B



**UNITED STATES**
**NUCLEAR REGULATORY COMMISSION**
WASHINGTON, D.C. 20555-0001

August 27, 2018

Ms. Margrethe Kearney
Ms. Andrene Dabaghi
Environmental Law and Policy Center
35 E. Wacker Drive, Ste. 1600
Chicago, IL 60601

SUBJECT:     10 CFR 2.206 PETITION FOR CITIZEN COMPLAINT AND REQUEST FOR
             ENFORCEMENT ACTION REGARDING FIRSTENERGY NUCLEAR FACILITY
             OPERATIONS IN OHIO AND PENNSYLVANIA

Dear Ms. Kearney and Ms. Dabaghi:

On behalf of the U.S. Nuclear Regulatory Commission (NRC), I am responding to your petition
dated March 27, 2018. Pursuant to Title 10 of the *Code of Federal Regulations* (10 CFR),
Section 2.206, "Requests for Action under this Subpart," you submitted a petition to the
Executive Director for Operations of the NRC and your petition has been referred to the Office
of Nuclear Reactor Regulation (NRR) for review. Your petition is available in the NRC
Agencywide Documents Access and Management System (ADAMS) under Accession
No. ML18094A642.

In your petition, you requested enforcement actions against FirstEnergy Corp. (FE), FirstEnergy
Solutions (FES), FirstEnergy Nuclear Generation (NG), and FirstEnergy Nuclear Operating
Company (FENOC) for failure to comply with nuclear decommissioning funding requirements
under 42 U.S.C.A. (United States Code Annotated), Section 2201(x)(1), for the Beaver Valley
Power Station, Units 1 and 2 (BVPS); Davis-Besse Nuclear Power Station (DBNPS), Unit 1; and
Perry Nuclear Power Plant (PNPP), Unit 1, all nuclear plants located in Ohio and Pennsylvania.

Specifically, you requested the following enforcement actions:

**A) Demands for Information**

(1) Promptly issue a Demand for Information to FE, FES, NG, and FENOC requesting
     site-specific decommissioning funding plans for the BVPS, DBNPS, and PNPP.

(2) Promptly issue a Demand for Information to FE, FES, NG, and FENOC regarding
     their reliance on external trust funds from FE and FES to satisfy their
     decommissioning financial obligations.

(3) Promptly issue a Demand for Information to FE, FES, NG, and FENOC regarding
     their continued reliance on Parent Guarantees from FE to satisfy decommissioning
     funding obligations, including the ability of FE to satisfy the Parent Guarantee
     financial test under Appendix A to 10 CFR Part 30.

(4) Promptly issue a Demand for Information to FES, NG, and FENOC to the extent that they are relying on Parent Guarantees from FES to satisfy decommissioning funding obligations, including the ability of FES to satisfy the Parent Guarantee financial test under Appendix A to 10 CFR, Part 30.

(5) Promptly issue a Demand for Information to FE, FES, NG, and FENOC regarding their proposed investment and financial contribution plans to make up the current decommissioning shortfall.

(6) Promptly issue a Demand for Information to FE and FES regarding each of their commitments to guarantee NG and FENOC's decommissioning shortfall in the event of bankruptcy.

**B) Notice of Violation and Penalties**

(1) Promptly issue a Notice of Violation against FE, FES, NG, and FENOC for operating nuclear facilities without sufficient decommissioning funds in violation of 42 U.S.C.A., Section 2201(x)(1), and 10 CFR Section 50.75.

(2) Promptly issue civil penalties against FE, FES, NG, and FENOC for operating nuclear facilities without sufficient decommissioning funds in violation of 42 U.S.C.A., Section 2201(x)(1), and 10 CFR Section 50.75.

(3) Promptly issue an order to suspend NG's and FENOC's licenses for BVPS, DBNPS, and PNPP.

The Environmental Law and Policy Center (ELPC) also urges the NRC to prohibit NG and FENOC from placing their nuclear facilities into SAFSTOR for purely financial reasons. In addition, ELPC requests that this petition be given immediate emergency consideration in light of FE's and FES' rapidly deteriorating financial conditions.

The basis for your request is summarized below:

1. NG and FENOC's decommissioning trust amounts are insufficient on their own to provide reasonable assurance of funding.

2. FE cannot rely on rate increases forced on retail ratepayers to pay for the decommissioning trust fund shortfalls.

3. The costs, including SAFSTOR costs, may still be much higher than expected due to significantly higher shortfalls as reported by the Callan Institute and recognized flaws in the NRC's cost estimate formula.

4. On March 28, 2018, FES and FENOC announced that they would permanently retire all four of their reactors within the next 3 years. If the plants close in 2020 and 2021, the funds cannot grow to levels that will pay for complete decommissioning.

5. Parent companies FE and FES filed for bankruptcy on March 31, 2018.

I would like to express my appreciation for your effort in bringing these matters to the attention of the NRC.

Although the petition does not request specific immediate action(s) or does not contain information that would warrant immediate NRC action, the petition requested "immediate emergency consideration." Based on the information provided, the petition manager informed you by e-mail on May 2, 2018 (ADAMS Accession No. ML18123A299), that the petition review board (PRB) concluded that there is no current public health and safety concern that requires immediate NRC action. The PRB determined that the financial concerns do not raise an imminent safety issue or indicate that the licensee, FENOC, is unable to safely operate the facilities listed in the petition.

You met with the PRB on June 19, 2018, to discuss your petition. The transcript of that meeting is publicly available at ADAMS Accession No. ML18194A395 and is considered a supplement to the petition. The PRB will consider both the petition, and your discussion at the June 19, 2018, meeting, in establishing the schedule for the review of your petition.

On August 2, 2018, the petition manager informed you that the PRB has determined that your petition meets the acceptance criteria for review under 10 CFR 2.206, in accordance with Management Directive (MD) 8.11, and has made an initial recommendation to accept your petition for review under the NRC's 10 CFR 2.206 process. The petition manager also asked whether you desired an opportunity to comment on this recommendation, in person or via teleconference, consistent with MD 8.11. You declined this offer for a second meeting with the PRB.

As provided by 10 CFR Section 2.206, we will take action on your request within a reasonable time. I have assigned Bhalchandra Vaidya to be the petition manager. Mr. Vaidya can be reached by e-mail at Bhalchandra.Vaidya@nrc.gov, or by telephone at 301-415-3308.

I have enclosed a copy of the proposed *Federal Register* notice, a copy of MD 8.11, and the associated brochure NUREG/BR-0200, "Public Petition Process," Revision 5, issued February 2003, by the NRC Office of Public Affairs.

Sincerely,

Ho K. Nieh, Director
Office of Nuclear Reactor Regulation

Enclosures:
1. *Federal Register* Notice
2. MD 8.11
3. NUREG/BR-0200

cc:  Mr. Don Moul
     President and Chief Nuclear Officer
     FirstEnergy Nuclear Operating Company
     341 White Pine Drive
     Akron, OH  44320

     Mr. David B. Hamilton
     Site Vice President
     FirstEnergy Nuclear Operating Company
     Mail Stop A PY A290
     PO. Box 97, 10 Center Road
     Perry, OH  44081 0097

     Mr. Mark B. Bezilla
     Site Vice President
     FirstEnergy Nuclear Operating Company
     Mail Stop A DB 3080
     5501 North State, Route 2
     Oak Harbor, OH  43449 9760

     Mr. Richard D. Bologna
     Site Vice President
     FirstEnergy Nuclear Operating Company
     Beaver Valley Power Station
     Mail Stop A BV SSB
     PO. Box 4, Route 168
     Shippingport, PA  15077

     Listserv