This document was signed electronically on September 18, 2018, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: September 18, 2018



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

<br>

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 18-50757 (Jointly Administered) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | Judge Alan M. Koschik |
| | ) | |

## MEMORANDUM DECISION DENYING DEBTORS' MOTION FOR AUTHORITY TO CONTINUE AND MAKE PAYMENTS DUE AND OWING UNDER THE 2018 FENOC KEY EMPLOYEE RETENTION PLAN, WITH LEAVE TO AMEND

On April 23, 2018, the debtors in these jointly administered chapter 11 cases (the "Debtors") filed a motion (Docket No. 400) (the "Motion") for authority to continue and make payments due and owing under several of the Debtors' employee retention plans. The Motion identified and requested authority to continue making payments under six separate plans. Only the largest and most-recently adopted retention plan, Debtor FirstEnergy Nuclear Operating Company's ("FENOC") 2018 Key Employee Retention Plan ("KERP") (the "2018 FENOC

KERP"), drew opposition. On May 14, 2018, the Court granted the Motion, in part, authorizing the Debtors to continue making payments due to qualifying employees under the other five employee retention plans identified in the Motion.[1] (Docket No. 542.) Consideration of the 2018 FENOC KERP was adjourned for further hearings after an opportunity for further investigation by the Debtors' creditors and other parties-in-interest.

The Court ultimately held an evidentiary hearing on the Motion with respect to the 2018 FENOC KERP and certain objections to that plan on August 10, 13, 14, 17, and 27, 2018. For the reasons set forth in this Memorandum Decision, the Court denies, with leave to amend, the remaining part of the Motion as it relates to the 2018 FENOC KERP. After weighing the evidence and considering the applicable legal standards under 11 U.S.C. §§ 363(b)(1), 503(c)(3), and applicable caselaw interpreting those provisions of the Bankruptcy Code, the Court concludes that the proposed bonus payments under the 2018 FENOC KERP in its present form are not justified by the facts and circumstances of these cases.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1), made applicable to this contested matter via Federal Rules of Bankruptcy Procedure 7052 and 9014.

## JURISDICTION AND VENUE

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of

---

[1] The five other plans include the Manager Retention Agreements, which covers five total employees throughout FENOC, with a retention period ending in January 2020; the Local 29 Retention Plan, which covered seven unionized reactor operators at the Debtors' Beaver Valley Power Station, with a retention period ending in June 2018; the Local 245 Retention Plan, which covered 68 unionized employees at the Debtors' Davis-Besse Nuclear Power Station, with a retention period ending December 31, 2018; and the 2016 FES KERP and 2016 FENOC KERP, which together cover 244 FENOC employees, 29 FES employees, and 13 FG employees, with a retention period ending November 30, 2018.

2

Ohio on April 4, 2012. Venue is proper pursuant to 28 U.S.C. § 1409(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), and (O).

## FACTUAL AND PROCEDURAL HISTORY

On March 31, 2018, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered. The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On April 11, 2018, the United States Trustee for the Northern District of Ohio appointed the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of unsecured creditors in these cases, pursuant to Section 1102 of the Bankruptcy Code.

Non-debtor FirstEnergy Corp. ("FE Corp"), an Ohio corporation, is the ultimate parent company for each of the Debtors, as well as certain of FE Corp's non-debtor affiliates. Debtor FirstEnergy Solutions Corp. ("FES"), an Ohio corporation, is the parent company for multiple other Debtors. These include FirstEnergy Generation, LLC ("FG"), an Ohio limited liability company that owns most or all of the Debtors' fossil-fuel powered electricity generation fleet, and FirstEnergy Nuclear Generation, LLC ("NG"), which owns the Debtors' nuclear powered electricity generation fleet, consisting of four nuclear reactors in three power stations. NG owns (i) the Beaver Valley Power Station ("Beaver Valley") in Shippingport, Pennsylvania, which encompasses two reactors ("Beaver Valley 1" and "Beaver Valley 2"); (ii) the Davis-Besse Nuclear Power Station ("Davis-Besse") in Oak Harbor, Ohio; and (iii) the Perry Nuclear Power Plant ("Perry") in Perry, Ohio.

Debtor FirstEnergy Nuclear Operating Company ("FENOC"), an Ohio corporation, is an affiliate of FES and a direct subsidiary of FE Corp. NG has no employees. The nuclear power plants owned by NG are operated by FENOC, whose employees compose more than two-thirds of the Debtors' combined workforce. As of March 15, 2018, the Debtors had 3,076 employees: 57 employed by FES, 686 employed by FG, and 2,333 employed by FENOC.

The Debtors have only seven employees who they concede meet the statutory definition of "insiders" under 11 U.S.C. § 101(31). None of those insiders participate in any of the Motion's retention plans, including the 2018 FENOC KERP. No party has challenged the Debtors' position that the seven insiders are not participants in any of their retention plans covered by the Motion, including the 2018 FENOC KERP. In addition, all parties appear to be in agreement that no participant in the 2018 FENOC KERP is an insider.

On March 28, 2018, three days prior to the petition date, the board of directors of FENOC and the managing members of NG made the decision to file with the Nuclear Regulatory Commission notice of their intent to deactivate of all of the Debtors' nuclear power plants. The proposed shutdown dates of the various plants are June 1, 2020, for Davis-Besse; June 1, 2021, for Perry and Beaver Valley 1; and October 31, 2021, for Beaver Valley 2. The FENOC board of directors approved the 2018 FENOC KERP contemporaneously with that decision.

The 2018 FENOC KERP was developed over the course of several months prior to the FENOC board's approval. At the time the Debtors began to plan for the potential deactivation of their nuclear plants, they began to consider how to alter or replace the 2016 FENOC KERP because the Debtors had determined that the existing retention plan would be inadequate to ensure the retention of critical employees through the nuclear plants' anticipated shutdown dates.

4

The 2016 FENOC KERP's retention period ends in November 2018, is limited in scope, and, in the Debtors' view, does not cover critical employees who would now be likely to constitute "flight risks" because they are seeking or are likely to seek job security elsewhere in light of the deactivation announcement.

In January 2018, senior management of FENOC formed a working group of experts (the "Working Group") to explore the potential of a new retention plan for FENOC employees. The Working Group consisted of members of FENOC's senior management, certain law firms, a restructuring advisory firm, and human resources management shared with FE Corp via a wholly-owned FE Corp. subsidiary providing shared services, FirstEnergy Service Company ("FESC").

While the Debtors' other, smaller, and already partially-performed retention plans were approved by the Court in May 2018, the 2018 FENOC KERP drew opposition from both the Committee and a group of FENOC's collective bargaining units, the Utility Workers Union of America, Locals 270, 351, and 457, AFL-CIO, and the International Brotherhood of Electrical Workers Locals 29, 245, 272, and 1413, AFL-CIO (collectively, the "Unions"). On May 9, 2018, the Committee filed its reservation of rights with respect to the 2018 FENOC KERP at Docket No. 511. The Committee supported the Debtors' other retention plans, but "with respect to the 2018 FENOC KERP . . . the Committee is not currently satisfied that [the] relief requested comports with the Bankruptcy Code." The Committee stated its intent to negotiate with the Debtors, obtain additional information, and reserved its right to interpose further objections.

The previous day, on May 8, 2018, the Unions filed their first response to the Motion. (Docket No. 481.) The Unions also asserted no objection to the other retention plans, but

reserved their rights with respect to the 2018 FENOC KERP on the grounds that the Unions were still investigating the details of that retention plan.

