This document was signed electronically on January 15, 2019, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: January 15, 2019



ALAN M. KOSCHIK
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re | ) |
| | ) Case No. 18-50757 (Jointly Administered) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*, | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Judge Alan M. Koschik |
| | ) |

**MEMORANDUM DECISION REGARDING DEBTORS' MOTION
TO ENFORCE THE AUTOMATIC STAY AND FOR CONTEMPT, CONCLUDING
THAT MEADVILLE FORGING COMPANY'S ACTIONS TO TERMINATE ITS
POWER SUPPLY CONTRACT WITH DEBTOR FES WAS UNLAWFUL AND
<u>CONSTITUTED A VIOLATION OF THE AUTOMATIC STAY</u>**

On July 3, 2018, the debtors in these jointly administered chapter 11 cases (the

"Debtors") filed a motion (Docket No. 878) (the "Motion") to enforce the automatic stay against

respondent Meadville Forging Company, L.P. ("Meadville" or "Respondent") and to hold

Meadville in contempt for violating the automatic stay. The Debtors contend that Meadville

violated the automatic stay when it unilaterally terminated its power supply agreement with

FirstEnergy Solutions Corporation ("FES"). Meadville responds that it was free to terminate the contract, notwithstanding the automatic stay, pursuant to 11 U.S.C. § 556 on the grounds that it was a forward contract merchant, that its contract with FES was a forward contract, that the contract contained a so-called "*ipso facto* clause" permitting a nondebtor party to terminate the contract once its counterparty became a bankruptcy debtor, and that the prohibition against enforcing such *ipso facto* clause pursuant to 11 U.S.C. § 365(e) did not apply.

On September 11, 2018, the Court held a final hearing on the Motion. The parties presented, and the Court accepted into evidence, stipulated exhibits. The parties also stipulated to certain undisputed facts. No live testimony or contested evidence was submitted, the parties relying instead of the declarations of their witnesses along with the stipulated facts and exhibits. For the reasons set forth herein, the Court finds that Section 365(e) prohibited Meadville from terminating its contract with FES and further finds that the automatic stay was applicable to Meadville and that Meadville violated the stay. As agreed by the parties at the September 11, 2018 hearing, determination of an appropriate sanction, if any, for the violation will be deferred until a further hearing before the Court.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1), made applicable to this contested matter pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## JURISDICTION AND VENUE

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. Venue is proper pursuant to 28 U.S.C. § 1409(a). This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) in which the Court is authorized to enter final judgment.

## PROCEDURAL HISTORY

On July 3, 2018, the Debtors filed the Motion.  (Docket No. 878.)  They also filed the Declaration of Thomas R. Schmuhl, FES's Director of Large Commercial and Industrial Sales, in support of the Motion (Docket No. 879) (the "Schmuhl Declaration").

On July 5, 2018, Meadville filed its response to the Motion (Docket No. 891) (the "Response").  That same day, the Court held an emergency hearing on the Motion (the "Preliminary Hearing").  At the conclusion of the Preliminary Hearing, the Court announced a ruling in open court granting the Motion on a limited basis and prohibiting Meadville from taking any further actions, or causing or permitting actions by third parties that could be reasonably prevented, that would implement Meadville's stated intent to terminate its power supply agreement with FES and replace it with a contract with another supplier.  The Court memorialized its ruling in an order entered July 10, 2018 (Docket No. 912) (the "Preliminary Order").

On July 13, 2018, the Court entered a scheduling order setting forth a schedule for the litigation of the Motion to a final order (Docket No. 960).  Later, at the request of the parties, the scheduling order was amended on August 3, 2018 (Docket No. 1096).  The amended scheduling order afforded both parties the opportunity to submit more robust briefing than was possible in the compressed, emergency timeline between the filing of the Motion and the Preliminary Hearing.

On September 4, 2018, Meadville filed its supplemental response to the Motion (Docket No. 1271) (the "Supplemental Response").  In support of its Supplemental Response, Meadville

3

also submitted the declarations of James J. Toy (Docket No. 1271-2) (the "Toy Declaration"), who formerly held positions at Meadville as Director of Purchasing & Materials and, later, Vice President of Operations, spanning 2006 to 2016. Meadville also submitted the declaration of Robert A. Lack (Docket No. 1271-5) (the "Lack Declaration"), who currently serves as Vice President and Chief Financial Officer of Meadville.

On September 10, 2018, the Debtors filed their reply brief in support of the Motion (Docket No. 1316) (the "Reply"). The Debtors also submitted with their reply a supplemental declaration of Mr. Schmuhl (the "Supplemental Schmuhl Declaration") (Docket No. 1317). The Schmuhl Declaration, Supplemental Schmuhl Declaration, Toy Declaration, and Lack Declaration, shall be referred to herein collectively as the "Declarations."

The Court held a final hearing on the Motion on September 11, 2018 (the "Hearing"). No party elected to cross-examine any of the declarants whose testimony was introduced by the other party. No party objected to the admission of any deposition designations or exhibits offered into evidence by the other, including the exhibits submitted with each of the Declarations and additional exhibits introduced at the Hearing.[1] While serving as an evidentiary hearing, the Hearing took the form of an oral argument on the Motion.

