# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>FIRSTENERGY SOLUTIONS CORP., *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 18-50757<br>) (Jointly Administered)<br>)<br>)<br>) Hon. Judge Alan M. Koschik<br>) |

## DEBTORS' THIRD MOTION FOR ENTRY OF AN ORDER EXTENDING THE EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file

this motion (the "<u>Motion</u>") for the entry of an order (the "<u>Order</u>"), substantially in the form

attached hereto as <u>Exhibit A</u>, extending the periods during which the Debtors have the exclusive

right to (a) file a chapter 11 plan by 88 days, through and including May 24, 2019 (the "<u>Filing</u>

<u>Exclusive Period</u>"), and (b) solicit votes thereon by 90 days, through and including July 24, 2019

(the "<u>Solicitation Exclusive Period</u>," and together with the Filing Exclusive Period, the

"<u>Exclusive Periods</u>"), without prejudice to the Debtors' right to seek further extensions to the

Exclusive Periods.  In support of this Motion, the Debtors submit the *Declaration of Charles M.*

*Moore, Chief Restructuring Officer, in Support of the Debtors' Third Motion for Entry of an*

*Order Extending the Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances*

*Thereof Pursuant to Section 1121 of the Bankruptcy Code* (the "<u>Moore Declaration</u>").  In further

support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186), and Norton Energy Storage L.L.C. (6928), case no. 18-50764.  The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

## PRELIMINARY STATEMENT

1.     On March 31, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition with the United States Bankruptcy Court for the Northern District of Ohio (the "Court"). The Debtors' chapter 11 cases (the "Chapter 11 Cases") constitute one of the largest and most complex operating company chapter 11 filings ever in the Northern District of Ohio.

2.     As described in further detail below, the Debtors have made significant progress in the approximately two months following the entry of the *Order Granting a Second Extension of the Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 1726] (the "Second Extension Order"). During the two months since the entry of the Second Extension Order, the Debtors have been busy with multiple workstreams, including (a) maintaining their operations; (b) continuing efforts to maximize liquidity and improve cash flow; and (c) working with key stakeholders on certain steps necessary to be able to formulate a chapter 11 plan.  In short, the last two months have been busy and productive, and the Debtors are making progress towards a plan of reorganization supported by the Debtors' major creditor groups and a path out of bankruptcy.

3.     Most significantly, the Debtors, with the support and input of the Independent Directors and Independent Managers (as defined below), have been engaged in negotiations regarding a plan term sheet (the "Term Sheet") and a restructuring support agreement (the "RSA") between the Debtors, an ad hoc group of holders of secured and unsecured notes and pollution control notes issued by the Debtors (the "Ad Hoc Noteholder Group"), an ad hoc group of holders of certificates issued in connection with the Bruce Mansfield sale-leaseback transaction (the "Mansfield Certificateholders Group" and, together with the Ad Hoc Noteholder Group, the "Ad Hoc Groups"), an ad hoc group of creditors holding claims against FES and

2

FENOC (the "FES Creditor Group" and, together with the Ad Hoc Groups, the "Creditor Groups") and the Official Committee of Unsecured Creditors (the "Committee").[2] The negotiations of the Term Sheet and the RSA demonstrate the Debtors' continued focus on working with parties in interest towards a plan of reorganization supported by the Debtors' major creditor groups.

4. ***Maintaining Operations.*** The Debtors focused significant efforts at the start of these Chapter 11 Cases on ensuring that the bankruptcy filing did not disrupt the Debtors' business operations, including service to their approximately 877,000 retail customers. During the two months that followed entry of the Second Extension Order, the Debtors have maintained stable operations and engaged in continuing efforts to preserve customer and vendor relations and to address employee matters.

5. ***Maximizing Liquidity and Improving Cash Flow.*** The Debtors have also focused their efforts since the entry of the Second Extension Order on continuing to maximize liquidity for the Debtors' estates and, by extension, the Debtors' creditors. Efforts to continue to increase the Debtors' liquidity have included: (a) work towards the transfer of the Pleasants Power Station (as defined below) from non-Debtor Allegheny Energy Supply Company, LLC ("AE Supply") to the Debtors; (b) the sale of FG's natural gas and oil powered plant in Lorain, Ohio ("West Lorain Plant"); (c) seeking and obtaining Court approval to enter into a secured letter of credit facility agreement (the "Letter of Credit Facility Agreement"); (d) filing omnibus objections to

