**Exhibit A**

RSA

4

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (including all exhibits and schedules attached hereto and in accordance with <u>Section 2</u>, this "**Agreement**")[1] is made and entered into as of January 23, 2019 by and among the following parties (each of the foregoing described in <u>sub-clauses (1)</u> through <u>(5)</u>, and any person or entity that becomes a party hereto in accordance with the terms hereof, a "**Party**" and, collectively, the "**Parties**"):

1. each of the debtors and debtors in possession in the jointly administered chapter 11 bankruptcy cases under the lead case *In re FirstEnergy Solutions Corp.*, Case No. 18-50757 (AMK), including FirstEnergy Solutions Corp. ("**FES**"), FirstEnergy Generation, LLC ("**FG**"), FirstEnergy Nuclear Generation, LLC ("**NG**"), FirstEnergy Nuclear Operating Company ("**FENOC**"), FE Aircraft Leasing Corp., FirstEnergy Mansfield Unit 1 Corp., and Norton Energy Storage, L.L.C. (collectively, the "**Debtors**");

2. the members of the ad hoc group of certain holders of (i) pollution control revenue bonds supported by notes (the "**PCNs**," and any claims of holders of the PCNs arising from the PCNs, the "**PCN Claims**") issued by FG and NG and (ii) certain unsecured notes (the "**FES Notes**," and any claims of holders of the FES Notes arising from the FES Notes, the "**FES Notes Claims**," and collectively with the PCN Claims, the "**Noteholder Claims**") issued by FES (which group includes holders of at least 50% of the outstanding amount of PCNs and FES Notes, in the aggregate, such holders being the "**Requisite Noteholders**") that are (and any such holder that may become in accordance with <u>Section 6</u> hereof) signatories hereto (each, a "**Consenting Noteholder**" collectively, the "**Ad Hoc Noteholder Group**");

3. the members of the ad hoc group of certain holders of pass-through certificates (the "**Certificates**," and any claims of holders of the Certificates arising from the Certificates, the "**Certificate Claims**") issued in connection with the sale-leaseback transaction for Unit 1 of the Bruce Mansfield Plant (a majority of the holders of outstanding Certificates being the "**Requisite Certificateholders**") that are (and any such holder that may become in accordance with <u>Section 6</u> hereof) signatories hereto

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan Term Sheet (as defined below) or the Settlement Agreement (as defined below), subject to <u>Section 2</u> hereof.

(each a "**Consenting Certificateholder**" and collectively, the "**Mansfield Certificateholders Group**");

4. certain holders (or advisors to holders thereof) of (i) unsecured claims against FES arising from the rejection of certain power purchase agreements (the "**FES Claims**") and (ii) unsecured claims against FENOC that are guaranteed by FES (the "**FENOC/FES Claims**")[2] and, together with the FES Claims, Noteholder Claims and Certificate Claims, the "**Creditor Claims**") that are (and any such holder that may become in accordance with Section 6 hereof) signatories hereto (each a "**Consenting FES Creditor**" and, Consenting FES Creditors that are the members of the ad hoc group represented by Davis Polk & Wardwell LLP collectively, the "**FES Creditor Group**" and, together with the Ad Hoc Noteholder Group and the Mansfield Certificateholders Group, the "**Consenting Creditors**"); and

5. the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**").

## RECITALS

**WHEREAS**, on March 31, 2018, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), which are being jointly administered under the caption *In re FirstEnergy Solutions Corp., et al.*, Case No. 18-50757 (AMK) (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Northern District of Ohio (the "**Bankruptcy Court**");

**WHEREAS**, on May 9, 2018, the Bankruptcy Court entered the *Order (I) Authorizing Debtors to Assume (A) the Process Support Agreement and (B) the Standstill Agreement and (II) Granting Related Relief* (the "**PSA Order**") [Docket No. 509], which authorized the Debtors to assume (i) that certain process support agreement by and among the Debtors and certain creditor and stakeholder parties signatory thereto, dated as of March 30, 2018 and attached as Exhibit 1 to the PSA Order (the "**PSA**") and (ii) that certain standstill agreement by and among the Debtors, FirstEnergy Corp. ("**FE**") and certain creditor parties, dated as of March 30, 2018 and attached as Exhibit 2 to the PSA Order (the "**Standstill Agreement**");

**WHEREAS**, on August 26, 2018, the Debtors, the Debtors' non-Debtor Affiliates, including FE, certain of the Consenting Creditors and the Committee entered into a settlement agreement (the "**Settlement Agreement**"), which was approved by the Bankruptcy Court on September 26, 2018, pursuant to an order located at Docket No. 1465;

**WHEREAS**, the Debtors, the independent directors and independent managers of FES, FG and NG (collectively, the "**Independent Directors**"), the Committee, and the Consenting Creditors have been engaged in good faith negotiations with each other regarding the terms of a settlement of, among other things (i) allocation of consideration provided under the Settlement Agreement, (ii) treatment and allowance of Intercompany Claims and (iii) the Mansfield

---

[2] For the avoidance of doubt, "FENOC/FES Claims" shall include FENOC/FES Claims to be held by Consenting Creditors that are subject to pending settlements as of the date hereof.

Settlement (defined below) (collectively, the "**Plan Settlement**"), and such parties have reached agreement with each other with respect to the Plan Settlement on terms as set forth in the Plan Term Sheet, and as will be memorialized in the Plan and the Disclosure Statement;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment with respect to facilitating a value-maximizing restructuring (the "**Restructuring**") of the Debtors and their assets, as set forth on the terms and conditions described in this Agreement (such transactions, the "**Restructuring Transactions**");

**WHEREAS**, the Parties have engaged in good faith, arm's length negotiations regarding the principal terms of a chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, the "**Plan**") by which the Debtors can effect the Restructuring, as set forth in the term sheet attached hereto as **Exhibit A** (the "**Plan Term Sheet**")

**WHEREAS**, the Parties have engaged in good faith, arm's length negotiations regarding the principal terms of a compromise and settlement (the "**Mansfield Settlement**") of certain claims and causes of action related to that certain sale-leaseback transaction for Unit 1 of the Bruce Mansfield Plant (including, without limitation, any claims or causes of action belonging to the holders of the Certificates or Wilmington Savings Fund Society, FSB, as indenture trustee and pass-through trustee, arising from the Debtors' rejection of certain agreements relating to such sale-leaseback transaction);

**WHEREAS**, the Consenting Creditors and the Committee are prepared to perform their obligations under this Agreement subject to the terms and conditions set forth herein, including, among other things, supporting the Plan and working with the Debtors to obtain approval of, and consummate, the Plan;

**WHEREAS**, in expressing such support and commitment, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable law, including chapter 11 of the Bankruptcy Code; and

**WHEREAS**, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Agreement set forth the Parties' entire agreement concerning their respective obligations.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**     *Agreement Effective Date.* This Agreement shall become effective and binding upon each Party immediately upon the occurrence of the following conditions (the "**Agreement Effective Date**"):

(a)     each of the Debtors shall have executed and delivered counterpart signatures to this Agreement to each other Party;

(b)     the Requisite Noteholders shall have executed and delivered counterpart signatures to this Agreement to each other Party;

(c)     the Requisite Certificateholders shall have executed and delivered counterpart signatures to this Agreement to each other Party;

(d)     the FES Creditor Group shall have executed and delivered counterpart signatures to this Agreement to each other Party; and

(e)     the Committee shall have executed and delivered counterpart signatures to this Agreement to each other Party.

**Section 2.     *Exhibits Incorporated by Reference.*** Each of the exhibits and schedules attached hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits. In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, the terms of the exhibits shall govern. This Agreement (without reference to the exhibits) may be interpreted with reference to the definitions set forth in the exhibits, to the extent such terms are used herein.

**Section 3.     *Definitive Documentation*.**

(a)     The Restructuring will be implemented pursuant to various documents and agreements, including the Plan, which Plan shall contain the terms and conditions set forth in, and shall be otherwise consistent with, the Plan Term Sheet. The definitive documents and agreements (collectively, the "**Restructuring Documents**") consist of:

(i)     the Plan;

(ii)     an order confirming the Plan (the "**Confirmation Order**");

(iii)     the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), and an order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(iv)     a motion by the Debtors seeking Bankruptcy Court approval to enter into this Agreement pursuant to section 363(b) of the Bankruptcy Code (the "**RSA Motion**");

(v)     an order approving the RSA Motion (the "**RSA Order**");

(vi)     any documents in respect of the MIP;

(vii)     any documents disclosing the identity of the officers and members of the board of directors or board of managers, as applicable, of any of the reorganized Debtors and the nature of and compensation for any

4

"insider" under the Bankruptcy Code who is proposed to be employed or retained by any of the reorganized Debtors;

(viii) any list of material executory contracts and unexpired leases to be assumed, assumed and assigned, or rejected;

(ix) any documents or agreements for the governance of the Reorganized Debtors following the Effective Date, including any constituent documents, certificates of incorporation, bylaws, or other shareholder or unitholder agreements;

(x) any documents necessary to effectuate the Mansfield Settlement, solely to the extent the terms therein are not incorporated into the Plan, the Plan Supplement, or the Confirmation Order; and

(xi) all other documents and agreements that will comprise the Plan Supplement, including but not limited to the Plan Administrator Agreement, the form of indenture for the New FE Notes and the Amended Separation Agreement, except as provided herein.

(b) The Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants materially consistent with the terms of this Agreement, including the Plan Term Sheet. Each of the Restructuring Documents shall be in form and substance reasonably acceptable to (i) the Debtors, (ii) Consenting Creditors representing at least 70% of the total aggregate principal and face amount of unsecured Creditor Claims held by the Consenting Creditors, which shall include (A) Consenting Creditors that hold at least 33% of the total aggregate principal amount of the Certificate Claims held by the Consenting Creditors and (B) (x) to the extent affecting distributions on account of, or economic treatment of, FES Single-Box Unsecured Claims in a manner inconsistent with the Plan Term Sheet (except to the extent such inconsistency only results in *pro rata* dilution of New FES Common Stock), the rights of minority holders of New FES Common Stock (to the extent inconsistent with the Corporate Governance Term Sheet) or release or exculpation provisions relating to the FES Creditor Group, members of the FES Creditor Group holding at least 50% of the total face amount of the FES Claims and FENOC/FES Claims held by the FES Creditor Group and (y) to the extent affecting distributions on account of, or economic treatment of, FENOC/FES Unsecured Claims in a manner inconsistent with the Plan Term Sheet (except to the extent such inconsistency only results in *pro rata* dilution of New FES Common Stock), members of the FES Creditor Group holding at least 50% of the total face amount of the FENOC/FES Claims held by the FES Creditor Group (the "**Requisite Supporting Parties**"), and (iii) the Committee. Each of the Debtors, the Committee, and the Consenting Creditors agrees that it shall act in good faith and use and undertake all commercially reasonable efforts to negotiate and finalize the terms of the Restructuring Documents.

**Section 4.** *Milestones.* The following milestones (the "**Milestones**") shall apply to this Agreement, unless extended or agreed to in writing by the Debtors, the Committee (solely with respect to Section 4(a) through (e)), and the Requisite Supporting Parties (which writing may be in the form of emails exchanged between counsel to the foregoing parties):

4818-6864-9094 v2

(a)     no later than February 8, 2019, the Debtors shall file the Plan, the Disclosure Statement and the motion to approve the Disclosure Statement;

(b)     no later than 5 business days following the filing of the Plan and the Disclosure Statement, the Debtors shall file the RSA Motion;

(c)     the Bankruptcy Court shall have entered the Disclosure Statement Order no later than March 21, 2019;

(d)     the Bankruptcy Court shall have entered the RSA Order no later than the date set forth in Section 4(c) above, as such date may have been amended, extended or modified in accordance with the terms of this Agreement;

(e)     the Bankruptcy Court shall have entered the Confirmation Order no later than May 10, 2019; and

(f)     the effective date of the Plan (the "**Plan Effective Date**") shall have occurred no later than September 15, 2019, which date shall automatically be extended to October 31, 2019 (the "**Plan Support Outside Date**") in the event that the only conditions to the Plan Effective Date remaining are any regulatory approvals.

## Section 5.    *Commitments Regarding the Restructuring*

5.01.   <u>Commitments of the Consenting Creditors and the Committee</u>.

(a)     Each Consenting Creditor intends to be and is bound under this Agreement with respect to any and all claims against, or interests in, any of the Debtors, whether currently held or hereafter acquired by such Consenting Creditor or such Consenting Creditor's controlled affiliates. Subject to the terms and conditions of this Agreement, during the period beginning on the Agreement Effective Date and ending on the Termination Date (defined in <u>Section 9.08</u>) (such period, the "**Effective Period**"), the Committee and each of the Consenting Creditors hereby covenant and agree:

(i)     to support confirmation of the Plan, including the solicitation, confirmation, and consummation of the Plan, as may be applicable, and will not direct and/or instruct any Indenture Trustee,[3] as applicable, to take any actions inconsistent with this Agreement and/or the Plan Term Sheet;

---

[3]     For purposes of the Agreement, the term "**Indenture Trustee**" means any of the following (and each of their respective successors and assigns): (i) The Bank of New York Mellon Trust Company, N.A. in its capacity as trustee under (a) that certain Indenture, dated as of August 1, 2009 as supplemented by that certain First Supplemental Indenture, dated as of August 1, 2009, as the same has been or may be subsequently modified, amended, supplemented, or otherwise revised from time to time and (b) the unsecured PCN indentures, as the same have been or may be subsequently modified, amended, supplemented, or otherwise revised from time to time; (ii) UMB Bank, National Association, as successor trustee under (a) that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust, dated as of June 19, 2008, as amended and supplemented and (b) that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust, dated as of June 1, 2009, as amended and supplemented; and (iii) Wilmington Savings Fund Society, FSB not in its individual capacity, but solely as Pass Through Trustee under the Bruce Mansfield Unit 1 2007 Pass Through Trust Agreement, dated as of June 26, 2007, as the same has been or may be

4818-6864-9094 v2

(ii)     solely with respect to the Consenting Creditors, to disclose in its signature pages attached hereto all claims, as such term is defined in section 101(5) of the Bankruptcy Code (including any subsequently acquired claims, each a "**Claim**" and collectively the "**Claims**") that it holds, controls, or has the ability to control, against the Debtors, which Claim amounts shall be redacted in any version of this Agreement distributed to the Parties, filed or otherwise made public and the Debtors shall keep such Claim amounts confidential;

(iii)     that entry into this Agreement shall be deemed a written extension of the Outside Date under the PSA to be coterminous with the Plan Effective Date in accordance with section 10.02(k) of the PSA;

(iv)     solely with respect to the Consenting Creditors, and subject to the terms of this Agreement and subject to receipt of the Disclosure Statement and the Solicitation Materials approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, (A) to timely vote or cause to be voted all such Claims that it holds, controls, or has the ability to control, to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis pursuant to the solicitation of votes in accordance with sections 1125 and 1126 of the Bankruptcy Code; and (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided that, such vote may be revoked by any Consenting Creditor at any time following the termination of this Agreement;

(v)     to not directly or indirectly (A) object to, delay, impede, vote to reject or take any other action to interfere with the acceptance, implementation, or consummation of the Plan, (B) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any restructuring, workout, plan of arrangement, settlement, or plan of reorganization for the Debtors other than the Plan, the Plan Term Sheet and the Restructuring Transactions contemplated therein, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any other regulatory agency, including without limitation, the Nuclear Regulatory Commission (the "**NRC**") and the Federal Energy Regulatory Commission (the "**FERC**"), or making or supporting any press release, press report or comparable public statement, or filing with respect to any restructuring, workout, plan of arrangement, settlement, or plan of reorganization for the Debtors other than the Plan, the Plan Term Sheet and the Restructuring Transactions contemplated therein, or (C) direct the Indenture Trustees (as applicable) to take any action contemplated in (A) and (B) of this Section 5.01(a)(v);

---

subsequently modified, amended, supplemented, or otherwise revised from time to time and Indenture Trustee under six Indentures of Trust, Open-End Mortgages and Security Agreements dated July 1, 2007 with Mansfield 2007 Trusts A-F, as amended from time to time.

4818-6864-9094 v2

(vi)     solely with respect to the Committee, and subject in all respects to the provisions of Section 5.01(c), to not propose, file, support, encourage, seek, solicit, pursue, initiate, assist, participate in the formulation of or enter into negotiations or discussions with any entity regarding or take any other action in furtherance of any plan of reorganization or liquidation, proposal, term sheet, offer, transaction, dissolution, winding up, liquidation, reorganization, refinancing, recapitalization, restructuring, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity involving the Debtors, other than the Plan, the Plan Term Sheet and the Restructuring Transactions contemplated therein, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any other regulatory agency, including without limitation, the NRC and FERC (any of the foregoing, an "**Alternative Proposal**");

(vii)     solely with respect to the Committee, to provide a letter, in consultation with the Debtors and the Requisite Supporting Parties, recommending that Unsecured Creditors vote to accept the Plan, which shall be included with the Debtors' solicitation materials;

(viii)     to cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the Debtors and to use commercially reasonable efforts to support and consummate the Restructuring Transactions contemplated by the Plan, as applicable, and to execute any document and give any notice, order, instruction, or direction reasonably necessary to support, facilitate, implement, consummate, or otherwise give effect to the Restructuring Transactions contemplated by the Plan, as applicable, including, for the avoidance of doubt, using reasonable best efforts to obtain any necessary federal, state, and local regulatory approvals, including, without limitation, approvals from the NRC and FERC, and to act in good faith and take all commercially reasonable actions to negotiate the Restructuring Documents with the other Parties and consummate the Restructuring Transactions in a manner consistent with this Agreement and the Plan Term Sheet;

(ix)     to support, and in good faith take all actions necessary or reasonably requested by the Debtors to obtain entry of an order approving the Mansfield Settlement and consummate such settlement; provided, that such an order may be the Confirmation Order;

(x)     to timely oppose, including by way of joinder, any objections filed with the Bankruptcy Court to (A) the Disclosure Statement, (B) the Plan, (C) confirmation of the Plan, or (D) the RSA Motion; and

(xi)     except to the extent expressly contemplated under the Plan or this Agreement, to not, and to not direct any Indenture Trustee (as applicable) to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Creditor Claims, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors; provided, however, that nothing in this

8

Agreement shall limit the right of any Party to exercise any right or remedy provided under the Confirmation Order or any other Restructuring Document; provided, further, that nothing in this Agreement shall limit the right of the Consenting Certificateholders to take any action in furtherance of the Mansfield Settlement, including, without limitation, foreclosing upon the undivided interest in Unit 1 of the Bruce Mansfield Plant to the extent necessary or appropriate to consummate the Mansfield Settlement.

(b)       The foregoing sub-clause (a) of this Section 5.01 will not limit any of the following Committee or Consenting Creditor rights:

(i)       rights in any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement (including the Plan Term Sheet) and do not hinder, delay or prevent consummation of the Plan, the Restructuring Transactions or the Mansfield Settlement;

(ii)       rights under any applicable credit agreement, indenture, other loan document, or any other contract, stipulation, or applicable law, and nothing herein shall constitute a waiver or amendment of any provision thereof, provided that the exercise of such rights is not inconsistent with the terms of this Agreement solely during the time in which this Agreement is in effect and does not hinder, delay or prevent consummation of the Plan, the Restructuring Transactions or the Mansfield Settlement;

(iii)       rights to purchase, sell or enter into any transactions in connection with the Creditor Claims subject to the terms of this Agreement, including a Permitted Transfer pursuant to Section 6 hereof;

(iv)       rights to consult with other Consenting Creditors, the Debtors, the Committee, or any other party in interest in the Chapter 11 Cases, provided, that such action is not inconsistent with this Agreement (including the Plan Term Sheet) and does not hinder, delay or prevent consummation of the Plan, the Restructuring Transactions or the Mansfield Settlement;

(v)       rights to direct or request the amendment or supplementation of any proof of claim filed by or on behalf of the Consenting Creditors including the proofs of claim filed by Wilmington Savings Fund Society, FSB, as indenture trustee and pass-through trustee;

(vi)       rights to object to any proof of claim that is not related to Creditor Claims held by the Consenting Creditors, or to any settlement or proposed allowance of any such proof of claim to the extent consistent with this Agreement and the Plan Term Sheet, *provided that* the Committee shall

4818-6864-9094 v2

retain the right to object to any amendment to Creditor Claims filed by the Consenting Creditors to the extent such amendment is inconsistent with this Agreement or the Plan Term Sheet; or

(vii)    rights to enforce any right, remedy, condition, consent or approval requirement under this Agreement, the Plan Term Sheet, the PSA or any of the Restructuring Documents.

(c)    Notwithstanding anything in this Agreement to the contrary, and solely with respect to the Committee, nothing in this Agreement, the Plan Term Sheet or any other Restructuring Document shall require the Committee to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law, provided, that it is agreed that any such action that results in a Termination Event hereunder shall be subject to the provisions set forth in Section 9 hereto. Notwithstanding the foregoing, the Committee acknowledges that its entry into this Agreement is consistent with its fiduciary duties.

