This document was signed electronically on January 25, 2019, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated:  January 25, 2019



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 18-50757 (AMK) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

**ORDER (A) APPROVING THE SALE OF FIRSTENERGY GENERATION, LLC'S WEST LORAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND (C) GRANTING RELATED RELIEF**

Upon consideration of the *Motion of FirstEnergy Generation, LLC Pursuant to 11 U.S.C.*

*§§ 105, 363, 365 and 503 and Fed. R. Bankr. P. 2002, 6004, and 6006 for Entry of (I) Order*

*Approving (A) Bid Procedures, (B) Procedures for Assumption and Assignment of Certain*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage LLC (6928), case no. 18-50764.  The Debtors' address is 341 White Pond Dr., Akron, OH 44320.

*Executory Contracts and Related Notices, (C) Notice of Auction and Sale Hearing, and (D)*
*Related Relief and (II) Order (A) Approving the Sale of FirstEnergy Generation, LLC's West*
*Lorain Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B)*
*Approving Assumption and Assignment of Certain Executory Contracts, and (C) Granting*
*Related Relief* [Docket No. 1730] (the "Motion")[2]; and the Court having entered an order

approving, among other things, the Bid Procedures [Docket No. 1861] (the "Bid Procedures

Order") based upon the evidence presented at the hearing held on December 18, 2018 (the "Bid

Procedures Hearing"); and the Auction (the "Auction") having been cancelled in accordance with

the Bid Procedures Order on January 10, 2019, and Vermillion Power, LLC, the Stalking Horse

Purchaser, (the "Purchaser") having been deemed the Successful Bidder for the West Lorain

Assets;[3] and upon the Purchaser and FirstEnergy Generation, LLC ("FG") having agreed to the

terms of that certain asset purchase agreement (together with all ancillary documents, as may be

amended, modified or supplemented from time to time, the "Asset Purchase Agreement");[4] and

upon (i) the Cowan Declaration and (ii) the Warvell Declaration; and the Court having conducted

a hearing (the "Sale Hearing") on January 25, 2019; and all parties in interest having been heard

or having had the opportunity to be heard regarding the Asset Purchase Agreement; and it

appearing that adequate and proper notice of the Motion has been given and that no other or

further notice need be given; and upon the record of the Sale Hearing and all of the proceedings

had before the Court; and the Court having found and determined that the relief sought in the

Motion is in the best interests of FG, its estate, its creditors and all other parties in interest; and

that the legal and factual bases set forth in the Motion, and the testimony adduced at the Sale

---

[2] Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings
ascribed to them in the Motion.

[3] The term "West Lorain Assets" as used herein shall have the same meaning given to the term "Purchased Assets"
in the Asset Purchase Agreement.

[4] A copy of the Asset Purchase Agreement is attached hereto as **Exhibit A**.

2

Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[5]

## JURISDICTION AND VENUE

A.      The Court has jurisdiction over this matter and the West Lorain Assets pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

## COMMENCEMENT AND JOINT ADMINISTRATION OF THE CHAPTER 11 CASES

C.      On the Petition Date, the Debtors commenced the Chapter 11 Cases.  On April 3, 2018, the Court entered an order [Docket No. 126] authorizing the joint administration of the Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b).  The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

---

[5] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* Fed. R. Bankr. P. 7052.

3

D.        Proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the

Sale Transaction,[6] the assumption and assignment to the Purchaser of the Assumed Contracts (as

defined in the Asset Purchase Agreement), the Auction and all deadlines related thereto has been

provided, as relevant, in accordance with Bankruptcy Code Sections 102(1), 363 and 365 and

Bankruptcy Rules 2002, 6004, 6006 and 9014 to all creditors, all non-Debtor parties to the

Assumed Contracts, parties-in-interest and other interested persons and entities.  Specifically,

notice of this Motion and the Sale Hearing has been provided to: (i) the Office of the United

States Trustee for the Northern District of Ohio (the "U.S. Trustee"); (ii) the Stalking Horse

Purchaser; (iii) the Official Committee of Unsecured Creditors (the "Committee"); (iv) all

Persons (as defined in the Asset Purchase Agreement) known by FG to have expressed an

interest to FG in a transaction with respect to the West Lorain Assets during the past twelve (12)

months; (v) all non-Debtor parties to the Assumed Contracts, (vi) all entities known by FG to

have asserted any lien, claim, encumbrance or other interest in the West Lorain Assets (for whom

identifying information and addresses are available to FG); (vii) any Governmental Authority

known to have an interest related to the West Lorain Assets; (viii) all parties who have requested

notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (ix) any other Persons

as directed by the Court (for whom identifying information and addresses are available to FG),

including those Persons listed on any service list previously approved by the Court for use in

these Chapter 11 Cases (collectively, the "Sale Notice Parties") all in accordance and as provided

by the Bid Procedures Order.  *See* Certificates of Service [Dockets No. 1754, 1883].  The

foregoing notice was good, sufficient and appropriate under the circumstances, and no other or

---

[6] The term "Sale Transaction" as used herein shall have the same meaning given to the term "Transactions" in the
Asset Purchase Agreement.

further notice of the Sale Transaction, Sale Hearing, the assumption and assignment to the Purchaser of the Assumed Contracts or any and all deadlines related thereto is required.

**MARKETING AND SALE PROCESS**

E.      As outlined in the Motion and the Cowan Declaration, and as incorporated herein by reference as findings of fact, FG and its professionals, agents, and other representatives marketed the West Lorain Assets and conducted all aspects of the sale process in good faith. The marketing process undertaken by FG and its professionals with respect to the West Lorain Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders. The Asset Purchase Agreement constitutes the highest or otherwise best offer for the West Lorain Assets.

**CORPORATE AUTHORITY**

F.      The West Lorain Assets constitute property of FG's estate and title thereto is vested in FG's estate within the meaning of section 541 of the Bankruptcy Code. FG (i) had full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction with the Purchaser has been duly and validly authorized by all necessary corporate action, (ii) has all of the corporate power and authority necessary to consummate the Sale Transaction and the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by FG of the Sale Transaction and the transactions contemplated thereby, and (iv) requires no corporate consents or approvals to consummate the Sale Transaction.

5

## BUSINESS JUDGMENT; HIGHEST OR OTHERWISE BEST OFFER

G.      FG has demonstrated good, sufficient and sound business purposes for entering into the Asset Purchase Agreement, selling the West Lorain Assets on the terms outlined therein and assuming and assigning to the Purchaser the Assumed Contracts under sections 363 and 365 of the Bankruptcy Code.  All such actions are appropriate exercises of FG's business judgment and are in the best interests of FG, its estate and other parties in interest.  Approval of the Sale Transaction pursuant to the Asset Purchase Agreement is in the best interests of FG, its estate, and all other parties in interest.

H.      The terms and conditions set forth in the Asset Purchase Agreement, including the total consideration to be realized by FG thereunder, (i) is the highest or otherwise best offer received by FG as a result of FG's marketing process, and (ii) is in the best interests of FG, its estate, and other parties in interest.  Taking into consideration all relevant factors and circumstances, no other person or entity has offered to purchase the West Lorain Assets for higher or otherwise better consideration to FG or its estate.

## STALKING HORSE PURCHASE AGREEMENT, BID PROCEDURES, AND AUCTION

I.      On November 16, 2018, FG entered into the Stalking Horse Agreement, subject to higher or better offers, which was approved by the Bid Procedures Order.  In accordance with the Bid Procedures Order, the transactions contemplated by the Stalking Horse Agreement were deemed a Qualified Bid and the Stalking Horse Purchaser was eligible to participate in the Auction.

J.      The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to

6

make a higher or otherwise better offer to purchase the West Lorain Assets. FG conducted the sale process without collusion and in accordance with the Bid Procedures.

K.     No other Qualified Bids were received by FG for the West Lorain Assets on or prior to the bid deadline of January 9, 2019. FG accordingly determined, in a valid and sound exercise of its business judgment, that the highest or otherwise best Qualified Bid for the West Lorain Assets was that of the Stalking Horse Purchaser as contemplated in the Asset Purchase Agreement in the amount of $144,000,000.00 (subject to adjustment as contemplated by the terms of the Asset Purchase Agreement) and the Stalking Horse Purchaser was determined to be the Successful Bidder for the West Lorain Assets.

## NO FRAUDULENT TRANSFER

L.     There has been no showing that FG or the Purchaser (i) has entered into the Asset Purchase Agreement or proposes to consummate the Sale Transaction and the transactions contemplated therein for the purposes of hindering, delaying, or defrauding FG's present or future creditors or (ii) is entering into the Asset Purchase Agreement or proposing to consummate the transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of any applicable jurisdiction.

M.     The offer of the Purchaser, upon the terms and conditions set forth in the Asset Purchase Agreement, including the total consideration to be realized by FG, thereunder, constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration, and fair value under any applicable laws

of the United States, any state, territory or possession or the District of Columbia for the West Lorain Assets.

<h3 align="center">NO <em>SUB ROSA</em> PLAN</h3>

N.     The sale of the West Lorain Assets outside a chapter 11 plan pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of FG's creditors or equity interest holders nor impermissibly dictates the terms of a chapter 11 plan of the Debtors, nor does the sale of the West Lorain Assets constitute an attempt by FG to circumvent the intent and purpose of sections 1125 and 1129 of the Bankruptcy Code.  The sale of the West Lorain Assets therefore does not constitute a *sub rosa* chapter 11 plan.

<h3 align="center">FREE AND CLEAR TRANSFER REQUIRED BY PURCHASER</h3>

O.     The Purchaser would not have entered into the Asset Purchase Agreement and would not have consummated the Sale Transaction, thus adversely affecting FG and its estate, if the Sale Transaction were not free and clear of all Liens (other than Permitted Liens)[7] and other interests or liabilities, other than Assumed Liabilities (as defined in the Asset Purchase Agreement).  As of the Closing (as defined in the Asset Purchase Agreement), pursuant and subject to the terms of the Asset Purchase Agreement and this Order, the transfer of the West Lorain Assets and the Sale Transaction will effect a legal, valid, enforceable, and effective transfer of the West Lorain Assets and will vest Purchaser with all of FG's rights, title, and interest in the West Lorain Assets free and clear of all Liens (other than Permitted Liens) and other interests or liabilities (with the exception of the Assumed Liabilities) of any kind or nature whatsoever, whether at law or in equity, including free and clear of any rights or claims based on theories of transferee or successor liability under any applicable law, whether arising before or

---

[7] The terms "Liens" and "Permitted Liens" shall have the meanings given to them in the Asset Purchase Agreement.

8

after the commencement of any bankruptcy case, save and excepting only those Assumed Liabilities expressly assumed by the Purchaser in writing under the Asset Purchase Agreement.

P.        The FG Mortgage Indenture lists certain excluded property not subject to the liens of the Mortgage Trustee, including inventory and spare parts (the "Unencumbered Assets"). Of the sale proceeds, the Closing Adjustment Amount is attributable to the Unencumbered Assets and the remaining $144,000,000 is attributable to the West Lorain Assets in which the Mortgage Trustee has liens (the "Secured Collateral Proceeds").  For the avoidance of doubt, notwithstanding anything to the contrary herein, the liens of the Mortgage Trustee, shall attach only to the Secured Collateral Proceeds, in the order of their priority, with the same validity, force and effect, if any, which they now have against such Secured Collateral Proceeds, subject to any claims, defenses and objections, if any, that FG or its estate may possess with respect thereto.

### SATISFACTION OF SECTION 363(F)

Q.        FG may sell the West Lorain Assets free and clear of any and all Liens (other than Permitted Liens) or other interests or liabilities of any kind or nature whatsoever, including any rights or claims based on any putative successor or transferee liability, as set forth herein, because, in each case, one or more standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  All parties in interest, including, without limitation, any holders of liens, claims and/or interests, and any non-Debtor parties to the Assumed Contracts, who did not object, or who withdrew their objection, to the Motion, the Sale Transaction and the assumption, assignment and sale of their applicable Assumed Contract may be deemed to have consented to the Sale Transaction and the relief granted herein and fall under section 363(f)(2) of the Bankruptcy Code.  In addition, those holders of liens, claims, encumbrances or other interests or

9

liens and non-Debtor parties to Assumed Contracts that did not object, or do not object as set forth in the Bid Procedures Order, are covered within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their liens, claims or other interests, if any, attach to the proceeds, or in the case of the Mortgage Trustee, the Secured Collateral Proceeds, against which they assert a lien, claim or other interest, in the order of their priority, with the same validity, force and effect, if any, which they now have against such proceeds, or in the case of the Mortgage Trustee, such Secured Collateral Proceeds, subject to any claims and defenses FG or its estate may possess with respect thereto. Any argument that the Assumed Contracts may not be assumed, assigned and sold pursuant to section 363(f), including, but not limited to any purported prohibition on assumption and assignment provided under section 365(c) of the Bankruptcy Code, is hereby overruled.

### GOOD FAITH PURCHASER; NO COLLUSION

R.      The Purchaser is not an insider (as that term is defined in section 101(31) of the Bankruptcy Code) of any of the Debtors.

S.      The Purchaser is purchasing the West Lorain Assets in good faith, and is a good faith purchaser, within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to and granted the full rights, benefits, privileges and protections of that provision, and has otherwise proceeded in good faith in all respects in connection with the transactions contemplated by the Asset Purchase Agreement in that, *inter alia*: (i) the Purchaser recognized that FG was free to deal with any other party interested in acquiring the West Lorain Assets; (ii) the Purchaser complied with the Bid Procedures and all other sales, bidding, and marketing procedures through the prepetition and postpetition marketing processes; (iii) the Purchaser did not violate section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common

identity of directors or controlling stockholders exists between the Purchaser, on the one hand, and FG, on the other hand; and (v) the negotiation and execution of the Asset Purchase Agreement and the entirety of the Sale Transaction were at arms' length and in good faith.

T. None of the Debtors, the Purchaser or any of their respective affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives or other professionals, or their respective successors and assigns, each in their capacity as such, has engaged in any conduct that would cause or permit the Asset Purchase Agreement or the consummation of the Sale Transaction to be avoidable or avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper or collusive manner with any person in connection with the Asset Purchase Agreement or the consummation of the Sale Transaction.

**THE ASSUMED CONTRACTS**

U. FG has demonstrated that (i) it is an exercise of its sound business judgment for FG to assume and assign the Assumed Contracts to the Purchaser in each case in connection with the consummation of the Sale Transaction and (ii) the assumption and assignment of the Assumed Contracts is in the best interests of FG, its estate, its equity interest holders, its creditors and other parties in interest. The Assumed Contracts being assigned to the Purchaser are integral to the sale of the West Lorain Assets to the Purchaser and, accordingly, such assumption, assignment, and cure of any defaults under the Assumed Contracts are reasonable and enhance the value of FG's estate. Any non-Debtor party to an Assumed Contract that has not, or did not, actually file with the Court an objection to such assumption and assignment in

accordance with the terms set forth in the Motion and the Bid Procedures Order is deemed to have consented to such assumption and assignment.

**ADEQUATE ASSURANCE**

V.    FG and the Purchaser, as applicable, have, including by way of entering into the Asset Purchase Agreement and agreeing to the provisions related to the Assumed Contracts therein, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts pursuant to sections 365(b)(1)(C) and 365(f)(2) of the Bankruptcy Code.  For all Assumed Contracts included on the Notice of Assumption and Assignment, the Cure Amounts as set forth in the schedule attached as Exhibit 1 to the notice, or any other amounts reached by agreement with the counterparties after objection to the assumption and assignment of the corresponding Assumed Contract by such counterparties (each, a "Cure Payment" and collectively, the "Cure Payments") are hereby found to be the sole amounts necessary to cure any and all defaults under the Assumed Contracts under section 365(b) of the Bankruptcy Code.  The Purchaser's agreement under the Asset Purchase Agreement to assume, pay, perform and discharge the Assumed Liabilities after the Closing is hereby found to constitute adequate assurance of future performance for the Assumed Contracts being assigned to the Purchaser within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

12

## NO PROFESSIONAL

W.      Neither the Purchaser nor any of its affiliates, members, officers, directors, shareholders or any of their respective successors or assigns is an Appointed Professional, employee or affiliate of an Appointed Professional or member of an Appointed Professional's immediate family pursuant to Local Rule 6004-1.

## NO SUCCESSORSHIP

X.      Neither the Purchaser nor any of its affiliates is a successor to FG or its estate by reason of any theory of law or equity.  The conveyance of the West Lorain Assets does not amount to a consolidation, merger or *de facto* merger of the Purchaser and FG and/or FG's estate, there is no substantial continuity between the Purchaser and FG, there is no continuity of enterprise between FG and the Purchaser, the Purchaser is not a mere continuation of FG or its estate, and the Purchaser does not constitute a successor to FG or its estate.  The Purchaser's acquisition of the West Lorain Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.  The Purchaser's operations shall not be deemed a continuation of FG's business as a result of the acquisition of the West Lorain Assets.  The Purchaser would not have acquired the West Lorain Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

## WAIVER OF STAY

Y.      Time is of the essence in consummating the Sale Transaction.  There is no credible basis for concluding that a delay in the sale of the West Lorain Assets would result in a higher or better offer for the West Lorain Assets than the offer reflected in the Asset Purchase Agreement. In order to maximize the value of the West Lorain Assets, it is essential that the sale,

transfer and assignment of the West Lorain Assets occur within the time constraints set forth in the Asset Purchase Agreement. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

**MOTION GRANTED**

1.      The relief requested in the Motion is GRANTED and the Sale Transaction and the Asset Purchase Agreement are approved, all as set forth in this Order.

**OBJECTIONS OVERRULED**

2.      All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice.

**APPROVAL OF SALE TRANSACTION AND CONSUMMATION OF THE SALE TRANSACTION**

3.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Asset Purchase Agreement (including all schedules and exhibits attached thereto), as amended pursuant to Paragraph 6 below, the assumption and assignment of the Assumed Contracts to the Purchaser as of the Closing Date (as defined in the Asset Purchase Agreement), and the sale of the West Lorain Assets are hereby approved and FG is authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the Sale Transaction, including the sale, transfer, and assignment of all of FG's right, title, and interest in the West Lorain Assets to the Purchaser free and clear of any and all Liens (other than Permitted Liens) or other interests or liabilities (other than the Assumed Liabilities) in accordance with the terms of the Asset Purchase Agreement. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are hereby authorized and directed to take any and all actions necessary or appropriate to:

14

(i) consummate the sale of the West Lorain Assets to the Purchaser and the Closing, the Asset

Purchase Agreement, and this Order; (ii) assume and assign the Assumed Contracts to the

Purchaser as of the Closing Date; and (iii) perform, consummate, implement, and close fully the

Asset Purchase Agreement together with any and all additional instruments and documents that

may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the

Sale Transaction.  FG is hereby authorized and directed to perform each of its covenants and

undertakings as provided in the Asset Purchase Agreement prior to or after the Closing without

further order of the Court.  The Purchaser and FG shall have no obligation to close the Sale

Transaction except as is contemplated and provided for in the Asset Purchase Agreement.  The

Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362

of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement or

any other sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy

Code is modified solely to the extent necessary to implement the provisions of this Order, and

the stay imposed by Bankruptcy Rule 4001(a)(3) is hereby waived with respect thereto.  The

Debtors are further authorized and empowered to cause to be filed with the secretary of state of

any state or other applicable officials of any applicable Governmental Body (as defined in the

Asset Purchase Agreement) any and all certificates, agreements, or amendments necessary or

appropriate to effectuate the Sale Transaction and this Order, and all such other actions, filings,

or recordings as may be required under appropriate provisions of the applicable Laws of all

applicable Governmental Bodies or as any of the officers of the Debtors may determine are

necessary, desirable or appropriate.  The execution of any such document or the taking of any

such action shall be, and hereby is, deemed conclusive evidence of the authority of such person

to so act.

4.      Effective as of the Closing, the sale of the West Lorain Assets to the Purchaser shall constitute a legal, valid, and effective transfer of the West Lorain Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Purchaser with good, valid and marketable title in and to the West Lorain Assets, free and clear of any and all Liens of any kind or nature whatsoever (other than the Permitted Liens) pursuant to section 363(f) of the Bankruptcy Code.

5.      The distribution of the Secured Collateral Proceeds at closing to the Mortgage Trustee as set forth in the Asset Purchase Agreement is hereby approved.  The Mortgage Trustee shall retain any portion of the Secured Collateral Proceeds it receives and shall not distribute or transfer such Secured Collateral Proceeds to any party except in accordance with (i) the terms of a confirmed chapter 11 plan of FG, or (ii) a further final order of the Court and, to the extent not inconsistent with such plan or order, the terms of the FG Mortgage Indenture.  Nothing herein shall (i) prejudice any party's entitlement to the Secured Collateral Proceeds retained by the Mortgage Trustee, or (ii) affect the transfer of the West Lorain Assets free and clear of all liens other than Assumed Liabilities or any other protections granted to the Purchaser under the Bankruptcy Code.

6.      The definition of "Avoidance Actions" in Section 1.01 of the Asset Purchase Agreement shall be amended as follows: "all of Seller's rights, claims, and causes of action under Chapter 5 of the Bankruptcy Code and any analogous state law action to the extent they relate to any of Seller's vendors or employees that are related to the Purchased Assets (other than any such claims, causes of action, or rights against any officers or directors of Seller)."  Except as so amended, the Asset Purchase Agreement remains in full force and effect and is approved in its entirety.

16

## TRANSFER OF THE ASSETS FREE AND CLEAR

7.      The Purchaser shall assume and be liable only for those liabilities expressly assumed by the Purchaser pursuant to the Asset Purchase Agreement as Assumed Liabilities. Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Order, pursuant to sections 105(a), 363(b), 363(f) and 365(b) of the Bankruptcy Code, upon the Closing, the West Lorain Assets shall be transferred to the Purchaser free and clear of any and all Liens (other than Permitted Liens) or other interests or liabilities of any kind or nature whatsoever, including whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing.  Any and all such liens, claims, or other interest shall attach to the proceeds and, in the case of the Mortgage Trustee to the Secured Collateral Proceeds, against which they assert an interest, if any, in the order of their priority, with the same validity, force and effect, if any, which they now have against such proceeds, or in the case of the Mortgage Trustee, the Secured Collateral Proceeds, subject to any claims, defenses and objections, if any, that FG or its estate may possess with respect thereto.

## SATISFACTION OF CONDITIONS PRECEDENT

8.      Neither the Purchaser nor FG shall have an obligation to close the Sale Transaction until all conditions precedent in the Asset Purchase Agreement to each of their

respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

<u>GOOD FAITH PURCHASER; NO COLLUSION</u>

9.     The Purchaser is a purchaser in good faith of the West Lorain Assets and has acted without collusion in undertaking the Sale Transaction and all of the transactions contemplated by the Asset Purchase Agreement, and is thus entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction with the Purchaser (including the assumption and assignment by FG of any of the Assumed Contracts), unless such authorization is duly stayed pending such appeal.  The Sale Transaction shall not be avoided, and recovery shall not be imposed, under section 363(n) of the Bankruptcy Code.

<u>VESTING OF ASSETS IN THE PURCHASER</u>

10.     The transfer and sale of the West Lorain Assets to the Purchaser pursuant to the Asset Purchase Agreement shall constitute a legal, valid, and effective transfer of the West Lorain Assets upon the Closing, and shall vest the Purchaser with all of FG's rights, title and interests in the West Lorain Assets free and clear of all Liens (other than Permitted Liens) or other interests or liabilities other than the Assumed Liabilities.

<u>ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS</u>

11.     The Assumption and Assignment Procedures described in the Motion are hereby approved in their entirety.

12.     FG is hereby authorized, in accordance with the Asset Purchase Agreement, the Assumption and Assignment Procedures and sections 105(a) and 365 of the Bankruptcy Code to

(i) assume and assign to the Purchaser the Assumed Contracts, effective upon and subject to the occurrence of the Closing or such other date as provided for in the Asset Purchase Agreement or this Order, which Assumed Contracts, by operation of this Order, shall be deemed assumed and assigned to the Purchaser; and (ii) execute and deliver to the Purchaser such documents or other instruments as the Purchaser may deem necessary to assign and transfer the Assumed Contracts to the Purchaser.

13.     FG has met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts to be assumed and assigned to the Purchaser as of Closing or such other date as may be set forth in the Asset Purchase Agreement.  Each and every provision of the documents governing the West Lorain Assets, including, without limitation, the Assumed Contracts, or of any applicable non-bankruptcy law that purports to require counterparty consent to assignment, or otherwise purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the West Lorain Assets, if any, have been satisfied or are otherwise unenforceable pursuant to section 365(f) of the Bankruptcy Code.

14.     Pursuant to section 365(k) of the Bankruptcy Code, FG and its estate shall be relieved from any liability under any Assumed Contract that arises on or after the Closing or other assignment date, whether as a result of a breach of an Assumed Contract on or after the Closing or otherwise.

15.     The inclusion of a contract or other agreement on the Notice of Assumption and Assignment shall not constitute or be deemed a determination or admission by FG and its estate, the Purchaser or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved.

16.     The Assumed Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and sold and assigned to the Purchaser at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to the payment of the Cure Payments.

17.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title and interest in and to each Assumed Contract.  The Debtors shall reasonably cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

18.     Subject to the terms of this Order, all defaults or other obligations under the Assumed Contracts arising prior to the Closing (without giving effect to any acceleration clauses, assignment fees, increases, advertising rates, or any other default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Payments.

19.     Any provision in any Assumed Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Assumed Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Payments, if any.  No sections or provisions of any Assumed Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor party to the Assumed Contract shall have any force and effect with respect to the Sale Transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Assumed Contract pursuant to the terms of the Asset Purchase

20

Agreement shall in any respect constitute a default under any Assumed Contract. The non-debtor party to each Assumed Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the Debtors' rights and benefits under each such Assumed Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

20.     The Purchaser has satisfied all requirements under sections 365(b)(1)(C) and 365(f)(2)(b) of the Bankruptcy Code to provide adequate assurance of future performance under the Assumed Contracts.

21.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all parties to the Assumed Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities being assumed by the Purchaser under the Asset Purchase Agreement.

### ATTACHMENT OF LIENS TO PROCEEDS; COLLECTION OF ASSETS

22.     Any valid Lien, including the Lien of the Mortgage Trustee, other than Assumed Liabilities, against the West Lorain Assets shall, as of the Closing, be deemed to be waived and released against the West Lorain Assets, without regard to whether such holder has executed or filed any applicable release, and such Lien shall automatically, and with no further action by any party, attach to the Secured Collateral Proceeds against which they assert an interest, in the order of their priority, with the same validity, force and effect, if any, which they now have against such Secured Collateral Proceeds, in the case of the Mortgage Trustee, subject to any claims,

defenses and objections, if any, that the Debtors, their estates or any other party in interest may possess with respect thereto.

23.     In the event that such termination statements, instruments of satisfaction or releases of all Liens are not filed in accordance with the foregoing paragraph, (i) FG and Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the West Lorain Assets in the event not filed by such person or entity, and (ii) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the West Lorain Assets of any kind or nature whatsoever.

24.     This Order, if filed, registered, or otherwise recorded, shall be effective as a conclusive determination that, upon the Closing, all Liens existing as to the West Lorain Assets prior to the Closing have been unconditionally released, discharged and terminated as it relates to the West Lorain Assets with such Liens, if any, attaching to the portion of the proceeds from the West Lorain Assets attributable to such Liens, and that the conveyances described herein have been effected; provided that this Order shall be binding and effective regardless of whether any such filing, registration or recordation occurs.  The Liens that are unconditionally released, discharged, and terminated pursuant to this Order include, without limitation, the Lien of the FG Mortgage Indenture and such Lien shall attached to the Secured Collateral Proceeds.

25.     This Order, if filed, registered or otherwise recorded, shall be binding upon and shall govern the acts of all persons and entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state,

local officials, notaries, protonotaries and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in, or to, the West Lorain Assets; provided that this Order shall be binding and effective regardless of whether any such filing, registration or recordation occurs.

26.     Each and every federal, state and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Order.  Without limiting the generality of the foregoing, nothing contained herein shall limit, satisfy or amend FG's obligations under the Asset Purchase Agreement to deliver any lien releases or other instruments at the Closing.

27.     All Persons presently or on or after the Closing Date in possession of some or all of the West Lorain Assets are directed to surrender possession of the West Lorain Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request.

<u>**BINDING EFFECT OF ORDER**</u>

28.     This Order and the Asset Purchase Agreement shall be binding upon all creditors of, and equity holders in, FG and any and all other Persons and parties in interest, including, without limitation, any and all holders of Liens of any kind or nature whatsoever, all non-Debtor parties to the Assumed Contracts, the Purchaser, FG and any trustee or successor trustee appointed in the FG chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code.  The Asset Purchase Agreement and the Sale Transaction shall not be subject to rejection or avoidance (whether through any avoidance, fraudulent transfer, preference or recovery, claim, action or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or

23

federal law or any other cause of action) by FG, any chapter 7 or chapter 11 trustee of FG's bankruptcy estate or any other person or entity. The Asset Purchase Agreement, this Order, and FG's obligations therein and herein shall not be altered, impaired, amended, rejected, discharged or otherwise affected by any chapter 11 plan proposed or confirmed in these Chapter 11 Cases, any order confirming any chapter 11 plan or any subsequent order of this Court without the prior express written consent of the Purchaser.

29.     Nothing in any Order of this Court or contained in any plan of reorganization or liquidation confirmed in these bankruptcy cases, or in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

30.     The provisions of this Order are non-severable and mutually dependent. The terms and conditions of the Asset Purchase Agreement (including all schedules and exhibits thereto) constitute a single, integrated transaction and are mutually dependent and non-severable.

<u>AMENDMENTS TO THE ASSET PURCHASE AGREEMENT</u>

31.     The Asset Purchase Agreement, the Transaction Agreements (as defined in the Asset Purchase Agreement) and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto in a writing signed by all parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement or restatement is not material to the Sale Transaction. The Debtors shall file a notice of any material modification, amendment, supplement or restatement of the Asset Purchase Agreement with the Court and such modification, amendment, supplement, or restatement shall be subject to Court approval while the Bankruptcy Cases remain pending.

24

## No Successorship or Transferee Liability

32.     Neither the Purchaser nor any of its affiliates shall be deemed, as a result of the

consummation of the transactions contemplated by the Asset Purchase Agreement, to: (i) be legal

successors to FG or its estate by reason of any theory of law or equity; (ii) have, *de facto* or

otherwise, merged with or into FG, or (iii) be an alter ego or a mere continuation or substantial

continuation or successor of FG in any respect.  Neither the Purchaser nor any of its affiliates

shall assume or in any way be responsible for any liability or obligation of any of FG and/or its

estate resulting from the consummation of the transactions contemplated by the Asset Purchase

Agreement, except as otherwise expressly provided therein or in this Order.

33.     Without limiting the generality of the foregoing, except for the Assumed

Liabilities or as expressly permitted or otherwise specifically provided for in the Asset Purchase

Agreement or this Order, neither the Purchaser nor any of its affiliates shall be liable for any

claims against or in the West Lorain Assets or against FG or any of its predecessors or affiliates,

and the Purchaser and its affiliates shall have no successor, transferee, derivative or vicarious

liabilities of any kind or character, whether known or unknown as of the Closing, then existing or

hereafter arising, fixed or contingent, asserted or unasserted, or liquidated or unliquidated, with

respect to FG or its affiliates or any obligations of FG or its affiliates arising prior to the Closing,

including, but not limited to: (i) any foreign, federal, state or local revenue, pension, ERISA (as

defined below), tax (including, without limitation, taxes arising, accruing or payable under, out

of, in connection with, or in any way relating to the operation of the West Lorain Assets prior to

the Closing), labor, employment, antitrust, environmental, or other law, rule, or regulation

(including, without limitation, filing requirements under any such laws, rules, or regulations,

provided, however that FG and Purchaser shall make all necessary and required filings under

25

applicable regulations and laws); (ii) any products liability law, rule, regulation, or doctrine with respect to any FG liability under such law, rule, regulation, or doctrine, or under any product liability law or doctrine; (iii) any employment or labor agreements, consulting agreements, severance agreements, change-in-control agreements or other similar agreements to which FG is a party; (iv) any pension, welfare, compensation or other benefit plants, agreements, practices and programs, including, without limitation, any pension plan of FG; (v) the cessation of FG's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to (a) the Employee Retirement Income Security Act of 1974 ("ERISA"), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1973, (g) the Americans with Disabilities Act of 1990, (h) Section 4980B of the Internal Revenue Code and Part 6 of Title I of ERISA, (i) Worker Adjustment Retraining and Notification Act of 1988 and any similar state or non-U.S. statute, or (j) Family and Medical Leave Act; (vi) any liabilities, debts or obligations of or required to be paid by any Debtor for any taxes of any kind for any period; (vii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the West Lorain Assets prior to the Closing; (viii) any bulk sale law; and (ix) any litigation.

34.     No bulk sale Law or any similar Law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

35.     Nothing in this Order or the Asset Purchase Agreement, including but not limited to paragraphs 29 and 33 of this Order, releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the

26

post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.

36. To the maximum extent permitted by section 525 of the Bankruptcy Code, no Governmental Body may revoke or suspend any Permit (as defined in the Asset Purchase Agreement) relating to the operation of the Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Bankruptcy Cases or the consummation of the Transactions.

### PROHIBITION OF ACTIONS AGAINST THE PURCHASER

37. Effective upon the Closing, solely based on or relating to, or in any manner arising from, in whole or in part, the Asset Purchase Agreement, this Order or any other contract, instrument, release or other agreement or document created or entered into in connection with the Asset Purchase Agreement or upon any other act or omission, transaction, agreement, event or other occurrence taking place after the Closing related to the Asset Purchase Agreement, all persons and entities shall be, and hereby are, forever barred and estopped from (i) taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the West Lorain Assets to the Purchaser in accordance with the terms of this Order and the Asset Purchase Agreement and (ii) asserting, prosecuting or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Liens (other than Permitted Liens) whatsoever against the Purchaser or the Purchaser's property, or the West Lorain Assets conveyed under this Order in accordance with the Asset Purchase Agreement.

## MODIFICATION OF THE AUTOMATIC STAY

38.     The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the Asset Purchase Agreement and the provisions of this Order.

## RETENTION OF JURISDICTION

39.     This Court retains jurisdiction prior to, on and after the Closing to, among other things, interpret, enforce, and implement the terms and provisions of this Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder and each of the agreements executed in connection therewith in all respects, including, without limitation, retaining jurisdiction to: (i) compel delivery of the West Lorain Assets or performance of other obligations owed to the Purchaser, including but not limited to, under the Assumed Contracts; (ii) compel performance of obligations owed to FG or the Purchaser, including but not limited to, under the Assumed Contracts; (iii) resolve any disputes arising under or related to the Asset Purchase Agreement; (iv) interpret, implement and enforce the provisions of this Order, including, without limitation, enforcement of FG's right to sell, transfer, assume, and assign to Purchaser all Assumed Contracts; (v) compel delivery of any waivers, releases or other related documentation reasonably requested by FG or the Purchaser to evidence the release of any liens, claims, encumbrances or other interests in the West Lorain Assets; (vi) protect the Purchaser and its affiliates against (a) any liens, claims, encumbrances or other interests in or against FG or the West Lorain Assets of any kind or nature whatsoever and (b) any creditors, equity interest holders, or other parties in interest regarding the turnover of the West Lorain Assets that may be in their possession; and (vii) protect FG and its affiliates against any liabilities (other than any liabilities retained by FG under the Asset Purchase Agreement) in any way relating to the West

28

Lorain Assets arising on or after the Closing other than to the Purchaser pursuant to the Asset Purchase Agreement.

NO STAY OF ORDER

40.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, FG and the Purchaser are free to close the Sale Transaction under the Asset Purchase Agreement at any time pursuant to the terms thereof.

INCONSISTENCIES WITH PRIOR ORDERS, PLEADINGS, OR AGREEMENTS

41.     To the extent of any conflict between the Asset Purchase Agreement and this Order, the terms of this Order shall govern.  To the extent this Order is inconsistent or conflicts with any prior order or pleading in these Chapter 11 Cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.

FAILURE TO SPECIFY PROVISIONS

42.     The failure to specifically reference any particular provisions of the Asset Purchase Agreement or related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement and other related documents be authorized and approved in their entirety.

# # #

SUBMITTED BY:

*/s/ Kate M. Bradley*
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

 - and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
David H. Botter (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

        - and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*

## Exhibit A

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

dated as of

November 16, 2018

by and between

FirstEnergy Generation, LLC,

as Seller,

and

Vermillion Power, L.L.C.,

as Buyer

4823-2112-3450 v14

# TABLE OF CONTENTS

_____

PAGE

ARTICLE 1 Definitions, Rules of Construction and Accounting Terms .......................................1

    Section 1.01    Definitions............................................................................................1
    Section 1.02    Rules of Construction ..........................................................................16

ARTICLE 2 Purchase and Sale.................................................................................................17

    Section 2.01    Purchase and Sale ................................................................................17
    Section 2.02    Excluded Assets ...................................................................................19
    Section 2.03    Assumed Liabilities .............................................................................20
    Section 2.04    Excluded Liabilities ............................................................................21
    Section 2.05    Assignment of Contracts and Rights....................................................22
    Section 2.06    Purchase Price; Adjustment and Allocation of Purchase Price ...............23
    Section 2.07    Deposit ................................................................................................26
    Section 2.08    Closing ................................................................................................27
    Section 2.09    Deliveries at Closing...........................................................................27
    Section 2.10    Remittance of Funds ...........................................................................29

ARTICLE 3 Representations and Warranties of Seller ...............................................................29

    Section 3.01    Corporate Existence and Power ...........................................................29
    Section 3.02    Corporate Authorization ......................................................................29
    Section 3.03    Governmental Authorization ................................................................30
    Section 3.04    Noncontravention ................................................................................30
    Section 3.05    Finders' Fees .......................................................................................30
    Section 3.06    Required Consents ...............................................................................30
    Section 3.07    Contracts .............................................................................................30
    Section 3.08    Litigation ............................................................................................32
    Section 3.09    Compliance with Laws ........................................................................33
    Section 3.10    Title....................................................................................................33
    Section 3.11    Employees...........................................................................................33
    Section 3.12    Environmental Matters.........................................................................34
    Section 3.13    Permits ................................................................................................35
    Section 3.14    Taxes ..................................................................................................36
    Section 3.15    Sufficiency of Purchased Assets; Condition of Purchased Assets.............36
    Section 3.16    Intellectual Property.............................................................................37
    Section 3.17    Insurance.............................................................................................37
    Section 3.18    Absence of Certain Changes or Events..................................................37
    Section 3.19    Real Property ......................................................................................38
    Section 3.20    Financial Statements ...........................................................................38
    Section 3.21    Credit Support......................................................................................39
    Section 3.22    Representations Complete ....................................................................39

i

ARTICLE 4 Representations and Warranties of Buyer ................................................................39

    Section 4.01      Corporate Existence and Power .....................................................39
    Section 4.02      Corporate Authorization ................................................................39
    Section 4.03      Governmental Authorization ..........................................................40
    Section 4.04      Noncontravention ...........................................................................40
    Section 4.05      Finders' Fees .................................................................................40
    Section 4.06      Available Funds; Equity Commitment Letter.................................40
    Section 4.07      Solvency.........................................................................................41
    Section 4.08      Litigation.......................................................................................41
    Section 4.09      No Other Representations ...............................................................41

ARTICLE 5 Covenants .............................................................................................................41

    Section 5.01      Conduct of Business Through the Closing .....................................41
    Section 5.02      Access to Information ....................................................................43
    Section 5.03      Further Assurances .........................................................................45
    Section 5.04      Certain Actions ..............................................................................45
    Section 5.05      Public Announcements ...................................................................45
    Section 5.06      Supplements to Seller Disclosure Schedule...................................45
    Section 5.07      Antitrust Clearance ........................................................................46
    Section 5.08      Approvals.......................................................................................47
    Section 5.09      Notices of Certain Events ..............................................................48
    Section 5.10      Certain Employee Matters .............................................................48
    Section 5.11      Confidentiality ...............................................................................50
    Section 5.12      Insurance .......................................................................................50
    Section 5.13      Risk of Loss ..................................................................................50
    Section 5.14      Title Insurance and Survey ............................................................53
    Section 5.15      Bulk Sales Laws.............................................................................54
    Section 5.16      Reactive Services ..........................................................................54
    Section 5.17      Release of Liens ............................................................................55
    Section 5.18      Submission for Bankruptcy Court Approval ..................................55
    Section 5.19      Overbid Procedures; Adequate Assurance.....................................56
    Section 5.20      Expense Reimbursement and Termination Fee ..............................57
    Section 5.21      Cure Payments ...............................................................................57
    Section 5.22      Competing Bids .............................................................................58
    Section 5.23      Access Agreement and Substation Easements................................58

ARTICLE 6 Tax Matters ...........................................................................................................59

    Section 6.01      Tax Definitions ..............................................................................59
    Section 6.02      Tax Cooperation; Allocation of Taxes...........................................59

ARTICLE 7 Conditions to Closing............................................................................................61

    Section 7.01      Conditions to Obligations of Buyer and Seller ..........................61
    Section 7.02      Conditions to Obligation of Buyer.................................................61

Section 7.03        Conditions to Obligation of Seller .................................................................62

ARTICLE 8 Survival ..........................................................................................................................62

ARTICLE 9 Termination .....................................................................................................................63

Section 9.01        Grounds for Termination ......................................................................63
Section 9.02        Effect of Termination ...........................................................................65

ARTICLE 10 Miscellaneous...............................................................................................................66

Section 10.01       Notices ...................................................................................................66
Section 10.02       Amendments and Waivers .....................................................................67
Section 10.03       Expenses ................................................................................................68
Section 10.04       Successors and Assigns..........................................................................68
Section 10.05       Governing Law ......................................................................................68
Section 10.06       Jurisdiction............................................................................................68
Section 10.07       WAIVER OF JURY TRIAL..................................................................69
Section 10.08       Counterparts; Third Party Beneficiaries ...............................................69
Section 10.09       Entire Agreement ..................................................................................69
Section 10.10       Captions .................................................................................................69
Section 10.11       Severability ............................................................................................69
Section 10.12       Specific Performance .............................................................................69

iii

**EXHIBITS**

Exhibit A     Form of Assignment and Assumption Agreement
Exhibit B     Form of Assignment of Real Property Entitlements
Exhibit C     Form of Bidding Procedures and Sale Motion
Exhibit D     Form of Bidding Procedures Order
Exhibit E     Form of Bill of Sale
Exhibit F     Form of Limited Warranty Deed
Exhibit G     Form of Transition Services Agreement
Exhibit H     Form of Owner's Affidavit

iv

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**_Agreement_**") is dated as of November 16, 2018 by and between FirstEnergy Generation, LLC, an Ohio limited liability company ("**_Seller_**"), and Vermillion Power, L.L.C., a Delaware limited liability company ("**_Buyer_**" and, together with Seller, the "**_Parties_**").

## RECITALS:

A.    Seller owns the West Lorain Facility (as defined below).

B.    On March 31, 2018 (the "**_Petition Date_**"), Seller, together with certain of its Affiliates (Seller and such Affiliates, collectively, the "**_Debtors_**") commenced voluntary cases (the "**_Bankruptcy Cases_**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division.

C.    In accordance with the Bidding Procedures (as defined below) and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order (as defined below), Seller desires to sell and transfer the Purchased Assets (as defined below) and the Assumed Liabilities (as defined below) to Buyer, and Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities, upon the terms and conditions set forth in this Agreement.

D.    The Purchased Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Liens (as defined below) (other than Permitted Liens (as defined below)), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

**NOW**, **THEREFORE**, in consideration of the mutual promises herein made and the mutual benefits to be derived therefrom, and in considerations of the representations, warranties, and covenants contained herein, the Parties agree as set forth below.

## ARTICLE 1

### DEFINITIONS, RULES OF CONSTRUCTION AND ACCOUNTING TERMS

Section 1.01    **Definitions**. Capitalized terms and phrases, as used in this Agreement, have the meanings assigned to such terms below, in the schedules attached hereto or as otherwise noted.

"**_Adjusted Condemnation Value_**" is defined in Section 5.13(b).

"**_Adjusted Restoration Cost_**" is defined in Section 5.13(a).

"**_Affiliate_**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under Common Control with, such first Person.

1

"**_Agreement_**" is defined in the preamble.

"**_Allocation_**" is defined in Section 2.06(e).

"**_ALTA_**" means the American Land Title Association.

"**_Alternative Transaction_**" means a sale, lease, assignment, transfer or other disposition by merger, consolidation, tender offer, exchange or otherwise of substantially all of the Purchased Assets to any Person (or group of Persons), other than to Buyer or an affiliate of Buyer or as otherwise permitted by the terms of this Agreement.

"**_Antitrust Law_**" means the Sherman Act, 15 U.S.C. §§ 1-7, as amended; the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended; the HSR Act; the Federal Trade Commission Act, 15 U.S.C. §§ 41-58, as amended; and all other federal, state and foreign statutes, rules, regulations, Orders, decrees, administrative and judicial doctrines, and other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade; provided, that for the avoidance of doubt, state and federal Laws related to energy production and transmission, including the Federal Power Act, shall not be considered Antitrust Laws.

"**_Apportioned Obligations_**" is defined in Section 6.02(b).

"**_Assignment and Assumption Agreement_**" means an Assignment and Assumption Agreement substantially in the form set forth on Exhibit A.

"**_Assignment of Real Property Entitlements_**" means an Assignment of Real Property Entitlements substantially in the form set forth on Exhibit B.

"**_Assumed Contracts_**" is defined in Section 2.01(e).

"**_Assumed Liabilities_**" is defined in Section 2.03.

"**_Attorney Work Product_**" means all notes, memoranda, correspondence or similar material reflecting the legal conclusions, recommendations, privileged communications or other work product of or to attorneys, whether they be in-house or external, acting as counsel to Seller or any of its Affiliates, in matters not relating to any Purchased Asset or Assumed Liability.

"**_Auction_**" is defined in Section 5.19(a).

"**_Avoidance Action_**" means any action of Seller or its estate arising under Chapter 5 of the Bankruptcy Code and any analogous state law action relating to the Purchased Assets or the Business.

"**_Back-Up Bidder_**" shall have the meaning ascribed to such term in the Bidding Procedures.

"**_Bankruptcy Cases_**" is defined in the Recitals.

2

"***Bankruptcy Code***" means title 11 of the United States Code, as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Ohio, Eastern Division, or such other court having competent jurisdiction over the Bankruptcy Cases.

"***Benefit Plan***" is defined in Section 3.11(e).

"***Bid Deadline***" shall have the meaning ascribed to such term in the Bidding Procedures.

"***Bidding Procedures***" means the "Bid Procedures for the Sale of FirstEnergy Generation, LLC" attached to the Bidding Procedures Order.

"***Bidding Procedures and Sale Motion***" means one or more motions and notices filed in the Bankruptcy Cases by Seller, in each case in form and substance as set forth in Exhibit C or as otherwise modified by Seller with the consent of Buyer (such consent not to be unreasonably withheld or conditioned so long as such motion is not inconsistent with, and does not limit the rights of Buyer under, this Agreement, including as reflected in Exhibit C), and served on creditors and parties in interest, in accordance with the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, which motion(s) seeks, among other things, (i) authority from the Bankruptcy Court for Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement and (ii) entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order as proposed therein.

"***Bidding Procedures Order***" means the order of the Bankruptcy Court, proposed in the Bidding Procedures and Sale Motion substantially in the form attached hereto as Exhibit D, or as otherwise modified by Seller with the consent of Buyer (such consent not to be unreasonably withheld or conditioned so long as such order is not inconsistent with, and does not limit the rights of Buyer under, this Agreement, including as reflected in Exhibit D), approving, among other matters, payment of the Buyer Expense Reimbursement and Termination Fee in accordance with Section 5.20.

"***Bill of Sale***" means a Bill of Sale substantially in the form set forth on Exhibit E.

"***Book Value***" means, as of any date, original cost (including related capital improvements, freight, commodity and handling (other than on-site handling)), less applicable depreciation and amortization, as reflected on Seller's books and records, through such date.

"***Business***" means the ownership and operation of the West Lorain Facility.

"***Business Day***" means any day other than Saturday, Sunday or a day on which United States national banks are authorized or required by Law to be closed.

"***Business Employee***" means any employee of Seller who works at the West Lorain Facility.

"***Buyer***" is defined in the preamble.

"**Buyer Disclosure Schedule**" means the schedules setting forth certain disclosures of Buyer, or qualifications or exceptions to any of Buyer's representations or warranties set forth in Article 4, which schedules are delivered simultaneously with the execution and delivery of this Agreement.

"**Buyer Expense Reimbursement**" means the sum of the aggregate amount of Buyer's reasonable documented out-of-pocket costs and expenses (including expenses of outside counsel, accountants and financial advisors) incurred by Buyer prior to termination of this Agreement in connection with or related to Buyer's evaluation, consideration, analysis, negotiation, and documentation of a possible transaction with Seller pursuant to this Agreement or in connection with or related to the Transactions, up to a maximum amount of $1,440,000, subject to the entry of the Bidding Procedures Order by the Bankruptcy Court.

"**Buyer Material Adverse Effect**" means an event, fact, circumstance, effect or occurrence that materially and adversely affects the ability of Buyer to consummate the Transactions or perform its obligations under the Transaction Agreements.

"**Buyer's Required Approvals**" means the consents and approvals set forth in Schedule 1.01(a).

"**Casualty Loss**" is defined in Section 5.13(a).

"**CBA**" is defined in Section 5.10(b).

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act, as amended, and any successor thereto.

"**Claim**" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Closing**" is defined in Section 2.08.

"**Closing Adjustment Amount**" means an amount equal to the Book Value of Seller's right, title and interest in and to (i) the Inventory located at the West Lorain Facility and (ii) the spare parts located at the West Lorain Facility, determined in accordance with Seller's accounting system, in each case, on the Closing Date. The aggregate Book Value of all such Inventory and spare parts as of November 14, 2018 is attached hereto as Schedule 1.01(b).

"**Closing Date**" means the date of the Closing.

"**Closing Payment**" means an amount equal to (i) the Initial Purchase Price plus (ii) the Estimated Adjustment Amount plus (iii) the Estimated Proration Adjustment Amount (which may be a positive or negative number).

"**Closing Statement**" is defined in Section 2.06(b)(i).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commitment**" is defined in Section 5.14(a).

4

"**Competing Bid**" means any bid contemplating an Alternative Transaction.

"**Condemnation Value**" is defined in Section 5.13(b).

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated October 28, 2018, by and between Starwood Energy Group Global, Inc. and FirstEnergy Solutions Corp.

"**Contract**" means any legally binding agreement, contract, license, letter of credit, lease, commitment or consensual obligation (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"**Control**," including corresponding meaning of the terms "**Controlled by**" and "**under Common Control with**," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"**Cure Payments**" means the amount required to be paid with respect to each Assumed Contract to cure all defaults under such Assumed Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Buyer of each such Assumed Contract.

"**Damages**" means all losses, damages, Liabilities, payments, awards, judgments, fines, deficiencies, Taxes, penalties, obligations, costs and expenses (including interest, court costs, reasonable and documented attorneys', accounting, expert and other fees and expenses).

"**Datasite**" means the online datasite provided by Donnelley Financial Solutions under project name "Project Erie."

"**Debtors**" is defined in the Recitals.

"**Deposit**" is defined in Section 2.07.

"**Emissions Allowances**" means all certificates or rights required to be obtained and submitted to authorize emissions of air pollutants (typically called "allowances") issued by a Governmental Body with jurisdiction over any of the Purchased Assets under any Environmental Law to emit specified units of pollutants or Hazardous Materials including those issued by the United States Environmental Protection Agency or the Ohio Environmental Protection Agency under the Clean Air Act, any related state, regional or local program or any other pollution reduction program with a similar purpose, in each case regardless of whether the Governmental Body establishing such authorizations designates such authorizations by a name other than "allowances".

"**End Date**" is defined in Section 9.01(b).

5

"***Enforceable***" means, with respect to any Contract stated to be Enforceable by or against any Person, that such Contract is a legal, valid and binding obligation enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a Proceeding in equity or at law).

"***Entitled Real Property***" is defined in Section 2.01(b).

"***Environmental Claims***" means any Proceeding or written notice of noncompliance, Liability or violation or any other written notice by or from any Person that alleges potential or actual Liability, Damages, personal injury or any other obligation to take any action or cease any action arising under any Environmental Law or Environmental Permit or otherwise related to any Release of, or exposure to, Hazardous Materials.

"***Environmental Consultant***" is defined in Section 5.02(d).

"***Environmental Laws***" means all Laws or Orders relating to the protection of human health, wildlife (including any endangered, threatened or protected species), natural resources or the environment or to the pollution or contamination of the environment (including ambient air, soil, surface water, groundwater, land surface or subsurface strata), including those relating to Releases or threatened Releases of any Hazardous Material, or otherwise relating to the presence, management, manufacture, production, generation, processing, distribution, use, recycling, treatment, storage, disposal, transport, or handling of, or exposure to, any Hazardous Material including the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. Section 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 5101 et seq.), the Occupational Safety and Health Act (29 U.S.C. Section 651 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Clean Water Act (33 U.S.C. Section 1251 et seq.), the Clean Air Act (42 U.S.C. Section 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), the Endangered Species Act (16 U.S.C. Section 1531 et seq.), the National Environmental Policy Act (42 U.S.C. Section 4321 et seq.), and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. Section 136 et seq.), each as amended, and the regulations promulgated pursuant thereto, and any similar state or local Laws, and the regulations promulgated pursuant thereto.

"***Environmental Permit***" means any Permit with respect to the Purchased Assets or the operation of the Business issued pursuant to or required under any applicable Environmental Law.

"***Equity Commitment Letter***" means that certain executed commitment letter, dated as of the Execution Date, pursuant to which each of the Funds has committed to purchase equity of Buyer in the amount set forth therein for purposes of financing the Transactions and related fees, expenses and liabilities.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder, and any successor thereto.

6

"***ERISA Affiliate***" means each trade or business (whether or not incorporated) that together with Seller is treated as or deemed a "single employer" pursuant to Section 414 of the Code.

"***Escrow Account***" is defined in <u>Section 2.07</u>.

"***Escrow Agent***" means JPMorgan Chase Bank, N.A.

"***Escrow Agreement***" is defined in <u>Section 2.07</u>.

"***Estimated Adjustment Amount***" is defined in <u>Section 2.06(a)</u>.

"***Estimated Closing Statement***" is defined in <u>Section 2.06(a)</u>.

"***Estimated Prorated Amount***" is defined in <u>Section 2.06(a)</u>.

"***Estimated Proration Adjustment Amount***" is defined in <u>Section 2.06(a)</u>.

"***Excluded Assets***" is defined in <u>Section 2.02</u>.

"***Excluded Liabilities***" is defined in <u>Section 2.04</u>.

"***Execution Date***" means November 16, 2018.

"***FEG Mortgage Indenture***" means that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust from Seller to the Trustee, filed for record June 27, 2008 and recorded in Instrument No. 2008-0259135 of the Lorain County Records, as supplemented or amended from time to time, pursuant to which some or all of the Purchased Assets are included as collateral thereunder.

"***FEG Mortgage Indenture Partial Release***" means a partial release under the FEG Mortgage Indenture which releases the Purchased Assets that are collateral under the FEG Mortgage Indenture from all rights, liens, interests, estates, and security interests under the FEG Mortgage Indenture by the Trustee and any other beneficiary thereunder to the extent required by the terms thereof.

"***FERC***" means the Federal Energy Regulatory Commission or any successor thereto.

"***FERC 203 Approval***" means the issuance of an order by FERC granting all authorizations requested by Seller in an application for authorization of the Transactions under Section 203 of the Federal Power Act.

"***Final Order***" means an Order of the Bankruptcy Court or other court of competent jurisdiction, the implementation or operation or effect of which has not been stayed, and as to which the time to appeal or petition for certiorari, has expired and as to which no appeal or petition for certiorari, shall then be pending or in the event that an appeal or writ of certiorari thereof has been sought, such Order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such Order was appealed,

7

or certiorari, shall have been denied and the time to take any further appeal or petition for certiorari shall have expired.

"**_Financial Statements_**" is defined in <u>Section 3.20</u>.

"**_Funds_**" means Starwood Energy Infrastructure Fund II U.S., L.P. and Starwood Energy Infrastructure Fund III U.S., L.P.

"**_GAAP_**" means United States generally accepted accounting principles in effect on the Execution Date.

"**_Generating Facility_**" means the West Lorain periodic-start combustion-turbine generating plant owned by Seller and located in Lorain, Ohio.

"**_Good Industry Practices_**" means those practices, methods and acts employed by a significant portion of the combustion-turbine generation industry at the particular time in question that, in the exercise of reasonable judgment in light of the facts reasonably known at the time the decision in question was being made, would have been expected to accomplish the desired result of such decision consistent with applicable manufacturers' recommendations, good merchant practices, safety, reliability, and the requirements of applicable Laws. Good Industry Practices are not limited to the optimum practices, methods or acts to the exclusion of all others, but rather include a spectrum of possible practices, methods or acts commonly employed in the combustion-turbine generation industry during the relevant period in light of the circumstances.

"**_Governmental Body_**" means any legislature, agency, bureau, branch, department, division, regulatory authority, commission, court, tribunal, magistrate, justice, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, or foreign government or other similar recognized organization or body exercising similar powers or authority and including FERC, NERC, any regional reliability organization, PJM and any other governmental, quasi-governmental or non-governmental body administering, regulating or having general oversight over electric markets or electric reliability matters.

"**_Hazardous Material_**" means any (i) substance, material, pollutant, contaminant, chemical or waste that is regulated by Environmental Law or that may require investigation, control or remediation pursuant to any Environmental Law and (ii) petroleum or hydrocarbons in any form, and any fraction, derivative or by product thereof, natural gas or natural gas products, natural gas liquids, radon gas, asbestos and asbestos-containing materials, mercury, radioactive materials, lead-based paint, mold, urea formaldehyde, and polychlorinated biphenyls.

"**_HSR Act_**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**_Indebtedness_**" means any of the following: (i) any indebtedness for borrowed money; (ii) any obligations evidenced by bonds, debentures, notes or other similar instruments; (iii) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current Liabilities arising in the ordinary course of business consistent with past practices; (iv) any obligations as lessee under capitalized leases under GAAP; (v) any

8

indebtedness created or arising under any conditional sale or other title retention agreement with respect to acquired property; (vi) any obligations, contingent or otherwise, under acceptances, letters of credit or similar facilities; (vii) any guaranty of any of the foregoing; and (viii) any accrued interest, prepayment penalties, premiums, late charges, penalties, and collection and similar fees relating to any of such indebtedness.

"*Independent Accounting Firm*" means such nationally recognized, independent accounting firm as is mutually appointed by Seller and Buyer for purposes of this Agreement.

"*Initial Purchase Price*" is defined in Section 2.06(a).

"*Insurance Policies*" is defined in Section 3.17.

"*Intellectual Property*" means intellectual property of any kind or character, including (i) inventions, improvements thereto, and patents, patent applications, and patent disclosures, (ii) trademarks, service marks, logos, brand names, trade names, domain names and corporate names, including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) copyrightable works, copyrights, and related applications, registrations, and renewals, and (iv) trade secrets, know-how, and tangible or intangible proprietary business information, software, computer programs, source and object codes, databases, and data.

"*Intellectual Property Rights*" means (i) all proprietary or other legally enforceable rights with respect to Intellectual Property relating to the Purchased Assets, including license and similar rights provided under any Contract, or under any Law of any jurisdiction that provides protective or other rights with respect to Intellectual Property, including patent, copyright, trademark, service mark, design patent, industrial design, and semi-conductor chip, mask work, trade secret, database, and internet Law, and (ii) all rights to sue and recover damages for infringement, dilution, misappropriation or other violation of such rights.

"*Intercompany Arrangements*" is defined in Section 2.02(e).

"*Inventory*" means all inventory (of any kind or nature, including fuel), merchandise and goods primarily related to the Business or located at the Real Property at the Closing, whether or not prepaid, and any prepaid deposit for any of the same.

"*Knowledge*" as applied to (i) Seller, means the actual knowledge, after reasonable inquiry, of the persons listed on Schedule 1.01(c) (and of any individual who replaces any person listed on Schedule 1.01(c) in the position held by such person as of the Execution Date) and (ii) Buyer, means the actual knowledge, after reasonable inquiry, of the persons listed on Schedule 1.01(d) (and of any individual who replaces any person listed on Schedule 1.01(d) in the position held by such person as of the Execution Date).

"*Law*" means any federal, state, local, municipal or foreign (including supranational) law (including common law), statute, ordinance, rule, code, directive, ruling, regulation, standard (including NERC standards and PJM tariffs or manuals), Order or Permit of any Governmental Body having or asserting jurisdiction over the Parties or any of their assets.

"**_Liabilities_**" means any Indebtedness, Damage, Claim or liability (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, or otherwise), and including all costs and expenses relating thereto.

"**_LIBOR_**" means an interest rate per annum equal to the rate per annum reported on the date two days prior to the first day of any relevant month on the Telerate Page 3750 (or if such screen shall cease to be publicly available, as reported on Reuters Screen page "LIBO" or by any other publicly available source of such market rate) for London interbank offered rates for U.S. dollar deposits for such month (or portion thereof).

"**_Lien_**" means any mortgage, deed of trust, lien (statutory or otherwise), encumbrance, pledge, charge, security interest, warrant, Claim, easement, condition, mechanics lien, covenant, encroachment, lease, right of use or possession, interest (as that term is used in Section 363(f) of the Bankruptcy Code), equitable interest, option, right to income or profits, earn-out, restrictions on transfer, conditional sale or other title retention device or arrangement (including a capital lease), whether contingent, fixed or otherwise, and which relate to Seller, the Business, the Purchased Assets or any property or right or the income or profits to the extent deriving therefrom, including any of the foregoing securing or otherwise related to the FEG Mortgage Indenture.

"**_Limited Warranty Deed_**" means the limited warranty deed substantially in the form set forth on Exhibit F.

"**_Material Contracts_**" is defined in Section 3.07(b).

"**_NERC_**" means the North American Electric Reliability Corporation or any successor thereto.

"**_Order_**" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Body or arbitrator.

"**_Owned Real Property_**" is defined in Section 2.01(a).

"**_Parties_**" is defined in the preamble.

"**_Payoff Amount_**" is defined in Section 2.09(a)(v).

"**_Petition Date_**" is defined in the Recitals.

"**_Permit_**" means any permit, license, certificate, approval, consent, notice, waiver, franchise, registration, filing, accreditation, or other similar authorization required by any Law, Governmental Body, or Contract.

"**_Permitted Liens_**" means: (i) inchoate construction, materialmens', carriers', landlords', repairers' and other similar Liens arising or incurred in the ordinary course of business by

10

operation of Law for sums not yet due and payable (<u>provided</u>, that with respect to any such Liens that will be in existence at Closing, such Liens shall only be Permitted Liens to the extent that the underlying obligations are Assumed Liabilities); (ii) Liens for Taxes on Purchased Assets that are not yet due and payable or which are being contested in good faith by appropriate Proceedings and with respect to which adequate reserves have been established in accordance with GAAP (<u>provided</u>, that with respect to any such contested Liens that will be in existence at Closing, such Liens shall only be Permitted Liens so long as such Proceedings are continued to completion and thereafter, only to the extent that the underlying obligations are Assumed Liabilities); (iii) Liens arising under Assumed Contracts (but excluding any Liens for non-monetary breaches under the Assumed Contracts that occurred prior to the Closing); (iv) Liens arising by, through or under Buyer; (v) Liens approved or waived by Buyer pursuant to <u>Section 5.14</u>; and (vi) Liens disclosed on the Commitment or Survey obtained by Buyer pursuant to <u>Section 5.14</u> and not otherwise objected to or waived by Buyer pursuant to <u>Section 5.14</u>.

"***Person***" means an individual, corporation, partnership, limited liability company, association, trust, an incorporated organization, or other entity or organization, including a Governmental Body.

"***Phase I Report***" is defined in <u>Section 5.02(d)</u>.

"***Pipeline Easements***" means each of the easements set forth on <u>Schedule 1.01(e)</u>.

"***PJM***" means PJM Interconnection, L.L.C., a FERC-approved regional transmission organization and energy market, or any successor thereto.

"***PJM Tariff***" means PJM's Open Access Transmission Tariff as filed with FERC.

"***Post-Closing Tax Period***" is defined in <u>Section 6.01</u>.

"***Pre-Closing Claim***" is defined in <u>Section 5.13(c)</u>.

"***Pre-Closing Tax Period***" is defined in <u>Section 6.01</u>.

"***Prime Rate***" means, as of any date, the prime rate as published in The Wall Street Journal on such date or, if not published on such date, on the most recent date of publication.

"***Proceeding***" means any contest, application, assessment, suit, demand, claim, grievance, complaint, inquiry, notice of violation, hearing, request for information, audit or investigation, at law or in equity, whether civil, criminal, administrative, by or before any Governmental Body, arbitrator or mediator, or notice of any of the foregoing.

"***Prorated Amount***" means, (i) with respect to any Prorated Item that is a prepayment, the amount allocable to the period on or after the Closing Date that was paid by Seller prior to the Closing Date, and (ii) with respect to any other Prorated Item, the amount (expressed as a negative number) allocable to the period prior to the Closing Date, whether or not then due and payable, which was not paid by Seller prior to the Closing Date and which represents an Assumed Liability, excluding, for the avoidance of doubt, any amount paid by Seller after the

Closing Date directly to the applicable third party, in each case, prorated in accordance with Section 2.06(c).

"***Prorated Difference***" is defined in Section 2.06(c)(iv).

"***Prorated Items***" is defined in Section 2.06(c)(i).

"***Proration Adjustment Amount***" means the sum of the Prorated Amounts with respect to all Prorated Items.

"***Proration Period***" is defined in Section 6.02(b).

"***Purchase Price***" is defined in Section 2.06(a).

"***Purchased Assets***" is defined in Section 2.01.

"***Purchased Intellectual Property***" is defined in Section 2.01(i).

"***Purchased Warranties***" is defined in Section 2.01(j).

"***Reactive Service***" means the provision of reactive supply and voltage control from generation or other sources service pursuant to the currently-effective terms of Schedule 2 to the PJM Tariff.

"***Real Property***" is defined in Section 2.01(b).

"***Real Property Transfer Documents***" means, collectively, the Limited Warranty Deed and the Assignments of Real Property Entitlements transferring, conveying and assigning the Real Property to Buyer.

"***Recognized Environmental Condition***" or "***REC***" means (a) any asbestos identified as friable or damaged and requiring abatement to comply with applicable legal requirements in any Phase I Report or (b) any condition identified in any Phase I Report as a "recognized environmental condition" set forth in ASTM International Standard E1527-13.

"***Records***" means the title and real property documents, drawings, diagrams, data, accounting and Tax records and supporting documentation, marketing and other such studies, present and former supplier and vendor, contractor and subcontractor lists, environmental studies and reports prepared by third parties, construction reports, operating and maintenance plans, monitoring plans, operating reports, logs and records, purchase orders, operating, maintenance and safety manuals, incident and injury reports, engineering design plans, blue prints and as-built drawings and plans, specifications, test reports, quality documentation and reports, motor vehicle and equipment records, maintenance and service records, hazardous waste disposal records, training records, operating procedures and similar items, all existing and historic Permits and their applications, files, papers and similar documents of Seller relating exclusively to the Purchased Assets, the Assumed Liabilities or the Business, including all data and electronic information relating to the Purchased Assets or the Business stored or archived in any server, computer, laptop, network, system, or other electronic database (including any such data or

12

information stored in any Excluded Asset) in each case to the extent located on the Real Property, otherwise in Seller's possession or readily available to Seller; <u>provided</u>, <u>however</u>, "Records" excludes (i) the Tax Returns (other than Tax Returns solely relating to the Purchased Assets, the Business or the Assumed Liabilities) and organizational documents of Seller and its Affiliates, (ii) any Attorney Work Product, (iii) such records, files and papers of Seller to the extent they do not relate to the Business, the Purchased Assets or the Assumed Liabilities, (iv) any material that Seller is prohibited from sharing with or transferring to Buyer by any confidentiality obligations (<u>provided</u>, that Seller shall use its commercially reasonable efforts to obtain any necessary consents to share or transfer such material to Buyer), (v) any models, forecasts or similar documents, (vi) any information or data that generally relates to Seller or its Affiliates' generating fleet and which was not specifically created, collected, compiled, archived, or otherwise stored in connection with the ownership and operation of the Generating Facility or the other Purchased Assets or the Assumed Liabilities, and (vii) all other books, records and data which Seller are prohibited from disclosing or transferring to Buyer under applicable Law and are required by applicable Law to retain.

"***Release***" means any releasing, spilling, emitting, leaking, pumping, pouring, emptying, injecting, escaping, dumping, disposing, discharging, depositing, leaching or migrating into or through the environment (including air, soil, surface water, groundwater, land surface or subsurface strata).

"***Required Consents***" is defined in <u>Section 3.06</u>.

"***Required Cure Items***" means, collectively, any (i) mortgage or deed of trust covering all or any portion of the Real Property; (ii) Title Objection A's consisting of judgment or other monetary Liens (excluding any covenants, conditions, restrictions, agreements, easements or other conditions) that are not within the definition of Permitted Liens and encumber only the Real Property or any portion thereof, for which the aggregate Title Objection A Cure Amount is less than or equal to $2,000,000; (iii) Title Objection A's consisting of judgment or other monetary Liens (excluding any covenants, conditions, restrictions, agreements, easements or other conditions) that are not within the definition of Permitted Liens and encumber the Real Property or any portion thereof together with other real property of Seller or any other Person, for which the aggregate Title Objection A Cure Amount is less than or equal to $500,000; (iv) Title Objection A's excluding all Title Objection A's described in clause (ii) or clause (iii) above, for which the aggregate Title Objection A Cure Amount is less than or equal to $300,000; (v) construction, materialmens', carriers', landlords', repairers' and other similar Liens against the Real Property that are not within the definition of Permitted Liens; (vi) tax or judgment Liens against the Real Property that are not within the definition of Permitted Liens; (vii) zoning or building code violations and related Liens affecting the Owned Real Property; and (viii) any title encumbrance affecting the Real Property which arises by, through or under Seller following the Execution Date and which is not a Permitted Lien; <u>provided</u>, <u>however</u>, that to the extent of any duplication, conflict or inconsistency among the items described in clauses (i)-(viii) above, the more specific provision shall govern and control.

"***Restoration Cost***" is defined in <u>Section 5.13(a)</u>.

13

"***Sale Hearing***" means the hearing at which the Bankruptcy Court considers approval of the Sale Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

"***Sale Order***" means the order of the Bankruptcy Court, in a form mutually agreed by the Parties in the Parties' commercially reasonable discretion (such agreement not to be unreasonably withheld or conditioned so long as such order is not inconsistent with, and does not limit the rights of Buyer under, this Agreement) to be filed at least two days in advance of the Sale Hearing or as otherwise modified by Seller with the consent of Buyer (such consent not to be unreasonably withheld or conditioned so long as such order is not inconsistent with, and does not limit the rights of Buyer under, this Agreement), which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (a) the execution, delivery and performance by Seller of this Agreement, (b) the sale of the Purchased Assets from Seller to Buyer free and clear of all Liens other than Permitted Liens on the terms set forth herein, and (c) the performance by Seller of its obligations under this Agreement; (ii) authorizes Seller to assume and assign to Buyer the Assumed Contracts; (iii) finds that Buyer is not a successor to Seller or any of its Affiliates and (iv) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grants Buyer the full protections provided thereby.

"***Schedule Supplement***" is defined in <u>Section 5.06</u>.

"***Seller***" is defined in the preamble.

"***Seller Authorized Individuals***" means the individuals listed on <u>Schedule 1.01(f)</u>.

"***Seller Disclosure Schedule***" means the schedules setting forth certain disclosures of Seller, or qualifications or exceptions to Seller's representations or warranties set forth in <u>Article 3</u>, which schedules are delivered simultaneously with the execution and delivery of this Agreement and may be supplemented solely to the extent provided in <u>Section 5.06</u> hereof.

"***Seller Material Adverse Effect***" means any fact, circumstance, event, change, effect or occurrence (a) that, with all other facts, circumstances, events, changes, effects or occurrences, has or would reasonably be expected to have a material adverse effect on the Purchased Assets, the business, results of operations or financial condition of the Business, taken as a whole, or (b) that would be reasonably likely to prevent or materially delay or materially impair the ability of Seller to consummate the Transactions, <u>provided</u>, <u>however</u>, that, with respect to clause (a) above, no facts, circumstances, events, changes, effects or occurrences (by themselves or when aggregated with any other facts, circumstances, events, changes, effects or occurrences) resulting from, relating to or arising out of the following shall be deemed to be or constitute a Seller Material Adverse Effect or shall be taken into account when determining whether there has, may, would or could have occurred a Seller Material Adverse Effect (except, with respect to any fact, circumstance, event, change, effect or occurrence described in clauses (i) through (iii) and (iv)(B), to the extent that it has a disproportionate impact on the Purchased Assets relative to other similarly situated generating facilities in the PJM region, but then only the extent of such disproportionate impact shall be considered for purpose of determining if a Seller Material Adverse Effect has occurred): (i) the effect of any change generally affecting the industries in which the Business operates or the economy or the financial or securities markets (including

14

changes in interest rates or other costs for or reduction in the availability of financing) in the United States or elsewhere in the world, including any regulatory and political conditions or developments, or any outbreak or escalation of hostilities, weather, climate change, acts of God, declared or undeclared acts of war or terrorism; (ii) seasonal fluctuations in the revenues, earnings or operations of the Business consistent with prior fiscal years; (iii) any change (including any Law of any Governmental Body, independent system operator or regional transmission organization) or effect generally affecting the North American, national, regional, state or local fuel supply or transportation markets, or electric generating, transmission, distribution or retail industry (or any electric generating, transmission, distribution or retail system or market (or access thereto)), including prices; (iv) the effect of (A) the announcement of this Agreement or the announcement of the Transactions or the identity of Buyer or its Affiliates or any facts or circumstances relating to Buyer or its Affiliates, or (B) any changes in applicable Law or GAAP or interpretation thereof, in each case first proposed after the Execution Date; (v) any action taken (or not taken) by Seller at the written request of Buyer; (vi) any failure of Seller to meet any projections, forecasts or estimates (but not the underlying cause of such failure); (vii) any changes in the credit rating of Seller or its Affiliates (but not the underlying cause of such change); (viii) the pendency of the Bankruptcy Cases; and (ix) any objections in the Bankruptcy Court to (A) this Agreement, any Transaction Agreement or the Transactions, (B) the reorganization of the Debtors and any related plan of reorganization or disclosure statement, (C) the Bidding Procedures and Sale Motion, the Bidding Procedures Order or the Sale Order or (D) the assumption or rejection of any Assumed Contracts (but, in each case, not the underlying factual content of such objections).

"***Successful Bidder***" is defined in the Bidding Procedures.

"***Survey***" is defined in Section 5.14(a).

"***Tangible Personal Property***" means the machinery, mobile or otherwise, equipment (including communications equipment), vehicles, cranes, forklifts, tools, fixtures, furniture and furnishings, consumables, parts, Inventory and other tangible personal property (i) located on the Real Property or (ii) used (or if not yet in use, intended to be used) primarily with respect to the Business or the Purchased Assets. "Tangible Personal Property" shall also include, to the extent transferable, all rights to warranties and licenses received from manufacturers of such Tangible Personal Property.

"***Tax***" is defined in Section 6.01.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or statement relating to Taxes, any amended return, extension request with respect thereto and any schedule or attachment thereto.

"***Taxing Authority***" is defined in Section 6.01.

"***Termination Fee***" means an amount equal to $3,600,000.

"***Title Company***" is defined in Section 5.14(a).

"***Title Objection***" is defined in Section 5.14(b).

"***Title Objection A***" is defined in <u>Section 5.14(b)</u>.

"***Title Objection A Cure Amount***" means the out of pocket costs paid by Seller to the Persons holding the Liens or other interests underlying a Title Objection A to cure such Title Objection A.

"***Title Review End Date***" is defined in <u>Section 5.14(a)</u>.

"***Transaction Agreements***" means each of this Agreement, the Assignment and Assumption Agreement, the Real Property Transfer Documents, the Bill of Sale, the Escrow Agreement and the Transition Services Agreement.

"***Transactions***" means, collectively, the transactions contemplated by the Transaction Agreements.

"***Transfer Taxes***" is defined in <u>Section 6.02(c)</u>.

"***Transferred Employee***" is defined in <u>Section 5.10(c)</u>.

"***Transferred Permits***" is defined in <u>Section 2.01(h)</u>.

"***Transition Services Agreement***" means the transition services agreement substantially in the form set forth on <u>Exhibit G</u>.

"***Transmission and Interconnection Facilities***" means the electric transmission, switchyard, substation, and communication facilities, together with all related interconnection rights, rights-of-way, use agreements, and corridor easements used exclusively in connection with the West Lorain Facility, as described on <u>Schedule 1.01(g)</u>.

"***Trustee***" means the trustee under the FEG Mortgage Indenture.

"***WARN Act***" is defined in <u>Section 5.10(e)</u>.

"***West Lorain Facility***" means the Generating Facility and all other ancillary facilities, improvements, buildings and other structures located on the Real Property (other than those improvements included in the definition of Real Property or Tangible Personal Property).

Section 1.02    **Rules of Construction**.

(a)      The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement.

(b)      Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular, (ii) references to the singular include the plural, (c) references to any gender include the other gender, (iii) the term "including" is not limiting and has the inclusive meaning represented by the phrase "including without limitation," (iv) the term

16

"include" is not limiting and has the inclusive meaning represented by the phrase "include without limitation," (v) the term "includes" is not limiting and has the inclusive meaning represented by the phrase "includes without limitation," (vi) the terms "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, and (vii) the terms "day" and "days" mean and refer to calendar day(s).

(c)     Unless otherwise set forth herein, references in this Agreement to (i) any Contract, Permit, document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules, disclosure schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such Contract, Permit, document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time; provided, that this clause (C) shall not apply to any reference to a Contract, Permit, document, instrument or agreement set forth in the Seller Disclosure Schedule, which shall be as of the date set forth in such reference, and (ii) a particular law, regulation or ordinance means such law, regulation or ordinance as amended, modified, supplemented or succeeded, and in effect on the Execution Date and all rules and regulations promulgated thereunder, unless the context requires otherwise. All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified.

(d)     The Parties intend that each representation, warranty, covenant, and condition contained herein will have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same or similar subject matter (regardless of the relative levels of specificity) which the Party has not breached will not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant. If any condition to Closing contained herein has not been satisfied in any respect, the fact that there exists another condition relating to the same or similar subject matter (regardless of the relative levels of specificity) which has been satisfied shall not detract from or mitigate the fact that the first condition has not been satisfied.

ARTICLE 2

PURCHASE AND SALE

Section 2.01    **Purchase and Sale**. Except as otherwise provided in Section 2.02, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase, acquire and accept from Seller and Seller agrees to sell, convey, transfer, assign and deliver, to Buyer at the Closing, free and clear of all Liens, other than Permitted Liens, all of Seller's (and with respect to certain Assumed Contracts only, Seller's Affiliates') right, title and interest in, to or under all properties, rights, claims and assets (in each case, other than the Excluded Assets), wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, used or held for use, in each case relating to the Business or located at the Real Property, and whether or not reflected on the

17

books and records of Seller, as the same shall exist on the Closing Date (collectively, the "***Purchased Assets***"), including the following:

(a)    the real property owned by Seller and listed on <u>Schedule 2.01(a)</u> (the "***Owned Real Property***");

(b)    all of Seller's rights (including as a tenant-in-common) under the easements, rights of way, real property leases or licenses, and other real property entitlements listed on <u>Schedule 2.01(b)</u> (the "***Entitled Real Property***" and, together with the Owned Real Property, the "***Real Property***");

(c)    the West Lorain Facility, including any part thereof;

(d)    the Tangible Personal Property;

(e)    the Transmission and Interconnection Facilities;

(f)    all Contracts that are set forth on <u>Schedule 2.01(f)</u> (together with the documents relating to Entitled Real Property, the "***Assumed Contracts***");

(g)    all electric capacity rights and obligations associated with any and all electric capacity of the Purchased Assets, including all rights and obligations that are associated with any electric capacity of the Purchased Assets that as of the Closing Date, is identified in PJM's eRPM system as having capacity supply obligations in and under PJM's RPM Program for any period of time following the Closing including but not limited to the delivery year in which the Closing occurs), together with all capacity interconnection rights, energy injection rights and other similar rights allocated to the Generating Facility or the Purchased Assets;

(h)    all Permits (including any Environmental Permits) relating to the Purchased Assets or the Business, to the extent legally transferable (collectively, the "***Transferred Permits***");

(i)    the Intellectual Property used with respect to or in connection with the Generating Facility or the Business listed on <u>Schedule 2.01(i)</u> (collectively, the "***Purchased Intellectual Property***");

(j)    all unexpired warranties, indemnities, and guarantees made or given by manufacturers, contractors, architects, engineers, consultants, vendors, suppliers and other third parties to the extent relating to the Business or any of the Purchased Assets (collectively, the "***Purchased Warranties***");

(k)    subject to <u>Section 5.13</u>, all claims or causes of action of Seller or any of its Affiliates against third parties to the extent (but only to the extent) arising from or relating to the Business or any of the Purchased Assets, whether arising by way of counterclaim or otherwise, including Proceedings, Avoidance Actions, indemnification claims, contribution claims, warranty claims, and claims for

18

refunds, prepayments, offsets, recoupment, insurance proceeds, condemnation awards, judgments and the like, other than the claims or causes of action described in Section 2.02(f);

(l)    all original or, to the extent originals are not readily available, copies of all, Records;

(m)    the Emissions Allowances set forth on Schedule 2.01(m);

(n)    any of Seller's rights with respect to all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not know or unknown or contingent or non-contingent), related to the Business and not solely related to an Excluded Asset or an Excluded Liability (but excluding any professional fee retainers and pre-paid deposits related thereto);

(o)    all goodwill of the Business; and

(p)    the assets set forth on Schedule 2.01(p).

Section 2.02    **Excluded Assets**. The Purchased Assets shall specifically exclude all of the following assets, rights, Claims or properties owned by Seller (the "***Excluded Assets***"):

(a)    except as set forth in Section 2.01(n), all cash, securities, accounts receivable, revenues, payments and cash equivalents and short term investments that are earned or accrued prior to the Closing Date;

(b)    all Contracts that are not Assumed Contracts and all Permits that are not Transferred Permits;

(c)    all equity interests of Seller and its Affiliates;

(d)    the corporate seals, organizational documents, minute books, stock books, Tax Returns (other than any Tax Returns that relate solely to the Business or any of the Purchased Assets), books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, other than personnel files of Transferred Employees, and any other books and records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(e)    any Contract of any nature in respect of any intercompany transaction between Seller, on the one hand, and any Affiliate of Seller, on the other hand, regardless of the subject matter of such transaction, including any contribution to capital, loan, the provision of goods or services, tax sharing arrangements, payment arrangements, intercompany advances, charges or balances, or the like (collectively, the "***Intercompany Arrangements***");

19

(f)     all rights to Proceedings, refunds or adjustments, and all other refunds or adjustments with respect to the Excluded Assets;

(g)     all assets attributable to or related to any Benefit Plan of Seller or its Affiliates;

(h)     all Insurance Policies and all rights to applicable claims and proceeds thereunder except to the extent provided in Section 5.12;

(i)     all Tax assets (including duty and Tax refunds and prepayments relating to the Purchased Assets with respect to Pre-Closing Tax Periods) of Seller;

(j)     the rights which accrue or will accrue to Seller under the Transaction Agreements; and

(k)     the assets set forth on Schedule 2.02(k).

Section 2.03     **Assumed Liabilities**. Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller agrees to assign to Buyer, and Buyer agrees to assume, perform and discharge from and after the Closing, in accordance with their respective terms, only the Liabilities set forth below (collectively, the "***Assumed Liabilities***"):

(a)     all Liabilities of Seller under the Assumed Contracts solely to the extent first arising after the Closing;

(b)     all Liabilities and obligations under the CBA listed in Section 3.11(b) of the Seller Disclosure Schedule with respect to Transferred Employees;

(c)     all Liabilities with respect to the Transferred Permits other than relating to breaches by Seller or its Affiliates prior to the Closing;

(d)     all Cure Payments under the Assumed Contracts;

(e)     all Liabilities and obligations solely to the extent arising on or after the Closing Date related to or otherwise arising out of electric capacity rights, capacity interconnection rights, energy injection rights and other similar rights described in Section 2.01(g);

(f)     all Liabilities and obligations related to or otherwise arising out of Buyer's employment of the Transferred Employees solely to the extent arising after the Closing, including all claims related to Transferred Employees after the Closing under any collective bargaining agreement to which Buyer is subject; provided, however, that Buyer shall assume all Liabilities solely to the extent directly arising out of any violation of Law by Buyer in connection with its acceptance of the transfer of all Transferred Employees, regardless of when such Liabilities arise;

(g)     all Liabilities for any Taxes for which Buyer is liable under Section 6.02 and Taxes attributable to the ownership or use of any of the Purchased Assets on or after the Closing Date (except for Taxes for which Seller is liable pursuant to Section 6.02); and

20

(h)     all Liabilities relating to any Environmental Law or Environmental Permit (including Environmental Claims) with respect to the Purchased Assets whether arising prior to, on or after the Closing Date, except for any Excluded Liabilities.

Section 2.04     **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, except for the Assumed Liabilities, Seller shall retain, and Buyer shall not assume or be obligated to pay, perform or otherwise discharge or be responsible or liable pursuant to this Agreement or otherwise with respect to, any Liability or obligation of Seller or any of its Affiliates, whether or not of, associated with, or arising from any of the Purchased Assets or the Business, and whether carried or not carried on the books and records of Seller or any of its Affiliates (all such Liabilities and obligations not being assumed being herein referred to as the "***Excluded Liabilities***"), including:

(a)     Seller's costs and expenses incurred in connection with this Agreement and the Transactions;

(b)     all Liabilities of Seller in respect of this Agreement or any of the Transaction Agreements (including any amendment or supplement thereto);

(c)     all Liabilities of Seller or any of its Affiliates in respect of or arising out of (i) any Indebtedness or (ii) any Contract that is not an Assumed Contract;

(d)     all Liabilities (other than Assumed Liabilities described in Section 2.03 arising out of any Proceeding arising out of the Business or the Purchased Assets before any Governmental Body arising out of events, facts or circumstances (in whole or in part, but if in part, only to the extent of such part) to the extent arising, occurring or existing prior to the Closing Date;

(e)     (i) all Liabilities related to or otherwise arising out of Seller's employment of the Business Employees who do not become Transferred Employees, except as set forth in Section 5.10, (ii) all Liabilities related to or otherwise arising out of Seller's employment of the Business Employees who do become Transferred Employees, to the extent arising prior to the Closing, including all Liabilities arising under or relating to any employee benefit or similar plan or any previous benefit or similar plan maintained by Seller or its Affiliates prior to the Closing for the benefit of the Business Employees (including any revaluations by Seller of such Liabilities relating to such plans undertaken on or after the Closing) (provided, however, that notwithstanding anything to the contrary in clauses (i) and (ii) of this Section 2.04(e), Buyer shall assume all Liabilities related to or otherwise arising out of any violation of Law by Buyer in connection with its acceptance of the transfer of employment of the Transferred Employees as set forth in Section 5.10 regardless of when such Liabilities arise), and (iii) any Liabilities for the Business Employees, whether arising prior to, on or after the Closing, for retiree medical benefits under the terms of Seller's plans and for the applicable periods required by the CBA (as such CBA is in effect immediately prior to the Closing); provided, that nothing herein is intended to or shall expand the scope or period of benefits for such employees beyond those provided under such terms and such CBA respectively and provided, further, that nothing herein shall modify Buyer's obligations under Section 5.10 herein;

21

(f)      all Liabilities or obligations of Seller or any of its Affiliates to the extent relating to or arising out of any Excluded Assets (or any other assets of Seller or any of its Affiliates that are not Purchased Assets), or the ownership, use, lease, operation, construction, modification or maintenance thereof or conduct of any business in connection therewith, including any amounts due from, or other obligations of, Seller under or arising from any of the Intercompany Arrangements;

(g)      all Liabilities (i) for any Taxes for which Seller is liable under Section 6.02, (ii) for Taxes attributable to the ownership or use of any of the Purchased Assets or operation of the Business before the Closing Date, (iii) for Taxes imposed with respect to the Excluded Assets for any taxable period, (iv) for income and other doing business Taxes (or Taxes imposed in lieu thereof) imposed on or payable by Seller, and (v) of Seller for Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local, or non-U.S. Law), as a transferee or successor, by contract or otherwise;

(h)      all Liabilities arising from or related to Intercompany Arrangements;

(i)      all Liabilities relating to any Environmental Law or Environmental Permit (including Environmental Claims) to the extent arising out of or relating to Seller's or its Affiliates' ownership or operation of the Purchased Assets prior to the Closing Date, except that such Excluded Liabilities shall not extend to Liabilities related to future corrective actions concerning, or remediation of, environmental contamination at the Real Property cause by a Release of Hazardous Materials occurring at the Real Property and occurring prior to the Closing Date;

(j)      any Liability under the Assumed Contracts arising out of or relating to events, breaches or defaults thereunder occurring on or prior to the Closing Date; and

(k)      any Liabilities to any Back-Up Bidder.

Section 2.05   **Assignment of Contracts and Rights**. Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign any Purchased Asset listed in Section 3.06 of the Seller Disclosure Schedule or any claim or right or any benefit arising thereunder or resulting therefrom if such assignment, without the consent of a third party thereto, would constitute a breach or other contravention of such Purchased Asset or in any way materially adversely affect the rights of Buyer or Seller thereunder. The Parties will use their commercially reasonable efforts (but without any payment of money other than filing, recordation or similar fees, which shall be shared equally by Seller and Buyer) to obtain the consent of the other parties to any such Purchased Asset listed in Section 3.06 of the Seller Disclosure Schedule or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may request. If such consent is not obtained prior to the Closing, or if an attempted assignment thereof would be ineffective or would materially adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights and benefits unless expressly waived by Buyer, Seller and Buyer will cooperate in a mutually agreeable, contractually permissible and commercially reasonable arrangement under which, after the Closing, Buyer would obtain the benefits and assume the obligations with respect to the relevant Purchased Asset in accordance with this Agreement, including sub-contracting, sub-licensing, or

22

sub-leasing to Buyer, or under which Seller would enforce for the benefit of Buyer or its assignee, with Buyer assuming Seller's obligations, any and all rights of Seller against a third party thereto, and Seller shall hold in trust for and pay to Buyer promptly upon receipt thereof, all income, proceeds and other monies received by Seller or any of its Affiliates in connection with any such arrangements; provided, however, the foregoing shall not apply if the failure to obtain any such consent causes a failure of any of the conditions to Closing set forth in Article 7. in which case the Closing shall proceed only if such failed condition is waived by the Party entitled to the benefit thereof in accordance with the terms of this Agreement. Seller agrees to continue its commercially reasonable efforts to obtain any such consents with respect to any Purchased Asset Seller owns, leases or otherwise possesses listed in Section 3.06 of the Seller Disclosure Schedule after the Closing for the benefit of Buyer in accordance with this Section 2.05. Once any such consent is obtained, Seller shall or shall cause its relevant Affiliates to, assign, transfer, convey and deliver any such Purchased Asset to Buyer at no additional cost.

Section 2.06 **Purchase Price; Adjustment and Allocation of Purchase Price**.

(a) Purchase Price. The purchase price for the Purchased Assets and the assumption of the Assumed Liabilities is (i) one hundred forty-four million dollars ($144,000,000) (the "***Initial Purchase Price***"), plus (ii) the Closing Adjustment Amount as finally determined pursuant to Section 2.06(b), plus (iii) the Proration Adjustment Amount as finally determined pursuant to Section 2.06(c) (together, the "***Purchase Price***"). At least three (3) Business Days prior to the Closing Date, Seller shall provide to Buyer a statement, certified in writing by an appropriate officer of Seller (the "***Estimated Closing Statement***"), setting forth Seller's good faith estimates of (A) the Closing Adjustment Amount (the "***Estimated Adjustment Amount***"), (B) the Prorated Amount for each Prorated Item (with respect to each Prorated Item, the "***Estimated Prorated Amount***"), and (C) the aggregate sum of the Estimated Prorated Amounts for all Prorated Items, which may be a positive or negative number (the "***Estimated Proration Adjustment Amount***"), together, in each case, with reasonable and sufficient detail and supporting material regarding the computation thereof. Seller shall provide Buyer with a reasonable opportunity to review and comment on the calculations Seller proposes to include in the Estimated Closing Statement prior to the delivery thereof to Buyer pursuant to this Section 2.06(a), and will consider in good faith any comments thereon provided by Buyer.

(b) Inventory/Spare Parts Adjustment.

(i) Within fifteen (15) Business Days after the Closing Date, Buyer shall deliver to Seller, at Buyer's sole cost and expense, a statement, prepared in good faith, setting forth the Closing Adjustment Amount (the "***Closing Statement***"), along with reasonable supporting documentation, prepared in good faith on the same basis as the Estimated Adjustment Amount, setting forth a calculation of the Purchase Price and the amount of any payment to be made, and by whom, pursuant to Section 2.06(b)(iv).

(ii) In the event that Seller disputes the Closing Statement, Seller shall, within thirty (30) after receipt of the Closing Statement, notify Buyer of such dispute setting forth with specificity the nature and amount(s) thereof and providing supporting documentation and calculations prepared in good faith by Seller containing the calculations of Inventory levels and/or spare parts used as the basis for such disputes. If

23

Seller disputes the Closing Statement, and Seller notifies Buyer within such thirty (30) day period in accordance with this Agreement, then Buyer and Seller shall promptly attempt to resolve such disputes by negotiation. If Buyer and Seller are unable to resolve such dispute(s) within ten (10) Business Days following such notice of dispute by Seller, then Buyer and Seller shall appoint an Independent Accounting Firm within forty-five (45) days following such notice, which shall review the Closing Statement and determine the Closing Adjustment Amount. In the event that Seller and Buyer cannot promptly agree on the selection of an accounting firm to act as the Independent Accounting Firm, either Buyer or Seller may request the American Arbitration Association to appoint a nationally recognized, independent accounting firm and such appointment shall be final, binding and conclusive on Buyer and Seller. Resolution of any disputes shall be made by the Independent Accounting Firm in a writing addressed to Buyer and Seller within thirty (30) days following referral to it by Buyer and Seller of such disputes in accordance with this Agreement. The findings of such Independent Accounting Firm shall be final, binding and conclusive on Buyer and Seller. The costs, fees and expenses of the Independent Accounting Firm in resolving the disagreement will be borne by Buyer, on the one hand, and Seller, on the other hand, based on the inverse of the percentage that the Independent Accounting Firm's determination bears to the aggregate amount of all of the items in dispute.

(iii)     In the event that Seller does not dispute the Closing Adjustment Amount as provided in <u>Section 2.06(b)(ii)</u> or upon the resolution of any such dispute in accordance with <u>Section 2.06(b)(ii)</u>, (A) in the event that the Estimated Adjustment Amount exceeds the Closing Adjustment Amount, then Seller shall pay to Buyer the amount by which the Estimated Adjustment Amount exceeds the Closing Adjustment Amount; or (B) in the event that the Closing Adjustment Amount exceeds the Estimated Adjustment Amount, then Buyer shall pay to Seller the amount by which the Closing Adjustment Amount exceeds the Estimated Adjustment Amount. Any payments pursuant to this <u>Section 2.06(b)(iii)</u> shall be made by wire transfer of immediately available funds to an account designated in writing by the receiving Party.

(iv)     Payments shall be due under this <u>Section 2.06(b)</u>, (A) in the event of no dispute by Seller, within ten (10) Business Days after Seller's receipt of the Closing Statement, and (B) in the case of a dispute by Seller, within ten (10) Business Days after the resolution of such dispute (including a finding by the Independent Accounting Firm pursuant to <u>Section 2.06(b)(ii)</u>).

(v)     The Parties agree to treat, for Tax purposes, any payments required by this <u>Section 2.06(b)</u> as adjustments to the Purchase Price, unless otherwise required by a change in Law occurring after the Execution Date, a closing agreement with an applicable Taxing Authority, or a final, non-appealable judgement of a court of competent jurisdiction.

(c)     <u>Prorations</u>.

(i)     Except as otherwise provided in this Agreement, all of the categories of items set forth on <u>Schedule 2.06(c)</u> (the "***Prorated Items***") relating to the ownership,

lease, maintenance or operation of the Purchased Assets during any period commencing before the Closing Date and ending on or after the Closing Date, including those listed below (except for Taxes, which are addressed in <u>Section 6.02</u>), shall be prorated as of the Closing Date, with Seller liable to the extent such items relate to any period prior to the Closing Date, and Buyer liable to the extent such items relate to any period on and after the Closing Date (measured in the same units to compute the item in question, and otherwise measured in calendar days):

> (A) rent and all other items (including prepaid services and goods not included in Inventory), in each case, payable by or to Seller under any Contract to which Seller is a party at Closing, or by which Seller or the Purchased Assets is bound or subject at Closing;

> (B) any license, registration, administrative or compliance assurance fees or other fees with respect to any Permit or Emissions Allowance relating to the Generating Facility;

> (C) sewer rents and charges for water, telephone, electricity and other utilities; and

> (D) prepaid operating and maintenance expenses.

(ii)    Pursuant to <u>Section 2.06(a)</u>, Seller will deliver the Estimated Closing Statement to Buyer at least three (3) Business Days prior to the Closing Date, which Estimated Closing Statement will include the Estimated Prorated Amount for each Prorated Item and the aggregate Estimated Proration Adjustment Amount. In the event that, with respect to any Prorated Item, actual figures are not available as of the time of the delivery of the Estimated Closing Statement, the Estimated Prorated Amount for such Prorated Item shall be a good faith estimate, including (as applicable) based upon the actual fee, cost or amount of the Prorated Item for the most recent preceding year (or other appropriate period) for which an actual fee, cost or amount paid is available.

(iii)    As promptly as reasonably practicable following the Closing, and in any event within thirty (30) days after the date that the actual Prorated Amount with respect to any Prorated Item becomes available, Buyer or Seller, as the case may be, shall notify the other of such Prorated Amount for such Prorated Item, together with the notifying Party's calculation (and reasonable detail supporting such calculation) of the difference, if any, between the Estimated Prorated Amount and the actual Prorated Amount for such Prorated Item (the "***Prorated Difference***").  Seller or Buyer, as applicable, shall furnish each other with such documents and other records as the other may reasonably request in order to confirm the calculations of any Prorated Differences delivered in accordance with this <u>Section 2.06(c)(iii)</u>. Any dispute with respect to the calculation of the Prorated Difference for any Prorated Item shall be resolved in accordance with the procedures set forth in <u>Section 2.06(b)(ii)</u>).

(iv)    If the actual Prorated Amount (whether a positive or a negative number) for any Prorated Item, as finally determined in accordance with Section 2.06(c)(iii), is greater than the Estimated Prorated Amount (whether a positive or a negative number) for such Prorated Item, Buyer shall promptly, and in any event within ten (10) Business Days following the final determination of the actual Prorated Amount for such Prorated Item, pay an amount equal to the Prorated Difference for such Prorated Item to Seller by wire transfer of immediately available funds to an account designated by Seller in writing.  If the actual Prorated Amount (whether a positive or a negative number) for any Prorated Item, as finally determined in accordance with Section 2.06(c)(iii), is less than the Estimated Prorated Amount (whether a positive or a negative number) for such Prorated Item, Seller shall promptly, and in any event within ten (10) Business Days following the final determination of the actual Prorated Amount for such Prorated Item, pay an amount equal to the Prorated Difference for such Prorated Item to Buyer by wire transfer of immediately available funds to an account designated by Buyer in writing.

(d)    Allocation of Purchase Price. Seller shall allocate the Purchase Price and the Assumed Liabilities treated as purchase price for Tax purposes, as of the Closing, among the classes of assets to which the Purchased Assets and the other Transaction Agreements relate (the "*Allocation*") in accordance with sections 1060 and 755 of the Code and the regulations promulgated thereunder (or any similar provision of local or state Tax law) and shall submit the proposed Allocation to Buyer not later than one hundred eighty (180) days after Closing. If, within sixty (60) days after the receipt of the proposed Allocation, Buyer notifies Seller in writing that Buyer disagrees with the proposed Allocation, then Buyer and Seller shall attempt in good faith to resolve their disagreement within the sixty (60) days following Buyer's notification to Seller of such disagreement. If Buyer does not so notify Seller within sixty (60) days of receipt of the proposed Allocation, or upon resolution of the dispute by Buyer and Seller, the proposed Allocation shall become the final Allocation. If Buyer and Seller are unable to resolve their disagreement within the sixty (60) days following any such notification by Buyer, the dispute shall be submitted to an Independent Accounting Firm, for resolution within sixty (60) days of such submission, which resolution shall be final, binding and non-appealable. Each Party shall cooperate fully with the other Parties to facilitate a prompt determination of the Allocation. For all Tax purposes, the transactions contemplated by this Agreement shall be reported in a manner consistent with the final Allocation and the terms of the Transaction Agreements and no Party, nor any of such Parties' Affiliates, shall take any position inconsistent therewith in any Tax Return (including IRS Form 8594), in any Tax refund claim, in any litigation or otherwise, unless required by applicable Law. The fees, costs and expenses of the valuation firm retained to resolve any dispute with respect to the Allocation, if applicable, shall be borne equally by Seller, on the one hand, and Buyer, on the other.

(e)    Not later than thirty (30) days prior to the filing of their respective Forms 8594 relating to this transaction, each Party shall deliver to the other Parties a copy of its Form 8594.

Section 2.07    **Deposit**. On or before the first Business Day following the date on which the Escrow Agreement is executed, Buyer shall deposit with the Escrow Agent, a deposit in the amount of $14,400,000 (the "*Deposit*"), by wire transfer of immediately available funds for deposit into a separate escrow account (the "*Escrow Account*"), established pursuant to the escrow agreement, to be executed on the first Business Day following the Execution Date, by

26

and among Seller, Buyer and the Escrow Agent (the "***Escrow Agreement***"). If the Closing occurs, Seller and Buyer shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release from the Escrow Account the entire Deposit, by wire transfer of immediately available funds to an account designated by Seller to the Escrow Agent, and the Deposit shall be credited against the amount required to be paid by Buyer to Seller at Closing. If this Agreement is validly terminated by Seller in accordance with the terms of this Agreement prior to Closing pursuant to Section 9.01(f) or Section 9.01(i), then Seller and Buyer shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release from the Escrow Account the entire Deposit, by wire transfer of immediately available funds to an account designated by Seller to the Escrow Agent, with such Deposit to be retained by Seller as Seller's sole and exclusive remedy as liquidated damages for any and all losses or damages of any nature against Buyer in respect of this Agreement or the contemplated Transactions; provided, however, that nothing set forth herein shall limit or restrict Seller's rights under Section 10.12 prior to the termination of this Agreement.  In all other circumstances, if this Agreement is validly terminated in accordance with the terms of this Agreement prior to Closing, then within two (2) Business Days of such termination, Seller and Buyer shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release all funds held in the Escrow Account, including any interest or earnings thereon, by wire transfer of immediately available funds to an account designated by Buyer to the Escrow Agent.

Section 2.08 **Closing**. The closing (the "***Closing***") of the purchase and sale of the Purchased Assets, and the assignment and assumption of the Assumed Liabilities hereunder, shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, on the date that is no more than two (2) Business Days after satisfaction of the conditions set forth in Article 7 or waiver by the Party for whose benefit such conditions exist (other than those conditions that by their nature will be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time or place as Buyer and Seller may agree. The Closing shall be effective for all purposes at 12:01 a.m., eastern prevailing time (EPT), on the Closing Date.

Section 2.09 **Deliveries at Closing**. In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a)  Seller shall deliver to Buyer:

(i)  the Bill of Sale duly executed by Seller;

(ii)  the Assignment and Assumption Agreement duly executed by Seller;

(iii)  the Real Property Transfer Documents duly executed by Seller;

(iv)  the Transition Services Agreement duly executed by Seller;

(v)  evidence in form and substance reasonably satisfactory to Buyer, that upon Seller depositing or causing to be deposited with the Trustee certain funds (the "***Payoff Amount***"), Seller will be able to deliver the FEG Mortgage Indenture Partial Release;

27

(vi)     the FEG Mortgage Indenture Partial Release, in form and substance reasonably acceptable to Buyer, duly executed and notarized by the Trustee;

(vii)    a counterpart to a notice to the Escrow Agent pursuant to the Escrow Agreement duly executed by Seller as contemplated by Section 2.07;

(viii)   a certificate from an authorized officer of Seller, dated as of the Closing Date, certifying that the conditions in Sections 7.02(a), 7.02(b), and 7.02(c) have been satisfied;

(ix)     a non-foreign affidavit for Seller (or, if Seller is a disregarded entity for U.S. federal income tax purposes, Seller's regarded owner), dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code stating that Seller (or regarded owner) is not a "foreign person" as defined in Section 1445 of the Code;

(x)      certificates of title for all vehicles included in the Purchased Assets;

(xi)     to the extent that any Purchased Assets (other than any *de minimis* assets) are not located on the Real Property, such Purchased Assets (which will be delivered to the Real Property or as specified by Buyer);

(xii)    an owner's affidavit in substantially the form set forth in Exhibit H and executed by a Person reasonably acceptable to the Title Company; and

(xiii)   any other documents or instruments reasonably required by Buyer to consummate the transactions contemplated by this Agreement and reasonably requested of Seller prior to the Closing Date.

(b)     Buyer shall deliver to Seller:

(i)      an amount equal to (A) the Initial Purchase Price, less (B) the Deposit, plus (C) the Estimated Adjustment Amount, plus (D) Estimated Proration Adjustment Amount (which amount may be positive or negative), in cash by wire transfer to an account or accounts designated by Seller, by notice to Buyer, such notice to be delivered not later than three (3) Business Days prior to the Closing Date;

(ii)     the Assignment and Assumption Agreement duly executed by Buyer;

(iii)    the Assignments of Real Property Entitlements duly executed by Buyer;

(iv)     the Transition Services Agreement duly executed by Buyer;

(v)      a counterpart to a notice to the Escrow Agent pursuant to the Escrow Agreement duly executed by Buyer as contemplated by Section 2.07;

28

(vi)     a certificate from an authorized officer of Buyer, dated as of the Closing Date, certifying that the conditions in Sections 7.03(a), 7.03(b), and 7.03(c) have been satisfied;

(vii)     any certificates required to be delivered by Buyer pursuant to Section 6.02(c), in each case, duly executed by Buyer; and

(viii)     any other documents or instruments reasonably required by Seller to consummate the transactions contemplated by this Agreement and reasonably requested of Buyer prior to the Closing Date.

Section 2.10     **Remittance of Funds**. Except as expressly provided otherwise in this Agreement, (a) Buyer shall pay Seller any and all amounts received after Closing by Buyer, and Seller shall reimburse Buyer for any and all costs, expenses and disbursements paid after Closing by Buyer (in each case, to the extent not accounted for in the Closing Adjustment Amount), that are attributable to the ownership, lease, maintenance or operation of the Purchased Assets prior to the Closing Date and (ii) Seller shall pay Buyer any and all amounts received after Closing by Seller, and Buyer shall reimburse Seller for any and all costs, expenses and disbursements paid after Closing by Seller (in each case, to the extent not accounted for in the Closing Adjustment Amount), that are attributable to the ownership, lease, maintenance or operation of the Purchased Assets on and after the Closing Date. The Party responsible for the payment of amounts received shall reimburse the other Party within fifteen (15) Business Days after the end of the month in which such amounts or the applicable invoice and proof of payment of such invoice, as applicable, were received by the Party responsible for payment and, if paid, no further adjustments shall be made with respect to such amounts in the Closing Adjustment Amount.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that the representations and warranties in this Article 3 are true, correct and complete as of the Execution Date and will be true, correct and complete as of the Closing Date (except for representations and warranties that speak as of a specific date or time, which need only be true, correct and complete as of such date or time):

Section 3.01     **Corporate Existence and Power**. Seller is an Ohio limited liability company duly formed, validly existing, and in good standing under the Laws of the State of Ohio and has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted. Seller is duly authorized, qualified or licensed to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required, except where failure to be so qualified would not have a Seller Material Adverse Effect.

Section 3.02     **Corporate Authorization**. Seller has the limited liability company power and authority necessary to execute and deliver each Transaction Agreement to which it is a party and to perform its obligations thereunder and to consummate the Transactions. Subject to

29

Bankruptcy Court approval, Seller has taken all actions necessary to authorize the execution and delivery of each Transaction Agreement to which it is a party, the performance of its respective obligations thereunder, and the consummation of the Transactions. Each Transaction Agreement to which Seller is a party has been duly authorized by, and has been or will be duly executed and delivered by, and, assuming the due authorization, execution and delivery thereof by each counterparty, is Enforceable against, Seller.

Section 3.03 **Governmental Authorization**. Except as set forth in <u>Section 3.03 of the Seller Disclosure Schedule</u> and subject to Bankruptcy Court approval and entry of the Bidding Procedures Order and Sale Order, the execution, delivery and performance by Seller of the Transaction Agreements to which it is a party and the consummation of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than any such action or filing (a) contemplated by, taken or made in connection with this Agreement or (b) as to which the failure to take, make or obtain would not reasonably be expected to have a Seller Material Adverse Effect.

Section 3.04 **Noncontravention**. Except as set forth in <u>Section 3.04 of the Seller Disclosure Schedule</u> and subject to Bankruptcy Court approval and entry of the Bidding Procedures Order and Sale Order, the execution, delivery and performance by Seller of the Transaction Agreements to which it is a party and the consummation of the Transactions do not and will not (a) result in a violation of the organizational documents of Seller, (b) violate any applicable Law, (c) assuming that all Required Consents are obtained, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit under any provision of any Assumed Contract or Permit relating to the Business, or (d) result in the creation or imposition of any Lien on any Purchased Asset owned by Seller, other than Permitted Liens, except in the cases of each of clause (b) and (c), where the violations, terminations, cancellations or accelerations (as applicable) would not, individually or in the aggregate, have, or would not reasonably be expected to have, a Seller Material Adverse Effect.

Section 3.05 **Finders' Fees**. Except as set forth in <u>Section 3.05 of the Seller Disclosure Schedule</u>, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Seller, or any of its Affiliates, who might be entitled to any fee or commission from Buyer or its Affiliates in connection with the Transactions.

Section 3.06 **Required Consents**. <u>Section 3.06 of the Seller Disclosure Schedule</u> sets forth each Assumed Contract to which Seller is a party and each other Purchased Asset requiring consent, or notice to or by, or other action by, any Person as a result of the execution, delivery and performance of the Transaction Agreements and the consummation of the Transactions (the "***Required Consents***").

Section 3.07 **Contracts**.

(a)     Seller has made available to Buyer true, correct and complete copies of each Material Contract and each Assumed Contract (including all amendments, supplements and modifications) to which Seller or an Affiliate of Seller is a party.

30

(b)     Section 3.07(b) of the Seller Disclosure Schedule sets forth a true, correct and complete list of the following Contracts to which Seller or an Affiliate of Seller is a party and which primarily relate to the Purchased Assets, the Assumed Liabilities or the Business Employees (the Contracts that meet the descriptions in this Section 3.07(b), collectively, the "*Material Contracts*"):

(i)     Contracts for the future purchase, exchange, transmission or sale of electric power in any form, including energy, capacity, capacity supply obligations, or any ancillary services;

(ii)     Contracts for the purchase of products or services pursuant to which Seller paid in excess of $50,000 during the calendar year ending December 31, 2017, or pursuant to which Seller reasonably expects to pay in excess of $50,000 during the calendar year ending December 31, 2018;

(iii)     electric interconnection Contracts;

(iv)     any (A) CBAs, or (B) other employment or employment-related (including severance, retention, change of control and bonus) Contracts providing for payments in excess of $100,000 per year;

(v)     outstanding futures, swap, hedge, collar, put, call, floor, cap, option or other Contracts that are intended to benefit from or reduce or eliminate the risk of fluctuations in interest rates or the price of commodities, including electric power (including energy, or any ancillary services) or fuel in any form;

(vi)     Contracts related to property Taxes or abatements;

(vii)     partnership, joint venture, development, construction, management, operation, limited liability company or similar agreements relating to the West Lorain Facility;

(viii)     Contracts between Seller, on the one hand, and any Affiliate of Seller, on the other hand related exclusively to the West Lorain Facility;

(ix)     Contracts that limit the rights of Seller to compete in any line of business or in any geographical area with respect to the operation of the Purchased Assets or Business (which, for the avoidance of doubt, shall not include any such restrictions that arise solely pursuant to applicable Law);

(x)     Contracts (A) under which any Person has incurred, created, assumed or guaranteed any outstanding Indebtedness or (B) for any outstanding agreement of guaranty or surety, whether direct or indirect;

(xi)     Contracts and any other arrangements, with respect to which Seller or any of its Affiliates provide monetary credit support or guarantees as of the Execution Date, with the amount of such monetary credit support or guarantees set forth in

31

<u>Section 3.07(b) of the Seller Disclosure Schedule</u> next to each such Contract and arrangement listed therein;

(xii)    Contracts or arrangements between Seller or any of its Affiliates, on the one hand, and any Governmental Body, on the other hand; and

(xiii)    any other Contract or arrangement not otherwise reflected above that would be considered material to the Business or the Purchased Assets.

(c)    Except as disclosed in <u>Section 3.07(c) of the Seller Disclosure Schedule</u>:

(i)    there are no Contracts to which Seller is a party and is obligated or has an option to sell, lease or dispose of any Purchased Asset which Seller owns, leases or otherwise possesses other than the sale of products in the ordinary course of business consistent with past practice;

(ii)    Seller is not in breach or default, and, to Seller's Knowledge, no other party is in breach or default, and no specific event or circumstance has occurred which with provision of notice or expiration of any applicable cure period would constitute a breach or default, or permit termination, modification, or acceleration, under any Assumed Contract, except as a result of the commencement of the Bankruptcy Cases, the insolvency or financial condition of Seller or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code;

(iii)    neither Seller nor, to Seller's Knowledge, any other party thereto has waived any of its material rights under an Assumed Contract to which Seller is a party, either orally or in writing; and

(iv)    subject to Bankruptcy Court approval, entry of the Bidding Procedures Order and Sale Order and following the assumption by Seller of the applicable Assumed Contract in accordance with the Bankruptcy Code (including satisfaction of any applicable Cure Payments) and except as a result of the commencement of the Bankruptcy Cases, the insolvency or financial condition of Seller or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code, each Assumed Contract is a valid and binding obligation of Seller, Enforceable against Seller and, to the Seller's Knowledge, each of the other parties thereto, in accordance with its terms.

Section 3.08    **Litigation**. Except as set forth in <u>Section 3.08 of the Seller Disclosure Schedule</u>, there is no (a) material Proceeding (or other Proceeding relating to criminal conduct or seeking injunctive relief) pending against, or to Seller's Knowledge, threatened against, Seller or any of Seller's Affiliates, with respect to the Business or relating to or affecting any of the Purchased Assets, or, to Seller's Knowledge, against any of the officers of Seller in regards to theirs actions as such, in each case, before any Governmental Body, arbitrator or mediator; (b) Proceeding pending against, or to Seller's Knowledge, threatened against, Seller or any of its Affiliates before any Governmental Body, arbitrator or mediator which, if adversely determined, would reasonably be expected to be materially adverse to the ability of Seller to perform its obligations under this Agreement or the other Transaction Agreements or to consummation the transactions contemplated hereby and thereby; or (c) Order of any

Governmental Body specifically relating to the Business or any of the Purchased Assets. As of the Execution Date, there is no Proceeding by Seller or any of its Affiliates pending, or which Seller or any such Affiliate has commenced preparations to initiate, against any other Person relating to or affecting the Business or the Purchased Assets. Notwithstanding the foregoing, no representation or warranty is made pursuant to this <u>Section 3.08</u> with respect to environmental matters which are covered exclusively by <u>Section 3.12</u>.

Section 3.09 **Compliance with Laws**. Since January 1, 2017, Seller has complied and is in compliance in all material respects with all applicable Laws that affect the Purchased Assets or the Business. Notwithstanding the foregoing, no representation or warranty is made in this <u>Section 3.09</u> with respect to environmental matters or Real Property, which are covered exclusively in <u>Section 3.12</u> and <u>Section 3.19</u>, respectively.

Section 3.10 **Title**.

(a)     Seller has good, marketable and valid title to all of the Purchased Assets, in each case free and clear of all Liens other than Permitted Liens and Liens arising under the FEG Mortgage Indenture. Upon the Closing, Buyer will have good and valid title to the Tangible Personal Property, free and clear of all Liens except Permitted Liens. Notwithstanding the foregoing, no representation or warranty is made in this <u>Section 3.10</u> with respect to the title to the Real Property, which shall be addressed in <u>Section 3.19</u> below or in the Real Property Transfer Documents.

(b)     <u>Section 3.10(b) of the Seller Disclosure Schedule</u> sets forth a complete and accurate description of each item of Tangible Personal Property leased, rented or licensed to Seller (the "***Leased Personal Property***"). Seller has good and valid leasehold interests in all of its Leased Personal Property that is included in the Purchased Assets, and is material to its Business or to the Generating Facility.

(c)     Except for the Leased Personal Property, Seller has good and valid title to its Tangible Personal Property, free and clear of all Liens except Permitted Liens and Liens arising under the FEG Mortgage Indenture. As of the Closing, no Tangible Personal Property included in the Purchased Assets is owned by any Person other than Seller, except for the Leased Personal Property.

Section 3.11 **Employees**.

(a)     Seller has previously provided to Buyer in File 2.7.5 of the Datasite a true and complete list of the names, titles, location, years of service, annual salaries or hourly wage and status as unionized or non-unionized, and status as exempt or non-exempt of all employees of Seller who, as of the Execution Date, work at the West Lorain Facility.

(b)     Except as set forth in <u>Section 3.11(b) of the Seller Disclosure Schedule</u>, with respect to the Business Employees (i) Seller is not a party nor subject to any union or collective bargaining agreement or relationship, and no such agreements are currently being negotiated, (ii) there are no ongoing or, to Seller's Knowledge, threatened, union organizational activities, and no labor organization or group of Business Employees has made a demand for recognition or certification, and no such activities have occurred since January 1, 2017, (iii) there are no

33

certification Proceedings or petitions seeking a representation pending or, to Seller's Knowledge, threatened to be brought or filed with the National Labor Relations Board or any other applicable labor relations authority, and (iv) there are no pending or, to Seller's Knowledge, threatened strikes, work stoppages, pickets, walkouts, lockouts or other material labor disputes by or on behalf of an Business Employees, and no such activities have occurred during the three (3) years immediately preceding the Execution Date.

(c)     Except as set forth in <u>Section 3.11(c) of the Seller Disclosure Schedule</u>, there are no unfair labor practice charges or other charges or complaints pending or, to Seller's Knowledge, threatened by or on behalf of any Business Employee or any group of Business Employees against Seller. Except as set forth in <u>Section 3.11(c) of the Seller Disclosure Schedule</u>, there are no material actions, material arbitrations, or material grievances pending or, to Seller's Knowledge, threatened against Seller relating to the employment or termination of employment of or failure to employ any individual.

(d)     Except as set forth in <u>Section 3.11(d) of the Seller Disclosure Schedule</u>, there are no severance, bonus or change in control payments due to any Business Employees in connection with the termination of employment or any transactions contemplated by this Agreement.

(e)     Except as specifically provided in this Agreement, neither Seller, nor any ERISA Affiliate of Seller, has or would reasonably be expected to have any Liability under ERISA or applicable Law in respect of any Benefit Plan that could result in any material Liability to Buyer, and the Purchased Assets are not and would not be expected to be subject to any Lien (other than a Permitted Lien) in respect of any such Benefit Plan. <u>Section 3.11(e) of the Seller Disclosure Schedule</u> sets forth a true and complete list of all Benefit Plans that cover any Business Employee as of the Execution Date. For purposes of this Agreement, "***Benefit Plan***" shall mean (i) each "employee benefit plan," as such term is defined in Section 3(3) of ERISA, (ii) each plan that would be an "employee benefit plan", as such term is defined in Section 3(3) of ERISA, if it was subject to ERISA, such as foreign plans and plans for directors, (iii) each stock bonus, stock ownership, stock option, stock purchase, stock appreciation rights, phantom stock, or other stock or stock-based plan (whether qualified or nonqualified), and (iv) each bonus or incentive compensation plan.

Section 3.12   **Environmental Matters**. Seller has made available and delivered to Buyer copies of all material environmental audits, reports, Permits, correspondence, files, memoranda and other environmental documents which are in Seller's possession, custody or control and have been generated in the past five (5) years primarily regarding the Business or any of the Purchased Assets. Except as set forth in Part I of <u>Section 3.12 of the Seller Disclosure Schedule</u>:

(a)     Seller's operation of the Business and the Purchased Assets are, and for the past two (2) years has been, in compliance in all material respects with all applicable Environmental Laws;

(b)     Seller has obtained all Environmental Permits required under applicable Environmental Laws; each such Environmental Permit is described on Part II of <u>Section 3.12 of</u>

34

; each such Environmental Permit is either valid, subsisting and in full force and effect or remains effective as a result of the timely filing of a renewal application; and Seller is in compliance in all material respects with all obligations imposed by such Environmental Permits;

(c)     There are no unresolved pending Environmental Claims and, to Seller's Knowledge, there are no Environmental Claims threatened, in each case with respect to or against the Purchased Assets and that would reasonably be expected to result in material liabilities.

(d)     Seller has not in the past five (5) years received, entered into, or agreed to enter into, and is not subject to, any written citation, inquiry, judgment, consent decree or Order related to any actual or alleged violation of or failure to comply in any material respect with, or the cleanup of Hazardous Materials under, any Environmental Law with respect to the Purchased Assets or the operation of the Business;

(e)     Seller and its Affiliates have not and, to Seller's Knowledge, no other Person has Released Hazardous Materials at, on, under or from the Purchased Assets, except for any such Release that was in material compliance with Environmental Law or that will not require investigation, control, material expenditure or remediation pursuant to any Environmental Law;

(f)     Neither Seller nor any of its Affiliates has received written notice of actual or threatened material liability under CERCLA or any similar applicable Law from any Governmental Body or any third party with respect to the Purchased Assets or the Business that remains unresolved; and

(g)     This Section 3.12 contains the sole and exclusive representations and warranties of Seller with respect to environmental health and safety matters, including all matters arising under Environmental Laws or related to Hazardous Materials, Environmental Permits or Environmental Claims.

Section 3.13     **Permits**.

(a)     Seller possesses, and is in compliance in all material respects with, all Permits (other than Environmental Permits, which are covered exclusively by Section 3.12) required for the ownership and operation of the Business or the Purchased Assets. Section 3.13(a) of the Seller Disclosure Schedule sets forth a true, correct and complete list of all such Permits. Seller has made available to Buyer true, correct and complete copies of all such Permits.  Except as set forth in Section 3.13(a) of the Seller Disclosure Schedule, with respect to each such Permit:

(i)     it is valid, subsisting and in full force and effect in accordance with its terms;

(ii)     no outstanding written notice of revocation, cancellation or termination of any such Permit has been received by Seller or any of its Affiliates; and

(iii)     there is no Proceeding pending, or to Seller's Knowledge, threatened which seeks the revocation, cancellation, termination or suspension of any such Permit or

35

might otherwise directly and adversely affect the validity of any effective or proposed Permit, and there exists no basis for revocation, cancellation, termination or suspension of any such Permit.

(b)     Notwithstanding the foregoing, no representation or warranty is made in this Section 3.13 with respect to environmental matters, which are covered exclusively in Section 3.12.

Section 3.14     **Taxes**.

(a)     Seller or its Affiliates has timely filed or will file when due all Tax Returns that are required to be filed by it with respect to any Tax relating to the Business or the Purchased Assets, such Tax Returns were, and, with respect to Tax Returns to be filed, will be, correct and complete in all material respects, and Seller or its Affiliates has paid, and prior to the Closing will pay, all Taxes as shown on such Tax Returns as owing, except where such Tax is being contested in good faith through appropriate proceedings.

(b)     No notice of deficiency or assessment or failure to file has been received by Seller or its Affiliates from any Taxing Authority with respect to Liabilities for Taxes relating to the Business or the Purchased Assets and to Seller's Knowledge there are no Liens (except for Permitted Liens) on the Purchased Assets resulting from unpaid Taxes. There are no outstanding agreements or waivers extending the applicable statutory periods of limitation for Taxes associated with the Business or the Purchased Assets that will be binding upon Buyer, the Business, or the Purchased Assets after the Closing Date.

(c)     Except as set forth in Section 3.14(c) of the Seller Disclosure Schedule, Seller is not a party to any pending Proceeding with any Taxing Authority with respect to the Business or any of the Purchased Assets, and, to Seller's Knowledge, there is no threatened Proceeding by a Taxing Authority with respect to the Business or any of the Purchased Assets. Seller has not received written notice of any Proceeding by any Taxing Authority in any jurisdiction where it does not file Tax Returns or pay Taxes that it is or may be subject to Tax by that jurisdiction.

(d)     All Taxes that Seller is required by Law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holder or other third party have been duly withheld or collected, and have been paid over to the proper authorities to the extent due and payable.

(e)     To Seller's Knowledge, Seller has not undertaken any actions, activities, or transactions outside of this Agreement that would be inconsistent with any "occasional sale," "isolated sale," "bulk sale," or other similar exemption from any Transfer Tax with respect to the transactions contemplated by this Agreement.

(f)     Except for the representations and warranties contained in this Section 3.14, Seller makes no other express or implied representation or warranty with respect to Taxes.

Section 3.15     **Sufficiency of Purchased Assets; Condition of Purchased Assets**.

36

(a)     Except as set forth in <u>Section 3.15(a) of the Seller Disclosure Schedule</u>, the Purchased Assets constitute all of the assets, properties, rights and interests sufficient for the use, operation and maintenance of the West Lorain Facility immediately after the Closing in substantially the same manner as operated as of the Execution Date.

(b)     Except as set forth in <u>Section 3.15(b) of the Seller Disclosure Schedule</u> and for such exceptions as would not, individually or in the aggregate, reasonably be expected to, individually or in the aggregate, materially impact the conduct of the Business, the buildings, plants, structures, machinery and equipment included in the Purchased Assets are structurally sound, in good operating condition and repair, except for ordinary wear and tear and routine maintenance, and adequate for the uses to which they are being put.

Section 3.16     **Intellectual Property**. Except for the Purchased Intellectual Property, neither Seller nor its Affiliates own any Intellectual Property that is primarily related to or primarily used in connection with the Business. To Seller's Knowledge, (i) Seller's possession and use of the Purchased Intellectual Property, and the use of the Purchased Intellectual Property in connection with the Business as currently conducted, do not violate or infringe upon the Intellectual Property Rights of any Person, (ii) no Person (A) has notified Seller that the possession or use of Purchased Intellectual Property by Seller or any of its Affiliates is or may be violating or infringing upon the Intellectual Property Rights of any Person or (B) owns or has any other right in or to, or has claimed any ownership or other right in, the Purchased Intellectual Property, and (iii) no Person is infringing upon or violating any Purchased Intellectual Property, in each case, except where such violation or infringement, is not, and would not reasonably be expected to be, individually or in the aggregate, material to the ownership and operation of the Business or the Purchased Assets.

Section 3.17     **Insurance**. <u>Section 3.17 of the Seller Disclosure Schedule</u> sets forth a true, correct and complete list of the insurance policies maintained by Seller with respect to the Business or the Purchased Assets (the "***Insurance Policies***") and a description of all pending claims under each of the Insurance Policies pertaining to the ownership and operation of the Business or the Purchased Assets. The Insurance Policies are in full force and effect, and Seller has not received any notice of any pending or threatened termination of the Insurance Policies.

Section 3.18     **Absence of Certain Changes or Events**. Except as (a) set forth on <u>Schedule 3.18</u> and (b) for any action taken by Seller with respect to the Purchased Assets that would be permitted without Buyer's consent under <u>Section 5.01</u>, from December 31, 2017 through the Execution Date, Seller's ownership, operation and maintenance of the Purchased Assets has been conducted in accordance with the ordinary course of business consistent with past practices, except in connection with any process relating to the sale of the Purchased Assets, including entering into this Agreement. Since December 31, 2017, there has not been any change, event or effect that, individually or in the aggregate with other changes, events or effects, has result in or would reasonably be expected to result in a Seller Material Adverse Effect.

37

Section 3.19   **Real Property**.

(a)      Schedule 2.01(a) contains a true, correct and complete description, in all material respects, of each parcel of real property owned by Seller and used or held for use by Seller in connection with the Business. Schedule 2.01(b) contains a true and correct list, in all material respects, of all rights under the easements, rights of way, real property licenses, and other real property entitlements used or held for use by Seller in connection with the Business. Seller has (i) good and marketable fee simple title to all of the Owned Real Property, (ii) except as set forth in Section 3.19 of the Seller Disclosure Schedule, good and valid rights to use all of the Entitled Real Property, subject in each case to the terms and conditions of the applicable Contracts or documents granting, conferring, establishing or creating Seller's rights with respect to the Entitled Real Property with respect to the conduct of the Business, in each case free and clear of all Liens other than Permitted Liens and Liens arising under the FEG Mortgage Indenture.  There do not exist any actual, pending or, to Seller's Knowledge, threatened condemnation or eminent domain proceedings that affect any Owned Real Property, and neither Seller nor any of its Affiliates has received any written notice of the intention of any Governmental Body or other Person to take or use any Owned Real Property.

(b)      No default, event or condition that, with notice or lapse of time or both, would constitute a default of Seller or, to Seller's Knowledge, any counterparty thereto, has occurred or exists under any Contracts or documents granting, conferring, establishing or creating Seller's rights with respect to the Entitled Real Property, except where any such default would not have a Seller Material Adverse Effect, and all payment obligations of Seller with respect to the Entitled Real Property have been paid to the extent due and payable.

(c)      Seller has delivered to Buyer, prior to the Execution Date, true, correct and complete copies of all deeds, leases, licenses, mortgages, deeds of trust, certificates of occupancy, title insurance policies, title reports, search reports, surveys and similar documents, and all amendments thereof, with respect to the Real Property, to the extent in Seller's possession or reasonably obtainable prior to the Execution Date.

(d)      Except as set forth in Section 3.19 of the Seller Disclosure Schedule, there are no subleases, assignments, occupancy agreements or other agreements granting to any Person the right of use or occupancy of, or the right to operate in, any of the Owned Real Property that would reasonably be expected to materially interfere with the use or operation of the Business in substantially the same manner as operated as of the Execution Date.

Section 3.20   **Financial Statements**. The unaudited summary financial statements of Seller relating to the Purchased Assets and the Business for the calendar years 2015 through 2017 and for the nine (9) month period ended September 30, 2018 (collectively, the "*Financial Statements*") have been made available to Buyer. The Financial Statements (a) are true, correct and complete in all material respects, (b) have been prepared from the books and records of the Business, (c) have been prepared on a consistent basis throughout the periods involved, and (d) fairly present, in all material respects, the results of operations of Seller with respect to the Purchased Assets and the Business for the periods indicated, subject, in the case of the interim financial statements for the nine (9) month period ended September 30, 2018, to normal year-end adjustments (which are not expected to be material).

38

Section 3.21   **Credit Support**.   <u>Section 3.21 of the Seller Disclosure Schedule</u> sets forth a complete and accurate list of all credit support provided by Seller or any of its Affiliates to any other Person with respect to the Generating Facility, the Business or the Assumed Contracts.

Section 3.22   **Representations Complete**. Except as to those matters covered by the representations and warranties and indemnities in this Agreement and the other Transaction Agreements, (I) SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES WHATSOEVER (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS) TO BUYER AND (II) THE PURCHASED ASSETS ARE BEING CONVEYED ON AN "AS-IS, WHERE-IS" AND "WITH ALL FAULTS" BASIS, AND (III) Seller hereby disclaims all Liability and responsibility for any representation, warranty, statement, or information not included herein that was made, communicated, or furnished (orally or in writing) to Buyer or its representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Seller). Without limiting the foregoing, no other representation or warranty is made with respect to (a) the information included in any materials provided by Seller or its representatives to Buyer or its representatives, or any supplement or amendment thereof or other information provided in connection with the solicitation of proposals to acquire the Business or the negotiations related thereto or to this Agreement, such information being provided for Buyer's convenience only, (b) any projections, estimates or budgets delivered to or made available to Buyer of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future business and operations of the Business or (c) any other information or documents made available to Buyer or its Affiliates, counsel, accountants or other representatives or advisors with respect to the Business, in each case, except as expressly set forth in this Agreement and the other Transaction Agreements.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, that the representations and warranties in this <u>Article 4</u> are true, correct and complete as of the Execution Date and will be true, correct and complete as of the Closing Date (except for representations and warranties that speak as of a specific date or time, which need only be true, correct and complete as of such date or time):

Section 4.01   **Corporate Existence and Power**. Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Buyer is duly authorized to conduct its business and is in good standing under the Laws of each jurisdiction where such qualification is required, except where failure to be so qualified would not have, individually or in the aggregate, a Buyer Material Adverse Effect.

Section 4.02   **Corporate Authorization**. Buyer has the relevant entity power and authority necessary to execute and deliver each Transaction Agreement to which it is a party and to perform its obligations thereunder and to consummate the Transactions. Buyer has taken

all action necessary to authorize the execution and delivery of each Transaction Agreement to which it is a party, the performance of its respective obligations thereunder, and the consummation of the Transactions. Each Transaction Agreement to which Buyer is a party has been duly authorized by, and has been or will be duly executed, and delivered by, and, assuming the due authorization, execution and delivery thereof by each counterparty, is Enforceable against, Buyer.

Section 4.03 **Governmental Authorization**. Except as set forth in <u>Section 4.03 of the Buyer Disclosure Schedule</u>, the execution, delivery and performance by Buyer of the Transaction Agreements to which it is a party and the consummation of the Transactions require no action by or in respect of, or filing with, any Governmental Body other than any such action or filing as to which the failure to take, make or obtain would not have a Buyer Material Adverse Effect.

Section 4.04 **Noncontravention**. Except as set forth in <u>Section 4.04 of the Buyer Disclosure Schedule</u> and subject to the actions and filings set forth in <u>Section 4.03 of the Buyer Disclosure Schedule</u>, the execution, delivery and performance by Buyer of the Transaction Agreements to which it is a party and the consummation of the Transactions do not and will not (a) result in a violation of the organizational documents of Buyer, (b) violate any applicable Law or (c) require any consent or other action by any Person under, constitute a default under or give rise to any right of termination, cancellation or acceleration of any material right or obligation or to a loss of any material benefit to which Buyer is entitled under any provision of any agreement or other instrument binding upon Buyer; <u>provided</u>, that in the cases of clauses (b) and (c), except where the violation, default, termination, cancellation, or acceleration would not have a Buyer Material Adverse Effect.

Section 4.05 **Finders' Fees**. There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Buyer or any of its Affiliates who might be entitled to any fee or commission from Seller or any of its Affiliates upon consummation of the Transactions.

Section 4.06 **Available Funds; Equity Commitment Letter**.

(a)      Buyer has access to, and will have available to it at the Closing all of the funds required to be provided by Buyer for the consummation of the Transactions and for the satisfaction of all of Buyer's obligations under the Transaction Agreements.

(b)      Buyer has provided to Seller a true, correct and complete copy of the Equity Commitment Letter. The Equity Commitment Letter has been duly authorized and executed by Buyer and each Fund. The obligations of the Funds to fund the commitment under the Equity Commitment Letter are not subject to any condition that is not set forth expressly in the Equity Commitment Letter. The Commitment Letter constitutes, and at the Closing will constitute, the legal, valid and binding obligation of each Fund, enforceable by Buyer against each Fund in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, arrangement, moratorium or other similar Laws now or hereafter in effect relating to or affecting creditors' rights generally, and general equitable principles (whether considered in a proceeding in equity or at law).

40

Section 4.07 **Solvency**. Buyer is solvent for all purposes under federal bankruptcy and applicable state fraudulent conveyance transfer and fraudulent conveyance Laws. Buyer's payment of the Purchase Price hereunder at the Closing will not render Buyer insolvent and does not constitute a fraudulent transfer or conveyance under such law.

Section 4.08 **Litigation**. Except as set forth in <u>Section 4.08 of Buyer Disclosure Schedule</u>, there is no Proceeding pending against, or to the Knowledge of Buyer, threatened against or affecting, Buyer before any court or arbitrator or any Governmental Body, which if determined adversely to Buyer, would have a Buyer Material Adverse Effect, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by the Transaction Agreement.

Section 4.09 **No Other Representations**. Buyer has inspected and investigated the Purchased Assets and knowingly and voluntarily accepts such Purchased Assets on an "AS IS, WHERE IS" basis, subject only to the express representations and warranties and indemnities and other terms and conditions of this Agreement and the other Transaction Agreements.

ARTICLE 5

COVENANTS

Section 5.01 **Conduct of Business Through the Closing**.

(a)        Except (i) as otherwise expressly contemplated by this Agreement, (ii) as disclosed in <u>Section 5.01 of the Seller Disclosure Schedule</u>, (iii) for any limitations imposed on Seller as a result of its status as a debtor-in-possession in the Bankruptcy Cases, including the exercise of its fiduciary duties to maximize the value of its estate and <u>provided</u>, <u>however</u>, that, Seller's obligations under this <u>Section 5.01</u> shall be subject to any limitations on its ability to perform such covenants pursuant to the Bankruptcy Code, including Seller's ability to pay amounts relating to the period prior to the Petition Date and the impact of Seller's filing for bankruptcy with respect to any Contract to which it is a party or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), during the period from the Execution Date to and through the Closing, Seller shall (A) conduct the Business in the ordinary course consistent with past practice and Good Industry Practices, (B) use commercially reasonable efforts to preserve intact in all material respects the current business organization and operations of the Business and maintain existing relations with Governmental Bodies, suppliers, vendors, lessors, employees, agents, licensors, and contractors, in each case with respect to the Business, and (C) use commercially reasonable efforts to maintain all Permits listed on <u>Section 3.12</u> and <u>Section 3.13(a) of the Seller Disclosure Schedule</u> in accordance with their terms.

(b)        Without limiting the generality of the foregoing, except (i) as otherwise expressly contemplated by this Agreement, (ii) as disclosed in <u>Section 5.01 of the Seller Disclosure Schedule</u>, or (iii) for any limitations imposed on Seller as a result of its status as a debtor in possession in the Bankruptcy Cases, including the exercise of its fiduciary duties to maximize the value of its estate or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), during the period from the

41

Execution Date to and through the Closing, Seller agrees that it shall not effect any of the following (as each pertains to or is related to the Business, the Purchased Assets or the Assumed Liabilities):

(i)    sell, assign, transfer, convey, license or dispose any Purchased Assets with a value, in the aggregate in excess of $100,000 or incur any Liens on any Purchased Assets (other than Permitted Liens) or allow any Purchased Assets to become subject to any Lien (other than Permitted Lien or a Lien to be released in connection with the Closing);

(ii)    fail to maintain all of the physical Purchased Assets in good operating condition (ordinary wear and tear excepted), and in a state of repair and condition that complies with applicable Law;

(iii)    make any modification, amendment or extension to any Assumed Contract, in each case other than in the ordinary course of business consistent with past practice or Contract governing any Entitled Real Property (it being understood that Seller is not obligated to enter into any new Contract or to amend, modify, renew or extend any Assumed Contract or Contract governing any Entitled Real Property);

(iv)    cancel, terminate, fail to renew or materially amend, modify or change any Permit;

(v)    make any capital expenditures or enter into a commitment with respect thereto, except with respect to (A) capital expenditures or commitments in accordance with Good Industry Practice that do not exceed $500,000 in the aggregate, (B) as may be necessitated by an emergency situation which has caused, or which imminently threatens to cause, injury or damage to persons, property, or to the environment or to result in non-compliance with applicable Law, Contracts or Permits (in which case Seller shall promptly notify Buyer of such expenditure), or (C) as reflected in the capital expenditure schedule set forth in Section 5.01 of the Seller Disclosure Schedule;

(vi)    increase the level of wages, compensation or other benefits of any Business Employee in any material respect (except for increases in salary or hourly wage rates in the ordinary course of business consistent with past practice or the payment of accrued or earned but unpaid bonuses, or as may be required by Law or Contract (as in existence as of the Execution Date));

(vii)    terminate the employment of any Business Employee, or hire any Business Employee, in each case other than in the ordinary course of business consistent with past practice;

(viii)    enter into any employment agreement, severance, retention or bonus agreement or other Contract with or with respect to a Business Employee, except in the ordinary course of business consistent with past practice or as may be required by Law or Contract (as in existence as of the Execution Date);

42

(ix)     incur, assume, guaranty or otherwise become liable in respect of any Indebtedness that could become an Assumed Liability;

(x)     institute or settle any Proceeding (whether at law or in equity), Order, ruling or arbitration that could become an Assumed Liability;

(xi)     fail to maintain in all material respects or fail to replace or renew the Insurance Policies or policies substantially similar thereto;

(xii)     make any new, or change any existing, election with respect to Taxes, settle any Tax Liability, or enter into any agreement with respect to Taxes, in each case, to the extent that any such action would reasonably be expected to have an adverse impact on the Purchased Assets;

(xiii)     except as required by concurrent changes in applicable Law or GAAP, make any change its accounting methods, principles or practices, including its accounting system used to determine the Book Value of Inventory and spare parts with respect to the West Lorain Facility; and

(xiv)     agree or commit to do any of the foregoing.

Notwithstanding the foregoing, Seller may, to the extent required by applicable Law, and without Buyer's prior written consent, take any action otherwise prohibited by this Section 5.01, provided, that Seller shall inform Buyer in writing prior to taking any such action.

Section 5.02     **Access to Information**.

(a)     From the Execution Date through the Closing Date, Seller shall:

(i)     give Buyer, its counsel, financial advisors, lenders, auditors and other authorized representatives, upon reasonable notice from Buyer, reasonable access to the offices, properties, employees and Records of Seller to the extent relating to the Business or the assets that would be Purchased Assets.

(ii)     furnish to Buyer, its counsel, financial advisors, lenders, auditors and other authorized representatives such other information relating to the Business, the Generating Facility or the assets that would be Purchased Assets (including updated financial statements, to the extent available) as such Persons may reasonably request; and

(iii)     instruct Seller's or Seller's Affiliate's employees, counsel and financial advisors and its Affiliates to reasonably cooperate with Buyer in Buyer's and its lenders' investigation (including in connection with any debt financing) of the Business, the Generating Facility or the assets that would be Purchased Assets.

Buyer shall have no right to perform any environmental sampling, testing or invasive or subsurface investigations of the Real Property of any type, and any investigation pursuant to this Section 5.02(a) shall be conducted in such manner as not to unreasonably interfere with the conduct of the Business. Notwithstanding the foregoing, Buyer shall not have access to

43

(i) personnel records of Seller or any of its Affiliates relating to individual performance or evaluation records, medical histories or other information which in Seller's good faith opinion is sensitive or the disclosure of which could subject Seller or its Affiliates to risk of Liability except to the extent the same relate to Business Employees, (ii) any information which is subject to any attorney-client or other privilege in favor of Seller or any confidentiality obligation by which Seller is bound (provided, Seller will use its commercially reasonable efforts to obtain any required third party consents to provide such information to Buyer or to mitigate any concerns relating to any loss of privilege, including by executing a joint defense agreement, as the case may be), or (iii) any information the provision of which Seller reasonably and in good faith believes may cause Seller to violate applicable Law. Prior to the entry of the Sale Order, without the prior written consent of Seller (which consent shall not be unreasonably withheld, conditioned or delayed), Buyer shall not contact, regarding the Transactions, any suppliers to, or customers or the constituencies of, the Business (with respect to the Business or the assets that would be Purchased Assets). Buyer shall, and shall cause its representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 5.02(a). From and after the Closing Date, Seller shall afford Buyer and its representatives reasonable access to its properties, books, records, and employees to the extent necessary to further effectuate the completion of the Transactions (for example, for purposes of any Tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Seller and Buyer in connection with this Agreement, the Transaction Agreements or otherwise); provided, that any such access by Buyer shall not unreasonably interfere with the conduct of the business of Seller.

(b)     After the Closing Date, Buyer will, as promptly as reasonably practicable, afford Seller and its agents reasonable access to its properties, books, records, and employees to the extent necessary to permit Seller to determine any matter relating to its rights and obligations hereunder or to any period ending on or before the Closing Date (for example, for purposes of any Tax or accounting audit or any claim or litigation matter, but not for any dispute or claim between Buyer and Seller in connection with this Agreement, the Transaction Agreements or otherwise); provided, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Buyer.

(c)     Seller shall use commercially reasonable efforts and take those actions and take all necessary steps in order to transfer any PJM accounts relating to the Purchased Assets as of the Closing to Buyer.

(d)     As promptly as reasonably practicable following the Execution Date, and in any event prior to the Closing Date, Seller shall provide Buyer with a current Phase I environmental site assessment (the "*Phase I Report*") for the West Lorain Facility from HZW Environmental Consultants, LLC or another consultant selected by Seller and reasonably acceptable to Buyer (the "*Environmental Consultant*") allowing reliance by Buyer.  Without in any way limiting Section 5.02(a)(i), Seller will provide Buyer and its representatives with all information reasonably requested by Buyer in connection with Buyer's due diligence review of such Phase I Report, including, upon reasonable notice, reasonable access to the West Lorain Facility, the Environmental Consultant and to Seller and its representatives.  Seller agrees that, upon notice to Seller, Buyer may communicate directly with the Environmental Consultant and that compliance with this Section 5.02(d) will not constitute a breach of this Agreement or the Confidentiality

44

Agreement; provided that Buyer shall allow Seller the opportunity to participate in such communications.

Section 5.03    **Further Assurances**. Subject to the terms and conditions of this Agreement, the Parties will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Transactions. The Parties agree to execute and deliver, or cause to be executed and delivered, such other documents, certificates, agreements and other writings as may be reasonably necessary after the Closing to implement expeditiously the Transactions; provided, that Buyer acknowledges that any such activities by Seller may be subject to the approval of the Bankruptcy Court.

Section 5.04    **Certain Actions**. The Parties shall reasonably cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Body is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 5.05    **Public Announcements**. No Party will issue any press release or make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties, except for any press releases or public statements the making of which are advisable by each Party's legal counsel (including in connection with the Bankruptcy Cases) or required by applicable Law or Contract, the Bankruptcy Court, regulation or any listing agreement with any national securities exchange; provided, that Seller may issue a press release announcing Seller's entry into this Agreement with Buyer, and provided, further, that prior to such issuance, Seller shall consult with Buyer.

Section 5.06    **Supplements to Seller Disclosure Schedule**. Seller shall, from time to time prior to the Closing by written notice to Buyer, (a) supplement the Assumed Contracts listed on Schedule 2.01(f) with Contracts entered into in accordance with Section 5.01 that relate exclusively to the Purchased Assets, and (b) supplement the Seller Disclosure Schedule or add a schedule or section to the Seller Disclosure Schedule with a corresponding reference to be added in this Agreement to disclose any matter arising after the Execution Date (each a "***Schedule Supplement***"), and, to the extent that Buyer does not terminate this Agreement in connection therewith (if it is entitled to do so under Article 9), each such Schedule Supplement shall be deemed to be incorporated into and to supplement and amend the Seller Disclosure Schedule subject to the last sentence of this Section 5.06. If the event, development or occurrence which is the subject of the Schedule Supplement constitutes or relates to something that would provide Buyer with a reasonably apparent right to terminate this Agreement in accordance with its express terms and Buyer has the right to, but does not elect to terminate this Agreement within ten (10) Business Days of its receipt of such Schedule Supplement (together with all additional information reasonably requested by Buyer in the ready possession of Seller), then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement in connection therewith.

Section 5.07    **Antitrust Clearance**.

(a)    Notwithstanding any provision to the contrary in this Agreement, the Parties shall, as promptly as possible, use their commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Bodies under Antitrust Laws that may be or become necessary for the execution and delivery of this Agreement and the performance of their obligations pursuant to this Agreement and the other Transaction Agreements. Each Party shall cooperate fully with the other Parties and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The Parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any such required consents, authorizations, orders and approvals. Each Party hereto agrees to make an appropriate filing pursuant to the HSR Act with respect to the Transactions within five (5) Business Days after the entry of the Sale Order and to supply as promptly as practicable to the appropriate Governmental Body any additional information and documentary material that may be requested pursuant to the HSR Act. Without limiting the foregoing, the Parties shall request and shall use commercially reasonable efforts to obtain early termination of the waiting period under the HSR Act. Each Party agrees not to commit to or agree with any Governmental Body to stay, toll or extend any applicable waiting period under the HSR Act, without the prior written consent of the other Party.

(b)    Each Party shall promptly notify and inform the others of any communication concerning this Agreement or other transactions contemplated by this Agreement from any Governmental Body, it being understood that correspondence, filings and communications received from any Governmental Body shall be provided to the others upon receipt, subject in appropriate cases to appropriate confidentiality agreements to limit disclosure to outside lawyers and consultants. Unless prohibited by Law, the Parties shall, to the extent reasonably practicable, not participate or agree to participate in any meeting or engage in substantive discussion with any Governmental Body relating to any filings or investigation concerning this Agreement or the Transactions unless it consults with the others and their representatives in advance and invites the other Party's representatives to attend, subject in appropriate cases, to appropriate confidentiality agreements to limit disclosure to outside lawyers and consultants, unless the Governmental Body prohibits such attendance.

(c)    Except as prohibited by Law, each Party shall (i) consult with each other prior to taking any material substantive position with respect to the filings under the HSR Act or any other Antitrust Law in discussions with or filings to be submitted to any Governmental Body, (ii) permit the other to review and discuss in advance, and consider in good faith the views of the other in connection with, any analyses, presentations, memoranda, briefs, arguments, opinions and proposals to be submitted to any Governmental Body with respect to filings under the HSR Act or any other Law, and (iii) coordinate with the other in preparing and exchanging such information and promptly provide the other (and its counsel) with copies of all filings, presentations or submissions (and a summary of any oral presentations) made by such party with any Governmental Body relating to this Agreement or the transactions contemplated hereby under the HSR Act or any other Antitrust Law.

(d)    Notwithstanding anything in this Agreement to the contrary, Buyer shall use its commercially reasonable efforts to promptly take any and all actions necessary or advisable to

46

obtain expiration or termination of the required waiting periods and any consents, clearances or approvals required under or in connection with the HSR Act, any other Antitrust Law, and any other federal or state Law, regulation or decree designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade or harm to competition and to avoid or eliminate each and every impediment under any Antitrust Law, in each case, to cause the Transactions to occur as soon as practicable following the Execution Date and, in any event, prior to the End Date, including (i) expeditiously complying with or modifying any requests or inquiries for additional information or documentation (including any second request) by any Governmental Body, and (ii) contesting, defending and appealing any threatened or pending Proceeding or preliminary or permanent injunction or other Order that would adversely affect the ability of any Party hereto to consummate, or otherwise delay the consummation of, the Transactions and taking any and all other actions to prevent the entry, enactment or promulgation thereof.

(e)        The parties expressly acknowledge and agree that nothing in this Agreement, including Section 5.07(d), shall require Buyer to (i) consent to any material condition or concession requested by any Governmental Body or third party; (ii) consent to any divestitures of any subsidiary or assets of Buyer or its Affiliates, or of the Business or the Purchased Assets, or accept any limitation on or condition on the manner in which any of the foregoing conducts their business; (iii) pay any material amounts required or requested by any Governmental Body (other than filing fees); (iv) accept any material capital expenditure commitments required for the West Lorain Facility following the Closing; or (v) accept an agreement to hold separate any portion of any business or of any assets of any subsidiary of Buyer or its Affiliates, or of the Business or the Purchased Assets.

Section 5.08    **Approvals**.

(a)        Other than with respect to matters covered by <u>Section 5.07</u> of this Agreement, each Party shall use its commercially reasonable efforts to obtain all authorizations, consents, actions, orders, and approvals of, and to give all notices to and make all filings with, all Governmental Bodies and third parties that are, may be or become necessary for its execution and delivery of, and the performance of its obligations under, this Agreement and the consummation of the Transactions and will cooperate fully with the other Party in promptly seeking to obtain all such authorizations, consents, actions, orders, and approvals, giving such notices, and making such filings, including with respect to the FERC 203 Approval. The Parties shall use commercially reasonable efforts to file the necessary application seeking the FERC 203 Approval no later than fifteen (15) days after the Execution Date.

(b)        Buyer shall use its commercially reasonable efforts to obtain, at the sole cost of Buyer, the Buyer's Required Approvals, and prepare and submit to FERC the necessary filings for the Buyer's Required Approvals, no later than fifteen (15) days after the filing of the joint FERC 203 application and Seller's Reactive Service filing pursuant to Schedule 2 of the PJM Tariff. Buyer shall have sole responsibility for, and sole discretion concerning, all statements and representations made in seeking the Buyer's Required Approvals, and shall provide Seller with a draft of, and an opportunity to comment on, such filings. Notwithstanding the foregoing, Seller shall cooperate with Buyer in promptly providing  such information as Buyer may reasonably require in connection with preparing, submitting to FERC and obtaining the Buyer's Required

Approvals, including any information necessary to comply with formal or informal requests received from FERC concerning the filings for these approvals.

Section 5.09 **Notices of Certain Events**. Without limiting the Parties' representations or warranties in this Agreement, Seller, on the one hand, and Buyer, on the other hand, shall promptly notify the other of (provided, that any matters disclosed in any such notice and/or update (and not pursuant to Section 5.06) shall not be deemed to have (i) amended this Agreement, including any Buyer Disclosure Schedule or Seller Disclosure Schedule, (ii) qualified any representations and warranties of such Party, or (iii) cured any misrepresentation or breach of the representations or warranties of such Party that otherwise might have existed hereunder by reason of such matter):

(a)       any notice or other communication received from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(b)       any material notice or other material communication received from any Governmental Body in connection with the Transactions;

(c)       any Proceeding commenced relating to the Purchased Assets or the Business of which it receives notice or any other fact, circumstance, event or action, the existence, occurrence or taking of which, individually or in the aggregate, (i) would reasonably be expected to have a Seller Material Adverse Effect or Buyer Material Adverse Effect, as applicable, (ii) has resulted in, or would reasonably be expected to result in, any representation or warranty made by the notifying Party hereunder not being true and correct in any material respect, or (iii) would reasonably be expected to result in the failure of any of the conditions set forth in Article 7 to be satisfied; and

(d)       any Proceeding which in any manner challenges or seeks to prevent, enjoin, alter or delay the Transactions.

Section 5.10 **Certain Employee Matters**.

(a)       With respect to Business Employees whose employment is not governed by a CBA, Buyer or its designee shall accept the transfer of employment of all such Business Employees who (i) remain employed by Seller immediately prior to the Closing Date; and (ii) as of the Closing Date, are actively at work or are on a previously scheduled and approved paid time-off or other paid or unpaid leave of absence. Buyer or its designee will employ the Transferred Employees whose employment is not governed by a CBA in substantially similar positions and on terms and conditions substantially comparable in the aggregate to each Business Employee's employment immediately prior to the Closing Date. In no case, however, will Buyer provide any Business Employee base salary or hourly rate that is less than his or her current base salary or hourly rate.  Subject to the foregoing, for a period of at least eighteen (18) months following the Closing Date, Buyer shall provide, or cause to be provided, to each Transferred Employee whose terms and conditions of employment are not governed by a CBA, compensation and employee benefits that are no less favorable when taken as a whole than the compensation and employee benefits provided to each such Business Employee immediately

48

prior to the Closing Date, which compensation and benefits for each such Business Employee as of the Execution Date have been made available to Buyer in File 2.7.5 of the Datasite.

(b)     Effective as of the Closing Date, with respect to Business Employees whose employment is governed by a CBA, Buyer or its designee shall recognize each of the incumbent unions that represent any Business Employees, Buyer or its designee shall accept the transfer of employment of all Business Employees whose employment is governed by a CBA, and Buyer or its designee shall assume and comply with the collective bargaining agreements listed in Section 3.11(b) of the Seller Disclosure Schedule (collectively, the "*CBAs*"); provided, however, that (i) neither Buyer nor its designee will be required to assume any non-replicable portion of any CBA, and (ii) Buyer or its designee shall bargain in good faith with the relevant incumbent unions to amend the CBAs or execute replacements thereof as reasonably necessary to address non-replicable portions of the CBAs. For the purposes of this Section 5.10(b), "non-replicable portions of the CBA" refers solely to provisions or terms of the CBAs for which Buyer's assumption is a legal impossibility. Subject to Buyer's or its designee's duty to bargain in good faith, Buyer intends to provide, or to cause its designee to provide, compensation and benefits, including new defined contribution plans with employer contributions, which in the aggregate, are substantially comparable to those currently provided.

(c)     Any Business Employee who becomes an employee of Buyer or its designee as of the Closing pursuant to Sections 5.10(a) and 5.10(b) of this Agreement shall each be deemed to be a transferred employee for all purposes of this Agreement (each such employee, a "*Transferred Employee*"). For each Transferred Employee whose employment is not governed by a CBA who, within eighteen (18) months following the Closing Date is involuntarily terminated by Buyer or its designee without cause, Buyer shall provide or cause to be provided severance and other separation benefits to each such Transferred Employee in the amounts set forth on Schedule 5.10(c).

(d)     Seller shall be responsible for those Liabilities set forth in Section 2.04(e) and Buyer shall be responsible for the Liabilities and obligations set forth in Section 2.03(d) in the manner provided therefor.

(e)     Buyer shall use its commercially reasonable efforts to take such action as is necessary to cause the transactions contemplated hereby not to trigger any Liability under the Workers Adjustment and Retraining Notification Act, as amended, and any similar state Laws (the "*WARN Act*") (including employing a sufficient number of Business Employees and offering such substantially similar compensation and benefits to the Business Employees as to prevent any "mass layoff" or "plant closing" from occurring within the meaning of the WARN Act) and Buyer shall indemnify and hold harmless Seller with respect to any Liability under the WARN Act arising from any actions taken by Buyer, its Affiliates or its designee on or after the Closing Date in connection with the transactions contemplated by this Agreement.

(f)     As of the Closing, Seller or each ERISA Affiliate shall take all necessary actions to cause the defined contribution plans maintained by Seller or such ERISA Affiliate to fully vest the Business Employees in their account balances under such defined contribution plans.

49

Section 5.11    **Confidentiality**.

(a)        Each Party acknowledges and agrees that the Confidentiality Agreement remains in full force and effect until the Closing, at which time it will be deemed terminated in accordance with its terms; provided, that the terms of the Confidentiality Agreement will be incorporated herein with respect to all information that is provided to Buyer pursuant to this Agreement to the extent explicitly designated herein as subject to the terms of the Confidentiality Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 5.11(a) shall nonetheless continue in full force and effect in accordance with the terms of the Confidentiality Agreement.

(b)        Upon and for a period of three (3) years following the Closing, Seller shall, and shall cause its Affiliates and representatives to, keep confidential all non-public information regarding the Purchased Assets or the Business, except for (i) such public disclosure as Seller and its counsel may reasonably determine to be required under any applicable Law, regulation, stock exchange requirement or Order (provided, Seller will provide Buyer with prior written notice of any such disclosure and, where applicable and reasonably requested by Buyer and at Buyer's sole cost and expense, will use commercially reasonable efforts to cooperate with Buyer to obtain a protective order or other confidential treatment or otherwise limit the scope of information that is required to be disclosed, and Seller shall only disclose that portion of such information as Seller is advised by its in counsel in writing is required to be disclosed) and (ii) disclosure to its representatives solely to the extent that such parties need to know such information and agree to be bound by confidentiality obligations no less protective than those set forth in this Section 5.11(b).  Seller will be responsible for any disclosure by its Affiliates and representatives of any such non-public information regarding the Purchased Assets or the Business to the same degree as if such disclosure were made by Seller.

Section 5.12    **Insurance**. Seller shall use commercially reasonable efforts to maintain or cause to be maintained in full force and effect the Insurance Policies or adequate replacements applicable to its assets that would be Purchased Assets until the Closing. Without limiting the rights of Buyer set forth elsewhere in this Agreement, if any claims are made or Damages occur or are suffered prior to the Closing Date that relate to any of the Purchased Assets, and such claims, or claims associated with such Damages, may be made against the Insurance Policies, then Seller shall use its commercially reasonable efforts to ensure that after the Closing Date, Seller, on behalf of Buyer, can file, notice and otherwise continue to pursue such claims and recover proceeds under the terms of such policies, and Seller agrees to otherwise cooperate in good faith with Buyer or its Affiliates to make the benefits and proceeds of any Insurance Policies available to Buyer or its Affiliates, at the expense of Buyer or its Affiliates.

Section 5.13    **Risk of Loss**.

(a)        If any assets that would be Purchased Assets are damaged or destroyed by casualty loss or a forced outage occurs prior to the Closing (in either case, a "***Casualty Loss***") and the sum of the cost of restoring such damaged or destroyed assets in the aggregate with all other such damaged destroyed assets prior to the Closing, to a condition reasonably comparable to their prior condition (as estimated by a qualified firm reasonably acceptable to Buyer and Seller) (such aggregate sum plus any lost net revenues reasonably expected to accrue after the

50

Closing as a result of such losses, the "**Restoration Cost**"), is greater than 0.5% of the Initial Purchase Price but does not exceed 10% of the Initial Purchase Price, Seller may elect, by written notice to Buyer, to (i) reduce the amount of the Purchase Price by the amount of such Restoration Cost net of any amounts paid by Seller prior to the Closing in connection with any restoration work related thereto, provided, that such restoration work results in the restoration of the damaged or destroyed assets to a condition reasonably comparable to their prior condition (as estimated by a qualified firm reasonably acceptable to Buyer and Seller) (such amount, the "**Adjusted Restoration Cost**"), or (ii) to restore, at Seller's sole cost and expense, such damaged or destroyed assets to a condition reasonably comparable to their prior condition (as estimated by a qualified firm reasonably acceptable to Buyer and Seller), and such Casualty Loss shall not affect the Closing or be deemed to cause any of the conditions to Closing set forth in Article 7 to be unsatisfied. If Seller does not make such an election within thirty (30) days after the date of such Casualty Loss (but in any event at least twenty (20) days prior to the Closing Date), Seller shall be deemed to have elected the option in clause (i) of the immediately preceding sentence. If the Restoration Cost is in excess of 10% of the Initial Purchase Price, either Party may, by notice to the other within thirty (30) days after Buyer's receipt of written notice of such Casualty Loss, elect to terminate this Agreement by providing written notice to the other, and if neither Buyer nor Seller elects to terminate this Agreement within such period, then the parties will proceed to Closing and the Purchase Price will be reduced by the Adjusted Restoration Cost. If the Restoration Cost is 0.5% of the Initial Purchase Price or less, neither Buyer nor Seller shall have the right or option to terminate this Agreement, the Casualty Loss shall not affect the Closing or be deemed to cause any of the conditions to Closing set forth in Article 7 to be unsatisfied and Buyer shall be entitled to receive all casualty insurance proceeds received by Seller, less any amounts expended by Seller or any of its Affiliates in connection with any repair applicable to a Restoration Cost. Buyer shall cause any insurance proceeds received by Buyer after the Closing to be assigned to Seller to the extent any deduction of the Purchase Price pursuant to this Section 5.13(a) corresponds to such insurance proceeds. For the avoidance of doubt, Seller has no obligation to make any such election or perform any such work.

(b)      If any assets that would be Purchased Assets are taken by condemnation prior to Closing and (x) the sum of the condemnation value of such assets in the aggregate with all other such taken or condemned assets prior to the Closing (as determined by a qualified firm reasonably acceptable to Buyer and Seller) (such aggregate sum plus any lost net revenues reasonably expected to accrue as a result of such takings or condemnations, the "**Condemnation Value**"), is greater than 0.5% of the Initial Purchase Price but does not exceed 10% of the Initial Purchase Price and (y) such condemned assets are not material to the conduct of the Business, Seller may elect, by written notice to Buyer, to (i) reduce the Purchase Price by the amount of such Condemnation Value net of and after giving effect to any condemnation award proceeds paid to Seller prior to Closing (such net sum, the "**Adjusted Condemnation Value**") in excess of 0.5% of the Initial Purchase Price or (ii) to replace such assets that are taken by condemnation at any time prior to the Closing with reasonably comparable assets, and such condemnation shall not affect the Closing or be deemed to cause any of the conditions to Closing set forth in Article 7 to be unsatisfied. If Seller does not make such an election within thirty (30) days after the award of the condemnation proceeds (but in any event at least twenty (20) days prior to the Closing Date), Seller shall be deemed to have elected the option in clause (i) of the immediately preceding sentence.  If (1) the Condemnation Value is in excess of 10% of the Initial Purchase Price or (2) the condemned assets are material to the conduct of the Business, then, either Party

51

may, by notice to the other within thirty (30) days after the notice of the condemnation proceeds (but in any event at least twenty (20) days prior to the Closing Date), elect to terminate this Agreement, by providing written notice to the other, and if neither Buyer nor Seller elects to terminate this Agreement within such period, then the parties will proceed to Closing and the Purchase Price will be reduced by the Adjusted Condemnation Value. If the Condemnation Value is 0.5% of the Initial Purchase Price or less and such condemned assets are not material to the conduct of the Business, neither Buyer nor Seller shall have the right or option to terminate this Agreement, such condemnation shall not affect the Closing or be deemed to cause any of the conditions to Closing set forth in Article 7 to be unsatisfied and Buyer shall be entitled to receive all condemnation proceeds received by Seller or any of its Affiliates. Buyer shall cause any condemnation proceeds received by Buyer after the Closing to be assigned to Seller to the extent any deduction of the Purchase Price pursuant to this Section 5.13(b) corresponds to such condemnation proceeds. For the avoidance of doubt, Seller has no obligation to make any such election.

(c)     To assist Buyer in its evaluation of a Casualty Loss or condemnation event, Seller shall provide Buyer with such access to the Purchased Assets and such information as Buyer may reasonably request in connection therewith. With respect to any Casualty Loss or condemnation event prior to the Closing that is covered by any occurrence-based insurance policy maintained by Seller or its Affiliates (a "*Pre-Closing Claim*") and for which Buyer is entitled to the insurance proceeds under Section 5.13(a) or Section 5.13(b), as applicable, at Buyer's request Seller shall use its commercially reasonable efforts to pursue and collect insurance proceeds under any such occurrence-based insurance policy with respect to such Pre-Closing Claim to which Buyer is so entitled as hereinabove provided. In the event that, after the Closing, Seller or any of its Affiliates receives insurance proceeds with respect to any such Pre-Closing Claim to which Buyer is entitled as aforesaid, Seller shall pay to Buyer, within ten (10) Business Days of receipt thereof, an amount equal to such insurance proceeds, minus (i) Seller's and its Affiliates' reasonable, documented out-of-pocket costs and expenses actually incurred in connection with obtaining such insurance proceeds and (ii) any amount of such proceeds in respect of reimbursement to Seller and its Affiliates for pre-Closing out-of-pocket repair costs incurred or pre-Closing business interruption losses. If the Closing occurs and there is a reduction in the Purchase Price related to the occurrence of a Casualty Loss or condemnation event under this Section 5.13, then Buyer shall use its commercially reasonable efforts to pursue and collect such insurance proceeds or award, and if after Closing, Buyer or its Affiliate receives any such insurance proceeds or award, Buyer shall pay to Seller, within ten (10) Business Days of receipt thereof, an amount equal to such insurance proceeds or condemnation award, minus (x) Buyer's and its Affiliates' reasonable, documented out of pocket costs and expenses actually incurred in connection with obtaining such proceeds or award and (y) related increases in insurance premiums, up to the amount of such reduction in the Purchase Price.

(d)     Notwithstanding anything to the contrary in this Agreement, if Seller elects to restore any damaged or destroyed assets to their prior condition in accordance with clause (i) of Section 5.13(a) above, Seller shall use its commercially reasonable efforts to complete, or cause to be completed, all such restoration, repair or replacement work as promptly as reasonably practicable, and the Closing Date shall be postponed for the amount of time reasonably necessary to complete such restoration, repair or replacement of such assets. If such restoration, repair or replacement has not been completed by the End Date, but Seller is diligently pursuing the

52

completion thereof at such time, the End Date will be extended to allow for such restoration, repair or replacement to be completed; provided, however, that in no event shall the End Date be extended for more than thirty (30) days pursuant to this Section 5.13(d). Subject to the Parties' termination rights under Section 9.01(b), the Closing shall occur on the first Business Day following the End Date (as extended pursuant to the immediately preceding sentence) on which each of the conditions set forth in Article 7 have been satisfied or waived. To the extent that any repairs or restorations elected by Seller under Section 5.13(a) have not been completed when the Closing occurs, the Purchase Price shall be reduced by an amount equal to the Adjusted Restoration Cost for all damaged or assets which have not been fully restored to a condition reasonably comparable to their prior condition less reasonable and documented amounts spent by Seller to repair or restore such assets.

Section 5.14    **Title Insurance and Survey**.

(a)    Seller has made available to Buyer Seller's current owner's title insurance commitment and most recent survey, for the Real Property. Buyer shall use commercially reasonable efforts to obtain (and deliver copies thereof to Seller), at any time prior to the date that is forty-five (45) days prior to the End Date (the "*Title Review End Date*"), a Survey (as hereinafter defined) and a commitment for title insurance or pro forma policy or policies of title insurance (collectively, the "*Commitment*") issued by Chicago Title Company or another nationally-recognized title insurer selected by Buyer (the "*Title Company*") for the issuance of an ALTA owner's policy of title insurance (together with such endorsements as Buyer may require) with respect to the Real Property (including the Entitled Real Property only to the extent insurable under an ALTA title insurance policy), which Commitment shall show that fee simple title to the Real Property is vested in Seller free and clear of all Liens except for the following: (i) Permitted Liens and (ii) any other Liens, covenants, conditions, restrictions, agreements and easements approved or waived by Buyer pursuant to Section 5.14(b) below. As used herein "*Survey*" means an ALTA/NSPS Land Title Survey of the Real Property in form and of substance acceptable to Buyer prepared by a reputable surveyor or surveying firm, licensed by the state in which the Real Property is located.

(b)    In the event that Buyer's Commitment or Survey of the Real Property discloses (A) any Lien or other circumstance (including any covenants, conditions, restrictions, agreements and easements) that is not a Permitted Lien and for which an amount is, on its face, definitively ascertainable ("*Title Objection A*"), or (B) any Lien or other circumstance (including any covenants, conditions, restrictions, agreements and easements) that is not a Permitted Lien for which an amount is not, on its face, definitively ascertainable that would reasonably be expected to impair in any material respect the West Lorain Facility, Buyer may, in its sole discretion at any time prior to the Title Review End Date, notify Seller of any of the foregoing issues listed in this Section 5.14(b) (a "*Title Objection*"); provided, however, Buyer shall have no obligation to deliver such notice for any of the following Required Cure Items: (i) any mortgage or deed of trust covering all or any portion of the Real Property; (ii) any construction, materialmens', carriers', landlords', repairers' and other similar Liens against the Real Property arising by, through or under Seller that are not within the definition of Permitted Liens, or (iii) any tax or judgment Liens against the Real Property that are not within the definition of Permitted Liens. Except as provided herein, Buyer hereby acknowledges that the matters set forth in clause (i) of Section 5.14(a) above shall not render title to the Real Property

53

unacceptable or constitute the basis of a Title Objection. Buyer further acknowledges that upon the payment of the Title Objection A Cure Amount and removal of the applicable Lien or other circumstance of record, the applicable Title Objection A shall be deemed to be fully cured.

(c)        In the event Buyer notifies Seller of a Title Objection in writing prior to the Title Review End Date, then Seller shall have thirty (30) days from receipt of such notice to use commercially reasonable efforts to cure such Title Objection. If any Title Objection is not timely cured, in a manner reasonably satisfactory to Buyer, then Buyer may elect either to terminate this Agreement pursuant to the terms of this Section 5.14(c) and Section 9.01(h) or Buyer may waive such Title Objection and accept such title as Seller is able to convey, without reduction in the Purchase Price, and such waiver shall not affect the Closing or be deemed to cause any of the conditions to Closing set forth in Article 7 to be unsatisfied. If Buyer notifies Seller that title to the Real Property is acceptable or fails to notify Seller in writing of any Title Objection (except for any Required Cure Items for which Buyer is not required to so notify Seller under Section 5.14(b)) before the Title Review End Date, then Buyer shall be conclusively presumed to have waived its right to raise any Title Objection and to have approved the condition of title shown in the Commitment and all matters shown on the Survey and shall accept such title at Closing. Notwithstanding anything herein to the contrary, Seller shall be obligated (i) to cure any and all Required Cure Items described in clauses (i) through (vi) of the definition of Required Cure Items and (ii) to use its commercially reasonable efforts to cure any and all Required Cure Items described in clauses (vii) and (viii) of the definition of Required Cure Items, in each case at or prior to Closing at its sole cost and expense.

(d)        The Survey and updated or new Commitment, any policy of title insurance and any endorsements shall be at Buyer's sole cost and expense.

Section 5.15    **Bulk Sales Laws**. Each of the Parties hereby waives compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

Section 5.16    **Reactive Services**. The Parties agree that on and after the Closing and subject to FERC approval, Buyer is entitled to the then-effective annual revenue requirement (and a pro rata share of such revenue requirement for any partial year) for Reactive Service from the Generating Facility as established in FERC Docket No. ER15-1510-000 (currently U.S. $2,108,369.00). The Parties agree to cooperate to ensure that the annual revenue requirement for Reactive Service from the Generating Facility is allocated to Buyer or its designee pursuant to Schedule 2 to the PJM Tariff and, in furtherance thereof, (a) Seller or Seller's Affiliates shall use commercially reasonable efforts to file, within five (5) days of the entry of the Sale Order, a filing with FERC to reduce Seller's or Seller's Affiliate's annual revenue requirement for Reactive Service by $2,108,369.00 with such reduction to become effective, to the extent approved by FERC, as of the Closing Date and (b) Buyer or Buyer's Affiliate shall file with FERC a new rate schedule reflecting a revenue requirement of $2,108,369.00 for Reactive Service from the Generating Facility, with such rate to become effective, to the extent approved

54

by FERC, as of the Closing Date. Notwithstanding the above, to the extent that, on or after the Closing Date, PJM continues to remit any amounts of the then-effective annual revenue requirement for the Generating Facility to Seller or Seller's Affiliates, Seller shall pay, or shall cause such Affiliates to pay, such amounts over promptly to Buyer.

Section 5.17 **Release of Liens**. Seller shall take all steps reasonably necessary to obtain the release, as of the Closing, of any Purchased Assets that are collateral under the FEG Mortgage Agreement from the Lien thereof by the Trustee and, to the extent required by the terms thereof, any other beneficiary thereunder. At or prior to Closing, Buyer shall deposit with the Trustee funds in the amount of the Payoff Amount and shall obtain and deliver to Seller an executed copy of the FEG Mortgage Indenture Partial Release. Seller shall further take all steps reasonably necessary to obtain, and shall cooperate with Buyer in connection with, the release of all Liens on any of the Purchased Assets (other than Permitted Liens) at or prior to the Closing.

Section 5.18 **Submission for Bankruptcy Court Approval**.

(a) No later than the close of business on the third (3rd) Business Day following the Execution Date, Seller shall file the Bidding Procedures and Sale Motion in the Bankruptcy Cases. The Parties shall use their respective commercially reasonable efforts to have (i) the Bankruptcy Court enter the Bidding Procedures Order within forty-five (45) days after the filing of the Bidding Procedures and Sale Motion, (ii) the Auction commence prior to the Sale Hearing and (iii) the Bankruptcy Court enter the Sale Order as promptly as practicable after the completion of the Auction but, in any event, no later than one hundred twenty (120) days after the Execution Date. Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures and Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Liens on the Purchased Assets and all non-debtor parties to the Assumed Contracts, and other appropriate notice as required by the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, including such additional notice as the Bankruptcy Court shall direct or as Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings or other proceedings in the Bankruptcy Court relating to this Agreement or the Transactions. Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be in form and substance acceptable to Buyer in its reasonable discretion and submitted, to the extent practicable, to Buyer prior to their filing with the Bankruptcy Court for Buyer's prior review and comment.

(b) A list of the Assumed Contracts shall be filed as an exhibit to the Bidding Procedures and Sale Motion (or, if required by the Bankruptcy Court, a motion to assume and assign the Assumed Contracts), and shall be described in sufficient detail to provide adequate notice to the counterparties to such Assumed Contracts. Such exhibit shall set forth the applicable Cure Payment, if any, for each Assumed Contract as reasonably estimated in good faith by Seller.

(c) Seller and Buyer shall consult with one another regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Order; provided, that Seller shall not be required to consult with Buyer with respect to any

55

pleadings relating to a Competing Bid. Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that Seller has in its possession (or receives) pertaining to the Bidding Procedures and Sale Motion, the Bidding Procedures Order, the Sale Order or any other order related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel.

(d)     If the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order or other such Order), subject to rights otherwise arising from this Agreement, Seller and Buyer shall use their commercially reasonable efforts to oppose such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(e)     Seller and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Bidding Procedures Order and the Sale Order. In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern; provided, however, that nothing in this Section 5.18 shall limit the rights of Buyer hereunder in the event that any Bidding Procedures Order or any Sale Order does not comply with the terms of this Agreement.

Section 5.19  **Overbid Procedures; Adequate Assurance**.

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption of the Assumed Liabilities are subject to higher and/or better bids and Bankruptcy Court approval. Buyer acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about the Purchased Assets to prospective bidders, entertaining higher and/or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Business and the Purchased Assets, conducting an auction (the "***Auction***") in accordance with the Bidding Procedures Order.

(b)     The Bidding Procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order; provided, however, that such Bidding Procedures shall be in form and substance materially consistent with those attached hereto as Exhibit D or otherwise reasonably acceptable to Buyer. Buyer acknowledges that Seller and its representatives are and may continue soliciting inquiries, proposals or offers for the Business and the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(c)     Prior to the Sale Hearing, Buyer shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assumed Contracts. Buyer agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance

56

of future performance under the Assumed Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's representatives available to testify before the Bankruptcy Court.

(d)     Seller and Buyer agree, and the Bidding Procedures and Sale Motion shall reflect the fact that, the provisions of this Agreement, including this Section 5.19 and Section 5.20, are reasonable, were a material inducement to Buyer, and were reasonably relied upon by Buyer in deciding, to enter into this Agreement, and are designed to achieve the highest or otherwise best price for the Business and Purchased Assets.

Section 5.20    **Expense Reimbursement and Termination Fee**.

(a)     Seller shall, subject to entry of the Bidding Procedures Order, and without the requirement of any notice or demand from Buyer, pay the Buyer Expense Reimbursement in cash to Buyer within five (5) Business Days only in the event that this Agreement is terminated pursuant to Section 9.01(d), Section 9.01(e), Section 9.01(j), Section 9.01(h) or by Buyer pursuant to Section 9.01(g) or Section 9.01(l).

(b)     Seller shall, subject to entry of the Bidding Procedures Order, and without the requirement of any notice or demand from Buyer, pay the Termination Fee in cash to Buyer within five (5) Business Days only in the event that this Agreement is terminated pursuant to Section 9.01(d)(i), Section 9.01(d)(ii), Section 9.01(j), or upon Bankruptcy Court approval of the Successful Bidder in the event that a bidder other than Buyer is the Successful Bidder at the Auction (unless Buyer is the Back-Up Bidder, in which event the Termination Fee shall be payable by Seller to Buyer upon the closing of the sale of the Purchased Assets to such alternative Successful Bidder).

(c)     Pursuant to the Bidding Procedures Order, the obligations of the Seller to pay the Termination Fee and/or Buyer Expense Reimbursement (i) shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the U.S. Bankruptcy Code and shall be a superpriority administrative expense claim (i.e., senior to all other administrative expense claims and payable out of Seller's cash or other collateral and prior to any recovery by such lenders) of the Seller under Section 364(c)(1) of the U.S. Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Seller, and (iii) shall survive the termination of this Agreement in accordance with Section 9.02(a). The Seller shall seek the approval of the Termination Fee and Buyer Expense Reimbursement as set forth in this paragraph and this Agreement in the Bidding Procedures Order.

Section 5.21    **Cure Payments**. Section 5.21 of the Seller Disclosure Schedule sets forth Seller's good faith estimate, as of the execution date, of all Cure Payments. Subject to entry of the Sale Order, Buyer shall, on or prior to the Closing, pay, or cause to be paid, the Cure Payments and cure any and all other defaults and breaches under the Assumed Contracts and so that such Assumed Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement. Seller agrees that it will promptly take such actions as are reasonably necessary to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of such Assumed Contracts. To

57

the extent that the aggregate amount of the Cure Payments for the Assumed Contracts (as determined by the Bankruptcy Court or otherwise agreed to by the Parties and the counterparties to the Assumed Contracts) exceeds the aggregate amount of the Cure Payments for such Assumed Contracts set forth in <u>Section 5.21 of the Seller Disclosure Schedule</u>, Buyer shall receive a credit against the Purchase Price at Closing in an equal amount.

Section 5.22 **Competing Bids**.

(a) Seller shall (i) promptly notify Buyer of any Competing Bid that Seller receives after the Execution Date, but shall not be required to provide Buyer with a copy of any such Competing Bid (except that Buyer shall be entitled to receive any bids submitted in connection with the Bid Deadline within one (1) Business Day following the Bid Deadline) and (ii) keep Buyer reasonably informed with respect to the status of the foregoing without breaching any Law, fiduciary duty or duty of confidentiality owed to any person, or waiving any legal or similar privileges (if the Parties are unable to mitigate any concerns relating to any loss of privilege through commercially reasonable efforts, including by executing a joint defense agreement). Within three (3) Business Days of the Bid Deadline, Seller will inform Buyer as to whether or not there will be an Auction.

(b) Seller and its representatives shall have the authority to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the Purchased Assets to prospective purchasers.

Section 5.23 **Access Agreement and Substation Easements**.

(a) As soon as reasonably practicable following the Execution Date, Buyer and Seller shall use commercially reasonable efforts to agree upon the definitive boundaries (and the applicable terms and conditions) of (i) an access agreement to be entered into between the substation operator and Buyer granting the substation operator access to substation equipment located on the Real Property, (ii) easements to be granted to one or more FirstEnergy Corp. Affiliates for vehicular access to the Beaver Substation (Lorain County Recorder's PPN 0203003000009) and for installation, use, operation, maintenance (including vegetation management and priority tree removal), repair, replacement and removal of substation grounding grid, transmission and distribution lines and related facilities and equipment, (iii) easements to be granted to Buyer for ingress and egress over the Beaver Substation access drive for access to the Owned Real Property, and for existing utilities and pipelines and transmission lines crossing over or under such access drive as required for the use, operation, maintenance and repair of the Generating Facility as operated on the Execution Date, and (iv) easements to be granted to one or more FirstEnergy Corp. Affiliates for access to and installation, use, operation, maintenance, repair, replacement and removal of a lattice telecommunications tower (including guys and supports), telecommunications hut, fiber cables (including FirstEnergy and Zayo fiber cables) and related facilities and equipment, including electric utilities. The approximate location of the access routes, substation grounding grid, centerlines of the transmission lines and distribution lines and the easements described in clauses (iii) and (iv) are depicted on <u>Schedule 5.23</u> attached hereto. The applicable Schedules to this Agreement shall be amended as necessary to reflect any changes required as a result of the determination by Buyer and Seller of the definitive

58

boundaries, terms and conditions of such access agreement and easements. Such access agreement and easements shall be Permitted Liens, and shall be perpetual and irrevocable (except as expressly set forth in the agreement(s) creating such access agreement and easements), without charge, cost or expense to the grantee.

(b)     As soon as reasonably practicable following the Execution Date, Seller shall use its commercially reasonable efforts to obtain an assignment of each of the Pipeline Easements from the current holders thereof to Seller. Following any such assignment, each assigned Pipeline Easement will become a Purchased Asset for all purposes of this Agreement. If Seller is unable to procure the assignment to Seller of any of the Pipeline Easements prior to the Closing, Seller will execute and deliver to Buyer at Closing a quitclaim assignment, in a form reasonably acceptable to Buyer, transferring and assigning to Buyer as of the Closing without warranty all of the rights, if any, held by Seller with respect to any such Pipeline Easement.


ARTICLE 6

TAX MATTERS

Section 6.01    **Tax Definitions**. The following terms, as used herein, have the following meanings:

"*Post-Closing Tax Period*" means (i) any Tax period beginning after the Closing Date and (ii) with respect to a Tax period that commences before but ends on or after the Closing Date, the portion of such period beginning on the Closing Date.

"*Pre-Closing Tax Period*" means (i) any Tax period ending before the Closing Date and (ii) with respect to a Tax period that commences before but ends on or after the day before the Closing Date, the portion of such period up to and including the day before the Closing Date.

"*Tax*" means any tax, governmental fee, including charges assessed by FERC under Part I of the Federal Power Act, or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Body (a "*Taxing Authority*") responsible for the imposition of any such tax, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax Liability of any other Person.

Section 6.02    **Tax Cooperation; Allocation of Taxes**.

(a)     Seller and Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for any Pre-Closing Tax Periods for a period of at least six (6) years

following the Closing Date. At the end of such period, Buyer shall provide Seller with at least ten (10) days prior written notice before destroying any such books and records, during which period Seller can elect to take possession, at its own expense, of such books and records. Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b)     All real property Taxes, personal property Taxes and similar ad valorem obligations levied, due or owing with respect to the Purchased Assets (collectively, the "*Apportioned Obligations*") for a taxable period, the calculation of which includes (but does not end on) the day before the Closing Date (the "*Proration Period*") shall be apportioned between the Pre-Closing Tax Period and the Post-Closing Tax Period based on the number of days of such taxable period included in the Pre-Closing Tax Period and the number of days of such taxable period included in the Post-Closing Tax Period. With respect to the Purchased Assets, Seller shall be liable for the Apportioned Obligations attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the Apportioned Obligations attributable to the Post-Closing Tax Period.

(c)     All excise, sales, use, value added, VAT, stamp duty, registration stamp, recording, documentary, conveyance, franchise, transfer and similar Taxes, levies, charges and fees (collectively, "*Transfer Taxes*") incurred in connection with the Transactions shall be paid by Buyer. Buyer and Seller shall cooperate in providing each other with any appropriate resale Seller certifications and other similar documentation, including provision by Buyer to Seller of any applicable exemption certificate. Notwithstanding anything herein to the contrary, the Parties agree, to the extent consistent with applicable Law, to treat all machinery and equipment included in the Purchased Assets as personal property for purposes of any Tax filings or elections.

(d)     Apportioned Obligations and Transfer Taxes shall be timely paid and all applicable filings, reports and returns shall be filed, as provided by applicable Law. The paying party shall be entitled to reimbursement from the non-paying party to the extent provided in Section 6.02(b) or (c), as the case may be. Upon payment of any such Apportioned Obligation or Transfer Tax, the paying party shall present a statement to the non-paying party setting forth the amount of reimbursement to which the paying party is entitled under Section 6.02(b) or (c), as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying party shall make such reimbursement promptly but in no event later than thirty (30) days after the presentation of such statement. Any payment not made within such time shall bear interest at the annual rate of LIBOR + 6% for each day until paid.

(e)     Any Tax refunds that are received by Buyer, and any amounts credited against Tax to which Buyer becomes entitled, that relate to Taxes paid by Seller with respect to a Pre-Closing Tax Period shall be for the account of Seller (excluding any refund or credit attributable to any loss in a tax year (or portion of a Proration Period) beginning on or after the Closing Date applied (e.g., as a carryback) to income in a tax year (or portion of a Proration Period) ending on or before the day before the Closing Date) and Buyer shall pay over to Seller any such refund or the amount of any such credit (net of any Taxes of Buyer attributable to such refund or credit) no later than thirty (30) days after receipt thereof.

60

# ARTICLE 7

## CONDITIONS TO CLOSING

Section 7.01 **Conditions to Obligations of Buyer and Seller**. The obligations of Buyer and Seller to consummate the Closing are subject to the satisfaction, on or before the Closing, of each of the following conditions unless waived in writing by each of the Parties:

(a)      There must not be issued and in effect any Order or Law restraining, enjoining or otherwise prohibiting or making illegal the consummation of the Transactions.

(b)      (i) The applicable waiting period imposed by the HSR Act with respect to the Transactions shall have expired or have been terminated, and (ii) all consents, approvals, orders, authorizations or actions of or by any Governmental Body set forth on Schedule 7.01(b) shall have been obtained and shall be in full force and effect.

(c)      Seller and Buyer shall have received all of the consents set forth on Schedule 7.01(c).

(d)      The FERC 203 Approval shall have been issued.

(e)      The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order and each such order shall be a Final Order (unless such Final Order requirement is waived by each of the Parties in its sole discretion).

Section 7.02 **Conditions to Obligation of Buyer**. The obligation of Buyer to consummate the Closing is subject to the satisfaction, on or before the Closing, of each of the following further conditions unless waived in writing by Buyer:

(a)      Seller shall have performed in all material respects the covenants and agreements contained in this Agreement that are required to be performed by it on or prior to the Closing Date.

(b)      (i) Each of the representations and warranties of Seller set forth in Sections 3.01, 3.02, 3.05 and 3.10 that are qualified with respect to materiality shall be true and correct on and as of the Closing Date in all respects, and the representations and warranties in Sections 3.01, 3.02, 3.05 and 3.10 that are not so qualified shall be true and correct in all material respects, in each case, on and as of the Closing Date, and (ii) all other representations and warranties of Seller set forth in Article 3 shall be true and correct (without giving effect to any "materiality" or "Seller Material Adverse Effect" or similar qualifier) on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time), except for the failure of such representations and warranties to be true and correct which would not, in the aggregate, have a Seller Material Adverse Effect.

(c)      From the Execution Date, there shall not have occurred and be continuing any Seller Material Adverse Effect.

61

(d)     Buyer shall have received evidence of the release in form and substance reasonably satisfactory to Buyer of all Liens on any of the Purchased Assets other than Permitted Liens.

(e)     Buyer shall have received evidence, in form and substance reasonably satisfactory to it, that upon Seller depositing or causing to be deposited with the Trustee funds in the amount of the Payoff Amount, any Purchased Assets that are collateral for the FEG Mortgage Indenture shall be released from the Lien of the FEG Mortgage Indenture.

(f)     Buyer shall have received all of the Buyer's Required Approvals, and each shall be in full force and effect.

(g)     Buyer shall have obtained evidence in writing that the Title Company is irrevocably committed to issue an owner's policy of title insurance as required in Section 5.14(a) together with a copy of a pro forma owner's policy of title insurance or marked commitment for the same, and a copy of the signed and sealed Survey, each in form and substance previously approved by Buyer.

(h)     Buyer shall have received each of the items set forth in <u>Section 2.09(a)</u>.

Section 7.03    **Conditions to Obligation of Seller**. The obligation of Seller to consummate the Closing is subject to the satisfaction, on or before the Closing, of each of the following further conditions unless waived in writing by Seller:

(a)     Buyer shall have performed in all material respects the covenants and agreements contained in this Agreement that are required to be performed by it on or prior to the Closing Date.

(b)     The representations and warranties of Buyer set forth in <u>Article 4</u> shall be true and correct (without giving effect to any "materiality" or "Buyer Material Adverse Effect" or similar qualifier) on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time), except for the failure of such representations and warranties to be true and correct which would not, individually or in the aggregate, have a Buyer Material Adverse Effect.

(c)     From the Execution Date, there shall not have occurred and be continuing any Buyer Material Adverse Effect.

(d)     Seller shall have received each of the items set forth in <u>Section 2.09(b)</u>.

ARTICLE 8

SURVIVAL

The Parties, intending to modify any applicable statute of limitations, agree that (a) the representations and warranties of the Parties contained in this Agreement and in any certificate delivered pursuant hereto shall terminate effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no liability on the part of, nor shall any

62

claim be made by, any Party or any of their respective Affiliates in respect thereof, and (b) after the Closing, there shall be no liability on the part of, nor shall any claim be made by, any Party or any of their respective Affiliates in respect of any covenant or agreement to be performed prior to the Closing.

ARTICLE 9

TERMINATION

Section 9.01    **Grounds for Termination**. This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written agreement of Seller and Buyer;

(b)    by either Buyer or Seller (i) if the Closing has not occurred on or before March 31, 2019 (the "***End Date***"); provided, that, either Buyer, on the one hand or Seller, on the other hand, shall have the right to extend by written notice to the other Party the End Date by up to sixty (60) days if the receipt of the FERC 203 Approval is the only condition to Closing that has not been satisfied or waived on or prior to March 31, 2019 (and the "End Date" shall be as so extended) and (ii) the terminating Party shall not have breached any of its representations, warranties, covenants or agreements under this Agreement in any material respect;

(c)    by either Buyer or Seller if (i) a Law shall have been enacted, entered or promulgated prohibiting the consummation of the Transactions or (ii) an Order shall have been entered permanently restraining, enjoining or otherwise prohibiting the consummation of the Transactions, and such Order shall have become final and non-appealable and the party seeking to terminate this Agreement pursuant to this Section 9.01(c)(ii)) shall have used commercially reasonable efforts to remove such Order; provided, that the Party desiring to terminate this Agreement pursuant to this Section 9.01(c) shall not have breached in any material respect any of its representations, warranties, covenants or agreements under this Agreement in any manner that shall have proximately caused the circumstances described in subparts (i) or (ii) to occur;

(d)    by Buyer or Seller if (i) the Bankruptcy Court approves an Alternative Transaction, (ii) Buyer is not the Successful Bidder or the Back-Up Bidder at the Auction, (iii) the Bankruptcy Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or (iv) an order of the Bankruptcy Court is entered denying approval of the Sale Order and such order becomes a Final Order;

(e)    by Buyer if: (i) the Bidding Procedures Order has not been entered on or prior to the date that is forty-five (45) days after the Execution Date or does not contain approval of the Buyer Expense Reimbursement or the Termination Fee as set forth herein; (ii) following entry of the Bidding Procedures Order, the Seller does not hold an Auction as provided in the Bidding Procedures Order (unless the Auction is cancelled because Buyer is the Successful Bidder) and the Bidding Procedures Order fails to be in full force and effect or shall have been stayed, reversed, modified or amended in respect of the Termination Fee or the Buyer Expense Reimbursement or otherwise in any material respect without the prior written consent of the Buyer; or (iii) the Sale Order is not entered on or prior to the date that is one hundred twenty (120) days after the Execution Date, or such order shall have been vacated or reversed at any

63

time without the prior written consent of Buyer; provided, however, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.01(e)(iii) if Buyer's failure to perform any of obligations under this Agreement has contributed to the issuance of any such judgment;

(f)      by Seller, if there shall have been a breach of any representation, warranty, covenant or agreement on the part of Buyer contained in this Agreement such that a condition in Section 7.01 or Section 7.03 is incapable of being satisfied before the End Date, and such breach either (i) is not capable of being cured on or before the End Date or (ii) has not been cured by Buyer to Seller's reasonable satisfaction within thirty (30) days of Seller's written notice to Buyer of such breach; provided, that no cure period shall extend past the End Date; provided, further, that Seller shall not have the right to terminate this Agreement pursuant to this Section 9.01(f) if Seller is then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement;

(g)      by Buyer, if there shall have been a breach of any representation, warranty, covenant or agreement on the part of Seller contained in this Agreement such that a condition in Section 7.01 or Section 7.02 is incapable of being satisfied before the End Date, and such breach either (i) is not capable of being cured on or before the End Date or (ii) has not been cured by Seller to Buyer's reasonable satisfaction within thirty (30) days of Buyer's written notice to Seller of such breach; provided, that no cure period shall extend past the End Date; provided, further, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.01(g) if Buyer is then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement;

(h)      by Buyer or Seller pursuant to Section 5.13;

(i)      by Seller, if (i) all of the conditions to Buyer's obligations to consummate the Closing under Sections 7.01 and 7.02 have been satisfied (other than any such conditions which by their nature are to be satisfied by the Closing Date) or waived, (ii) Seller shall have given written notice to Buyer that Seller stands ready, willing and able to consummate the Transactions, and (iii) Buyer shall not, within ten (10) Business Days after the later of the date of such notice and the date on which the Closing was required to have occurred pursuant to Section 2.08, have consummated the Transaction and paid the Closing Payment to Seller in accordance with Section 2.09(b)(i);

(j)      by Seller if it, or the board of managers of Seller, determines, in consultation with outside legal counsel, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or the board's fiduciary obligations under applicable Law, including to pursue an Alternative Transaction. For the avoidance of doubt, and subject to the terms and conditions of this Agreement, Seller retains the right to pursue any transaction that, in Seller's business judgment, will maximize the value of its estate; or

(k)      by Seller if the Deposit is not timely paid by Buyer in accordance with Section 2.07; or

(l)      by Buyer pursuant to Section 5.14(c).

The Party desiring to terminate this Agreement pursuant to Section 9.01(d) or (g) shall give five (5) Business Days written notice of such termination (subject to any applicable cure period expressly set forth in this Section 9.01) to the other Party.

Section 9.02    **Effect of Termination**.

(a)    In the event of termination of this Agreement by Seller or Buyer pursuant to the terms of Section 9.01, written notice thereof shall forthwith be given to the other Party, specifying the provision hereof pursuant to which such termination is made, and this Agreement shall forthwith become null and void and of no further force and effect (other than the provisions of Section 2.07 (Deposit), Section 5.05 (Public Announcements), Section 5.11 (Confidentiality), Section 5.20 (Expense Reimbursement and Termination Fee), this Article 9 (Termination) and Article 10 (Miscellaneous), all of which shall survive termination of this Agreement), and there shall be no Liability on the part of Seller or Buyer or their respective affiliates or representatives; provided, however, that nothing herein shall relieve Buyer from any Liability for any breach of this Agreement prior to such termination.

(b)    Subject in all respects to the Bidding Procedures Order, Seller shall pay to Buyer the Buyer Expense Reimbursement and/or the Termination Fee, to the extent applicable, by wire transfer of immediately available funds in the event that this Agreement is terminated and the Buyer Expense Reimbursement and/or the Termination Fee are payable by Seller in connection with such termination pursuant to the terms of Section 5.20, provided, however, that under no circumstances shall Seller be obligated to pay the Buyer Expense Reimbursement or the Termination Fee more than once. Notwithstanding anything herein, upon payment by Seller of the Termination Fee and/or the Buyer Expense Reimbursement pursuant to this Section 9.02(b) and, if applicable, the return of the Deposit pursuant to Section 2.07, Buyer shall be precluded from any other remedy against Seller, at law or in equity or otherwise, and Buyer shall not seek to obtain any recovery, judgment or damages of any kind against Seller in connection with this Agreement, the other Transaction Agreements or the Transactions.

(c)    The Parties acknowledge and agree that any payment of the Buyer Expense Reimbursement and/or Termination Fee shall constitute liquidated damages (and not a penalty) and together with the return of the Deposit pursuant to Section 2.07 shall be deemed to be the sole and exclusive remedy of Buyer and any other Person against Seller in connection with this Agreement and the Transactions, and Seller's former, current or future equity holders, controlling persons, directors, officers, employees, agents, managers, shareholders, Affiliates or assignees and any and all former, current or future equity holders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, shareholders, Affiliates or assignees of any of the foregoing, and any and all former, current or future heirs, executors, administrators, trustees, successors or assign of any of the foregoing, and each Affiliate, officer, director, employee, controlling person, advisor, agent, attorney or representatives of any such Person (each, a "**_Related Party_**" and, collectively, the "**_Related Parties_**"), and no Related Party of Seller shall have any other Liability for any or all damages suffered or incurred by Buyer or any other Person in connection with this Agreement (and the termination hereof), the Transactions (and the abandonment thereof) or any matter forming the basis for such termination, and, upon payment of the Termination Fee, Buyer Expense Reimbursement and the return of the Deposit to Buyer hereunder, in each case as

65

applicable, under such circumstances, neither Buyer nor any other Person shall be entitled to bring or maintain any other Proceeding against Seller or any Related Party of Seller and none of Seller nor any Related Party of Seller shall have any further liability or obligation to Buyer arising out of this Agreement or any of the Transactions or any matters forming the basis for such termination. The Parties acknowledge and agree that (i) the agreements contained in this Section 9.02(c) are an integral part of this Agreement and the Transactions and (ii) in light of the difficulty of accurately determining actual damages with respect to the foregoing, the right to any such payment of the Termination Fee constitutes a reasonable estimate of the damages that will compensate Buyer in the circumstances in which such fee is payable for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions.

(d)     The Parties acknowledge and agree that if this Agreement is terminated pursuant to Section 9.01(f) or Section 9.01(i), any payment of the Deposit to Seller shall constitute liquidated damages (and not a penalty) and shall be deemed to be the sole and exclusive remedy of Seller and any other Person against Buyer and any Related Party of Buyer arising under this Agreement in connection with any such termination, and upon payment of the Deposit to Seller under such circumstances, neither Seller nor any other Person shall be entitled to bring or maintain any other Proceeding against Buyer or any Related Party of Buyer and none of Buyer nor any Related Party of Buyer shall have any further liability or obligation to Seller arising out of this Agreement or any of the Transactions or any matters forming the basis for such termination.  The Parties acknowledge and agree that (i) the agreements contained in this Section 9.02(d) are an integral part of this Agreement and the Transactions and (ii) in light of the difficulty of accurately determining actual damages with respect to the foregoing, the right to any such receipt of the Deposit constitutes a reasonable estimate of the damages that will compensate Seller in the circumstances in which such fee is payable for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions. Notwithstanding the foregoing, nothing set forth herein shall limit or restrict Seller's rights set forth in Section 10.12 prior to the termination of this Agreement.

ARTICLE 10

MISCELLANEOUS

Section 10.01 **Notices**. Any notice or other communication from Seller to Buyer or Buyer to Seller shall be made in writing in the English language and shall be (a) delivered by hand or sent by a nationally or internationally recognized courier to the address of the Party set forth below, (b) sent by facsimile to the facsimile number of the Party set forth below and shall be marked for the attention of the person therein referred to, or (c) sent by e-mail to the e-mail address set forth below, which e-mail transmission shall request receipt of such e-mail transmission. All notices and communications shall be deemed received upon: (a) actual receipt thereof by the addressee or actual delivery thereof to the appropriate address; (b) in the case of a facsimile transmission, upon transmission thereof by the sender and the issuance by the transmitting machine of a confirmation slip confirming that the number of pages constituting the notice have been transmitted without error; or (c) in the case of an e-mail transmission, the sender receiving receipt of such e-mail transmission:

18-50757-amk    Doc 2018    FILED 01/25/19    ENTERED 01/25/19 14:35:13    Page 102 of 292

if to Buyer, to:

> Vermillion Power, L.L.C.
> c/o Starwood Energy Group Global, Inc.
> 591 West Putnam Avenue
> Greenwich, Connecticut 06830
> Attention: General Counsel
> e-mail: grosem@starwood.com

> with a copy to (such copy not to constitute notice):

> King & Spalding LLP
> 1185 Avenue of the Americas
> New York, New York 10036
> Attention: Jonathan M.A. Melmed
> Tel: 212-556-2344
> Fax: 212-556-2222
> e-mail: jmelmed@kslaw.com

if to Seller, to:

> FirstEnergy Generation, LLC
> 341 White Pond Drive
> Akron, Ohio 44320
> Attention: Rick C. Giannantonio, General Counsel
> Tel: 330-384-5893
> Fax: 330-384-3875
> e-mail: giannanr@firstenergycorp.com

> with a copy to (such copy not to constitute notice):

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, New York 10036
> Attention: Zachary N. Wittenberg
> Tel: 212-872-1081
> Fax: 212-872-1002
> e-mail: zwittenberg@akingump.com

Section 10.02 **Amendments and Waivers**.

(a)  Any provision of this Agreement or of any other Transaction Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement or such other Transaction Agreement, as the case may be, or in the case of a waiver, by the Party against whom the waiver is to be effective.

67

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder or under any of the other Transaction Agreements shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided or provided in any of the other Transaction Agreements shall be cumulative and not exclusive of any rights or remedies provided by Law.

Section 10.03 **Expenses**. Except as expressly provided herein with respect to Buyer Expense Reimbursement and Transfer Taxes, all costs and expenses incurred in connection with negotiating, preparing and executing the Transaction Agreements shall be paid by the Party incurring such cost or expense. Each Party shall be responsible for paying one-half of the filing expenses incurred pursuant to any filings under the HSR Act.

Section 10.04 **Successors and Assigns**. The provisions of the Transaction Agreements shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns; provided, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement or under any of the other Transaction Agreements without the consent of each other Parties hereto and thereto; provided, further, Buyer may assign its rights, interests or obligations under this Agreement, in whole or in part, to Buyer's debt financing sources for collateral security purposes, which assignment shall not release Buyer from its obligations hereunder.

Section 10.05 **Governing Law**. THIS AGREEMENT SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

Section 10.06 **Jurisdiction**. Except as otherwise expressly provided in this Agreement or any of the other Transaction Agreements, and without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes arising out of or in connection with this Agreement or the Transactions or disputes relating hereto and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that if the Bankruptcy Cases are closed, any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the other Transaction Agreements or the Transactions shall be brought in a federal court located in the Southern District of the State of New York and that any cause of action arising out of this Agreement or any of the other Transaction Agreements shall be deemed to have arisen from a transaction of business in the State of New York, and each of the Parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding which is brought in any such court has been brought in an

68

inconvenient forum. Process in any such Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.

Section 10.07 **WAIVER OF JURY TRIAL**. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 10.08 **Counterparts; Third Party Beneficiaries**. This Agreement and the other Transaction Agreements may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto and thereto were upon the same instrument. This Agreement and the other Transaction Agreements shall become effective when each Party hereto or thereto shall have received a counterpart hereof or thereof signed by the other Parties hereto or thereto. Except as explicitly provided herein or therein, no provision of this Agreement or of any of the other Transaction Agreements is intended to confer upon any Person other than the Parties hereto or thereto any rights or remedies hereunder or thereunder.

Section 10.09 **Entire Agreement**. This Agreement and the other Transaction Agreements constitute the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement.

Section 10.10 **Captions**. The captions herein and in the other Transaction Agreements are included for convenience of reference only and shall be ignored in the construction or interpretation hereof or thereof.

Section 10.11 **Severability**. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Body or arbitrator not to be enforceable in accordance with its terms, the Parties agree that such Governmental Body or arbitrator making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

Section 10.12 **Specific Performance**. Each of Buyer and Seller acknowledge and agree that the other Party would be damaged irreparably if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, except as expressly set forth herein, each of Buyer and Seller agree that the other Party will be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court or any other court of the United States or any state thereof having jurisdiction over the other Party and the matter, subject to Section 10.05, Section 10.06, and Section 10.07, in addition to any other remedy to which the other Party may be entitled, at law or in equity.

*[Signature Page Follows]*

69

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLER:**

FIRSTENERGY GENERATION, LLC

By: _____
Name: Kevin T. Warvell
Title: Chief Financial Officer

**BUYER:**

Vermillion Power, L.L.C.

By: _Himan C._
        Name:    Himanshu Saxena
        Title:     Chief Executive Officer

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [•], 2019 (this "***Agreement***"), is by and between FirstEnergy Generation, LLC, an Ohio limited liability company ( "***Assignor***") and Vermillion Power, LLC, a Delaware limited liability company ("***Assignee***" and, together with Assignor, the "***Parties***").

### RECITALS

A.     Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of November 16, 2018 (the "***Asset Purchase Agreement***"), pursuant to which Assignee has agreed to purchase the Purchased Assets and assume the Assumed Liabilities pursuant to the terms of the Asset Purchase Agreement, including Section 2.03 thereof; and

B.     In accordance with the terms of the Asset Purchase Agreement, Assignor and Assignee have agreed to enter into this Agreement, providing for (a) Assignor's sale, conveyance, grant, assignment, transfer and delivery to Assignee of all of Assignor's right, title and interest in, under and to the Purchased Assets other than Real Property or Tangible Personal Property (collectively, the "***Assigned Assets***"), (b) Assignee's acceptance of such sale, conveyance, grant, assignment, transfer and delivery and (c) Assignee's assumption of all of the Assumed Liabilities, in each case on and subject to the terms of the Asset Purchase Agreement.

### AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.     **Definitions.** Undefined capitalized terms herein are defined in the Asset Purchase Agreement.

2.     **Assignment**. Assignor hereby sells, conveys, grants, assigns, transfers and delivers to Assignee as of the date hereof, all of its right, title and interest in, under and to the Assigned Assets free and clear of all Liens other than Permitted Liens in accordance with and subject to the terms and conditions of the Asset Purchase Agreement, including Section 2.03 thereof (the "***Assignment***").

3.     **Acceptance and Assumption**. Assignee hereby, as of the date hereof, (a) purchases, acquires and accepts the sale, conveyance, grant, assignment, transfer and delivery of Assignor's right, title and interest in, under and to the Assigned Assets free and clear of all Liens other than Permitted Liens and (b) assumes and agrees to pay, perform and discharge when due, and shall be liable with respect to the Assumed Liabilities in accordance with and subject to the terms and conditions of the Asset Purchase Agreement, including Section 2.03 thereof. For purposes of clarity, Assignee does not, and will not by assumption of the Assumed Liabilities or acceptance of the Assignment, assume any Excluded Assets or Excluded Liabilities, all of which will remain the sole responsibility of Assignor as set forth in the Asset Purchase Agreement.

4.    **Parties in Interest**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.    **Terms of Asset Purchase Agreement**. The scope, nature, and extent of the Assumed Liabilities are expressly set forth in the Asset Purchase Agreement. Nothing contained herein will itself change, amend, extend, or alter (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Asset Purchase Agreement in any manner whatsoever. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Asset Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement will govern.

6.    **Other Provisions**. The provisions of Article 10 of the Asset Purchase Agreement are hereby incorporated into this Agreement, *mutatis mutandis*.

[*Signature Page Follows*]

2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

FIRSTENERGY GENERATION, LLC


By: _____
Name:
Title:


VERMILLION POWER, LLC


By: _____
Name:
Title:

[Signature Page to Assignment and Assumption Agreement]

[Space Above For Recorder's Use Only]

## ASSIGNMENT OF REAL PROPERTY ENTITLEMENTS

THIS ASSIGNMENT OF REAL PROPERTY ENTITLEMENTS (this "*Assignment*") is made this _____ day of _____, 20__, but effective the _____ day of _____, 20__ (the "*Closing Date*"), by and between **FirstEnergy Generation, LLC**, an Ohio limited liability company, formerly known as FirstEnergy Generation Corp., an Ohio corporation, having a tax mailing address of 341 White Pond Drive, Akron, Ohio 44320 ("*Grantor*"), and _____ a _____ limited liability company, having a tax mailing address of _____, Attention: _____ ("*Grantee*").

Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does by these presents transfer, convey, and assign unto Grantee, its successors and assigns, to the extent assignable, all of Grantor's rights, title and interests in and to the easements, rights of way, real property licenses, permits, and other real property entitlements described on Attachment 1, attached hereto and made a part hereof, subject to the terms and conditions of this Assignment (collectively, the "*Assigned Rights*"); and Grantee does hereby accept the Assigned Rights and does hereby assume all of Grantor's rights and benefits in, to and under the Assigned Rights, and all of Grantor's liabilities, duties and obligations under or relating the Assigned Rights, but only to the extent such liabilities, duties and obligations arise or accrue on or after the Closing Date, it being expressly agreed that Grantor will remain liable for any such liabilities, duties, and obligations arising or accruing before the Closing Date.

The Assigned Rights, and the assignment, transfer and conveyance of the Assigned Rights under this Assignment, are subject to (a) the terms and conditions of the applicable instruments and agreements granting, conferring, establishing or creating the Assigned Rights, (b) all easements, covenants, conditions, restrictions, reservations and other matters of record

affecting, encumbering or relating to the Assigned Rights, and (c) all Permitted Liens, as defined in the Asset Purchase Agreement (defined below).

-

This Assignment is an instrument of transfer and conveyance contemplated by, and is executed and delivered under and subject to that certain Asset Purchase Agreement dated as of November 16, 2018, by and between Grantor and Grantee (together with any amendments thereto, the "***Asset Purchase Agreement***"), and is executed and delivered in connection with the execution and delivery by Grantor to Grantee of a deed conveying to Grantee certain real property of Grantor to which the Assigned Rights are related and/or appurtenant, in accordance with the Asset Purchase Agreement. Nothing contained herein will itself change, amend, extend, or alter (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Asset Purchase Agreement in any manner whatsoever. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Asset Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Assignment, the terms of the Asset Purchase Agreement will govern.

Undefined capitalized terms herein are defined in the Asset Purchase Agreement. The provisions of Article 10 of the Asset Purchase Agreement are hereby incorporated into this Assignment, *mutatis mutandis*.

The Assigned Rights are being conveyed free and clear of any and all liens, claims, interests and judgments pursuant to the[1] [Order Authorizing the Sale of Certain Assets of the Debtors Free and Clear of all Liens, Claims and Interests, Other Than Permitted Liens Pursuant to the Asset Purchase Agreement and Granting Related Relief in that certain Chapter 11 proceeding styled In Re: FirstEnergy Solutions Corp. *et al*., Debtors, Case No. 18-50757 (AMK) (Jointly Administered) in the United States Bankruptcy Court, Northern District of Ohio, Eastern Division, dated _____] (the "***Order***"). Any such liens, claims, interests and judgments regarding the Assigned Rights are transferred to the proceeds of this sale, pursuant to the Order.

*[Signature Pages Follow]*

---

[1] Reference to Order to be inserted.

IN WITNESS WHEREOF, Grantor and Grantee have executed and delivered this Assignment as of the Closing Date.

**FirstEnergy Generation, LLC**,
an Ohio limited liability company

By:_____
Name:
Title:

STATE OF OHIO          )
                                )     SS:
COUNTY OF SUMMIT      )

On this ___ day of _____, 20___, before me, the undersigned Notary Public, personally appeared [_____], the [_____] of FirstEnergy Generation, LLC, an Ohio limited liability company, on behalf of such limited liability company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

[SEAL]                                       _____
Notary Public

My commission expires:_____

*[Signatures Continued On Following Page]*

*Signature Page To Assignment Of Real Property Entitlements*

_____,
A _____ limited liability company

By:_____
Name:_____
Title:_____


STATE OF _____              )
                                 )      SS:
COUNTY OF _____               )

       On this ___ day of _____, 20___, before me, the undersigned Notary Public, personally appeared _____, the _____ of _____, a _____ limited liability company, on behalf of such limited liability company.


       IN WITNESS WHEREOF, I hereunto set my hand and official seal.


[SEAL]                           _____
       Notary Public

       My commission expires:_____


*Signature Page To Assignment Of Real Property Entitlements*

This instrument prepared by
Lynn M. Gattozzi
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114

**ATTACHMENT 1 TO ASSIGNMENT OF REAL PROPERTY ENTITLEMENTS**

EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
|  | ) | Chapter 11 |
| In re: | ) |  |
|  | ) | Case No. 18-50757 |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) | Hon. Judge Alan M. Koschik |
|  | ) |  |

**MOTION OF FIRSTENERGY GENERATION, LLC PURSUANT TO 11 U.S.C. §§ 105, 363, 365, AND 503 AND FED. R. BANKR. P. 2002, 6004, AND 6006 FOR ENTRY OF (I) ORDER APPROVING (A) BID PROCEDURES, (B) PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND RELATED NOTICES, (C) NOTICE OF AUCTION AND SALE HEARING, AND (D) RELATED RELIEF AND (II) ORDER (A) APPROVING THE SALE OF THE FIRSTENERGY GENERATION, LLC'S WEST LORAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND RELATED CURE AMOUNTS AND (C) GRANTING RELATED RELIEF**

FirstEnergy Generation, LLC ("FG"), by and through its undersigned counsel, respectfully represents as follows in support of their motion for (i) an order approving (a) bid procedures, (b) procedures for assumption and assignment of certain executory contracts and related notices, (c) notice of auction and sale hearing and (ii) an order (a) approving the sale of FG's West Lorain Assets (as defined herein) free and clear of liens, claims, encumbrances and

---

[1] The debtors in these chapter 11 cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage LLC (6928), case no. 18-50764. The Debtors' address is 341 White Pond Dr., Akron, OH 44320.

other interests, (b) approving assumption and assignment of certain executory contracts and related cure amounts, and (c) granting related relief (this "Motion"):

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the Northern District of Ohio (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief request herein are sections 105, 363, 365, and 503 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

2.     On March 31, 2018 (the "Petition Date"), the Debtors filed voluntary petitions with the Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases (the "Chapter 11 Cases") are being jointly administered.

3.     The Debtors continue to operate their businesses and manage their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On April 11, 2018, the United States Trustee for the Northern District of Ohio (the "US Trustee") appointed an official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

4.     The Debtors participate in both the generation wholesale and retail electricity markets.  Through its subsidiaries, FES owns and operates multiple power generation facilities and sells the power generated at these facilities through wholesale energy, capacity, and ancillary

2

service markets.  FG owns three fossil generation plants, including a plant located in Lorain, Ohio (the "West Lorain Facility").

5.      The West Lorain Facility is a 545 MW, periodic-start, combustion-turbine generating station located near Lake Erie.  The West Lorain Facility was constructed in 1973 as a combined-cycle electric generating system with two combustion turbines (Units 1A and 1B), two heat recovery steam generators, and a steam turbine generator.  In 2001, five additional combustion turbines were installed (Units 2–6) and placed in operation.  The plant currently operates on fuel oil, but it is also capable of operating on natural gas.

6.      A more detailed description of the Debtors' businesses, generation facilities, and the reasons for filing these Chapter 11 Cases is set forth in the *Declaration of Donald R. Schneider in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed previously with this Court [Docket No. 55] and is incorporated by reference as if fully set forth herein.

## RELIEF REQUESTED

7.      Pursuant to sections 105, 363, 365, and 503 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Bankruptcy Rules, FG hereby moves the Court for the entry of an order (the "Bid Procedures Order"), substantially in the form annexed hereto as **Exhibit A**: (i) approving the bid procedures (substantially in the form annexed to the Bid Procedures Order as **Exhibit 1** the "Bid Procedures,") for the sale of FG's West Lorain Facility and related assets (collectively, the "West Lorain Assets"); (ii) approving the procedures for the assumption and assignment of executory contracts, which procedures include notice of proposed cure amounts related to certain of the contracts (the "Assumption and Assignment Procedures"); (iii) approving FG's selection of the Stalking Horse Purchaser (as defined herein) and the provision

3

of Bid Protections (as defined herein) to the Stalking Horse Purchaser; (iv) establishing dates for (a) an auction if FG receives one or more timely and acceptable Qualified Bids (as defined herein) (the "Auction") and (b) a final hearing (the "Sale Hearing") to approve the sale of the West Lorain Assets (the "Sale Transaction"); and (v) approving the form and manner of notice of the Auction, Sale Hearing, and the Assumption and Assignment Procedures. A form of notice of assumption and assignment is annexed to the Bid Procedures Order as **Exhibit 2**. A form of notice of the Auction and Sale Hearing is annexed to the Bid Procedures Order as **Exhibit 3**.

8. FG also moves the Court, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, for the entry of an order (the "Sale Order"), a form of which will be filed with the Court in advance of the Sale Hearing (which form shall be mutually agreed by the parties to the Stalking Horse Agreement (as defined below) in their commercially reasonable discretion and in consultation with the Supporting Parties and the Committee), (i) approving the sale of the West Lorain Assets free and clear of liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, (ii) approving the assumption and assignment of certain executory contracts pursuant to sections 363 and 365 of the Bankruptcy Code and related cure amounts, and (iii) granting related relief.

A. **Marketing and Sale Process**

9. FG's pursuit of a sale of the West Lorain Assets began in the summer of 2018.[2] The sale process, which is being led by Lazard Frères & Co. LLC ("Lazard"), was formally launched on July 30, 2018. FG and Lazard began the sale process by reaching out to thirty-nine potential counterparties, consisting of broadly-focused financial investors, power- and energy-

---

[2] Additional information regarding the marketing and sale process is set forth in the Declaration of Tyler Cowan (the "Cowan Declaration"), filed contemporaneously herewith.

4

focused financial investors, strategic power generation companies, demolition and salvage companies, and entities that had expressed interest to FG's advisors. *See* Cowan Decl. ⁋ 6. Of those thirty-nine initial potential counterparties, twenty-one executed non-disclosure agreements with FG and were provided with a confidential information memorandum and financial projections. *Id.*

10. The deadline for interested counterparties to submit a phase one bid was September 7, 2018. *See* Cowan Decl. ⁋ 7. FG received a total of fourteen phase one bids, which were evaluated by Lazard. Lazard recommended inviting all parties who submitted a phase one bid over $100 million—seven potential counterparties—to conduct further due diligence during phase two of the process. *Id.* In addition, Lazard provided feedback to counterparties that submitted phase one bids that were marginally lower than $100 million—three potential counterparties—to raise their bids to remain in the process. *Id*. One such potential counterparty raised its bid over $100 million and was invited to join phase two. *Id*.

11. After one potential counterparty dropped out, seven potential counterparties participated in phase two. *See* Cowan Decl. ⁋ 8. The potential counterparties that participated in phase two were given access to additional diligence information, participated in a management presentation and a site visit, and received a draft asset purchase agreement and bid procedures. *Id*. The deadline for phase two participants to submit an updated proposal was November 2, 2018. *Id.* Six parties submitted phase two proposals, which included updated bids and redlines of the asset purchase agreement and bid procedures. *Id.* In evaluating each of the proposals, FG and its advisors considered, among other things, (i) the consideration offered by each potential buyer; (ii) the conditions to be imposed by each potential buyer, including the conditions of

5

closing; (iii) the potential buyer's ability to close a transaction; and (iv) the proposal's impact on FG's creditors and input from FG's creditor constituencies. *Id.*

12.     Over the following few weeks, FG and its advisors engaged in extensive negotiations with the phase two bidders that appeared to have the highest or otherwise best bids. *See* Cowan Decl. ¶ 9. These negotiations included numerous calls with legal and commercial teams from FG and commercial and legal personnel at each bidder. *Id.*

13.     After extensive deliberations with the advisors and separate negotiations with the potential bidders that participated in phase two, FG has elected to proceed with the bid submitted by Vermillion Power, LLC (the "Stalking Horse Purchaser")[3] as the highest or otherwise best bid received for the West Lorain Assets, subject to FG's receipt of any higher or otherwise better bids at an Auction proposed to be held on **January 15, 2019**.

14.     Absent the approval of the Bid Procedures, a Sale Transaction, and the related relief contemplated by this Motion, FG believes it will be unable to realize the maximum value of the West Lorain Assets for the benefit of all stakeholders.[4]

**B.      Proposed Sale Transaction**

   *i.      The Stalking Horse Agreement*

15.     FG and the Stalking Horse Purchaser negotiated an asset purchase agreement (the "Stalking Horse Agreement"), a copy of which is annexed hereto as **Exhibit B**, which represents a binding bid for the West Lorain Assets. The total consideration to be realized by FG is approximately $151,700,000, subject to certain adjustments set forth in the Stalking Horse

---

[3] Vermillion Power, LLC is an affiliate of Starwood Energy Group. Starwood Energy Group is a private investment firm based in Greenwich, CT that specializes in energy infrastructure investments. Through its general opportunity funds and other affiliated investment vehicles, Starwood Energy Group has raised equity commitments in excess of $3 billion and has executed transactions totaling more than $7 billion in enterprise value.

[4] In further support of the Sale Transaction, FG submits the Declaration of Kevin T. Warvell (the "Warvell Declaration"), filed contemporaneously herewith.

6

Agreement (the "Stalking Horse Bid"). Certain terms of the Stalking Horse Agreement are described below:

| APA Term[5] | Summary Description |
|---|---|
| Parties | FirstEnergy Generation, LLC, as Seller<br><br>Vermillion Power, L.L.C., as the Stalking Horse Purchaser |
| Purchase Price | $144,000,000 (the "**Initial Purchase Price**") *plus* the Closing Adjustment Amount *plus* the Proration Adjustment Amount. "Closing Adjustment Amount" means an amount equal to the Book Value of Seller's right, title and interest in and to (i) the Inventory located at the West Lorain Facility and (ii) the spare parts located at the West Lorain Facility, determined in accordance with Seller's accounting system, in each case, on the Closing Date. (Section 2.06) |
| Deposit | 10% of the Initial Purchase Price, to be deposited into escrow on or before the Business Day following the date on which the Escrow Agreement is executed. Seller may retain the Deposit as liquidated damages in the event of the Stalking Horse Agreement or the Stalking Horse Purchaser's material breach of the Stalking Horse Agreement or the Stalking Horse Purchaser's failure to close when required. (Section 2.07) |
| Purchased Assets | The Purchased Assets are (a) the Owned Real Property; (b) the Entitled Real Property; (c) the West Lorain Facility; (d) the Tangible Personal Property; (e) the Transmission and Interconnection Facilities; (f) the Assumed Contracts; (g) all electric capacity rights and obligations; (h) Transferred Permits; (i) Purchased Intellectual Property; (j) Purchased Warranties; (k) all related rights of the Seller in and to any causes of action against a third party; (l) all Records or copies of Records; (m) certain Emissions Allowances; (n) Seller's rights to deposits; (o) goodwill of the Business and (p) certain specified assets. |
| Closing Conditions | The Stalking Horse Agreement contains usual and customary conditions to closing, including:<br>• No order shall have been entered prohibiting the Transactions (Section 7.01(a))<br>• HSR and other regulatory approvals and receipt of governmental consents (Section 7.01(b))<br>• The receipt of certain specific third party consents (Section 7.01(c))<br>• FERC 203 Approval (Section 7.01(d))<br>• The Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, which shall be Final Orders (Section 7.01(e))<br>• Accuracy of the other Party's representations and warranties (subject to a material adverse effect threshold) and material performance of covenants (Section 7.02(a) and (b) and Section 7.03(a) and (b))<br>• No Seller Material Adverse Effect or Buyer Material Adverse Effect shall exist (Section 7.02(c) and Section 7.03(c))<br>• Receipt of a certificate from an authorized officer acknowledging satisfaction of the conditions to Closing (Section 7.02(d) and Section 7.03(d))<br>• The release of Liens on the Purchased Assets (Section 7.02(d) and (e)) |

[5] This summary of the terms of the Stalking Horse Agreement has been included for the convenience of the parties receiving this Motion. This summary in no way alters, changes, or amends the actual terms set forth in the Stalking Horse Agreement. In the event that there are any inconsistencies between this summary and the actual terms of the Stalking Horse Agreement, the language set forth in the Stalking Horse Agreement controls. Defined terms used in this summary shall have the meanings ascribed to them in the Stalking Horse Agreement.

| | |
|---|---|
| | • The receipt of the Buyer Required Approvals (Section 7.02(f)) <br> • Stalking Horse Purchaser's receipt of a title insurance policy (Section 7.02(g)) <br> • Exchange of Closing deliverables (Section 7.02(h) and Section 7.03(d)) |
| **Representations and Warranties of Seller** | The Stalking Horse Agreement contains standard representations and warranties (with schedule carve outs) with respect to Seller. <br><br> Seller makes the following reps: <br> • Corporate existence and power (Section 3.01) <br> • Corporate authorization (Section 3.02) <br> • Government authorization (Section 3.03) <br> • Non-contravention (Section 3.04) <br> • Finders' fees (Section 3.05) <br> • Required consents (Section 3.06) <br> • Contracts (Section 3.07) <br> • Litigation (Section 3.08) <br> • Compliance with laws (Section 3.09) <br> • Title (Section 3.10) <br> • Employees (Section 3.11) <br> • Environmental matters (Section 3.12) <br> • Permits (Section 3.13) <br> • Taxes (Section 3.14) <br> • Sufficiency of Purchased Assets (Section 3.15) <br> • Intellectual Property (Section 3.16) <br> • Insurance (Section 3.17) <br> • Absence of certain changes (Section 3.18) <br> • Real Property (Section 3.19) <br> • Financial Statements (Section 3.20) <br> • Credit Support (Section 3.21) |
| **Representations and Warranties of Stalking Horse Purchaser** | The Stalking Horse Agreement contains standard representations and warranties by the Buyer including as to (i) corporate existence and power, (ii) corporate authorization, (iii) governmental authorization, (iv) non-contravention, (v) finders' fees, (vi) available funds, (vii) solvency and (viii) litigation. |
| **Covenants** | The Stalking Horse Agreement includes covenants made or agreed to by the parties typical and customary for transactions of this kind, including, without limitation, covenants relating to (i) the conduct of business through the Closing; (ii) access to information; (iii) further assurances; (iv) anti-trust clearance; (v) approvals; (vi) employee matters; (vii) confidentiality; (viii) insurance; (ix) casualty and condemnation; (x) real property; (xi) bulk sales; (xii) reactive services; (xiii) release of liens; (xiv) submission for Bankruptcy Court approval; (xv) overbid procedures; (xvi) expense reimbursement and termination fee; (xvii) cure payments, (xviii) completing bids and (xix) access agreement and substation easements. |
| **Expense Reimbursement and Termination Fee** | The Stalking Horse Agreement contemplates that, under certain circumstances, the Stalking Horse Purchaser shall be entitled to a Termination Fee equal to 2.5% of the Initial Purchase Price and a Buyer Expense Reimbursement equal to 1% of the Initial Purchase Price. |

16.     The Stalking Horse Agreement includes various customary representations, warranties, and covenants by and from FG and the Stalking Horse Purchaser, as well as certain conditions to closing and rights of termination.  The transaction contemplated by the Stalking Horse Agreement is subject to approval by the Court and entry of the Bid Procedures Order and the Sale Order.

17.     The Stalking Horse Purchaser is not an "insider" or "affiliate" of FG, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling shareholders exists between the Stalking Horse Purchaser and FG.

18.     Ample authority exists for approval of the sale envisioned by this Motion. Bankruptcy Code section 363(b) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1).  Courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *In re Lionel Corp.*, which decision has been adopted in the Sixth Circuit.  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) *adopted by Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (sale may be authorized "when a sound business purpose dictates such action.").  Once a debtor articulates a valid business justification, there is under the business judgment rule "a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (citation omitted)); *see also Comm. of Asbestos-*

9

*Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions") (citation omitted). The sale of the West Lorain Assets is critical to preserving and realizing their value and, in turn, to maximizing recoveries for FG's stakeholders. Pursuing the Stalking Horse Agreement and the Sale Transaction represents a reasonable exercise of FG's business judgment and is in the best interests of all parties.

19.     FG believes that the purchase price set forth in the Stalking Horse Agreement is fair and reasonable, and the Court and parties in interest will be assured at the Sale Hearing—after an extended diligence period and the prepetition marketing by FG's advisors—that FG will have selected the highest or otherwise best offer for the West Lorain Assets.

## C.     <u>Bid Procedures and Bid Protections</u>

### i.     *Bid Procedures*

20.     FG's proposed Bid Procedures are designed to maximize value for FG's estate in connection with the Sale Transaction and provide an opportunity for all interested parties to submit offers for the West Lorain Assets. The Bid Procedures describe, among other things, the manner in which potential bidders and bids become "qualified," the procedures for receipt and negotiation of bids, the conduct of the Auction, if any, the election and approval of any successful bidders (the "<u>Successful Bidders</u>"), and related deadlines. The Bid Procedures afford FG a sufficient opportunity to pursue a robust sale process that will maximize the value of the West Lorain Assets for the benefit of their estates and all stakeholders.

21.     Certain of the key terms of the Bid Procedures are highlighted below:

   a.   **Bid Deadline**: Any person or entity interested in participating in the Auction must submit a Qualified Bid (as defined herein) on or before **January 9, 2019 at 5:00**

10

**p.m. (prevailing Eastern Time)**, or such other later date and time established by FG in accordance with the terms hereof (the "Bid Deadline"), in writing, to the attorneys for FG, Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Ave. N.W., Washington, DC 20036 (Attn: Scott L. Alberino, Esq. and Kate Doorley, Esq.) (salberino@akingump.com and kdoorley@akingump.com) and One Bryant Park, New York, NY 10036 (Attn: David H. Botter, Esq. and Zachary Wittenberg, Esq.) (dbotter@akingump.com and zwittenberg@akingump.com). FG shall provide the Supporting Parties[6] and the Committee with copies of each bid received, *provided, however*, that the Supporting Parties and the Committee may not contact or otherwise engage in any discussions with any Qualified Bidder or Potential Bidder concerning its bid, the bidding process or the West Lorain Assets absent the express written consent of FG, which consent may be provided by e-mail from FG's counsel. FG may extend the Bid Deadline, in consultation with the Supporting Parties and the Committee, and shall promptly notify all potential bidders of any such extension.

b. **Auction Qualification Procedures**: To participate in the bidding process and be deemed a "Qualified Bidder," each potential bidder must submit a "Qualified Bid" by the Bid Deadline.[7] To constitute a Qualified Bid, a bid must:

    i.       be in writing;

    ii.      provide for the purchase of all or substantially all of the West Lorain Assets and identify the liabilities (including, without limitation, a proposed list of contracts, if any, that the Potential Bidder proposes to assume in connection with the transaction (the "Assigned Contracts")), if any, to be assumed by the Potential Bidder;

    iii.     provide for a cash purchase price equal to or greater than the sum of: (i) $151,700,000; (ii) the Termination Fee in the amount of 2.5% of the Initial Purchase Price, as defined in the Stalking Horse Agreement; (iii) the Buyer Expense Reimbursement in the amount of 1% of the Initial Purchase Price, as defined in the Stalking Horse Agreement; and (iv) $1,000,000;

    iv.     include an acknowledgement and representation that the Potential Bidder will assume FG's obligations that arise after the closing under the Assigned Contracts proposed to be assigned pursuant to the Sale Transaction;

---

[6] The Supporting Parties shall be those parties set forth in that certain Process Support Agreement approved by the Court in the *Order (I) Authorizing Debtors to Assume (A) The Process Support Agreement and (B) The Standstill Agreement and (II) Granting Related Relief* [Docket No. 509].

[7] For the avoidance of doubt, the Stalking Horse Purchaser is deemed to be a Qualified Bidder for purposes of the Bid Procedures.

11

v.       include information sufficient to demonstrate the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such Potential Bidder's ability to perform under the Assigned Contracts proposed in the bid to be assumed by FG and assigned to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such Assigned Contracts as and when deemed necessary by FG;

vi.      to the extent a potential bidder has not already executed such an agreement, include an executed version of a valid confidentiality or non-disclosure agreement, in form and substance satisfactory to FG;

vii.     fully disclose the legal identity of each entity that will be bidding for the West Lorain Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

viii.    provide current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the West Lorain Assets, current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will either guarantee the obligations of the Potential Bidder, or provide such other form(s) of financial disclosure and credit-quality support or enhancement that will allow FG and its advisors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale Transaction;

ix.      state that such bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement (as defined below) and detail the source(s) of funds that will be used to consummate the transactions;

x.       include satisfactory evidence of committed financing or other financial ability to consummate the transactions contemplated by the Modified Asset Purchase Agreement (as defined below) in a timely manner;

xi.      fully disclose any connections or agreements with FG, any non-Debtor affiliate of FG, any other known Potential Bidders or Qualified Bidders, and/or any officer or director of FG;

xii.     contain a signed definitive asset purchase agreement, including all exhibits and schedules contemplated thereby (other than exhibits

12

and schedules that, by their nature, must be prepared by FG or which have yet to be provided to the Potential Bidders) (the "<u>Modified Asset Purchase Agreement</u>"), with, at minimum, the following requirements: (i) having materially similar terms and conditions as the Stalking Horse Agreement, except with higher or otherwise better consideration, and (ii) containing terms and conditions otherwise no less favorable, as determined by FG in its sole discretion in consultation with the Supporting Parties and the Committee, to FG's estate than the terms and conditions in the Stalking Horse Agreement (provided that no Qualified Bid shall provide for the payment to the Potential Bidder of any breakup fee, topping fee, termination fee, expense reimbursement or similar arrangement);

xiii.    include a marked copy of the Modified Asset Purchase Agreement reflecting the differences between the Modified Asset Purchase Agreement and the Stalking Horse Agreement;

xiv.    expressly acknowledge and represent that the Potential Bidder (i) has had an opportunity to conduct any and all due diligence regarding the West Lorain Assets prior to making its bid, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and the West Lorain Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the West Lorain Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Modified Asset Purchase Agreement ultimately accepted and executed by FG;

xv.    not be conditioned upon the obtaining or sufficiency of financing or any internal approval, or on the outcome or review of due diligence;

xvi.    not contain any condition to closing of the transaction on the receipt of any third-party approvals, to the extent necessary (excluding required Court approval, any required consents under the Assumed Contracts subject to the terms and conditions in the Modified Asset Purchase Agreement, and required governmental and/or regulatory approval, if any);

xvii.    include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with

13

respect to the submission, execution, delivery, and closing of the Sale Transaction;

xviii.    state the specific person(s) whom FG's investment bankers, Lazard, should contact in the event that FG has any questions or wishes to discuss the Modified Asset Purchase Agreement;

xix.    include a good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a certified or bank check (or other form acceptable to FG in its sole and absolute discretion) payable to the order of FirstEnergy Generation, LLC in an amount equal to ten (10%) percent of the purchase price offered to purchase the West Lorain Assets. All Good Faith Deposits shall be held in an escrow account established by FG pursuant to the escrow agreement provided by FG (the "<u>Escrow Agreement</u>"). Each bid should include any proposed modifications to the Escrow Agreement. All Good Faith Deposits shall be held until no later than five (5) business days after the Sale Hearing and thereafter returned to the respective bidders in accordance with the Bid Procedures, unless the bidder has been selected as the Successful Bidder (as defined below);

xx.    remain open and irrevocable until five (5) business days after the Sale Hearing;

xxi.    contain other information reasonably requested by FG; and

xxii.    be received by the Bid Deadline.

c.    **Qualified Bidder**: FG will determine, in consultation with the Supporting Parties and the Committee, whether to entertain bids that do not conform to one or more of the requirements specified herein and whether to deem such bids to be Qualified Bids. FG, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, shall make a determination regarding whether a bid constitutes a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than **January 10, 2019 at 5:00 p.m. (prevailing Eastern Time)** or the business day following the Bid Deadline. If FG does not receive any Qualified Bids other than the bid set forth in the Stalking Horse Agreement, the Auction shall be cancelled and FG shall report the same to the Supporting Parties, the Committee, the Stalking Horse Purchaser, and the Court, and subject to obtaining approval of the Court and satisfaction of the conditions set forth in the Stalking Horse Agreement, FG shall promptly proceed to consummate the Sale Transaction with the Stalking Horse Purchaser pursuant to (and subject to) the terms and conditions set forth in the Stalking Horse Agreement. In addition, if no Qualified Bid is received (other than the Stalking Horse Agreement), FG reserves the right,

14

subject to the consent of the Stalking Horse Purchaser, which consent shall not be unreasonably withheld, to request that the Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

d. **Auction, Auction Procedures, and Overbids**: In the event that FG receives one or more timely Qualified Bids other than the Stalking Horse Agreement, FG shall conduct the Auction. The Auction, if required, will be conducted at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 on **January 15, 2019 at 9:00 a.m. (prevailing Eastern Time)**, or such other time and location as designated by FG, in its sole and absolute discretion, in a notice to all Qualified Bidders, the Committee and the Supporting Parties. FG reserves the right, in its sole and absolute discretion, subject only to the exercise of its business judgment in accordance with its fiduciary duties, in consultation with the Supporting Parties and the Committee, to adjourn or cancel the Auction at or prior to the Auction. If the Auction is cancelled or if the date, time, or place of the Auction is changed, FG will file a notice with the Court regarding such cancellation or modification and will publish the notice on the website of Prime Clerk LLC at http://cases.primeclerk.com/FES. The Auction shall be governed by the following procedures, subject to modification by FG, in consultation with the Supporting Parties and the Committee. At the Auction:

    i.    The Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

    ii.    only representatives of FG, the Supporting Parties, the Committee, the Office of the United States Trustee, and the Qualified Bidders shall be entitled to be present at the Auction. Any and all other creditors interested in attending the Auction must provide FG with notice of their intent to attend the Auction no later than ten (10) days before the Auction by notifying counsel for FG, Akin Gump Strauss Hauer & Feld LLP (Attn: Scott L. Alberino, Esq., David H. Botter, Esq., Zachary Wittenberg, Esq. and Kate Doorley, Esq.). FG may object to and request a hearing regarding the attendance of any particular creditor at the Auction;

    iii.    only Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

    iv.    each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale Transaction;

    v.    bidding shall commence at the initial highest bid, which FG, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, shall announce to all

15

Qualified Bidders, the Supporting Parties and the Committee no later than one (1) business day prior to the Auction (such bid, the "Opening Bid"). The Opening Bid may be an Initial Topping Bid or the Stalking Horse Purchaser's bid;

vi. Qualified Bidders may then submit successive bids higher than the previous bid, based on and increased from the Opening Bid, in increments of at least $1,000,000, *provided* that FG reserves the right, in their sole and absolute discretion, following consultation with the Supporting Parties and the Committee, to announce reductions or increases in minimum incremental bids at any time during the Auction (each, an "Overbid");

vii. all Qualified Bidders shall have the right to submit Overbids and make additional modifications to the Stalking Horse Agreement or their respective Modified Asset Purchase Agreement, as applicable, at the Auction to improve such bids;

viii. the Auction may include individual negotiations with the Qualified Bidders, however, all incremental bids by Qualified Bidders shall occur in open bidding in the presence of all other Qualified Bidders;

ix. FG reserves the right to (i) determine, in their sole and absolute discretion following consultation with the Supporting Parties and the Committee, which bid is the highest or otherwise best and (ii) reject at any time, without liability, any offer that FG, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, deems to be (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or procedures set forth therein or in these Bid Procedures, or (c) contrary to the best interests of FG and its estate;

x. the Auction among Qualified Bidders shall continue according to these procedures until FG determines, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, subject to Court approval, that FG has received a Successful Bid. In making this decision, FG may consider, without limitation, the amount of the purchase price, the amount of proposed assumed liabilities, the value of any excluded assets, the form of consideration being offered, the tax consequences of such bid, the likelihood of the Qualified Bidder's ability to close a given transaction, the proposed timing thereof, and rights of such Qualified Bidder and FG with respect to the termination thereof, the number, type and nature of any changes reflected in the

16

Modified Asset Purchase Agreement requested by each Qualified Bidder, the extent to which such changes are likely to delay closing of the Sale Transaction and the cost to FG of such changes or delay, and the net benefit to FG's estate, taking into account the Stalking Horse Purchaser's rights to the Termination Fee and the Buyer Expense Reimbursement. Upon making this decision, FG shall announce the Successful Bidder in the presence of all other Qualified Bidders and close the Auction. The Qualified Bidder submitting such Successful Bid for the West Lorain Assets shall become the Successful Bidder and shall have such rights and responsibilities of a purchaser, as set forth in the Modified Asset Purchase Agreement or the Stalking Horse Agreement, as applicable;

xi.     the Auction shall be transcribed and may also be videotaped;

xii.    after consultation with the Committee and the Supporting Parties, FG may, in its sole and absolute discretion subject only to its business judgment, employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not materially inconsistent with these Bid Procedures, the Bankruptcy Code, or any order of the Court and (ii) disclosed to each Qualified Bidder at the Auction; and

xiii.   all bidding for the West Lorain Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing, and following the closing of the Auction, FG shall not initiate contact with, solicit, or encourage proposals from any person or entity with respect to the West Lorain Assets.

e.   **Back-Up Bidder**: If an Auction is conducted, the Qualified Bidder (including the Stalking Horse Purchaser) with the next highest or otherwise best Qualified Bid for the West Lorain Assets at the Auction other than the Successful Bidder (the "Back-Up Bid") as determined by FG in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, shall be required to serve as the back-up bidder (the "Back-Up Bidder") for the West Lorain Assets and keep such Back-Up Bid open and irrevocable until the first to occur of (i) 60 days after the termination of the transaction with the Successful Bidder, (ii) consummation of the transaction with the Successful Bidder, or (iii) termination of the Back-Up Bidder's obligations under the Stalking Horse Agreement or under the Modified Asset Purchase Agreement with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction whether due to the Successful Bidder's breach or otherwise, the Back-Up Bidder will be automatically deemed to be the new

17

Successful Bidder, and FG will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

f. **Alteration of Procedures and Reservation of Rights**: FG reserves the right, in their sole and absolute discretion, subject only to the exercise of their business judgment in accordance with their fiduciary duties, following consultation with the Supporting Parties and the Committee, to alter or terminate these Bid Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, provide reasonable accommodations to any potential bidders with respect to such terms, conditions, and deadlines of the Bid Procedures and bid process to promote further bids by such bidders and/or, following consultation with the Supporting Parties and the Committee, to terminate discussions with any and all prospective acquirers and investors (except for the Successful Bidder) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bid Procedures. Any modification that FG makes to the Bid Procedures shall apply to all Qualified Bidders; *provided, however* that any modification of bidding procedures shall not be inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Bidding Procedures Order or any other order of the Court entered in the chapter 11 cases.

22. FG believes that the Bid Procedures are fair and reasonable and will ensure that the Auction, if necessary, will yield the maximum value for FG's estate and stakeholders. The Bid Procedures provide an appropriate framework for FG to review, analyze, and compare all bids received to determine which bid(s) are in the best interests of FG and its economic stakeholders. The Bid Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids (as such terms are defined in the Bid Procedures). Accordingly, approval of the Bid Procedures, including the dates established therein for the Auction and the Sale Hearing, is warranted, and FG respectfully requests the Court approve them in their entirety.

ii. *Break-Up Fee and Expenses Reimbursement*

23. The Bid Procedures contain certain bid protections for the Stalking Horse Purchaser.[8] FG submits that the Bid Procedures and bid protections are an integral part of the

---

[8] Subject to the terms of the Stalking Horse Agreement, FG retains the right to alter or amend the Bid Procedures at any time prior to, or during, the Auction.

Sale Transaction and are beneficial to FG's estate. The Stalking Horse Agreement contains additional bid protections; namely, the provision of a break-up fee in the amount of 2.5% of the Initial Purchase Price, as defined in the Stalking Horse Agreement] (the "Termination Fee") and an expense reimbursement of up to 1% of the Initial Purchase Price, as defined in the Staking Horse Agreement (the "Expense Reimbursement" and collectively with the Termination Fee, the "Bid Protections"), which would be payable in the event that a higher or otherwise better competing bid in respect of the West Lorain Assets is consummated and under certain other limited circumstances, all as provided in the Stalking Horse Agreement.

24.     The Bid Procedures also contemplate an Initial Topping Bid of $1,000,000.00 and that subsequent overbids shall be in the amount of $1,000,000.00.

25.     Approval of bid protections in the form of termination fees and expense reimbursements to be paid as an administrative expense claim in connection with a stalking horse bid for a sale of assets pursuant to section 363 of the Bankruptcy Code has become a widely-accepted practice in chapter 11 cases. These protections, individually, and collectively, were a material inducement for, and condition of, the Stalking Horse Purchaser's entry into the Stalking Horse Agreement. The Stalking Horse Purchaser is unwilling to commit to hold open its offer under the terms of the Stalking Horse Agreement unless assured of payment of the Termination Fee and Expense Reimbursement under the conditions set forth in the Stalking Horse Agreement. The Termination Fee and Expense Reimbursement promote more competitive bidding by inducing the Stalking Horse Purchaser to hold its offer open as a minimum or floor bid on which other potential bidders—and FG—can rely. The Stalking Horse Bid increases the likelihood that the price at which the West Lorain Assets are sold will reflect their true worth. Such protections have been approved by a number of other courts around the

19

country.  *See, e.g., In re Luca Int'l Gro., LLC*, 15-34221 (DRJ) (Bankr. S.D. Tex. Feb. 1, 2016) (approving break-up fees); *In re RAAM Global Energy Co.*, 15-35616 (MI) (Bankr. S.D. Tex. Dec. 20, 2015) (approving expense reimbursement); *In re The Great Atlantic & Pacific Tea Co.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (approving break-up fees and expense reimbursements); *In re Finlay Enters, Inc., et al.*, Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fees).

26.     Courts have held that the break-up fees should be approved so long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *See, e.g., In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014).  FG submits that the Termination Fee and Expense Reimbursement should be approved under each of these factors.  First, the Termination Fee and the Expense Reimbursement are the product of good faith, arm's-length negotiations between FG and the Stalking Horse Purchaser.  Second, FG believes, based on its business judgment, that the Termination Fee and Expense Reimbursement will enable it to maximize the value of the West Lorain Assets without chilling bidding.  The Termination Fee and Expense Reimbursement were a material inducement for, and a condition of, the Stalking Horse Purchaser's agreement to enter into the Stalking Horse Agreement, which in turn assures FG of a sale to a committed bidder at a price that FG believes is fair and reasonable, while providing the opportunity that FG could receive a higher or otherwise better offer at the Auction.  Third, FG believes that the Termination Fee and Expense Reimbursement are reasonable and appropriate relative to the size, nature and complexity of the transaction and the commitments made and resources expended by the Stalking Horse Purchaser.

20

27.     The foregoing Bid Protections will not deter or chill bidding and are reasonable, and the proposal of the same will enable FG to maximize the value of the West Lorain Assets for the benefit of its estate and stakeholders.   Accordingly, FG respectfully request that the Bid Protections be approved.

### D.     Approval of Assumption and Assignment Procedures

28.     To facilitate the Sale Transaction, FG proposes the following procedures with respect to the assumption and assignment of certain contracts:

a.     **Notice of Assumption and Assignment of Executory Contracts**:   No later than **December 20, 2018** FG shall file with the Court and serve via first class mail on (i) all counterparties to FG's executory contracts that the Stalking Horse Purchaser wishes to assume in connection with the Sale Transaction (the "Executory Contracts") and (ii) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "Executory Contract Notice Parties") a notice of assumption, assignment, and sale, substantially in the form of the Notice of Assumption and Assignment attached to the Bid Procedures Order as **Exhibit 2**, listing all of the Executory Contracts that the Stalking Horse Purchaser proposes to be assumed and assigned to it in connection with the Sale Transaction (each, an "Assumed Contract"), which Notice of Assumption and Assignment shall include FG's calculation of the amount necessary to cure all monetary defaults, if any, (the "Cure Costs") for each Assumed Contract.   In the event that the Stalking Horse Purchaser is not the Successful Bidder, FG shall file a schedule of any Executory Contracts that were not designated as Assumed Contracts by the Stalking Horse Purchaser (such contracts, "Newly Designated Assumed Contracts"), but which the Successful Bidder wishes to assume, no later than one (1) day following the conclusion of the Auction.   Any counterparty to such Newly Designated Assumed Contract that objects to the assumption and assignment of such contract to the Successful Bidder must file an objection no later than the commencement of the Sale Hearing.

b.     **Objections to Assumption and Assignment**:   Any counterparty to an Assumed Contract that objects to the assumption of its Assumed Contract or the proposed Cure Costs associated with its Assumed Contract shall file any objections to (i) the proposed assumption, assignment, and sale of the Assumed Contracts (and must state in its objection, with specificity, the legal and factual basis thereof) and (ii) if applicable, the proposed Cure

21

Costs (and must state in its objection, with specificity, what Cure Costs are required with appropriate documentation in support thereof) no later than **January 18, 2019 at 4:00 p.m. (ET)** (the "Assumption and Assignment Objection Deadline").

Any objections shall (i) be in writing; (ii) comply with the Bankruptcy Rules; (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the Northern District of Ohio at 455 U.S. Courthouse, 2 Main Street, Akron, Ohio 44308, together with proof of service on or before the Assumption and Assignment Objection Deadline; and (iv) be served, so as to be actually received on or before the Assumption and Assignment Objection Deadline upon the Contract Objection Notice Parties.

c.      The "Contract Objection Notice Parties" are as follows: (i) FG, FirstEnergy Generation, LLC, 341 White Pond Drive, Akron, OH 44320 (Attn: Rick Giannantonio, Esq.); (ii) counsel for FG, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 (Attn: David H. Botter, Esq. and Zachary Wittenberg, Esq.) and 1333 New Hampshire Avenue, N.W., Washington, DC 20036 (Attn: Scott L. Alberino, Esq. and Kate Doorley, Esq.); (iii) local counsel for FG, Brouse McDowell LPA, 388 South Main St., Suite 500, Akron, OH 44311 (Attn: Kate Bradley, Esq. and Bridget A. Franklin, Esq.); (iv) the Office of the United States Trustee, Howard M. Metzenbaum U.S. Courthouse, 201 Superior Avenue East, Suite 441, Cleveland, OH 4414 (Attn: Tiiara Patton, Esq.); (v) counsel to the Stalking Horse Purchaser, King & Spalding LLP, 1185 6th Avenue, New York, NY 10036 (Attn: Jonathan Melmed, Esq. and Austin Jowers, Esq.); (vi) counsel to the Ad Hoc Noteholders Group, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Joshua K. Brody, Esq.) ; (vii) counsel to the Mansfield Certificateholders Group, Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: George A. Davis, Esq. and Andrew M. Parlen, Esq.); and (viii) counsel to the Committee, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005 (Attn: Evan Fleck, Esq. and Parker Milender, Esq.).

d.      If a counterparty to an Assumed Contract files a timely objection asserting a higher Cure Cost than the Cure Costs set forth in the Notice of Assumption and Assignment, and the parties are unable to consensually resolve the dispute prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing or at a subsequently scheduled hearing as mutually agreed to by FG and the relevant counterparty.  All other objections to the proposed assumption and assignment of FG's right, title, and interest in, to, and under the Executory Contract, if it is ultimately designated an Assumed Contract, will be heard at the Sale Hearing.

e.  If no objection is timely filed and served, the counterparty to an Assumed Contract shall be deemed to have consented to the assumption, assignment, and sale of the Assumed Contract to the applicable Successful Bidder(s) and shall be forever barred from asserting any objection with regard to such assumption, assignment, and sale, except, in the case of a counterparty to an Assumed Contract, with respect to the ability of any Successful Bidder(s) to provide adequate assurance of future performance. Any objections from a counterparty to an Assumed Contract to any Successful Bidder's proposed form of adequate assurance of future performance must be raised prior to the Sale Hearing and will be resolved at the Sale Hearing.

The Cure Costs set forth in the Notice of Assumption and Assignment shall be controlling, notwithstanding anything to the contrary in any Assumed Contract, or any other document, and the counterparty to the Assumed Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Assumed Contract against FG or the Successful Bidder(s), or the property of any of them.

29.  Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). When determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease, courts in the Sixth Circuit apply the "business judgment" test. *See In re Greektown Holdings, L.L.C.*, 51 Bankr. Ct. Dec. 173, *3 (Bankr. E.D. Mich. 2009) ("Courts initially apply a 'business judgment' and 'benefit to the estate' test under § 365(a) to determine whether or not a debtor should be allowed to assume an executory contract.") (citation omitted); *In re VisionAmerica, Inc.*, 47 Collier Bankr. Cas. 2d (MB) 166 (Bankr. W.D. Tenn. 2001) (adopting the "flexible 'business judgment' test" for the assumption of executory contracts) (citation omitted); *In re Federated Dep't. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases."); *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 495 (Bankr.

S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code, and particularly of 11 U.S.C. § 365.").

30.    In connection with the Sale Transaction, FG will assume and assign only the Assumed Contracts pertaining to the West Lorain Assets. FG's assumption of the particular Assumed Contracts will be contingent upon payment of the Cure Costs and effective only upon the closing of the proposed Sale Transaction. Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Pursuant to section 365(k), FG will, therefore, be relieved from any liability for any breach of an Assumed Contract after assignment to the Successful Bidder. As such, the assumption of the Assumed Contracts constitutes an exercise of FG's sound business judgment.

31.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts that will be assumed be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, FG proposes to file with the Court, and serve on each counterparty to an Assumed Contract, a copy of the Notice of Assumption and Assignment indicating FG's calculation of the Cure Costs for each such contract. Assumed Contract counterparties will have the opportunity to file any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, to the proposed Cure Cost.

24

32.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of another party's interest in such property if: (i) applicable non-bankruptcy law permits such a free and clear sale; (ii) the holder of the interest consents; (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  11 U.S.C. § 363(f).  Because Bankruptcy Code Section 363(f) is stated in the disjunctive, it is only necessary to meet one of the five conditions of the section.  *In re Shary,* 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993) ("the five conditions enumerated under 363(f) are disjunctive and, as such, a sale thereunder can be authorized if the trustee can prove any of the five conditions").

33.     The only lien on the West Lorain Assets is the lien of the trustee (the "Mortgage Trustee") under that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust from FG to the Trustee, filed for record June 27, 2008 and recorded in instrument No. 20080627-0032756 of the Lucas County Records, as supplemented or amended from time to time (the "FG Mortgage Indenture").  FG anticipates that the requirements of section 363(f) will be satisfied because the Mortgage Trustee will consent to the release of its lien under the FG Mortgage Indenture and to the sale of the West Lorain Assets, as proceeds of the sale will be paid to the Mortgage Trustee.  If necessary, FG believes that it will be able to provide additional evidence to demonstrate at the Sale Hearing that they have satisfied one or more of the conditions under section 363(f).  Accordingly, FG should be permitted to sell the West Lorain Assets free and clear of any interests in the West Lorain Assets, including the FG Mortgage Indenture.

34.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract

. . . is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *See In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

35. At the Sale Hearing, to the extent necessary, FG will be prepared to proffer testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under the applicable Assumed Contracts. The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Successful Bidder(s) to provide adequate assurance of future performance, as required by section 365(b)(1) of the Bankruptcy Code. Accordingly, FG requests that at the conclusion of the Sale Hearing, the proposed assumption and assignment of the applicable Assumed Contracts be approved.

i. *The Assumption and Assignment Procedures Provide Sufficient Notice and Are Appropriate*

36. As a procedural matter, "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease . . . is governed by Rule 9014." Fed. R. Bankr. P. 6006(a). Bankruptcy Rule 9014 provides that "[i]n a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought." Fed. R. Bankr. P. 9014(a). The notice and hearing requirements for contested matters under Bankruptcy Rule 9014 are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances. *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" or a similar

phrase to mean such notice and opportunity for hearing "as [are] appropriate in the particular circumstances").

37. FG respectfully submits that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored. Upon receipt of the Notice of Assumption and Assignment, the counterparties to Assumed Contracts will be given the opportunity to object to the assumption and assignment of their respective contracts or the proposed Cure Costs, as applicable.

38. The Assumption and Assignment Procedures provide that any contract counterparty that fails to object to the proposed assumption and assignment of any Assumed Contract will be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code, notwithstanding any anti-assignment provision or other restriction on assignment contained in the applicable contract. Courts have routinely granted such relief. *See, e.g.*, *In re Schwab Industries, Inc.*, Case No. 10-60702 (RK) (Bankr. N.D. Ohio May 4, 2010) [Docket No. 408] (ordering that any person that did not object to the assumption and assignment of executory contracts prior to the hearing would not be heard at the hearing); *see also Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not objecting to the sale motion, a creditor was deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

39. Establishing the Assumption and Assignment Procedures will streamline the administration of these Chapter 11 Cases and enhance the efficiency of the reorganization process by eliminating substantial legal expenses that would otherwise be incurred if multiple hearings were held on separate motions with respect to every Assumed Contract. Bankruptcy

Rule 6006(e) allows a trustee to seek authority to assign multiple executory contracts in one motion if the contracts are to be assigned to the same assignee. Fed. R. Bankr. P. 6006(e). FG seeks to assign each and all of the Assumed Contracts to the Stalking Horse Purchaser or Successful Bidder(s).

40.     The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances because they afford counterparties to the Assumed Contracts due process and the notice and opportunity to be heard. They also provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, FG submits that implementation of the Assumption and Assignment Procedures is appropriate in these Chapter 11 Cases and request that the Court authorize the assumption and assignment of the Assumed Contracts.

### E.     Approval of Sale Notice Procedures

41.     No later than three (3) business days after entry of the Bid Procedures Order, FG (or its agents) shall provide notice (substantially in the form of the Sale Hearing Notice annexed as **Exhibit 3** to the Bid Procedures Order) of the Motion, the Bid Procedures, the Auction, the Assumption and Assignment Objection Deadline, and the Sale Hearing by first-class mail upon (i) the Office of the United States Trustee for the Northern District of Ohio; (ii) the Stalking Horse Purchaser; (iii) the Committee; (iv) all persons known to FG to have expressed an interest to FG in a transaction with respect to the West Lorain Assets during the past 12 months; (v) all entities known by FG to have asserted any lien, claim, encumbrance, or other interest in the West Lorain Assets (for whom identifying information and addresses are available to FG); (vi) all non-Debtor parties to the Assumed Contracts (for whom identifying information and addresses are available to FG); (vii) any governmental authority known to have a claim related to the West

Lorain Assets; (viii) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (ix) all other persons as directed by the Court (for whom identifying information and addresses are available to FG) (collectively, the "Sale Notice Parties").

42.     By December 20, 2018, FG (or its agents) shall cause a summary version of the Sale Hearing Notice to be published on the website established by PrimeClerk.

43.     FG submits that the proposed Sale Hearing Notice, as described herein, complies fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto.  FG respectfully requests, therefore, that this Court approve the form of the Sale Hearing Notice and the notice procedures proposed above.

**F.     Protections as Good Faith Purchaser**

44.     Bankruptcy Code section 363(m) provides that

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

45.     In the Sixth Circuit, Bankruptcy Code section 363(m) grants finality to a sale to a good faith purchaser authorized under section 363(b) and thus maximizes value for the parties to the sale.  *See Official Comm. of Unsecured Creditors v. Anderson Senior Living Prop., LLC (In re Nashville Senior Living, LLC)*, 620 F.3d 584, 594 (6th Cir. 2010).

46.     A good faith purchaser under Bankruptcy Code section 363(m) is one who purchases assets for value, in good faith and without notice of adverse claims.  *Made in Detroit,*

29

*Inc. v. Official Comm. of Unsecured Creditors of Made in Detroit, Inc. (In re Made in Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir. 2005) (adopting the "traditional equitable definition of a 'good faith purchaser,'" defined as "one who purchases the assets for value, in good faith, and without notice of adverse claims") (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)); *see also In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). To be covered under the statutory protection of Bankruptcy Code section 363(m), the purchaser must demonstrate that it purchased the assets in good faith and that it did so for value. *In re Made in Detroit, Inc.*, 414 F.3d at 581 (citation omitted). To show lack of good faith, a party "must demonstrate that there was fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted 'an attempt to take grossly unfair advantage of other bidders.'" *Id.* (citing *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1218 (6th Cir. 1996)).

47.     The selection of the Successful Bidder(s) will be the product of arm's-length, good faith negotiations in a competitive bidding process that has been part of a months-long process run by FG and its advisors. Based upon the record to be made at the Sale Hearing, FG will request a finding that the Successful Bidder(s) is or are a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

48.     The orderly but expeditious sale of the West Lorain Assets is critical to maximizing their value for FG's stakeholders. Pursuing the Sale Transaction in the manner set forth above represents a reasonable exercise of FG's business judgment and is in the best interests of FG's estate and all its stakeholders.

### G. Adequate and Reasonable Notice of the Sale Transaction Will Be Provided

49.     The Sale Hearing Notice satisfies the requirements of Bankruptcy Rule 6004(a). The Sale Hearing Notice (i) will be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing, (ii) informs interested parties of the deadlines for objecting to the Sale Transaction, and (iii) otherwise includes all information relevant to parties interested in or affected by the Sale Transaction.

### H. The Stalking Horse Purchaser is Not an Appointed Professional in These Chapter 11 Cases

50.     Pursuant to Local Rule 6004-1, neither the Stalking Horse Purchaser nor any of its affiliates, members, officers, directors, shareholders, or any of their respective successors or assigns is a professional person appointed in these Chapter 11 Cases by order of the Court (an "Appointed Professional"), employee or affiliate of an Appointed Professional or member of an Appointed Professional's immediate family.

### REQUEST FOR RELIEF PURSUANT TO BANKRUPTCY RULES 6004(H) AND 6006(D)

51.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bank. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under section 365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

52.     In order to maximize recoveries for FG's stakeholders, FG asserts that the sale contemplated herein must be consummated as soon as practicable. Accordingly, FG respectfully requests that the Bid Procedures Order and Sale Order be effective immediately upon entry by

31

the Court and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

**NOTICE**

53.    Notice of this Motion has been served on the following parties and/or their counsel, if known, via facsimile, overnight delivery, e-mail, and/or hand delivery: (i) those parties listed on the General Service List (as defined in the *Amended Order Pursuant to Sections 102 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9013 and 9014 and Local Bankruptcy Rules Establishing: (I) Omnibus Hearing dates; and (II) Certain Case Management Procedures* [Docket No. 280]) and (ii) the Sale Notice Parties.  FG submits that, in light of the nature of the relief requested, no other or further notice need be given.

**NO PRIOR REQUEST**

54.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, FG respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

32

Dated:    November \_\_\_, 2018      **Respectfully submitted,**

_____

**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

 - and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
David H. Botter (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

   - and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*

33

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) Case No. 18-50757 |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

**ORDER APPROVING (A) BID PROCEDURES, (B) PROCEDURES FOR ASSUMPTION**
**AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND RELATED**
**NOTICES, (C) NOTICE OF AUCTION AND SALE HEARING,**
**AND (D) RELATED RELIEF**

Upon consideration of the *Motion of FirstEnergy Generation, LLC Pursuant to 11 U.S.C. §§ 105, 363, 365, and 503 and Fed. R. Bankr. P. 2002, 6004, and 6006 for Entry of (I) Order Approving (A) Bid Procedures, (B) Procedures for Assumption and Assignment of Certain Executory Contracts and Related Notices, (C) Notice of Auction and Sale Hearing, and (D) Related Relief and (II) Order (A) Approving the Sale of FirstEnergy Generation, LLC's West Lorain Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Related Cure Amounts, and (C) Granting Related Relief* (the "Motion")[2] filed by FirstEnergy Generation, LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to those terms in the Motion.

("FG"), one of the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"); and upon (i) the Cowan Declaration and (ii) the Warvell Declaration; and the Court having conducted a hearing on [____], 2018; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion; and it appearing that adequate and proper notice of the Motion has been given and that no other or further notice need be given; and upon the record of hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of FG, its estates, its creditors and all other parties in interest; and that the legal and factual bases set forth in the Motion, and the testimony adduced at the hearing, establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is HEREBY FOUND AND DETERMINED THAT:[3]

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9006 and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

B.      On the Petition Date, the Debtors commenced the Chapter 11 Cases.  On April 3, 2018, the Court entered an order [Docket No. 126] authorizing the joint administration of the Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b).  The Debtors have operated their businesses and managed their properties as debtors-in-possession pursuant to sections 1107(a)

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

C.    Proper, timely, adequate and sufficient notice of the Motion has been provided, as relevant, in accordance with Bankruptcy Code Sections 102(1), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006 and 9014 to all creditors, parties in interest and other interested persons and entities. Specifically, notice of this Motion has been provided to: (i) the Office of the United States Trustee for the Northern District of Ohio (the "U.S. Trustee"); (ii) the Stalking Horse Purchaser; (iii) the Official Committee of Unsecured Creditors (the "Committee"); (iv) all persons known by FG to have expressed an interest to FG in a transaction with respect to the West Lorain Assets during the past twelve (12) months; (v) all non-Debtor parties to the Assigned Contracts, (vi) all entities known by FG to have asserted any lien, claim, encumbrance or other interest in the West Lorain Assets (for whom identifying information and addresses are available to FG); (vii) any Governmental Authority known to have an interest related to the West Lorain Assets; (viii) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and (ix) any other persons as directed by the Court (for whom identifying information and addresses are available to FG) (collectively, the "Sale Notice Parties"). The foregoing notice was good, sufficient and appropriate under the circumstances, and no other or further notice is required.

D.    The legal and factual bases set forth in the Motion, the Cowan Declaration and the Warvell Declaration establish just cause for the relief granted herein. The entry of this Order and approval of the relief sought in the Motion (including approval of the Bid Protections) are in the best interests of FG, its estates, its creditors and other parties in interest.

3

E.     FG has articulated good and sufficient reasons for the Court to approve (i) the Bid Procedures for the sale of the West Lorain Assets, (ii) the Assumption and Assignment Procedures, (iii) the establishment of a date for the Auction, (iv) the form and manner of notices of the Auction and the Assumption and Assignment Procedures,[4] and (v) related relief in connection with the sale of the West Lorain Assets.  Such good and sufficient reasons were set forth in the Motion or have been described at the hearing, are incorporated by reference herein, and, among other things, form the basis of the findings of fact and conclusions of law set forth herein.

F.     FG has demonstrated that the Bid Procedures are fair, reasonable and appropriate and are designed to maximize the value of FG's estate.

G.     The Stalking Horse Agreement with the Stalking Horse Purchaser represents the highest or otherwise best offer FG has received to date for the sale of the West Lorain Assets. Approval of the Stalking Horse Purchaser as a "stalking horse" bidder and the Stalking Horse Agreement as a "stalking horse" sale agreement is in the best interests of FG and FG's estate and creditors, and it reflects a sound exercise of FG's business judgment.  The Stalking Horse Agreement provides FG with the opportunity to sell the West Lorain Assets to preserve and realize their highest available value.  The Stalking Horse Agreement will enable FG to secure a fair baseline price for the West Lorain Assets at the Auction and, accordingly, will provide a clear benefit to FG's estate, its creditors and all other parties in interest.

H.     The Bid Protections, including, but not limited to, the Termination Fee and Expense Reimbursement[5] (i) have been negotiated by the Stalking Horse Purchaser and FG, and

---

[4] A copy of the Notice of Assumption and Assignment to be served on the Contract Notice Parties (as defined herein) (the "Notice of Assumption and Assignment") are annexed hereto as **Exhibit 2**.

[5] In connection with payment of the Expense Reimbursement authorized under this Order, the Stalking Horse Purchaser shall provide a statement (the "Expense Invoice") via e-mail to the United States Trustee and the

their respective advisors, at arms' length and in good faith and (ii) are necessary to ensure that the Stalking Horse Purchaser will continue to pursue its Stalking Horse Agreement and the proposed sale of the West Lorain Assets. The Termination Fee and Expense Reimbursement, to the extent payable under the Stalking Horse Agreement, (a) are an actual and necessary cost and expense of preserving assets of FG within the meaning of section 503(b) of the Bankruptcy Code and shall be treated as allowed administrative expense claims against FG's estate pursuant to section 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon FG's estate by the Stalking Horse Purchaser, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the sale and the efforts that have been and will be expended by the Stalking Horse Purchaser. The Bid Protections, including, but not limited to, the Termination Fee and Expense Reimbursement, are a material inducement for, and condition of, the Stalking Horse Purchaser's execution of the Stalking Horse Agreement. FG's decision to enter into the Stalking Horse Agreement and grant the Bid Protections is a sound exercise of FG's business judgment. The Bid Protections, including, but not limited to, the Termination Fee and Expense Reimbursement, are an actual and necessary cost and expense of preserving FG's estate. The Stalking Horse Purchaser has

---

Purchaser shall provide a statement (the "Expense Invoice") via e-mail to the United States Trustee and the Committee. Upon receipt of an Expense Invoice, the United States Trustee and the Committee shall have ten (10) days (the "Review Period") to provide the Stalking Horse Purchaser with written objections to any expenses (the "Disputed Expenses") requested in such Expense Invoice. Following the expiration of the Review Period, the Debtors shall pay to the Stalking Horse Purchaser all amounts due under the Expense Reimbursement other than Disputed Expenses, if any. To the extent any objections to the Disputed Expenses cannot be resolved, the United States Trustee, the Committee or the Stalking Horse Purchaser may request a determination by the Court with respect to such Disputed Expenses by filing with the Court a motion or other pleading, on at least seven (7) days' prior written notice to the United States Trustee, the Committee, and the Stalking Horse Purchaser, as applicable, of any hearing on such motion or other pleading, setting forth specific objections to the Disputed Expenses. In the event any Disputed Expenses are resolved either by the parties or by the Court in favor of the Stalking Horse Purchaser, the Debtors, upon notice of any such resolution, shall pay such Disputed Expenses to the Stalking Horse Purchaser.

provided an actual and necessary benefit to FG, its estate and its creditors by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood that FG will receive the best possible price and terms for the West Lorain Assets. Without the Bid Protections, including, but not limited to, the Termination Fee and Expense Reimbursement, the Stalking Horse Purchaser is unwilling to remain obligated to consummate a sale or otherwise be bound under the Stalking Horse Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bid Procedures).

I.  The Stalking Horse Purchaser is not an "insider" or "affiliate" of FG, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling shareholders exists between the Stalking Horse Purchaser and FG. The Stalking Horse Purchaser and its respective counsel and advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with the Stalking Horse Purchaser's negotiation of and entry into the Stalking Horse Agreement. All negotiations between the Stalking Horse Purchaser, FG, and their respective advisors have been in good faith, at arms' length and without collusion.

J.  The proposed Notice of Assumption and Assignment, substantially in the form annexed as **Exhibit 2**, is adequate and reasonably calculated to provide adequate notice concerning the proposed assumption, assignment and sale of FG's executory contracts (the "Assumed Contracts") and will provide due and adequate notice of the relief sought in the Motion.

6

K.     The procedures set forth below regarding notice to all parties in interest of the time, date and place of the hearing to consider approval of the sale of FG's West Lorain Assets (the "Sale Hearing"),[6] and the filing of objections thereto, comply with Bankruptcy Rule 2002 and constitute sufficient notice to all interested parties and provide sufficient notice of the proposed Sale Transaction.

L.     The notice of the Motion, the Bid Procedures Hearing and the proposed entry of this Order are adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, no further notice of the Motion, the Bid Procedures Hearing or this Order is necessary or required.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The Motion is granted as provided herein.

2.     All objections to the relief granted herein that have not been withdrawn with prejudice, waived or settled, and all reservations of rights included in such objections, are hereby overruled with prejudice.

3.     The Bid Procedures are hereby approved in their entirety in the form annexed hereto as **Exhibit 1** and are incorporated herein.  The failure to specifically include or reference any particular provision of the Bid Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Bid Procedures are approved in their entirety, as if fully set forth in this Order.  All actions of FG as authorized herein may be taken by any officer or director of FG.  Notwithstanding the foregoing,

---

[6] A form of notice of the Sale Hearing is annexed hereto as **Exhibit 3**.

7

the consummation of the sale of the West Lorain Assets shall remain subject to entry of a further order of the Court (the "Sale Order"), which shall serve as an order approving the Sale Transaction free and clear of any interests under section 363 of the Bankruptcy Code.

4.    FG is authorized to proceed with the bidding process in accordance with the Bid Procedures and is authorized to take any and all actions necessary or appropriate to implement the Bid Procedures in accordance with the terms thereof and the following timeline:

| | |
|---|---|
| **Deadline to File Notice of Assumption and Assignment and Schedule of Proposed Cure Costs, If Any** | **December 20, 2018** |
| **Deadline to Serve Sale Hearing Notice** | **December 20, 2018** |
| **Bid Deadline** | **January 9, 2019 (at 5:00 p.m.)** |
| **Deadline to Notify Qualified Bidders** | **January 10, 2019 (at 5:00 p.m.)** |
| **Auction (if required)** | **January 15, 2019** |
| **Deadline to Object to Sale Transaction** | **January 18, 2019 (at 4:00 p.m.)** |
| **Assumption and Assignment Objection Deadline** | **January 18, 2019 (at 4:00 p.m.)** |
| **Sale Hearing** | **January 25, 2019** |

5.    The process for submitting Qualified Bids (as defined in the Bid Procedures) is fair, reasonable and appropriate and is designed to maximize recoveries for the benefit of FG's estate, its creditors and other parties in interest. Any disputes as to the selection of a Qualified Bidder and the Successful Bidder(s) (as defined in the Bid Procedures) shall be resolved by this Court.

8

6.     FG is authorized to conduct the Auction in the event they receive one or more timely and acceptable Qualified Bids (other than the Stalking Horse Purchaser's bid).  If the Stalking Horse Purchaser's bid, as reflected in the Stalking Horse Agreement, is determined by FG, in its sole and absolute discretion, subject only to the exercise of its business judgment in accordance with its fiduciary duties, in consultation with the Supporting Parties and the Committee, to be the only Qualified Bid in respect of the West Lorain Assets that is received by FG by the Bid Deadline, no Auction will be conducted for the West Lorain Assets and the Stalking Horse Purchaser shall be deemed the Successful Bidder for the West Lorain Assets.

7.     Subject to final Court approval at the Sale Hearing, FG is authorized to enter into the Stalking Horse Agreement with the Stalking Horse Purchaser.

8.     The Bid Protections are approved in their entirety, including, without limitation, the right to a Termination Fee of 2.5% of the Initial Purchase Price, as defined in the Stalking Horse Agreement, plus an Expense Reimbursement of up to 1% of the Initial Purchase Price, as defined in the Stalking Horse Agreement.  Except as expressly provided for herein, no other Bid Protections are authorized or permitted under this Order.

9.     FG is authorized to pay the Termination Fee and Expense Reimbursement, to the extent payable under the Stalking Horse Agreement, without further order of the Court.  The Termination Fee and Expense Reimbursement, to the extent payable under the Stalking Horse Agreement, shall constitute an allowed administrative expense claim against FG's estate pursuant to sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code.  The Termination Fee and Expense Reimbursement shall only be paid pursuant to the provisions of the Stalking Horse Agreement.

10.     The form of Notice of Assumption and Assignment annexed hereto as **Exhibit 2** is approved. The Notice of Assumption and Assignment (i) contains the type of information required under Bankruptcy Rule 2002 that is currently known to FG and (ii) is reasonably calculated to provide due, adequate, and timely notice to all counterparties of (a) the potential assumption and assignment of the Assumed Contracts and rights thereunder, (b) the proposed Cure Costs for Assumed Contracts, if any, and (c) the deadline to file objections to such assumption and assignment, applicable Cure Costs, the existence of any defaults, and/or adequate assurance of future performance.

11.     No later than December 20, 2018, FG shall file with the Court and serve via first class mail on (i) all counterparties to FG's executory contracts (the "Executory Contracts") that the Stalking Horse Purchaser wishes to assume in connection with the Sale Transaction (the "Assumed Contracts") and (ii) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, a notice of assumption, and assignment, substantially in the form of the Notice of Assumption and Assignment as **Exhibit 2**, listing all of the Assumed Contracts that the Stalking Horse Purchaser proposes to be assumed and assigned to it, which shall include FG's calculation of the amount necessary to cure any monetary defaults (the "Cure Costs") for each Assumed Contract. Service of such Notice of Assumption and Assignment as approved and set forth herein shall be deemed proper, due, timely, good, and sufficient notice of, among other things, the proposed assumption and assignment of the Assumed Contracts and rights thereunder, the Cure Costs, and the procedures for objecting thereto, and no other or further notice is necessary. In the event that the Stalking Horse Purchaser is not the Successful Bidder, FG shall file a schedule of any Executory Contracts that were not designated as Assumed Contracts by the Stalking Horse Purchaser (such contracts, "Newly Designated Assumed

Contracts," but which the Successful Bidder wishes to assume, no later than one (1) day following the conclusion of the Auction. Any counterparty to such Newly Designated Assumed Contract that objects to the assumption and assignment of such contract to the Successful Bidder must file an objection no later than the commencement of the Sale Hearing.

12. Any counterparty to an Assumed Contract that objects to the proposed Cure Costs or the assumption of its Assumed Contract must file any objection to (i) the proposed assumption and assignment of the applicable Assumed Contract (and must state in its objection, with specificity, the legal and factual basis thereof) and (ii) if applicable, the proposed Cure Costs (and must state in its objection, with specificity, what Cure Costs are required with appropriate documentation in support thereof) no later than **January 18, 2019 at 4:00 p.m. (Eastern Time)** (the "Assumption and Assignment Objection Deadline"), on (i) FG, FirstEnergy Generation, LLC, 341 White Pond Drive, Akron, OH 44320 (Attn: Rick Giannantonio, Esq.); (ii) counsel for FG, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 (Attn: David H. Botter, Esq. and Zachary Wittenberg, Esq.) and 1333 New Hampshire Avenue, N.W., Washington, DC 20036 (Attn: Scott L. Alberino, Esq. and Kate Doorley, Esq.); (iii) local counsel for FG, Brouse McDowell LPA, 388 South Main St., Suite 500, Akron, OH 44311 (Attn: Kate Bradley, Esq. and Bridget A. Franklin, Esq.); (iv) the Office of the United States Trustee, Howard M. Metzenbaum U.S. Courthouse, 201 Superior Avenue East, Suite 441, Cleveland, OH 4414 (Attn: Tiiara Patton, Esq.); (v) counsel to the Stalking Horse Purchaser King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036 (Attn: Jonathan M.A. Melmed, Esq.); (vi) counsel to the Ad Hoc Noteholder Group, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Joshua K. Brody, Esq.); (vii) counsel to the Mansfield Certificateholders Group, Latham & Watkins LLP, 885 Third Avenue, New York,

11

NY 10022 (Attn: George A Davis, Esq. and Andrew Parlen, Esq.); and (viii) counsel to the Committee, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005 (Attn: Evan Fleck, Esq. and Parker Milender, Esq.) (collectively, the "Objection Notice Parties"); *provided* that if a Successful Bidder other than the Stalking Horse Purchaser prevails at the Auction, then as soon as practicable after the conclusion of the Auction, FG shall file with the Bankruptcy Court a notice that identifies the Successful Bidder(s).

13.     If a counterparty to an Assumed Contract files a timely objection asserting a higher Cure Cost than the Cure Costs set forth in the Notice of Assumption and Assignment or otherwise objecting to the assumption and assignment of the Assumed Contract, and the parties are unable to resolve the dispute consensually prior to the commencement of the Sale Hearing, the amount to be paid or reserved with respect to such objection shall be determined at the Sale Hearing or at a subsequently scheduled hearing as mutually agreed to by FG and the relevant counterparty.  The Cure Costs set forth in the Notice of Assumption and Assignment, if any, shall be controlling, notwithstanding anything to the contrary in any Assumed Contract, or any document, and the counterparty to the Assumed Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Assumed Contract against FG or the Successful Bidder, or the property of any of them.  All other objections to the proposed assumption and assignment of FG's right, title, and interest in, to, and under the Assumed Contracts shall be heard at the Sale Hearing.

14.     If no objection is timely filed and served, the counterparty to an Assumed Contract shall be deemed to have consented to the assumption and assignment of the Assumed Contract to the Successful Bidder and shall be forever barred from asserting any objection.  Any objections by a counterparty to an Assumed Contract to any Successful Bidder's proposed

adequate assurance of future performance must be raised prior to the Sale Hearing and shall be resolved at the Sale Hearing.

15.     The form of Sale Hearing Notice, substantially in the form annexed hereto as **Exhibit 3**, is approved.

16.     Within two (2) business days after the Court enters this Order, FG (or its agents) shall serve the Sale Hearing Notice by first class mail on the Sale Notice Parties.

17.     By December 20, 2018, FG (or its agents) shall cause a summary version of the Sale Hearing Notice to be published on the website established by FG's court approved claims and noticing agent, PrimeClerk LLC, at http://www.cases.primeclerk.com/FES.

18.     Service of the Sale Hearing Notice as approved and set forth herein shall be deemed proper, due, timely, good, and sufficient notice of, among other things, the entry of this Order, the Bid Procedures, the Auction, the Sale Hearing, and the proposed sale, including the transfer of FG's right, title, and interest in, to, and under the West Lorain Assets free and clear of any and all liens, claims, encumbrances, and other interests, and no other or further notice is necessary.

19.     Objections to the sale of the West Lorain Assets (including the sale of the West Lorain Assets subject to such objection free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code) and entry of the Sale Order (other than objections to the assumption and assignment of Assumed Contracts) (each, a "Sale Objection") must: (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Rules; (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the Northern District of Ohio at 455 U.S. Courthouse, 2 South Main Street, Akron, Ohio 44308, together with proof of service on or before **January 18, 2019 at 4:00 p.m. (Eastern Time)** (the

13

"Sale Objection Deadline"); and (iv) be served, so as to be actually received on or before the Sale Objection Deadline upon the Objection Notice Parties. All Sale Objections will be heard by the Court at the Sale Hearing.

20.     The failure of any objecting person or entity to timely file and serve a Sale Objection by the Sale Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of the sale contemplated by the Stalking Horse Agreement or any purchase agreement with any Successful Bidder, including the transfer of the West Lorain Assets to the Stalking Horse Purchaser or the Successful Bidder, free and clear of all liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code and will be deemed to consent to the sale, including the transfer of FG's right, title, and interest in, to and under the West Lorain Assets in accordance with the Stalking Horse Agreement or asset purchase agreement with any Successful Bidder, free and clear of all liens, claims encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code.

21.     Any party desiring to submit a bid for FG's right, title and interest in, to and under the West Lorain Assets must comply with the Bid Procedures. Only representatives of FG, Qualified Bidders, the Stalking Horse Purchaser, and the advisors for the Committee and the Supporting Parties shall be entitled to be present at the Auction. Any and all other creditors or parties interested in attending the Auction must provide FG with notice of their intent to attend the auction no later than ten (10) days before the Auction by sending a fax or email to counsel for FG, Akin Gump Strauss Hauer & Feld LLP (Attn: David H. Botter, Esq., Zachary Wittenberg, Esq., and Kate Doorley, Esq. email: dbotter@akingump.com;

14

zwittenberg@akingump.com; kdoorley@akingump.com; Fax: (212) 872-1002). FG may object to and request a hearing regarding the attendance of any particular Person at the Auction.

22.     FG may, in its sole and absolute discretion, subject only to the exercise of its business judgment in accordance with its fiduciary duties, following consultation with the advisors to the Supporting Parties and the Committee, adjourn or cancel the Auction at or prior to the Auction. If the Auction is cancelled or if the date, time, or place of the Auction is changed, FG shall file a notice with the Court regarding such cancellation or modification and shall publish the notice on the website established by PrimeClerk at http://cases.primeclerk.com/FES.

23.     The Auction shall be transcribed and may be videotaped.

24.     FG may, in its sole and absolute discretion, subject only to the exercise of its business judgment in accordance with its fiduciary duties, following consultation with the advisors to the Supporting Parties and the Committee, make alterations to the Bid Procedures and/or terminate discussions with any and all prospective acquirers at any time and without specifying the reasons therefor, but only to the extent not materially inconsistent with the Bid Procedures, but including changes so as to modify deposit amounts, subsequent bid increments, the makeup of Qualified Bids, and to modify or eliminate the requirements with respect to Back-Up Bidders.

25.     On or before January 16, 2019, FG shall cause the results of the Auction, including a copy of the Successful Bid, the identity of the Successful Bidder, and the Successful Bidder's proposed form of adequate assurance of future performance, to be filed with the Court and published on the website of PrimeClerk.

26.     Copies of the Stalking Horse Agreement and Bid Procedures may be downloaded at http://cases.primeclerk.com/FES or obtained upon receipt of a written request to the attorneys for FG, Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, NW, Washington, DC 20036 (Attn: Kate Doorley, Esq.).

27.     The notice to be provided pursuant to the procedures set forth herein is good and sufficient notice to all parties in interest, and no other further notice need be provided.

28.     FG is hereby authorized to execute any additional or supplemental documents incident to the relief granted pursuant to this Order.

29.     Notwithstanding Bankruptcy Rules 6004, 6006, or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  To the extent applicable, the stays described in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived.

30.     The terms of this Order shall control to the extent of any conflict with the Motion.

31.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

# # #

**SUBMITTED BY:**

*/s/ DRAFT*
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

  - and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
David H. Botter (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

    - and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*

## Exhibit 1

**Bid Procedures**

18

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 18-50757 (AMK) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | Hon. Judge Alan M. Koschik |
| | ) | |

## BID PROCEDURES FOR THE SALE OF FIRSTENERGY GENERATION LLC'S WEST LORAIN FACILITY

FirstEnergy Generation LLC ("FG"), one of the above captioned debtors and debtors-in-possession (collectively, the "Debtors"), sets forth the following bidding procedures (the "Bid Procedures") to be employed in connection with an auction (the "Auction") to be held if FG receives one or more Qualified Bids (as defined herein) for the sale of the West Lorain Facility and related assets and the assumption of the related liabilities (collectively, the "West Lorain Assets"). At a hearing following the Auction (the "Sale Hearing"), FG will seek the entry of an order (the "Sale Order") from the United States Bankruptcy Court for the Northern District of Ohio (the "Court") authorizing and approving the transactions contemplated by the Stalking Horse Agreement, a copy of which is attached to the Motion as Exhibit D together with any and all subsequently filed amendments thereto (the "Stalking Horse Agreement") or a Modified Asset Purchase Agreement (as defined herein) between FG and the Qualified Bidder that FG determines, in consultation with the Supporting Parties (as defined in the Process Support Agreement)[2] and the Official Committee of Unsecured Creditors (the "Committee"), to have made the highest or otherwise best bid (the "Successful Bid" and each such bidder, a "Successful Bidder"), as such Stalking Horse Agreement or Modified Asset Purchase Agreement may have been revised during the Auction. The Stalking Horse Agreement provides for the transfer of FG's right, title, and interest in, to and under the West Lorain Assets and Assumed Liabilities (as defined in the Stalking Horse Agreement) pursuant to the terms and conditions set forth therein. These Bid Procedures have been approved and authorized pursuant to the *Order Approving (a) Bid Procedures, (b) Procedures for Assumption and Assignment of Certain Executory Contracts and Related Notices, (c) Notice of Auction and Sale Hearing, and (d) Related Relief* [Docket No.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2] The Process Support Agreement is attached as Exhibit 1 to the order included with the *Motion of Debtors for Entry of Order (I) Authorizing the Debtors to Assume (A) the Process Support Agreement and (B) the Standstill Agreement and (II) Granting Related Relief* [Docket No. 203].

__] entered by the Court on [__] (the "Bid Procedures Order"). A summary of relevant deadlines is below:

| | |
|---|---|
| **Deadline to File Notice of Assumption and Assignment of Executory Contracts** | **December 20, 2018** |
| **Bid Deadline** | **January 9, 2019** |
| **Deadline to Notify Qualified Bidders** | **January 10, 2019** |
| **Auction (If Required)** | **January 15, 2019** |
| **Objection Deadline (to Sale and Assumption and Assignment of Executory Contracts)** | **January 18, 2019** |
| **Sale Hearing** | **January 25, 2019** |

## Approvals

The proposed sale of the West Lorain Assets (the "Sale Transaction") shall in all respects be subject to approval by the Court and in compliance with: (i) the applicable provisions of title 11 of the United States Code (the "Bankruptcy Code"); (ii) the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) other applicable rules, law, and Orders of the Court.

## Assets to Be Sold

The West Lorain Assets shall consist of the Purchased Assets and Assumed Liabilities (as each is defined in the Stalking Horse Agreement) related to the West Lorain Power Plant.

## Preliminary Due Diligence

Upon execution of a valid confidentiality agreement, in form and substance satisfactory to FG, any prospective bidder (each, a "Potential Bidder") identified by FG as reasonably likely to be a Qualified Bidder (as defined herein)[3] that wishes to conduct due diligence on the West Lorain Assets may be granted access to all material information regarding the West Lorain Assets, provided that, if any Potential Bidder is (or is affiliated with) a competitor of the Debtors, FG will not be required to disclose to such Potential Bidder any trade secrets or proprietary information unless the confidentiality agreement executed by such Potential Bidder contains appropriate provisions to ensure that such trade secrets or proprietary information will not be used for an improper purpose or to gain an unfair competitive advantage; *provided, further*, that if any documents are provided to a Potential Bidder that have not previously been provided to the Stalking Horse Purchaser.[4] FG will provide such documents to the Stalking

---

[3] FG shall consult with the Committee and the Supporting Parties to the extent it determines, in an exercise of its business judgment, that a potential bidder is not reasonably likely to be a Qualified Bidder.

[4] Capitalized Terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale and Bid Procedures Motion.

Horse Purchaser within one (1) business day of providing such documents to such Potential Bidder.

FG shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. All due diligence requests shall be directed to Lazard Frères & Co., LLC ("Lazard"), 300 N. LaSalle Street, 23rd Floor, Chicago, IL 60654 (Attn: Tyler Cowan and David Hales). If FG determines that a Potential Bidder does not constitute a Qualified Bidder, then such Potential Bidder shall not be entitled to receive additional due diligence access or additional non-public information. FG shall have no obligation to provide due diligence access after the Bid Deadline (as defined below) to any party that has not submitted a Qualified Bid by the Bid Deadline.

## Bid Deadline

Any person or entity interested in participating in the Auction must submit a Qualified Bid (as defined herein) on or before **January 9, 2019 at 5:00 p.m. (prevailing Eastern Time)**, or such other later date and time established by FG in accordance with the terms hereof (the "Bid Deadline") in writing, to the attorneys for FG, Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Ave. N.W., Washington, DC 20036 (Attn: Scott L. Alberino, Esq. and Kate Doorley, Esq.) (salberino@akingump.com and kdoorley@akingump.com) and One Bryant Park, New York, NY 10036 (Attn: David H. Botter, Esq. and Zachary Wittenberg, Esq.) (dbotter@akingump.com and zwittenberg@akingump.com). FG shall provide the Supporting Parties and the Committee with copies of each bid received, *provided, however*, that the Supporting Parties and the Committee may not contact or otherwise engage in any discussions with any Qualified Bidder or Potential Bidder concerning its bid, the bidding process or the West Lorain Assets absent the express written consent of FG, which consent may be provided by e-mail from FG's counsel. FG may extend the Bid Deadline, in consultation with the Supporting Parties and the Committee, and shall promptly notify all potential bidders of any such extension.

## Qualified Bids

To participate in the bidding process and be deemed a "Qualified Bidder" each Potential Bidder must submit a "Qualified Bid" by the Bid Deadline.[5] To constitute a Qualified Bid, a bid must:

(a)    be in writing;

(b)    provide for the purchase of all or substantially all of the West Lorain Assets and identify the liabilities (including, without limitation, a proposed list of contracts, if any, that the Potential Bidder proposes to assume in connection with the transaction (the "Assigned Contracts")), if any, to be assumed by the Potential Bidder;

(c)    provide for a cash purchase price equal to or greater than the sum of: (i) $151,700,000; (ii) the Termination Fee in the amount of 2.5% of the Initial

---

[5] For the avoidance of doubt, the Stalking Horse Purchaser is deemed a Qualified Bidder for purposes of these Bid Procedures.

18-50757-amk    Doc 2018    FILED 01/25/19    ENTERED 01/25/19 14:35:13    Page 171 of 292

Purchase Price, as defined in the Stalking Horse Agreement; (iii) the Buyer Expense Reimbursement in the amount of 1% of the Initial Purchase Price, as defined in the Stalking Horse Agreement; and (iv) $1,000,000.

(d)    include an acknowledgement and representation that the Potential Bidder will assume FG's obligations that arise after the closing under the Assigned Contracts proposed to be assigned pursuant to the Sale Transaction;

(e)    include information sufficient to demonstrate the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code, including providing adequate assurance of such Potential Bidder's ability to perform under the Assigned Contracts proposed in the bid to be assumed by FG and assigned to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such Assigned Contracts as and when deemed necessary by FG;

(f)    to the extent a potential bidder has not already executed such an agreement, include an executed version of a valid confidentiality or non-disclosure agreement, in form and substance satisfactory to FG;

(g)    fully disclose the legal identity of each entity that will be bidding for the West Lorain Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

(h)    provide current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the West Lorain Assets, current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will either guarantee the obligations of the Potential Bidder, or provide such other form(s) of financial disclosure and credit-quality support or enhancement that will allow FG and its advisors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale Transaction;

(i)    state that such bidder is financially capable of consummating the transactions contemplated by the Modified Asset Purchase Agreement (as defined below) and detail the source(s) of funds that will be used to consummate the transactions;

(j)    include satisfactory evidence of committed financing or other financial ability to consummate the transactions contemplated by the Modified Asset Purchase Agreement (as defined below) in a timely manner;

22

(k)      fully disclose any connections or agreements with FG, any non-Debtor affiliate of FG, any other known Potential Bidders or Qualified Bidders, and/or any officer or director of FG;

(l)      contain a signed definitive asset purchase agreement, including all exhibits and schedules contemplated thereby (other than exhibits and schedules that, by their nature, must be prepared by FG or which have yet to be provided to the Potential Bidders) (the "Modified Asset Purchase Agreement"), with, at minimum, the following requirements: (i) having materially similar terms and conditions as the Stalking Horse Agreement, except with higher or otherwise better consideration, and (ii) containing terms and conditions otherwise no less favorable, as determined by FG in its sole discretion in consultation with the Supporting Parties and the Committee, to FG's estate than the terms and conditions in the Stalking Horse Agreement (provided that no Qualified Bid shall provide for the payment to the Potential Bidder of any breakup fee, topping fee, termination fee, expense reimbursement or similar arrangement);

(m)     include a marked copy of the Modified Asset Purchase Agreement reflecting the differences between the Modified Asset Purchase Agreement and the Stalking Horse Agreement;

(n)      expressly acknowledge and represent that the Potential Bidder (i) has had an opportunity to conduct any and all due diligence regarding the West Lorain Assets prior to making its bid, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and the West Lorain Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the West Lorain Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Modified Asset Purchase Agreement ultimately accepted and executed by FG;

(o)      not be conditioned upon the obtaining or sufficiency of financing or any internal approval, or on the outcome or review of due diligence;

(p)      not contain any condition to closing of the transaction on the receipt of any third-party approvals, to the extent necessary (excluding required Court approval, any required consents under the Assigned Contracts subject to the terms and conditions in the Modified Asset Purchase Agreement, and required governmental and/or regulatory approval, if any);

<table>
<tr><td>(q)</td><td>include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Sale Transaction;</td></tr>
<tr><td>(r)</td><td>state the specific person(s) whom FG's investment bankers, Lazard, should contact in the event that FG has any questions or wishes to discuss the Modified Asset Purchase Agreement;</td></tr>
<tr><td>(s)</td><td>include a good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a certified or bank check (or other form acceptable to FG in its sole and absolute discretion) payable to the order of FirstEnergy Generation, LLC in an amount equal to ten (10%) percent of the purchase price offered to purchase the West Lorain Assets. All Good Faith Deposits shall be held in an escrow account established by FG pursuant to the escrow agreement provided by FG (the "<u>Escrow Agreement</u>"). Each bid should include any proposed modifications to the Escrow Agreement. All Good Faith Deposits shall be held until no later than five (5) business days after the Sale Hearing and thereafter returned to the respective bidders in accordance with the Bid Procedures, unless the bidder has been selected as the Successful Bidder (as defined below);</td></tr>
<tr><td>(t)</td><td>remain open and irrevocable until five (5) business days after the Sale Hearing;</td></tr>
<tr><td>(u)</td><td>contain other information reasonably requested by FG; and</td></tr>
<tr><td>(v)</td><td>be received by the Bid Deadline.</td></tr>
</table>

FG will determine, in consultation with the Supporting Parties and the Committee, whether to entertain bids that do not conform to one or more of the requirements specified herein and whether to deem such bids to be Qualified Bids. FG, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, shall make a determination regarding whether a bid constitutes a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids by no later than **January 10, 2019 at 5:00 p.m. (prevailing Eastern Time)** or the business day following the Bid Deadline.

If FG does not receive any Qualified Bids other than the bid set forth in the Stalking Horse Agreement, the Auction shall be cancelled and FG shall report the same to the Supporting Parties, the Committee, the Stalking Horse Purchaser, and the Court, and subject to obtaining approval of the Court and satisfaction of the conditions set forth in the Stalking Horse Agreement, FG shall promptly proceed to consummate the Sale Transaction with the Stalking Horse Purchaser pursuant to (and subject to) the terms and conditions set forth in the Stalking Horse Agreement. In addition, if no Qualified Bid is received (other than the Stalking Horse Agreement), FG reserves the right, subject to the consent of the Stalking Horse Purchaser, which consent shall not be unreasonably withheld, to request that the Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

## Auction, Auction Procedures and Overbids

In the event that FG receives one or more timely Qualified Bids in addition to the Stalking Horse Agreement, FG shall conduct the Auction. The Auction, if required, will be conducted at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 on **January 15, 2019 at 9:00 a.m. (prevailing Eastern Time)**, or such other time, date, and location as designated by FG, in its sole and absolute discretion, in a notice to all Qualified Bidders, the Committee and the Supporting Parties. FG reserves the right, in its sole and absolute discretion, subject only to the exercise of its business judgment in accordance with its fiduciary duties, in consultation with the Supporting Parties and the Committee, to adjourn or cancel the Auction at or prior to the Auction. If the place of the Auction is changed, FG will file a notice with the Court regarding such modification and will publish the notice on the website of Prime Clerk LLC at http://cases.primeclerk.com/FES.

The Auction shall be governed by the following procedures, subject to modification by FG as permitted by these Bid Procedures, in consultation with the Supporting Parties and the Committee. At the Auction:

(a) the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

(b) only representatives of FG, the Supporting Parties, the Committee, the Office of the United States Trustee, and the Qualified Bidders shall be entitled to be present at the Auction. Any and all other creditors interested in attending the Auction must provide FG with notice of their intent to attend the Auction no later than ten (10) days before the Auction by notifying counsel for FG, Akin Gump Strauss Hauer & Feld LLP (Attn: Scott L. Alberino, Esq., David H. Botter, Esq., Zachary Wittenberg, Esq. and Kate Doorley, Esq.). FG may object to and request a hearing regarding the attendance of any particular creditor at the Auction;

(c) only Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(d) each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or sale;

(e) bidding shall commence at the initial highest bid, which FG, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, shall announce to all Qualified Bidders, the Supporting Parties and the Committee no later than one (1) business day prior to the Auction (such bid, the "Opening Bid"). The Opening Bid may be an Initial Topping Bid or the Stalking Horse Purchaser's bid;

(f) Qualified Bidders may then submit successive bids higher than the previous bid, based on and increased from the Opening Bid, in increments of at least $1,000,000, *provided* that FG reserves the right, in their sole and absolute discretion, following consultation with the Supporting Parties

25

and the Committee, to announce reductions or increases in minimum incremental bids at any time during the Auction (each, an "Overbid");

(g)    all Qualified Bidders shall have the right to submit Overbids and make additional modifications to the Stalking Horse Agreement or their respective Modified Asset Purchase Agreement, as applicable, at the Auction to improve such bids;

(h)    the Auction may include individual negotiations with the Qualified Bidders, however, all incremental bids by Qualified Bidders shall occur in open bidding in the presence of all other Qualified Bidders;

(i)    FG reserves the right to (i) determine, in their sole and absolute discretion following consultation with the Supporting Parties and the Committee, which bid is the highest or otherwise best and (ii) reject at any time, without liability, any offer that FG, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, deems to be (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or procedures set forth therein or in these Bid Procedures, or (c) contrary to the best interests of FG and its estate;

(j)    the Auction among Qualified Bidders shall continue according to these procedures until FG determines, in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, subject to Court approval, that FG has received a Successful Bid.  In making this decision, FG may consider, without limitation, the amount of the purchase price, the amount of proposed assumed liabilities, the value of any excluded assets, the form of consideration being offered, the tax consequences of such bid, the likelihood of the Qualified Bidder's ability to close a given transaction, the proposed timing thereof, and rights of such Qualified Bidder and FG with respect to the termination thereof, the number, type and nature of any changes reflected in the Modified Asset Purchase Agreement requested by each Qualified Bidder, the extent to which such changes are likely to delay closing of the Sale Transaction and the cost to FG of such changes or delay, and the net benefit to FG's estate, taking into account the Stalking Horse Purchaser's rights to the Termination Fee and the Buyer Expense Reimbursement.  Upon making this decision, FG shall announce the Successful Bidder in the presence of all other Qualified Bidders and close the Auction.  The Qualified Bidder submitting such Successful Bid for the West Lorain Assets shall become the Successful Bidder and shall have such rights and responsibilities of a purchaser, as set forth in the Modified Asset Purchase Agreement or the Stalking Horse Agreement, as applicable;

(k)    the Auction shall be transcribed and may also be videotaped;

(l)     after consultation with the Committee and the Supporting Parties, FG may, in its sole and absolute discretion subject only to its business judgment, employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not materially inconsistent with these Bid Procedures, the Bankruptcy Code, or any order of the Court and (ii) disclosed to each Qualified Bidder at the Auction; and

(m)     all bidding for the West Lorain Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing, and following the closing of the Auction, FG shall not initiate contact with, solicit, or encourage proposals from any person or entity with respect to the West Lorain Assets.

Within two (2) business days following the closing of the Auction, FG shall cause the results of the Auction, including a copy of the Successful Bid and the identity of the Successful Bidder and the Back-Up Bidder, to be filed with the Court and published on the website of Prime Clerk LLC at http://cases.primeclerk.com/FES.

### Termination Fee and Buyer Expense Reimbursement

FG has agreed that it must pay the Termination Fee and Buyer Expense Reimbursement (as defined in the Stalking Horse Agreement) to the Stalking Horse Purchaser under certain conditions and circumstances as set forth in the Stalking Horse Agreement. Payment of the Termination Fee and Buyer Expense Reimbursement shall be governed by the Stalking Horse Agreement and the Bid Procedures Order. Pursuant to the Bid Procedures Order and the Stalking Horse Agreement, the Stalking Horse Purchaser's claim to the Termination Fee and the Buyer Expense Reimbursement shall constitute an administrative expense claim.

### Back-Up Bidder and Return of Good Faith Deposit

If an Auction is conducted, the Qualified Bidder (including the Stalking Horse Purchaser) with the next highest or otherwise best Qualified Bid for the West Lorain Assets at the Auction other than the Successful Bidder (the "Back-Up Bid") as determined by FG in its sole and absolute discretion following consultation with the Supporting Parties and the Committee, shall be required to serve as the back-up bidder (the "Back-Up Bidder") for the West Lorain Assets and keep such Back-Up Bid open and irrevocable until the first to occur of (i) 60 days after the termination of the transaction with the Successful Bidder, (ii) consummation of the transaction with the Successful Bidder, or (iii) termination of the Back-Up Bidder's obligations under the Stalking Horse Agreement or under the Modified Asset Purchase Agreement with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale Transaction whether due to the Successful Bidder's breach or otherwise, the Back-Up Bidder will be automatically deemed to be the new Successful Bidder, and FG will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court.

27

Except as provided herein, Good Faith Deposits shall be returned, without interest, to each bidder not selected by FG as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day after the completion of the Sale Hearing, as provided for above.

## Reservation of Rights

FG reserves the right, in its sole and absolute discretion, subject only to the exercise of its business judgment in accordance with its fiduciary duties, following consultation with the Supporting Parties and the Committee, to alter or terminate these Bid Procedures, to waive terms and conditions set forth herein with respect to all potential bidders, extend the deadlines set forth herein, alter the assumptions set forth herein, provide reasonable accommodations to any potential bidders with respect to such terms, conditions, and deadlines of the Bid Procedures and bid process to promote further bids by such bidders and/or, following consultation with the Supporting Parties and the Committee, to terminate discussions with any and all prospective acquirers and investors (except for the Successful Bidder) at any time and without specifying the reasons therefor, in each case to the extent not materially inconsistent with these Bid Procedures. Any modification that FG makes to the Bid Procedures shall apply to all Qualified Bidders; *provided, however* that any modification of bidding procedures shall not be inconsistent with the Bankruptcy Code, the Bankruptcy Rules, the Bidding Procedures Order or any other order of the Court entered in the chapter 11 cases.

## Sale Hearing

The Successful Bid will be subject to approval by the Court. The Sale Hearing will take place on **January 25, 2019 at 10:00 a.m. (prevailing Eastern Time)** before the United States Bankruptcy Court, Northern District of Ohio, 455 U.S. Courthouse, 2 South Main Street, Akron, Ohio 44308. The Sale Hearing may be adjourned by FG in its sole discretion from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court on the date scheduled for the Sale Hearing or on the Court's docket.

At the Sale Hearing, FG shall report the results of the Auction and FG's recommendation with respect to the Successful Bid, which is subject to Court Approval. FG shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

## Consent to Jurisdiction and Authority as a Condition to Bidding

All Qualified Bidders shall be deemed to have (i) consented to the core jurisdiction of the Court to enter an order or orders, which shall be binding in all respects, in any way related to the Bid Procedures, the Auction, or the construction and enforcement of any Stalking Horse Agreement, Modified Asset Purchase Agreement, or any other documents relating to the Sale Transaction, (ii) waived any right to a jury trial in connection with any disputes relating to the Bid Procedures, the Auction, or the construction and enforcement of the Stalking Horse Agreement, any Modified Asset Purchase Agreement or any other document relating to the Sale Transaction, and (iii) consented to the entry of a final order or judgment in any way related to the Bid Procedures, the Auction, or the construction and enforcement of the Stalking Horse Agreement, any Modified Asset Purchase Agreement, or any other document relating to the Sale

28

Transaction if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

### Sale is "As Is/Where Is"

Except as otherwise provided in an applicable Stalking Horse Agreement, Modified Asset Purchase Agreement, or any order approving the Sale Transaction, any and all portions of the West Lorain Assets sold pursuant to the Bid Procedures shall be conveyed at the closing of the Sale Transaction in their then-present condition, "as is, with all faults, and without any warranty whatsoever, whether express or implied."

## Exhibit 2

**Notice of Assumption and Assignment**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) Case No. 18-50757 |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

**NOTICE OF EXECUTORY CONTRACTS WHICH MAY BE ASSUMED AND
ASSIGNED IN CONNECTION WITH THE SALE OF FIRSTENERGY GENERATION
LLC'S WEST LORAIN ASSETS AND THE PROPOSED CURE
AMOUNTS WITH RESPECT THERETO**

  You are receiving this *Notice of Executory Contracts Which May Be Assumed and Assigned in Connection with the Sale of FirstEnergy Generation, LLC's West Lorain Assets and the Proposed Cure Amounts With Respect Thereto* (the "Notice of Assumption and Assignment") because you may be a counterparty to an executory contract with FirstEnergy Generation, LLC ("FG"), and/or certain affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") in connection with FG's West Lorain Assets.  Please read this notice carefully as your rights may be affected by the transactions described herein.

  **PLEASE TAKE NOTICE** that on [ ], 2018, the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court") entered an order (the "Bid Procedures Order") approving the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 365, and 503 and Fed. R. Bank. P. 2002, 6004, and 6006 for Entry of (i) Order Approving (a) Bid Procedures, (b) Procedures for Assumption and Assignment of Certain Executory Contracts and Related Notices, (c) Notice of Auction and Sale Hearing, and (d) Related Relief and (ii) Order Approving the Sale of the West Lorain Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (b) Approving Assumption and Assignment of Certain Executory Contracts, and (c) Granting Related Relief* [Docket No. __] (the "Motion").  The Motion and Bid Procedures Order set forth certain procedures (the "Bid Procedures") in connection with the sale of FG's West Lorain Assets.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764.  The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

PLEASE TAKE FURTHER NOTICE that pursuant to the Bid Procedures Order, FG has established procedures for the assumption and assignment of certain executory contracts (collectively, the "Executory Contracts") to a potential purchaser and the determination of related Cure Costs (as defined herein). FG is party to numerous Executory Contracts and, in accordance with the Bid Procedures Order, hereby file this notice identifying (i) the Contracts which may be assumed and assigned to a Successful Bidder in connection with the sale (such Contracts, the "Assumed Contracts") and (ii) the proposed amounts, if any, FG believes are owed to the counterparty to the Assumed Contracts to cure any defaults or arrears existing under the Assumed Contract (the "Cure Costs") both as set forth on **Exhibit 1** attached hereto.

PLEASE TAKE FURTHER NOTICE that the hearing to approve the sale of the West Lorain Assets (the "Sale Hearing") will take place before the Honorable Alan M. Koschik, United States Bankruptcy Judge, United States Bankruptcy Court, Northern District of Ohio, 455 U.S. Courthouse, 2 South Main Street, Akron, Ohio 44308 on **January 25, 2019 at 10:00 a.m. (Eastern Time)**. A summary of relevant dates and deadlines is below:

| | |
|---|---|
| **Deadline to File Notice of Assumption and Assignment** | **December 20, 2018** |
| **Bid Deadline** | **January 9, 2019 (at 5:00 p.m.)** |
| **Deadline to Notify Qualified Bidders** | **January 10, 2019 (at 5:00 p.m.)** |
| **Auction (if required)** | **January 15, 2019** |
| **Deadline to Object to Sale Transaction** | **January 18, 2019 (at 4:00 p.m.)** |
| **Assumption and Assignment Objection Deadline** | **January 18, 2019 (at 4:00 p.m.)** |
| **Sale Hearing** | **January 25, 2019** |

PLEASE TAKE FURTHER NOTICE that the listing of Assumed Contracts on **Exhibit 1** does not constitute and admission that the agreement is an executory contract as contemplated by section 365(a) of the Bankruptcy Code or that FG has any liability thereunder, and FG expressly reserves all of their rights, claims, causes of action, and defenses with respect to the Assumed Contracts on **Exhibit 1**.

PLEASE TAKE FURTHER NOTICE that any objections to the assumption and assignment of any Assumed Contract identified in this notice (except with respect to the adequate assurance of future performance by any successful bidder) must be (i) in writing, (ii) comply with the Bankruptcy Rules, (iii) filed with the Bankruptcy Court and (iv) be served, so as to be actually received by (a) FG, FirstEnergy Generation, LLC, 341 White Pond Drive, Akron, OH 44320 (Attn: Rick Giannantonio, Esq.); (b) counsel for FG, Akin Gump Strauss Hauer &

32

Feld LLP, One Bryant Park, New York, NY 10036-6745 (Attn: David H. Botter, Esq. and Zachary Wittenberg, Esq.) and 1333 New Hampshire Avenue, N.W., Washington, DC 20036 (Attn: Scott L. Alberino, Esq. and Kate Doorley, Esq.); (c) local counsel for FG, Brouse McDowell LPA, 388 South Main St., Suite 500, Akron, OH 44311 (Attn: Kate Bradley, Esq. and Bridget A. Franklin, Esq.); (d) the Office of the United States Trustee, Howard M. Metzenbaum U.S. Courthouse, 201 Superior Avenue East, Suite 441, Cleveland, OH 4414 (Attn: Tiiara Patton, Esq.); (e) counsel to the Stalking Horse Purchaser King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036 (Attn: Jonathan M.A. Melmed, Esq.); (f) counsel to the Ad Hoc Noteholder Group, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Joshua K. Brody, Esq.); (g) counsel to the Mansfield Certificateholders Group, Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: George A. Davis, Esq. and Andrew Parlen, Esq.); and (h) counsel to the Committee, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005 (Attn: Evan Fleck, Esq. and Parker Milender, Esq.); by **January 18, 2019 at 4:00 p.m. (Eastern Time)** (the "Assumption and Assignment Objection Deadline").  Any such objections must set forth the proposed objection to the assumption and assignment of the Assumed Contracts (and must state, with specificity, the legal and factual basis thereof) and, if applicable, the proposed Cure Costs (and must state, with specificity, what Cure Costs are required with appropriate documentation in support thereof).  Other than the Cure Costs listed on **Exhibit 1**, FG is not aware of any amounts due and owing under the Assumed Contracts listed therein.

      **PLEASE TAKE FURTHER NOTICE** that objections with respect to the Successful Bidder's proposed form of adequate assurance of future performance must be raised prior to the Sale Hearing and will be resolved at the Sale Hearing.

      **PLEASE TAKE FURTHER NOTICE** that if a counterparty to an Assumed Contract files a timely objection asserting a higher Cure Cost than the Cure Cost set forth in this Notice of Assumption and Assignment, and the parties are unable to consensually resolve the dispute prior to the commencement of the Sale Hearing, the amount to be paid or reserve with respect to such objection shall be determined at the Sale Hearing.  All other objections to the proposed assumption and assignment of FG's right, title and interest in, to and under the Assumed Contracts, including objections to the proposed form of adequate assurance, shall be heard at the Sale Hearing.

      **PLEASE TAKE FURTHER NOTICE** that each non-Debtor party to any Assumed Contract that does not timely file an objection by the Assumption and Assignment Objection Deadline shall be forever barred from asserting any objection with regard to the assumption, assignment, and/or Cure Costs set forth on **Exhibit 1**, including any objections with respect to the adequate assurance of future performance by the Successful Bidder or FG's ability to assign the Assumed Contract.  The Cure Costs set forth in the Notice of Assumption and Assignment shall be controlling, notwithstanding anything to the contrary in any Assumed Contract or any other document, and the counterparty to the Assumed Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Assumed Contract against FG or the Successful Bidder(s), or the property of any of them to the extent such counterparty does not file a timely objection to the Cure Costs set forth above.

18-50757-amk    Doc 2018    FILED 01/25/19    ENTERED 01/25/19 14:35:13    Page 183 of 292

Date: [_____], 2018

_____
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
David H. Botter (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

- and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*

34

## Exhibit 3

**Sale Hearing Notice**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) Case No. 18-50757 |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) Hon. Judge Alan M. Koschik |
|  | ) |

## NOTICE OF AUCTION AND SALE HEARING

**TO PARTIES IN INTEREST IN THE CHAPTER 11 CASES OF FIRSTENERGY SOLUTIONS CORP. AND ITS AFFILIATED DEBTORS:**

**PLEASE TAKE NOTICE** that:

1.      **Approval of Bid Procedures**.  By Order dated [____], 2018 [Docket No. ___] (the "Order"), the United States Bankruptcy Court for the Northern District of Ohio (the "Bankruptcy Court") authorized FirstEnergy Generation, LLC ("FG") to market, solicit bids, conduct an auction (the "Auction") and select the highest or otherwise best bidder at the Auction for the sale and transfer (the "Sale Transaction") of FG's assets related to the West Lorain Power Plant (the "West Lorain Assets").  The terms of the solicitation of bids, conduct of the Auction, and selection of the highest or otherwise best bid for the West Lorain Assets shall be governed by the Bankruptcy Court-approved bidding procedures (the "Bid Procedures").  Copies of the Bid Procedures and the Order can be accessed free of charge on the website established by FG's claims and noticing agent, PrimeClerk LLC at http://cases.primeclerk.com/FES.  The Order also approved FG's selection of Vermillion Power, L.L.C. (the "Stalking Horse Purchaser") to serve as a stalking horse purchaser and the provision of bid protections thereto (the "Bid Protections").

2.      **Relevant Dates and Deadlines**.  A summary of the relevant key dates and deadlines for the Sale Transaction is below:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764.  The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

18-50757-amk    Doc 2018    FILED 01/25/19    ENTERED 01/25/19 14:35:13    Page 186 of 292

| | |
|---|---|
| **Deadline to File Notice of Assumption and Assignment** | **December 20, 2018** |
| **Bid Deadline** | **January 9, 2019 (at 5:00 p.m.)** |
| **Deadline to Notify Qualified Bidders** | **January 10, 2019 (at 5:00 p.m.)** |
| **Auction (if required)** | **January 15, 2019** |
| **Deadline to Object to Sale Transaction** | **January 18, 2019 (at 4:00 p.m.)** |
| **Assumption and Assignment Objection Deadline** | **January 18, 2019 (at 4:00 p.m.)** |
| **Sale Hearing** | **January 25, 2019** |

3.      **Auction**.  Pursuant to the Order and the Bid Procedures, if FG receives one or more timely and acceptable Qualified Bids (as defined in the Bid Procedures), in addition to the Stalking Horse Purchaser's bid, for the Retail Power Sales Assets, an Auction shall take place on **January 15, 2019 at 9:00 a.m. (Eastern Time)**, at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036.  Only parties that have submitted a Qualified Bid, as set forth in the Bid Procedures, by no later than **January 9, 2019 at 5:00 p.m. (Eastern Time)** (the "Bid Deadline") may bid at the Auction.  Any party that wishes to take part in this process and submit a bid for the West Lorain Assets must submit their bid prior to the Bid Deadline and in accordance with the Bid Procedures.  Only representatives of FG, Qualified Bidders, the Committee, the Stalking Horse Purchaser, and the Supporting Parties shall be entitled to be present at the Auction.  Any and all other creditors or parties in interest interested in attending the Auction must provide FG with notice of their intent to attend the Auction by sending a fax or e-mail to counsel for FG, Akin Gump Strauss Hauer & Feld LLP (Attn: David H. Botter, Esq., Zachary Wittenberg, Esq., and Kate Doorley, Esq.) (dbotter@akingump.com; zwittenberg@akingump.com; kdoorley@akingump.com) Fax: (212) 872-1002.

4.      **Objections to Assumption and Assignment**.  No later than December 20, 2018, FG shall file with the Court a notice of assumption and assignment (the "Notice of Assumption and Assignment") listing all of the Executory Contracts that the Stalking Horse Purchaser proposes to be assumed and assigned to it in connection with the Sale Transaction (each, an "Assumed Contract").  Any counterparty to an Assumed Contract shall file any objection to the proposed assumption and assignment of the Assumed Contracts (and must state in its objection, with specificity, the legal and factual basis thereof) no later than **January 18, 2019 at 4:00 p.m. (Eastern Time)**.

5.      **Sale Hearing**.  A hearing (the "Sale Hearing") to consider the sale of the West Lorain Assets to the Successful Bidder will be held at **10:00 a.m. (Eastern Time) on January 25, 2019**, before the Honorable Alan M. Koschik, United States Bankruptcy Judge, United States

Bankruptcy Court for the Northern District of Ohio, 455 U.S. Courthouse, 2 South Main Street, Akron, Ohio 44308. The Sale Hearing may be continued from time to time without further notice other than the announcement by FG of the adjourned date(s) at the Sale Hearing or any continued hearing or as indicated in any notice of agenda of matters scheduled for hearing filed by FG with the Bankruptcy Court.

6. **Objection to Sale Transaction**. Objections to the Sale Transaction, if any, must be filed and served so as to actually be received by (i) FG, FirstEnergy Generation, LLC, 341 White Pond Drive, Akron, OH 44320 (Attn: Rick Giannantonio, Esq.); (ii) counsel for FG, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036-6745 (Attn: David H. Botter, Esq. and Zachary Wittenberg, Esq.) and 1333 New Hampshire Avenue, N.W., Washington, DC 20036 (Attn: Scott L. Alberino, Esq. and Kate Doorley, Esq.); (iii) local counsel for FG, Brouse McDowell LPA, 388 South Main St., Suite 500, Akron, OH 44311 (Attn: Kate Bradley, Esq. and Bridget A. Franklin, Esq.); (iv) the Office of the United States Trustee, Howard M. Metzenbaum U.S. Courthouse, 201 Superior Avenue East, Suite 441, Cleveland, OH 4414 (Attn: Tiiara Patton, Esq.); (v) counsel to the Stalking Horse Purchaser King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036 (Attn: Jonathan M.A. Melmed, Esq.); (vi) counsel to the Ad Hoc Noteholder Group, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Joshua K. Brody, Esq.); (vii) counsel to the Mansfield Certificateholders Group, Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 (Attn: George A. Davis, Esq. and Andrew Parlen, Esq.); and (viii) counsel to the Committee, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005 (Attn: Evan Fleck, Esq. and Parker Milender, Esq.); no later than **January 18, 2019 at 4:00 p.m. (Eastern Time)**.

7. Unless an objection is timely served and filed in accordance with this notice, it may not be considered by the Bankruptcy Court and the Bankruptcy Court may grant the relief requested in the Sale Motion without further hearing and notice.

8. This Notice of Auction and Sale Hearing is subject to the fuller terms and conditions of the Order and the Bid Procedures, with such Order controlling in the event of any conflict, and FG encourages parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the West Lorain Assets and/or copies of any related document, including the Motion, the Stalking Horse Agreement, or the Order, may make a written request to: counsel for FG, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attn: David H. Botter, Esq. and Zachary Wittenberg, Esq.). In addition, copies of the Motion, the Order and this Notice may be examined by interested parties (i) free of charge at the website established for these chapter 11 cases by FG's court appointed claims and noticing agent, PrimeClerk LLC, at http://cases.primeclerk.com/FES or (ii) on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the internet at www.ohnb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).

Dated: [____], 2018

_____

**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

 - and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
David H. Botter (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

 - and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*

## FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the terms and conditions of that certain Asset Purchase Agreement dated as of November 16, 2018 (the "*Asset Purchase Agreement*") by and between FirstEnergy Generation, LLC, an Ohio limited liability company ("*Seller*") and Vermillion Power, LLC, a Delaware limited liability company ("*Buyer*" and, together with Seller, the "*Parties*"), Seller hereby unconditionally and irrevocably grants, bargains, transfers, sells, assigns, conveys, and delivers to Buyer, its successors and assigns forever, all of Seller's rights, titles, and interests, in, to and under the Purchased Assets pursuant to this bill of sale, dated as of [•], 2019 (this "*Bill of Sale*") and subject to the terms of the Asset Purchase Agreement, including Section 2.01(a) thereof, free and clear of all Liens other than Permitted Liens, TO HAVE AND TO HOLD the Purchased Assets with all appurtenances thereto.

A.     Undefined capitalized terms herein are defined in the Asset Purchase Agreement.

B.     Notwithstanding anything to the contrary contained herein, none of the Excluded Assets shall be included in the Purchased Assets.

C.     This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns.

D.     This Bill of Sale is being executed solely pursuant to the Asset Purchase Agreement to give effect to the transactions contemplated by the Asset Purchase Agreement. Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Asset Purchase Agreement. To the extent that any provisions of this Bill of Sale conflicts or is inconsistent with the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

E.     Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to, any person, firm or corporation other than Buyer and its successors and assigns any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of Buyer and its successors and assigns.

F.     At any time or from time to time, at Buyer's request and without further consideration (but without any requirement that Seller expends any out of pocket funds), Seller shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign the Purchased Assets to Buyer.

G.     The provisions of Article 10 of the Asset Purchase Agreement are hereby incorporated into this Bill of Sale, *mutatis mutandis*.

*[Signature Page Follows]*

4830-9440-7552 v2

IN WITNESS WHEREOF, this Bill of Sale is being executed and delivered by Seller as of the date first written above.

FIRSTENERGY GENERATION, LLC

By: _____
Name:
Title:

[Signature Page to Bill of Sale]

_[Space Above For Recorder's Use Only]_

# LIMITED WARRANTY DEED
### [Ohio Revised Code Section 5302.07]

**FirstEnergy Generation, LLC**, an Ohio limited liability company, formerly known as FirstEnergy Generation Corp., an Ohio corporation, having a tax mailing address of 341 White Pond Drive, Akron, Ohio 44320 ("***Grantor***"), for good and valuable consideration paid, the receipt and sufficiency of which are hereby acknowledged, grants with limited warranty covenants to _____, a _____ limited liability company, having a tax mailing address of _____, Attention: _____ ("***Grantee***"), the following real property (the "***Property***"): situated in Lorain County, Ohio and more particularly described in Exhibit A attached hereto and incorporated herein by reference;

TOGETHER WITH (i) all rights-of-way, easements, rights and privileges appurtenant to the Property, (ii) all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining the Property, and (iii) all buildings and improvements thereon and all rights, ways, privileges, waters, easements, and appurtenances thereunto appertaining;

THE FOREGOING GRANT AND CONVEYANCE is made under and subject to the matters set forth on Exhibit B attached hereto and incorporated herein by reference (the "***Permitted Exceptions***").

The Property is being conveyed free and clear of any and all liens, claims, interests and judgments pursuant to the[1] [Order Authorizing the Sale of Certain Assets of the Debtors Free and Clear of all Liens, Claims and Interests, Other Than Permitted Liens Pursuant to the Asset Purchase Agreement and Granting Related Relief in that certain Chapter 11 proceeding styled In Re: FirstEnergy Solutions Corp. *et al*., Debtors, Case No. 18-50757 (AMK) (Jointly

---

[1] **Reference to Order to be inserted.**

4815-5103-4752 v2

Administered) in the United States Bankruptcy Court, Northern District of Ohio, Eastern Division, dated _____] (the "***Order***"), a certified copy of which is attached hereto as Exhibit C.  Any such liens, claims, interests and judgments regarding the Property are transferred to the proceeds of this sale, pursuant to the Order.

*[Signature Page Follows]*

- 2 -

This Deed is executed by Grantor on _____, 2019, to be effective as of _____, 20___.

**FirstEnergy Generation, LLC**,
an Ohio limited liability company

By:_____
Name:
Title:

STATE OF OHIO           )
                              )     SS:
COUNTY OF SUMMIT    )

On this ___ day of _____, 20___, before me, the undersigned Notary Public, personally appeared [_____], the [_____] of FirstEnergy Generation, LLC, an Ohio limited liability company, on behalf of such limited liability company.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

[SEAL]                                 _____
Notary Public

My commission expires:_____

*Signature Page to Limited Warranty Deed*

This instrument prepared by
Lynn M. Gattozzi
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114

**Exhibit A to Limited Warranty Deed**

**Legal Description of the Property**

See attached pages.

Permanent Parcel Numbers:

PPN: 01-00-008-000-004
PPN: 01-00-008-000-005
PPN: 01-00-008-000-012
PPN: 02-03-003-000-010
PPN: 02-03-008-000-007

Prior Instrument Reference:

Deed filed for record November 23, 2005 and recorded in Instrument No. 2005-0112394 of the Lorain County Records.

*Exhibit A To Limited Warranty Deed - Page 1*

**TRACT 1:**

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being parts of Original Brownhelm Township Lot Number 8 and Original Black River Township Lot Number 8, Tract Number 3, and further described as follows:

Commencing at a 1 inch iron pipe found in a monument box at the intersection of the centerline of Cooper-Foster Park Road (right of way varies) and the centerline of Crosse Road (60 feet);

Thence South 66°25'15" West, along the centerline of said Cooper-Foster Park Road, a distance of 352.29 feet to a set at an angle point therein;

Thence South 57°15'00" West, along the centerline of said Cooper-Foster Park Road, a distance of 535.24 feet to a Masonry Nail set in the Northerly right of way line of a parcel of land described in a deed to Pennsylvania Lines L.L.C. (01-00-024-501-003) as recorded in Document Number 20020851798 of the Lorain County Deed Records;

Thence North 82°49'15" West, along the Northerly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-003) parcel, a distance of 138.50 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Southeasterly corner of a parcel of land described in a deed to Pennsylvania Lines L.L.C. (01-00-024-501-004) as recorded in Document Number 20020851798 of the Lorain County Deed Records;

Thence North 77°05'45" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 642.39 feet to a 5/8" rebar with cap stamped "Bramhall 8073"  set at an angle point therein;

Thence North 68°14'01" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 278.96 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set at an angle point therein;

Thence North 48°53'40" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 278.96 feet to a 5/8" rebar with cap stamped  "Bramhall 8073" set at an angle point therein;

Thence North 08°24'50" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 2069.22 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set at an angle point therein;

Thence North 06°40'12" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 2298.30 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Southeasterly corner of a parcel of land described in a deed to Pennsylvania Lines L.L.C. (01-00-024-501-005) as recorded in Document number 20020851798 of the Lorain County Deed Records;

Thence North 08°47'34" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-005) parcel, a distance of 861.26 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set, and the true place of beginning of land herein described;

*Exhibit A To Limited Warranty Deed - Page 2*

Course 1:

Thence continuing North 08°47'34" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-005) parcel, a distance of 3165.54 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Westerly line of a parcel of land described in a deed to the City of Lorain as recorded in Volume 938, Page 284 of the Lorain County Deed Records;

Course 2:

Thence South 38°48'09" East, along a Westerly line of said City of Lorain parcel, a distance of 120.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 3:

Thence South 06°53'24" East, along a Westerly line of said City of Lorain parcel, a distance of 283.05 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 4:

Thence North 77°51'18" East, along a Southerly line of said City of Lorain parcel, a distance of 383.66 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 5:

Thence North 08°51'42" West, along an Easterly line of said City of Lorain parcel, a distance of 120.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 6:

Thence South 84°20'55" West, along a Northerly line of said City of Lorain parcel, a distance of 100.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 7:

Thence North 08°27'35" West, along an Easterly line of said City of Lorain parcel, a distance of 532.24 feet to a Masonry Nail set in the centerline of U.S. Route 6  (right of way varies);

Course 8:

Thence North 68°18'10" East, along the centerline of said U.S. Route 6, a distance of 111.65 feet to a Masonry Nail set in the Northwesterly corner of a parcel of land described in a Deed to Ohio Edison Company as recorded in Document Number 19990659959 of the Lorain County Deed Records;

Course 9:

*Exhibit A To Limited Warranty Deed - Page 3*

Thence South 21°41'50" East, along the Westerly line of said Ohio Edison Parcel (document number 19990659959), a distance of 221.02 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 10:

Thence North 68°18'10" East, along the Southerly line of said Ohio Edison parcel (Document Number 19990659959), a distance of 200.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 11:

Thence North 21°41'50" said Ohio Edison Parcel (Document Number 19990659959), a distance of 221.02 feet to a Masonry Nail set in the centerline of said U.S. Route 5;

Course 12:

Thence 68°18'10" East, along the centerline of said U.S. Route 6, a distance of 98.00 feet to a Masonry Nail set in the most Westerly corner of a parcel of land described in a deed to Ohio Edison Company as recorded in Volume 972, Page 740 of the Lorain County Deed Records;

Course 13:

Thence North 83°34'25" East, along the Southerly line of said Ohio Edison Company (Volume 972, Page 740) parcel and the centerline of Old Lake Road vacated per Ordinance Number 175-67 on October 19, 1967, a distance of 910.87 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Westerly line of Original Black River Township Lot Number 3, Tract Number 3;

Course 14:

Thence South 06°18'21" East, along the Westerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 1599.49 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Southwesterly corner of said Original Black River Township Lot Number 3, Tract Number 3;

Course 15:

Thence North 84°09'41" East, along the Southerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 3249.18 feet to a §" iron pipe found in the Northwesterly corner of a parcel of land described in a deed to Board of Parks Commissioners as recorded in Document Number 19990661588 of the Lorain County Deed Records;

Course 16:

Thence South 05°44'47" East, along the Westerly line of said Board of Parks Commissioners parcel and the Westerly line of the Oaks Subdivision as recorded in Plat Volume 65, Page

*Exhibit A To Limited Warranty Deed - Page 4*

11, and the Westerly line of Oak Point Estates Subdivision Number 3 as recorded in Plat Volume 64, Page 38 of the Lorain County Plat Records, distance of 1993.48 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Westerly line of Sublot Number 39 in said Oak Point Subdivision Number 3;

Course 17:

Thence South 84°09'41" West,  parallel to the Southerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 4721.91 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set, and the true place of beginning.

Containing within said bounds 270.0178 acres of land, of which 121.7678 acres of land lie within Original Brownhelm Township Lot Number 8 and 148.2500 acres of land lie with in Original Black River Township Lot Number 8, Tract Number 3, be the same more or less, but subject to all legal highways as surveyed by Bramhall Engineering & Surveying Company, Inc. in August of 2004. All bearings are to an assumed meridian and are intended to describe angles only. The basis for bearings used was the centerline of said Cooper-Foster Park Road (right of way varies), which was assumed to be "North 54°44'11" East".

Being a combination of part of Permanent Parcel Numbers: 02-03-008-000-001, 01-00-008-000-003, 01-00-008-000-001.

**TRACT 2:**

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius of 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 5, a distance of 570.62 feet to a point;

Thence South 02° 33' 34" West, a distance of 87.98 feet to a point in the Southerly right-of-way line of said U.S. Route 6 and the Northwesterly corner of a parcel of land described in a deed to the City of Lorain as recorded in Volume 1395, Page 284 of the Lorain County Deed Records, and the true place of beginning of land herein described;

Course 1:

Thence continuing South 02° 33' 34" West, along the Westerly line of said City of Lorain parcel, a distance of 255.94 feet to an iron pin found in concrete at the Southwesterly corner of said City of Lorain parcel;

Course 2:

Thence South 87° 26' 26" East, along the Southerly line of said City of Lorain parcel, a distance of 400.00 feet to a point in the Westerly line of a parcel of land described in a deed to Lorain County Metro Park District Board of Park Commissioners as recorded in Document Number 20030942739 of the Lorain County Deed Records;

Course 3:

Thence South 02° 33' 34" West, along the Westerly line of said to Lorain County Metro Park District Board of Park Commissioners (Document Number 20030942739) parcel and the Westerly line of a parcel of land described in a deed to Lorain County Metro Park District Board of Park Commissioners as recorded in Document Number 19990661588 of the Lorain County Deed Records, a distance of 2588.72 feet to an iron pin in concrete found in the Southerly line of said Original Black River Township Lot Number 3, Tract Number 3, said point being 0.21 feet Westerly from and 0.56 feet Southerly from a 5/8-inch iron pin found;

Course 4:

Thence North 88° 04' 29" West, along the Southerly line of said Original Black River Township Lot Number 3, a distance of 3224.90 feet to the Southwesterly corner of said Original Black River Township Lot Number 3;

Course 5:

Thence North 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, a distance of about 2171.66 feet to the approximate low water mark of Lake Erie;

Course 6:

Thence North 73° 10' 25" East, along the approximate low water line of said Lake Erie, a distance of about 970.53 feet;

*Exhibit A To Limited Warranty Deed - Page 6*

Course 7:

Thence North 71° 46' 40" East, along the approximate low water line of said Lake Erie, a distance of about 1110.52 feet;

Course 8:

Thence North 68° 50' 57" East, along the approximate low water line of said Lake Erie, a distance of about 749.69 feet;

Course 9:

Thence North 63° 24' 54" East, along the approximate low water line of said Lake Erie, a distance of about 224.40 feet, to a point in the Westerly line of a parcel of land described in a deed to Beaver Park North Inc. as recorded in the Lorain County Deed Records;

Course 10:

Thence South 02° 33' 34" West, along the Westerly line of said Beaver Park North Inc. parcel, a distance of about 233.97 feet to a point in the Southerly right-of-way line of said Norfolk Southern Combined Railroad subsidiaries parcel;

Course 11:

Thence North 71° 50' 00" East, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way line of said Norfolk Southern Combined Railroad Subsidiaries parcel, a distance of 461.89 feet to a point in the Easterly line of said Original Black River Township Lot Number 3, Tract Number 3;

Course 12:

Thence South 02° 33' 34" West, along the Easterly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 37.42 feet to a point in the Northerly right-of-way of said U.S. Route 6;

Course 13:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Northerly right-of-way line of said U.S. Route 6, a distance of 461.89 feet to a point;

Course 14:

Thence South 02° 33' 34" West, a distance of 146.78 feet to a point in the Southerly right-of-way line of said U. S. Route 6 parcel, the Northwesterly corner of said City of Lorain parcel, and the true place of beginning.

Containing within said bounds approximately 198.5013 acres of land.

**EXCEPTION NO. 1**

*Exhibit A To Limited Warranty Deed - Page 7*

Excepting therefrom so much land as deeded to the State of Ohio as a perpetual easement and right-of-way for public highway and road purposes as recorded in Volume 264, Page 178 on November 11th 1931 and Volume 269, Page 123 on November 4th 1932 of the Lorain County Deed Records and in the Lorain County Highway Plans (Lor-6-0.00-1.75) on February 6th, 1956 and further described as follows:

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius of 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 6, a distance of 570.62 feet to a point;

Thence South 02° 33' 34" West, a distance of 87.98 feet to a point in the Southerly right-of-way line of said U.S. Route 6 and the Northwesterly corner of a parcel of land described in a deed to The City of Lorain as recorded in Volume 1395, Page 284 of the Lorain County Deed Records, and the true place of beginning of land herein described;

Course 1:

Thence South 70° 06' 54" West, along the Southerly right-of-way of said U.S Route 6, a distance of 257.33 feet to an angle point therein;

Course 2:

Thence South 72° 47' 17" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 300.04 feet to an angle point therein;

Course 3:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 200.00 feet to an angle point therein;

Course 4:

Thence South 73° 44' 33" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 300.17 feet to an angle point therein;

Course 5:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 300.00 feet to an angle point therein;

Course 6:

Thence South 72° 24' 23" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 1000.05 feet to an angle point therein, said point being 0.24 feet Westerly from and 0.20 feet Southerly from a 3/4-inch iron pipe found bent;

Course 7:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 400.00 feet to an angle point therein, said point being 0.12 feet Southerly from a 3/4-inch iron pipe found;

Course 8:

Thence South 74° 41' 45" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 200.25 feet to an angle point therein;

Course 9:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 63.00 feet to a point in the Westerly line of said Original Black River Township Lot Number 3;

Course 10:

Thence North 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, a distance of 117.38 feet to a point in the Northerly right-of-way line of said U.S. Route 6;

18-50757-amk    Doc 2018    FILED 01/25/19    ENTERED 01/25/19 14:35:13    Page 204 of 292

Course 11:

Thence North 71° 50' 00" East, parallel with the centerline of said U.S. Route 6, along the Northerly right-of-way of said U.S. Route 6, a distance of 3031.20 feet to a point;

Course 12:

Thence South 02° 33' 34" West, a distance of 146.78 feet to a point in the Southerly right-of-way line of said U.S. Route 6 and the Northwesterly corner of said City of Lorain parcel, and the true place of beginning.

Containing within said perpetual easement 8.9716 acres of land, be the same more or less.

**EXCEPTION NO. 2**

Further excepting therefrom so much Land as deeded to the New York, Chicago & St. Louis Railway Company for the purpose of building and operating a railroad as recorded in Volume 49, Page 255 of the Lorain County Deed Records, and further described as follows:

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius of 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 6, a distance of 570.62 feet to a point;

Thence North 02° 33' 34" East, a distance of 58.81 feet to a point in the Northerly right-of-way line of said U.S. Route 6;

Thence continuing North 02° 33' 34" East, a distance of 37.42 feet to a point, and the true place of beginning of land herein described;

Course 1:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of Norfolk Southern Combined Railroad Subsidiaries, a distance of 3031.41 feet to point in the Westerly line of said Original Black River Township Lot Number 3;

Course 2:

Thence North 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, a distance of 106.71 feet to a point in the Northerly right-of-way line of said Norfolk Southern Combined Railroad Subsidiaries;

Course 3:

Thence North 71° 50' 00" East, parallel with the centerline of said U.S. Route 6, along the Northerly right-of-way of said Norfolk Southern Combined Railroad Subsidiaries, a distance of 3032.01 feet to a point in the Southeasterly corner of a parcel of land described in a deed to Beaver Park North Inc. as recorded in the Lorain County Deed Records;

Course 4:

Thence South 02° 33' 34" West, a distance of 106.92 feet to a point, and the true place of beginning.

Containing within said railroad parcel 6.9600 acres of land, be the same more or less.

## EXCEPTION NO. 3

Excepting therefrom so much land further described as follows:

Situate in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

*Exhibit A To Limited Warranty Deed - Page 11*

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius of 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 6, a distance of 3601.48 feet to a point in the Westerly line of said Original Black River Township Lot Number 3, Tract Number 3;

Thence South 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 1436.12 feet to a point;

Thence South 87° 44' 35" East, a distance of 123.84 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set, and the true place of beginning of land herein described;

Course 1:

Thence North 02° 06' 42" East, parallel with an 8 foot tall chainlink fence, a distance of 316.52 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 2:

Thence South 88° 14' 46" East, parallel with an 8 foot tall chainlink fence, a distance of 194.98 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 3:

Thence North 02° 09' 58" East, parallel with an 8 foot tall chainlink fence, a distance of 96.41 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 4:

Thence South 87° 42' 24" East, parallel with an 8 foot tall chainlink fence, a distance of 78.81 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 5:

Thence North 02° 17' 36" East, a distance of 1100.13 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set in the Southerly right-of-way line of said U.S. Route 6;

18-50757-amk    Doc 2018    FILED 01/25/19    ENTERED 01/25/19 14:35:13    Page 207 of 292

Course 6:

Thence North 71° 50' 00" East, along the Southerly right-of-way line of said U.S. Route 6, a distance of 10.67 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 7:

Thence South 02° 17' 36" West, a distance of 1103.86 feet to 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 8:

Thence South 87° 42' 24" East, parallel with an 8 foot tall chainlink fence, a distance of 421.00 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 9:

Thence South 02° 19' 57" West, parallel with an 8 foot tall chainlink fence, a distance of 533.47 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 10:

Thence North 87° 42' 45" West, parallel with an 8 foot tall chainlink fence, a distance of 524.49 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 11:

Thence North 02° 25' 52" East, parallel with an 8 foot tall chainlink fence, a distance of 119.27 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 12:

Thence North 87° 52' 18" West, parallel with an 8 foot tall chainlink fence, a distance of 179.00 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set, and the True Place of Beginning.

Containing within said bounds 7.9494 acres of land, be the same more or less.

The above described parcel intends to describe a parcel of land of about 174.6203 acres of land, be the same more or less, but subject to all legal highways and easements as surveyed by Bramhall Engineering & Surveying Company, Inc. in August of 2005. All bearings are to an assumed meridian and are intended to describe angles only. The basis of bearings used was a portion of the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West River Road) (width varies), which was assumed to be North 71° 50' 00" East.

This document intends to describe a parcel of land currently known as Permanent Parcel Number 02-03-003-000-001 of the Lorain County Parcel Number System.

*Exhibit A To Limited Warranty Deed - Page 13*

The above-described land was previously described in a deed to Ohio Edison Company as recorded in Volume 637, Page 76 of the Lorain County Deed Records.

**TRACT 3:**

Situated in the Township of Brownhelm, County of Lorain and State of Ohio, and known as being part of Original Lot No. 8 of said Township and bounded and described as follows:

Beginning at the point of intersection with the Westerly line of said Lot No. 8 with the centerline of the Lake Shore Road; thence in the centerline of The Lake Shore Road, N 78 deg.37' E about 390.79 feet to an angle; thence continuing in the centerline of said road N 77 deg. 22' E about 701.96 feet to an angle; thence continuing in the centerline of said road N 75 deg. 07' E about 414.40 feet to the place of beginning for this description;  thence in the centerline of said Lake Shore Road, N 75 deg. 07' E a distance of 200.00 feet; thence S 5 deg. 06' E 221.02 feet to an iron pin and passing through two iron pins, one 19.28 feet from the centerline of said road and the other 43.16 feet from the centerline; thence S 75 deg. 07' W and parallel with the centerline of the Lake Shore Road 200.00 feet to an iron pin; thence N 5 deg. 06' W 221.02 feet to the centerline of the Lake Shore Road at the place of beginning and passing through an iron pin 60.88 feet from the centerline of said road and another iron pin 19.28 feet from the centerline the above described parcel containing 1 acre of land, together with all appurtenances and hereditaments thereunto belonging, but subject to all legal highways and restrictions of record and zoning ordinances.

**TRACT 4:**

Situated in the City of Lorain, County of Lorain and State of Ohio:

Known as being part of Original Brownhelm Township Lot No. 8, and bounded and described as follows:

Beginning in the centerline of what was formerly the Lake Road, (now abandoned) and the Easterly line of said Lot No. 8, which is also the line between Black River and Brownhelm Township; thence in the Easterly line of said Lot No. 8, North 00 deg. 02' East, 239.84 feet to the centerline of the now Lake Road and passing through an iron pin 30 feet from the centerline of the abandoned Lake Road and passing through an iron pin 32 feet from the centerline of the New Lake Road; thence in the centerline of the New Lake Road, South 69 deg. 39' West, and in said centerline produced in a Straight Line, 686.82 feet to its intersection with the centerline of the abandoned Lake Road; thence in the centerline of the Old Lake Road (now abandoned) South 89 deg. 58' East, 643.70 feet to the place of beginning and containing 1.772 acres of land, subject however to all legal highways.

PPN: 01-00-008-000-004
PPN: 01-00-008-000-005
PPN: 01-00-008-000-012
PPN: 02-03-003-000-010
PPN: 02-03-008-000-007

Property Address:

*Exhibit A To Limited Warranty Deed - Page 14*

Lorain, Ohio 44053.

<u>**Exhibit B to Limited Warranty Deed**</u>

<u>**Permitted Exceptions[2]**</u>

1.

---

[2] **To be inserted, based on final title/survey review in accordance with Section 5.14 of the Asset Purchase Agreement.**

## Exhibit C to Limited Warranty Deed

## Order

Attached hereto.[3]

---

[3] Certified copy of Order to be attached.

## FORM OF TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (the "***Agreement***"), dated as of [____], 2019 is by and among Vermillion Power, L.L.C., a Delaware limited liability company ("***Owner***") and FirstEnergy Generation, LLC, an Ohio limited liability company ("***Provider***" and, together with Owner, each, a "***Party***" and collectively, the "***Parties***").

## RECITALS

WHEREAS, under that certain Asset Purchase Agreement, dated as of November 16, 2018, by and among Owner and Provider (as may be amended, supplemented or otherwise modified from time to time, the "***Asset Purchase Agreement***"), Provider has agreed to sell and convey to Owner, and Owner has agreed to purchase from Provider, the Purchased Assets;

WHEREAS, pursuant to the Asset Purchase Agreement, Owner and Provider have agreed to enter into, or cause to be entered into, this transition services agreement at the Closing pursuant to which Provider will provide, or cause to be provided through its Affiliates, to Owner, certain transition services with respect to the West Lorain Facility.

NOW, THEREFORE, in consideration of the mutual premises and the mutual covenants and agreement contained herein, Owner and Provider agree as set forth below.

## ARTICLE I
## DEFINITIONS

1.1     Capitalized terms that are used but are not otherwise defined in this Agreement shall have the meanings given to such terms in this Article I or, with respect to any such terms that are not defined in this Article I, shall have the meanings given to such terms in the Asset Purchase Agreement.

1.2     "***Confidential Information***" means all information relating to the business, operations, assets, liabilities, plans, prospects, projects, West Lorain Facility and other affairs of Owner and its Affiliates, in whatever form.

1.3     "***Emergency***" means an emergency adversely affecting the health or protection of, or otherwise endangering, any Persons or property located at or about the West Lorain Facility.

1.4     "***Facility Equipment***" means, collectively, all equipment, commodities, consumables, special tools and spare and replacement parts necessary for Provider to provide the Services.

1.5     "***Good Industry Practices***" means those practices, methods and acts generally employed in the combustion-turbine generation industry at the particular time in question that, in the exercise of reasonable judgment in light of the facts reasonably known at the time the decision in question was being made, would have been expected to accomplish the desired result

of such decision consistent with manufacturers' recommendations, good utility practices, safety, reliability and the requirements of applicable Laws. Good Industry Practices are not limited to the optimum practices, methods or acts to the exclusion of all others, but rather include a spectrum of possible practices, methods or acts commonly employed in the combustion-turbine generation industry during the relevant period in light of the circumstances.

    1.6    "*Owner Facility Equipment*" means, collectively, all Facility Equipment actually delivered to Owner pursuant to the Asset Purchase Agreement or acquired by Owner after the Closing in the ordinary course of business.

**ARTICLE II**
**SCOPE OF SERVICES**

    2.1    On the terms and subject to the conditions set forth in this Agreement, Provider agrees to provide to Owner, directly, or indirectly through one or more of its Affiliates, the services (a) set forth on Exhibit A hereto, or (b) otherwise agreed to by any Owner and Provider to be provided pursuant hereto (each a "*Service*" and collectively the "*Services*").

    2.2    Notwithstanding any provision of this Agreement to the contrary, Provider shall only be required to perform, or to cause its Affiliates to perform, the type and volume of Services that are substantially the same type and volume as the Services provided to the West Lorain Facilities during the ninety (90) day period immediately prior to November 16, 2018.

    2.3    Standards for Performance. Provider shall provide the Services and perform its obligations under this Agreement in a manner consistent with Owner's directions and in accordance with Good Industry Practices; provided, however, Provider shall not be required to take any actions that in Provider's reasonable judgment, would be likely to violate applicable Law or Provider's internal safety policies (including NERC's Critical Infrastructure Protection program), be inconsistent with Provider's or its Affiliates' safety policies and safety practices, materially and adversely impact the West Lorain Facility, or create an Emergency. Provider may, without incurring any liability hereunder, make reasonable changes from time to time in the manner of performing any Service(s) if Provider is making similar changes in performing similar services for itself and its Affiliates.

    2.4    Independent Contractor. Provider shall, at all times during the Term (as defined below), act as, be deemed to be, and be, an independent contractor to, or of, Owner. Furthermore, nothing in this Agreement shall create or be deemed to create the relationship of joint venture, principal and agent, master and servant or any partnership, employment or other relationship between Owner and Provider, that is, would be, or could be construed to be inconsistent with Provider's status hereunder as an independent contractor to, or of, Owner. At all times during the performance of Services by Provider, all persons performing such Services who shall be in the employ or under the control of Provider or its Affiliates (including agents, contractors, temporary employees and consultants) shall not be entitled to any payment, benefit or perquisite directly from Owner on account of such Services.

    2.5    Consents. Provider shall use commercially reasonable efforts to obtain any applicable third party consents, approvals, licenses, or other appropriate rights in order to

-2-

provide the Services; provided, however, that (a) neither Provider nor its Affiliates shall be required to pay any fees or other payments or incur any liabilities or payment obligations to obtain any such consents, approvals, licenses, or other rights (except to the extent (i) required to be paid by Provider pursuant to the Asset Purchase Agreement or (ii) with respect to which Owner promptly reimburses Provider as Out of Pocket Costs (as defined below) pursuant to Section 4.1), and (b) if Provider is unable to obtain any such consents, approvals, licenses, or other rights, Provider shall continue to provide the Services, to the extent legal permissible; provided, however that if providing the Services is not legally permissible, Provider shall be relieved of its obligation to provide the applicable Service(s) until such consents, approvals, licenses or other rights are obtained.

2.6     Records. Provider shall maintain or cause to be maintained true and correct records of all receipts, invoices, reports and such other documents as are customarily maintained by it for its own operations relating to the Services rendered hereunder. Owner shall, at its sole cost and expense, have the right to inspect such records during regular office hours following reasonable prior written notice of any such inspection.  Owner shall be limited to one such inspection hereunder.

2.7     Subcontracting. Provider may delegate performance of all or any part of the Services to (a) any Affiliate of Provider, or (b) one or more third parties; provided that no such delegation by Provider to any such Affiliate or third party shall in any way affect Owner's rights or relieve Provider of any of its obligations under this Agreement.

## ARTICLE III
## RESPONSIBILITIES OF OWNER AND PROVIDER

3.1     Under this Agreement, Owner and Provider shall act or perform consistent with, in furtherance of, or in accordance with, the following:

(a)     Owner will not direct Provider to take any action inconsistent with applicable Law, or otherwise adversely affecting the safety, health or protection of, or otherwise endangering any Persons or property located at or about the West Lorain Facility, and Provider shall be under no obligation to follow any such direction by Owner.

(b)     Owner shall provide, or cause to be provided, to Provider access to the West Lorain Facility and all Owner Facility Equipment in the possession of Owner to the extent necessary for Provider to perform the Services. Provider shall provide all Facility Equipment necessary for Provider to perform the Services for which access is not required to be provided by Owner pursuant to the immediately previous sentence.

(c)     Owner shall provide, obtain and maintain, or cause to be provided, obtained and maintained, policies of comprehensive and commercial liability insurance with respect to the West Lorain Facility. Provider shall obtain and provide, and be solely responsible for, all workers compensation and other mandatory insurance applicable to employees of Provider.

(d)     Notwithstanding anything to the contrary herein other than Article VII, Owner shall be solely responsible at all times for all costs of the West Lorain Facility, including,

but not limited to (i) all capital expenditures and maintenance costs and (ii) compliance with Environmental Laws and the handling and disposition of Hazardous Materials including Releases thereof.

3.2    Notwithstanding Provider's prior ownership of the West Lorain Facility, Owner will provide, or make reasonably available, copies of all technical, operational and other information (including manuals) that are necessary or useful in Provider's performance of the Services hereunder and any updates thereto, including additional information received from the manufacturers of any such equipment or replacement equipment to the extent actually possessed by Owner. Provider shall be entitled to rely upon any information provided by Owner (other than the Records to be delivered in accordance with the terms of the Asset Purchase Agreement) in the performance of the Services hereunder.

3.3    <u>Computer-Based and other Resources</u>. From and after the Closing Date, (a) Owner shall cause all of its personnel having access to Provider's owned and licensed computer software, networks, hardware, technology or computer-based resources in connection with performance, receipt or delivery of a Service to comply with all security guidelines (including physical security, network access, internet security, confidentiality and personal data security guidelines) of Provider and its Affiliates, and (b) Provider shall cause all of its personnel and the personnel of its Affiliates and its and their respective subcontractor's personnel having access to Owner's owned and licensed computer software, networks, hardware, technology or computer-based resources in connection with performance, receipt or delivery of a Service to comply with all security guidelines (including physical security, network access, internet security, confidentiality and personal data security guidelines) of Owner and its Affiliates, in each case, that have been communicated to the other party in writing.

3.4    <u>Information</u>. All information and records received by Provider or its Affiliates from Owner or any of its Affiliates in connection with the Services, and any information, records or reports generated by Provider in connection with providing Services to Owner, shall be and remain the sole property of Owner and shall be subject to <u>Section 5.11(b)</u> of the Asset Purchase Agreement. Provider, and its Affiliates and third party service providers, shall have a license to use Confidential Information solely for purposes of providing the Services. Such license shall automatically terminate contemporaneously with the termination of this Agreement. Any manuals that are not Purchased Assets and that have not been provided pursuant to Section 5.02(b) of the Asset Purchase Agreement shall remain the sole property of Provider.

**ARTICLE IV**
**COMPENSATION AND PAYMENT**

4.1    <u>Fees; Out of Pocket Costs</u>. During the Term (unless terminated earlier in accordance with <u>Section 5.2</u>), Owner shall pay to Provider the compensation set forth on Exhibit B for the applicable Services (the "***Remuneration***").

4.2    <u>Invoices</u>. Provider shall invoice, or cause invoices to issue to, Owner on a monthly basis for any Remuneration hereunder in respect of Services for the immediately

preceding month (together with supporting documentation therefor) and such invoices shall be payable thirty (30) days after receipt ("**Due Date**").

4.3     Late Payment. To the extent Owner fails to pay any amount required to be paid under this Agreement by the Due Date, such unpaid amount will accrue interest each day at an annual rate of interest equal to LIBOR plus 4% from the Due Date until such amount (plus accrued interest) is paid in full.

4.4     Payment Default. In the event of Owner's failure to pay any Remuneration in accordance with the terms herein, and such failure to pay is not cured within thirty (30) days after Owner has received notice of such default, Provider may suspend performance hereunder until the default payments and all associated late payments are paid in full.

4.5     Taxes. Owner shall be solely responsible for any sales, use or similar Taxes (and excluding all income and similar Taxes) arising with respect to, or on account of, the provision of Services hereunder. If Owner submits to Provider a timely and valid resale or other exemption certificate reasonably acceptable to Provider and sufficient to support the exemption from Taxes, then such Taxes will not be added to the Remuneration payable pursuant to this Section 4.  The Parties shall cooperate to minimize the imposition of any Taxes.

4.6     Payment Disputes.  Owner may object to any invoiced amounts for any Service at any time before, at the time of or after payment is made; provided, however, that such objection is made in writing to Provider no later than ten (10) Business Days after receipt of such invoice and further provided that any such objection shall not relieve Owner of its obligations pursuant to Section 4.2 and Section 4.3 of this Agreement. Payment or acceptance of payment of any amount set forth in an invoice shall not constitute approval thereof. The Parties shall meet as expeditiously as possible to resolve any payment dispute. Any payment dispute that is not resolved between the Parties within ten (10) Business Days shall be resolved in accordance with the dispute resolution procedures set forth in Section 8.5 of this Agreement.

**ARTICLE V**
**TERM**

5.1     Term. This Agreement shall become effective upon the Closing Date and, unless the Parties have otherwise agreed in writing, this Agreement shall terminate, with respect to each applicable Service, at the end of the period set forth in Exhibit A with respect to such Service, and otherwise shall terminate in its entirety 90 days after the Closing Date (the "**Term**").

5.2     Termination.

(a)     The Parties are permitted to terminate this Agreement if they enter into a mutual written agreement to do so.

(b)     Provider is permitted to terminate this Agreement if Provider has suspended performance under Section 4.4 above for fifteen (15) consecutive days.

(c)     Owner is permitted to reduce (to the extent practicable due to the nature of the specific Service) or terminate any and all Services, without penalty, in whole or in part and

-5-

including the termination of this Agreement in its entirety, at any time and for any reason (or for no reason) upon three (3) days' written notice to Provider.

5.3     Within thirty (30) days after the date of any termination, Owner shall pay Provider for any invoiced Remuneration not yet paid by Owner for Services rendered by Provider through the termination date (except for any such Remuneration that is subject to Section 4.6)).

## ARTICLE VI
## INDEMNIFICATION

6.1     Subject to the limitations on liability set forth in Article VII, Owner will defend, indemnify and hold harmless Provider and its Affiliates and their respective officers, directors, employees, agents and representatives (the "***Provider Indemnitees***"), from and against, and no Provider Indemnitee will have responsibility hereunder for, any and all Damages arising in connection with any action, suit, demand, claim or legal, administrative, arbitration or other alternative dispute resolution proceeding, hearing or investigation (any of the foregoing a "***Claim***") asserted or instituted by any Person other than the Parties or their respective Affiliates and incurred or suffered by any Provider Indemnitee, to the extent caused by (a) the breach or violation of, or default under, any covenant, agreement or undertaking of Owner contained in this Agreement, or (b) any actions undertaken within the scope of or in connection with the Services to the extent, but only to the extent, that such actions result from the willful misconduct, gross negligence or fraud of Owner or its Affiliates or their respective employees, agents, affiliates, representatives or third party service providers.

6.2     Subject to the limitations on liability set forth in Article VII, Provider will defend, indemnify and hold harmless Owner and its Non-Recourse Parties, agents and representatives (the "***Owner Indemnitees***"), from and against, and no Owner Indemnitee will have responsibility hereunder for, any and all Damages arising in connection with any Claim asserted or instituted by any Person other than the Parties or their respective Affiliates and incurred or suffered by any Owner Indemnitee to the extent caused by (a) the breach or violation of, or default under, any covenant, agreement or undertaking of Provider contained in this Agreement, or (b) any actions undertaken within the scope of or in connection with the Services, to the extent, but only to the extent, that such actions result from the willful misconduct, gross negligence or fraud of Provider or its Affiliates or their respective employees, agents, affiliates, representatives or third party service providers.

## ARTICLE VII
## LIABILITIES OF THE PARTIES

7.1     Limitations of Liability.

(a)     None of the Parties or their respective Non-Recourse Parties shall be liable for any punitive, incidental, consequential, special or indirect Damages, provided, however, that this provision shall not limit the obligation of Provider to indemnify any Owner Indemnitee, or the obligation of Owner to indemnify any Provider Indemnitee, with respect to any such amounts paid in settlement or judgment with respect to any Claim asserted or instituted

-6-

by any Person other than the Parties or their respective Affiliates and with respect to which such Provider Indemnitee or Owner Indemnitee is entitled to indemnification pursuant to Article VI.

(b)     The Parties further agree that the indemnification obligations, waivers and disclaimers of liability, indemnities (including Article VI), releases from liability and limitations of liability arising under this Agreement will survive for a period of twelve (12) months from the termination or expiration of this Agreement and are only applicable with respect to rights and obligations under this Agreement; *provided*, *however*, that if a written claim or written notice is duly given in good faith with respect to any such indemnity obligation prior to such twelve (12) month expiry period, the claim with respect to the indemnity obligation shall continue indefinitely until such claim is finally resolved. Notwithstanding any provision in this Agreement to the contrary, nothing in this Agreement shall in any way limit, modify, alter, amend, change or otherwise affect the terms of or obligations, rights, remedies, or liabilities of any Party, Affiliate of a Party or other Person under the Asset Purchase Agreement.

(c)     No Warranties or Guarantees. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THE ASSET PURCHASE AGREEMENT OR THE OTHER TRANSACTION AGREEMENTS, THE PARTIES DO NOT MAKE ANY WARRANTIES OR GUARANTEES TO EACH OTHER, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES PROVIDED HEREUNDER.

7.2     Further Limitation of Liability. Liability hereunder will further be limited as follows:

(a)     The Parties agree that this Agreement does not require, and Provider shall not be liable hereunder for any failure of, the West Lorain Facility to operate or to achieve any particular or required level of performance.

(b)     Provider's liability under this Agreement for any loss of, or damage to, the West Lorain Facility, or any other property in the care, custody or control of Provider will be reduced by the actual amount of net proceeds received or recovered by any Owner pursuant to any applicable insurance.

(c)     Notwithstanding anything to the contrary in this Agreement, the total aggregate liability of Owner to Provider for all liabilities arising out of any events occurring or claims made in connection with the performance of its obligations under this Agreement shall not exceed the amounts paid or payable to Provider under this Agreement.

(d)     Notwithstanding anything to the contrary in this Agreement, the total aggregate liability of Provider to Owner for all liabilities arising out of any events occurring or claims made in connection with the performance of its obligations under this Agreement shall not exceed the amounts paid or payable to Provider under this Agreement.

7.3     Exclusive Remedy. Except as specifically set forth in this Agreement, each Party waives any rights and claims it may have against the other Party, whether in law or in equity, relating to the Services covered by this Agreement. Article VI provides the exclusive remedies for any claim arising out of this Agreement or the Services provided hereunder. Each Party has an obligation to use commercially reasonable efforts to mitigate Damages subject to

indemnification pursuant to Article VI. Notwithstanding anything to the contrary in this Section 7.3 or elsewhere in this Agreement, nothing in this Section 7.3 or elsewhere in this Agreement shall in any way limit, reduce, change, amend, modify, terminate or otherwise affect any term or provision of, or any liability, obligation or right under or with respect to, the Asset Purchase Agreement and other Transaction Agreements.

**ARTICLE VIII**
**MISCELLANEOUS**

8.1     Mutual Cooperation. The Parties and their respective Affiliates shall use commercially reasonable efforts to cooperate with each other in connection with the performance of the Services hereunder, including producing on a timely basis all information that is reasonably requested with respect to the performance of Services and the transition at the end of the term of this Agreement; provided that such cooperation does not unreasonably disrupt the normal operations of the Parties or their respective Affiliates.

8.2     Force Majeure.

(a)     No Party shall be liable for any failure or delay in performing its obligations hereunder, or for any loss or damage resulting from such failure or delay, due to:

(i)     acts of God or public enemy, acts of a Governmental Body, wars, acts of terrorism, civil disturbances, riots, insurrections and sabotage, labor disputes, floods, droughts, tidal waves, fires, hurricanes, earthquakes, landslides, other catastrophes or unusually severe storms of extended duration or impact, or

(ii)     causes beyond its reasonable control and which are not foreseeable, or causes beyond the reasonable control of their suppliers which are not foreseeable, if the Party claiming the force majeure is unable to prevent its occurrence or mitigate its effects notwithstanding the exercise of commercially reasonable efforts.

(b)     In the event of any such failure or delay, the date of performance shall be extended for a period equal to the time lost by reason of the delay, and Owner need not pay Provider during or because of such delay. Both Parties shall be prompt in restoring normal conditions, establishing new schedules and resuming operations as soon as the event causing the failure or delay has ceased. Provider shall promptly notify the applicable Owner of any delay and its effects on the Services to be provided under this Agreement.

(c)     If an actual or potential labor dispute delays or threatens to delay the performance of the Services hereunder, Provider shall promptly notify the applicable Owner in writing, stating all relevant information concerning the dispute and its background.

(d)     Nothing set forth in this Article VIII will release the Parties from the obligations that by their nature are not affected by Force Majeure.

8.3     Entire Agreement. This Agreement, in conjunction with any exhibits, schedules, addenda, amendments or attachments hereto, and the Asset Purchase Agreement contain the entire agreement between the Parties with respect to the subject matter hereof. Nothing in this

18-50757-amk     Doc 2018     FILED 01/25/19     ENTERED 01/25/19 14:35:13     Page 220 of 292

Agreement shall in any way modify, amend, alter, limit, reduce, change or otherwise affect the terms of, or the obligation, rights, remedies, or liabilities of any Party, Affiliate of a Party or other Person under the Asset Purchase Agreement.

8.4    <u>Governing Law</u>. THIS AGREEMENT SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW<u>Jurisdiction</u>. Except as otherwise expressly provided in this Agreement and without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes arising out of or in connection with this Agreement or the Transactions or disputes relating hereto and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases are closed, any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement shall be brought in a federal court located in the Southern District of the State of New York and that any cause of action arising out of this Agreement or any of the other Transaction Agreements shall be deemed to have arisen from a transaction of business in the State of New York, and each of the Parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.<u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.<u>Other Provisions</u>. The provisions set forth in Sections 1.02(a), 1.02(b), 10.01, 10.02, 10.04, 10.08, 10.09, 10.10, and 10.11, in each case, of the Asset Purchase Agreement shall apply *mutatis mutandis*, to this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Owner and Provider have executed this Transition Services Agreement as of the date first above written.

**PROVIDER:**

**FIRSTENERGY GENERATION, LLC**

By:_____
Name:
Title:

[Signature Page to Transition Services Agreement]

**OWNER:**

**VERMILLION POWER, L.L.C.**

By:_____
Name:
Title:

**Exhibit A**

**Services**

The Scope of Services shall be as follows:

1. Provide reasonable assistance to Owner to forecast generation schedules for the West Lorain Facility by 8:30 AM Eastern each day, and coordinate with Owner's energy manager. Provide reasonable assistance to Owner with transition of the Facilities to Owner's energy manager and any required coordination with PJM. Provide reasonable assistance to Owner in preparing for submission of any required reports, forms, etc. to PJM.

2. Submit PJM unit offers as provided to Provider by Owner; provided, however, (i) such Service shall not include any advice regarding strategy for such offers and (ii) Owner must provide bid instructions for such offers to Provider no later than one hour prior to the offer deadline of PJM, as applicable.

3. Facilitate with PJM unit dispatch, scheduling and communications with PJM; provided, however, that any request or deviate from schedule must be delivered by Owner to Provider, and then delivered by Provider to the West Lorain Facility.

4. Provide reasonable assistance to Owner with submission of proper reactive and voltage schedules in accordance with defined PJM/NERC reliability standards/procedures.

5. Provide data and information and prepare for submission (but not file or submit) any required reports and forms regarding the West Lorain Facility that Provider or its Affiliates have in its possession as reasonably requested by Owner in order to comply with applicable Law or other requirement of any Governmental Authority have the force and effect of law or regulation (including, the PJM Tariff, the PJM Manuals and other FERC approved tariffs or agreements). Support the transfer of any licenses, permits, authorization. etc. to Owner or Owner's applicable service provider.

6. Provide reasonable access to Provider's information technology subject matter experts to support Owner's integration of the Facilities and data gathering requirements.

7. Continue to maintain all information technology, including existing information technology and telecom services at the West Lorain Facility to support the Services and support the transition of the information technology and telecom services to Owner. Support transition of all data and reports to Owner's technology applications. Continue to arrange for payment of invoices for services related to T-1 or similar telecom service accounts and applications and not cancel such accounts or licenses.

8. Assist with fuel procurement contract negotiation.

9. Provision of accounting and accounts payable information (to the extent reasonably available) to Owner's asset manager.

10. Upon request, provide information available in connection with the preparation of the 2019 operating budget. Support the transition of the West Lorain Facility's subcontractors to Owner's purchasing systems.

11. Provide reasonable assistance with tax filings to the extent such tax filings require information about the West Lorain Facility for any period prior to the Effective Date.

## Exhibit B

## Compensation

Owner shall compensate Provider for:

(1) the actual costs charged to Provider by its Affiliate in connection with the provision of Services hereunder; and

(2) all third party costs and out of pocket costs actually and reasonably incurred in connection with the provision of the Services (whether such costs are incurred prior to, on or after the Effective Date) including costs related to materials, parts, supplies, transportation, equipment rentals, temporary facilities, telecom services, computers and phones (which for the avoidance of doubt shall exclude any cost included in item (1), above).

# **TITLE AFFIDAVIT**

---

| **Re:** | **Seller:** | FirstEnergy Generation, LLC |
|---|---|---|
| | **Purchaser:** | _____ |
| | **Policy Amount:** | $_____ |
| | **Title Insurer:** | Chicago Title Insurance Company, a Nebraska corporation |
| | **Commitment No.:** | **555160451** (the "Commitment") |
| | **Property:** | As legally described in the Commitment |

**Certifications:**

Seller hereby certifies the following to Title Insurer, as to its estate and/or interest in each Property:

**Mechanics Liens:**

All labor, services or materials rendered or furnished by or on behalf of Seller within the last six (6) months to the Property or in connection with the construction or repair of any building or improvements to the Property have been completed and paid for in full except for routine repairs and/or maintenance, which have been or will be duly paid by Seller in the ordinary course of its business.

**Possession:**

To the knowledge of Seller, except as set forth on the survey of the Property prepared by _____ (the "Survey"), (a) Seller's possession of the Property has been peaceable and undisturbed and (b) Seller has not been notified of any dispute regarding Seller's title to the Property.

**Unrecorded Easements:**

To the knowledge of Seller, except as set forth on the Survey, there are no easements or claims of easements affecting the Property that are not shown by the public records.

**Tenants/Parties in Possession:**

To the knowledge of Seller, there are no tenants or other parties who are in possession or have the right to be in possession of the Property except (i) under leases, easements or other agreements described in the Commitment or of record, or (ii) as shown on the Survey of the Property.

**Taxes/Assessments:**

Except as otherwise set forth on the Commitment, all taxes, assessments, water rents and/or charges, sewer rents and/or charges, sewer hook-up charges, fire service, gas charges, and other municipal charges that would constitute a lien and be currently due and payable have been duly paid.

**Covenants & Restrictions:**

To the knowledge of Seller (a) Seller has received no notice of past or present violations of any effective covenants, conditions or restrictions set forth in the Commitment (the "CC&Rs") with respect to Seller's Property and (b) any charge or assessment provided for in any of such CC&Rs has been duly paid.

**Bankruptcy:**

No proceedings in bankruptcy or receivership have been instituted by or Seller (or its respective constituent entities) which are now pending, nor has Seller (or its respective constituent entities) made any assignment for the benefit of creditors which is in effect as to Seller's Property, except as follows:  In re: FirstEnergy Solutions Corp., *et al.*, United States Bankruptcy Court Northern District Of Ohio, Eastern Division Case No. 18-50757.

**Inducement:**

Seller provides this Affidavit to induce Title Insurer to insure title to the Property knowing that it will do so in reliance upon the matters asserted hereinabove.

*SIGNATURE PAGE FOLLOWS*

EXECUTED _____, 20___.

**SELLER:**


**FIRSTENERGY GENERATION, LLC,**
an Ohio limited liability company


By: _____
       Name:
       Title:


Subscribed and sworn to on _____, 20___


_____
Notary Public

4840-5129-8688 v2

**<u>Schedule 1.01(a)</u>**

Buyer's Required Approvals

1. FERC approval pursuant to Section 203 of the Federal Power Act

2. FERC acceptance of a stand-alone reactive power service rate schedule for the West Lorain Facility (irrespective of whether such acceptance is subject to refund and/or hearing procedures)

3. FERC granting market-based rate authorization, together with customary waivers for regulation and blanket authorization, for the sale of energy, capacity, and ancillary services from the West Lorain Facility

4. Buyer filing self-certification of exempt wholesale generator status with FERC in accordance with 18 CFR 366.7

5. Approval of the Ohio Power Siting Board, unless the docket is closed.

### Schedule 1.01(b)

Book Value of Inventory and Spare Parts[1]

| | |
|---|---|
| Fuel | $7,200,000 |
| Non-Fuel Inventory and Spare Parts | $800,000 |
| **Total Inventory and Spare Parts** | **$8,000,000** |

---

[1] Numbers indicated are approximations.

## **Schedule 1.01(c)**

Knowledge Persons of Seller

1. Peter Kotsenas, Vice President and COO of FirstEnergy Generation, Fossil Units

2. Guy LeBlanc, Plant Supervisor, West Lorain Power Station

## **Schedule 1.01(d)**

Knowledge Persons of Buyer

Alexander Daberko

Abraham Kepes

## Schedule 1.01(e)

Pipeline Easements

| Type | Grantor | Grantee | Instrument No. (Date) |
|---|---|---|---|
| Easement | Gede, John | Gas Transport Inc. | 2000-0708671 |
| Easement | Gede, S. | Gas Transport Inc. | 2000-0709025 |
| Easement Agreement and Addendum to Easement[2] | Norfolk Southern Railway Company | Ohio Edison Company | Easement: Book 684, Page 732, (Dec. 10, 1992); Addendum: 2000-708309 |

---

[2] To be partially assigned, as to only the easement granted in the Addendum to Easement.

## Schedule 1.01(f)

Seller Authorized Individuals

1.  Peter Kotsenas

## Schedule 1.01(g)

Transmission and Interconnection Facilities

1. Two 13.8kV to 138kV step-up transformers

2. One 138kV breaker with disconnect switches

3. 1,100 feet of 138kV transmission line to point of interconnection

4. Four 13.8kV to 345kV step-up transformers

5. Four 345kV breakers with disconnect switches

6. 2,500 feet of 345kV transmission line to point of interconnection

7. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 138 kV ISA, Original Service Agreement No. 2836), effective June 1, 2011

8. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 345 kV ISA, Original Service Agreement No. 2837), effective June 1, 2011

## Schedule 2.01(a)

### Owned Real Property

TRACT 1:

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being parts of Original Brownhelm Township Lot Number 8 and Original Black River Township Lot Number 8, Tract Number 3, and further described as follows:

Commencing at a 1 inch iron pipe found in a monument box at the intersection of the centerline of Cooper-Foster Park Road (right of way varies) and the centerline of Crosse Road (60 feet);

Thence South 66°25'15" West, along the centerline of said Cooper-Foster Park Road, a distance of 352.29 feet to a set at an angle point therein;

Thence South 57°15'00" West, along the centerline of said Cooper-Foster Park Road, a distance of 535.24 feet to a Masonry Nail set in the Northerly right of way line of a parcel of land described in a deed to Pennsylvania Lines L.L.C. (01-00-024-501-003) as recorded in Document Number 20020851798 of the Lorain County Deed Records;

Thence North 82°49'15" West, along the Northerly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-003) parcel, a distance of 138.50 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Southeasterly corner of a parcel of land described in a deed to Pennsylvania Lines L.L.C. (01-00-024-501-004) as recorded in Document Number 20020851798 of the Lorain County Deed Records;

Thence North 77°05'45" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 642.39 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set at an angle point therein;

Thence North 68°14'01" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 278.96 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set at an angle point therein;

Thence North 48°53'40" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 278.96 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set at an angle point therein;

Thence North 08°24'50" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 2069.22 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set at an angle point therein;

Thence North 06°40'12" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-004) parcel, a distance of 2298.30 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Southeasterly corner of a parcel of land described in a deed to Pennsylvania Lines L.L.C. (01-00-024-501-005) as recorded in

Document number 20020851798 of the Lorain County Deed Records;

Thence North 08°47'34" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-005) parcel, a distance of 861.26 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set, and the true place of beginning of land herein described;

Course 1:

Thence continuing North 08°47'34" West, along the Easterly right of way line of said Pennsylvania Lines L.L.C. (01-00-024-501-005) parcel, a distance of 3165.54 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Westerly line of a parcel of land described in a deed to the City of Lorain as recorded in Volume 938, Page 284 of the Lorain County Deed Records;

Course 2:

Thence South 38°48'09" East, along a Westerly line of said City of Lorain parcel, a distance of 120.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 3:

Thence South 06°53'24" East, along a Westerly line of said City of Lorain parcel, a distance of 283.05 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 4:

Thence North 77°51'18" East, along a Southerly line of said City of Lorain parcel, a distance of 383.66 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 5:

Thence North 08°51'42" West, along an Easterly line of said City of Lorain parcel, a distance of 120.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 6:

Thence South 84°20'55" West, along a Northerly line of said City of Lorain parcel, a distance of 100.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 7:

Thence North 08°27'35" West, along an Easterly line of said City of Lorain parcel, a distance of 532.24 feet to a Masonry Nail set in the centerline of U.S. Route 6 (right of way varies);

Course 8:

Thence North 68°18'10" East, along the centerline of said U.S. Route 6, a distance of 111.65 feet to a Masonry Nail set in the Northwesterly corner of a parcel of land described in a Deed to Ohio Edison Company as recorded in Document Number 19990659959 of the Lorain County Deed Records;

Course 9:

Thence South 21°41'50" East, along the Westerly line of said Ohio Edison Parcel (document number 19990659959), a distance of 221.02 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 10:

Thence North 68°18'10" East, along the Southerly line of said Ohio Edison parcel (Document Number 19990659959), a distance of 200.00 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set;

Course 11:

Thence North 21°41'50" said Ohio Edison Parcel (Document Number 19990659959), a distance of 221.02 feet to a Masonry Nail set in the centerline of said U.S. Route 5;

Course 12:

Thence 68°18'10" East, along the centerline of said U.S. Route 6, a distance of 98.00 feet to a Masonry Nail set in the most Westerly corner of a parcel of land described in a deed to Ohio Edison Company as recorded in Volume 972, Page 740 of the Lorain County Deed Records;

Course 13:

Thence North 83°34'25" East, along the Southerly line of said Ohio Edison Company (Volume 972, Page 740) parcel and the centerline of Old Lake Road vacated per Ordinance Number 175-67 on October 19, 1967, a distance of 910.87 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Westerly line of Original Black River Township Lot Number 3, Tract Number 3;

Course 14:

Thence South 06°18'21" East, along the Westerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 1599.49 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Southwesterly corner of said Original Black River Township Lot Number 3, Tract Number 3;

Course 15:

Thence North 84°09'41" East, along the Southerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 3249.18 feet to a §" iron pipe found in the Northwesterly corner of a parcel of land described in a deed to Board of Parks Commissioners as recorded in Document Number 19990661588 of the Lorain County Deed Records;

Course 16:

Thence South 05°44'47" East, along the Westerly line of said Board of Parks Commissioners parcel and the Westerly line of the Oaks Subdivision as recorded in Plat Volume 65, Page 11,

and the Westerly line of Oak Point Estates Subdivision Number 3 as recorded in Plat Volume 64, Page 38 of the Lorain County Plat Records, distance of 1993.48 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set in the Westerly line of Sublot Number 39 in said Oak Point Subdivision Number 3;

Course 17:

Thence South 84°09'41" West, parallel to the Southerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 4721.91 feet to a 5/8" rebar with cap stamped "Bramhall 8073" set, and the true place of beginning.

Containing within said bounds 270.0178 acres of land, of which 121.7678 acres of land lie within Original Brownhelm Township Lot Number 8 and 148.2500 acres of land lie with in Original Black River Township Lot Number 8, Tract Number 3, be the same more or less, but subject to all legal highways as surveyed by Bramhall Engineering & Surveying Company, Inc. in August of 2004. All bearings are to an assumed meridian and are intended to describe angles only. The basis for bearings used was the centerline of said Cooper-Foster Park Road (right of way varies), which was assumed to be "North 54°44'11" East".

Being a combination of part of Permanent Parcel Numbers: 02-03-008-000-001, 01-00-008-000-003, 01-00-008-000-001.

TRACT 2:

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius of 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 5, a distance of 570.62 feet to a point;

Thence South 02° 33' 34" West, a distance of 87.98 feet to a point in the Southerly right-of-way line of said U.S. Route 6 and the Northwesterly corner of a parcel of land described in a deed to the City of Lorain as recorded in Volume 1395, Page 284 of the Lorain County Deed Records, and the true place of beginning of land herein described;

Course 1:

Thence continuing South 02° 33' 34" West, along the Westerly line of said City of Lorain parcel, a distance of 255.94 feet to an iron pin found in concrete at the Southwesterly corner of said City of Lorain parcel;

Course 2:

Thence South 87° 26' 26" East, along the Southerly line of said City of Lorain parcel, a distance of 400.00 feet to a point in the Westerly line of a parcel of land described in a deed to Lorain County Metro Park District Board of Park Commissioners as recorded in Document Number 20030942739 of the Lorain County Deed Records;

Course 3:

Thence South 02° 33' 34" West, along the Westerly line of said to Lorain County Metro Park District Board of Park Commissioners (Document Number 20030942739) parcel and the Westerly line of a parcel of land described in a deed to Lorain County Metro Park District Board of Park Commissioners as recorded in Document Number 19990661588 of the Lorain County Deed Records, a distance of 2588.72 feet to an iron pin in concrete found in the Southerly line of said Original Black River Township Lot Number 3, Tract Number 3, said point being 0.21 feet Westerly from and 0.56 feet Southerly from a 5/8-inch iron pin found;

Course 4:

Thence North 88° 04' 29" West, along the Southerly line of said Original Black River Township Lot Number 3, a distance of 3224.90 feet to the Southwesterly corner of said Original Black River Township Lot Number 3;

Course 5:

Thence North 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, a distance of about 2171.66 feet to the approximate low water mark of Lake Erie;

Course 6:

Thence North 73° 10' 25" East, along the approximate low water line of said Lake Erie, a distance of about 970.53 feet;

Course 7:

Thence North 71° 46' 40" East, along the approximate low water line of said Lake Erie, a distance of about 1110.52 feet;

Course 8:

Thence North 68° 50' 57" East, along the approximate low water line of said Lake Erie, a distance of about 749.69 feet;

Course 9:

Thence North 63° 24' 54" East, along the approximate low water line of said Lake Erie, a distance of about 224.40 feet, to a point in the Westerly line of a parcel of land described in a deed to Beaver Park North Inc. as recorded in the Lorain County Deed Records;

Course 10:

Thence South 02° 33' 34" West, along the Westerly line of said Beaver Park North Inc. parcel, a distance of about 233.97 feet to a point in the Southerly right-of-way line of said Norfolk Southern Combined Railroad subsidiaries parcel;

Course 11:

Thence North 71° 50' 00" East, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way line of said Norfolk Southern Combined Railroad Subsidiaries parcel, a distance of 461.89 feet to a point in the Easterly line of said Original Black River Township Lot Number 3, Tract Number 3;

Course 12:

Thence South 02° 33' 34" West, along the Easterly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 37.42 feet to a point in the Northerly right-of-way of said U.S. Route 6;

Course 13:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Northerly right-of-way line of said U.S. Route 6, a distance of 461.89 feet to a point;

Course 14:

Thence South 02° 33' 34" West, a distance of 146.78 feet to a point in the Southerly right-of-way line of said U. S. Route 6 parcel, the Northwesterly corner of said City of Lorain parcel, and the true place of beginning.

Containing within said bounds approximately 198.5013 acres of land.

EXCEPTION NO. 1

Excepting therefrom so much land as deeded to the State of Ohio as a perpetual easement and right-of-way for public highway and road purposes as recorded in Volume 264, Page 178 on November 11th 1931 and Volume 269, Page 123 on November 4th 1932 of the Lorain County Deed Records and in the Lorain County Highway Plans (Lor-6-0.00-1.75) on February 6th, 1956 and further described as follows:

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 6, a distance of 570.62 feet to a point;

Thence South 02° 33' 34" West, a distance of 87.98 feet to a point in the Southerly right-of-way line of said U.S. Route 6 and the Northwesterly corner of a parcel of land described in a deed to The City of Lorain as recorded in Volume 1395, Page 284 of the Lorain County Deed Records, and the true place of beginning of land herein described;

Course 1:

Thence South 70° 06' 54" West, along the Southerly right-of-way of said U.S Route 6, a distance of 257.33 feet to an angle point therein;

Course 2:

Thence South 72° 47' 17" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 300.04 feet to an angle point therein;

Course 3:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 200.00 feet to an angle point therein;

Course 4:

Thence South 73° 44' 33" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 300.17 feet to an angle point therein;

Course 5:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 300.00 feet to an angle point therein;

Course 6:

Thence South 72° 24' 23" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 1000.05 feet to an angle point therein, said point being 0.24 feet Westerly from and 0.20 feet Southerly from a 3/4-inch iron pipe found bent;

Course 7:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 400.00 feet to an angle point therein, said point being 0.12 feet Southerly from a 3/4-inch iron pipe found;

Course 8:

Thence South 74° 41' 45" West, along the Southerly right-of-way of said U.S. Route 6, a distance of 200.25 feet to an angle point therein;

Course 9:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of said U.S. Route 6, a distance of 63.00 feet to a point in the Westerly line of said Original Black River Township Lot Number 3;

Course 10:

Thence North 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, a distance of 117.38 feet to a point in the Northerly right-of-way line of said U.S. Route 6;

Course 11:

Thence North 71° 50' 00" East, parallel with the centerline of said U.S. Route 6, along the Northerly right-of-way of said U.S. Route 6, a distance of 3031.20 feet to a point;

Course 12:

Thence South 02° 33' 34" West, a distance of 146.78 feet to a point in the Southerly right-of-way line of said U.S. Route 6 and the Northwesterly corner of said City of Lorain parcel, and the true place of beginning.

Containing within said perpetual easement 8.9716 acres of land, be the same more or less.

EXCEPTION NO. 2

Further excepting therefrom so much Land as deeded to the New York, Chicago & St. Louis Railway Company for the purpose of building and operating a railroad as recorded in Volume 49, Page 255 of the Lorain County Deed Records, and further described as follows:

Situated in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius of 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 6, a distance of 570.62 feet to a point;

Thence North 02° 33' 34" East, a distance of 58.81 feet to a point in the Northerly right-of-way line of said U.S. Route 6;

Thence continuing North 02° 33' 34" East, a distance of 37.42 feet to a point, and the true place of beginning of land herein described;

Course 1:

Thence South 71° 50' 00" West, parallel with the centerline of said U.S. Route 6, along the Southerly right-of-way of Norfolk Southern Combined Railroad Subsidiaries, a distance of 3031.41 feet to point in the Westerly line of said Original Black River Township Lot Number 3;

Course 2:

Thence North 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, a distance of 106.71 feet to a point in the Northerly right-of-way line of said Norfolk Southern Combined Railroad Subsidiaries;

Course 3:

Thence North 71° 50' 00" East, parallel with the centerline of said U.S. Route 6, along the Northerly right-of-way of said Norfolk Southern Combined Railroad Subsidiaries, a distance of 3032.01 feet to a point in the Southeasterly corner of a parcel of land described in a deed to Beaver Park North Inc. as recorded in the Lorain County Deed Records;

Course 4:

Thence South 02° 33' 34" West, a distance of 106.92 feet to a point, and the true place of beginning.

Containing within said railroad parcel 6.9600 acres of land, be the same more or less.

EXCEPTION NO. 3

Excepting therefrom so much land further described as follows:

Situate in the City of Lorain, County of Lorain, State of Ohio, known as being part of Original Black River Township Lot Number 3, Tract Number 3, and further described as follows:

Commencing the intersection of the centerline of Oak Point Road (width varies) and the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West Erie Road) (width varies), said point being 0.20 feet Westerly from and 0.40 feet Northerly from a 1-inch iron pin found in a monument box;

Thence South 55° 05' 00" West, along the centerline of said U.S. Route 6, a distance of 16.19 feet to a 1-inch iron pin found in a monument box at a point of curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 56° 57' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 370.00 feet along the arc of a curve that bears to the right, with a radius of 2291.83 feet and a chord length of 369.60 feet bearing South 63° 27' 30" West to a point of compound curvature;

Thence Southwesterly, continuing along the centerline of said U.S. Route 6, a distance of 200.00 feet along the arc of a curve that bears to the right, with a radius of 3055.91 feet and a chord length of 199.97 feet bearing South 69° 57' 30" West to a point of tangency;

Thence South 71° 50' 00" West, continuing along the centerline of said U.S. Route 6, a distance of 3601.48 feet to a point in the Westerly line of said Original Black River Township Lot Number 3, Tract Number 3;

Thence South 02° 15' 25" East, along the Westerly line of said Original Black River Township Lot Number 3, Tract Number 3, a distance of 1436.12 feet to a point;

Thence South 87° 44' 35" East, a distance of 123.84 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set, and the true place of beginning of land herein described;

Course 1:

Thence North 02° 06' 42" East, parallel with an 8 foot tall chainlink fence, a distance of 316.52 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 2:

Thence South 88° 14' 46" East, parallel with an 8 foot tall chainlink fence, a distance of 194.98 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 3:

Thence North 02° 09' 58" East, parallel with an 8 foot tall chainlink fence, a distance of 96.41 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 4:

Thence South 87° 42' 24" East, parallel with an 8 foot tall chainlink fence, a distance of 78.81 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 5:

Thence North 02° 17' 36" East, a distance of 1100.13 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set in the Southerly right-of-way line of said U.S. Route 6;

Course 6:

Thence North 71° 50' 00" East, along the Southerly right-of-way line of said U.S. Route 6, a distance of 10.67 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 7:

Thence South 02° 17' 36" West, a distance of 1103.86 feet to 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 8:

Thence South 87° 42' 24" East, parallel with an 8 foot tall chainlink fence, a distance of 421.00 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 9:

Thence South 02° 19' 57" West, parallel with an 8 foot tall chainlink fence, a distance of 533.47 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 10:

Thence North 87° 42' 45" West, parallel with an 8 foot tall chainlink fence, a distance of 524.49 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 11:

Thence North 02° 25' 52" East, parallel with an 8 foot tall chainlink fence, a distance of 119.27 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set;

Course 12:

Thence North 87° 52' 18" West, parallel with an 8 foot tall chainlink fence, a distance of 179.00 feet to a 5/8-inch iron rebar with cap stamped "Bramhall 8073" set, and the True Place of Beginning.

Containing within said bounds 7.9494 acres of land, be the same more or less.

The above described parcel intends to describe a parcel of land of about 174.6203 acres of land, be the same more or less, but subject to all legal highways and easements as surveyed by Bramhall Engineering & Surveying Company, Inc. in August of 2005. All bearings are to an assumed meridian and are intended to describe angles only. The basis of bearings used was a portion of the centerline of U.S. Route 6 (a.k.a. Lake Road) (a.k.a. West River Road) (width varies), which was assumed to be North 71° 50' 00" East.

This document intends to describe a parcel of land currently known as Permanent Parcel Number 02-03-003-000-001 of the Lorain County Parcel Number System.

The above-described land was previously described in a deed to Ohio Edison Company as recorded in Volume 637, Page 76 of the Lorain County Deed Records.

TRACT 3:

Situated in the Township of Brownhelm, County of Lorain and State of Ohio, and known as being part of Original Lot No. 8 of said Township and bounded and described as follows:

Beginning at the point of intersection with the Westerly line of said Lot No. 8 with the centerline of the Lake Shore Road; thence in the centerline of The Lake Shore Road, N 78 deg.37' E about 390.79 feet to an angle; thence continuing in the centerline of said road N 77 deg. 22' E about

701.96 feet to an angle; thence continuing in the centerline of said road N 75 deg. 07' E about 414.40 feet to the place of beginning for this description; thence in the centerline of said Lake Shore Road, N 75 deg. 07' E a distance of 200.00 feet; thence S 5 deg. 06' E 221.02 feet to an iron pin and passing through two iron pins, one 19.28 feet from the centerline of said road and the other 43.16 feet from the centerline; thence S 75 deg. 07' W and parallel with the centerline of the Lake Shore Road 200.00 feet to an iron pin; thence N 5 deg. 06' W 221.02 feet to the centerline of the Lake Shore Road at the place of beginning and passing through an iron pin 60.88 feet from the centerline of said road and another iron pin 19.28 feet from the centerline the above described parcel containing 1 acre of land, together with all appurtenances and hereditaments thereunto belonging, but subject to all legal highways and restrictions of record and zoning ordinances.

TRACT 4:

Situated in the City of Lorain, County of Lorain and State of Ohio:

Known as being part of Original Brownhelm Township Lot No. 8, and bounded and described as follows:

Beginning in the centerline of what was formerly the Lake Road, (now abandoned) and the Easterly line of said Lot No. 8, which is also the line between Black River and Brownhelm Township; thence in the Easterly line of said Lot No. 8, North 00 deg. 02' East, 239.84 feet to the centerline of the now Lake Road and passing through an iron pin 30 feet from the centerline of the abandoned Lake Road and passing through an iron pin 32 feet from the centerline of the New Lake Road; thence in the centerline of the New Lake Road, South 69 deg. 39' West, and in said centerline produced in a Straight Line, 686.82 feet to its intersection with the centerline of the abandoned Lake Road; thence in the centerline of the Old Lake Road (now abandoned) South 89 deg. 58' East, 643.70 feet to the place of beginning and containing 1.772 acres of land, subject however to all legal highways.

PPN: 01-00-008-000-004
PPN: 01-00-008-000-005
PPN: 01-00-008-000-012
PPN: 02-03-003-000-010
PPN: 02-03-008-000-007

Property Address:
Lorain, Ohio 44053.

**Schedule 2.01(b)**

Entitled Real Property

| Item # | Type | Grantor | Grantee | Instrument No. (Date) | Assignee | Instrument No. (Date) | Assignee | Instrument No. (Date) |
|---|---|---|---|---|---|---|---|---|
| **Easements regarding pipeline running from Plant to Columbia Gas Station** | | | | | | | | |
| 1. | Easement | Ohio Edison Company | Northeast Ohio Natural Gas Corp. | 2001-0748361 (April 12, 2001) | FirstEnergy Generation | 2003-0926073 (June 20, 2003) | | |
| 2. | Easement | Abraham, Milad H. Abraham, Fanny A. | Gas Transport Inc. | 2000-07020920 (July 28, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736220 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926087 (Oct. 29, 2002) |
| 3. | Easement | Jenkins, Roy T. Jenkins Ann E. | FirstEnergy Generation Corp. | 2010-0324095 (Dec. 10, 2009) | | | | |
| 4. | Easement | Abraham, Timothy W. Abraham, Marjorie A. Abraham, Gregory Abraham, Eileen Conibear, Michael, et al. | Gas Transport Inc. | 2000-0709023 (Aug. 14, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736227 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926094 (Oct. 29, 2002) |
| 5. | Easement | Walton, Richard E. Walton, Karen P. | Gas Transport Inc. | 1999-0660382 (Nov. 9, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736228 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926095 (Oct. 29, 2002) |
| 6. | Easement | American Stone Corporation | Gas Transport Inc. | 1999-0641595 (Aug. 27, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736229 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926106 (Oct. 29, 2002) |
| 7. | Easement | Corley, John A. Corley, Shirley A. | Gas Transport Inc. | 1999-0641594 (Aug. 25, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736230 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926107 (Oct. 29, 2002) |
| 8. | Easement | Miller, David D. Miller, Sandra J. Miller, Roger G. Miller, Jenny M. Miller, Dwight J., et al. | Gas Transport Inc. | 1999-0651589 (Oct. 27, 1999) | Northeast Ohio Natural Gas Corporation | 2001-0736231 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926105 (Oct. 29, 2002) |
| 9. | Easement | Reinhard, George C. Reinhard, Helen L. | Gas Transport Inc. | 2000-0709024 (Sept. 1, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736251 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926083 (Oct. 29, 2002) |
| 10. | RESERVED | | | 7 | | | | |
| 11. | Easement | Ray, Roger T. Ray, Susann S. | Gas Transport Inc. | 2000-708672 (Sept. 11, 2000) | Northeast Ohio Natural Gas Corporation | 2001-0736232 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926086 (Oct. 29, 2002) |

| Item # | Type | Grantor | Grantee | Instrument No. (Date) | Assignee | Instrument No. (Date) | Assignee | Instrument No. (Date) |
|---|---|---|---|---|---|---|---|---|
| 12. | RESERVED | | | | | | | |
| 13. | Easement | Gede, S.<br>Gede, L. | Gas Transport Inc. | 2000-0721414<br>(Nov. 22, 2000) | Northeast Ohio Natural Gas Corporation | 2001-0736233<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926104<br>(Oct. 29, 2002) |
| 14. | Easement | Gede, John E.<br>Gede, Janice | Gas Transport Inc. | 2000-0709026<br>(Sept. 5, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736221<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926092<br>(Oct. 29, 2002) |
| 15. | Easement | Gede, John<br>Gede, Florence | Gas Transport Inc. | 2000-0672689<br>(Feb. 23, 2000) | Northeast Ohio Natural Gas Corporation | 2001-0736234<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926103<br>(Oct. 29, 2002) |
| 16. | Easement | Gede, Deborah A. | Gas Transport Inc. | 1999-0641596<br>(Aug. 27, 1999) | Northeast Ohio Natural Gas Corporation | 2001-0736235<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926102<br>(Oct. 29, 2002) |
| 17. | Easement | Gede, John<br>Gede, Florence | Gas Transport Inc. | 2000-0672688<br>(Feb. 23, 2000) | Northeast Ohio Natural Gas Corporation | 2001-0736236<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926101<br>(Oct. 29, 2002) |
| 18. | Easement | Phillips, Larry W.<br>Phillips, Linda E. | Gas Transport Inc. | 2000-0672839<br>(Feb. 16, 1999) | Northeast Ohio Natural Gas Corporation | 2001-0736237<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926085<br>(Oct. 29, 2002) |
| 19. | Easement | Swiers, Albert W. Jr.<br>Swiers, Thelma L. | Gas Transport Inc. | 2000-0674115<br>(Jan. 28, 2000) | Northeast Ohio Natural Gas Corporation | 2001-0736238<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926099<br>(Oct. 29, 2002) |
| 20. | Easement | Chappell, David L.<br>Chappell, Gina M. | Gas Transport Inc. | 2000-0663596<br>(Dec. 21, 1999) | Northeast Ohio Natural Gas Corporation | 2001-0736239<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926075<br>(Oct. 29, 2002) |
| 21. | Easement | Ruffing, Edwin<br>Ruffing, Sandra<br>Mertz, Lynn P.<br>Metz, Barbara C. | Gas Transport Inc. | 2000-0672690<br>(Feb. 23, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736240<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926076<br>(Oct. 29, 2002) |
| 22. | Easement | Flynn, Nevada | Gas Transport Inc. | 2000-0669637<br>(Feb. 1, 2000) | Northeast Ohio Natural Gas Corporation | 2001-0736241<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926100<br>(Oct. 29, 2002) |
| 23. | Easement | Celaschi, Victor K.<br>Celaschi, Alberta | Gas Transport Inc. | 2000-0669636<br>(Feb. 1, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736242<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926077<br>(Oct. 29, 2002) |
| 24. | Easement | Hurd, Anna H., Trustee<br>Anna H. Hurd Revocable<br>Living Trust | Gas Transport Inc. | 2000-0696891<br>(Feb. 10, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736243<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926098<br>(Oct. 29, 2002) |
| 25. | Easement | Sablack, Dezso M. | Gas Transport Inc. | 2000-0709027<br>(Sept. 10, 2000) | Northeast Ohio Natural Gas Corp. | 2001-0736244<br>(Feb. 14, 2001) | FirstEnergy Generation | 2003-0926078<br>(Oct. 29, 2002) |

| Item # | Type | Grantor | Grantee | Instrument No. (Date) | Assignee | Instrument No. (Date) | Assignee | Instrument No. (Date) |
|---|---|---|---|---|---|---|---|---|
| 26. | Easement | Weston, Jean Court Weston, Jean Court, Trustee Gerberick, Christine Weston Gerberick, Jeff | Northeast Ohio Natural Gas Corp. | 2000-0722952 (Dec. 5, 2000) | FirstEnergy Generation | 2003-0926074 (June 20, 2003) | | |
| 27. | Easement | Klingman, Frank Richard, Trustee Klingman, Gaye Susanne, Trustee Klingman Family Trust | Northeast Ohio Natural Gas Corp. | 2001-0729631 (Jan. 10, 2001) | FirstEnergy Generation | 2003-0926072 (June 20, 2003) | | |
| 28. | Easement | Kobal, Stella | Gas Transport Inc. | 1999-0651588 (Oct. 20, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736245 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926079 (Oct. 29, 2002) |
| 29. | Easement | Harrell, Bruce W. Harrell, Katherine F. | Gas Transport Inc. | 1999-0660383 (Nov. 1, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736222 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926091 (Oct. 29, 2002) |
| 30. | Easement | Gressler, Robert A. Gressler, Janet R. | Gas Transport Inc. | 1999-0647626 (Sept. 20, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736246 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926097 (Oct. 29, 2002) |
| 31. | Easement | Kinsley, Leland W. Kinsley, Margaret B. | Gas Transport Inc. | 1999-0647628 (Sept. 30, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736247 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926080 (Oct. 29, 2002) |
| 32. | Easement | Hozalski, Carl | Gas Transport Inc. | 1999-0647627 (Sept. 20, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736223 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926090 (Oct. 29, 2002) |
| 33. | Easement | Hozalski, Floyd A., Trustee | Gas Transport Inc. | 1999-0660384 (Nov. 23, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736224 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926089 (Oct. 29, 2002) |
| 34. | Easement | Monhollen, James E. Monhollen, Charlotte K. | Gas Transport Inc. | 1999-0652809 (Oct. 11, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736252 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926084 (Oct. 29, 2002) |
| 35. | Easement | Horning, Wilmer C. Horning, Marjorie A. | Gas Transport Inc. | 1999-0660385 (Nov. 9, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736225 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926088 (Oct. 29, 2002) |
| 36. | Easement | Gemmel, Lester Gemmel, Emma | Gas Transport Inc. | 1999-0661260 (Nov. 9, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736226 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926093 (Oct. 29, 2002) |
| 37. | Easement | Hozalski, Floyd A., Trustee | Gas Transport Inc. | 1999-0661261 (Nov. 23, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736248 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926081 (Oct. 29, 2002) |

| Item # | Type | Grantor | Grantee | Instrument No. (Date) | Assignee | Instrument No. (Date) | Assignee | Instrument No. (Date) |
|---|---|---|---|---|---|---|---|---|
| 38. | Easement | Gillespie, David H. Gillespie, Roselyn M. | Gas Transport Inc. | 1999-0661262 (Nov. 23, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736249 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926096 (Oct. 29, 2002) |
| 39. | Easement | Gifford, Iva Mae | Gas Transport Inc. | 1999-0661263 (Nov. 23, 1999) | Northeast Ohio Natural Gas Corp. | 2001-0736250 (Feb. 14, 2001) | FirstEnergy Generation | 2003-0926082 (Oct. 29, 2002) |

<u>**Schedule 2.01(f)**</u>

Assumed Contracts

1. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 138 kV ISA, Original Service Agreement No. 2836), effective June 1, 2011

2. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 345 kV ISA, Original Service Agreement No. 2837), effective June 1, 2011

3. Agreement between FirstEnergy Generation Corp. and Utility Workers Union of America Local Union Nos. 350 and 351, effective July 1, 2015 through June 30, 2020

4. *Purchase Order No. 46102174, dated August 24, 2012 between Safety-Kleen Systems and FirstEnergy Service Company

5. *Purchase Order No. 46102414, dated December 18, 2013 between Control Analytics Incorporated and FirstEnergy Service Company

6. *Purchase Order No. 46102676, dated November 17, 2014 between Leppo Incorporated and FirstEnergy Service Company

7. *Purchase Order No. 46103157, dated March 9, 2017 between General Supply & Services Inc. and FirstEnergy Generation, LLC

8. *Purchase Order No. 46103161, dated March 16, 2017 between Action Supply Products Inc. and FirstEnergy Generation, LLC

9. *Purchase Order No. 46103162, dated March 16, 2017 between Brand Energy Services LLC and FirstEnergy Generation, LLC

10. *Purchase Order No. 46103165, dated March 16, 2017 between AirGas Incorporated d/b/a Airgas USA LLC and FirstEnergy Generation, LLC

11. *Purchase Order No. 46103170, dated March 16, 2017 between Fastenal Company and FirstEnergy Generation, LLC

12. *Purchase Order No. 46103175, dated March 17, 2017 between MPW Industrial Water Services and FirstEnergy Generation, LLC

13. *Purchase Order No. 46103216, dated March 22, 2017 between Wright Industrial Supply Inc. and FirstEnergy Generation, LLC

14. *Purchase Order No. 46103231, dated March 22, 2017 between North American Substation Services LLC and FirstEnergy Generation, LLC

15. *Purchase Order No. 46103244, dated March 22, 2017 between Konecranes Incorporated and FirstEnergy Generation, LLC

16. *Purchase Order No. 46103257, dated March 23, 2017 between Lanier Consulting LLC and FirstEnergy Generation, LLC

17. *Purchase Order No. 46103267, dated March 23, 2017 between United Rentals North America Inc. and FirstEnergy Generation, LLC, as extended by the Change Order dated October 6, 2017

18. *Purchase Order No. 46103269, dated March 23, 2017 between Mobile Medical Corporation and FirstEnergy Generation, LLC, as extended by the Change Order dated August 31, 2018

19. *Purchase Order No. 46103351, dated May 8, 2017 between Clean Harbors Environmental Services Incorporated and FirstEnergy Generation, LLC

20. *Purchase Order No. 46103352, dated May 9, 2017 between Weavertown Transport Leasing Inc. and FirstEnergy Generation, LLC

21. *Purchase Order No. 46103357, dated May 15, 2017 between Filtech Incorporated and FirstEnergy Generation, LLC

22. *Purchase Order No. 46103372, dated June 7, 2017 between Murray Sheet Metal Company Inc. and FirstEnergy Generation, LLC

23. *Purchase Order No. 46103375, dated June 7, 2017 between Tri-State Roofing & Sheet Metal Co. and FirstEnergy Generation, LLC

24. *Purchase Order No. 46103514, dated December 5, 2017 between Applied Industrial Technologies and FirstEnergy Generation, LLC

25. *Purchase Order No. 46103538, dated January 23, 2017 between Portersville PRD LLC and FirstEnergy Generation, LLC

26. *Purchaser Order No. 46103540, dated January 23, 2018 between FCX Performance Incorporated and FirstEnergy Generation, LLC

27. Purchase Order No. 55117771, dated September 4, 2013 between Northeast Ohio Natural Gas and FirstEnergy Generation, LLC

28. Purchase Order No. 55118588, dated February 11, 2014 between White House Artesian Springs Inc. and FirstEnergy Service Company

29. Purchase Order No. 55122062, dated April 21, 2016 between Lucas Plumbing and Heating Inc. and FirstEnergy Service Company

30. Purchase Order No. 55122877, dated October 11, 2016 between Rebman Systems Incorporated and FirstEnergy Service Company

31. Purchase Order No. 55123940, dated April 24, 2017 between Don Moulds Plantation Incorporated and FirstEnergy Generation, LLC

32. *Purchase Order No. 55124436, dated July 17, 2017 between Grace Services Incorporated and FirstEnergy Generation, LLC

33. Purchase Order No. 55124535, dated August 2, 2017 between Mansfield Maintenance Incorporated and FirstEnergy Generation, LLC

34. Purchase Order No. 55124583, dated August 7, 2017 between H&B Mat Rental Incorporated and FirstEnergy Generation, LLC

35. Purchase Order No. 55124596, dated August 8, 2017 between Fire Tech Incorporated and FirstEnergy Generation, LLC

36. Purchase Order No. 55125241, dated November 29, 2017 between Magesco Incorporated and FirstEnergy Generation, LLC

37. Purchase Order No. 55125749, dated February 26, 2018 between Don Moulds Plantation Incorporated and FirstEnergy Generation, LLC

38. Purchase Order B 10002, dated January 30, 2004 between Guttman Oil Company and FirstEnergy Generation, LLC

39. Purchase Order B10008, dated November 18, 2003 between Petroleum Traders Corporation and FirstEnergy Generation, LLC

40. Purchaser Order, dated August 12, 2018 between Sprague Energy and FirstEnergy Generation, LLC

41. Agreements by and between FirstEnergy Generation Corp., an Ohio corporation, and Diamond Towers II, LLC, a Delaware limited liability company, a memorandum of which is filed for record December 20, 2011 and recorded in Instrument No. 2011-0395871 of the Lorain County Records

42. *Purchaser Order 55126814, dated October 1, 2018 among Shred-It US JV LLC, FirstEnergy Generation, LLC and FirstEnergy Nuclear Operating Company

43. Purchase Order 55126536, dated July 9, 2018 between Patrick K Johnson (d/b/a Dewey Pelton) and FirstEnergy Generation, LLC

44. Master Lease Agreement, dated February 1, 2018, by and among the Cleveland Electric Illuminating Company, Metropolitan Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, and the Toledo Edison Company, as lessors, and Lamar Advertising of Penn, LLC, Lamar Advertising of Youngstown, Inc., The Lamar

Company, LLC and Lamar Texas Limited Partnership, as lessees. The Parties acknowledge that Seller is not a party to this agreement and has no rights thereunder. Seller will use commercially reasonable efforts to enter into a new agreement with the applicable lessee(s) relating to the Real Property only on substantially the same terms and conditions as the existing agreement or facilitate the Buyer entering into such an agreement with the applicable lessee(s) (effective as of the Closing).

Fleet-wide Purchase Orders (denoted by an asterisk (*)) listed on this Schedule 2.01(g) to be assumed by Buyer solely to the extent such Purchase Order relates the West Lorain Power Plant.

## Schedule 2.01(i)

Purchased Intellectual Property

None.

## Schedule 2.01(m)

Emissions Allowances

Annual Emission Allowance Allocations
West Lorain (002869)

| Acid Rain Program | CSAPR | | |
| --- | --- | --- | --- |
| | NOx Annual | NOx Ozone | SO2 |
| 0 | 35 | 20 | 7 |

## Schedule 2.01(p)

### Additional Purchased Assets

1. Gas lateral, including working gas inside the lateral and associated interconnect / easement rights and infrastructure;

2. HRSGs and Unit 1C Steam Turbine / Generator;

3. Spare 138kV (1) and 345kV (1) GSU Transformers;

4. Lake water intake system and infrastructure;

5. Cooling tower and associated infrastructure;

6. Spare CEMS Analyzers for units 2-6;

7. Spare Flow Divider (1); and

8. Fuel tank with full fuel level, in keeping with past practice.

## **Schedule 2.02(k)**

Excluded Assets

1. American Tower monopole telecommunications tower (including any facilities and equipment related thereto) located on the Real Property, southwest of the Ohio Edison Beaver substation.

2. FirstEnergy lattice telecommunications tower (including guys and supports, telecommunications hut and any other facilities and equipment related thereto) located on the Real Property, southwest of the Ohio Edison Beaver substation.

3. FirstEnergy fiber cables, including all related poles and structures, located on the Real Property.

4. Zayo fiber cables, including all related poles and structures, located on the Real Property.

5. StackVision CEMS Terminal Server

6. PI Terminal Server

7. Three Lamar billboard signs (including sign structures and panels) located on the Real Property, on the south side of West Erie Avenue.

## **Schedule 2.06(c)**

### Prorated Items

1. Taxes

2. Utilities (e.g. electric, gas, water, sewer / septic, waste removal)

3. Third party vendor services and equipment

4. IT and telecommunication-related leases, licenses and service agreements

5. Prepaid permits, licenses and fees

6. Prepaid rents and leases

7. PI license

8. CEMS support and maintenance agreement

## Schedule 5.10(c)

Severance for Transferred Employees
Whose Employment is not Governed by a CBA

1. (a) One and one-half weeks' base pay for each year of service plus one additional year, calculated as of January 1 of the year in which the Transferred Employee whose employment is not governed by a CBA is involuntary terminated by Buyer without cause, subject to a minimum of six weeks' pay and a maximum of 52 weeks' pay; <u>provided</u>, that severance amounts for employees who would be eligible for FirstEnergy's Long-Term Incentive Compensation program if such Transferred Employee whose employment is not governed by a CBA had been continuously employed by Seller through the date of termination shall be subject to a minimum of 12 weeks' pay and a maximum of 52 weeks' pay. For the avoidance of doubt, "years of service" shall be cumulative and shall include years employed by Seller or an Affiliate of Seller prior to the Closing Date and years employed by Buyer or Buyer's contractor after the Closing Date; (b) 30-day paid notice period prior to termination; (c) continuation of medical and prescription drug coverage under COBRA; Buyer will pay the COBRA premium for a period equal to the period used for severance pay purposes; and (d) training stipend for reimbursement of up to $3,000 for the cost of education and training to assist in the preparation for a new career.

## **Schedule 5.23**

Access Agreements and Substation Easements

Attached.

## Schedule 7.01(b)

Governmental Approvals

1. The applicable waiting period imposed by the HSR Act with respect to the Transactions shall have expired or have been terminated.

## Schedule 7.01(c)

Consents to Transactions

Consents of the counterparties to each of the following Contracts, in each case solely the extent required pursuant to the Bankruptcy Code or other applicable Law:

1. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 138 kV ISA, Original Service Agreement No. 2836), effective June 1, 2011; and

2. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 345 kV ISA, Original Service Agreement No. 2837), effective June 1, 2011.

**Seller Disclosure Schedule to
Asset Purchase Agreement**

**Dated as of November 16, 2018**

   This Seller Disclosure Schedule is being delivered by FirstEnergy Generation, LLC, an Ohio limited liability company ("**_Seller_**"), pursuant to that certain Asset Purchase Agreement, dated as of the date hereof (the "**_Purchase Agreement_**"), by and among Seller and Vermillion Power, L.L.C., a Delaware limited liability company ("**_Buyer_**"). Capitalized terms used herein shall have the meanings set forth in the Purchase Agreement unless otherwise defined herein.

   This Seller Disclosure Schedule is qualified in its entirety by reference to the Purchase Agreement and is not intended to constitute, and shall not be construed as constituting, representations, warranties, covenants or agreements of Seller, except as and to the extent provided in the Purchase Agreement. Items disclosed on one particular section of this Seller Disclosure Schedule shall be deemed to be disclosed or listed in all other sections of this Seller Disclosure Schedule to the extent it is readily apparent from the face of such disclosure that such disclosure is applicable to such other sections of this Seller Disclosure Schedule. All references in this Seller Disclosure Schedule to the enforceability of agreements with third parties, the existence or non-existence of third-party rights, the absence of breaches or defaults by third parties or similar matters or statements, are intended only to allocate rights and risks among the Parties and are not intended to be admissions against interests, give rise to any inference or proof of accuracy, be admissible against any party to the Purchase Agreement by any Person who is not a party to the Purchase Agreement, or give rise to any claim or benefit to any Person who is not a party to the Purchase Agreement. The fact that any item of information is contained in this Seller Disclosure Schedule shall not be construed as an admission of liability under any applicable Law, or to mean that such information is required to be disclosed in or by the Purchase Agreement or this Seller Disclosure Schedule, or to mean that such information is material. Such information shall not be used as a basis for interpreting the terms "material," "materially," "materiality," "Seller Material Adverse Effect" or any similar qualification in the Purchase Agreement.

## Section 3.03

Governmental Authorization

1. The granting of early termination or the expiration of the applicable waiting period under the HSR Act.

2. The FERC Approvals.

3. FERC acceptance of the Reactive Service-related informational filings required by Schedule 2 of the PJM Open Access Transmission Tariff, and the waiver, expiration or early termination of PJM's 90-day notice requirement with respect thereto.

4. Notice to the Ohio Department of Environmental Protection ("*Ohio EPA*") for the transfer of the Permits set forth in Item II of <u>Section 3.12 of the Seller Disclosure Schedule</u>.

5. Approval of the Ohio Power Siting Board, unless the docket is closed.

## Section 3.04

Noncontravention

The matters set forth in <u>Section 3.03 of the Seller Disclosure Schedule</u>.

## Section 3.05

Finders' Fees

1. Lazard Freres & Co. LLC (such fee to be payable by Seller and its Affiliates)

## Section 3.06

### Required Consents

1. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 138 kV ISA, Original Service Agreement No. 2836), effective June 1, 2011

2. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 345 kV ISA, Original Service Agreement No. 2837), effective June 1, 2011

Pursuant to Section 365(f) of the Bankruptcy Code, the consent of the counterparties under the Contracts listed above should not be required in order to assign such Contracts to Buyer, except as otherwise provided for pursuant to the Bankruptcy Code or other applicable Law.

## Section 3.07(b)

Material Contracts

1. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 138 kV ISA, Original Service Agreement No. 2836), effective June 1, 2011

2. Interconnection Service Agreement among PJM Interconnection, L.L.C. and FirstEnergy Generation Corp. and American Transmission Systems, Incorporated (West Lorain 345 kV ISA, Original Service Agreement No. 2837), effective June 1, 2011

3. Agreement between FirstEnergy Generation Corp. and Utility Workers Union of America Local Union Nos. 350 and 351, effective July 1, 2015 through June 30, 2020

4. Purchase Order No. 46103175, dated March 17, 2017 between MPW Industrial Water Services and FirstEnergy Generation, LLC

5. Purchase Order No. 55117771, dated September 4, 2013 between Northeast Ohio Natural Gas and FirstEnergy Generation, LLC

6. Purchase Order No. 55125241, dated November 29, 2017 between Magesco Incorporated and FirstEnergy Generation, LLC

7. Purchase Order B10008, dated November 18, 2003 between Petroleum Traders Corporation and FirstEnergy Generation, LLC, as amended

8. Purchase Order B10002, dated January 30, 2004 between Guttman Oil Company and FirstEnergy Generation, LLC, as amended

9. Purchase Order, dated August 12, 2018 between Sprague Energy and FirstEnergy Generation, LLC

## **Section 3.07(c)**

Assumed Contract Matters

None.

## Section 3.08

Litigation

1. The Bankruptcy Cases.

## **Section 3.10(b)**

Leased Tangible Personal Property

None.

## Section 3.11(b)

Collective Bargaining

1. Agreement between FirstEnergy Generation Corp. and Utility Workers Union of America Local Union Nos. 350 and 351, effective July 1, 2015 through June 30, 2020

## Section 3.11(c)

Labor Matters

None.

## Section 3.11(d)

Severance Payments

1. FirstEnergy Severance Benefits Plan, as set forth in the FirstEnergy Employee Compensation and Benefits Handbook.

## Section 3.11(e)

Benefit Plans

1. FirstEnergy Health Care Plan

2. FirstEnergy Dental Plan

3. FirstEnergy Prescription Drug Plan

4. FirstEnergy Vision Plan

5. The FirstEnergy Corp. Long Term Disability Plan

6. The FirstEnergy Corp. Health Savings Account Plan

7. The FirstEnergy Corp. Group Life Insurance Plan – Basic, Supplemental, Dependent Life, AD&D

8. Business Travel-Accident Plan

9. FirstEnergy Healthy Living Program

10. FirstEnergy Corp. Flexible Spending Accounts Plan

11. FirstEnergy Corp. Master Pension Plan

12. FirstEnergy Corp. Savings Plan

13. FirstEnergy Corp. Short-Term Incentive Program (Human Resource Letter 504)

14. FirstEnergy Severance Benefit Plan

15. Time Off Programs – Company Observed Holidays

16. Time Off Programs – Paid Absence Days, Vacation Paid Absence Days, and Personal Time Off

17. Time Off Programs – Sick Leave Benefits / Short Term Disability

18. Sick Leave policy for union employees

19. Time Off Programs – Military Leave of Absence

20. Time Off Programs – Time Off for Bereavement (Funeral)

21. Time Off Programs – Jury Duty

22. Adoption Assistance Program

23. Education Assistance Plan

24. Business Travel Accident Plan

25. Voluntary Benefits

26. 2017 Family Care Leave Policy

27. Life Resources Program (EAP)

28. Flexible Benefits Plan

## Section 3.12

Environmental Matters

Part I

1. Asbestos present in abandoned cooling tower and in upper elevations of the HSRG building.

2. A 1998 report was recently discovered that identified an overstress issue with the fuel oil tank. Recommendations/repairs were provided in the report but evidence of repairs could not be located. Evidence of jacking of the tank was discovered. Latest tank survey in 2018 shows out of roundness. Tank to be resurveyed 1Q 2019 to determine stability and complete API inspection.

3. The earthen dike that serves as containment for the fuel oil tank has experienced burrowing rodents (groundhogs). The dike is visually inspected weekly, the grass is regularly cut, and any holes/tunnels discovered are filled with bentonite clay.

4. During excavation associated with the rebuild of the fuel oil offload station containment, some soil showed the presence of oil. The contaminated soil was excavated and removed.

Part II

1. Ohio EPA Title IV Acid Rain Permit (Permit No. P0117771).

2. Ohio EPA National Pollutant Discharge Elimination System Permit (Permit No. 3IB00008*GD).

3. Air Pollution Title V Permit (Permit No. P0119928).

4. Ohio Department of Natural Resources Water Withdrawal Registration (Registration No. 00712).

## Section 3.13(a)

Permits

1. Ohio Power Siting Board Opinion, Order and Certificate No. 99-541-GA-BTX, as amended by the Order on Certificate Amendment No. 00-1785-GA-BTA

2. Ohio Power Siting Board Opinion, Order and Certificate No. 99-540-EL-BGN

1.

**Section 3.14(c)**

Taxes

None.

## Section 3.15(a)

Sufficiency of Assets

1. All shared or overlapping corporate services or operations provided by Seller or its Affiliates, including, without limitation, legal, compliance, purchasing, human resources, regulatory, IT, telecommunications (e.g. cellphones), accounting, finance, risk management, scheduling and dispatch of generation assets, tax, real estate, environmental, engineering/project management, and safety services.

2. Certain contracts by FirstEnergy Solutions Corp. and/or its Affiliates relating to general and administrative matters only and not services, other than the services set forth in Item 1 above.

3. Data acquisition system for data collection and regulatory reporting from the continuous emissions monitoring system (CEMs). Buyer will need to procure a contract from Environmental Systems Corporation, Attn: Eric Bowers, 10801 N. Mopac Expressway, Suite 200, Austin, TX 78759. Phone: (512) 258-5836, for the current data acquisition systems.

4. PI System software license from OSISoft.

5. Telemetry data system required by PJM.

## Section 3.15(b)

### Condition of Assets

1. All equipment associated with steam production and steam-based generation when the plant operated as a combined cycle was retired in place. This equipment includes, but is not limited to, the HRSGs, the HRSG building, the steam turbine / generator and auxiliary equipment, the cooling tower, the water intake structure and system, the circulating water system and pumphouse.

2. The gas pipeline and associated supporting equipment has not been in service since 2013. It is expected that some level of re-commissioning would be required to resume gas operations.

3. Unit 1A/1B fire system CO2 tank inventory maintenance issue

4. Unit 1A/1B – portions of the exhaust plenum / duct liner and insulation has liberated.

5. The retired HRSG building houses the generator output breakers, 13.8kV bus, and fuel oil lines for units 1A and 1B. Failure of parts or all of the HRSG building could pose a threat to equipment identified above.

6. Current staffing levels (4 CT Specialists) limits the ability to support extended periods of continuous operations.

7. Valve regulated station batteries are 7 years old and approaching end of life.

8. High voltage bushings on units 2-5 GSU's were manufactured by Trench Group. Although the West Lorain plant has not experienced any bushing failures, there have been failures of similar bushings at other generation plants

9. Combustion inspections are recommended by GE to occur every 450 factored starts. Some of the units are approaching 600 factored starts.

10. The GE Mark V control system on units 2-6 is the original control system and parts, service and support for this system is limited

11. The acid measurements for the lube oil for all units is above the GE spec.

12. The fuel oil tank cathodic protection system needs repair.

## Section 3.17

### Insurance

1. Liability Insurance – the West Lorain Facility is covered under the FirstEnergy Corp. corporate insurance program. FirstEnergy Corp. purchases $35M per occurrence ($70M in the aggregate) in excess liabilities above its $15M per occurrence self-insured retention. Coverage is provided by Associated Electric and Gas Insurance Services, Inc. (AEGIS).

2. Property Insurance – the West Lorain Facility is covered under the FirstEnergy Corp. corporate insurance program. FirstEnergy Corp. purchases a primary $250M per occurrence limits above a $10M per occurrence Self Insured retention. AEGIS provides 80% of the primary line, with the remaining 20% provided by EIM. FirstEnergy Corp. purchases an excess $250M quota share layer to sit above the primary layer.

### Section 3.18

Absence of Certain Changes

1. The commencement of the Bankruptcy Cases on March 31, 2018.

## Section 3.19

Real Property

1. A portion of the Real Property is leased pursuant to the Agreements by and between FirstEnergy Generation Corp., an Ohio corporation, and Diamond Towers II, LLC, a Delaware limited liability company, a memorandum of which is filed for record December 20, 2011 and recorded in Instrument No. 2011-0395871 of the Lorain County Records.

2. There are three Lamar billboards (sign structures and panels) located on the Real Property which are subject to a Master Lease Agreement dated as of February 1, 2018, by and between Ohio Edison Company and various other FirstEnergy Corp. Affiliates as "LESSOR" and Lamar Advertising Of Penn, LLC, Lamar Advertising Of Youngstown, Inc., The Lamar Company, LLC and Lamar Texas Limited Partnership , as "LESSEE", which covers the Real Property and other property.

3. Seller and Ohio Edison entered into a fleet-wide operating agreement, covering the Facility and other generating facilities of Seller and adjacent real property of Ohio Edison, which will not be assigned to Buyer at Closing but will be replaced with the easements to be granted pursuant to Section 5.23 of the Asset Purchase Agreement.

## Section 3.21

Credit Support

None.

## Section 5.01

Conduct of the Business Through Closing

1. Extend fuel oil supply agreements (Items 7, 8 and 9 set forth on Section 3.07(b) of the Seller Disclosure Schedule) through June 30, 2019.

2. Repair fuel oil tank cathodic protection system.

3. Re-survey fuel oil tank and complete API inspection.

4. Unit 1A/1B CO2 tank investigation and possible repair.

5. Unit 1A/1B exhaust plenum / duct liner and insulation possible repair.

6. Remove louvres from HRSG building roof.

7. Further investigations regarding acid levels of the lube oil and possible replacement.

8. Extension of the existing pipeline O&M agreement through a date on or around the Closing Date or entering into a replacement contract with new pipeline O&M provider; provided, that such replacement contract is terminable without penalty upon no more than sixty (60) days' notice.

**Section 5.21**

Cure Payments

| Vendor Name | Purchase Order # | Cure Amount ($'s) |
|---|---|---|
| ACTION SUPPLY PRODUCTS INC | 46103161 | 282.00 |
| ACTION SUPPLY PRODUCTS INC | 46103161 | 53.23 |
| AIRGAS INCORPORATED | 46103165 | (57.00) |
| AIRGAS INCORPORATED | 46103165 | (1,500.00) |
| DON MOULDS PLANTATION INCORPORATED | 45528261 | 2,945.00 |
| DON MOULDS PLANTATION INCORPORATED | 55123940 | 3,325.00 |
| DON MOULDS PLANTATION INCORPORATED | 55123940 | 1,996.00 |
| DON MOULDS PLANTATION INCORPORATED | 55125749 | 1,598.00 |
| DON MOULDS PLANTATION INCORPORATED | 55123940 | 1,329.00 |
| DON MOULDS PLANTATION INCORPORATED | 55123940 | 886.00 |
| FASTENAL COMPANY | 46103170 | 683.24 |
| FIRE TECH INCORPORATED | 55124596 | 8,212.00 |
| FIRE TECH INCORPORATED | 55124596 | 3,140.00 |
| GRACE SERVICES INCORPORATED | 55124436 | 67.00 |
| GRACE SERVICES INCORPORATED | 55124436 | 67.00 |
| H & B MAT RENTAL INCORPORATED | 55124583 | 75.75 |
| H & B MAT RENTAL INCORPORATED | 55124583 | 75.75 |
| MAGESCO INCORPORATED | 55125241 | 69,855.71 |
| MAGESCO INCORPORATED | 55125241 | 12,327.48 |
| MAGESCO INCORPORATED | 55125241 | 7,708.97 |
| MAGESCO INCORPORATED | 55125241 | 3,266.94 |

| | | |
|---|---|---|
| MANSFIELD MAINTENANCE INCORPORATED | 55124535 | 229.50 |
| MPW INDUSTRIAL WATER SERVICES INC | 46103173 | 23,013.79 |
| MPW INDUSTRIAL WATER SERVICES INC | 46103173 | 2,000.00 |
| NORTHEAST OHIO NATURAL GAS | 55117771 | 5,000.00 |
| NORTHEAST OHIO NATURAL GAS | 55117771 | 5,000.00 |
| WHITE HOUSE ARTESIAN SPRINGS INC | 55118588 | 47.75 |
| WHITE HOUSE ARTESIAN SPRINGS INC | 55118588 | 40.75 |
| WHITE HOUSE ARTESIAN SPRINGS INC | 55118588 | 33.50 |
| WHITE HOUSE ARTESIAN SPRINGS INC | 55118588 | 26.50 |
| WHITE HOUSE ARTESIAN SPRINGS INC | 55118588 | 19.00 |
| WHITE HOUSE ARTESIAN SPRINGS INC | 55118588 | 14.50 |