# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 18-50757 (AMK) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | (Jointly Administered) |
|  | ) |  |
| Debtors | ) |  |
|  | ) | Hon. Judge Alan M. Koschik |
|  | ) |  |

**DEBTORS' MOTION IN FURTHERANCE OF SETTLEMENT AGREEMENT
FOR ENTRY OF AN ORDER (I) AUTHORIZING, *NUNC PRO TUNC* TO
DECEMBER 31, 2018, FIRSTENERGY GENERATION, LLC'S ENTRY
INTO AND ASSUMPTION OF THE PLEASANTS POWER STATION ASSET
PURCHASE AGREEMENT; (II) AUTHORIZING FIRSTENERGY GENERATION,
LLC'S ENTRY INTO THE DISPOSAL AGREEMENT ON THE CLOSING DATE;
(III) AUTHORIZING THE DEBTORS' PERFORMANCE UNDER SUCH
AGREEMENTS; (IV) AUTHORIZING THE TRANSFER OF THE PLEASANTS
POWER STATION TO THE DEBTORS AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), file

this motion (the "Motion") for entry of an order (the "Order") pursuant to Bankruptcy Code

sections 105(a), 363, 365 and 1146, and Bankruptcy Rules 2002 and 6004, substantially in the

form attached hereto as Exhibit A, in furtherance of the Settlement Agreement (defined below),

(i) authorizing, *nunc pro tunc* to December 31, 2018, Debtor FirstEnergy Generation, LLC

("FG", or a subsidiary of FG formed prior to the consummation of the acquisition of Pleasants

(as defined below) the "Buyer") to enter into, and assume, that certain asset purchase agreement,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Drive, Akron, OH 44320.

dated as of December 31, 2018, by and among FG and non-Debtor Allegheny Energy Supply

Company, LLC ("AE Supply" or, the "Seller") and as amended pursuant to those certain

amendments, dated as of January 16, 2019 and January 22, 2019 (as may be further amended

from time to time, a copy of which is attached hereto as Exhibit B, the "APA"); (ii) on the

Closing Date (defined below), authorizing FG to enter into the Disposal Agreement (defined

below), attached hereto as Exhibit C; (iii) authorizing the Buyer's performance under the APA

and the Disposal Agreement; (iv) authorizing the sale and transfer to the Buyer of the Pleasants

Power Station (as further defined below, "Pleasants"); and (v) granting related relief.  In support

of this Motion, the Debtors submit the *Declaration of Charles M. Moore in Support of the*

*Pleasants APA Motion* (the "Moore Declaration"), attached hereto as Exhibit D and the

*Declaration of Mark Kubow in Support of the Pleasants APA Motion* (the "Kubow

Declaration"), attached hereto as Exhibit E, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      Entry into, and approval of, the Settlement Agreement (as defined below)[2] was a

critical milestone in these chapter 11 cases and is now serving as the cornerstone on which the

Debtors and their stakeholders are building a plan of reorganization that will allow the Debtors to

ultimately exit from these chapter 11 cases.  As detailed in Settlement Motion, the Debtors'

estates will receive significant benefits from the Settlement Agreement.  Among these benefits,

---

[2] The Settlement Agreement is among: (i) the Debtors; (ii) the Debtors' parent company FirstEnergy Corp. ("FE Corp.") and its affiliates and subsidiaries other than the Debtors (collectively with FE Corp., the "FE Non-Debtor Parties"); (iii) the ad hoc group of holders (the "Ad Hoc Noteholder Group") of certain pollution control revenue bonds supported by notes issued by FG and FirstEnergy Nuclear Generation, LLC ("NG") and certain unsecured notes issued by FirstEnergy Solutions, Corp. ("FES"); (iv) the ad hoc group of certain holders of pass-through certificates issued in connection with the sale-leaseback transaction for Unit 1 of the Bruce Mansfield Power Plant (the "Mansfield Group" and, together with the Ad Hoc Noteholder Group, the "Supporting Parties"); and (v) the Official Committee of Unsecured Creditors (the "Committee" and, collectively with the FE Non-Debtor Parties and the Supporting Parties, the "Settlement Parties").

the Debtors will receive the value of Pleasants (the "Pleasants Value Transfer").[3]  As part of the Pleasants Value Transfer, the FE Non-Debtor Parties also agreed to pay up to $18 million in costs associated with the maintenance outage completed for the fourth quarter of 2018.[4]

2.	Importantly, the Pleasants Value Transfer has already been approved by this Court as part of the Settlement Agreement.  This Motion merely seeks to effectuate the mechanics under which such value will be transferred to the Debtors' estates.  Specifically, the Debtors seek authority to enter into, and perform under, the APA, which accomplishes two things:  (i) provides for the transfer of Pleasants to the Debtors' estates upon the confirmation and consummation of a plan of reorganization (subject to the satisfaction of the other conditions to closing set forth in the APA) and (ii) outlines the terms by which the Seller will operate Pleasants, and related rights and obligations of the parties, until such closing occurs, which includes a transfer of the economic benefits (and risks) of Pleasants to FG as of January 1, 2019. The terms of the APA under which the Pleasants Value Transfer will take place have been the subject of good faith and arm's length negotiations between the Buyer and the Seller for more than three months; the terms of the Disposal Agreement have similarly been the subject of good faith and arm's length negotiations between the Buyer and the Seller for more than a month.  As such, the decision to enter into the APA and the Disposal Agreement is a reasonable exercise of the Debtors' business judgment.  Accordingly, the Debtors submit that the Motion, and the relief requested herein, should be approved.

