# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| | ) Chapter 11 |
| In re: | ) |
| | ) Case No. 18-50757 |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

## JOINT PLAN OF REORGANIZATION OF FIRSTENERGY SOLUTIONS CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ........................................................................... 1
- A. Defined Terms. ................................................................................................. 1
- B. Rules of Interpretation. .................................................................................. 29
- C. Computation of Time. .................................................................................... 30
- D. Governing Law. .............................................................................................. 31
- E. References to Monetary Figures. .................................................................... 31

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ..................... 31
- A. Administrative Claims. ................................................................................... 31
  - 1. General Administrative Claims. ......................................................... 31
  - 2. Postpetition Inter-Debtor Claims. ...................................................... 32
  - 3. Professional Compensation. ............................................................... 32
- B. Priority Tax Claims. ........................................................................................ 33

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................... 34
- A. Classification of Claims and Interests. ........................................................... 34
- B. Treatment of Claims and Interests. ................................................................. 37
- C. Special Provision Governing Unimpaired Claims. ......................................... 63
- D. Elimination of Vacant Classes. ...................................................................... 63
- E. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .............................................................................................. 63
- F. Controversy Concerning Impairment. ............................................................ 63
- G. Equity Election Conditions. ........................................................................... 63

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..................................... 64
- A. Plan Settlement. .............................................................................................. 64
  - 1. FE Settlement Agreement. .................................................................. 64
  - 2. Allocation of FE Settlement Consideration Among the Estates. ........ 65
  - 3. Allocation of FE/FES Revolver Proceeds. .......................................... 65
  - 4. Allocation of Proceeds from Sales of the Bay Shore Power Plant, West Lorain Power Plant and the RE Burger Power Plant. ........................... 65
  - 5. Allocation of Administrative Expense Claims and Distributable Value Adjustment. ......................................................................................... 65
  - 6. Inter-Debtor Claims. .......................................................................... 66
  - 7. Settlement of Valuation of the Debtors' Estates and Allocation of Value Among the Debtors' Creditors. .......................................................... 67
- B. Restructuring Transactions. ............................................................................ 67
  - 1. Restructuring Transactions, Generally. .............................................. 67
  - 2. Implementation of FE Settlement Agreement. ................................... 68
  - 3. Implementation of Mansfield Settlement. .......................................... 69
  - 4. Issuance and Distribution of New FES Common Stock. ..................... 70
  - 5. Effective Date Cash Distribution. ...................................................... 70
  - 6. Unsecured Bondholder Cash Pool. ..................................................... 70
  - 7. Dissolution and Liquidation of Certain Debtor Entities. .................... 71
- C. Sources of Consideration for Plan Distributions. ........................................... 71
  - 1. Cash on Hand at the Debtors. ............................................................. 72
  - 2. New FES Common Stock. .................................................................. 72

|   | 3. | FE Settlement Value. | 72 |
| D. | | Corporate Existence. | 72 |
| E. | | Vesting of Assets in Reorganized Debtors. | 72 |
| F. | | Transfer of FES Assets to New Entity. | 72 |
| G. | | Cancellation of Existing Securities and Agreements. | 73 |
| H. | | Corporate Action. | 74 |
| I. | | FERC Approvals. | 74 |
| J. | | New Organizational Documents. | 74 |
| K. | | Directors and Officers of the Reorganized Debtors. | 75 |
| L. | | Section 1146 Exemption. | 75 |
| M. | | Director, Officer, Manager, and Employee Liability Insurance. | 75 |
| N. | | Management Incentive Plan. | 76 |
| O. | | Employee Obligations and Management Employment Contracts. | 76 |
| P. | | Transition Working Group Management Agreement. | 76 |
| Q. | | Preservation of Causes of Action. | 76 |
| R. | | Payment of Certain Fees. | 77 |
| S. | | Plan Administrator. | 77 |
|   | 1. | Appointment. | 77 |
|   | 2. | Authority. | 78 |
|   | 3. | Indemnification of Plan Administrator. | 79 |

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 79

| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 79 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 79 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 80 |
| D. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. | 81 |
| E. | Indemnification Obligations. | 81 |
| F. | Collective Bargaining Agreement. | 81 |
| G. | Insurance Policies. | 82 |
| H. | Surety Bonds. | 82 |
| I. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 82 |
| J. | Reservation of Rights. | 82 |
| K. | Nonoccurrence of the Effective Date. | 82 |
| L. | Contracts and Leases Entered Into After the Petition Date. | 82 |

ARTICLE VI . PROVISIONS GOVERNING DISTRIBUTIONS ................ 83

| A. | | Timing and Calculation of Amounts to be Distributed. | 83 |
| B. | | Disbursing Agent. | 83 |
| C. | | Rights and Powers of Disbursing Agent. | 83 |
|   | 1. | Powers of the Disbursing Agent. | 83 |
|   | 2. | Expenses Incurred On or After the Effective Date. | 83 |
| D. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 84 |
|   | 1. | Record Date for Distributions. | 84 |
|   | 2. | Delivery of Distributions. | 84 |
|   | 3. | No Fractional Distributions. | 84 |
|   | 4. | Minimum Distribution. | 84 |
|   | 5. | Undeliverable Distributions and Unclaimed Property. | 84 |
|   | 6. | Allocation of Distributions. | 85 |
| E. | | Manner of Payment. | 85 |
| F. | | SEC Registration/Exemption. | 85 |
| G. | | Compliance with Tax Requirements. | 86 |

18-50757-amk    Doc 2120    FILED 02/11/19    ENTERED 02/11/19 23:53:02    Page 3 of 113

| | | | |
|---|---|---|---|
| H. | | No Postpetition or Default Interest on Claims. | 86 |
| I. | | Setoffs and Recoupment. | 86 |
| J. | | Distributions on Account of Obligations of Multiple Debtors. | 87 |
| K. | | Claims Paid or Payable by Third Parties. | 87 |
| | 1. | Claims Paid by Third Parties. | 87 |
| | 2. | Claims Payable by Third Parties. | 87 |
| | 3. | Applicability of Insurance Policies. | 87 |

ARTICLE VII.  PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ... 88

| | |
|---|---|
| A.  Allowance of Claims. | 88 |
| B.  Claims Administration Responsibilities. | 88 |
| C.  Estimation of Claims. | 88 |
| D.  Adjustment to Claims or Interests without Objection. | 88 |
| E.  Time to File Objections to Claims or Interests. | 89 |
| F.  Disputed Claims Reserve. | 89 |
| G.  Disallowance of Claims. | 90 |
| H.  Amendments to Proofs of Claim or Interest. | 90 |
| I.  Reimbursement or Contribution. | 90 |
| J.  No Distributions Pending Allowance. | 91 |
| K.  Distributions After Allowance. | 91 |

ARTICLE VIII.  SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ... 91

| | |
|---|---|
| A.  Discharge of Claims and Termination of Interests. | 91 |
| B.  Release of Liens. | 91 |
| C.  Releases by the Debtors. | 92 |
| D.  Party Releases of the FE Non-Debtor Parties by the Consenting Creditors and the Committee. | 93 |
| E.  Releases of the FE Non-Debtor Parties by Third Parties and Holders of Claims or Interests. | 93 |
| F.  Releases of the Debtor Released Parties and Other Released Parties by Third Parties and Holders or Claims or Interests. | 95 |
| G.  Exculpation. | 96 |
| H.  Injunction. | 97 |
| I.  Protections Against Discriminatory Treatment. | 97 |
| J.  Recoupment. | 97 |
| K.  Document Retention. | 97 |

ARTICLE IX.  CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ... 98

| | |
|---|---|
| A.  Conditions Precedent to Confirmation of a Plan. | 98 |
| B.  Conditions Precedent to the Effective Date. | 98 |
| C.  Waiver of Conditions. | 99 |
| D.  Effect of Failure of Conditions. | 100 |

ARTICLE X.  MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ... 100

| | | |
|---|---|---|
| A. | Modification and Amendments. | 100 |
| B. | Effect of Confirmation on Modifications. | 100 |
| C. | Revocation or Withdrawal of Plan. | 100 |
| | 1.  Revocation or Withdrawal of the Plan. | 100 |
| | 2.  Consequence of Withdrawal of the Plan. | 101 |

ARTICLE XI.  RETENTION OF JURISDICTION ............................................................. 101

ARTICLE XII.  MISCELLANEOUS PROVISIONS ........................................................ 103

    A.     Immediate Binding Effect. ........................................................................ 103
    B.     Additional Documents. ............................................................................. 103
    C.     Payment of Statutory Fees. ....................................................................... 103
    D.    Statutory Committee and Cessation of Fee and Expense Payment. .............. 103
    E.     Substantial Consummation. ....................................................................... 104
    F.     Reservation of Rights. .............................................................................. 104
    G.    Successors and Assigns. ........................................................................... 104
    H.    Notices. ................................................................................................... 104
    I.     Term of Injunctions or Stays. .................................................................... 106
    J.     Entire Agreement. .................................................................................... 106
    K.    Exhibits. .................................................................................................. 106
    L.     Nonseverability of Plan Provisions. .......................................................... 107
    M.    Votes Solicited in Good Faith. .................................................................. 107
    N.    Waiver or Estoppel. .................................................................................. 107
    O.    Conflicts. ................................................................................................. 107

# INTRODUCTION

The Debtors propose this joint plan of reorganization (the "<u>Plan</u>") for the resolution of the outstanding claims against, and interests in, the Debtors pursuant to the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Accordingly, the Plan constitutes a separate plan of reorganization for each of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "<u>503(b)(9) Claim</u>" means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

2.    "<u>Ad Hoc Noteholders Group</u>" means the ad hoc group of certain Holders of (i) pollution control revenue bonds supported by PCNs issued by FG and NG and (ii) the FES Notes in each case that are signatories to the Restructuring Support Agreement (and any such Holder that may become, in accordance with Section 6 of the Restructuring Support Agreement, a signatory thereto) represented by Kramer Levin Naftalis & Frankel LLP and GLC Advisors & Co.

3.    "<u>Administrative Claim</u>" means a Claim for costs and expenses of administration of the Estates under sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the applicable Estates and operating the businesses of the Debtors; (ii) Allowed Professional Fee Claims; and (iii) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

4.    "<u>Administrative Claims Bar Date</u>" means the deadline for Filing requests for payment of Administrative Claims, other than Professional Fee Claims, any obligations arising in the ordinary course of the Debtors' business with respect to post-petition accounts payable which by their terms become due and owing after the Effective Date, and any post-petition obligations owed to employees, former employees, and retirees of the Debtors, which deadline shall be 30 days after the Effective Date.

5.    "<u>AE Supply</u>" means Allegheny Energy Supply Company LLC, an FE Non-Debtor Party.

6. "<u>AE Supply/FES Note</u>" means that certain Revolving Credit Note, dated June 29, 2016, by and among FES, as borrower, and AE Supply, as lender, as amended.

7. "<u>Affiliate</u>" has the meaning set forth in section 101(2) of the Bankruptcy Code, except that for the avoidance of doubt, unless specifically articulated in this Plan, no FE Non-Debtor Party will be considered an Affiliate of any Debtor. With respect to any Person that is not a Debtor (other than any FE Non-Debtor Party), the term "Affiliate" shall apply to such person as if the Person were a Debtor.

8. "<u>Allocated Administrative Expense</u>" means those Estimated Administrative Expenses that were allocated among the Debtor entities in accordance with the Plan Settlement.

9. "<u>Allowed</u>" means with respect to any Claim or Interest, except as otherwise provided herein: (i) a Claim or Interest as to which no objection has been Filed prior to the Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Final Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (ii) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (iii) a Claim or Interest that is upheld or otherwise allowed (a) pursuant to the Plan, (b) in any stipulation that is approved by the Bankruptcy Court, or (c) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided, however*, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed" under the Plan; *provided further, however*, that unless otherwise expressly specified in the Plan, the Consummation and the occurrence of the Effective Date is not intended to impair the right of any Holder or any of the Indenture Trustees to prosecute and appeal from, or otherwise petition for review of, any order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) disallowing any Claim; *provided, further*, for the avoidance of doubt, all parties reserve all rights in connection with any such appeal or petition, including (i) the right of any party to move for the dismissal of any such appeal or petition on grounds of equitable mootness or any other prudential basis and (ii) the right of any Holder or any of the Indenture Trustees to oppose any such appeal or petition on any grounds, including on grounds that the relief sought in the appeal or petition is contemplated by or provided for under the Plan. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

10. "<u>Assets</u>" means, with respect to any Debtor, all of such Debtors' right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code. For the avoidance of doubt, with respect to any Debtor, all of such Debtor's rights and benefits under any license, permit, or other governmental or quasi-governmental undertaking or action shall constitute an interest in property.

11. "<u>Assumed Executory Contract or Unexpired Lease</u>" means the list of Executory Contracts and Unexpired Leases to be assumed by a Debtor (with proposed cure amounts) as reflected in the Plan Supplement and as may be further amended or modified by inclusion in the Plan Supplement, and any Executory Contracts and Unexpired Leases previously assumed by a Debtor by an order of the Bankruptcy Court. For the avoidance of doubt, none of the PPA Appeal Proceeding Contracts shall be deemed to be Assumed Executory Contracts.

12. "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

13. "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Ohio having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Northern District of Ohio.

14. "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15. "<u>Bar Date</u>" means the applicable date established by the Bankruptcy Court by which respective Proofs of Claim and Interests must be filed.

16. "<u>BCIDA</u>" means the Beaver County Industrial Development Authority.

17. "<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "<u>Cash</u>" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the U.S., less the amount of any outstanding checks or transfers at such time.

19. "<u>Causes of Action</u>" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, in contract, tort, law, equity, or otherwise. Causes of Action also include: (i) all rights of setoff, counterclaims, or recoupment and claims under contracts or for breaches of duties imposed by law; (ii) the right to object to or otherwise contest Claims or Interests; (iii) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

20. "<u>Chapter 11 Cases</u>" means, collectively: (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21. "<u>Claim</u>" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

22. "<u>Claims and Noticing Agent</u>" means Prime Clerk LLC, retained as the Debtors' notice and claims agent pursuant to the Order Authorizing Retention and Appointment of Prime Clerk LLC as Claims, Noticing and Solicitation Agent Nunc Pro Tunc to the Petition Date [Docket No. 152].

23. "<u>Claims Objection Deadline</u>" means the later of: (i) the date that is 240 days after the Effective Date; and (ii) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of the deadline to object to Claims or Interests.

3

24. "Claims Register" means the official register of Claims maintained by the Claims and Noticing Agent.

25. "Class" means a category of Claims or Interests as set forth in Article III of the Plan.

26. "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

27. "COBRA" means Section 4980B of the Internal Revenue Code and Part 6 of Subtitle B of Title 1 of the Employee Retirement Income Security Act of 1974.

28. "COBRA Costs" means any costs (other than any indirect costs relating to human resources management services) borne by the FE Non-Debtor Parties for compliance with COBRA under any group health plan of the FE Non-Debtor Parties related to a Debtors' Current Employee or a Debtors' Former Employee or a dependent of any such person.

29. "Committee" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on April 11, 2018, the membership of which may be reconstituted from time to time.

30. "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions precedent to Confirmation set forth in Article IX of the Plan.

31. "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021, subject to the conditions precedent to Confirmation set forth in Article IX of the Plan.

32. "Confirmation Hearing" means the one or more hearings held by the Bankruptcy Court to consider Confirmation of the Plan as to one or more Debtors pursuant to section 1129 of the Bankruptcy Code.

33. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan with respect to the Debtors pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Debtors, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement), the Requisite Supporting Parties and the Committee.

34. "Consenting Creditors" has the meaning ascribed to such term in the Restructuring Support Agreement.

35. "Consummation" means the occurrence of the Effective Date.

36. "Convenience Claim" means a General Unsecured Claim that is either (i) in an amount that is equal to or less than $1,000,000 or (ii) in an amount that is greater than $1,000,000, but with respect to which the Holder of such General Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Claim to $1,000,000 or less pursuant to a valid election by the Holder of such General Unsecured Claim made on its Ballot on or before the Plan Voting Deadline.

37. "Cure Claim" means a Claim based upon the Debtors' monetary defaults under any Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

4

38. "<u>Debtor</u>" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in its respective Chapter 11 Case.

39. "<u>Debtor Released Parties</u>" means each of the Debtors and the Reorganized Debtors and, with respect to the Debtors, their current and former Affiliates (other than the FE Non-Debtor Parties), and the Debtors' and their current and former Affiliates' (other than the FE Non-Debtor Parties) current and former directors, managers (including all Independent Directors and Managers), officers, predecessors, successors and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

40. "<u>Debtor Releases</u>" means the release set forth in Article VIII.C.

41. "<u>Debtors</u>" means, collectively, FES, FG, NG, FENOC, FGMUC, FE Aircraft and Norton.

42. "<u>Debtors' Current Employees</u>" means, collectively, any employee that is assigned to a Debtor company code in the SAP System of Record as of the Effective Date. For the avoidance of doubt, no employee that is assigned to an FE Non-Debtor Party's company code in the SAP System of Record as of the Effective Date shall be considered a Debtors' Current Employee.

43. "<u>Debtors' Former Employees</u>" means, collectively, any former employee that was assigned to a Debtor company code in the SAP System of Record prior to but not as of the Effective Date, *provided, however*, that a person shall not be considered a Debtors' Former Employee if, as of the Effective Date, he or she is assigned to a Debtor or FE Non-Debtor company code in the SAP System of Record, and, *provided, further, however*, that a person shall only be a Debtors' Former Employee if prior to the Effective Date his or her last assignment of company code in the SAP System of Record was with a Debtor.

44. "<u>Debtors' Incentive and Retention Plans</u>" means the 2019 FES Short-Term Incentive Plan, the 2019 FENOC Short-Term Incentive Plan, the 2019 FES Annual Incentive Plan, the 2019 FENOC Annual Incentive Plan, the 2018 FENOC Key Employee Retention Plan as approved by the Bankruptcy Court [Docket No. 1782] and any other employee retention plans approved by the Bankruptcy Court prior to the Effective Date.

45. "<u>Debtors' Retirees</u>" means, collectively, any of the Debtors' Former Employees who, as of the effective date under the FE Settlement Agreement, have terminated employment from a Debtor after satisfying the age and service requirements for retirement under the applicable employee benefit plan.

46. "<u>Deferred Compensation Claims</u>" means claims related to the participation of the Debtors' Current Employees and the Debtors' Former Employees in the Deferred Compensation Plans.

47. "<u>Deferred Compensation Plans</u>" means, collectively, the (i) FirstEnergy Corp. Amended and Restated Executive Deferred Compensation Plan, effective as of November 1, 2015 (including with respect to the supplemental pension benefit set forth therein, *i.e.*, the non-qualified pension benefit); (ii) FirstEnergy Corp. Supplemental Executive Retirement Plan, amended and restated as of January 1, 2005 and further amended December 31, 2010, as amended by Amendment No. 1 effective as of January 1, 2012; and (iii) FirstEnergy Corp. Cash Balance Restoration Plan, effective as of January 1, 2014.

48. "Disbursing Agent" means the Plan Administrator; *provided, however* that the Indenture Trustees shall serve as the Disbursing Agent for Holders of the Unsecured PCN Claims, FES Notes Claims and Mansfield Certificate Claims, as applicable.

49. "Disclosure Statement" means the *Disclosure Statement for the Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al.*, *Pursuant to Chapter 11 of the Bankruptcy Code*, dated [__] [Docket No. __], including all exhibits and schedules thereto, as approved pursuant to the Disclosure Statement Order.

50. "Disclosure Statement Order" means the *Order (a) Approving the Disclosure Statement, (b) Establishing the Voting Record Date, Voting Deadline and Other Dates, (c) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (d) Approving the Manner and Forms of Notice and Other Related Documents* [Docket No. __].

51. "Disputed" means with regard to any Claim or Interest, a Claim or Interest that is not Allowed.

52. "Disputed Claims Reserve" means a reserve consisting of Cash and New FES Common Stock (including any corresponding portion of the Effective Date Cash Distribution), in amounts determined by the Debtors, in consultation with the Requisite Supporting Parties and the Committee, unless otherwise ordered by the Bankruptcy Court, to the extent Holders elect to receive New FES Common Stock as set forth herein, reserved for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date.

53. "Distributable Value Split" means, with respect to each Class of General Unsecured Claims and Unsecured Bondholder Claims (other than any Classes of Inter-Debtor Claims or Convenience Claims), the ratable share of the aggregate Unsecured Distributable Value, after taking into account adjustments for the reallocation of the Reallocation Pool, the NG Reallocation Pool, and the FENOC/FES Claims Reallocation, as applicable, available for distribution to Holders of Allowed Claims of that particular Class, which shall be as set forth on **Exhibit A** to the Plan, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

54. "Distributable Value Adjustment Amount" means, with respect to each Class of General Unsecured Claims and Unsecured Bondholder Claims (other than any Classes of Inter-Debtor Claims or Convenience Claims), its share, based on the respective Distributable Value Splits for such Class, of the amount equal to (i) the difference between, on the one hand, (a) the aggregate value of the actual amount of Cash on the Effective Date and (b) the aggregate value the projected amount of Cash as of the Effective Date, incorporated into Exhibit A to the Plan Term Sheet, on the other hand, whether positive or negative and (ii) the difference between (a) the aggregate estimated Allowed amount of Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims on the Effective Date as estimated on the Effective Date, on the one hand and, (b) the aggregate Estimated Administrative Expenses, on the other hand, whether positive or negative.

55. "Distribution Date" means the Effective Date and any Periodic Distribution Date thereafter.

56. "<u>Distribution Record Date</u>" means other than with respect to any publicly-held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be seven days prior to the Effective Date.

57. "<u>DTC</u>" means the Depository Trust Company.

58. "<u>Effective Date</u>" means the Business Day upon which all of the conditions to Consummation of the Plan as set forth in Article IX.B have been satisfied or waived as provided in Article IX.C of the Plan, and is the date on which the Plan becomes effective.

59. "<u>Effective Date Cash Distribution</u>" means an amount of cash that may be determined prior to the Effective Date by the Requisite Supporting Parties and the Debtors, in consultation with the Committee, to be distributed to all Holders of Unsecured Claims that are to receive New FES Common Stock under the Plan, as described in Article IV.B.5 of the Plan.

60. "<u>Electing Bondholder</u>" means a Holder of an Allowed Unsecured Bondholder Claim who has opted to elect to receive, in lieu of New FES Common Stock, all or a portion of its recovery in Cash based upon its Pro Rata portion of the Unsecured Bondholder Cash Pool.

61. "<u>Entity</u>" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

62. "<u>Equity Election Conditions</u>" means the conditions set forth in Article III.G.

63. "<u>Equity Election Record Date</u>" means January 23, 2019 or such later date as may be agreed to by the Debtors with the consent of the Requisite Supporting Parties and the Committee.

64. "<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 as amended, and the regulations promulgated thereunder.

65. "<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

66. "<u>Estimated Administrative Expenses</u>" means the aggregate estimated amount as of the Effective Date of Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims with respect to each Debtor, which amount was estimated for the purposes of the Plan Settlement and is equal to $216,905,308.

67. "<u>Exculpated Parties</u>" means, collectively, and in each case in its capacity as such: (i) the Debtors; (ii) the FE Non-Debtor Parties; (iii) the Indenture Trustees; (iv) the Consenting Creditors; (v) the Committee and each of its members, in their capacities as such; and (vi) with respect to each of the foregoing Entities in clauses (i) through (v), such Entity and its current and former Affiliates and members (except any such member of the Ad Hoc Noteholders Group, the Mansfield Certificateholders Group, or the FES Creditor Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), and such Entities' and their current and former Affiliates' current and former directors, managers (including all Independent Directors and Managers), officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed/advised funds or accounts, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

68.     "Executory Contract" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

69.     "FE Aircraft" means Debtor FE Aircraft Leasing Corp.

70.     "FE Aircraft Cash Distribution Pool" means, to the extent there are any General Unsecured Claims Against FE Aircraft, Cash in the amount of $19,900,000.

71.     "FE Consolidated Tax Group" means, until the tax year immediately following the Effective date, the FE Non-Debtor Parties and the Debtors, collectively.

72.     "FE Corp." means FirstEnergy Corp., an FE Non-Debtor Party and the ultimate parent of each of the Debtors.

