## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 18-50757 |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) | Hon. Judge Alan M. Koschik |
|  | ) |  |

**SUPPLEMENTAL STATEMENT AND JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF DEBTORS' MOTION FOR ORDER APPROVING DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned jointly administered chapter 11 cases, by and through its undersigned counsel, hereby submits this supplemental statement and joinder[2] in support of the *Debtors' Motion for Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 2121] (the "Disclosure Statement Motion"),[3] and in support thereof, respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186), Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is 341 White Pond Dr., Akron, OH 44320.

[2] The Committee hereby joins in the supplemental brief of the Debtors, filed contemporaneously herewith.

[3] Capitalized terms used and not defined herein have the meanings as in the Disclosure Statement Motion.

## PRELIMINARY STATEMENT

1.    The releases being provided in the Plan to the Debtors' non-debtor parent, FirstEnergy Corporation, and its non-debtor subsidiaries (i.e., the "FE Non-Debtor Parties") are essential to the success of the Debtors' reorganization. They are being provided as consideration for the FE Non-Debtor Parties' contribution of more than $1 billion in distributable value to the estate, and their agreement to continue providing critical transition services to the Debtors to enable them to operate as a stand-alone entity. Without these releases, the FE Settlement Agreement would fall apart, the Debtors and their creditors would be back to the drawing board on a plan of reorganization (if one were still possible), the estates and the FE Non-Debtor Parties would find themselves enmeshed in sprawling, expensive, and complex litigation of indefinite duration, the Debtors' business operations would be imperiled, and there would be no certainty that the Debtors would find any viable path forward in chapter 11—let alone one that provides comparable value to the Debtors and their stakeholders. This case thus presents the kind of "unusual circumstances" that, under Sixth Circuit law, justify the approval of third-party releases. As a result, the Plan is not unconfirmable on its face, the Disclosure Statement can and should be approved, and the Debtors should be permitted to move forward with their proposed reorganization.

2.    The relevant facts are not reasonably in dispute. Nearly a year after filing their chapter 11 cases, the Debtors have proposed a plan that enjoys broad support from the vast majority of their creditors, and that will permit them to reorganize successfully and distribute substantial value to creditors. The Plan is based on the agreements set forth in the now-approved Restructuring Support Agreement, which itself was the product of over five months of negotiation. The proposed reorganization, however, is possible only because the FE Non-Debtor Parties agreed to contribute over $1 billion in value to the Debtors under a comprehensive multiparty settlement agreement, and

2

to waive at least that amount in intercompany claims. Beyond this, the FE Non-Debtor Parties have executed various other agreements that are mission-critical to the Debtors' reorganization, including agreements to transfer the Pleasants power station from non-Debtor AE Supply to FG upon the Effective Date of the Plan, separate the Debtors' businesses and IT infrastructure from those of the FE Non-Debtor Parties through a multi-year transition process, and continue to provide transitional shared services to the Debtors through June 2020 as part of their business separation, without which the Debtors would not be able to operate their businesses. Indeed, as the Debtors stated in the early days of their chapter 11 cases, the FE Non-Debtor Parties provide:

> numerous services and functions to the Debtors that would be nearly impossible and prohibitively expensive for the Debtors to replace. For example, the Debtors do not have their own computer systems or information technology support. Nor do the Debtors have their own human resources departments, complete finance functions, or their own treasury or accounting functions to track accounts payable, accounts receivable and similar items. The Debtors would be utterly incapable of operating their businesses in any form, let alone in a "business-as-usual" manner, absent the Shared Services provided under the Shared Services Agreements.[4]

3.      At the same time, the Debtors' estates possess a number of litigation claims against the FE Non-Debtor Parties arising from various prepetition transactions. Absent a settlement, the pursuit of those claims would have been the only viable way for the Debtors to generate substantial value for creditors. But this would have placed the Debtors in a precarious position: suing the FE Non-Debtor Parties would have threatened the shared services arrangement (which was renewed as part of the FE Settlement Agreement) that makes the Debtors' continued operations possible in the first place. Had the claims against the FE Non-Debtor Parties been litigated, it is difficult to see how the Debtors could have existed on a day-to-day basis. A consensual settlement providing for the FE

---

[4]     *Motion of Debtors for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Intercompany and Shared Services Agreements*, ¶ 12 [Docket No. 12] (April 1, 2018).

