# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | Case No. 18-50757 |
|  | (Jointly Administered) |
| Debtors. | Hon. Judge Alan M. Koschik |

## APPLICATION OF CONSENTING CREDITORS PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION

The parties to the Restructuring Support Agreement, dated as of January 22, 2019 (as amended, modified, waived or otherwise, the "**RSA**")[2] consisting of (i) the ad hoc group of holders (the "**Ad Hoc Noteholder Group**") of (a) secured and unsecured pollution control revenue bonds supported by notes ("**PCNs**") issued by FirstEnergy Generation, LLC ("**FG**") and FirstEnergy Nuclear Generation, LLC ("**NG**") and (b) certain unsecured notes ("**Unsecured Notes**") issued by FirstEnergy Solutions Corp. ("**FES**," and together with FG, NG and certain affiliated debtors, the "**Debtors**"), (ii) the ad hoc group of holders of 6.85% pass-through certificates due 2034 issued in connection with the leveraged lease transactions involving Unit 1 of the Bruce Mansfield Plant (the "**Mansfield Certificateholders Group**"), (iii) the ad hoc

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186), case no. 18-50757; and Norton Energy Storage L.L.C. (6928), case no. 18-50763. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Enter into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* [Docket No. 2151] (the "**RSA Motion**").

group of holders of unsecured claims arising against FES arising from the rejection of power purchase agreements and unsecured claims against FENOC that are guaranteed by FES ("**FES Creditor Group**"), (iv) MetLife Capital, Limited Partnership (in its capacity as Owner Participant of Mansfield 2007 Trusts A-E, the "**Consenting Owner Participant**"), and (v) U.S. Bank Trust National Association (in its individual capacity and/or its capacity as owner trustee for Mansfield 2007 Trusts A-E, the "**Consenting Owner Trustee**" (together with the Consenting Owner Participant, the "**Mansfield Owner Parties**") and, collectively with the Consenting Owner Participant, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group, and the FES Creditor Group, the "**Consenting Creditors**") hereby submit this application (the "**Application**"), pursuant to sections 503(b)(3)(D) and 503(b)(4) of title 11 of the United States Code (the "**Bankruptcy Code**"), seeking entry of an order substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**") allowing, as administrative expenses of the Debtors' estates, and authorizing the Debtors to reimburse, the professional fees and expenses incurred by the Consenting Creditors and certain other fees and expenses incurred by the Consenting Owner Trustee in making a substantial contribution in these chapter 11 cases.  In support thereof, the Consenting Creditors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As set forth in more detail in the RSA Motion and the *Declaration of Charles M. Moore in Support of Motion of Debtors for Entry of an Order (I) Authorizing Debtors to Enter into and Perform Under the Restructuring Support Agreement and (II) Granting Related Relief* [Docket No. 2308] (the "**Moore Declaration**"), the Consenting Creditors have played a pivotal and constructive role throughout the Debtors' chapter 11 cases.  The continuing efforts of the Consenting Creditors have been instrumental in (i) formulating a process support agreement and standstill agreement under which these chapter 11 cases could (and in fact, did) proceed

expeditiously in a manner reflective of the interests of all creditors and the Debtors could transition into chapter 11 without the distraction and expense of unnecessary, protracted litigation, (ii) reaching a settlement with the Debtors' parent, FirstEnergy Corp. ("**FE Corp.**") and the Debtors' other non-Debtor affiliates (together with FE Corp., the "**FE Non-Debtor Parties**") which, in exchange for the waiver of potential claims and causes of action against the FE Non-Debtor Parties, not only provided necessary assistance with the separation of the Debtors' businesses from those of the FE Non-Debtor Parties, and the continued provision of critical services to the Debtors' estates for the duration of these cases, but also the waiver of numerous claims against the Debtors that could have been asserted by the FE Non-Debtor Parties, all of which ultimately resulted in nearly $3 billion in additional value being contributed to the Debtors' estates, and (iii) developing the framework for a consensual chapter 11 plan of reorganization and the various complex settlements contemplated therein. Following this Court's denial of the *Disclosure Statement for the Third Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2431] (the "**Initial Disclosure Statement**"), the Consenting Creditors have continued to work constructively with the Debtors to amend the Initial Disclosure Statement and the Plan (as defined herein), providing waivers under the RSA necessary to ensure stability in these chapter 11 cases while the Debtors, FE Non-Debtor Parties, and the Consenting Creditors worked to revise the Plan to address this Court's ruling regarding certain nonconsensual third party releases. As a result of these efforts, the Debtors filed the *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2530] (the "**Revised Disclosure Statement**"),

3

which the Consenting Creditors believe address the Court's stated concerns with the Initial Disclosure Statement and related Plan.

2.      The Consenting Creditors submit that their involvement in these chapter 11 cases (a) has conferred a substantial benefit on the Debtors' estates and (b) will ultimately lead to the confirmation of a value-maximizing plan for the benefit of all stakeholders as efficiently as possible under the circumstances.

3.      The substantial contribution of the Consenting Creditors began even prior to the filing of these chapter 11 cases.  For over six months prior to the Petition Date (as defined herein), the Debtors, the Ad Hoc Noteholder Group and the Mansfield Certificateholders Group engaged in negotiations and diligence sessions with the Debtors and, ultimately, the Mansfield Owner Parties, which successfully resulted in a prepetition process support agreement.  The PSA (as defined herein) provided the Debtors with a soft entry into chapter 11 protection, assuring overwhelming creditor support for the Debtors' requested first day relief and continued operation of the Debtors' business, established a framework for the Debtors, in consultation with the Ad Hoc Noteholder Group, to evaluate the sale/retention and/or of the Debtors' operating assets and established the framework for further discussions among the parties.  The PSA also incorporated a protocol regarding discovery and potential litigation regarding the claims held by the Mansfield Certificateholders Group and the Consenting Owner Participant.

4.      In addition, the Debtors, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group and the FE Non-Debtor Parties negotiated the terms of a standstill agreement (the "**Standstill Agreement**") that provided a framework for discovery and potential litigation in connection with the numerous estate claims against the FE Non-Debtor Parties.

5.      Absent negotiation and entry into the PSA and Standstill Agreement, there is no question that these cases would have devolved into value-destructive litigation.  Instead, the PSA and the Standstill Agreement provided a path forward for all parties, while still reserving their underlying claims.  On April 5, 2018, the Debtors filed the PSA/Standstill Motion (as defined herein), seeking authority to assume the PSA and the Standstill Agreement.  On May 9, 2018, the Court entered the PSA/Standstill Order (as defined herein).

6.      Prior to entry of the PSA/Standstill Order, the Ad Hoc Noteholder Group engaged in settlement discussions with FE Corp. to settle the potential claims against the FE Non-Debtor Parties that were the subject of the PSA/Standstill Order.  As a result of these efforts, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group and FE Corp. reached an agreement in principle on April 23, 2018 that contemplated the resolution of the litigation claims, provided for, among other things, massive contributions by FE Corp. to the Debtors' estates, including a cash contribution of $225 million, $628 million in securities issued by FE Corp. and the transfer of the Pleasants Power Plant (as defined herein) to the Debtors' generating fleet,  and resolved the treatment of the claims held by the Mansfield Certificateholders Group (the "**Initial FE Settlement**").

