# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

*In re*:
**FirstEnergy Solutions Corp., *et al*.[1]**,

*Debtors.*

**Chapter 11**

**Case No. 18-50757-amk
(Jointly Administered)**

**Judge Alan M. Koschik**

---

### OBJECTION OF AMERICAN CENTRIFUGE ENRICHMENT, LLC AND UNITED STATES ENRICHMENT CORPORATION TO CONFIRMATION OF THE SIXTH AMENDED JOINT PLAN OF REORGANIZATION OF FIRSTENERGY SOLUTIONS CORP., *ET AL.*

NOW COMES Creditors American Centrifuge Enrichment, LLC ("ACE") and United States Enrichment Corporation (together with ACE, "USEC"),[2] and hereby object to the confirmation of the Debtor's *Sixth Amended Joint Plan of Reorganization of First Energy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 2934] under § 1129(b) of Title 11 of the United States Bankruptcy Code, as the plan does not meet the requirements of § 1129(a)(3), unfairly discriminates, and is not fair and equitable. Because Debtors' Plan fails to meet the requirements under § 1129(a)(1), § 1123(a)(4), § 1125, § 1129(a)(3), § 1129(a)(7) and § 1129(b), confirmation of the plan must be denied.

---

[1]    The Debtors in these cases are: FE Aircraft Leasing Corp.; FirstEnergy Generation, LLC; FirstEnergy Generation Mansfield Unit 1 Corp.; FirstEnergy Nuclear Generation, LLC; FirstEnergy Nuclear Operating Company; FirstEnergy Solutions Corp; and Norton Energy Storage, LLC.

[2]    Creditors are suppliers of enriched uranium used to fuel reactors owned by FirstEnergy Nuclear Generation, LLC and operated by FirstEnergy Nuclear Operating Company. United States Enrichment Corporation operated and maintained the Portsmouth, Ohio gaseous diffusion uranium enrichment plant until 2011. ACE was established by Centrus Energy Corp. (formerly USEC Inc.) to deploy a gas centrifuge uranium enrichment plant at the Portsmouth, Ohio site. ACE signed a long-term agreement with FirstEnergy Nuclear Operating Company in 2009 that subsequently was partially assigned to United States Enrichment Corporation. This agreement is the subject of claims before this Court.

1

This Objection is supported by the attached Memorandum.

Date: August 2, 2019

Respectfully submitted:

**BRENNAN, MANNA & DIAMOND, LLC**

*/s/ Michael A. Steel*
Michael A. Steel (#0072367)
75 East Market Street
Akron, Ohio 44308
PH:     (330) 374-7471
FX:     (330) 374-7472
EMAIL: masteel@bmdllc.com

*Attorney for Creditors American Centrifuge
Enrichment, LLC & United States Enrichment
Corporation*

## <u>TABLE OF CONTENTS</u>

MEMORANDUM IN SUPPORT OF OBJECTION TO CONFIRMATION OF PLAN .............. 4
I.     SUMMARY OF OBJECTION ...................................................................................... 4

II.    FACTUAL BACKGROUND ...................................................................................... 9

III.   LAW AND ARGUMENT ....................................................................................... 17

IV.   THE PLAN CANNOT BE CONFIRMED BECAUSE IT MISALLOCATES VALUE AMONG THE ESTATES TO THE DETRIMENT OF NG AND FENOC CREDITORS. .... 20

    A.  Under-Valuation of the NG assets. ............................................................... 21

    B.  Misallocation of the FE/FES Revolver Proceeds. .......................................... 21

    C.  Misallocation of the FE Settlement Value .................................................... 23

    D.  Failure to Consider FES Debt Relief in Cash Allocation of FE Settlement. ................. 26

    E.  Definition of "NG Distributable Value." ...................................................... 26

    F.  Under-Valuation of the FENOC Assets and Business. .................................... 26

    G.  Examiner. ...................................................................................................... 28

V.    OTHER DEFICIENCIES IN DEBTORS' PLAN. ..................................................... 28

    A.  Disputed Claims and Claims Resolution Provisions. .................................... 28

    B.  Impact of Legislature Developments Related to the Nuclear Business. ......................... 30

    C.  Setoffs and Recoupments. ............................................................................ 30

    D.  Reallocation of Value Based on Claim Allowance. ...................................... 31

    E.  Lack of Equity Option for FENOC Creditors and Holders of Disputed Claims. ........... 31

VI.   CONCLUSION ....................................................................................................... 32

**House Bill 6**.........................................................................................................**EXHIBIT A**

**House Bill 6 Legislative Analysis**...........................................................................**EXHIBIT B**

## MEMORANDUM IN SUPPORT OF OBJECTION TO CONFIRMATION OF PLAN

## I.  SUMMARY OF OBJECTION

1.  The *Sixth Amended Joint Plan of Reorganization of First Energy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") is the product of closed negotiations dominated by creditor constituencies that benefit from allocation of a disproportionate share of the Debtors' collective value to the parent FirstEnergy Solutions Corp. ("FES") rather than the operating entities that generate the power sold by the Debtors and represent the real value of their businesses. Predictably, this process has resulted in the unfair redistribution of value to FES that should be attributable to the assets and businesses of the operating companies, including FirstEnergy Nuclear Generation ("NG") and First Energy Nuclear Operating Company ("FENOC").

2.  Unlike other creditors such as the FES bondholders, USEC asserts direct claims against NG, the entity that owns the nuclear power plants that produce much of the power sold by the Debtors and against FENOC, the entity that operates the nuclear plants. USEC has filed $313 million in claims related to a rejected nuclear supply agreement with NG as principal/owner and FENOC as operator/agent. Virtually every other class of claims against NG (besides USEC) has stipulated claims against FES as well.[3] Many other creditor constituencies that participated in the allocation of the assets among the estates, including the settlement consideration, have a strong interest in assuring that the holding company (FES) gets a disproportionate larger share of the assets because that entity is the sole obligor on their claims.

---

[3]  While USEC also asserts claims against FES and FG under an umbrella guaranty covering, *inter alia*, "the deferred purchase price of property or services," the Debtors have contested USEC's rights thereunder.  As a result, USEC has no assurance that it will recover against FES (unlike literally every other creditor in every class of claims against NG).

18-50757-amk    Doc 2976    FILED 08/02/19    ENTERED 08/02/19 14:43:47    Page 4 of 40

The balance of the participating creditor constituencies are at least indifferent if FES gets a larger share since they also have stipulated claims against FES.

3.      Indeed, there is not a single member of the Creditors Committee or any of the groups that were invited to participate in the allocation of value who asserts trade claims against NG as USEC does. And USEC is informed and believes that it is the only trade creditor with claims against *both* NG and FENOC. As such, USEC has a unique interest in making sure that the allocation of assets (through the valuation of the nuclear assets and allocation of the claims against the non-Debtor affiliates) is fair to NG and FENOC and the estates of these entities.

4.      The Plan unfairly over allocates value to the holding company parent (FES) to the disadvantage of NG and FENOC for the following reasons, among others, as discussed below:

> A.  <u>Revolver Proceeds</u>. Prior to the petition date, the Debtors had a five hundred million-dollar ($500,000,000) line of credit from their non-Debtor affiliates (the "Revolver"). Prior to the bankruptcy filing, the Revolver was fully drawn down and is still held by the estates. The Revolver was extended after the operating entities (including NG) pledged their assets to secure the debt. Moreover, prior to the petition date, all of the cash resources of the estates were pooled. Yet, under the Plan, $475,000,000 million of the Revolver draw is allocated to FES, with just $25,000,000 allocated to FG. Nothing is attributed to NG.

> B.  <u>Allocation of Cash/Note FE Settlement Proceeds</u>. The Plan allocates the FE Settlement Value [4] with the non-Debtor affiliates as follows: (i) FES (57.5%); (ii) FG (23.4%); (iii) NG (15.1%) and (iv) FENOC (2.7%). But virtually every one of the settled claims was either exclusively or at least partially attributable to NG, yet NG received a relatively small portion of the FE Settlement Value. And at least one of the settled claims was primarily attributable to FENOC, yet FENOC receives almost none of the FE Settlement Value. The identified claims and their connection to NG and/or FENOC, included the following: (i) replacement of the Existing Credit Facility on which NG had not

---

[4]      "FE Settlement Value", Plan p.10, para no. 92, means the overall value contributed by the FE Non-Debtor Parties to the Debtors' Estate pursuant to the FE Settlement Agreement, including, but not limited to (i) the FE Settlement Cash, (ii) the New FE Notes, (iii) the Pleasants Power Plant, (iv) payments under the Tax Allocation Agreement, (v) credits for shared services and other operational support, and (vi) waivers of certain Claims as set forth in the FE Settlement Agreement.

encumbered its assets with the Revolver whereby NG pledged its assets as collateral; (ii) loss of a nuclear support obligation from non-Debtor FE for NG's operations and replacement with a valueless guaranty from FES; (iii) purchase by NG of power plants from non-Debtors at excessive prices; (iv) multiple cash transfers on various transactions from the Debtors to the non-Debtors based on proceeds of energy produced by NG and FG, not FES; and (v) pension plan payments of $188 million for which FENOC (with 2333 employees out of a total of 3076 for all of the Debtors) was by far the largest employer. Likewise, the settlement of veil-piercing claims against the non-Debtor affiliates should have benefited NG and FENOC to a much greater degree.

C. <u>Failure to Account for FES Debt Relief in the FE Settlement</u>. The misallocation of value in favor of FES in the FE Settlement is exacerbated by the fact that debts owed *solely* by FES to FE in the amount of $102,000,000 are released under the FE Settlement. Having been relieved of this sole FES obligation (with no resulting benefit to NG or FENOC), FES should have received even less of the cash and note consideration under the FE Settlement.

