UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 ) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) Case No. 18-50757 (AMK) ) (Jointly Administered) |
| Debtors. | ) ) Hon. Judge Alan M. Koschik ) |

**MOTION OF THE DEBTORS TO APPROVE SETTLEMENT
BETWEEN FIRSTENERGY SOLUTIONS CORP.
AND MEADVILLE FORGING COMPANY, L.P.**

FirstEnergy Solutions Corp. ("FES") and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") seeking entry of an order pursuant to section 105 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving the settlement agreement (the "Settlement Agreement")[2] between FES and Meadville Forging Company, L.P. ("Meadville" and, together with FES, the "Settlement Parties"). The Settlement Agreement is attached hereto as Exhibit A. In support of this Motion, the Debtors submit the *Declaration of Brian A. Farley in Support of the Motion of the Debtors to Approve Settlement between FirstEnergy Solutions Corp. and Meadville Forging Company, L.P.* (the "Farley Declaration") filed simultaneously herewith. In further support of this Motion, the Debtors respectfully submit as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage, LLC (6928), case no. 18-50764. The Debtors' address is 341 White Pond Dr., Akron, OH 44320.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

<u>JURISDICTION AND VENUE</u>

1.     The United States Bankruptcy Court for the Northern District of Ohio (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief requested herein are sections 105 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

<u>BACKGROUND</u>

**A.     General Background**

4.     FES, through its subsidiaries and affiliates, is an owner and operator of coal and nuclear power generating facilities throughout Ohio and Pennsylvania.  FES also enters into electricity supply agreements with large commercial and industrial customers, among other things.  (Farley Declaration ¶ 9.)

5.     Meadville is a Pennsylvania Limited Partnership engaged in the forging business located in Meadville, Pennsylvania, which manufactures metal products for the automotive industry.

6.     FES has a commercial relationship with Meadville dating back to at least 2010. In July 2010, FES and Meadville entered into a Customer Supply Agreement for the supply of electricity for consumption at two of Meadville's locations, or "service addresses" (as amended, the "<u>CSA</u>").  (*See Declaration of Thomas R. Schmuhl in Support of the Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and for Contempt* (the "<u>Schmuhl Declaration</u>") [Dkt. No. 879], Ex. 1; Farley Declaration ¶ 10.)

7. In September 2014, the CSA was amended via a "Fixed Price Pricing Attachment," which added a third service address and changed the price paid by Meadville for electricity. (*See* Schmuhl Decl., Ex. 2; Farley Declaration ¶ 10.)

8. In February 2016, FES and Meadville entered the Fixed Price Blend and Extend Amendment No. 2 to Customer Supply Agreement, whereby certain new pass-through costs were blended with lower energy prices over an extended contract term. (*See* Schmuhl Decl., Ex. 3; Farley Declaration ¶ 11.) Specifically, the term of the CSA was extended from January 2018 to December 2020. (*Id.*) Meadville represents that it has already entered into an electricity supply contract with a third party to provide electricity until December 31, 2022.

9. On April 17, 2018, three weeks after the Debtors filed for bankruptcy, Meadville sent a letter to FES purporting to terminate the CSA because of an *ipso facto* clause in the CSA and because Meadville claimed that the CSA was a "forward contract" and that FES and Meadville were "forward contract merchants" as those terms are defined in the Bankruptcy Code. (*See Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and for Contempt* (the "Motion to Enforce Automatic Stay") [Dkt. No. 878], Ex. B; Farley Declaration ¶ 12.) On April 27, 2018, the FES sent a letter to Meadville, stating that Meadville's attempt to terminate the CSA was a violation of the automatic stay and void. (*See* Motion to Enforce Automatic Stay, Ex. C; Farley Declaration ¶ 12.)

10. On June 28, 2018, FES received notice that Meadville had switched electricity providers at one of Meadville's three service addresses. (*See* Schmuhl Decl., Ex. 5; Farley Declaration ¶ 13.) On June 29, 2018, Meadville ceased purchasing electricity from FES at that service address. (*Id.*)

3

11. On July 3, 2018, FES filed the *Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and for Contempt* [Dkt. No. 878], seeking to enforce the automatic stay by requiring Meadville to, among other things, continue to perform its obligations under the CSA and for Meadville to be sanctioned for violating the automatic stay. On July 3, 2018, FES also filed the Schmuhl Declaration.

