**This document was signed electronically on August 29, 2019, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated:  August 29, 2019**



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 18-50757 (Jointly Administered) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | Judge Alan M. Koschik |

## MEMORANDUM DECISION SUPPLEMENTING ORDER DENYING
## MOTION TO APPROVE THE DEBTORS' DISCLOSURE STATEMENT FOR THEIR
## THIRD AMENDED JOINT PLAN OF REORGANIZATION

On February 11, 2019, debtors FirstEnergy Solutions Corp. and its jointly administered debtors and debtors-in-possession (collectively, the "Debtors"), filed their Motion for Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief (Docket No. 2121) (the "Motion").  The Motion sought, *inter alia*,

approval of the Debtors' disclosure statement (Docket No. 2119, as later amended at Docket No. 2431) (the "Disclosure Statement") for the Debtor's third amended joint plan of reorganization (originally filed at Docket No. 2120, as later amended at Docket No. 2430) (the "Plan").[1]

On April 4, 2019, the Court delivered its oral decision on the Motion in open court, announcing its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure and Rule 7052 of the Federal Rules of Bankruptcy Procedure. Those findings and conclusions are incorporated herein. The Court also entertained post-decision motions on April 4, 2019, noting that it intended to issue a written decision to supplement its oral one and that such opinion could be considered additional findings under Rule 7052 and thus subject to Rule 8002(b)(1)(A) of the Federal Rules of Bankruptcy Procedure. At that time, the parties asked for additional time to consider whether to make such post-decision motions.

At a regularly scheduled omnibus hearing held in this case on April 9, 2019, the Debtors made an oral motion pursuant to Bankruptcy Rule 8002(b)(1)(A) for the Court to make additional findings under Bankruptcy Rule 7052. No party opposed that motion.

The Court entered its written order denying the Motion on April 11, 2019, at Docket No. 2500 (the "Disclosure Statement Denial Order"). That order also memorialized the Debtors' oral motion pursuant to Bankruptcy Rule 8002(b)(1)(A) and the Court's acknowledgment that the Court intended to enter a written opinion more fully setting forth the reasoning of its decision

---

[1] Subsequent to the Court's oral ruling on the Motion on April 4, 2019, described herein, and the Court's written order entered on April 11, 2019, at docket number 2500, to which this Memorandum Decision pertains, the Debtors proceeded to file their Fourth Amended Plan, and later their Fifth Amended Plan, along with Amended Disclosure Statements related to each. This Memorandum Decision does not address those later amended disclosure statements or proposed plans of reorganization. In fact, the Disclosure Statement for the Debtors' Fifth Amended Plan (Docket No. 2661) was approved by the Court pursuant to an Order entered on May 29, 2019, at Docket No. 2714. After the Disclosure Statement for the Fifth Amended Plan was approved and the Debtors solicited acceptances of that Plan, the Debtors filed their Sixth and Seventh Amended Plans at Docket Nos. 2934 and 3056, respectively. The confirmation hearing regarding the Debtors' most recently amended proposed plan of reorganization was held on August 20-21, 2019, and has been adjourned to an as yet unspecified date.

and its findings and conclusions pursuant to Rule 7052 and that the time for filing an appeal would run from the date of the Court's written opinion.

This Memorandum Decision constitutes the Court's further written findings and conclusions pursuant to Civil Rule 52(b), and shall also be deemed to be the order granting the parties' Rule 8002(b) motion. Pursuant to Rule 8002(b)(1)(A), the time to file an appeal from the Court's Disclosure Statement Denial Order, pursuant to Rule 8002(a), runs from the entry of this Memorandum Decision. Pursuant to Rule 8002(b)(2), any notices of appeal filed after entry of the Disclosure Statement Denial Order and before the entry of this Memorandum Decision are now effective.

## JURISDICTION AND VENUE

The full extent of this Court's jurisdiction to consider all matters relevant to the Motion, in particular the claims that might be affected by the nonconsensual third-party releases proposed by the Debtors in their Plan, described in the Disclosure Statement, and that are the central issue in the Motion, was actively contested by certain parties objecting to the Motion. Those arguments are considered and resolved herein. However, as an initial matter, the Court observes that it has original jurisdiction over the Motion as a contested matter arising in this bankruptcy case pursuant to 28 U.S.C. § 1334(b) and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012.

Venue is proper pursuant to 28 U.S.C. § 1409(a). Consideration of the Motion itself and the adequacy of the Disclosure Statement is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O).

18-50757-amk    Doc 3135    FILED 08/29/19    ENTERED 08/29/19 16:22:57    Page 3 of 41

## STANDARD OF DECISION

The Court did not take evidence during the hearings on the Motion. On March 21, 2019, after the first hearing on the Motion, the Court entered a scheduling order (Docket No. 2356) (the "Scheduling Order") allowing parties to file supplemental briefs on the central legal issue raised in most of the eleven responses to the Motion—the legality of the nonconsensual third-party releases proposed by the Plan. The Scheduling Order provided that the second hearing on the Motion would be an oral argument

> specifically on the issue of whether the Releases can be shown to render the Plan legally infirm on its face and thus patently unconfirmable—that the Debtors could prove no set of facts at a future confirmation hearing that would allow the Court to confirm a Plan containing such Releases. The Court will not take evidence at the April 2, 2019 oral argument. If the need for an evidentiary record is shown, that would demonstrate that the Debtors have at least the possibility of satisfying the Sixth Circuit's tests for non-consensual third-party releases and injunctions, or other applicable law, and the Court would then defer such issues to a confirmation hearing.

(Docket No. 2356 at 3.) The parties collectively filed a total of eighteen supplemental briefs, joinders, and replies pursuant to that Scheduling Order.

As set forth in the Scheduling Order, and as recognized by many of the parties in their opening statements, the Court considers the issue of *patent* unconfirmability to be a legal issue. Several times during the hearings on the Motion, both at the conclusion of the March 21 hearing and during the April 2 oral argument, both the Court and several counsel referred to the relevant standard as being that for summary judgment.

However, upon reflection, the Court has determined that the correct standard for considering the parties' arguments concerning the legality of the Plan's proposed nonconsensual third-party releases at this early stage, when only the adequacy of the Disclosure Statement is being considered, should be more akin to the standard for considering motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Not

4

only did the Court receive no live testimony at the hearings on the Motion, it also did not receive any declarations or other written evidence addressing the proposed nonconsensual third-party releases as might be expected to support a summary judgment motion pursuant to Rule 56 of the Federal Rules of Civil procedure. Indeed, as the Court's own Scheduling Order stated, the inquiry was whether "the Debtors could prove no set of facts" at the confirmation hearing to establish legal grounds to approve the challenged releases. Scheduling Order, Docket No. 2356 at 3. The Court did not seek to determine whether there were genuine issues of material fact relevant to the proposed releases, but rather whether the Plan *as written* was patently unconfirmable. This is the standard that the Court applied when it made its April 4, 2019 oral ruling, notwithstanding several inartful references to the summary judgment standard. It is also the standard the Court applies here.

## FACTUAL AND PROCEDURAL HISTORY

On March 31, 2018 (the "Petition Date"), the six affiliated Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Their chapter 11 cases are being jointly administered. The Debtors continue to operate their businesses and manage their property pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Debtors' cases. On April 11, 2018, the Office of the United States Trustee (the "UST") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.

The Debtors own and/or operate multiple fossil-fueled and nuclear electric generating facilities in Ohio and Pennsylvania, in addition to providing services that support the various facilities, including ownership and operation of certain landfills and impoundments for byproducts of power generation. The Debtors' remaining generating fleet consists primarily of

5

two fossil-fueled generation plants located in Ohio and Pennsylvania, which produce electricity using coal, oil, or natural gas, as well as three nuclear generation facilities (incorporating four licensed reactors) located in Ohio and Pennsylvania, each of which was placed into service between 1978 and 1987. The Debtors' business as of the Petition Date also included two additional fossil-fueled generation plants in Ohio that have since been sold pursuant to sales approved by this Court. The Debtors also propose to acquire another fossil-fueled electric generating facility from a nondebtor affiliate upon the Plan's effective date.

Each of the Debtors is a direct or indirect subsidiary of FirstEnergy Corporation ("FE Corp"), which is also the ultimate parent company to multiple other non-Debtor entities (collectively, with FE Corp, the "FE Non-Debtor Parties"). Prior to the incorporation of the Debtor entities, either FE Corp or another of the FE Non-Debtor Parties owned and/or operated each of the power plants and supporting sites (*e.g.,* coal ash impoundments, landfills) currently or previously owned by the Debtors.