On June 8, 2018, at Docket No. 707, the Unions filed their substantive objection (the "Unions' Response") to the Debtors' Motion seeking approval of the 2018 FENOC KERP. The Union objected to what it characterized as the unreasonable relationship between the proposed plan and the results that the Debtors sought to achieve with the 2018 FENOC KERP. The Unions objected, in particular, to the proposal to provide substantial retention bonuses to management level employees and other non-union employees only, without providing retention bonuses to any union employees, including a variety of skilled employees they alleged were necessary to operate and maintain the nuclear plants. The Unions cited examples of other utility companies and electricity producers undergoing the shutdown and deactivation of nuclear plants that had maintained their workforce by implementing retention programs applicable to wider cross-sections of their respective employees than would the Debtors' 2018 FENOC KERP. The Unions also objected to the 2018 FENOC KERP on the grounds that it discriminated unfairly against union employees in favor management level employees. The Unions also objected to the cost of the 2018 FENOC KERP, considering that it only provided retention benefits to almost half of FENOC's workforce with average annual retention bonuses per participant allegedly in excess of retention programs implemented by other utilities and electricity generating companies engaged in the deactivation of nuclear plants. The Unions also objected on the grounds that the Debtors' plan was not consistent with applicable industry standards, specifically other nuclear plant deactivation retention plans, and because the Unions were "frozen out of any discussions regarding the design of the [2018 FENOC KERP]." The Unions concluded that the Debtors' proposed retention plan was not the product of sound business judgment.

6

The Debtors and the Committee ultimately resolved the Committee's concerns with respect to the 2018 FENOC KERP, concerns that were not shared on the bankruptcy court docket with a formal objection. On June 29, 2018, the Debtor filed its Notice of Filing of Second Supplement to Motion for Authority to Continue and Make Payments Due and Owing Under the Debtors' Retentions Plans (Docket No. 869), describing the revised 2018 FENOC KERP (the "Revised KERP Notice"), which was the product of the Debtors' negotiations with the Committee, as well as the Office of the United States Trustee.

Several weeks after the Debtors filed their Revised KERP Notice, the Unions filed their Supplemental Objection to the Motion and the revised KERP (Docket No. 944) (the "Supplemental Objection"). The Unions' Supplemental Objection echoed the positions raised in the Unions' original objection. In their Supplemental Objection, the Unions objected more specifically to certain types of union employees being excluded from the 2018 FENOC KERP who the Unions contended were critical to the operation and maintenance of the Debtors' nuclear power plants and their reactors. The Unions also contended that certain management level employees, such as superintendents and supervisors, were not necessary, and that other unspecified and unidentified employees may not be necessary, to the operation and maintenance of the nuclear power plants. Finally, the Unions asserted that the failure to provide retention bonuses to the certain union employees placed the power plants in danger of losing many of their most critical employees.

The parties engaged in discovery during June and July, 2018, while the 2018 FENOC KERP was being renegotiated and revised and the parties refined their objections and responses. On July 27, 2018, the Court entered a scheduling order providing for deadlines to complete all discovery, including specific outstanding depositions, the extent to which the parties would be

7

expected to proffer direct testimony at an evidentiary hearing through declarations, the extent to which direct examination of live witnesses would be permitted, and the availability of all witnesses for cross-examination.

The Court held a multi-day evidentiary hearing on the Motion and in consideration of the Debtors' proposed 2018 FENOC KERP on August 10, 13, 14, and 17, 2018. Closing arguments were presented to the Court on August 27, 2018. This Memorandum Decision follows the Court's consideration of the Motion, the Unions' Objections thereto, the trial testimony, and the exhibits admitted into evidence, after taking the Motion under advisement at the conclusion of the evidentiary hearing.

## SUMMARY OF REVISED FENOC KERP'S TERMS

The following is a brief summary of the Debtors' 2018 FENOC KERP, as amended following consultations with the Committee and the United States Trustee, and filed on the Court's docket at Docket No. 869 on June 29, 2018.

The 2018 FENOC KERP establishes three tiers of bonuses for the plan participants. Tier I covers (i) fleet and site management, and (ii) senior reactor operators and reactor operators, who the Debtors contend "are highly marketable in the industry, take several years to replace, and without an adequate number of such employees, the Debtors' nuclear power plants cannot be operated." (Motion at 15.) Tier II primarily applies to superintendents and supervisors. Tier III applies to non-supervisory "individual contributors who are considered essential by senior management." *Id.*

The eligible participants are set forth in a "Schedule A" referenced but not included in the June 29, 2018 Notice of Revised 2018 FENOC KERP the Debtors' filed with the Court. A redacted form of this schedule was produced in discovery and admitted at trial. The redacted

8

version excludes both the names and base salaries of the eligible participants. It also does not include their job function or category, a criterion that is explained in trial testimony as being the central basis for including or excluding an employee as a participant in the plan. The redacted schedule included the participants' job title, primary location, and bonus tier.

Participants in the 2018 FENOC KERP would receive 15 percent of their respective bonus as soon as practicable after May 1, 2019; 15 percent as soon as practicable after May 1, 2020; and the remaining amount as soon as practicable following their full vesting date, which is generally tied to the planned deactivation date of the participant's plant, the last of which (at Beaver Valley 2) is scheduled for October 31, 2021.

Including all interim and final bonus payments, participants in Tier I are each eligible for bonuses equal to 100 percent of their base salary. Reactor operators and senior reactor operators would receive an additional payment of $50,000, all paid at final vesting. Participants in Tier II are eligible to earn a bonus equal to 80 percent their base salary. Participants in Tier III are eligible to earn a bonus equal to 60 percent of their base salary.

Under the 2018 FENOC KERP, an employee forfeits any remaining KERP bonus for which he or she might otherwise be eligible if, prior to the vesting date, he or she (i) transfers to another position without FENOC permission; (ii) voluntarily resigns or retires; or (iii) is involuntarily terminated by FENOC for cause. Employees will be paid prorated amounts if they leave FENOC due to death or disability. In addition, the 2018 FENOC KERP provides for early termination in the event that the deactivation notices for any of the nuclear power plants are rescinded or fuel is procured to operate such plants beyond their currently-announced shutdown dates. If such an early termination event occurs, affected participants would receive only certain

prorated amounts up through the date of such early termination event, and would not accrue

further entitlement to any retention bonuses thereafter.

The schedule for interim and final bonus payments, as well as the provisions for

participant forfeiture and early termination, reflect input from and negotiations with the

Committee and the United States Trustee.

The Debtors estimate that the 2018 FENOC KERP will cost approximately $99.7 million,

including a discretionary pool of $4.5 million, of which $482,000 had already been utilized prior

to the date of the Motion.

## LEGAL ANALYSIS

**I.      Legal Standard Applicable to Employee Retention Plans Proposed by Chapter 11
Debtors-In-Possession.**

The Debtors and Unions agree that the approval of a chapter 11 debtor-in-possession's

employee retention plan that does not include insiders is governed by 11 U.S.C. §§ 363(b) and

503(c)(3) of the Bankruptcy Code.  (Motion at 16; Unions' Response at 4-5.)  Section 363(b) of

the Bankruptcy Code provides that a trustee, including a debtor-in-possession, "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  A court may authorize non-ordinary-course transactions using

property of the estate pursuant to Section 363(b)(1) "when a sound business purpose dictates

such action."  *Stephens Industries, Inc. v. McClung*, 789 F.2d. 368, 390 (6th Cir. 1986)

(regarding sale of all of a debtor's assets).  The court must "expressly find from the evidence

presented before him at the hearing a good business reason to grant such an application."  *Id.* at

389 (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  "[T]here must be some

articulated business justification, other than appeasement of major creditors, for using, selling or

leasing property out of the ordinary course of business before the bankruptcy judge may order

10

such disposition under section 363(b)." *Id.* (quoting *Lionel Corp.*, 722 F.2d at 1070).  The *Lionel* rule is commonly referred to as the "business judgment" test and is commonly described as "deferential."  *See, e.g., In re Alpha Natural Resources, Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016).  However, as described above, even this ostensibly deferential standard requires findings based on a fair preponderance of evidence actually presented.  The facially lenient requirement of an "articulated business justification," *Lionel Corp.*, 722 F.2d at 1070, for a transaction outside the ordinary course of business is not a license to rely on pretextual justifications that fail to withstand scrutiny.  This is particularly true when the proposed transaction and the motion filed seeking its approval are the subject of a substantive objection.