This Memorandum Decision follows the Court's consideration of the Motion, all of the parties' briefing thereon, the Declarations, the exhibits admitted into evidence, and the arguments of counsel after taking the Motion under advisement at the conclusion of the Hearing.

## FINDINGS OF FACT

The findings of fact herein are based on (i) the Court's docket, (ii) the joint stipulations of the parties (Docket No. 1271 Ex. 1) (the "Stipulations"), (iii) the testimony contained in the

---

[1] The parties acknowledged that there was some overlap between the exhibits to the Declarations and the exhibits submitted at the Hearing.

4

Declarations; and (iv) the exhibits admitted into evidence at the Hearing, which include, *inter alia*, all exhibits to each of the Declarations.

On March 31, 2018, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors' cases were consolidated for procedural purposes only and are being jointly administered. The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. As part of its business, Debtor FES engages in the purchase and sale of electricity in the retail market for profit.

Among other things, FES enters into electricity supply agreements with large commercial and industrial ("LCI") customers. As of July 3, 2018, the date of the Schmuhl Declaration, FES had 938 large- and medium-sized commercial and industrial customers in its retail book of business, which has been marketed for sale and is the subject of a sale agreement not yet approved by the Court.[2] FES is concerned that if Meadville and other retail customers are permitted to unilaterally terminate their contracts with the Debtors while their chapter 11 cases are pending, the value of the sale of those retail contracts would be impaired, perhaps significantly. FES's projected future revenue from its contract with Meadville is over $7.2 million.

Meadville is a forging business located in Meadville, Pennsylvania, that manufactures forged metal parts for the automotive industry. The commercial relationship between FES and Meadville dates back to at least 2010. In July of 2010, FES and Meadville entered into a

---

[2] The sale agreement regarding FES's retail book, including FES's contracts with LCI customers as well as residential, government aggregation, and other customers, is the subject of both a sale motion (Docket No. 908), whose final hearing has been adjourned numerous times, and an adversary proceeding, AP No. 18-05081, wherein the stalking horse bidder, Exelon Generating Company, LLC, seeks to enforce the sale agreement. Both the sale motion and the Exelon adversary proceeding remain pending as of the date of this Memorandum Decision.

5

"Customer Supply Agreement" (Schmuhl Declaration Ex. 1) (the "CSA") for the supply of electricity to two of Meadville's locations, or "service addresses." (Stipulations ¶ 4.) Meadville requires certain commodities in the conduct of its business including electricity, natural gas, and certain industrial metals, including steel.

Meadville enters into forward contracts for the purchase of commodities needed in the operation of its business, and a schedule of such contracts was admitted into evidence. The schedule contains thirty-six such contracts, but only three of them (other than the CSA with FES) concern electricity. One of those, a purchase agreement with Source Power & Gas, LLC, is not scheduled to start until 2020. A second contract's start date was July 1, 2018, suggesting it was intended as a replacement for the electricity purchased pursuant to the CSA.

Meadville's third non-FES electricity contract is not an agreement for the purchase or sale of power at all, or even to hedge against a commodity price risk. It is an Energy Management Agreement, dated March 28, 2014, between Meadville and EnerNOC, Inc. Pursuant to that agreement, Meadville agrees to curtail its energy use during specified periods identified by PJM[3] when there is high demand for electricity. EnerNOC acts as a "Curtailment Service Provider" for PJM, and in that role, compensates Meadville both for holding itself open to respond to such demands from PJM, and for actually curtailing its energy use when called upon to do so. As of the September 11, 2018 hearing, PJM had never called upon Meadville to curtail its electricity usage pursuant to the EnerNOC agreement. In such a hypothetical event, Meadville would not sell any electricity to EnerNOC or any other party; rather, it would simply

---

[3] PJM Interconnection is a regional transmission organization. It coordinates the movement of wholesale electricity in all or parts of 13 states and the District of Columbia, including Pennsylvania. It is one of the primary channels into and through which FES sells power, including to Meadville.

purchase and consume less electricity than usual, allowing that electricity to be available to other purchasers and consumers instead.

The parties specifically stipulated that electricity is a "commodity" and the CSA is a "forward contract," as each of those terms are defined in the Bankruptcy Code. (Stipulations ¶ 5.) While these are at least in part conclusions of law, the Court accepts the parties' joint characterization of both electricity and the CSA as being obviously correct.

Meadville is the end user of all electricity it purchases from FES pursuant to the CSA. It does not trade or re-sell electricity. Indeed, Meadville is incapable of doing so. Meadville can only purchase electricity from FES by drawing it and consuming it. The CSA is a requirements contract.

Paragraph 24 of the CSA provides that a party shall be in default in the event of, among other things, "either party or its guarantors voluntarily or involuntarily filing for bankruptcy, becoming bankrupt or being forced into bankruptcy." The CSA further states that "[i]n the event of default by one Party, the other Party may in its sole discretion terminate this Agreement upon written notice to the defaulting Party as soon as such termination is permitted consistent with state and Electric Utility rules, orders, and tariffs."