---

[2] The Creditor Groups that are engaged in negotiations with the Debtors regarding the RSA and the Term Sheet include: the members of the ad hoc group of certain holders of (i) pollution control revenue bonds supported by notes issued by FirstEnergy Generation, LLC ("FG") and FirstEnergy Nuclear Generation, LLC ("NG") and (ii) certain unsecured notes issued by FirstEnergy Solutions Corp. ("FES") (which group includes holders of at least 50% of the outstanding amount of PCNs and FES Notes, in the aggregate) and the members of the ad hoc group of certain holders of pass-through certificates issued in connection with the sale-leaseback transaction for Unit 1 of the Bruce Mansfield Plant and (iii) the members of an ad hoc group of creditors holding claims against FES and claims against FENOC guaranteed by FES.

3

proofs of claim; and (e) seeking and obtaining approval to either reject or assume various executory contracts and leases.

6. ***Working with Creditor Groups towards a Plan of Reorganization.*** The Debtors continue to foster productive discussions between and among the Debtors, the Creditor Groups and the Committee. As outlined in further detail in the *Debtors' Second Motion for Entry of an Order Extending the Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 1571] (the "Second Extension Motion"), on August 28, 2018, the Debtors reached a significant milestone in these Chapter 11 Cases by reaching a settlement (the "Settlement Agreement") among the Debtors, their parent FirstEnergy Corp. ("FE Corp.") and other non-Debtor affiliates (together with FE Corp., the "FE Non-Debtor Parties") and certain other Settlement Parties (as defined in the Second Extension Motion). The Court entered the *Order Granting Motion of Debtors to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties Pursuant to 11 U.S.C. §§ 105, 363, 365 and 502 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 1465] (the "Settlement Order") on September 27, 2018.

7. The Settlement Agreement provided a clear path for the Debtors to shift their main focus in the cases towards a plan of reorganization. Since entry of the Settlement Order, and as outlined in further detail below, the Debtors, the Committee and the Creditor Groups have made progress towards this goal. Plan negotiations have also included the independent directors of FES (the "Independent Directors") and the independent members of the board of managers of FG and NG (the "Independent Managers") as it relates to the resolution of the various issues between and among the Debtor entities necessary to formulate a plan.

4

8.     In short, since entry of the Second Extension Order, the Debtors have made progress towards the negotiation, formulation and ultimate filing and prosecution of a plan of reorganization supported by the Debtors' major creditor groups.  The Debtors' continued work on maintaining stable operations and maximizing liquidity have facilitated this progress.  If granted an extension, the Debtors will be able to facilitate a continued dialogue with their stakeholders and finalize the Term Sheet and the RSA and file a plan of reorganization. Therefore, the Debtors believe a further extension of the Exclusive Periods should be granted.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

10.     Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The bases for the relief requested herein are section 1121(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

12.     The Debtors seek entry of an Order extending (a) the Filing Exclusive Period by 88 days, through and including May 24, 2019, and (b) the Solicitation Exclusive Period by 90 days, through and including July 24, 2019, without prejudice to the Debtors' right to seek further extensions to the Exclusive Periods.

## BACKGROUND

13.     The Debtors continue to operate their businesses and manage their property as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No

trustee or examiner has been appointed in these cases. On April 11, 2018, the United States

Trustee for the Northern District of Ohio (the "U.S. Trustee") appointed the Committee pursuant

to Bankruptcy Code section 1102. The Debtors filed the *Motion to Extend Exclusivity Period for*

*Filing a Chapter 11 Plan and Disclosure Statement* [Docket No. 850] (the "First Extension

Motion") on June 27, 2018. The *Order Granting an Extension of the Exclusive Periods to File a*

*Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy*

*Code* [Docket No. 988] (the "First Extension Order") was entered July 18, 2018, under which the

Filing Exclusive Period was extended to November 26, 2018 and the Soliciting Exclusive Period

was extended to January 25, 2019, without prejudice to the Debtors' right to seek further

extensions.

14.     The Second Extension Motion was filed on October 23, 2018. The Second

Extension Order was entered on November 20, 2018, under which the Filing Exclusive Period

was extended to February 25, 2019 and the Soliciting Exclusive Period was extended to April 25,

2019, without prejudice to the Debtors' right to seek further extensions.

15.     A more detailed discussion of the Debtors' background, including their business

operations and capital structure, is set forth in the *Declaration of Donald R. Schneider in Support*

*of Chapter 11 Petitions and First Day Motions* [Docket No. 55].