5.02.    Commitments of the Debtors.

(a)    Subject to the terms and conditions of this Agreement, during the Effective Period, each Debtor agrees:

(i)    to prepare, or cause to be prepared, the Restructuring Documents and any related documents, and distribute such documents concurrently to the other Parties, and afford reasonable opportunity to comment and review to the respective legal and financial advisors for the other Parties, as applicable, in advance of any filing thereof;

(ii)    to file, as soon as reasonably practicable, but in no event later than the dates set forth in the Milestones (as such Milestones may otherwise be extended), the Plan, the Disclosure Statement and the RSA Motion;

(iii)    to (A) support and take all actions reasonably necessary to facilitate the solicitation, confirmation, and consummation of the Plan; and (B) not take any action or commence or continue any proceeding that is inconsistent with, or that would delay or impede the solicitation, confirmation, or consummation of the Plan;

(iv)    to (A) support and take all actions reasonably necessary to facilitate the approval of the RSA Motion; and (B) not take any action that is inconsistent with, or that would delay or impede the approval of the RSA Motion;

(v)    to pursue the Restructuring Transactions and the Mansfield Settlement on the terms set forth in this Agreement and the Plan Term Sheet, and, subject to Section 5.02(b) of this Agreement, not sign any agreement to pursue any auction, sale process or other restructuring transaction for the Debtors or substantially all of its assets. For the avoidance of doubt, the

4818-6864-9094 v2

Debtors shall continue to pursue the sale processes associated with the West Lorain Power Plant and the acquisition of the Pleasants Power Plant;

(vi)    to pursue any necessary federal, state, and local regulatory approvals to enable confirmation of the Plan, including, without limitation, approvals from the NRC and FERC;

(vii)    subject to Section 5.02(b) of this Agreement, to not (x) propose, file, support, encourage, seek, solicit, pursue, initiate, assist, participate in the formulation of or enter into negotiations or discussions with any entity regarding or take any other action in furtherance of any Alternative Proposal or (y) make or support any press release, press report or comparable public statement, or filing with respect to any Alternative Proposal, in each case without the prior written consent (which may be by email) of the Committee and the Requisite Supporting Parties;

(viii)    subject to Section 5.02(b) of this Agreement, to (A) not take any action, directly or indirectly, that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the RSA Motion, the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan and the Restructuring Transactions, including soliciting or causing or allowing any of its agents or representatives to solicit any agreements or commence or continue negotiations with any party in interest in these Chapter 11 Cases relating to any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) or otherwise facilitating the consummation of an alternative transaction; and (B) not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement (including the Plan Term Sheet) or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring Transactions;

(ix)    to timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(x)    to timely oppose any objections filed with the Bankruptcy Court to (A) the Disclosure Statement, (B) the Plan, (C) confirmation of the Plan or (D) the RSA Motion;

(xi)    to timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Debtors'

4818-6864-9094 v2

exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(xii) to operate the business of each of the Debtors in the ordinary course and consistent with past practice (taking into account the announced deactivations of certain of the Debtors' generating assets) and in a manner that is consistent with this Agreement (including the Plan Term Sheet) and confer with the Committee and the Consenting Creditors and their respective representatives, as reasonably requested, on operational matters and the general status of ongoing operations, provided that:

(A) during the Effective Period, the Debtors shall consult in good faith with and consider recommendations of a committee comprised of John Kiani, Donald R. Schneider (or any successor president of FES), a member of management designated by the Debtors and acceptable to Mr. Kiani, and, at the election of the Ad Hoc Noteholders Group, and reasonably acceptable to the Debtors, an individual designated by the Ad Hoc Noteholder Group (collectively, the "**Transition Working Group**") regarding all material business plans and strategic initiatives relating to the operation of the Debtors' generating assets and management of the Debtors' retail business, and provide the Transition Working Group with reasonable access during normal business hours to the Debtors' employees, facilities, and reports, *provided, however* that the Transition Working Group shall not have any power to control or direct the Debtors' employees or advisors and *provided, further, however*, that all access of the Transition Working Group shall be subject in all respects to the execution of confidentiality agreements for Mr. Kiani, and any other member of the Transition Working Group designated by the Ad Hoc Noteholder Group acceptable to the Debtors; and

(B) the Debtors shall, in consultation with counsel to the Consenting Creditors and the Committee, negotiate in good faith a management agreement (which agreement shall be considered to be a Restructuring Document and shall be filed as part of the Plan Supplement) with Mr. Kiani to become effective upon entry of the Confirmation Order, which agreement shall also provide for the compensation of the member of the Transition Working Group designated by the Ad Hoc Noteholder Group;

(xiii) to not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is inconsistent in any material respect with this Agreement or the Plan Term Sheet;

12

(xiv)   to not file any pleading inconsistent in any material respect with the Restructuring Transactions, the Mansfield Settlement, or the terms of this Agreement or the Plan Term Sheet;

(xv)   that entry into this Agreement shall be deemed a written extension of the Outside Date under the PSA to be coterminous with the Plan Effective Date in accordance with section 10.02(k) of the PSA;

(xvi)   solely with respect to FES and FENOC, to consent in writing to the assignment and transfer of Commerzbank AG's rights, entitlements and claims in respect of Claim Nos. 931 and 932 and under the written agreements between FES, FENOC, Nukem, Inc. and Commerzbank AG relating to such claims to HSBC Bank plc and to any subsequent assignees by executing the form of consent received from Commerzbank AG's counsel by counsel to FES and FENOC on December 26, 2018 or in such other form as is agreed upon by counsel to FES and FENOC (the "**Consent**") and delivering its signature pages to the Consent to counsel for Commerzbank AG, *provided, however*, that Commerzbank AG and Nukem, Inc. shall have also executed and delivered their signature pages to the Consent to counsel for FES and FENOC;

(xvii)   to file within 7 days of the date hereof, a motion with the Bankruptcy Court seeking approval of a stipulation and order providing that (a) Claim No. 931 shall be an allowed and general unsecured claim against FENOC in the amount of $59,817,058.49 and (b) Claims No. 932 shall be an allowed and general unsecured claim against FES in the amount of $59,817,058.49 (the "**FES/FENOC Claim Stipulation Order**"); and

(xviii) if the Debtors know or should know of a breach by any Debtor in any respect of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) Business Days of such actual knowledge) to the other Parties.

(b)   Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement, the Plan Term Sheet or any other Restructuring Document shall require any of the Debtors, the Debtors' directors, managers, and officers, or the Independent Directors, to take or refrain from taking any action that any such person or persons determines in good faith would be inconsistent with its fiduciary duties under applicable law, provided, that it is agreed that any such action that results in a Termination Event hereunder shall be subject to the provisions set forth in Section 9 hereto. Notwithstanding the foregoing the Debtors acknowledge that their entry into this Agreement is consistent with their fiduciary duties.

(c)   If the Debtors receive a proposal or expression of interest in undertaking an Alternative Proposal, the Debtors shall promptly notify the respective counsel to the Committee and the Consenting Creditors of the receipt of such proposal or expression of interest, with such notice to include the identity of the person or group of persons involved as well as the terms of such Alternative Proposal, as well as a written copy of such Alternative Proposal.

13

**Section 6.**    *Transfer of Claims and Interests.*

(a)    During the Effective Period, no Consenting Creditor shall sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any beneficial ownership)[4] in the Creditor Claims in whole or in part (each, a "**Transfer**", *provided, however,* that any pledge in favor of a bank or broker dealer at which a Consenting Creditor maintains an account, where such bank or broker dealer holds a security interest in or other encumbrances over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder) to any party, unless it satisfies all of the following requirements (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

(i)    the intended transferee (x) is another Consenting Creditor, (y) as of the date of such Transfer, the Consenting Creditor controls, is controlled by or is under common control with such transferee or is an affiliate, affiliated fund or affiliated entity with a common investment advisor, or (z) executes a transfer agreement in the form attached hereto as **Exhibit B** (a "**Transfer Agreement**") prior to or concurrently with the closing of such Transfer; and

(ii)    notice of any Transfer, including the amount transferred and, in the case of (i)(z) above, the fully executed Transfer Agreement, shall be provided to counsel to each Party within three (3) business days following the closing of such Transfer.

(b)    Upon satisfaction of the requirements in <u>Section 6(a)</u>, (i) the Permitted Transferee shall be deemed to be a Consenting Creditor hereunder and shall be deemed to be a Consenting Noteholder, Consenting Certificateholder, or Consenting FES Creditor, or all, as applicable, and, for the avoidance of doubt, a Permitted Transferee is bound as a Consenting Creditor under this Agreement with respect to any and all claims against, or interests in, any of the Debtors (including, without limitation, any Creditor Claims), whether held at the time such Permitted Transferee becomes a Party or later acquired by such Permitted Transferee, and (ii) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.

(c)    Notwithstanding <u>Section 6(a)</u>, a Qualified Marketmaker[5] that acquires any Creditor Claims with the purpose and intent of acting as a Qualified Marketmaker for such Creditor Claims , shall not be required to execute and deliver to counsel to any Party a Transfer Agreement in respect of such Creditor Claims if (A) such Qualified Marketmaker subsequently transfers such Creditor Claims (by purchase, sale, assignment, participation, or otherwise) within

---

[4] As used herein, the term "beneficial ownership" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Creditor Claims or the right to acquire such claims or interests.

[5] As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

.

4818-6864-9094 v2

ten (10) business days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund or affiliated entity with a common investment advisor, (B) the transferee otherwise is a Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and (C) the Transfer otherwise is a Permitted Transfer. To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in Creditor Claims that such Consenting Creditor acquires in its capacity as a Qualified Marketmaker from a holder of the Creditor Claims who is not a Consenting Creditor without regard to the requirements set forth in Section 6(a) hereof.

(d)     This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Creditor Claims; provided, however, that (i) any Consenting Creditor that acquires additional Creditor Claims, as applicable, after the Agreement Effective Date shall notify counsel to each Party of such acquisition, within five business days following such acquisition, including the amount of such acquisition, which notice may be deemed to be provided by the filing of a statement with the Bankruptcy Court as required by Rule 2019 of the Federal Rules of Bankruptcy Procedure, including revised holdings information for such Consenting Creditor and (ii) such additional Creditor Claims shall automatically and immediately upon acquisition by a Consenting Creditor, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the respective counsels to the Parties).

(e)     In addition, other than pursuant to a Permitted Transfer, any holder of Creditor Claims shall become a Party, and become obligated as a Consenting Creditor, solely to the extent (i) such holder executes a joinder agreement in the form attached hereto as **Exhibit C** (a "**Joinder Agreement**"), and shall be deemed a Consenting Creditor, (ii) such joinder is delivered to counsel to each Party within three (3) business days following the execution thereof, and (iii) such holder is reasonably acceptable to the Debtors.

(f)     Any Transfer made in violation of this Section 6 shall be void *ab initio*. Each other Consenting Creditor shall have the right to enforce the voiding of such Transfer. Any Consenting Creditor or Qualified Marketmaker that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement. The failure by a Consenting Creditor to comply with the transfer provisions of this Section 6 (resulting in such Transfer becoming null and void *ab initio*) shall not constitute a material breach for purposes of Section 9 of this Agreement.

(g)     Notwithstanding anything to the contrary herein, if a Consenting Creditor effects the Permitted Transfer of all of its Creditor Claims in accordance with this Agreement, such Consenting Creditor shall cease to be a Party to this Agreement in all respects and, subject to Section 12.10 herein, shall have no further obligation hereunder.

## Section 7.     *Representations and Warranties.*

7.01.     Mutual Representations, Warranties, and Covenants.     Each Party (except for the Committee with respect to Section 7.01(a)), severally and not jointly, represents and warrants to

15

4818-6864-9094 v2

the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(a) <u>Power and Authority</u>. Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

(b) <u>No Conflict</u>. The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(c) <u>No Consent or Approval</u>. Except as expressly provided in this Agreement or the Bankruptcy Code, and with respect to the Debtors, as contemplated by Section 7.01(e) below, no consent or approval is required by any other person or entity in order for it to effectuate the Plan contemplated by, and perform the respective obligations under, this Agreement.

(d) <u>Enforceability</u>. This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(e) <u>Governmental Consents</u>. Except with respect to the receipt of necessary Bankruptcy Court and regulatory approvals associated with or contemplated by the Plan, the execution, delivery and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

(f) <u>Representation</u>. It has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof.

7.02. <u>Representations and Warranties of Consenting Creditors</u>. Each Consenting Creditor individually represents, warrants, and covenants to each other Party that the following statements are true, correct, and complete as of the date of this Agreement (or, with respect to a transferee, the date of such Transfer) (each of which is a continuing representation, warranty, and covenant), *provided that*, this Section 7.02 shall not be applicable to any FENOC/FES Claims subject to pending settlements until the purchase has settled:

16

(a)       it (i) is either (x) the sole beneficial owner of the original principal or face amount of Creditor Claims set forth below its signature hereto, or (y) has sole investment or voting discretion with respect to the original principal or face amount of Creditor Claims set forth below its signature hereto and has the power and authority to bind the beneficial owner(s) of such Creditor Claims to the terms of this Agreement, (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Creditor Claims and to dispose of, exchange, assign, and transfer such Creditor Claims and (iii) holds no other Creditor Claims;

(b)       other than pursuant to this Agreement, its Creditor Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind (each, a "Security Interest") that would materially and adversely affect in any way such Consenting Creditor's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, it being understood that any Security Interest in favor of a broker-dealer in connection with any prime brokerage account does not materially and adversely affect a Consenting Creditor's ability to perform its obligations contained in this Agreement at the time such obligations are required to be performed;

(c)       it (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is either (A) an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended) (the "Securities Act"), (B) a qualified institutional buyer as defined by Rule 144A under the Securities Act, or (C) a non-U.S. person under Regulation S under the Securities Act;

(d)       it has made no prior assignment, sale, participation, grant, conveyance, pledge, or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey, pledge, or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any of the Creditor Claims that are inconsistent or conflict with representations and warranties of such Consenting Creditor herein or that would render it otherwise unable to comply with this Agreement and perform its obligations hereunder, either generally or with respect to any specific Creditor Claims; *provided, however* that any pledge in favor of a bank or broker dealer at which the Supporting Party maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder; and

(e)       as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement.

**Section 8.**    *Acknowledgement*. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

4818-6864-9094 v2

**Section 9.**     *Termination Events*.

9.01.   <u>Mutual Consent</u>.  This agreement may be terminated by the mutual written consent of (i) each of the Debtors, (ii) the Requisite Supporting Parties and (iii) the Committee.

9.02.   <u>Consenting Creditors Termination Events</u>.  The Requisite Supporting Parties may terminate this Agreement (and the liabilities and obligations of all Parties hereto) upon two (2) Business Days prior written notice delivered to the Parties identified in Section 12.09 and in accordance with Section 12.09 hereof, upon the occurrence and continuation of any of the following events (each, a "**<u>Creditor Termination Event</u>**"):

(a)      except as provided in Section 9.02(c) of this Agreement, upon the failure to meet any of the Milestones, unless the failure to meet such Milestone has been caused by a breach of this Agreement by a Consenting Creditor;

(b)      following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any Party of any of the representations, warranties, covenants, obligations or commitments set forth in this Agreement, or the failure of any Party to act in a manner materially consistent with this Agreement (including the Plan Term Sheet), which breach or failure to act (i) would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring Transactions or the Mansfield Settlement in accordance with the Milestones and on the terms and conditions set forth in this Agreement (including the Plan Term Sheet) and (ii) is uncured for a period of seven (7) business days after the receipt of written notice in accordance with Section 12.09 of such breach from any non-breaching Party provided that such breach is capable of being cured; *provided, however,* that such termination right will not be available to the Requisite Supporting Parties if the breach of this Agreement is by a Consenting Creditor;

(c) the occurrence of the Plan Support Outside Date; *provided, however,* that:

(i)      if all regulatory approvals with respect to consummation of the Plan have been obtained before October 31, 2019, and so long as the Debtors are not in material breach of their obligations under this Agreement, then the Plan Support Outside Date automatically shall be extended to and be thirty (30) days following receipt of the last-received regulatory approval; and

(ii)      if all regulatory approvals with respect to consummation of the Plan have not been obtained before October 31, 2019, and so long as the Debtors are not in material breach of their obligations under this Agreement, then the Plan Support Outside Date shall be extended at the request of the Debtors, on the one hand, or the Requisite Supporting Parties, on the other hand, until December 31, 2019.

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Plan in a way that cannot be reasonably remedied by the Debtors or would have a material adverse effect on consummation of the Plan, unless the Debtors, the Requisite Noteholders or the Requisite Certificateholders have sought a stay of such injunction, judgment, decree, charge,

4818-6864-9094 v2

ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance;

(e)     the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Requisite Supporting Parties;

(f)     except to the extent necessary for the Requisite Supporting Parties to seek to terminate this Agreement pursuant to this paragraph, any of the Parties files a pleading seeking authority to amend, modify or withdraw any of the Restructuring Documents without the prior written consent of the Requisite Supporting Parties and the Debtors, and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement (including the Plan Term Sheet);

(g)     the Plan or Disclosure Statement is amended or modified in any manner that is adverse to either the Noteholders or the Certificateholders;

(h)     except to the extent necessary for the Requisite Supporting Parties to seek to terminate this Agreement pursuant to this paragraph, any of the Parties directly or indirectly propose, support, assist, solicit or file a pleading seeking approval of any alternative transaction (or any approval of any sales, voting or other procedures in connection with an alternative transaction) without the prior written consent of the Requisite Supporting Parties and the Debtors that results in a material adverse effect for the consummation of the Restructuring Transactions;

(i)     the Debtors enter into an agreement to sell, or file a motion or application seeking authority to sell, all or a material portion of its assets without the prior written consent of the Requisite Supporting Parties;

(j)     the Debtors enter into an agreement to enter into, or file a motion seeking authority to enter into, post-petition secured financing, without the prior written consent of the Requisite Supporting Parties; and

(k)     the Bankruptcy Court grants relief, or by declining to grant relief sought by any of the Parties causes a circumstance, that (i) is inconsistent with this Agreement (including the Plan Term Sheet) in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, unless the Debtors or the Requisite Noteholders and the Requisite Certificateholders have sought a stay of such relief within ten (10) business days after the date of such issuance, and such order is stayed, reversed or vacated within twenty (20) business days after the date of such issuance;

(l)     if any of the Debtors gives notice of a termination pursuant to Section 9.03(e);

19

4818-6864-9094 v2

(m)    the Settlement Agreement is terminated; or

(n)    the issuance of an order or decree by any applicable regulatory agency making unlawful or otherwise prohibiting the consummation of the Plan or the transactions contemplated thereby or an unconditional denial with prejudice by any applicable regulatory agency of regulatory approvals required for consummation of the Plan.

9.03.    Debtor Termination Events. The Debtors (and with regard to Section 9.03(e) any of the Debtors) may terminate their obligations and liabilities under this Agreement upon two (2) business days prior written notice delivered to the Parties identified in Section 12.09 in accordance with Section 12.09 hereof, upon the occurrence of any of the following events (each, a "**Debtor Termination Event**" and, together with the Creditor Termination Events, the "**Termination Events**"):

(a) the breach in any material respect by one or more of the Consenting Creditors of any of the undertakings, representations, warranties or covenants of the Consenting Creditors set forth herein which remains uncured for a period of five (5) business days after the receipt by the breaching Consenting Creditor(s) of written notice of such breach from the Debtors; *provided, however*, that the Debtors shall not have the right to terminate this Agreement if the remaining non-breaching Consenting Creditors have sufficient holdings to constitute Requisite Noteholders and/or Requisite Certificateholders;

(b) the occurrence of the Plan Support Outside Date; *provided, however*, that:

(i)    if all regulatory approvals with respect to consummation of the Plan have been obtained before October 31, 2019, and so long as the Consenting Creditors are not in material breach of their obligations under this Agreement, then the Plan Support Outside Date automatically shall be extended to and be thirty (30) days following receipt of the last-received regulatory approval; and

(ii)    if all regulatory approvals with respect to consummation of the Plan have not been obtained before October 31, 2019, and so long as the Requisite Supporting Parties are not in material breach of their obligations under this Agreement, then the Plan Support Outside Date shall be extended at the request of the Debtors, on the one hand, or the Requisite Supporting Parties, on the other hand until December 31, 2019;

(c) on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan (unless caused by a default by the Debtors of their obligations hereunder, in which event the Debtors shall not have the right to terminate under this subsection) or declining to approve the Disclosure Statement;

(d) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transactions, which ruling, judgment or order has not been stayed, reversed or vacated within twenty (20) business days after such issuance; and

4818-6864-9094 v2

(e) exercise by any of the Debtors of its "fiduciary out" as debtors-in-possession as provided for in Section 5.02(b) of this Agreement.

9.04. <u>Mansfield Termination Events</u>. Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 3 and 11 of this Agreement), the members of the Mansfield Certificateholders Group holding at least 65% of the total aggregate outstanding principal amount of the Certificate Claims held by the Mansfield Certificateholders Group (the "**Mansfield RSA Majority**"), shall have the right to terminate this Agreement, solely as to the Mansfield Certificateholders Group, upon the occurrence of any of the following:

(a) any Restructuring Document is not in form and substance acceptable to the Requisite Supporting Parties;

(b) any Restructuring Document is filed and is inconsistent with the Plan Term Sheet, and such inconsistency disproportionately and adversely affects the rights, obligations, or interests of the Consenting Certificateholders relative to the Consenting Noteholders;

(c) this Agreement, the Plan, or any other Restructuring Document is amended or modified, or any terms and conditions in any Restructuring Document are waived, in any manner that is adverse to the Consenting Certificateholders, and such amendment, modification or waiver disproportionately affects the rights, obligations, or interests of Consenting Certificateholders relative to the Consenting Noteholders;

(d) this section 9.04 is amended without the consent of the Mansfield RSA Majority; or

(e) any provisions of the Plan Term Sheet requiring the consent of the Mansfield RSA Majority are amended or modified without the consent of the Mansfield RSA Majority.