---

[3] The Debtors will receive title to Pleasants upon the consummation of a plan of reorganization and the satisfaction or waiver of the other conditions to closing under the APA.

[4] Upon information and belief, the FE Non-Debtor Parties have incurred approximately $14 million in connection with such maintenance outage.

3

## JURISDICTION

3.      The United States Bankruptcy Court for the Northern District of Ohio (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365 and 1146 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the United States Bankruptcy Court Rules for the Northern District of Ohio (the "Local Rules").

## BACKGROUND

4.      On March 31, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their property as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  On April 11, 2018, the United States Trustee for the Northern District of Ohio appointed the Committee pursuant to Bankruptcy Code section 1102.  No trustee or examiner has been appointed in these chapter 11 cases.

5.      A more detailed discussion of the Debtors' background, including its business operation and capital structure, is set forth in the *Declaration of Donald R. Schneider, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 55].

4

6.     Pleasants is a 1,300 megawatt power plant located in Willow Island, West Virginia.  Pleasants is owned by AE Supply, which is a non-debtor subsidiary of FirstEnergy Corp.  A summary of operating and financial figures for FY 2019 is below:

| | |
|---|---|
| Generation and capacity factor, forecast | 8.7 TWhs and 75-77% |
| Capital expenditures and cash flow, forecast | $12-13 million and $15-25 million |

**A.  The Settlement Agreement**

7.     On August 26, 2018 the Debtors filed the *Motion of Debtors to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties Pursuant to 11 U.S.C. §§ 105, 363, 365 and 502 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* (the "Settlement Motion") [Docket No. 1224], which was approved by the Court on September 26, 2018 [Docket No. 1465] (the "Settlement Order").  This settlement (the "Settlement Agreement") represents a comprehensive settlement between the Settlement Parties, resolving the investigation and potential prosecution of claims and causes of action against the FE Non-Debtor Parties that has been a focus of the Debtors and other stakeholders since prior to the Petition Date.

8.     As set forth in detail in the Settlement Motion and accompanying declaration in support thereof [Docket No. 1225], the Settlement Agreement was a product of lengthy negotiations between the Settlement Parties.  Entry of the Settlement Order was a critical, and necessary, aspect of the Debtors' restructuring that will serve as a key component of the Debtors' plan of reorganization and ultimate exit from these chapter 11 cases.

5

9.    The Settlement Agreement provides substantial financial and transition benefits to the Debtors' estates.  One of these benefits, and the subject of this Motion, is the Pleasants Value Transfer, which entails the Buyer's receipt of plant economics (both positive and negative) starting January 1, 2019 and receipt of title to Pleasants upon the consummation of a plan of reorganization (subject to the satisfaction of the other conditions to closing set forth in the APA).

10.    The Settlement Agreement sets out some, but not all, of the terms governing the Pleasants Value Transfer, each of which are incorporated into the APA, including the following:

- AE Supply will transfer the economic benefits and risks of Pleasants to the Buyer as of January 1, 2019;

- AE Supply will transfer all of its right, title and interest in Pleasants and related assets to the Buyer upon the consummation of a plan of reorganization (subject to the satisfaction or waiver of the other conditions to closing under the APA);

- AE Supply will effectuate such transfers while retaining certain liabilities with respect to Pleasants and related operations;[5]

- AE Supply will allow the Debtors, the Committee and the Supporting Parties reasonable access at reasonable times to Pleasants and books, records and personnel of the FE Non-Debtor Parties related thereto and permit the Debtors, the Committee, the Supporting Parties and their professionals to make investigations with respect thereto;

- AE Supply performed an outage in the fourth quarter 2018 (the "Pleasants Outage"), and AE Supply is ultimately responsible for approximately $14 million of the cost of the Pleasants Outage which was intended to maintain the operating performance of the station;

- AE Supply shall retain all of its liabilities under environmental laws with respect to Pleasants arising prior to January 1, 2019.

---

[5] Pleasants' assets exclude the "Disposal Facilities" (as such term is defined below and outlined in the APA), which includes the solid waste surface impoundment facility located on the property referred to as McElroy's Run Impoundment ("McElroy's Run Impoundment").  As discussed in more detail below, AE Supply will retain all of its ownership interests in the Disposal Facilities and AE Supply will remain responsible for environmental obligations associated with the Disposal Facilities, including the closure and remediation of such facilities (other than those arising from a breach by the Buyer of the Disposal Agreement, the Buyer's violation of environmental law, or arising from the disposal or release of materials from Pleasants on or after the Transfer Date).  The Disposal and Access Agreement (the "Disposal Agreement"), which is further discussed herein, is attached hereto as Exhibit C (other than Exhibit A to the Disposal Agreement (Expected Yearly Budget (2019), which is not attached).