73.     "FE Non-Debtor Parties" means, collectively, the Debtors' non-Debtor Affiliates, including FE Corp.

74.     "FE Non-Debtor Released Parties" means, collectively, the FE Non-Debtor Parties and each of their respective current and former officers, directors, members, shareholders, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members and professionals), each solely in their capacity as such.

75.     "FE Non-Debtor Parties' Third Party Release" means the releases provided to the FE Non-Debtor Parties set forth in Article VIII.E of the Plan.

76.     "FE Settlement Agreement" means the Settlement Agreement dated as of August 26, 2018, by and among (i) the Debtors, (ii) the FE Non-Debtor Parties, (iii) the Ad Hoc Noteholder Group, (iv) the Mansfield Certificateholders Group, and (v) the Committee and approved by the FE Settlement Order. A copy of the FE Settlement Agreement is attached to the Plan as **Exhibit B**.

77.     "FE Settlement Cash" means the cash settlement payment described in Section 2.1 of the FE Settlement Agreement in an amount equal to $225,000,000, which amount shall not be subject to any setoff or reduction.

78.     "FE Settlement Direct Consideration" means the FE Settlement Value other than the waivers of Claims.

79.     "FE Settlement Order" means the *Order Granting Motion of Debtors to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties Pursuant to 11 U.S.C. §§ 105, 363, 365, and 502 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 1465].

80.     "FE Settlement Value" means the overall value contributed by the FE Non-Debtor Parties to the Debtors' Estates pursuant to the FE Settlement Agreement, including, but not limited to (i) the FE Settlement Cash, (ii) the New FE Notes, (iii) the Pleasants Power Plant, (iv) payments under the Tax Allocation Agreement, (v) credits for shared services and other operational support, and (vi) waivers of certain Claims as set forth in the FE Settlement Agreement.

81.     "FE/FES Revolver" means that certain $700,000,000 credit agreement, consisting of a $500,000,000 revolver facility and a $200,000,000 surety bond credit facility, dated December 6, 2016,

by and among FE Corp. as lender, FES as borrower, and FG and NG as guarantors, as the same has been modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto.

82. "<u>Federal Judgment Rate</u>" means the rate of interest calculated pursuant to the provisions of 28 U.S.C. § 1961, which shall be a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, as of the Petition Date, which rate was 2.09%, compounded annually.

83. "<u>FENOC</u>" means Debtor FirstEnergy Nuclear Operating Company.

84. "<u>FENOC Distributable Value</u>" means $144,463,616, which shall be comprised of the following assets: (i) all cash in FENOC bank accounts, which cash shall be fixed at $38,000,000, (ii) the value of FENOC's assets, (iii) the projected FENOC accounts receivable as of the Effective Date excluding accounts receivable arising from Inter-Debtor Claims, (iv) 2.7% of the FE Settlement Value and (v) the FENOC Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

85. "<u>FENOC Inter-Debtor Recovery</u>" means the recovery on account of all Inter-Debtor Claims owed to FENOC.

86. "<u>FENOC-FES Claim Reallocation</u>" means $12,500,000 of the aggregate Unsecured Distributable Value otherwise available for distribution to the Holders of Unsecured Bondholder Claims, which shall be re-allocated to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims.

87. "<u>FENOC-FES Unsecured Claims</u>" means any General Unsecured Claim, other than Inter-Debtor Claims, against both FENOC and FES (and only FENOC and FES).

88. "<u>FENOC Unsecured Distributable Value</u>" means the value available for distribution to Holders of Allowed Unsecured Claims against FENOC, which shall be determined by calculating the FENOC Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to FENOC in accordance with the Plan Settlement and as set forth on Exhibit A to the Plan Term Sheet, (ii) Other Secured Claims Allowed against FENOC, as set forth on Exhibit A to the Plan Term Sheet and (iii) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against FENOC, pursuant to the Plan Settlement

89. "<u>FENOC Single-Box Unsecured Claim</u>" means any General Unsecured Claim, other than Inter-Debtor Claims, against only FENOC.

90. "<u>FERC</u>" means the Federal Energy Regulatory Commission.

91. "<u>FERC-Jurisdictional Debtors</u>" means all of the Debtors subject to FERC's jurisdiction, including, without limitation, FES, FG, NG, and FGMUC.

92. "<u>FES</u>" means Debtor FirstEnergy Solutions Corp.

93. "<u>FES Creditor Group</u>" has the meaning ascribed to such term in the Restructuring Support Agreement.

94.    "FES Distributable Value" means $2,030,820,514, which shall be comprised of the following assets: (i) the projected amount of Cash in the FES bank accounts, other than the proceeds from the FE/FES Revolver as of the Effective Date, that was incorporated into Exhibit A to the Plan Term Sheet; (ii) the value of the FES retail business; (iii) any surplus proceeds of the FE Aircraft Cash Distribution Pool after satisfaction of any Allowed General Unsecured Claims against FE Aircraft; (iv) the projected FES accounts receivable as of the Effective Date, excluding accounts receivable arising from Inter-Debtor Claims, incorporated into Exhibit A to the Plan Term Sheet; (v) $475,000,000 of the proceeds from the FE/FES Revolver; (vi) 57.5% of the FE Settlement Value; (vii) the value of the Interests in FE Aircraft held by FES; and (viii) the FES Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

95.    "FES Inter-Debtor Recovery" means the recovery on account of all Inter-Debtor Claims owed to FES.

96.    "FES Notes" means, collectively, those certain: (i) 6.05% senior unsecured notes due 2021; and (ii) 6.80% senior unsecured notes due 2039, in each case issued under the FES Notes Indenture.

97.    "FES Notes Claims" means, collectively, any Claims evidenced by, arising under, or in connection with the FES Notes Indenture, the FES Notes, or other agreements related thereto.

98.    "FES Notes Indenture" means that certain Indenture, dated as of August 1, 2009, between FES and the FES Notes Indenture Trustee, as the same has been modified, amended, supplemented, or otherwise revised from time to time, including by the First Supplemental Indenture, dated as of August 1, 2009, and together with all instruments, documents, and agreements related thereto.

99.    "FES Notes Indenture Trustee" means The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the FES Notes Indenture.

100.    "FES-Only Administrative Expenses" means, if applicable, any Allowed Administrative Claims arising from the PPA Appeal Proceeding Contracts.

101.    "FES Single-Box Unsecured Claim" means any General Unsecured Claim against only FES.

102.    "FES Tax Overpayment" means any overpayment that may have been made to certain of the Debtors by FE Corp. pursuant to the Tax Allocation Agreement for the tax year 2017.

103.    "FES Unsecured Distributable Value" means the value available for distribution to Holders of Allowed Unsecured Claims against FES, which shall be determined by calculating the FES Distributable Value *less* (i) the payment of (x) Allocated Administrative Expenses allocated to FES in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet, (y) FES-Only Administrative Expenses, (ii) Other Secured Claims Allowed against FES, as set forth on Exhibit A of the Plan Term Sheet, and (iii) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against FES pursuant to the Plan Settlement.

104.    "FESC" means FirstEnergy Service Company, an FE Non-Debtor Party.

105.    "FG" means Debtor FirstEnergy Generation, LLC.

106.    "FG Distributable Value" means $1,093,194,361, which shall be comprised of the following assets: (i) the value of FG's assets; (ii) the projected FG accounts receivable as of the Effective Date, excluding accounts receivable arising from Inter-Debtor Claims, incorporated into Exhibit A to the Plan Term Sheet; (iii) $25,000,000 of proceeds from the FE/FES Revolver; (iv) the value of the membership interests in Norton, if any; (v) 23.4% of the FE Settlement Value; and (vi) the FG Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

107.    "FG Inter-Debtor Recovery" means the recovery on account of all Inter-Debtor Claims owed to FG.

108.    "FG Mortgage" means that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust, dated as of June 19, 2008, as amended and supplemented, by and between FG and UMB Bank, National Association, as successor trustee.

109.    "FG Mortgage Indenture Trustee" means UMB Bank, National Association, as successor trustee under the FG Mortgage, solely in its capacity as such.

110.    "FG Single-Box Unsecured Claim" means any General Unsecured Claim against only FG.

111.    "FG Unsecured Distributable Value" means the value available for distribution to Holders of Allowed Unsecured Claims against FG, which shall be determined by calculating the FG Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to FG in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet, (ii) Other Secured Claims Allowed against FG, as set forth on Exhibit A to the Plan Term Sheet, (iii) the value of the Secured FG PCN Claims being reinstated or paid in full in accordance with the Plan, and (iv) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against FG pursuant to the Plan Settlement.

112.    "FGMUC" means Debtor FirstEnergy Generation Mansfield Unit 1 Corp.

113.    "FGMUC Distributable Value" means $134,059,905, which shall be comprised of the following assets: (i) FGMUC's assets, if any, (ii) 1.3% of the FE Settlement Value; and (iii) the FGMUC Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

114.    "FGMUC Inter-Debtor Recovery" means the recovery on account of all Inter-Debtor Claims owed to FGMUC.

115.    "FGMUC Single-Box Unsecured Claims" means any General Unsecured Claim against only FGMUC.

116.    "FGMUC Unsecured Distributable Value" means the value available for distribution to Holders of Allowed Unsecured Claims against FGMUC, which shall be determined by calculating the FGMUC Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to FGMUC in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet, (ii)

11

Other Secured Claims Allowed against FGMUC as set forth on Exhibit A to the Plan Term Sheet, and (iii) Administrative Claims arising from on postpetition Inter-Debtor Claims Allowed against FGMUC pursuant to the Plan Settlement.

117. "File," "Filed," or "Filing" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

118. "Final Order" means (i) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in any Chapter 11 Case (or any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may timely be Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the local rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

119. "FMB" means the first mortgage bonds issued by FG or NG, as the case may be, pursuant to the FG Mortgage and the NG Mortgage, respectively.

120. "FPA 203 Authorization" means authorization from FERC under Section 203 of the Federal Power Act, 16 U.S.C. § 824b.

121. "General Administrative Claim" means any Administrative Claim, other than a Professional Fee Claim but including any Claims of ordinary course professionals retained pursuant to the Ordinary Course Professional Order for fees and expenses incurred postpetition.

122. "General Unsecured Claim" means any Unsecured Claim that is not an Unsecured Bondholder Claim and is not otherwise paid in full pursuant to a Final Order of the Bankruptcy Court, but excluding: (i) Administrative Claims, (ii) Priority Tax Claims, (iii) Inter-Debtor Claims, and (iv) Other Priority Claims.

123. "General Unsecured Claim Against FE Aircraft" means any Unsecured Claim against FE Aircraft that is not an Unsecured Bondholder Claim and is not otherwise paid in full pursuant to a Final Order of the Bankruptcy Court, but excluding: (i) Administrative Claims, (ii) Priority Tax Claims against FE Aircraft, (iii) Inter-Debtor Claims and (iv) Other Priority Claims against FE Aircraft.

124. "General Unsecured Claim Against Norton" means any Unsecured Claim against Norton that is not an Unsecured Bondholder Claim and is not otherwise paid in full pursuant to a Final Order of the Bankruptcy Court, but excluding: (i) Administrative Claims, (ii) Priority Tax Claims against Norton, (iii) Inter-Debtor Claims and (iv) Other Priority Claims against Norton.

125. "<u>Governmental Unit</u>" has the meaning set forth in section 101(27) of the Bankruptcy Code.

126. "<u>Health Care Plans</u>" means the medical and prescription drug benefits provided under the FirstEnergy Corp. Health Care Plan, FirstEnergy Prescription Drug Plan, and any similar plans sponsored by FE Corp.

127. "<u>Holder</u>" means an Entity holding a Claim or an Interest, as applicable.

128. "<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

129. "<u>Impaired</u>" means, with respect to a particular Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

130. "<u>Incentive Securities</u>" means New FES Common Stock, or options, warrants, or similar equity securities to be distributed pursuant to the terms of the Management Incentive Plan.

131. "<u>Indemnification Obligations</u>" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers (including all Independent Directors and Managers), employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable.

132. "<u>Indentures</u>" means, collectively, (i) the FES Notes Indenture, (ii) the Mansfield Pass Through Trust Agreement and Mansfield Lease Note Indentures, (iii) the FG Mortgage, (iv) the NG Mortgage, (v) the PCN Indentures, and (vi) the PCN Loan Agreements.

133. "<u>Indenture Trustees</u>" means, collectively: (i) the FES Notes Indenture Trustee, (ii) the Mansfield Indenture Trustee, (iii) the Secured PCN Indenture Trustees, and (iv) the Unsecured PCN Indenture Trustee.

134. "<u>Independent Directors and Managers</u>" means the independent directors and/or managers of FES, FENOC, FG and NG.

135. "<u>Insurance Policies</u>" means any insurance policies, insurance settlement agreements, coverage-in-place agreements, or other agreements relating to the provision of insurance entered into by or issued to or for the benefit of any of the Debtors or their predecessors.

136. "<u>Inter-Debtor Claims</u>" means a Claim or Cause of Action by a Debtor against any other Debtor.

137. "<u>Interest</u>" means any equity security (as defined in section 101(16) of the Bankruptcy Code) issued with respect of any Debtor, any membership interests issued with respect to any Debtor, and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity.

13

138.     "<u>Interim Compensation Order</u>" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 177].

139.     "<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

140.     "<u>Judicial Code</u>" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

141.     "<u>Lien</u>" has the meaning set forth in section 101(37) of the Bankruptcy Code.

142.     "<u>Management Incentive Plan</u>" means a management incentive plan which may be implemented with respect to the Reorganized Debtors on or after the Effective Date providing for the issuance of New FES Common Stock, which Management Incentive Plan shall not exceed 7.5% of the New FES Common Stock as of the Effective Date (on a fully diluted basis), the terms of which shall be disclosed in the Plan Supplement (or left to the determination of the New Board) and which shall be reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties to the extent disclosed in the Plan Supplement.

143.     "<u>Mansfield Certificate Claims</u>" means, collectively, Claims that could be brought by the Mansfield Indenture Trustee or the Holders of Mansfield Certificates, evidenced by, arising under or in connection with the Mansfield Certificates, the Mansfield Pass Through Trust Agreement, the Mansfield Lease Note Indentures or any other Mansfield Facility Documents.

144.     "<u>Mansfield Certificate Claims Against FES</u>" means any Mansfield Certificate Claims against FES, including Mansfield Certificate Claims against FES arising from guarantees.

145.     "<u>Mansfield Certificate Claims Against FG</u>" means any Mansfield Certificate Claims against FG, including Mansfield Certificate Claims against FG arising from guarantees.

146.     "<u>Mansfield Certificate Claims Against FGMUC</u>" means any Mansfield Certificate Claims against FGMUC.

147.     "<u>Mansfield Certificate Claims Against NG</u>" means any Mansfield Certificate Claims against NG, including Mansfield Certificate Claims against NG arising from guarantees.

148.     "<u>Mansfield Certificateholders Group</u>" means the ad hoc group of certain Holders of the Mansfield Certificate Claims that are signatories to the Restructuring Support Agreement (and any such Holder that may, in accordance with Section 6 of the Restructuring Support Agreement, become a signatory thereto).

149.     "<u>Mansfield Certificates</u>" means those certain 6.85% pass through certificates issued under the Mansfield Pass Through Trust Agreement.

150.     "<u>Mansfield Facility Documents</u>" means, collectively, the Mansfield Facility Lease Agreements, the Mansfield Participation Agreements, the Mansfield Pass Through Trust Agreement, the Mansfield Guarantees, the Mansfield Site Subleases, and the Mansfield Tax Indemnity Agreements.

151.     "<u>Mansfield Facility Lease Agreements</u>" means those certain six facility leases dated as of July 1, 2007, between FG, as lessee, and Mansfield 2007 Trusts A-F, as lessors, relating to an aggregate undivided interest in 93.825% of Unit 1 of the Mansfield Plant.

18-50757-amk     Doc 2120     FILED 02/11/19     ENTERED 02/11/19 23:53:02     Page 19 of 113

152.     "Mansfield Guarantees" means those certain guarantees dated July 1, 2007 pursuant to which FES guaranteed FG's obligations under the Mansfield Facility Lease Agreements and certain other agreements associated with the 2007 sale and leaseback transaction.

153.     "Mansfield Indenture Trustee" means Wilmington Savings Fund Society, FSB (not in its individual capacity, but solely as Pass Through Trustee for the Mansfield Pass Through Trust Agreement dated as of June 26, 2007, as the same has been amended or modified from time to time, and the Indenture Trustee under the Mansfield Lease Notes Indentures).

154.     "Mansfield Lease Note Indentures" means the six Indentures of Trust, Open-End Mortgages and Security Agreements, dated July 1, 2007 with Mansfield Trusts A-F (as amended from time to time).

155.     "Mansfield Owner Participants" means those certain equity owners of the Mansfield 2007 Trusts A-F, as lessors under the Mansfield Facility Leases.  Metlife Capital, Limited Partnership is the current Mansfield Owner Participant of Mansfield 2007 Trusts A-E.   FE Corp. is the current Mansfield Owner Participant of Mansfield 2007 Trust F.

156.     "Mansfield Participation Agreements" means those certain participation agreements dated June 26, 2007, setting forth the manner in which the parties intended to participate in the 2007 sale and leaseback transactions for an aggregate undivided interest in 93.825% of Unit 1 of the Mansfield Plant, the conditions precedent to such participation, the representations and warranties of the parties, and certain covenants and indemnities of the parties in connection with such transactions.

157.     "Mansfield Pass Through Trust Agreement" means that certain Pass Through Trust Agreement, dated as of June 26, 2007, among FG, FES and the Mansfield Indenture Trustee (not in its individual capacity, but solely as Pass Through Trustee for the Bruce Mansfield Unit 1 2007 Pass Through Trust), as the same has been modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

158.     "Mansfield Plant" means the Bruce Mansfield Plant, a 2,490 megawatt coal-fired power plant located in Shippingport, Pennsylvania.

159.     "Mansfield Reallocation" means $10,000,000 of the aggregate Unsecured Distributable Value from all Debtors otherwise available for distribution to the Holders of the Mansfield Certificate Claims, which shall be reallocated to Holders of Unsecured PCN Claims and FES Notes Claims as set forth in Article III of the Plan.

160.     "Mansfield Settlement" means that certain settlement agreement, by and among the Bruce Mansfield Certificateholders Group and the Ad Hoc Noteholders Group, which settlement is incorporated herein.

161.     "Mansfield Site Subleases" means those certain six site subleases dated as of July 1, 2007, between Mansfield 2007 Trust A-F, as site sublessors, and FG, as site sublessee.

162.     "Mansfield Tax Indemnity Agreements" means those certain tax indemnity agreements dated July 1, 2007, pursuant to which FG agreed to indemnify the Mansfield Owner Participants for certain adverse tax consequences related to the 2007 sale and leaseback transactions for an aggregate undivided interest in 93.825% of Unit 1 of the Mansfield Plant.

18-50757-amk     Doc 2120     FILED 02/11/19     ENTERED 02/11/19 23:53:02     Page 20 of 113

163. "Mansfield TIA Claims" means the claims of the Mansfield Owner Participants arising under the Mansfield Tax Indemnity Agreements and other Mansfield Facility Documents.

164. "Money Pool Balance" means the Debtors' liability as of the Petition Date, as adjusted by the transactions contemplated by the FE Settlement Agreement, under the Fifth Amended and Restated Non-Utility Money Pool Agreement, dated as of December 19, 2013 as the same has been or may be subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

165. "Multi-Debtor Unsecured Claims" means Unsecured Claims which are Allowed against multiple Debtors, which for the avoidance of doubt, shall include, among others, the Unsecured Bondholder Claims, any Mansfield TIA Claims, and Claims Allowed against both FENOC and NG.

166. "New FE Notes" means the senior notes to be issued by FE Corp. to the Debtors on the Effective Date pursuant to the terms of the FE Settlement Agreement.

167. "New FES" means a new legal entity which may be formed at the election of the Debtors and the Requisite Supporting Parties, in consultation with the Committee, to which the assets of FES are transferred.

168. "New FES Board" means the board of directors of Reorganized FES, New FES or a newly created holding company, and the board of directors and the board of managers of the other Reorganized Debtors, as applicable, on and after the Effective Date.

169. "New FES Common Stock" means the shares of common stock in Reorganized FES, New FES or a new holding company entity to be created, to be issued and distributed under and in accordance with the Plan.

170. "New Management Employment Contracts" means employment contracts to be entered into between the Reorganized Debtors and members of management for the Reorganized Debtors on terms and conditions to be agreed by the Debtors and the Requisite Supporting Parties prior to approval of the Disclosure Statement.

171. "New Organizational Documents" means the certificates or articles of incorporation of formation, by-laws, limited liability company agreements, or other applicable organizational documents of each of the Reorganized Debtors, as applicable, the form of which shall be included in the Plan Supplement.

172. "NG" means Debtor FirstEnergy Nuclear Generation, LLC.

173. "NG Distributable Value" means $1,365,187,029, which shall be comprised of the following assets: (i) the value of the power plants owned by NG and all related assets, (ii) the insurance proceeds from Mansfield Unit 1, as well as the value of any other assets comprising the "Undivided Interest" in the "Facility" as such terms are defined in the Mansfield Facility Documents, (iii) the projected NG accounts receivable as of the Effective Date, excluding accounts receivable arising from Inter-Debtor Claims, incorporated into Exhibit A to the Plan Term Sheet, (iv) 15.1% of the FE Settlement Value, and (v) the NG-Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

174. "NG-FENOC Unsecured Claim" means any General Unsecured Claim against both NG and FENOC.

175. "NG Inter-Debtor Recovery" means the recovery on account of all Inter-Debtor Claims owed to NG.

176. "NG Mortgage" means that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust, dated as of June 1, 2009, as amended and supplemented, by and between NG and UMB Bank, National Association, as successor trustee.

177. "NG Mortgage Indenture Trustee" means UMB Bank, National Association, as successor trustee under the NG Mortgage, in its capacity as such.

178. "NG Reallocation Pool" means the portion of the Reallocation Pool allocable to NG.

179. "NG Single Box Unsecured Claims" means any General Unsecured Claim, other than an Inter-Debtor Claim, solely against NG.

180. "NG Unsecured Distributable Value" means the value available for distribution to Holders of Allowed Unsecured Claims against NG, which shall be determined by calculating the NG Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to NG in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet, (ii) Other Secured Claims Allowed against NG, as set forth on Exhibit A to the Plan Term Sheet, (iii) the value of the Secured NG PCN Claims being reinstated pursuant to the Plan, and (iv) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against NG pursuant to the Plan Settlement.

181. "Norton" means Debtor Norton Energy Storage L.L.C.

182. "Norton Cash Distribution Pool" means, to the extent there are any General Unsecured Claims against Norton, Cash [in an amount to be determined].

183. "NRC" means the United States Nuclear Regulatory Commission.

184. "Nuclear Decommissioning Obligations" means the Debtors' funding obligations related to nuclear decommissioning trusts, as required by the United States Department of Energy, that will be established by the Debtors to fund the decommissioning of the Beaver Valley, Davis-Besse, and Perry nuclear power plants.

185. "OAQDA" means the Ohio Air Quality Development Authority.

186. "OWDA" means the Ohio Water Development Authority.

187. "Ordinary Course Professional Order" means the *Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 428].

188. "Other Priority Claims" means any Claim, other than an Administrative Claim, or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

189. "Other Released Parties" means, collectively, (i) the Consenting Creditors, (ii) the Committee, (iii) the Indenture Trustees, (iv) the issuers of the PCNs, (v) the Plan Administrator, and (vi) with respect to each of the foregoing entities in clauses (i) through (v), their current and former Affiliates,

and such Entities' current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed/advised funds or accounts and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

190.     "Other Released Parties' Third Party Releases" means the releases provided to the Other Released Parties set forth in Article VIII.F of the Plan.

191.     "Other Secured Claims" means any Secured Claim against any of the Debtors, other than the Secured PCN Claims.

192.     "Party Releases" means the releases provided to the FE Non-Debtor Parties set forth in Article VIII.D of the Plan.