18-50757-amk    Doc 2399    FILED 03/26/19    ENTERED 03/26/19 21:40:42    Page 3 of 14

Non-Debtor Parties' cooperation in the restructuring was the only realistic option if the Debtors were to maximize value and emerge from bankruptcy as a standalone enterprise.

4.      For their part, the FE Non-Debtor Parties understandably require a level of certainty that, if they settle with the Debtors and provide value to be distributed to stakeholders, those same stakeholders will not immediately turn around and bring claims against them, thereby undermining the economic bargain reflected in the Plan.  It is reasonable for the FE Non-Debtor Parties to ask for global peace in return for the contributions they are making to the estates, and to receive the assurance that they will not be endlessly targeted in litigation by claimants they have already paid. In this regard, the releases at issue here are analogous in many ways to those at issue in Dow Corning, where the debtors' parent entities and insurers made a substantial contribution to a fund for the payment of creditor claims.

5.      The scope of the third-party releases in the Plan, moreover, is reasonable and narrowly tailored given these circumstances.  The releases apply only to holders of "claims" against the Debtors or "equity securities" of the Debtors—i.e., the beneficiaries of the consideration being provided by the FE Non-Debtor Parties.  The releases do not apply to entities that are not creditors of the Debtors, including with respect to certain environmental obligations that are not claims.[5]  The third-party releases are also limited in subject matter as they affect only claims and causes of action "related to" the Debtors.  Any cause of action that is completely divorced from the relationship between the FE Non-Debtor Parties and the Debtors will be unaffected.  The releases are temporally

---

[5]     Various courts have held that certain environmental obligations are not "claims" under the Bankruptcy Code.  See, e.g., United States v. Apex Oil Company, 579 F.3d 734 (7th Cir. 2009) (holding that an injunction ordering a debtor to clean up a contaminated site pursuant to the Resource Conservation and Recovery Act (RCRA) is an equitable remedy, despite the fact that the debtor would have to spend money in order to comply with the injunction, and thus did not give rise to a "right to payment" or a dischargeable claim under the Bankruptcy Code; In re Torwico Electronics Inc., 8 F.3d 146 (3d Cir. 1993) (holding that a state's attempt to force a debtor to comply with environmental laws and to clean up hazardous waste was not a "claim" within the meaning of the Bankruptcy Code); In re Chateaugay Corp., 944 F.2d 997, 1008 (2d Cir. 1991) ("We recognize that most environmental injunctions will fall on the non-'claim' side of the line.").

4

limited as well, as they apply only to causes of action relating to pre-Effective Date conduct.  This is entirely consistent with the rationale of the FE Settlement and the Plan, which is to accomplish a separation of the Debtors from FE and provide finality as to litigation by the Debtors' stakeholders that could arise from the pre-separation relationship.

6.      Accordingly, there is no reason to conclude that the Plan is unconfirmable because it contains third-party releases.   The same is true of the release and exculpation provisions in favor of the "Other Released Parties" (e.g., the Consenting Creditors, the Committee, and other parties that have played a critical role in the Debtors' chapter 11 cases).  For the reasons described below, such releases and exculpations are commonplace in many chapter 11 plans, and are consistent with applicable case law.

## ARGUMENT

### I.   The FE Non-Debtor Third-Party Releases and Injunctions Are Lawful

7.      The third-party releases are narrowly tailored to accomplish a very specific objective: ensure that stakeholders who are benefitting from increased recoveries as a result of the Debtors' settlement with the FE Non-Debtor Parties cannot turn around and sue the FE Non-Debtor Parties on claims related to the Debtors.  If the Plan is confirmed, the FE Non-Debtor Parties would only be released from claims that (i) are related to the Debtors, (ii) arise prior to the Effective Date of the Plan, and (iii) are held by holders of claims against or interests in the Debtors.