7.      The Initial FE Settlement set the stage for further negotiations among the Debtors, the Committee (as defined herein), the FE Non-Debtor Parties and other parties in interest. Following the Debtors' and Committee's own investigation into the claims against the FE Non-Debtor Parties and the ensuing multiparty negotiations, certain improvements were made to the Initial FE Settlement, and the parties, including the Debtors, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group and the Committee, entered into definitive documentation on August 26, 2018 (the "**FE Settlement Agreement**").  On September 26, 2018, this Court entered

5

an order approving the FE Settlement Agreement. Following approval of the FE Settlement Agreement, the Ad Hoc Noteholder Group's professionals worked closely with the Debtors on the integration of the Pleasants Power Plant into the Debtors' generation fleet.

8.     Finally, with the FE Settlement Agreement in place, the parties then focused on the formulation of a chapter 11 plan that included the settlement of complex issues including (i) the allocation of the consideration provided for under the FE Settlement Agreement, (ii) the allocation of the Debtors' other assets, (iii) the allowance and treatment of the various intercompany claims, (iv) the allocation of postpetition administrative expense claims among the various estates, and (v) the rejection of agreements arising from the leveraged lease transaction for Unit 1 of the Bruce Mansfield Plant. The Ad Hoc Noteholder Group was central to discussions among the Debtors, the FES Creditor Group and the Mansfield Certificateholders Group in the hopes of reaching a resolution of these issues. Absent such a resolution, any plan process had the potential to become mired in complex litigation that would take months, if not years, to resolve. As a result of these efforts, the Debtors, the FES Creditor Group, the Ad Hoc Noteholder Group and the Mansfield Certificateholders Group reached a deal in principle at the end of 2018. During these discussions, the members of the FES Creditor Group, instead of serving their own parochial claim interest, negotiated and focused on treatment of their creditor classes as a whole. In particular, the work and analysis of the FES Creditor Group Professionals was instrumental to the ultimate allocation of the consideration provided for under the FE Settlement Agreement among all Debtors, as well as the resolution of inter-Debtor claims.

9.     Shortly after the execution of the initial version of the RSA, the Mansfield Owner Parties joined the RSA, further expanding the scope of the significant restructuring issues to be consensually resolved pursuant to that agreement. The Mansfield Owner Parties' Professionals

also made valuable contributions to the process, working with the other Consenting Creditors and Consenting Creditors' Professionals, as well as the Debtors and Committee and their respective professionals, to enhance the RSA and the restructuring contemplated therein.

10. The execution of the RSA represents a significant achievement in these chapter 11 cases, and is the product of months of negotiations by the Debtors and the Consenting Creditors to reach consensus on the value-maximizing path out of bankruptcy for the Debtors and their businesses, and to resolve complex and interwoven disputes between and among the Debtors and their creditors. The terms of the RSA provide a framework for a comprehensive restructuring plan that will enable the Debtors to confirm a broadly consensual chapter 11 plan of reorganization (as may be amended or supplemented from time to time, the "**Plan**") and emerge from chapter 11 as a reorganized company (the "**Restructuring**").

11. In addition, entry into the RSA has enabled the Debtors, with the help of the Ad Hoc Noteholder Group's advisors, to develop the Nuclear Regulatory Commission ("**NRC**") nuclear license transfer applications ("**LTAs**"), which are required for the NRC to approve the transfer of Debtors' four nuclear operating licenses to the new business owners, as described in the Plan. The NRC approval process is expected to take several months and is expected to be the final milestone achieved before the Debtors can exit bankruptcy. Therefore, starting this approval process early, with the assistance of the Consenting Creditors embodied in the RSA, is expected to reduce the overall time that the Debtors will remain in bankruptcy.

12. Entry into the RSA has enabled the Debtors to seek confirmation and consummation of the Plan in an efficient and cost-effective manner, and to avoid the incurrence of substantial litigation costs and lengthy delays in connection with the various inter-Debtor and intercreditor disputes that are otherwise resolved pursuant to the Plan. The RSA secured

7

important commitments from the RSA Parties to support the Plan and the settlements and compromises encompassed therein. The RSA is supported by each of the Debtors, the Consenting Creditors and the official committee of unsecured creditors appointed in the chapter 11 cases (the "**Committee**").

13.     The broad support reflected by the RSA was the result of hard work by the Debtors and all of the Consenting Creditors, beginning well before the Petition Date, to negotiate the terms of a consensual restructuring resolving complicated legal and financial issues and disputes that would have inevitably sidetracked these chapter 11 cases and threatened the Debtors' ability to confirm a chapter 11 plan. Notwithstanding the Court's decision to deny approval of the Initial Disclosure Statement, based on subsequent modifications, the Consenting Creditors are optimistic that their efforts and continued support under the RSA will ultimately lead to confirmation of the Plan that reflects all material compromises embodied in the RSA, as well as the continued complex negotiations and settlements with the FE Non-Debtor Parties. The Consenting Creditors' active participation and support in the chapter 11 cases has substantially benefited, and will continue to benefit, the Debtors and their estates.

14.     The Consenting Creditors are key stakeholders in these cases and the Debtors' restructuring negotiations given the magnitude of the claims they hold. Rather than acting as adversaries to the Debtors and one another, they have chosen to work collaboratively and productively, directing their efforts toward supporting an efficient, value-maximizing restructuring that will benefit all stakeholders. The Consenting Creditors' continued cooperation with the Debtors is integral to the Debtors' ability to keep these cases on track.

### JURISDICTION AND VENUE

15.     The United States Bankruptcy Court for the Northern District of Ohio (the "**Court**") has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The statutory predicates for the relief requested herein are sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

## RELIEF REQUESTED

16.     By this Application, the Consenting Creditors seek entry of an order pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, substantially in the form of the Proposed Order, allowing as administrative expenses of the Debtors' estates, and authorizing the Debtors to reimburse, the professional fees and expenses and transaction fees incurred by the Consenting Creditors, as well as certain other fees and expenses incurred by the Consenting Owner Trustee, in making a substantial contribution in these chapter 11 cases. For the avoidance of doubt, the Consenting Creditors are submitting this Application without prejudice to the Debtors' rights to seek payment pursuant to section 363(b) of the Bankruptcy Code of the fees and expenses that are the subject of this Application. The Consenting Creditors, as set forth in this Application and the Moore Declaration, submit this Application based on the overwhelming evidence of their substantial contribution in these chapter 11 cases.