D. <u>Valuation of Nuclear Assets</u>. The Disclosure Statement provides literally no information on the value of the nuclear power assets owned by NG, which are critical in determining the proportionate split of value among the different estates. The issue of valuation has become much more acute given recent legislation just passed in Ohio (Ohio House Bill 6) that will result in a significant injection of financial support for the nuclear assets starting in 2021 (*$150,000,000 per year*). Given this infusion of nearly a billion dollars over six years, it is very likely that whatever value was ascribed to the nuclear power plants when the Plan was drafted, is now substantially wide of the mark. This development makes the allocation of value in the Plan even more unfair and the Disclosure Statement stale and inaccurate.

5.    As a result of these misallocations of value, FES (a holding company with no generation assets of its own) has been converted from an empty silo into the most valuable of the Debtor entities with fully $2,030,487,341 in allocable value. By comparison, only $1,365,106,331 is attributed to NG despite the fact that NG: (i) owns valuable power generation assets, (ii) will be the beneficiary of annual nuclear supplemental payments of $150,000,000 established by legislation approved after the solicitation of the Plan, (iii) is rightfully entitled to its share of the Revolver proceeds and (iv) is the logical beneficiary of a majority of the settled claims against FE. And the Plan only allocates $144,462,279 in distributable value to FENOC (which, unlike the other Debtors, is not a co-obligor on FES's debts). FENOC gets virtually nothing from the FE Settlement despite being the largest employer of any of the Debtors with

6

the highest pension cost and a beneficiary of veil-piercing claims against the non-Debtor affiliates.

6. The recent legislative developments concerning the nuclear business provided in Ohio House Bill 6 make the Plan unconfirmable for other reasons in addition to the value allocation problems.[5] The increase in reimbursement significantly changes the economics of the Debtors' operations going forward and compounds all of the separate valuation questions raised herein. It may also likely lead to a significant disparity between the value of cash and stock offered under the Plan. Holders of Claims (including USEC) should be given an opportunity to make the decision to opt for cash or equity after full and adequate disclosure of the impact of these very significant recent developments. To the extent that not enough stock is reserved for all holders of Disputed Claims, this may also lead to holders of Claims in the same class being treated inconsistently in violation of Section 1123(a)(4). Likewise, all of the disclosure related to asset value and the business going forward (not to mention the value of the stock) is stale, making the Disclosure Statement grossly inadequate under Section 1125. [6]

7. The Plan suffers from other defects as well. The most glaring of these defects are found in Articles VII (Procedures for Resolving Contingent, Unliquidated and Disputed Claims) and VIII (Settlement, Release, Injunction, and Related Provisions), as well as the related definitions used therein. These Articles establish a series of unacceptable procedures for resolving Disputed Claims (which are defined as all Claims except those already Allowed under the Plan) that unfairly tilts the deck in favor of the Debtors. A number of these provisions purport to nullify the provisions of the Bankruptcy Code and applicable law that protect holders

---

[5] A copy of Ohio House Bill 6 and the related legislative analysis by the Ohio Legislative Service Commission are attached at Exhibit A and Exhibit B hereto.

[6] USEC is continuing to assess the impact of the legislative change in this area and reserves the right to supplement this objection.

7

of claims. Among other things, the Plan purports to limit holders of Disputed Claims to a Disputed Claims Reserve set by the Debtors and other plan proponents (which can be released by those same parties in their discretion), with absolutely no recourse once the money and stock runs out. The Debtors must be required to reserve enough cash and stock to pay all Disputed Claims in full. Offsets and recoupments are limited. Inexplicably, no stock election is provided for FENOC creditors. Creditors who make the stock election after they get sufficient information to do so should be protected from discrimination concerning their equity including registration rights.

8.      Likewise, it is impossible to decipher the provisions in the Plan that will control reallocation of value among the estates to assure that the recovery rates will be fair. In particular, it is impossible to tell whether allowance of larger Disputed Claims against one of the Debtors will result in an appropriate reallocation of cash/stock value among the other classes of unsecured claims against that same Debtor estate and among the other Debtors.

9.      In sum, because the Plan unfairly discriminates against and fails to fairly and equitably treat creditors with claims specifically against NG and FENOC, it should not be confirmed by this Court. It suffers from numerous other material defects as well, all of which have the effect of unfairly disadvantaging creditors who did not participate in the negotiations. If the misallocation of value cannot be corrected as part of this Plan, the Court should consider appointment of a truly neutral Examiner selected by the Court to advise it on a fair allocation among the estates.

## II.    FACTUAL BACKGROUND

10.    On March 31, 2018 (the "Petition Date"), Debtors filed the Bankruptcy Cases and continue to operate and manage their businesses as debtors-in-possession according to §§ 1107 and 1108 of the Bankruptcy Code.

11.    The Debtors filed the Plan at Docket No. 2934 on July 23, 2019.

12.    The Debtors also filed the Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of First Energy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code at Docket No. 2661 on May 17, 2019 (herein, the "Disclosure Statement") but have not updated or amended the Disclosure Statement despite certain material new legislative developments that have a significant impact in the case.

13.    On May 17, 2019, the Debtors also filed Notice of Filing Proposed Order (i) Approving Disclosure Statement, (ii) Establishing Procedures For Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (iii) Approving the Form of Ballots, (iv) Scheduling a Hearing on Confirmation of the Plan, (v) Approving Procedures For Notice of the Confirmation Hearing and For Filing Objections to Confirmation of the Plan, and (vi) Granting Related Relief at Docket No. 2662.

14.    The Court scheduled an August 20, 2019 hearing and established an August 2, 2019 deadline for filing objections and responses to the confirmation of the plan at Docket No. 2714.

### Debtors' Operations

15.    FES is a holding company that just resells power produced by its operating subsidiaries, including NG, to retail and wholesale customers. *See* Declaration of Donald R Schneider in Support of Chapter 11 First Day Motions (the "Schneider Decl.") [Dkt. No. 55] at para. 19 ("Through its subsidiaries, FES owns and operates multiple power generation facilities

9

and sells the power generated by these facilities…. FES is a party to power purchase agreements ('PPA's') with its subsidiaries FG and NG, whereby it purchases all of the energy produced by FG and NG."). FES's primary asset is the stock of its subsidiaries, which is worthless given the direct claims against those entities by their creditors.  Its sole business consists of selling power produced by NG and FG. *See* Schneider Decl. at para. 40. ("NG and FES are parties to a PPA, whereby NG sells the entire output from its nuclear generation facilities to FES.").

16. The Disclosure Statement does not provide a value of NG's nuclear power plants as of the solicitation, despite the fact that the market value of those assets is a major factor in allocating the total consideration among the estates. The nuclear plants produce substantial power generation. *See* Schneider Decl. at para. 40 ("NG's nuclear plants have a Net Demonstrated Capacity of 4,048 MWs"). Nuclear comprises roughly fifty percent (50%) of the Debtors' generation capacity.  *See* Schneider Decl. para. 31 (Fossil Fuel) and para. 40 (Nuclear).

17. FENOC employs the vast bulk of the Debtors' employees and manages the valuable nuclear plants. *See* Schneider Decl. at para. 44–45. According to the schedules, its assets were valued at approximately $260,000,000. [Dkt. No. 547]. FENOC apparently provides its services at "cost" to the Debtors and various non-Debtor affiliates. *See* Schneider Decl. at para. 44.  FENOC generated consolidated revenues of $660,000,000 for fiscal year 2017, which of course doesn't account for the recently enacted legislation. *See* Schneider Decl. at para. 28.

## Revolver and Cash Management

18.     Prior to the Petition Date, the Debtors pooled their cash with various non-Debtor entities. *See* Schneider Decl. at paras. 50–51. The Debtors continued to pool their cash resources post-petition as well. *See* Schneider Decl. at paras. 298–308.

19.     Pre-petition, the Debtors maintained the $500,000,000 Revolver with their non-Debtor affiliates serving as lenders. The Revolver replaced loans under a third-party financing arrangement (the "Existing Credit Facility"). *See* Motion of Debtors to Approve Settlement Among The Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties, filed August 28, 2018 (the "Settlement Motion"), [Dkt. No. 1224]. They replaced the Existing Credit Facility with the Revolver from FE, guaranteed and secured by first liens on the assets of NG and FG. *See* Settlement Motion at paras. 16–17. Shortly prior to the Petition Date, the Revolver was drawn down by $500,000,000 (the "Revolver Draw"), which is still held in the Debtors' estates. *See* Schneider Decl. at para. 106.

20.     Despite the practice of cash pooling and the fact that the Revolver was based on the guaranties and asset pledges by the operating entities, including NG, the $500,000,000 Revolver Draw was placed in an "FES account." *See* Schneider Decl. at para. 106. Under the Plan, FES creditors will receive the benefit of $475,000,000 of the Revolver Draw, FG creditors get just $25,000,000 and NG and its creditors get literally nothing. *See* Plan, Article I, Sections 106, 118 and 199 (Definitions of FES Distributable Value, FG Distributable Value and NG Distributable Value).

## FE Settlement and Settlement Consideration

21.     The Debtors moved to approve their settlement with their non-Debtor affiliates including the parent FirstEnergy Corp. ("FE") on August 26, 2018. *See* Settlement Motion. In

the Settlement Motion, the Debtors provided descriptions of six avoidance actions and a seventh veil piercing claim against FE that were being settled (the "Released Claims"). *See* Settlement Motion at Paras. 23 (listing six potential "Avoidance Claims") and 34–38 (Veil Piercing). Virtually all of the Released Claims are either exclusively NG claims or NG should have at least been allocated a substantial portion of the relative settlement consideration. FENOC also had claims against FE based on the limited disclosure available (including veil piercing).