12. On July 5, 2018, Meadville filed its *Response to Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and for Contempt* [Dkt. No. 891].

13. Also on July 5, 2018, the Court held a hearing on the Motion to Enforce Automatic Stay (the "Preliminary Hearing"). At the Preliminary Hearing, the Court ruled that FES had shown a likelihood of success on the merits and granted the Motion to Enforce Automatic Stay on a limited basis. The Court then granted the Settlement Parties time to develop an evidentiary record in advance of a final hearing on the merits. The Court's ruling subsequently was memorialized in the *Preliminary Order Enforcing the Automatic Stay*, dated July 10, 2018 (the "Preliminary Order") [Dkt. No. 912].

14. On September 4, 2018, Meadville filed its *Supplemental Response to Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and for Contempt* [Dkt. No. 1271].

15. On September 10, 2018, the Debtors filed the *Debtors' Reply to the Supplemental Response by Meadville Forging Company, L.P. to Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and for Contempt* [Dkt. No. 1316].

16. The Court held a final hearing on the Motion to Enforce Automatic Stay on September 11, 2018.

17. On January 15, 2019, the Court issued a decision titled *Memorandum Decision Regarding Debtors' Motion to Enforce the Automatic Stay and for Contempt, Concluding that*

*Meadville Forging Company's Actions to Terminate its Power Supply Contract with Debtor FES Was Unlawful and Constituted a Violation of the Automatic Stay* (the "<u>Memorandum Decision</u>") [Dkt. No. 1962]. Among other things, the Court ruled that Meadville is not a forward contract merchant with respect to the electric power market and that Meadville's termination of the CSA was a violation of the automatic stay. The Court deferred any ruling on sanctions for Meadville's violation of the automatic stay. The Memorandum Decision is not a final order.

18. Since February 2019, the Settlement Parties have engaged in extensive good-faith, arm's-length negotiations regarding a final resolution of the Motion to Enforce Automatic Stay and the issue of sanctions. These negotiations ultimately produced the Settlement Agreement.

**B. The Settlement Agreement**

19. The Settlement Parties entered into the Settlement Agreement in order to avoid the burden, expense and uncertainty of further litigating their dispute regarding sanctions or regarding a possible appeal of the Preliminary Order or Memorandum Decision. (Farley Declaration ¶¶ 16-17.) The Settlement Agreement also provides value to FES's business by facilitating a mutually-beneficial business relationship between Meadville and FES going forward. (Farley Declaration ¶ 18.) Among other things, the Settlement Agreement provides that:

   a. Meadville shall provide FES with a "last look" opportunity to match any pricing offer provided to Meadville by another electricity supplier for terms starting after December 31, 2022, and such "last look" opportunity shall be in effect for three years after December 31, 2022 (the "<u>Last Look Provision</u>");

   b. Meadville waives any right to appeal or reconsideration of the issues addressed in the Preliminary Order or Memorandum Decision;

   c. FES agrees not to seek sanctions against Meadville relating to Meadville's conduct described in the Memorandum Decision; and

5

d. FES shall file a motion pursuant to Bankruptcy 9019 seeking entry of an order approving the Settlement Agreement and a final order consistent with the Court's findings in the Memorandum Decision.

**RELIEF REQUESTED**

20. By this Motion, the Debtors request that the Court (i) enter an order pursuant to section 105 of the Bankruptcy Code and Rule 9019(a) of the Bankruptcy Rules authorizing and approving the Settlement Agreement and authorizing the Debtors to enter into the Settlement Agreement and to perform all obligations thereunder; and (ii) enter a final order consistent with the Court's findings in the Memorandum Decision.