One of the FE Non-Debtor Parties, FirstEnergy Service Corporation ("FESC"), has historically provided shared corporate-level services to the Debtors and FE Non-Debtor Parties alike. These functions include*, inter alia*, human resources, information technology, controller, legal, external affairs and communications, corporate real estate and records management, supply chain, fleet engineering, fleet operations and outage support, environmental, and corporate affairs and community involvement services (the "Shared Services"). As of the Petition Date, the Debtors had little or no personnel or equipment of their own dedicated to these functions, and many of these services would have been, as stated in the declaration of the Debtors' chief restructuring officer, "nearly impossible and prohibitively expensive for the Debtors to replace …. The Debtors would be utterly incapable of operating their businesses in any form, let alone in

6

a 'business-as-usual' manner, absent the Shared Services." (Decl. of Charles M. Moore, Docket No. 24, ¶ 22.) The Debtors and FE Non-Debtor Parties are also party to a number of intercompany agreements related to the core generation business of the Debtors, including, *inter alia*, power purchase agreements, operating and maintenance agreements, and fuel supply agreements. (*See* Decl. of Donald R. Schneider, Docket No. 55, ¶¶ 309-330; *see also* Mot. to Authorize Continued Performance Under Intercompany and Shared Services Agreements, Docket No. 12, Ex. C; Mot. to Approve Settlement Among the Debtors, Non-Debtor Affiliates, and Certain Other Settlement Parties, Docket No. 1224, ¶ 12.) These are only two significant ways among several that the Debtors and FE Non-Debtor Parties were joined at the hip as of the Petition Date. A significant amount of the work of many teams of estate professionals in this case has been devoted to structuring and managing the surgical separation of these conjoined entities.

A significant milestone in that separation was brought to the Court on August 26, 2018, when the Debtors filed their Motion to Approve Settlement Among the Debtors, Non-Debtor Affiliates, and Certain Other Settlement Parties (Docket No. 1224) (the "FE Settlement Motion"). The Settlement Motion sought approval of a settlement agreement (Docket No. 1224 Ex. A Ex. 1) (the "FE Settlement Agreement") between the Debtors, the FE Non-Debtor Parties, the Committee, and two ad hoc groups of creditors that represent holders of the majority of the Debtors' funded debt (excluding any claims of the FE Non-Debtor Parties). The Settlement Agreement was designed to resolve intercompany claims between and among the Debtors and the FE Non-Debtor Parties. Pursuant to the Settlement Agreement, the FE Non-Debtor Parties agreed to provide the following value to the Debtors' estates:

- $225 million in cash, not subject to setoff or reduction;

7

- $628 million in principal amount of new unsecured notes issued by FE Corp.;

- the value of the Pleasants Power Station (presently owned by an FE Non-Debtor Party with a book value of approximately $70 million), to be provided to the Debtors either through the transfer of ownership of the plant or through the contribution of the net cash proceeds of the sale of such plant by the FE Non-Debtor Parties, as well as the FE Non-Debtor Parties paying of up to $18.0 million of the costs associated with an upcoming maintenance outage;[2]

- the continued provision of Shared Services by the FE Non-Debtor Parties to the Debtors, along with a credit of up to $112.5 million for postpetition costs for such services;

- the payment of certain substantial employee and retiree obligations that would otherwise be borne by the Debtors;

- the continued performance by the FE Non-Debtor Parties under the existing intercompany tax allocation agreement for all periods or portions thereof ending on or before the Plan Effective Date (as defined in the Settlement Agreement), including (i) a guaranteed purchase of at least $66 million in value of the Debtors' tax attributes for tax year 2018, (ii) the waiver of certain overpayments to the Debtors for tax year 2017, and (iii) the reversal of a March 2018 prepayment for certain of the Debtors' tax attributes which prepayment offsets the Debtors' Non-Utility Money Pool balance; and

- the waiver of all prepetition claims the FE Non-Debtor Parties may have against the Debtors, as well as the waiver of certain postpetition administrative expense claims.

It was also at this juncture that the issue of the breadth of the releases that would later be proposed in the Plan was first brought to the Court's attention. On September 19, 2018, the United States on behalf of the U.S. Environmental Protection Agency and the U.S. Nuclear

---

[2] On February 1, 2019, the Debtors filed a motion in furtherance of the FE Settlement Agreement, seeking authority to enter into an asset purchase agreement to acquire the Pleasants Power Station *nunc pro tunc* to December 31, 2018, as well as related disposal agreement. (Docket No. 2052.) Pursuant to that motion, the closing of the transaction is conditioned on, among other things, confirmation and consummation of a plan of reorganization with an effective date achieved by June 30, 2020. The Governments (defined hereinafter) filed a response on March 1, 2019. (Docket No. 2178.) However, the Governments did not object to the sale; their response was simply another occasion on which they noted the issue of nonconsensual third-party releases looming on the horizon. The Governments expressed concern that the transfer to the Debtors of the Pleasants Power Station, which no Debtor had ever owned, could potentially expand the scope of the releases proposed in the Plan to encompass claims related to that facility. Since the Governments did not object to the relief sought in the sale motion, on March 7, 2019, the Court entered an order granting the motion to approve the asset purchase agreement. (Docket No. 2217.)

8

Regulatory Commission, the Office of the Ohio Attorney General on behalf of the Ohio Environmental Protection Agency and the Ohio Department of Natural Resources, and the Pennsylvania Department of Environmental Protection (the "Governments"), filed a consolidated objection to the FE Settlement Motion. (Docket No. 1405.) While the FE Settlement Motion itself did not seek approval of third-party releases, it did state that "the Debtors have also agreed to seek third-party releases in conjunction with the confirmation of any plan of reorganization or liquidation to be proposed in the Chapter 11 Cases." (FE Settlement Motion, Docket No. 1224 at 53 n.27.) Sections 6.2 and 6.3 of the FE Settlement Agreement obligated the Debtors, or any other signatory of the FE Settlement Agreement that might become a plan proponent, to include such third-party release provisions in any proposed plan. (FE Settlement Agreement, Docket No. 1224 Ex. A Ex. 1 at 41.) The Governments indicated that they intended to object to the later inclusion of such releases in any plan, and objected to the FE Settlement Motion and proposed order thereon to the extent necessary to reserve their rights to object to the nonconsensual third-party releases later. The proposed order was modified to preserve clearly the rights of all parties to object to releases by non-signatories to the FE Settlement Agreement. The Court held a hearing on the FE Settlement Motion on September 25, 2018, and entered the amended proposed order granting the FE Settlement Motion on September 26, 2018. (Docket No. 1465.)

On October 23, 2018, the Debtors filed their second motion for an extension of their exclusive periods to file a chapter 11 plan and solicit acceptances thereof (Docket No. 1571) (the "Second Exclusivity Motion"). The Governments did not object to the Second Exclusivity Motion,[3] but counsel for the Governments appeared telephonically at the hearing on the Second Exclusivity Motion on November 13, 2018. Counsel did not specifically reiterate the concerns

---

[3] No parties substantively objected to the Second Exclusivity Motion, though several filed reservations of rights of various kinds. (Docket Nos. 1629, 1633, 1634, and 1635.)

9

of the Governments about the nonconsensual third-party releases that the FE Settlement Agreement would require to be proposed in any future plan; he merely stated the Governments' ongoing concerns about the negotiation process and the risk of a plan containing nonconsensual third-party releases becoming a *fait accompli*. The Court granted the Second Exclusivity Motion and entered an order to that effect on November 19, 2018. (Docket No. 1726.)