The Debtors bear the burden of establishing, by a preponderance of the evidence, that the 2018 FENOC KERP should be approved, and that the payments required by the plan should be made, pursuant to 11 U.S.C. §§ 363(b)(1) and 503(c)(3).  *See In re Flour City Bagels, LLC*, 557 B.R. 53, 57 (Bankr. W.D.N.Y. 2016) (citing *Lionel Corp., 722* F.2d at 1071); *In re Residential Capital, LLC,* 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. June 27, 2013).

While all transactions by a bankruptcy debtor outside the ordinary course of business require court approval pursuant to Section 363(b), employee retention plans invoke other statutory provisions as well.  Section 503(c) was added to the Bankruptcy Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act, Pub. L. 109-8, 119 Stat. 23 (2005) ("BAPCPA").  Sections 503(c)(1) and (2) establish very strict and specific tests governing retention and severance payments for "insiders."  As discussed above, the Unions have not contested the Debtors' assertion that no insider would participate in the proposed 2018 FENOC KERP.  Therefore, the only portion of Section 503(c) relevant to FENOC's Motion is Section 503(c)(3), which "governs bonus payments to employees that are outside of the ordinary

11

course." *In re Global Aviation Holdings, Inc.*, 478 B.R. 142, 150 (Bankr. E.D.N.Y 2012). Such payments are permitted only if they are "justified by the facts and circumstances of the case." *Id.;* 11. U.S.C. § 503(c)(3).

Section 363(b)(1) and its long-established business judgment standard predate BAPCPA. Courts are divided about what, if anything, the new language of Section 503(c)(3) added to the standard for evaluating retention programs that did not include the debtor-in-possession's insiders. Most bankruptcy courts that have considered the issue have concluded that it adds nothing to the preexisting business judgment standard, and therefore regardless of Section 503(c)(3), the business judgment standard controls. *See, e.g., Alpha Natural Resources,* 564 B.R. at 356 ("a majority of courts … agree that the 'facts and circumstances' test of § 503(c)(3) is identical to the business judgment test under § 363(b)(1)"); *In re Patriot Coal Corp.*, 492 B.R. 518, 530–31 (Bankr. E.D. Mo. 2013) (non-ordinary course transfers "must be justified by the facts and circumstances of the case, which ordinarily means that the business judgment standard of Section 363(b) applies"); *In re Borders Group., Inc.*, 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011) ("the legal standard under section 363(b) is no different than section 503(c)(3)").

However, other bankruptcy courts have concluded that Section 503(c)(3) requires something above and beyond what was already required by Section 363(b)(1). *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009) ("section 503(c)(3) is intended to give the judge a greater role [than section 363(b)(1)]: even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it"); *In re Global Home Products, LLC*, 369 B.R. 778, 783 (Bankr. D. Del. 2007) (if bonus plans are a KERP, "they are subject to the bright light and

restrictions of § 503(c)," rather than the "more liberal business judgment review under § 363").

The *Pilgrim's Pride* court held:

> … the test of section 503(c)(3) should not be equated to the business judgment rule as applied under section 363(b)(1). First, to do so would mean that section 503(c)(3) is redundant. A transfer made or an obligation incurred outside the ordinary course of a debtor's business would fall within section 363(b)(1) in the absence of section 503(c)(3), and, thus, the latter provision would add nothing to the Code. Congress is presumed to intend that independent sections of the Code will have independent, differing impacts. *See, e.g., BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). To read section 503(c)(3) as requiring nothing not already required by section 363(b)(1) would violate this principle of construction.
>
> Second, the conditioning of approval of covered transfers and obligations upon their being "justified by the facts and circumstances of the case" suggests to the court that Congress intended the court to play a more critical role in assessing transactions, at least those with insiders, that fall within the ambit of section 503(c)(3). In applying the simple business judgment test, courts are adjured to defer to the debtor in possession or trustee; if a valid business reason is shown for a transaction, the transaction is to be presumed appropriate. *See* 7 Collier on Bankruptcy ¶ 1108.06 (15th ed. rev. 2006).

401 B.R. at 236–37.

The general statutory history of BAPCPA reflects Congress' concern that creditor recoveries were being unfairly diluted by debtors' inequitable conduct. *See, e.g., Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 64, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011) ("Congress enacted [BAPCPA] to correct perceived abuses of the bankruptcy system.") (quotation omitted); *Baud v. Carroll*, 634 F.3d 327, 356 (6th Cir. 2011) ("We believe it is now clear that, where each competing interpretation of a Code provision amended by BAPCPA is consistent with the plain language of the statute, we must, as the Supreme Court did in [*Hamilton v. Lanning*, 560 U.S. 505, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010)] and *Ransom*, apply the interpretation that has the best chance of fulfilling BAPCPA's purpose of maximizing creditor recoveries.").

While the Unions argue in their original Response that *Pilgrim's Pride* was correct and a higher standard than the business judgment standard applies, the Unions have chosen to frame

13

the bulk of their argument in this case within the framework of the six factors commonly cited by courts applying the business judgment standard. That standard was articulated in *In re Dana Corp. ("Dana II")*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006), a post-BAPCPA case governed by Section 503(c)(3) as well as Section 363(b)(1) and the pre-BAPCPA cases that interpreted it. Under the *Dana II* standard,

> Courts consider the following in determining if the structure of a compensation proposal and the process for developing the proposal meet the "sound business judgment" test:
>
> – Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?
>
> – Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> – Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> – Is the plan or proposal consistent with industry standards?
>
> – What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> – Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576-77 (emphasis deleted).

These factors are neither exhaustive nor of inherently equal weight. "The *Lionel* court expressly stated that its list of factors was to 'provide guidance' to the bankruptcy judge and prefaced its list by stating that a bankruptcy judge 'might, for example look to such relevant factors.'" *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (D. Del. 1999) (quoting *Lionel*, 722 F.2d at 1071). Neither *Lionel*'s nor *Dana II*'s factors are strictly required by the statute. Indeed, Judge Lifland's opinion in *Dana II* refers to its factors as the ones commonly

used by courts to "in determining if the structure of a compensation proposal and the process for developing the proposal meet the 'sound business judgment' test." *Dana II,* 358 B.R. at 576. *Dana II* concluded that its factors are the appropriate ones to apply *Lionel*'s sound business judgment test to compensation plans, including KERPs. It is reasonable, therefore, to apply these factors as *Lionel* intended with respect to its own factors: as guidance bankruptcy courts may consider, not mandatory elements that must be accorded equal weight in all cases. Since *Dana II* was decided, its factors have been widely invoked by courts analyzing key employee retention plans pursuant to sections 363(b)(1) and 503(c)(3). *E.g., Patriot Coal Corp.*, 492 B.R. 518 (approving both an insider incentive plan and a non-insider retention plan under section 503(c)(3)); *In re Residential Capital, LLC (ResCap II)*, 491 B.R. 73 (Bankr. S.D.N.Y. 2013) (applying *Dana II* factors in approving both a non-insider key employee retention plan ("KERP") and an incentive plan for insiders); *Global Aviation Holdings*, 478 B.R. 142 (approving non-insider KERP); *In re Velo Holdings, Inc.,* 472 B.R. 201 (Bankr. S.D.N.Y. 2012) (applying *Dana II* factors and concluding that debtors exercised sound judgment in their KERP plan); *see also* 4 Collier on Bankruptcy ¶ 503.17[5] (Richard Levin & Henry J. Sommer, eds., 16th ed.).

No circuit court of appeals has opined as to what, if anything, Section 503(c)(3) adds to Section 363(b)(1) with respect to transfers of retention bonuses to non-insiders. In addition, despite finding that Section 503(c)(3) "is intended to give the judge a greater role" than Section 363(b)(1) in considering proposals for transactions subject to Section 503(c)(3), *Pilgrim's Pride* was considerably less specific than the *Dana II* court about what factors it would consider in making that analysis. Indeed, even when the district court in a later case agreed with the analysis in *Pilgrim's Pride*, it instructed the bankruptcy court on remand to "(1) analyze the KERP in

15

terms of the *Dana [II]* factors; and (2) do so with the level of scrutiny described in *Pilgrim's Pride*." *GT Advanced Technologies v. Harrington*, 2015 WL 4459502, at *8 (D.N.H. July 21, 2015).