Paragraph 41 of the CSA states:

> The parties acknowledge and agree that the transaction contemplated under this Agreement constitutes a "forward contract" with the meaning of the United States Bankruptcy Code, and the Parties further acknowledge and agree that each Party is a "forward contract merchant" within the meaning of the … Bankruptcy Code."

In September 2014, the CSA was amended via a "Fixed Price Pricing Attachment," which added a third service address and changed the price Meadville paid for electricity. (Stipulations ¶ 9; Schmuhl Declaration Ex. 2.)

In early 2016, FES notified Meadville that certain new pass-through costs to be imposed on FES and other power generators would be passed onto Meadville pursuant to the terms of the CSA. As a result, in February 2016, FES and Meadville agreed to a "blend and extend" agreement, whereby such pass-through costs were "blended" with lower energy prices over an extended contract term. Specifically, the term of the CSA was extended from January 2018 to December 2020. This agreement is memorialized in the Fixed Price Blend and Extend Amendment No. 2 to Customer Supply Agreement. (Stipulations ¶ 11; Schmuhl Declaration Ex. 3.)

On April 10, 2018, following the filing of the Debtors' bankruptcy petitions, Meadville notified FES on a telephone call that Meadville was considering terminating the CSA because electricity could be purchased more cheaply and because Meadville believed the terms of the CSA permitted Meadville to terminate it because of the bankruptcy filing.

On April 11, 2018, FES sent a letter to Meadville offering to renegotiate the price of the CSA, but arguing that any attempt by Meadville to terminate the agreement unilaterally would be unlawful (Stipulations ¶ 14; Schmuhl Declaration Ex. 4) (the "April 11 Letter").

On April 17, 2018, Meadville sent a letter to FES stating that Meadville was terminating the CSA (Stipulations ¶ 15; Motion Ex. B) (the "Termination Letter").

On April 27, 2018, the Debtors' counsel sent a letter to Meadville's counsel, stating that Meadville's attempt to terminate the CSA was a violation of the automatic stay and void (Stipulations ¶ 16; Motion Ex. C) (the "Stay Notice Letter").

On May 1, 2018, Meadville's counsel responded to the Stay Notice Letter and argued to the Debtors' counsel that Meadville was exercising its rights under the CSA as authorized by the Bankruptcy Code and the specific provisions of the contract, quoted above, in which the parties

acknowledge each other to be forward contract merchants (Motion Ex. D; *see also* Stipulations ¶ 17) (the "Stay Notice Response Letter"). In the Stay Notice Response Letter, Meadville's counsel therefore argued that the automatic stay did not apply to Meadville's termination of the CSA.

The electricity market in Pennsylvania is structured so that Meadville has the ability to unilaterally cease receiving electricity from FES. Once Meadville entered into an alternative agreement with another electricity provider, the new provider informed the relevant distribution company (an entity known as Penelec) that the switch had been made. On June 28, 2018, FES received notice from Penelec that Meadville had switched providers at one of Meadville's three service addresses (Stipulations ¶ 19; Schmuhl Declaration Ex. 5) (the "Drop Notice"). On June 29, 2018, Meadville ceased purchasing electricity from FES at the service address in the Drop Notice. At the July 5, 2018 Preliminary Hearing, it was believed by counsel that Meadville's other two service addresses had not yet switched their electricity supplier. It was understood, as a result of the Court's preliminary ruling at the Preliminary Hearing, memorialized by the Court's July 10, 2018 Preliminary Order, that Meadville was directed to take every reasonable effort to prevent switching the electricity provider at its two remaining service addresses from FES to Meadville's replacement electric power supplier.

## LEGAL ANALYSIS

I. **Unless an Exception Applies, the Bankruptcy Code's Automatic Stay and Provisions Governing Executory Contracts Prohibit Meadville from Enforcing the CSA's *Ipso Facto* Clause.**

Upon the filing of the Debtors' bankruptcy petitions, the Debtors' estates succeeded to the rights the Debtors had prepetition in their executory contracts and unexpired leases, and unless an exception applies, the automatic stay prohibits any acts to terminate or modify the

9

estates' interests in those contractual rights. *Computer Communications Corp. v. Codex Corp. (In re Computer Communications, Inc.)*, 824 F.2d 725, 731 (9th Cir. 1987) (nondebtor counterparty violated the automatic stay by unilaterally terminating an executory contract); *In re Board of Directors of Compañía General de Combustibles S.A.*, 269 B.R. 104, 113 (Bankr. S.D.N.Y. 2001) ("Under the Bankruptcy Code … a debtor has until confirmation of a plan … to either assume or reject an executory contract. …. During such time a creditor is ordinarily barred by the automatic stay from terminating the contract.") (citations omitted); *In re Elder-Beerman Stores Corp.*, 195 B.R. 1019, 1024 (Bankr. S.D. Ohio 1996) ("Thus while parties may otherwise be permitted to terminate an agreement under state contract law, in bankruptcy such a termination would be in violation of the stay, and the parties must seek permission of the court to act."); *In re Redpath Computer Services., Inc.*, 181 B.R. 975, 978 (Bankr. D. Ariz. 1995) ("An executory contract that is property of the estate can only be terminated after a grant of relief from stay."); *In re Tudor Motor Lodge Associates, Limited Partnership*, 102 B.R. 936, 951 (Bankr. D.N.J. 1989) (postpetition efforts to terminate executory franchise or license agreement that had not been properly terminated prepetition were subject to the automatic stay); *see also* 3 Collier on Bankruptcy ¶ 362.03[5][a], p. 362-32 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("As property of the estate, the debtor's interests in [executory] contracts or leases are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of section 362(a)(3).")