### A.     Maintaining Stable Operations

16.     ***Customer Relations.***  Since the Second Extension Order, the Debtors have

continued to work to preserve customer relations and to ensure stability for their customers

("Customers"). As of December of 2018, FES served approximately 877,000 Customers in 22

utility services territories across Illinois, Maryland, Michigan, Ohio, Pennsylvania and New

Jersey. FES is a party to approximately 1,940 agreements with Customers, representing

approximately 41.3 TWh of estimated delivery power and approximately $1.9 billion in

6

estimated revenue for the 2018 calendar year. The Debtors have continued to spend time addressing Customer concerns and calls since entry of the Second Extension Order.

17. ***Employee Matters***. The Debtors also continued their efforts with regards to various employee matters. As outlined in the Second Extension Order, during these Chapter 11 Cases, the Debtors have devoted significant time to the proposed FirstEnergy Nuclear Operating Company ("FENOC") 2018 key employee retention plan (the "2018 FENOC KERP"). As outlined in further detail in the Second Extension Motion, the Debtors devoted significant time and effort to developing the 2018 FENOC KERP and to addressing objections from the Utility Workers Union of America, Local 270, AFL-CIO, and International Brotherhood of Electrical Workers Locals 29, 245, and 1413, AFL-CIO (collectively, the "Unions" and, the "Unions' Objection"). On September 18, 2018, the Court entered the *Memorandum Decision Denying Debtors' Motion for Authority to Continue and Make Payments Due and Owing Under the 2018 FENOC Key Employee Retention Plan* [Docket No. 1398]. The Court's decision permitted the Debtors leave to amend the motion to approve the 2018 FENOC KERP to cure certain deficiencies noted in the decision.

18. In September 2018, FENOC began good faith, arms-length negotiations with the Unions regarding retention arrangements for represented employees. On November 9, 2018, the Debtors filed the *Debtors' Amended Motion for Entry of an Order Authorizing the Debtors to Continue and Make Payments Due and Owing Under the Debtors' Retention Plans* [Docket No. 1676] (the "Amended KERP Motion"). Following the Debtors' filing of the Amended KERP Motion, which included proposed retention arrangements for represented FENOC employees, the Debtors, the Committee and the Unions continued to engage in good faith, arms-length negotiations and ultimately reached a consensual resolution regarding the 2018 FENOC KERP.

7

19.     On November 30, 2018, the Court entered the *Order Authorizing the Debtors to Continue and Make Payments Due and Owing Under the Debtors' Retention Plans* [Docket No. 1773].

20.     ***IT Separation Agreement.***  As part of their ongoing efforts to separate the Debtors' businesses and operations from the FE Non-Debtor Parties, the Debtors have begun the process of creating an independent IT system and infrastructure separate and apart from the IT system utilized by the FE Non-Debtor Parties.  In furtherance of this process, the Debtors filed a motion seeking authority to enter into and perform under the IT Separation Agreement [Docket No. 1740], which contemplated that the FE Non-Debtor Parties would provide the Debtors with access to critical information and support as they implement the ongoing separation process.  The Bankruptcy Court entered an order approving the IT Separation Agreement on December 11, 2018 [Docket No. 1817].

21.     ***Vendor Relations.*** Maintaining relations with vendors is crucial to the Debtors' ability to obtain essential goods and services necessary to continue operating their businesses, including: (a) vendors that provide goods and services during planned maintenance outages; (b) vendors that provide services and related goods that are highly specialized and/or closely integrated with the Debtors' business operations and customer relationships; (c) sole source or geographically limited providers of critical goods; (d) vendors that provide goods and services related to regulatory compliance obligations; and (e) vendors that provide goods and services related to the Debtors' nuclear power plants (each a "Critical Vendor").  This also allows the Debtors to ensure continued compliance with all applicable state and federal laws and regulations.  The Debtors have continued to work with vendors since the entry of the Second Extension Order, including through the execution of new vendor agreements.

8

22.     Since the Petition Date, the Debtors have maintained a matrix summarizing: (a) the name of each Critical Vendor that receives a payment (or payments) under the Critical Vendors Order (as defined below); (b) the total amount paid to each Critical Vendor; and (c) the nature of the goods and/or services provided by each Critical Vendor to whom a payment is made (the "Critical Vendor Summary").  The Debtors have provided the Critical Vendor Summary to the U.S. Trustee, counsel to the Committee and counsel to the Ad Hoc Groups.  The Debtors have also provided the U.S. Trustee, counsel to the Ad Hoc Groups and counsel to the Committee with a summary each calendar month of all payments made on account of the *Final Order Authorizing the Debtors to (A) Grant Administrative Expense Priority to all Undisputed Obligations for Goods and Services Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business and (B) Pay Prepetition Claims of Shippers, Warehousemen, and Materialmen* [Docket No. 486] (the "Critical Vendors Order").