9.05. <u>FES Creditor Group Termination Events</u>. Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 3 and 11 of this Agreement), for the purposes of subsections (a)-(f) of this Section 9.05, the members of the FES Creditor Group holding at least 50% of the total face amount of the FES Claims and FENOC/FES Claims held by the FES Creditor Group, and for the purposes of subsections (a) and (g)-(i) of this Section 9.05, the members of the FES Creditor Group holding at least 50% of the total face amount of the FENOC/FES Claims held by the FES Creditor Group (the "**FES Creditor RSA Majority**"), shall have the right to terminate this Agreement, solely as to the FES Creditor Group, upon the occurrence of any of the events in subsections (a)-(f) of this Section 9.05, and solely as to the members of the FES Creditor Group that hold FENOC/FES Claims upon the occurrence of any of the events in subsections (a) and (g)-(i) of this Section 9.05:

(a) to the extent required by Section 3(b), any Restructuring Document is not in form and substance acceptable to the FES Creditor RSA Majority;

(b) any Restructuring Document is filed and is inconsistent with the Plan Term Sheet (including the Corporate Governance Term Sheet attached thereto) and such

21

inconsistency is related to the distributions on account of, or economic treatment of, the FES Single-Box Unsecured Claims, the rights of minority holders of New FES Common Stock, or release or exculpation provisions (except to the extent such inconsistency only results in *pro rata* dilution of New FES Common Stock);

(c)     this Agreement, the Plan, or any other Restructuring Document is amended or modified, or any terms and conditions in any Restructuring Document are waived, in any manner that is related to the distributions on account of, or economic treatment of, the FES Single-Box Unsecured Claims, the rights of minority holders of New FES Common Stock, or release or exculpation provisions (except to the extent such amendment, modification or waiver only results in *pro rata* dilution of New FES Common Stock);

(d)     Section 3(b), Section 5.02(a)(xvi), Section 5.02(a)(xvii), Section 9.05 or Section 9.10 of this Agreement, or any provision related to the payment of professional fees in the Plan Term Sheet (including Exhibit C attached thereto) is amended without the consent of the FES Creditor RSA Majority;

(e)     any provisions of the Plan Term Sheet requiring the consent of the FES Creditor RSA Majority are amended or modified without the consent of the FES Creditor RSA Majority;

(f)     the Plan Effective Date shall have not occurred on or before December 31, 2019;

(g)     any Restructuring Document is filed and is inconsistent with the Plan Term Sheet, and such inconsistency is related to the distributions on account of, or economic treatment of the FENOC/FES Unsecured Claims (except to the extent such inconsistency only results in *pro rata* dilution of New FES Common Stock);

(h)     this Agreement, the Plan, or any Restructuring Document is amended or modified, or any terms and conditions in any Restructuring Document are waived, in any manner that is related to the economic treatment of the FENOC/FES Unsecured Claims (except to the extent such amendment, modification or waiver only results in *pro rata* dilution of New FES Common Stock); or

(i)     subsection (g), (h) or (i) of this Section 9.05 is amended without the consent of the FES Creditor RSA Majority.

9.06.     <u>Committee Termination Events</u>. Notwithstanding anything to the contrary in this Agreement (including, without limitation, Sections 3 and 11 of this Agreement), the Committee may terminate this Agreement, solely as to the Committee, upon the occurrence of any of the following:

(a)     any Restructuring Document (other than this Agreement, which shall be in form and substance acceptable to the Committee) or any amendment thereto or waiver of any terms and conditions thereof, including any amendment to this Agreement, is not in form and substance reasonably acceptable to the Committee;

4818-6864-9094 v2

(b)     this section 9.06 is amended without the consent of the Committee;

(c)     upon the failure to meet any of the Milestones, other than the Milestone set forth in Section 4(f), unless the failure to meet such Milestone has been caused by a breach of this Agreement by the Committee;

(d)     following the delivery of written notice thereof by a non-breaching Party, the occurrence of a material breach by any Party of any of the representations, warranties, covenants, obligations or commitments set forth in this Agreement, or the failure of any Party to act in a manner materially consistent with this Agreement (including the Plan Term Sheet), which breach or failure to act (i) would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring Transactions or the Mansfield Settlement in accordance with the Milestones and on the terms and conditions set forth in this Agreement (including the Plan Term Sheet) and (ii) is uncured for a period of seven (7) business days after the receipt of written notice in accordance with Section 12.09 of such breach from any non-breaching Party provided that such breach is capable of being cured; *provided, however*, that such termination right will not be available to the Committee if the breach of this Agreement is by the Committee;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Plan in a way that cannot be reasonably remedied by the Debtors, the Requisite Noteholders, the Requisite Certificateholders or the Committee, or would have a material adverse effect on consummation of the Plan, unless the Debtors have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance;

(f)     the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Committee;

(g)     except to the extent necessary for the Committee to seek to terminate this Agreement pursuant to this paragraph, any of the Parties files a pleading seeking authority to amend, modify or withdraw any of the Restructuring Documents without the prior written consent of the Committee and the Debtors, and such motion or pleading has not been withdrawn or is not otherwise denied by the Bankruptcy Court within twenty (20) business days of receipt of notice by such party that such motion or pleading is inconsistent with this Agreement (including the Plan Term Sheet);

(h)     except to the extent necessary for the Committee to seek to terminate this Agreement pursuant to this paragraph, any of the Parties directly or indirectly propose, support, assist, solicit or file a pleading seeking approval of any alternative transaction (or any approval of any sales, voting or other procedures in connection with an alternative transaction)

23

4818-6864-9094 v2

without the prior written consent of the Committee and the Debtors that results in a material adverse effect for the consummation of the Restructuring Transactions;

(i)     the Debtors enter into an agreement to sell, or file a motion or application seeking authority to sell, all or a material portion of its assets without a prior written consent of the Committee;

(j)     the Debtors enter into an agreement to enter into, or file a motion seeking authority to enter into, post-petition secured financing, without the prior written consent of the Committee;

(k)     the Bankruptcy Court grants relief, or by declining to grant relief sought by any of the Parties causes a circumstance, that (i) is inconsistent with this Agreement (including the Plan Term Sheet) in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, unless the Debtors, the Requisite Noteholders, the Requisite Certificateholders, or the Committee have sought a stay of such relief within ten (10) business days after the date of such issuance, and such order is stayed, reversed or vacated within twenty (20) business days after the date of such issuance;

(l)     if any of the Debtors gives notice of a termination pursuant to Section 9.03(e);

(m)     the Settlement Agreement is terminated;

(n)     the issuance of an order or decree by any applicable regulatory agency making unlawful or otherwise prohibiting the consummation of the Plan or the transactions contemplated thereby or an unconditional denial with prejudice by any applicable regulatory agency of regulatory approvals required for consummation of the Plan;

(o)     any provisions of the Plan Term Sheet requiring the consent of the Committee are amended or modified without the consent of the Committee;

(p)     the Plan Effective Date shall have not occurred on or before December 31, 2019; or

(q)     exercise by the Committee of its "fiduciary out" as provided for in Section 5.01(c) of this Agreement.

9.07.     <u>Termination Upon Completion of the Restructuring Transactions</u>. This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date.

9.08.     <u>Effect of Termination</u>.

(a)     Notwithstanding anything in this Agreement to the contrary, no Party may terminate this Agreement if such Party failed to perform or comply in all material respects

24

with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.

(b)    The date on which termination of this Agreement is effective as to any Party (the "**Terminating Party**") shall be referred to as the "**Termination Date**." Upon the occurrence of the Termination Date and subject to Section 12.10, (i) this Agreement shall be of no further force and effect as to the Terminating Party and such Terminating Party shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, provided, that in no event shall any termination relieve any Terminating Party from liability for its material breach or material non-performance of its obligations hereunder prior to the date of such termination and (ii) any and all consents or ballots (other than consents or ballots tendered by Committee members solely in their individual capacity and not in their capacity as members of the Committee) tendered by the Terminating Party before the Termination Date relating to the Restructuring Transactions or this Agreement shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise.

(c)    Notwithstanding anything to the contrary in this Agreement, this Section 9.08 shall not be construed to prohibit any of the Debtors, the Committee, or the Consenting Creditors from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before the Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict any right of any Party, or the ability of any Party, to protect and preserve its rights (including rights under this Agreement), remedies and interests, including its claims against any other Party.

9.09.    Automatic Stay. The Debtors acknowledge that the giving of any notice of termination by any Party pursuant to this Agreement or the exercise of any rights in compliance with any provision hereto shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code; provided, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

9.10.    Fees. Subject to entry of the RSA Order and except as otherwise provided for in the PSA, the Debtors shall pay the reasonable and documented professional fees and expenses of the following advisors (i) GLC Advisors & Co., as financial advisors to the Ad Hoc Noteholder Group, (ii) Guggenheim Securities, LLC, as financial advisor to the Mansfield Certificateholders Group, (iii) Davis Polk and Wardwell LLP, as legal advisor to the FES Creditor Group, (iv) Frost Brown Todd LLC, as local legal advisor to the FES Creditor Group, and (v) Houlihan Lokey Capital, Inc. as financial advisor to the FES Creditor Group (including, with respect to the advisors referenced in clauses (i), (ii) and (v), fees in accordance with the terms set forth in Exhibit D to the Plan Term Sheet (notwithstanding the terms of any existing engagement letters entered into by such advisors)); provided that the Debtors shall not be responsible under this Agreement for any fees and expenses referenced in this Section 9.10 incurred after the termination of this Agreement; provided further, that the Debtors shall only pay transaction or back-end fees of financial advisors

25

upon consummation of the Plan as set forth in the Plan Term Sheet or as may be modified or amended in accordance with the terms hereof.

**Section 10.**   *Good Faith Cooperation; Further Assurances.*   The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring Transactions. Further, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (provided, that nothing set forth in this Section 10 shall require any Consenting Creditor to provide any information that it determines, in its discretion, to be sensitive or confidential or to take any actions other than in its capacity as holder of Creditor Claims, provided, further, however that the Consenting Creditors shall be required to provide any information reasonably necessary, or information requested from regulators, to obtain required regulatory approvals, including, but not limited to, approvals from FERC and the NRC) subject to the Debtors using commercially reasonable efforts to obtain an appropriate protective order or other appropriate confidentiality protections with respect to any such information that the Consenting Creditors indicate is confidential in nature. Each of the Parties hereby covenants and agrees (a) to negotiate in good faith and in a timely manner (giving effect to the Milestones set forth in Section 4) the Restructuring Documents (including, without limitation, the Plan and Disclosure Statement) and (b) subject to the satisfaction of the terms and conditions set forth herein, to execute the Restructuring Documents.

**Section 11.**   *Amendments and Waivers.*   The terms and conditions of this Agreement, including any exhibits, annexes or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the prior written consent of the Debtors, the Committee, the Requisite Supporting Parties, *provided* that any amendment, modification or supplement that adversely affects any of the Debtor estates is subject to the reasonable consent of each such Debtor; *provided further*, that, any waiver, modification, amendment or supplement to this Agreement (or any exhibits, annexes or schedules hereto) that, if effective, would permit the Mansfield RSA Majority to terminate this Agreement as to the Mansfield Certificateholders Group pursuant to Section 9.04 of this Agreement, shall also require the consent of the Mansfield RSA Majority; *provided further*, that, any waiver, modification, amendment or supplement to this Agreement (or any exhibits, annexes or schedules hereto) that, if effective, would permit the FES Creditor RSA Majority to terminate this Agreement as to the FES Creditor Group pursuant to Section 9.05 of this Agreement, shall also require the consent of the FES Creditor RSA Majority.

**Section 12.**   *Miscellaneous.*

12.01.   <u>Entire Agreement</u>.   This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

12.02.   <u>Headings</u>.   The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

26

4818-6864-9094 v2

12.03. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court (or court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter.

12.04. <u>Trial by Jury Waiver</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.05. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

12.06. <u>Rules of Construction</u>. Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a chapter 11 plan under the Bankruptcy Code. When a reference is made in this Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include email. Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

12.07. <u>Interpretation; Representation by Counsel</u>. This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Parties were each represented by

27

counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

12.08. <u>Successors and Assigns; No Third Party Beneficiaries</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity other than as permitted herein.

12.09. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

      (a)    if to the Debtors, to the electronic mail addresses set forth below such Party's signature, as the case may be, with copies to:

> FirstEnergy Solutions Corp.
> 341 White Pond Drive
> Akron, OH 44320
> Attention: Rick Giannantonio, General Counsel
> Email address: giannanr@firstenergycorp.com
>
> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, NY 10036
> Attention: Ira Dizengoff; Brad Kahn
> Email address: idizengoff@akingump.com and bkahn@akingump.com
>
> Akin Gump Strauss Hauer & Feld LLP
> 1333 New Hampshire Avenue, N.W.
> Washington, DC 20036
> Attention: Scott Alberino
> Email address: salberino@akingump.com
>
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attention: Matthew A. Feldman; Joseph G. Minias
> Email address: mfeldman@willkie.com; jminias@willkie.com
>
> Honigman Miller Schwartz and Cohn LLP
> 2290 First National Building
> 660 Woodward Avenue

28

4818-6864-9094 v2

Detroit, MI 48226
Attention: Joseph Sgroi
Email address: jsgroi@honigman.com

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attention: Mark Somerstein
Email address: mark.somerstein@ropesgray.com

      (b)     if to the Committee, to the electronic mail addresses set forth below such Party's signature, as the case may be, with copies to:

Milbank Tweed Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attention: Evan R. Fleck and Parker J. Milender
Email address: efleck@milbank.com; pmilender@milbank.com

      (c)     if to the Ad Hoc Noteholder Group (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention: Joshua K. Brody and Joseph A. Shifer
Email address: jbrody@kramerlevin.com;
jshifer@kramerlevin.com

      (d)     if to the Mansfield Certificateholders Group, to the electronic mail addresses set forth below such Party's signature (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attention: George Davis and Andrew Parlen
Email address: george.davis@lw.com; andrew.parlen@lw.com

      (e)     if to the FES Creditor Group to the electronic mail addresses set forth below such Party's signature (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017

4818-6864-9094 v2

Attention: Darren S. Klein and Natasha Tsiouris
Email address: darren.klein@davispolk.com;
natasha.tsiouris@davispolk.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

12.10.  Survival.  Notwithstanding the termination of this Agreement pursuant to Section 9, the agreements and obligations of the Parties in this Section 12.10 and Sections 9.08, 12.01, 12.03, 12.04, 12.05, 12.06, 12.07, 12.08, 12.09, 12.11, 12.12, 12.13, 12.14, 12.15, 12.16, 12.17 and 12.19 shall survive.

12.11.  Independent Analysis.  Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

12.12.  Waiver.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions or the payment of damages to which a Party may be entitled under this Agreement.

12.13.  Relationship Among Parties.

(a)      Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Debtors and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"); (v) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, including as a result of this Agreement or the transactions contemplated herein or in the Plan; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

(b)      Notwithstanding anything to the contrary herein, this Agreement (including the Plan Term Sheet) and the transactions contemplated hereby shall not create any fiduciary duties between and among the Consenting Creditors, or other duties or responsibilities to each other, the Committee, the Debtors, or any Debtor's creditors or other stakeholders.

4818-6864-9094 v2

12.14. <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

12.15. <u>Several, Not Joint and Several, Obligations</u>. Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the Parties under this Agreement are, in all respects, several and not joint and several.

12.16. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.17. <u>Reporting of Creditor Claims</u>. The Parties agree and acknowledge that the reported amount of the Creditor Claims reflected in each Consenting Creditor signature block does not necessarily reflect the full amount of such Consenting Creditor's Creditor Claims (including, without limitation, principal, accrued and unpaid interest, makewhole, fees and expenses) and any disclosure made on any such signature block shall be without prejudice to any subsequent assertion by or on behalf of such Consenting Creditor of the full amount of its Creditor Claims.

12.18. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

12.19. <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

12.20. <u>Intercompany Agreements Motion</u>. The Debtors agree to adjourn the *Motion of Debtors for Entry of Interim and Final Orders Authorizing Continued Performance Obligations Under Intercompany and Shared Services Agreements* [Docket No. 12] without date and shall file a notice of such adjournment on the Bankruptcy Court docket promptly following the Agreement Effective Date.

4818-6864-9094 v2

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first above written.

**DEBTORS**

**FIRSTENERGY SOLUTIONS CORP.**

By: _____

Name: Kevin T. Warvell
Title: Vice President, Corporate Secretary,
Chief Financial Officer, Treasurer

**FIRSTENERGY NUCLEAR OPERATING COMPANY**

By: _____

Name: Kevin T. Warvell
Title: Vice President, Corporate Secretary,
Chief Financial Officer, Treasurer

**FIRSTENERGY GENERATION, LLC**

By: _____

Name: Kevin T. Warvell
Title: Vice President, Corporate Secretary,
Chief Financial Officer, Treasurer

**FIRSTENERGY MANSFIELD UNIT 1 CORP.**

By: _____

Name: Kevin T. Warvell
Title: Vice President, Corporate Secretary,
Chief Financial Officer, Treasurer

**NORTON ENERGY STORAGE, LLC**

By: FirstEnergy Generation, LLC, its sole Member

By: _____

Name: Kevin T. Warvell
Title: Vice President, Corporate Secretary,
Chief Financial Officer, Treasurer

**FIRSTENERGY NUCLEAR GENERATION, LLC**

By: _____
Name: Kevin T. Warvell
Title: Vice President, Corporate Secretary, Chief Financial Officer, Treasurer

**FIRSTENERGY AIRCRAFT LEASING CORP.**

By: _____
Name: Kevin T. Warvell
Title: Vice President, Corporate Secretary, Chief Financial Officer, Treasurer

**Avenue Capital Management II L.P.**
**solely on behalf of certain funds it advises**

BY: its General Partner, Avenue Capital
Management II GenPar, LLC

By: _____
Name: Sonia Gardner
Title: Member

Principal amount of Pollution Control Notes: ██████████

Principal amount of Unsecured Notes: ██████████

Principal amount of Pass-Through Certificates: ██████████

Other claims (specify type and amount): ██████████

| Notice Address: | 399 Park Avenue |
| | New York, NY 10024 |

| Attn: | Matt Kimble |
| Fax: | |
| Email: | mkimble@avenuecapital.com |

*[Signature Page Restructuring Support Agreement]*

**Cove Key Management, LP**

By: _____

Name: John Kiani

Title:  Co-Founder and Portfolio Manager


Principal amount of Pollution Control Notes: ██████████████

Principal amount of Unsecured Notes: ███████████████

Principal amount of Pass-Through Certificates: ██████████████

Other claims (specify type and amount): ███████████████


Attn:              John Kiani
                    Cove Key Management
Email:            john@covekey.com

*[Signature Page Restructuring Support Agreement]*

**Nuveen Asset Management, LLC,**
as investment adviser on behalf of certain
fund/s accounts, severally and not jointly

By: _____

Name: _____
STUART J. COHEN

Title: _____
MANAGING DIRECTOR & HEAD OF LEGAL
NUVEEN ASSET MANAGEMENT, LLC

Principal amount of Pollution Control Notes: ███████████████

Principal amount of Unsecured Notes: ███████████████

Principal amount of Pass-Through Certificates: ███████████████

Other claims (specify type and amount): ███████████████

Notice Address:        Nuveen Asset Management, LLC
                       333 W Wacker Drive
                       Chicago, IL 60606
Attn:                  Douglas Johnston
                       Douglas.johnston@nuveen.com

With Copy to:          Nuveen Asset Management, LLC
                       333 W Wacker Drive
                       Chicago, IL 60606
                       Attn: Stuart Cohen
                       Stuart.cohen@nuveen.com

*[Signature Page Restructuring Support Agreement]*

**USAA**
**USAA General Indemnity Co.**
**Garrison Property & Casualty Ins. Co.**
**USAA Life Insurance Co.**
**USAA Life Insurance Co. of NY**
**USAA Tax Exempt Long-Term Fund**
**USAA Tax Exempt Intermediate-Term Fund**
**USAA Tax Exempt Short-Term Fund**

By: _____

Name: _____ John C Spear _____

Title: _____ SVP CIO USAA Asset Management Co _____

Principal amount of Pollution Control Notes: ████████████████

Principal amount of Unsecured Notes: ████████████████

Principal amount of Pass-Through Certificates: ████████████████

Other claims (specify type and amount): ████████████████

Notice Address:    USAA
                   A03E, Fixed Income
                   9800 Fredericksburg Rd
                   San Antonio, TX 78288

Attn:    Hal Candland, Tim Caffrey & Andrew
         Whyte
Fax:     210-498-7953
Email:   hal.candland@usaa.com,
         timothy.caffery@usaa.com
         andrew.whyte@usaa.com

*[Signature Page Restructuring Support Agreement]*

P. Schoenfeld Asset Management LP

By: _____

Name: _____

Title: _____
Dhananjay Pai
President & COO

Principal amount of Pollution Control Notes: $ _REDACTED____

Principal amount of Unsecured Notes: $ _REDACTED_____

Principal amount of Pass-Through Certificates: $ _REDACTED_

Other claims (specify type and amount): $ _____

Notice Address:     P. Schoenfeld Asset Management LP
                    1350 Avenue of the Americas, 21st Floor
                    New York, NY 10019
Attn:               Legal Department
Fax:                _____
Email:              pbrown@psam.com

**Latigo Partners, LP**

By: _____

Name: Ben Cohn

Title: Authorized Signatory

Principal amount of Pollution Control Notes: $ _____

Principal amount of Unsecured Notes: $ _____

Principal amount of Pass-Through Certificates: $ REDACTED

Other claims (specify type and amount): $ _____

Notice Address: 450 Park Avenue, 12th Floor

New York, NY 10022

Attn: Ben Cohn
Fax: 212-371-2949
Email: bc@latigopartners.com

*[Signature Page Restructuring Support Agreement]*

**CVC CREDIT PARTNERS LLC**

By: _____

Name:  Caroline Benton

Title:  Senior Managing Director


Principal amount of Pollution Control Notes:  $REDACTED

Principal amount of Unsecured Notes:  $REDACTED

Principal amount of Pass-Through Certificates:  $REDACTED

Other claims (specify type and amount):  $REDACTED


| Notice Address: | CVC Credit Partners LLC |
|---|---|
| | 712 Fifth Avenue, 42nd Fl |
| | New York, NY 10019 |
| Attn: | Caroline Benton |
| Fax: | 1-212-761-0481 |
| Email: | cbenton@cvc.com |

*[Signature Page Restructuring Support Agreement]*

**Serengeti Asset Management, LP as
investment manager**

By: _____

Name:  Marc Baum

Title:  Director


Principal amount of Pollution Control Notes:  $REDACTED

Principal amount of Unsecured Notes:  $REDACTED

Principal amount of Pass-Through Certificates:  $REDACTED

Other claims (specify type and amount):  $REDACTED

| | |
|---|---|
| Notice Address: | 632 Broadway |
| | New York, NY 10024 |
| | |
| Attn: | Marc Baum |
| Fax: | |
| Email: | mbaum@serengeti-am.com |

*[Signature Page Restructuring Support Agreement]*

**RIMROCK HIGH INCOME PLUS
(MASTER) FUND, LTD
RIMROCK LOW VOLATILITY
(MASTER) FUND, LTD**

By: Rimrock Capital, as its investment
manager

By: _____

Name: Chris Chester

Title: Managing Director

Principal amount of Pollution Control Notes:  $REDACTED

Principal amount of Unsecured Notes:  $REDACTED

Principal amount of Pass-Through Certificates:  $REDACTED

Other claims (specify type and amount): $REDACTED

Notice Address:  100 Innovation Drive
Irvine, CA 92617

Attn:  Andrew Gu
Fax:
Email:  agu@rimrockcapital.com

*[Signature Page Restructuring Support Agreement]*

VR Global Partners, L.P.