11. In addition, the Settlement Agreement outlines certain indemnity provisions that have been included in the APA and the Disposal Agreement (collectively, the "Pleasants Agreements"), including that FE Corp. shall guaranty certain indemnity obligations of AE Supply.

**B. The Pleasants Sale**

12. Contemporaneously with the negotiation of the Settlement Agreement, the Debtors and their professionals began to evaluate how to effectuate the Pleasants Value Transfer. Under the terms of the Settlement Agreement, the Debtors' obligation to enter into a purchase agreement for Pleasants was subject to completion of due diligence to the reasonable satisfaction of the Debtors, the Committee, and the Supporting Parties, with such diligence to be completed by August 26, 2018. *See* Moore Declaration, ¶ 8; Settlement Agreement, 3.1(b).

13. Following this diligence period, and as part of the larger ongoing restructuring negotiations the Debtors are currently undertaking with various stakeholders, the Debtors, in consultation with, and the support of, the Supporting Parties and the Committee, determined not to exercise their "diligence out" and began to negotiate the terms of the APA for the transfer of Pleasants to the Debtors (the "Pleasants Sale"). *See* Moore Declaration, ¶ 9.

14. Thereafter, the Debtors entered into good faith and arm's length negotiation with AE Supply regarding the terms of the Pleasants Agreements. *See* Moore Declaration, ¶ 10. During these negotiations, the Debtors consulted with the Supporting Parties and the Committee. As required by the Settlement Agreement, the APA is in a form reasonably acceptable to the Supporting Parties and the Committee.

15. As summarized in more detail below, the closing of this transaction, and the transfer of Pleasants to the Debtors (the "Closing Date"), is conditioned on, among other things,

18-50757-amk    Doc 2052    FILED 02/01/19    ENTERED 02/01/19 13:16:33    Page 7 of 23

(i) obtaining entry of a final and non-appealable order approving the sale and (ii) confirmation, and consummation, of, a plan of reorganization (which effective date must occur by June 30, 2020). *See* APA, § 11.01(b). Effective January 1, 2019, subject to approval by this Court and any required state or federal government entity, the Buyer will be deemed to have obtained economic and beneficial ownership of Pleasants. Until the Closing Date occurs, the Seller is required to continue to operate the station in accordance with the terms and conditions set forth in the APA.

16. The principal terms and provisions of the APA are summarized in the following table:[6]

| APA Term | Summary Description |
|---|---|
| Parties | Allegheny Energy Supply Company, LLC, as Seller<br><br>FirstEnergy Generation, LLC, as Buyer |
| Consideration | The consideration for the Purchased Assets consists of assumption of the Assumed Liabilities, the releases and waivers of Seller provided for in the Settlement Agreement and the payment of the Cash Consideration. "Cash Consideration" means the Closing Date Inventory Amount plus Buyer's share of the Outage costs (to the extent not already paid), plus or minus the Timing Adjustment Amount. (Section 2.06) |
| Purchased Assets | The Purchased Assets are (i) the Real Property; (ii) the Facilities; (iii) the Tangible Personal Property; (iv) the Assumed Contracts, (v) the Transmission and Interconnection Facilities; (vi) the certain Claims against third parties to the extent relating to the Purchased Assets or the Assumed Liabilities, (vii) the Intellectual Property, (viii) all Records or copies of Records, (xix) all assets of Seller located at the Real Property or in transit to the Real Property for use primarily in connection with the Generating Facility and all assets of Seller located offsite if for use exclusively in connection with the Generating Facility or the Business, (x) certain Emissions Allowances, (xi) all electric capacity rights associated with the any and all capacity of the Purchased Assets, together with all capacity interconnection rights, energy injection rights and other similar rights allocated to the Generating Facility or to the Seller (to the extent related to the Purchased Assets), (xii) all Inventory and rights of Seller, to the extent transferable, to the warranties received from suppliers with respect to such Inventory, (xiii) all warranty benefits with respect to the Purchased Assets or the Assumed Liabilities with respect to events occurring before the Closing Date and (xiv) all Permits relating primarily to the Purchased Assets or the Business (to the extent |

---

[6] This summary of the terms of the APA has been included for the convenience of the parties receiving this Motion. This summary in no way alters, changes, or amends the actual terms set forth in the APA. In the event that there are any inconsistencies between this summary and the actual terms of the APA, the language set forth in the APA controls. Defined terms used in this summary shall have the meanings ascribed to them in the APA. The Disposal Agreement is not summarized herein, but which copy is attached hereto as <u>Exhibit C</u> (other than Exhibit A to the Disposal Agreement (Expected Yearly Budget (2019), which is not attached).