193.     "PCNs" means, collectively, the following series of notes issued under the PCN Loan Agreements in support of the pollution control revenue bonds that were issued under the PCN Indentures: (i) FG's $56.6 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-A due April 1, 2041; (ii) FG's $46.3 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-B due October 1, 2047 , which note is secured by FG FMBs; (iii) FG's $25 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-C due June 1, 2028 , which note is secured by FG FMBs; (iv) FG's $234.52 million Air Quality Facilities Note, Series 2006-A due December 1, 2023; (v) FG's $177 million Air Quality Facilities Note, Series 2009-E due August 1, 2020; (vi) FG's $50 million Air Quality Facilities Note, Series 2009-B due March 1, 2023; (vii) FG's $141.26 million Air Quality Facilities Note, Series 2009-C due June 1, 2018, which note is secured by FG FMBs; (viii) FG's $100 million Air Quality Facilities Note, Series 2009-D due August 1, 2029 , which note is secured by FG FMBs; (ix) FG's $90.14 million Waste Water Facilities Note, Series 2006-A due May 15, 2019; (x) FG's $26 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2006A due November 1, 2041; (xi) FG's $43 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2005A due December 1, 2040; (xii) FG's $15 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2002 A due June 1, 2028 , which note is secured by FG FMBs; (xiii) NG's $98.9 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-A due April 1, 2035; (xiv) NG's $163.965 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-B due December 1, 2035; (xv) NG's $72.65 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2005-A due January 1, 2035; (xvi) NG's $60 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-A due January 1, 2035, which note is secured by NG FMBs; (xvii) NG's $8 million Air Quality Facilities Note, Series 2010-A due July 1, 2033; (xviii) NG's $7.2 million Air Quality Facilities Note, Series 2005-B due January 1, 2034; (xix) NG's $9.1 million Air Quality Facilities Note, Series 2008-B due October 1, 2033; (xx) NG's $23 million Air Quality Facilities Note, Series 2008-C due November 1, 2032; (xxi) NG's $15.5 million Air Quality Facilities Note, Series 2006-B due December 1, 2033; (xxii) NG's $26 million Air Quality Facilities Note, Series 2010-B due June 1, 2033; (xxiii) NG's $62.5 million Air Quality Facilities Note, Series 2009-A due June 1, 2033 , which note is secured by NG FMBs; (xxiv) NG's $135.55 million Waste Water Facilities and Solid Waste Facilities Note, Series 2006-B due December 1, 2033; (xxv) NG's $46.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-C due June 1, 2033; (xxvi) NG's $20.45 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-B due October 1, 2033; (xxvii) NG's $33 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-C due November 1, 2032; (xxviii) NG's $99.1 million Waste Water Facilities

18

and Solid Waste Facilities Note, Series 2010-A due July 1, 2033; (xxix) NG's $82.8 million Waste Water Facilities and Solid Waste Facilities Note, Series 2005-B due January 1, 2034; (xxx) NG's $54.6 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-B due June 1, 2033 , which note is secured by NG FMBs; and (xxxi) NG's $107.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2009-A due June 1, 2033 , which note is secured by NG FMBs.

194.    "PCN Claims" means, collectively, any Claims evidenced by, arising under or in connection with the PCN Loan Agreements, the PCN Indentures, the PCNs or other agreements related thereto.

195.    "PCN Indentures" means, collectively, as they may have been subsequently amended, the following trust indentures: (i) the Trust Indenture, dated as of April 1, 2006, as supplemented as of April 2, 2012, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $56.6 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2006-A (FirstEnergy Generation Project) are issued and outstanding; (ii) the Trust Indenture, dated as of September 1, 2008, as supplemented as of April 2, 2012, between BCIDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $46.3 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2008-B (FirstEnergy Generation Project) are issued and outstanding; (iii) the Trust Indenture, dated as of November 1, 2008, as supplemented as of May 25, 2012, between BCIDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $25 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2008-C (FirstEnergy Generation Project) are issued and outstanding; (iv) the Trust Indenture, dated as of December 1, 2006, as supplemented as of February 19, 2014, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $234.52 million principal amount of State of Ohio Pollution Control Revenue Bonds, Series 2006-A (FirstEnergy Generation Project) are issued and outstanding; (v) the Trust Indenture, dated as of August 1, 2009, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $177 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-A (FirstEnergy Generation Project) are issued and outstanding; (vi) the Trust Indenture, dated as of March 1, 2009, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $50 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-B (FirstEnergy Generation Project) are issued and outstanding; (vii) the Trust Indenture, dated as of June 1, 2009, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $141.26 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-C (FirstEnergy Generation Project) are issued and outstanding; (viii) the Trust Indenture, dated as of June 1, 2009, as supplemented as of August 1, 2012, between OAQDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $100 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-D (FirstEnergy Generation Project) are issued and outstanding; (ix) the Trust Indenture, dated as of April 1, 2006, as supplemented as of April 2, 2012, between OWDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $90.14 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2006-A (FirstEnergy Generation Project) are issued and outstanding; (x) the Trust Indenture, dated as of November 1, 2006, as supplemented as of November 15, 2010, between PEDFA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $26 million principal amount of Exempt Facilities Revenue Bonds, Series 2006A (Shippingport Project) are issued and outstanding; (xi) the Trust Indenture, dated as of December 1, 2005, as supplemented as of September 14, 2010, between PEDFA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $43 million principal amount of Exempt Facilities Revenue Bonds, Series 2005A (Shippingport Project) are issued and outstanding; (xii) the Trust Indenture, dated as of July 1, 2002, as supplement as of July 30, 2010, and amended as of November 1, 2012, between PEDFA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $15 million principal amount of Exempt Facilities Revenue Bonds, Series

19

2002 A (Shippingport Project) are issued and outstanding; (xiii) the Trust Indenture, dated as of June 1, 2008, as supplemented as of May 25, 2012, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $98.9 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2008-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xiv) the Trust Indenture, dated as of December 1, 2006, as supplemented as of June 5, 2009 and April 2, 2012, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $163.965 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2006-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xv) the Trust Indenture, dated as of December 1, 2005, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $72.65 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2005-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xvi) the Trust Indenture, dated as of April 1, 2006, as supplemented as of May 25, 2012, between BCIDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $60 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2006-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xvii) the Trust Indenture, dated as of September 15, 2010, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $8 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xviii) the Trust Indenture, dated as of December 1, 2005, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $7.2 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2005-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xix) the Trust Indenture, dated as of September 1, 2008, as supplemented as of April 2, 2012, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $9.1 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xx) the Trust Indenture, dated as of November 1, 2008, as supplemented as of November 1, 2012, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $23 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-C (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxi) the Trust Indenture, dated as of December 1, 2006, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $15.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2006-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxii) the Trust Indenture, dated as of November 15, 2010, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $26 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxiii) the Trust Indenture, dated as of April 1, 2009, between OAQDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $62.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxiv) the Trust Indenture, dated as of December 1, 2006, as supplemented as of April 2, 2012, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $135.55 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2006-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxv) the Trust Indenture, dated as of November 15, 2010, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $46.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-C (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxvi) the Trust Indenture, dated as of September 1, 2008, as supplemented as of April 2, 2012, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $20.45 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxvii) the Trust Indenture, dated as of November 1, 2008, as supplemented as of November 1, 2012, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $33 million principal

amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-C (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxviii) the Trust Indenture, dated as of September 15, 2010, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $99.1 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxix) the Trust Indenture, dated as of December 1, 2005, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $82.8 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2005-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxx) the Trust Indenture, dated as of November 15, 2010, between OWDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $54.6 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; and (xxxi) the Trust Indenture, dated as of June 1, 2009, between OWDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $107.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-A (FirstEnergy Nuclear Generation Project) are issued and outstanding.

196. "PCN Loan Agreements" means, collectively, as they may have been subsequently amended, the following loan agreements: (i) the Pollution Control Facilities Loan Agreement, dated as of April 1, 2006, between BCIDA and FG, as amended as of April 2, 2012, with respect to FG's $56.6 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-A due April 1, 2041; (ii) the Pollution Control Facilities Loan Agreement, dated as of September 1, 2008, between BCIDA and FG, as amended as of April 2, 2012, with respect to FG's $46.3 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-B due October 1, 2047, which note is secured by FG FMBs; (iii) the Pollution Control Facilities Loan Agreement, dated as of November 1, 2008, between BCIDA and FG, as amended as of May 25, 2012, with respect to FG's $25 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-C due June 1, 2028, which note is secured by FG FMBs; (iv) the Air Quality Facilities Loan Agreement, dated as of December 1, 2006, between OAQDA and FG, with respect to FG's $234.52 million Air Quality Facilities Note, Series 2006-A due December 1, 2023; (v) the Air Quality Facilities Loan Agreement, dated as of August 1, 2009, between OAQDA and FG, with respect to FG's $177 million Air Quality Facilities Note, Series 2009-E due August 1, 2020; (vi) the Air Quality Facilities Loan Agreement, dated as of March 1, 2009, between OAQDA and FG, with respect to FG's $50 million Air Quality Facilities Note, Series 2009-B due March 1, 2023; (vii) the Air Quality Facilities Loan Agreement, dated as of June 1, 2009, between OAQDA and FG, as amended as of February 14, 2012, with respect to FG's $141.26 million Air Quality Facilities Note, Series 2009-C due June 1, 2018, which note is secured by FG FMBs; (viii) the Air Quality Facilities Loan Agreement, dated as of June 1, 2009, between OAQDA and FG, as amended as of February 14, 2012, with respect to FG's $100 million Air Quality Facilities Note, Series 2009-D due August 1, 2029, which note is secured by FG FMBs; (ix) the Waste Water Facilities Loan Agreement, dated as of April 1, 2006, between OWDA and FG, as amended as of April 2, 2012, with respect to FG's $90.14 million Waste Water Facilities Note, Series 2006-A due May 15, 2019; (x) the Exempt Facilities Loan Agreement, dated as of November 1, 2006, between PEDFA and FG, with respect to FG's $26 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2006A due November 1, 2041; (xi) the Exempt Facilities Loan Agreement, dated as of December 1, 2005, between PEDFA and FG, with respect to FG's $43 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2005A due December 1, 2040; (xii) the Exempt Facilities Loan Agreement, dated as of July 1, 2002, between PEDFA and FG, as amended as of July 30, 2010, with respect to FG's $15 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2002 A due June 1, 2028, which note is secured by FG FMBs; (xiii) the Pollution Control Facilities Loan Agreement, dated as of June 1, 2008, between BCIDA and NG, as amended as of May 25, 2012, with respect to NG's $98.9 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series

21

2008-A due April 1, 2035; (xiv) the Pollution Control Facilities Loan Agreement, dated as of December 1, 2006, between BCIDA and NG, as amended as of April 2, 2012, with respect to NG's $163.965 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-B due December 1, 2035; (xv) the Pollution Control Facilities Loan Agreement, dated as of December 1, 2005, between BCIDA and NG, as amended as of February 14, 2012, with respect to NG's $72.65 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2005-A due January 1, 2035; (xvi) the Pollution Control Facilities Loan Agreement, dated as of April 1, 2006, between BCIDA and NG, as amended as of May 25, 2012, with respect to NG's $60 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-A due, which note is secured by NG FMBs; (xvii) the Air Quality Facilities Loan Agreement, dated as of September 15, 2010, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $8 million Air Quality Facilities Note, Series 2010-A due July 1, 2033; (xviii) the Air Quality Facilities Loan Agreement, dated as of December 1, 2005, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $7.2 million Air Quality Facilities Note, Series 2005-B due January 1, 2034; (xix) the Air Quality Facilities Loan Agreement, dated as of September 1, 2008, between OAQDA and NG, as amended as of April 2, 2012, with respect to NG's $9.1 million Air Quality Facilities Note, Series 2008-B due October 1, 2033; (xx) the Air Quality Facilities Loan Agreement, dated as of November 1, 2008, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $23 million Air Quality Facilities Note, Series 2008-C due November 1, 2032; (xxi) the Air Quality Facilities Loan Agreement, dated as of December 1, 2006, between OAQDA and NG, with respect to NG's $15.5 million Air Quality Facilities Note, Series 2006-B due December 1, 2033; (xxii) the Air Quality Facilities Loan Agreement, dated as of November 15, 2010, between OAQDA and NG, with respect to NG's $26 million Air Quality Facilities Note, Series 2010-B due June 1, 2033; (xxiii) the Air Quality Facilities Loan Agreement, dated as of April 1, 2009, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $62.5 million Air Quality Facilities Note, Series 2009-A due June 1, 2033, which note is secured by NG FMBs; (xxiv) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of December 1, 2006, between OWDA and NG, as amended as of April 2, 2012, with respect to NG's $135.55 million Waste Water Facilities and Solid Waste Facilities Note, Series 2006-B due December 1, 2033; (xxv) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 15, 2010, between OWDA and NG, with respect to NG's $46.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-C due June 1, 2033; (xxvi) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of September 1, 2008, between OWDA and NG, as amended as of April 2, 2012, with respect to NG's $20.45 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-B due October 1, 2033; (xxvii) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 1, 2008, as amended as of February 14, 2012, between OWDA and NG, with respect to NG's $33 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-C due November 1, 2032; (xxviii) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of September 15, 2010, between OWDA and NG, as amended as of February 14, 2012, with respect to NG's $99.1 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-A due July 1, 2033; (xxix) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of December 1, 2005, between OWDA and NG, as amended as of February 14, 2012, with respect to NG's $82.8 million Waste Water Facilities and Solid Waste Facilities Note, Series 2005-B due January 1, 2034; (xxx) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 15, 2010, between OWDA and NG, with respect to NG's $54.6 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-B due June 1, 2033, which note is secured by NG FMBs; and (xxxi) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of June 1, 2009, between OWDA and NG, as amended as of February 14, 2012, with respect to NG's $107.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2009-A due June 1, 2033, which note is secured by NG FMBs.

197.    "PEDFA" means the Pennsylvania Economic Development Financing Authority.

198. "<u>Pension Bridge</u>" means the terms of section B6.5 of the Pension Plan as in effect on the effective date of the FE Settlement Agreement, and as may be amended in the future as contemplated by the FE Settlement Agreement, under which an eligible participant who is (i) at least age 50, but not yet age 55, and is credited with at least 10 years of service, at the time of termination of employment, (ii) is terminated because the assets in his or her business unit are sold on or before December 31, 2020 after giving effect to the amendment contemplated by the FE Settlement Agreement, and (iii) remains employed by the buyer until the participant reaches age 55 or has an earlier qualifying termination of employment, will be eligible to elect to receive early retirement benefits under the Pension Plan as if the participant had remained employed by a participating employer under the Pension Plan until reaching age 55.

199. "<u>Pension Plan</u>" means the tax-qualified FirstEnergy Corp. Master Pension Plan.

200. "<u>Pension Plan Claims</u>" means claims arising from or related to the Pension Plan.

201. "<u>Periodic Distribution Date</u>" means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is [__] days after the Effective Date, and, for the first year thereafter, the first Business Day that is [__] days after the immediately preceding Periodic Distribution Date. After one year following the Effective Date, the Periodic Distribution Date will occur on the first Business Day that is [__] days after the immediately preceding Periodic Distribution Date, unless and otherwise ordered by the Bankruptcy Court.

202. "<u>Person</u>" means a person as such term is defined in section 101(41) of the Bankruptcy Code.

203. "<u>Petition Date</u>" means March 31, 2018.

204. "<u>Plan</u>" means this *Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement.

205. "<u>Plan Administrator</u>" means an entity to be named in the Plan Supplement or any successor appointed in accordance with the Plan Administrator Agreement pursuant to the authority granted in Section IV.S of the Plan.

206. "<u>Plan Administrator Agreement</u>" means the agreement governing the appointment and operation of the Plan Administrator, which Plan Administrator Agreement shall be filed with the Plan Supplement.

207. "<u>Plan Settlement</u>" means the compromises and settlements by and among the Debtors and their respective Estates, the Independent Directors and Managers, the Committee, and the Consenting Creditors, of among other things (i) all Inter-Debtor Claims, (ii) the allocation of cash and/or New FES Common Stock between the Holders of Unsecured Bondholder Claims and the Holders of General Unsecured Claims against the Debtors, and (iii) the allocation of value between and among the Debtors' Estates, including allocation of the FE Settlement Value.

208. "<u>Plan Supplement</u>" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 7 days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement comprised of, among other documents, the following, as applicable: (i) the New Organizational Documents; (ii) the list of Rejected Executory Contracts and Unexpired Leases; (iii) the

list of Assumed Executory Contracts and Unexpired Leases; (iv) a list of retained Causes of Action; (v) the Management Incentive Plan; (vi) the identity of the members of the New Boards and management for the Reorganized Debtors; (vii) the Plan Administrator Agreement; (viii) the Reorganized Debtor Stockholders' Agreement; and (ix) the Transition Working Group Management Agreement. Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as applicable. The documents that comprise the Plan Supplement shall be subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents or the Restructuring Support Agreement. The Parties entitled to amend the documents contained in the Plan Supplement shall be entitled to amend such documents in accordance with their respective terms and Article X of the Plan through and including the Effective Date.

209. "Plan Term Sheet" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

210. "Pleasants Power Plant" means the 1,300 megawatt power plant located in Willow Island, West Virginia and currently owned by AE Supply.

211. "Pleasants Purchase Agreement" means that certain asset purchase agreement dated December 31, 2018 between AE Supply, as seller and FG (or its assignee), as buyer for the Pleasants Power Plant.

212. "PPA Appeal Proceeding" means collectively, (i) *FirstEnergy Solutions Corp. and FirstEnergy Generation, LLC v. Federal Energy Regulatory Commission and Ohio Valley Electric Corp., Case No. 18-0306* (6th Cir.) and (ii) *In re Ohio Valley Electric Corp.*, Case No. *18-0307* (6th Cir.).

213. "PPA Appeal Proceeding Contracts" means, collectively, (i) that certain multi-party intercompany power purchase agreement pursuant to which FES and several other power companies "sponsor" and purchase power generated by fossil fuel from the Ohio Valley Electric Corporation and (ii) that certain Renewable Power Purchase Agreement between FES and Maryland Solar LLC.

214. "Priority Tax Claim" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

215. "Pro Rata" means (i) with respect to any individual Claim, the proportion that the amount of a Claim or Interest of a particular type bears to the aggregate amount of the Claims or Interests of that type, (ii) in connection with the Plan Settlement, with respect to any Debtor, the proportion of value or other distributions allocated to such Debtor in accordance with the Plan Settlement, (iii) in connection with the allocation of Unsecured Creditor Distributable Value, the Reallocation Pool, the NG Reallocation Pool, or the FENOC-FES Claim Reallocation, the proportion that the amount of an Allowed Claim or Allowed Interest bears to the aggregate amount of the Allowed Claims or Allowed Interests entitled to recover from the same Unsecured Distributable Value, the Reallocation Pool, the NG Reallocation Pool, and/or the FENOC-FES Claim Reallocation, (iv) in connection with the allocation of the Distributable Value Adjustment Amount, the proportion based upon the Distributable Value Split applicable to such Class of Claims, or (v) in connection with the allocation of the Effective Date Cash Distribution to each Holder of New FES Common Stock, the proportion that the amount of New FES Common Stock to be issued to such Holder bears to the aggregate amount of all New FES Common Stock to be issued under the Plan (including to the Disputed Claims Reserve) as of the Effective Date.

216. "Process Support Agreement" means that certain Process Support Agreement entered into by and among (i) the Debtors; (ii) members of the Ad Hoc Noteholder Group and the Mansfield Certificateholders Group; (iii) the Committee, solely for purposes of the Mansfield Issues Protocol (as

24

defined in the Process Support Agreement); (iv) MetLife Capital, Limited Partnership, solely for purposes of the Mansfield Issues Protocol, the Term Sheet (as defined in the Process Support Agreement) and Section 1, 2, 3 (solely with respect to the Mansfield Issues Protocol and the Term Sheet), 4, 5, 7.01, 8, 9, 10.02, 10.03, and 11; (v) U.S. Bank Trust National Association solely for purposes of the Mansfield Issues Protocol, the Term Sheet (as defined in the Process Support Agreement) and Section 1, 2, 3 (solely with respect to the Mansfield Issues Protocol and the Term Sheet), 4, 5, 7.01, 8, 9, 10.02, 10.03, and 11; and (vi) Wilmington Savings Fund Society, FSB, solely for purposes of the Mansfield Issues Protocol, and which Process Support Agreement was approved by the Bankruptcy Court on May 9, 2018 [Docket No. 509].

217. "Professional" means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professional Order: (i) retained pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

218. "Professional Fee Claims" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

219. "Professional Fee Claims Bar Date" means the deadline for Filing final requests for payment of Professional Fee Claims, which shall be 60 days after the Effective Date.

220. "Professional Fee Escrow Account" means an escrow account established and funded pursuant to Article II.A.3(b) of the Plan for Professional Fee Claims.

221. "Professional Fee Escrow Agent" means the escrow agents for the Professional Fee Escrow Account appointed pursuant to Article II.A.3(b) of the Plan and the escrow agreements entered into pursuant thereto.

222. "Professional Fee Reserve Amount" means the total amount of unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.A.3(c).

223. "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

224. "Proof of Interest" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

225. "Rail Claim Settlement" means that certain Settlement Agreement, dated May 1, 2017, by and among FE Corp., FG, BNSF Railway Company and CSX Transportation Inc.

226. "Reallocation Pool" means a pool consisting of $45,750,000 of the aggregate Unsecured Distributable Value from all Debtors otherwise available for distribution to Holders of Unsecured Bondholder Claims, which shall be reallocated to Holders of Single-Box Unsecured Claims against the various Debtors ratably based on the allocation of FE Settlement consideration to such Debtors.

227. "Reinstate," "Reinstated," or "Reinstatement" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

228. "Rejected Executory Contract or Unexpired Lease" means any Executory Contract or Unexpired Lease rejected by order of the Bankruptcy Court or to be rejected pursuant to the Plan, as reflected in the Plan Supplement and as may be further amended or modified by inclusion in the Plan Supplement.

229. "Released Parties" means collectively, the Debtor Released Parties, the FE Non-Debtor Released Parties and the Other Released Parties.

230. "Reorganized" or "Reorganized Debtor" means any Debtor as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, which in the case of FES and FENOC may include, in the discretion of the Debtors with the reasonable consent of the Requisite Supporting Parties, and in consultation with the Committee, a New FES, other newly created entities that will take transfer of certain of the Debtors' Assets, and/or a newly created holding company that will be a parent to the other Reorganized Debtors.

231. "Reorganized Debtor Stockholders' Agreement" means the one or more stockholders' agreements, if any, to be entered into (or deemed entered into) by the Reorganized Debtors and the holders of the New FES Common Stock on the Effective Date that will govern certain matters related to the governance of the Reorganized Debtors, which shall be included in the Plan Supplement and shall be reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties.

232. "Requisite Supporting Parties" means Consenting Creditors representing at least 70% of the total aggregate principal and face amount of Unsecured Claims held by the Consenting Creditors, which shall include (i) Consenting Creditors holding at least 33% of the total aggregate principal and face amount of the Mansfield Certificate Claims held by the Consenting Creditors and (ii) (x) to the extent affecting distributions on account of, or economic treatment of, FES Single-Box Unsecured Claims in a manner inconsistent with the Restructuring Support Agreement (except to the extent such inconsistency only results in Pro Rata dilution of New FES Common Stock), the rights of minority holders of New FES Common Stock (to the extent inconsistent with the corporate governance term sheet attached to the Restructuring Support Agreement) or release or exculpation provisions relating to the FES Creditor Group, members of the FES Creditor Group holding at least 50% of the total face amount of the FES Single-Box Unsecured Claims and FENOC-FES Unsecured Claims held by the FES Creditor Group and (y) to the extent affecting distributions on account of, or economic treatment of, FENOC-FES Unsecured Claims in a manner inconsistent with the Plan Term Sheet (except to the extent such inconsistency only results in Pro Rata dilution of New FES Common Stock), members of the FES Creditor Group holding at least 50% of the total face amount of the FENOC-FES Unsecured Claims held by the FES Creditor Group.

233. "Restructuring Support Agreement" means that certain Restructuring Support Agreement dated as of January 23, 2019 by and among the Debtors, the Consenting Creditors and the Committee, as may be amended, supplemented or otherwise modified from time to time in accordance therewith.