8.      Such third-party releases are consistent with Dow Corning.  In that case, the debtors' products liability insurers and shareholders provided $2.35 billion for the payment of claims asserted by victims injured by the debtor's silicone breast implants. Id. at 654-55.  In exchange for making these funds available, the plan provided for a release and injunction in favor of the debtor's insurers and shareholders (all of whom were non-debtors) from all further liability related to the victims'

5

claims. In its opinion, the Sixth Circuit affirmed the district court's determination that, when there are "unusual circumstances," the bankruptcy court may enjoin non-consenting creditors' claims against a non-debtor to facilitate a chapter 11 plan of reorganization. Id. at 663. The court identified those circumstances as follows:

(1)    there is an identity of interests between the debtor and the third party (such as an indemnity obligation), such that a suit against the third party is, in essence, a suit against the debtor or will otherwise deplete the estate assets;

(2)    the third party has contributed substantial assets/value to the reorganization;

(3)    the injunction is essential to the reorganization;

(4)    the impacted class (or classes) has overwhelmingly voted to accept the plan;

(5)    the plan provides for the payment of all, or substantially all, of the class or classes affected by the release;

(6)    the plan provides an opportunity for those claimants who choose not to settle to recover in full; and

(7)    the bankruptcy court made a record of specific factual findings that support its conclusions.

Id. at 658.

9.    Numerous courts interpreting Dow Corning within the Sixth Circuit and elsewhere have held that *not* all seven factors must be present for releases to be approved. See, e.g., In re Seaside Engineering & Surveying, Inc., 780 F.3d 1070, 1079 (11th Cir. 2015) ("[B]ankruptcy courts should have discretion to determine which of the Dow Corning factors will be relevant in each case. The factors should be considered a nonexclusive list of considerations."); Nat'l Heritage Foundation, Inc. v. Highbourne Foundation, 760 F.3d 344, 352 (4th Cir. 2014) ("A debtor need not demonstrate that every Dow Corning factor weighs in its favor to obtain approval of a non-debtor release."); In re City of Detroit, 524 B.R. 147, 172 (Bankr. E.D. Mich. 2014) (approving a non-consensual third-party release for entities that had made a substantial contribution to the debtor's reorganization,

despite the fact that not all <u>Dow Corning</u> factors were present); <u>In re Connector 2000 Ass'n, Inc.</u>, 447 B.R. 752 (Bankr. D.S.C. 2011) (approving third-party releases without the presence of the sixth <u>Dow Corning</u> factor).[6]

10.     Here, the <u>Dow Corning</u> factors weigh in favor of approving the third-party releases in the Plan.   There is a strong identity of interests between the Debtors and the FE Non-Debtor Parties (factor #1).   The Debtors and the FE Non-Debtor Parties are affiliates of one another, and will need to work collaboratively over the course of many months to separate their businesses.   The Debtors have entered into both a Separation Agreement (approved Sept. 25, 2018 [Docket Nos. 1376, 1465]) and an IT Separation Agreement (approved Dec. 11, 2018 [Docket No. 1817]) with the FE Non-Debtor Parties in an effort to disentangle themselves from their non-Debtor affiliates. Without the FE Settlement Agreement, the Debtors' estates would be mired in extensive, multiyear litigation against the FE Non-Debtor Parties that not only would deplete the limited assets of the estate, but also would jeopardize the provision of critical services to the Debtors.   The fates of the Debtors are thus inextricably tied to the global peace the Plan would provide.

11.     Moreover, as discussed above, the FE Non-Debtor Parties are transferring more than $1 billion for the benefit of the Debtors' reorganization and are also waiving a comparable amount in claims that they otherwise could have asserted against the Debtors (factor #2).   This consideration is the foundation for the Debtors' reorganization, and the third-party releases in the Plan that were a

---

[6]     In the inapposite case of <u>In re SL Liquidating, Inc.</u>, 428. B.R. 799, 802 (Bankr. S.D. Ohio 2010), the bankruptcy court held that all of the <u>Dow Corning</u> factors must be present.  But, <u>SL Liquidating</u> was a liquidating chapter 11 case in which the debtors' directors and officers, whom the plan attempted to release from third-party liability, were facing three active lawsuits by two plaintiffs.  Here, in a complex case that does not involve the liquidation of the Debtors, but instead a reorganization and substantial distributions to creditors that are possible only because of the cooperation of the FE Non-Debtor Parties, the Court should instead adopt the flexible standard used in <u>City of Detroit</u> and the other cases cited herein.  As the bankruptcy court in <u>City of Detroit</u> held, when "the other <u>Dow Corning</u> factors weigh so heavily in favor of approving the releases … it is appropriate to do so even if [an] element is not met."  524 B.R. at 175.