## BACKGROUND

### A.     The Chapter 11 Cases

17.     On March 31, 2018 (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their property as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases are jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

18.     Shortly after the Petition Date, on April 5, 2018, the Debtors filed the *Motion of the Debtors for Entry of Order (I) Authorizing the Debtors to Assume (A) the Process Support*

9

Agreement and (B) the Standstill Agreement and (II) Granting Related Relief* (the "**PSA/Standstill Motion**") [Docket No. 203], which was the culmination of pre-Petition Date negotiations between the Debtors, FE Corp., the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group, Wilmington Savings Fund Society, FSB, in its capacity as indenture trustee and pass-through trustee in connection with the leveraged lease transaction of Unit 1 of the Bruce Mansfield plant ("**WSFS**") and the Consenting Owner Participant (collectively, the "**PSA Parties**") to provide a framework for the PSA Parties (as defined herein) and other creditor groups to explore potential restructuring alternatives and value-maximizing paths for reorganizing the Debtors' businesses and assets. On May 9, 2018, the Court entered the *Order (I) Authorizing Debtors to Assume (A) the Process Support Agreement and (B) the Standstill Agreement and (II) Granting Related Relief* (the "**PSA/Standstill Order**") [Docket No. 509], which authorized the Debtors to assume that certain process support agreement by and among the Debtors and certain creditor and stakeholder parties signatory thereto, dated March 30, 2018, and attached as Exhibit 1 to the PSA/Standstill Order (the "**PSA**"). The RSA extended the outside date under the PSA to be coterminous with the Plan Effective Date. RSA § 5.01(a)(iii).

19. On April 11, 2018, the United States Trustee for the Northern District of Ohio (the "**U.S. Trustee**") appointed the Committee pursuant to section 1102 of the Bankruptcy Code, and no trustee or examiner has been appointed.

20. On April 23, 2018, FE Corp. announced a settlement in principle (the Initial FE Settlement) with the Ad Hoc Noteholder Group and the Mansfield Certificateholders Group, resolving, among other things, potential claims and causes of action between the Debtors, on the one hand, and the FE Non-Debtor Parties, on the other hand. FIRSTENERGY CORP., Current Report (Form 8-K) (April 23, 2018).

18-50757-amk    Doc 2569    FILED 04/29/19    ENTERED 04/29/19 20:23:04    Page 10 of 40

21.     Following months of further negotiations, on August 26, 2018, the Debtors, the FE-Non Debtor Parties, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group and the Committee entered into the FE Settlement Agreement, which was approved by the Court on September 26, 2018 [Docket No. 1465].

22.     On February 1, 2019, as contemplated by the FE Settlement Agreement, FG sought authorization to acquire the Pleasants Power Plant in Pleasant County, West Virginia (the "**Pleasants Power Plant**"), which is comprised of two 650 megawatt coal-fired units [Docket No. 2052]. GLC (as defined herein) worked with the Debtors to diligence the transaction and maximize synergies upon integration into the Debtors' business. On March 7, 2019, the Court entered an order authorizing the Pleasants Power Plant acquisition [Docket No. 2217].

23.     Following approval of the FE Settlement Agreement, the Consenting Creditors and the Debtors engaged in extensive and complex negotiations concerning, among other things, various issues relating to value allocation among the Debtors, and the resolution of inter-Debtor claims. Each side made numerous proposals and counterproposals on a variety of different plan terms and structures. During this time, the Debtors concurrently engaged with the independent directors and independent managers of FES, FENOC, FG and NG (collectively, the "**Independent Directors and Managers**") on the various issues required to be resolved by the Plan Settlement (as defined below), as well as the various settlement proposals being made by the parties. In addition, the Independent Directors and Managers engaged in a separate round of analysis of and negotiations over the terms of a plan that would be acceptable to the Independent Directors and Managers. The various financial advisors to the Consenting Creditors engaged in extensive diligence and conducted numerous waterfall analyses to fully demonstrate distributions to each box of creditors, a critical component to fostering a global, integrated settlement.

18-50757-amk    Doc 2569    FILED 04/29/19    ENTERED 04/29/19 20:23:04    Page 11 of 40

24.     After almost five months of ongoing good faith negotiations, the Debtors, the Committee and the Consenting Creditors, with the approval of the Independent Directors and Managers, reached an agreement in principle regarding the terms of a chapter 11 plan, and the settlement of, among other things, potential significant claims and causes of action concerning (i) the allocation of the consideration provided under the FE Settlement Agreement among the Debtors' estates, (ii) the treatment and allowance of Intercompany Claims, (iii) the allocation of value between and among the Debtors' estates and various creditor constituencies, and (iv) the Mansfield Settlement (collectively, the "**Plan Settlement**").  The Plan Settlement is incorporated in the Plan and explained more fully in the Revised Disclosure Statement.

25.     As further discussed in the RSA Motion, the Debtors' boards of directors, upon the advice and recommendation of the Debtors' advisors, as well as the Independent Directors and Managers, upon the advice and recommendation of their respective advisors and in exercise of their fiduciary duties, concluded that the Plan Settlement represented the best path forward for the Debtors, their estates and all parties in interest, not only because the Plan was supported by the Committee and creditor constituencies representing a substantial majority of the Debtors' claims, but because, critically, it reflected a reasonable and consensual resolution of a number of complicated inter-Debtor and inter-creditor issues.

26.     The good faith, arm's length negotiations described above between the various parties culminated in the execution of the original RSA on January 23, 2019.  The Debtors, the Consenting Creditors and the Committee subsequently engaged in settlement discussions with the Mansfield Owner Parties, resulting in a settlement of claims and causes of action held by the Mansfield Owner Parties.  As part of the settlement, the Mansfield Owner Parties agreed to sign on to the RSA and support the Plan contemplated thereby.  Among other things, as part of the

18-50757-amk    Doc 2569    FILED 04/29/19    ENTERED 04/29/19 20:23:04    Page 12 of 40

Restructuring, the Mansfield Owner Parties will be required to implement the contemplated legal transfer of ownership of Unit 1 of the Bruce Mansfield Plant to the Debtors, which involves a series of complex corporate steps including the termination and rejection of multiple lease-related documents, the release of liens, and the transfer of the undivided interests in Unit 1, with the Mansfield Owner Parties and various other RSA Parties providing requisite authorization for the transaction. The RSA sets forth the terms and conditions among the Debtors and all of the RSA Parties with respect to supporting the terms of the Plan and the Plan Settlement.

27. On April 4, 2019, the Court issued an oral ruling denying the Debtors' motion to approve the Initial Disclosure Statement following hearings on March 19, 2019 and April 2, 2019 on the grounds that nonconsensual third-party releases provided to the FE Non-Debtor Parties pursuant to the Plan rendered the Plan "patently unconfirmable."

28. Since the April 4, 2019 ruling, the Consenting Creditors have been in regular dialogue with the Debtors, operating as constructive partners with respect to the task of reformulating the Plan in a manner that is both consistent with the Court's April 4 ruling and acceptable to the FE Non-Debtor Parties and the Consenting Creditors. In order to provide stability to the Debtors' estates while these complex negotiations continued, among other things, the Consenting Creditors provided waivers and extensions of the RSA milestones that related to entry of the Disclosure Statement Order, RSA Order and Confirmation Order (each as defined in the RSA). These extensions provided the Debtors with much-needed breathing room to modify the FE Settlement Agreement with the FE Non-Debtor Parties and to ensure that the Debtors would be able to proceed with a value-maximizing chapter 11 plan that built upon the previously negotiated settlements.