22.     <u>First</u>, the Debtors asserted claims against FE related to the substitution of the Existing Credit Facility with the Revolver under which NG pledged its assets and gave a guaranty. *See* Settlement Motion para. 23(ii).

23.     <u>Second</u>, NG had the benefit of a $400 million support obligation from its solvent affiliate FE. However, that support was cancelled, and it received a worthless support obligation from FES in its place. *See* Settlement Motion para. 23(iii).  FES never paid any consideration on account of this transferred support arrangement. *See* Schneider Decl. at para. 319.  Thus, NG was the sole victim in this switch, losing access to funds from FE and getting nothing in return from FES.

24.     <u>Third</u>, NG was also caused to buy equity interests in plants at an above-market rate. *See* Settlement Motion at para. 23(iv).  NG is the sole beneficiary of this claim.

25.     <u>Fourth</u>, the Settlement Motion identifies cash transfers from the Non-Utility Money Pool by FES to FE.  *See* Settlement Motion at para. 23(vi). But as noted above, the cash of the estates was consolidated. Moreover, all of the power generated and sold by the Debtors was ultimately produced by NG and FG, not FES.

26.     <u>Fifth</u>, the Settlement Motion also asserts that the Debtors had claims related to payments of $188 million in pension liabilities. *See* Settlement Motion at para. 23(v).  The

18-50757-amk    Doc 2976    FILED 08/02/19    ENTERED 08/02/19 14:43:47    Page 12 of 40

Settlement Motion does not identify the details of this claim. But the Schneider First Day Declaration lists the relative employment figures for the different estates. FENOC, which operates the nuclear assets owned by NG, is by far the largest employer of any of the Debtors with 2333 employees. That is roughly 76% of the total employment. By contrast, FES has only 57 employees. *See* Schneider Decl. at paras. 29, 44. Accordingly, a far greater value should have been attributed to FENOC.

27.     Sixth, The Settlement Motion also noted that the Debtors had veil-piercing and alter ego claims against FE, which would have presumably benefited all of the Debtors including NG and FENOC, not just FES. *See* Settlement Motion at paras. 34–38.

28.     The FE Settlement provided over $850,000,000 in cash and notes to the Debtors' collective estates. *See* Settlement Motion at para. 4 ($225 million cash and $628 million in notes). On top of the cash and notes, the ownership of a power plant was also contributed. *Id.* FE also forgave various debts that were owed by all of the Debtors' estates (the Revolver). And it forgave $102,000,000 owed by FES to FE, which was apparently not guaranteed by NG, FENOC or FG—meaning that the sole beneficiary of this consideration was FES. *See* Settlement Motion at para. 25.

29.     The FE Settlement continued the practice of allocating tax benefits among the Debtors and their non-Debtor affiliates. There is no disclosure regarding where the tax attributes were generated among the Debtors. But the Schneider First Day Declaration notes that the plan to exit "operations" resulted in $9.2 billion of impairment. *See* Schneider Decl. at para. 72. Presumably, these are the operations owned and operated by NG, FENOC and FG and thus, irrespective of how the Debtors chose to internally allocate tax credits, the actual tax benefits were actually derived from the operations of NG, FENOC and FG—not FES. Even if the

13

Debtors chose to undertake tax maneuvers that put FES in charge of their collective tax attributes, that does not mean they were generated or owned by FES. Moreover, the Debtors will be compensated for the future use of tax attributes under the tax sharing agreements with FE, separate from the cash, notes and power plant provided by FE. *See* Settlement Motion at para. 4 (projecting $66 million in future payments for tax year 2018). Thus, the tax arrangements should have no effect on the allocation of cash and note consideration from the FE Settlement.

### Allocation of Value under the Plan

30.  Given the foregoing, there is a compelling basis for concluding that the Plan grossly misallocates value away from FENOC and NG. As noted above, the Plan allocates $475,000,000 (95%) of the Revolver Draw proceeds to FES, with $25,000,000,000 (5%) to FG. Zero is allocated to NG and FENOC. The Plan allocates the FE Settlement Value as follows: FES—57.5%; FG—23.4%; NG—15.1%; FENOC—2.7%. *See* Plan, p. 69. As a result of the foregoing (and the low valuation of the NG and FENOC nuclear assets), the estates' relative value for distribution is as follows: FES—$2,030,487,34; NG—$1,365,106,331; FENOC—$144,462,279. *See* Plan, pp. 10, 11, 19. The Debtors concede that the allocation proposed in the Plan is largely the product of *negotiation* among certain organized creditor groups rather than a bottoms-up valuation of the different estates' individual claims and rights. *See* Disclosure Statement at pp. 77–78.

31.  The Plan documents offer no information on the valuation of the nuclear assets, although certain third-party valuations of NG's nuclear operations as of the time the Plan was solicited suggested that NG's nuclear plants were being operated profitably. See e.g., "The Market and Financial Position of Nuclear Resources in Ohio," Paul M. Sotkiewicz, Ph.D. (May

28, 2019). If this analysis was correct, the allocation of value to nuclear assets as of the issuance of the Plan would likely have been too low.

32.     After the Plan was solicited, a major legislative development occurred. On July 23, 2019, Ohio House Bill 6 was enacted. The Act provides substantial payments on account of their existing nuclear facilities. Starting in 2021, additional support of approximately $150,000,000 per year will go directly to the Debtors' nuclear operations owned by NG and managed by FENOC. *See* Ohio Legislative Service Commission, Bill Analysis of H.B. 6 ("Bill Analysis") at p. 1 (July 17, 2019) attached as Exhibit B (Bill generates "$150 million annually for total disbursements from the Nuclear Generation Fund.").

33.     Accordingly, the subsequent supplemental payments to Debtors not set forth in the Plan and Disclosure Statement will total approximately $1 billion over 6 years. NG and FENOC are the sole operators of nuclear facilities in Ohio. The Debtors, and the nuclear industry at large, strongly supported the Bill and testified in its support. Its passage is a major economic development for the industry, and NG and FENOC in particular, since they are the sole owners and operators of nuclear facilities in the Ohio and will receive all of the proceeds of the nuclear generation fund. Ohio House Bill 6 specifically establishes a "nuclear generation fund" that will be paid directly to "the owner and operator of a qualifying nuclear resource" (i.e., NG and FENOC). So even if the Debtors had correctly valued the nuclear assets as of the date the Plan was solicited, the valuation would now be stale and low given the infusion of almost a billion dollars over just 6 years. *See* H.B. 6; Bill Analysis attached as Exhibit B.

### USEC is Uniquely Situated (USEC Claims)

34.     USEC has filed claims against the Debtors for in excess of $313 million per claim based on obligations set forth in a long-term enriched uranium supply agreement as set

forth in its proof of claims (the "Supply Agreement"). *See* Proofs of Claim 1088, 1090, 1093 and 1094. USEC asserts direct claims against NG[7] as owner of the nuclear power plants and as principal under the Supply Agreement, and against FENOC[8] as the operator of the nuclear power plants and as agent under the Supply Contract. USEC asserts the same claims against FirstEnergy Generation, LLC ("FG")[9] and against FES[10] under an umbrella guaranty issued on March 26, 2007 (the "Umbrella Guaranty") that covers, *inter alia*, "the deferred purchase price of property or services, excluding however, trade accounts payable incurred in the ordinary course of business." *See* Schneider Decl. [Dkt. No. 55] at para. 63.

35. However, USEC is informed and believes that the Debtors contest USEC's Claims against FES and FG, asserting that the Umbrella Guaranty only covers claims for funded debt like FES's bond obligations. *See* Stipulation and Order Between the Debtors and USEC for Voting Purposes Pursuant to Bankruptcy Rule 3018(A) at para. 1, filed June 25, 2019 [Dkt. No. 2821] (allocating zero dollar voting value to FES and FG Claim).[11] Accordingly, given the likelihood that its claims against FES and FG will be contested, USEC has a significant stake in the fairness of the allocation of assets and value to NG and FENOC.

36. Under the Plan, there are three classes of NG unsecured claims (other than the Convenience Class and Class C6 for which there are zero estimated claims): Classes C4, C5 and C7. *See* Disclosure Statement at pp. 22–25. Other than USEC (the sole creditor in Class C7),

---

[7] Class C7.

[8] Class D5.

[9] Class B7.

[10] Class A6.

[11] While USEC believes that its claims against FES and FG are valid, it will have to overcome the Debtors' legal objections on that point to recover and, unlike the other NG creditors, has no assurance of an Allowed Claim against those entities.

18-50757-amk    Doc 2976    FILED 08/02/19    ENTERED 08/02/19 14:43:47    Page 16 of 40

literally every other unsecured creditor in every Class of Claims against NG will have stipulated Allowed Claims against FES. *See* Disclosure Statement at pp. 10–14, 22–25 (Classes A3–C4 (FES/PCN Note Claims) and A4–C5 (Mansfield Certificate Holders)).

37.     There are zero estimated "Single Box" NG creditors in Class C6, meaning that there are no other trade claims identified against NG other than USEC. *Id.* at p. 24 (Class C6 estimated at zero). There are no trade creditors with claims against NG on the Unsecured Creditors' Committee. *See* Notice of Appointment of Committee of Unsecured Creditors [Dkt. No. 279], filed April 12, 2018. At most, there is but one single creditor on the Creditors Committee with a trade claim against FENOC. None of the constituencies that negotiated the settlement that allocated value among the estates assert a trade claims against NG. Also, none, or virtually none, assert claims against both NG and FENOC.