**ARGUMENT**

**A. Overview of the Rule 9019 Standard**

21. Approval of the Settlement Agreement is governed by Rule 9019(a) of the Bankruptcy Rules, which provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." In order to approve a settlement, a court must find that the settlement is fair and equitable and in the best interests of the debtors' estates. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *see also Treinish v. Topco Assocs., Inc. (In re AWF Liquidation Corp.)*, 208 B.R. 399, 400 (Bankr. N.D. Ohio 1997); *McGraw v. Yelverton (In re Bell & Beckwith)*, 87 B.R. 476, 478 (N.D. Ohio 1988); *In re Mobile Air Drilling Co.*, 53 B.R. 605, 607 (Bankr. N.D. Ohio 1985). In doing so, the Court need not decide the numerous issues of law and fact raised in the underlying dispute, but must only "canvass the issues in order to determine whether the settlement falls below the lowest point in the range of reasonableness, and if the settlement falls within a range of reasonable compromises, it may be approved." *In re Junk*, 566 B.R. 897, 912 (Bankr. S.D. Ohio 2017) (citing *In re Nicole Gas Prod.*, 518 B.R. 429, 441 (Bankr. S.D. Ohio 2014)); *see also In re Bell & Beckwith*, 87 B.R. at 479; *Cosoff v. Rodman (In re W.T. Grant Co.)*,

18-50757-amk    Doc 3088    FILED 08/22/19    ENTERED 08/22/19 15:24:26    Page 6 of 15

699 F.2d 599, 608 (2d Cir. 1983); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (Bankr. S.D.N.Y. 1993).

22. The Court need not "conduct a 'mini-trial,'" but rather only need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment about the settlement. *Fishell v. Soltow (In re Fishell)*, no. 94-1109, 1995 WL 66622, at *3 (6th Cir. Feb. 16, 1995); *see also In re Pugsley*, 569 B.R. 704, 707–08 (Bankr. N.D. Ohio 2017); *In re Adelphia Commc'n Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005). In order to evaluate the necessary facts, a court may rely on the opinion of trustees, settlement parties, and professionals. *In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010) (citation omitted); *see also In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ("All of this does not mean, however, that the Court must conduct its own investigation concerning the reasonableness of the settlement; the Court may credit and consider the opinion of counsel that the settlement is fair and equitable.").

23. In addition, the Court's review of a settlement should be viewed "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see also Myers v. Martin (In re Martin)*, 91 F. 3d 389, 393 (3d Cir. 1996) ("compromises are favored in bankruptcy") (citation omitted); *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("the general rule [is] that settlements are favored, and in fact, encouraged by the approval process outlined above").

24. As noted above, in order to approve a settlement, a court must find that the settlement is fair and equitable and in the best interests of the debtors' estates. *TMT Trailer*, 390 U.S. at 424–25. The Sixth Circuit has set forth four factors to consider in making this determination: (i) the probability of success in litigation; (ii) the difficulties, if any, to be

7

encountered in the matter of collection;[3] (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views. *Bard v. Sicherman (In re Bard)*, 49 F. App'x 528, 530 (6th Cir. 2012); *see also In re MQVP, Inc.*, 477 F. App'x at 313; *In re Victoria Alloys, Inc.*, 261 B.R. 918, 920 (Bankr. N.D. Ohio 2001); *In re AWF Liquidation Corp.*, 208 B.R. at 400; *In re Dow Corning Corp.*, 192 B.R. 415, 421–22 (Bankr. E.D. Mich. 1996); *In re Bell & Beckwith*, 87 B.R. at 478. Additionally, the Supreme Court instructs courts to consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *TMT Trailer*, 390 at 424.

### B. The Settlement Agreement Should Be Approved

#### i. The Balance Between the Litigation's Possibility of Success and the Settlement's Benefits Weighs in Favor of Approval of the Settlement Agreement

25. Considering the balance between the litigation's possibility of success and the settlement's benefits reflects the Supreme Court's view that a court should form an "intelligent and objective opinion" of the probability of success in the underlying litigation and inherent costs of such litigation. *TMT Trailer*, 290 U.S. at 424. In fact, some courts have identified this factor as the most important in determining the reasonableness of the settlement under Bankruptcy Rule 9019(a). *In re Adelphia*, 327 B.R. at 160 ("This factor . . . is in my view the most important factor, and I weigh it accordingly.").