On January 15, 2019, the Debtors filed their third motion for an extension of their exclusive periods to file a chapter 11 plan and solicit acceptances thereof (Docket No. 1967) (the "Third Exclusivity Motion"). On January 23, 2019, they also filed copies of a Restructuring Support Agreement (the "RSA") (Docket No. 1995 Ex. A) and "Plan Term Sheet" (Docket No. 1995 Ex. A at 54) setting forth the anticipated significant terms of a plan to come. This time, the Governments filed a written response to the Third Exclusivity Motion (Docket No. 2035), although they did not oppose the relief requested in the Third Exclusivity Motion. The Governments' response to the Third Exclusivity Motion reiterated the concern expressed by their counsel orally at the hearing on the Second Exclusivity Motion, noting that the RSA and Plan Term Sheet "were filed without any discussion or advance notice to the Governments and are silent with respect to the Governments' concerns" (Docket No. 2035 ¶ 15) and both of those plan precursor documents further called for the inclusion of nonconsensual third-party releases by the Governments (along with any other holders of claims or interests against the Debtors) of any claims or causes of action they might have against the FE Non-Debtor Parties.[4] The

---

[4]  *See, e.g.*, Notice of the Debtors' Entry into a Restructuring Support Agreement and of the Record Date for Equity Elections Under the Debtors' Plan of Reorganization, Docket No. 1995 Ex. A (Restructuring Support Agreement) at 60 (the "Plan shall implement the [FE] Settlement Agreement"); *id.* at 77 ("The Plan shall provide for releases to the FE Non-Debtor Parties of all Claims and causes of action that could be asserted against, or in any way relating to, or arising out of (i) any Debtor, the Reorganized Debtors, their businesses, or their property; (ii) any causes of action against the FE Non-Debtor Parties arising in connection with any intercompany transactions or other matters arising in or related to the conduct of the Debtors' businesses; (iii) the Chapter 11 Cases; (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of the Plan; or (v) any other act or omission in connection with the Chapter 11 Cases.").

Governments' response to the Third Exclusivity Motion reiterated the Governments' concerns about such releases and noted that they expected to object to such releases, citing cases previewing their later argument. (Docket No. 2035 ¶ 16-17.) The Court held a hearing on the Third Exclusivity Motion on February 5, 2019, and signed an order granting it on February 7, 2019. (Docket No. 2084.)

On February 11, 2019, the Debtors filed their original Plan, their original Disclosure Statement, and the instant Motion. While the Plan and Disclosure Statement were both amended multiple times before the final hearing on the Motion, Section VIII.E remained constant. That Section VIII.E provides, in full:

> On and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, the consideration provided by the FE Non-Debtor Parties under the Settlement Agreement and the contributions of the FE Non-Debtor Released Parties to facilitate and implement the Plan, each Holder of a Claim or Interest is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each FE Non-Debtor Released Party from any and all claims and Causes of Action, including derivative claims asserted or assertable by or on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties) as applicable, that such Entity would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including the FE Non-Debtor Parties), the purchase, sale, or recession of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any FE Non-Debtor Released Party, the PCNs, the FES Notes, any interest in the Mansfield Facility Documents, the Chapter 11 Cases, and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including

providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any FE Non-Debtor Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, any obligation under any Assumed Executory Contract or Unexpired Lease where an FE Non-Debtor Party is a counterparty, the FE Postpetition Agreements, the FE Settlement Agreement and any related obligations under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the FE Settlement Agreement.

For the avoidance of doubt, on and as of the Effective Date of the Plan, the Holders of Claims and Interests shall be deemed to provide a full and complete release to the FE Non-Debtor Released Parties and their respective property of and from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for or sounding in tort, fraud, contract, violations of federal or state securities laws, veil piercing, substantive consolidation or alter-ego theories of liability, contribution, indemnification, joint or several liability, or otherwise, arising from or related in any way to (i) the Debtors, Reorganized Debtors, their businesses, or their property; (ii) any Causes of Action against the FE Non-Debtor Released Parties or their property arising in connection with any intercompany transactions and other matters arising in the conduct of the Debtors' businesses; (iii) the Chapter 11 Cases; (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, Confirmation, or Consummation of the Plan, the Plan Supplement, any contract, employee pension or benefit plan, instrument, release, or other agreement or document related to any Debtor, the Chapter 11 Cases or the Plan, modified, amended, terminated, or entered into in connection with either the Plan, or any agreement between the Debtors and any FE Non-Debtor Released Party, including the FE Settlement Agreement; or (v) any other act taken or omitted to be taken in connection with the Chapter 11 Cases, including, without limitation, acts or omissions occurring after the Effective Date in connection with distributions made consistent with the terms of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the FE Non-Debtor Parties' Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan.

(Docket No. 2430 at 105-06.)  The language is challenging to parse but simple enough in intent: if the Plan containing this release (the "FE Non-Debtor Parties' Third-Party Release") were confirmed, FE Corp would wash its hands of any liability flowing from its historical ownership of the properties and operation of the businesses and facilities now or at any time owned and operated by the Debtors, or at least any liability to any party that also holds any "claim," as defined in 11 U.S.C. § 101(5) of the Bankruptcy Code, against the Debtors.

The Court received eleven timely-filed responses and objections to the Disclosure Statement.  While not all of them focused on the issue of the FE Non-Debtor Parties' Third-Party Release, many did.

The Court held the first day of hearings on the Motion on March 19, 2019.  Following that hearing, on March 21, 2019, the Court entered a scheduling order (Docket No. 2356) (the "Scheduling Order") allowing parties to file supplemental briefs on the central legal issue raised in most of the eleven responses to the Motion—the legality of the proposed nonconsensual third-party releases that the Plan would impose.  The parties collectively filed a total of eighteen supplemental briefs, joinders, and replies.

The Court held the final hearing on the Motion on April 2, 2019.  The hearing lasted until after the close of regular business hours.  The Court took the matter under advisement, which was followed by the Court's April 4, 2019 oral ruling, the Debtors' April 9, 2019 post-decision motion pursuant to Bankruptcy Rule 8002(b)(1)(A) for additional findings under Civil Rule 52 and Bankruptcy Rule 7052, and the April 11, 2019 order memorializing the April 4 oral ruling and indicating the Court's intent to enter a written opinion that would constitute its final ruling on the Motion and the Rule 8002(b)(1)(A) post-decision motion.

The Court notes that in the interim between the Court's oral ruling on April 4 and the date of this Memorandum Decision, the Debtors filed their fourth and fifth proposed plans (Docket Nos. 2529 and 2658), amended disclosure statements for each (Docket Nos. 2530 and 2661, respectively), a motion to approve the amended disclosure statement (Docket No. 2531), and a motion to approve and perform under a consent and waiver to the FE Settlement Agreement and grant certain related relief (Docket No. 2528). The Court approved the Debtors' Disclosure Statement for their Fifth Amended Joint Plan of Reorganization in an Order entered May 29, 2019 (Docket No. 2714) (the "Disclosure Statement Approval Order"). More recently, the Debtors filed their sixth and seventh amended plans of reorganization (Docket Nos. 2934 and 3056, respectively), which were considered for confirmation at a hearing held on August 20-21, 2019 (the "Confirmation Hearing"). The Court overruled several objections to confirmation during the Confirmation Hearing, but sustained one other objection. As a result, the Confirmation Hearing was adjourned to an as yet unspecified date.

This Memorandum Decision does not concern any of these post-April 11, 2019 filings and does not disturb the Disclosure Statement Approval Order or the Court's rulings during the Confirmation Hearing. This Memorandum Decision is limited to providing further findings and conclusions relating to the Court's April 4, 2019 oral ruling on the Motion and the Disclosure Statement Denial Order entered on April 11, 2019.

## LEGAL ANALYSIS

The central issue in dispute with respect to the Motion is whether the FE Non-Debtor Parties' Third-Party Release, a nonconsensual release and injunction of the claims of the Debtors' creditors against the FE Non-Debtor Parties, is an "appropriate provision" of the Plan "not inconsistent with the [Bankruptcy Code]" pursuant to 11 U.S.C. § 1123(b)(6). Such a

14

determination would ordinarily be a confirmation issue reserved for the confirmation hearing, and not addressed at the disclosure statement stage. *In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012). However, courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing. *Id.* at 154 (collecting cases). A court should not proceed with the time-consuming and expensive propositions of solicitation and contested hearings on a plan when the plan would not legally be confirmable because it does not comply with confirmation requirements. *See id.* (quotation omitted).

Patent unconfirmability is treated as a matter of law. *In re Dow Corning Corp.*, 237 B.R. 380, 384 n.1 (Bankr. E.D. Mich. 1999) (recounting procedural history of that case in which the court at the disclosure statement hearing "determined that the plan was not patently unconfirmable as a matter of law"); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("Only where the disclosure statement *on its face* relates to a plan that cannot be confirmed does the court have an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of the plan; otherwise, confirmation issues are left for later consideration.") (emphasis in original); *In re Monroe Well Service*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) ("it may be appropriate to disapprove of a disclosure statement … when a court is convinced that the plan could not possibly be confirmed," but "the objections considered must be limited to defects which could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing").