The Unions do not rest their argument on the extent or nature of the difference between the standards different courts have found in Sections 363(b)(1) and 503(c)(3). As a result, this Motion in this case is a poor vehicle to consider in depth the proper interpretation of Section 503(c)(3) and how it may, or may not, modify Section 363(b)'s business judgment standard as it applies to a non-insider employee retention plan.

Because the parties contesting the Motion have agreed as to the factors relevant in deciding the Motion, the Court will apply the *Dana II* factors to examine whether the 2018 FENOC KERP, in its present form, should be approved.

## II. Court's Findings Based on Assessment of Testimony and Document Evidence Introduced at Trial.

Over the course of three and a half days of trial, the Court received the testimony, by declaration and live examination, from witnesses offered by the Debtors, including Donald R. Schneider, the president and chairman of the board of directors of Debtor FirstEnergy Solutions; Donald A. Moul, the president of Debtor FG and chief nuclear officer of Debtor FENOC; Paul A. Harden, senior vice president and chief operating officer of Debtor FENOC; and Brian L. Cumberland, an expert witness and national managing director of the compensation and benefits practice of Alvarez and Marsal, North America, LLC.

The Unions offered testimony of five witnesses, along with their written declarations, in opposition to the Motion. The Court received the testimony of Glenn Camp, president and assistant business manager of International Brotherhood of Electrical Workers Local Union 29, AFL-CIO, which represents 380 bargaining unit members at Beaver Valley. Mr. Camp had

16

worked at the Beaver Valley Power Station from 1987 through December 1, 2016.  The Unions also called Patrick Shutic, a master nuclear mechanic at the Perry Nuclear Power Plant in Perry, Ohio and an employee of FENOC.  The Unions' third witness was Daniel Kunzman, a FENOC employee serving as a senior nuclear instrument and control ("I&C") technician at the Perry Nuclear Power Plant in Perry, Ohio.  Frank Meznarich, another witness called by the Unions, is the president of the Utility Workers Union of America, Local 270, AFL-CIO, which represents 190 bargaining unit members at the Perry Nuclear Power Plant, pursuant to two separate collective bargaining agreements.  The Unions' final witness was Larry Tscherne, the business manager and financial secretary of International Brotherhood of Electrical Workers Local Union 245, AFL-CIO, which represents 185 employees in the bargaining unit at the Davis-Besse Nuclear Power Station in Oak Harbor, Ohio.  Mr. Tscherne previously worked for Toledo Edison and other predecessor companies of the Debtors from 1978 to 1996.

### A. The 2018 FENOC KERP Is Necessitated by, and Intended to Address, the Debtors' Planned Nuclear Power Plant Shutdowns, Not the Reorganization of the Debtors In Chapter 11.

At the outset, the Court observes, based on not only the testimony of the witnesses, but also the stated purpose of the 2018 FENOC KERP and the arguments of Debtors' counsel in support of the Motion, that the proposed retention plan must be judged by whether it is necessary and effective to ensure that FENOC will be able to maintain and operate NG's nuclear power stations during a multi-year shutdown process.  In designing the KERP, FENOC and its advisors focused on job functions, whether onsite or at headquarters, hands-on or supervisory, with the purpose of maintaining and operating the nuclear power plants safely, but with an eye toward a shutdown within two or three years rather than the long-term operation of the facilities for the remainder of their useful life, or at least until the expiration of their existing licenses issued by the Nuclear Regulatory Commission.

17

It is also clear from the testimony of the Debtors' witnesses that the precipitating event leading to the 2018 FENOC KERP was FENOC's decision to schedule an early shutdown of the nuclear power plants. These decisions were both made on the eve of the bankruptcy filing, but yet there was no testimony to the effect that the necessity for the retention plan had anything directly to do with the chapter 11 bankruptcy filing and the reorganization process.

Moreover, notwithstanding the frequent argument of counsel to the effect that this case represents a unique circumstance of nuclear power plant deactivation combined with a chapter 11 bankruptcy case, there is no evidence that the circumstances of this chapter 11 case further complicated the already difficult circumstances of retaining critical employees created by the shutdown and deactivation announcement, with the exception of the procedural requirement that the KERP obtain bankruptcy court approval. In this sense, the unique intersection of a nuclear plant shutdown and a chapter 11 case is a coincidence, one that required the consideration of the Motion, notice and an opportunity for hearing, and ultimately the jurisdiction of the bankruptcy court to consider whether the 2018 FENOC KERP should be approved, but not a basis for a unique substantive result.

The scope of the Debtors' own 2018 FENOC KERP demonstrates that this is essentially a nuclear plant shutdown retention plan, not a chapter 11 reorganization retention plan. The testimony of FENOC's expert witness, Brian Cumberland, makes clear that while the scope of this retention plan would be considered exceptional compared to most chapter 11 cases, it is an average one measured by the number of employees involved for a nuclear plant shutdown, perhaps even a conservative one. Mr. Cumberland also testified that the 2018 FENOC KERP by some measures was somewhat average with respect to other chapter 11 cases involving an energy industry debtor, comparing these cases to ones in the energy, chemical, and mining

industries with over 100 proposed KERP participants. Nevertheless, the overwhelmingly clear evidence regarding the challenges the Debtors face, whether regulatory, operational, and/or safety, as well as sheer complexity of operating, shutting down, and deactivating three nuclear plants with four reactors, make it clear to the Court that the Motion must be evaluated with respect to the proper exercise of business judgment by a nuclear power plant operator seeking to deactivate its nuclear power plants and the facts and circumstances related thereto, not merely the business judgment of a routine chapter 11 debtor-in-possession seeking to reorganize.

**B.** **The 2018 FENOC KERP Does Not Bear a Reasonable Relationship To the Debtors' Purpose In Proposing a Retention Plan.**

The trial on the Motion focused heavily on the third *Dana II* factor -- whether the plan is fair and reasonable, and in particular, whether it discriminates unfairly among the Debtors' employees. However, in the Court's view, much of the evidence presented had overlapping applicability to both the first and third *Dana II* factors. The Court chooses to begin by examining the first factor: whether "the plan [is] calculated to achieve the desired purpose." *Dana II,* 358 B.R. at 576.

Debtor FENOC proposes a retention plan for its key employees that may incur a cost as high as $99.7 million dollars. In considering whether this retention program, which is clearly outside the ordinary course of business, may be approved under the applicable standards imposed by Sections 363(c)(1) and 503(c)(3) of the Bankruptcy Code, the Court must determine whether the Debtors have shown by a preponderance of evidence that the 2018 FENOC KERP is *necessary* to maintain and operate the three nuclear power plants safely until the target shutdown date, and is *adequate* to reach that goal.

19

**2018 FENOC KERP Excludes Employees the Debtors Concede Are Critical While Being Imprecise About Which Employees Are Included.**

Aside from the necessity and sufficiency of the proposed bonuses, the Court has concerns about the Debtors' qualitative decisions regarding which employees to include in the 2018 FENOC KERP. The fundamental approach of the Debtors in formulating its 2018 FENOC KERP was to focus on necessary job functions and to identify which employees it needed to retain to perform those functions and which ones were less critical over the course of a two- to three-year shutdown horizon. This focus included identifying jobs that were particularly critical for the shutdown process, which jobs were less critical if the nuclear plants were not going to be operated on a long-term basis, and also whether the Debtors were overstaffed or perhaps only barely staffed in any of these job functions. This approach is eminently reasonable and the Court has no qualms with this approach. Debtor FENOC identified in particular reactor operators and senior reactor operators, engineers, technical specialists, decommissioning planners, regulatory compliance planners, and supervisors as the most critical job functions, with supervisors included at least in part to assist with the reassignment of various employees, as needed, when faced with the inevitable attrition that the shutdown horizon would generate. The Court accepts FENOC's judgment that these were the critical job functions for which retention was most important.