Furthermore, while the automatic stay alone does not modify the express terms of executory contracts themselves and therefore does not prohibit their expiration by their stated terms, the Bankruptcy Code separately prohibits the termination or modification of any executory contract or unexpired lease based on any provision therein that is conditioned on (a)

10

the insolvency or financial condition of the debtor at any time before the closing of the case, (b) the commencement of any bankruptcy case, or (c) the appointment or taking possession by a trustee in a bankruptcy case or a custodian prepetition. 11 U.S.C. § 365(e). Paragraph 24 of the CSA is just such an "*ipso facto*" clause.

Meadville does not contest these basic rules. Meadville instead argues that one of the express exceptions in the Bankruptcy Code *does* apply, which would allow both the activation of the *ipso facto* clause of paragraph 24 of the CSA and the termination of the CSA pursuant to that clause notwithstanding the automatic stay.

## II. The Exception to the Automatic Stay Established by Bankruptcy Code Section 556 Does Not Apply to Meadville Because it is Not a Forward Contract Merchant.

Meadville argues, based on both the stipulation of the parties in the CSA and the nature of their businesses and transactions, that Meadville is a "forward contract merchant" and the CSA is a "forward contract." Meadville contends that under those circumstances it is allowed an express exception from the automatic stay allowing it to liquidate, terminate, or accelerate commodity contracts and forward contracts:

> The contractual right of a commodity broker, financial participant, or forward contract merchant to cause the liquidation, termination, or acceleration of a commodity contract, as defined in section 761 of this title, or forward contract because of a condition of the kind specified in section 365(e)(1) of this title, and the right to a variation or maintenance margin payment received from a trustee with respect to open commodity contracts or forward contracts, shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title.

11 U.S.C. § 556. "Forward contract merchant" is a defined term in the Bankruptcy Code:

> The term "forward contract merchant" means a Federal reserve bank, or an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade.

18-50757-amk    Doc 1962    FILED 01/15/19    ENTERED 01/15/19 10:00:13    Page 11 of 23

11 U.S.C. § 101(26). This provision "sets forth two elements that a party must meet to be a forward contract merchant: 1) its business must consist in whole or in part of entering into forward contracts as or with merchants; and 2) the contract must involve a commodity or similar good, article, service, right, or interest." *DeGirolamo v. McIntosh Oil Co. (In re Laurel Valley Oil Co.)*, 2013 WL 832407, *4 (Bankr. N.D. Ohio Mar. 5, 2013) (Kendig, J.).

Based on the Court's findings of fact as set forth above, the Court concludes that Meadville does not meet the legal definition of a forward contract merchant, and therefore is unable to rely on that status to invoke the safe harbor provided by Section 556.

### A.    The Text of the Contract is Not Dispositive.

As a threshold matter, the Court must grapple with the fact that the plain text of the CSA states that both parties *are* forward contract merchants as that term is used by the Bankruptcy Code. Meadville argues that affording Meadville status as a forward contract merchant was part of the bargain that FES made, and that therefore ignoring paragraph 41 of the CSA would essentially rewrite the contract to excuse FES from a consequence of a bad bargain.

However, the parties cannot directly agree to confer legal status as forward contract merchant on Meadville, and bind this Court to that conclusion, any more than they could have backed into that status by mutually signing an agreement stipulating that Meadville is a Federal Reserve Bank. When noting the limits of litigation stipulations, which have been described as "the analogue of terms binding parties to a contract," *TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995), courts have consistently held that "parties may not stipulate to the legal conclusions to be reached by the court." *Saviano v. C.I.R.*, 765 F.2d 643, 645 (7th Cir. 1985); *accord DelBonis* at 928; *see also Swift v. Hocking River Ry. Co.*, 243 U.S. 281, 289-90 (1917) ("If [a] stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on

12

a subsidiary question of law."). Put another way, allowing parties to agree or stipulate to forward contract merchant status would allow for the possibility that this Court should accord such treatment to an entity that is *not* a Federal Reserve Bank and is *not* engaged in business which consists in whole or in part of entering into forward contracts as or with merchants in a commodity, notwithstanding Congress' clear direction that only such entities should qualify for that status. It is not a subject of private negotiation.