### B.     Maximizing Liquidity and Improving Cash Flow

23.     Since entry of the Second Extension Order, the Debtors have continued to take steps to maximize their liquidity and improve cash flow for the benefit of the Debtors' estates and, by extension, the Debtors' creditors.  Efforts to do this have included: (a) work towards the transfer of the Pleasants Power Station (as defined below) from AE Supply to the Debtors; (b) continuation of the process to sell the West Lorain Plant; (c) seeking and obtaining Court approval to enter into the Letter of Credit Facility Agreement; (d) filing omnibus objections to proofs of claim; and (e) seeking and obtaining approval to either reject or assume various executory contracts and leases.

24.     ***Pleasants Power Station.***  As outlined in further detail in the Settlement Motion, the transfer of the plant located in Willow Island, West Virginia (the "Pleasants Power Station") from AE Supply to the Debtors was a key term of the Settlement Agreement.  Since entry of the

Second Extension Order, the Debtors worked to effectuate this term of the Settlement Agreement. Specifically, the Debtors' professionals worked with professionals representing FE Corp., the Ad Hoc Groups and the Committee to negotiate an asset purchase agreement (the "Pleasants APA") that was acceptable to all parties in interest. The Pleasants APA was signed on December 31, 2018.

25. The Pleasants APA provides that the Debtors are to receive the economic benefits (and risks) of the Pleasants Power Station *nunc pro tunc* to January 1, 2019, subject to approval of the Court. The Debtors will receive full title of the Pleasants Power Station upon the confirmation and consummation of a plan of reorganization (subject to the satisfaction of the other conditions to closing set forth in the APA). The Pleasants APA also outlines the terms by which AE Supply will operate the Pleasants Power Station on behalf of the Debtors, as well as related rights and obligations of the parties, until the closing occurs.

26. ***West Lorain Sale.*** Additionally, the Debtors and their professionals continued the sale process for the West Lorain Plant, the initial stages of which were outlined in further detail in the Second Extension Motion. Since the Debtors filed the Second Extension Motion, the Debtors narrowed the field of potential bidders for the West Lorain Plant and selected a "stalking horse" purchaser, Vermillion Power, LLC (the "Stalking Horse Purchaser"). The Debtors negotiated the relevant documents, including negotiating the asset purchase agreement with the Stalking Horse Purchaser as well as the relevant bidding procedures.

27. On November 20, 2018, the Debtors filed the *Motion of FirstEnergy Generation, LLC Pursuant to 11 U.S.C. §§ 105, 363, and 503 and Fed. R. Bankr. P. 2002, 6004, and 6006 for Entry of (I) Order Approving (A) Bid Procedures, (B) Procedures for Assumption and Assignment of Certain Executory Contracts and Related Notices, (C) Notice of Auction and Sale*

10

*Hearing, and (D) Related Relief and (II) Order (A) Approving the Sale of the FirstEnergy Generation LLC's West Lorain Assets Free and Clear of Liens, Assumption and Assignment of Certain Executory Contracts and Related Cure Amounts and (C) Granting Related Relief* [Docket No. 1730]. On December 20, 2018, the Court entered the *Order Approving (A) Bid Procedures, (B) Procedures for Assumption and Assignment of Certain Executory Contracts and Related Notices, (C) Notice of Auction and Sale Hearing, and (D) Related Relief* [Docket No. 1861].

28. ***Seeking and Obtaining Approval to Enter into the Letter of Credit Facility Agreement.*** Shortly after filing the Second Extension Motion, but before entry of the Second Extension Order, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Debtor FirstEnergy Solutions Corp. and Debtor FirstEnergy Nuclear Operating Company to Enter Into a Secured Letter of Credit Facility Agreement, (II) Modifying the Automatic Stay With Respect Thereto, and (III) Granting Related Relief* [Docket No. 1541] (the "Letter of Credit Facility Motion"). The Court granted the relief sought in the Letter of Credit Facility Motion on November 20, 2018.[3] Specifically, the Court approved FES and FENOC's entry into the Letter of Credit Facility Agreement between FES, FENOC and Citizens Bank, N.A. Entry into the Letter of Credit Facility Agreement facilitates the Debtors' operational and other goals underlying their business plan. Further, the availability of letters of credit under the Letter of Credit Facility Agreement is useful to the Debtors when entering into new hedging and trading arrangements and other commercial contracts that are critical for the Debtors to be able to successfully separate from FE Corp. Finally, the letters of credit provide the Debtors with reassurance that they will be able to comply with state and federal laws and regulations,