By: _[signature]_

Name: Emile du Toit

Title: Authorized signatory

Principal amount of Pollution Control Notes: $ _____

Principal amount of Unsecured Notes: $ _____

Principal amount of Pass-Through Certificates: $ REDACTED

Other claims (specify type and amount): $ _____

| | |
|---|---|
| Notice Address: | 300 Park Avenue, Suite 1602, |
| | New York, NY 10022, USA |
| Attn: | Sina Toussi |
| Fax: | |
| Email: | stoussi@vr-capital.com |

*[Signature Page Restructuring Support Agreement]*

[Consenting Creditor]

By: _____

Name: JOSEPH DARCONTE

Title: SENIOR VICE PRESIDENT


Principal amount of Pollution Control Notes: $ REDACTED

Principal amount of Unsecured Notes: $ REDACTED

Principal amount of Pass-Through Certificates: $ REDACTED

Other claims (specify type and amount): $ REDACTED


Notice Address: JEFFERIES LLC

520 MADISON AVE

NY NY 10022

Attn: ERIC GELLER

Fax: _____

Email: ERIC.GELLER@JEFFERIES.COM


*[Signature Page Restructuring Support Agreement]*

DocuSign Envelope ID: 472F5325-DC1C-4D76-A52E-EB4DD076B9A9

LEGAL & GENERAL INVESTMENT
MANAGEMENT AMERICA, INC. on
behalf of certain holders of Pass-Through
Certificates

By: _Todd Bowker_

Name: Todd Bowker

Title: Head of PM Operations


Principal amount of Pollution Control Notes: $ REDACTED

Principal amount of Unsecured Notes: $ REDACTED

Principal amount of Pass-Through Certificates: $ REDACTED

Other claims (specify type and amount): $ REDACTED


| Notice Address: | Legal & General Investment Management America, Inc. |
|---|---|
| | 71 South Wacker Drive, Suite 800 |
| | Chicago, Illinois 60606 |
| Attn: | Legal |
| Fax: | |
| Email: | legallgima@lgima.com |


*[Signature Page Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**JPMorgan Chase Bank, N.A.**[1], with respect
to only its Credit Trading Group

By: _____
Name: Brian M. Ercolani
Title: Operations Manager

█████████████████████████████████████

Notice Address

JPMorgan Chase Bank, N.A.
Mail Code: DE3-4127
500 Stanton Christiana Rd., NCC5, Floor 01
Newark, DE 19713
Attention: Brian M. Ercolani
Email: CLS_Notices@jpmchase.com

---

[1] The Restructuring Support Agreement (the "Agreement") applies only to the Credit Trading Group of JPMorgan Chase Bank, N.A. ("CTG") and the Creditor Claims held by such group in the aggregate principal or face amount(s) set forth below the signature of JPMorgan Chase Bank, N.A. on behalf of, and with respect to, CTG.  Accordingly, the terms "Consenting FES Creditor", "Consenting Creditor", "Party", and "Parties" for all purposes of the Agreement mean and refer only to CTG and such business unit's holdings of the Creditor Claims. For the avoidance of doubt, the Agreement does not apply to (i) Creditor Claims, claims, securities, notes, other obligations or any other interests in the Debtors that may be held, acquired or sold by, or any activities, services or businesses conducted or provided by, any other group or business unit within, or affiliate of, JPMorgan Chase Bank, N.A., (ii) any credit facilities to which JPMorgan Chase & Co. or any of its affiliates ("Morgan") is a party in effect as of the date hereof, (iii) any new credit facility, amendment to an existing credit facility, or debt or equity securities offering involving Morgan, (iv) any direct or indirect principal activities undertaken by any Morgan entity engaged in the venture capital, private equity or mezzanine businesses, or portfolio companies in which they have investments, (v) any ordinary course sales and trading activity undertaken by employees who are not a member of CTG, (vi) any Morgan entity or business engaged in providing private banking or investment management services, or (vii) any Creditor Claims, loans, notes, or related claims that may be beneficially owned by non-affiliated clients of JPMorgan Chase Bank, N.A. or  any of its affiliates or for which JPMorgan acts in a fiduciary capacity.

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**Canyon Distressed Opportunities Master Fund II, L.P.**
By: Canyon Capital Advisors LLC, its Investment Advisor

By: _____
      Name: Jonathan M. Kaplan
      Title: Authorized Signatory

███████████████████████████████████████████

**Canyon-EDOF (Master) L.P.**
By: Canyon Capital Advisors LLC, its Investment Advisor

_____
Name: Jonathan M. Kaplan
Title: Authorized Signatory

███████████████████████████████████████████

**Canyon-NZ-DOF Investing, L.P.**
By: Canyon Capital Advisors LLC, its Investment Advisor

_____
Name: Jonathan M. Kaplan
Title: Authorized Signatory

███████████████████████████████████████████

Notice Address

Canyon Capital Advisors LLC
Attn: General Counsel
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067

Email: legal@canyonpartners.com; rviyer@canyonpartners.com; rteahen@canyonpartners.com

[*Signature Page to Restructuring Support Agreement*]

**CONSENTING CREDITOR**

**Marble Ridge Capital LP**, on behalf of funds or
accounts managed by it

By: _____

    Name: D. Kamensky
    Title: Managing Partner

Notice Address

Marble Ridge Capital LP
111 West 33rd Street, Suite 2116
New York, NY 10120
Fax: _____
Attention:_____
Email: dkamensky@marbleridgecap.com; rjoshi@marbleridgecap.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**LJH portfolio of Sunrise Partners Limited Partnership**, solely in respect of itself and not any other affiliate thereof (or any other separately managed portfolio thereof)

By: _____

Name: Douglas W. Ambrose

Title: Executive Vice President of Paloma Partners Management Company, general partner of Sunrise Partners Limited Partnership

Notice Address

c/o Paloma Partners Management Company
Two American Lan
Greenwich, CT 06831
Fax: 203-861-3210
Attention: Douglas Ambrose
Email: dambrose@paloma.com

*[Signature Page to Restructuring Support Agreement]*

**CONSENTING CREDITOR**

**Scoggin International Fund, Ltd.**, solely in respect of itself and not any other affiliate thereof (or any other separately managed portfolio thereof)

By:   Scoggin Management LP its investment manager
      By: Scoggin GP LLC its GP



      _____
      Name: Craig Effron
      Title:  Member

**Scoggin Worldwide Fund, Ltd.**, solely in respect of itself and not any other affiliate thereof (or any other separately managed portfolio thereof)

By:   Old Bellows Partners LP its investment manager
      By: Old Bell Associates LLC its GP
      _____
      Name: Craig Effron
      Title:  Member

Notice Address

Scoggin Management LP
660 Madison Avenue, Floor 20
New York, NY 10065
Attention: Dev Chodry / Matt Ragsdale
Email: dchodry@scogcap.com / mragsdale@scogcap.com

*[Signature Page to Restructuring Support Agreement]*

**THE COMMITTEE CO-CHAIRS, FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**BNSF Railway Company**

By: _____
Name: Munsoor Hussain
Title:  Assistant General Tax Counsel

**Wilmington Savings Fund Society, FSB,**
in its capacity as the indenture trustee for the lessor notes issued under six indentures with Mansfield 2007 Trusts A-F and its capacity as pass through trustee under the pass through trust agreement with FirstEnergy Generation, LLC and FirstEnergy Solutions Corp. for the pass through certificates issued in connection with the sale-leaseback transaction for Unit 1 of the Bruce Mansfield Plant

By: _____
Name: Patrick J. Healy
Title:  Senior Vice President and Director

**THE COMMITTEE CO-CHAIRS, FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**BNSF Railway Company**

By: _____
Name: Munsoor Hussain
Title: Assistant General Tax Counsel

**Wilmington Savings Fund Society, FSB,**
in its capacity as the indenture trustee for the lessor notes issued under six indentures with Mansfield 2007 Trusts A-F and its capacity as pass through trustee under the pass through trust agreement with FirstEnergy Generation, LLC and FirstEnergy Solutions Corp. for the pass through certificates issued in connection with the sale-leaseback transaction for Unit 1 of the Bruce Mansfield Plant

By: _____
Name: Patrick J. Healy
Title: Senior Vice President and Director

## EXHIBIT A

## PLAN TERM SHEET

# FirstEnergy Solutions Corp. Plan Term Sheet

January 23, 2019

This term sheet (the "**Term Sheet**") sets forth certain of the principal terms for the proposed restructuring (the "**Restructuring**") for FirstEnergy Solutions Corp. ("**FES**") and its subsidiaries, and FirstEnergy Nuclear Operating Company ("**FENOC**") (each a "**Debtor**" and, collectively, the "**Debtors**") that have commenced cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Ohio (the "**Bankruptcy Court**") on March 31, 2018 (the "**Petition Date**"). The Restructuring contemplated herein shall be implemented pursuant to a proposed joint chapter 11 plan of reorganization for the Debtors (the "**Plan**"). Consistent with the Debtors' exclusive right to file the Plan pursuant to section 1121 of the Bankruptcy Code, the Debtors shall be the proponents of the Plan.

This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation necessary for the consummation of the Plan and the transactions to be contemplated therein, which will remain subject to discussion and negotiation in good faith among the Debtors and the following parties: (i) members of the ad hoc group (the "**Ad Hoc Noteholder Group**") consisting of the holders of the majority in aggregate amount of (a) certain secured pollution control revenue bonds supported by notes (the claims arising under such notes, the "**Secured PCN Claims**") issued by Debtors FirstEnergy Generation, LLC ("**FG**") and FirstEnergy Nuclear Generation, LLC ("**NG**"), (b) certain unsecured pollution control revenue bonds supported by notes (the claims arising under such notes, the "**Unsecured PCN Claims**" and, together with the Secured PCN Claims, the "**PCN Claims**") issued by FG and NG, and (c) certain unsecured notes issued by FES (the claims arising under such notes, the "**FES Notes Claims**"); (ii) members of the ad hoc group (the "**Mansfield Certificateholders Group**") of certain holders of pass-through certificates issued in connection with the leveraged lease transaction for Unit 1 of the Bruce Mansfield Power Plant (the claims arising under such certificates, the "**Mansfield PTC Claims**" and together with the Unsecured PCN Claims and FES Note Claims, the "**Unsecured Bond Claims**"); (iii) certain holders (or advisors or managers thereof) of (a) unsecured claims against FES arising from the rejection of certain power purchase agreements (the "**FES Claims**") and (b) unsecured claims against FENOC that are guaranteed by FES (the "**FENOC/FES Claims**") that are members of the ad hoc group represented by Davis Polk & Wardwell LLP (collectively, the "**FES Creditor Group**" and, together with the Mansfield Certificateholders Group and the Ad Hoc Noteholder Group, the "**Consenting Creditors**"); and (iv) the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**").

The transactions contemplated by this Term Sheet are subject to (i) entry into a Restructuring Support Agreement (the "**RSA**")[1] among the Debtors, the Consenting Creditors and the Committee (collectively, the "**RSA Parties**"), in form and substance acceptable to the Debtors and the RSA Parties, (ii) satisfaction of all of the conditions set forth in the RSA and in any definitive documentation evidencing the transactions comprising the Restructuring, (iii) the

---

[1] Capitalized terms not otherwise defined in this Term Sheet shall have the meanings ascribed to them in the RSA.

negotiation and execution of definitive documents evidencing and related to the Restructuring contemplated herein, (iv) approval of a disclosure statement in respect of the Plan pursuant to section 1125 of the Bankruptcy Code (the "**Disclosure Statement**"), and (v) entry of an order of the Bankruptcy Court confirming the Plan (the "**Confirmation Order**") and the satisfaction of any conditions to the effectiveness thereof (the date of such effectiveness, the "**Effective Date**").

This Term Sheet has been prepared for settlement discussion purposes only and shall not constitute an admission of liability by any party, nor be admissible in any action relating to any of the matters addressed herein. Nothing in this Term Sheet shall be deemed to be the solicitation of an acceptance or rejection of a Plan. Further, nothing herein shall be an admission of fact or liability or deemed binding on the Parties, except as provided by the RSA.

| PLAN OVERVIEW | |
|---|---|
| Debtors | FES, FENOC, FE Aircraft Leasing Corp. ("**FEALC**"), FG, NG, FirstEnergy Generation Mansfield Unit 1 Corp. ("**FGMUC**"), and Norton Energy Storage L.L.C. ("**Norton**"). |
| Transaction Overview | As set forth in greater detail herein, the Plan shall provide for:<br><br>• The reorganization of each of the Debtor entities;<br>• The distribution of cash or equity interests in either (i) reorganized FES ("**Reorganized FES**") or (ii) New FES (as defined below) (such election of either Reorganized FES or New FES to be made by Debtors and the Requisite Supporting Parties in the reasonable discretion of such parties and in consultation with the Committee)[2];<br>• The implementation of a Plan Settlement, as described further below, and the Mansfield Settlement; and<br>• The reinstatement or payment in full of the Secured PCN Claims. |
| Plan Settlement | The Plan shall contain and effect a global and integrated compromise and settlement (the "**Plan Settlement**") of all disputes between and among the Debtors, the Independent Directors of the Debtors, the Committee, and the Consenting Creditors pursuant to section 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, including, without limitation, any and all issues relating to (i) the allowance and treatment of all Claims the Debtors may have against each other, whether arising prior to (the "**Prepetition Intercompany Claims**") or after the Petition Date (the |

---

[2] It is contemplated that additional newly-formed corporate entities may be included in the corporate restructuring of the Debtors as determined by the Debtors and the Requisite Supporting Parties (in consultation with the Committee) and that the distribution of equity interests in Reorganized FES or New FES may be in the form of equity interests in the ultimate parent entity of the reorganized Debtors which may be one such newly-formed entity.

2

"**Postpetition Intercompany Claims**" and collectively with Prepetition Intercompany Claims, the "**Intercompany Claims**"), (ii) allocation of administrative expenses among the Debtors, (iii) the allocation among the Debtors of the FE Settlement Consideration (defined below) and (iv) the allocation of value of all other assets of the Debtors.

*Allowance and Treatment of Intercompany Claims*

The treatment of Intercompany Claims shall be as set forth below. Additionally, as part of the Plan Settlement, $45.75 million of the aggregate Unsecured Creditor Distributable Value otherwise available for distribution to holders of Unsecured Bond Claims shall be reallocated to holders of Single-Box Unsecured Claims[3] against the various Debtors ratably based on the allocation of FE Settlement consideration to such Debtors (the "**Reallocation Pool**"). For the avoidance of doubt, Prepetition Intercompany Claims shall not receive a recovery from the Reallocation Pool.

The portion of the Reallocation Pool allocable to NG (the "**NG Reallocation Pool**") shall in turn be re-allocated ratably to Holders of Allowed Single-Box Unsecured Claims against FES. For the avoidance of doubt, Prepetition Intercompany Claims shall not receive any portion of the NG Reallocation Pool.

In connection with the resolution of the FENOC Postpetition Claim Against FES, $12.5 million of the aggregate Unsecured Creditor Distributable Value (as defined below) otherwise available for distribution to the holders of Unsecured Bondholder Claims shall be re-allocated to holders of Single-Box Unsecured Claims against FES and holders of claims against both FENOC and FES (the "**FENOC/FES Claim Reallocation**"). For the avoidance of doubt, Prepetition Intercompany Claims shall not receive a recovery from the FENOC/FES Claim Reallocation.

*Allocation of Administrative Expenses*

For the purposes of the Plan Settlement, the payment of projected claims entitled to administrative expense or priority expense status under the Bankruptcy Code, including professional fees, ("**Administrative Expense Claims**") and Other Secured Claims (as defined below), was allocated among the Debtor entities on a ratable basis based on the estimated amount of Unsecured Claims[4] against each Debtor, taking into account any guarantee

---

[3] "**Single-Box Unsecured Claims**" means all Unsecured Claims (as defined below) other than Unsecured Claims which are allowed against multiple Debtors. "General Unsecured Claims" means all Unsecured Claims (as defined below) other than Unsecured Bondholder Claims.

[4] "**Unsecured Claims**" shall mean all unsecured claims against the Debtors other than Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims (including, without limitation, General Unsecured Claims and

claims against such Debtor (the "**Allocated Administrative Expenses**"); *provided* that to the extent a projected Administrative Expense Claim or Other Secured Claim was directly attributable to a particular Debtor (*e.g.* a trade claim) such a claim was allocated to that particular Debtor and does constitute an Allocated Administrative Expense. For the avoidance of doubt, Intercompany Claims shall not be included in the calculation of Allocated Administrative Expenses.

Notwithstanding the foregoing, to the extent aggregate allowed Administrative Expense Claims or Other Secured Claims differ from the projected amount of such claims set forth on **Exhibit A** hereto and incorporated into the calculation of Unsecured Creditor Distributable Value (as defined below) (the "**Estimated Administrative Expenses**"), the difference between such aggregate allowed amount of Administrative Expense Claims and Other Secured Claims and Estimated Administrative Expenses (positive or negative) shall be allocated among the Debtors ratably based on their respective Distributable Value Splits (the "**Administrative Expense Adjustment**").

"**Distributable Value Splits**" shall mean, with respect to each Debtor, the ratable share of aggregate Unsecured Creditor Distributable Value (as defined below) available for distribution to third-party Unsecured Claims of such Debtor (such third-party Unsecured Claims do not include Prepetition Intercompany Claims) taking into account the Reallocation Pool, the NG Reallocation Pool and the FENOC/FES Claim Reallocation as set forth on **Exhibit A**.

Notwithstanding the foregoing, to the extent there are allowed Administrative Expense Claims arising from the long-term power purchase agreements between FES, on the one hand, and the Ohio Valley Electric Corporation and Maryland Solar LLC, on the other hand, any such claims shall be directly allocated to FES and shall not be deemed Allocated Administrative Expenses (the "**FES-Only Administrative Expenses**").

*Allocation of FE Settlement Consideration*

The Plan shall allocate the direct consideration provided to the Debtors under the FE Settlement (specifically the New FE Notes, the $225 million settlement payment, the value of the Pleasants Power Plant and the $112.5 million credit provided with respect to shared services) which is estimated to be $1,046,500,000.00 (the "**FE Settlement Consideration**"). The FE Settlement Consideration shall be allocated among the Debtor entities as

---

Unsecured Bond Claims).