| APA Term | Summary Description |
| --- | --- |
| | transferable). (Section 2.01) |
| Assumed Liabilities | The Assumed Liabilities are (i) all Liabilities relating to the period on or after the Closing Date under the Assumed Contracts, (ii) all Liabilities arising out of any Proceeding arising out of the Business or the Purchased Assets arising on or after the Closing Date, (iii) Buyer Environmental Liabilities, (iv) Buyer Retained Property Liabilities, (v) all electric capacity obligations associated with the capacity rights included in the Purchased Assets, (vi) all Liabilities arising out of the Buyer's employment of the Buyer Employees solely to the extent arising on or after the Closing Date and (vii) all Liabilities for all Taxes for which the Buyer is liable under Section 8.02 of the APA, certain Taxes attributable to the ownership or use of any of the Purchased Assets on or after the Closing Date, all Taxes reflected in elements included or contemplated in the calculation of the Daily Cash Flow and all West Virginia business and operation Taxes attributable to the ownership or use of any of the Purchased Assets on and after the Closing Date. |
| Representations and Warranties of Seller | The APA contains standard representations and warranties (with schedule carve-outs) with respect to the Seller, the Generating Facility and the Business. The APA includes representations of the Seller regarding the following items:<br><br>• Existence and power (Section 3.01)<br>• Authorization (Section 3.02)<br>• Governmental authorization (Section 3.03)<br>• Noncontravention (Section 3.04)<br>• Finders' fees (Section 3.05)<br>• Required consents (Section 3.06)<br>• Financial statements (Section 3.07)<br>• Absence of certain changes (Section 3.08)<br>• Contracts (Section 3.09)<br>• Litigation (Section 3.10)<br>• Compliance with laws (Section 3.11)<br>• Title to purchased assets (Section 3.12)<br>• Employees (Section 3.13)<br>• Environmental matters (Section 3.14)<br>• Permits (Section 3.15)<br>• Taxes (Section 3.16)<br>• Personal property (Section 3.17)<br>• Real property (Section 3.18)<br>• Sufficiency of purchased assets (Section 3.19)<br>• Fuels (Section 3.20)<br>• Intellectual property (Section 3.21)<br>• Insurance (Section 3.22)<br>• Operation and maintenance of the Generating Facility (Section 3.23)<br>• Representations complete (Section 3.24) |
| Representations and Warranties of Buyer | The APA contains standard representations and warranties by the Buyer including as to (i) existence and power, (ii) authorization, (iii) governmental authorization, (iv) noncontravention, (v) finders' fees, (vi) available funds, (vii) litigation (viii) regulatory status, (ix) no other representations and (x) representations complete. |
| Covenants | The APA includes covenants made or agreed to by the parties typical and customary for transactions of this kind, including, without limitation, covenants relating to (i) the conduct of business until the Closing; (ii) access to information; (iii) casualty and condemnation, (iv) exclusivity, (v) real property and related matters, (vi) transition |

9

| APA Term | Summary Description |
|---|---|
| | cooperation, (vii) provision of assets and services, (viii) responsibility for the costs of the fall 2018 outage with respect to the Generating Facility, (ix) inventory levels at Closing, (x) capital expenditures prior to the Closing, (xi) participation by Seller in PJM capacity auctions with respect to the Generating Facility prior to the Closing, (xii) access to Buyer's employees, books and records, (xiii) the transfer of permits, (xiv) Buyer's approvals required in connection with the APA, (xv) negotiations with respect to existing coal supply contracts, (xvi) actions in the bankruptcy cases related to the APA and the transactions contemplated by the APA, (xvii) further assurances, (xviii) cooperation of Buyer and Seller regarding required actions, (xix) public announcements with respect to the APA and the transactions contemplated by the APA, (xx) supplements to the schedules to the APA, (xxi) PJM capacity supply obligations, (xxii) efforts to obtain required approval, (xxiii) notice of certain events, (xxiv) employee matters, (xxv) confidentiality; (xxvi) bulk sales laws; (xxvii) reactive services; (xxviii) antitrust matters; (xxix) property to be retained by the Seller and (xxx) the process by which the Seller will request consent from the Buyer with respect to certain matters under the APA. |
| Closing Conditions | The APA contains usual and customary conditions to closing, including:<br><br>• No order or law shall have been entered prohibiting the transactions (Section 9.01(a))<br>• HSR clearance (to the extent applicable) (Section 9.01(b))<br>• FERC Approval shall have been received and certain other regulatory approvals and governmental consents shall have been obtained (Section 9.01(c))<br>• The receipt of certain specific third party consents (Section 9.01(d))<br>• The Bankruptcy Court shall have issued the Sale Order, and issued an order confirming the Plan, and such orders shall be final and not subject to any pending appeals (Section 9.01(e))<br>• The effective date of the Plan shall have occurred (Section 9.01(f))<br>• The Settlement Agreement shall be in full force and effect (Section 9.01(g))<br>• Material performance of pre-Closing covenants (Section 9.02(a) and Section 9.03(a))<br>• Bringdown of each party's representations and warranties (Section 9.02(b) and Section 9.03(b))<br>• No Seller Material Adverse Effect shall have occurred and be continuing (Section 9.02(c))<br>• The release of liens on the Purchased Assets (Section 9.02(d))<br>• The receipt of all of the Buyer's Required Approvals (Section 9.02(e))<br>• Buyer's receipt of title insurance policy (Section 9.02(f))<br>• Exchange of closing deliverables (Section 9.02(g) and Section 9.03(d))<br>• All of the waivers and releases provided in the Settlement Agreement shall be in full force and effect (Section 9.03(c)) |