234. "Restructuring Transactions" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors, the Consenting Creditors, and except as specifically provided herein, the Committee, reasonably determine to be necessary or desirable to implement the Plan.

235.    "SAP System of Record" means the Systems, Applications and Products in Data Processing system maintained and controlled by FESC.

236.    "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

237.    "SEC" means the Securities and Exchange Commission.

238.    "Secured" means when referring to a Claim: (i) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (ii) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured claim.

239.    "Secured FG PCN Claims" means, collectively, any PCN Claims against FG that are Secured by FG FMBs.

240.    "Secured FG PCN Designated Claims" means, collectively, the Secured FG PCN Claims relating to any series of Secured PCN Claims (i) that have matured on or before the Effective Date, or (ii) arise under PCNs listed as CUSIPs 074876HQ9 and 708686EE6.

241.    "Secured FG PCN Reinstated Claims" means, collectively, the Secured FG PCN Claims that are not Secured FG PCN Designated Claims.

242.    "Secured NG PCN Claims" means, collectively, any PCN Claims against NG that are Secured by NG FMBs.

243.    "Secured PCN Claims" means, collectively the Secured FG PCN Claims and Secured NG PCN Claims.

244.    "Secured PCN Indenture Trustee" means, as applicable, UMB Bank, National Association, as successor trustee under the applicable PCN Indentures, which entity is also successor trustee under the FG Mortgage and the NG Mortgage.

245.    "Securities Act" means the Securities Act of 1933, as amended, codified at 15 U.S.C. § 77a *et seq.*, together with the rules and regulations promulgated thereunder.

246.    "Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, codified at 15 U.S.C. §§ 78a *et. seq.*, together with the rules and regulations promulgated thereunder.

247.    "Security" or "Securities" has the meaning set forth in section 101(49) of the Bankruptcy Code.

248.    "Single-Box Unsecured Claim" means any General Unsecured Claim filed against only one Debtor.

249.    "Standstill Agreement" means that certain Amended and Restated Standstill Agreement entered into by and among (i) the Debtors, (ii) members of the Ad Hoc Noteholders Group and the

Mansfield Certificateholders Group, (iii) the FE Non-Debtor Parties, and (iv) the Committee, and which Standstill Agreement was approved by the Bankruptcy Court on May 9, 2018 [Docket No. 509], as amended on August 1, 2018 [Docket No. 1084].

250. "<u>Tax Allocation Agreement</u>" means that certain Intercompany Income Tax Allocation Agreement, dated as of January 31, 2017, by and among FE Corp. and each of its subsidiaries, including the Debtors, as the same has been or may be subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto.

251. "<u>Tax Matters Agreement</u>" means that certain Tax Matters Agreement to be entered into between the Debtors and the FE Non-Debtor Parties prior to the Plan Effective Date which agreement shall be in form and substance reasonably acceptable to the Requisite Supporting Parties.

252. "<u>Third Party Release</u>" means, collectively, the FE Non-Debtor Parties' Third Party Releases and the Other Released Parties' Third Party Releases.

253. "<u>Transition Working Group</u>" has the meaning ascribed to such term in the Restructuring Support Agreement.

254. "<u>Transition Working Group Management Agreement</u>" means the agreement among the Debtors and the members of the Transition Working Group who are not employees of the Debtors.

255. "<u>Unexpired Lease</u>" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

256. "<u>Unimpaired</u>" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

257. "<u>U.S.</u>" means the United States of America.

258. "<u>U.S. Trustee</u>" means the Office of the U.S. Trustee for the Northern District of Ohio.

259. "<u>Unsecured Bondholder Cash Pool</u>" means, a pool of cash equal to the aggregate value of New FES Common Stock distributed on the Effective Date to Holders of Allowed General Unsecured Claims who have an election to receive New FES Common Stock in lieu of Cash and make such election.

260. "<u>Unsecured Bondholder Claims</u>" means, collectively: (i) FES Notes Claims, (ii) Unsecured PCN Claims, and (iii) Mansfield Certificate Claims.

261. "<u>Unsecured Claim</u>" means any Claim that is not a Secured Claim.

262. "<u>Unsecured Distributable Value</u>" means (i) with respect to FENOC, the FENOC Unsecured Distributable Value, (ii) with respect to FES, the FES Unsecured Distributable Value, (iii) with respect to FG, the FG Unsecured Distributable Value, (iv) with respect to FGMUC, the FGMUC Unsecured Distributable Value, and (v) with respect to NG, the NG Unsecured Distributable Value.

263. "<u>Unsecured FG PCN Claims</u>" means any PCN Claims against FG that are not Secured FG PCN Claims.

264. "<u>Unsecured NG PCN Claims</u>" means any PCN Claims against NG that are not Secured NG PCN Claims.

18-50757-amk    Doc 2120    FILED 02/11/19    ENTERED 02/11/19 23:53:02    Page 33 of 113

265.    "Unsecured Non-Priority Claims" means any Unsecured Claims that are not Administrative Claims, Priority Tax Claims or Other Priority Claims.

266.    "Unsecured PCN Claims" means collectively, the Unsecured FG PCN Claims and the Unsecured NG PCN Claims.

267.    "Unsecured PCN/FES Notes Claims" means, collectively: (i) the Unsecured PCN Claims and (ii) the FES Notes Claims.

268.    "Unsecured PCN/FES Notes Claims Against FES" means any Unsecured PCN Claims and FES Notes Claims against FES, including Unsecured PCN Claims and FES Notes Claims against FES arising from guarantees.

269.    "Unsecured PCN/FES Notes Claims Against FG" means any Unsecured PCN Claims and FES Notes Claims against FG, including Unsecured PCN Claims and FES Notes Claims against FG arising from guarantees.

270.    "Unsecured PCN/FES Notes Claims Against NG" means any Unsecured PCN Claims and FES Notes Claims against NG, including Unsecured PCN Claims and FES Notes Claims against NG arising from guarantees.

271.    "Unsecured PCN Indenture Trustee" means the Bank of New York Mellon Trust Company, N.A., as trustee under the applicable PCN Indentures.

272.    "Vacation Claims" means any claims guaranteed by FE Corp. in that certain Guarantee, dated as of February 21, 2017, in favor of certain employees who (i) participate in the FirstEnergy Time Off Program, (ii) have participated in a predecessor plan on or before December 31, 2008, and (iii) have earned a banked or frozen vacation benefit.

273.    "Waived Tax Claims" means any Claim in respect of the FES Tax Overpayment.

274.    "Welfare and Benefit Plan Administration Costs" means the costs (other than any indirect costs related to human resources management services pursuant to the Amended Shared Services Agreement) relating to the administration of any Welfare Plan that are incurred with respect to or allocable to the Debtors' Current Employees or the Debtors' Former Employees, from and after the date on which the Debtors cease to participate in any such plan.

275.    "Welfare Plans" means the welfare benefit plans or programs sponsored by FE Corp. or FESC.

276.    "Worthless Stock Deduction" means any deduction related to FE Corp.'s ownership interest in the Debtors to be claimed pursuant to 26 U.S.C. § 165.

B.    *Rules of Interpretation.*

For the purposes of the Plan:

(1)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

18-50757-amk    Doc 2120    FILED 02/11/19    ENTERED 02/11/19 23:53:02    Page 34 of 113

(2)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; provided that any such amendment, modification, or supplement is made in accordance with the terms of the Plan and the Restructuring Support Agreement and the terms governing any applicable document, schedule, or exhibit, including any consent right in favor of the Debtors, the Reorganized Debtors, the FE Non-Debtor Parties, the Requisite Supporting Parties, or the Committee;

(3)     any reference to an Entity as a Holder of a Claim or Interest includes the Entity's successors and assigns;

(4)     unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto;

(5)     unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement;

(6)     unless otherwise specified, the words "herein," "hereof", and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(7)     captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(8)     unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

(9)     any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be;

(10)     all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

(11)     all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated;

(12)     any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity;

(13)     except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, including a newly created holding company entity or other newly created entities, as applicable, to the extent the context requires.

C.     *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Except as otherwise provided herein or in the

Restructuring Support Agreement, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.  *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Ohio, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.  *References to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the U.S., unless otherwise expressly provided.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.

A.  *Administrative Claims.*

1.  <u>General Administrative Claims.</u>

Except as specified in this Article II, and with respect to the FE Non-Debtor Parties, subject to the FE Settlement Agreement, unless the Holder of an Allowed General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (i) on the Effective Date; (ii) if the General Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (iii) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

Requests for payment of General Administrative Claims must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date applicable to the Debtor against whom the General Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by

31

the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors, the Reorganized Debtors, or their respective property and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors or further order of the Bankruptcy Court. To the extent this Article II.A.1 conflicts with Article XII.C of the Plan with respect to fees and expenses payable under section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, Article XII.C of the Plan shall govern.

2.      Postpetition Inter-Debtor Claims.

Without the need to file or serve any request for payment of a General Administrative Claim, in accordance with the Plan Settlement, the postpetition Inter-Debtor Claims shall be Allowed as follows: (i) the postpetition Inter-Debtor Claim of FG against FES shall be Allowed as super-priority Administrative Claims in an amount equal to $120,291,389; (ii) the postpetition Inter-Debtor Claim of NG against FES shall be Allowed as super-priority Administrative Claims in an amount equal to $238,431,879; (iii) the postpetition Inter-Debtor Claims of FGMUC against FG shall be disallowed in full; (iv) the postpetition Inter-Debtor Claims of FENOC against FES shall be Allowed as a super-priority Administrative Claim in the amount of $2,000,000; and (v) the postpetition Inter-Debtor Claims of FENOC against NG shall be Allowed as super-priority Administrative Claims in the amount of $69,929,041. In lieu of Cash payment or other distribution to the Debtors holding such Inter-Debtor Claims, the distributions on account of such Inter-Debtor Claims may be made to the Holders of Allowed Unsecured Claims against the Debtor holding such Inter-Debtor Claims in accordance with the terms and conditions of this Plan.

3.      Professional Compensation.

a.      **Final Fee Applications.**

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be Filed and served on the Debtors or Reorganized Debtors, as applicable, the Committee and the United States Trustee no later than the Professional Fee Claims Bar Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Bankruptcy Court, paid promptly from the Professional Fee Escrow Account in its full Allowed amount. Notwithstanding anything to the contrary herein, the provisions regarding the reimbursement of professional fees and expenses of the Supporting Creditors as set forth in the Process Support Agreement and of the Consenting Creditors as set forth in the Restructuring Support Agreement shall continue through the Effective Date and, for the avoidance of doubt, such professionals shall not be required to file any request for payment of such amounts pursuant to Article II.A.3 of the Plan or otherwise.

b.      **Professional Fee Escrow Account.**

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.

Upon the establishment of the Professional Fee Escrow Account, the Reorganized Debtors shall select a Professional Fee Escrow Agent for the Professional Fee Escrow Account to administer payments

32

to and from such Professional Fee Escrow Account in accordance with the Plan and shall enter into an escrow agreement providing for administration of such payments in accordance with the Plan.

The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by Final Order.

### c. Professional Fee Reserve Amount.

Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimate to the Debtors no later than ten Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total amount estimated pursuant to this Article II.A.3(c) shall comprise the Professional Fee Reserve Amount.

### d. Post-Effective Date Fees and Expenses.

When all Allowed amounts owing to Professionals have been paid in full from the Professional Fee Escrow Account, any remaining amount in the Professional Fee Escrow Account shall be disbursed to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

If the amount in the Professional Fee Escrow Account is insufficient to fund payment in full of all Allowed amounts owing to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow Account by the Reorganized Debtors.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B. *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.     *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the applicable Effective Date. The Debtors reserve the right to assert that the treatment provided to Holders of Claims and Interests pursuant to Article III.B of the Plan renders such Holders Unimpaired.

1.     <u>Class Identification for the Debtors.</u>

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, as applicable, and shall include the classifications set forth below. Subject to Article III.D of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular Debtor, such Class applies solely to such Debtor.

The following charts represent the classification of Claims and Interests for the Debtors pursuant to the Plan.

a.     **FES**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class A1 | Other Secured Claims Against FES | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A2 | Other Priority Claims Against FES | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A3 | Unsecured PCN/FES Notes Claims Against FES | Impaired | Entitled to Vote |
| Class A4 | Mansfield Certificate Claims Against FES | Impaired | Entitled to Vote |
| Class A5 | FENOC-FES Unsecured Claims | Impaired | Entitled to Vote |
| Class A6 | FES Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class A7 | Mansfield TIA Claims | Impaired | Entitled to Vote |
| Class A8 | Convenience Claims | Impaired | Entitled to Vote |
| Class A9 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class A10 | Interests in FES | Impaired | Not Entitled to Vote (Deemed to Reject) |

b.     **FG**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class B1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed |

34

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| | Against FG | | to Accept) |
| Class B2 | Other Priority Claims Against FG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B3 | Secured FG PCN Designated Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B4 | Secured FG PCN Reinstated Claims | Impaired | Entitled to Vote |
| Class B5 | Unsecured PCN/FES Notes Claims Against FG | Impaired | Entitled to Vote |
| Class B6 | Mansfield Certificate Claims Against FG | Impaired | Entitled to Vote |
| Class B7 | FG Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class B8 | Mansfield TIA Claims | Impaired | Entitled to Vote |
| Class B9 | Convenience Claims | Impaired | Entitled to Vote |
| Class B10 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class B11 | Interests in FG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

c.    NG

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class C1 | Other Secured Claims Against NG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class C2 | Other Priority Claims Against NG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class C3 | Secured NG PCN Claims | Impaired | Entitled to Vote |
| Class C4 | Unsecured PCN/FES Notes Claims Against NG | Impaired | Entitled to Vote |
| Class C5 | Mansfield Certificate Claims Against NG | Impaired | Entitled to Vote |
| Class C6 | NG Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class C7 | NG-FENOC Unsecured Claims against NG | Impaired | Entitled to Vote |
| Class C8 | Convenience Claims | Impaired | Entitled to Vote |
| Class C9 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class C10 | Interests in NG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

d.    FENOC

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class D1 | Other Secured Claims Against FENOC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class D2 | Other Priority Claims Against FENOC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class D3 | FENOC-FES Unsecured Claims against FENOC | Impaired | Entitled to Vote |

35

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class D4 | FENOC Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class D5 | NG-FENOC Unsecured Claims against FENOC | Impaired | Entitled to Vote |
| Class D6 | Convenience Claims | Impaired | Entitled to Vote |
| Class D7 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class D8 | Interests in FENOC | Impaired | Not Entitled to Vote (Deemed to Reject) |

e. **FGMUC**

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class E1 | Other Secured Claims Against FGMUC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class E2 | Other Priority Claims Against FGMUC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class E3 | Mansfield Certificate Claims Against FGMUC | Impaired | Entitled to Vote |
| Class E4 | FGMUC Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class E5 | Mansfield TIA Claims | Impaired | Entitled to Vote |
| Class E6 | Convenience Claims | Impaired | Entitled to Vote |
| Class E7 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class E8 | Interests in FGMUC | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |

f. **FE Aircraft**

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class F1 | Other Secured Claims Against FE Aircraft | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class F2 | Other Priority Claims Against FE Aircraft | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class F3 | General Unsecured Claims Against FE Aircraft | Impaired | Entitled to Vote |
| Class F4 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class F5 | Interests in FE Aircraft | Impaired | Not Entitled to Vote (Deemed to Reject) |

g. **Norton**

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class G1 | Other Secured Claims Against Norton | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class G2 | Other Priority Claims Against Norton | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class G3 | General Unsecured Claims Against Norton | Impaired | Entitled to Vote |
| Class G4 | Inter-Debtor Claims | Impaired | Shall Not Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class G5 | Interests in Norton | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

B.    *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.    <u>Class A1 – Other Secured Claims Against FES.</u>

a.    *Classification*: Class A1 consists of Other Secured Claims against FES.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A1, each such Holder shall receive, at the option of FES, either:

i.    payment in full in Cash;

ii.    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii.    Reinstatement of such Claim; or

iv.    other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class A1 is Unimpaired under the Plan.  Holders of Claims in Class A1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class A2 – Other Priority Claims Against FES.</u>

a.    *Classification*: Class A2 consists of Other Priority Claims against FES.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A2, each such Holder shall receive, at the option of FES, either:

i.    payment in full in Cash; or

ii.    other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class A2 is Unimpaired under the Plan.  Holders of Claims in Class A2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

37

3. <u>Class A3 Unsecured PCN/FES Notes Claims Against FES</u>.

    a.     *Classification*: Class A3 consists of Unsecured PCN/FES Notes Claims against FES.

    b.     *Allowance*: The Unsecured PCN/FES Notes Claims Against FES shall be Allowed in the aggregate amount of $2,237,912,062, including the FES Notes Claims in the amount of $701,311,411 and the guarantee claims of the Holders of Unsecured FG PCN Claims in the amount of $684,638,378, and Unsecured NG PCN Claims in the amount of $851,962,273.

    c.     *Treatment*: Except to the extent that a Holder of an Allowed Unsecured PCN/FES Notes Claim Against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured PCN/FES Notes Claim Against FES, each Holder of an Allowed Unsecured PCN/FES Notes Claim Against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims, (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation. The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A3.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Effective Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New FES Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims, (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock, subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A3.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Unsecured PCN/FES Notes Claim Against FES that received New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

    d.     *Voting*: Class A3 is Impaired under the Plan. Holders of Claims in Class A3 are entitled to vote to accept or reject the Plan.

4.     <u>Class A4 – Mansfield Certificate Claims Against FES</u>.

   a.     *Classification*:  Class A4 consists of Mansfield Certificate Claims against FES.

   b.     *Allowance*:  The Mansfield Certificate Claims Against FES shall be Allowed in the aggregate amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

   c.     *Treatment*:   Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim Against FES, each Holder of an Allowed Mansfield Certificate Claim Against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims, and (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A4.

   Notwithstanding the foregoing, Electing Bondholders shall receive, on the Effective Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New FES Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims, (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and the Holders FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock, subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A4.

   In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against FES that received New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

   d.     *Voting*: Class A4 is Impaired under the Plan.  Holders of Claims in Class A4 are entitled to vote to accept or reject the Plan.

5.      Class A5 – FENOC-FES Unsecured Claims Against FES.

a.      *Classification*:  Class A5 consists of Holders of FENOC-FES Unsecured Claims (solely as to the portion of the claim against FES).

b.      *Treatment:*  Except to the extent that a Holder of an Allowed FENOC-FES Unsecured Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC-FES Unsecured Claim Against FES, each Holder of an Allowed FENOC-FES Unsecured Claim Against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of (i) the FES Unsecured Distributable Value, and (ii) the FENOC-FES Claim Reallocation, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New FES Common Stock in equal amount, subject to the Equity Election Conditions, and subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed FENOC-FES Unsecured Claims against FES set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A5.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FENOC-FES Unsecured Claim Against FES that receives New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c.      *Voting*: Class A5 is Impaired under the Plan.  Holders of Claims in Class A5 are entitled to vote to accept or reject the Plan.

6.      Class A6 – FES Single-Box Unsecured Claims.

a.      *Classification*:  Class A6 consists of FES Single-Box Unsecured Claims.

b.      *Treatment*: Except to the extent that a Holder of an Allowed FES Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FES Single-Box Unsecured Claim, each Holder of an Allowed FES Single-Box Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of (i) the FES Unsecured Distributable Value, (ii) the portion of the Reallocation Pool allocated to FES, (iii) the FENOC-FES Claim Reallocation, and (iv) the NG Reallocation Pool, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed FES Single-Box Unsecured Claims set forth in clauses (i) through (iv) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A6.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FES Single-Box Unsecured Claim that receives New FES

Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

    c.    *Voting*: Class A6 is Impaired under the Plan. Holders of Claims in Class A6 are entitled to vote to accept or reject the Plan.

7.    <u>Class A7 –Mansfield TIA Claims Against FES.</u>

    a.    *Classification*: Class A7 consists of the Mansfield TIA Claims against FES.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Mansfield TIA Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of the Mansfield TIA Claims against FES, each Holder of an Allowed Mansfield TIA Claims against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of FES Unsecured Distributable Value available to Holders of Allowed Mansfield TIA Claims against FES. The aggregate amount of value available for distribution to Holders of Allowed Mansfield TIA Claims against FES shall be subject to the Distributable Value Adjustment Amount applicable to Class A7.

    c.    *Voting*: Class A7 is Impaired under the Plan. Holders of Claims in Class A6 are entitled to vote to accept or reject the Plan.

8.    <u>Class A8 – Convenience Claims against FES.</u>

    a.    *Classification*: Class A8 consists of all Convenience Claims against FES.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FES, each Holder of an Allowed Convenience Claim against FES that has properly elected to be treated as such on its Ballot shall receive, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to 36.4% of the Allowed Convenience Claim.

    c.    *Voting*: Class A8 is Impaired under the Plan. Holders of Claims in Class A7 are entitled to vote to accept or reject the Plan.

9.    <u>Class A9 – Inter-Debtor Claims against FES.</u>

    a.    *Classification*: Class A9 consists of prepetition Inter-Debtor Claims against FES.

    b.    *Allowance:* The prepetition Inter-Debtor Claims against FES shall be Allowed as follows: (i) the prepetition Inter-Debtor Claims of FG against FES shall be Allowed as Unsecured Claims in the aggregate amount of $1,488,190,630; (ii) the prepetition Inter-Debtor Claims of NG against FES shall be Allowed as Unsecured Claims in the aggregate amount of $1,670,896,976; (iii) the prepetition Inter-Debtor Claims of FENOC against FES shall be Allowed as Unsecured Claims in the aggregate amount of $28,000,000; and (iv) all other

41

Inter-Debtor Claims against FES shall be treated as if Allowed in the amount of $2,322,082.

    c.    *Treatment*:  Each Holder of an Allowed prepetition Inter-Debtor Claim against FES shall receive their Pro Rata share of the FES Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against FES, the distributions on account of such prepetition Inter-Debtor Claims against FES shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FES by including the recovery on such prepetition Inter-Debtor Claims against FES in the calculation of the Unsecured Distributable Value relating to the Debtor holding such Inter-Debtor Claims against FES.

    d.    *Voting*: Class A9 is Impaired under the Plan.  Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FES are insiders whose votes will not be counted.  Accordingly, this class will not vote to accept or reject the Plan.

10.    <u>Class A10 – Interests in FES</u>.

    a.    *Classification*: Class A10 consists of Interests in FES.

    b.    *Treatment*: As of the Effective Date, Interests in FES shall be cancelled and released without any distribution on account of such Interests.

    c.    *Voting*: Class A10 is Impaired under the Plan.  Holders of Claims in Class A10 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

11.    <u>Class B1 – Other Secured Claims against FG</u>.

    a.    *Classification*: Class B1 consists of Other Secured Claims against FG.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B1, each such Holder shall receive, at the option of FG, either:

        i.    payment in full in Cash;

        ii.    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        iii.    Reinstatement of such Claim; or

        iv.    other treatment rendering such Claim Unimpaired.

    c.    *Voting*: Class B1 is Unimpaired under the Plan.  Holders of Claims in Class B1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of

the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

12. <u>Class B2 – Other Priority Claims Against FG</u>.

    a. *Classification*: Class B2 consists of Other Priority Claims against FG.

    b. *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B2, each such Holder shall receive, at the option of FG, either:

        i. payment in full in Cash; or

        ii. other treatment rendering such Claim Unimpaired.

    c. *Voting*: Class B2 is Unimpaired under the Plan. Holders of Claims in Class B2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

13. <u>Class B3 – Secured FG PCN Designated Claims</u>.

    a. *Classification*: Class B3 consists of the Secured FG PCN Designated Claims.

    b. *Allowance*: The Secured FG PCN Designated Claims shall be Allowed in the aggregate principal amount of $181,260,000, plus accrued and unpaid pre- and postpetition interest (at the prepetition rate) on such principal amount through and including the Effective Date.

    c. *Treatment*: Allowed Secured FG PCN Designated Claims shall be paid in full in Cash on the Effective Date or as soon thereafter as practicable.

    d. *Voting*: Class B3 is Unimpaired under the Plan. Holders of Claims in Class B3 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.]