7

necessary inducement to persuade the FE Non-Debtor Parties to enter into the FE Settlement Agreement in the first place (factor #3).

12.     Given the broad consensus that has been reached in the Restructuring Support Agreement among the major creditor groups, it is likely that the vast majority of claims affected by the releases will vote in favor of the Plan (factor #4).  The Plan also provides a mechanism to pay a substantial portion of the claims in the classes affected by the release, without which the impairment to these classes would have been much more significant (factor #5).  See City of Detroit, 524 B.R. at 175 (holding that comparatively higher recoveries are sufficient to satisfy the fifth Dow Corning factor).  Additionally, the foregoing facts will be established through admissible evidence at the confirmation hearing, enabling the Court to make a record of specific factual findings necessary to approve the third-party releases (factor #7).

13.     In short, the FE Non-Debtor Parties are receiving releases in exchange for providing vast and essential value to the estates, and making possible a reorganization that will result in meaningful recoveries and that has wide stakeholder support.  The presence of these factors is sufficient to establish the necessary legal predicate for the approval of the FE Non-Debtor third-party releases and injunctions contained in the Plan.[7]

---

[7]     The sixth Dow Corning factor is not necessary or relevant.  One court has held that this factor is "typically employed in mass tort cases," In re Connector 2000, 447 B.R. at 768, such as Dow Corning.  The City of Detroit court also approved non-consensual third-party releases without the presence of this factor:

> The sixth element of the Dow Corning test requires that the plan provide an opportunity for non-consenting creditors to recover in full. The City's plan does not have such a provision.  Accordingly, this element is not met… The Court concludes that it is unnecessary to determine whether this element applies here. Instead, it concludes that the other Dow Corning factors weigh so heavily in favor of approving the releases that it is appropriate to do so even if this element is not met.  524 B.R. at 175.

8

## II.    **The Other Releases and Exculpations Are Lawful**

14.    Courts agree that *consensual* third-party releases within a chapter 11 plan are permissible.  Here, the entry of the confirmation order will release all creditor claims and causes of action against each of the "Debtor Released Parties"[8] and the "Other Released Parties"[9] (together, the "Other Releases") for any creditor that (i) votes to accept the Plan, (ii) is Unimpaired and deemed to have accepted the Plan, (iii) is entitled to vote, but fails to "opt out" of the Other Releases, or (iv) is entitled to vote, but fails to submit a ballot.  The language of the Other Releases is spelled out clearly in bold typeface in the Disclosure Statement and the Plan, and is also contained in the ballots to be distributed to creditors along with a prominent warning about creditors' rights to opt out.  This will thus provide creditors with sufficient notice and due process to make an informed and intelligent decision about whether to be bound by the Other Releases.  The Other Releases therefore will be consensual, as creditors will have the opportunity to reject the Plan or otherwise opt out of the Other Releases if they so choose.

15.    Numerous courts have held that voting in favor of a plan, abstaining from voting, and/or failing to "opt out" on a voting ballot constitutes sufficient consent to a third-party release in a plan.  See, e.g., In re Remington Outdoor Company, Inc., Case No. 18-10684 (Bankr. D. Del. 2018)

---

[8]    "Debtor Released Parties" is defined as each of the Debtors and the Reorganized Debtors and, with respect to the Debtors, their current and former Affiliates (other than the FE Non-Debtor Parties), and the Debtors' and their current and former Affiliates' (other than the FE Non-Debtor Parties) current and former directors, managers (including all Independent Directors and Managers), officers, predecessors, successors and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

[9]    "Other Released Parties" is defined as, collectively, (i) the Consenting Creditors, (ii) the Committee, (iii) the Indenture Trustees, (iv) the issuers of the PCNs, (v) the Plan Administrator, and (vi) with respect to each of the foregoing entities in clauses (i) through (v), their current and former Affiliates, and such Entities' current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed/advised funds or accounts and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