29.     On April 18, 2019, the Debtors filed the Revised Disclosure Statement and a further amended version of the Plan,[3] which is the result of additional and extensive effort to resolve the issues identified by the Court in the Initial Disclosure Statement and related Plan. During this time, the Consenting Creditors continued to provide critical support to the Debtors in the negotiations with the FE Non-Debtor Parties, ultimately resulting in the Fourth Amended Plan, and the Consenting Creditors are optimistic that the resulting settlement reached with the FE Non-Debtor Parties will allow the Debtors to proceed in a timely manner to confirmation of a value-maximizing Plan.

**B.      Overview of the Consenting Creditors' Professionals**

*i. Professionals for the Ad Hoc Noteholder Group*

30.     The Ad Hoc Noteholder Group's advisor team consists of (i) Kramer Levin Naftalis & Frankel LLP, as lead bankruptcy counsel, (ii) Baker & Hostetler LLP, as local bankruptcy counsel, (iii) David Repka, as nuclear regulatory counsel and (iv) GLC Advisors & Co. ("**GLC**"), as financial advisors (collectively, the "**Ad Hoc Noteholder Group Professionals**").

31.     The Ad Hoc Noteholder Group is party to the PSA and is entitled to reimbursement of certain reasonable and documented professional fees and expenses under the PSA/Standstill Order.  However, the PSA/Standstill Order only provides for the reimbursement of hourly and monthly fees and expenses of the Ad Hoc Noteholder Group Professionals, and does not provide for reimbursement of the transaction fees payable to GLC (i) upon consummation of the Plan and (ii) in connection with transfer of the Pleasant Power Plant to the Debtors concurrently with the consummation of the Plan (the "**GLC Transaction Fees**").

---

[3] *Fourth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2529] (the "**Fourth Amended Plan**").

Notably, beginning on the date the Court enters an order confirming the Plan, fifty percent of GLC's monthly fees will be credited against the GLC Transaction Fees.

32.     Subject to the terms of the Proposed Order, the Ad Hoc Noteholder Group is seeking the allowance, as administrative expenses of the Debtors' estates, and authorization for the Debtors to reimburse GLC for the GLC Transaction Fees, as set forth on Exhibit 1 to the Proposed Order.

*ii. Professionals for the Mansfield Certificateholders Group*

33.     The Mansfield Certificateholders Group has retained four advisors: (i) Latham & Watkins LLP ("**LW**"), as legal counsel, (ii) O'Melveny & Myers LLP ("**OMM**"), as legal counsel, (iii) McDonald Hopkins ("**MH**") as local legal counsel, and (iv) Guggenheim Securities, LLC ("**Guggenheim**"), as investment banker and financial advisor (collectively, the "**Mansfield Certificateholders Group Professionals**").    The Mansfield Certificateholders Group is party to the PSA and the Mansfield Issues Protocol incorporated therein, which provides for payment of the reasonable and documented fees and expenses of LW, OMM and MH as legal counsel, and the monthly fees of Guggenheim.   The Debtors have been paying these fees and expenses on a current basis during these chapter 11 cases.   The PSA and Mansfield Issues Protocol do not, however, provide for payment of the back-end/transaction fees payable to Guggenheim as set forth on Exhibit 1 to the Proposed Order; it is payment of those fees that the Mansfield Certificateholders Group seeks to have authorized by this Motion.   As set forth on Exhibit 1 to the Proposed Order, 50% of Guggenheim's monthly fees have been credited against any such transaction fees since execution of the RSA, and 75% of Guggenheim's monthly fees will be credited in the same manner following plan confirmation.

*iii. Professionals for the FES Creditor Group*

34.     The FES Creditor Group's advisor team consists of (i) Davis Polk & Wardwell LLP ("**Davis Polk**"), as legal counsel, (ii) Frost Brown Todd LLC ("**Frost Brown Todd**"), as local legal counsel, and (iii) Houlihan Lokey Capital Inc. ("**HL**"), as financial advisor (collectively, the "**FES Creditor Group Professionals**").  The FES Creditor Group engaged the FES Creditor Group Professionals in or around August 2018 to represent it in connection with these chapter 11 cases.

35.     Subject to the terms of the Proposed Order, the FES Creditor Group is seeking the allowance, as administrative expenses of the Debtors' estates, and authorization for the Debtors to reimburse (i) the fees and expenses earned by Davis Polk and Frost Brown Todd prior to and from the entry of the Proposed Order and (ii) the fees and expenses of HL as set forth on Exhibit 1 to the Proposed Order.

*iv. Professionals for Mansfield Owner Parties*

36.     The Consenting Owner Participant's advisor team consists of (i) Sidley Austin LLP ("**Sidley**"), as lead bankruptcy counsel, (ii) Vorys, Sater, Seymour and Pease LLP ("**Vorys**"), as local bankruptcy counsel, (iii) Ann Pollock ("**Pollock**"), as tax counsel (retained as a specialist with respect to the tax indemnity claim issues implicated by the sale-leaseback transactions for Mansfield Unit 1 and related bankruptcy claims), and (iv) Crestview Capital Advisors Corporation ("**Crestview Capital**"), as financial advisor (collectively, the "**Consenting Owner Participant Professionals**," and together with Seward & Kissel LLP, the "**Mansfield Owner Parties' Professionals**").  The Consenting Owner Trustee is separately represented by Seward & Kissel LLP, as bankruptcy counsel ("**Seward**," and together with the Consenting Owner Participant Professionals, the Ad Hoc Noteholder Group Professionals, the Mansfield

16

Certificateholders Group Professionals, and the FES Creditor Group Professionals, the "**Consenting Creditors' Professionals**"). The RSA and the Plan provide for payment by the Debtors of the fees and expenses of the Mansfield Owner Parties' Professionals.

37. The Consenting Owner Participant and the Consenting Owner Trustee are also parties to the PSA and are already entitled to reimbursement of certain reasonable and documented professional fees and expenses under the PSA/Standstill Order and the Mansfield Issues Protocol approved therein. However, unlike the reimbursement rights of certain other creditor parties to the PSA, the Consenting Owner Participant's and Consenting Owner Trustee's respective reimbursement rights under the PSA/Standstill Order are subject to a negotiated cap. Specifically, pursuant to paragraphs 35 and 36 of the Mansfield Issues Protocol, the Consenting Owner Participant's right to reimbursement of the fees and expenses of its advisors is subject to an aggregate cap of $1,500,000 for the twelve-month period following the Petition Date (March 31, 2018 through March 31, 2019), and the Consenting Owner Trustee's right to reimbursement is subject to an aggregate cap of $250,000 for the twelve-month period following the Petition Date.