## III.    **LAW AND ARGUMENT**

38.     Section 1129(a) of the Bankruptcy Code states that "[t]he court shall only confirm a plan if all of the [requirements of 1129] are met." [12] As the proponents of the Plan, the Debtors bear the burden proof with respect to the confirmation requirements by a preponderance of the evidence.[13] *In re Christian Faith Assembly*, 402 B.R. 794, 798 (Bankr. N.D. Ohio 2009). *See also In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440, 459 (Bankr. S.D. Ohio 2011) ("The Court cannot confirm a Chapter 11 plan unless the proponent of the plan shows by a preponderance of the evidence all of the requirements under § 1129 are met, including feasibility."); *In re Arts Dairy, LLC*, 432 B.R. 712, 716 (Bankr. N.D. Ohio 2010)

---

[12]     11 U.S.C. § 1129(a).

[13]     *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000). *See also In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 459 (Bankr. S.D. Ohio 2011) ("Courts universally agree that the burden of proof lies with the proponent of the plan").

("The plan proponent bears the burden of establishing to the satisfaction of the Court that the conditions set forth in § 1129 have been satisfied.").

39.     Further, § 1129(a)(3) requires the proponent's plan to be submitted in "good faith and not by any means forbidden by law" and § 1129(a)(8) requires that every class of creditors accept the proponent's plan unless their class is not impaired under the plan. 11 U.S.C § 1129(a)(3), (a)(8).

40.     However, if the Debtors establish all provisions of § 1129(a) except for § 1129(a)(8), the Plan can only be confirmed under § 1129(b) if the Plan: (1) does not discriminate unfairly, and (2) is fair and equitable. 11 U.S.C § 1129(b)(1).

41.     A plan unfairly discriminates if it treats creditors with similar legal rights and interests materially different. *In re Allied Consol. Industries, Inc.*, 569 B.R. 284, 295 (Bankr. N.D. Ohio 2017); *See also In re Hercules Offshore, Inc.*, 565 B.R. 732, 766 (Bankr. D. Del. 2016).

42.     The Court uses a four-part test to determine whether discrimination against a class is unfair:

a.     whether the discrimination is supported by a reasonable basis;

b.     whether the debtor can confirm and consummate a plan without the discrimination;

c.     whether the discrimination is proposed in good faith; and

d.     how the class that is being discriminated against is treated.

*In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 894–95 (Bankr. N.D. Ohio 2004).

18-50757-amk    Doc 2976    FILED 08/02/19    ENTERED 08/02/19 14:43:47    Page 18 of 40

43.    However, the Court also has an *independent duty* to ensure Debtors' Plan is in compliance with the Bankruptcy Code's confirmation requirements, including the cramdown requirements of 1129(b).[14]

44.    Allocation of value among creditors is one of the most central functions of Bankruptcy Courts and is controlled by detailed provisions of the Bankruptcy Code. [15]

45.    In allocating the value of assets among the estates, the Court has an independent duty to determine the proper allocation on an entity by entity basis. No deference should be paid to the proposed allocation of the settlement by the Debtors, particularly where the proposed allocation favors the controlling parent and the official and unofficial committees are dominated by the parent's creditors. *See Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39 (S.D.N.Y. 2003).

46.    "In order for a plan to be 'fair and equitable' for purposes of §1129(b), it must satisfy the absolute-priority rule." *Ice House America, LLC v. Cardin*, 751 F.3d 734, 737 (6th Cir. 2014) (citing *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)). Per the statute, "the rule provides that every unsecured creditor must be paid in full before the debtor can retain 'any property' under a plan." 11 U.S.C. §1129(b)(2)(B)(ii). *Ice House America, LLC v. Cardin*, 751 F.3d 734, 737 (6th Cir. 2014).

---

[14]    *In re Tenton Ridge Investors, LLC,* 461 B.R. 440, 458 (Bankr. S.D. Ohio 2011)

[15]    *See* 11 U.S.C. § 1129 (providing standard for plan confirmation and allocation of distributions among creditors under a plan of reorganization, including acceptance by the relevant class of creditors or satisfaction of "fair and equitable" requirements); See e.g. *Fourth Branch Assocs. V. Mohawk Paper Mills, Inc. (In re Kings Falls Power Corp.*), 185 B.R. 431, 438–439 (Bankr. N.D.N.Y. 1995)("The concept of distribution has long been recognized as one of the essential and core elements of bankruptcy law, citing *In re Central Funding Corp.,*75 F.2d 256, 260 (2d Cir. 1935) which stated: "Bankruptcy laws are designated primarily to distribute equitably the property of a debtor among his creditors.").

47.    11 U.S.C. § 1129(a)(3) requires the proponent's plan to be submitted in "good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is not defined by the Bankruptcy Code, but "is generally interpreted to meant that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 468 (Bankr. S.D. Ohio 2011) (quoting *In re Madison Hotel Assocs.*, 749 E.2d 410, 425 (7th Cir. 1984).

## IV.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT MISALLOCATES VALUE AMONG THE ESTATES TO THE DETRIMENT OF NG AND FENOC CREDITORS.

48.    The Plan allocates value (whether cash or stock) among creditors of the estates through fixed values established in the Distributable Value set for each estate; one each for FES, NG, FG and FENOC.  *See Plan Definitions*, Article I, § A(96) (FENOC); Article I § A(106) (FES); Article I § A(118) (FG); Article I § A(199) (NG). The components of Distributable Value are based on the undisclosed value placed on each Debtor's assets, plus the shares of the Settlement Value and Revolver Draw negotiated by the parties who participated in the allocation. *Id.*

49.    Here, the allocation of value in the Plan among the estates unfairly and disproportionately distributes value to the parent holding company, FES, over the interest of creditors with claims against NG and FENOC. In doing so, the Plan fails to satisfy, *inter alia*,: (i) the four part discrimination test under Section 1129(b); (ii) the fair and equitable requirements of Section 1129(b); (iii) the provisions of Section 1129(a)(3), (iv) the requirement that the Plan comply with applicable provisions of the Bankruptcy Code under Section 1129(a)(1) (including Section 1125) and (v) the best interests test of Section 1129(a)(7). Fundamentally, the under-valuation of the nuclear assets and the misallocation of settlement and

20

revolver value has resulted in FES, the equity-holder of NG and FG, getting more than half of the total value of all four estates, while the creditors of the entities that actually generated all the value and have the real claims are receiving much less than they should. In essence, FES and its creditors are receiving a massive recovery on the equity interests in the operating entities. This is a clear violation of the absolute priority rule.

### A. Under-Valuation of the NG assets.

50. Presumably the starting point for the allocation to NG and FENOC creditors would be the value of their respective businesses. But the Disclosure Statement provides no information as to how the comparative valuation of the NG operating assets was calculated. Third party valuations suggest that the nuclear assets may have already been profitable when the Plan was solicited. Moreover, given recent legislative developments (specifically, the enactment of Ohio House Bill 6), the information contained in the Disclosure Statement regarding nuclear assets is hopelessly stale and does not contain adequate information as required under Bankruptcy Code § 1125. Just based upon the recent legislative action, the value of the nuclear assets is massively more than the value ascribed to them in the Plan.

### B. Misallocation of the FE/FES Revolver Proceeds.[16]

51. As noted in paragraphs 30–33 above, a clear misallocation of value occurred in the apportioning of the $500 million that was drawn on the FE/FES Revolver. The Debtors drew down on a revolver before filing for bankruptcy and held the $500 million in proceeds throughout the bankruptcy cases. While FES relied on the value of NG and FG to obtain that

---

[16] The FE/FES Revolver as defined in the Plan means that certain $700,000,000 credit agreement, consisting of a $500,000,000 revolver facility and a $200,000,000 surety bond credit facility, dated December 6, 2016, by and among FE Corp., as lender, FES as borrower, and FG and NG as guarantors, as the same has been modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto.

21

credit, under the plan FES kept $475 million of that amount and $25 million was allocated to FG. However, no funds were given to NG even though NG pledged its assets and provided the largest amount of credit support for the loan. Very little explanation of how the allocation was made is provided in the Disclosure Statement.[17]

52. The Plan allocation ignores the economic reality of the loan from FE. FES may have installed itself as the agent "borrower" on the loan, but it didn't have any repayment capacity other than the value generated by the operating entities and the value of their assets. The revolver draw-down should be re-allocated among the estates based on their *borrowing capacity* and what they pledged in order to get the loan from the parent FE. The proceeds of the draw-down should be deemed to be held in trust for their benefit. The allocation of the revolver draw-down to FES also ignores the fact that FES maintained a consolidated bank account with NG and FG.[18] Except for the funds pulled on the FE line, the Debtors' cash is placed in a consolidated account. There is no equitable justification for the revolver draw to be viewed as FES' property.

---

[17] The only explanation in the Disclosure Statement for NG receiving nothing and FES being allowed to keep the vast majority of the funds is the following: *"During negotiations of the Plan Settlement, FES and its creditors asserted that all of the proceeds of the FE/FES Revolver should be allocated to FES, as FES was the borrower and the proceeds are held in a bank account owned by FES. FG and NG, as well as certain of the creditor parties, asserted that substantial amounts of the proceeds should be allocated to those entities, as those entities provided guarantees to FE Corp. secured by the generating assets of those entities, and FES would not have been able to obtain similar financing without such secured guarantees. Under the Plan Settlement, $475 million of the FE/FES Revolver will be allocated to FES, and the remaining $25 million will be allocated to FG."*

[18] Schneider Decl. at paras. 50, 51, 308.