26. Courts have found the uncertainty of recovery to be a compelling factor favoring approval of a settlement. As the court stated in *Adelphia,* "there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any

---

[3] "The first two *Bard* factors—the probability of success in the litigation and the difficulties in the manner of collection—are related can be analyzed together." *Hindelang v. Mid. State After Market Body Parts, Inc. (In re MQVP, Inc.)*, 477 F. App'x 310, 313 (6th Cir. 2012).

8

particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." 327 B.R. at 159 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972) (Friendly, J.)); *see also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 71 (Bankr. E.D.N.Y. 2009) ("[T]he outcome of litigation is nearly always uncertain and may be distant. It is also costly. And the enforcement of any resulting judgment may be far from sure. A settlement, by contrast, eliminates uncertainty and delay, reduces costs, and brings finality to the parties' dispute.").

27. In this case, the benefits to be obtained under the Settlement Agreement more than justify the Debtors' decision to enter the Settlement Agreement with Meadville. The Settlement Agreement resolves the dispute between FES and Meadville. As explained above, the Court ruled that Meadville's termination of the CSA was a violation of the automatic stay, but the Court deferred any ruling on sanctions for Meadville's violation of the automatic stay. Without the Settlement Agreement, FES would likely have to incur substantial litigation costs relating to pursuing sanctions and substantial litigation costs regarding a possible appeal by Meadville of the Court's ruling. (Farley Declaration ¶¶ 16.)

28. If FES were to pursue sanctions, in the absence of a Settlement Agreement, at best, FES will recover an undetermined amount of sanctions while incurring substantial litigation costs. At worst, FES will incur substantial litigation costs and yet receive no award of sanctions. With respect to a potential appeal by Meadville, FES's prospects include only risk and downside. Win or lose, FES will incur substantial litigation costs defending the appeal, and at best, FES will win the appeal and preserve the Court's ruling. Pursuing sanctions or defending an appeal would be potentially lengthy, costly processes, and FES would have no guarantee of success. (Farley Declaration ¶ 17.)

29. Where a settlement "will facilitate a plan of reorganization that will ultimately benefit all creditors and reduce the fees, costs and expenses that the estate would have to bear in order to litigate . . . extensive, complex, and uncertain issues," it should be approved. *In re Kaiser Aluminum Corp.*, 399 B.R. 91, 96 (D. Del. 2006); *In re Idearc, Inc.*, 423 B.R. 138, 186 (Bankr. N.D. Tex. 2009), *aff'd*, 662 F.3d 315 (5th Cir. 2011) (approving settlement that would "permit the parties to focus their efforts on assisting the Debtors in promptly emerging from chapter 11 and maximizing their value for all constituencies").

30. Additionally, entry into the Settlement Agreement will provide FES with valuable benefits to its business by facilitating a mutually-beneficial business relationship with Meadville going forward. Although Meadville currently has electricity supply contracts through December 31, 2022, the Last Look Provision, described above, provides FES with the valuable right to provide services to Meadville in the future for a period of three years at market power rates. (Farley Declaration ¶ 18.)

31. These benefits clearly outweigh the Debtors' probability of success in pursuing sanctions against Meadville or defending a potential appeal of the Court's ruling. The Debtors' ability to realize any benefit from litigating the sanctions or an appeal would, of course, be wholly dependent on the ultimate success of the litigation on the merits, which carries inherent risks and uncertainty. For these reasons, the Debtors submit that the benefits afforded to the Debtors' estates pursuant to the Settlement Agreement, without needing to incur the significant costs and risks associated with further litigation, represent a fair and reasonable exchange for the consideration being provided under the Settlement Agreement.