15

The question before the Court at this juncture is the legal sufficiency of the proposed FE Non-Debtor Parties' Third-Party Release *on its face*. As noted in the section of this Memorandum Opinion concerning the Standard of Decision, the Court is only examining whether the Debtors could prove any set of facts sufficient to establish grounds for approval of this release as part of a plan confirmation process. Because this question is a matter of law alone, it does not require the discovery or presentation of evidence regarding the possible or plausible application of the FE Non-Debtor Parties' Third-Party Release to existing or anticipated factual circumstances.

Indeed, the full effect of the proposed release may not be capable of full evaluation even at plan confirmation. The specific impact of the FE Non-Debtor Parties' Third-Party Release could not be fully known for months or years after confirmation, and even then only when a specific claim arises, the release is raised as a defense, and the application of the release to specific facts and evidence is litigated in a court with jurisdiction over the claim. This Bankruptcy Court must, therefore, determine now whether the FE Non-Debtor Parties' Third-Party Release would by its written terms be sufficiently and predictably constrained that its potential impact was consistent with the "applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1123(b)(6).

The FE Non-Debtor Parties' Third-Party Release is broadly drafted and is not narrowly-tailored to a well-defined set of claims. In order for a bankruptcy court to confirm a plan containing nonconsensual third-party releases, the Court must be confident that the breadth of the release will be consistent with the Bankruptcy Code's chapter 11 plan confirmation standards when applied. If the scope of the release language could plausibly encompass claims against nondebtors whose release is not permitted under the appropriate plan confirmation standards, the

16

FE Non-Debtor Parties' Third-Party Release could not be approved and the Plan containing it could not be confirmed. The question is whether the release language is, on its face, appropriate as to any *possible* claim.

It would not be relevant to examine evidence that such inappropriately released claims are merely theoretical and might not actually exist with respect to the debtor in question, or that such claims are unlikely to arise. The only conceivable purpose of additional evidence regarding the release would be to demonstrate that the release cannot, even in theory, apply inappropriately to bar a creditor's claims against nondebtors. The Court concludes that evidence of existing claims or likely claims does not advance this inquiry because the determination can be and must be made based upon the interpretation of the proposed language itself regardless of the probability of its inappropriate application. A debtor cannot save a plan with overbroad release language by demonstrating with evidence that troublesome application of the release is unlikely; it must show that the release provision is, on its face, permissible as to any possible claim that could be affected in light of the debtor's circumstances, its plan of reorganization, and the foreseeable claims of the debtor's creditors.

Therefore, the Court must consider whether every reasonably conceivable application of the FE Non-Debtor Parties' Third-Party Release would satisfy the exacting legal standard for nonconsensual nondebtor releases. Because the Court concludes that the FE Non-Debtor Parties' Third-Party Release cannot meet that standard, the Court holds that the Debtors' Third Amended Plan is patently unconfirmable and therefore the Disclosure Statement corresponding to that plan cannot be approved.

# I. Non-Consensual Third Party Releases of Nondebtors Are the Exception, Not the Rule

While the Sixth Circuit has set forth the factors relevant to a determination of whether a nonconsensual third-party release of a nondebtor is permitted, the Court finds it worthwhile to acknowledge that there is a broad and nearly even circuit split on the issue of whether bankruptcy courts can, under any circumstances, release nondebtors from claims held by nonconsenting parties in connection with a debtor's reorganization plan. Some circuits have held that nonconsensual third-party releases are categorically beyond the power of a bankruptcy court. Some, including the Sixth Circuit, have held that they are permissible in unusual circumstances. No circuit has held or even suggested that such releases are anything less than an extraordinary use of the bankruptcy court's power. The circuit split occupies the spectrum between "impossible" and "very rare."

## A. Law Governing Nonconsensual Third-Party Releases of Nondebtors Outside the Sixth Circuit

The Fifth, Ninth, and Tenth Circuits have held that permanent injunctions that effectively discharge the debts of nondebtors are categorically outside the power of the bankruptcy courts. *See Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir. 1995) ("we must overturn a § 105 injunction if it effectively discharges a nondebtor"[5]); *Resorts International, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401 (9th Cir. 1995); *Landsing Diversified Properties-II v. The First National Bank and Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990) ("while a temporary stay prohibiting a creditor's suit against a

---

[5] *Matter of Zale Corp.* recognized a possible exception to, rather than expressly disagreeing with, rulings of other circuits in which "the courts upheld permanent injunctions of third-party claims because while the injunction permanently enjoined the lawsuits, it also channeled those claims to allow recovery from separate assets and thereby avoided discharging the nondebtor." *Id.* (citing *Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d Cir. 1988).

18

nondebtor … during the bankruptcy proceeding may be permissible to facilitate the reorganization process … the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor").

Other circuits are not as strict. The Fourth Circuit has held that the bankruptcy court has the power to release liabilities of a nondebtor under the terms of a chapter 11 plan when the affected creditors of the nondebtor approved of and accepted the terms of the plan. *See Menard-Sanford, et al. v. Mabey, et al. (In re A.H. Robins Company, Inc.)*, 880 F.2d 694 (4th Cir. 1989); *see also Stuart, LLC v. First Mount Vernon Industrial Loan Association (In re Peramco International, Inc.)*, 3 Fed. Appx. 38, 42 (4th Cir. 2001) (citing *A.H. Robins*). More recently, that circuit has cited approvingly the factors the Sixth Circuit set forth in *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir. 2002) (discussed in greater detail below) when considering whether to approve nonconsensual third-party releases of nondebtors as part of a plan of reorganization. *Behrmann v. National Heritage Foundation*, 663 F.3d 704, 712 (4th Cir. 2011).

The Second and Seventh Circuits likewise allow for the possibility of nonconsensual third party releases in a confirmed chapter 11 plan of reorganization, but always in rare and exceptional circumstances. *See Airadigm Communications, Inc. v. Federal Communications Commission (In re Airadigm Communications, Inc.)*, 519 F.3d 640 (7th Cir. 2008) (approving nondebtor release when release was necessary for the reorganization and appropriately tailored … affected only claims arising out of or in connection with the reorganization itself, not blanket immunity); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) (warning that "a nondebtor release is a device that lends itself to abuse" and "[n]o case has tolerated nondebtor

19

releases absent the finding of circumstances that may be characterized as unique," and holding

that the bankruptcy court finding that the nondebtor seeking the release made a material

contribution to the reorganization was not independently sufficient to justify such a release);

*Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel*

*Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992).

The Third Circuit may be willing to allow for such releases as well. In *In re Continental*

*Airlines*, 203 F.3d 203 (3d Cir. 2000), the court canvassed the law as it had been developed at the

time and expressly declined to "establish [its] own rule regarding the conditions under which

non-debtor releases and permanent injunctions are appropriate or permissible," because the

proposed releases in the debtors' plan for certain non-debtor director and officer defendants

"[did] not pass muster under even the most flexible tests for the validity of non-debtor releases."

*Id.* at 214.

While the standards vary, it is striking that each circuit that has considered nondebtor

releases either rejects them absolutely or approves them only reluctantly.

### B. Controlling Sixth Circuit Standard for Non-Consensual Third Party Releases of Nondebtors

The controlling authority concerning the legal viability of the nonconsensual releases of

third-party claims against nondebtors proposed by the Debtors' Third Amended Plan is the Sixth

Circuit's opinion in *Dow Corning*. *Dow Corning* held, contrary to the holdings of the Fifth,

Ninth, and Tenth Circuits, that nonconsensual third-party releases of nondebtors are not

categorically prohibited by the Bankruptcy Code. The Sixth Circuit noted that bankruptcy

courts, "as courts of equity, have broad authority to modify creditor-debtor relationships," 280

F.3d at 656, and the Bankruptcy Code permits a reorganization plan to "include any appropriate

18-50757-amk    Doc 3135    FILED 08/29/19    ENTERED 08/29/19 16:22:57    Page 20 of 41

provision not inconsistent with the applicable provisions" of the Code. *Id.* (quoting 11 U.S.C. § 1123(b)(6)).