The Court is concerned with the apparently discretionary definition of the participants in Tier III and the lack of any meaningful disclosure as who may or may not be included therein. The Unions offered their Exhibit 1 into evidence, which is a spreadsheet obtained from the Debtors by the Unions during discovery that included many pages containing line-by-line records for each of the positions to be included in the 2018 FENOC KERP. This document did not include names of any individuals, ostensibly because of the Debtors' concerns for employee

privacy.  It also did not include reference to any job *function,* which the Debtors emphasize was the basis for formulating the retention plan.  Instead, it included job titles, which are reflective of human resources classifications rather than descriptions of each employees' functional purpose. The latter would have been more informative and tie closer to the strategic theory undergirding the proposed retention plan.  The lack of disclosure of the job functions, and perhaps also the identification of the actual employees, leaves the Court wondering who exactly is included or not included in the plan.  Moreover, it makes it difficult for third parties, such as the Unions, but perhaps also the Committee and other creditors, to receive clear disclosure as to what is proposed so that they can evaluate whether the 2018 FENOC KERP, is in their view, effective and reasonable.

The Court's greatest concern with respect to the efficacy of the 2018 FENOC KERP is its treatment of reactor operators under Tier I.  FENOC goes to great length to describe how critical reactor operators and senior reactor operators are to the safe operation and maintenance of the nuclear power plants for day-to-day operations, as well as the shutdown process.  These are the individuals who are licensed to operate the nuclear reactors.  They are critical for oversight of the reactors and to avoid regulatory violations with respect to their operations.  They are highly trained and marketable.  They are difficult to replace and their replacement is both costly and time consuming.  At this stage of the shutdown horizon for the three nuclear plants, it may be very difficult to train any new reactor operators before such time as the plants are closed and no such operators are necessary.  The Debtors also emphasized that these individuals and job functions are essential to the deactivation process that FENOC contemplates.

Therefore, it is without question that reactor operators and senior reactor operators are, by the Debtors' own admission, the most critical employees to retain and may be one of the most

21

marketable employees who are "flight risks" because they may be hired away by other employers. It is for these reasons that the Debtors would be willing to pay the reactor operators the highest bonuses under the plan, 100 percent of annual salary, plus an additional bonus of $50,000.

However, the 2018 FENOC KERP is glaringly inconsistent in satisfying this stated goal of retaining critical reactor operators. The retention plan excludes reactor operators working at two of the three nuclear power plants, Davis-Besse and Beaver Valley. The only reactor operators included as participants in the KERP are those at the Perry Nuclear Power Plant, the only reactor operators who are not members of the Unions. Nothing in the stated purpose of the 2018 FENOC KERP, or the Debtors' witnesses' original declarations in support of the Motion, provide any basis for the failure to include reactor operators at Davis-Besse and Beaver Valley. The Court's concern is that while Debtor FENOC is willing to spend upwards of $100 million to retain employees, it proposes to exclude a set of employees it has already determined are the most critical to retain.

On rebuttal and on cross-examination, the Debtors' witnesses attempted to explain this exclusion of reactor operators at two of the three plants. Mr. Harden in particular explained that the reactor operators at the Perry plant are also supervisors and provide supervisory functions in addition to serving as reactor operators. However, there is nothing in the Plan or its original stated imperative that explains why a reactor operator who is also a supervisor should be paid in Tier I with an additional bonus, while supervisors that are not reactor operators are relegated to Tier II treatment. Moreover, if it is the status as a reactor operator that justifies the exceptional bonuses offered to them, it is difficult to understand why reactor operators at the two other plants are excluded completely.

The Debtors also argue that that status as a union worker, whose employment is the subject of a collective bargaining agreement, provides sufficient additional benefits to justify the disparate treatment between union and non-union reactor operators under the retention plan. This argument is not persuasive. Status as a bargaining unit member and protected under a collective bargaining agreement may have any number of benefits in the ordinary course of business. However, in this situation, FENOC is planning the shutdown of the nuclear power plants in two or three years. That decision was the original justification for the 2018 FENOC KERP. The Debtors' witnesses concede, as they must, that upon closing of the plants, the union workers will lose their jobs and be laid off. It is inconceivable to the Court that collective bargaining agreement rights, such as access to grievance procedures, vacation pay, or any of a number of other collective bargaining agreement attributes, would be of material value under these circumstances.

The failure to include the reactor operators at Davis-Besse and Beaver Valley from the 2018 FENOC KERP is the clearest example in which the retention plan's purpose is not addressed by the plan's actual terms. The exclusion of the reactor operators from the 2018 FENOC KERP also stands in stark contrast to an earlier and smaller retention plan offer by FENOC in 2016. The Local 29 Retention Plan covered seven reactor operators at Beaver Valley, who were members of Local 29, because they were approaching retirement and FENOC desired to retain them for a sufficient period so that new reactor operators could be trained. This was eminently reasonable. However, the replacement reactor operators, who are only now graduating from their training program to be available to work for FENOC, are being both recruited by other employers in the face of the shutdown announcement and excluded from the

23

2018 FENOC KERP. These circumstances further support a finding that the 2018 FENOC KERP would not meet its own goals.

While the Debtors' witnesses strove valiantly to minimize its importance, the Unions provided testimony to the effect that other employers, such as Shell Oil and Entergy, are actively recruiting many of FENOC's employees. In this environment, the Court is reminded of the Debtors' own observations that many of these employees, in particular, reactor operators, are marketable and hard to replace. This is the stated reason why the Debtors seek to enact a retention plan in the first place and spend as much as $100 million dollars to retain employees for the next few years. The Court finds the Debtors' explanations for the exclusions to be unreasonable *post-hoc* rationalizations used to justify an earlier decision made for other reasons.

The Court is less certain with respect to other job categories or functions such as I&C technicians, chemistry technicians, plant operators, and electricians. FENOC's Paul Harden was clear in his testimony that the Debtor has ample numbers of certain job categories, such as mechanics and project managers. Mr. Harden explained that in light of the shutdown horizon, long-term maintenance will become increasingly unnecessary at the plants and in light of the number of mechanics he has available, it would unnecessary to provide retention bonuses to maintain the current staff. Similarly, with respect to project managers, Mr. Harden testified that the ease of training others to qualify for that job function and perhaps the number of existing project managers in the Debtor's employment makes retention bonuses for those job functions unwise. This decision is reasonable given the testimony before the Court.

However, the Debtors' analysis by job function is somewhat scattershot and not comprehensive, at least as it was presented to the Court. It was anecdotal and given by example rather than as a comprehensive review. The Debtors did not provide evidence of every job

function, the targets established by management, the basis for evaluating them, and the current number of employees qualified for each function. The Court has no dispute with the theory of the Debtors' approach. However, the evidence supporting its implementation is lacking. The fact that there is such a glaring failure to explain the Debtors' decision with respect to the reactor operators gives the Court pause as to Debtors' analysis of all of the job functions (except with respect to specific functions that were clearly delineated for exclusion, such as mechanics and project managers). With clearer disclosure and more comprehensive testimony, the Debtor may be able to show that the current plan, perhaps with some modifications, would constitute the proper exercise of the business judgment. However, the Court must make a decision based on the record before it.

**The Unions' Witnesses Offer Clearer Testimony of the 2018 FENOC KERP's Weaknesses Than Do the Debtors' Witnesses of Its Strengths.**

While it is not their burden to either design or to justify a retention program, the Court is struck by the fact that the Unions frequently offered clearer testimony as to the inadequacies of the 2018 FENOC KERP than the Debtor offered to justify it.

For example, Patrick Shutic testified that the concept of "flight risk" emphasized by the Debtor is most properly determined based on the age and the time until retirement of each employee. That observation is supported by the Debtor's own 2016 KERP with respect to the reactor operators at Beaver Valley. It is also an intuitive argument that older workers who are approaching retirement will patiently wait for several years, whereas younger workers will inevitably realize that they have to find long-term positions and will not wait until the bitter end without obtaining a bonus to justify a delay in moving on.