Thus, for example, in *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), the court held that a governmental entity was not a forward contract merchant despite a prepetition agreement stating that the governmental entity in question was a forward contract merchant, because governmental units were not included within the legal definition of "persons" who could, in turn, qualify as forward contract merchants within that statutory definition. *Id.* at 326-27.[4]

The Court in *In re Clear Peak Energy, Inc.*, 488 B.R. 647 (Bankr. D. Ariz. 2013), may have reached a contrary conclusion with respect to whether a contractual provision can create forward contract merchant status. *See id.* at 661 (emphasizing that despite not drafting the contractual provision at issue acknowledging both parties to the contract to be forward contract merchants, the Debtor signed and did not ask for it to be stricken or reworded). To the extent the *Clear Peak Energy* court intended to suggest that a standalone contractual provision would be sufficient to confer such status regardless of whether the party in question would otherwise satisfy the definition in Section 101(26), this Court disagrees. However, *Clear Peak Energy* also

---

[4] The definition of forward contract merchant in 11 U.S.C. § 101(26) was later amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. 109-8, 119 Stat. 23. Following the effective date of BAPCPA, the definition of "forward contract merchant" was expanded so that "entit[ies]," not merely "person[s]," qualified. Federal Reserve Banks were also included within the definition of forward contract merchant at that time.

found that (a) the debtor met the definition of a forward contract merchant based on the nature of the contracts at issue, and (b) the debtor's status was irrelevant because the nondebtor counterparty was a forward contract merchant and "Section 101(26) only requires that one party to the contract be so designated."[5]  *Id.* at 661 (citing *BCP Liquidating LLC v. Bridgeline Gas Marketing., LLC (In re Borden Chemicals and Plastics Operating Limited Partnership)*, 336 B.R. 214, 225 (Bankr. D. Del. 2006)).  Therefore, *Clear Peak Energy's* reading of the law

---

[5]  As an aside, it is necessary to take a moment to distinguish between two separate Bankruptcy Code safe harbor defenses that turn on whether or not a party is a forward contract merchant and whether only one party to a transaction, both parties to the transaction, or only one specific party to the transaction must be a forward contract merchant.  The set of cases cited herein and in the parties' briefs regarding the definition of forward contract merchant include various opinions wrestling with either one defense or the other.  Because it includes cases involving different statutes and safe harbor defenses, the analysis is susceptible to confusion.  In some cases, opinions may internally confuse these two defenses.

In the case before the Court, as previously explained in this Memorandum Decision, the question is whether the automatic stay was violated when the nondebtor party to a contract terminated it pursuant to *ipso faco* clause and whether such a termination was prohibited by 11 U.S.C. § 365(e).  The possible safe harbor defense that might allow this action notwithstanding Sections 362(a)(3) and 365(e) is 11 U.S.C. § 556.  Section 556 permits a nondebtor who is a forward contract merchant to terminate a contract with a debtor pursuant to an *ipso facto* clause and exempts such action from the stay.  Only one party must be a forward contract merchant and that party must be the nondebtor party.  This is so because the statute provides that "[t]he contractual right of a . . . forward contract merchant to cause the . . . termination . . . of a forward contract because of [an *ipso facto* clause in the contract] . . . shall not be stayed."  11 U.S.C. § 556.  Among the cases cited herein that concern the Section 556 safe harbor are *Clear Peak Energy,* 488 B.R. 647 (Bankr. D. Ariz. 2013), and *Mirant*, represented by two opinions, 303 B.R. 319 (Bankr. N.D. Tex. 2003), and 310 B.R. 548 (Bankr. N.D. Tex. 2004).

An entirely separate safe harbor defense is found in 11 U.S.C. § 546(e).  That defense is an exception to the avoidance of certain transfers, such as fraudulent transfers or preferences, pursuant to 11 U.S.C. §§ 544, 545, 547, 548(a)(1)(B), and 548(b).  This defense precludes avoidance of any margin or settlement payment "by or to" a forward contract merchant.  11 U.S.C. § 546(e).  Pursuant to this defense, *either* party may be a forward contract merchant for the defense to apply.  It could be either the debtor who made the transfer or the nondebtor transferee.  The cases cited herein regarding the definition of forward contract merchant that concern the Section 546(e) defense include, *Laurel Valley Oil Co.,* 2013 WL 832407 (Bankr. N.D. Ohio, Mar. 5, 2013) and *Borden Chemicals,* 336 B.R. 214 (Bankr. D. Del. 2006).

*Clear Peak Energy* confuses these separate defenses and their respective lines of cases.  *Clear Peak Energy* incorrectly relied on the "either party" formulation of the Section 546(e) defense to an avoidance action.  *Clear Peak Energy* concerned, as this case does, Section 556's defense to a nondebtor party's termination of a contract with the debtor.  Under Section 556, the nondebtor party must be a forward contract merchant.  *Clear Peak Energy* relied upon *Borden*, which did concern the Section 546(e) defense to an avoidance action.  488 B.R. at 661.  In so doing, *Clear Peak Energy* overlooked the plain language of Section 556.  Nevertheless, it correctly concluded separately that the nondebtor party was a forward contract merchant and that the debtor's status was irrelevant.