---

[3] *See Order (I) Authorizing Debtor FirstEnergy Solutions Corp. and Debtor FirstEnergy Nuclear Operating Company to Enter into a Secured Letter of Credit Facility Agreement, (II) Modifying the Automatic Stay with Respect Thereto, and (III) Granting Related Relief* [Docket No. 1723] (the "Letter of Credit Facility Order").

including environmental obligations, business license requirements and other bonding requirements.

29.      ***Omnibus Objections to Proofs of Claim.***  As outlined in further detail in the Second Extension Motion, on August 22, 2018, the Court entered an order establishing October 15, 2018 as the bar date (the "Bar Date") for filing proofs of claim for nongovernmental units, as well as for filing proofs of claim for governmental units and further establishing deadlines for filing proofs of claim by claimants affected by any amendments to the Debtors' schedules and for damages resulting from the rejection of any executory contract or unexpired lease of the Debtors (the "Bar Date Order").  More than 1000 proofs of claim (each a "Claim," and collectively, the "Claims") have been filed against the Debtors.  Since entry of the Second Extension Order, the Debtors have continued to address proofs of claim that have been filed, including protecting the Debtors' liquidity by objecting to certain proofs of claim.  Specifically, since entry of the Second Extension Order, the Debtors have filed two additional omnibus objections to certain proofs of claim (the "Objections to Proofs of Claim")[4] and the Court has entered corresponding orders to several of the Objections to Proofs of Claim.[5]  Moreover, on November 20, 2018, the Debtors filed the *Motion of the Debtors for Entry of an Order (a) Approving Omnibus Claims Objection Procedures and (b) Authorizing the Debtors to File Substantive Omnibus Objections to Claims Pursuant to Bankruptcy Rule 3007(c)* (the "Claims

---

[4] *See Debtors' Seventh Omnibus Objection to Certain Proofs of Claim (Reclassified, Reduced Amount, Reclassified and Reduced Amount, Satisfied, Reduced Amount and Misfiled and Reclassified and Misfiled Claims)* [Docket No. 1841]; *Debtors' Eighth Omnibus Objection to Certain Proofs of Claim (Misfiled, Duplicative and Amended Claims)* [Docket No. 1844].

[5] *See Order Sustaining Debtors' Sixth Omnibus Objection to Certain Proofs of Claim (Superseded Claims)* [Docket No. 1828]; *Order Sustaining Debtors' Fifth Omnibus Objection to Certain Proofs of Claim (Duplicative Claims* [Docket No. 1827]; *Order Sustaining Debtors' Fourth Omnibus Objection to Certain Proofs of Claim (Misfiled Claims* [Docket No. 1811]; *Order Sustaining Debtors' Third Omnibus Objection to Certain Proofs of Claim (Misfiled Claims)* [Docket No. 1810]; *Order Sustaining Debtors' Second Omnibus Objection to Certain Proofs of Claim (Misfiled Claims)* [Docket No. 1809]; *Order Sustaining Debtors' First Omnibus Objection to Certain Proofs of Claim (Misfiled Claims)* [Docket No. 1808].

Objection Procedure Motion") [Docket No. 1738]. The Court entered an *Order Approving the Claims Objection Procedure Motion* on December 11, 2018 [Docket No. 1816].

30.     ***Seeking and Obtaining Approval to Either Reject or Assume Various Executory Contracts.*** Since the entry of the Second Extension Order, the Debtors have continued to analyze executory contracts and leases and determine whether these contracts are beneficial or burdensome to the Debtors' estates. Notably, on November 13, 2018, the Debtors filed a motion seeking approval of the settlement agreement with Consolidation Coal Company and McElroy Coal Company (together with Consolidation Coal Company, "Murray") [Docket No. 1683] (the "Murray Settlement Motion"). The Murray settlement provided for the settlement of existing litigation between the parties involving the 2006 coal sale agreement and the 2016 CCR removal agreement by providing for the rejection of such executory contracts, the entry into a new coal sale agreement, new CCR removal agreement, and 2019 barge agreement, the allowance of an unsecured claim for Murray in the amount of $75 million relating to the rejection of such executory contracts and the release of all other claims between the parties, excluding any claims arising under the new agreements. On December 11, 2018, the Court entered an order granting the Murray Settlement Motion [Docket No. 1814]. The Murray settlement became effective on December 27, 2018.