4

| | follows: |
|---|---|
| | • FES: 57.5%<br>• FG: 23.4%<br>• NG: 15.1%<br>• FGMUC: 1.3%<br>• FENOC: 2.7%<br><br>*Allocation of Inter-Company Revolver*<br><br>The Plan Settlement shall provide for the allocation the prepetition inter-company revolver with FE as follows:<br><br>• FES: $475 million<br>• FG: $25 million |
| Intercompany Claim Settlement | Pursuant to the Plan Settlement (and solely in connection with consummation of the Plan Settlement), the Intercompany Claims shall be allowed under the Plan as follows:<br><br>• <u>FG Prepetition Intercompany Claims against FES</u> – allowed as unsecured claims in the aggregate amount of $1,488,190,630 (representing a 15% discount to the aggregate asserted amount of such claims);<br>• <u>NG Prepetition Intercompany Claims against FES</u> – allowed as unsecured claims in the aggregate amount of $1,670,896,976 (representing a 4.7% discount to the aggregate asserted amount of such claims);<br>• <u>FG Postpetition Intercompany Claims against FES</u> – claims shall be allowed as super-priority administrative expense claims in an amount equal to $120,291,389;<br>• <u>NG Postpetition Intercompany Claims against FES</u> - claims shall be allowed as super-priority administrative expense claims in an amount equal to $238,431,879;<br>• <u>FGMUC Prepetition Intercompany Claims against FG</u> – allowed as unsecured claims in the aggregate amount of $901,881,812 (representing a 15% discount to the aggregate asserted amounts of such claims);<br>• <u>FGMUC Postpetition Intercompany Claims against FG</u> - disallowed in full;<br>• <u>FENOC Postpetition Intercompany Claims against FES</u>- claims shall be allowed (i) as super-priority administrative claims in the amount of $2,000,000 and (ii) as an unsecured claim in the aggregate amount of $28,000,000.<br>• <u>FENOC Postpetition Intercompany Claims against NG</u> – claims shall be allowed as super-priority administrative claims in the amount of $69,929,041. |

5

| | All other Prepetition Intercompany Claims shall be treated as if allowed in the amounts set forth in accordance with the applicable intercompany agreements. That certain Second Revised Genco Power Supply Agreement, dated as of January 1, 2007, between FES and FG (the "**FG PPA**") is, upon the Agreement Effective Date, hereby automatically amended to allow either party thereto to terminate the FG PPA for the term beginning July 1, 2019, upon at least 30 days' notice prior to June 30, 2019. |
|---|---|
| FE Settlement | The Plan shall implement the Settlement Agreement, dated as of August 26, 2018, among the Debtors, the Debtors' non-Debtor affiliates (the "**FE Non-Debtor Parties**"), the Ad Hoc Noteholders Group, the Mansfield Certificateholders Group, and the Official Committee of Unsecured Creditors (the "**FE Settlement**"). |
| | The Plan shall authorize the Debtors, with the reasonable consent of the Committee and the Requisite Supporting Parties, to enter into one or more transactions to monetize the New FE Notes on or as soon as practicable following the Effective Date. |
| Mansfield Settlement | As part of the Plan Settlement, the Plan shall incorporate a compromise and settlement of the Claims held by Mansfield Indenture Trustee for the Mansfield Certificates and potential objections to the amount, priority and availability or applicability of any guarantees related to such Claims (the "**Mansfield Settlement**"). Specifically, the Mansfield Settlement shall include the following terms, among others: |
| | (i)      Mansfield PTC Claims shall be allowed as unsecured claims in the amount of $786,763,400.00 (i.e., the outstanding amount of principal and accrued prepetition interest on the Mansfield PTC Claims) (the "**Allowed Mansfield PTC Claims**"); |
| | (ii)      The Allowed Mansfield PTC Claims shall be allowed against FG, NG, FES, and FGMUC, *provided, however*, that any distribution on account of the Allowed Mansfield PTC Claims against FGMUC shall be shared on a ratable basis among the holders of the Allowed Mansfield PTC Claims and the holders of the Unsecured PCN Claims and the FES Notes Claims;[5] |
| | (iii)      The following property shall be deemed and treated as unencumbered property of the Debtors' estates of (a) the 93.825% undivided interest in Unit 1 of the Mansfield Facility that is the subject of the leveraged |

---

[5] Mansfield Settlement turnover mechanics shall be incorporated in the Plan.

6

|  | sale and leaseback transaction and (b) any and all insurance proceeds to which the Mansfield Indenture Trustee might otherwise be entitled;<br><br>(iv)    The transfer to NG of any insurance proceeds recovered on account of Bruce Mansfield Unit 1 and any additional value attributable Bruce Mansfield Unit 1;<br><br>(v)    The Confirmation Order shall serve as an order authorizing the rejection, *nunc pro tunc* to the Petition Date, of the Mansfield Facility Lease Agreements; and<br><br>(vi)    $10 million of the aggregate Unsecured Creditor Distributable Value otherwise available for distribution to the holders of Certificate Claims shall be reallocated to the holders of the Unsecured PCN Claims and the FES Notes Claims. [6] |
|---|---|
| Restructuring | The Plan will provide for the following Restructuring of the Debtors:<br><br>• At the election of the Debtors and the Requisite Supporting Parties (such election to be made in the reasonable discretion of such parties) in consultation with the Committee, the Debtors shall either (i) reorganize FES, or (ii) form a new legal entity ("**New FES**") and/or (iii) transfer the assets of FES to New FES or another newly created legal entity, and cancel the equity of FES. [7]<br><br>• Each of the other Debtors shall be reorganized. The equity of FENOC shall be cancelled and new common stock of Reorganized FENOC shall be issued to either Reorganized FES or New FES, as applicable.<br><br>• Reorganized NG, Reorganized FG, and Reorganized FENOC, as applicable, shall each be wholly-owned subsidiaries of Reorganized FES or New FES, as applicable.<br><br>• On the Effective Date, the Pleasants Power Plant shall be transferred to a subsidiary of Reorganized FG (subject to the satisfaction of the conditions to closing under the asset purchase agreement related to the Pleasants Power Plant). Notwithstanding such transfer to a subsidiary of Reorganized FG, for purposes of distributions under the Plan, the value of the Pleasants Power Plant shall be |

---

[6] Mansfield Settlement turnover mechanics shall be incorporated in the Plan.

[7] It is contemplated that additional newly-formed corporate entities may be included in the corporate restructuring of the Debtors as determined by the Debtors and the Requisite Supporting Parties (in consultation with the Committee) and that the distribution of equity interests in Reorganized FES or New FES may in the form of equity interests in the ultimate parent entity of the reorganized Debtors which may be one such newly-formed entity.

7

| | |
|---|---|
| | allocated pursuant to the Plan Settlement. |
| | • Reorganized FES or New FES (as applicable) shall issue [___] shares of common stock, par value $0.001 per share (the "**New FES Common Stock**"). The issuance of the New FES Common Stock shall be pursuant to the registration exemptions provided by section 1145 of the Bankruptcy Code. All distributions of the New FES Common Stock under the Plan shall be subject to dilution by the MIP (defined below). |

## RETAIL BUSINESS

| | |
|---|---|
| Continued Operation of the Retail Business | Upon execution of the RSA, the Debtors shall terminate the Asset Purchase Agreement with Exelon Generation Company, LLC ("**Exelon**") for the sale of the Retail Business (the "**Exelon APA**"). |

## ALLOCATION OF DISTRIBUTABLE VALUE

| | |
|---|---|
| Secured PCN Claim Distributions | Pursuant to the Plan and the applicable governing indentures and mortgage indentures, the collateral trustee for the Secured PCN Claims against FG shall distribute to the holders of Secured PCN Claims against FG any cash being held by such collateral trustee under the mortgage indenture as of the Plan Effective Date on account of (i) FG's portion of the Bay Shore Plant sale proceeds, (ii) the West Lorain Power Plant sale proceeds, if any, (iii) sale proceeds from the RE Burger Power Plant sale, (iv) insurance proceeds with respect to the January 2018 fire at the Bruce Mansfield Plant to the extent allocable to Unit 2 or common facilities, if any, and (v) any proceeds from any other collateral securing mortgage bonds underlying the Secured PCN Claims against FG (the "**Secured PCN Cash Distribution**"). The Secured PCN Cash Distribution shall be allocated as follows: (i) *first*, to pay in full, including accrued and unpaid prepetition and postpetition interest, the Secured PCN Claims arising from any secured pollution control revenue bonds supported by notes that will have matured according to their stated maturity prior to the Effective Date; (ii) *second*, to pay in full, including accrued and unpaid prepetition and postpetition interest, the Secured PCN Claims arising from secured pollution control revenue bonds supported by notes listed as CUSIPs 074876HQ9 and 708686EE6; and (iii) *third*, ratably to Secured PCN Claims consisting of accrued and unpaid prepetition and postpetition interest, other than any such Secured PCN Claims that received a distribution pursuant to the foregoing clauses (i) or (ii). For the avoidance of doubt, in the event the Secured PCN Cash Distribution is insufficient to satisfy the foregoing claims in full, such claims will be paid in full in cash. The amount of any |

| | |
|---|---|
| | Holder's Secured PCN Claims against FG shall be reduced by the amount of Secured PCN Cash Distribution paid to such holder. |
| Distributable Value | The Plan shall allocate the value of the Debtors' estates to each Debtor entity in accordance with **Exhibit A** to this Term Sheet, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on Prepetition Intercompany Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition claims asserted against the various Debtors (to the extent different from projected allowed claims reflected in the Plan Settlement) (the "**Distributable Value**"). For the avoidance of doubt, each Debtor's Distributable Value Split shall be based on a fixed, assumed Allowed amount of Postpetition Intercompany Claims as of June 30, 2019 after taking into account the discounts embodied in the Plan Settlement, adjustments or disallowances set forth in the Plan Settlement. Any difference in the amount of aggregate Distributable Value as of the Plan Effective Date from that set forth on **Exhibit A** (positive or negative) shall be allocated to the Debtors in accordance with the Distributable Value Splits. |
| | The amount of distributions available to holders of allowed Unsecured Claims under the Plan shall be determined by calculating the Distributable Value as of the Plan Effective Date (*i.e.* after adjusting for actual recoveries on Prepetition Intercompany Claims and actual cash on hand) allocable to each such Debtor *less* (i) the payment of Allocated Administrative Expenses and any other Administrative Expense Claims (subject to the Administrative Expense Adjustment) and, solely with respect to FES, any FES-Only Administrative Expenses; (ii) Other Secured Claims of such Debtor (subject to the Administrative Expense Adjustment); and (iii) in the case of FG and NG, the value of the Secured PCN Claims being reinstated or paid in full pursuant to the Plan as further set forth on **Exhibit A** hereto (the "**Unsecured Creditor Distributable Value**").[8] For the avoidance of doubt, the calculation of Unsecured Creditor Distributable Value does not take into account the reallocation of the Reallocation Pool or the FENOC/FES Claim Reallocation to certain of the holders of General Unsecured Claims. |

---

[8] The Requisite Supporting Parties and the Debtors, in consultation with the Committee, may agree to distribute cash, in addition to equity, to those creditors who will receive distributions of New FES Common Stock under the Plan, in which case such cash shall be distributed ratably based on such creditors' holdings of the New FES Common Stock. For the avoidance of doubt, such cash distribution shall be funded solely by cash that would otherwise be transferred to the Reorganized Debtors on the Effective Date and will not increase the value of recoveries to those creditors receiving such cash distributions.

| | |
|---|---|
| | Any distributions that would have otherwise been made to Holders of Allowed Single-Box Unsecured Claims against NG as part of the Reallocation Pool shall in turn be re-allocated on a ratable basis to Holders of Allowed Single-Box Unsecured Claims against FES. For the avoidance of doubt, prepetition Intercompany Claims shall not receive any portion of this reallocation. |
| | In calculating the FENOC Unsecured Creditor Distributable Value, the FENOC cash balance at emergence shall be fixed at $38 million. |
| | Each of the Debtors or Reorganized Debtors shall make distributions of cash to holders of allowed Administrative Expense Claims allocable to their estate, claims afforded priority status under the Bankruptcy Code, including those employee claims entitled to priority status ("**Priority Claims**"), and secured claims other than Secured PCN Claims ("**Other Secured Claims**") allocable to their respective estates, as set forth below. |
| FEALC Cash Distribution Pool | To the extent there are any General Unsecured Claims against FEALC, the FE Aircraft Cash Distribution Pool shall be established with Cash in the amount of the proceeds from the sale of the aircraft belonging to FEALC. |
| Norton Cash Distribution Pool | To the extent there are any General Unsecured Claims against Norton, the Norton Cash Distribution Pool shall be established with Cash in the amount of the value of Norton's interest in the Norton mine. |
| Unsecured Bondholder Cash Pool | Holders of allowed Unsecured Bondholder Claims shall have the option to elect to receive, in lieu of New FES Common Stock, their ratable portion (based on the allowed principal amount of such claims) of cash (such electing holders, the "**Electing Bondholders**") equal to the aggregate value of New FES Common Stock distributed to Holders of Allowed General Unsecured Claims who have an election to receive New FES Common Stock and make such election (the "**Unsecured Bondholder Cash Pool**"); *provided*, that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder their allocable recovery of Unsecured Creditor Distributable Value in accordance with the Plan, Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock in accordance with the Plan; *provided further*, that to the extent there is surplus cash in the Unsecured Bondholder Cash Pool after taking into account distributions to the Electing Bondholders on account of their Unsecured Bondholder Claims, such cash shall revert to the Reorganized Debtors. For the avoidance of doubt, the maximum amount of |

| | cash contributed to the Unsecured Bondholder Cash Pool shall be the amount of cash that is equal to the aggregate value of New FES Common Stock distributed to Holders of Allowed General Unsecured Claims who have an election to receive New FES Common Stock. |
|---|---|
| **TREATMENT OF CLAIMS** | |
| Administrative Expense Claims | Holders of allowed Administrative Expense Claims shall receive, from the applicable Debtor, on account of and in full and complete settlement, release and discharge of such claim, cash equal to the full unpaid amount of such allowed Administrative Expense Claim, which payments shall be made on either (a) the latest to occur of (i) the Effective Date (or as a soon as practicable thereafter), (ii) the date such claim becomes an allowed Administrative Expense Claim or as soon as practicable thereafter, and (iii) such other date as may be agreed upon by the Reorganized Debtors and the holder of such claim, or (b) on such other date as the Bankruptcy Court may order. |
| Priority Tax Claims | Holders of allowed Priority Tax Claims against any of the Debtors that are due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of such claim, cash equal to the amount of such allowed Priority Tax Claim on the later of (i) the Effective Date (or as soon as practicable thereafter), (ii) the date such Priority Tax Claim becomes an allowed claim, or as soon as practicable thereafter and (iii) on such other date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. All allowed Priority Tax Claims against any of the Debtors which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof. |
| Priority Non-Tax Claims | Holders of allowed Priority Non-Tax Claims against the Debtors shall receive on account of and in full and complete settlement, release and discharge of such claim, at the Reorganized Debtors' election, (i) cash in the amount of such allowed Priority Non-Tax Claim in accordance with section 1129(a)(9) of the Bankruptcy Code and/or (ii) such other treatment required to render such claim unimpaired pursuant to section 1124 of the Bankruptcy Code. All allowed Priority Non-Tax Claims against the Debtors which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such claims become due and payable in the ordinary course of business in accordance with the terms thereof. |

11

| Other Secured Claims | On or as soon after the Effective Date as practicable, holders of Allowed Other Secured Claims shall receive the following treatment at the option of the Debtors or the Reorganized Debtors: (i) reinstatement of any such allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; (ii) payment in full, in cash, of any such allowed Other Secured Claims; (iii) satisfaction of any such allowed Other Secured Claim by delivering the collateral securing any such allowed other Secured Claims and paying any interest required to be paid under section 506(b) of the Bankruptcy Code; or (iv) providing such holders with such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. |
|---|---|
| Secured PCN Claims | The Secured PCN Claims will be allowed in their full amount (including, for the avoidance of doubt, all accrued and unpaid prepetition and postpetition interest); *provided*, that the amount of the Secured PCN Claims against FG shall be reduced by the amount of the Secured PCN Cash Distribution.<br><br>The remaining Secured PCN Claims shall be (i) reinstated and shall be secured by the same collateral as the prepetition Secured PCN Claims, to the extent such assets have not been sold prior to the Effective Date, or (ii) paid in full in Cash, at the election of the Debtors and the Requisite Supporting Parties.<br>In the event that New FES is formed, the FES guarantee with respect to such Secured PCN Claims shall remain in place following the Plan Effective Date, and New FES shall provide an additional unsecured guarantee with respect to such Secured PCN Claims.<br><br>Voting: To the extent the Debtors elect to form New FES and New FES provides an additional guarantee with respect to the Secured PCN Claims, the holders of Secured PCN Claims being reinstated shall be Impaired and entitled to vote to accept or reject the Plan. To the extent the Debtors do not elect to form New FES, the Secured PCN Claims shall be deemed unimpaired, deemed to have accepted the Plan and shall not be entitled to vote. |
| FES Unsecured Bondholder Claims | Classification: This Class consists of Unsecured Bondholder Claims against FES, which, for the avoidance of doubt, shall include guarantee claims (other than guarantees related to the Secured PCN Claims).<br><br>Allowance: The Unsecured Bondholder Claims against FES shall be Allowed in the aggregate amount of $3,023,931,757, including the FES Notes Claims and any guarantee claims of the Holders of |

12

| | |
|---|---|
| | Unsecured FG PCN Claims and Unsecured NG PCN Claims and the Mansfield Certificate Claims in accordance with the terms of the Mansfield Settlement.<br><br>Treatment: Except to the extent that a Holder of an Allowed Unsecured Bondholder Claim Against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured Bondholder Claim Against FES, each Holder of an Allowed Unsecured Bondholder Claim Against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock (or, in the case of an Electing Bondholder, the Electing Bondholder's allocable share of the Unsecured Bondholder Cash Pool), subject to dilution by the MIP, in an amount equal to its ratable share of the FES Unsecured Creditor Distributable Value, subject to the reallocation of (i) the Reallocation Pool to holders of Single Box Unsecured Claims and (ii) the FENOC/FES Claim Reallocation to holders of Single-Box Unsecured Claims against FES and FES/FENOC Unsecured Claims against FES.<br><br>Voting: Holders of FES Unsecured Bondholder Claims are Impaired under the Plan. Holders of FES Unsecured Bondholder Claims are entitled to vote to accept or reject the Plan. |
| FENOC/FES Unsecured Claims against FES | Classification: This Class consists of Holders of unsecured claims against both FES and FENOC (but solely with respect to such Holder's claims at FES).<br><br>Treatment: Except to the extent that a Holder of an Allowed FENOC/FES Unsecured Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC/FES Unsecured Claim against FES, each Holder of an Allowed FENOC/FES Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of the FES Unsecured Creditor Distributable Value and the FENOC/FES Claim Reallocation, *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions, and subject to dilution by the MIP.<br><br>Voting: Holders of FENOC/FES Unsecured Claims are Impaired under the Plan. Holders of FENOC/FES Unsecured Claims are entitled to vote to accept or reject the Plan. |

13

| | |
|---|---|
| FES Single-Box Unsecured Claims | <u>Classification</u>: This Class consists of Single-Box Unsecured Claims against FES.<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed Single-Box Unsecured Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Single-Box Unsecured Claim against FES, each Holder of an Allowed Single-Box Unsecured Claim Against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of (i) the FES Unsecured Creditor Distributable Value, (ii) the portion of the Reallocation Pool allocated to FES, (iii) the FENOC/FES Claim Reallocation, and (iv) the portion of the Reallocation Pool allocated to NG (the "**NG Reallocation Pool**"), *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution by the MIP.<br><br><u>Voting</u>: Holders of Single-Box Unsecured Claims against FES are Impaired under the Plan. Holders of Single-Box Unsecured Claims against FES are entitled to vote to accept or reject the Plan. |
| FES Mansfield TIA Claim | <u>Classification</u>: This Class consists of claims of the Owner-Participants in the Bruce Mansfield Sale-Leaseback Transaction arising under the tax indemnification agreements and other lease documents (the "**Mansfield TIA Claims**") against FES.<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed Mansfield TIA Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield TIA Claims against FES, each Holder of an Allowed Mansfield TIA Claims against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of the FES Unsecured Creditor Distributable Value.<br><br><u>Voting</u>: Holders of the Mansfield TIA Claim against FES are Impaired under the Plan. Holders of the Mansfield TIA Claim is entitled to vote to accept or reject the Plan. |
| FG Unsecured Bondholder Claims | <u>Classification</u>: This Class consists of Unsecured Bondholder Claims against FG.<br><br><u>Allowance</u>: The Unsecured Bondholder Claims against FG shall be Allowed in the aggregate amount of $3,023,931,757, including |