## RELIEF REQUESTED

17.     By this Motion, the Debtors respectfully request entry of the Order, pursuant to

Bankruptcy Code sections 105(a), 363, 365 and 1146, and Bankruptcy Rules 2002, 6004, 6006

and 9014 (i) authorizing FG's entry into, and assumption of, the APA, effective as of December

31, 2018; (ii) authorizing FG's entry into the Disposal Agreement on the Closing Date; (iii) authorizing the Debtors performance under the Pleasants Agreements; (iv) authorizing the transfer of Pleasants to the Debtors; and (v) granting related relief.

<u>**BASIS FOR RELIEF REQUESTED**</u>

A. **The Entry into the Pleasants Agreements, and Assumption of the APA, Should be Approved**

  i.    <u>The Entry Into the Pleasants Agreements and the Assumption of the APA Should be Evaluated Under the Business Judgment Standard</u>

18.    As stated above, pursuant to this Motion, the Debtors are seeking authority for FG to enter into the Pleasants Agreements and to assume the APA. Whether evaluating a debtor's decision to enter into a contract or to assume a contract (or both), the same standard applies— whether such decision was a reasonable exercise of the debtor's business judgment.

19.    Bankruptcy Code section 363(b) provides that, after notice and a hearing, a debtor may "use, sell or lease" property of the estate outside the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). A debtor may use, sell or lease property of the estate outside the ordinary course of business if the debtor can demonstrate some articulated business justification. *See Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (sale may be authorized "when a sound business purpose dictates such action."); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999). Specifically, once a debtor articulates a valid business justification for a particular form of relief, the court reviews the debtor's request under the business judgment rule. *In re Frank*, 27 B.R. 748, 751 (Bankr. S.D. Ohio 1983).

20.    Under the business judgment rule there is a presumption that, in making the business decision, the directors of a corporation acted on an informed basis, in good faith and in

11

the honest belief that the action was in the best interests of the company. Ohio Rev. Code Ann. §1701.59(D) (West 2018) (directors of a corporation are presumed to act in accordance with fiduciary duties "unless it is proved by clear and convincing evidence that the director has not acted in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, or with the care that an ordinarily prudent person in a like position would use under similar circumstances"); *Granada Invs. Inc. v. DWG Corp.*, 823 F. Supp. 448, 454 (N.D. Ohio 1993) ("The business judgment rule 'presumes that in making a business decision, actions have been taken on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company'") (citations omitted); *In re Goodyear Tire & Rubber Co. Derivative Litig.*, No. 5:03CV2180, 2007 WL 43557, at *10 (N.D. Ohio Jan. 5, 2007) (holding that there is a presumption that in making business decisions the directors exercised duties "with due care, without self-dealing, and in good faith").

21.     Similarly, a debtor's decision to assume a contract is evaluated under the business judgment standard. Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). When determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease, courts in the Sixth Circuit apply the "business judgment" test. *See In re Greektown Holdings, L.L.C.*, No. 08-53104-WSD, 2009 WL 1653461, at *1 (Bankr. E.D. Mich. May 13, 2009) ("Courts initially apply a 'business judgment' and 'benefit to the estate' test under § 365(a) to determine whether or not a debtor should be allowed to assume an executory contract.") (citation omitted); *In re VisionAmerica, Inc.*, No. 01-214615-B, 2001 WL 1097741, at *5 (Bankr. W.D. Tenn. Sept. 12, 2001) (adopting the "flexible 'business judgment' test" for the assumption of executory

contracts) (citations omitted); *In re Federated Dep't. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases") (citations omitted); *Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc. (In re Allied Tech., Inc.)*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982) ("As long as assumption of a lease appears to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code, and particularly of 11 U.S.C. § 365.").