14. <u>Class B4 – Secured FG PCN Reinstated Claims</u>.

    a. *Classification:* Class B4 consists of the Secured FG PCN Reinstated Claims against FG.

    b. *Allowance*: The Secured FG PCN Reinstated Claims shall be Allowed in the aggregate principal amount of $146,300,000, plus accrued and unpaid pre- and postpetition interest (at the prepetition rate) on such principal amount through and including the Effective Date.

    c. *Treatment*: Allowed Secured FG PCN Reinstated Claims shall be Reinstated in full on the Effective Date or as soon as practicable thereafter, *provided, however*,

43

that any Allowed Secured FG PCN Reinstated Claims relating to accrued and unpaid pre- and postpetition interest on the principal amount of Secured FG PCN Reinstated Claims shall be paid in full in Cash.

In the event that the Debtors elect to form New FES, the guarantee of FES with respect to such Allowed Secured FG PCN Reinstated Claims shall be released following the Effective Date, and on the Effective Date New FES shall provide a new unsecured guarantee with respect to such Allowed Secured FG PCN Reinstated Claim.

d. *Voting*: Class B4 is Impaired under the Plan. Holders of Claims in Class B4 shall be entitled to vote to accept or reject the Plan.

15. <u>Class B5 – Unsecured PCN/FES Notes Claims Against FG</u>.

a. *Classification*: Class B5 consists of Unsecured PCN/FES Notes Claims against FG.

b. *Allowance*: The Unsecured PCN/FES Notes Claims Against FG shall be Allowed in the aggregate amount of $2,237,912,062, which is comprised of the Unsecured FG PCN Claims in the amount of $684,638,378 and the guarantee claims of the Holders of FES Notes Claims in the amount of $701,311,411, and the Unsecured NG PCN Claims in the amount of $851,962,273.

c. *Treatment*: Except to the extent that a Holder of an Allowed Unsecured PCN/FES Notes Claim Against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured PCN/FES Notes Claim Against FG, each Holder of an Allowed Unsecured PCN/FES Notes Claim Against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of the FG Unsecured Distributable Value, subject to (i) the reallocation of the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation. The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B5.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Effective Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New FES Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock and subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims Against

44

FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B5.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Unsecured PCN/FES Notes Claim Against FG that received New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

    d.    *Voting*: Class B5 is Impaired under the Plan. Holders of Claims in Class B5 are entitled to vote to accept or reject the Plan.

16.    <u>Class B6 – Mansfield Certificate Claims Against FG</u>.

    a.    *Classification*: Class B6 consists of Mansfield Certificate Claims against FG.

    b.    *Allowance*: The Mansfield Certificate Claims Against FG shall be Allowed in the aggregate amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

    c.    *Treatment*: Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim Against FG, each Holder of an Allowed Mansfield Certificate Claim Against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of the FG Unsecured Distributable Value, subject to (i) the reallocation of the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation. The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B6.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Effective Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New FES Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B6.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against FG that received New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d.    *Voting*: Class B6 is Impaired under the Plan.  Holders of Claims in Class B6 are entitled to vote to accept or reject the Plan.

17.    <u>Class B7 – FG Single-Box Unsecured Claims</u>.

a.    *Classification*: Class B7 consists of FG Single-Box Unsecured Claims.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed FG Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FG Single-Box Unsecured Claim, each Holder of an Allowed FG Single-Box Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of (i) the FG Unsecured Distributable Value and (ii) the Reallocation Pool allocable to FG, *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed FG Single-Box Unsecured Claims set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B7.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FG Single-Box Unsecured Claim that receives New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c.    *Voting*: Class B7 is Impaired under the Plan.  Holders of Claims in Class B5 are entitled to vote to accept or reject the Plan.

18.    <u>Class B8 –Mansfield TIA Claims against FG</u>.

a.    *Classification*:  This Class consists of the Mansfield TIA Claims against FG.

b.    *Treatment*:  Except to the extent that the Holder of an Allowed Mansfield TIA Claim against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of the Mansfield TIA Claims against FG, each Holder of an Allowed Mansfield TIA Claims against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of FG Unsecured Distributable Value.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield TIA Claims against FG shall be subject to the Distributable Value Adjustment Amount applicable to Class B8.

c.    *Voting*:  Class B8 is Impaired under the Plan.  Holders of Claims in Class B8 are entitled to vote to accept or reject the Plan.

19.    <u>Class B9 -- Convenience Claims against FG</u>.

a.    *Classification*: Class B9 consists of all Convenience Claims against FG.

b. *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FG, each Holder of an Allowed Convenience Claim against FG that has properly elected to be treated as such on its Ballot shall receive, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to 22.0% of the Allowed Convenience Claim.

c. *Voting*: Class B9 is Impaired under the Plan. Holders of Claims in Class B9 are entitled to vote to accept or reject the Plan.

20. <u>Class B10 – Inter-Debtor Claims against FG</u>.

a. *Classification*: Class B10 consists of prepetition Inter-Debtor Claims against FG.

b. *Allowance:* The prepetition Inter-Debtor Claims against FG shall be Allowed as unsecured claims in the aggregate amount of $901,881,812.

c. *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against FG shall receive their Pro Rata share of the FG Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claim against FG, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FG by including the recovery on such prepetition Inter-Debtor Claims against FG in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against FG.

d. *Voting*: Class B10 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FG are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

21. <u>Class B11 – Interests in FG</u>.

a. *Classification*: Class B11 consists of Interests in FG.

b. *Treatment*: Reorganized FES shall retain ownership of all Interests in FG.

c. *Voting*: Holders of Interests in Class B11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

22. <u>Class C1 – Other Secured Claims against NG</u>.

a. *Classification*: Class C1 consists of Other Secured Claims against NG.

b. *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each

Allowed Claim in Class C1, each such Holder shall receive, at the option of NG, either:

    i.      payment in full in Cash;

    ii.     delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

    iii.    Reinstatement of such Claim; or

    iv.    other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class C1 is Unimpaired under the Plan. Holders of Claims in Class C1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

23.    <u>Class C2 – Other Priority Claims against NG</u>.

a.    *Classification*: Class C2 consists of Other Priority Claims against NG.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C2, each such Holder shall receive, at the option of NG, either:

    i.      payment in full in Cash; or

    ii.     other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class C2 is Unimpaired under the Plan. Holders of Claims in Class C2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

24.    <u>Class C3 – Secured NG PCN Claims</u>.

a.    *Classification*: Class C3 consists of the Secured NG PCN Claims against NG.

b.    *Allowance*: The Secured NG PCN Claims shall be Allowed in the aggregate principal amount of $284,600,000, plus accrued and unpaid pre- and postpetition interest (at the prepetition rate) on such principal amount through and including the Effective Date.

c.    *Treatment:* Allowed Secured NG PCN Claims shall be Reinstated in full on the Effective Date, or as soon thereafter as practicable, *provided, however*, that any Allowed Secured NG PCN Claims relating to accrued and unpaid pre- and postpetition interest on the principal amount of the Secured NG PCN Claims through and including the Effective Date shall be paid in full in Cash.

In the event that the Debtors elect to form New FES, the guarantee of FES with respect to such Allowed Secured NG PCN Claims shall be released following the Effective Date, and on the Effective Date New FES shall provide a new unsecured guarantee with respect to such Allowed Secured NG PCN Claim.

d.    *Voting*:  Class C3 is Impaired under the Plan.  Holders of Claims in Class C3 are entitled to vote to accept or reject the Plan.

25.    <u>Class C4 –Unsecured PCN/FES Notes Claims against NG</u>.

a.    *Classification*:  Class C4 consists of Unsecured PCN/FES Notes Claims against NG.

b.    *Allowance*:  The Unsecured PCN/FES Notes Claims Against NG shall be Allowed in the aggregate amount of $2,237,912,062, which is comprised of the Unsecured NG PCN Claims in the amount of $851,962,273 and the guarantee claims of the Holders of FES Notes Claims in the amount of $701,311,411 and the Unsecured FG PCN Claims in the amount of $684,638,378.

c.    *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured PCN/FES Notes Claim Against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured PCN/FES Notes Claim Against NG, each Holder of an Allowed Unsecured PCN/FES Notes Claim Against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C4.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Effective Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New FES Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C4.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Unsecured PCN/FES Notes Claim Against NG that received New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d.      *Voting*:  Class C4 is Impaired under the Plan.  Holders of Claims in Class C4 are entitled to vote to accept or reject the Plan.

26.     <u>Class C5 – Mansfield Certificate Claims Against NG</u>.

a.      *Classification*: Class C5 consists of Mansfield Certificate Claims against NG.

b.      *Allowance*: The Mansfield Certificate Claims Against NG shall be Allowed in the aggregate amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

c.      *Treatment*:  Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim Against NG, each Holder of an Allowed Mansfield Certificate Claim Against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C5.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Effective Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New FES Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C5.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against NG that received New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d.      *Voting*: Class C5 is Impaired under the Plan.  Holders of Claims in Class C5 are entitled to vote to accept or reject the Plan.

27.     <u>Class C6 –NG Single-Box Unsecured Claims</u>.

a.      *Classification*: Class C6 consists of NG Single-Box Unsecured Claims.

50

b. *Treatment*: Except to the extent that a Holder of an Allowed NG Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each NG Single-Box Unsecured Claim, each Holder of an Allowed NG Single-Box Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to their Pro Rata share of NG Unsecured Distributable Value, *provided* that such Holders shall have the option to elect to receive their ratable share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed NG Single-Box Unsecured Claims shall be subject to the Distributable Value Adjustment Amount applicable to Class C6.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed NG Single-Box Unsecured Claim that receives New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c. *Voting*: Class C6 is Impaired under the Plan. Holders of Claims in Class C6 are entitled to vote to accept or reject the Plan.

28. <u>Class C7 – NG-FENOC Unsecured Claims against NG</u>.

a. *Classification*: Class C7 consists of Holders of NG-FENOC Unsecured Claims (solely as to the portion of the claim against NG).

b. *Treatment*: Except to the extent that a Holder of an Allowed NG-FENOC Unsecured Claim against NG agrees to less favorable treatment, in exchange for full and final satisfaction, compromise, settlement, release and discharge of each NG-FENOC Unsecured Claim, each Holder of an Allowed NG-FENOC Unsecured Claim against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to their Pro Rata share of NG Unsecured Distributable Value, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New FES Common Stock in equal amount, subject to the Equity Election Conditions, and subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed NG-FENOC Unsecured Claims against NG shall be subject to the Distributable Value Adjustment Amount applicable to Class C7.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed NG-FENOC Unsecured Claim Against NG that receives New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c. *Voting*: Class C7 is Impaired under the Plan. Holders of Claims in Class C7 are entitled to vote to accept or reject the Plan.

29. <u>Class C8 – Convenience Claims against NG</u>.

a. *Classification*: Class C8 consists of all Convenience Claims against NG.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against NG, each Holder of an Allowed Convenience Claim against NG that has properly elected to be treated as such on its Ballot shall receive, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to 35.7% of the Allowed Convenience Claim.

c.    *Voting*: Class C8 is Impaired under the Plan. Holders of Claims in Class C8 are entitled to vote to accept or reject the Plan.

30.    Class C9 – Inter-Debtor Claims against NG.

a.    *Classification*: Class C8 consists of prepetition Inter-Debtor Claims against NG.

b.    *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against NG, if any, shall receive their Pro Rata share of the NG Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against NG, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against NG by including the recovery on such prepetition Inter-Debtor Claims against NG in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against NG.

c.    *Voting*: Class C9 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against NG are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

31.    Class C10 – Interests in NG.

a.    *Classification*: Class C10 consists of Interests in NG.

b.    *Treatment*: Reorganized FES shall retain ownership of all of the Interests in NG.

c.    *Voting*: Holders of Interests in Class C10 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

32.    Class D1 – Other Secured Claims against FENOC.

a.    *Classification*: Class D1 consists of Other Secured Claims against FENOC.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class D1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class D1, each such Holder shall receive, at the option of FENOC, either:

52

        i.       payment in full in Cash;

        ii.      delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        iii.     Reinstatement of such Claim; or

        iv.     other treatment rendering such Claim Unimpaired.

c.     *Voting*: Class D1 is Unimpaired under the Plan. Holders of Claims in Class D1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

33.    <u>Class D2 – Other Priority Claims against FENOC.</u>

a.     *Classification*: Class D2 consists of Other Priority Claims against FENOC.

b.     *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class D2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class D2, each such Holder shall receive, at the option of FENOC, either:

        i.       payment in full in Cash; or

        ii.      other treatment rendering such Claim Unimpaired.

c.     *Voting*: Class D2 is Unimpaired under the Plan. Holders of Claims in Class D2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

34.    <u>Class D3 – FENOC-FES Unsecured Claims against FENOC.</u>

a.     *Classification*: Class D3 consists of Holders of FENOC-FES Unsecured Claims (solely as to the portion of the claim against FENOC).

b.     *Treatment*: Except to the extent that a Holder of an Allowed FENOC-FES Unsecured Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC-FES Unsecured Claim against FENOC, each Holder of an Allowed FENOC-FES Unsecured Claim against FENOC shall receive, on the Effective Date or as soon as reasonably practicable thereafter cash equal to its Pro Rata share of FENOC Unsecured Distributable Value, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New FES Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan, *provided* however, that such election shall only be available on account of the portion of the Allowed FENOC-FES Unsecured Claim guaranteed by FES. The aggregate amount of value available for distribution to Holders of Allowed FENOC-FES

53

Unsecured Claims against FENOC shall be subject to the Distributable Value Adjustment Amount applicable to Class D3.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FENOC-FES Unsecured Claim against FENOC that receives New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c.    *Voting*:  Class D3 is Impaired under the Plan.  Holders of Claims in Class D3 are entitled to vote to accept or reject the Plan.

35.    Class D4 – FENOC Single-Box Unsecured Claims against FENOC.

a.    *Classification*:  Class D4 consists of FENOC Single-Box Unsecured Claims.

b.    *Treatment:* Except to the extent that a Holder of an Allowed FENOC Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC Single-Box Unsecured Claims, each Holder of an Allowed FENOC Single-Box Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of (i) the FENOC Unsecured Distributable Value and (ii) the portion of the Reallocation Pool allocable to FENOC.  The aggregate amount of value available for distribution to Holders of Allowed FENOC Single-Box Unsecured Claims set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class D4.

c.    *Voting*: Class D4 is Impaired under the Plan.  Holders of Claims in Class D4 are entitled to vote to accept or reject the Plan.

36.    Class D5 – NG-FENOC Unsecured Claims against FENOC.

a.    *Classification*:  Class D5 consists of Holders of NG-FENOC Unsecured Claims (solely as to the portion of the claim against FENOC).

b.    *Treatment*: Except to the extent that a Holder of an Allowed NG-FENOC Unsecured Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each NG-FENOC Unsecured Claim against FENOC, each Holder of an Allowed NG-FENOC Unsecured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of FENOC Unsecured Distributable Value.  The aggregate amount of value available for distribution to Holders of Allowed NG-FENOC Unsecured Claims against FENOC shall be subject to the Distributable Value Adjustment Amount applicable to Class D5.

c.    *Voting*: Class D5 is Impaired under the Plan.  Holders of Claims in Class D5 are entitled to vote to accept or reject the Plan.

37.     Class D6 – Convenience Claims against FENOC.

   a.     *Classification*: Class D6 consists of all Convenience Claims against FENOC.

   b.     *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FENOC, each Holder of an Allowed Convenience Claim against FENOC that has properly elected to be treated as such on its Ballot shall receive, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to 24.0% of the Allowed Convenience Claim.

   c.     *Voting*: Class D6 is Impaired under the Plan. Holders of Claims in Class D6 are entitled to vote to accept or reject the Plan.

38.     Class D7 – Inter-Debtor Claims against FENOC.

   a.     *Classification*: Class D7 consists of prepetition Inter-Debtor Claims against FENOC.

   b.     *Allowance*: The prepetition Inter-Debtor Claims against FENOC shall be Allowed as Unsecured Claims in the aggregate amount of $32,603,216.

   c.     *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against FENOC shall receive their Pro Rata share of the FENOC Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims, the distributions on account of such prepetition Inter-Debtor Claims against FENOC shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FENOC by including the recovery on such prepetition Inter-Debtor Claims against FENOC in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against FENOC.

   d.     *Voting*: Class D7 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FENOC are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

39.     Class D8 – Interests in FENOC.

   a.     *Classification*: Class D8 consists of Interests in FENOC.

   b.     *Treatment*: On the Effective Date, Interests in FENOC shall be cancelled and released without any distribution on account of such Interests. On the Effective Date, shares of new common stock of Reorganized FENOC shall be issued to Reorganized FES.

c.　*Voting*: Holders of Interests in Class D8 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

40.　Class E1 – Other Secured Claims against FGMUC.

a.　*Classification*: Class E1 consists of Other Secured Claims against FGMUC.

b.　*Treatment*: Except to the extent that a Holder of an Allowed Claim in Class E1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class E1, each such Holder shall receive, at the option of FGMUC, either:

i.　payment in full in Cash;

ii.　delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii.　Reinstatement of such Claim; or

iv.　other treatment rendering such Claim Unimpaired.

c.　*Voting*: Class E1 is Unimpaired under the Plan.  Holders of Claims in Class E1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

41.　Class E2 – Other Priority Claims against FGMUC.

a.　*Classification*: Class E2 consists of Other Priority Claims against FGMUC.

b.　*Treatment*: Except to the extent that a Holder of an Allowed Claim in Class E2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class E2, each such Holder shall receive, at the option of FGMUC, either:

i.　payment in full in Cash; or

ii.　other treatment rendering such Claim Unimpaired.

c.　*Voting*: Class E2 is Unimpaired under the Plan.  Holders of Claims in Class E2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

42.　Class E3 – Mansfield Certificate Claims against FGMUC.

a.　*Classification*:  Class E3 consists of the Mansfield Certificate Claims against FGMUC.

56

b. *Allowance*:  The Mansfield Certificate Claims shall be allowed in the amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

c. *Treatment*:  Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim against FGMUC, each Holder of an Allowed Mansfield Certificate Claim against FGMUC shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New FES Common Stock subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of FGMUC Unsecured Distributable Value, subject to (i) the reallocation of the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FGMUC in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class E3.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Effective Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New FES Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FGMUC Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FGMUC in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class E3.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against FGMUC that received New FES Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d. *Voting*:  Class E3 is Impaired under the Plan.  Holders of Claims in Class E3 are entitled to vote to accept or reject the Plan.

43.  <u>Class E4 – FGMUC Single-Box Unsecured Claims</u>.

a. *Classification*:  Class E4 consists of FGMUC Single-Box Unsecured Claims.

b. *Treatment*:  Except to the extent that a Holder of an FGMUC Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of the FGMUC Single-Box Unsecured Claims, the Holders of FGMUC Single-Box Unsecured Claims shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to its Pro Rata share of (i) the FGMUC Unsecured Distributable Value, and (ii) the portion of the Reallocation Pool allocable to FGMUC.  The aggregate amount of value available for distribution

57

to Holders of Allowed FGMUC Single-Box Unsecured Claims set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class E4.

  c. *Voting*: Class E4 is Impaired under the Plan. Holders of Claims in Class E4 are entitled to vote to accept or reject the Plan.

44. <u>Class E5 – Mansfield TIA Claims against FGMUC</u>.

  a. *Classification*: Class E5 consists of the Mansfield TIA Claims against FGMUC.

  b. *Treatment*: Except to the extent that a Holder of the Mansfield TIA Claims against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of the Mansfield TIA Claims against FGMUC, the Holder of an Allowed Mansfield TIA Claim against FGMUC shall receive, on the Effective Date or as soon as reasonably practicable thereafter, cash equal to the Pro Rata share of the FGMUC Unsecured Distributable Value. The aggregate amount of value available for distribution to Holders of Allowed Mansfield TIA Claims against FGMUC shall be subject to the Distributable Value Adjustment Amount applicable to Class E5.

  c. *Voting*: Class E5 is Impaired under the Plan. Holders of Claims in Class E5 are entitled to vote to accept or reject the Plan.

45. <u>Class E6 – Convenience Claims against FGMUC</u>.

  a. *Classification*: Class E6 consists of all Convenience Claims against FGMUC.

  b. *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FGMUC, each Holder of an Allowed Convenience Claim against FGMUC that has properly elected to be treated as such on its Ballot shall receive, on the Effective Date or as soon as reasonably practicable thereafter, Cash in an amount equal to 18.0% of the Allowed Convenience Claim.

  c. *Voting*: Class E6 is Impaired under the Plan. Holders of Claims in Class E6 are entitled to vote to accept or reject the Plan.

46. <u>Class E7 – Inter-Debtor Claims against FGMUC</u>.

  a. *Classification*: Class E7 consists of prepetition Inter-Debtor Claims against FGMUC.

  b. *Allowance:* The prepetition Inter-Debtor Claims against FGMUC shall be Allowed in the amount of $367,534,565.

  c. *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against FGMUC shall receive their Pro Rata share of the FGMUC Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors

58

holding such prepetition Inter-Debtor Claims, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FGMUC against FGMUC by including the recovery on such prepetition Inter-Debtor Claims against FGMUC in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against FGMUC.

 d. *Voting*: Class E7 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FGMUC are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

47. <u>Class E8 – Interests in FGMUC</u>.

 a. *Classification*: Class E8 consists of Interests in FGMUC.

 b. *Treatment*: In the discretion of the Debtors, in consultation with the Consenting Creditors and the Committee, Reorganized FG shall continue to own all of the Interests in FGMUC or FGMUC shall be dissolved and all Interests in FGMUC shall be cancelled and released without any distribution on account of such Interests.

 c. *Voting*: Holders of Interests in Class E8 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

48. <u>Class F1 – Other Secured Claims against FE Aircraft</u>.

 a. *Classification*: Class F1 consists of Other Secured Claims against FE Aircraft.

 b. *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class F1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class F1, each such Holder shall receive, at the option of FE Aircraft, either:

  i. payment in full in Cash;

  ii. delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

  iii. Reinstatement of such Claim; or

  iv. other treatment rendering such Claim Unimpaired.

 c. *Voting*: Class F1 is Unimpaired under the Plan. Holders of Claims in Class F1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

49.    Class F2 – Other Priority Claims against FE Aircraft.

   a.    *Classification*: Class F2 consists of Other Priority Claims against FE Aircraft.

   b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class F2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class F2, each such Holder shall receive, at the option of FE Aircraft, either:

      i.    payment in full in Cash; or

      ii.    other treatment rendering such Claim Unimpaired.

   c.    *Voting*: Class F2 is Unimpaired under the Plan.  Holders of Claims in Class F2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

50.    Class F3 – General Unsecured Claims against FE Aircraft.

   a.    *Classification*: Class F3 consists of General Unsecured Claims against FE Aircraft.

   b.    *Treatment*:  To the extent there are any General Unsecured Claims Against FE Aircraft, except to the extent that a Holder of an Allowed General Unsecured Claim Against FE Aircraft agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each General Unsecured Claim Against FE Aircraft, each Holder of an Allowed General Unsecured Claim Against FE Aircraft shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the FE Aircraft Cash Distribution Pool.

   c.    *Voting*: Class F3 is Impaired under the Plan.  Holders of Claims in Class F3 are entitled to vote to accept or reject the Plan.