9

Hr'g Tr. May 2, 2018 at 69-70 (permitting third-party releases over the objections of the U.S. Trustee where creditors had notice and ability to opt out); In re GenOn Energy, Inc., Case No. 17-33695 (Bankr. S.D. Tex. 2017) (Confirmation Order, Dec. 12, 2017 [Docket 1250]) (finding, over objection of a creditor, third-party releases to be consensual where creditors "were provided with notice and the right to opt out"); In re Indianapolis Downs, LLC, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (permitting third-party releases by creditors who either abstained from voting or failed to opt out of the releases, even if such creditors voted to reject the plan); In re Millennium Lab Holdings II, LLC, Case No. 15-12284 (Bankr. D. Del. 2015), Hr'g Tr. Dec. 11, 2015 at 27:20-28:5 [Docket No. 206] (holding that because parties in interest were on notice of the third party releases, and because such notice contained the full text, in bold print, of the releases, that non-voting parties were deemed to have consented to, and would be bound by, the releases); In re Calpine Corp., 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) (holding third-party releases to be consensual, over multiple objections from creditors, where holders of claims and interests voted in favor of the plan, abstained from voting and choose not to opt out of the releases, or otherwise consented to a release); In re Coram Healthcare Corp., 315 B.R. 321, 336 (Bankr. D. Del. 2004) (holding that "a Plan is a contract that may bind those who vote in favor of it"); In re Consesco, Inc., 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The ... release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release. Therefore, the ... release is purely consensual.").

16.     The exculpation provisions contained in the Plan for the Exculpated Parties are also appropriate and consistent with applicable case law.[10]  In addition to plan proponents, exculpation

---

[10]  "Exculpated Parties" means, collectively, and in each case in its capacity as such: (i) the Debtors; (ii) the FE Non-Debtor Parties; (iii) the Indenture Trustees; (iv) the Consenting Creditors; (v) the Committee and each of its members, in their capacities as such; (vi) the FE Owner Trustee; and (vii) with respect to each of the foregoing

provisions may properly cover creditors' committees and their members, as well as indenture trustees. <u>See</u>, <u>e.g.</u>, <u>In re PWS Holding Corp.</u>, 228 F.3d 224, 246 (3d Cir. 2000) ("Section 1103(c) of the Bankruptcy Code, which grants to the Committee broad authority to formulate a plan and perform such other services as are in the interest of those represented, has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members … [A]ctions against committee members in their capacity as such should be discouraged.") (citations and internal quotations omitted); <u>In re Washington Mut., Inc.</u>, 442 B.R. 314, 350 (Bankr. D. Del. 2011) (a creditors' committee, its members, indenture trustees, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case); <u>In re L.F. Rothschild Holdings, Inc.</u>, 163 B.R. 45, 49 (S.D.N.Y. 1994) (section 1103(c) of the Bankruptcy Code "implies both a fiduciary duty to committee constituents, and a grant of limited immunity to committee members").

17.     Separately, courts in this Circuit also have regularly approved exculpations of third-party non-estate fiduciaries. <u>See</u>, <u>e.g.</u>, <u>In re AmFin Financial Corp.</u>, Case No. 09-21323 (Bankr. N.D. Ohio Nov. 3, 2011) [Docket Nos. 1277, 1314] (exculpating holders of bonds, senior notes, and subordinated notes, along with their respective current and former directors, officers, employees, advisors, and affiliates); <u>In re The Wornick Co.</u>, Case No. 08-10654 (Bankr. S.D. Ohio June 27, 2008) [Docket Nos. 177, 262] (releasing and exculpating the debtors' directors, noteholders, indenture trustees, and purchaser of assets, among others); <u>In re Collins & Aikman Corp.</u>, Case No. 05-55927 (Bankr. E.D. Mich. July 18, 2007) [Docket Nos. 7731, 7827] (exculpating current and

---

Entities in clauses (i) through (vi), such Entity and its current and former Affiliates and members (except any such member of the Ad Hoc Noteholders Group, the Mansfield Certificateholders Group, or the FES Creditor Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), and such Entities' and their current and former Affiliates' current and former directors, managers (including all Independent Directors and Managers), officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed/advised funds or accounts, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

former directors, prepetition lenders, and the debtors' critical customers who settled sizable claims with the debtors).