38. The substantial majority of the Consenting Owner Participant's professional fees and expenses to date were within the $1,500,000 cap under the PSA/Standstill Order. However, due to, among other things, the increased activity associated with the negotiation and documentation of the RSA, the Plan Term Sheet and the related Plan and Initial Disclosure Statement, the Consenting Owner Participant's professional fees and expenses for February and March of 2019 (when combined with the postpetition fees and expenses incurred through January 2019) exceed the cap. Moreover, the Consenting Owner Participant will continue to incur additional fees and expenses in connection with the RSA and continued prosecution of the

17

Plan and Initial Disclosure Statement throughout a particularly complicated and extended confirmation process. The Consenting Owner Trustee's fees and expenses for the postpetition period through March 2019 are still within the applicable $250,000 cap, but the Consenting Owner Trustee will likewise continue to incur additional fees and expenses in connection with the RSA.

39. In addition, the Consenting Owner Trustee is entitled to payment of its own postpetition fees and expenses incurred in connection with the chapter 11 cases under the PSA/Standstill Order and the Mansfield Issues Protocol approved therein, as well as under the RSA. These fees and expenses (while not expected to be significant) would include fees and expenses (other than professional fees and expenses) incurred in administering Mansfield 2007 Trusts A-E and implementing the transactions involving Mansfield 2007 Trusts A-E contemplated under the RSA and the Plan.

40. Subject to the terms of the Proposed Order, the Mansfield Owner Parties are seeking allowance, as administrative expenses of the Debtors' estates, and authorization for the Debtors to reimburse (i) the fees and expenses incurred by the Consenting Owner Participant Professionals prior to and from the entry of the Proposed Order (including, without limitation, the fees and expenses of Crestview Capital as set forth on Exhibit 1 to the Proposed Order), and (ii) the fees and expenses incurred by the Consenting Owner Trustee prior to and from the entry of the Proposed Order, in each case to the extent such payment is not already authorized under the reimbursement provisions of the PSA/Standstill Order and the Mansfield Issues Protocol.

18-50757-amk    Doc 2569    FILED 04/29/19    ENTERED 04/29/19 20:23:04    Page 18 of 40

## BASIS FOR RELIEF

**A.    The Consenting Creditors Have Made a Substantial Contribution in the Debtors' Chapter 11 Cases**

41.    Section 503(b)(3)(D) provides that after notice and a hearing, there shall be allowed, as an administrative expense, the actual necessary expenses incurred by "a creditor . . . in making a substantial contribution" in a chapter 11 case.   11 U.S.C. § 503(b)(3)(D).   In addition, section 503(b)(4) of the Bankruptcy Code provides for the reimbursement of related:

> reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant . . . .[4]

42.    Thus, sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code allow reimbursement from a debtor's estate for a creditor's actual and necessary expenses incurred in making a substantial contribution in a chapter 11 case.   *See, e.g.*, *In re Granite Partners, L.P.*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).   "Substantial contribution" is not defined in the Bankruptcy Code, but courts have said that "[s]ervices which substantially contribute to a case are those which foster and enhance the progress of reorganization." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (internal citations and quotation marks omitted).   Factors to consider when determining whether services make a "substantial contribution" include: "whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct, significant and demonstrably positive benefit upon the estate; and whether the services were duplicative of services performed by others." *In re AmFin Financial Corp.*, 468 B.R. 827, 832 (Bankr. N.D. Ohio 2012) (internal citations and quotation marks omitted).

---

[4] 11 U.S.C. § 503(b)(4).

43.     The Consenting Creditors' negotiation, development and support for the proposed Plan have undoubtedly "foster[ed] and enhance[d]" the Debtors' progress of reorganization and, therefore, their efforts qualify as a substantial contribution to these chapter 11 cases under applicable authority.

44.     *First*, the Consenting Creditors' efforts in connection with the negotiation (and re-negotiation) of the RSA and the related Plan benefit not only the Debtors' estates but all stakeholders in these cases, by offering a value-maximizing resolution to the myriad complex issues in these cases and allowing the Debtors to exit chapter 11 in a relatively expeditious manner. *See* Moore Declaration, ¶¶ 14, 20.  The Consenting Creditors were at the forefront of all of these negotiations, exchanging term sheets with the Debtors and various parties-in-interest, and drafting and negotiating various versions of the RSA, the Plan and related disclosure statements ultimately filed with the Court.  The Consenting Creditors also conducted significant diligence to ensure the FE Non-Debtor Parties were providing sufficient consideration in exchange for the settlement of the Debtors' potential causes of actions.

45.     Since well before the Petition Date, the Consenting Creditors have worked hard to foster settlement and consensus among the various creditor constituencies.  The Debtors were able to make a smooth entry into these chapter 11 cases because of the prepetition PSA and Standstill Agreement, preventing a litigation free-for-all on day one of the case.  Moreover, the Ad Hoc Noteholder Group and the Mansfield Certificateholders Group took the initiative to negotiate the Initial FE Settlement, which was crucial in setting the groundwork for a global settlement with FE Corp. that would provide consideration necessary for the Debtors' reorganization and create a critical pillar for negotiation of the RSA.  As part of the FE Settlement Agreement, GLC has been instrumental in the process of integrating the Pleasants

20

Power Plant into the Debtors' existing portfolio. Following the announcement of the FE Settlement Agreement, the FES Creditor Group played a critical role in negotiating the allocation of the consideration provided under the FE Settlement Agreement among the Debtors' estates.

46. Moreover, because the Consenting Creditors represent a diverse array of claims across all of the Debtor entities, their participation in the negotiation of the RSA benefited all stakeholders by ensuring that value will be allocated equitably across the various estates. One of the critical features of the RSA is that various creditors will receive different types of *pro rata* distributions from different Debtors' estates (cash and/or equity). For example, the Mansfield Owner Parties agreed to take their distributions in cash on account of their claims against FES, FG and FGMUC, which (in addition to freeing up additional equity interests for distribution to other creditors pursuant to the Plan) ensured that the interests of creditors receiving cash distributions from those Debtors' estates were adequately represented during the Plan process.

47. *Second*, the Consenting Creditors have provided, and continue to provide, a direct, significant and demonstrably positive benefit to the Debtors' estates because the RSA results in significant cost savings for the Debtors' estates by avoiding the litigation-related costs and delays that would otherwise arise without the assured support of the Consenting Creditors, and provides a clear path to confirmation and emergence. *See* Moore Declaration, ¶ 19. In addition, the Consenting Creditors' ongoing commitment to this restructuring continues to provide stability to the Debtors' businesses, and thus provides an ongoing tangible benefit to all stakeholders. *See id*.

48. *Third*, given that the Consenting Creditors hold the overwhelming majority of claims across various creditor classes in these chapter 11 cases, the services and support

18-50757-amk    Doc 2569    FILED 04/29/19    ENTERED 04/29/19 20:23:04    Page 21 of 40

provided by the Consenting Creditors are not, and could not be, duplicative of any services performed by any other parties. *See* Moore Declaration, ¶ 17.