C.     **Misallocation of the FE Settlement Value**[19]

53.     As described in paragraphs 30–33 above, the FE Settlement Value also was misallocated in favor of FES. The FE Settlement Value is "the overall value contributed by the FE Non-Debtor Parties to the Debtors' Estates pursuant to the FE Settlement Agreement, including, but not limited to (i) the FE Settlement Cash, (ii) the New FE Notes, (iii) the Pleasants Power Plant, (iv) payments under the Tax Allocation Agreement, (v) credits for shared services and other operational support, and (vi) waivers of certain Claims as set forth in the FE Settlement Agreement." *See* Plan, p. 10. The FE Settlement Value ultimately allocated direct consideration to each debtor estate in the following percentages: FES—57.5%; FG—23.4%; NG—15.1%; FGMUC—1.3%; FENOC—2.7%. *See* Plan, p. 69.  The allocation of settlement consideration is unfairly distributed at a higher value towards FES creditors, resulting in discrimination against non-FES creditors with direct claims against operating entities like NG and FENOC.

54.     FES is allocated 57.5% of the FE settlement consideration while the FES subsidiaries that actually produce the power, NG and FG, are only allocated 15.1% and 23.4% respectively. This allocation results in FES as a holding company receiving approximately $600 million while the most valuable operating entity—NG—receives a fourth of that value at $151 million.[20]

---

[19]     FE Settlement Value, as defined in the Plan, means the overall value contributed by the FE Non-Debtor Parties to the Debtors' Estates pursuant to the FE Settlement Agreement, including, but not limited to (i) the FE Settlement Cash, (ii) the New FE Notes, (iii) the Pleasants Power Plant, (iv) payments under the Tax Allocation Agreement, (v) credits for shared services and other operational support, and (vi) waivers of certain Claims as set forth in the FE Settlement Agreement.

[20]     Plan, p. 68.

23

55.     FES is merely a holding company of entities that actually generate the power FES resells to its customers. "Through its subsidiaries, FES owns and operates multiple power generation facilities and sells the power generated by these facilities. [21] FES is a party to power purchase agreements ('PPA's') with its subsidiaries FG and NG, whereby it purchases all of the energy produced by FG and NG." [22]

56.     Thus, the primary asset of FES is the stock of its subsidiaries, which is worthless given the direct claims against those entities by their creditors. That being the case, FES likely suffered little if any actual damage as a result of the supposed obligations it incurred at the direction of its non-bankrupt affiliates. In contrast, the operating entities had actual businesses and value. They (and their creditors) were the ones damaged as a result of the transactions that are covered by the settlement.

57.     The total value allocated to FES as a holding company is almost as much as the two operating subsidies NG and FG combined. FES is allocated over $2 billion, while the total distributable value for NG and FG creditors is approximately $1.365 billion and $1.09 billion respectively.

58.     The bulk of the value of the settled claims really belong to NG, FENOC and FG. As noted in the Settlement Motion, the settlement largely covered "avoidance actions" against the non-bankrupt entities. As described below, virtually all of the causes of action settled should have generated significant proceeds for NG rather than FES. *See* Settlement Motion at 12–14:

   a.     <u>Substitution of Revolver for Existing Credit Facility</u>. As set forth in the Settlement Motion, the extension of credit was premised on pledges of assets by NG and FG. FES had no valuable collateral to pledge except what it intercepted from the operating entities. The loan was premised on the fraudulent transfer of

---

[21]     *See* Schneider Decl. at para. 19.

[22]     *Id.*

NG's assets for the benefit of the parent and non-bankrupt entities. There is no indication in the Disclosure Statement that potential avoidance actions based on the guaranties were ever considered or investigated. If they were, the allocation of value in the proposed settlement suggests this basic fact was ignored.

b.  <u>Elimination of FE Support Obligation for NG</u>. This claim relates to the transfer of a nuclear support agreement (of up to $400 million) for NG's benefit from FE to FES. At first blush, this may seem to be a significant FES claim; but that is not actually the case. By the Debtors' own admission, FES never provided any funding to NG under this agreement and was never even asked to do so. Schneider Decl. at para. 319 ("FES has never been requested to provide any funding to NG under the Nuclear Support Agreement."). That being the case, there is no basis to reallocate cash to FES for this supposed claim. In fact, the transfer of the $400 million support obligation from FE to FES only hurt NG. Also, NG lost the support of the solvent non-debtor entities for these obligations and received a worthless support agreement from Debtor FES.

c.  <u>Forced Sale of Equity Interests to NG at Inflated Prices</u>. NG was also caused to buy equity interests in plants at an above-market rate. *See* Settlement Motion at para. 23(iv). This claim appears to belong exclusively to NG, yet value is apparently ascribed to other Debtors.

59.    As noted in paragraph 25, the Settlement Motion identifies cash transfers from the Non-Utility Money Pool by "FES" to FE. *See* Settlement Motion at para. 23(vi). But the cash of the estates was consolidated. Moreover, all of the power generated and sold by the Debtors to generate cash was ultimately produced by NG and FG, not FES.[23]

---

[23]    Certain FES creditors argued at the Disclosure Statement Hearing that FES "owned" the tax attributes allocated to the non-bankrupt parent and that this was a basis to ascribe settlement value to FES. The opposite is true. As the head of the corporate tax family, FES is merely an agent of the other entities. It is not the "owner" of their tax attributes. The tax attributes were generated by the operations and depreciation of the assets owned by the operating entities like NG (not FES). Those tax attributes remain property of the estates for the operating entities, not FES. If, despite not owning any operating assets, FES somehow came to "own" the tax losses flowing from its subsidiaries' operations, that should be explained by the Debtors, assuming that the tax attributes were in fact considered in allocating settlement value. In any event, under the FE Settlement, FE will pay going forward for tax attributes used. Thus, as also discussed in paragraph 29 of this motion, the tax provisions of the settlement provide no basis to reallocate the other consideration paid in the settlement.

### D. Failure to Consider FES Debt Relief in Cash Allocation of FE Settlement.

60. The misallocation of the cash settlement value is even more lopsided than it appears from the above division because part of the settlement involved forgiveness of debt owed by FES to the non-bankrupt entities. In addition to the loan from FE (which was jointly owed by the Debtors), FES was released from the $150 million FES Intercompany Note owed to non-debtors.[24] In allocating the cash portion of the settlement, the benefit already received by FES for debt forgiveness must be accounted for, mandating that the cash allocated to FES should be lower.

### E. Definition of "NG Distributable Value."

61. In the Plan, it is not clear that the Distributable Value for NG creditors is based on the value of all of NG's assets. Instead, Distributable Value appears to be limited to, *inter alia*, "the value of the power plants owned by NG and all related assets." In contrast, the FG Distributable Value includes, *inter alia*, the value of "FG's assets." The language disparity suggests that only specifically designated assets owned by NG were included, while all assets of FG were used. It is thus not clear whether this means that some of NG's assets were excluded in the valuation.

### F. Under-Valuation of the FENOC Assets and Business.

62. Likewise, FENOC has also been allocated less than its fair settlement value and its market value is underpriced. FENOC operated the nuclear assets. But as is the case with NG, the creditor constituents that negotiated the allocation of settlement proceeds had no interest in seeing value ascribed to FENOC.

---

[24] *See* Settlement Motion at p. 14.

63.    FENOC receives only 2.7% of the settlement consideration and FENOC creditors will receive only $144 million in distributable value even though FENOC provided the engineering, supervisory, operating, maintenance, and other services that were required to run the nuclear power plants and had 2,333 employees. FENOC apparently provided these services at cost, including to non-debtors. The schedules indicate that FENOC had total asset values at around $260 million, which is over $115 million more than the distributable value that FENOC creditors will receive under the plan. Moreover, the Debtors have admitted that FENOC generated revenues of $660,000,000, which is 21% of the total revenue generated by the Debtors. [25] Like NG, the recent legislative action to provide funding to support the nuclear business will greatly enhance the value of FENOC's business, and this needs to be taken into account in any approved plan.

64.    The Settlement Motion identifies potential recovery actions concerning payment of pension fund obligations totaling $188 million. *See* Settlement Motion at para. 23(v). But despite having 2,333 employees, FENOC is given virtually nothing under the settlement. *See* Schneider Decl. at para. 44 (FENOC has 2,333 employees). In contrast, FES has just 57 employees. *Id.* at para 29. FG has just 686 employees. *Id.* at para. 31. Based on employee headcount, FENOC should have been allocated 76% of the value of this claim for pension liability and payments. Moreover, any payments made by the Debtors would have been generated by the operating entities and/or loans against their assets. Again, that should be allocated to the entities that produced the value.

---

[25]    *See* Schneider Decl. at para. 28.

18-50757-amk    Doc 2976    FILED 08/02/19    ENTERED 08/02/19 14:43:47    Page 27 of 40

### G. Examiner.

65. Given the inherent conflicts presented by allocation of the settlement and the revolver proceeds among the estates, the Court should appoint an independent examiner to advise concerning the appropriate allocation of the settlement and revolver proceeds. It is not sufficient to have one "independent" director under procedures established by FES control parties to serve in that function. The Court has the power to appoint an examiner for this purpose under Bankruptcy Code § 1104(c).

## V. OTHER DEFICIENCIES IN DEBTORS' PLAN.

66. The above deficiencies are not the only defects in the Plan. The Plan contains numerous provisions that are contrary to the applicable provisions of the Bankruptcy Code. Many of these defective Plan provisions are purposefully designed to unfairly treat holders of Disputed Claims.

### A. Disputed Claims and Claims Resolution Provisions.

67. The Plan contains an impermissible set of private rules for resolving and paying Disputed Claims that is contrary to the Bankruptcy Code and Bankruptcy Rules. Indeed, much of Article VII is defective and the rights of holders of Disputed Claims should be restored to those provided by the Bankruptcy Code, the Bankruptcy Rules and applicable law notwithstanding anything to the contrary in that Article.