### ii. The Length and Cost of Litigation

32. In evaluating the reasonableness of a settlement, a court should also "form an educated estimate of the complexity, expense, and likely duration of such litigation." *TMT Trailer*, 390 U.S. at 424; *see also In re Bard*, 49 F. App'x at 530. Absent approval of the Settlement Agreement, FES would have to engage in highly contentious and expensive litigation to pursue sanctions against Meadville, and Meadville may appeal the Court's Preliminary Order or Memorandum Decision, which would result in a lengthy and costly appeals process. The proposed Settlement Agreement resolves these issues immediately, obtains substantial benefits for the Debtors' estates, and will avoid the likely dissipation of estate resources that would likely have to be spent litigating the very issues resolved through the comprehensive Settlement Agreement. *See In re Ambac Fin. Group., Inc.*, 457 B.R. 299, 306 (Bankr. S.D.N.Y. 2011) (finding this factor satisfied where estate received value for releasing derivative claims "by (i) avoiding the significant legal costs in the actions [ . . . ] and (ii) enabling the Debtor's management to continue to work toward the Debtor's reorganization instead of focusing their attention on litigation-related activities which could delay such reorganization and cause the Debtor to, among other things, incur substantial administrative expenses"). Consequently, this factor weighs in favor of approving the Settlement Agreement.

### iii. Interests of the Creditors

33. A court should also look to the "paramount interests of the creditors and a proper deference to their reasonable views" when deciding whether to approve a settlement. *In re Bard*, 49 F. App'x at 530. Here, the Settlement Agreement is clearly in the best interests of the creditors in these Chapter 11 Cases. Entering into the Settlement Agreement resolves the dispute between Meadville and FES. Without this resolution, FES would have to engage in a time-

consuming and expensive process to pursue sanctions against Meadville and defend a possible appeal by Meadville of the Preliminary Order or Memorandum Decision—an uncertain prospect at best.

34. Additionally, the Settlement Agreement provides value to FES's business and facilitates a mutually-beneficial business relationship between Meadville and FES going forward through the Last Look Provision, discussed above. These benefits to FES's business will ultimately inure to the benefit of the Debtors' estates. (*See* Farley Declaration ¶ 18.)

    *iv.    Other Relevant Factors*

35. In addition to the factors set forth by the Sixth Circuit in *In re Bard*, certain factors considered by other courts in reviewing settlements under Bankruptcy Rule 9019 also weigh in favor of approving the Settlement Agreement. Two such factors—considered by the Second Circuit—are "the competency and experience of counsel supporting the settlement" and "the extent to which the [proposed] settlement is the product of arm's-length bargaining." *See Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (citations and internal quotation marks omitted).

36. The Settlement Parties have been represented by skilled and experienced bankruptcy and litigation practitioners during these Chapter 11 Cases and the negotiations regarding the Settlement Agreement. Courts have previously given this factor substantial weight. *See e.g. In re Adelphia*, 327 B.R. at 164; *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (holding that settlement easily satisfied the Second Circuit's requirements, in part, because "[n]o argument has been made, nor could any argument be made, that counsel who put the Settlement together were anything less that highly skilled in their craft, and knowledgeable in the considerations underlying a settlement of this character").

37. The extent to which the Settlement Agreement is the product of arm's-length bargaining also suggests that the Settlement Agreement should be approved. As discussed above, the proposed Settlement Agreement is a product of good-faith negotiations and "represents the considered judgment of economically motivated parties who were negotiating at arm's-length to reach the best settlement that could be achieved under the circumstances." *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009). Ultimately, the Settlement Agreement represents concessions by both parties, is the result of extensive negotiation by parties with differing economic interests, and was not the result of fraud or collusion. *See In re Chemtura Corp.*, 439 B.R. at 608.

### NOTICE

38. Notice of this Motion has been served on the following parties and/or their counsel, if known, via facsimile, regular mail, e-mail and/or hand delivery: those parties listed on the General Service List (as defined in the *Amended Order Pursuant to Sections 102 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6007, 7016, 9013 and 9014 and Local Bankruptcy Rules Establishing: (I) Omnibus Hearing dates; and (II) Certain Case Management Procedures* [Dkt. No. 280]). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### NO PRIOR REQUEST

39. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form attached hereto as Exhibit B, (ii) enter a final order substantially in the

13

form attached hereto as <u>Exhibit C</u>, and (iii) grant such other and further relief as the Court may deem proper.

[*Remainder of page intentionally left blank*]

Dated: August 22, 2019

*/s /Bridget A. Franklin*
**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted pro hac vice)
Joseph Sorkin (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jsorkin@akingump.com

- and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors and Debtors in Possession*