The question, as the Sixth Circuit frames it, is under what circumstances would a nonconsensual third-party release or injunction be "appropriate" within the meaning of Section 1123(b)(6). *Dow Corning* echoes the caution expressed by other circuits about such releases. While possible within the Sixth Circuit, the nonconsensual release of third-party claims against nondebtors remains an exception, not the rule. "[S]uch an injunction is a dramatic measure to be used cautiously . . . [and therefore] enjoining a non-consenting creditor's claim is only appropriate in unusual circumstances." *Dow Corning,* 280 F.3d at 658 (citing *Drexel Burnham Lambert,* 960 F.2d at 293; *A.H. Robins,* 880 F.2d at 702; and *Johns-Manville Corp.,* 837 F.2d at 93-94). The Court proceeded to hold, as follows:

> [W]hen the following seven factors are present, the bankruptcy court may enjoin a nonconsenting creditor's claims against a nondebtor: (1) There is an identify of interest between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all or substantially all of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.*

### C. The Circumstances of the Debtors' Bankruptcy Case and Their Proposed Nonconsensual Third-Party Releases of Nondebtors Are Materially Different Than Those of the Leading Cases Permitting Such Releases

Before addressing the *Dow Corning* factors, the Court pauses to make an observation about the circumstances present in the line of cases leading to the *Dow Corning* decision and several of those that follow. These cases, such as the seminal cases of *A.H. Robins* and *Johns-*

*Manville*, *Dow Corning* itself, and more recent cases relying upon *Dow Corning*, such as the *In re City of Detroit,* 524 B.R. 147 (Bankr. E.D. Mich 2014), concern debtors who were the primary obligors or tortfeasors responsible for the claims that were obstacles to plan confirmation. Overcoming those obstacles required employment of third-party releases of secondarily liable nondebtor parties in exchange for substantial contributions from the nondebtor obligors to assist funding of a plan and providing a dividend to the creditors whose claim would be released.

The most classic example of these cases are those involving mass tort claims against a debtor who is the primary defendant in personal injury products liability actions, such as the Dalkon Shield litigation against the debtor in *A.H. Robins*, asbestos litigation against the debtor *Johns-Manville*, and the silicone breast implant litigation against the debtor in *Dow Corning*. The *City of Detroit* Chapter 9 municipal case involved a variation on this theme. One of the central issues in that case concerned the City's pension obligations to its current and former employees. In each of these cases, in order to obtain confirmation the debtors were required to resolve a multitude of claims in an orderly way and obtain those creditors' approval of a plan of reorganization. To accomplish this, the debtors obtained contributions from other parties who were secondarily liable, or at least allegedly so, for the claims asserted against the debtor. These parties included insurers whose policies covered personal injury claims against the debtors, the debtor's corporate parents that were alleged to have had some role in causing the injuries suffered by plaintiffs, or at least some legal responsibility for their corporate subsidiary or joint venture, and in the case of *City of Detroit*, the State of Michigan who may have shared legal responsibility for the pensions of public employees and former employees of the City of Detroit, a municipality incorporated under Michigan law. In all of these cases, a plan was negotiated in which in exchange for significant contributions from the secondary obligors, large groups of

22

creditors approved the plan. Under these plans, the third-party contributions, along with other assets held by or provided by the debtors themselves, funded a trust or some other legal vehicle with sufficient assets to convince the affected creditors to agree, as a class, on a majority or overwhelming vote to accept the plan. These are essentially class action settlements releasing a debtor and its co-obligors, ensuring that no claims of contribution or indemnity against the debtor survive plan confirmation, and directing substantial compensation to the class of claimants voting to accept the settlement incorporated into the plan of reorganization.

In this case, however, the FE Non-Debtor Parties' Third-Party Release in Plan Section VIII.E is, as noted by many of the objecting parties, extraordinarily broad or at least potentially so. The FE Non-Debtor Parties' Third-Party Release the Debtor seeks to impose upon all of its creditors, including those who do not consent, concerns a wide array of potential claims including all claims that have anything to do with historic operation of the business or the assets of the Debtors. During the course of the disclosure statement hearings, counsel for both the Debtors and FE Corp conceded that the proposed release included any and all claims relating to the properties currently owned by the Debtors, including properties well-known to have been built, maintained, operated, and in some cases, rebuilt over the course of decades by FE Corp and its corporate predecessors before Debtor FirstEnergy Solutions was vested with those assets and FE Corp's former electric generation business.

The Governments argued that they held latent claims arising from actions that occurred long ago and concerned facilities owned and operated for decades by the FE Corp, its corporate predecessors, and/or its nondebtor affiliates, none of whom are bankruptcy debtors seeking reorganization or a chapter 11 discharge. They made impassioned pleas that their potential claims against the FE Non-Debtor Parties for environmental cleanup or other damages should

not be released for the benefit of the Debtors' creditors holding liquidated claims. Unlike the Governments, those creditors, through representative committees, participated in the negotiations of the Debtors' Third Plan of Reorganization and would receive the bulk of the financial value provided by the Plan. The Governments asserted that most of their claims that would be released by the Plan lie *solely* against the FE Non-Debtor Parties, and *not at all* against the Debtors. Ironically, to the extent such claims lie against both the Debtors and FE Non-Debtor Parties, the Debtors have agreed to assume those obligations despite the Plan releasing the nondebtors.

None of the cases cited in support of nonconsensual third-party releases, including *Dow Corning*, concerns a fact pattern like the one present in this case. All other precedents involve a debtor that is the primary obligor of the claims being resolved in its reorganization plan, with other parties with plausible secondary obligations obtaining their releases so as to foreclose the possibility of contribution claims by those parties against the debtor. Here, instead, the release would cover a set of claims against nondebtors that do not lie at all against the Debtors. To the extent the Debtors have no liability to begin with, no contribution claims would be foreclosed by the Plan.

This case deviates from the other cases supporting third-party releases in another important way. The other third-party release cases involved a plan that provided for a fund or a trust funded by the secondary obligors for the benefit of the relevant class of creditors. The release granted to nondebtors typically represents consideration for payments made by those nondebtors to the creditors holding claims against both them and the debtor via the complex interface of the debtor's plan of reorganization. In this case, by contrast, the Debtors' Plan would provide new common stock or cash only to its creditors with liquidated claims, including institutional creditors and bondholders. The Plan provides no property for holders of

unliquidated contingent claims, such as those of the Governments, whose claims against the FE Non-Debtor Parties would nevertheless be released. The Governments are creditors with claims in the broad sense as defined by 11 U.S.C. § 101(5), but as conceded by all relevant parties at the hearing on the Disclosure Statement, do not have liquidated, noncontingent claims. Instead, their claims will not become apparent and capable of liquidation until some point in the future, if at all, when an incident occurs, such as when a nuclear power plant leaks radiation, a coal impoundment gives way damaging a river or neighboring land, or some contamination leaches into the ground water affecting other land holders, the environment, and members of the public. The releases proposed by the Debtors would curtail those claims against the FE Non-Debtor Parties and yet those creditors would receive none of the Plan's consideration.

This Court will analyze the Proposed Plan and the proposed nonconsensual third-party releases under the rubric of the *Dow Corning* factors. However, before doing so, it is important to make this stark comparative observation in order to ensure that the forest is not lost for the trees.

   **D.      Proposed Plans Including Third-Party Releases Are Increasingly Common**

The Court takes notice that this is far from the only pending bankruptcy case in which broad nonconsensual third-party releases of nondebtors are being sought. The United States Bankruptcy Court for the Southern District of New York recently expressed concern in an oral ruling made four days following this Court's oral ruling on the Motion in this case that chapter 11 debtors and their professionals were seeking broad third-party releases with increasing frequency. *See In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019). Moreover, *Aegean Marine* was concerned that such releases often lack legal justification or procedural safeguards.

In *Aegean Marine*, Bankruptcy Judge Wiles emphasized, as does this Court in this Memorandum Decision, that a nonconsensual third-party release of a nondebtors is an extraordinary remedy. Judge Wiles observed that debtors appear to be growing increasingly cavalier about seeking such releases, as if they were a routine request, not an exceptional one:

> Debtors in chapter 11 cases before me frequently seek third-party releases, and they are often presented as though the involuntary imposition of a third-party release is no big deal. I disagree. In order to put the issue in context, it is worth pausing for a minute to note just what an extraordinary thing it is for a court to impose an involuntary third-party release and how different that is from what courts ordinarily do.

*Id.* at 723.

*Aegean Marine* also emphasized that a nondebtor's contributions to the reorganization plan cannot alone be the basis to justify their nonconsensual third-party release. Moreover, just as *Dow Corning* requires in this circuit, *Aegean Marine* held that third-party releases of this nature must be shown to be critical to the success of the restructuring plan.