By contrast, the Debtors' witnesses, based on their "thirty years' experience" in managing their employees, contend that union employees are primarily "locals" and therefore

not inclined to move.  However, this analysis is not supported by any data regarding who was a "local" and who was not.  For example, there is no evidence with respect to who attended high school within a particular radius of each plant by job category or union membership status.  More to the point, while Mr. Harden and other FENOC witnesses stressed that on average union employees have been historically less likely to be a flight risk, they offered no evidence comparing rates of voluntary attrition for union employees to the same statistic for non-union employees while controlling for level of education and job function.  For example, is it really true that a well-trained, marketable reactor operator who is a member of one of the Unions is less of a flight risk than a non-union reactor operator at the Perry Nuclear Power Plant?  There is no reason to assume that that is true and the Debtors offered no credible evidence to establish that conclusion.  Moreover, even to the extent the Court could accept the impressions of a management witness with thirty years' experience supervising employees in the nuclear industry, the fact remains, as conceded by those witnesses, that they do not have any experience with nuclear power plant shutdowns.  The circumstances that FENOC is facing in the next several years are extraordinary and are unlike anything these witnesses have experienced before.  While union workers may very well have been content to stay near home and enjoy their union jobs when the work was steady, one cannot reasonably extrapolate from that observation and conclude that those union employees will be content to remain at a job with a scheduled end date if other opportunities are made available to them.  It is also inconceivable that they will not seek out new employment.

In addition, Daniel Kunzman provided simple and informative testimony with respect to the key participants in any of the plants' emergency response organizations ("ERO").  The parties and their witnesses agreed that EROs were required by applicable regulations to be in

place in the event of any emergency at a nuclear power plant. The Debtors' witnesses had indicated that as many as seventy percent of its employees at all of the plants were participants in such teams. The Debtors relied on this point to emphasize that because so many employees were qualified to participate in the EROs that certain union employees who were members of those teams were not absolutely necessary to make those EROs function and thereby garner a retention bonus.

However, Mr. Kunzman explained that each ERO required at all times at least one I&C technician, two radiation protection technicians onsite, three additional radiation protection technicians on-call with pagers, and one chemical technical onsite. By his testimony, none of these job functions were included in the 2018 FENOC KERP. This testimony was much more persuasive in suggesting the currently proposed retention plan fails to provide key employees necessary for the EROs compared to the much more vague testimony of the Debtors' witnesses.

The Unions' position with respect to the staffing of the EROs may ultimately be shown to be lacking in perspective, information, or even ultimate accuracy. However, based on the record before the Court, Kunzman's testimony was strikingly clearer on this point than that offered by the Debtors' witnesses.

**Basing KERP Bonuses on Job Functions and Actual Need Is Reasonable, But the Debtors' Implementation of That Strategy Is Not Supported By the Record.**

Debtor FENOC assures the Court that it planned the 2018 FENOC KERP focusing on each job category at the nuclear power plants, assessing their criticality for operating the plant for the next two or three years, and staffing adequately for the shutdown process. The Debtors' witnesses, in particular Mr. Harden, stressed that certain job functions would be less important during this time frame than others, that level of criticality may be different than is generally true while the plants are operating on a long-term basis, that some job functions are overstaffed, that

27

attrition is inevitable, and that attrition can be planned for. The Court has no objection to any of these concepts or theories.

However, the Court finds, based on the record presented by the Debtors, that the Debtors did not show that the 2018 FENOC KERP reflected a fair exercise of the Debtors' business judgment "calculated to achieve the desired performance" planned by FENOC and its Working Group, or meet the challenges for preparing nuclear power plants and reactors for shutdown. *Dana II,* 358 B.R. at 576. This is particularly true with respect to its treatment of reactor operators. These circumstances, while unusual and perhaps unique among other chapter 11 bankruptcy reorganization cases, are the "facts and circumstances of [these Debtors'] cases" that must be considered when evaluating whether the Debtors' proposed KERP satisfies the applicable legal standard. Based on the record before the Court, it does not.

### C. The 2018 FENOC KERP, in Its Present Form, Would Discriminate Unfairly Among Its Employees.

The Court also concludes, based on the evidence introduced at trial, that the proposed 2018 FENOC KERP unfairly discriminates among its employees and therefore the scope of the plan is not fair and reasonable. Many of the Court's findings in support of this conclusion are among the findings made in Section II.B., wherein the Court concludes that the details of the 2018 FENOC KERP bear an unreasonable relationship to the Debtors' goal of retaining critical employees necessary to maintain and operate its nuclear power plants until their scheduled shutdown date.

The Debtors' witnesses provide clear testimony that their Working Group concluded that the decision of who to include and who to exclude from the retention plan should focus on job functions, which job functions were critical to the safe maintenance and operation of the power plants during their shutdown horizon, which job functions were sufficiently staffed such that the

28

Debtors could sustain expected attrition, and which job functions required the retention of most of its existing employees in those positions because of limited staffing, their marketability and risk of flight, and the difficulty, expense, and lead time necessary to train new employees. The Debtors' witnesses, both in their declarations and live testimony, emphasized that the highest ranked of such positions were those of senior reactor operators and reactor operators.

Donald Moul testified for FENOC about the high value of reactor operators, both from an operational perspective and to satisfy regulatory requirements. Mr. Moul testified that there was no training difference between union reactor operators and non-union reactor operators. He testified further that Entergy began actively recruiting FENOC employees for one of its power plants located in Louisiana, including reactor operators, immediately after the deactivation announcement was made by the Debtors in late March 2018.

Indeed, the 2018 FENOC KERP by its own terms clearly provides the most favored treatment for senior reactor operators and reactor operators, specifically a bonus equal to 100 hundred percent of the employee's annual salary, *plus an additional $50,000*. No other job function would receive such a generous bonus under the 2018 FENOC KERP. The qualifications for such a bonus, under the terms of the plan, is an employee's status as a reactor operator or senior reactor operator. Nevertheless, the 2018 FENOC KERP would exclude all union-represented reactor operators employed at the Davis-Besse Nuclear Power Station and the Beaver Valley Power Station. Mr. Moul justified this distinction on the grounds that the reactor operators at the Perry facility were also supervisors -- a job function that would entitle an employee to, at most, a Tier II bonus under the plan.

Mr. Moul's testimony, both as to the value of reactor operators and the distinction between those at Perry and those at the other two plants, is also echoed by the testimony of Paul

29

Harden. Mr. Harden testified that not only were reactor operators highly trained, but that they were difficult to replace and replacement took a substantial period of time. He testified that the training horizon for a reactor operator was approximately two years. He confirmed that these employees were essential to the operation of the nuclear power plants and that having an inadequate number of them would violate regulations imposed by the Nuclear Regulatory Commission.

The testimony of the Debtors' witnesses and the evidence supporting the purpose of the 2018 FENOC KERP cannot be reconciled with that plan's disparate treatment of the union and non-union reactor operators. The Court finds reasonable the general observations of Mr. Harden that certain job functions would be less necessary in a shutdown mode and that existing staffing may offer a deeper bench for some job categories than others. The Court also agrees that the Debtors and their management team are entitled to reasonable deference with respect to their decisions about these choices. However, where their analysis and intentions are grossly inconsistent with their actions, the Court is forced to intercede. Discrimination itself is permitted. However, where the discrimination is unfair, the retention plan fails to meet the necessary standard.

Other observations already made by the Court support this conclusion. In the Court's view, based on the record evidence, the Debtors' flight risk analysis is faulty. It appears that the Debtors' management relied on stereotypes based on their perception of union employees in determining that they would not be flight risks, notwithstanding the fact that at least some of those employees filled job functions the same management team had concluded were both critical to the operation and maintenance of the nuclear power plants and highly marketable to other employers. The Debtors' justification for denying retention bonuses to union employees

30

based on their rights under their respective collective bargaining agreements is also weak in light of the looming shutdowns and eventual deactivation of the nuclear power plants where they are employed. Moreover, the Court observes that discretionary aspects of the 2018 FENOC KERP, in particular the vague standard for selecting which employees would be participants of the plan under its Tier III category leaves fertile ground for discriminatory decisions based more on stereotypes and gut impressions rather than actual data or objective standards.