While all of these opinions offer relevant analysis of who is or is not a forward contract merchant, the present case concerns the Section 556 defense.  It is Meadville, the non-party debtor, who must be a forward contract merchant for the defense to apply.  FES's status as forward contract merchant is irrelevant.

14

regarding whether forward contract merchant status is eligible for stand-alone negotiation between two private parties was not determinative of its ultimate decision in that case.

Paragraph 41 of the CSA also cannot be saved by offering a more limited interpretation in which it is simply a bilateral waiver of FES's right to argue, as it has, that Meadville does not meet the statutory definition of a forward contract merchant. While a prepetition debtor has the power to enter into a contract binding upon the debtor under nonbankruptcy law, a "pre-bankruptcy debtor simply does not have the capacity to waive rights bestowed by the Bankruptcy Code upon a debtor in possession, particularly where those rights are as fundamental as the automatic stay." *In re Pease*, 195 B.R. 431, 433 (Bankr. D. Neb. 1996) (regarding prepetition waiver of automatic stay); *accord In re Trans World Airlines*, 261 B.R. 103, 114-15 (Bankr. D. Del. 2001). "The Bankruptcy Code pre-empts the private right to contract around its essential provisions." *Pease* at 435. Given that forward contract merchant status gives an entity access to certain immunities to claims and rights of trustees and debtors-in-possession under the Bankruptcy Code, including Section 556's exception to the operation of the automatic stay at issue here, prepetition attempts to contract into such a status must be similarly disfavored. Therefore, in paragraph 41 of the CSA, FES and Meadville attempted to grant each other something that was not theirs to grant. That paragraph of the CSA is therefore unenforceable.

**B.** **Meadville Is Not a Forward Contract Merchant Because It Is Not in the Business of Entering into Forward Contracts for Profit.**

Because the prepetition contract itself cannot excuse Meadville from its obligation to meet the statutory definition of a forward contract merchant on its own merit, if Meadville intends to take advantage of Section 556's statutory safe harbor allowing a nondebtor to terminate a forward contract with a bankruptcy debtor on the grounds of an *ipso facto* clause alone, the Court must determine whether the evidence establishes that Meadville is a forward

15

contract merchant. It does not. In fact, it shows the contrary. In the language of the statute, the "business" of Meadville does not consist, even in part, of entering into forward contracts as or with merchants in electricity.

The bankruptcy court in *Laurel Valley Oil* recognized a split in authority regarding the breadth of the definition of "forward contract merchant," and subsequent developments in the caselaw since that decision in 2013 do not appear to have narrowed that split:

> While few courts have analyzed the definition of forward contract merchant, those that have reached opposing conclusions of the breadth of the definition. To find a narrow definition, one court focused on the words "business" and "merchant." *Mirant Americas Energy Marketing, L.P. v. Kern Oil & Refining Co. (In re Mirant Corp.),* 310 B.R. 548, 567 (Bankr. N.D.Tex. 2004). The *Mirant* court defined a "merchant" as "one that is not acting as either an end-user or a producer ... [r]ather ... is one that buys, sells or trades in a market." 310 B.R. at 567 (citing Black's Law Dictionary 1001 (7th ed.1999)). The *Mirant* court defined "business" as "something one engages in to generate a profit." 310 B.R. at 568. To reach these conclusions, the court emphasized that the term forward contract merchant should not mean that every party to a contract for goods or services falls within the definition. *Id.* Rather, the court concludes that "a forward contract merchant is a person that, in order to profit, engages in the forward contract trade as a merchant or with merchants." *Id.; accord Superior Livestock Auction, Inc. v. E. Livestock co., LLC (In re E. Livestock Co., LLC),* Case No. 10–93905–BHL–11, Adv. No. 11–59088, 2012 Bankr.LEXIS 1469, at 17–19 (Bankr.S.D.Ind. Apr. 5, 2012); *Magnesium Corp. of Am.* 460 B.R. at 376.
>
> At the opposite end of the spectrum, another court discussed that the inclusion of the phrase "in whole or in part" in the definition has the effect of including "essentially any person that is in need of protection with, respect to a forward contract in a business setting should be covered, except in the unusual instance of a forward contract between two nonmerchants who do not enter into forward contracts with merchants." *BCP Liquidating LLC v. Bridgeline Gas Marketing, LLC (In re Borden Chemicals and Plastics Operating L.P.),* 336 B.R. 214, 225 (Bankr.D.Del.2006) (quoting 5 Collier on Bankruptcy § 556.03[2] at 556–6 (15th ed. Rev.2001)). This definition provides a much broader scope than the definition set forth in *Mirant.*

*Laurel Valley Oil* at *4. The Debtors urge this Court to adopt the narrow *Mirant* definition and conclude that a "merchant" must refer to an entity that is not acting as either an end user or a producer, but rather buys, sells, or trades in a market. (Motion at 11.) The Debtors also urge this

Court to adopt the *Mirant* definition of "business" and conclude that a business is something one engages in to generate a profit.  (Reply at 12.)  Meadville, by contrast, urges this Court to adopt the broader definition of forward contract merchant in the *Borden* decision, focusing on the phrases "in whole or in part" and "as or with merchants" contained in the statutory definition. Meadville also emphasizes that "Section 101(26) only requires that one party to the contract be a forward contract merchant,"[6] (Response at 5), and that the statute provides that "forward contracts can be entered into '*with* merchants' and not just '*as* merchants'" (Supplemental Response at 6).