### C.     Working Towards a Plan of Reorganization

31.     Both prior to and throughout these Chapter 11 Cases, the Debtors have worked extensively with the Ad Hoc Groups, the Committee and the U.S. Trustee in order to put the Debtors on a path towards a successful reorganization. As outlined in the First Extension Motion and the Second Extension Motion, this work has led to the Debtors' entry into various agreements with parties in interest that pave the way towards a plan of reorganization supported by the Debtors' major creditor groups.

13

32.     As noted in the First Extension Motion, prior to entry of the First Extension Motion, the Debtors worked with the Ad Hoc Groups and with FE Corp. to enter into certain Pre-Filing Agreements (the "Pre-Filing Agreements").  The Pre-Filing Agreements provided a framework for the Debtors, the Ad Hoc Groups and other parties (including the Committee)[6] to analyze claims the Debtors and their creditors could have against the FE Non-Debtor Parties and a framework to expeditiously determine the value-maximizing path forward for the Debtors' businesses.

33.     As noted in the Second Extension Motion, prior to entry of the Second Extension Order, the Debtors were able to successfully negotiate and obtain approval of the Settlement Agreement.  The Settlement Agreement resolves a material aspect of the Debtors' restructuring – the investigation and potential prosecution of claims and causes of action against the FE Non-Debtor Parties.  Further, the Settlement Agreement maximizes value for the Debtors' estates and establishes the cornerstone on which the Debtors and their stakeholders were able to begin plan negotiations and move towards the Debtors' exit from chapter 11.

34.     These agreements paved the way for the Debtors to make significant progress since entry of the Second Extension Order.  Specifically, in the two months since entry of the Second Extension Order, the Debtors have been engaged in negotiations with the Creditor Groups and the Committee regarding the Term Sheet and the RSA.

35.     ***The Term Sheet and the Restructuring Support Agreement.***  Since entry of the Second Extension Order, the Debtors have spent considerable time working diligently with

---

[6] The Committee and Wilmington Savings Fund Society, FSB, solely in its capacity as the indenture trustee for the lessor notes issued under six indentures with Mansfield 2007 Trusts A-F and its capacity as pass through trustee under the pass through trust agreement with FG and FES for the pass through certificate issued in connection with the sale-leaseback transaction for Unit 1 of the Bruce Mansfield Plant ("WSFS"), are each a party to the PSA solely for the purposes of the stipulation and protocol for issues relating to the Bruce Mansfield Plant (the "Bruce Mansfield Plant" and the "Mansfield Issues Protocol").

14

parties in interest to negotiate the Term Sheet and the RSA. In doing so, the Debtors have been making progress with respect to material terms of a plan of reorganization and therefore have made significant progress towards their ultimate goal – a plan of reorganization supported by the Debtors' major creditor groups and exit from chapter 11. The Debtors have continued to make such progress and have simultaneously maintained business operations and increased liquidity through other means. The Debtors are close to being able to finalize the Term Sheet and the RSA and file a plan of reorganization. An extension of the Exclusive Periods is necessary to complete these efforts.

<u>**BASIS FOR RELIEF**</u>

36.     The Bankruptcy Code vests debtors with the exclusive right to propose a chapter 11 plan for the first 120 days of a chapter 11 case pursuant to section 1121(b). Section 1121(c)(3) further extends the period of exclusivity for an additional 60 days, to an initial maximum of 180 days, where the debtor has filed a chapter 11 plan and is soliciting votes on such plan. "[T]he point of exclusivity is 'to promote an environment in which the debtor's business may be rehabilitated and a consensual plan may be negotiated." *In re Burns & Roe Enters., Inc.*, No. 00-41610 (RG), 2005 WL 6289213, *4 (D.N.J. Nov. 2, 2005) (quoting H.R. Rep. No. 103-835, at 36 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3344).