14

| | |
|---|---|
| | the Unsecured FG PCN Claims and any guarantee claims of the Holders of FES Notes Claims and Unsecured NG PCN Claims and the Mansfield Certificate Claims in accordance with the terms of the Mansfield Settlement.<br><br>Treatment: Except to the extent that a Holder of an Allowed Unsecured Bondholder Claim Against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured Bondholder Claim Against FG, each Holder of an Allowed Unsecured Bondholder Claim Against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock (or, in the case of an Electing Bondholder, the Electing Bondholder's allocable share of the Unsecured Bondholder Cash Pool), subject to dilution by the MIP, in an amount equal to its ratable share of the FG Unsecured Creditor Distributable Value, subject to the reallocation of the Reallocation Pool to holders of Single Box Unsecured Claims.<br><br>Voting: Holders of FG Unsecured Bondholder Claims are Impaired under the Plan. Holders of FG Unsecured Bondholder Claims are entitled to vote to accept or reject the Plan. |
| FG Single-Box Unsecured Claims | Classification: This Class consists of Single-Box Unsecured Claims against FG.<br><br>Treatment: Except to the extent that a Holder of an Allowed Single-Box Unsecured Claim Against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Single-Box Unsecured Claim against FG, each Holder of a Single-Box Unsecured Claim Against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of (i) the FG Unsecured Creditor Distributable Value and (ii) the portion of the Reallocation Pool allocable to FG, *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution by the MIP.<br><br>Voting: Holders of Single-Box Unsecured Claims against FG are Impaired under the Plan. Holders of Single-Box Unsecured Claims against FG are entitled to vote to accept or reject the Plan. |
| FG Mansfield TIA Claims | Classification: This Class consists of the Mansfield TIA Claims against FG. |

| | |
|---|---|
| | <u>Treatment</u>:  Except to the extent that the Holder of an Allowed Mansfield TIA Claim against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield TIA Claim against FG, each Holder of an Allowed Mansfield TIA Claim against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of the FG Unsecured Creditor Distributable Value.<br><br><u>Voting</u>: Holders of the Mansfield TIA Claim against FG are Impaired under the Plan.  Holders of the Mansfield TIA Claim against FG are entitled to vote to accept or reject the Plan. |
| NG Unsecured Bondholder Claims | <u>Classification</u>: This Class consists of Unsecured Bondholder Claims against NG.<br><br><u>Allowance</u>: The Unsecured Bondholder Claims against NG shall be Allowed in the aggregate amount of \$3,023,931,757, including the Unsecured NG PCN Claims and any guarantee claims of the Holders of FES Notes Claims and Unsecured FG PCN Claims and the Mansfield Certificate Claims in accordance with the terms of the Mansfield Settlement.<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed Unsecured Bondholder Claim Against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured Bondholder Claim Against NG, each Holder of an Allowed Unsecured Bondholder Claim Against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock (or, in the case of an Electing Bondholder, the Electing Bondholder's allocable share of the Unsecured Bondholder Cash Pool), subject to dilution by the MIP, in an amount equal to its ratable share of the NG Unsecured Creditor Distributable Value, subject to the reallocation of the Reallocation Pool to holders of Single Box Unsecured Claims.<br><br><u>Voting</u>:  Holders of NG Unsecured Claims are Impaired under the Plan.  Holders of NG Unsecured Claims are entitled to vote to accept or reject the Plan. |
| NG-FENOC Unsecured Claims against NG | <u>Classification</u>: This Class consists of Holders of General Unsecured Claims who have claims against both FENOC and NG (but solely with respect to such Holder's claims at NG).<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed NG/FENOC Unsecured Claim against NG agrees to less |

| | |
|---|---|
| | favorable treatment, in exchange for full and final satisfaction, compromise, settlement, release and discharge of each NG/FENOC Unsecured Claim, each Holder of an Allowed NG/FENOC Unsecured Claim against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of the NG Unsecured Creditor Distributable Value, *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions, and subject to dilution by the MIP.<br><br>Voting: Holders of NG/FENOC Claims against NG are Impaired under the Plan. Holders of NG/FENOC Claims against NG are entitled to vote to accept or reject the Plan. |
| NG Single-Box Unsecured Claims | Classification: This Class consists of Single-Box Unsecured Claims against NG.<br><br>Treatment: Except to the extent that a Holder of an Allowed Single-Box Unsecured Claim against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Single-Box Unsecured Claim against NG, each Holder of an Allowed Single-Box Unsecured Claim against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of the NG Unsecured Creditor Distributable Value *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution by the MIP.<br><br>Voting: Holders of General Unsecured Claims against NG are Impaired under the Plan. Holders of General Unsecured Claims against NG are entitled to vote to accept or reject the Plan. |
| FENOC Single-Box Unsecured Claims | Classification: This Class consists of Single-Box Unsecured Claims against FENOC.<br><br>Treatment: Except to the extent that a Holder of an Allowed Single-Box Unsecured Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Single-Box Unsecured Claims against FENOC, each Holder of an Allowed Single-Box Unsecured Claim against FENOC shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of (i) the FENOC Unsecured Creditor Distributable Value and (ii) the portion of the Reallocation Pool allocated to FENOC. |

| | |
|---|---|
| | <u>Voting</u>: Holders of FENOC Single-Box Unsecured Claims are Impaired under the Plan. Holders of FENOC Single-Box Unsecured Claims are entitled to vote to accept or reject the Plan. |
| FENOC/FES Unsecured Claims against FENOC | <u>Classification</u>: This Class consists of Holders of Claims against both FENOC and FES (but solely with respect to such Holder's claims at FENOC).<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed FENOC/FES Unsecured Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC/FES Unsecured Claim against FENOC, each Holder of an Allowed FENOC/FES Unsecured Claim against FENOC shall receive, on the Effective Date or as soon as reasonably practicable thereafter cash equal to its ratable share of the FENOC Unsecured Creditor Distributable Value, *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution by the MIP, *provided* however, that such election shall only be up to the portion of the Allowed FENOC/FES Unsecured Claim guaranteed by FES.<br><br><u>Voting</u>: Holders of FENOC/FES Unsecured Claims against FENOC are Impaired under the Plan. Holders of FENOC/FES Unsecured Claims are entitled to vote to accept or reject the Plan. |
| NG-FENOC Unsecured Claims against FENOC | <u>Classification</u>: This Class consists of Holders of Unsecured Claims against both NG and FENOC (but solely with respect to such Holder's claims at FENOC).<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed NG/FENOC Unsecured Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each NG/FENOC Unsecured Claim against FENOC, each Holder of an Allowed NG/FENOC Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of the FENOC Unsecured Creditor Distributable Value.<br><br><u>Voting</u>: Holders of NG/FENOC Unsecured Claims against FENOC are Impaired under the Plan. Holders of NG/FENOC Unsecured Claims are entitled to vote to accept or reject the Plan. |
| FGMUC Unsecured | <u>Classification</u>: This Class consists of Unsecured Bondholder |

| | |
|---|---|
| Bondholder Claims | Claims against FGMUC, which for the avoidance of doubt shall consist of the Mansfield Certificate Claims.<br><br>Allowance: The Mansfield Certificate Claims shall be allowed in the amount of $786,763,400.00.<br><br>Treatment: Except to the extent that a Holder of an Allowed Unsecured Bondholder Claim Against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured Bondholder Claim Against FGMUC, each Holder of an Allowed Unsecured Bondholder Claim Against FGMUC shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock (or, in the case of an Electing Bondholder, the Electing Bondholder's allocable share of the Unsecured Bondholder Cash Pool), subject to dilution by the MIP, in an amount equal to its ratable share of the FGMUC Unsecured Creditor Distributable Value, subject to the reallocation of the Reallocation Pool to holders of Single Box Unsecured Claims.<br><br>Voting: Holders of FGMUC Unsecured Bondholder Claims are Impaired under the Plan. Holders of FGMUC Unsecured Bondholder Claims are entitled to vote to accept or reject the Plan. |
| FGMUC Single-Box Unsecured Claims | Classification: This Class consists of Single-Box Unsecured Claims against FGMUC.<br><br>Treatment: Except to the extent that a Holder of an FGMUC Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FGMUC Single-Box Unsecured Claims, the Holders of FGMUC Single-Box Claims shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of (i) the FGMUC Unsecured Creditor Distributable Value and (ii) the portion of the Reallocation Pool allocated to FGMUC.<br><br>Voting: Holders of FGMUC Single-Box Unsecured Claims are Impaired under the Plan. Holders of FGMUC Single-Box Unsecured Claims will be entitled to vote to accept or reject the Plan. |
| FGMUC TIA Claim | Classification: This Class consists of the Mansfield TIA Claims against FGMUC. |

| | |
|---|---|
| | <u>Treatment</u>: Except to the extent that a Holder of the Mansfield TIA Claims against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield TIA Claim against FGMUC, each Holder of an Allowed Mansfield TIA Claim against FGMUC shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its ratable share of the FGMUC Unsecured Creditor Distributable Value.<br><br><u>Voting</u>: Holders of the Mansfield TIA Claim against FGMUC are Impaired under the Plan. Holders of the Mansfield TIA Claims against FGMUC are entitled to vote to accept or reject the Plan. |
| FEALC Unsecured Claims | <u>Classification</u>: This Class consists of General Unsecured Claims against FEALC, if any.<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed General Unsecured Claim Against FEALC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each General Unsecured Claim Against FEALC, each Holder of an Allowed General Unsecured Claim Against FEALC shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its ratable share of the FEALC Cash Distribution Pool.<br><br><u>Voting</u>: Holders of General Unsecured Claims against FEALC are Impaired under the Plan. Holders of General Unsecured Claims against FEALC are entitled to vote to accept or reject the Plan. |
| Norton Unsecured Claims | <u>Classification</u>: This Class consists of General Unsecured Claims against Norton, if any.<br><br><u>Treatment</u>: Except to the extent that a Holder of an Allowed General Unsecured Claim Against Norton agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each General Unsecured Claim Against Norton, each Holder of an Allowed General Unsecured Claim Against Norton shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its ratable share of the Norton Cash Distribution Pool.<br><br><u>Voting</u>: Holders of General Unsecured Claims against Norton are Impaired under the Plan. Holders of General Unsecured Claims against Norton are entitled to vote to accept or reject the Plan. |
| Certain Employee Claims | Pursuant to the FE Settlement Agreement, FE Corp. will pay, or will cause to be paid, in the ordinary course of business, certain |

20

| | claims of the Debtors' current employees and/or applicable retirees (the "**Covered Employee Claims**"). The Covered Employee Claims will be disallowed under the Plan. |
|---|---|
| Convenience Class Claims | Holders of General Unsecured Claims (other than General Unsecured Claims against FEALC and Norton) that are either (i) in an amount that is equal to or less than $1,000,000 or (ii) in an amount that is greater than $1,000,000, but with respect to which the holder of such Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Unsecured Claim to $1,000,000 pursuant to a valid election by the holder of such Unsecured Claim against the Debtors (the "**Convenience Class Claims**") shall receive on the Effective Date or as soon as reasonably practicable thereafter, cash in an amount equal to a premium of five (5) percentage points above the recovery the Holder of a Convenience Class Claim would have otherwise received against the applicable Debtor (*i.e.* if a Holder of a Convenience Class claim would have received a 20 percent recovery from the applicable Debtor, such Holder would receive a 25 percent recovery). |

| **REGULATORY REQUIREMENTS** | |
|---|---|
| FERC | Prior to the Effective Date, the Debtors and Reorganized Debtors shall receive a final order from the Federal Energy Regulatory Commission ("**FERC**") granting authorization under Section 203 of the Federal Power Act ("**FPA**") to transfer the Debtors' FERC-jurisdictional assets to the Reorganized Debtors. <br><br> Prior to the Effective Date, Allegheny Energy Supply Company, LLC, and Reorganized FG shall have received a final order from FERC granting authorization under FPA Section 203 to transfer the Pleasants Power Plant to a subsidiary of Reorganized FG. |
| PJM | To the extent necessary based on the form of the Restructuring Transactions, at least 90 days prior to the Effective Date, the Debtors shall provide PJM with an informational filing notifying PJM of the transfer of any facilities currently receiving payment in accordance with a FERC-approved reactive power tariff (the same as the informational filing submitted to FERC). |
| NERC | Prior to the Effective Date, the Reorganized Debtors will register with ReliabilityFirst for the appropriate reliability functions. |
| NRC | Prior to the Effective Date, the Nuclear Regulatory Commission shall have approved the license transfer or new license application (as determined by the Debtors with the reasonable consent of the Committee and the Requisite Supporting Parties) filed by |

21

|  | Reorganized FENOC and Reorganized NG with respect to the change in ownership pursuant to the Plan. |
|---|---|
| **OTHER TERMS** | |
| Releases | The Plan shall provide for customary releases of all Claims among (i) Debtors, (ii) the FE Non-Debtor Released Parties, (iii) the Consenting Creditors, (iv) the Committee, (v) the Indenture Trustees, (vi) the issuers of the PCNs, (vii) the Plan Administrator, and (viii) with respect to each of the foregoing entities in clauses (i) through (vii) such entity and its Related Persons (such entities in the foregoing clauses (i) through (viii), to the extent providing a release under the Plan, each a "<u>Releasing Party</u>", and to the extent being released under the Plan, each a "<u>Released Party</u>").[9]<br><br>The releases to be set forth in the Plan shall include releases of each Released Party from any Claims or Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or affiliates or that each other Releasing Party, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claims or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any released party (including any Released Party), the PCNs, the FES Notes, the Mansfield facility documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, the |

---

[9] "<u>**Related Persons**</u>" with respect to an entity shall mean that entity's current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

| | |
|---|---|
| | Plan Settlement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, or upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.<br><br>The Plan shall provide for releases to the FE Non-Debtor Parties of all Claims and causes of action that could be asserted against, or in any way relating to, or arising out of (i) any Debtor, the Reorganized Debtors, their businesses, or their property; (ii) any causes of action against the FE Non-Debtor Parties arising in connection with any intercompany transactions or other matters arising in or related to the conduct of the Debtors' businesses; (iii) the Chapter 11 Cases; (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of the Plan; or (v) any other act or omission in connection with the Chapter 11 Cases. |
| Exculpation | The Plan shall provide certain customary exculpation provisions, which shall include a full exculpation from liability in favor of the Debtors, the Consenting Creditors, the Committee, the FE Non-Debtor Parties, and the Indenture Trustees, and the Related Persons of all of the foregoing parties from any and all claims and causes of action arising on or after the Petition Date and any and all claims and causes of action relating to any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, soliciting, confirming or consummating the Plan, the Disclosure Statement, the Plan Settlement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases or the restructuring of the Debtors, with the sole exception of willful misconduct or gross negligence. |
| Corporate Governance | The organizational documents and provisions related to the identification of the initial board of directors (the "**New Board**") for the Reorganized Debtors, including, without limitation, a stockholders agreement, shall reflect the terms set forth in the Corporate Governance Term Sheet attached hereto as **Exhibit B**, and shall be reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties. |
| Equity Election Conditions | The voting record date and record date for eligible creditors of FES, FG, NG, and FENOC, as applicable, shall be the date on which the RSA is publicly announced in a press release, or such later date as agreed to by the Debtors with the consent of the Requisite Supporting Parties and the Committee, which |

| | |
|---|---|
| | agreement and consent may be evidenced by an email acknowledgment from counsel to each of such Parties. |
| | If an eligible Holder of a General Unsecured Claim elects to receive equity rather than cash, such Holder shall exercise the Equity Election on their ballots to accept or reject the Plan, or by such other method acceptable to the Debtors with the consent of the Requisite Supporting Parties and the Committee. Holders of General Unsecured Claims that exercise such election will be required to certify that they were the beneficial holder of their claims as of the record date and have not sold, transferred, or provided a participation in, or directly or implicitly agreed to do so following the record date. On the date the RSA is publicly announced or as soon as practicable thereafter, the Debtors will file a notice on the docket informing creditors that (i) any holder of a General Unsecured Claim who is not a party to the RSA who sells their claim following the record date, will not be permitted to make an election for equity under the Plan, and (ii) any buyer of a General Unsecured Claim, which claim is not subject to the RSA as of the record date will only be permitted to receive cash on account of such claim. Notwithstanding the foregoing, no Holder of a General Unsecured Claim shall be prohibited from selling their General Unsecured Claim at any time after the record date, *provided* that the transferee of any such General Unsecured Claim will not be eligible to receive an equity distribution (unless such claim is subject to the RSA). |
| Employee Matters | Compensation-related agreements between any of the Debtors and any directors, officers and employees of the Debtors existing as of the Effective Date, including any indemnification and severance obligations, and all of the Debtors' Retention Plans, Voluntary Enhanced Retirement Option Plans, Short-Term Incentive Plans and Annual Incentive Plans existing as of the Effective Date, shall be assumed by the Reorganized Debtors. |
| Plan Administrator | The Plan shall provide for a Plan Administrator selected by the Debtors with the reasonable consent of the Committee, the Noteholder RSA Majority and the Mansfield RSA Majority to: <ul><li>administer the Claims reconciliation process, *provided* that the settlement of any Allowed General Unsecured Claim in excess of $10 million or any administrative or priority claim in excess of $1 million shall require notice and a Court order;</li><li>supervise distributions to holders of Allowed Claims in accordance with the plan; and</li><li>prosecute certain claims and causes of action on behalf of</li></ul> |

24

|  | the Debtors' estates and creditors to the extent set forth in the Plan Administrator Agreement (as defined below). |
|  | A Plan Administrator agreement shall be included in the Plan Supplement (the "**Plan Administrator Agreement**"), which agreement shall provide for the reasonable and necessary reimbursement of fees and expenses of the Plan Administrator. |
| Executory Contracts and Unexpired Leases | All executory contracts and unexpired leases not expressly listed for rejection on an exhibit to the Plan or previously assumed or rejected by order of the Bankruptcy Court shall be deemed assumed as of the Effective Date. |
|  | The Debtor or Reorganized Debtors, as applicable, may alter, amend, modify, or supplement the list of Assumed Executory Contracts and Unexpired Leases and the schedules of Executory Contracts and Unexpired Leases with respect to the Debtors or Reorganized Debtors, as applicable, at any time, through and including 45 days after the Effective Date. |
|  | In no event shall either Reorganized FES or New FES, as applicable, assume the Inter-Company Power Agreement between the Debtors and members of the Ohio Valley Electric Corporation. |
| Disputed Claims Reserve | A Disputed Claims Reserve shall be established for distributions on account of disputed claims that are subsequently allowed after the Effective Date. |
| Tax Matters | The Debtors and the Consenting Creditors will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring in a tax efficient and cost-effective manner for the Reorganized Debtors and the Consenting Creditors. |
| Payment of Certain Professional Fees | The Plan shall incorporate language providing for the payment of the reasonable and documented professional fees for the Indenture Trustees, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group and the FES Creditor Group, to the extent not already provided for under the Process Support Agreement or the RSA, including, for the avoidance of doubt, payment of transaction completion fees of GLC Advisors & Co. as financial advisor to the Ad Hoc Noteholder Group, Guggenheim Securities, LLC as financial advisor to the Mansfield Certificateholders Group, and Houlihan Lokey Capital, Inc., as financial advisor to the FES Creditor Group, with respect to the fees of the foregoing financial advisors in accordance with the terms set forth in **Exhibit C** to this Term Sheet (notwithstanding the terms of any existing engagement letters |