22.     Further, Bankruptcy Code section 105(a) provides this Court with broad powers in the administration of a case under the Bankruptcy Code.  Bankruptcy Code section 105(a) provides, in pertinent part, that a court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

23.     The Debtors respectfully submit that, as further set forth below, the Buyer has exercised reasonable business judgment in its decision to enter into the Pleasants Agreement and to assume the APA and that such decision is in the best interests of all parties in interest in these chapter 11 cases.

ii.     The Pleasants Value Transfer Has Already Been Approved as Part of the Settlement Agreement

24.     As discussed above, the Court has already approved the Pleasants Value Transfer as part of the Settlement Agreement.  The Pleasants Value Transfer was a core term of the Settlement Agreement and provides one of the benefits that the Debtors' estates received thereunder.  As such, the ***only*** issue before the Court today is whether, in furtherance of the Settlement Agreement and Settlement Order, the Court should approve the Debtors' entry into

13

the Pleasants Agreements, and assumption of the APA, as a valid exercise of the Debtors' reasonable business judgment. As set forth herein, the answer to that question is "yes" and, accordingly, the Motion should be approved.

      iii.   <u>The Transfer of Pleasants to the Debtors' Estates is a Valid Exercise of the Debtors' Sound Business Judgment</u>

25.     The Debtors have concluded, in an exercise of their sound business judgment, that acquiring Pleasants and integrating it into their current infrastructure would be advantageous to their estates and in the best interests of all creditors. The transfer of Pleasants to the reorganized Debtors on the Closing Date inures to the benefit of the Debtors' creditors and their estates—by integrating Pleasants into the Debtors' infrastructure currently in place, the Debtors believe that they will be able to efficiently operate Pleasants for a financial gain that will be beneficial to their creditors. *See* Kubow Declaration, ¶ 7.

26.     Specifically, adding Pleasants into the portfolio for the reorganized business, and integrating it into the Debtors' current infrastructure, will not only add scale and purchasing power to enhance the value to the Debtors' enterprise, but will also result in increased efficiencies and savings on operations (fuel, labor, etc.), maintenance, general administrative costs and other costs by integrating Pleasants with the Debtors' existing coal-powered plants, the W.H. Sammis Power Station ("<u>Sammis</u>") and the Bruce Mansfield Power Station ("<u>Mansfield</u>"). *See* Kubow Declaration, ¶¶ 6 - 7. The Debtors will also realize overhead synergies because services to Pleasants will be managed with Sammis and Mansfield and should be provided at minimal additional cost. *Id.*

27.     Finally, throughout these chapter 11 cases, the Debtors and their professionals have worked to develop a long-term business plan (the "<u>Business Plan</u>"). *See* Kubow Declaration, ¶ 2. The transfer of Pleasants fits into the Business Plan and the Debtors plan to

14

potentially continue to operate its generation units long-term in the event of legislative support and / or market reforms are realized. *See id.* at ¶ 8. Further, as outlined above and in the Moore Declaration, the Debtors will receive certain environmental protections under the APA. Accordingly, the Debtors have concluded, in an exercise of their reasonable business judgment, that the combination of the Business Plan benefits and the contractual protections included in the Pleasants Agreements indicate that acquiring Pleasants is a financially advantageous decision for their estates.

      iv.   <u>The Terms of the Pleasants Agreements are Appropriate and, as such, FG's Entry the Pleasants Agreements, Assumption of the APA, and the Debtors' Performance Thereunder, Should be Approved</u>

28.     In determining to proceed with the Pleasants Sale, the Debtors engaged in good faith and arm's length negotiations with the FE Non-Debtor Parties for more than three months in order to obtain the best possible terms for the estates, while also adhering to those terms already agreed to as part of the Settlement Agreement. *See* Moore Declaration, ¶ ¶ 10, 16.

29.     As part of these negotiations, the Debtors were able to obtain favorable terms of the estates and their creditors. First and foremost, the Debtors were able to negotiate protective terms related to potential environmental liabilities associated with Pleasants. The Seller is retaining all environmental liabilities associated with Pleasants prior to the Transfer Date and will indemnify the Buyer against such liabilities. *See* Moore Declaration ¶ 11.

30.     In addition, on the Closing Date, FE Corp. will provide a three-year, $15 million guarantee with respect to AE Supply's indemnification obligations regarding the pre-Transfer Date environmental liabilities described above. *See* Moore Declaration, ¶ 12. This guarantee will be transferable to a subsequent owner of Pleasants. *See id.* at ¶ 12.

31.     The Debtors were also able to negotiate certain benefits related to the disposal facilities currently utilized by Pleasants (the "<u>Disposal Facilities</u>"), including McElroy's Run

Impoundment (as defined in the APA).  *See* Moore Declaration, ¶ 13.  McElroy's Run
Impoundment is the solid waste surface impoundment facility located near the Pleasants
property.  *See id*.  First, the Debtors were able to negotiate a beneficial Disposal Agreement that
will be entered into on the Closing Date.  This agreement allows the Buyer to utilize the Disposal
Facilities, including McElroy's Run Impoundment, on and after the Closing Date on a cost-
sharing basis.  *See id*.  Continued access to the Disposal Facilities is beneficial because it
provides the ability to dispose of coal combustion residuals ("CCR's") at a large facility in close
proximity to the plant, which provides for a low-cost solution.  *See id*.  The Disposal Agreement
is beneficial to the estates because Pleasants must have a reliable site that meets regulatory rules
to dispose of this waste from the Pleasants power station and alternative options would be
inefficient and result in significantly higher costs.  *See id*.