51.    Class F4 – Inter-Debtor Claims against FE Aircraft.

   a.    *Classification*: Class F4 consists of prepetition Inter-Debtor Claims against FE Aircraft.

   b.    *Treatment*:  Each Holder of an Allowed prepetition Inter-Debtor Claim against FE Aircraft if any, shall be treated *pari passu* with Unsecured Claims against FE Aircraft and will share in distributions from FE Aircraft.  In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against FE Aircraft, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FE Aircraft against FE Aircraft by including the recovery on such prepetition Inter-Debtor Claims against FE Aircraft in the calculation of the Unsecured Distributable Value

60

relating to the Debtor holding such prepetition Inter-Debtor Claims against FE Aircraft.

    c.    *Voting*: Class F4 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FE Aircraft are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

52.    <u>Class F5 – Interests in FE Aircraft</u>.

    a.    *Classification*: Class F5 consists of Interests in FE Aircraft.

    b.    *Treatment*: FE Aircraft shall be dissolved and Interests in FE Aircraft shall be cancelled and released without any distribution on account of such Interests.

    c.    *Voting*: Holders of Interests in Class F5 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

53.    <u>Class G1 – Other Secured Claims against Norton</u>.

    a.    *Classification*: Class G1 consists of Other Secured Claims against Norton.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class G1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class G1, each such Holder shall receive, at the option of Norton, either:

        i.    payment in full in Cash;

        ii.    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        iii.    Reinstatement of such Claim; or

        iv.    other treatment rendering such Claim Unimpaired.

    c.    *Voting*: Class G1 is Unimpaired under the Plan. Holders of Claims in Class G1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

54.    <u>Class G2 – Other Priority Claims against Norton</u>.

    a.    *Classification*: Class G2 consists of Other Priority Claims against Norton.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class G2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each

Allowed Claim in Class G2, each such Holder shall receive, at the option of Norton, either:

i.        payment in full in Cash; or

ii.       other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class G2 is Unimpaired under the Plan. Holders of Claims in Class G2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

55.    <u>Class G3 – General Unsecured Claims against Norton</u>.

a.    *Classification*: Class G3 consists of General Unsecured Claims against Norton.

b.    *Treatment*: To the extent there are any General Unsecured Claims Against Norton, except to the extent that a Holder of an Allowed General Unsecured Claim Against Norton agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each General Unsecured Claim Against Norton, each Holder of an Allowed General Unsecured Claim Against Norton shall receive, on the Effective Date or as soon as reasonably practicable thereafter, its Pro Rata share of the Norton Cash Distribution Pool.

c.    *Voting*: Class G3 is Impaired under the Plan. Holders of Claims in Class G3 are entitled to vote to accept or reject the Plan.

56.    <u>Class G4 – Inter-Debtor Claims against Norton</u>.

a.    *Classification*: Class G4 consists of prepetition Inter-Debtor Claims against Norton.

b.    *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against Norton, if any, shall be treated *pari passu* with General Unsecured Claims Norton and will share in distributions from Norton. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against Norton, the distributions on account of such prepetition Inter-Debtor Claims against Norton shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against Norton against Norton by including the recovery on such prepetition Inter-Debtor Claims against Norton in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against Norton.

c.    *Voting*: Class G4 is Impaired under the Plan. Notwithstanding such Impairment, holders of prepetition Inter-Debtor Claims against Norton are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

57.     Class G5 – Interests in Norton.

    a.      *Classification*: Class G5 consists of Interests in Norton.

    b.      *Treatment*:   Reorganized FG shall retain ownership of all of the Interests in Norton.

    c.      *Voting*: Holders of Interests in Class G5 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims.*

    Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.      *Elimination of Vacant Classes.*

    Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

    Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

F.      *Controversy Concerning Impairment.*

    If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

G.      *Equity Election Conditions.*

    As noted in Article III.B of the Plan and as disclosed on the Bankruptcy Court's public docket in the Notice of the Debtors' Entry into a Restructuring Support Agreement and of the Record Date for Equity Elections under the Debtors' Plan of Reorganization filed with the Bankruptcy Court on January 23, 2019 [Docket No. 1995], Holders of Claims in Classes A5, A6, B7, C6, C7, and D3 have an option on their ballots to accept or reject the Plan to elect to receive a distribution in the form of New FES Common Stock instead of a distribution in the form of Cash in satisfaction of their Claims if such Holder certifies on its ballot to accept or reject the Plan, or by such other method acceptable to the Debtors with the consent of the Requisite Supporting Parties (as defined in the Restructuring Support Agreement) and the Committee, that the Holder (i) was the beneficial holder of such Claims as of the applicable Equity Election Record Date and has not sold, transferred, or provided a participation in such Claims, or directly

or implicitly agreed to do so following the applicable Equity Election Record Date or (ii) is otherwise a party to the Restructuring Support Agreement and the beneficial holder of such Claims and such Claims were subject to the Restructuring Support Agreement as of the applicable Equity Election Record Date (the "Equity Election Conditions").

Accordingly, any Holder who is not a party to the Restructuring Support Agreement is not permitted to make any equity election applicable to its Claim if it sold such Claims after the Equity Election Record Date. Any Holder who purchased a Claim after the Equity Election Record Date is not permitted to make any equity election applicable to its Claim unless such Claim is subject to the Restructuring Support Agreement because the Holder would be unable to make the certification required by the Equity Election Conditions. For the avoidance of doubt, any Holder of a Claim that arises after the Equity Election Record Date (*e.g.*, a Claim arising from the Debtors' rejection of an executory contract that occurs after the Equity Election Record Date) shall be permitted to make an election to receive Cash or New FES Common Stock subject to satisfaction of each of the other Equity Election Conditions.

The Plan Administrator and Disbursing Agent are authorized to request from any Holder information supporting a Holder's certification that it has satisfied the Equity Election Conditions. If a Holder fails to provide such information prior to the Effective Date, then the Disbursement Agent may at its discretion make a distribution to such Holder on account of its Claim in the manner required by the Plan as if such Holder did not elect to receive New FES Common Stock.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Plan Settlement.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of those matters resolved pursuant to the Plan Settlement. The Plan Settlement constitutes a settlement of the potential litigation of issues including, among other things, the validity, enforceability and priority of various Inter-Debtor Claims, the allocation of value between and among the Debtors' Estates, including the allocation of the FE Settlement Value among the Debtors, and incorporates the Mansfield Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements contemplated herein and comprising the Plan Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the Plan, as it pertains to the settlements incorporated herein, shall be deemed non-severable from each other and from the remaining terms of the Plan. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final. As set forth herein, the Plan Settlement will be implemented as follows:

1.    FE Settlement Agreement.

The FE Non-Debtor Parties shall pay the Estates the FE Settlement Value in accordance with the terms of the FE Settlement Agreement and the FE Settlement Order. In exchange for the FE Non-Debtor Parties' contributions to the Chapter 11 Cases, including the FE Settlement Value, the FE Non-Debtor Parties shall be entitled to the Party Releases, the FE Non-Debtor Parties' Third Party Releases, the

Exculpations and the Injunctions set forth in the Plan, along with the other consideration provided to the FE Non-Debtor Parties under the FE Settlement Agreement.

On the Effective Date, in consideration for the Party Releases, the FE Non-Debtor Parties' Third Party Releases, the Exculpations and the Injunctions set forth in the FE Settlement Agreement and the Plan, along with the other consideration provided to the FE Non-Debtor Parties in the FE Settlement Agreement, the FE Non-Debtor Parties shall release any and all prepetition Claims against the Debtors (except for any Claims under the Tax Allocation Agreement on account of tax year 2018), all Employee Related Claims (as defined in the FE Settlement Agreement), except as expressly provided for in the FE Settlement Agreement, and certain postpetition claims as expressly provided in the FE Settlement Agreement. In addition, on the Effective Date, the FE Non-Debtor Parties will also waive and release the following Claims arising after the Petition Date: (i) any Claims under the FE/FES Revolver including, without limitation, any Claims for postpetition interest; (ii) any Claims related to the Rail Claim Settlement; (iii) any Claims held by AE Supply against FES in respect of the AE Supply/FES Note, including, without limitation, any Claims for postpetition interest; and (iv) any Claims from FE Corp.'s ownership interest in the Mansfield 2007 Trust F including, without limitation, any tax or other indemnity Claims arising from the rejection of the Mansfield Facility Documents. Because the FE Non-Debtor Parties are releasing any and all prepetition Claims against the Debtors, the FE Non-Debtor Parties shall not vote on the Plan. To the extent the FE Settlement Agreement is terminated, nothing contained in the Plan shall be deemed to waive or release any Claims held by the FE Non-Debtor Parties under any subsequent plan of reorganization or liquidation.

2.     <u>Allocation of FE Settlement Consideration Among the Estates</u>.

The FE Settlement Value contributed to the Estates as part of the FE Settlement Agreement will be paid to the Estates in accordance with the terms of the Plan, the FE Settlement Agreement, and the FE Settlement Order. The FE Settlement Direct Consideration will be allocated among the Debtors as follows: (i) FES – 57.5%; (ii) FG – 23.4%; (iii) NG – 15.1%; (iv) FENOC – 2.7%; and (v) FGMUC – 1.3%.

3.     <u>Allocation of FE/FES Revolver Proceeds</u>

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, the Plan shall constitute a good faith settlement of any and all potential or actual Claims or Causes of Action related to the allocation of the proceeds from the FE/FES Revolver. Such proceeds shall be allocated as follows: (i) FES -- $475,000,000; and (ii) FG -- $25,000,000.

4.     <u>Allocation of Proceeds from Sales of the Bay Shore Power Plant, West Lorain Power Plant and the RE Burger Power Plant</u>.

On the Effective Date, the FG Mortgage Indenture Trustee is authorized and directed to transfer to the Reorganized Debtors (i) FG's allocable share of the proceeds from the sale of the Bay Shore Power Plant, (ii) the proceeds from the sale of the West Lorain Power Plant, if any, allocable to assets covered by the FG Mortgage, (iii) proceeds from the RE Burger Power Plant sale, and (iv) any additional proceeds from the sale of other collateral securing the Secured FG PCN Claims.

5.     <u>Allocation of Administrative Expense Claims and Distributable Value Adjustment</u>.

For the purposes of the Plan Settlement, the Allocated Administrative Expenses were allocated among the Debtor entities on a ratable basis based on the estimated amount of Unsecured Non-Priority

Claims against each Debtor, taking into account any guarantee claims against such Debtor; *provided* that to the extent an Estimated Administrative Expense was directly attributable to a particular Debtor such claim was allocated to that particular Debtor. Notwithstanding the foregoing, to the extent aggregate Allowed amount of Administrative Claims, Priority Claims, Other Priority Claims and Other Secured Claims differ from the Estimated Administrative Expenses, such difference, whether positive or negative, shall be allocated among the Classes of General Unsecured Claims and Unsecured Bondholder Claims (other than Inter-Debtor Claims and Convenience Claims) Pro Rata based on their respective Distributable Value Splits. Notwithstanding the foregoing, to the extent there are Allowed Administrative Claims arising from the PPA Appeal Proceeding Contracts, any such Claims shall be directly allocated to FES.

For the purposes of the Plan Settlement, certain components of Distributable Value were fixed. To the extent the sum of (i) the aggregate actual amount of accounts receivable for FENOC, FES, FG, NG and FGMUC as of the Effective Date and (ii) the actual amount of Cash in the FES bank accounts, other than the proceeds from the FE/FES Revolver, as of the Effective Date, differs from the sum of (x) the projected aggregate amount of the accounts receivable for FENOC, FES, FG, NG, and FGMUC as of the Effective Date used for the purposes of the Plan Settlement and (y) the projected amount of Cash in the FES bank accounts, other than the proceeds from the FE/FES Revolver, as of the Effective Date used for purposes of the Plan Settlement, such difference, whether positive or negative, shall be allocated among the Classes of General Unsecured Claims and Unsecured Bondholder Claims (other than Inter-Debtor Claims and Convenience Claims) Pro Rata based on their respective Distributable Value Splits.

Pursuant to the Plan Settlement, the Plan establishes a Distributable Value for each Debtor entity and fixes the Distributable Value Splits in accordance with such value after taking into account the various reallocations embodied in the Plan Settlement. The reasonableness of the Distributable Value for each Debtor in accordance with the Plan Settlement is supported by the valuation analysis conducted by Lazard Frères & Co., LLC ("Lazard"), the Debtors' investment banker, and attached to the Disclosure Statement as Exhibit E.

Prior to the Effective Date, the Debtors will calculate, in accordance with the terms and conditions of this Plan, (i) the final Distributable Value Splits applicable to the Classes of General Unsecured Claims and Unsecured Bondholder Claims (other than Inter-Debtor Claims and Convenience Claims), (ii) the updated estimated Allowed amount of Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims, and (iii) the allocation of the Distributable Value Adjustment to such Classes. Prior to the Effective Date, the Debtors shall consult with the advisors to the Committee, the Ad Hoc Noteholders Group, the Mansfield Certificateholders Group and the FES Creditor Group with respect to such calculations. Additionally, prior to the Effective Date, the Debtors, with the reasonable consent of the Requisite Supporting Parties and the Committee shall determine an amount of cash, if any, necessary to reserve for Administrative Claims that have not been Allowed and remain disputed as of the Effective Date.

6. Inter-Debtor Claims.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, the Plan shall constitute a good faith settlement of any and all potential or actual objections to the validity or allowance of the Inter-Debtor Claims. Entry of the Confirmation Order shall constitute approval of the Allowed amount of the Inter-Debtor Claims, as follows: (i) the prepetition Inter-Debtor Claims of FG against FES shall be Allowed as unsecured claims in the aggregate amount of $1,488,190,630; (ii) the prepetition Inter-Debtor Claims of NG against FES shall be Allowed as Unsecured Claims in the aggregate amount of $1,670,896,976; (iii) the prepetition Inter-Debtor Claims of FENOC against FES shall be Allowed as

Unsecured Claims in the aggregate amount of $28,000,000; (iv) the postpetition Inter-Debtor Claims of FG against FES shall be Allowed as superpriority Administrative Claims in an amount equal to $120,291,389; (iv) the postpetition Inter-Debtor Claims of NG against FES shall be Allowed as superpriority Administrative Claims in an amount equal to $238,431,879; (v) the prepetition Inter-Debtor Claims of FGMUC against FG shall be Allowed as Unsecured Claims in the aggregate amount of $901,881,812; (vi) the postpetition Inter-Debtor Claims of FGMUC against FG shall be disallowed in full; (vii) the postpetition Inter-Debtor Claims of FENOC against FES shall be Allowed as super-priority Administrative Claims in the amount of $2,000,000; (viii) the postpetition Inter-Debtor Claims of FENOC against NG shall be allowed as super-priority Administrative Claims in the amount of $69,929,041; and (ix) all other Inter-Debtor Claims shall be treated as if Allowed as set forth in the Plan.

In connection with the resolution of the FENOC postpetition Inter-Debtor Claim against FES, $12,500,000 of the aggregate value otherwise available for distribution to Holders of Allowed Unsecured Bondholder Claims shall be reallocated to the Holders of Allowed FES Single-Box Unsecured Claims and Allowed FENOC-FES Unsecured Claims.

Notwithstanding anything to the contrary contained in the Plan, including but not limited to the approval of the Allowed amounts of the Inter-Debtor Claims, in lieu of Cash payment or other distribution to the Debtors holding such Inter-Debtor Claims, the value of distributions on account of such Inter-Debtor Claims may be made to the Holders of Allowed Unsecured Claims against the Debtor holding such Inter-Debtor Claims in accordance with the terms and conditions of this Plan.

> 7. Settlement of Valuation of the Debtors' Estates and Allocation of Value Among the Debtors' Creditors.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, the Plan shall constitute a good faith settlement of any and all potential claims, disputes, causes of action or objections with respect to the allocation of value of the Debtors' Estates (including the value of the Debtors' generation assets and other businesses) between and among the Debtors and their Creditors. In addition to the Plan Settlement of potential or actual objections to the validity or allowance of the Inter-Debtor Claims, and as settlement for, among other things, arguments and assertions that the Debtors' Estates should be substantively consolidated, the Reallocation Pool consisting of $45,750,000 of the aggregate value otherwise available for distribution to Holders of Allowed Unsecured Bondholder Claims shall be reallocated to the Holders of Allowed Single-Box Unsecured Claims against the various Debtors ratably based on the allocation of FE Settlement Value between and among the Debtors; *provided, however*, that the NG Reallocation shall in turn be re-allocated Pro Rata to Holders of Allowed FES Single-Box Unsecured Claims. For the avoidance of doubt, prepetition Inter-Debtor Claims shall not receive a recovery from the Reallocation Pool or any portion of the NG Reallocation Pool.

B. *Restructuring Transactions.*

> 1. Restructuring Transactions, Generally.

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will effectuate the Restructuring Transactions, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided herein. The actions to implement the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements, or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms

of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan, in each case in form and substance reasonably acceptable to the Requisite Supporting Parties, and except as otherwise specifically provided herein, the Committee.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

2.  Implementation of FE Settlement Agreement.

On the Effective Date, the FE Settlement Agreement shall be implemented in accordance with the terms and conditions of the FE Settlement Agreement and the FE Settlement Order, without waiving any rights of any of the Debtors, the Reorganized Debtors, or the FE Non-Debtor Parties, as applicable, under the FE Settlement Agreement or FE Settlement Order. The Debtors shall be authorized to, with the reasonable consent of the Requisite Supporting Parties and the Committee, enter into one or more transactions to monetize the New FE Notes on or as soon as practicable after the Effective Date. The allocation of the FE Settlement Value and all distributions of FE Settlement Value under the Plan are integral parts of the Plan Settlement and the settlements contained therein, including, but not limited to the settlement of Inter-Debtor Claims, the settlement of the valuation of the Debtors' Estates and the settlement of the allocation of value as between the Debtors' Creditors. Therefore, the FE Settlement Agreement and the terms thereof that are reflected in the Plan are non-severable elements of the Plan and necessary conditions to the Confirmation and Consummation of the Plan.

a.  *Manner of Debtors' Separation from FE Non-Debtor Parties.*

The Debtors shall be separated from the FE Non-Debtor Parties as follows:

1.  On the Effective Date, the existing FE Corp. interests in FENOC shall be cancelled and, subject to Article IV.F of the Plan, Reorganized FENOC shall contribute all the new common stock of Reorganized FENOC to Reorganized FES; and

2.  On the Effective Date, the existing FE Corp. Interests in Reorganized FES shall be cancelled and, subject to Article IV.F of the Plan, Reorganized FES shall issue the New FES Common Stock.

b.  *Tax Matters Agreement.*

On the Effective Date, in consideration for the Party Releases, the FE Non-Debtor Parties' Third Party Releases, the Exculpations and the Injunctions set forth in the FE Settlement Agreement and the Plan, along with the other consideration provided to the FE Non-Debtor Parties under the FE Settlement Agreement, the Reorganized Debtors and the FE Non-Debtor Parties shall enter into the Tax Matters Agreement. After the Effective Date, the Tax Matters Agreement shall not be amended or modified in

68

any manner without the written consent of the Reorganized Debtors. The Tax Matters Agreement shall provide for the following: (i) the FE Non-Debtor Parties will, with the Debtors' or Reorganized Debtors', as applicable, review and consultation (beginning for tax year 2018), timely prepare in the ordinary course of business: (a) the U.S. federal income tax returns reflecting the Debtors' membership in the FE Consolidated Tax Group, and (b) any and all state and local income or other tax returns (including, but not limited to, income, franchise, use, property tax returns and other similar returns), in each case, for any tax period ending on or before the Effective Date; *provided, however*, that FE Corp. shall not be required to take any action, or omit to take any action, that would result in an adverse effect on any of the FE Non-Debtor Parties; (ii) FE Corp. shall not take or cause to be taken the Worthless Stock Deduction with effect prior to the Effective Date; (iii) the Debtors and the FE Non-Debtor Parties shall cooperate in developing a strategy for the Debtors to exit from chapter 11 that minimizes adverse tax consequences to the Reorganized Debtors and their stakeholders, *provided, however*, that FE Corp. shall not be required to take any action, or omit to take any action, that would result in an adverse effect on any of the FE Non-Debtor Parties; (iv) FE Corp. shall cooperate with reasonable tax diligence inquiries from the Debtors, the Committee, and the Consenting Creditors regarding historical intercompany tax issues and tax consequences of different chapter 11 exit structures, including in connection with any sale of the Debtors' assets; and (v) the FE Non Debtor Parties and the Debtors or Reorganized Debtors, as applicable, shall agree to reasonably cooperate regarding any audit or tax.

        3.      <u>Implementation of Mansfield Settlement</u>.

        Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the Mansfield Settlement, on the terms set forth herein. The Mansfield Settlement constitutes a good faith compromise and settlement of the Mansfield Certificate Claims held by the Mansfield Indenture Trustee, and of the potential objections to the amount, priority and availability or applicability of any guarantees related to such Claims. The Plan shall implement the terms of the Mansfield Settlement, as follows: (i) allowance of the Mansfield Certificate Claims in the amount of $786,763,400.00, (ii) the allowance of the Mansfield Certificate Claims as Unsecured Claims against each of FGMUC, FG, NG and FES in the aforementioned amount, (iii) the treatment as unencumbered property of the Debtors' estates of (a) the undivided interest in 93.825% of Mansfield Unit 1 that is the subject to the leveraged sale and leaseback transaction and (b) any and all insurance proceeds recovered on account of Mansfield Unit 1 and any additional value attributable to Mansfield Unit 1 to which the Mansfield Indenture Trustee might otherwise be entitled; (iv) the transfer of a Pro Rata share of any recovery distributed to the Mansfield Indenture Trustee, on behalf of the Holders of Mansfield Certificate Claims, on account of the Mansfield Certificate Claims against FGMUC to the Indenture Trustees for the PCNs and the FES Notes Indenture Trustee, based on the proportion that the Allowed amount of each of the Mansfield Certificate Claims, on the one hand, and Unsecured PCN Claims and FES Notes Claims, on the other hand, in each case against FES, bear to the aggregate Allowed amount of Mansfield Certificate Claims, Unsecured PCN Claims and FES Notes Claims at FES, (v) the transfer to NG of any insurance proceeds recovered on account of Mansfield Unit 1 and any additional value attributable to Mansfield Unit 1, (vi) the Confirmation Order shall serve as an order authorizing the rejection, *nunc pro tunc* to the Petition Date, of the Mansfield Facility Documents; (vii) $10,000,000 of the aggregate Unsecured Distributable Value from all Debtors otherwise available for distribution to the Holders of the Mansfield Certificate Claims shall be reallocated to the Holders of the Unsecured PCN/FES Notes Claims and (viii) the release and discharge of all other prepetition Mansfield Certificate Claims held by the Mansfield Indenture Trustee and any Holder of Mansfield Certificate Claims. The Mansfield Settlement further contemplates that ownership of Mansfield Unit 1 will be transferred to FG and authorizes the parties to the Mansfield Settlement to take any actions necessary in furtherance of that transfer, including any necessary regulatory filings or filings with FERC. The Mansfield Indenture Trustee is authorized to take any actions reasonably necessary in order to facilitate the Mansfield

69

Settlement, and the Confirmation Order shall so provide. On the Effective Date, the Mansfield Facility Documents shall be deemed rejected as of the Petition Date.

4.    Issuance and Distribution of New FES Common Stock.

On the Effective Date, or as soon as reasonably practicable thereafter, the New FES Common Stock shall be distributed in accordance with the Plan. The New FES Common Stock shall be subject to dilution by any New FES Common Stock issued pursuant to the Management Incentive Plan. The issuance of the New FES Common Stock by FES, including options, stock appreciation rights, or other equity awards, if any, contemplated by the Management Incentive Plan, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

The New FES Common Stock will be issued in global certificate form only and registered to DTC, which interests in the certificate being held through DTC participants, for so long as the shares of New FES Common Stock are eligible to be held through DTC. Holders must follow specified procedures to designate a direct or indirect DTC participant to receive their shares of New FES Common Stock.

All of the New FES Common Stock issued pursuant to the Plan, including the New FES Common Stock issued pursuant to section 1145 of the Bankruptcy Code and the New FES Common Stock issued pursuant to other exemptions from registration under the Securities Act, shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of New FES Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, Reorganized FES and each of the other Reorganized Debtors shall be private companies. As such, upon the Effective Date, (i) the New FES Common Stock shall not be registered under the Securities Act or the Securities Exchange Act, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors will be a reporting company under the Securities Exchange Act. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New FES Common Stock shall be subject to certain transfer and other restrictions pursuant to the New Organizational Documents and/or the Reorganized Debtor Stockholders' Agreement. Any Holder of New FES Common Stock who does not execute the Reorganized Debtors' Stockholders' Agreement will be automatically deemed to have accepted the terms of such agreement and to be a party to such agreement without further action.

5.    Effective Date Cash Distribution.

The Requisite Supporting Parties and the Debtors, in consultation with the Committee, may agree to distribute Cash, in addition to New FES Common Stock, to those creditors who will receive distributions of New FES Common Stock under the Plan, in which case such Cash shall be distributed ratably based on such creditors' holdings of the New FES Common Stock. For the avoidance of doubt, such Cash distribution shall be funded solely by Cash that would otherwise be transferred to the Reorganized Debtors on the Effective Date and will not increase the value of recoveries to those creditors receiving such Cash distributions.