18.     For these reasons, the Court should overrule the objections to the Other Releases and exculpations contained in the Plan and described in the Disclosure Statement.

## III.     The Plan is Not Patently Unconfirmable

19.     When applying the "patently unconfirmable" standard set forth in American Capital, the only circuit-level decision directly addressing the issue, the Debtors' Plan easily passes muster.[11] In American Capital, the Third Circuit articulated the standard for when a plan is patently unconfirmable: "where (1) confirmation defects cannot be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  688 F.3d 145, 155 (3d Cir. 2012) (citation and internal quotations omitted).   Here, the objectors to the Disclosure Statement cannot satisfy the second factor because they (and the Court) have not had the benefit of a full evidentiary record, which the Debtors have stated they will provide at confirmation and which the Court has acknowledged it does not currently have.[12]

---

[11]   Some courts have held that a disclosure statement may be denied if the underlying plan is "patently unconfirmable," but at least one court in this Circuit has reinforced the standard set forth in section 1125 of the Bankruptcy Code, which requires only that a disclosure statement contain "adequate information" and does not reference the confirmation standards set forth in section 1129.  See In re Scioto Valley Mortg. Co., 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) ("It is imperative … that the Debtor disclose all pertinent information so that such holders can cast an informed vote accepting or rejecting the plan. That is all the Code requires. If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation. Therefore, the Debtor need not obtain the creditors' approval of the plan; it need only provide them with adequate information as that term is defined in 11 U.S.C. § 1125(a)(1).").

[12]   The Court has said it will not take evidence at the April 2, 2019 Disclosure Statement hearing.  See Scheduling Order Regarding Briefing and Oral Argument on Motion to Approve Disclosure Statement [Docket No. 2356], at 3 ("The Court will not take evidence at the April 2, 2019 oral argument. If the need for an evidentiary record is shown, that would demonstrate that the Debtors have at least the possibility of satisfying the Sixth Circuit's tests for non-consensual third-party releases and injunctions, or other applicable law, and the Court would then defer such issues to a confirmation hearing.")

20.     Furthermore, there is no basis to conclude that any purported confirmation defects are so patently evident as to doom the Plan before it is even solicited.  While some jurisdictions prohibit non-consensual third-party releases altogether, this Circuit is not one of them.  See Dow Corning, 280 F.3d at 657-58 ("[S]ome courts have found that the Bankruptcy Code does not permit enjoining a non-consenting creditor's claims against a non-debtor…. Because we determine that enjoining a non-consenting creditor's claim against a non-debtor is 'not inconsistent' with the Code … we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'").  The releases contained in the Plan are based on circuit-level precedent and palpably unusual circumstances, and therefore, should be addressed at confirmation after the approval of the Disclosure Statement.

## CONCLUSION

21.     For the reasons stated herein, the Committee respectfully requests that the Court grant the relief requested in the Disclosure Statement Motion and overrule all objections to the same, and grant such other relief as this Court deems just.

Dated: March 26, 2019

By: /s/ *Rocco Debitetto*

Lawrence E. Oscar (0022696)
Daniel A. DeMarco (0038920)
Christopher B. Wick (0073126)
Rocco I. Debitetto (0073878)
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Telephone:    (216) 621-0150
Facsimile:    (216) 241-2824
Email:    leoscar@hahnlaw.com
    dademarco@hahnlaw.com
    cwick@hahnlaw.com
    ridebitetto@hahnlaw.com

- and -

MILBANK LLP

Dennis F. Dunne (admitted *pro hac vice*)
Evan R. Fleck (admitted *pro hac vice*)
Parker J. Milender (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001-2163
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
Email:    ddunne@milbank.com
    efleck@milbank.com
    pmilender@milbank.com

*Counsel to the Official Committee of Unsecured Creditors of FirstEnergy Solutions Corp., et al.*

18-50757-amk    Doc 2399    FILED 03/26/19    ENTERED 03/26/19 21:40:42    Page 14 of 14