## B. The Consenting Creditors' Fees and Expenses Are Reasonable

49. Under section 503(b) of the Bankruptcy Code, the reasonableness of professional charges is based on the time, nature, extent and value of the services rendered, and whether related expenses are actual and necessary. 11 U.S.C. § 503(b). The fees and expenses of the Consenting Creditors' Professionals and the Consenting Owner Trustee satisfy the requirements of section 503(b) of the Bankruptcy Code based on the time and labor required, the skills necessary, and the customary fees charged to clients in bankruptcy and non-bankruptcy cases.

50. *Time and Labor Required / Skills Necessary*. The Consenting Creditors' Professionals performed services for the Consenting Creditors on a nearly daily basis in order to analyze and evaluate the numerous settlements contained in the Plan Settlement and the FE Settlement Agreement concerning (i) the allocation of the consideration provided under the FE Settlement Agreement among the Debtors' estates, (ii) treatment and allowance of Intercompany Claims, (iii) the allocation of value between and among the Debtors' estates and various creditor constituencies and (iv) the Mansfield Settlement. The Consenting Creditors' Professionals also performed services for the Consenting Creditors in order to analyze and diligence the Pleasants Power Plant transaction, optimize the organization of the business entities under the Plan, and coordinate the development and submittal of the nuclear units' LTAs to the NRC. The analysis and evaluation performed by the Consenting Creditors' Professionals required substantial time and effort from various attorneys, including corporate/M&A, litigation, regulatory, tax and restructuring, as well as the financial advisors. As the Plan Settlement began to solidify, the various attorneys and financial advisors began the time-consuming work of drafting the RSA, Initial Disclosure Statement and Plan to reflect the Plan Settlement over the course of several

22

months, as well as preparing recovery models and reviewing business forecasts. After the Court denied approval of the Initial Disclosure Statement, the Consenting Creditors Professionals got back to work, earnestly working with the Debtors to negotiate a consent and waiver with the FE Non-Debtor Parties that kept the economic benefits of the Plan Settlement in place, and amending the Initial Disclosure Statement and Plan.

51. *Customary Fees and Expenses*. The Consenting Creditors submit that the fees and expenses for which they seek reimbursement in this Application are reasonable. *See* Moore Declaration, ¶¶ 5, 19, 22. The success fees, hourly rates and expense reimbursement policies of the Consenting Creditors' Professionals are customary for professional firms in complex chapter 11 cases. In addition, the amount of time spent, the level of staffing and the success fees are entirely consistent with the substantial effort of the Consenting Creditors in the chapter 11 cases.

52. Under the Proposed Order, the Consenting Creditors' Professionals and other applicable parties must provide copies of their monthly invoices to the Debtors, the Committee and the U.S. Trustee, and such parties shall have seven (7) days following receipt of an invoice to object to the payment of such invoice. Contemporaneously with the filing of the Application, the FES Creditor Group Professionals and the Consenting Owner Participants Professionals (to the extent not already paid pursuant to the PSA/Standstill Order) have submitted invoices for fees and expenses earned through March 31, 2019 to the Debtors, the Committee and the U.S. Trustee, and such invoices will be subject to a seven (7) day review period following the entry of an order substantially in the form of the Proposed Order.

## RESERVATION OF RIGHTS

53. This Application is without prejudice to the Consenting Creditors or the Debtors seeking payment of the Consenting Creditors' fees and expenses on any other applicable

18-50757-amk    Doc 2569    FILED 04/29/19    ENTERED 04/29/19 20:23:04    Page 23 of 40

grounds, including pursuant to section 363(b) of the Bankruptcy Code, and the Consenting Creditors specifically reserve all rights.

## NOTICE

54.     Notice of this Application has been served on each party or entity on the General Service List (as defined in the *Amended Order, Pursuant to Sections 102 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9013 and 9014 and Local Bankruptcy Rules Establishing: (I) Omnibus Hearing Dates; and (II) Certain Case Management Procedures* [Docket No. 280]).  The Consenting Creditors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

55.     WHEREFORE, the Consenting Creditors respectfully request that the Court enter the Proposed Order substantially in the form attached hereto as **Exhibit A** granting the relief requested in this Application and such other and further relief as may be just and proper.

18-50757-amk    Doc 2569    FILED 04/29/19    ENTERED 04/29/19 20:23:04    Page 24 of 40

Dated: April 29, 2019

Respectfully submitted,

/s/ Eric R. Goodman

Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114-1214
Telephone: 216.621.0200
Facsimile: 216.696.0740
Email: egoodman@bakerlaw.com

Amy Caton
P. Bradley O'Neill
Joseph A. Shifer
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Telephone: 212.715.9100
Facsimile: 212.715.8000
Email: acaton@kramerlevin.com
       boneill@kramerlevin.com
       jshifer@kramerlevin.com

*Counsel for Ad Hoc Noteholder Group*

/s/ A.J. Webb

Douglas L. Lutz
A.J. Webb
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone: 513.651.6724
Facsimile: 513.651.6981
Email: dlutz@fbtlaw.com
       awebb@fbtlaw.com

Darren S. Klein (admitted *pro hac vice*)
Natasha Tsiouris (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: 212. 450.4000
Facsimile: 212.701.5800
Email: darren.klein@davispolk.com
       natasha.tsiouris@davispolk.com

*Counsel to the FES Creditor Group*

/s/ Michael J. Kaczka
Scott N. Opincar (0064027)
Michael J. Kaczka (0076548)
Maria G. Carr (0092412)
MCDONALD HOPKINS LLC
600 Superior Ave. E., Suite 2100
Cleveland, Ohio 44114-2653
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
Email:  sopincar@mcdonaldhopkins.com
            mkaczka@mcdonaldhopkins.com
            mcarr@mcdonaldhopkins.com


 - and -

LATHAM & WATKINS LLP
George A. Davis (admitted *pro hac vice*)
Andrew Parlen (admitted *pro hac vice*)
Adam S. Ravin (admitted *pro hac vice*)
Andrew D. Sorkin (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile: (212) 751-4864
Email:   george.davis@lw.com
            andrew.parlen@lw.com
            adam.ravin@lw.com
            andrew.sorkin@lw.com


O'MELVENY & MYERS LLP
Gary Svirsky (admitted *pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Email:  gsvirsky@omm.com


*Counsel to the Mansfield Certificateholders
Group*

/s/ Elia O Woyt
VORYS, SATER, SEYMOUR AND
PEASE LLP
Elia O. Woyt (0074109)
106 South Main Street, Suite 1100
Akron, Ohio 44308
Telephone:  (330) 208-1047
Facsimile:  (330) 208-1072
Email:  eowoyt@vorys.com


        -and-


SIDLEY AUSTIN LLP
Jennifer C. Hagle (admitted *pro hac vice*)
Anna Gumport (admitted *pro hac vice*)
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
Email:  jhagle@sidley.com
            agumport@sidley.com


        -and-


Michael G. Burke (*admitted pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599
Email:  mgburke@sidley.com


*Attorneys for MetLife Capital, Limited
Partnership*

/s/ John R. Ashmead

John R. Ashmead (admitted *pro hac vice*)
Gregg S. Bateman (admitted *pro hac vice*)
Robert J. Gayda (admitted *pro hac vice*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 574-1200
Facsimile:  (212) 480-8421
Email:  ashmead@sewkis.com
        bateman@sewkis.com
        gayda@sewkis.com

*Attorneys for U.S. Bank Trust National Association*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  | Chapter 11 |
|---|---|
| In re: | |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | Case No. 18-50757 (Jointly Administered) |
| Debtors. | Hon. Judge Alan M. Koschik |

### ORDER GRANTING APPLICATION OF CONSENTING CREDITORS PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION

Upon consideration of the application (the "**Application**")[2] seeking entry of an order pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code (this "**Order**") allowing, as administrative expenses of the Debtors' estates, and authorizing the Debtors to reimburse, the professional fees and expenses incurred by the Consenting Creditors and the fees and expenses incurred by the Consenting Owner Trustee in making a substantial contribution in these chapter 11 cases; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186), case no. 18-50757; and Norton Energy Storage L.L.C. (6928), case no. 18-50763.  The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Application.