68. <u>Disputed Claims</u>. All claims that have yet to be Allowed are defined as "Disputed Claims." *See* Plan Article I.A(58). But the "Disputed Claims Reserve" is not required to cover the amounts of claims that have yet to be Allowed. [26] *See* Plan Article I.A(59). Rather, the Debtors and parties who sponsor the Plan set the Disputed Claims Reserve. *Id*. The Debtors

---

[26] *See* Plan, "Disputed Claims Reserve" at p. 7.

28

then propose that their self-set Disputed Claims Reserve will be *the sole source* of satisfaction of the Disputed Claims. *See* Plan at Article VII.F. If not enough is reserved, the holder of the Disputed Claim has no recourse whatsoever. *Id*. If the Debtors and the Plan Administrator decide to release the Disputed Claims Reserve, they may do so on their own decision, wiping out any recovery for remaining Disputed Claims. *Id*. These provisions are facially unconfirmable. The full amount of ACE and USEC's claims against each estate should be reserved in full pending Allowance and holders of Disputed Claims should be paid in full (whether cash or stock) whenever those Claims are Allowed.[27]

69.     <u>Estimation.</u> Article VII.C purports to establish rules for estimating claims. Among other things, it purports to eliminate res judicata and collateral estoppel for the Debtors to permit them to enforce binding estimation even if the Court already ruled on objections to a Disputed Claim. All estimations are automatically deemed to set the maximum recovery. The rules for claims estimation should be left as provided in the Bankruptcy Code § 502(c) and applicable law and determined by the Court based on the facts then presented to the Court, not an assumed list of new rules that always favor the Debtors.

70.     <u>Amendments</u>.  The Plan purports to automatically disallow amended claims. *See* Plan Article VII.H. Again, the Bankruptcy Code and Rules define the treatment of claim amendments and should govern here, not specially designed rules created to disadvantage creditors.

71.     <u>Partially Contested Claims</u>. If any part of a claim is disputed, no distributions are permitted on claims even to the extent that they are not disputed. *See* Plan Article VII.J. This

---

[27]     *See* Plan, "Claim" at p. 3; "Allowed" at p. 2.

stacks the rules in favor of Debtors and to the disadvantage of meritorious claimants, both in negotiation of settlements and the litigation of claims.

## B.    Impact of Legislature Developments Related to the Nuclear Business.

72.    The recent Ohio nuclear legislation not only affects the asset allocation questions, but a host of other issues under the Plan. This fundamentally changes the business future for the nuclear business owned and operated by NG and FENOC and requires revision of the Plan.

73.    The new reimbursement provided by the legislation in Ohio House Bill 6 changes the economics of the Debtors' operations going forward and all of the separate valuation questions. It may lead to a significant disparity between the value of cash and stock offered under the Plan. Holders of Claims (including USEC) should be given an opportunity to make that decision after full disclosure of the impact of these very significant developments. To the extent that not enough stock is reserved for all holders of Disputed Claims, this may also lead to holders of Claims in the same class being treated inconsistently in violation of § 1123(a)(4).

74.    Likewise, all of the disclosure related to asset value and the business going forward (not to mention the value of the stock) is stale, making the Disclosure Statement grossly inadequate under § 1125. Creditors are entitled to be presented with notice of these critical developments and the impact they have on the nuclear business. Virtually all of the valuation work needs to be redone and solicitation should be restarted.

## C.    Setoffs and Recoupments.

75.    Notwithstanding the provisions of the Bankruptcy Code and applicable law that preserve creditors' rights to setoffs and recoupments, the Plan contains a number of separate provisions that could have the effect of impairing rights of offset and recoupment causing the

30

Plan to violate § 1129(a)(2) and (3). *See e.g.*, Articles VII and VIII.A (Discharge); VIII.B (Release of Liens), VIII.G (Injunction against setoff claims) and K (Recoupment must have already been performed before Confirmation or is deemed waived). The rights of creditors to assert offsets and recoupments should be fully preserved as provided under the Bankruptcy Code and applicable law. 11 U.S.C. § 553; *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995)(Section 553 preserves setoffs); *Reiter v. Cooper*, 113 S. Ct. 1213, 1218 n.2 (1993)(recoupment rights honored in bankruptcy); *In re Flagstaff Realty Assocs.*, 60 F.3d 1031 (3d Cir.1995)("[a] claim subject to recoupment avoids the usual bankruptcy channels and thus, in essence, is priority over other creditor's claims").

### D. Reallocation of Value Based on Claim Allowance.

76. The Plan includes a series of incomprehensible provisions regarding allocation of value among the estates. *See* Definitions of FENOC, FES, FG and NG Distributable Value and Unsecured Distributable Value, Plan, Article I.A, Sections 96, 100, 106, 115, 118, 123, 199, and 206. It is impossible to confirm how the relative assets assigned to each Unsecured Class of Claims for a particular Debtor will be adjusted as additional Disputed Claims are resolved. Moreover, the practical application of the Distributable Value Adjustments is likewise incomprehensible. All of these mechanics need to be fully disclosed and adjusted to assure that creditors are treated fairly among the different estates of classes for each estate. Currently, that is impossible to decipher.

### E. Lack of Equity Option for FENOC Creditors and Holders of Disputed Claims.

77. Without justification, FENOC Creditors are denied an option to receive New Common Stock in equal amount to their Pro Rata Share of FENOC Unsecured Distributable Value. Specifically, creditors in Class D5 — NG-FENOC Unsecured Claims against FENOC —

are denied an equity option in place of cash that other similar classes are offered.[28] By contrast, other similar claims against FES, FG, and NG are given the option to receive New Common Stock in equal amount to their Pro Rata Share of Unsecured Distributable Value.[29]

78. The Amended Plan does not, however, provide any explanation for treating Class D5 Creditors of FENOC materially differently from other similar classes. Likewise, the Disclosure Statement provides no further explanation for treating Class D5 creditors materially differently from other similar classes, resulting in unfair discrimination.

79. Only one week prior to the deadline to object to the Plan, the Debtors have proposed further changes to the Disputed Reserve in the Plan (6th Amended) that may have the effect of denying holders of Disputed Claims access to equity consideration. Moreover, the recent developments concerning the nuclear business require a fresh disclosure so that creditors can decide what the equity is actually worth compared to the cash option. Finally, the latest amendments to the Plan identify registration rights agreements that may be selectively executed with certain holders of equity. All parties who choose equity after getting the adequate information to make the election should be treated equally, including without limitation for registration rights purposes.

## VI. <u>CONCLUSION</u>

FES and its creditors are attempting to use the bankruptcy process to amass billions of dollars in assets for themselves to the detriment of the minority creditors who have direct claims against the operating entities with real value. FES has been assigned a majority of the settlement consideration received from its non-bankrupt affiliates, has been allocated nearly all of the cash

---

[28]     Plan, p. 57.

[29]     *See* Class A6, Plan, p. 42; Class B7, Plan, p. 48; Class C7, Plan, p. 54.

proceeds from a revolver secured by the assets of other debtor entities and is otherwise given a disproportionate share of the aggregate value of the assets attributable to the Debtors' estates. Additionally, the Plan does not provide sufficient details about the valuation of the nuclear assets that was used to formulate the allocation of value in the Plan and, given recent legislation developments, even that valuation now appears to be stale. Further, the Plan, as currently proposed by the Debtors, fails to meet the statutory requirements of 11 U.S.C. § 1129(b) as it clearly does discriminate unfairly and is not fair and equitable.

WHEREFORE, Creditors American Centrifuge Enrichment, LLC and United States Enrichment Corporation respectfully requests this Court to deny confirmation of the Debtors' Sixth Amended Plan as currently presented under Bankruptcy Code § 1129.

Dated: August 2, 2019        Respectfully Submitted,

/s/Michael A. Steel
MICHAEL A. STEEL (#0072367)
**BRENNAN, MANNA & DIAMOND, LLC**
75 East Market Street
Akron, Ohio 44308
PH:    (330) 374-7471
FX:    (330) 374-7472
masteel@bmdllc.com

*Attorney for Creditors American Centrifuge Enrichment, LLC and United States Enrichment Corporation*

33

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above Objection was served on the 2nd day of August, 2019, upon the following:

Via electronic mail:

- John R. Ashmead, ashmead@sewkis.com
- Michele L. Angell, mangell@kasowitz.com, courtnotices@kasowitz.com
- John P. Archer, jpa@kjk.com, ckv@kjk.com
- Todd A. Atkinson, tatkinson@ulmer.com, 4442920420@filings.docketbird.com
- Richard Bain, rbain@meyersroman.com
- Christopher James Azzara, cazarra@smgglaw.com
- Renee A. Bacchus, ReneeBacchus@usdoj.gov, SusanLowe@usdoj.com
- Richard A. Baumgart, rbaumgart@dsb-law.com
- David Beck, beck@carpetlipps.com
- James Bentley, James.Bentley@srz.com, NYROBankruptcy@sec.gove
- Julie Anderson Bickis, jbickis@stark-knoll.com
- Richard E. Bordonaro, rbordonaro@mmbwslaw.com
- Kate M. Bradley, kbradley@brouse.com, tpalcic@brouse.com, mmiller@brouse.com
- Mona Burton, mburton@hollandhart.com
- Jeremy M. Campana, Jeremy.campana@thompsonhine.com, ecfdocket@thompsonhine.com
- Brian Carney, bcarney@akingump.com
- Maria Carr, mcarr@mcdonaldhopkins.com, bkfilings@mcdonaldhopkins.com
- Patrick Michael Casey, patrickcasey@usdoj.gov
- Sonia A. Chae, chaes@sec.gov
- Conrad Chiu, cchiu@pryorcashman.com
- Shawn M. Christianson, schristianson@buchalter.com, cmcintire@buchalter.com
- James A. Copeland, james.copeland@nortonrosefulbright.com
- Harold A. Corzin, hcorzin@csu-law.com, ccorzin@aol.com
- David J. Coyle, dcoyle@slk-law.com, molly.kjartason@quarles.com, sybil.aytch@quarles.com
- Robert Darnell, Robert.darnell@usdoj.gov
- Clayton W. Davisdon, cdavidson@mcneeslaw.com, triser@mcneeslaw.com
- George A. Davis, George.davis@lw.com
- Daniel A. DeMarco, dademarco@hahnlaw.com, hlpcr@hahnlaw.com, cmbeitel@hahnlaw.com
- Anthony Degiroloamo, ajdlaw@sbcglobal.net, amber_weaver@sbcglobal.net, g23630@notify.cincompass.com
- Rocco I. Debitetto, ridebitetto@hahnlaw.com, cmbeitel@hahnlaw.com
- Lisa S. DelGrosso, ldelgrosso@brouse.com
- Danielle L. Dietrich, ddietrich@tuckerlaw.com, lbuckreis@tuckerlaw.com, rbergman@tuckerlaw.com, agilbert@tuckerlaw.com, mshiner@tuckerlaw.com
- James Michael Doerfler, jdoerfler@reedsmith.com, kgwynne@reedsmith.com

- Kate Doorley, kdoorley@akingump.com, ideizeneoff@akingroup.com, salbernio@aikengroup.com
- Keri Ebeck, kbeck@bernsteinlaw.com, jbluele@bernsteinlaw.com
- Robert C. Edmundson, redmundson@attorneygeneral.gov
- James W. Ehrman, jew@weadvocate.net, newpleadings@gmail.com, ecf-7d83ee620d47@ecf.pacerpro.com
- Kristin S. Elliot, kdwbankruptcydepartment@kellydrye.com, kelliot@kelleydrye.com
- Michael Esser, Michael.esser@kirkland.com, Adrienne-levin-5018@ecf.pacerpro.com
- John Cleveland Fairweather, jfairweather@brouse.com, sgibson@brouse.com
- Debra Felder, dfelder@orrick.com, lmcgowen@orrick.com, leslie.freiman@edpr.com, rand.sawyer@edpr.com
- Matthew A. Feldman, mao@wolkie.com, jminias@wilkie.com, mfriemuth@wilkie.com, mfeldman@wolkie.com
- Robert C. Folland, rob.folland@btlaw.com
- Bridget Aileen Franklin, bfranklin@brouse.com, tpalcic@brouse.com, mmiller@brouse.com
- Stephen R. Franks, srfranks@manleydeas.com
- Patricia B. Fugee, patricia.fugee@fisherbroyles.com, ecf@cflechsolutions.com
- Michael A. Galasso, mglasso@rkpt.com, bbass@rkpt.com
- Mark P. Gertz, mpgertz@goldman-rosen.com, mpgertz@dayketterer.com, dmichna@dayketterer.com
- Caroline Gange, caroline.ganger@srz.com
- Stephen B. Gerald, sgerald@wtplaw.com
- Richard Alan Getty, rgetty@gettlawgroup.com, astith@gettylawgroup.com, tezzell@gettylawgroup.com, menglish@gettylawgroup.com, klampert@gettlawgroup.com
- Raymond Gifford, rgifford@wbklaw.com
- John H. Ginsberg, Ginsberg.john@pbgc.gov, efile@pbgc.gov
- Matthew Gold, courts@argopartners.com
- Eric R. Goodman, egoodman@bakerlaw.com
- Barbara Jean Grabowski, bgrabowski@pa.gov
- Frank James Guadagnino, fguadagnino@mcguirewoods.com
- Richard G. Hardy, rhardy@ulmer.com
- Nathan Haynes, haynesn@gtlaw.com
- Zachary A. Herbert, Zachary.hebert@nlrb.gov
- John Herman, joherman@pa.gov
- David Hillman, David.hillman@srz.com, mgoldman@huntonak.com, hlong@huntonak.com
- Michael E. Idzkowski, Michael.idzkowski@ohioattorneygeneral.gov, Sandra.finan@ohioattorneygeneral.gov
- Williams J. Ihlenfeld, wihlenfeld@baileyglasser.com, jkittinger@baileyglasser.com
- Michael J. Kaczka, mkaczka@mcdonaldhopkins.com, bkfilings@mcdonaldhopkins.com
- Gus Kallergis, gkallergis@calfee.com
- Vera Kanova, Verkanova@pa.gov
- Gary Mark Kaplan, gkaplan@fbm.com, drosner@kasowitz.com

35

- Ryan F. Kelley, rkelley@pierceatwood.com, mpottle@pierceatwood.com, aredmond@pierceatwood.com
- Timothy J. kern, timothy.kern@ohioattorneygeneral.gov
- Marc Kieselstein, marc.kieselstein@kirkland.com, David.seligman@kirkland.com, Ciara.foster@kirkland.com, matthew.fagen@kirkland.com, nacif.taousse@kirkland.com
- Kathy Jo Kolich, kjklaw@yahoo.com
- John F. Kostelnik, jkostelnik@frantzward.com, dlbeatrice@frantzward.com, boneill@kramerlevin.com, jshifer@kramerlevin.com, nhameman@kramerlevin.com
- Michael D. Langford, mlangford@kilpatricktownsend.com, sagreen@kilpatricktownsend.com, mwilliams@kilpatricktownsend.com
- Heather Lennox, hlennox@jonesday.com, twersch@jonesday.com, tdreynolds@jonesday.com
- Thomas Scott Leo, sleo@leolaw.pc, emartenize@leolaw.pc
- Stephen D. Lerner, Stephen.lerner@squirepb.com
- Jeffery M. Levinson, jml@jml-legal.com
- Kim Martin Lewis, kim.lewis@dinsmore.com, lisa.geeding@dinsmore.com, allie.horwitz@dinsmore.com
- David A. Lockshaw, Jr., dlocksahw@dickinsonwright.com, cmaynard@dickinsonwright.com
- Jeanne S. Lofgren, jlofgren@stonecipherlaw.com
- Michael D. Lorton, mdlorton@umich.edu
- Douglas Lutz, dlutz@fbtlaw.com
- Richard W. Mancino, mao@wolkie.com
- Jonathan A. Margolies, jmargolies@mcdowellrice.com, ksims@mcdowellrice.com
- Michael Flynn McBride, mfm@vnf.com
- Joseph M. McCandlish, joseph.mccandlish@ohioattorneygeneral.gov, colnationalecf@weltman.com
- Matthew E. McClintock, mattm@goldmclaw.com, seanw@goldmclaw.com, teresag@restructuringshop.com
- Aaron G. McCollough, amccollough@mcguirewoods.com
- Nicholas McDaniel, Nicholas.a.mcdaniel@usdoj.gov
- Mark McKane, mark.mckane@kirkland.com, Adrienne-levin-5018@ecf.pacerpro.com
- Marc Merklin, mmerklin@brouse.com, tpalcic@brouse.com, miller@brouse.com
- Laura Dawn Metzger, lmetzger@orrick.com
- Todd C. Meyers, tmeyers@kilpatricktownsend.com, sagreen@kilpatricktownsend.com, mwilliams@kilpatricktownsend.com
- Douglas F. Monkhouse, dough.monkhouse@bracewell.com, mary.kearney@bracewell.com
- Peter R. Morrison, peter.morrison@squirepb.com, cle_dckt@squirepb.com
- Elliot Moskowtiz, Elliot.moskowitz@davispolk.com, natasha.tsiouris@davispolk.com
- David M. Neumann, dneumann@meyersroman.com, jray@meyersroman.com, mnovak@meyersroman.com
- Andrew S. Nicoll, anicoll@porterwright.com
- Christopher Niekamp, cjn@nwm-law.com, tom@nwm-law.com, wade@nwm-law.com
- Nick Nykulak, nnykulak@rbslaw.com

36

- Bridget O'Connor, bridget.oconnor@kirkland.com
- Michael G. Oliva, mgoliva@loomislaw.com
- Scott N. Opincar, sopincar@mcdonalhopkins.com, bkfilings@mcdonaldhopkins.com
- Lawrence E. Oscar, leoscar@hahnlaw.com
- Ellen Ostrow, eeostrow@hollandhart.com
- Alec P. Ostrow, aostrow@beckerglynne.com
- Richard J. Parks, rjp@pietragallo.com, ms@peitragallo.com, jk@pietragallo.com
- Andrew Parlen, aparlen@omm.com
- Lloyd R. Persun, lrpersun@persunhamlin.com
- Danielle Pham, Danielle.pham@usdoj.gov
- Zachary F. Proulx, Zachary.poulx@lw.com
- Adam Ravin, adam.ravin@lw.com
- Orville L. Reed, oreed@stark-knoll.com
- Jared S. Roach, jroach@reedsmith.com, bankruptcy-2628@ecf.pacerpro.com, edevan@reedsmith.com
- Ross Brittain & Schoenberg Co, LPA, nnykulal@rbslaw.com
- Marc Sacks, marcus.s.sacks@usdoj.gov
- Neil Schor, nschor@hhmlaw.com
- Bruce R. Schrader, bschrader@ralwa.com
- Erik Alan Schramm, hems@ohiovalleylaw.com
- Richard P. Schroeter, Jr., rschroeter@amer-collect.com, sallman@amer-collect.com, houliecf@aol.com, jvaughan@amer-collect.com
- Joseph R. Sgroi, jsgroi@honigman.com
- Saloni Shah, sshah@leolawpc.com, eartinez@leolawpc.com
- Gina Sherer, gina.sherer@clarkhillstrasburger.com, Teresa.barrera@clarkhillstrasbuger.com
- Mark J. Sheriff, msheriff@tt-law.com
- Chester B. Salomon, csalomon@beckerglynn.com
- Forrest Smith, forsmith@pa.gov
- George Thomas Snyder, gsnyder@stonecipherlaw.com
- Edward J. Stechschulte, estechschulte@kiflaw.com
- Robert M. Stefancin, rms@weadvoacte.net, Robert-stefancin-0240@ecf.pacerpro.com
- Rachel L. Steinlage, rsteinlage@meyersroman.com
- Jarrod Stone, jstone@manierherod.com, rmiller@manierherod.com, mcollins@manierherod.com
- Molly Gallgher Sykes, molly.sykes@nlrb.gov
- Alan S. Tenenbaum, alan.tenenbaum@usdoj.gov
- John Thompson, jthompson@mcguirewoods.com
- Melissa L. Van Eck, mvaneck@attorneygeneral.gov
- Jeffrey David Van Volkenburg, jdvanvolkenburg@wvlawyers.com, lprice@wvlawyers.com
- Chrysanthe E. Vassiles, cvassiles@bmsa.com, wpoling@ecf.courtdrive.com, cvassiles@ecfcourtdriver.com
- A.J. Webb, awebb@fbtlaw.com, awebb@ecf.inforuptcy.com
- Pete White, pete.white@srz.com
- United States Trustee (Registered address)@usdoj.gov

- Mary K. Whitmer, mkw@weadvocate.net, mary-k-whitmer-0919@ecf.pacerpro.com
- Keith E. Whitson, kwhitson@schnader.com, 1282467420@filings.docketbird.com
- Christopher B. Wick, cwick@hahnlaw.com, hlpcr@hahnlaw.com, cmbeitel@hahnlaw.com
- Paul A. Wilhelm, pwilhelm@clarkhill.com
- Brady C. Williamson, bwilliam@gklaw.com, kboucher@gklaw.com
- Thomas A. Wilson, tawilson@jonesday.com
- Risa Lynn Wolf, rwolf@hollandhart.com, lmlopezvelasquez@hollandhard.com
- William A. Wood, trey.wood@bracewell.com
- Elia O. Woyt, eowoyt@vorys.com, mdwalkuski@vorys.com
- David Lynn Yaussy, dyaussy@spilmanlaw.com
- Tiiara N. A. Patton, ust401 tiiara.patton@usdoj.gov
- Antoinette Young, Antoinette.young@sodexo.com

Via U.S. Mail:

Alvarez & Marsal North America, LLC, 1000 Town Center, Suite 750, Southfield, MI 48075
Argent Group, Ltd.
BDO USA, LLP
BNSF Railway Company, Attn: Munsoor Hussain, 2500 Lou Menk Dr. AOB-3, Fort Worth, Tx 76131
Babst Colland Clements & Zomnir, P.C.
Benesch, Friedlander, Coplan & Aronoff, LLP, 200 Public Square, Suite 2300, Cleveland, OH 44114-2378
Black, McCuskey, Souers & Arbaugh on behalf of Debtor FirstEnergy Solutions Corp., 220 Market Ave. S, Suite 1000, Canton, OH 44702
Bradford Capital Management, 1051 Bloomfield Ave., Suite 10, Clifton, NJ 07012
Brouse McDowell, 388 S. Main St., Suite 500, Akron, OH 44311
Mona Burton on behalf of Attorney EnergySolutions, LLC, Holland & Hart, LLP, 222 S. Main St., Suite 2200, Salt Lake City, UT 84101
CRG Financial, LLC, 100 Union Ave., Suite 240, Cresskill, NJ 07626
Canyon Distressed Opportunity Master Fund II, LP, 2000 Ave. of the Stars, 11th Floor, Los Angeles, CA 90067
Canyon NZ-DOF Investing, LP, 2000 Ave. of the Stars, 11th Floor, Los Angeles, CA 90067
Canyon-EDOF (Master) LP, 2000 Ave. of the Stars, 11th Floor, Los Angeles, CA 90067
Commonwealth of Pennsylvania Department of Labor and Industry, Collections Support Unit, 651 Boas St., Room 702, Harrisburg, PA 17121
Day Pitney, LLP
Dear John, Inc., 1618 State Route 65, Austin, TX 78701
Dewey Square Group, LLC
Energy Claims, LLC, c/o Richards Kibbe & Orbe, LLP, 200 Liberty St., New York, NY 10281
Environmental Defense Fund
Etsy & Associates
Experis US, Inc.
F.N. Cuthbert, Inc., c/o Bradley C. Elrod, 5749 Park Center Court, Toledo, OH 43615
Fair Harbor Capital, LLC, PO Box 237037, New York, NY 10023
Flowserve Corporation

Mark E. Freedlander on behalf of Plaintiff Exelon Generation Company, LLC, McGuireWoods, LLP, Tower Two-Sixty, 260 Forbes Ave., Suite 1800, Pittsburg, PA 15222-3142

GIW Industries, Inc., c/o Audrey Schumacher Turner, 4415 Sarellen Rd., Henrico, VA 23231

Gibson, Dunn & Crutcher, LLP

HSBC Bank, PLC, 8 Canada Square Level 17, London E14 5HQ

Human Resources Consulting, c/o Gary Kaufman, 1561 Oxford Court, Gallatin, TN 37066

Internal Revenue Service, 300 E. 8th, Stop 5026AUS, Austin, TX 78701

International Brotherhood of Electrical Workers, Local 272, Attn: Victor Roppa, 838A Midland Ave., 2nd Floor, Midland, PA 15059

International Brotherhood of Electrical Workers, Local 272, c/o Robert O. Lampl Law Office, 223 Fourth Ave., 4th Floor, Pittsburgh, PA 15222

J.E. Chichanowcz, Inc.

JPMorgan Chase Bank, NA, Mail Code: NY1-E054, 4 New York Plaza, Floor 15, New York, NY 10004

Jackson Kelly, PLLC

Kebco, Inc., 175 Heritage Valley Dr., Sprinville, AL 35146

Knighthead (NY) Fund, LP, c/o Knighthead Capital Management, LLC, 1140 Avenue of the Americas, 12 Floor, New York, NY 10036

Knighthead Annuity & Life Assurance Company, c/o Knighthead Capital management, 1140 Avenue of the Americas, 12 Floor, New York, NY 10036

Knighthead Master Fund, LP, c/o Knighthead Capital Management, LLC, 1140 Avenue of the Americas, 12 Floor, New York, NY 10036

Kurtzman Carson Consultant, LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245

Lanier Consulting, LLC

Lewis Brisbois Bisgaard & Smith, LLP

Litchfield Cavo, LLP

Marble Ridge Master Fund, LP

Timothy P. Matthews

Meyer, Unkovic & Scott, LLP

Middle River Power, LLC, 200 W. Madison St., Suite 3810, Chicago, IL 60606

Navigant Consulting, Inc.

Ohio Citizen Action

Ohio Environmental Council

Penny Legal, LLC

Persun & Hamlin, PC, c/o Lloyd R. Persun, 1700 Bent Creek Blvd., Suite 160, Mechanicsburg, PA 17050

Phillip Elwell Troy, Esq.

Prime Clerk, 830 Third Ave., 9th Floor, New York, NY 1002

Prime Clerk, LLC, 830 3rd Ave., 9th Floor, New York, NY 10022

Primeshares, 261 Fifth Ave., 22nd floor, New York, NY 10016

Radiological Solutions, Inc., c/o Richard H. Kohlmann, President, 1840 Moen Ave., Suite A, Rockdale, IL 60436

Rawle & Henderson, LLP

Reed Oil Company, Inc., c/o Chris Jurkiewicz, 511 Montgomery Ave., New Castle, PA 16102

Ridge Policy Group, LLC

Roberto Management, Ltd., 1336 Yale Place, Painesville, OH 44077

Rocky Point Claims, LLC, PO Box 165, Norwalk, CT 06853

Ropes & Gray, LLP

Roth Bros., Inc., Sodexo, Inc., c/o Antointette Young, Eq., 9801 Washington Blvd., 12 Floor, Gaithersburg, MD 20878

Scanlon, Howley & Doherty, PC

Scoggin International Fund, Ltd.

Scoggin Worldwide Fund, Ltd.

Studer Industrial Tool, Inc. c/o Albert O. Pivirotto, President, 4500A New Texas Rd., Pittsburg, PA 15239

TR Capital Management, LLC, PO Box 633, Woodmere, NY 11598

Tannor Partners Credit Fund, LP, 555 Theodore Fremd Ave., Suite C-209, Rye, NY 10580

The Bank of New York Mellon Trust Company, NA, Attn: Jennifer J. Provenzano, 500 Ross St., 12 Floor, Pittsburg, PA 15262

The Boston Consulting Group, Inc.

The Brattle Group, Inc.

The Levicoff Law Firm, PC, 4 PPG Place, Suite 200, Pittsburgh, PA 15222

Van Meter, Ashbrook & Associates

Vendor Recovery Fund IV, LLC, PO Box 669, Smithtown, NY 11787

Wells Capital Management Inc., c/o Gilbert L. Southwell III, VP, 100 Heritage Reserve, MAC N9882-010, Menomonee Falls, WI 53051

Wilmington Savings Fund Society, FSB, as Trustee, Attn: Patrick J. Healy, 500 Delaware Ave., Wilmington, DE 19801

Zeiger, Tigges & Little, LLP


/s/Michael A. Steel
MICHAEL A. STEEL (#0072367)