> The issues I have described above ought to illustrate just how extraordinary a thing it is for us to impose involuntary releases and why, as commanded by the Second Circuit in *Metromedia*, we should do so only in those extraordinary cases where a particular release is essential and integral to the reorganization itself.
>
> Unfortunately, in actual practice the parties usually ignore this portion of the *Metromedia* decision, and often seek to impose involuntary releases based solely on the contention that anybody who makes a contribution to the case has a earned a third-party release. Almost every proposed Chapter 11 Plan that I receive includes proposes releases. Instead of targeting particular claims and explaining why the release of those particular claims is necessary to some feature of the reorganization, the proposes releases usually are as broad as possible in their scope. Parties rarely identify any particular claim that they are even worried about or that has been threatened, and almost never explain why an order extinguishing a particular third-party claim is fair to the party whose claim is being extinguished. Instead, I am usually told that various people have made contributions to the process that have been important in producing a successful outcome, and that they should be rewarded by being given third-party releases.
>
> Frankly, if this were enough, then releases would never be limited to the "rare" and "unusual" circumstances that the court required in *Metromedia* . . . . [T]hird-party releases are not a merit badge that somebody gets in return for making a positive

contribution to a restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case—even important positive things—is not enough. Nonconsensual releases are not supposed to be granted unless barring a particular claim is important in order to accomplish a particular feature of the restructuring. *See Metromedia,* 416 F.3d at 143 (find that a party had made a "material contribution" to a case was not enough and that the approval of releases requires a finding that the releases themselves are "important" and "necessary" to a plan).

*Id.* at 726-27.

This Court shares the reservations expressed by *Aegean Marine* regarding the increasing temptation for debtors to seek nonconsensual third-party releases favoring nondebtors who have, for various reasons, made contributions to the debtor's reorganization plan and the need for bankruptcy courts to remain circumspect about the legality of employing such releases and to determine whether those releases would be fair to the affected third parties. The Court agrees with *Aegean Marine's* analysis. While it applies a different circuit's law to the same question raised in this case, many of *Aegean Marine's* reservations and admonitions provides support for this Court's conclusion here.

## II. The Debtors' Plan Cannot Satisfy *Dow Corning's* "Unusual Circumstances" Test for Nonconsensual Third Party Releases of Nondebtors

After considering the *Dow Corning* factors as applied to the Plan, the Court concludes that the proposed release is not justified by unusual circumstances as required by *Dow Corning,* that the Third Amended Plan is unconfirmable on its face as a result, and therefore the Disclosure Statement supporting that Plan cannot be approved.

### A. Lack of Identity of Interest Between the Debtors and FE Non-Debtor Parties

The FE Non-Debtor Parties' Third-Party Release would release claims, if such claims exist, for which there is no identity of interest between the Debtors and the FE Non-Debtor Parties. While the proposed language may also cover claims for which the Debtors and FE Non-Debtor Parties might have shared liabilities due to indemnity or contribution theories, it

27

encompassed far more than those.  The FE Non-Debtor Parties' Third-Party Release would release and discharge independent, standalone claims against the FE Non-Debtor Parties held by any party that also held a claim against the Debtors, as long as those independent claims also related in some way to the Debtors' electricity generation business or to the power plants, landfills, or other properties they own, have owned, or will own post-confirmation pursuant to agreements that this Court has already approved, such as Pleasants Power Station.

Counsel for FE Corp argued at the hearing that the universe of independent claims against the FE Non-Debtor Parties is actually empty, and suggested that the objecting parties' arguments unfairly force FE Corp to try to prove a negative—"we're being forced to prove that ghosts don't exist."  (Hrg. Tr. Apr. 2, 2019 163:25-164:1.)

However, the problem with this argument is that the breadth of the release language asks this Court to banish any such ghosts if they *do* exist, even if they are only haunting FE Corp and not the Debtors.  The Court cannot banish ghosts that do not haunt the Debtors' house.  Less metaphorically, it cannot release and enjoin claims unless they pose some risk of diminishing the bankruptcy estate over which it has jurisdiction pursuant to 28 U.S.C. § 1334(e).  The objecting parties need not prove that the Plan *will* release and enjoin existing claims that do not affect the estate.  They need only prove that the Plan *would* release and enjoin such claims if they do exist.  If the set of such claims is truly empty, then narrowing the release to exclude them would be costless for the nondebtor released parties, such as the FE Non-Debtor Parties in this case.  If the set of such claims is *not* empty, then the issue is neither theoretical nor costless, and the Court is being asked to release claims that are beyond the limits of what the Sixth Circuit would possibly consider "appropriate" within the meaning Section 1123(b)(6).

The Debtors argue that this is an issue that requires discovery and an evidentiary record at a confirmation hearing. They contend that the Governments will never have to rely on FE Corp for recovery on any future environmental claims relating to the Debtors' business or property. (Hrg. Tr. Apr. 2, 2019 170:6-171:4.) The Debtors and FE Corp frame the issue as one of feasibility, arguing that they could prove at a confirmation hearing, with an evidentiary record, that the Debtor will be able to shoulder all such claims themselves.

Even if true, this is irrelevant to the identity of interest factor. The releases or injunctions permitted on an extraordinary basis in the Sixth Circuit under *Dow Corning* require that there be an identity of interest between the Debtor and the released nondebtor. As already observed, the scope of the FE Non-Debtor Parties' Third-Party Release is extraordinarily broad. The releases apply to anyone with a claim against the Debtors, where claim is defined as broadly as it is by the Bankruptcy Code Section 101(5). The Debtors' proposed Plan would release any claims of such parties against the FE Non-Debtor Parties that are "related" to the Debtors' property or business. Because the Debtors' property and its business previously belonged to various FE Non-Debtor Parties prior to FE Corp's spin-off of its electric generating business over a decade ago, the Plan would release the nondebtors from any claims arising from that business, even though the Debtors were assuming the obligations for most of the Governments' claims. To fully understand the scope of the FE Non-Debtor Parties' Third-Party Release, one need only observe the uncontroverted fact that the Debtors' property and business includes three nuclear electric generating plants, including four nuclear reactors, as many as five fossil-fueled generating electric plants, including several plants sold during the course of this bankruptcy case and one to be acquired from the FE Non-Debtor Parties upon confirmation. It also includes a variety of landfills, coal ash impoundments, and other facilities, all of which are subject to wide-

29

ranging environmental and other regulatory monitoring for foreseeable problems, maintenance to forestall environmental emergencies, and the possibility of catastrophic failures.

The FE Non-Debtor Parties' Third-Party Release would, by its broad language, include claims that lie solely against FE Non-Debtor Parties arising from its or their ownership and operation of the physical plants and electric generating business, which were only later owned and operated by the Debtors. It does not matter whether such claims exist, how many such claims exist, or how large those claims are. What matters is that the release language by its terms includes such claims for which the Debtors would have no liability. Therefore, the FE Non-Debtor Parties' Third-Party Release would apply, at least in part, to claims for which there is no identity of interest between the Debtors and the FE Non-Debtor Parties. This conclusion does not depend on evidence at a confirmation hearing about what claims might actually arise during the years to come.

To the extent that there is any flexibility in the requirement to analyze all of the *Dow Corning* factors, this first factor is the least negotiable because it polices the same boundary that other courts have analyzed as a jurisdictional issue. The test for the Court's related-to jurisdiction is whether the action or claim in question will have any conceivable effect on the bankruptcy estate. *In re Wolverine Radio Co.*, 930 F.2d 1132, 1142 (6th Cir. 1991) (citing *In re Pacor, Inc.*, 743 F.2d 984, 994 (3d Cir. 1984)). Actions that exposes the estate to indirect claims for contribution or indemnity, such as the mass products liability claims involved in *Dow Corning, A.H. Robins,* and *Johns-Manville*, which were covered by insurance policies, would have an obvious effect on the estate because of the potential for contribution claims. The same cannot be said of independent claims against a nondebtor, ones that do not give rise to good faith claims for indemnity or contribution against the estate or the reorganized debtor.

30

Because there is no identity of interest between the Debtors and the FE Non-Debtor Parties as to some of the affected claims, the Debtors fail to satisfy *Dow Corning's* first factor. Therefore, for this reason alone, the FE Non-Debtor Parties' Third-Party Release is facially overbroad and impermissible under *Dow Corning*. The inclusion of this release renders the Plan patently unconfirmable.