Moreover, the 2018 FENOC KERP is inconsistent with FENOC's implementations of other retention plans such as the Local 245 Retention Plan at Davis-Besse, the Local 29 Retention Plan at Beaver Valley, and the 2016 FENOC KERP. All of these retention plans were included in the Motion and the completion of those programs through to their end dates has already been approved by the Court. Mr. Tscherne testified that the Local 245 Retention Plan at Davis-Besse did not include all workers, only focused on job functions that FENOC had determined to be critical, that those job functions included reactor operators, equipment operators, and I&C technicians and that among those job categories receiving bonuses to ensure their retention were sixty-eight union workers.

As previously discussed in Section II.B., the Local 29 Retention Plan included seven union reactor operators at Beaver Valley. Clearly, in very recent history, the same Debtor sought to retain employees to maintain the operations of the same nuclear power plants and in so doing, not only sought to retain critical job functions as it purports to be doing here, but also included union workers who qualified because of their job categories. Of course, it is possible that circumstances have changed in the intervening months and years and that the shutdown plan may have altered FENOC's calculus in a legitimate way. However, there is a lack of evidence to explain or reconcile the distinctions between these plans on this score.

The Court is struck by the explanations for the exclusion of union reactor operators given by Mr. Harden in rebuttal and on cross-examination after the Unions filed their objections. FENOC now argues that the collective bargaining agreement is a basis to exclude union workers from the 2018 FENOC KERP (even though they were not excluded from the earlier retention plans); that supervisory skills justify inclusion of certain reactor operators at the highest level of bonuses, despite the fact that supervisory skills only qualify an employee for a Tier II treatment under the KERP; and that a few reactor operators with special emergency skills necessary to avoid catastrophic disaster scenarios such as the one that occurred at the nuclear power plant in Fukushima, Japan, justifies inclusion of those reactor operators notwithstanding the exclusion of other reactor operators, despite the fact that the KERP does not provide an additional bonus based on such emergency skills and does provide for a uniformly generous bonus for all reactor operators -- if they are covered by the plan. The Court is forced to conclude that faced with the Unions' objections to the retention plan, the Debtors had no good responses with respect to how they implemented their original job function strategy and were forced to rely upon *post-hoc* rationalizations. The Court finds these to be inadequate.

While focusing on the unfair discrimination present in the 2018 FENOC KERP in its current form, the Court must emphasize that it is also clear that the position of the Unions, if given full rein, go too far. The Unions' witnesses, and to some extent their attorneys in argument in open court, urge the inclusion of all union workers in the retention plan. At least one witness stated his opinion that every employee is important and that all employees should be included in order to ensure better morale at the nuclear power plants.

The Court understands and appreciates these sentiments. However, the Debtors' stated purpose of only providing retention bonuses for critical employees and to be efficient and

minimize the costs to the extent possible is absolutely the correct approach, certainly for a debtor-in-possession in a chapter 11 bankruptcy case, and quite possibly in all situations such as these. While the Court has considered the observations regarding PG&E's retention plan at Diablo Canyon, which the parties seem to agree included all employees, the Court is not suggesting in any way that such a global retention plan here would be logical, necessary, or proper exercise of the Debtors' reasonable business judgment in this case.

The Unions do not have to be given everything that they want in order for the Debtors to propose a retention plan that does not discriminate unfairly. Unfortunately, the 2018 FENOC KERP in its current form does discriminate unfairly and, based on application of the *Dana II* factors, is not the product of reasonable business judgment.

### D.    Consistency with Industry Standards.

The 2018 FENOC KERP includes far more employees and a far larger budget than is typical for key employee retention plans proposed by chapter 11 debtors. This observation was made by the Debtors' expert witness, Brian Cumberland, in his testimony before the Court.

Mr. Cumberland's expert testimony only addressed whether the 2018 FENOC KERP was reasonably in line with industry standards for other retention plans involving nuclear plant shutdowns, energy chapter 11 cases, and chapter 11 reorganization cases generally. He offered no opinion with respect to the identification of critical FENOC employees necessary to maintain and operate the three nuclear plants safely through to shutdown or the percentage bonuses necessary and sufficient to retain critical employees.

Comparing the 2018 FENOC KERP to other retention plans, Mr. Cumberland's testimony suggested that other nuclear plant shutdown retention plans may be more inclusive regarding employees. His testimony and his analysis was based on publicly available information from other nuclear power generating companies and utilities and did not rely on

comprehensive data concerning the number and type of employees participating in those other plans and the circumstances under which those decisions were made. Some of the limited data Mr. Cumberland relied upon in his analysis was obtained by the company officers themselves, including Paul Harden and one of his colleagues. That attempt to gather information was informal in nature, more anecdotal than scientific, and included phone calls to only a handful of electricity generating companies. That effort revealed facts concerning the ongoing retention plan offered by Pacific Gas and Eletric ("PG&E") with respect to its Diablo Canyon Nuclear Power Plant shutdown in California, which included all employees located at that nuclear power plant. Mr. Harden and Mr. Cumberland believed that their other examples of nuclear plant shutdown retention plans did not include such widespread employee participation, but they conceded that they did not have conclusive information regarding the breadth of those other plans.

Mr. Cumberland noted that while the 2018 FENOC KERP would provide bonuses to 44 percent of FENOC's total employees and 71 percent of its non-bargaining (non-union) employees, he observed that other nuclear plant shutdown retention plans "generally involve all employees, including senior management," and that in this sense the 2018 FENOC KERP was "more selective than other nuclear retention programs." (Cumberland Decl. ¶ 12, Ex. B at 14.) On redirect-examination, Mr. Cumberland stressed that the point of his direct testimony was that other non-bankruptcy programs provide bonuses to senior employees, whereas in FENOC's bankruptcy case the vice president rank and above are excluded from the plan. Nevertheless, as previously noted, the evidence shows that PG&E included all employees and the Debtors' experts and other witnesses were uncertain as to whether their other competitors they had contacted offered plans as broad.

34

In addition, the Court observes that Mr. Cumberland's analysis regarding the average payment on the 2018 FENOC KERP in comparison to his market observations both refer to per employee payments. *Id.* However, only 44 percent of the employees at FENOC will be eligible for bonuses and therefore dividing the entire KERP over all employees working for FENOC dilutes the per employee figure, which is, as a mathematical certainty, less than the per participant average. The market observations to which Mr. Cumberland compares those figures offer a range in which the 2018 FENOC KERP figure fits nicely. However, in the case of PG&E, all employees are participants in the retention plan. This suggests that PG&E is able to retain its employees for significantly less per participant than Debtor FENOC proposes here.

While the Court is more persuaded by the comparisons between the 2018 FENOC KERP and retention plans made available by other employers engaged in nuclear power plant shutdown and deactivation, the Court notes that Mr. Cumberland's comparison with other bankruptcy retention plans appears to compare different metrics for FENOC's KERP and Cumberland's other market observations. With respect to retention bonuses only, Cumberland reports that the 2018 FENOC KERP offers an "average retention of $31,000 per employee on an annual basis." Cumberland compares this to a range of $19,800 to $42,900 for the average payout *per participant* ranges" for other comparable bankruptcy retention plans. As previously observed, the 2018 FENOC KERP only includes 44 percent of the FENOC employees. Therefore, the $31,000 per employee figure understates by some amount, perhaps a substantial amount, the average retention payment per participant on an annualized basis. That figure would have been a more appropriate measure to compare to the other market observations.