Meadville is correct that Section 101(26) establishes that a forward contract merchant can be one who enters into forward contracts *with* a merchant and not merely *as* a merchant. However, in both cases, the statute requires that a forward contract merchant be an entity "the business of which consists in whole or in part of entering into forward contracts."  The statute's "[u]se of the terms 'business' and 'merchant' is significant. Without references to 'business' and 'merchant,' the definition of 'forward contract merchant' could as easily have been 'a person that enters into forward contracts.'"  *Mirant,* 310 B.R. 548, 567 (Bankr. N.D. Tex. 2004).  Congress did not intend for Section 556 to "lead to virtually every person that is party to a contract for goods or services … being permitted to ignore the automatic stay and to enforce *ipso facto* clauses."  *Mirant* 310 B.R. at 568.  If Congress intended that result, it could have written Sections 556 and 101(26) much more simply and directly to provide so.  The language in Section 101(26) suggests that a more limited universe of entities qualify as forward contract merchants. Any other interpretation would lead to the absurd result of an exception swallowing the rule.  In

---

[6] Like *Clear Peak Energy*, Meadville confuses the Section 546(e) safe harbor defense to avoidance actions with the Section 556 safe harbor defense to the automatic stay and the prohibition against terminating contracts pursuant to an *ipso facto* clause relevant here.  *See* footnote 5, *supra*.  It is true that only one party must be a forward contract merchant for the Section 556 defense to apply here, but that party *must be* Meadville.

this case, the rule at issue (the automatic stay) is fundamental to the Bankruptcy Code and the reorganization process.  For these reasons, the Court adopts the narrow definition of forward contract merchant articulated by *Mirant* and rejects the broader definition embraced by *Borden*.

Notwithstanding adopting the *Mirant* definition for now, the Court is concerned that the definition of "merchant" relied upon by *Mirant*, which excludes producers and end users, may be too restrictive for the purposes of the Bankruptcy Code's definition of forward contract merchant in Section 101(26).  Even the Debtors acknowledge that it is possible for an end user to also participate in the forward contract trade if it, in addition to being an end user of a commodity, also separately buys, sells, or trades in the forward contract market of that commodity to generate a profit.  (Reply at 18.)  Similar problems could arise from the exclusion of producers from the definition of "merchant."  It hardly seems farfetched to posit the existence of a commodity producer whose business also consists of entering into forward contracts for the commodity produced—quite possibly as the entity's dominant means of profiting from what it produces, for that matter.  That issue can await testing another case, however.  In this case, what is critical is the nature of Meadville's "business."

For Meadville to be a forward contract merchant, Meadville's business must consist, in whole or in part, of entering into forward contracts for electricity.  More specifically, Meadville must enter into forward contracts for the purchase and sale of electricity to generate a profit.  Merely entering into supply contracts as an end user of electricity is insufficient.  *See Mirant*, 310 B.R. at 568 (rejecting argument "that any person that, in connection with its business, enters into forward contracts is within the scope of Code section 101(26)").

Entering into supply contracts as an end user and consumer, even if such contracts meet the definition of forward contracts in Section 101(25), is the extent of Meadville's involvement

18

with forward contracts for electric power. The CSA is a requirements contract. Under the CSA, Meadville cannot buy more power than it consumes, and prior to the petition date, Meadville had no other active contracts to purchase electricity. Meadville does not generate its own electricity, nor is electricity a byproduct of its manufacturing processes. Nothing in the record suggests that Meadville has the ability to store any meaningful volume of electricity. It does not acquire rights to third parties' electricity that can be resold for profit. Therefore, Meadville is not in a position to sell or resell electricity, whether by forward contracts or otherwise, and does not do so. Moreover, Meadville does not advertise or market itself as a purchaser or seller of electricity, and does not broker or trade forward contracts for electric power.

Meadville's participation in PJM's demand response program via the EnerNOC Agreement is likewise not part of Meadville's "business" within the meaning of the statute, nor is the EnerNOC Agreement a forward contract. In Mr. Toy's deposition, which was introduced into evidence, he agreed with PJM's description of the demand response program administered by EnerNOC as a "voluntary program that compensates end users for reducing their electricity load." (Toy Dep. at 91:10-20.) He further testified that Meadville is such an end user retail customer. (*Id.* at 91:21-24.) In his declaration, Mr. Toy does characterize the EnerNOC Agreement as the "EnerNOC Resell Agreement" and claims that "Meadville sells a portion of the energy purchased from FES to EnerNOC who then sells the electricity back into [PJM.]" (Toy Declaration ¶ 12.) However, from 2010 until June of 2018, FES was Meadville's single supplier of electricity at all three of its services addresses via the CSA. Under the CSA, Meadville only purchases the energy it consumes in its operations and is not permitted to purchase a surplus. The EnerNOC Agreement itself does not describe its operation as having

19

EnerNOC either purchase electricity from Meadville or gain access to Meadville's rights to purchase electricity from FES.