37.     Section 1121(d) of the Bankruptcy Code permits a court to extend a debtor's exclusivity for cause. Specifically, Bankruptcy Code section 1121(d) provides that, upon the debtor's request made within 120 days after the petition date and "after notice and a hearing, the court may for cause…increase the 120-day period or the 180-day period referred to in [Bankruptcy Code section 1121]." 11 U.S.C. § 1121(d). Although section 1121(d) does not define "cause," courts have construed the term by examining the underlying legislative history of Bankruptcy Code section 1121(d). *See, e.g., Official Comm. of Unsecured Creditors v. Elder-*

15

*Beerman Stores, Corp. (In re Elder-Beerman Stores Corp.)*, No. C-3-97-175, 1997 U.S. Dist. Lexis 23785, at *22 & n.11 (S.D. Ohio June 23, 1997); *In re Amko Plastics, Inc.*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996); *Gaines v. Perkins (In re Perkins)*, 71 B.R. 294, 297-98 (W.D. Tenn. 1987). Legislative history indicates that, although the term "cause" is not defined by the Bankruptcy Code, such term should be viewed flexibly "in order to allow the debtor to reach an agreement." H.R. Rep. 95-595, at 232 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6191.

38.    In determining whether cause exists, courts look to the totality of circumstances in each case. *See, e.g.*, *First Am. Bank of N.Y. v. Sw. Gloves & Safety Equip., Inc.*, 64 B.R. 963, 965 (D. Del. 1986); *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997); *In re Express One Int'l Inc.*, 194 B.R. 98, 100-01 (Bankr. E.D. Tex. 1996); *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re Nicolet, Inc.*, 80 B.R. 733, 741-42 (Bankr. E.D. Pa. 1987). Specifically, the factors that courts look to in determining whether or not cause exists to extend the Exclusive Periods prescribed in Bankruptcy Code section 1121 include: (a) the size and complexity of the case; (b) the existence of good-faith progress; (c) the necessity of sufficient time to negotiate and prepare adequate information; (d) whether creditors are prejudiced by the extension; (e) whether the debtor is paying its debts as they become due; (f) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (g) whether the debtor has made progress negotiating with creditors; (h) the length of time a case has been pending; (i) whether the debtor is seeking an extension to pressure creditors; and (j) whether or not unresolved contingencies exist. *See, e.g.*, *In re Crescent Mfg. Co.*, 122 B.R. 979, 982-83 (Bankr. N.D. Ohio 1990); *In re Serv. Merchandise Co.*, 256 B.R. 744, 751-54 (Bankr. M.D. Tenn. 2000); *In re Elder-Beerman Stores Corp*, 1997 U.S. Dist. Lexis 23785 at *14, *18, *26; *In re Grand Traverse Dev, Co. Ltd. P'ship*, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992).

16

39.     The Debtors respectfully submit that sufficient cause exists pursuant to section 1121(d) to extend the Exclusive Periods as provided herein.  As discussed below, the Exclusive Periods should be extended under these factors.

**A.  The Debtors' Chapter 11 Cases Are Large and Complex**

40.     These Chapter 11 Cases involve multiple Debtor entities that engage in complex operations in a number of heavily-regulated businesses.  Further, these Chapter 11 Cases are among the largest chapter 11 cases ever filed in the Northern District of Ohio.  As outlined above and in the First Extension Motion and the Second Extension Motion, the Debtors made great strides during the first nine months of these Chapter 11 Cases.  In the time since the entry of the Second Extension Order, the Debtors have made significant progress in negotiations with their parties in interest and are close to being able to file a plan of reorganization supported by the Debtors' major creditor groups.

41.     In addition, this Court and other courts in this Circuit routinely grant lengthy extensions of exclusivity in reorganization cases facing complex issues.  *See*, *e.g.*, *In re Phar-Mor, Inc.*, No. 92-41599 (Bankr. N.D. Ohio) (exclusivity ultimately extended for approximately three years); *In re Revco D.S., Inc.*, Case Nos. 88-51308-1321, 1305, 1761-1812 and 1820 (Bankr. N.D. Ohio) (exclusivity ultimately extended for over two years); *In re The Elder-Beerman Stores Corp.*, No. 95-33643 (S.D. Ohio) (exclusivity ultimately extended for approximately 22 months); *see also In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 1, 2015) [Docket No. 4634] (granting a third extension for an additional 60 days, following the first two extensions of a total of 300 days); *In re Exide Technologies*, No. 13-11482 (KJC) (Bankr. D. Del. July 1, 2014) [Docket No. 1959] (granting a second extension of 60 days, following an initial extension of approximately 235 days).