25

| | |
|---|---|
| | entered into by such advisors). For the avoidance of doubt, the Debtors shall only pay transaction completion fees upon the consummation of the Plan as contemplated in this Plan Term Sheet or as may be modified or amended in accordance with the terms hereof or the RSA. |
| Other Agreements on Professional Fees | The Parties to the RSA agree to take reasonable action to support, on the record before the Bankruptcy Court or otherwise, (i) the payment of the restructuring fee of PJT Partners, LP, as financial advisor to the Committee, as contemplated in its retention order and (ii) that Lazard Freres & Co. LLC, investment banker to the Debtors, shall be entitled to an "M&A Fee", as contemplated in their retention order, in the event any transaction is effectuated to monetize the New FE Notes. |
| Management Incentive Plan | Upon the Effective Date, the New Board may adopt a management incentive plan (the "**MIP**") providing for the distribution of New FES Common Stock, which MIP shall not exceed 7.5% of the New FES Common Stock as of the Effective Date (on a fully diluted basis). |
| | The MIP shall provide for the distribution of the New FES Common Stock, or options, warrants, or similar arrangements (the "**Incentive Securities**"). |
| | As part of the MIP, Mr. John Kiani, in connection with his service on the Board of the Reorganized Debtors, will receive the issuance of Incentive Securities based on recoveries to Unsecured Bondholder Claims utilizing the following thresholds (using linear interpolation when the unsecured note recovery is between 117% and 124%): |

| Recovery | Incentive Securities |
|---|---|
| 110% | 1.4% of New FES Common Stock |
| 124% | 2.15% of New FES Common Stock (aggregate total Incentive Securities, inclusive of Incentive Securities previously issued) |

| | |
|---|---|
| | In addition, pursuant to the MIP and in connection with his service on the Board of the Reorganized Debtors, Mr. Kiani will receive a director fee of $900,000 in cash per annum. Other terms of the MIP will include vesting, apportionment, forfeiture and granting of the MIP shares. The terms of any MIP shall be disclosed in the Plan Supplement (or left to the determination by the New Board) and shall be reasonably acceptable to the Debtors, the Committee and the Requisite Supporting Parties. |
| | |

| | |
|---|---|
| Conditions to Confirmation | The conditions precedent to confirmation of the Plan shall be customary for a reorganization of this size and type, including, without limitation, the following:<br><br>• the Bankruptcy Court shall have entered an order approving the Disclosure Statement in a manner consistent in all material respects with the Plan, this Term Sheet, and the FE Settlement Order and in form and substance reasonably satisfactory to the Debtors, the Committee, and the Requisite Supporting Parties<br>• the Bankruptcy Court shall have entered the Confirmation Order in a manner consistent in all material respects with the Plan and the FE Settlement Order and in form and substance reasonably satisfactory to the Debtors, the Committee, and the Requisite Supporting Parties<br>• the FE Settlement Order and Settlement Agreement shall remain in full force and effect<br><br>Each of the foregoing may be waived by agreement of all of the following parties: (i) each of the Debtors, (ii) the Committee, and (iii) the Requisite Supporting Parties. |
| Conditions to the Effective Date | The conditions precedent to the occurrence of the Effective Date of the Plan shall be customary for a reorganization of this size and type, and shall include, without limitation, the Conditions to Confirmation set forth in this Term Sheet and the following:<br><br>• the Confirmation Order shall become a Final Order;<br>• the FE Settlement Order shall remain in full force and effect;<br>• the FE Settlement Agreement shall have been consummated including (i) the issuance of the New FE Notes and (ii) the payment of the Settlement Cash;<br>• all Allowed professional fee claims approved by the Bankruptcy Court shall have been paid in full;<br>• the Disputed Claims Reserve shall have been established and funded;<br>• the New FES Common Stock shall have been issued;<br>• the RSA shall not have been terminated and shall remain in full force and effect;<br>• all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental entities in accordance with applicable laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied or waived substantially |

| | |
|---|---|
| | concurrently with the occurrence of the Effective Date);<br>• the Debtors shall have obtained all authorizations, consents, regulatory approvals, including from the FERC, and NRC, as applicable, rulings or documents that are necessary to the restructuring, and shall remain in full force and effect.<br><br>Each of the foregoing may be waived by agreement of all of the following parties: (i) each of the Debtors, (ii) the Committee, and (iii) the Requisite Supporting Parties; *provided, however,* that with respect to the Condition to the Effective Date related to the termination of the RSA, such waiver shall not require the consent of any of the foregoing parties to the extent such parties have terminated their participation in the RSA and the RSA otherwise remains in effect. |

## **EXHIBIT A**

### **Distributable Value Schedule**

## Plan Term Sheet - Exhibit A

($ in millions)

*The following table sets forth estimated Distributable Value allocated to each Debtor entity in accordance with the Plan Settlement, and the resulting estimated Unsecured Creditor Distributable Value. These figures are subject to adjustment based upon the recoveries on Prepetition Intercompany Claims and the allocation of the Reallocation Pool, the NG Reallocation Pool, and the FENOC/FES Claim Reallocation in accordance with the terms of the Plan Settlement.*

| | FES | FG | NG | FENOC | Aircraft | BM | Norton | Elimination | Total |
|---|---|---|---|---|---|---|---|---|---|
| Distributable Value | $2,029.2 | $1,069.2 | $1,362.0 | $144.4 | $0.5 | $132.1 | – | ($1,449.7) | $3,287.7 |
| Less: | | | | | | | | | |
| Secured Recovery | – | 334.7 | 304.0 | – | – | – | – | – | 638.8 |
| Postpetition Interco. Claim Recovery | 360.7 | – | 69.9 | – | – | – | – | (430.7) | – |
| Admin. / Priority Recovery | 49.5 | 141.3 | 70.8 | 81.2 | – | 18.3 | – | (144.3) | 216.9 |
| **Unsecured Creditor Distributable Value** | **$1,618.9** | **$593.1** | **$917.3** | **$63.2** | **$0.5** | **$113.8** | **–** | **($874.8)** | **$2,432.1** |

*The following table sets forth estimated Distributable Value Splits allocated to the third-party creditors of the respective Debtors in accordance with the Plan Settlement set forth in the Plan Term Sheet. The Distributable Value Splits take into account adjustments for the allocation of the Reallocation Pool, the NG Reallocation Pool, and the FENOC/FES Claim Reallocation. For the avoidance of doubt, the estimated Distributable Value Splits reflected in the schedule below are subject to adjustment based on actual allowed prepetition third-party claims.*

| Distributed Value Splits | FES | FG | NG | FENOC | Aircraft | BM | Norton | Total |
|---|---|---|---|---|---|---|---|---|
| General Unsecured Claims | 10.7% | 3.6% | 1.0% | 2.4% | - | 0.8% | - | 18.6% |
| Unsecured Bondholders Claims | 28.0% | 16.3% | 37.1% | - | - | 0.0% | - | 81.4% |
| **Total** | **38.7%** | **19.9%** | **38.1%** | **2.4%** | **0.0%** | **0.8%** | **0.0%** | **100.0%** |

| Unsecured Distributable Value | Amount |
|---|---|
| Distributable Value | $3,287.7 |
| Less: Secured Recovery | (638.8) |
| Less: Admin. / Priority Recovery | (216.9) |
| **Unsecured Creditor Distributable Value** | **$2,432.1** |

**The figures set forth in this exhibit do not represent estimated creditor recoveries. Estimated creditor recoveries will be incorporated into the Disclosure Statement.**

**EXHIBIT B**

**Corporate Governance Term Sheet**

30

Common Stock:

The Amended and Restated Articles of Incorporation of reorganized FirstEnergy Solutions Corp. ("FES") or the Certificate of Incorporation of a newly formed Delaware corporation into which FES is merged or into which certain of FES's assets are transferred (in either event, the "Certificate of Incorporation") in connection with FES's Plan of Reorganization (the "Plan of Reorganization", and reorganized FES or such newly formed corporation, the "Company") will provide for the authorization of up to [500,000,000] shares of common stock, par value $0.001 per share ("Common Stock"), certain of which will be issued on the effective date of the Plan of Reorganization (the "Effective Date") to all holders of (i) pollution control revenue bonds supported by unsecured notes issued by FirstEnergy Generation, LLC and FirstEnergy Nuclear Generation, LLC; (ii) certain unsecured notes issued by FES; (iii) pass-through certificates issued in connection with the leveraged lease transaction for Unit 1 of the Bruce Mansfield Power Plant (the "PTCs"); and (iv) certain other unsecured claims. Only Common Stock will be issued and outstanding on, and immediately after, the Effective Date.

The Company will issue incentive securities to John Kiani, in accordance with the Equity Incentive Plan, the terms of which will be set forth in the Management Incentive Plan Term Sheet.

Following the Effective Date, the Company's new Board of Directors (the "Board") may make grants to members of the Company's senior management selected by the Compensation Committee of the Company (such members of senior management referred to as "Management Holders") under the terms of a management equity plan to be adopted by the Board after the Effective Date (the "Management Equity Plan"). The terms and conditions of the Management Equity Plan and the grants to be made thereunder will be determined by the Board after the Effective Date.

---

[1] Capitalized terms not defined herein have the meanings given to them in the Restructuring Support Agreement dated as of January 23, 2019 among FES and the other parties thereto (as the same may be amended from time to time, the "RSA").

KL2 3108842.8

The Common Stock will be DTC eligible.[2]

The Certificate of Incorporation will also provide for "blank check" preferred stock (no shares of which will be issued or outstanding on the Effective Date).

Governing Documents:
On the Effective Date, pursuant to the Plan of Reorganization, (i) the Company will adopt the Certificate of Incorporation, which will be filed with the Secretary of State of the State of Delaware, (ii) the Company will adopt the Amended and Restated Bylaws of the Company (the "Bylaws") and (iii) the Company and each holder of Common Stock (as a condition to receiving distributions of such Common Stock under the Plan of Reorganization) will enter into, or will have deemed to have entered into, a Stockholders Agreement (the "Stockholders Agreement"). The Certificate of Incorporation, Bylaws and Stockholders Agreement will collectively include the provisions described below, subject to the further negotiation of additional terms and provisions acceptable to the Ad Hoc Noteholder Group and the Mansfield RSA Majority.

All shares of Common Stock at any time after the Effective Date will be subject to the applicable restrictions, and entitled to the applicable benefits, set forth in the Stockholders Agreement.

Upon the Effective Date and subject to applicable securities laws, the Company shall be a non-reporting company (i.e., it will not be required to register the Common Stock or any other securities pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder unless the Board elects to register the Common Stock or the Company is required to register under the Exchange Act). The Common Stock will not initially be listed on a national securities exchange (NYSE/NASDAQ).

Transfer Agent:
Prior to the Effective Date, the Company will engage a qualified institution to serve as transfer agent for the Common Stock.

Board of Directors:
On the Effective Date and in accordance with the terms of the Certificate of Incorporation, Bylaws and Stockholders Agreement, as applicable (collectively, the "Organizational

---

[2] The provisions of this Term Sheet shall be reflected in the certificate of incorporation, bylaws and/or a shareholders agreement as necessary or desirable to give effect to such provisions in a manner that is both consistent with the Delaware General Corporation Law and permits the DTC eligibility of the Common Stock.

KL2 3108842.8

Documents"), the Board of the Company will consist of no fewer than seven members, who shall initially consist of :

- One (1) member who shall be the Chief Executive Officer of the Company,
- Mr. Kiani,
- Two (2) members designated by Nuveen Asset Management, LLC on behalf of the Nuveen noteholders; *provided*, that one such member (i) shall be independent of any stockholder with nomination rights, including Nuveen Asset Management, LLC, and (ii) shall be reasonably acceptable to the Mansfield RSA Majority (the "Nuveen Designees" and each, a "Nuveen Designee"),
- One (1) member designated by Avenue Capital Management II L.P. (the "Avenue Designee", and together with the Nuveen Designee, the "Noteholder Designees", and Nuveen Asset Management LLC and Avenue Capital Management II L.P. each, respectively, together with any affiliates, a "Designating Noteholder"),
- One (1) member who shall serve as Executive Chairman of the Board designated jointly by the Ad Hoc Noteholder Group and the Mansfield RSA Majority, subject to the reasonable consent of the Committee, and
- One (1) member (the "Independent Director") designated jointly by the Ad Hoc Noteholder Group, the Mansfield RSA Majority, and the Committee, who shall be independent of any stockholder with nomination rights, and shall be an individual with relevant industry or regulatory experience, provided, however, that the requirement of relevant industry or regulatory experience may be waived at the discretion of, and jointly by, the Ad Hoc Noteholder Group, the Mansfield RSA Majority, and the Committee.

If the New Board initially consists of more than seven (7) members, as may be determined on or prior to the Effective Date by the Ad Hoc Noteholder Group, such additional members may include members comprised of senior management of the Company or members designated by the Requisite Supporting Parties.

Directors not employed by the Company shall receive market rate compensation from the Company (to be determined by the Board); all directors shall be reimbursed for reasonable and documented expenses.

KL2 3108842.8

No party will have observation rights with respect to the Board.

The Board will, by majority vote, establish (i) an Audit Committee (ii) a Compensation Committee, (iii) a Finance and Strategy Committee, (iv) a Nomination and Governance Committee and (v) a Nuclear Committee and may, by majority vote, establish one or more additional Board committees to exercise such powers as may be determined by the Board (subject to the limitations described below). Mr. Kiani will initially serve as Chairman of the Finance and Strategy Committee. The Board will determine the other committee assignments following the Effective Date.

No Board committee will have the authority to: (a) declare a dividend; (b) authorize the issuance of Common Stock (or any other class or series of capital stock); (c) approve or propose to stockholders any action that Delaware law requires to be approved by stockholders; (d) fill vacancies on the Board or on any of its committees; (e) approve any amendment to the Certificate of Incorporation; (f) adopt, amend or repeal the Bylaws; or (g) or terminate the Company's chief executive officer or replace the Chairman of the Board.

<u>Election of Directors:</u>

Each of the Noteholder Designees will continue to be appointed as set forth above so long as the Stockholder Agreement is in effect and so long as the relevant Designating Noteholder (i.e., Nuveen or Avenue), continues to hold at least 7.5% of the then issued and outstanding shares of Common Stock (subject to customary anti-dilution protections for the benefit of the Designating Noteholder).

A Designating Noteholder may transfer its respective right to designate a Noteholder Designee, as applicable, in the event it transfers at least 7.5% of the then issued and outstanding shares of Common Stock (subject to customary anti-dilution protections for the benefit of the Designating Noteholder) upon which the transferee shall have the right to appoint the Noteholder Designee so long as such transferee maintains ownership of at least 7.5% of the issued and outstanding shares of Common Stock (subject to customary anti-dilution protections for the benefit of the Designating Noteholder), provided that no such Noteholder Designee may be an individual employed, controlled by or otherwise affiliated with any competitors of the Company (as reasonably determined by a majority of the disinterested members of the Board).

Except as otherwise provided pursuant to the terms of the Stockholders Agreement, election of directors in uncontested

KL2 3108842.8

elections will require the affirmative vote of a majority of the votes cast. In any such election of directors, the candidates for election will be those candidates proposed by the Nominating Committee of the Board along with any nominees as may be proposed by holders of Common Stock subject to such advance notice required by the Bylaws or as the Board may adopt.

Subject to the terms of the Organizational Documents, the Board may, by majority vote, elect to establish the size of the Board from time to time at a number that is not less than five or more than nine directors.

Removal/Replacement of Directors:

If a Noteholder Designee resigns, is removed for cause, dies or becomes incapacitated, or if there is a Noteholder Designee vacancy for any other reason, so long as such Designating Noteholder has the right to appoint such director, a replacement director will be designated by the applicable Designating Noteholder to fill such vacancy until the next annual meeting of stockholders.

Except as otherwise set forth in the Stockholders Agreement, if a director resigns, is removed by the stockholders, dies or becomes incapacitated, or if there is a vacancy on the Board for any other reason, a replacement director will be elected, to serve until the next annual meeting of stockholders, within 90 days by a majority of the Board members then in office, including, for the avoidance of doubt, with respect to the Independent Director. Except as otherwise set forth in the Stockholders Agreement, the holders of a majority of the then-issued and outstanding Common Stock may remove any director, with or without cause (as determined by such stockholders); *provided*, *however*, that the Stockholders Agreement shall provide that the Independent Director only may be removed for cause. If any officer of the Company is a director, and the employment of such officer is terminated, the terminated officer will automatically cease to be a director. If the Independent Director is removed, dies, becomes incapacitated, or if his or her board seat is vacant for any other reason, his or her replacement must be an individual who is independent (in accordance with NYSE or NASDAQ standards) from the Company and independent from each of the stockholders with Board nomination rights.

Board Meetings:

The Board shall meet at least once per quarterly period. In addition, the Chairman of the Board or any 2 directors may call a special meeting of the Board.

KL2 3108842.8

| | |
|---|---|
| <u>Affiliate Transactions</u>: | If the Board seeks to enter into, modify or terminate a transaction or agreement between the Company or any of its subsidiaries on the one hand, and any holder of at least 5% of the Common Stock, director, officer, or affiliate thereof, on the other hand, such transaction or agreement must be approved by a majority of the disinterested members of the Board; provided, that if such transaction or agreement involves the aggregate payment of more than $25 million, then in addition either: (1) a majority of disinterested stockholders must approve such transaction or agreement, or (2) an independent, nationally recognized investment banking firm (to be selected by the disinterested directors and paid for by the Company) must deliver an opinion that the proposed transaction or agreement is fair to the Company from a financial point of view. The Affiliate Transaction provisions shall contain customary exceptions (e.g., with respect to indemnification). |
| <u>Special Meetings of Stockholders/Action by Written Consent</u>: | Special meetings of the stockholders may be called at the written request of the holders of then-issued and outstanding Common Stock representing at least 25% of all votes entitled to be cast on any issues proposed to be considered at such meeting. The Bylaws shall contain customary advance notice provisions in respect of stockholder meetings.<br><br>Action by written consent of the stockholders without a meeting shall be permitted. Action by written consent shall require the same percentage of stockholders that would be required to take the same action at a meeting of stockholders in which all shares are represented and voting. |
| <u>Amendments</u>: | Any amendments to the Certificate of Incorporation or Bylaws will require approval of holders of at least a majority of the then-issued and outstanding Common Stock.<br><br>The approval of holders of at least 66-2/3% of the outstanding Common Stock party to the Stockholders Agreement will be required to amend the Stockholders Agreement; provided that any amendment or waiver that adversely affects the rights granted to an identified stockholder or group of stockholders (e.g., the right to designate a Director) requires the consent of such stockholder(s) and any amendments to the tag-along rights, pre-emptive rights or other similar minority protections will require the approval of holders of at least 80% of the outstanding Common Stock party to the Stockholders Agreement (including to the extent such right is in the Certificate of Incorporation and/or Bylaws). |

KL2 3108842.8

| | |
|---|---|
| <u>Transfers:</u> | It will be a condition to transfer that any transferee of Common Stock deliver to the Company an executed joinder to the Stockholders Agreement. Until the Common Stock is listed on the NYSE or NASDAQ, shares of Common Stock will be subject to the drag-along and tag-along rights described below. [3] |
| | Any transfer, or series of transfers, that (i) will result in the Company being required to register the Common Stock under the Exchange Act or (ii) otherwise violates the terms of the Organizational Documents or, to the extent applicable, the MEP, will be prohibited and any purported such transfer will be void and will not be recognized by the Company. |
| | Other than as set forth above, the Organizational Documents will not contain any other restrictions on the transfers of shares of Common Stock. |
| <u>Preemptive Rights:</u> | The Stockholders Agreement will provide that if, other than pursuant to the Equity Incentive Plan and the Management Incentive Plan, the Board decides to issue additional shares of Common Stock (or Preferred Stock or other equity interests or securities convertible into equity interests of the Company and its Subsidiaries) to any party (including any then-current stockholder), other than in a pro rata distribution to all holders of Common Stock and other customary exceptions as set forth in the Stockholders Agreement, the Company must make an offer to permit each holder (or group of affiliated parties) party to the Stockholders Agreement holding in the aggregate 0.5% or more of the Company's Common Stock (on a fully diluted basis) to purchase its *pro rata* portion of such additional shares on the same terms and conditions. The Stockholders Agreement will further provide that the Company and its Subsidiaries may issue additional shares of Common Stock (or Preferred Stock or other equity interests or securities convertible into equity interests) without first complying with the foregoing preemptive rights provisions if following the proposed issuance, the Company provides all applicable holders with the right to purchase its *pro rata* portion of any additional shares it may otherwise be entitled to purchase in accordance with the preemptive rights procedures as set forth in the Stockholders Agreement. |
| <u>Tag-Along Rights:</u> | The Stockholders Agreement will provide that if one or more holders of Common Stock (such selling holders, the "<u>Initiating</u> |

---

[3] The provisions of this Term Sheet shall be reflected in the certificate of incorporation, bylaws and/or a shareholders agreement as necessary or desirable to give effect to such provisions in a manner that is both consistent with the Delaware General Corporation Law and permits the DTC eligibility of the Common Stock.

KL2 3108842.8

Holders") agree to sell shares of Common Stock representing at least 20% of the then-issued and outstanding shares of Common Stock (on a fully diluted basis) in any transaction (or series of related transactions), the Initiating Holders must arrange for each other stockholder of the Company party to the Stockholders Agreement holding at least 1% of the then-issued and outstanding shares of Common Stock (on a fully diluted basis) to have the opportunity to include in such sale a corresponding percentage of the shares of Common Stock owned by such other stockholder at the same price per share and on the same terms as the Initiating Holders. However, this tag-along right will not apply to any transfer of shares of Common Stock by such a stockholder to its affiliates. The tag-along right may be exercised by any stockholder delivering a written notice to the Company or a designated representative of the Initiating Holders within seven (7) business days following receipt of written notice of the proposed sale by the Initiating Holders.

Drag-Along Rights:

The Stockholders Agreement will provide that if one or more holders of Common Stock holding at least 66-2/3% of the then-issued and outstanding shares of all Common Stock (on a fully diluted basis) (the "Selling Holders") desires to effect a Sale of the Company (as defined below), the Company or the Selling Holders will have the right to require all other stockholders of the Company (the "Dragged Stockholders") to (i) sell to such third party, for the same type and amount of per share consideration and on the same terms, a percentage of their shares corresponding to the aggregate percentage of the shares held by the Selling Holders that are proposed to be included in such Sale of the Company; (ii) vote such stockholder's shares, whether by proxy, voting agreement or otherwise, in favor of the Sale of the Company; (iii) enter into agreements with the purchaser on terms substantially identical to those applicable to the Selling Holders (subject to customary exceptions), and obtain any required consents; (iv) waive appraisal or dissenters rights; and (v) fully cooperate with the Company and Selling Holders and take any and all reasonably necessary action in furtherance of the foregoing.

A "Sale of the Company" means the bona fide sale, lease or transfer in one or a series of related transactions of (i) all or substantially all of the consolidated assets of the Company and its subsidiaries or (ii) at least 66-2/3% of the Common Stock (on a fully diluted basis), to any person or group of related persons (other than the Selling Holders or any affiliate thereof), whether directly or indirectly or by way of any merger, statutory share exchange, recapitalization, sale of equity, reclassification,

KL2 3108842.8

consolidation or other business combination transaction or purchase of beneficial ownership.