32.     In addition, the Debtors were able to negotiate favorable provisions in both the
APA and the Disposal Agreement pursuant to which the Seller will retain ownership and all
liabilities associated with the Disposal Facilities (other than those arising from a breach by the
Buyer of the Disposal Agreement, the Buyer's violation of environmental law, or from the
disposal or release of materials from Pleasants on or after the Transfer Date) and the Seller will
indemnify the Buyer against such liabilities, which includes the closure and associated
remediation costs associated with the Disposal Facilities.  Further, FE Corp. will guarantee the
indemnification obligations of AE Supply under the APA with respect to liabilities under
environmental laws that relate solely to McElroy's Run Impoundment, including closure and
associated remediation costs.  This guarantee will be unlimited in time and amount and will be
transferable to a subsequent owner of Pleasants.  *See* Moore Declaration, ¶ 14.

33.     As added value to the transfer, the Debtors negotiated significant economic concessions with the Seller and FE Non-Debtor Parties with respect to the cost of shared services (overhead) during the period through the Closing Date.  The negotiated rates are (i) $667,000 per month for indirect or allocated charges, (ii) cost for direct charges for services to support Pleasants, and (iii) $250,000 per month for pension charges related to the workforce at Pleasants. These negotiated rates for shared services will improve the cash flow of the station in FY 2019. *See* Moore Declaration, ¶ 15.

34.     As noted above, the Debtors worked closely with the Supporting Parties and the Committee throughout these negotiations.  The Debtors believe that the Pleasants Agreements embody the best possible terms that they will be able to negotiate with the FE Non-Debtor Parties.  *See* Moore Declaration, ¶ ¶ 10, 16.  Importantly, the APA allows the Debtors to proceed with the Pleasants Sale and realize the potential upside and economic benefits discussed herein, while the Disposal Agreement ensures that, on and after the Closing Date and subject to the terms of the Disposal Agreement, Pleasants will have a reliable site in close proximity on which Pleasants can dispose of waste.  *See supra* A(iii).

35.     As such, for the reasons set forth herein, the Buyer's decision to acquire Pleasants pursuant to the terms of the APA and enter into the Disposal Agreement, and the Debtors' performance thereunder, is a valid and sound exercise of the Debtors' business judgment and should be approved.

v.     The Pleasants Sale Has Been Proposed in Good Faith and Without Collusion, and the Buyer is a Good Faith Purchaser

36.     Bankruptcy Code section 363(m) provides that

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

37.     In the Sixth Circuit, Bankruptcy Code section 363(m) grants finality to a sale to a good faith purchaser authorized under section 363(b) and thus maximizes value for the parties to the sale. *See Official Comm. of Unsecured Creditors v. Anderson Senior Living Prop., LLC (In re Nashville Senior Living, LLC)*, 620 F.3d 584, 594 (6th Cir. 2010).

38.     A good faith purchaser under Bankruptcy Code section 363(m) is one who purchases assets for value, in good faith and without notice of adverse claims. *Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made in Detroit, Inc. (In re Made in Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir. 2005) (adopting the "traditional equitable definition of a 'good faith purchaser,'" defined as "one who purchases the assets for value, in good faith, and without notice of adverse claims.") (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)); *see also In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). To be covered under the statutory protection of Bankruptcy Code section 363(m), the purchaser must demonstrate that it purchased the assets in good faith and that it did so for value. *In re Made in Detroit, Inc.*, 414 F.3d at 581. To show lack of good faith, a party "must demonstrate that there was fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders."

18

*Id.* (quoting *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1218 (6th Cir. 1996)).

39. The Buyer is a good faith purchaser and is entitled to the protections of Bankruptcy Code section 363(m). *See Weingarten Nostat, Inc. v. Serv. Merch. Co.*, 396 F.3d 737, 741 (6th Cir. 2005) ("the primary goal of § 363(m) is to protect good faith purchasers"). The Buyer seeks to acquire Pleasants as part of the Settlement Agreement, which was negotiated in good faith to address the investigation and potential prosecution of claims and causes of action against the FE Non-Debtor Parties and which was already approved by this Court. The Pleasants Power Transfer was a significant term of the Settlement Agreement and provides value to the estates as a significant and critical component of the Settlement Agreement. Similarly, the APA was negotiated within the parameters of the Settlement Agreement in good faith between the Buyer and the Seller.

40. Accordingly, the Debtors submit that the Buyer should be entitled to the full protections of Bankruptcy Code section 363(m).

vi. <u>Adequate and Reasonable Notice of the Pleasants Sale Will Be Provided</u>

41. Notice of the Motion will satisfy the requirements of Bankruptcy Rule 6004(a). Such notice will (i) provide at least 21-days' notice of the date, time and location of the hearing, (ii) inform interested parties of the deadlines for objecting to the Pleasants Sale and (iii) otherwise includes information relevant to parties interested in or affected by the Pleasants Sale.

vii. <u>The Buyer is not an Appointed Professional in These Chapter 11 Cases</u>

42. Pursuant to Local Rule 6004-1, neither the Buyer nor any of its affiliates, members, officers, directors, shareholders or any of their respective successors or assigns is a professional person appointed in these chapter 11 cases by order of the Court (an "<u>Appointed</u>

19

Professional"), employee or affiliate of an Appointed Professional or member of an Appointed Professional's immediate family.