6.    Unsecured Bondholder Cash Pool.

Holders of Allowed Unsecured Bondholder Claims shall have the option to elect to receive, in lieu of New FES Common Stock, their Pro Rata share (based on the Allowed principal amount of such

Claims) of Cash equal to the aggregate value of New FES Common Stock distributed to Holders of Allowed General Unsecured Claims who have an election to receive New FES Common Stock and make such an election; *provided* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of Unsecured Distributable Value in accordance with the Plan, Electing Bondholders shall receive the remainder of their distribution in New FES Common Stock in accordance with the Plan; *provided further*, that to the extent there is surplus Cash in the Unsecured Bondholder Cash Pool after taking into account distributions to the Electing Bondholders on account of their Unsecured Bondholder Claims, such Cash shall revert to the Reorganized Debtors. For the avoidance of doubt, the maximum amount of Cash contributed to the Unsecured Bondholder Cash Pool shall be the amount of Cash that is equal to the aggregate value of New FES Common Stock distributed to Holders of Allowed General Unsecured Claims who have made an election to receive New FES Common Stock.

In order to elect to receive their Pro Rata share of the Unsecured Bondholder Cash Pool, an Electing Bondholder will be required to submit a subscription form to their broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee, or, in the event an Electing Bondholder holds their Unsecured Bondholder Claims directly on the books of the transfer agent in their own name, to Prime Clerk no later than thirty (30) days prior to the Effective Date. Following an election to participate in the Unsecured Bondholder Cash Pool, the related PCNs, FES Notes, or Mansfield Certificates held through DTC will be frozen from trading.

7. <u>Dissolution and Liquidation of Certain Debtor Entities</u>.

FE Aircraft and such other Debtors as designated by the Debtors, shall be dissolved and liquidated in accordance with the Plan and applicable law without any further court or corporate action, including the filing of any documents with the Secretary of State for any state in which any such entity is incorporated or any other jurisdiction, *provided, however*, that the Debtors or Reorganized Debtors, as applicable, shall be permitted to make such filings as they deem reasonable or necessary in their sole discretion. For the avoidance of doubt, none of (i) the Debtors, (ii) the Reorganized Debtors, (iii) the FE Non-Debtor Parties, (iv) the Consenting Creditors, (v) the Committee or its members solely in their capacities as such, or (vi) with respect to each of the foregoing Entities in clauses (i) through (v), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers (including all Independent Directors and Managers), officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agent, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, shall have or incur any liability whatsoever in connection with or as a result of the dissolution or liquidation of any entity, in accordance with the terms of this Article IV.B.7.

C. *Sources of Consideration for Plan Distributions.*

Distributions under the Plan shall be funded with, as applicable: (i) the New FES Common Stock, (ii) Cash on hand at the Debtors, and (iii) the FE Settlement Value contributed to the Debtors under the FE Settlement Agreement and the FE Settlement Order. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance of the New FES Common Stock in connection with the Plan will be exempt from SEC registration to the fullest extent permitted by law.

1.     Cash on Hand at the Debtors.

The Debtors shall use Cash on hand at the Debtors to fund Cash distributions to certain Holders of Claims against the Debtors in accordance with the Plan.

2.     New FES Common Stock.

Reorganized FES shall be authorized to issue up to [__] shares of New FES Common Stock, subject to dilution by the Management Incentive Plan.  Reorganized FES shall issue all securities, instruments, certificates, and other documents required to be issued for the New FES Common Stock in respect of Reorganized FES or its subsidiaries.  All of the shares of New FES Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

3.     FE Settlement Value.

The FE Settlement Value received by the Debtors pursuant to the FE Settlement Agreement and the FE Settlement Order, including the FE Settlement Cash and the proceeds of the New FE Notes may be used to fund Cash distributions to certain Holders of Allowed Claims and Allowed Interests against the Debtors in accordance with the Plan.

D.     *Corporate Existence.*

Except as otherwise provided in the Plan, including as set forth in Article IV.B.7, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates of incorporation and by-laws (or other formation documents) in effect before the Effective Date, except to the extent such certificates of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

E.     *Vesting of Assets in Reorganized Debtors.*

Except as otherwise provided in the Plan, and subject to any transfer of Assets of FES and/or FENOC as described in Article IV.F, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, Interests, or other encumbrances. Except as otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.     *Transfer of FES and/or FENOC Assets to New Entities.*

At the election of the Debtors and the Requisite Supporting Parties, in consultation with the Committee, on the Effective Date, FES and/or FENOC may transfer all of their Assets to newly created entities, including the transfer by FES of its Assets to New FES or such other new entity to be formed, or a combination thereof.

FES and/or FENOC and such newly created entities, shall continue to exist as separate legal Entities on and after the Effective Date, having all rights and powers under applicable law. Immediately after consummation of the transfer of Assets to such newly created entities, (i) the Plan Administrator will serve as the sole director and officer of FES and/or FENOC, as applicable, and (ii) FES and/or FENOC, as applicable will change its name in a manner acceptable to the Debtors and the Requisite Supporting Parties, in consultation with the Committee.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, NEITHER NEW FES OR ANY OTHER NEW ENTITY TO BE FORMED NOR ANY OTHER REORGANIZED DEBTOR SHALL HAVE OR BE CONSTRUED TO HAVE OR MAINTAIN, ANY LIABILITY, CLAIMS, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY, CLAIM OR OBLIGATION ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO FES AND/OR FENOC) AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS SHALL ATTACH TO NEW FES OR ANY OTHER NEW ENTITY TO BE FORMED OR THE OTHER REORGANIZED DEBTORS.

G.    *Cancellation of Existing Securities and Agreements.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or Plan Supplement, on the Effective Date: (i) the obligations of the Debtors under the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, contract, agreement, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such indentures, certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; *provided, however* that the Indentures evidencing indebtedness or obligations not specifically Reinstated pursuant to the Plan shall continue in effect solely for the purposes of (a) allowing the Holders of Unsecured Bondholder Claims to receive distributions on account of their Claims as provided in the Plan, (b) allowing the Indenture Trustees, as applicable, to make distributions to be made on account of the Unsecured Bondholder Claims, (c) preserving the Indenture Trustee's rights to compensation and indemnity under each of the applicable Indentures as against any money or property distributed or allocable to Holders of Unsecured Bondholder Claims, including the Indenture Trustee's rights to maintain, enforce, and exercise their respective charging liens against such money or property, (d) permitting the Indenture Trustees, as applicable, to enforce any right or obligation owed to them under the Plan, and (e) permitting the Indenture Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the Indentures; (ii) the FE/FES Revolver shall be cancelled as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (iii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, indentures, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. For the avoidance of doubt, each of the Indenture Trustees shall be entitled to assert its respective charging liens arising under and in accordance with the applicable Indenture and any ancillary document, instrument, or agreement to obtain payment of its fees and expenses. On and after the

73

Effective Date, all duties and responsibilities of each Indenture Trustee under the applicable Indenture shall be fully discharged except to the extent required in order to effectuate the Plan, including the continued obligations of the Secured PCN Indenture Trustees with respect to the Secured FG PCN Reinstated Claims and the Secured NG PCN Claims that will be Reinstated pursuant to the Plan. Subsequent to the performance by each Indenture Trustee of its obligations pursuant to the Plan and the Confirmation Order, such Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the applicable Indenture.

H.    *Corporate Action.*

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (i) implementation of the Restructuring Transactions; (ii) selection of the directors and officers for the Reorganized Debtors; (iii) issuance and distribution of the New FES Common Stock; and (iv) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Bankruptcy Court, the Debtors, the Reorganized Debtors, or their respective security holders, directors, managers, or officers.  On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, and instruments, and take such actions, contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, including the issuance of the New FES Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing, and all such documents shall be deemed ratified.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.    *FERC Approvals.*

On the Effective Date, the FERC-Jurisdictional Debtors, and those Consenting Creditors who are party to the relevant Restructuring Transactions which require such authorization, shall have received FPA 203 Authorization for the Restructuring Transactions.  The FERC-Jurisdictional Debtors, and those Consenting Creditors who are party to the relevant Restructuring Transactions, shall cooperate to submit one or more application(s) requesting such FPA 203 Authorization from FERC at least 120 days prior to the Effective Date.  FPA 203 Authorization shall be requested for, at a minimum, separation of the FERC-Jurisdictional Debtors from the FE Non-Debtor Parties, the transfer of ownership of the Mansfield Facility to FG, and the reorganization of FES into Reorganized FES.

J.    *New Organizational Documents.*

The New Organizational Documents shall be consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties.

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective

Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state of incorporation and its respective New Organizational Documents.

K.    *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors or managers of the applicable Debtors shall expire, and the New Boards of directors or managers and the officers of each of the Reorganized Debtors shall be appointed in accordance with the Plan and the respective New Organizational Documents.  The New Board shall consist of no fewer than seven (7) members, who shall initially consist of: (i) one (1) member who shall be the chief executive officer or Reorganized FES; (ii) Mr. John Kiani; (iii) two (2) members designated by Nuveen Asset management, LLC on behalf of the Nuveen noteholders; *provided*, that one (1) such member (a) shall be independent of any stockholder with nomination rights, including Nuveen Asset Management, LLC, and (b) shall be reasonably acceptable to the Mansfield RSA Majority (as defined in the Restructuring Support Agreement) subject to the reasonable consent of the Committee; and (iv) one (1) member designated by Avenue Capital Management II L.P.; (v) one (1) member who shall serve as executive chairman of the New Board designated jointly by the Ad Hoc Noteholder Group and the Mansfield RSA Majority (as defined in the Restructuring Support Agreement) subject to the reasonable consent of the Committee; and (vi) one (1) member designated jointly by the Ad Hoc Noteholder Group, the Mansfield RSA Majority (as defined in the Restructuring Support Agreement), and the Committee, who shall be independent of any stockholder with nomination rights, and shall be an individual with relevant industry or regulatory experience, *provided, however*, that the requirement of relevant industry or regulatory experience may be waived at the discretion of, and jointly by, the Ad Hoc Noteholder Group, the Mansfield RSA Majority, and the Committee.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors.  To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.

L.    *Section 1146 Exemption.*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including without limitation (i) the Restructuring Transactions; (ii) the issuance of the New FES Common Stock; (iii) the assignment or surrender of any lease or sublease; and (iv) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage recording tax, or other similar tax, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

M.    *Director, Officer, Manager, and Employee Liability Insurance.*

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, will obtain sufficient liability insurance policy coverage for the benefit of the Debtors' respective current and former directors, managers (including all Independent Directors and Managers), officers, and employees on

terms no less favorable to the directors, managers, officers, and employees than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement. After the Effective Date, none of the Debtors or Reorganized Debtors shall terminate or otherwise reduce the coverage under any director, officer, manager, and employee insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, managers (including all Independent Directors and Managers), and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

N.      *Management Incentive Plan.*

Upon the Effective Date, the New FES Board shall adopt the Management Incentive Plan providing for the issuance of New FES Common Stock, which Management Incentive Plan shall not authorize the issuance of in excess of 7.5% of the New FES Common Stock as of the Effective Date (on a fully diluted basis). The Management Incentive Plan shall provide for distribution of the Incentive Securities. Other terms of the Management Incentive Plan will include vesting, apportionment, forfeiture and granting of the Incentive Shares. The terms of any Management Incentive Plan shall be disclosed in the Plan Supplement (or left to the determination by the New FES Board following the Effective Date) and shall be reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties to the extent disclosed in the Plan Supplement.

O.      *Employee Obligations and Management Employment Contracts.*

The Debtors' Incentive and Retention Plans shall be deemed to be assumed by the Reorganized Debtors. On the Effective Date, the Reorganized Debtors shall enter into the New Management Employment Contracts.

P.      *Transition Working Group Management Agreement.*

The Debtors shall enter into the Transition Working Group Management Agreement which shall provide for the terms of services provided by the members of the Transition Working Group who are not employees of the Debtors and for compensation and reimbursement of expenses for such members. The Transition Working Group Management Agreement shall be filed as part of the Plan Supplement and shall become effective on the Confirmation Date.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII, except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action belonging to the Debtors' Estates, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the applicable Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; (ii) the Causes of Action released by the Debtors pursuant to the FE Settlement Agreement; and (iii) the Causes of Action specifically retained by the Debtors' Estates that are subject to the authority of the Plan Administrator.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as an indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled herein or in a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action that are vested with the Reorganized Debtors, but subject to Article VIII of the Plan notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. Except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors in accordance with section 1123(b)(3) of the Bankruptcy Code. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action that is vested with the Reorganized Debtors and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R. *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors shall pay on the Effective Date any reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by professionals and the Mansfield Indenture Trustee payable under the *Order (i) Authorizing Debtors to Assume (a) the Process Support Agreement and (b) the Standstill Agreement and (ii) Granting Related Relief* [Docket No. 509] and pursuant to the Restructuring Support Agreement, including, for the avoidance of doubt, payment of any transaction completion fees to GLC Advisors & Co. as financial advisor to the Ad Hoc Noteholders Group, Guggenheim Securities LLC as financial advisor to the Mansfield Certificateholders Group, and Houlihan Lokey Capital, Inc., as financial advisor to the FES Creditor Group. The Reorganized Debtors shall pay the reasonable and documented fees of the Indenture Trustees and their counsel incurred in connection with the Chapter 11 Cases. The Reorganized Debtors shall indemnify the Indenture Trustees for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan, and any disputes arising in connection therewith.

All amounts distributed and paid pursuant to this Article IV.R shall not be subject to disgorgement, setoff, recoupment, reduction, or reallocation of any kind.

S. *Plan Administrator.*

1. <u>Appointment</u>.

The Plan Administrator shall serve as Plan Administrator for each of the Debtors pursuant to the terms of the Plan Administrator Agreement.

2.      <u>Authority</u>.

Subject to Article IV.S of the Plan and the terms of the Plan Administrator Agreement, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

a.      except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors subject to Bankruptcy Court approval; *provided, however*, that where the Debtors have authorization to compromise or settle any Claims against the Debtors under a Final Order including the Confirmation Order, the Plan Administrator shall be authorized to compromise or settle such Claims after the Effective Date, in accordance with and subject to such Final Order and *provided further, however* that the settlement of any Allowed General Unsecured Claim in excess of $10,000,000 or any Administrative Claim or Priority Tax Claim or Other Priority Claim in excess of $1,000,000, shall require notice and an order of the Bankruptcy Court;

b.      make Distributions to Holders of Allowed Claims in accordance with the Plan;

c.      prosecute Claims and Causes of Action on behalf of the Debtors, and to elect not to pursue any Claims or Causes of Action and whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Claims or Causes of Action, as set forth in the Plan Administrator Agreement. A list of the Causes of Action to be retained by the Debtors and turned over the Plan Administrator shall be set forth in the Plan Supplement. Recoveries on such Causes of Action shall be (i) in the case of Holders of Allowed Claims against the applicable Debtor or Debtors that own such Causes of Action that received their distribution in Cash, distributed to such Holders on a Pro Rata basis in accordance with such Cash recoveries; and (ii) in the case of Holders of Allowed Claims against the applicable Debtor or Debtors that own such Causes of Action that received their distribution under the Plan (or any portion thereof) in the form of New FES Common Stock distributed in Cash to the Reorganized Debtors;

d.      make payments to existing Professionals who will continue to perform in their current capacities;

e.      retain professionals to assist in performing its duties under the Plan;

f.      incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; and

g.      perform other duties and functions that are consistent with the implementation of the Plan and this provision.

3.    Indemnification of Plan Administrator.

Subject to the terms of the Plan Administrator Agreement, each of the Debtors shall indemnify and hold harmless the Plan Administrator for any losses incurred in execution of its duties as the Plan Administrator, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct or criminal conduct.

**ARTICLE V.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases of the Debtors, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed to be Assumed Executory Contracts or Unexpired Leases, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (i) previously were assumed or rejected by the Debtors; (ii) are identified on the list of Rejected Executory Contracts and Unexpired Leases filed with the Plan Supplement; (iii) are the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Effective Date; or (iv) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is on or after the Effective Date; *provided, however* that to the extent an Executory Contract or Unexpired Lease is among one or more Debtors and one or more FE Non-Debtor Parties, such Executory Contract or Unexpired Lease is deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease (a) has been previously assumed by the Debtors or (b) is identified on the list of Assumed Executory Contracts or Unexpired Leases.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and, to the extent applicable, assignments of the Executory Contracts and Unexpired Leases, and the rejection of the Executory Contracts or Unexpired Leases listed on the list of Rejected Executory Contracts and Unexpired Leases filed with the Plan Supplement pursuant to sections 365(a) and 1123 of the Bankruptcy Code, in each case effective as of the Effective Date.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable law.  The Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the list of Assumed Executory Contracts and Unexpired Leases and the schedules of Executory Contracts and Unexpired Leases with respect to the Debtors or Reorganized Debtors, as applicable, at any time through and including 45 days after the Effective Date, without the incurrence of any penalty or changing the priority or security of any Claims as a result of such treatment change.  For the avoidance of doubt, nothing in this paragraph shall be deemed to apply to any collective bargaining agreement.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed and served upon the Debtors or Reorganized Debtors, as applicable, within 30 days after the later of: (i) notice of entry of an order of the Bankruptcy

18-50757-amk    Doc 2120    FILED 02/11/19    ENTERED 02/11/19 23:53:02    Page 84 of 113

Court (including the Confirmation Order) approving such rejection; and (ii) the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed and served within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Debtor and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan. In no event shall any counterparty to a Rejected Executory Contract or Unexpired Lease be permitted to exercise any non-monetary contractual remedies under such Executory Contract or Unexpired Lease against the Debtors, the Reorganized Debtors, their Estates or their respective properties. All such remedies shall, as of the Effective Date, be permanently enjoined. For the avoidance of doubt, nothing in this paragraph shall be deemed to apply to any collective bargaining agreement.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least 17 days before the Confirmation Hearing, the Debtors will provide for notices of proposed assumption and propose cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount. If the Bankruptcy Court determines that the cure amount for any Executory Contract or Unexpired Lease is greater than the amount set forth in the notice sent by the Debtors, the Debtors may add such Executory Contract or Unexpired Lease to the list of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. **Upon the occurrence of the Effective Date and the payment by the Debtors of any cure amount, any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the Executory Contract or Unexpired Lease counterparty or counterparties to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

E.    *Indemnification Obligations.*

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation of any Debtor shall be assumed by the applicable Reorganized Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.  Each such Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors and Reorganized Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers (including all Independent Directors and Managers), employees, and other professionals of the Debtors, as applicable, in their capacities as such.

Notwithstanding the foregoing, nothing shall impair the ability of the Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for acts or omissions arising after the Effective Date.

F.    *Collective Bargaining Agreement.*

The Debtors are unable to assume their collective bargaining agreements as currently constituted because, among other things, the collective bargaining agreements require the Debtors to provide benefits to their employees under health care, severance, welfare, incentive compensation, and retirement plans sponsored by FE Corp.  As of the Effective Date, the Debtors will no longer be able to offer such benefits to their employees under these FE Corp. plans.  Prior to the Effective Date and once decisions have been made as to the health care, severance, welfare, incentive compensation and retirement plans that the Reorganized Debtors will offer their employees as of the Effective Date, the Debtors will negotiate with the unions that are parties to collective bargaining agreements with the Debtors regarding modifications necessary for the Debtors' post-Effective Date operations, including (i) to incorporate the changes to the health care, severance, welfare, incentive compensation, and retirement plans that the Reorganized Debtors will offer their employees as of the Effective Date and (ii) separation so that the Reorganized Debtors, and not the Debtors and the FE Non-Debtor Parties, are party to and responsible for the applicable collective bargaining agreements upon the Effective Date, with the goal of reaching agreement on all such modifications prior to the Effective Date.  In the event that the Debtors are unable to reach agreement with any particular union that is a party to a collective bargaining agreement on all such modifications to the collective bargaining agreement, the Debtors reserve their right to seek relief from the Bankruptcy Court under sections 1113 and 1114, to the extent applicable, of the Bankruptcy Code. Notwithstanding any provision of this Section V.F, nothing contained herein shall create an obligation of the FE Non-Debtor Parties to participate in, or contribute (either economically or otherwise) to, any negotiations between the Debtors and the unions that are parties to collective bargaining agreements.

G.    *Insurance Policies.*

Each of the Insurance Policies are treated as Executory Contracts under the Plan.   Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, and such Insurance Policies shall not be impaired in any way by the Plan or the Confirmation Order, but rather will remain valid and enforceable in accordance with their terms, including the sureties' retention of any collateral.

H.    *Surety Bonds.*

The Debtors' indemnification agreements with their sureties will be assumed.  The surety bonds issued and in effect as of the Effective Date shall remain in full force and effect and such surety bonds and indemnification agreements shall not be impaired in any way by the Plan or the Confirmation Order, but rather will remain valid and enforceable in accordance with their terms.

I.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, or restatements thereto or thereof, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority or amount of any Claims arising thereunder.

J.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on any list of Rejected Executory Contracts or Unexpired Leases or list of Assumed Executory Contracts or Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

K.    *Nonoccurrence of the Effective Date.*

In the event that the Effective Date does not occur with respect to a Debtor, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases with respect to such Debtor pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline has expired.

L.    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Executory Contracts or Unexpired Leases, will be performed by the applicable Debtor, or the applicable

Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, any such contracts and leases (including Assumed Executory Contracts or Unexpired Leases) that have not been rejected as of the Confirmation Date shall survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.   *Timing and Calculation of Amounts to be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.   *Disbursing Agent.*

All distributions under the Plan shall be made to Holders of Allowed Claims by the applicable Disbursing Agent on the Effective Date, or as soon as reasonably practicable thereafter, in accordance with the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.   *Rights and Powers of Disbursing Agent.*

1.   <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

2.   <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent in performing its duties under the Plan on or after the Effective Date (including taxes) shall be paid in Cash by the Reorganized Debtors (and in the case of the Plan Administrator, such fees and expenses shall be paid as set forth in the Plan Administrator Agreement).

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.    <u>Record Date for Distributions</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  The Debtors, the Indenture Trustees and/or the Disbursing Agent shall have no obligation to recognize any transfer of any Claims or Interests occurring on or after the Distribution Record Date.  For the avoidance of doubt, the Distribution Record Date shall not apply to any publicly-held securities.

    2.    <u>Delivery of Distributions</u>.

Except as otherwise provided herein, the applicable Disbursing Agent shall make distributions to Holders of Allowed Claims, as applicable, as of the Distribution Record Date at the address for each such Holder indicated on the Debtors' records as of the date of any such distribution.  The manner of such distributions shall be determined at the discretion of the applicable Disbursing Agent and the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  For the avoidance of doubt, Distributions to the Holders of Allowed Unsecured Bondholder Claims shall be made to the applicable Indenture Trustees for further distribution to the Holders of Allowed Unsecured Bondholder Claims, subject to the charging lien of the Indenture Trustees.

    3.    <u>No Fractional Distributions</u>.

No fractional shares of New FES Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Applicable Allowed Claim would otherwise result in the issuance of a number of shares of New FES Common Stock that is not a whole number, the actual distribution of shares of New FES Common Stock shall be rounded as follows: (i) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (ii) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New FES Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

    4.    <u>Minimum Distribution</u>.

No Cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of any Allowed Claim.

    5.    <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder at which time such distribution shall be made to such Holder without interest; *provided, however*, that any distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date.  In the event that the Disbursing Agent is unable to effectuate distributions to any Holder due to the Holder's non-compliance with the provisions of this Plan required for distributions (including compliance with tax requirements and/or identifying a DTC participant for the distributions of the New FES Common Stock), such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date.  All unclaimed property or interests in

property shall revert to the applicable Reorganized Debtor(s) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the claim of any Holder to such property shall be fully discharged, released, and forever barred.

6.    <u>Allocation of Distributions</u>.

Except as otherwise set forth herein, Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest to the extent Allowed herein.