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been served, and it appearing that no other or further notice need be provided; and the Court having reviewed the Application and the Moore Declaration and determined that the legal and factual bases set forth therein establish just cause for the relief granted herein; and upon all the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT**

1. The Application is granted as set forth herein.

2. The Debtors, subject to paragraphs 4 and 5 of this Order and to the extent not already provided under the PSA/Standstill Order, are authorized and directed to pay (1) the reasonable and documented professional fees and expenses of the following advisors: (i) GLC Advisors & Co., as financial advisors to the Ad Hoc Noteholder Group, (ii) Guggenheim Securities, LLC, as investment banker and financial advisor to the Mansfield Certificateholders Group, (iii) Davis Polk and Wardwell LLP, as legal advisor to the FES Creditor Group ("**Davis Polk**"), (iv) Frost Brown Todd LLC, as local legal advisor to the FES Creditor Group ("**Frost Brown Todd**"), (v) Houlihan Lokey Capital, Inc., as financial advisor to the FES Creditor Group ("**HL**," and together with Davis Polk and Frost Brown Todd, the "**FES Creditor Group Professionals**"), (vi) Sidley Austin LLP, as legal advisor to the Consenting Owner Participant ("**Sidley**"), (vii) Ann Pollock, as legal advisor to the Consenting Owner Participant ("**Pollock**"), (viii) Vorys, Sater, Seymour and Pease LLP, as local legal advisor to the Consenting Owner Participant ("**Vorys**"), (ix) Crestview Capital Advisors Corporation, as financial advisor to the Consenting Owner Participant ("**Crestview Capital**," and together with Sidley, Pollock

2

and Vorys, the "**Consenting Owner Participant Professionals**"), and (x) Seward & Kissel LLP, as legal advisor to the Consenting Owner Trustee (including, with respect to the advisors referenced in clauses (i), (ii), (v) and (ix), fees in accordance with the terms set forth in **Exhibit 1** to this Order (notwithstanding the terms of any existing engagement letters entered into by such advisors)), and (2) the reasonable and documented fees and expenses of the Consenting Owner Trustee.  For the avoidance of doubt, following entry of this Order (such date, the "**Order Effective Date**"), but subject to paragraphs 4 and 5 of this Order, the Debtors shall pay all reasonable and documented fees and expenses of (x) the FES Creditor Group Professionals through March 31, 2019 and (y) the Consenting Owner Participant Professionals through March 31, 2019 (to the extent not already paid pursuant to the PSA/Standstill Order).

3.      The fees and expenses authorized under paragraph 2 of this Order shall be allowed as administrative expense claims under Bankruptcy Code sections 503(b)(3)(D) and 503(b)(4) for reimbursement of professional fees and expenses incurred in connection with making a substantial contribution to the chapter 11 cases.

4.      Upon the consummation of the Plan as set forth in the Plan Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof, the Debtors shall pay all transaction or back-end fees of all financial advisors listed in the foregoing paragraph 2 in accordance with the terms set forth on Exhibit 1 to this Order.

5.      In connection with the payment of any fees and expenses authorized under paragraph 2 of this Order (other than the transaction and back-end fees referenced in paragraph 4), the applicable professional and other applicable parties shall provide monthly fee statements ("**Invoices**") (including Invoices for fees and expenses that have

3

been incurred prior to the Order Effective Date) via e-mail to the Debtors, the Committee and the U.S. Trustee (collectively, the "**Fee Notice Parties**"). For the avoidance of doubt, such professionals and other parties shall not be required to comply with the U.S. Trustee fee guidelines or file any interim or final fee applications with the Court. The Invoices shared with the Fee Notice Parties pursuant to this paragraph shall, in the case of legal counsel, include the number of hours billed and reasonably detailed descriptions of services provided and expenses incurred by each applicable professional; *provided, however*, that the Invoices may be redacted to protect privileged, confidential or proprietary information. Upon receipt of an Invoice, the Fee Notice Parties shall have seven (7) days to provide the applicable professional with written objections to any fees and expenses (the "**Disputed Invoiced Fees**") requested in such Invoice (the "**Review Period**"); *provided* that, with respect to Invoices submitted to the Fee Notice Parties prior to the Order Effective Date, the Review Period shall begin on the Order Effective Date. If such objections provided by the Fee Notice Parties during the Review Period cannot be resolved with the applicable professional or other party seeking payment of fees and expenses, the Fee Notice Parties or the applicable professional or other party may request a determination by this Court with respect to the Disputed Invoiced Fees by filing with the Court a motion or other pleading, on at least seven (7) days' prior written notice to the Fee Notice Parties, the Consenting Creditors and the applicable professional or other party seeking payment of fees and expenses of any hearing on such motion or other pleading, setting forth specific objections to the Disputed Invoiced Fees. Following expiry of the Review Period, the Debtors shall only be required to pay amounts requested

4

in an Invoice other than the Disputed Invoiced Fees pending resolution of any disputes by the parties or the Court.

6.     This Order is without prejudice to the rights of the Consenting Creditors, the Debtors or any other party to assert that other legal bases exist for payment of the Consenting Creditors' professional fees and expenses approved and authorized herein, including pursuant to section 363(b) of the Bankruptcy Code.

7.     The Court shall retain exclusive jurisdiction to hear and decide all matters arising from or related to this Order.

# # #

**SUBMITTED BY:**

/s/ Eric R. Goodman
Eric R. Goodman
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio  44114-1214
Telephone:  216.621.0200
Facsimile:  216.696.0740
Email:   egoodman@bakerlaw.com

Amy Caton
P. Bradley O'Neill
Joseph A. Shifer
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036-2714
Telephone:  212.715.9100
Facsimile:  212.715.8000
Email:   acaton@kramerlevin.com
         boneill@kramerlevin.com
         jshifer@kramerlevin.com

*Counsel for Ad Hoc Noteholder Group*

/s/ A.J. Webb
Douglas L. Lutz
A.J. Webb
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone:  513.651.6724
Facsimile: 513.651.6981
Email:   dlutz@fbtlaw.com
         awebb@fbtlaw.com

Darren S. Klein (admitted *pro hac vice*)
Natasha Tsiouris (admitted *pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone:  212. 450.4000
Facsimile:  212.701.5800
Email:   darren.klein@davispolk.com
         natasha.tsiouris@davispolk.com

*Counsel to the FES Creditor Group*

/s/ Michael J. Kaczka
Scott N. Opincar (0064027)
Michael J. Kaczka (0076548)
Maria G. Carr (0092412)
MCDONALD HOPKINS LLC
600 Superior Ave. E., Suite 2100
Cleveland, Ohio 44114-2653
Telephone:  (216) 348-5400
Facsimile:  (216) 348-5474
Email:  sopincar@mcdonaldhopkins.com
          mkaczka@mcdonaldhopkins.com
          mcarr@mcdonaldhopkins.com

  - and -

LATHAM & WATKINS LLP
George A. Davis (admitted *pro hac vice*)
Andrew Parlen (admitted *pro hac vice*)
Adam S. Ravin (admitted *pro hac vice*)
Andrew D. Sorkin (admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile: (212) 751-4864
Email:   george.davis@lw.com
          andrew.parlen@lw.com
          adam.ravin@lw.com
          andrew.sorkin@lw.com

O'MELVENY & MYERS LLP
Gary Svirsky (admitted *pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Email:  gsvirsky@omm.com

*Counsel to the Mansfield Certificateholders
Group*

/s/ Elia O Woyt
VORYS, SATER, SEYMOUR AND
PEASE LLP
Elia O. Woyt (0074109)
106 South Main Street, Suite 1100
Akron, Ohio 44308
Telephone:  (330) 208-1047
Facsimile:  (330) 208-1072
Email:  eowoyt@vorys.com

          -and-

SIDLEY AUSTIN LLP
Jennifer C. Hagle (admitted *pro hac vice*)
Anna Gumport (admitted *pro hac vice*)
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600
Email:  jhagle@sidley.com
          agumport@sidley.com

          -and-

Michael G. Burke (*admitted pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599
Email:  mgburke@sidley.com

*Attorneys for MetLife Capital, Limited
Partnership*

/s/ John R. Ashmead

John R. Ashmead (admitted *pro hac vice*)
Gregg S. Bateman (admitted *pro hac vice*)
Robert J. Gayda (admitted *pro hac vice*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
Telephone:  (212) 574-1200
Facsimile:  (212) 480-8421
Email:  ashmead@sewkis.com
        bateman@sewkis.com
        gayda@sewkis.com

*Attorneys for U.S. Bank Trust National Association*

**Exhibit 1**

**Financial Advisor Professional Fees**

| Professional | Fee Terms |
|---|---|
| GLC Advisors & Co. | Monthly Fee: $175,000<br><br>Transaction Fee (as defined in the GLC Engagement Letter dated as of March 1, 2017): $5,200,000<br><br>Pleasants M&A Fee: $1,000,000<br><br>Crediting: 50% of Monthly Fees credited against the Transaction Fee beginning on the date that a confirmation order is entered by the Court.<br><br>Fee Cap: None<br><br>Treatment of Accrued Fees: Accrued and unpaid prepetition fees in the amount of $700,000 will be waived.<br><br>Transaction Fees shall only be paid upon the Debtors' consummation of the Plan as set forth in the Plan Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof. |
| Guggenheim Securities, LLC | Monthly Fee: $150,000<br><br>Transaction Fee (as defined in the Guggenheim Engagement Letter dated as of July 1, 2017): $3,250,000<br><br>Crediting: 50% of Monthly Fees credited against the Transaction Fee beginning on the date the RSA is signed. On the date that a confirmation order is entered, crediting of Monthly Fees against the Transaction Fee will increase to 75%.<br><br>Fee Cap: None<br><br>Treatment of Accrued Fees: No prepetition fees are owed.<br><br>Transaction Fees shall only be paid upon the Debtors' consummation of the Plan as set forth in the Plan |

Exhibit 1-1

| Professional | Fee Terms |
|---|---|
| | Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof. |
| Houlihan Lokey Capital, Inc. | <u>Monthly Fee</u>: $150,000 beginning as of August 13, 2018<br><br><u>Initial Deferred Fee</u> (as defined in the Houlihan Lokey Engagement Letter dated as of October 23, 2018): $2,000,000<br><br><u>Discretionary Fee</u> (as defined in the Houlihan Lokey Engagement Letter dated as of October 23, 2018): $1,000,000<br><br><u>Crediting</u>: 50% of Monthly Fees credited against the Initial Deferred Fee and Discretionary Fee beginning on the date the RSA is signed.  On the date that a confirmation order is entered, crediting of Monthly Fees against the Initial Deferred Fee and Discretionary Fee will increase to 75%.<br><br><u>Fee Cap</u>: None<br><br><u>Treatment of Accrued Fees</u>: Accrued Monthly Fees and expenses in the amount of $1,244,523.29 will be paid following entry of the Order, subject to paragraph 5 of the Order.<br><br>Initial Deferred Fees and Discretionary Fees shall only be paid upon the Debtors' consummation of the Plan as set forth in the Plan Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof. |

Exhibit 1-2

| | |
|---|---|
| Crestview Capital | <u>Service Fee</u>: The Service Fee shall be equal to $775 per hour, subject to annual adjustments.<br><br><u>Restructuring Fee</u>: Crestview Capital shall be entitled to earn a Restructuring Fee, which shall be equal to 0.50% of the Claim Recovery[1] less the Restructuring Fee Credit.<br><br><u>Restructuring Fee Credit</u>: The Restructuring Fee Credit means an amount equal to (i) 37.5% of the Service Fees paid over the life of the engagement less (ii) $77,500.<br><br>Restructuring Fee shall only be paid upon the Debtors' consummation of the Plan as set forth in the Plan Term Sheet and RSA or as may be modified or amended in accordance with the terms thereof. |

---

[1] "**Claim Recovery**" means the total aggregate fair market value of cash and non-cash consideration that MetLife recovers on account of any claims that it may assert against FES, FG, or any of their affiliates, successors or assigns.

Exhibit 1-1

## CERTIFICATE OF SERVICE

     *Pursuant to this Court's Amended Order, Pursuant to Sections 102 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9013 and 9014 and Local Bankruptcy Rules Establishing: (I) Omnibus Hearing Dates; and (II) Certain Case Management Procedures* (Docket No. 280) (the "**Case Management Order**"), the undersigned hereby certifies that, on April 29, 2019, a copy of the foregoing *Application of Consenting Creditors Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and Payment of Fees and Expenses Incurred in Making a Substantial Contribution* was served: (i) electronically through CM/ECF on those parties who have elected to receive electronic notice in this case, at the email addresses registered with the Court; and (ii) by U.S. Mail, postage prepaid, on the General Service List and the 2002 Service List, as those terms are defined in the Case Management Order, in effect as of April 29, 2019.

                            /s/ *A.J. Webb*
                            A.J. Webb