**B.    Contribution of Substantial Assets to the Reorganization**

The FE Settlement Agreement between FE Corp. and the Debtors, approved by the Court in September 2018, which mandated the FE Non-Debtor Parties' Third-Party Release, contingent on plan confirmation, clearly provides for a substantial amount of consideration to be given to the Debtors. This consideration includes hundreds of millions of dollars of cash, three times as much in the form of Notes payable to the Debtors, as well as the release of various claims that the parent corporation harbored against the Debtors (and the settlement of claims running in the opposite direction). The settlement included, among other things, accommodations with respect to the Shared Services that are necessary to the Debtor during a transition period in which the Debtors are separating themselves from the parent corporation so they can operate as a standalone company.

There is no question that at this juncture, where the Court is only considering approval of the Debtors' Disclosure Statement and making no factual findings regarding whether the considerable consideration given here constitutes a "substantial assets to the reorganization" as required by *Dow Corning*, that the Debtors have a plausible case to establish this element at a plan confirmation hearing. Certain objecting parties reserve the right to challenge the sufficiency of such consideration. Even if the amount of consideration is adequate, it may become necessary to determine which affiliate provided the consideration and whether that distinction matters.

31

Nevertheless, the Court cannot conclude at this early stage that the Debtors have failed to satisfy this factor. Therefore, for purposes of this ruling on the Debtors' Disclosure Statement, the Court concludes that the Debtors may have been able to establish this second *Dow Corning* factor at a confirmation hearing.

### C. The Proposed Release and Injunction Is Not Essential to Reorganization

Under the Debtors' Third Amended Plan, it is difficult to see how the reorganization "hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor." This is so because the reorganized Debtors will remain subject to *direct* suits on many of the affected claims. The typical purpose of a third-party release is to stop a claimant from making an end run around both the plan's distribution scheme and discharge injunction by recovering against a nondebtor and causing a contribution claim by the nondebtor to arise against the reorganized debtor that is not discharged. However, with respect to many of the claims from which nondebtors would be released under the Debtors' Third Amended Plan, the Debtors voluntarily assume those obligations directly.

The most substantial class of threatened claims that give rise to the objections concerning the proposed nonconsensual releases are the environmental cleanup and maintenance claims held by the Governments. In the course of seeking to assuage these agencies of the merits of their Plan, the Debtors argue that by remaining viable and well-capitalized, they will ensure that many of these obligations are met in the future. The Debtors propose to assume these environmental obligations; they are not seeking a discharge of them nor are they diverting them via a channeling injunction to a trust or other fund. They pledge to stand by their continuing environmental obligations to the Governments and private parties, and also to assume their performance obligations under court approved consent decrees relating to similar matters. As a result, the releases granted to the FE Non-Debtor Parties include claims for which the Debtors

32

themselves volunteer to remain liable. As to those claims, the risk of indemnity or contribution claims from the corporate parent would not expand in any way the obligations that the Debtors willingly assume as part of their Plan. As a result, the Debtors' proposed reorganization does not hinge on the Debtor being free from indirect suits for these claims in exchange for granting nondebtors third-party releases, as required by *Dow Corning*.

The Court also rejects the argument advanced by the Debtors and the FE Non-Debtor Parties that the corporate parent's monetary and other substantial contributions to the Debtors, pursuant to the Settlement Agreement, satisfy this factor. It certainly is true, based on the frequent statements of counsel for the Debtors, the Unsecured Creditors Committee, the bondholders, and other creditor groups, that the contributions proposed by and, in some cases, already made by FE Corp to the Debtors to facilitate and to fund the stabilization of the Debtors and their proposed reorganization are important and advantageous. However, that is not what the third *Dow Corning* factor means with respect to determining whether an unusual circumstance exists that would justify a nonconsensual third-party release. The necessity of a substantial contribution is its own separate factor under *Dow Corning*. Indeed, as warned by the Second Circuit in *Metromedia*, "A nondebtor release is a device that lends itself to abuse. By it a nondebtor can shield itself from liability to third-parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code." 416 F.3d at 142. While *Dow Corning* permits flexibility in granting the releases in exchange for contributions under certain extraordinary circumstances to facilitate the reorganization of the debtor that finds itself in an intractable situation, nondebtors should not be able simply to buy their own release or quasi-discharge without themselves being bankruptcy debtors.

The Court instead relies on the language and holding of *Dow Corning* to hold that the injunction protecting the third-party released parties must be essential to the reorganization in the sense that it ensures that the debtor avoids indirect suits that could complicate, if not derail, a successful reorganization.  Because the Debtors here do not avoid such claims, in large part because they propose to assume those claims voluntarily under the Plan, the Court concludes that the FE Non-Debtor Parties' Third-Party Release is not essential to the Debtors' reorganization.

### D.    Lack of Overwhelming Vote in Favor by the Impacted Class

As conceded by counsel at the April 2 oral argument, there is no provision for the Governments to vote on the Plan during the confirmation process despite holding environmental claims against the FE Non-Debtor Parties that would be released.  These creditors, some of whom have filed protective but unliquidated proofs of claim, are not classified, will not receive ballots, and will not vote.  It appears obvious that there will be no opportunity to test whether this class "overwhelmingly accepts" the terms of the Debtors' Third Amended Plan, as would be required by *Dow Corning*.  Indeed, given the strenuousness with which these parties have opposed the Plan and Disclosure Statement, and have foreshadowed these arguments for many weeks and months at other junctures in this case, it appears obvious that the Governments overwhelmingly oppose the Third Amended Plan.

The Debtors and other parties supporting the Third Amended Plan argue that the overwhelmingly support of this Plan by other classes of unsecured claims in this case satisfies this obligation.  They contend that the claims of the Governments, if they were to ever be liquidated, would also be unsecured claims, and therefore should be counted in the same class or classes as the other general unsecured classes.  This argument is not persuasive.  The general unsecured classes who will receive ballots and will be allowed to vote are, for the most part, among the groups of unsecured creditors who have been actively involved during this case and

34

have had a seat at the table while terms were negotiated and the Plan was composed. Even more notably, those creditors will receive the benefit of the contributions made by the FE Non-Debtor Parties. If not cash, those creditors will receive in exchange for their claims common stock in the reorganized Debtors after they have been newly-capitalized by those contributions. Nothing in this Plan transfers property of value to the Governments, nor will they receive common stock or any other securities in the reorganized Debtors.

This situation is clearly distinct from the circumstances of *Dow Corning* or the *City of Detroit* where the affected creditors (the personal injury claimants or the pension claimants) not only were involved in the negotiations of the plans, but ultimately voted for it overwhelmingly and received direct benefits from it.

The Court concludes that the impacted classes of creditors will not vote overwhelmingly to approve this Plan. This is clear on its face because that class will not vote at all. This is clear on the record in existence as of the hearing on the Disclosure Statement; there will be no facts discovered or evidence made available that could change this result prior to a confirmation hearing with respect to the Debtors' Third Amended Plan.

### E.     No Mechanism to Pay for All or Substantially All of the Affected Claims

The fifth *Dow Corning* factor also fails in connection with the Debtors' Proposed Third Amended Plan. The Governments have no monetary claims that will be paid under the Plan. There is no provisions in the Plan to pay them via a trust or a fund, or any other method of channeling proceeds offered by the FE Non-Debtor Parties to the Governments, or to set them aside to provide security that such claims, when they arise in the future, would be paid.

The only "mechanism" offered by the Debtors is its own assumption of these long-term environmental obligations and a promise that as a reorganized debtor with new capital structure facilitated by the released corporate parent, it will stalwartly stand by and satisfy these claims if

and when they arise.  This is not a mechanism to pay affected claims within the meaning of *Dow Corning*.  If it were, plan feasibility would be a factual issue that would need to be resolved at confirmation to ensure that this factor was satisfied.  However, as a manner of law, the Court finds that satisfying *Dow Corning's* fifth factor requires not merely the promise of a feasible reorganization, but rather a special accommodation for the Governments and any other creditors burdened by nondebtor releases being imposed upon them.  There are no facts that could be found in the course of months of discovery and days of trial at a confirmation hearing that would change the reality that this Plan makes no such provision for the affected creditors.

### F.  No Opportunity for Those Choosing Not to Settle to Recover in Full

As noted by several other opinions addressing the question of nonconsensual third-party releases of nondebtors, the sixth *Dow Corning* factor may be peculiar to *Dow Corning* and cases with similar fact patterns and may simply be inapplicable to others.  *See City of Detroit,* 524 B.R. at 174 ("Some courts have, however, tailored the seven *Dow Corning* elements to suit the needs of the case and have not required satisfaction of all seven factors."); *In re Akron Thermal, Ltd. Partnership*, No. 07-51884 (Bankr. N.D. Ohio Jan. 26, 2009) (Shea-Stonum, J.), ECF No. 567 at 61 (holding that "certain [*Dow Corning*] factors … are not applicable" on the facts of that case).

*Dow Corning*, like *A.H. Robins* and *Johns-Manville* before it, concerned mass tort claims by a multitude of plaintiffs who were asked not only to accept payments from a fund obtained from nondebtor secondary obligors who were to be released by the plan of reorganization in exchange for those contributions, but also as a group they were urged to settle their claims.  *Dow Corning* held that this situation, which was in essence a proposed class-action settlement embedded into a reorganization plan, required that individual plaintiffs be entitled, consistent with Rule 23 of the Federal Rules of Civil Procedure, to opt out of the settlement option and

36

retain their rights to litigate their personal injury claims seeking to establish the full value of those claims, or risk losing completely. In order to accommodate several creditors' class action rights and still justify the nondebtor releases, *Dow Corning* insisted that funds be set aside to ensure, within a reasonable degree of certainty, that those claimants would be able to recover in full on any judgments they obtained against the debtor. Because of the nature of the large class of mass tort plaintiffs, and the class settlement component of the plan itself, a provision for nonsettling plaintiffs was necessary to legitimize the releases being granted to the nondebtor parties and to be fair to the creditors who exercised their due process rights not to join the class settlement and instead litigate their claims.

The Court sees no obvious parallel to the facts of this case, not merely to the Plan proposed by the Debtors. The inapplicability of this factor to the present case may be a reflection that this case simply does not fit within the "unusual circumstances" contemplated by the Sixth Circuit for permitting nonconsensual releases of nondebtors in a chapter 11 plan of reorganization.

This analysis may exaggerate the problems with the proposed releases in cases where a class settlement of disputed tort claims is not involved. The application of this factor, as noted by Judge Rhoades in the *City of Detroit* case, can be "awkward." Perhaps *Dow Corning* can apply in cases where the claims being released are not tort claims being settled as a class. *City of Detroit* so held where the affected claims were pension claims.

> The City's plan does not have [an opt-out] provision. Accordingly, this element is not met. The City argues that this element should not apply here because the release of liabilities is a condition precedent to receiving the State Contribution and the DIA funding. Therefore, there can be no "opt out" option for pension creditors. The Court concludes that it is unnecessary to determine whether this element applies here. Instead, it concludes that the other Dow Corning factors weigh so heavily in favor of approving the releases that it is appropriate to do so even if this element is not met.

37

*City of Detroit,* 524 B.R. at 175. However, unlike in *City of Detroit,* here the failure of the Debtors' Third Amended Plan to satisfy *Dow Corning's* sixth factor reinforces the same conclusion dictated by the first, third, fourth, and fifth factors: that the FE Non-Debtor Parties' Third-Party Release proposed by these Debtors' Third Amended Plan of Reorganization does not comply with the *Dow Corning* standard for establishing an unusual circumstance that would justify the extraordinary relief of imposing third-party releases without consent. Therefore, the outcome here does not turn on the question regarding whether *Dow Corning's* sixth factor was met or whether it could be disregarded.[6]

### G. Specific Factual Findings

The requirement of a factual record is necessary to establish that the other factors imposed by *Dow Corning* are satisfied and did thereby permit the extraordinary relief of third-party releases imposed upon nonconsenting creditors. Because, in the current posture, the Court is analyzing whether the Debtors' Third Amended Plan is patently unconfirmable notwithstanding any facts that may be established at a confirmation hearing, that this factor is not relevant to the current analysis. Of course, if a plan were proposed that was potentially confirmable, and sought to impose a nonconsensual third-party releases, establishment of a full factual record to support the *Dow Corning* Factors would be necessary. It is not necessary today.

---

[6] The Debtors and the FE Non-Debtor Parties urge the Court to conclude that *Dow Corning* factors that are not satisfied may be disregarded so that the Debtors' opportunity to reorganize with the benefit of the substantial contributions from the FE Non-Debtor Parties not be lost. The Court is skeptical of this argument. As noted by the United States Bankruptcy Court for the Southern District of Ohio, "At least in the Sixth Circuit, all of the [*Dow Corning*] factors must be present and all of the factors are important." *In re SL Liquidating, Inc.,* 428 B.R. 799, 802 (Bankr. S.D. Ohio 2010). However, because the Debtors have only established a plausible case for the second *Dow Corning* factor, and cannot hope to satisfy four other factors at confirmation, the Court does not have to decide that issue here. Even if the Court could disregard one, or even two, *Dow Corning* factors when assessing whether proposed third-party releases are appropriate under the unusual circumstances test, under no circumstances would satisfying only one factor, as the Debtors do here, be sufficient to meet the Sixth Circuit's standard.

38

The Court has found that four critical factors cannot be satisfied by the Debtors in their Third Amended Plan. These determinations illustrate why the FE Non-Debtor Parties' Third-Party Release cannot be permitted. The Debtors' Third Amended Plan also violates *Dow Corning's* spirit, which permits third-party releases of nondebtors as a means to a debtor's reorganization, not as the purpose of a debtor's reorganization plan. In this regard, the Court reiterates the Second Circuit's warning in *Metromedia Fiber Network*: "A nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third-parties. In that form it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code." 416 F.3d at 142. This admonition, as well as the application of the *Dow Corning* factors to the undisputed facts of the Debtors' Third Amended Plan, convinces this Court that the Plan is patently unconfirmable and that it would be futile to approve a Disclosure Statement, set a confirmation hearing, and authorize solicitation of votes for a plan that under no conceivable circumstances or evidence could justify the nonconsensual third-party releases of nondebtors contained therein.

## III. Jurisdiction

The objections of many of the parties to the Court's jurisdiction over the proposed nonconsensual releases of the FE Non-Debtor Parties are inconsistent with controlling Sixth Circuit law. While courts from other circuits analyze similar issues regarding nonconsensual third-party releases through the prism of the court's jurisdiction and what does or does not constitute "related to" jurisdiction under 28 U.S.C. § 1334, the Court finds that the Sixth Circuit Court of Appeals opinion in *Dow Corning* presumes, if not holds, that the bankruptcy court has core jurisdiction to enter final orders pursuant to 28 U.S.C. § 157 with respect to matters concerning plans of reorganization, their confirmation, and the process of seeking such

39

confirmation, including the approval of a disclosure statement and the solicitation of approvals of a proposed plan, and that bankruptcy courts have subject matter jurisdiction to consider those matters pursuant to 28 U.S.C. § 1334. This contrasts sharply with the analysis of the Sixth Circuit in *In re Greektown Holdings, LLC,* 728 F.3d, 567, 576-579 (6th Cir. 2013), in which the Court considered a chapter 11 debtor's attempt to settle certain claims, including claims between nondebtors, well after a plan of reorganization had been confirmed. In that context, the Sixth Circuit considered the scope of the bankruptcy court's authority to impose a settlement release between nondebtors under the rubic of the court's related-to jurisdiction and found that the court lacked jurisdiction.

The contrast between these two Sixth Circuit opinions demonstrate that at least in this Circuit, matters concerning nonconsensual third-party releases in the context of a proposed plan of reorganization are within the bankruptcy court's subject matter jurisdiction.

## CONCLUSION

For the reasons set forth in this Memorandum Decision, the FE Non-Debtor Parties' Third-Party Release proposed in Section VIII.E. of the Debtors' Third Amended Plan is inconsistent with the applicable provisions of the Bankruptcy Code and, therefore, the Court concludes that the Plan is patently unconfirmable under 11 U.S.C. § 1123(b)(6), as that provision is applied in the Sixth Circuit pursuant to *Dow Corning*. Any solicitation of such Plan would be futile. Therefore, the Debtors' Disclosure Statement in support of their Third Amended Plan of Reorganization is not approved.

The Court previously entered, on April 11, 2019, its Disclosure Statement Denial Order denying the Debtors' Motion seeking approval of their Disclosure Statement based on the Court's April 4, 2019 oral ruling. Therefore, there will be no further order entered pursuant to

this Memorandum Decision.  This Memorandum Decision constitutes the Court's further written findings and conclusions pursuant to Civil Rule 52(a) and the Court's order granting the Debtors' Rule 8002(b) motion.  The 14-day time period for filing a notice of appeal from the Disclosure Statement Denial Order and this Memorandum Decision shall run from the date this Memorandum Decision is docketed by the Clerk pursuant to Rule 8002(b)(1)(A).

# # #