The Court also observes that Debtors' counsel have frequently argued that the Unions' suggestion to spread out the existing KERP budget of $99.7 million among more employees, or

35

all employees, of the Debtors, would "eviscerate its retentive effect." It is not for the Court to rewrite any retention plan, or impose one on the Debtors. However, the Court is compelled to comment that counsels' statements appear to be hyperbole and at the very least made without supporting evidence. There is no evidence to support the argument that any dilution of the per participant bonus would be so dramatic as to "eviscerate" the retentive effect. The Court accepts that diluting the bonus pool would likely have some effect on the margin with respect to its retentive effect. However, the Court requires better evidence before it could conclude that the marginal effect would be material. Moreover, the evidence regarding industry standards, which is essentially limited to case studies involving a few other nuclear power generators, suggests that a broader employee retention plan with a more diluted bonus pool has been used effectively. Therefore, the Court concludes on the record before it that the 2018 FENOC KERP is not consistent with the relevant industry standards.

### E. Application of Other *Dana II* Factors.

The Court concludes that the first and third *Dana II* factors discussed in Sections II.B. and II.C., *supra*, are the most critical factors relevant to whether the Debtors have established by a fair preponderance of the evidence that the 2018 FENOC KERP reflects a proper exercise of the Debtors' reasonable business judgment. The Court's conclusions concerning the fourth *Dana II* factor, consistency with industry standards, discussed in Section II.D., lead to the same result, albeit based on more limited evidence. The remaining factors are less problematic for the Debtors and are not as heavily disputed by the Unions. To complete the *Dana II* analysis, the Court considers the remaining factors below.

#### 1. Cost.

The cost of a retention plan would ordinarily be a critical issue for a proposed KERP in a chapter 11 reorganization plan. The Court expects that the issue was front and center among the

36

concerns of the Committee and the United States Trustee when they privately reviewed the original 2018 FENOC KERP with the Debtors and their professionals.

However, the revised 2018 FENOC KERP, having been vetted by the Committee and the United States Trustee, a process that resulted in significant changes to the terms of the proposed plan, suggest that those concerns have been resolved. Clearly, those amendments have addressed payment thresholds, the circumstances upon which employees would waive their right to a bonus, and the early termination of the plan in the event a scheduled nuclear plant deactivation is cancelled. These factors may greatly reduce the cost of the 2018 FENOC KERP, especially to the extent circumstances change and the retention plan is no longer needed because the Debtors' cancel their shutdown plans.

The $99.7 million price tag remains a concern for the Court. However, the careful review of the Committee and the United States Trustee, as well as the lack of any objection from the Unions on this point, assures the Court that the cost of the 2018 FENOC KERP has been adequately scrutinized.

Moreover, because this is not an ordinary chapter 11 KERP, but rather one addressing the challenges of nuclear plant shutdowns, which the evidence shows are typically broader and more expensive, the Court is satisfied that the overall cost of the 2018 FENOC KERP is reasonable. Therefore, there is adequate evidence that the proposed 2018 FENOC KERP is not excessively costly and that its cost is not a basis for the denial the Motion.

        2.      <u>Debtors' Due Diligence and Use of Independent Counsel in Preparing Proposed 2018 FENOC KERP.</u>

The evidence introduced by the Debtors established that the efforts of its Working Group, along with its legal and restructuring advisors, as well as its human resources management team provided by non-debtor affiliate FESC, devoted ample time and effort designing the 2018

FENOC KERP. These efforts led to the identification of principles that lay a sound foundation for implementing a KERP that could be approved by the Court. These include the decision to focus on job functions necessary to maintain and operate the nuclear power plants pending their shutdown dates in two or three years. The Working Group also, in principle, focused on evaluating the necessary level of staffing of each of the critical job functions and the rates of attrition in each job function that FENOC could accept during the course of the shutdown process. The Court's conclusion here in denying the Motion with leave to amend is not a rejection of this fundamental work of the Working Group.

The Court concludes that the Debtors satisfied the *Dana II* factors with respect to both due diligence and the use of independent counsel.

### III. The Motion Will Be Denied, But With Leave to Amend.

The Court cannot, either practically or legally, rewrite the 2018 FENOC KERP or write a new replacement KERP for the Debtors. It will also not compel the process by which the Debtors may, if they so choose, revise their proposed retention plan and seek a further hearing on that revision and on the Motion. However, the Court does grant leave to the Debtors to revise the 2018 FENOC KERP, as well as its evidence in support of it. It encourages the Debtors to seek input from the Committee, the Unions, the United States Trustee, and other parties-in-interest, or at the very least provide full disclosure of any revised retention plan to those parties so they may have an opportunity to provide comment, suggestions, or objections.

If the Debtors choose not to revise the retention plan and stand only on its existing Motion with its existing 2018 FENOC KERP in the face of this ruling, that would be the Debtors' decision and the Court would stand by its ruling herein. The Debtors are debtors-in-possession and entitled to operate their business and manage their estates pursuant to 11 U.S.C. §§ 1107 and 1108. A decision not to amend would be the Debtors' decision and theirs alone.

The Court will not immediately enter an order denying the Motion along with this Memorandum Decision. Therefore this Memorandum Decision shall not be considered a judgment or final order pursuant to Rule 54 of the Federal Rules of Civil Procedure as incorporated into this bankruptcy case pursuant to Rules 7054 and 9014(c) of the Federal Rules of Bankruptcy Procedure. Instead, the Court will direct the Clerk to schedule a status conference on the Motion with counsel for the Debtors, the Unions, the Committee, the United States Trustee, and other parties-in-interest who would like to participate as soon as possible consistent with the schedules of relevant counsel as well as the Court. The Court expects this status conference to be held within two weeks of the entry of this Memorandum Decision.

If the Debtors choose to seek an immediate appeal of this Memorandum Decision, whether requested in writing or at the status conference yet to be scheduled, the Court will promptly enter a final order consistent with this Memorandum Decision.

## CONCLUSION

The Debtors bear the burden of proving that the 2018 FENOC KERP is a sound exercise of their business judgment and is justified by the facts and circumstances of the case. Among several criteria that courts review in evaluating whether debtors have made such an evidentiary showing are whether the plan bears a reasonable relationship to its purpose, whether it is fair and reasonable or instead discriminates unfairly, and whether it is consistent with industry standards. The evidence does not show that the Debtors satisfy these criteria in this case, and the Court finds that the Debtors' own caginess in presenting their evidence is a significant reason for that.

The 2018 FENOC KERP excludes employees the Debtors expressly found to be critical, marketable, and difficult to replace. The plan also leaves the Debtor with too much discretion to choose KERP participants without meaningful disclosure of those decisions to the creditors or

39

the Court. Finally the evidence supports a finding that the Debtors' 2018 FENOC KERP relies too often on stereotypes instead of reasonable judgment.

It is undisputed that the proposed KERP discriminates between union and non-union personnel, with more than 70 percent of non-union employees qualified to receive bonus payments equal to at least 60 percent of their annual salary, while no union employees would receive any bonus. The burden is on the Debtors to prove a sound business reason for this discrimination, *i.e.,* that this discrimination was not unfair. They did not do so.

The evidence also suggests that the bonuses the Debtors propose to pay to participants in the 2018 FENOC KERP are higher than those offered to participants in other comparable retention plans in the nuclear industry, in particular, where a nuclear plant shutdown looms. At the same time, the Debtors' proposed retention plan excludes more employees that other electricity producers appear to do in similar situations.

For these reasons, the Court will not approve the 2018 FENOC KERP as being a reasonable exercise of the Debtors' business judgment or justified by the facts and circumstances of their bankruptcy cases. However, the Motion is denied with leave to amend. The Court will not enter an order implementing this Memorandum Decision immediately in order to allow the Debtors a reasonable opportunity to amend the 2018 FENOC KERP and seek approval of that revised retention plan after further hearing on the Motion. If the Debtors prefer to appeal this Memorandum Decision, the Court will enter a final order.

The Clerk will schedule a status conference within the next two weeks after consultation with counsel for all parties-in-interest in this contested matter.

Judgment on the Motion will not be deemed entered until a separate form of judgment has been entered by the Clerk.

# # #