Both Meadville's forward contracts for electricity and its participation in PJM's demand response program are ancillary to Meadville's actual business. That business is manufacturing metal parts for the automotive industry. Meadville's contracts with suppliers of electricity, and its voluntary participation in PJM's demand response program, are aimed at controlling the costs of one of its manufacturing inputs -- electric power -- necessary to engage in that business. Meadville's involvement in the electricity markets is necessitated solely by its involvement in manufacturing. It seeks to hedge against price fluctuations in the market for electric power, not to profit from that market. If Meadville's manufacturing operations ceased, it would and could gain no further benefit from any of its contracts for electricity; they are not separate profit centers. While the record does not contain evidence directly on this point, evidence was introduced suggesting that PJM generally offers the opportunity to participate in demand response programs like the one administered by EnerNOC only to large users, who presumably have the ability to make more material contributions to reducing the load on the grid at times of high demand. If Meadville's manufacturing operations ceased, Meadville would also likely become ineligible for participation in such programs, because that program compensates heavy users for maintaining the ability to curtail heavy demand upon the grid, and Meadville would no longer be such a user without its manufacturing business.

Meadville's business does not consist in whole or in part of entering into forward contracts. That is not Meadville's business *at all*. While Meadville is correct that a statute should be interpreted to give all words meaning, Meadville's argument would impermissibly exaggerate the meaning of the phrase "business consisting in part" to include activity that is not

20

its business at all. Therefore, Meadville is not a forward contract merchant with respect to the electric power market and was not entitled to invoke the *ipso facto* clause in the CSA and terminate that contract pursuant to 11 U.S.C. § 556.

Termination of a debtor-in-possession's executory contract pursuant to one *ipso facto* clause by a nondebtor party is prohibited by 11 U.S.C. § 365(e) and is a violation of the automatic stay imposed by 11 U.S.C. § 362(a)(3). No exception to that rule applies in this instance.

## III. The Issue of Sanctions is Deferred.

While the parties briefed the question of whether sanctions against Meadville might be appropriate if the Court found, as it has, that Meadville's purported termination of the CSA violated the automatic stay, they did not brief in detail their theory of what would be an appropriate sanction. No evidence was introduced regarding the economic damage, if any, resulting from Meadville's threat to terminate the CSA and replace FES with another electricity supplier, its refusal to abide by the warnings of the Debtor's bankruptcy counsel, and its switch of one of its three facilities to a different electricity provider before the Court issued its Preliminary Order on July 10, 2018. Neither was any evidence introduced as to FES's legal costs relating to this episode nor was any detailed argument made as to whether reimbursement of any or all of that cost would serve as an appropriate sanction. Indeed, the argument at the Hearing did not even focus on the appropriate standard for determining whether and when sanctions are appropriate for a stay violation in a case involving a corporate debtor. At the Hearing, the parties both expressed the position that the issue of sanctions should be deferred until the questions of whether Meadville's contract termination was lawful and whether the automatic stay had been violated had been answered. This Memorandum Decision, therefore, does not reach the issue of sanctions, including what acts constituted a willful and/or bad faith

21

violation of the stay, what legal theory of sanctions would be appropriate, and what amount of sanctions would be supported by evidence that may be introduced. The Court will promptly schedule a status conference to determine a schedule for further proceedings to address the issue of whether Meadville should be sanctioned for its violation, and if so, to what extent.

## CONCLUSION

Meadville is exclusively an end user of the electric power it purchases from FES pursuant to the CSA, which acts as a requirements supply contract. Meadville does not resell electricity and does not currently have access to a supply of electricity it could legally or practically resell. Its future contracts for electricity, like its current one with FES, are intended to procure electricity for use in Meadville's real business, which is forging metal products for the automotive industry. Meadville's participation in demand response programs likewise does not make the company a participant in the forward contract trade.

The plain language of paragraph 41 of the CSA is unenforceable, because a prepetition debtor cannot bind a future debtor-in-possession, or a bankruptcy court, to a particular postpetition application of the Bankruptcy Code that is contrary to the express direction of the statute. A prepetition debtor also generally cannot waive or contract away rights that only arise upon the filing of a bankruptcy petition and the creation of the bankruptcy estate.

Therefore, Meadville is not a forward contract merchant, and could not and cannot use the safe harbor of Section 556 to invoke the *ipso facto* clause in the CSA and terminate that contract notwithstanding the automatic stay. The automatic stay prohibited such termination, and Meadville violated the stay by proceeding with that termination.

22

The Court will schedule a status conference for further proceedings on the issue of sanctions. This Memorandum Decision does not constitute a final order on the Motion. A final order must await a ruling on the question of sanctions relating to Meadville's violation of the automatic stay.

# # #