17

**B. The Debtors Have Made Good Faith Progress Toward a Chapter 11 Plan of Reorganization**

42.     An extension of a debtor's exclusive periods is justified by progress in the resolution of issues facing the debtor's estate.  *See*, *e.g.*, *In re Serv. Merchandise Co., Inc.*, 256 B.R. at 753-54; *In re Amko Plastics*, 197 B.R. at 76; *In re McLean Indus., Inc.*, 87 B.R. at 834-35; and *In re Texaco*, *Inc.*, 76 B.R 322, 327 (Bankr. S.D.N.Y. 1987).  In the time since the Second Extension Order, the Debtors have continued to maintain operations and maximize liquidity and have simultaneously made significant progress towards a plan of reorganization.

43.     As described above, the Debtors are nearing a global restructuring.  To make sure that this progress continues and to move the Debtors towards filing a plan of reorganization, the Debtors require a further extension of the Exclusive Periods.

**C. An Extension of the Exclusive Periods Is Necessary to Provide Sufficient Time to Negotiate and Prepare Adequate Information**

44.     The Debtors have demonstrated an ability to work productively with parties in interest, including the Creditor Groups and the Committee, by executing the Settlement Agreement and entering into negotiations regarding the Term Sheet and the RSA.  Negotiations of the Term Sheet and the RSA in the two months following entry of the Second Extension Order demonstrates continued efforts on the part of the Debtors to work with their parties in interest and further demonstrates the Debtors' ability to reach a plan of reorganization supported by the Debtors' major creditors.

**D. An Extension of the Exclusive Periods Will Not Prejudice Creditors**

45.     The Debtors are requesting an extension of the Exclusive Periods so that they can maintain their focus on working with the Creditor Groups, the Committee, the Debtors' Independent Directors and Independent Managers and other significant creditors towards a value-maximizing plan of reorganization.  This extension is not intended to pressure the Debtors'

creditors but instead is necessary to protect and consider the respective interests of the varying creditor and stakeholder constituencies. To the extent feasible and necessary, the Debtors will continue to hold and foster productive discussions with these parties in interest as they have done to date. In addition, the Debtors continue to maintain significant cash balances that are not expected to decline materially during the extension, so the requested extension will not result in a deterioration of value available to their creditors. Accordingly, the relief requested in this Motion is without prejudice to the Debtors' creditors but will instead benefit the Debtors' estates, their creditors and all other key stakeholders.

### E. The Debtors Are Paying Their Bills as They Come Due

46. Since the Petition Date, the Debtors have paid all of their debts as they have come due postpetition in the ordinary course of business.

### F. This is The Debtors' Third Extension Request

47. While the Chapter 11 Cases are not in their infancy, the Debtors' request for an additional extension of the Exclusive Periods is only the Debtors' third request for such extension, and the Debtors request only an additional 88 and 90 days. As outlined above, the Debtors have demonstrated significant progress and continue to work diligently towards a plan of reorganization. The Debtors are doing everything that they should be doing as chapter 11 debtors in possession to facilitate a successful conclusion to these Chapter 11 Cases and should be granted an extension.

### G. The Debtors Are Continuing to Address Open Contingencies

48. The Debtors have worked diligently towards a successful reorganization by simultaneously engaging in productive negotiations with their parties in interest, maintaining operations and working to increase liquidity. Through these efforts, the Debtors have successfully positioned themselves to engage in productive negotiations with their parties in

19

interest on creating a value-maximizing plan of reorganization.  Accordingly, the Exclusive

Periods should be extended.  The requested extension will not prejudice the legitimate interests

of the Debtors' creditors and will afford the Debtors a meaningful opportunity to pursue a plan of

reorganization.

**NOTICE**

49.     Notice of this Motion has been served on each party or entity on the General

Service List (as defined in the *Amended Order, Pursuant to Sections 102 and 105(a) of the*

*Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9013 and 9014 and Local*

*Bankruptcy Rules Establishing: (I) Omnibus Hearing Dates; and (II) Certain Case Management*

*Procedures* [Docket No. 280]).  The Debtors submit that, in light of the nature of the relief

requested, no other or further notice need be given.

**NO PRIOR REQUEST**

50.     No prior request for the relief sought in this Motion has been made to this or any

court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Order

substantially in the form attached hereto as **Exhibit A** and (b) grant such other and further relief

as the Court may deem proper.


[*Remainder of page intentionally left blank.*]

Dated:     January 15, 2019          Respectfully submitted,

/s/ Kate M. Bradley
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

 - and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

        - and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*