Additionally, if a merger, consolidation, recapitalization, sale of all or substantially all the consolidated assets of the Company and its subsidiaries or any other Sale of the Company is approved in accordance with the organizational documents of the Company, the stockholders shall consent to and cooperate fully with respect thereto and, without limiting the generality of the foregoing, shall not in any way object to or exercise any appraisal rights in connection with such merger, consolidation, recapitalization, sale of assets or Sale of the Company.

The Company or the Selling Holders must promptly deliver written notice to the Dragged Stockholders, setting forth the amount and form of consideration, the identity of the third party purchaser and the other material terms and conditions of the Sale of the Company.

The Selling Holders will determine in their sole discretion whether to effect or consummate a Sale of the Company pursuant to the foregoing and there will be no liability on the part of the Company or the Selling Holders if such Sale of the Company is not consummated for any reason.

<u>Registration Rights</u>:

Subject to the terms of the Stockholders Agreement, once the Company is eligible to file a short-form shelf registration statement under the Securities Act of 1933, as amended, each affiliate and/or holder of restricted Common Stock issued on the Effective Date may require the Company to register their shares for resale on a shelf registration statement.

In addition, following the registration of the Common Stock under the Exchange Act (a "<u>Registration Event</u>"), holders that received at least 10% of the issued and outstanding Common Stock on the Effective Date that continue to hold at least 5% of the then issued and outstanding Common Stock will have demand rights, subject to certain customary qualifications and limitations.

<u>Piggyback Registration Rights</u>:

If at any time following the closing of the first underwritten public offering of Common Stock with an aggregate offering price of at least $100 million, the Company undertakes an underwritten public offering of its Common Stock, all holders of Common Stock on the Effective Date party to the Stockholders Agreement will have piggyback rights to include their shares of Common Stock received on the Effective Date in the public

- 9 -

KL2 3108842.8

offering, subject to the right of the Company to sell shares first in any such public offering and other customary cutback provisions.

| | |
|---|---|
| <u>Confidentiality</u>: | Subject to certain customary permitted disclosures and exceptions, each stockholder will covenant to hold in strict confidence any proprietary and financial information such stockholder receives regarding the Company or any proprietary and financial information regarding the business or affairs of any other stockholder in respect of the Company ("<u>Confidential Information</u>"), whether such Confidential Information is received from the Company, another stockholder or affiliate or partner of a stockholder for the period commencing on the Effective Date and ending on the Registration Event (except to the extent any Confidential Information is not made public in connection with such Registration Event). |

In the event that any stockholder proposes to sell any shares of Common Stock to any potential transferee in compliance with the transfer restrictions described above prior to a Registration Event, such stockholder may make available to such potential transferee Confidential Information, subject to such potential transferee entering into an agreement with the Company to comply with the foregoing confidentiality provisions, including through entry into a customary "Click Through" non-disclosure agreement as described in "Reporting" below.

No such information may be shared with a potential transferee that is determined by the Board and disclosed to the stockholders to be a material customer, supplier or competitor of the Company (a "<u>Restricted Person</u>"). In furtherance of the foregoing, the Stockholders Agreement will include a list of Restricted Persons, which may be updated in good faith by the Board from time to time.

| | |
|---|---|
| <u>Reporting</u>: | Subject to the "Confidentiality" section above and other customary exceptions and until a Registration Event, the Company shall make available to each holder of Common Stock (i) unaudited quarterly and audited annual financial statements of the Company and its consolidated subsidiaries (which financial statements shall be prepared on a basis substantially consistent with then-applicable SEC requirements, including segment reporting (retail and generation) and footnotes, and include an MD&A substantially equivalent to that required in SEC-compliant quarterly and annual reports, as applicable (provided, however, that no such MD&A disclosures will be required solely to the extent the Board reasonably determines, after taking into |

- 10 -

KL2 3108842.8

account confidentiality, regulatory and market considerations, that such disclosures would cause material harm to the Company's business) within (A) 60 and 90 days after the end of the applicable period, respectively, for any quarterly or annual period which ends on or prior to the 6-month anniversary of the Effective Date and (B) 45 and 75 days after the end of the applicable period, respectively, with respect to any subsequent period; provided that, for any period ending prior to the 6 month anniversary of the Effective Date, if the Board reasonably determines that despite the Company's reasonable best efforts it is unable to comply with one or more then-applicable SEC requirements with respect to such financial statements, the Company shall make available financial statements that are prepared on a basis substantially consistent with the above other than such then-applicable SEC requirements that the Company is unable to comply with (so long as in all cases such financial statements include a balance sheet, statement of income and statement of cash flows prepared in accordance with GAAP), (ii) current reports containing substantially the same information required to be contained in a Current Report on Form 8-K with respect to events requiring disclosure under Items 1.01, 1.02, 1.03, 2.01 (which, for the avoidance of doubt, will not require financial information under Item 9.01), 2.03, 2.04, 3.03, 4.02, 5.01, 5.02 (other than compensation-related information required thereunder, including vesting metrics and valuation methodologies; provided that total cash compensation and total current stockholdings shall be disclosed for senior executives and directors to the extent required thereunder as if the Company were a 1934 Act reporting company) and 5.03 of Form 8-K, which current reports shall be made available (A) from the day following the Effective Date through the 6-month anniversary of the Effective Date, within fifteen (15) business days of the occurrence of the applicable triggering event described above (but, for the avoidance of doubt, only with respect to events occurring after the Effective Date) and (B) after the 6-month anniversary of the Effective Date, within ten (10) business days after the occurrence of the applicable triggering event described above; provided, however, that no such current report will be required to include information solely to the extent that the Board reasonably determines, after taking into account confidentiality, regulatory and market considerations, that such disclosure would cause material harm to the Company's business, (iii) notice of the sale of any additional shares of Common Stock or equity securities convertible into Common Stock to a third-party that generates in excess of $10 million of proceeds (subject to customary carve-outs), which notice shall be made available

within the time period applicable to current reports set forth in clause (ii) above and (iv) promptly upon the written request of any foreign holder (or any domestic holder that is taxable as a partnership for United States federal income tax purposes and has at least one beneficial owner that is a foreign person), a statement satisfying the requirements of the applicable Treasury regulations under Section 1445 of the Code signed by an authorized representative of the Company (and the Company shall duly file a corresponding notice with the Internal Revenue Service pursuant to the applicable Treasury regulations under Section 897 of the Code) setting forth the Company's determination of whether the Company is a U.S. Real Property Holding Corporation for the purposes of the Foreign Investment in Real Property Tax Act of 1980 at any time during the period such foreign holder held their Common Stock, provided that no such statement shall be required to be delivered to any person that is not described in Treasury Regulation Section 1.897-1(c)(2)(iii)(A) at any time that the Company is regularly traded on an established securities market within the meaning of Section 897(c)(3) of the Internal Revenue Code, in the case of clauses (i), (ii) and (iii) via a secured website (the "Data Room") requiring entry into a customary "Click Through" non-disclosure agreement consistent with the "Confidentiality" section above and in the case of clause (iv) by e-mail to the requesting holder. Potential transferees of the Common Stock shall also be granted access to the Data Room (subject to the "Confidentiality" section above). Additionally, as promptly as practicable (but no earlier than 3 business days) following the quarterly and annual financial statements described in clause (i) above being posted to the Data Room, the Company will hold a conference call to discuss the results of operations and to answer questions posed by stockholders.

Termination:

In the event that the Common Stock becomes registered on the NYSE or NASDAQ, the affiliate transactions, transfer, tag-along, drag-along and preemptive rights provisions of the Stockholders Agreement will terminate. In addition, any party to the Stockholders Agreement will cease to be a party to the Stockholders Agreement from and after the time such party, together with its affiliates, ceases to own Common Stock, in all instances subject to the confidentiality provision described above.

Governing Law:

Delaware

- 12 -

KL2 3108842.8

| | |
|---|---|
| <u>Transactions with Interested Stockholders</u>: | The Certificate of Incorporation shall contain a provision in which the Company elects not to be subject to the restrictions on transactions with interested stockholders set forth in Section 203 of the Delaware General Corporation Law (the "<u>DGCL</u>"). |
| <u>Corporate Opportunities</u>: | The Company's Organizational Documents will provide, to the fullest extent permitted by applicable law, for the renunciation of the Company's interest in business opportunities that are presented to directors or the stockholders, in each case, other than opportunities (a) presented to directors, employees, consultants or officers of the Company in their capacity as such or (b) identified through disclosure by or on behalf of the Company. |
| <u>Management Equity Plan</u>: | The terms and conditions of the Management Equity Plan, including without limitation vesting requirements, will be determined by the Board following the Effective Date. |
| <u>Employment Agreements/Other Compensation</u>: | Employees will be subject to appropriate confidentiality arrangements. Employment terms of any key employees to be addressed on an individual basis with applicable employee. |

*This Draft Summary is not intended to be all-inclusive. Any terms and conditions that are not specifically addressed in this Draft Summary are subject to future negotiations among the parties.*

- 13 -

KL2 3108842.8

## <u>EXHIBIT C</u>

**Financial Advisor Transaction Fee Terms**

31

**Exhibit C**

**Financial Advisor Professional Fees**

| Professional | Fee Terms |
|---|---|
| GLC Advisors & Co. | <u>Monthly Fee</u>: $175,000<br><br><u>Transaction Fee</u> (as defined in the GLC Engagement Letter dated as of March 1, 2017): $5,200,000<br><br><u>Pleasants M&A Fee</u>: $1,000,000<br><br><u>Crediting</u>: 50% of Monthly Fees credited against the Transaction Fee beginning on the date that a confirmation order is entered by the Bankruptcy Court.<br><br><u>Fee Cap</u>: None<br><br><u>Treatment of Accrued Fees</u>: Accrued and unpaid prepetition fees in the amount of $700,000 will be waived.<br><br>Transaction Fees shall only be paid upon the Debtors' consummation of the Plan as set forth in the Plan Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof |
| Guggenheim Securities, LLC | <u>Monthly Fee</u>: $150,000<br><br><u>Transaction Fee</u> (as defined in the Guggenheim Engagement Letter dated as of July 1, 2017): $3,250,000<br><br><u>Crediting</u>: 50% of Monthly Fees credited against the Transaction Fee beginning on the date the RSA is signed. On the date that a confirmation order is entered, crediting of Monthly Fees against the Transaction Fee will increase to 75%<br><br><u>Fee Cap</u>: None<br><br><u>Treatment of Accrued Fees</u>: No prepetition fees are owed.<br><br>Transaction Fees shall only be paid upon the Debtors' consummation of the Plan as set forth in the Plan Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof |

| | |
|---|---|
| Houlihan Lokey Capital, Inc. | **Monthly Fee**: $150,000 beginning as of August 13, 2018 <br><br> **Initial Deferred Fee** (as defined in the Houlihan Lokey Engagement Letter dated as of October 23, 2018): $2,000,000 <br><br> **Discretionary Fee** (as defined in the Houlihan Lokey Engagement Letter dated as of October 23, 2018): $1,000,000 <br><br> **Crediting**: 50% of Monthly Fees credited against the Initial Deferred Fee and Discretionary Fee beginning on the date the RSA is signed. On the date that a confirmation order is entered, crediting of Monthly Fees against the Initial Deferred Fee and Discretionary Fee will increase to 75% <br><br> **Fee Cap**: None <br><br> **Treatment of Accrued Fees**: Accrued Monthly Fees and expenses in the amount of $933,419.44 will be paid as promptly as practicable following entry of an order approving the RSA. <br><br> Initial Deferred Fees and Discretionary Fees shall only be paid upon the Debtors' consummation of the Plan as set forth in the Plan Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof |

## EXHIBIT B

## TRANSFER AGREEMENT

# FORM OF TRANSFER AGREEMENT

This TRANSFER AGREEMENT (this "**Transfer Agreement**") to (a) the Process Support Agreement, dated as of March 30, 2018, by and among (i) the Company, (ii) the Supporting Parties, (iii) solely for purposes of the Mansfield Issues Protocol and Sections 1, 2, 3 (solely with respect to the Mansfield Issues Protocol and the Term Sheet), 4, 5, 7.01, 8, 9, 10.02, 10.03, and 11 of the Agreement, MetLife and the Owner Trustee, and (iv) solely for purposes of the Mansfield Issues Protocol, the official committee of unsecured creditors and Wilmington Savings Fund Society, FSB, (as amended, supplemented or otherwise modified, the "**Support Agreement**"); (b) the Amended and Restated Standstill Agreement, dated May 7, 2018, by and among the Company, the Independent Creditors, and FirstEnergy Corp. (as amended, supplemented or otherwise modified, the "**Standstill Agreement**"); (c) the Settlement Agreement, dated as of August 26, 2018, among the Debtors, the FE Non-Debtor Parties, the Ad Hoc Noteholders Group, the Bruce Mansfield Certificateholders Group, and the Committee (the "**Settlement Agreement**"); and (d) the Restructuring Support Agreement, dated as of _____ __, 2019, among the Debtors, the Committee and the Consenting Creditors(the "**RSA**"), is executed and delivered by _____ (the "**Transferee**") as of _____ __, 201__, as contemplated under Section 6(a)(ii) of the Support Agreement, Section 3(a)(ii) of the Standstill Agreement, Section 8.1(a) of the Settlement Agreement, and Section 6(a)(ii) of the RSA. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Support Agreement, the Standstill Agreement, the Settlement Agreement, or the RSA, as applicable.

1.     <u>Agreement to be Bound</u>.  The Transferee hereby agrees to be bound, soley to the same extent as the transferor of the Creditor Claims being acquired by the Transferee in connection herewith, by all of the terms of, as applicable, (a) the Support Agreement, in the form attached to this Transfer Agreement as **Annex I** (as the same may be hereafter amended, restated or otherwise modified from time to time), including the commitments of the Parties set forth in Section 5; (b) the Standstill Agreement, in the form attached to this Transfer Agreement as **Annex II** (as the same may be hereafter amended, restated or otherwise modified from time to time); (c) the Settlement Agreement, in the form attached to this Transfer Agreement as **Annex III** (as the same may be hereafter amended, restated or otherwise modified from time to time); and (d) the RSA, in the form attached to this Transfer Agreement as **Annex IV** (as the same may be hereafter amended, restated or otherwise modified from time to time), including the commitments of the Consenting Creditors set forth in Section 5.01. The Transferee shall hereafter be deemed to be a "Supporting Party," a "Consenting Creditor" and a "Party" for all purposes under the Support Agreement, the Standstill Agreement, the Settlement Agreement, or the RSA, as applicable.

2.     <u>Representations and Warranties</u>.  Subject to the limitations set forth in Section 1 of this Transfer Agreement, as of the effective date of this Transfer Agreement, the Transferee hereby makes the representations and warranties to the other Parties as set forth in Sections 7.01 and 7.02 of the Support Agreement and as set forth in Sections 7.01 and 7.02 of the RSA, as well as the following representations and warranties:

(i)     The Transferee is duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation; and

(ii)     The Transferee possesses all requisite power and authority necessary to carry out the transactions contemplated by this Agreement, the Support Agreement, the Standstill Agreement, the Settlement Agreement, and the RSA.

3.     <u>Effectiveness</u>.  Subject to the limitations set forth in Section 1 of this Transfer Agreement, this Transfer Agreement shall become effective upon delivery by the Transferee of this Transfer Agreement, executed by the Transferee, to counsel to each Supporting Party, Consenting Creditor, and Party, as applicable, in accordance with Section 11.12 of the Support Agreement, Section 6(i) of the Standstill Agreement, Section 13.9 of the Settlement Agreement, and Section 6(a) of the RSA, and this Transfer Agreement shall terminate in accordance with Section 10 of the Support Agreement, Section 4 of the Standstill Agreement, Article XII of the Settlement Agreement, or Section 9 of the RSA, as applicable.

4.     <u>Governing Law</u>.  This Transfer Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in such state, without giving effect to the conflict of law principles thereof.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Transferee has caused this Transfer Agreement to be executed as of the date first written above.

**[NAME OF INSTITUTION]**

By: _____

Name: _____

Title: _____


Principal amount of Pollution Control Notes: $ _____

Principal amount of Unsecured Notes: $ _____

Principal amount of Pass-Through Certificates: $ _____

Other claims (specify type and amount): $ _____


Notice Address:

_____

_____

Attn: _____

Fax: _____

Email: _____

## **Annex I**

Form of Process Support Agreement

[Attached.]

## **Annex II**

Form of Standstill Agreement

[Attached.]

## **Annex III**

Form of Settlement Agreement

[Attached.]

## **Annex IV**

Form of RSA

[Attached.]

**EXHIBIT C**

**JOINDER AGREEMENT**

# FORM OF JOINDER AGREEMENT

This Joinder Agreement to, as applicable, (a) the Process Support Agreement, dated as of March 30, 2018, by and among (i) the Company, (ii) the Supporting Parties, (iii) solely for purposes of the Mansfield Issues Protocol and Sections 1, 2, 3 (solely with respect to the Mansfield Issues Protocol and the Term Sheet), 4, 5, 7.01, 8, 9, 10.02, 10.03, and 11 of the Agreement, MetLife and the Owner Trustee, and (iv) solely for purposes of the Mansfield Issues Protocol, the official committee of unsecured creditors and Wilmington Savings Fund Society, FSB, (as amended, supplemented or otherwise modified, the "**Support Agreement**"); (b) the Amended and Restated Standstill Agreement, dated May 7, 2018, by and among the Company, the Independent Creditors, and FirstEnergy Corp. (as amended, supplemented or otherwise modified, the "**Standstill Agreement**"); (c) the Settlement Agreement, dated as of August 26, 2018, among the Debtors, the FE Non-Debtor Parties, the Ad Hoc Noteholders Group, the Bruce Mansfield Certificateholders Group, and the Committee (the "**Settlement Agreement**"); and (d) the Restructuring Support Agreement, dated as of _____ __, 2019, among the Debtors, the Committee, and the Consenting Creditors (the "**RSA**"), is executed and delivered by _____ (the "**Joining Party**") as of _____ __, 201[9].  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Support Agreement, the Standstill Agreement, the Settlement Agreement, or the RSA, as applicable.

1. <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound, solely to the extent as the Joining Party was previously bound, by all of the terms of, as applicable, (a) the Support Agreement, in the form attached to this Joinder Agreement as **Annex I** (as the same may be hereafter amended, restated or otherwise modified from time to time), including the commitments of the Parties set forth in Section 5, (b) the Standstill Agreement, in the form attached to this Joinder Agreement as **Annex II** (as the same may be hereafter amended, restated or otherwise modified from time to time), (c) the Settlement Agreement, in the form attached to this Joinder Agreement as **Annex III** (as the same may be hereafter amended, restated or otherwise modified from time to time), and (d) the RSA, in the form attached to this Joinder Agreement as **Annex IV** (as the same may be hereafter amended, restated or otherwise modified from time to time), including the commitments of the Consenting Creditors set forth in Section 5.01.  The Joining Party shall hereafter be deemed to be a "Supporting Party," a "Consenting Creditor," and a "Party" for all purposes under the Support Agreement, the Standstill Agreement, the Settlement Agreement, or the RSA, as applicable.

2. <u>Representations and Warranties</u>.  Subject to the limitations set forth in Section 1 of this Joinder Agreement, as of the effective date of this Joinder Agreement, the Joining Party hereby makes the representations and warranties to the other Parties as set forth in Sections 7.01 and 7.02 of the Support Agreement and/or as set forth in Section 7.01 and 7.02 of the RSA, as well as the following representations and warranties:

      (i)     The Joining Party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation; and

        (ii)     The Joining Party possesses all requisite power and authority necessary to carry out the transactions contemplated by this Agreement, the Support Agreement, the Standstill Agreement, the Settlement Agreement, and the RSA.

        3.     <u>Effectiveness</u>.  This Joinder Agreement shall become effective upon, as applicable, (i) delivery by the Joining Party of this Joinder Agreement, executed by the Joining Party and countersigned by the Company, solely to reflect its acknowledgement of the Joining Party becoming a Party to the Support Agreement and the Standstill Agreement, and to reflect its agreement that the Joining Party is reasonably acceptable to the Company prior to the Joining Party becoming a Party to the RSA and (ii) delivery of the executed and countersigned Joinder Agreement to counsel to all Parties, Consenting Creditors, and Supporting Parties by counsel to the Company and FE Corp. This Joinder Agreement shall terminate in accordance with relevant sections of the Support Agreement, the Standstill Agreement, the Settlement Agreement, and the RSA, as applicable.

        4.     <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed in such state, without giving effect to the conflict of law principles thereof.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

**[NAME OF INSTITUTION]**

By: _____

Name: _____

Title: _____

Principal amount of Pollution Control Notes: $ _____

Principal amount of Unsecured Notes: $ _____

Principal amount of Pass-Through Certificates: $ _____

Other claims (specify type and amount): $ _____

Notice Address:

_____

_____

Attn: _____

Fax: _____

Email: _____

ACKNOWLEDGED AND AGREED:


**FIRSTENERGY SOLUTIONS CORP., on behalf of itself and its affiliated Debtors**


By: _____

Name:

Title:

## **Annex I**

Form of Process Support Agreement

[Attached.]

## **Annex II**

Form of Standstill Agreement

[Attached.]

## Annex III

Form of Settlement Agreement

[Attached.]

**<u>Annex IV</u>**

Form of RSA

[Attached.]