**B.  The Transfer of Pleasants is Exempt from State or Local Transfer or Deed Recording Taxes Pursuant to Bankruptcy Code Section 1146**

43.     The Debtors request that, in approving the Pleasants Sale, the Court find that, pursuant to Bankruptcy Code section 1146(a), any deed or other instrument made or delivered in accordance with the terms of the APA shall be exempt from any state or local transfer or deed recording taxes, and other similar taxes (collectively, the "Transfer Taxes").

44.     Section 1146(a) of the Bankruptcy Code provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  11 U.S.C. §1146(a).  The Debtors submit that the Pleasants Sale is exempt from Transfer Taxes pursuant to Bankruptcy Code sections 105(a) and 1146(a) since the Pleasants Sale will be incorporated into a plan of reorganization and the Closing Date will not occur until after such plan has been confirmed and consummated.

45.     The Bankruptcy Court for the Southern District of New York, in a case analogous to the facts here, was asked to determine whether a pre-confirmation sale that closed post-confirmation was exempt from payment of Transfer Taxes under Bankruptcy Code section 1146. *See In re New 118th, Inc.*, 398 B.R. 791 (Bankr. S.D.N.Y. 2009).  In analyzing this question, the court distinguished the Supreme Court's decision in *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008), which attempted to establish a "simple, bright-line rule" limiting the scope of the transfer tax exemption to "transfers made pursuant to a Chapter 11 plan that has been confirmed."  *See id.* at 52.  Specifically, in *In re 118th, Inc.,* the bankruptcy court noted that Piccadilly did not address transfers that were approved pre-

20

confirmation but were consummated post-confirmation. *In re New 118th, Inc.*, 398 B.R. at 797 ("*Piccadilly* did not address whether the exemption could apply to a pre-confirmation sale that closed post-confirmation. Nevertheless, the post-confirmation delivery of the deed, and hence, the transfer, satisfies" *Piccadilly*.) Further, the court found, the 1146(a) exemption "applies to a post-confirmation *transfer* that follows a pre-confirmation sale if the transfer facilitates the implementation of the plan." *Id*. (emphasis in original).

46.     So too is the case here. Notably, although the Buyer will obtain economic and beneficial ownership of Pleasants on the Transfer Date, the Closing Date of the Pleasants Sale, including the transfer of any deeds or other instruments, will not take place until after a plan of reorganization has been confirmed and consummated. The Pleasants Sale is specifically conditioned on the confirmation and consummation of a plan and, therefore, the Pleasants Sale will be closed "under a plan confirmed" pursuant to Bankruptcy Code section 1146(a). Further, as outlined above, the Pleasants Value Transfer is a significant term of the Settlement Agreement, and is a key component of the Debtors' overall plan structure that will provide value to the Debtors' creditors and that will be implemented as part of a plan of reorganization in connection with the Debtors' ultimate exit from bankruptcy. *See In re New 118th, Inc.*, 398 B.R. at 798 (noting that the transfer of the rental properties were "essential" to the consummation of the plan, in part because the proceeds were necessary to effectuate a settlement agreement). Therefore, the Debtors submit that the Pleasants Sale should be exempt from Transfer Taxes pursuant to Bankruptcy Code section 1146(a).

### C.  The Court Should Waive the Stay of Bankruptcy Rules 6004 and 6006

47.     Under the Settlement Agreement, the Debtors must take beneficial and economic ownership of Pleasants by January 1, 2019. *See* Moore Declaration, ¶ 6. As such, the Debtors request that the Court waive the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d).

<u>**NOTICE**</u>

48.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

Notice of this Motion has been served on the following parties and/or their counsel, if known, via

facsimile, overnight delivery, e-mail, and/or hand delivery (a) each party or entity on the General

Service List (as defined in the *Order, Pursuant to Sections 102 and 105(A) of the Bankruptcy*

*Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9013 and 9014 and Local Bankruptcy*

*Rules Establishing: (I) Omnibus Hearing Dates; and (II) Certain Case Management Procedures*

[Docket No. 154]); and (b) those taxing authorities and other parties that may be impacted by

this Motion.  The Debtors submit that, in light of the nature of the relief requested, no other or

further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Order

substantially in the form attached hereto as <u>Exhibit A</u> granting the relief requested in this Motion

and such other and further relief as may be just and proper.

18-50757-amk    Doc 2052    FILED 02/01/19    ENTERED 02/01/19 13:16:33    Page 22 of 23

Dated:    February 1, 2019                    Respectfully submitted,

*/s/ Kate M. Bradley*
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

- and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*

18-50757-amk    Doc 2052    FILED 02/01/19    ENTERED 02/01/19 13:16:33    Page 23 of 23