E.    *Manner of Payment.*

Unless as otherwise set forth herein, all distributions of Cash or New FES Common Stock to the Holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable. At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.    *SEC Registration/Exemption.*

The New FES Common Stock is or may be a "Security" as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New FES Common Stock (other than New FES Common Stock, if any, to be issued pursuant to the Management Incentive Plan) is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities. The New FES Common Stock issued pursuant to section 1145 of the Bankruptcy Code (i) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (ii) is freely tradeable and transferable by any initial recipient thereof that (a) at the time of the transfer is not an "affiliate" of the Reorganized Debtors, as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (b) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. New FES Common Stock underlying the Management Incentive Plan will be issued pursuant to other available exemptions from registration under the Securities Act and applicable law.

Notwithstanding any policies, practices, or procedures of DTC or any other applicable clearing system, DTC and all other applicable clearing systems shall cooperate with and take all actions reasonably requested by a Disbursing Agent or an Indenture Trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest. No Disbursing Agent or Indenture Trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

In connection with any ownership of the New FES Common Stock that will be reflected through the facilities of DTC on or after the Effective Date, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New FES Common Stock under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New FES

Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New FES Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

G.   *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit with respect to distributions pursuant to the Plan. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any Governmental Unit including income, withholding, and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such Holder has made an arrangement satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse the Disbursing Agent for such amounts. Notwithstanding any provision herein to the contrary, the Reorganized Debtors and the Disbursing Agent, as applicable, shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, and establishing any other mechanisms they believe are reasonable and appropriate to comply with such requirements. The Disbursing Agent may require, as a condition of receipt of a distribution, that the Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder. If the Holder fails to comply with such a request for six months, such distribution shall be deemed an unclaimed distribution and treated in accordance with Article VI.D of the Plan. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

H.   *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in the Plan or in the Confirmation Order, and notwithstanding any documents that govern the Debtors' prepetition funded indebtedness to the contrary, (i) postpetition and/or default interest shall not accrue or be paid on any Claims and (ii) no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim; (b) interest at the contract default rate, as applicable.

I.   *Setoffs and Recoupment.*

The Debtors and Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against the Holder of such Claim.

J.    *Distributions on Account of Obligations of Multiple Debtors.*

Holders of Allowed Claims (other than Secured PCN Claims) may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

K.    *Claims Paid or Payable by Third Parties.*

1.    Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor (other than the Disbursing Agent). Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein (i) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers, or (ii) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

# ARTICLE VII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A. *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date. This Article VII of the Plan shall not apply to the Secured PCN Claims, the Unsecured PCN Claims, the FES Note Claims, the Mansfield Certificate Claims, or the Inter-Debtor Claims as Allowed in accordance with the Plan Settlement, which Claims shall be Allowed in full and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment (except as provided in this Plan), objection, or any other challenges under any applicable law or regulation by any person or entity.

B. *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the applicable Reorganized Debtor(s), or the Plan Administrator acting on behalf of the Reorganized Debtor(s) to the extent set forth in the Plan Administrator Agreement, shall have the sole authority: (i) to File, withdraw, or litigate to judgment, objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. A list of the Claims and Causes of Action to be retained by the Debtors and turned over the Plan Administrator or the Reorganized Debtors shall be set forth in the Plan Supplement.

C. *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, or the Plan Administrator on their behalf, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim or Interest that has been disallowed by Bankruptcy Court order or expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

D. *Adjustment to Claims or Interests without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors

or the Plan Administrator without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.     *Time to File Objections to Claims or Interests.*

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Deadline.

F.     *Disputed Claims Reserve.*

On the Effective Date, the Debtors shall establish the Disputed Claims Reserve for any Disputed Claim (to the extent such Claim is ultimately Allowed) existing as of the Effective Date, which Disputed Claims Reserve shall be administered by the Plan Administrator.  After the Effective Date, the Reorganized Debtors shall hold an amount of New FES Common Stock and Cash in such Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date.  The Plan Administrator shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the Disputed Claims Reserve.

Disputed Claims that become Allowed, in whole or in part, shall be satisfied exclusively out of the Disputed Claims Reserve.  In the event that the New FES Common Stock and Cash remaining in the Disputed Claims Reserve shall be insufficient to satisfy all of the Disputed Claims that have become Allowed and are due to be satisfied with distributions from the Disputed Claims Reserve on any Periodic Distribution Date, such Disputed Claims shall be satisfied Pro Rata from the Disputed Claims Reserve. After all New FES Common Stock and Cash have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed Claims and the Holders of any such Disputed Claims shall have no recourse in respect of such Claims to the Debtors or the Reorganized Debtors, Holders of Allowed Claims, or their respective assets or properties.

If a Disputed Claim is disallowed, in whole or in part, on the Periodic Distribution Date next following the date of determination of such disallowance, then (i) shares of New FES Common Stock equal to the shares of New FES Common Stock that would have been released from the Disputed Claims Reserve to the Holder thereof had such Claim been Allowed in the as-filed or estimated amount, as applicable, of such Claim, or disallowed portion thereof if such Claim is disallowed in part, shall be released from the Disputed Claims Reserve and shall be immediately cancelled, and (ii) Cash equal to the amount of Cash that would have been released from the Disputed Claims Reserve to the Holder thereof had such Claim been Allowed in the as-filed or estimated amount, as applicable, of such Claim, or disallowed portion thereof if such Claim is disallowed in part, shall be (x) in the case of Holders of Allowed Claims that received their distribution under the Plan (or any portion thereof) in the form of Cash, distributed in Cash to such Holders on a Pro Rata basis in accordance with such Cash recoveries, and (y) in the case of Holders of Allowed Claims that received their distribution under the Plan (or any portion thereof) in the form of New FES Common Stock, distributed in Cash to the Reorganized Debtors.

If at any time it is determined by both the Reorganized Debtors and the Plan Administrator that it is not necessary to hold in the Disputed Claims Reserve all of the shares of New FES Common Stock and Cash, if any, the Plan Administrator shall release such shares of New FES Common Stock and Cash as is determined to no longer be necessary for the satisfaction of Disputed Claim, upon which such shares shall be immediately cancelled, and such Cash shall be (i) in the case of Holders of Allowed Claims against the applicable Debtor or Debtors relating to such Disputed Claims Reserve that received their distribution in Cash, distributed to such Holders on a Pro Rata basis in accordance with such Cash recoveries; and (ii) in

18-50757-amk    Doc 2120    FILED 02/11/19    ENTERED 02/11/19 23:53:02    Page 94 of 113

the case of Holders of Allowed Claims against the applicable Debtor or Debtors relating to such Disputed Claims Reserve that received their distribution under the Plan (or any portion thereof) in the form of New FES Common Stock, distributed in Cash to the Reorganized Debtors.

G.      *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Proofs of Claim Filed on account of an employee or retiree obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors, or the FE Non-Debtor Parties pursuant to the FE Settlement Agreement, honor such employee or retiree obligation, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date (excluding amended Proofs of Claim which amend timely Filed Proofs of Claim) shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

H.      *Amendments to Proofs of Claim or Interest.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, or the Plan Administrator acting on their behalf, and any such new or amended Proof of Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

I.      *Reimbursement or Contribution.*

In the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Effective Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

J.    *No Distributions Pending Allowance.*

Except as otherwise set forth herein, if an objection to a Claim or portion thereof is Filed as set forth in Article VII.A or VII.B of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

K.    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  Except as otherwise set forth in the Plan, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under such order or judgment of the Bankruptcy Court.

## ARTICLE VIII.

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date and any Administrative Claims whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.    *Release of Liens.*

**Except as otherwise specifically provided in the Plan and except for (i) any FG Secured PCN Claims against FG that are Reinstated in accordance with Article III of the Plan, (ii) any NG Secured PCN Claims against NG that are Reinstated in accordance with Article III of the Plan, and (iii) any Other Secured Claims against any Debtor that are Reinstated in accordance with Article III of the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each**

case, without any further approval or other of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan (or any agent for such Holder) has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors that are reasonably necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      *Releases by the Debtors.*

Pursuant to section 1123(b) of the Bankruptcy Code, on and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party is deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims or Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties), as applicable, would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the PCNs, the FES Notes, the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the FE Settlement

Agreement and any related obligations under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan.

D. *Party Releases of the FE Non-Debtor Parties by the Consenting Creditors and the Committee.*

On and as of the Effective Date, pursuant to the terms of the FE Settlement Agreement, in exchange for good and valuable consideration, including the contributions of the FE Non-Debtor Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each FE Non-Debtor Released Party is deemed to have been conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the: (i) the Consenting Creditors and (ii) the Committee, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims or Causes of Action, including any derivative claims asserted or assertable by, or on behalf of any of the (i) Consenting Creditors or (ii) the Committee, or their Affiliates, as applicable, that such Entities would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or recession of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the PCNs, the FES Notes, the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the release set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the FE Settlement Agreement and any related obligations under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

E. *Releases of the FE Non-Debtor Parties by Third Parties and Holders of Claims or Interests.*

On and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, the consideration provided by the FE Non-Debtor

Parties under the Settlement Agreement and the contributions of the FE Non-Debtor Released Parties to facilitate and implement the Plan, each Holder of a Claim or Interest is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each FE Non-Debtor Released Party from any and all Claims and Causes of Action, including derivative claims asserted or assertable by or on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties) as applicable, that such Entity would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including the FE Non-Debtor Parties), the purchase, sale, or recession of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any FE Non-Debtor Released Party, the PCNs, the FES Notes, the Mansfield Facility Documents, the Chapter 11 Cases, and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any FE Non-Debtor Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the FE Settlement Agreement and any related obligations under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

For the avoidance of doubt, on and as of the Effective Date of the Plan, the Holders of Claims and Interests shall be deemed to provide a full and complete release to the FE Non-Debtor Released Parties and their respective property of and from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for or sounding in tort, fraud, contract, violations of federal or state securities laws, veil piercing, substantive consolidation or alter-ego theories of liability, contribution, indemnification, joint or several liability, or otherwise, arising from or related in any way to (i) the Debtors, Reorganized Debtors, their businesses, or their property; (ii) any Causes of Action against the FE Non-Debtor Released Parties or their property arising in connection with any intercompany transactions and other matters arising in the conduct of the Debtors' businesses; (iii) the Chapter 11 Cases; (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, Confirmation, or Consummation of the Plan, the Plan Supplement, any contract, employee pension or benefit plan, instrument, release, or other agreement or document related to any Debtor, the Chapter 11 Cases or the Plan, modified, amended, terminated, or entered into in connection with either the Plan, or any agreement between the Debtors and any FE Non-Debtor Released Party, including the FE Settlement Agreement; or (v) any other act taken or omitted to be taken in

connection with the Chapter 11 Cases, including, without limitation, acts or omissions occurring after the Effective Date in connection with distributions made consistent with the terms of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the FE Non-Debtor Parties' Third Party Release, which includes by reference each of the related provisions and definitions contained in this Plan.

F.    *Releases of the Debtor Released Parties and Other Released Parties by Third Parties and Holders or Claims or Interests.*

On and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Debtor Released Parties and Other Released Parties to facilitate and implement the **Plan, each Holder of a Claim or Interest that (i) voted to accept the Plan, (ii) is deemed to have accepted the Plan, (iii) was entitled to vote and did not opt out of granting the release, or (iv) was entitled to vote and failed to submit a ballot, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Other Released Party and Debtor Released Party from any and all Claims and Causes of Action, including any derivative claims asserted or assertable by or on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties), as applicable, that such Entity would have been legally entitled to assert its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and Released Party, the PCNs, the FES Notes, the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the FE Settlement Agreement and any related obligations under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

For the avoidance of doubt, on and as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full and complete discharge and release to the Debtor Released Parties and the Other Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or

95

direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise arising from or related in any way to (i) the Debtors, the Reorganized Debtors, their businesses, or their property; (ii) any Cause of Action against the FE Non-Debtor Released Parties or their property arising in connection with any intercompany transactions or other matters arising in the conduct of the Debtors' businesses; (iii) the Chapter 11 Cases; (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, Confirmation or Consummation of the Plan, the Plan Supplement, any contract, employee pension or benefit plan instrument, release, or other agreement or document related to any Debtor, the Chapter 11 Cases or the Plan, modified, amended, terminated, or entered into in connection with either the Plan, or any agreement between the Debtors and any FE Non-Debtor Released Party, including the FE Settlement Agreement; or (v) any other act taken or omitted to be taken in connection with the Chapter 11 Cases, including, without limitation, acts or omissions occurring after the Effective Date in connection with distributions made consistent with the terms of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtors Released Parties' and Other Released Parties' Third Party Release, which includes by reference each of the related provisions and definitions contained in this Plan.

G.    *Exculpation.*

Notwithstanding anything herein to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest or to any other Entity for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Mansfield Settlement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Mansfield Settlement, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.    *Injunction.*

**In addition to any injunction provided in the FE Settlement Order, except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.C-E of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties or the FE Non-Debtor Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or respect to any such claim or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interest; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

I.    *Protections Against Discriminatory Treatment.*

**Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a Debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.**

J.    *Recoupment.*

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

K.    *Document Retention.*

**On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.**

# ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.     *Conditions Precedent to Confirmation of a Plan.*

It shall be a condition to Confirmation of the Plan that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.     the Bankruptcy Court shall have entered the Disclosure Statement Order in a manner consistent in all material respects with the Restructuring Support Agreement, the Plan and the FE Settlement Order and in form and substance reasonably satisfactory to the Debtors, the Requisite Supporting Parties, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement) and the Committee;

2.     the Bankruptcy Court shall have entered the Confirmation Order in a manner consistent in all material respects with the Plan and the FE Settlement Order and in form and substance reasonably satisfactory to the Debtors, the Committee, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement) and the Requisite Supporting Parties; and

3.     the FE Settlement Order and the FE Settlement Agreement shall remain in full force and effect.

B.     *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.     the Confirmation Order shall have been duly entered in form and substance reasonably acceptable to the Debtors, the Committee, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement) and the Requisite Supporting Parties and the Confirmation Order shall be a Final Order;

2.     the FE Settlement Order shall remain in full force and effect;

3.     the FE Settlement Agreement shall have been consummated including (i) the issuance of the New FE Notes and (ii) the payment of the Settlement Cash;

4.     all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full and the Professional Fee Escrow Account shall have been established and funded in accordance with Article II.A.3(b);

5.     the Disputed Claims Reserve shall have been established and funded;

6.     the New FES Common Stock shall have been issued;

7.     the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

8.      if, at the election of the Debtors and the Requisite Supporting Parties, in consultation with the Committee, the Restructuring Transactions will involve the transfer of the Assets of FES to New FES or another newly created entity or a combination thereof as set forth in Article IV.F, then (i) all Assets of FES shall have been transferred to New FES or another newly created entity or a combinations thereof as described in Article IV.F; and (ii) New FES or another newly created entity shall have issued an additional guarantee for the PCNs related to the Secured FG PCN Reinstated Claims and the Secured NG PCN Claims that are being Reinstated in accordance with the Plan.

9.      all actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied or waived substantially concurrently with the occurrence of the Effective Date); and

10.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, including from the FERC and NRC, as applicable, rulings or documents that are necessary to consummate the Restructuring Transactions, and all such authorizations, consents and approvals shall remain in full force and effect, including without limitation, the following:

  a.    a final order or order(s) from FERC granting any and all authorization(s) (including Section 203 Authorization(s)) required in connection with the Restructuring Transactions;

  b.    Allegheny Energy Supply Company, LLC and Reorganized FG shall have received a final order from FERC granting authorization under Federal Power Act Section 203 to transfer the Pleasants Power Plant to a subsidiary of Reorganized FG;

  c.    to the extent necessary based on the form of the Restructuring Transactions, at least 90 days prior to the Effective Date, the Debtors shall provide PJM with an informational filing notifying PJM of the transfer of any facilities currently receiving payment in accordance with a FERC-approved reactive power tariff (the same as the informational filing submitted to FERC);

  d.    the Reorganized Debtors will register with ReliabilityFirst for the appropriate reliability functions; and

  e.    the NRC shall have approved the license transfer or new license application (as determined by the Debtors with the reasonable consent of the Committee and the Requisite Supporting Parties) filed by Reorganized FENOC and Reorganized NG with respect to the change in ownership pursuant to the Plan.

C.      *Waiver of Conditions.*

The conditions to Confirmation and the Effective Date set forth in this Article IX may be waived by agreement of all of the following parties (i) the Debtors, (ii) the Requisite Supporting Parties, (iii) the FE Non-Debtor Parties (solely as to the conditions precedent in Article IX.A.1-3 and Article IX.B.1-2 and solely as provided for in the FE Settlement Agreement) and (iv) the Committee, *provided, however*, that with respect to the condition to the Effective Date set forth in Article IX.B.7, such waiver shall not require the consent of any of the foregoing parties to the extent such parties have terminated their

99

participation in the Restructuring Support Agreement and the Restructuring Support Agreement otherwise remains in effect as to the other parties.

D.    *Effect of Failure of Conditions.*

If the Effective Date does not occur with respect to a particular Debtor, then, as to such particular Debtor: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effective under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity. Notwithstanding the foregoing, for the avoidance of doubt, the failure of Confirmation or Consummation to occur with respect to FE Aircraft or Norton shall not impact the effectiveness of the Settlement embodied in the FE Settlement Agreement and such settlement shall remain in full force and effect in accordance with the terms of the FE Settlement Agreement, or the effectiveness of the Plan Settlement embodied herein as to the other Debtors and the Plan Settlement shall remain in full force and effect.

# ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Subject to the Restructuring Support Agreement, each of the Debtors reserves the right to modify the Plan, one or more times, before Confirmation, whether such modification is material or immaterial, and to seek Confirmation consistent with the Bankruptcy Code and, as applicable, not resolicit votes on such modified plan.  Subject to certain restrictions and requirements set forth in the Plan and in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, each of the Debtors expressly reserves its respective rights to alter, amend, or modify the Plan, one or more times, after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, including with respect to such modifications.  Any alteration, amendment, or modification to the Plan shall be in accordance with the Restructuring Support Agreement and the FE Settlement Agreement.

B.    *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that each alteration, amendment, or modification to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019; *provided, however*, that each alteration, amendment or modification shall be made in accordance with Article X.A of the Plan and the Restructuring Support Agreement.

C.    *Revocation or Withdrawal of Plan.*

1.    <u>Revocation or Withdrawal of the Plan</u>.

Subject to the Restructuring Support Agreement, and the FE Settlement Agreement, each of the Debtors reserves the right to revoke or withdraw the Plan as it applies to that Debtor before the Confirmation Date and to File subsequent plans for any reason, including to the extent the Debtors

100

receive a higher or otherwise better offer than what is provided for in the Plan, or if pursuing Confirmation of the Plan would be inconsistent with any Debtor's fiduciary duties.

      2.      <u>Consequence of Withdrawal of the Plan</u>.

If any of the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects as to such Debtor(s); (ii) any settlement or compromise embodied in the Plan, including the Plan Settlement, and the FE Settlement Agreement (except in accordance with the terms set forth therein and in the FE Settlement Order), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void as to such Debtors; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action as to such Debtors; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

      1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

      2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

      3.      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any list of Rejected Executory Contracts or Unexpired Leases, or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

      4.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

      5.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

6.      enter and implement such order as may be necessary to execute, implement, or consummate the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including injunctions or other actions as may be necessary to restrain interference by an Entity with Consummation or enforcement of the Plan;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

9.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, to the extent such deadline has not passed;

10.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.     resolve any and all disputes arising from or relating to distributions under the Plan, including any cases, controversies, suits, disputes, or Causes of Action relating to the distribution or the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or amounts not timely repaid pursuant to Article VI of the Plan;

13.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     enter an order or decree concluding or closing the Chapter 11 Cases;

15.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability for a Debtor for any tax incurred during the administration of the Chapter 11 Cases, including any tax liability arising from or relating to the Restructuring Transactions, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Cases;

17.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

18.     except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

19.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

20.     enforce all orders previously entered by the Bankruptcy Court; and

21.     hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the applicable Debtors, the Reorganized Debtors and any and all applicable Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the applicable Reorganized Debtors (or the Disbursing Agent on behalf of each of the applicable Reorganized Debtors) for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtors is converted, dismissed, or closed, whichever occurs first. All such fees due and payable prior to the Effective date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Disbursing Agent or the applicable Reorganized Debtor shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until the earliest of the date on which the applicable Chapter 11 Case of the Reorganized Debtors is converted, dismissed, closed, or closed.

D.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases (including the Committee) shall dissolve; *provided, however*, that following the Effective Date the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes

(i) Claims and/or applications, and any relief related thereto, for compensation by professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (ii) appeals of the Confirmation Order as to which the Committee is a party. Upon dissolution of the Committee, the members thereof and their respective officers, employees, counsel, advisors, and agents shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date, except for the limited purposes identified above.

E.     *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

F.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor or any Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other Entity with respect to the Holders of Claims or Interests prior to the Effective Date.

G.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.     *Notices.*

All notices, requests, and demands to be effective shall be in writing, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

1.     if to the Debtors, to:

FirstEnergy Solutions Corp.
341 White Pond Drive
Akron, Ohio 44320
Attn; Rick C. Giannantonio, Esq.
Email: giannanr@firstenergycorp.com

—and—

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Ira S. Dizengoff
Lisa G. Beckerman

Brad M. Kahn
Email: idizengoff@akingump.com;lbeckerman@akingump.com; bkahn@akingump.com

—and—

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036
Attn: Scott L. Alberino
Kate Doorley
Email: salberino@akingump.com; kdoorley@akingump.com

2.      if to the Consenting Creditors, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn: Joshua K. Brody
Joseph A. Shifer
Email: jbrody@kramerlevin.com; jshifer@kramerlevin.com

—and—

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn: George A. Davis
Andrew M. Parlen
Email: george.davis@lw.com, andrew.parlen@lw.com

—and—

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn: Darren S. Klein
Natasha Tsiouris
Email: darren.klein@davispolk.com; natasha.tsiouris@davispolk.com

3.      if to the Committee, to:

Milbank Tweed Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attn: Dennis Dunne
Evan Fleck
Parker Milender
Email: ddunne@milbank.com, efleck@milbank.com; pmilender@milbank.com

<blockquote>

4.      if to the FE Non-Debtor Parties, to:

FirstEnergy Corp.
76 S. Main Street
Akron, OH 44308
Attn: Robert Reffner
Email: rreffner@firstenergycorp.com

—and—

JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114-1190
Attn: Heather Lennox
Thomas M. Wearsch
T. Daniel Reynolds
Email: hlennox@jonesday.com; twearsch@jonesday.com; tdreynolds@jonesday.com

</blockquote>

After the Effective Date, the Reorganized Debtors in their discretion, have authority to send a notice to Entities, which notice shall provide that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors and the Plan Administrator are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. From and after the Effective Date, the stay shall remain in full force and effect with respect to any pending action or proceeding where the basis for the pending action or proceeding occurred prior to the Petition Date, the non-Debtor party or parties to the pending action or proceeding received notice of the Bar Date, and the non-Debtor party or parties failed to timely File a Proof of Claim, until such time as the applicable Debtor party or parties is dismissed from the pending action or proceeding. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement.*

Except as otherwise indicated, and except with respect to the FE Settlement Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

K.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address

above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/FES or the Bankruptcy Court's website at www.ohnb.uscourts.gov.

L.    *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, except with respect to any term contained in or related to the FE Settlement Agreement (which may not be altered or waived), and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (iii) nonseverable and mutually dependent.

M.    *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates (including the FE Non-Debtor Parties), agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors shall have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

N.    *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

O.    *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any agreement or order (other than the Confirmation Order and the FE Settlement Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan or the FE Settlement Agreement, the Plan or the FE Settlement Order, as applicable, shall govern and control; *provided, however*, with respect to any conflict or inconsistency between the Plan and the Confirmation Order or the FE Settlement Order, the Confirmation Order or FE Settlement Order, as applicable shall govern.

Dated: February 11, 2019

Respectfully submitted,

FIRSTENERGY SOLUTIONS CORP.
FIRSTENERGY GENERATION, LLC
FIRSTENERGY NUCLEAR GENERATION, LLC
FIRSTENERGY GENERATION MANSFIELD
    UNIT 1 CORP.
FIRSTENERGY NUCLEAR OPERATING COMPANY
FE AIRCRAFT LEASING CORP.
NORTON ENERGY STORAGE L.L.C.


By: _____
Name:
Title: