This document was signed electronically on October 16, 2019, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: October 16, 2019



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 18-50757 (AMK) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) Hon. Judge Alan M. Koschik |
| | ) |

## ORDER CONFIRMING THE EIGHTH AMENDED JOINT PLAN OF REORGANIZATION OF FIRSTENERGY SOLUTIONS CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")[2]

having, as applicable:

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases"), along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2] Capitalized terms used by not otherwise defined herein, shall have the meanings given to them in the *Eighth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.,* et al.*, Pursuant to Chapter 11 of the Bankruptcy Code* dated October 14, 2019 [Docket No. 3278], attached hereto as **Exhibit A** (the "Plan").

1

- commenced, on March 31, 2018 (the "<u>Petition Date</u>"), the chapter 11 cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions in the United States Bankruptcy Court for the Northern District of Ohio (the "<u>Court</u>") for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>");

- continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code'

- filed on February 11, 2019, (i) the *Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2120] (ii) the *Disclosure Statement for the Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2119] and (iii) *Debtors' Motion for Order (i) Approving Disclosure Statement, (ii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (iii) Approving the Form of Ballots, (iv) Scheduling a Hearing on Confirmation of the Plan, (v) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (vi) Granting Related Relief* [Docket No. 2121];

- filed on March 9, 2019, (i) the *First Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2250] and (ii) the *Disclosure Statement for the First Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2251];

- filed on March 17, 2019, (i) the *Second Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2310] and (ii) the *Disclosure Statement for the Second Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2313];

- filed on March 26, 2019, the *Debtors' Supplemental Brief in Support of Debtors' Motion for Order (i) Approving Disclosure Statement, (ii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (iii) Approving the Form of Ballots, (iv) Scheduling a Hearing on Confirmation of the Plan, (v) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (vi) Granting Related Relief* [Docket No. 2397];

- filed on March 29, 2019, the *Debtors' Supplemental Reply Brief in Support of Debtors' Motion for Order (i) Approving Disclosure Statement, (ii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (iii) Approving the Form of Ballots, (iv) Scheduling a Hearing on Confirmation of the Plan, (v) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (vi) Granting Related Relief* [Docket No. 2422];

2

- filed on April 1, 2019, (i) the *Third Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2430] and (ii) the *Disclosure Statement for the Third Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2431];

- following the Court's entry on April 11, 2019 of the *Order Denying Motion to Approve Disclosure Statement* [Docket No. 2500] filed on April 18, 2019, (i) the *Fourth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2529]; (ii) *Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2530]; and (iii) *Debtors' Motion for Order (i) Approving Disclosure Statement, (ii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (iii) Approving the Form of Ballots, (iv) Scheduling a Hearing on Confirmation of the Plan, (v) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (vi) Granting Related Relief* [Docket No. 2531] (the "Disclosure Statement Motion");

- filed on April 18, 2019, the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Enter Into and Perform Under the Consent and Waiver to the Settlement Agreement and (II) Granting Related Relief* [Docket No. 2528];

- filed on May 17, 2019, (i) the *Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2658] and (ii) the *Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2661];

- filed on May 20, 2019, the *Notice of Filing Solicitation Version of Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code and Solicitation Version of Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2675];

- obtained, on May 23, 2019, the *Order (I) Authorizing the Debtors to Enter Into and Perform Under the Consent and Waiver to the Settlement Agreement and (II) Granting Related Relief* [Docket No. 2691] (the "Consent and Waiver Order");

- obtained, on May 29, 2019, the *Order (i) Approving Disclosure Statement, (ii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Joint Chapter 11 Plan, (iii) Approving the Form of Ballots, (iv) Scheduling a Hearing on Confirmation of the Plan, (v) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (vi) Granting Related Relief* [Docket No. 2714] (the "Disclosure Statement Order") approving the Disclosure Statement, solicitation procedures (the "Solicitation

3

Procedures") and related notices, forms, and ballots (collectively, the "Solicitation Packages");

- filed on May 30, 2019, the *Notice of Filing Updated Solicitation Version of Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2721] (the "Disclosure Statement");

- caused the Solicitation Packages and notice of the Confirmation Hearing and the deadline for objecting to confirmation of the Plan to be distributed beginning on or about June 4, 2019 (the "Solicitation Date"), in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), the Disclosure Statement Order and the Solicitation Procedures, as evidence by, among other things the *Affidavit of Service of Solicitation Materials* [Docket No. 2786] (the "Solicitation Affidavit");

- caused notice of the Confirmation Hearing to be published on or about June 12, 2019, in the publications listed on Exhibit 24 to the Disclosure Statement Order, as evidenced by the *Affidavit of Publication* [Docket No. 2775] (the "Publication Affidavit");

- filed on July 23, 2019, the *Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2934];

- filed on July 23, 2019, the *Plan Supplement for the Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp. et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2936] (as the same may have been subsequently modified, supplemented, or otherwise amended from time to time, the "Plan Supplement");

- filed on July 30, 2019, the *Amended Exhibit G to Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et. al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2951];

- filed on August 1, 2019, the *Amended Exhibit B to Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et. al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2966];

- filed on August 1, 2019, the *Amended Exhibit C to Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et. al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2967];

- filed on August 1, 2019, the *Amended Exhibit D to Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et. al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2968];

18-50757-amk    Doc 3283    FILED 10/16/19    ENTERED 10/16/19 13:06:00    Page 4 of 299

- filed on August 13, 2019, the *Declaration of James Daloia of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3030] (as may be supplemented from time to time by the Debtors or the Reorganized Debtors, as applicable) (the "Voting Declaration");

- filed on August 16, 2019, the *Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3056];

- filed on August 16, 2019, the *Debtors' Memorandum of Law in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3064] (the "Confirmation Memorandum");

- filed on August 16, 2019, the *Expert Declaration of Charles M. Moore in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.* et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3057] (the "Moore Expert Declaration");

- filed on August 16, 2019, the *Declaration of David A. Henderson in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.*, at al., *Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3059] (the "Henderson Declaration");

- filed on August 16, 2019, the *Declaration of David B. Hamilton in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3060] (the "Hamilton Declaration");

- filed on August 16, 2019, the *Declaration of Charles M. Moore in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.* et al*., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 3058] (the "Moore Confirmation Declaration" and, together with the Moore Expert Declaration, the Voting Declaration, the Henderson Declaration, and the Hamilton Declaration, the "Declarations");

- submitted on August 19, 2019, the *Declaration of John Seymour in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code*;

- submitted on August 19, 2019, the *Declaration of Tyler W. Cowan in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.*, et al., *Pursuant to Chapter 11 of the Bankruptcy Code*;

- submitted on August 19, 2019, the *Declaration of Francis W. Seymore in Support of Confirmation of the Seventh Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp.,* et al., *Pursuant to Chapter 11 of the Bankruptcy Code*; and

- filed on October 14, 2019, the Plan;

This Court having:

- entered the *Order Granting Motion of Debtors to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties Pursuant to 11 U.S.C. §§ 105, 363, 365, and 502 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 1465] on September 27, 2018;

- entered the *Revised Order Scheduling Certain Hearing Dates, Deadlines and Protocols in Connection with the Confirmation of Debtors' Plan of Reorganization* [Docket No. 2702] on May 24, 2019;

- held the Confirmation Hearing on August 20, 2019 and August 21, 2019;

- reviewed the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Memorandum, and all pleadings, exhibits, statements, responses, and comments regarding confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

- considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing; and

- overruled any and all objections to the Plan and to confirmation, except as otherwise stated or indicated on the record, and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated.

NOW, THEREFORE, the Court having found that notice of the Confirmation Hearing and the opportunity for any party to object to confirmation has been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of confirmation and all evidence proffered or adduced by counsel at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact, conclusions of law, and order:

# I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**

## A. Findings and Conclusions.

1.    The findings and conclusions set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extend any of the following conclusions of law constitute findings of fact, they are adopted as such.

## B. Jurisdiction and Venue.

2.    On the Petition Date, the Debtors commenced the Chapter 11 Cases.  Venue in this Court was proper as of the Petition Date and remains proper under 28 U.S.C. §§1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334.  The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

## C. Eligibility for Relief.

3.    The Debtors were and continue to be entities eligible for relief under section 109 of the Bankruptcy Code.

## D. Commencement and Joint Administration of the Chapter 11 Cases.

4.    On April 3, 2018, the Court entered an order [Docket No. 126] authorizing the joint administration of the Chapter 11 Cases in accordance with Bankruptcy Rule 1015(b).  The Debtors have operated their businesses and managed their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.

5. On April 11, 2018, the United States Trustee (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 279].

**E. Judicial Notice.**

6. The Bankruptcy Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases.

**F. Plan Supplement.**

7. Commencing on July 23, 2019 [Docket Nos. 2936, 2960, 2966, 2967, and 2968], the Debtors filed the Plan Supplement with the Court. The documents identified in the Plan Supplement were filed as required and notice of such documents was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Plan, the Disclosure Statement Order, the Bankruptcy Code and the Bankruptcy Rules. All parties required to be given notice of the documents identified in the Plan Supplement have been provided due, proper, timely and adequate notice and have had an opportunity to appear and be heard with respect thereto. The transmittal and notice of the Plan Supplement (and all documents identified therein) was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was conducted in good faith. No other or further notice with respect to the Plan Supplement (and all documents identified therein) is necessary or shall be required.

8

### G. Modifications to the Plan.

8.     In accordance with section 1127 of the Bankruptcy Code, the modifications to the Plan described or set forth in this Order constitute technical changes, are modifications that are immaterial or do not adversely affect the treatment of any Claim against or Interest in the Debtors under the Plan, or are modifications to which the adversely affected parties have consented. These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and solicitation materials served pursuant to the Disclosure Statement Order, and notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases.

9.     In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims and Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

10.    The filing of the Plan and the Plan Supplement, and the description of the modifications contained therein on the record at the Confirmation Hearing provided due and sufficient notice to all parties in interest under the circumstances of these Chapter 11 Cases.

## H. Resolution of Objections.[3]

11.     As presented on the record at the Confirmation Hearing, and as provided in this Confirmation Order, the consensual resolutions of those objections that were resolved at or prior to the Confirmation Hearing satisfy all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules, are in the best interests of the Debtors and their estates, and are hereby

---

[3] The following objections were filed to confirmation of the Plan (i) *Objection by Utility Workers Union of America, Local 270, AFL-CIO, to Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code, and Exhibits* [Docket No. 2970] (the "FERC Objection" and the objecting parties, the "Unions"); (ii) *Objection of Federal Energy Regulatory Commission to Confirmation of Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2971] (the "FERC Objection" and the objecting party, "FERC"); (iii) *Ohio Consumers' Counsel's Joinder with Objection of Federal Energy Regulatory Commission and Ohio Consumers' Counsel's Own Objection to Confirmation of Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2973] (the "OCC Objection" and the objecting party, the "OCC"); (iv) *Objection of American Centrifuge Enrichment, LLC and United States Enrichment Corporation to Confirmation of the Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., at al.* [Docket No. 2976] (the "USEC Objection" and the objecting party, "USEC"); (v) *Letter from Jeff Barge* [Docket No. 2977] (the "Barge Objection"); (vi) *Objection of Ohio Valley Electric Corporation to Confirmation of Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2978] (the "OVEC Objection" and the objecting party, "OVEC"); (vii) *Maryland Solar's Limited Objection to Confirmation of Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2979] (the "Maryland Solar Objection" and the objecting party "Maryland Solar"); (viii) *United States' Objection to Confirmation of the Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2980] (the "DOJ Objection" and the objecting party, the "DOJ"); (ix) *Limited Objection of UniTech Services Group, Inc. to the Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2982] (the "UniTech Objection" and the objecting party, "UniTech"); (x) *Feasibility Objection of the Environmental Law & Policy Center, Ohio Citizen Action, Ohio Environmental Council and Environmental Defense Fund to Debtors' Sixth Amended Joint Plan of Reorganization* [Docket No. 2984] (the "ELPC Objection" and the objecting parties, collectively, the "ELPC") and (xi) *Objection of United States Trustee to Confirmation of Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 2986] (the "U.S. Trustee Objection"). Additionally, the following objections were filed in connection with the proposed assumption or rejection of executory contracts and/or unexpired leases: (i) *Limited Objection of JAIX Leasing Company to Notice of (a) Executory Contracts and Unexpired Leases to be Assumed or Assumed and Assigned by the Debtors Pursuant to the Plan, (b) Cure Amounts, if Any, and (c) Related Procedures in Connection Therewith* [Docket No. 2974] (the "JAIX Objection"); (ii) *Baker Bohnert, LLC's Objection to Confirmation of Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al.* [Docket No. 2983] (the "Baker Bohnert Objection"); (iii) *Limited Objection of NAES Power Contractors, Inc. to Debtors' Notice of (a) Executory Contracts and Unexpired Leases to be Assumed or Assumed and Assigned by the Debtors Pursuant to the Plan, (b) Cure Amounts, if any, and (c) Related Procedures in Connection Therewith* [Docket No. 3003] (the "NAES Objection"); (iv) *Limited Objection of Duquesne Light Company to Notice of (a) Executory Contracts and Unexpired Leases to be Assumed or Assumed and Assigned by the Debtors Pursuant to this Plan, (b) Cure Amount, if any and (c) Related Procedures in Connection Therewith and Sixth Amended Joint Plan of Reorganization of FirstEnergy Solutions, Corp. et. al.* [Docket No. 3004] (the "Duquesne Objection"); and (v) *Limited Objection of Enerfab Power & Industrial, Inc., to Debtor's Contract Cure Amounts* [Docket No. 3015] (the "Enerfab Objection").

10

approved. All objections, statements and reservations of rights that were not resolved prior to or at the Confirmation Hearing, and were not withdrawn, are overruled.

**I.    Disclosure Statement Order.**

12.    On May 29, 2019, the Court entered the Disclosure Statement Order [Docket No. 2714], which, among other things, fixed August 2, 2019, as the deadline for voting to accept or reject the Plan (the "<u>Voting Deadline</u>"), as well as the deadline for objecting to the Plan (the "<u>Objection Deadline</u>"). Additionally, the Disclosure Statement Order approved the Disclosure Statement, finding that it contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code, and established procedures for the Debtors' solicitation and tabulation of votes on the Plan.

**J.    Transmittal and Mailing of Materials; Notice.**

13.    As evidenced by the Solicitation Affidavit, the Publication Affidavit and the Voting Declaration, the Debtors provided due, adequate and sufficient notice of the Plan, the Disclosure Statement, the Disclosure Statement Order, the Scheduling Order, the Solicitation Packages, the Confirmation Hearing, the Plan Supplement, and all other materials distributed by the Debtors in connection with confirmation of the Plan in compliance with the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3017, 3019, and 3020(b) and the procedures set forth in the Disclosure Statement Order. The Debtors provided due, adequate, and sufficient notice of the Objection Deadline and the Confirmation Hearing (as may be continued from time to time) and served each of the Ballots and notices as described in the Disclosure Statement Order in compliance with the Bankruptcy Code, Bankruptcy Rules and the Disclosure Statement Order. No other or further notice is or shall be required.

**K. Solicitation.**

14.     The Debtors solicited votes for acceptance and rejection of the Plan in good faith and such solicitation complied with sections 1125 and 1126, and all other applicable sections, of the Bankruptcy Code, Bankruptcy Rules 3017, 3018, and 3019, and the Disclosure Statement Order and all other applicable rules, laws, and regulations.

**L. Voting Declaration.**

15.     Prior to the Confirmation Hearing, the Debtors filed the Voting Declaration.  The procedures used to tabulate ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations.

16.     As set forth in the Plan and the Disclosure Statement, Holders of Claims in Classes A3, A4, A5, A6, A7, A8, B4, B5,B6, B7, B8, B9, C3, C4, C5, C6, C7,C8, D3, D4, D5, D6, E3, E4, E5, E6, F3, and G3 (collectively, the "Voting Classes") were eligible to vote to accept or reject the Plan in accordance with the Solicitation Procedures.  Holders of Claims and Interests in Classes A1, A2, B1, B2, B3, B11, C1, C2, C10, D1, D2, E1, E2, F1, F2, G1, G2, and G5 (collectively, the "Deemed Accepting Classes") are Unimpaired and conclusively presumed to accept the Plan and, therefore, could not vote to accept or reject the Plan.  Holders of Claims or Interests in Classes A10, D8, E8, and F5 (collectively, the "Deemed Rejecting Classes") are Impaired under the Plan, entitled to no recovery under the Plan, and are therefore deemed to have rejected the Plan.  Holders of Claims in Classes A9, B10, C9, D7, E7, F4, and G4 are inter-Debtor Claims and are not entitled to vote to accept or reject the Plan.

17.     As evidenced by the Voting Declaration, Voting Classes A3, A4, A5, A7, A8 B4, B5, B6, B7, B8, B9, C3, C4, C5, C6, D3, D4, D6, E3, E5, F3, and G3 have voted to accept the

Plan and Voting Classes A6, C7, D5, and E4 have voted to reject the Plan. No votes were received in Voting Classes C8 or E6.

**M. Bankruptcy Rule 3016.**

18.     The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The Debtors appropriately filed the Disclosure Statement and Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b).

**N. Burden of Proof.**

19.     The Debtors, as proponents of the Plan, have satisfied their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for confirmation.

**O. Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

20.     The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**a.      Section 1129(a)(1)—Compliance with Applicable Provisions of the Bankruptcy Code.**

21.     The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

**i.      Sections 1122 and 1123(a)(1)—Proper Classification.**

22.     The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into 57 different Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are addressed in Article II of the Plan and are not required to be designated as separate Classes by

13

section 1123(a)(1) of the Bankruptcy Code). Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not implemented for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims and Interests.

23. In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims or Interests contains only Claims or Interests substantially similar to the other Claims or Interests within that Class. Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b) and 1123(a)(1) of the Bankruptcy Code.

### ii. Section 1123(a)(2)—Specification of Unimpaired Classes.

24. Article III of the Plan specifies that Claims and Interests in Classes A1, A2, B1, B2, B3, B11, C1, C2, C10, D1, D2, E1, E2, F1, F2, G1, and G2 are Unimpaired under the Plan. Additionally, Article II of the Plan specifies that Administrative Claims and Priority Tax Claims are Unimpaired, although the Plan does not classify these Claims. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iii. Section 1123(a)(3)—Specification of Treatment of Impaired Classes.

25. Article III of the Plan specifies the treatment of each Impaired Class under the Plan. Specifically, Sections III.B.1 through III.B.57 of the Plan specify the treatment of Claims and Interests in such Classes. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### iv. Section 1123(a)(4)—No Discrimination.

26. Article III of the Plan provides the same treatment to each Claim or Interest in any particular Class, as the case may be, unless the Holder of a particular Claim or Interest has

14

agreed to a less favorable treatment with respect to such Claim or Interest. Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### v. Section 1123(a)(5)—Adequate Means for Plan Implementation.

27. The Plan and the various documents included in the Plan Supplement provide adequate and proper means for the execution and implementation of the Plan, including, without limitation, (i) the implementation of the FE Settlement Agreement, the Plan Settlement, the Mansfield Settlement, and the Mansfield Owner Parties' Settlement; (ii) the New Organizational Documents; (iii) the consummation of the Restructuring Transactions contemplated by the Plan; (iv) the cancellation of certain existing agreements, obligations, instruments, and Interests; (v) the vesting of the assets of the Debtors' Estates in the Reorganized Debtors, including, as applicable, New Holdco; and (vi) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vi. Section 1123(a)(6)—Non-Voting Equity Securities.

28. The New Organizational Documents prohibit the issuance of non-voting securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

### vii. Section 1123(a)(7)—Directors, Officers, and Trustees.

29. The Reorganized Debtors' initial directors and officers have been disclosed at or prior to the Confirmation Hearing, which is consistent with the interests of creditors and equity holders and with public policy. The initial directors of New Holdco were selected consistent with the terms of the Restructuring Support Agreement. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

15

**b.    Section 1123(b)—Discretionary Contents of the Plan.**

30.    The Plan contains various provisions that may be construed as discretionary but not necessary for confirmation under the Bankruptcy Code. Any such discretionary provision in the Plan complies with section 1123(b) of the Bankruptcy Code and is consistent with the applicable provisions of the Bankruptcy Code. Thus, the Plan satisfies section 1123(b).

**i.    Impairment/Unimpairment of Any Class of Claims or Interests.**

31.    Pursuant to the Plan, Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, as contemplated by section 1123(b)(1) of the Bankruptcy Code.

**ii.    Assumption and Rejection of Executory Contracts or Unexpired Leases.**

32.    The Debtors (as applicable) have exercised sound business judgment in determining whether to assume or reject each of their Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, Article V of the Plan and as set forth in the Plan Supplement. Article V of the Plan provides for the assumption and, with respect to certain Executory Contracts and Unexpired Leases, assignment of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date unless such Executory Contract or Unexpired Lease: (i) was previously assumed or rejected; (ii) is identified on the Rejected Executory Contract or Unexpired Lease list; (iii) is the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the date of entry of this Order; or (iv) is subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Except as set forth herein and/or in separate orders entered by the Court relating to assumption of Executory Contracts and Unexpired Leases, the Debtors have cured or provided adequate assurance that they will cure

16

defaults (if any) under or relating to each Executory Contract and Unexpired Lease assumed under the Plan.

33. On the Effective Date, each of the Mansfield Facility Documents shall be deemed rejected and terminated *nunc pro tunc* to the Petition Date pursuant to the Mansfield Unit 1 Transfer Agreement as contemplated by the Mansfield Settlement and the Mansfield Owner Parties' Settlement.

34. FG and FENOC have reached framework agreements with the unions regarding modifications to their collective bargaining agreements. On the Effective Date, FG and FENOC will assume their collective bargaining agreements as modified by the framework agreements and any other documents entered into by the parties to the collective bargaining agreements to implement the modifications set forth in the framework agreements. As set forth in the framework agreements signed by the Unions and FENOC, the Unions' Objection shall be withdrawn.

### iii. Compromise and Settlement.

35. In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual and legal rights that a Holder of a Claim or Interest against a Debtor may have with respect to any Allowed Claim or Interests or any distribution to be made on account of such Allowed Claim or Interest. For the avoidance of doubt, nothing in the Plan Settlement is intended, nor shall be interpreted, to settle, resolve or release any claim of any non-debtor party against any other non-debtor party, except as otherwise set forth in Sections VIII.D or VIII.E of the Plan.

17

### iv. Debtor Release.

36. The releases of Claims and Causes of Action by the Debtors described in Article VIII.C of the Plan in accordance with section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment under Bankruptcy Rule 9019 (the "Debtor Release"). The pursuit by the Debtors, or the Reorganized Debtors, of any such claims against the Released Parties is not in the best interests of the Estates' various constituencies because the costs involved would likely outweigh any potential benefit from pursuing such Claims. The Debtor Release is furthermore: (i) an essential means of implementing the Plan, (ii) an integral and non-severable element of the Plan and the transactions incorporated therein, (iii) conferring a material benefit on, and in the best interests of, the Debtors, their Estates and their creditors, (iv) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, (v) is fair, equitable and reasonable and in exchange for good and valuable consideration and (vi) is consistent with Sections 105, 1123, 1129, 1141 and other applicable provisions of the Bankruptcy Code..

37. The Debtor Release appropriately offers protection to parties that constructively participated in the Debtors' restructuring process including the FE Non-Debtor Parties, the members of the Committee, the members of the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group, the FES Creditor Group, the Mansfield Owner Parties, and to the extent not included in the foregoing, the Other Released Parties. Such protections from liability facilitated the participation of many of the Debtors' stakeholders in the negotiations and compromises that led to the Plan, the Plan Settlement and the FE Settlement Agreement. Specifically, the Released Parties under the Plan contributed to the Debtors' Chapter 11 Cases, including, as applicable, entering into the Process Support Agreement, the Standstill Agreement,

the Restructuring Support Agreement, the FE Settlement Agreement, the Mansfield Settlement and the Mansfield Owner Parties' Settlement. The Debtors and the Reorganized Debtors shall be deemed to provide the release set forth in Article VIII.C of the Plan as of the Effective Date.

38. The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases. In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Release to the Plan and the FE Settlement Agreement, the Debtor Release is approved and authorized in its entirety.

#### v. Release by Holders of Claims and Interests.

39. The release by the Consenting Creditors and the Committee set forth in Article VIII.D of the Plan (the "FE Settlement Party Release"), is an essential provision of the Plan. The FE Settlement Party Release is (i) an essential means of implementing the Plan; (ii) fair, equitable, and reasonable and in exchange for the good and valuable consideration provided by the FE Non-Debtor Parties pursuant to the FE Settlement Agreement and otherwise; (iii) a good-faith settlement and compromise of the claims and Causes of Action released by the FE Settlement Party Release; (iv) a bar to any of the Consenting Creditors or the Committee asserting any claim or Cause of Action released by the FE Settlement Party Release against any of the FE Non-Debtor Parties; (v) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Court; (vi) an integral and non-severable element of the Plan and the transactions incorporated therein; (vii) confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their creditors; and (viii) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors.

19

40.     The FE Settlement Party Release is an integral part of the Plan.  The FE Settlement Party Release was instrumental to the FE Settlement Agreement, which in turn provided important benefits to the Debtors and their estates in developing a path forward for the Reorganized Debtors and preventing potentially significant and time-consuming litigation.  The FE Settlement Party Release was a core negotiating point in connection with and instrumental in developing the FE Settlement Agreement and the Plan.  As such, the FE Settlement Party Release appropriately offers certain protection to the FE Non-Debtor Parties in accordance with the agreements previously approved by this Court in connection with the FE Settlement Agreement.

41.     The release by the Holders of Claims and Interests that (i) voted to accept the Plan or (ii) are deemed to have accepted the Plan set forth in Article VIII.E of the Plan (the "Consensual Third Party Release"), is an essential provision of the Plan.  The Consensual Third Party Release is: (i) an essential means of implementing the Plan; (ii) fair, equitable, and reasonable and in exchange for the good and valuable consideration provided by the Released Parties pursuant to the FE Settlement Agreement and otherwise; (iii) a good-faith settlement and compromise of the claims and Causes of Action released by the Consensual Third Party Release; (iv) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; (vii) a bar to any of the parties deemed to grant the Consensual Third Party Release asserting any claim or Cause of Action released by the Consensual Third Party Release against any of the Released Parties (which, for the avoidance of doubt, includes the FE Non-Debtor Parties); (viii) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code; (ix) an integral and non-severable element of the Plan and the transactions incorporated therein; (x) confers a material benefit on, and is in the best

interests of, the Debtors, their Estates and their creditors, and (xi) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors.

42.     Like the Debtor Release, and the FE Settlement Party Release, the Consensual Third Party Release facilitated participation in the Plan and the chapter 11 process generally. The Consensual Third Party Release was instrumental to the FE Settlement Agreement and the Restructuring Support Agreement, which provided important benefits to the Debtors and their estates in developing a path forward for the Reorganized Debtors and preventing potentially significant and time-consuming litigation.  The Consensual Third Party Release was a core negotiating point in connection with and instrumental in developing the FE Settlement Agreement and the Plan.  As such, the Consensual Third Party Release appropriately offers certain protection to parties that have constructively participated in the Debtors' restructuring process by supporting the Plan.

43.     The parties that are deemed to grant the Consensual Third Party Release shall be deemed to provide such release for all claims and Causes of Action that relate to the Debtors, the Reorganized Debtors, and the FE Non-Debtor Parties as of the Effective Date.  The scope of the Consensual Third Party Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases, and parties received due and adequate notice of the Consensual Third Party Release.  In light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Consensual Third Party Release to the Plan and the settlements and compromises contained therein, the Consensual Third Party Release is approved and authorized in its entirety.

### vi. Exculpation.

44. The exculpation provisions set forth in Article VIII.F of the Plan are essential to the Plan. The exculpation provision was negotiated by the Debtors and the Exculpated Parties and was agreed upon in return for the Exculpated Parties providing benefits to the Debtors. The record in the Chapter 11 Cases fully supports the exculpation and the exculpation provisions set forth in Article VIII,F of the Plan, which are appropriately tailored to protect the Exculpated Parties from inappropriate litigation arising from their participation in the Chapter 11 Cases and the Debtors' restructuring. The exculpation provisions in the Plan do not relieve any party of liability for an act or omission to the extent such act or omission is determined by a final order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct or gross negligence. Based upon the record of these Chapter 11 Cases, including the *Order Granting Application of Consenting Creditors Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and Payment of Fees and Expenses Incurred in Making a Substantial Contribution* [Docket No. 2694] (the "Substantial Contribution Order"), the Declarations, and the evidence proffered or adduced at the Confirmation Hearing, the Bankruptcy Court finds that the exculpation provisions set forth in Article VIII.F of the Plan are consistent with the Bankruptcy Code and applicable law.

### vii. Injunction.

45. Section 105(a) of the Bankruptcy Code permits issuance of an injunction in order to give effect to the releases and exculpation provisions of the Plan. As established based upon the record in these Chapter 11 Cases, the Declarations, and the evidence proffered or adduced at the Confirmation Hearing, the injunction provisions set forth in Article VIII.G of the Plan are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the

22

Debtor Release, the FE Settlement Party Release, the Consensual Third Party Release, and the exculpations. Such injunction provisions are appropriately tailored to achieve those purposes. The failure to include the injunction, and to effectuate the release and exculpation provisions of the Plan, would seriously impair the Debtors' ability to confirm a Plan in these Chapter 11 Cases.

46. The Court finds that it has jurisdiction pursuant to 28 U.S.C. § 1334 to enforce the injunctions set forth in Article VIII.G of the Plan in accordance with their terms.

### viii. Preservation of Claims and Causes of Action.

47. Article IV.Q of the Plan appropriately provides for the preservation of certain Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code. Causes of Action not released by the Debtors or exculpated under the Plan will be retained by the Reorganized Debtors and/or transferred to the Plan Administrator, as provided by the Plan. The provisions regarding Causes of Action in the Plan are appropriate and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests against the Debtors. For the avoidance of doubt, Causes of Action released or exculpated under the Plan will not be retained by the Reorganized Debtors.

### c. Section 1123(d) – Cure of Defaults.

48. Article V.C of the Plan provides for the satisfaction of Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code. Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described in Article V.C of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any disputed cure amounts will be

23

determined in accordance with the procedures set forth in Article V.C of the Plan and applicable bankruptcy and nonbankruptcy law. As such, the Plan provides that the Reorganized Debtors will cure, or provide adequate assurance that they will promptly cure, defaults with respect to Assumed Executory Contracts or Unexpired Leases in accordance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

       **d.     Section 1125 – Solicitation.**

49.     The Debtors and their agents solicited votes to accept or reject the Plan after the Court approved the adequacy of the Disclosure Statement, pursuant to section 1125(g) of the Bankruptcy Code and the Disclosure Statement Order.

50.     The Debtors and their agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e), and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article VIII.F of the Plan.

51.     The Debtors and their agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan. The Unions' Objection is hereby overruled.

24

e.      **Section 1129(a)(2) – Compliance with the Applicable Provisions of the Bankruptcy Code.**

52.      The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, and 1128 and Bankruptcy Rules 3017, 3018, and 3019.

f.      **Section 1129(a)(3) – Proposal of Plan in Good Faith.**

53.      The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation.  The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the hearings on the Disclosure Statement and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

54.      The Plan is the product of good faith, arm's-length negotiations by and among the Debtors, the Debtors' disinterested directors, the Committee, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group, the FES Creditor Group, the Mansfield Owner Parties, the FE Non-Debtor Parties and certain of the Debtors' other stakeholders. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' and such other parties' good faith, serve the public interest, and assure fair treatment of Holders of Claims and Interests against such Debtors.  Consistent with the overriding purpose of chapter 11, the Debtors filed the Chapter 11 Cases, and proposed the Plan, with the legitimate purpose of allowing the Debtors to reorganize their business and operations and maximize stakeholder value. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

**g. Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable.**

55.     Any payment made or to be made by the Debtors, or by a person issuing securities under the Plan as it relates to the Debtors, for services or costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable.  Accordingly, the Plan satisfies the requirements of section 1129(a)(4).

**h. Section 1129(a)(5) – Disclosure of Directors and Officers and Consistency with the Interests of Creditors and Public Policy.**

56.     The identities and affiliations of the Reorganized Debtors' initial directors and officers have been disclosed in the Plan Supplement, or at or prior to the Confirmation Hearing. The appointment of such directors and officers is consistent with the interests of creditors and with public policy.   The identity of any insider that shall be employed or retained by the Reorganized Debtors, and the nature of such insider's compensation, has been disclosed in the Plan Supplement.  Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**i. Section 1129(a)(6) – Rate Changes.**

57.     The Plan does not contain any rate changes for the Debtors that would require approval of any governmental regulatory commission and therefore will not require governmental regulatory approval.  Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.  The OVEC Objection, FERC Objection, OCC Objection, and Maryland Solar Objection are hereby overruled.

**j. Section 1129(a)(7) – Best Interests of Holders of Claims and Interests.**

58.     The evidence in support of the Plan that was proffered or adduced at the Confirmation Hearing and the facts and circumstances of the Chapter 11 Cases, establish that

each Holder of Allowed Claims or Interests in every Class will recover as much or more value under the Plan on account of such Claim or Interest, as of the Effective Date, than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. As a result, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

> **k.** **Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Certain Impaired Class.**

59. Claims and Interests in Classes A1, A2, B1, B2, B3, B11, C1, C2, C10, D1, D2, E1, E2, F1, F2, G1, and G2 are Unimpaired under the Plan and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan. Classes A3, A4, A5, A7, A8, B4, B5, B6, B7, B8, B9, C3, C4, C5, C6, D3, D4, D6, E3, E5, F3 and G3, which are Impaired Classes of Claims eligible to vote, have affirmatively voted to accept the Plan. As such, section 1129(a)(8) is satisfied with respect to such Classes of Claims. Because the Plan has not been accepted by the Deemed Rejecting Classes and Classes A6, C7, D5, and E4 (collectively, the "Rejecting Classes"), the Debtors seek Confirmation of the Plan under section 1129(b), rather than section 1129(a)(8) of the Bankruptcy Code. Thus, although section 1129(a)(8) has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

l.      **Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

60.     The treatment of Administrative Claims, Professional Fee Claims and Priority Tax Claims under Article II of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

m.      **Section 1129(a)(10)—Acceptance by at Least One Impaired Class.**

61.     As set forth in the Voting Declaration, Classes A3, A4, A5, A7, A8, B4, B5, B6, B7, B8, B9, C3, C4, C5, C6, C8, D4, D6, E3, E5, F3 and G3, which were Impaired Classes of Claims entitled to vote on the Plan, have voted to accept the Plan.  As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

n.      **Section 1129(a)(11) – Feasibility of the Plan.**

62.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing, including the *Expert Report of Charles M. Moore, CPA, Rebuttal Report of Charles M. Moore, CPA, Expert Report of John Seymour, PE* and *Rebuttal Report of John Seymour, PE*: (i) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (ii) has not been controverted by other persuasive evidence; (iii) establishes that the Plan is feasible and confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization; and (iv) establishes that the Debtors will have sufficient funds available to meet their obligations under the Plan—including sufficient amounts of Cash to reasonably ensure payment of, among other things, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, any Allowed Other

28

Secured Claims, Allowed Professional Fee Claims, ongoing environmental obligations and other Allowed Claims that will receive Cash distributions pursuant to the terms of the Plan and other expenses in accordance with the terms of the Plan and section 507(a) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

   **o.  Section 1129(a)(12) – Payment of Statutory Fees.**

   63.  All reports and fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be filed and paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

   **p.  Section 1129(a)(13) – Retiree Benefits.**

   64.  The Debtors have been paying all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, during the Chapter 11 Cases owed to the Debtors' former employees.  The Debtors will continue to pay all such retiree benefits until the Effective Date. The FE Settlement Agreement provides that FE Corp., from and after the Effective Date, will pay or cause to be paid (including from an applicable trust or other funding vehicle maintained by any FE Non-Debtor Party) Retiree Group Life Insurance Claims (as defined in the FE Settlement Agreement), Limited Retiree Medical Claims (as defined in the FE Settlement Agreement) with respect to any of the Debtors' Retirees (as defined in the FE Settlement Agreement) and any

Limited Union Medical Claims (as defined in the FE Settlement Agreement). Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

> **q.** **Section 1129(a)(14), (15), and (16) – Domestic Support Obligations, Individuals, and Nonprofit Corporations.**

65. The Debtors do not owe any domestic support obligations, are not individuals, and are not nonprofit corporations. Therefore, sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

> **r.** **Section 1129(b) – Confirmation of the Plan over Nonacceptance of Impaired Class.**

66. Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. First, the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes because no Class of Claims or Interests having similar legal rights to the Claims and Interests in the Rejecting Classes is receiving different treatment under the Plan. Second, the Plan is "fair and equitable" as to the Rejecting Classes because (i) no Interests or Claims junior to the Claims or Interests of the Rejecting Classes will receive or retain any property under the Plan on account of such junior Interests or Claims and (ii) no holder of a Claim senior to the respective Rejecting Classes is receiving more than equal value on account of its Claim. As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied. After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

s.      **Section 1129(c)—Only One Plan.**

67.     Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

t.      **Section 1129(d) – Principal Purpose of the Plan is Not Avoidance of Taxes or Section 5 of the Securities Act.**

68.     No Governmental Unit has required that the Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. As evidenced by its terms, the principal purpose of the Plan is not such avoidance. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

u.      **Section 1129(e) – Not Small Business Cases.**

69.     The Chapter 11 Cases are not small business cases, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

P.  **Satisfaction of Confirmation Requirements.**

70.     Based upon the foregoing, the Plan satisfies the requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code.

Q.  **Good Faith.**

71.     The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of maximizing the value of the Debtors' Estates for the benefit of their stakeholders. The Plan accomplishes this goal. Accordingly, the Debtors and the Reorganized Debtors, as applicable, the Debtors' directors and officers, the Committee, the Ad Hoc Noteholder Group, the Mansfield Certificateholders Group, the FES Creditor Group, the Mansfield Owner Parties, the FE Non-Debtor Parties have been, are, and will continue to be acting in good faith if they

31

proceed to: (i) consummate the Plan and the agreements, settlements, transactions and transfers contemplated thereby in accordance with the Plan and this Order (including, without limitation, the transactions set forth in the FE Settlement Agreement); and (ii) take the actions authorized and directed or contemplated by this Order. Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**R. Conditions to the Effective Date.**

72. The Plan shall not become effective unless and until the conditions set forth in Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan. Each of the conditions precedent to confirmation and consummation of the Plan, as set forth in Article IX of the Plan, has been satisfied or waived, or is reasonably likely to be satisfied or waived prior to confirmation of the Plan or the Effective Date, as applicable. Nothing in this paragraph modifies the Debtors' statements on the record at the Confirmation Hearing that the conditions set forth in Article IX.B.11.e of the Plan will not be waived.

**S. Implementation.**

73. All documents and agreements necessary to implement the Plan, including, without limitation, those contained or summarized in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law. The Debtors are authorized to take any action reasonably necessary or appropriate to consummate such agreements and the transactions contemplated thereby.

74. The terms of the Plan, including the Plan Supplement and all exhibits and schedules thereto, and all other documents filed in connection with the Plan, or executed or to be

executed in connection with the transactions contemplated by the Plan, and all amendments and modifications of any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications are incorporated by reference, and approved in all respects, and constitute an integral part of this Order.

### T.  Vesting of Assets.

75.     Except as otherwise provided in the Plan, on the Effective Date, all property in each Debtor, all Causes of Action, and all property acquired by each Debtor pursuant to the Plan, shall vest in each applicable Reorganized Debtor or New Holdco, free and clear of all Liens, Claims, charges, Interests, or other encumbrances.  Except as otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action, except for those Causes of Action or potential Causes of Action specifically assigned to the Plan Administrator, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  All transfers of property of the Estates under the Plan shall be free and clear of all Liens, claims, charges, interests, and other encumbrances, in accordance with applicable law, except as provided for in the Plan and this Confirmation Order.  Such transfers include, without limitation, the transfer of full ownership of Mansfield Unit 1, and any and all insurance proceeds recovered on account of Mansfield Unit 1 to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee), or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled, pursuant to the Mansfield Unit 1 Transfer Agreement as contemplated by the Mansfield Settlement and the Mansfield Owner Parties' Settlement.

## U. Retention of Jurisdiction.

76.     The Court properly retains jurisdiction over the matters set forth in Article XI and other applicable provisions of the Plan.

## II.     **ORDER**

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

77.     All requirements for confirmation of the Plan have been satisfied.  Accordingly, the Plan is confirmed in its entirety pursuant to Bankruptcy Code section 1129.  The terms of the Plan and the Plan Supplement are incorporated by reference into, and are an integral part of, this Confirmation Order.

78.     The Plan (including the Plan Supplement and all documents or agreements included therein) and this Confirmation Order will be effective and binding on all parties in interest, including: (i) the Debtors; (ii) the Committee; (iii) the FE Non-Debtor Parties; (iv) the Objecting Parties; and (v) all Holders of Claims and Interests.

79.     The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related documents, agreements, or exhibits in this Confirmation Order does not impair the effectiveness of that article, section, or provision; it being the intent of the Court that the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in their entirety.

## A. Objections.

80.     To the extent that any Objections (including any reservations of rights contained therein) to Confirmation have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, are not cured by the relief granted in this Confirmation Order, or have not been otherwise resolved as stated by the Debtors on the record of the Confirmation Hearing, all

34

such Objections (including any reservation of rights contained therein) are hereby overruled on the merits.

**B. The Plan Supplement.**

81.     The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements introduced into evidence by the Debtors at the Confirmation Hearing (including all exhibits and attachments thereto), and the execution, delivery and performance thereof by the Debtors and the Plan Administrator, are authorized and approved, and are an integral part of, and incorporated by reference into, the Plan.  Without further notice to, or action, order or approval of the Court, the documents included in the Plan Supplement may be amended and supplemented in accordance with the Restructuring Support Agreement, whether prior to or after execution, so long as such amendment or supplement does not materially or adversely change the treatment of holders of Claims under the Plan and is not inconsistent with the terms of the Restructuring Support Agreement.  The documents comprising the Plan Supplement shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.

**C. Deemed Acceptance of Plan as Modified.**

82.     In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to accept the Plan, subject to modifications, if any.  No Holder of a Claim shall be permitted to change its vote as a consequence of any modifications to the Plan that have been incorporated at or prior to the Confirmation Hearing.  All modifications

35

to the Plan made after the Solicitation Date are hereby approved, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**D. Compromise and Settlement of Claims, Equity Interests and Controversies.**

83.    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of the matters resolved pursuant to the Plan Settlement. The Plan Settlement constitutes a settlement of the potential litigation of issues including, among other things, the validity, enforceability and priority of various Inter-Debtor Claims, the allocation of value between and among the Debtors' Estates, including the allocation of the FE Settlement Value among the Debtors, and incorporates the Mansfield Settlement and the Mansfield Owner Parties' Settlement. All of the Classes comprised of Holders of Mansfield Certificate Claims (in that capacity) have accepted the Plan in accordance with section 1126 of the Bankruptcy Code, and, in accordance with the Plan, such acceptance shall be deemed to constitute the consent of all Holders of Mansfield Certificate Claims and the Mansfield Indenture Trustee to the transfer contemplated by the terms of the Mansfield Settlement and the Mansfield Unit 1 Transfer Agreement. In addition, such acceptance of the Plan by all Classes comprised of Holders of the Mansfield Certificate Claims (in that capacity) has caused the Plan to be binding on the Mansfield Indenture Trustee, whereupon the Mansfield Indenture Trustee, without more, shall be legally authorized, regardless of any prerequisites, conditions or other provisions in the Mansfield Lease Note Indentures, the Mansfield Pass Through Trust Agreement or any other document or instrument that might otherwise apply, to take any actions reasonably necessary in order to facilitate the Mansfield Settlement, including, without limitation, the execution of the

36

Mansfield Unit 1 Transfer Agreement by the Mansfield Indenture Trustee, consenting to execution of the Mansfield Unit 1 Transfer Agreement by the Consenting Owner Trustee and the FE Owner Trustee, and the execution and delivery or recording of any documents reasonably necessary to evidence the release of the Liens of the Mansfield Lease Note Indentures, including, without limitation any such Liens on the undivided interests in Mansfield Unit 1 and the insurance proceeds recovered on account of Mansfield Unit 1. The entry of this Confirmation Order constitutes the Bankruptcy Court's approval of each of the compromises and settlements contemplated in the Plan and comprising the Plan Settlement. Nothing in the Plan Settlement is intended, nor shall be interpreted, to settle, resolve or release any claim of any non-debtor party against any other non-debtor party, except as otherwise set forth in Sections VIII.D and VIII.E of the Plan. Each provision of the Plan, as it pertains to the settlements incorporated therein, shall be deemed non-severable from each other and from the remaining terms of the Plan.

**E. Post-Confirmation Notices.**

84. In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) Business Days after the entry of this Order, the Reorganized Debtors shall cause notice of confirmation of the Plan (the "Notice of Confirmation") to be served by United States mail, first-class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice and no later than seven (7) Business Days after the Effective Date, the Reorganized Debtors shall cause notice of the Effective Date (the "Notice of Effective Date") to be served by United States mail, first-class postage prepaid by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; *provided, that* no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice but received such notice returned marked "undeliverable

18-50757-amk    Doc 3283    FILED 10/16/19    ENTERED 10/16/19 13:06:00    Page 37 of 299

as addressed," "moved, left no forwarding address," "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

85.     To supplement the notice procedures described in the preceding sentence, no later than ten (10) Business Days after the entry of this Order, the Reorganized Debtors shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in the list of publications attached as Exhibit B to the Disclosure Statement Motion.  No later than ten (10) Business Days following the Effective Date, the Reorganized Debtors shall cause the Notice of Effective Date, modified for publication, to be published on one occasion in the same publications.  Mailing and publication of the Notice of Confirmation and Notice of Effective Date, in the time and manner set forth herein will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

**F.  Effectiveness of All Actions.**

86.     Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to this Order, without further application to, or order of the Court, or further action by the Debtors and/or the Reorganized Debtors and their respective directors, officers, members, or stockholders, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

**G.  Approval of Consents and Authorization to Take Acts Necessary to Implement Plan.**

87.     Except as otherwise provided in this Confirmation Order or the Plan, including but not limited to any authorizations, consents, and regulatory approvals provided for in Article

38

VIII.I, Article IX.B.10, and Article IX.B.11 of the Plan, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**H. Plan Implementation Authorization.**

88.     Without further approval of the Bankruptcy Court, the Debtors' boards of directors or managers, or the New Holdco Board, the Debtors are authorized to undertake the Restructuring Transactions.  The Debtors, or the Reorganized Debtors, as the case may be, and their respective directors, officers, members, agents, and attorneys, financial advisors, and investment bankers are authorized and empowered from and after the date hereof to negotiate, execute, issue, deliver, implement, file, or record any contract, instrument, release, or other agreement or document related to the Plan as the same may be modified, amended and supplemented, and to take any action necessary or appropriate to implement, effectuate, consummate, or further evidence the Plan as it relates to the Debtors in accordance with its terms, or take any or all corporate actions authorized to be taken pursuant to the Plan, whether or not specifically referred to in the Plan or any exhibit thereto, without further order of the Court. To the extent applicable, any or all such documents shall be accepted upon presentment by each of the respective state filing offices and recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.  No action of the Debtors' boards of directors or the board of directors of the Reorganized Debtors shall be

required to authorize the Debtors or the Reorganized Debtors, as applicable, to enter into, execute and deliver, adopt or amend, as the case may be, any such contract, instrument, release, or other agreement or document related to the Plan, and following the Effective Date, each of the documents related to the Plan will be a legal, valid and binding obligation of the Debtors or the Reorganized Debtors, as applicable, enforceable against the Debtors and the Reorganized Debtors in accordance with the respective terms thereof.

### I. Mansfield Settlement and Mansfield Owner Parties' Settlement Implementation Authorization.

89. Pursuant to the terms of the Mansfield Settlement and the Mansfield Owner Parties' Settlement as set forth in the Plan, the Debtors, the Mansfield Indenture Trustee, the Mansfield Owner Parties and the FE Owner Trustee are authorized to execute, file and take any steps otherwise necessary to evidence the transfer of full ownership of Mansfield Unit 1, and any and all insurance proceeds recovered on account of Mansfield Unit 1 to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee), or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled, including, without limitation, the execution of the Mansfield Unit 1 Transfer Agreement; *provided*, that all classes comprised of Holders of Mansfield Certificate Claims (in that capacity) shall have accepted the Plan in the manner set forth in the immediately succeeding sentence of this paragraph.  In that regard, acceptance of the Plan by all of the classes comprised of Holders of the Mansfield Certificate Claims (in that capacity) shall cause the Plan to be binding on the Mansfield Indenture Trustee, in which event the Mansfield Indenture Trustee, without more, shall be legally authorized, regardless of any prerequisites, conditions or other provisions in the Mansfield Lease Note Indentures, the Mansfield Pass Through Trust Agreement or any other

40

document or instrument that might otherwise apply, to take any actions reasonably necessary in order to facilitate the Mansfield Settlement, including, without limitation, the execution of the Mansfield Unit 1 Transfer Agreement by the Mansfield Indenture Trustee, consenting to the execution of the Mansfield Unit 1 Transfer Agreement by the Consenting Owner Trustee and the FE Owner Trustee, and the execution and delivery or recording of any documents reasonably necessary to evidence the release of Liens of the Mansfield Lease Note Indentures, including without limitation any such Liens on the undivided interests in Mansfield Unit 1 and the insurance proceeds recovered on account of Mansfield Unit 1.

**J. Binding Effect.**

90.     On the date of and after entry of this Order, subject to the occurrence of the Effective Date, and subject to the remaining provisions set forth in this Order, the Plan and the Plan Supplement (including all documents and agreements contained therein) shall bind the Debtors, their estates, any party seeking to act on behalf of, or in respect of, the Debtors or the Debtors' estates, and any Holder of a Claim or Interest against the Debtors and such Holder's respective successors or assigns, whether or not: (i) such Holder's Claim or Interest is Impaired under the Plan; (ii) such Holder has accepted the Plan; (iii) such Holder failed to vote to accept or reject the Plan or voted to reject the Plan; (iv) such Holder is entitled to a distribution under the Plan; (v) such Holder will receive or retain any property or interests in property under the Plan; or (vi) such Holder has filed a Proof of Claim in the Chapter 11 Cases. The Plan and its related documents constitute legal, valid, binding and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan and its related documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

41

**K. Directors and Officers of the Reorganized Debtors.**

91. The Reorganized Debtors' initial directors and officers have been disclosed prior to the Confirmation Hearing.

**L. Management Incentive Plan.**

92. The Reorganized Debtors are authorized to adopt and establish the Management Incentive Plan. For the avoidance of doubt, the Confirmation Order shall not be deemed to be an approval or authorization of the specific terms of the Management Incentive Plan.

**M. Release of Liens.**

93. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan and except for (i) any FG PCN Claims against FG that are Reinstated in accordance with Article III of the Plan, (ii) any NG Secured PCN Claims against NG that are Reinstated in accordance with Article III of the Plan, (iii) any Other Secured Claims against any Debtor that are Reinstated in accordance with Article III of the Plan and (iv) any Lien on or security interest in cash held by a customer or third party custodian as collateral or security for a customer contract that is assumed by FES, on the Effective Date all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan (or any agent for such Holder) has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as

reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors that are reasonably necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

### N. Cancellation of Existing Securities and Agreements.

94.     Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or Plan Supplement, on and after the Effective Date, the obligations of the Debtors under the Indentures and any other certificate, share, note, bond, indenture, purchase right, option, warrant, contract, agreement, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such indentures, certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; *provided, however* that the Indentures evidencing indebtedness or obligations not specifically Reinstated pursuant to the Plan shall continue in effect solely for the purposes of (i) allowing the Holders of Unsecured Bondholder Claims to receive distributions on account of their Claims as provided in the Plan, (ii) allowing the Indenture Trustees, as applicable, to make distributions to be made on account of the Unsecured Bondholder Claims, (iii) preserving the Indenture Trustees' rights to compensation and indemnity under each of the applicable Indentures as against any money or property distributed or allocable to Holders of

43

Unsecured Bondholder Claims, including the Indenture Trustee's rights to maintain, enforce, and exercise their respective charging liens against such money or property, (iv) permitting the Indenture Trustees, as applicable, to enforce any right or obligation owed to them under the Plan, and (v) permitting the Indenture Trustees to appear in the Chapter 11 Cases or in any proceeding in the Court or any other court after the Effective Date on matters relating to the Plan or the Indentures. The FE/FES Revolver shall be cancelled as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder. The obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, indentures, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. For the avoidance of doubt, each of the Indenture Trustees shall be entitled to assert its respective charging liens arising under and in accordance with the applicable Indenture and any ancillary document, instrument, or agreement to obtain payment of its fees and expenses. On and after the Effective Date, all duties and responsibilities of each Indenture Trustee under the applicable Indenture shall be fully discharged except to the extent required in order to effectuate the Plan, including the continued obligations of the Secured PCN Indenture Trustees with respect to the Secured FG PCN Reinstated Claims and the Secured NG PCN Claims that will be Reinstated pursuant to the Plan. Subsequent to the performance by each Indenture Trustee of its obligations pursuant to the Plan and this Order, such Indenture Trustee

44

and its agents shall be relieved of all further duties and responsibilities related to the applicable Indenture.

**O. Securities Law Exemption.**

95.    Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Common Stock as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities.  The New Common Stock issued pursuant to section 1145 of the Bankruptcy Code is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act and is freely tradable and transferrable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized Debtors, as defined in Rule 144(a)(1) of the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.  New Common Stock underlying the Management Incentive Plan will be issued pursuant to other available exemptions from registration under the Securities Act and applicable law.

96.    Notwithstanding any policies, practices or procedures of DTC or any other applicable clearing system, DTC and all other applicable clearing systems shall cooperate with and take all actions reasonably requested by a Disbursing Agent or an Indenture Trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest.  No Disbursing Agent or Indenture Trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

97.     In connection with any ownership of the New Common Stock that will be reflected through the facilities of DTC on or after the Effective Date, the Reorganized Debtors need not provide any further evidence other than the Plan or this Order with respect to the treatment of the New Common Stock under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and this Order in lieu of a legal opinion regarding whether any of the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

98.     On and as of the Effective Date, the Reorganized Debtors shall enter into and deliver the Reorganized Debtors' Stockholders Agreement to each Entity that is intended to be a party thereto and such agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each party thereto shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtors.  For the avoidance of doubt, each Person or Entity that receives shares of New Common Stock pursuant to the Plan shall automatically be deemed to be a party to the Reorganized Debtors' Stockholders' Agreement, in accordance with its terms, whether it receives shares on or after the Effective Date and regardless of whether it executes a signature page to the Reorganized Debtors' Stockholders' Agreement.

99.     On and as of the Effective Date, the Registration Rights Agreement is approved and shall be valid and binding in accordance with its terms and conditions upon the parties

thereto, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications acceptable in accordance with the Registration Rights Agreement.

**P. Section 1146 Exemption.**

100.    Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including (i) the Restructuring Transactions; (ii) the issuance of the New Common Stock; (iii) the assignment or surrender of any lease or sublease; and (iv) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage, recording tax, or other similar tax, and upon entry of this Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**Q. Distributions Under the Plan.**

101.    All distributions under the Plan shall be made in accordance with Article VI of the Plan, and such methods of distribution are approved.  The classification of Claims and Interests for purposes of distributions under the Plan shall be governed by the terms of the Plan.  The classifications and Claims amounts set forth on ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan: (i) were set forth on the Ballots solely for

purposes of voting to accept or reject the Plan; (ii) do not necessarily represent and in no event shall be deemed to modify or otherwise affect the actual classification of such Claims under the Plan for distribution purposes; and (iii) shall not be binding on the Debtors, the Reorganized Debtors, the Plan Administrator, or any holder of a Claim against the Debtors for purposes other than voting on the Plan.

**R. Plan Administrator.**

102.     The Plan Administrator shall serve as Plan Administrator for each of the Debtors pursuant to the terms of the Plan Administrator Agreement including as part of the Plan Supplement.  The Plan Administrator Agreement and the terms and conditions thereof are hereby approved.

103.     Subject to Article IV.S of the Plan and the terms of the Plan Administrator Agreement, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to: (i) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors subject to Bankruptcy Court approval; *provided, however*, that where the Debtors have authorization to compromise or settle any Claims against the Debtors under a Final Order including this Order, the Plan Administrator shall be authorized to compromise or settle such Claims after the Effective Date, in accordance with and subject to such Final Order and *provided further, however*, that the settlement of any Allowed General Unsecured Claim in excess of $10,000,000 or any Administrative Claim or Priority Tax Claim in excess of $1,000,000 (in Allowed amount), shall require notice and an order of the Bankruptcy Court; (ii)

48

make distributions to Holders of Allowed Claims in accordance with the Plan; (iii) prosecute Claims, Causes of Action and potential Causes of Action transferred to the Plan Administrator on behalf of the Debtors, and to elect not to pursue any Claims, Causes of Action, or potential Causes of Action transferred to the Plan Administrator and whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Claims or Causes of Action, as set forth in the Plan Administrator Agreement; (iv) make payment to existing Professionals who will continue to perform in their current capacities; (v) retain professionals to assist in performing its duties under the Plan; (vi) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; and (vii) perform other duties and functions that are consistent with the implementation of the Plan.

104.    Subject to the terms of the Plan Administrator Agreement, each of the Debtors shall indemnify and hold harmless the Plan Administrator for any losses incurred in execution of its duties as the Plan Administrator, except to the extent such losses were the result of the Plan Administrator's fraud, gross negligence, willful misconduct or criminal conduct (as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction).

**S. Transition Working Group**.

105.    Pursuant to the Transition Working Group Agreements, the form of which were filed with the Plan Supplement, the Debtors shall consult in good faith with the Transition Working Group regarding, among other things, all material business plans and strategic initiatives relating to the operation of the Debtors' generating assets and management of the Debtors' retail business.   The Transition Working Group Agreements and the terms and conditions thereof are hereby approved.

**T. Administrative Expense Bar Date.**

106.    The Administrative Claims Bar Date shall be the date that is 30 days following the Effective Date.

**U. Professional Compensation and Reimbursement Claims.**

107.    On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. Upon the establishment of the Professional Fee Escrow Account, the Reorganized Debtors shall select a Professional Fee Escrow Agent for the Professional Fee Escrow Account to administer payments to and from such Professional Fee Escrow Account in accordance with the Plan and shall enter into an escrow agreement providing for administration of such payments in accordance with the Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by Final Order.

108.    Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimate to the Debtors no later than ten Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total amount estimated pursuant to Article II.A.3(c) of the Plan shall constitute the Professional Fee Reserve

Amount. Final fee applications shall be filed by all retained Professionals with the Court no later than sixty (60) days after the Effective Date.

109. On the Effective Date, the Debtors or Reorganized Debtors (as applicable) shall pay any Other Professional Fee Claims, including, for the avoidance of doubt, the reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by (i) professionals and the Mansfield Indenture Trustee payable under the *Order (i) Authorizing Debtors to Assume (a) the Process Support Agreement and (b) the Standstill Agreement and (ii) Granting Related Relief* [Docket No. 509] (the "PSA Order"), (ii) professionals payable pursuant to the Restructuring Support Agreement and the Substantial Contribution Order, including, for the avoidance of doubt, payment of any transaction completion fees to GLC Advisors & Co., as financial advisor to the Ad Hoc Noteholder Group, Guggenheim Securities LLC as financial advisor to the Mansfield Certificateholders Group, Houlihan Lokey Capital, Inc., as financial advisor to the FES Creditor Group and Crestview Capital Advisors Corporation, as financial advisor to the Consenting Owner Participant, and (iii) the Consenting Owner Trustee, Indenture Trustees and their counsel. For the avoidance of doubt, the Debtors are also authorized to continue to pay, in Cash, the fees and expenses set forth in (i) through (iii) of the preceding sentence when due and payable pursuant to the PSA Order, the Substantial Contribution Order and the Restructuring Support Agreement, as applicable (in each case solely as and to the extent previously authorized by this Court) prior to the Effective Date. The Reorganized Debtors shall indemnify the Indenture Trustees for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but

51

not limited to, making distributions pursuant to and in accordance with the Plan, and any disputes arising in connection therewith.

### V. Discharge of Claims and Termination of Interests.

110. Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date and any Administrative Claims whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.

### W. The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.

111. The following releases, injunctions, exculpations, and related provisions set forth in Article VIII of the Plan are hereby approved and authorized in their entirety:

A. **Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, on and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party is deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims or Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties), as applicable, would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the PCNs, the FES Notes, any interest in the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of**

53

any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, any obligation under any Assumed Executory Contract or Unexpired Lease where an FE Non-Debtor Party is a counterparty, the FE Postpetition Agreements, the FE Settlement Agreement and any related obligations under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the FE Settlement Agreement.

B. **Third Party Releases of the FE Non-Debtor Parties by the Consenting Creditors and the Committee.**

On and as of the Effective Date, pursuant to the terms of the FE Settlement Agreement, in exchange for good and valuable consideration, including the contributions of the FE Non-Debtor Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each FE Non-Debtor Released Party is deemed to have been conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the: (i) the Consenting Creditors and (ii) the Committee, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims or Causes of Action, including any derivative claims asserted or assertable by, or on behalf of any of the (i) Consenting Creditors or (ii) the Committee, or their Affiliates, as applicable, that such Entities would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the PCNs, the FES Notes, any interest in the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion

54

requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the FE Settlement Agreement and any related obligations under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

C. Releases of the Debtor Released Parties, FE Non-Debtor Released Parties and Other Released Parties by Third Parties and Holders of Claims or Interests.

On and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Debtor Released Parties, FE Non-Debtor Released Parties and Other Released Parties, to facilitate and implement the Plan, each Holder of a Claim or Interest that (i) votes to accept the Plan or (ii) is deemed to have accepted the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor Released Party, FE Non-Debtor Released Party, and Other Released Party from any and all claims and Causes of Action, including any derivative claims asserted or assertable by or on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties), as applicable, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and Released Party, the PCNs, the FES Notes, any interest in the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the

Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the FE Settlement Agreement and any related obligations under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the FE Settlement Agreement, (ii) any Consenting Owner Participant from its obligations to the Consenting Owner Trustee, in its individual capacity (and its successors, permitted assigns, directors, officers, employees, agents, and servants) under the Mansfield Trust Agreements or (iii) the Consenting Owner Trustee from its obligations under the Mansfield Trust Agreements with respect to periods after the Effective Date.

For the avoidance of doubt, on and as of the Effective Date, each Holder of a Claim or Interest that (i) votes to accept the Plan or (ii) is deemed to have accepted the Plan shall be deemed to provide a full and complete discharge and release to the Debtor Released Parties, the FE Non-Debtor Released Parties, and the Other Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for or sounding in tort, fraud, contract, violations of federal or state securities laws, veil piercing, substantive consolidation, or alter-ego theories of liability, contribution, indemnification, joint or several liability, or otherwise arising from or related in any way to (i) the Debtors, the Reorganized Debtors, their businesses, their property, or any interest in the Mansfield Facility Documents; (ii) any Cause of Action against the FE Non-Debtor Released Parties or their property arising in connection with any intercompany transactions or other matters arising in the conduct of the Debtors' businesses; (iii) the Chapter 11 Cases; (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, Confirmation or Consummation of the Plan, the Plan Supplement, any contract, employee pension or benefit plan instrument, release, or other agreement or document related to any Debtor, the Chapter 11 Cases or the Plan, modified, amended, terminated, or entered into in connection with either the Plan, or any

56

agreement between the Debtors and any FE Non-Debtor Released Party, including the FE Settlement Agreement; or (v) any other act taken or omitted to be taken in connection with the Chapter 11 Cases, including, without limitation, acts or omissions occurring after the Effective Date in connection with distributions made consistent with the terms of the Plan.

For the avoidance of doubt and notwithstanding anything else in the Plan, this Order, or any implementing or supplementing plan documents, (i) no Governmental Units shall be deemed to accept the Plan for purposes of Article VIII.E of the Plan and (ii) the United States, Ohio Environmental Protection Agency, Ohio Department of Natural Resources, and Pennsylvania Department of Environmental Protection have agreed not to vote on the Plan and will not be subject to the releases in Article VIII.E of the Plan, provided, however, if any agency of the United States or any agency of any state actually votes to accept the Plan, such agency shall be deemed to provide the releases in Article VIII.E of the Plan on the Effective Date for such agency and only for such agency. Additionally, for the avoidance of doubt, the releases contained in Article VIII.C and VIII.D shall not act as a release of any non-derivative claims and causes of action of the United States, Ohio Environmental Protection Agency, Ohio Department of Natural Resources, and Pennsylvania Department of Environmental Protection against any non-debtor parties.

### D. Exculpation.

Notwithstanding anything herein to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim or Interest or to any other Entity, (i) as it pertains to Exculpated Parties that are Estate Fiduciaries, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, and (ii) as it pertains to all Exculpated Parties including Exculpated Parties that are non-Estate Fiduciaries, for any act or omission in connection with, relating to, or arising out of, the negotiation, documentation and implementation of any agreement, transaction or action approved by the Bankruptcy Court in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Mansfield Settlement, the Mansfield Owner Parties' Settlement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Mansfield Settlement, the Mansfield Owner Parties' Settlement, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of

57

Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided*, nothing herein shall prevent Entities from asserting as a defense that they relied in good faith upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. For the avoidance of doubt, an Exculpated Party will be entitled to the foregoing exculpation of (i) an Estate Fiduciary when acting in such capacity and (ii) a non-Estate Fiduciary when acting in such capacity.

### E. Injunction.

In addition to any injunction provided in the FE Settlement Order, upon the occurrence of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons or Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.C-E of the Plan (collectively, the "<u>Released Claims</u>"), shall be discharged pursuant to Article VIII.A of the Plan (collectively, the "<u>Discharged Claims</u>"), or are subject to exculpation pursuant to Article VIII.F of the Plan (collectively, the "<u>Exculpated Claims</u>"), shall be enjoined from taking any actions to interfere with the implementation of the Plan, and are permanently enjoined and forever barred from taking any actions with respect to the Released Claims, the Discharged Claims or the Exculpated Claims, including but not limited to: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or respect to the Released Claims, the Discharged Claims, or the Exculpated Claims; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to the Released Claims, the Discharged Claims, or the Exculpated Claims; (iii) creating,

perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to the Released Claims, the Discharged Claims, or the Exculpated Claims; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to the Released Claims, the Discharged Claims, or the Exculpated Claims unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims, the Discharged Claims, or Exculpated Claims, except in accordance with the terms of the Plan. For the avoidance of doubt, nothing in this Article VIII.G modifies paragraph 19 of the FE Settlement Order.

## X. Plan Modifications

112.    Subject to certain restrictions and requirements set forth in the Plan and in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, each of the Debtors expressly reserves its respective rights to alter, amend, or modify the Plan, one or more times, after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or this Order, including with respect to such modifications. Any alteration, amendment, or modification to the Plan (including for the avoidance of doubt, the Plan Supplement) shall be in accordance with the Restructuring Support Agreement and the FE Settlement Agreement.

## Y. Revocation, Withdrawal or Non-Occurrence of Effective Date.

113.    If any of the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects as to such Debtor(s); (ii) any settlement or compromise embodied in the Plan, including the Plan

59

Settlement, and the FE Settlement Agreement (except in accordance with the terms set forth therein and in the FE Settlement Order), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void as to such Debtor(s); and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action as to such Debtor(s); (b) prejudice in any manner the rights of such Debtor(s) or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor(s) or any other Entity.

**Z.  Nonseverability of Plan Provisions upon Confirmation.**

114.    Each term and provision of the Plan, including the Plan Supplement and all exhibits and schedules thereto and all other documents filed in connection with the Plan, or executed or to be executed in connection with transactions contemplated by the Plan and all amendments and modifications of any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications are: (i) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified except as provided by the Plan or this Order; and (iii) nonseverable and mutually dependent.

**AA.    Authorization to Consummate.**

115.    The Debtors are authorized to consummate the Plan at any time after the entry of this Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to the Effective Date set forth in Article X.B of the Plan.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

**BB.    Treatment of Executory Contracts and Unexpired Leases.**

116.    The assumption of Executory Contracts or Unexpired Leases set forth on Exhibit B to the Plan Supplement, the rejection of the Executory Contracts or Unexpired Leases set forth on Exhibit C to the Plan Supplement, and the assignment of the Executory Contracts or Unexpired Leases set forth on Exhibit D to the Plan Supplement are hereby authorized.

117.    Unless otherwise agreed, the Debtors will not assume, cure, or otherwise treat any contract pursuant to this Order that is the subject of an outstanding objection to a proposed assumption or cure amount (an "Assumption Objection") until the Assumption Objection has been consensually resolved or the Court has made a determination on the Assumption Objection. Unless otherwise agreed, all outstanding Assumption Objections will be heard at the omnibus hearing scheduled for November 19, 2019 at 10:00 a.m. (Eastern Time) or another hearing that is convenient to the Court.  For the contract counterparties who were served with the *Notice Of (A) Additional Executory Contracts And Unexpired Leases To Be Assumed By The Debtors Pursuant To The Plan, (B) Cure Amounts, If Any, And (C) Related Procedures In Connection Therewith*, Docket No. [3274], the hearing on any Assumption Objections filed by any such notice party will be heard will be heard at the omnibus hearing scheduled for November 19, 2019 at 10:00 a.m. (Eastern Time) or another hearing that is convenient to the Court.

118.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order (including, without limitation, paragraphs 32, 48, 116, and 117 hereof), as a resolution of the UniTech Objection, the Debtors have agreed that, if they move a reference to a purchase order with UniTech that is currently listed on Exhibit C to the Plan Supplement to Exhibit B to the Plan Supplement, subject to the Court adjudicating whether such referenced purchase order is or is not an executory contract that can be assumed, UniTech will receive written notice thereof and have

61

at least two weeks to file an objection to the proposed assumption and cure amount, and any such dispute shall be promptly calendared for hearing by this Court. In addition, if there is a dispute as to the cure amount, the Debtors shall escrow the full cure amount asserted by UniTech on the Effective Date.

119. As a resolution of the cure objection filed by JAIX Leasing Company ("JAIX") [Docket No. 2974], the Debtors agree that (i) FG's lease with JAIX shall be moved to the schedule of assumed contracts, and (ii) Reorganized FG shall satisfy all obligations under the lease, whether accrued before or after the Petition Date, and including but not limited to the maintenance and repair obligations referenced in the lease, as and when such obligations become due and owing under the terms of the lease.

**CC.** **Committee Provisions.**

120. On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve; *provided, however* that following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications, and any relief related thereto, for compensation by professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) appeals of the Confirmation Order; and (iii) any pending litigation as to which the Committee is a party. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date, except for the limited purposes identified above.

**DD. Environmental Liabilities and Governmental Unit Matters.**

121. Nothing in the Plan or this Order shall release, discharge, or preclude the enforcement of, (or preclude release, defeat, or limit the defense under non-bankruptcy law of): (i) any liability to a Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any liability under Environmental Law to a Governmental Unit on the part of any Entity to the extent of such Entity's liability under non-bankruptcy law on account of its status as owner or operator of such property after the Effective Date; or (iv) any Governmental Unit's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtors or the Reorganized Debtors and such rights and defenses are expressly preserved. All parties' rights and defenses under Environmental Law with respect to (i) through (iv) above are fully preserved. Nor shall anything in the Plan Documents or this Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside of the Bankruptcy Court, any liability described in the preceding sentence. Nothing in the Plan or this Order shall authorize the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization, or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law. Nothing in the Plan or this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Plan or this Order or to adjudicate any defense asserted under the Plan or this Order. Notwithstanding the foregoing, nothing in the Plan or this Order terminates or limits the effect of the *Preliminary Injunction Against the Federal Regulatory Commission*, Case No. 18-50757, Adv. Pro. No. 18-5021 (Bankr. N.D. Ohio, May 11, 2018) [Docket No. 114]. For the sake of clarity, any matter not released or discharged pursuant to the

foregoing can be enforced either by (i) applicable Governmental Units or (ii) any persons or entities authorized to bring actions under enabling statutes.

122.     For the avoidance of doubt, the United States Environmental Protection Agency did not submit a Ballot accepting or rejecting the Plan on account of Claim No. 1377 and, accordingly, is not deemed to have granted the Consensual Third Party Releases set forth in Article VIII.E of the Plan.

**EE.     OVEC Matters.**

123.     The Debtors have agreed that they (i) will not seek to dismiss OVEC's appeals in the PPA Appeal Proceedings, or, if applicable, OVEC's appeal of this Confirmation Order or oppose further review by the United States Supreme Court, on the grounds of mootness[4], and (ii) have removed the following language from the definition of "Assumed Executory Contracts and Unexpired Leases" in the Plan: "For the avoidance of doubt, none of the PPA Appeal Proceeding Contracts shall be deemed to be Assumed Executory Contracts."

124.     The Debtors and OVEC have otherwise reserved all rights in the PPA Appeal Proceedings and in any other proceedings regarding that certain multi-party intercompany power purchase agreement pursuant to which FES and several other power companies "sponsor" and purchase power generated by fossil fuel from OVEC, whether it be at this Court, a regulatory agency or another court or agency of competent jurisdiction.

**FF.     Agreement with Commonwealth of Pennsylvania, Department of Environmental Protection.**

125.     Reorganized FG shall continue to comply with all obligations under the Consent Decrees (as defined in the Plan).

---

[4] For the avoidance of doubt, "mootness" includes the theories of mootness, equitable mootness, or any equivalent legal theory that is premised upon the protection of the good faith reliance interests created by implementation of the Plan from being undone following consummation.

64

126. Reorganized FG will accept all liability for and acknowledge that it must comply with all applicable operation, maintenance, pollution, closure, post-closure maintenance, final cover and other responsibilities under the Solid Waste Management Act and analogous Pennsylvania environmental acts and the Pennsylvania residual waste landfill and impoundment permits Nos. 300370 (Hatfield Ferry Landfill) and 300558 (Little Blue Run Impoundment) from the original issuance of the permits as required under 25 Pa. Code § 287.221(b)(1) including the bonding requirements under 25 Pa. Code §§ 287.361-287.364 and the requirement to obtain re-issued permits Nos. 300370 (Hatfield Ferry Landfill) and 300558 (Little Blue Run Impoundment) to Reorganized Debtors from the Commonwealth of Pennsylvania, Department of Environmental Protection ("PA DEP") under 25 Pa. Code § 287.221.

127. Reorganized FG shall complete all remediation and restoration actions required by Environmental Law to address the violations identified by PA DEP with respect to the ash slide at the Hatfield's Ferry Landfill that occurred on or about February 2019.

128. Within 60 days of the Effective Date, the Reorganized Debtors shall obtain an additional surety bond in favor of PA DEP in the amount of $2 million to secure FG's obligations required under the Consent Order and Agreement dated November 23, 2010 between the PA DEP and FG. The surety bond shall remain in place until the PA DEP determines that FG has completed all obligations under the Consent Order and Agreement.

129. Reorganized FG will use reasonable efforts to remediate the coal pile at the Bruce Mansfield Power Station under a work plan to be developed by Reorganized FG and approved by PA DEP and in accordance with applicable standards established under Pennsylvania Environmental Law within one year of the deactivation of Unit 3 at the Bruce Mansfield Power Station.

130.     On or before the Effective Date, FG shall assume the submerged land licenses dated December 29, 1981 (amended September 15, 2015) and August 4, 1991 (amended November 8, 2016 (the "Mansfield Licenses"); and the PA DEP agrees that cessation of operations of a generating facility at the Bruce Mansfield Power Station shall not, in and of itself, constitute default under the Mansfield Licenses.  PA DEP also agrees that it shall not seek to terminate the Mansfield Licenses for a period of 10 years following the Effective Date other than following a default by FG (other than any alleged default arising from cessation of operation of a generating facility at the site).

131.     Confirmation of the Plan will not impact PA DEP's ongoing oversight and enforcement rights with respect to the Reorganized Debtors under applicable Environmental Law, including, without limitation, with respect to the Consent Decrees identified in the Plan, or any rights or defenses of the Debtors or Reorganized Debtors with respect thereto.

132.     All other provisions of the *Stipulation Resolving Confirmation Objection of Commonwealth of Pennsylvania, Department of Environmental Protection* [Docket No. 3019] are expressly approved and incorporated herein.

**GG.     Agreement with Sierra Club.**

133.     The Reorganized Debtors shall use reasonable best efforts to do one of the following within 60 days following the Effective Date: (a) obtain an additional surety bond reasonably acceptable to Sierra Club in favor of PA DEP in the amount of $5 million to secured Reorganized FG's future obligations under Environmental Law arising from its ownership of the Hatfield's Ferry Landfill and certain surrounding property, and specifically PA DEP solid waste permit No. 300370; or (b) increase the amount of the existing surety bond(s) for the Hatfield's Ferry Landfill and associated permit property (PA DEP solid waste permit no. 300370) by $5

million.  The Debtors will select (a) or (b) after consulting with, and reaching agreement with, PA DEP on the appropriate form of the $5 million in bonding.  In either of the foregoing scenarios, the new/additional bond shall otherwise contain commercially reasonable terms generally consistent with those of the existing bond (including with respect to the duration of the new/additional bond) and with the requirements of the Commonwealth of Pennsylvania for similar surety bonds.

134.    Upon entry by the Bankruptcy Court of the Confirmation Order, the Debtors agree to pay $400,000 (the "Sierra Club Payment") to Goldstein & McClintock LLLP, in its capacity as outside bankruptcy counsel to Sierra Club for a portion of the fees and expenses incurred by Sierra Club and its outside counsel in connection with the Chapter 11 Cases, consistent with the *Motion of Sierra Club for Approval of Fee and Expense Component of Confirmation-Related Settlement* [Docket No. 3041].

135.    All other provisions of the *Stipulation Resolving Confirmation Objection of Sierra Club* [Docket No. 3021] are expressly approved and incorporated herein.

**HH.    Agreements with the U.S. Environmental Protection Agency, the Ohio Environmental Protection Agency and the Ohio Department of Natural Resources.**

136.    *Ashtabula Property*.  Reorganized FG shall either (i) demolish the power plant facility owned by Reorganized FG (the "Ashtabula Property"), restore such property in full compliance with all applicable state and federal environmental laws, rules, and regulations, and use reasonable best efforts to do the foregoing activities within five (5) years of the Effective Date or (ii) sell or transfer the property to a third party purchaser who will demolish the Ashtabula Property, restore such property in full compliance with all applicable state and federal environmental laws, rules, and regulations, and use reasonable best efforts to do the foregoing

67

activities within five (5) years of the Effective Date. Reorganized FG shall demolish the NPDES treatment building and restore the property in full compliance with all state and federal environmental laws, rules, and regulations within one (1) year after discharge treatment is no longer required. Notwithstanding the foregoing, if Reorganized FG sells or transfers the Ashtabula Property to a third party purchaser, and such purchaser agrees to provide financial assurance for the demolition and asbestos abatement costs at such property in the amount of $15 million (or such lesser amount agreed by the third party purchaser and the Ohio Environmental Protection Agency ("Ohio EPA")), the third party purchaser will not be bound by the demolition and restoration deadlines set forth herein.

137. Subject to the immediately preceding sentence, if Reorganized FG sells or transfers the Ashtabula Property to a third party purchaser, the asset purchase agreement shall require the third party purchaser to meet the demolition and restoration obligations set forth in paragraph 136, and provide that Ohio EPA is a third party beneficiary with respect to such obligations. To the extent Reorganized FG sells or transfers the Ashtabula Property following the Effective Date, Reorganized FG shall provide to counsel for the Ohio EPA the following: (i) 60 days' notice of the scheduled closing date of a proposed sale or transfer, (ii) 60 days' notice, or as soon as reasonably practicable thereafter, the name of the prospective purchaser or transferee, and (iii) as soon as reasonably practicable, and in no event later than 20 days prior to the scheduled closing date of a proposed sale or transfer, a copy of the proposed sale or transfer agreement.

138. New Holdco shall provide a guarantee to Reorganized FG with respect to Reorganized FG's obligations under paragraph 136, in the amount of $15 million, and Ohio EPA shall be a third party beneficiary of such guarantee.

139.    *Ashtabula Submerged Land Lease.*  Reorganized FG shall assume the submerged land lease associated with the Ashtabula site (the "Ashtabula SLL") as of the Effective Date, which Ashtabula SLL shall be modified to provide for the following: (i) Reorganized FG shall remove personal property, structures, buildings and fixtures and performance of shore modifications to be set forth in a work plan to be reasonably agreed to between the Debtors and the Ohio Department of Natural Resources ("ODNR"), and to complete such activities within three (3) years of the Effective Date, (ii) Reorganized FG shall remove all other buildings, fixtures, and personal property, except for any piping required for discharge treatment, to be set forth in a work plan to be reasonably agreed between the Debtors and ODNR, and to complete such activities within 7.5 years of the Effective Date, (iii) the Debtors and ODNR shall use their best efforts to agree to a work plan no later than the Effective Date, (iv) access to the Ashtabula SLL property as necessary to perform discharge treatment, (v) removal of any piping and property restoration within one (1) year after discharge treatment is no longer required, and (vi) all demolition, removal, and restoration work shall be in full compliance with all applicable state and federal environmental laws, rules, and regulations.  ODNR agrees to an extension under section 365(d)(4)(B)(ii) of the Bankruptcy Code with respect to the Ashtabula SLL until the Effective Date.

140.    New Holdco shall provide a guarantee to Reorganized FG with respect to Reorganized FG's Ashtabula SLL obligations set forth in paragraph 139 in the amount of $12 million, and ODNR shall be a third party beneficiary of such guarantee.

141.    ODNR, subject to its statutory and regulatory requirements, will consider an assignment of the Ashtabula SLL as set forth in paragraph (7) of the Ashtabula SLL, including, without limitation, consideration of the financial ability, including any provision of financial

assurance, of any proposed assignees of the Ashtabula SLL to perform the demolition, removal, and restoration requirements set forth in paragraph 139, subject to ODNR's approval not being unreasonably withheld or unreasonably conditioned. If the Director of ODNR approves the assignment, the assignee(s) of the Ashtabula SLL shall perform the demolition, removal, and restoration requirements as set forth above in full compliance with the aforesaid plans agreed to between the Debtors and ODNR and all applicable state and federal environmental laws, rules, and regulations within the time periods set forth in paragraph 139.

142. *Lake Shore Submerged Land Lease*. Reorganized FG shall assume the submerged land lease associated with the Lake Shore site (the "Lake Shore SLL") as of the Effective Date, which Lake Shore SLL shall be modified to provide for the following: (i) Reorganized FG shall remove all structures, buildings, fixtures, and personal property, except for the NPDES treatment building, the ash treatment pond, and any piping requirements for discharge treatment, and structures on the shoreline and extending into Lake Erie, to be set forth in a work plan to be reasonably agreed to between the Debtors and ODNR, and to complete such activities within 7.5 years of the Effective Date, (ii) the Debtors and ODNR shall use their best efforts to agree to a work plan no later than the Effective Date, (iii) long term maintenance for the existing shore structures that remain in place, (iv) allow Reorganized FG (or any subsequent transferee of the Lake Shore property) access to the Lake Shore SLL property as necessary to perform discharge treatment, (v) Reorganized FG shall remove the NPDES treatment building, the ash treatment pond, and any piping and property restoration within one year after discharge treatment is no longer required, and (vi) all demolition, removal, and restoration work shall be in full compliance with all applicable state and federal environmental laws, rules, and regulations.

70

ODNR agrees to an extension under section 365(d)(4)(B)(ii) of the Bankruptcy Code with respect to the Lake Shore SLL until the Effective Date.

143. New Holdco shall provide a guarantee to Reorganized FG with respect to Reorganized FG's Lake Shore SLL obligations set forth in paragraph 142 in the amount of $9 million, and ODNR shall be a third party beneficiary of such guarantee.

144. ODNR, subject to its statutory and regulatory requirements, will consider an assignment of the Lake Shore SLL as set forth in paragraph (7) of the Lake Shore SLL, including, without limitation, consideration of the financial ability, including any provision of financial assurance, of any proposed assignees of the Lake Shore SLL to perform the demolition, removal, and restoration requirements set forth in paragraph 142, subject to ODNR's approval not being unreasonably withheld or unreasonably conditioned. If the Director of ODNR approves the assignment, the assignee(s) of the Lake Shore SLL shall perform the demolition, removal, and restoration requirements as set forth above in full compliance with the aforesaid plans agreed to between the Debtors and ODNR and all applicable state and federal environmental laws, rules, and regulations within the time periods set forth in paragraph 142.

145. *Lake Shore Oily Treatment Pond*. Within one year after discharge treatment is no longer required, Reorganized FG shall remove the oily treatment pond on FG's owned property and conduct restoration in full compliance with all applicable state and federal environmental laws, rules, and regulations. New Holdco shall provide a guarantee to Reorganized FG with respect to Reorganized FG's obligations under this paragraph 145 in the amount of $1 million, and Ohio EPA shall be a third party beneficiary of such guarantee.

146. If Reorganized FG sells or transfer the property containing the oily treatment pond (the "Oily Pond Property") to a third party purchaser, the asset purchase agreement shall

require the third party purchaser to meet the removal and restoration deadlines set forth in paragraph 145; *provided*, that if the third party purchaser agrees to provide financial assurance for the removal and restoration of the oily treatment pond in the amount of $1 million (or such lesser amount agreed by the third party purchaser and Ohio EPA), such purchaser will not be bound by the deadline set forth in paragraph 145.

147.    Subject to the proviso in the immediately preceding sentence, if Reorganized FG sells or transfers the Oily Pond Property to a third party purchaser, the asset purchase agreement shall require the third party purchaser to meet the demolition and restoration obligations set forth in paragraph 145, and provide that Ohio EPA is a third party beneficiary with respect to such obligations.  To the extent Reorganized FG sells or transfers the Oily Pond Property following the Effective Date, Reorganized FG shall provide to counsel for the Ohio EPA the following: (i) 60 days' notice of the scheduled closing date of a proposed sale or transfer, (ii) 60 days' notice, or as soon as reasonably practicable thereafter, the name of the prospective purchaser or transferee, and (iii) as soon as reasonably practicable, and in no event later than 20 days prior to the scheduled closing date of a proposed sale or transfer, a copy of the proposed sale or transfer agreement.

148.    *Sammis Power Plant*.  New Holdco shall provide a guarantee to Reorganized FG with respect to Reorganized FG's obligations for CCR pond closure, tank and treatment system decommissioning and coal pile decommissioning at the W.H. Sammis site, in the amount of $2.2 million, and Ohio EPA and the United States Environmental Protection Agency ("US EPA") shall be third party beneficiaries of such guarantee.

149.    To the extent Reorganized FG reissues deactivation notices for Sammis Units 5-7, Reorganized FG shall demolish the power plant facility, restore the property in full compliance

with all applicable state and federal environmental laws, rules, and regulations and use reasonable best efforts to do such activities within five (5) years of deactivation of the units.

150.     New Holdco shall provide guarantees to Reorganized FG with respect to Reorganized FG's obligations set forth in paragraph 149, as follows: (i) a guarantee in the amount of $14.75 million for environmental obligations, and (ii) a guarantee solely with respect to the costs of demolition work (which, for the avoidance of doubt, does not include environmental obligations, including any asbestos abatement and removal costs or the costs to comply with applicable state and federal environmental laws, rules and regulations), which guarantee shall not be limited in amount.   Ohio EPA and US EPA shall be third party beneficiaries of such guarantees.

151.     *Hollow Rock Landfill.*  The Reorganized Debtors shall comply with Ohio Adm. Code 3745-37-06 and any other applicable Ohio rule for the transfer of the residual waste landfill permit, license, and financial assurance.

152.     The Debtors, Ohio EPA, ODNR and US EPA shall negotiate the form of the guarantees, in form and substance reasonably acceptable to each party, and file such forms of guarantee on the Court docket within 45 days of entry of the Confirmation Order.  To the extent these parties are unable to reasonably agree to the form of guarantees within that time period, the Parties may file a motion or application with the Court to resolve any disputes.

153.     All work under the *Stipulation Resolving Confirmation Objection of Environmental Agencies* [Docket No. 3045] (the "Environmental Agencies Stipulation") shall be in compliance with applicable environmental laws and regulations.

154.     With respect to the guarantees by New Holdco referenced in the Environmental Agencies Stipulation, as incorporated into this Confirmation Order, such guarantees shall not

73

limit Reorganized FG's obligations as set forth in the Environmental Agencies Stipulation, as incorporated into this Confirmation Order.

155.    All other provisions of the Environmental Agencies Stipulation are approved and incorporated herein.

**II.    Notice of Subsequent Pleadings.**

156.    Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings filed by the Plan Administrator, the Reorganized Debtors, or any other party in the Chapter 11 Cases after the Effective Date will be limited to the following parties: (i) the U.S. Trustee; (ii) counsel to the Ad Hoc Noteholder Group; (iii) counsel to the Mansfield Certificateholders Group; (iv) counsel to the FES Creditor Group; (v) counsel to the Mansfield Owner Participant; (vi) counsel to the Consenting Owner Trustee; (vii) counsel to the Committee, to the extent it has not been dissolved; and (viii) any party known to be directly affected by the relief sought by such pleadings.

**JJ.    Supplementation of the Voting Declaration.**

157.    On or prior to the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall filed a supplemental Voting Declaration (the "Supplemental Voting Declaration") which shall include the names of any and all creditors who submitted Ballots voting to accept the Plan.  The Debtors or the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to include on the Supplemental Voting Declaration the names of any and all creditors who were deemed to accept the Plan.  For the avoidance of doubt, the failure to include any creditor on the Supplement Voting Declaration shall not preclude any of the Released Parties from subsequently asserting or presenting evidence that a creditor either (i) voted to accept the Plan or (ii) was deemed to have accepted the Plan, and, accordingly that such

74

creditor should be deemed to have granted the Consensual Third Party Releases as set forth in the Plan.

**KK.  FE Settlement Agreement.**

158.    Nothing herein shall or shall be deemed to limit or impair any relief granted to, or rights of, any FE Non-Debtor Party pursuant to the FE Settlement Agreement, the FE Settlement Order or any ancillary documents thereof, as each were modified by the Consent and Waiver Order.

**LL.  Reports.**

159.    After the Effective Date, the Debtors have no obligation to file with the Court or serve on any parties reports that the Debtors were obligated to file under the Bankruptcy Code or a Court order, including monthly operating reports (except that the Debtors shall file monthly operating reports for any periods for which a monthly operating report was not filed prior to the Effective Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided, however*, that the Debtors will continue to comply with the U.S. Trustee's quarterly reporting requirements.

**MM.  Injunctions and Automatic Stay.**

160.    Unless otherwise provided in or this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date. From and after the Effective Date, the stay shall remain in full force and effect with respect to any pending action or proceeding where the basis for the pending action or proceeding occurred prior to the Petition Date, the non-Debtor party or parties to the pending action or proceeding

received such notice of the Bar Date, and the non-Debtor party or parties failed to timely File a Proof of Claim, until such time as the applicable Debtor party or parties is dismissed from the pending action or proceeding. All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

**NN.    Conflicts.**

161.    Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any agreement or order (other than this Order and the FE Settlement Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing) conflict with or are in any way inconsistent with any provision of the Plan or the FE Settlement Agreement, the Plan or the FE Settlement Order, as applicable, shall govern and control; *provided, however*, with respect to any conflict or inconsistency between the Plan and this Order or the FE Settlement Order, this Order or the FE Settlement Order, as applicable, shall govern.

**OO.    Retention of Jurisdiction.**

162.    This Court retains jurisdiction over the matters set forth in Article XI and other applicable provisions of the Plan.

**PP.    Final Order**

163.    This Order is a Final Order and the period in which a notice of appeal must be Filed will commence upon entry of this Order.

# # #

SUBMITTED BY:

*/s/ Bridget A. Franklin*

**BROUSE MCDOWELL LPA**
Marc B. Merklin (0018195)
Kate M. Bradley (0074206)
Bridget A. Franklin (0083987)
388 South Main Street, Suite 500
Akron, OH 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
mmerklin@brouse.com
kbradley@brouse.com
bfranklin@brouse.com

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
bkahn@akingump.com

- and -

Scott Alberino (admitted *pro hac vice*)
Kate Doorley (admitted *pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
salberino@akingump.com
kdoorley@akingump.com

*Counsel for Debtors*
*and Debtors in Possession*

## **Exhibit A**

Eighth Amended Joint Plan of Reorganization

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| FIRSTENERGY SOLUTIONS CORP., *et al.*,[1] | ) Case No. 18-50757 |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) Hon. Judge Alan M. Koschik |
|  | ) |

## EIGHTH AMENDED JOINT PLAN OF REORGANIZATION OF FIRSTENERGY SOLUTIONS CORP., *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186); and Norton Energy Storage L.L.C. (6928), case no. 18-50764. The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

**TABLE OF CONTENTS**

**ARTICLE I.** DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME, AND GOVERNING LAW ........................................................................................ 1
   A.    Defined Terms. ........................................................................................................ 1
   B.    Rules of Interpretation. ......................................................................................... 32
   C.    Computation of Time. ........................................................................................... 33
   D.    Governing Law. ..................................................................................................... 33
   E.    References to Monetary Figures. ........................................................................... 34

**ARTICLE II.** ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ........................ 34
   A.    Administrative Claims. ......................................................................................... 34
        1.    General Administrative Claims. ............................................................... 34
        2.    Postpetition Inter-Debtor Claims. ............................................................ 35
        3.    Professional Compensation. ..................................................................... 35
   B.    Priority Tax Claims. .............................................................................................. 36

**ARTICLE III.** CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................. 36
   A.    Classification of Claims and Interests. ................................................................. 36
   B.    Treatment of Claims and Interests. ....................................................................... 40
   C.    Special Provision Governing Unimpaired Claims. ............................................... 66
   D.    Elimination of Vacant Classes. ............................................................................ 66
   E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code. ..................................................................................................................... 66
   F.    Controversy Concerning Impairment. ................................................................... 66
   G.    Equity Election Conditions. .................................................................................. 66

**ARTICLE IV.** MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 67
   A.    Plan Settlement. .................................................................................................... 67
        1.    FE Settlement Agreement. ........................................................................ 68
        2.    Allocation of FE Settlement Consideration Among the Estates. .............. 68
        3.    Allocation of FE/FES Revolver Proceeds. ............................................... 68
        4.    Allocation of Proceeds from Sales of the Bay Shore Power Plant, West
            Lorain Power Plant and the RE Burger Power Plant. ............................... 68
        5.    Allocation of Administrative Expense Claims and Distributable Value
            Adjustment Amount. ................................................................................ 69
        6.    Inter-Debtor Claims. ................................................................................ 70
        7.    Settlement of Valuation of the Debtors' Estates and Allocation of Value
            Among the Debtors' Creditors. ................................................................. 70
   B.    Restructuring Transactions. ................................................................................... 71
        1.    Restructuring Transactions, Generally. .................................................... 71
        2.    Implementation of FE Settlement Agreement. ......................................... 71
        3.    Implementation of Mansfield Settlement. ................................................ 72
        4.    Implementation of Mansfield Owner Parties' Settlement. ........................ 74
        5.    Issuance and Distribution of New Common Stock. .................................. 75
        6.    Effective Date Cash Distribution. ............................................................ 76
        7.    Unsecured Bondholder Cash Pool. .......................................................... 76
        8.    Dissolution and Liquidation of Certain Debtor Entities. .......................... 76
   C.    Sources of Consideration for Plan Distributions. .................................................. 77
        1.    Cash on Hand at the Debtors. ................................................................... 77

|  | 2. | New Common Stock. | 77 |
|  | 3. | FE Settlement Value. | 77 |
| D. | | Corporate Existence. | 77 |
| E. | | Vesting of Assets in Reorganized Debtors. | 78 |
| F. | | Transfer of FES Assets to New Holdco. | 78 |
| G. | | Cancellation of Existing Securities and Agreements. | 78 |
| H. | | Corporate Action/Name Change. | 79 |
| I. | | FERC Approvals. | 79 |
| J. | | New Organizational Documents. | 80 |
| K. | | Directors and Officers of the Reorganized Debtors. | 80 |
| L. | | Section 1146 Exemption. | 80 |
| M. | | Director, Officer, Manager, and Employee Liability Insurance. | 81 |
| N. | | Management Incentive Plan. | 81 |
| O. | | Employee Obligations and Management Employment Contracts. | 81 |
| P. | | Transition Working Group Management Agreement. | 81 |
| Q. | | Preservation of Causes of Action. | 82 |
| R. | | Payment of Certain Fees. | 82 |
| S. | | Plan Administrator. | 83 |
|  | 1. | Appointment. | 83 |
|  | 2. | Authority. | 83 |
|  | 3. | Indemnification of Plan Administrator. | 84 |
| T. | | Environmental Matters | 84 |

**ARTICLE V.** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 84
| A. | | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 84 |
| B. | | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 85 |
| C. | | Cure of Defaults for Assumed Executory Contracts or Unexpired Leases. | 86 |
| D. | | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. | 86 |
| E. | | Indemnification Obligations. | 86 |
| F. | | Collective Bargaining Agreement. | 87 |
| G. | | Insurance Policies. | 87 |
| H. | | Surety Bonds. | 87 |
| I. | | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 88 |
| J. | | Reservation of Rights. | 88 |
| K. | | Nonoccurrence of the Effective Date. | 89 |
| L. | | Contracts and Leases Entered Into After the Petition Date. | 89 |

**ARTICLE VI.** PROVISIONS GOVERNING DISTRIBUTIONS ... 89
| A. | | Timing and Calculation of Amounts to be Distributed. | 89 |
| B. | | Disbursing Agent. | 89 |
| C. | | Rights and Powers of Disbursing Agent. | 89 |
|  | 1. | Powers of the Disbursing Agent. | 89 |
|  | 2. | Expenses Incurred On or After the Effective Date. | 90 |
| D. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 90 |
|  | 1. | Record Date for Distributions. | 90 |
|  | 2. | Delivery of Distributions. | 90 |
|  | 3. | No Fractional Distributions. | 90 |
|  | 4. | Minimum Distribution. | 90 |
|  | 5. | Undeliverable Distributions and Unclaimed Property. | 91 |
|  | 6. | Allocation of Distributions. | 91 |
| E. | | Manner of Payment. | 91 |

F.      SEC Registration/Exemption. ...................................................................... 91
G.     Compliance with Tax Requirements. ............................................................ 92
H.     No Postpetition or Default Interest on Claims. ........................................... 93
I.      Setoffs and Recoupment. .............................................................................. 93
J.      Distributions on Account of Obligations of Multiple Debtors. .................... 93
K.     Claims Paid or Payable by Third Parties. .................................................... 93
        1.     Claims Paid by Third Parties. .......................................................... 93
        2.     Claims Payable by Third Parties. ..................................................... 93
        3.     Applicability of Insurance Policies. ................................................. 94

**ARTICLE VII.** PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
      DISPUTED CLAIMS ................................................................................................. 94
A.     Allowance of Claims. ................................................................................... 94
B.     Claims Administration Responsibilities. ...................................................... 94
C.     Estimation of Claims. ................................................................................... 94
D.     Adjustment to Claims or Interests without Objection. .................................. 95
E.     Time to File Objections to Claims or Interests. ........................................... 95
F.      Disputed Claims Reserve. ............................................................................ 95
G.     Disallowance of Claims. ............................................................................... 96
H.     Amendments to Proofs of Claim or Interest. ............................................... 97
I.      Reimbursement or Contribution. .................................................................. 97
J.      No Distributions Pending Allowance. .......................................................... 97
K.     Distributions After Allowance. ..................................................................... 97

**ARTICLE VIII.** SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........... 97
A.     Discharge of Claims and Termination of Interests. ...................................... 97
B.     Release of Liens. .......................................................................................... 98
C.     Releases by the Debtors. ............................................................................... 98
D.     Party Releases of the FE Non-Debtor Parties by the Consenting Creditors and the
        Committee. ..................................................................................................... 99
E.     Releases of the Debtor Released Parties, FE Non-Debtor Released Parties and
        Other Released Parties by Third Parties and Holders or Claims or Interests. ................. 100
F.      Exculpation. ................................................................................................ 102
G.     Injunction. ................................................................................................... 102
H.     PBGC. ......................................................................................................... 103
I.      Environmental Liabilities. ........................................................................... 103
J.      Protections Against Discriminatory Treatment. ......................................... 104
K.     Recoupment. ................................................................................................ 104
L.      Document Retention. .................................................................................. 104

**ARTICLE IX.** CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
      OF THE PLAN ......................................................................................................... 104
A.     Conditions Precedent to Confirmation of a Plan. ........................................ 104
B.     Conditions Precedent to the Effective Date. ............................................... 105
C.     Waiver of Conditions. ................................................................................. 106
D.     Effect of Failure of Conditions. .................................................................. 106

**ARTICLE X.** MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ................. 107
A.     Modification and Amendments. ................................................................... 107
B.     Effect of Confirmation on Modifications. ................................................... 107
C.     Revocation or Withdrawal of Plan. ............................................................ 107
        1.     Revocation or Withdrawal of the Plan. .......................................... 107
        2.     Consequence of Withdrawal of the Plan. ....................................... 107

18-50757-amk    Doc 3283    FILED 10/16/19    ENTERED 10/16/19 16:08:09    Page 82 of 299

**ARTICLE XI.** RETENTION OF JURISDICTION ............................................................ 108

**ARTICLE XII.** MISCELLANEOUS PROVISIONS ............................................................ 110

    A.    Immediate Binding Effect. .............................................................. 110

    B.    Additional Documents. .................................................................. 110

    C.    Payment of Statutory Fees. ............................................................ 110

    D.    Statutory Committee and Cessation of Fee and Expense Payment. ................ 110

    E.    Substantial Consummation. ............................................................ 111

    F.    Reservation of Rights. ................................................................... 111

    G.    Successors and Assigns. ................................................................ 111

    H.    Notices. .................................................................................... 111

    I.    Term of Injunctions or Stays. ......................................................... 113

    J.    Entire Agreement. ....................................................................... 114

    K.    Exhibits. ................................................................................... 114

    L.    Nonseverability of Plan Provisions. .................................................. 114

    M.    Votes Solicited in Good Faith. ........................................................ 114

    N.    Waiver or Estoppel. ..................................................................... 114

    O.    Conflicts. .................................................................................. 115

18-50757-amk    Doc 3238    FILED 10/16/19    ENTERED 10/16/19 16:08:09    Page 83 of 299

# INTRODUCTION

The Debtors propose this eighth amended joint plan of reorganization (the "<u>Plan</u>") for the resolution of the outstanding claims against, and interests in, the Debtors pursuant to the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I.A of the Plan. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, events during the Chapter 11 Cases, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Accordingly, the Plan constitutes a separate plan of reorganization for each of the Debtors.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "<u>503(b)(9) Claim</u>" means a Claim or any portion thereof entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

2.      "<u>Ad Hoc Noteholders Group</u>" means the ad hoc group of certain Holders of (i) pollution control revenue bonds supported by PCNs issued by FG and NG and (ii) the FES Notes in each case that are signatories to the Restructuring Support Agreement (and any such Holder that may become, in accordance with Section 6 of the Restructuring Support Agreement, a signatory thereto) represented by Kramer Levin Naftalis & Frankel LLP and GLC Advisors & Co.

3.      "<u>Administrative Claim</u>" means a Claim for costs and expenses of administration of the Estates under sections 503(b) (including 503(b)(9) Claims), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the applicable Estates and operating the businesses of the Debtors; (ii) Allowed Professional Fee Claims; and (iii) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

4.      "<u>Administrative Claims Bar Date</u>" means the deadline for Filing requests for payment of Administrative Claims, other than Professional Fee Claims, any obligations arising in the ordinary course of the Debtors' business with respect to post-petition accounts payable which by their terms become due and owing after the Effective Date, and any post-petition obligations owed to employees, former employees, and retirees of the Debtors, which deadline shall be 30 days after the Effective Date.

5.      "<u>AE Supply</u>" means Allegheny Energy Supply Company LLC, an FE Non-Debtor Party.

6. "**AE Supply/FES Note**" means that certain Revolving Credit Note, dated June 29, 2016, by and among FES, as borrower, and AE Supply, as lender, as amended.

7. "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code, except that for the avoidance of doubt, unless specifically articulated in this Plan, no FE Non-Debtor Party will be considered an Affiliate of any Debtor. With respect to any Person that is not a Debtor (other than any FE Non-Debtor Party), the term "Affiliate" shall apply to such person as if the Person were a Debtor.

8. "**Allocated Administrative Expense**" means those Estimated Administrative Expenses that were allocated among the Debtor entities in accordance with the Plan Settlement.

9. "**Allowed**" means with respect to any Claim or Interest, except as otherwise provided herein: (i) a Claim or Interest as to which no objection has been Filed prior to the Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Final Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (ii) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (iii) a Claim or Interest that is upheld or otherwise allowed (a) pursuant to the Plan, (b) in any stipulation that is approved by the Bankruptcy Court, or (c) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided, however*, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed" under the Plan; *provided further, however*, that unless otherwise expressly specified in the Plan, the Consummation and the occurrence of the Effective Date is not intended to impair the right of any Holder or any of the Indenture Trustees to prosecute and appeal from, or otherwise petition for review of, any order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) disallowing any Claim; *provided, further*, for the avoidance of doubt, all parties reserve all rights in connection with any such appeal or petition, including (i) the right of any party to move for the dismissal of any such appeal or petition on grounds of equitable mootness or any other prudential basis and (ii) the right of any Holder or any of the Indenture Trustees to oppose any such appeal or petition on any grounds, including on grounds that the relief sought in the appeal or petition is contemplated by or provided for under the Plan. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

10. "**Assets**" means, with respect to any Debtor, all of such Debtors' right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code. For the avoidance of doubt, with respect to any Debtor, all of such Debtor's rights and benefits under any license, permit, or other governmental or quasi-governmental undertaking or action shall constitute an interest in property.

11. "**Assigned Contract or Unexpired Lease**" means any contracts or leases entered into following the Petition Date to be assigned by FES to New Holdco, as reflected in the Plan Supplement and as may be further amended or modified by inclusion in the Plan Supplement.

12. "**Assumed Executory Contract or Unexpired Lease**" means any Executory Contracts or Unexpired Leases to be assumed by a Debtor (with proposed cure amounts) as reflected in the Plan Supplement and as may be further amended or modified by inclusion in the Plan Supplement, and any

Executory Contracts and Unexpired Leases previously assumed by a Debtor by an order of the Bankruptcy Court.

13. "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

14. "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Ohio having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Northern District of Ohio.

15. "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

16. "<u>Bar Date</u>" means the applicable date established by the Bankruptcy Court by which respective Proofs of Claim and Interests must be filed.

17. "<u>BCIDA</u>" means the Beaver County Industrial Development Authority.

18. "<u>Business Day</u>" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19. "<u>Cash</u>" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the U.S., less the amount of any outstanding checks or transfers at such time.

20. "<u>Causes of Action</u>" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, in contract, tort, law, equity, or otherwise. Causes of Action also include: (i) all rights of setoff, counterclaims, or recoupment and claims under contracts or for breaches of duties imposed by law; (ii) the right to object to or otherwise contest Claims or Interests; (iii) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (iv) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

21. "<u>Chapter 11 Cases</u>" means, collectively: (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

22. "<u>Claim</u>" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

23. "<u>Claims and Noticing Agent</u>" means Prime Clerk LLC, retained as the Debtors' notice and claims agent pursuant to the Order Authorizing Retention and Appointment of Prime Clerk LLC as Claims, Noticing and Solicitation Agent Nunc Pro Tunc to the Petition Date [Docket No. 152].

24.     "Claims Objection Deadline" means the later of: (i) the date that is 240 days after the Effective Date; and (ii) such other date as may be fixed by the Bankruptcy Court, after notice and hearing, upon a motion Filed before the expiration of the deadline to object to Claims or Interests.

25.     "Claims Register" means the official register of Claims maintained by the Claims and Noticing Agent.

26.     "Class" means a category of Claims or Interests as set forth in Article III of the Plan.

27.     "CM/ECF" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

28.     "COBRA" means Section 4980B of the Internal Revenue Code and Part 6 of Subtitle B of Title 1 of the Employee Retirement Income Security Act of 1974.

29.     "COBRA Costs" means any costs (other than any indirect costs relating to human resources management services) borne by the FE Non-Debtor Parties for compliance with COBRA under any group health plan of the FE Non-Debtor Parties related to a Debtors' Current Employee or a Debtors' Former Employee or a dependent of any such person.

30.     "Committee" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on April 11, 2018, the membership of which may be reconstituted from time to time.

31.     "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions precedent to Confirmation set forth in Article IX of the Plan.

32.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021, subject to the conditions precedent to Confirmation set forth in Article IX of the Plan.

33.     "Confirmation Hearing" means the one or more hearings held by the Bankruptcy Court to consider Confirmation of the Plan as to one or more Debtors pursuant to section 1129 of the Bankruptcy Code.

34.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan with respect to the Debtors pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Debtors, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement), the Requisite Supporting Parties, the Mansfield Owner Parties (solely to the extent provided for in the Restructuring Support Agreement) and the Committee.

35.     "Consensual Third Party Releases" means the releases provided to the Debtor Released Parties, the Other Released Parties and the FE Non-Debtor Released Parties set forth in Article VIII.E of the Plan.

36.     "Consent and Waiver" means that certain Consent and Waiver Agreement between the Debtors and the FE Non-Debtor Parties entered into as of April 18, 2019.

37.     "Consent and Waiver Order" means the order of the Bankruptcy Court dated May [__], 2019, approving the Consent and Waiver.

4

38. "Consent Decrees" means collectively, the (i) consent decree between FG and the Commonwealth of Pennsylvania Department of Environmental Protection with respect to a solid waste disposal impoundment known as "Little Blue Run" which consent decree was entered into on December 14, 2012; (ii) the consent adjudication between FG and the Sierra Club and Pennsylvania Department of Environmental Protection with respect to a solid waste disposal site known as "Hatfield's Ferry" which was entered into on September 11, 2017; (iii) consent order and agreement between FG and the Commonwealth of Pennsylvania Department of Environmental Protection with respect to on-going groundwater abatement at the Mansfield Plant which was entered into on November 23, 2010; (iv) consent order and agreement between FG and the Pennsylvania Department of Environmental Protection with respect to the air emissions and certain emission limits from the Mansfield Plant which was entered into on September 21, 2017; and (v) any other consent decree entered into by the Debtors.

39. "Consenting Creditors" has the meaning ascribed to such term in the Restructuring Support Agreement.

40. "Consenting Owner Participant" means MetLife (in its capacity as Mansfield Owner Participant of the respective Mansfield 2007 Trusts A-E).

41. "Consenting Owner Trustee" means (i) collectively, Mansfield 2007 Trusts A-E, represented in each case by U.S. Bank (in its capacity as owner trustee for each such trust) and (ii) as applicable, U.S. Bank in its individual capacity and/or its capacity as owner trustee for Mansfield 2007 Trusts A-E.

42. "Consummation" means the occurrence of the Effective Date.

43. "Convenience Claim" means a General Unsecured Claim that is either (i) in an amount that is equal to or less than $1,000,000 or (ii) in an amount that is greater than $1,000,000, but with respect to which the Holder of such General Unsecured Claim voluntarily and irrevocably reduces the aggregate amount of such Claim to $1,000,000 or less pursuant to a valid election by the Holder of such General Unsecured Claim made on its Ballot on or before the Plan Voting Deadline.

44. "Cure Claim" means a Claim based upon the Debtors' monetary defaults under any Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

45. "Debtor" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in its respective Chapter 11 Case.

46. "Debtor Released Parties" means each of the Debtors and the Reorganized Debtors and, with respect to the Debtors, their current and former Affiliates (other than the FE Non-Debtor Parties), and the Debtors' and their current and former Affiliates' (other than the FE Non-Debtor Parties) current and former directors, managers (including all Independent Directors and Managers), officers, predecessors, successors and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

47. "Debtor Releases" means the release set forth in Article VIII.C.

48. "Debtors" means, collectively, FES, FG, NG, FENOC, FGMUC, FE Aircraft and Norton.

5

49. "Debtors' Current Employees" means, collectively, any employee that is assigned to a Debtor company code in the SAP System of Record as of the Effective Date. For the avoidance of doubt, no employee that is assigned to an FE Non-Debtor Party's company code in the SAP System of Record as of the Effective Date shall be considered a Debtors' Current Employee.

50. "Debtors' Former Employees" means, collectively, any former employee that was assigned to a Debtor company code in the SAP System of Record prior to but not as of the Effective Date, *provided, however*, that a person shall not be considered a Debtors' Former Employee if, as of the Effective Date, he or she is assigned to a Debtor or FE Non-Debtor company code in the SAP System of Record, and, *provided, further, however*, that a person shall only be a Debtors' Former Employee if prior to the Effective Date his or her last assignment of company code in the SAP System of Record was with a Debtor.

51. "Debtors' Incentive and Retention Plans" means the 2019 FES Short-Term Incentive Plan, the 2019 FENOC Short-Term Incentive Plan, the 2019 FES Annual Incentive Plan, the 2019 FENOC Annual Incentive Plan, the 2018 FENOC Key Employee Retention Plan as approved by the Bankruptcy Court [Docket No. 1782] and any other employee retention plans approved by the Bankruptcy Court prior to the Effective Date.

52. "Debtors' Retirees" means, collectively, any of the Debtors' Former Employees who, as of the effective date under the FE Settlement Agreement, have terminated employment from a Debtor after satisfying the age and service requirements for retirement under the applicable employee benefit plan.

53. "Deferred Compensation Claims" means claims related to the participation of the Debtors' Current Employees and the Debtors' Former Employees in the Deferred Compensation Plans.

54. "Deferred Compensation Plans" means, collectively, the (i) FirstEnergy Corp. Amended and Restated Executive Deferred Compensation Plan, effective as of November 1, 2015 (including with respect to the supplemental pension benefit set forth therein, *i.e.*, the non-qualified pension benefit); (ii) FirstEnergy Corp. Supplemental Executive Retirement Plan, amended and restated as of January 1, 2005 and further amended December 31, 2010, as amended by Amendment No. 1 effective as of January 1, 2012; and (iii) FirstEnergy Corp. Cash Balance Restoration Plan, effective as of January 1, 2014.

55. "Disbursing Agent" means the Plan Administrator; *provided, however* that the Indenture Trustees shall serve as the Disbursing Agent for Holders of the Unsecured PCN Claims, FES Notes Claims and Mansfield Certificate Claims, as applicable.

56. "Disclosure Statement" means the *Disclosure Statement for the Fifth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated May 30, 2019 [Docket No. 2721], including all exhibits and schedules thereto, as approved pursuant to the Disclosure Statement Order.

57. "Disclosure Statement Order" means the *Order (a) Approving the Disclosure Statement, (b) Establishing the Voting Record Date, Voting Deadline and Other Dates, (c) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan, and (d) Approving the Manner and Forms of Notice and Other Related Documents* [Docket No. 2714].

58. "Disputed" means with regard to any Claim or Interest, a Claim or Interest that is not Allowed.

59. "Disputed Claims Reserve" means a reserve consisting of Cash in an amount determined by the Debtors, in consultation with the Requisite Supporting Parties and the Committee, unless otherwise ordered by the Bankruptcy Court, reserved for distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date.

60. "Distributable Value" means (i) with respect to FENOC, the FENOC Distributable Value, (ii) with respect to FES, the FES Distributable Value, (iii) with respect to FG, the FG Distributable Value, (iv) with respect to FGMUC, the FGMUC Distributable Value, and (v) with respect to NG, the NG Distributable Value.

61. "Distributable Value Adjustment Amount" means, with respect to each Class of General Unsecured Claims and Unsecured Bondholder Claims (other than any Classes of Inter-Debtor Claims or Convenience Claims), its share, based on the respective Distributable Value Splits for such Class, of the amount equal to (i) the difference between, on the one hand, (a) the aggregate value of the actual amount of Cash on the Effective Date other than the proceeds from the FE/FES Revolver as of the Effective Date and cash held in escrow account numbers xxxxxxx0085 and xxxxxxx8799 and (b) the aggregate value of the projected amount of Cash as of the Effective Date other than the proceeds from the FE/FES Revolver as of the Effective Date and cash held in escrow account numbers xxxxxxx0085 and xxxxxxx8799, incorporated into Exhibit A to the Plan Term Sheet, on the other hand, whether positive or negative and (ii) the difference between (a) the aggregate estimated Allowed amount of Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims on the Effective Date as estimated on the Effective Date, on the one hand and, (b) the aggregate Estimated Administrative Expenses, on the other hand, whether positive or negative.

62. "Distributable Value Split" means, with respect to each Class of General Unsecured Claims and Unsecured Bondholder Claims (other than any Classes of Inter-Debtor Claims or Convenience Claims), the ratable share of the aggregate Unsecured Distributable Value, after taking into account adjustments for the reallocation of the Reallocation Pool, the NG Reallocation Pool, and the FENOC/FES Claims Reallocation, as applicable, available for distribution to Holders of Allowed Claims of that particular Class, which shall be as set forth on **Exhibit A** to the Plan, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

63. "Distribution" means any initial or periodic payment or transfer of consideration to holders of Allowed Claims made under this Plan.

64. "Distribution Date" means the Initial Distribution Date and any Periodic Distribution Date thereafter.

65. "Distribution Record Date" means other than with respect to any publicly-held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be seven days prior to the Effective Date.

66. "DTC" means the Depository Trust Company.

67. "Effective Date" means the Business Day upon which all of the conditions to Consummation of the Plan as set forth in Article IX.B have been satisfied or waived as provided in Article IX.C of the Plan, and is the date on which the Plan becomes effective.

7

68. "Effective Date Cash Distribution" means an amount of cash that may be determined prior to the Effective Date by the Requisite Supporting Parties and the Debtors, in consultation with the Committee, to be distributed to all Holders of Unsecured Claims that are to receive New Common Stock under the Plan, as described in Article IV.B.5 of the Plan.

69. "Electing Bondholder" means a Holder of an Allowed Unsecured Bondholder Claim who has opted to elect to receive, in lieu of New Common Stock, all or a portion of its recovery in Cash based upon its Pro Rata portion of the Unsecured Bondholder Cash Pool.

70. "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

71. "Environmental Law" means all federal, state, and local statutes, regulations, ordinances and similar provisions having the force or effect of law concerning pollution or protection of the environment, or environmental impacts on human health and safety, including, without limitation, the Atomic Energy Act; the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right-to-Know Act; the Federal Insecticide, Fungicide, and Rodenticide Act; the Nuclear Waste Policy Act; the Resource Conservation and Recovery Act; the Safe Drinking Water Act; the Surface Mining Control and Reclamation Act; the Toxic Substances Control Act; and any state or local equivalents.

72. "Equity Election Conditions" means the conditions set forth in Article III.G.

73. "Equity Election Record Date" means January 23, 2019 or such later date as may be agreed to by the Debtors with the consent of the Requisite Supporting Parties and the Committee.

74. "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 as amended, and the regulations promulgated thereunder.

75. "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

76. "Estate Fiduciaries" means (i) the Debtors, (ii) the Committee, (iii) each member of the Committee, in its capacity as such, and (iv) each of the foregoing Entities' current and former Affiliates and members, and such Entities' and their current and former Affiliates' current and former directors, managers (including all Independent Directors and Managers), officers, predecessors, successors, and assigns, subsidiaries, managed/advised funds or accounts, and each of their respective officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

77. "Estimated Administrative Expenses" means the aggregate estimated amount as of the Effective Date of Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims with respect to each Debtor, which amount was estimated for the purposes of the Plan Settlement and is equal to $216,905,308.

78. "Exculpated Parties" means, collectively, and in each case in its capacity as such: (i) the Debtors; (ii) the FE Non-Debtor Parties; (iii) the Indenture Trustees; (iv) the Consenting Creditors; (v) the Committee and each of its members, in their capacities as such; (vi) the FE Owner Trustee; and (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), such Entity and its current and former Affiliates and members, and such Entities' and their current and former Affiliates' current and former directors, managers (including all Independent Directors and Managers), officers, equity holders

8

(regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed/advised funds or accounts, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

79.     "<u>Executory Contract</u>" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

80.     "<u>FE Aircraft</u>" means Debtor FE Aircraft Leasing Corp.

81.     "<u>FE Aircraft Cash Distribution Pool</u>" means, to the extent there are any General Unsecured Claims Against FE Aircraft, Cash in the amount of $19,900,000.

82.     "<u>FE Consolidated Tax Group</u>" means, until the tax year immediately following the Effective date, the FE Non-Debtor Parties and the Debtors, collectively.

83.     "<u>FE Corp.</u>" means FirstEnergy Corp., an FE Non-Debtor Party and the ultimate parent of each of the Debtors.

84.     "<u>FE Non-Debtor Parties</u>" means, collectively, the Debtors' non-Debtor Affiliates, including FE Corp, as listed on **Exhibit C** attached to the Plan.

85.     "<u>FE Non-Debtor Released Parties</u>" means, collectively, the FE Non-Debtor Parties and each of their respective current and former officers, directors, members, shareholders, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members and professionals), each solely in their capacity as such.

86.      "<u>FE Owner Parties</u>" means, collectively, FE Corp. (in its capacity as Mansfield Owner Participant of Mansfield 2007 Trust F) and the FE Owner Trustee.

87.     "<u>FE Owner Trustee</u>" means (i) Mansfield 2007 Trust F, represented in each case by U.S. Bank in its capacity as owner trustee for such trust, and (ii) where applicable, U.S. Bank in its individual capacity and in its capacity as owner trustee for Mansfield 2007 Trust F.

88.     "<u>FE Postpetition Agreements</u>" means (i) the Amended and Restated Service Agreement dated as of September 27, 2018 by and among FESC, FES on behalf of itself and its direct and indirect subsidiaries, (ii) the Separation Agreement dated as of September 27, 2018 by and among the Debtors, FE Corp., FESC and Ohio Edison Company, (iii) the Information Technology Separation Agreement dated as of November 16, 2018 by and among the Debtors, FE Corp. and FESC, (iv) the Pleasants Purchase Agreement, (v) the Tax Matters Agreement and (vi) any agreed upon amendments to (i) through (v).

89.     "<u>FE Settlement Agreement</u>" means the Settlement Agreement dated as of August 26, 2018, by and among (i) the Debtors, (ii) the FE Non-Debtor Parties, (iii) the Ad Hoc Noteholder Group, (iv) the Mansfield Certificateholders Group, and (v) the Committee and approved by the FE Settlement Order, subject to the Consent and Waiver and the Consent and Waiver Order. A copy of the FE Settlement Agreement is attached to the Plan as **Exhibit B**.

90.  "FE Settlement Cash" means the cash settlement payment described in Section 2.1 of the FE Settlement Agreement in an amount equal to $225,000,000, which amount shall not be subject to any setoff or reduction.

91.  "FE Settlement Direct Consideration" means the FE Settlement Value other than the waivers of Claims.

92.  "FE Settlement Order" means the *Order Granting Motion of Debtors to Approve Settlement Among the Debtors, Non-Debtor Affiliates and Certain Other Settlement Parties Pursuant to 11 U.S.C. §§ 105, 363, 365, and 502 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 1465].

93.  "FE Settlement Value" means the overall value contributed by the FE Non-Debtor Parties to the Debtors' Estates pursuant to the FE Settlement Agreement, including, but not limited to (i) the FE Settlement Cash, (ii) the New FE Notes, (iii) the Pleasants Power Plant, (iv) payments under the Tax Allocation Agreement, (v) credits for shared services and other operational support, and (vi) waivers of certain Claims as set forth in the FE Settlement Agreement.

94.  "FE/FES Revolver" means that certain $700,000,000 credit agreement, consisting of a $500,000,000 revolver facility and a $200,000,000 surety bond credit facility, dated December 6, 2016, by and among FE Corp. as lender, FES as borrower, and FG and NG as guarantors, as the same has been modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto.

95.  "Federal Judgment Rate" means the rate of interest calculated pursuant to the provisions of 28 U.S.C. § 1961, which shall be a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, as of the Petition Date, which rate was 2.09%, compounded annually.

96.  "FENOC" means Debtor FirstEnergy Nuclear Operating Company.

97.  "FENOC Distributable Value" means $144,462,279, which shall be comprised of the following assets: (i) all cash in FENOC bank accounts, which cash shall be fixed at $38,000,000, (ii) the value of FENOC's assets, (iii) 2.7% of the FE Settlement Value and (iv) the FENOC Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

98.  "FENOC Inter-Debtor Recovery" means the recovery on account of all Inter-Debtor Claims owed to FENOC.

99.  "FENOC-FES Claim Reallocation" means $12,500,000 of the aggregate Unsecured Distributable Value otherwise available for distribution to the Holders of Unsecured Bondholder Claims, which shall be re-allocated to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims.

100.  "FENOC-FES Unsecured Claims" means any General Unsecured Claim, other than Inter-Debtor Claims, against both FENOC and FES (and only FENOC and FES).

10

101. "<u>FENOC Unsecured Distributable Value</u>" means the value available for distribution to Holders of Allowed Unsecured Claims against FENOC, which shall be determined by calculating the FENOC Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to FENOC in accordance with the Plan Settlement and as set forth on Exhibit A to the Plan Term Sheet, (ii) Other Secured Claims Allowed against FENOC, as set forth on Exhibit A to the Plan Term Sheet and (iii) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against FENOC, pursuant to the Plan Settlement.

102. "<u>FENOC Single-Box Unsecured Claim</u>" means any General Unsecured Claim, other than Inter-Debtor Claims, against only FENOC.

103. "<u>FERC</u>" means the Federal Energy Regulatory Commission.

104. "<u>FERC-Jurisdictional Debtors</u>" means all of the Debtors subject to FERC's jurisdiction, including, without limitation, FES, FG, NG, and FGMUC.

105. "<u>FES</u>" means Debtor FirstEnergy Solutions Corp.

106. "<u>FES Creditor Group</u>" has the meaning ascribed to such term in the Restructuring Support Agreement.

107. "<u>FES Distributable Value</u>" means $2,030,487,341, which shall be comprised of the following assets: (i) the projected amount of Cash in the FES bank accounts, other than the proceeds from the FE/FES Revolver as of the Effective Date and cash held in escrow account numbers xxxxxxx0085 and xxxxxxx8799, that was incorporated into Exhibit A to the Plan Term Sheet; (ii) the value of the FES retail business; (iii) any surplus proceeds of the FE Aircraft Cash Distribution Pool after satisfaction of any Allowed General Unsecured Claims against FE Aircraft; (iv) $475,000,000 of the proceeds from the FE/FES Revolver; (v) 57.5% of the FE Settlement Value; (vi) the value of the Interests in FE Aircraft held by FES; and (vii) the FES Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

108. "<u>FES Inter-Debtor Recovery</u>" means the recovery on account of all Inter-Debtor Claims owed to FES.

109. "<u>FES Notes</u>" means, collectively, those certain: (i) 6.05% senior unsecured notes due 2021; and (ii) 6.80% senior unsecured notes due 2039, in each case issued under the FES Notes Indenture.

110. "<u>FES Notes Claims</u>" means, collectively, any Claims evidenced by, arising under, or in connection with the FES Notes Indenture, the FES Notes, or other agreements related thereto.

111. "<u>FES Notes Indenture</u>" means that certain Indenture, dated as of August 1, 2009, between FES and the FES Notes Indenture Trustee, as the same has been modified, amended, supplemented, or otherwise revised from time to time, including by the First Supplemental Indenture, dated as of August 1, 2009, and together with all instruments, documents, and agreements related thereto.

112. "<u>FES Notes Indenture Trustee</u>" means The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the FES Notes Indenture.

11

113.     "FES-Only Administrative Expenses" means, if applicable, any Allowed Administrative Claims arising from the PPA Appeal Proceeding Contracts.

114.     "FES Single-Box Unsecured Claim" means any General Unsecured Claim against only FES.

115.     "FES Tax Overpayment" means any overpayment that may have been made to certain of the Debtors by FE Corp. pursuant to the Tax Allocation Agreement for the tax year 2017.

116.     "FES Unsecured Distributable Value" means the value available for distribution to Holders of Allowed Unsecured Claims against FES, which shall be determined by calculating the FES Distributable Value *less* (i) the payment of (x) Allocated Administrative Expenses allocated to FES in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet and (y) FES-Only Administrative Expenses, (ii) Other Secured Claims Allowed against FES, as set forth on Exhibit A of the Plan Term Sheet, and (iii) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against FES pursuant to the Plan Settlement.

117.     "FESC" means FirstEnergy Service Company, an FE Non-Debtor Party.

118.     "FG" means Debtor FirstEnergy Generation, LLC.

119.     "FG Distributable Value" means $1,093,123,280, which shall be comprised of the following assets: (i) the value of FG's assets; (ii) $25,000,000 of proceeds from the FE/FES Revolver; (iii) the value of the membership interests in Norton, if any; (iv) 23.4% of the FE Settlement Value; and (v) the FG Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

120.     "FG Inter-Debtor Recovery" means the recovery on account of all Inter-Debtor Claims owed to FG.

121.     "FG Mortgage" means that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust, dated as of June 19, 2008, as amended and supplemented, by and between FG and UMB Bank, National Association, as successor trustee.

122.     "FG Mortgage Indenture Trustee" means UMB Bank, National Association, as successor trustee under the FG Mortgage, solely in its capacity as such.

123.     "FG Single-Box Unsecured Claim" means any General Unsecured Claim against only FG.

124.     "FG Unsecured Distributable Value" means the value available for distribution to Holders of Allowed Unsecured Claims against FG, which shall be determined by calculating the FG Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to FG in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet, (ii) Other Secured Claims Allowed against FG, as set forth on Exhibit A to the Plan Term Sheet, (iii) the value of the Secured FG PCN Claims being reinstated or paid in full in accordance with the Plan, and (iv) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against FG pursuant to the Plan Settlement.

18-50757-amk     Doc 3278     FILED 10/16/19     ENTERED 10/16/19 16:06:00     Page 95 of 299

125. "<u>FGMUC</u>" means Debtor FirstEnergy Generation Mansfield Unit 1 Corp.

126. "<u>FGMUC Distributable Value</u>" means $133,976,275, which shall be comprised of the following assets: (i) FGMUC's assets, if any, (ii) 1.3% of the FE Settlement Value; and (iii) the FGMUC Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

127. "<u>FGMUC Inter-Debtor Recovery</u>" means the recovery on account of all Inter-Debtor Claims owed to FGMUC.

128. "<u>FGMUC Single-Box Unsecured Claims</u>" means any General Unsecured Claim against only FGMUC.

129. "<u>FGMUC Unsecured Distributable Value</u>" means the value available for distribution to Holders of Allowed Unsecured Claims against FGMUC, which shall be determined by calculating the FGMUC Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to FGMUC in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet, (ii) Other Secured Claims Allowed against FGMUC as set forth on Exhibit A to the Plan Term Sheet, and (iii) Administrative Claims arising from on postpetition Inter-Debtor Claims Allowed against FGMUC pursuant to the Plan Settlement.

130. "<u>File</u>," "<u>Filed</u>," or "<u>Filing</u>" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, including with respect to a Proof of Claim or Proof of Interest, the Claims and Noticing Agent.

131. "<u>Final Order</u>" means (i) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in any Chapter 11 Case (or any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may timely be Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the local rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

132. "<u>FMB</u>" means the first mortgage bonds issued by FG or NG, as the case may be, pursuant to the FG Mortgage and the NG Mortgage, respectively.

133. "<u>FPA 203 Authorization</u>" means authorization from FERC under Section 203 of the Federal Power Act, 16 U.S.C. § 824b.

134. "<u>General Administrative Claim</u>" means any Administrative Claim, other than a Professional Fee Claim but including any Claims of ordinary course professionals retained pursuant to the Ordinary Course Professional Order for fees and expenses incurred postpetition.

135. "<u>General Unsecured Claim</u>" means any Unsecured Claim that is not an Unsecured Bondholder Claim and is not otherwise paid in full pursuant to a Final Order of the Bankruptcy Court, but excluding: (i) Administrative Claims, (ii) Priority Tax Claims, (iii) Inter-Debtor Claims, and (iv) Other Priority Claims.

136. "<u>General Unsecured Claim Against FE Aircraft</u>" means any Unsecured Claim against FE Aircraft that is not an Unsecured Bondholder Claim and is not otherwise paid in full pursuant to a Final Order of the Bankruptcy Court, but excluding: (i) Administrative Claims, (ii) Priority Tax Claims against FE Aircraft, (iii) Inter-Debtor Claims and (iv) Other Priority Claims against FE Aircraft.

137. "<u>General Unsecured Claim Against Norton</u>" means any Unsecured Claim against Norton that is not an Unsecured Bondholder Claim and is not otherwise paid in full pursuant to a Final Order of the Bankruptcy Court, but excluding: (i) Administrative Claims, (ii) Priority Tax Claims against Norton, (iii) Inter-Debtor Claims and (iv) Other Priority Claims against Norton.

138. "<u>Governmental Unit</u>" has the meaning set forth in section 101(27) of the Bankruptcy Code.

139. "<u>Health Care Plans</u>" means the medical and prescription drug benefits provided under the FirstEnergy Corp. Health Care Plan, FirstEnergy Prescription Drug Plan, and any similar plans sponsored by FE Corp.

140. "<u>Holder</u>" means an Entity holding a Claim or an Interest, as applicable.

141. "<u>HSR Act</u>" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

142. "<u>Impaired</u>" means, with respect to a particular Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

143. "<u>Incentive Securities</u>" means New Common Stock, or options, warrants, or similar equity securities to be distributed pursuant to the terms of the Management Incentive Plan.

144. "<u>Indemnification Obligations</u>" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers (including all Independent Directors and Managers), employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable.

145. "<u>Indentures</u>" means, collectively, (i) the FES Notes Indenture, (ii) the Mansfield Pass Through Trust Agreement and Mansfield Lease Note Indentures, (iii) the FG Mortgage, (iv) the NG Mortgage, (v) the PCN Indentures, and (vi) the PCN Loan Agreements.

146. "Indenture Trustees" means, collectively: (i) the FES Notes Indenture Trustee, (ii) the Mansfield Indenture Trustee, (iii) the Secured PCN Indenture Trustees, and (iv) the Unsecured PCN Indenture Trustee.

147. "Independent Directors and Managers" means the independent directors and/or managers of FES, FENOC, FG and NG.

148. "Initial Distribution Date" means, unless otherwise ordered by the Bankruptcy Court, (i) with respect to distributions of the New Common Stock, the Effective Date, or as soon thereafter as reasonably practicable in accordance with Article III of the Plan or, (ii) in the case of distributions of Cash, as soon as reasonably practicable, but no later than 45 days after the Effective Date.

149. "Insurance Policies" means any insurance policies, insurance settlement agreements, coverage-in-place agreements, or other agreements relating to the provision of insurance entered into by or issued to or for the benefit of any of the Debtors or their predecessors.

150. "Inter-Debtor Claims" means a Claim or Cause of Action by a Debtor against any other Debtor.

151. "Interest" means any equity security (as defined in section 101(16) of the Bankruptcy Code) issued with respect of any Debtor, any membership interests issued with respect to any Debtor, and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Entity.

152. "Interim Compensation Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 177].

153. "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

154. "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

155. "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

156. "Management Incentive Plan" means a management incentive plan which may be implemented with respect to the Reorganized Debtors on or after the Effective Date providing for the issuance of New Common Stock, which Management Incentive Plan shall not exceed 7.5% of the New Common Stock as of the Effective Date (on a fully diluted basis), the terms of which shall be disclosed in the Plan Supplement (or left to the determination of the New Holdco Board) and which shall be reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties to the extent disclosed in the Plan Supplement.

157. "Mansfield Certificate Claims" means, collectively, Claims that could be brought by the Mansfield Indenture Trustee or the Holders of Mansfield Certificates, evidenced by, arising under or in connection with the Mansfield Certificates, the Mansfield Pass Through Trust Agreement, the Mansfield Lease Note Indentures or any other Mansfield Facility Documents.

158. "Mansfield Certificate Claims Against FES" means any Mansfield Certificate Claims against FES, including Mansfield Certificate Claims against FES arising from guarantees.

159. "<u>Mansfield Certificate Claims Against FG</u>" means any Mansfield Certificate Claims against FG, including Mansfield Certificate Claims against FG arising from guarantees.

160. "<u>Mansfield Certificate Claims Against FGMUC</u>" means any Mansfield Certificate Claims against FGMUC.

161. "<u>Mansfield Certificate Claims Against NG</u>" means any Mansfield Certificate Claims against NG, including Mansfield Certificate Claims against NG arising from guarantees.

162. "<u>Mansfield Certificateholders Group</u>" means the ad hoc group of certain Holders of the Mansfield Certificate Claims that are signatories to the Restructuring Support Agreement (and any such Holder that may, in accordance with Section 6 of the Restructuring Support Agreement, become a signatory thereto).

163. "<u>Mansfield Certificates</u>" means those certain 6.85% pass through certificates issued under the Mansfield Pass Through Trust Agreement.

164. "<u>Mansfield Facility Documents</u>" means, collectively, the Mansfield Facility Lease Agreements, the Mansfield Participation Agreements, the Mansfield Pass Through Trust Agreement, the Mansfield Guarantees, the Mansfield Site Subleases, the Mansfield Site Leases, the Mansfield Support Agreements, the Mansfield Tax Indemnity Agreements, and the Mansfield Operating Agreement.

165. "<u>Mansfield Facility Lease Agreements</u>" means those certain six facility leases dated as of July 1, 2007, between FG, as lessee, and Mansfield 2007 Trusts A-F, as lessors respectively, relating to an aggregate undivided interest in 93.825% of Unit 1 of the Mansfield Plant.

166. "<u>Mansfield Guarantees</u>" means those certain guarantees dated July 1, 2007 pursuant to which FES guaranteed FG's obligations under the Mansfield Facility Lease Agreements and certain other Mansfield Facility Documents.

167. "<u>Mansfield Indemnity Claims</u>" means, collectively, the Mansfield TIA Claims and the Mansfield OT Claims.

168. "<u>Mansfield Indenture Trustee</u>" means Wilmington Savings Fund Society, FSB (not in its individual capacity, but solely as Pass Through Trustee for the Mansfield Pass Through Trust Agreement dated as of June 26, 2007, as the same has been amended or modified from time to time, and the Indenture Trustee under the Mansfield Lease Notes Indentures).

169. "<u>Mansfield Lease Note Indentures</u>" means the six Indentures of Trust, Open-End Mortgages and Security Agreements, dated July 1, 2007 with Mansfield 2007 Trusts A-F, respectively (as amended from time to time).

170. "<u>Mansfield Operating Agreement</u>" means that certain operating agreement with respect to the Mansfield Plant dated as of June 1, 1976, as amended and supplemented from time to time.

171. "<u>Mansfield OT Claims</u>" means the claims of the Consenting Owner Trustee (in its individual capacity) arising under the Mansfield Participation Agreements, which claims shall be Allowed as Unsecured Claims in the aggregate amount of $28,882.75 pursuant to the Mansfield Owner Parties' Settlement.

172.    "<u>Mansfield Owner Participant</u>" means the beneficial owner of each of Mansfield 2007 Trust A, Mansfield 2007 Trust B, Mansfield 2007 Trust C, Mansfield 2007 Trust D, Mansfield 2007 Trust E or Mansfield 2007 Trust F.  MetLife is the current Mansfield Owner Participant of Mansfield 2007 Trusts A-E.  FE Corp. is the current Mansfield Owner Participant of Mansfield 2007 Trust F.

173.    "<u>Mansfield Owner Parties</u>" means, collectively, the Consenting Owner Participant and the Consenting Owner Trustee.

174.    "<u>Mansfield Owner Parties' Settlement</u>" means that certain settlement agreement, by and among the Debtors, the Ad Hoc Noteholders Group, the Mansfield Certificateholders Group, the Consenting Owner Participant, the Consenting Owner Trustee, the FES Creditor Group, and the Committee, which settlement is incorporated herein.

175.    "<u>Mansfield Participation Agreements</u>" means those certain participation agreements dated June 26, 2007, setting forth the manner in which the parties intended to participate in the 2007 sale and leaseback transactions for an aggregate undivided interest in 93.825% of Mansfield Unit 1, the conditions precedent to such participation, certain representations and warranties of the parties, and certain covenants and indemnities of the parties in connection with such transactions.

176.    "<u>Mansfield Pass Through Trust Agreement</u>" means that certain Pass Through Trust Agreement, dated as of June 26, 2007, among FG, FES and the Mansfield Indenture Trustee (not in its individual capacity, but solely as Pass Through Trustee for the Bruce Mansfield Unit 1 2007 Pass Through Trust), as the same has been modified, amended, supplemented, or otherwise revised from time to time.

177.    "<u>Mansfield Plant</u>" means the Bruce Mansfield Plant, a 2,490 megawatt coal-fired power plant located in Shippingport, Pennsylvania.

178.    "<u>Mansfield Reallocation</u>" means $10,000,000 of the aggregate Unsecured Distributable Value from all Debtors otherwise available for distribution to the Holders of the Mansfield Certificate Claims, which shall be reallocated to Holders of Unsecured PCN Claims and FES Notes Claims as set forth in Article III of the Plan.

179.    "<u>Mansfield Sale-Leaseback Transaction</u>" means, collectively, the series of sale-leaseback arrangements for Mansfield Unit 1.

180.    "<u>Mansfield Settlement</u>" means that certain settlement agreement, by and among the Bruce Mansfield Certificateholders Group and the Ad Hoc Noteholders Group, which settlement is incorporated herein.

181.    "<u>Mansfield Site Leases</u>" means those certain six site leases dated as of July 1, 2007, between FG, as site lessor, and Mansfield 2007 Trust A-F, respectively, as site lessees.

182.    "<u>Mansfield Site Subleases</u>" means those certain six site subleases dated as of July 1, 2007, between Mansfield 2007 Trust A-F, respectively as site sublessors, and FG, as site sublessee.

183.    "<u>Mansfield Support Agreements</u>" means those certain six support agreements dated as of July 1, 2007, between Mansfield Trust A-F, respectively, as lessors and FG, as lessee.

184.    "<u>Mansfield Tax Indemnity Agreements</u>" means those certain tax indemnity agreements dated July 1, 2007, pursuant to which FG agreed to indemnify the Mansfield Owner Participants for

certain adverse tax consequences related to the 2007 sale and leaseback transactions for an aggregate undivided interest in 93.825% of Unit 1 of the Mansfield Plant.

185. "<u>Mansfield TIA Claims</u>" means the claims of the Consenting Owner Participant arising under the Mansfield Tax Indemnity Agreements for Mansfield 2007 Trusts A-E and other Mansfield Facility Documents, which are Allowed in the aggregate amount of $182,000,000 pursuant to the Mansfield Owner Parties' Settlement. For the avoidance of doubt, Mansfield TIA Claims do not include any claims of FE Corp. or the FE Corp. Owner Trustee, which claims are being waived and released pursuant to the FE Settlement Agreement.

186. "<u>Mansfield Trust Agreements</u>" means those six trust agreements, dated as of June 6, 2007, relating to Mansfield 2007 Trusts A-F, between the applicable Mansfield Owner Participants and the Consenting Owner Trustee or the FE Owner Trustee.

187. "<u>Mansfield Unit 1</u>" means Unit 1 of the Mansfield Plant.

188. "<u>Mansfield Unit 1 Transfer Agreement</u>" means the agreement or agreements implementing the transfer of the aggregate 93.825% undivided interests in Mansfield Unit 1 to the Debtors or Reorganized Debtors in accordance with the Mansfield Settlement and the Mansfield Owner Parties' Settlement, a form of which shall be included in the Plan Supplement and shall be in form and substance reasonably acceptable to the Debtors, the Committee, the Requisite Supporting Parties, the FE Owner Parties, the Mansfield Indenture Trustee, and the Mansfield Owner Parties, and which shall also provide for the termination of the Mansfield Trust Agreements and any related documents to which the Consenting Owner Trustee or the FE Owner Trustee is a party and the dissolution of the Mansfield 2007 Trusts A-F, on terms acceptable to the Debtors, the Committee, the Requisite Supporting Parties, the FE Owner Parties, the Mansfield Indenture Trustee and the Mansfield Owner Parties.

189. "<u>MetLife</u>" means MetLife Capital, Limited Partnership.

190. "<u>Money Pool Balance</u>" means the Debtors' liability as of the Petition Date, as adjusted by the transactions contemplated by the FE Settlement Agreement, under the Fifth Amended and Restated Non-Utility Money Pool Agreement, dated as of December 19, 2013 as the same has been or may be subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

191. "<u>Multi-Debtor Unsecured Claims</u>" means Unsecured Claims which are Allowed against multiple Debtors, which for the avoidance of doubt, shall include, among others, the Unsecured Bondholder Claims, any Mansfield TIA Claims, and Claims Allowed against both FENOC and NG.

192. "<u>New Common Stock</u>" means the shares of common stock of New Holdco to be issued and distributed under and in accordance with the Plan.

193. "<u>New FE Notes</u>" means the senior notes to be issued by FE Corp. to the Debtors on the Effective Date pursuant to the terms of the FE Settlement Agreement.

194. "<u>New Holdco</u>" means a newly created holding company, which shall be the ultimate corporate parent of each of the other Reorganized Debtors.

195. "<u>New Holdco Board</u>" means the board of directors of New Holdco, and the board of directors and the board of managers of the other Reorganized Debtors, as applicable, on and after the Effective Date.

196. "New Management Employment Contracts" means employment contracts to be entered into between the Reorganized Debtors and members of management for the Reorganized Debtors on terms and conditions to be agreed by the Debtors and the Requisite Supporting Parties, the forms of which shall be included in the Plan Supplement.

197. "New Organizational Documents" means the certificates or articles of incorporation of formation, by-laws, limited liability company agreements, or other applicable organizational documents of each of the Reorganized Debtors, as applicable, the form of which shall be included in the Plan Supplement.

198. "NG" means Debtor FirstEnergy Nuclear Generation, LLC.

199. "NG Distributable Value" means $1,365,106,331, which shall be comprised of the following assets: (i) the value of the power plants owned by NG and all related assets, (ii) the insurance proceeds from Mansfield Unit 1, as well as the value of any other assets comprising the "Undivided Interest" in the "Facility" as such terms are defined in the Mansfield Facility Documents, (iii) 15.1% of the FE Settlement Value, and (iv) the NG-Inter-Debtor Recovery, subject only to adjustment based on the actual recoveries (to the extent different from estimated recoveries reflected in the Plan Settlement) on prepetition Inter-Debtor Claims due to changes in the estimated amount of Allowed Unsecured Claims by virtue of the settlement or adjudication of all other prepetition Unsecured Claims asserted against the applicable Debtors.

200. "NG-FENOC Unsecured Claim" means any General Unsecured Claim against both NG and FENOC.

201. "NG Inter-Debtor Recovery" means the recovery on account of all Inter-Debtor Claims owed to NG.

202. "NG Mortgage" means that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust, dated as of June 1, 2009, as amended and supplemented, by and between NG and UMB Bank, National Association, as successor trustee.

203. "NG Mortgage Indenture Trustee" means UMB Bank, National Association, as successor trustee under the NG Mortgage, in its capacity as such.

204. "NG Reallocation Pool" means the portion of the Reallocation Pool allocable to NG.

205. "NG Single Box Unsecured Claims" means any General Unsecured Claim, other than an Inter-Debtor Claim, solely against NG.

206. "NG Unsecured Distributable Value" means the value available for distribution to Holders of Allowed Unsecured Claims against NG, which shall be determined by calculating the NG Distributable Value *less* (i) the payment of Allocated Administrative Expenses allocated to NG in accordance with the Plan Settlement as set forth on Exhibit A to the Plan Term Sheet, (ii) Other Secured Claims Allowed against NG, as set forth on Exhibit A to the Plan Term Sheet, (iii) the value of the Secured NG PCN Claims being reinstated pursuant to the Plan, and (iv) Administrative Claims arising from postpetition Inter-Debtor Claims Allowed against NG pursuant to the Plan Settlement.

207. "Norton" means Debtor Norton Energy Storage L.L.C.

208.    "Norton Cash Distribution Pool" means, to the extent there are any General Unsecured Claims against Norton, Cash in the amount equal to the assets of Norton to be determined in accordance with an appraisal.

209.    "NRC" means the United States Nuclear Regulatory Commission.

210.    "Nuclear Decommissioning Obligations" means the Debtors' funding obligations related to nuclear decommissioning trusts, as required by the Nuclear Regulatory Commission, that will be established by the Debtors to fund the decommissioning of the Beaver Valley, Davis-Besse, and Perry nuclear power plants.

211.    "OAQDA" means the Ohio Air Quality Development Authority.

212.    "OWDA" means the Ohio Water Development Authority.

213.    "Ordinary Course Professional Order" means the *Order Authorizing the Debtors to Employ and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 428].

214.    "Other Priority Claims" means any Claim, other than an Administrative Claim, or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

215.    "Other Professional Fee Claims" means the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases prior to the Effective Date of (i) the Consenting Creditors to the extent each such Consenting Creditor has not terminated its participation in the Restructuring Support Agreement as of the Effective Date and (ii) the Indenture Trustees, in each case as provided for by an order of the Bankruptcy Court, which order may include, without limitation, the Confirmation Order, the *Order (i) Authorizing Debtors to Assume (a) the Process Support Agreement and (b) the Standstill Agreement and (ii) Granting Related Relief* [Docket No. 509] and an order of the Court approving any such fees and expenses pursuant to section 503(b)(4) of the Bankruptcy Code.

216.    "Other Released Parties" means, collectively, (i) the Consenting Creditors, (ii) the Committee, (iii) the Indenture Trustees, (iv) the issuers of the PCNs, (v) the Plan Administrator, (vi) the FE Owner Trustee, and (vii) with respect to each of the foregoing entities in clauses (i) through (vi), their current and former Affiliates, and such Entities' current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed/advised funds or accounts and with respect to each of the foregoing entities in clauses (i) through (vi), each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

217.    "Other Secured Claims" means any Secured Claim against any of the Debtors, other than the Secured PCN Claims.

218.    "Party Releases" means the releases provided to the FE Non-Debtor Parties set forth in Article VIII.D of the Plan.

219.    "PCNs" means, collectively, the following series of notes issued under the PCN Loan Agreements in support of the pollution control revenue bonds that were issued under the PCN Indentures: (i) FG's $56.6 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-A due April 1, 2041; (ii) FG's $46.3 million Pollution Control Facilities Note

(Beaver County Industrial Development Authority), Series 2008-B due October 1, 2047 , which note is secured by FG FMBs; (iii) FG's $25 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-C due June 1, 2028 , which note is secured by FG FMBs; (iv) FG's $234.52 million Air Quality Facilities Note, Series 2006-A due December 1, 2023; (v) FG's $177 million Air Quality Facilities Note, Series 2009-E due August 1, 2020; (vi) FG's $50 million Air Quality Facilities Note, Series 2009-B due March 1, 2023; (vii) FG's $141.26 million Air Quality Facilities Note, Series 2009-C due June 1, 2018, which note is secured by FG FMBs; (viii) FG's $100 million Air Quality Facilities Note, Series 2009-D due August 1, 2029 , which note is secured by FG FMBs; (ix) FG's $90.14 million Waste Water Facilities Note, Series 2006-A due May 15, 2019; (x) FG's $26 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2006A due November 1, 2041; (xi) FG's $43 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2005A due December 1, 2040; (xii) FG's $15 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2002 A due June 1, 2028 , which note is secured by FG FMBs; (xiii) NG's $98.9 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-A due April 1, 2035; (xiv) NG's $163.965 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-B due December 1, 2035; (xv) NG's $72.65 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2005-A due January 1, 2035; (xvi) NG's $60 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-A due January 1, 2035, which note is secured by NG FMBs; (xvii) NG's $8 million Air Quality Facilities Note, Series 2010-A due July 1, 2033; (xviii) NG's $7.2 million Air Quality Facilities Note, Series 2005-B due January 1, 2034; (xix) NG's $9.1 million Air Quality Facilities Note, Series 2008-B due October 1, 2033; (xx) NG's $23 million Air Quality Facilities Note, Series 2008-C due November 1, 2032; (xxi) NG's $15.5 million Air Quality Facilities Note, Series 2006-B due December 1, 2033; (xxii) NG's $26 million Air Quality Facilities Note, Series 2010-B due June 1, 2033; (xxiii) NG's $62.5 million Air Quality Facilities Note, Series 2009-A due June 1, 2033 , which note is secured by NG FMBs; (xxiv) NG's $135.55 million Waste Water Facilities and Solid Waste Facilities Note, Series 2006-B due December 1, 2033; (xxv) NG's $46.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-C due June 1, 2033; (xxvi) NG's $20.45 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-B due October 1, 2033; (xxvii) NG's $33 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-C due November 1, 2032; (xxviii) NG's $99.1 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-A due July 1, 2033; (xxix) NG's $82.8 million Waste Water Facilities and Solid Waste Facilities Note, Series 2005-B due January 1, 2034; (xxx) NG's $54.6 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-B due June 1, 2033 , which note is secured by NG FMBs; and (xxxi) NG's $107.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2009-A due June 1, 2033 , which note is secured by NG FMBs.

220. "PCN Claims" means, collectively, any Claims evidenced by, arising under or in connection with the PCN Loan Agreements, the PCN Indentures, the PCNs or other agreements related thereto.

221. "PCN Indentures" means, collectively, as they may have been subsequently amended, the following trust indentures: (i) the Trust Indenture, dated as of April 1, 2006, as supplemented as of April 2, 2012, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $56.6 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2006-A (FirstEnergy Generation Project) are issued and outstanding; (ii) the Trust Indenture, dated as of September 1, 2008, as supplemented as of April 2, 2012, between BCIDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $46.3 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2008-B (FirstEnergy Generation Project) are issued and outstanding; (iii) the Trust Indenture, dated as of November 1, 2008, as supplemented as of May 25, 2012, between BCIDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to

which $25 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2008-C (FirstEnergy Generation Project) are issued and outstanding; (iv) the Trust Indenture, dated as of December 1, 2006, as supplemented as of February 19, 2014, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $234.52 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2006-A (FirstEnergy Generation Project) are issued and outstanding; (v) the Trust Indenture, dated as of August 1, 2009, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $177 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-A (FirstEnergy Generation Project) are issued and outstanding; (vi) the Trust Indenture, dated as of March 1, 2009, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $50 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-B (FirstEnergy Generation Project) are issued and outstanding; (vii) the Trust Indenture, dated as of June 1, 2009, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $141.26 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-C (FirstEnergy Generation Project) are issued and outstanding; (viii) the Trust Indenture, dated as of June 1, 2009, as supplemented as of August 1, 2012, between OAQDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $100 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-D (FirstEnergy Generation Project) are issued and outstanding; (ix) the Trust Indenture, dated as of April 1, 2006, as supplemented as of April 2, 2012, between OWDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $90.14 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2006-A (FirstEnergy Generation Project) are issued and outstanding; (x) the Trust Indenture, dated as of November 1, 2006, as supplemented as of November 15, 2010, between PEDFA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $26 million principal amount of Exempt Facilities Revenue Bonds, Series 2006A (Shippingport Project) are issued and outstanding; (xi) the Trust Indenture, dated as of December 1, 2005, as supplemented as of September 14, 2010, between PEDFA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $43 million principal amount of Exempt Facilities Revenue Bonds, Series 2005A (Shippingport Project) are issued and outstanding; (xii) the Trust Indenture, dated as of July 1, 2002, as supplement as of July 30, 2010, and amended as of November 1, 2012, between PEDFA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $15 million principal amount of Exempt Facilities Revenue Bonds, Series 2002 A (Shippingport Project) are issued and outstanding; (xiii) the Trust Indenture, dated as of June 1, 2008, as supplemented as of May 25, 2012, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $98.9 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2008-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xiv) the Trust Indenture, dated as of December 1, 2006, as supplemented as of June 5, 2009 and April 2, 2012, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $163.965 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2006-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xv) the Trust Indenture, dated as of December 1, 2005, between BCIDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $72.65 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2005-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xvi) the Trust Indenture, dated as of April 1, 2006, as supplemented as of May 25, 2012, between BCIDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $60 million principal amount of Pollution Control Revenue Refunding Bonds, Series 2006-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xvii) the Trust Indenture, dated as of September 15, 2010, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $8 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xviii) the Trust Indenture, dated as of December 1, 2005, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $7.2 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds,

18-50757-amk    Doc 3273    FILED 10/16/19    ENTERED 10/16/19 13:08:09    Page 105 of 299

Series 2005-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xix) the Trust Indenture, dated as of September 1, 2008, as supplemented as of April 2, 2012, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $9.1 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xx) the Trust Indenture, dated as of November 1, 2008, as supplemented as of November 1, 2012, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $23 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-C (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxi) the Trust Indenture, dated as of December 1, 2006, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $15.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2006-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxii) the Trust Indenture, dated as of November 15, 2010, between OAQDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $26 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxiii) the Trust Indenture, dated as of April 1, 2009, between OAQDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $62.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxiv) the Trust Indenture, dated as of December 1, 2006, as supplemented as of April 2, 2012, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $135.55 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2006-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxv) the Trust Indenture, dated as of November 15, 2010, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $46.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-C (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxvi) the Trust Indenture, dated as of September 1, 2008, as supplemented as of April 2, 2012, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $20.45 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxvii) the Trust Indenture, dated as of November 1, 2008, as supplemented as of November 1, 2012, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $33 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2008-C (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxviii) the Trust Indenture, dated as of September 15, 2010, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $99.1 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-A (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxix) the Trust Indenture, dated as of December 1, 2005, between OWDA and the Unsecured PCN Indenture Trustee, as successor trustee, with respect to which $82.8 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2005-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; (xxx) the Trust Indenture, dated as of November 15, 2010, between OWDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $54.6 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2010-B (FirstEnergy Nuclear Generation Project) are issued and outstanding; and (xxxi) the Trust Indenture, dated as of June 1, 2009, between OWDA and the Secured PCN Indenture Trustee, as successor trustee, with respect to which $107.5 million principal amount of State of Ohio Pollution Control Revenue Refunding Bonds, Series 2009-A (FirstEnergy Nuclear Generation Project) are issued and outstanding.

222. "PCN Loan Agreements" means, collectively, as they may have been subsequently amended, the following loan agreements: (i) the Pollution Control Facilities Loan Agreement, dated as of April 1, 2006, between BCIDA and FG, as amended as of April 2, 2012, with respect to FG's $56.6 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series

18-50757-amk    Doc 3373    FILED 10/16/19    ENTERED 10/16/19 13:08:09    Page 106 of 299

2006-A due April 1, 2041; (ii) the Pollution Control Facilities Loan Agreement, dated as of September 1, 2008, between BCIDA and FG, as amended as of April 2, 2012, with respect to FG's $46.3 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-B due October 1, 2047, which note is secured by FG FMBs; (iii) the Pollution Control Facilities Loan Agreement, dated as of November 1, 2008, between BCIDA and FG, as amended as of May 25, 2012, with respect to FG's $25 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-C due June 1, 2028, which note is secured by FG FMBs; (iv) the Air Quality Facilities Loan Agreement, dated as of December 1, 2006, between OAQDA and FG, with respect to FG's $234.52 million Air Quality Facilities Note, Series 2006-A due December 1, 2023; (v) the Air Quality Facilities Loan Agreement, dated as of August 1, 2009, between OAQDA and FG, with respect to FG's $177 million Air Quality Facilities Note, Series 2009-E due August 1, 2020; (vi) the Air Quality Facilities Loan Agreement, dated as of March 1, 2009, between OAQDA and FG, with respect to FG's $50 million Air Quality Facilities Note, Series 2009-B due March 1, 2023; (vii) the Air Quality Facilities Loan Agreement, dated as of June 1, 2009, between OAQDA and FG, as amended as of February 14, 2012, with respect to FG's $141.26 million Air Quality Facilities Note, Series 2009-C due June 1, 2018, which note is secured by FG FMBs; (viii) the Air Quality Facilities Loan Agreement, dated as of June 1, 2009, between OAQDA and FG, as amended as of February 14, 2012, with respect to FG's $100 million Air Quality Facilities Note, Series 2009-D due August 1, 2029, which note is secured by FG FMBs; (ix) the Waste Water Facilities Loan Agreement, dated as of April 1, 2006, between OWDA and FG, as amended as of April 2, 2012, with respect to FG's $90.14 million Waste Water Facilities Note, Series 2006-A due May 15, 2019; (x) the Exempt Facilities Loan Agreement, dated as of November 1, 2006, between PEDFA and FG, with respect to FG's $26 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2006A due November 1, 2041; (xi) the Exempt Facilities Loan Agreement, dated as of December 1, 2005, between PEDFA and FG, with respect to FG's $43 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2005A due December 1, 2040; (xii) the Exempt Facilities Loan Agreement, dated as of July 1, 2002, between PEDFA and FG, as amended as of July 30, 2010, with respect to FG's $15 million Exempt Facilities Notes (Pennsylvania Economic Development Financing Authority), Series 2002 A due June 1, 2028, which note is secured by FG FMBs; (xiii) the Pollution Control Facilities Loan Agreement, dated as of June 1, 2008, between BCIDA and NG, as amended as of May 25, 2012, with respect to NG's $98.9 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2008-A due April 1, 2035; (xiv) the Pollution Control Facilities Loan Agreement, dated as of December 1, 2006, between BCIDA and NG, as amended as of April 2, 2012, with respect to NG's $163.965 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-B due December 1, 2035; (xv) the Pollution Control Facilities Loan Agreement, dated as of December 1, 2005, between BCIDA and NG, as amended as of February 14, 2012, with respect to NG's $72.65 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2005-A due January 1, 2035; (xvi) the Pollution Control Facilities Loan Agreement, dated as of April 1, 2006, between BCIDA and NG, as amended as of May 25, 2012, with respect to NG's $60 million Pollution Control Facilities Note (Beaver County Industrial Development Authority), Series 2006-A due, which note is secured by NG FMBs; (xvii) the Air Quality Facilities Loan Agreement, dated as of September 15, 2010, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $8 million Air Quality Facilities Note, Series 2010-A due July 1, 2033; (xviii) the Air Quality Facilities Loan Agreement, dated as of December 1, 2005, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $7.2 million Air Quality Facilities Note, Series 2005-B due January 1, 2034; (xix) the Air Quality Facilities Loan Agreement, dated as of September 1, 2008, between OAQDA and NG, as amended as of April 2, 2012, with respect to NG's $9.1 million Air Quality Facilities Note, Series 2008-B due October 1, 2033; (xx) the Air Quality Facilities Loan Agreement, dated as of November 1, 2008, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $23 million Air Quality Facilities Note, Series 2008-C due November 1, 2032; (xxi) the Air Quality Facilities Loan Agreement, dated as of December 1, 2006, between OAQDA and NG, with respect to NG's $15.5 million

18-50757-amk    Doc 3273    FILED 10/16/19    ENTERED 10/16/19 13:58:09    Page 107 of 299

Air Quality Facilities Note, Series 2006-B due December 1, 2033; (xxii) the Air Quality Facilities Loan Agreement, dated as of November 15, 2010, between OAQDA and NG, with respect to NG's $26 million Air Quality Facilities Note, Series 2010-B due June 1, 2033; (xxiii) the Air Quality Facilities Loan Agreement, dated as of April 1, 2009, between OAQDA and NG, as amended as of February 14, 2012, with respect to NG's $62.5 million Air Quality Facilities Note, Series 2009-A due June 1, 2033, which note is secured by NG FMBs; (xxiv) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of December 1, 2006, between OWDA and NG, as amended as of April 2, 2012, with respect to NG's $135.55 million Waste Water Facilities and Solid Waste Facilities Note, Series 2006-B due December 1, 2033; (xxv) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 15, 2010, between OWDA and NG, with respect to NG's $46.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-C due June 1, 2033; (xxvi) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of September 1, 2008, between OWDA and NG, as amended as of April 2, 2012, with respect to NG's $20.45 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-B due October 1, 2033; (xxvii) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 1, 2008, as amended as of February 14, 2012, between OWDA and NG, with respect to NG's $33 million Waste Water Facilities and Solid Waste Facilities Note, Series 2008-C due November 1, 2032; (xxviii) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of September 15, 2010, between OWDA and NG, as amended as of February 14, 2012, with respect to NG's $99.1 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-A due July 1, 2033; (xxix) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of December 1, 2005, between OWDA and NG, as amended as of February 14, 2012, with respect to NG's $82.8 million Waste Water Facilities and Solid Waste Facilities Note, Series 2005-B due January 1, 2034; (xxx) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 15, 2010, between OWDA and NG, with respect to NG's $54.6 million Waste Water Facilities and Solid Waste Facilities Note, Series 2010-B due June 1, 2033, which note is secured by NG FMBs; and (xxxi) the Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of June 1, 2009, between OWDA and NG, as amended as of February 14, 2012, with respect to NG's $107.5 million Waste Water Facilities and Solid Waste Facilities Note, Series 2009-A due June 1, 2033, which note is secured by NG FMBs.

223.     "PEDFA" means the Pennsylvania Economic Development Financing Authority.

224.     "Pension Bridge" means the terms of section B6.5 of the Pension Plan as in effect on the effective date of the FE Settlement Agreement, and as may be amended in the future as contemplated by the FE Settlement Agreement, under which an eligible participant who is (i) at least age 50, but not yet age 55, and is credited with at least 10 years of service, at the time of termination of employment, (ii) is terminated because the assets in his or her business unit are sold on or before December 31, 2020 after giving effect to the amendment contemplated by the FE Settlement Agreement, and (iii) remains employed by the buyer until the participant reaches age 55 or has an earlier qualifying termination of employment, will be eligible to elect to receive early retirement benefits under the Pension Plan as if the participant had remained employed by a participating employer under the Pension Plan until reaching age 55.

225.     "Pension Plan" means the tax-qualified FirstEnergy Corp. Master Pension Plan.

226.     "Pension Plan Claims" means claims arising from or related to the Pension Plan.

227.     "Periodic Distribution Date" means, unless otherwise ordered by the Bankruptcy Court, the Initial Distribution Date, and, thereafter, the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date.

228. "<u>Person</u>" means a person as such term is defined in section 101(41) of the Bankruptcy Code.

229. "<u>Petition Date</u>" means March 31, 2018.

230. "<u>Plan</u>" means this *Eighth Amended Joint Plan of Reorganization of FirstEnergy Solutions Corp., et al., Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement.

231. "<u>Plan Administrator</u>" means an entity to be named in the Plan Supplement or any successor appointed in accordance with the Plan Administrator Agreement pursuant to the authority granted in Section IV.S of the Plan.

232. "<u>Plan Administrator Advisory Board</u>" means that certain advisory board appointed pursuant to the terms and conditions of the Plan Administrator Agreement.

233. "<u>Plan Administrator Agreement</u>" means the agreement governing the appointment and operation of the Plan Administrator, which Plan Administrator Agreement shall be filed with the Plan Supplement.

234. "<u>Plan Settlement</u>" means the compromises and settlements by and among the Debtors and their respective Estates, the Independent Directors and Managers, the Committee, and the Consenting Creditors, of among other things (i) all Inter-Debtor Claims, (ii) the allocation of cash and/or New Common Stock between the Holders of Unsecured Bondholder Claims and the Holders of General Unsecured Claims against the Debtors, and (iii) the allocation of value between and among the Debtors' Estates, including allocation of the FE Settlement Value.

235. "<u>Plan Supplement</u>" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors no later than 10 days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement comprised of, among other documents, the following, as applicable: (i) the New Organizational Documents; (ii) the list of Rejected Executory Contracts and Unexpired Leases; (iii) the list of Assumed Executory Contracts and Unexpired Leases; (iv) the list of Assigned Contracts and Unexpired Leases; (v) a list of retained Causes of Action; (vi) the Management Incentive Plan; (vii) the identity of the members of the New Boards and management for the Reorganized Debtors; (viii) the Plan Administrator Agreement; (ix) the Reorganized Debtor Stockholders' Agreement; (x) the Reorganized Debtor Registration Rights Agreement; (xi) the Transition Working Group Management Agreement; (xii) the New Management Employment Contracts; and (xiii) the form of Mansfield Unit 1 Transfer Agreement. Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as applicable. The documents that comprise the Plan Supplement shall be subject to any consent or consultation rights provided hereunder and thereunder, including as provided in the definitions of the relevant documents or the Restructuring Support Agreement. The Parties entitled to amend the documents contained in the Plan Supplement shall be entitled to amend such documents in accordance with their respective terms and Article X of the Plan through and including the Effective Date.

236. "<u>Plan Term Sheet</u>" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

237. "<u>Pleasants Power Plant</u>" means the 1,300 megawatt power plant located in Willow Island, West Virginia and currently owned by AE Supply.

238. "Pleasants Purchase Agreement" means that certain asset purchase agreement dated December 31, 2018 between AE Supply, as seller and FG (or its assignee), as buyer for the Pleasants Power Plant.

239. "PPA Appeal Proceeding" means collectively, (i) *FirstEnergy Solutions Corp. and FirstEnergy Generation, LLC v. Federal Energy Regulatory Commission and Ohio Valley Electric Corp.*, Case No. 18-0306 (6th Cir.); (ii) *In re Ohio Valley Electric Corp.*, Case No. *18-0307* (6th Cir.); (iii) *In re FirstEnergy Solutions Corp, et al.*, Case No. 18-3787 (6th Cir.); (iv) *In re FirstEnergy Solutions Corp, et al.*, Case No. 18-3788 (6th Cir.); (v) *In re FirstEnergy Solutions Corp, et al.*, Case No. 18-4095 (6th Cir.), (vi) *In re FirstEnergy Solutions Corp, et al.*, Case No. 18-4097 (6th Cir.); (vii) *In re FirstEnergy Solutions Corp, et al.*, Case No. 18-4107 (6th Cir.); and (viii) *In re FirstEnergy Solutions Corp, et al.*, Case No. 18-4110 (6th Cir.).

240. "PPA Appeal Proceeding Contracts" means, collectively, (i) that certain multi-party intercompany power purchase agreement pursuant to which FES and several other power companies "sponsor" and purchase power generated by fossil fuel from the Ohio Valley Electric Corporation and (ii) that certain Renewable Power Purchase Agreement between FES and Maryland Solar LLC.

241. "Priority Tax Claim" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

242. "Pro Rata" means (i) with respect to any individual Claim, the proportion that the amount of a Claim or Interest of a particular type bears to the aggregate amount of the Claims or Interests of that type, (ii) in connection with the Plan Settlement, with respect to any Debtor, the proportion of value or other distributions allocated to such Debtor in accordance with the Plan Settlement, (iii) in connection with the allocation of Unsecured Distributable Value, the Reallocation Pool, the NG Reallocation Pool, or the FENOC-FES Claim Reallocation, the proportion that the amount of an Allowed Claim or Allowed Interest bears to the aggregate amount of the Allowed Claims or Allowed Interests entitled to recover from the same Unsecured Distributable Value, the Reallocation Pool, the NG Reallocation Pool, and/or the FENOC-FES Claim Reallocation, (iv) in connection with the allocation of the Distributable Value Adjustment Amount, the proportion based upon the Distributable Value Split applicable to such Class of Claims, or (v) in connection with the allocation of the Effective Date Cash Distribution to each Holder of New Common Stock, the proportion that the amount of New Common Stock to be issued to such Holder bears to the aggregate amount of all New Common Stock to be issued under the Plan (including to the Disputed Claims Reserve) as of the Effective Date.

243. "Process Support Agreement" means that certain Process Support Agreement entered into by and among (i) the Debtors; (ii) members of the Ad Hoc Noteholder Group and the Mansfield Certificateholders Group; (iii) the Committee, solely for purposes of the Mansfield Issues Protocol (as defined in the Process Support Agreement); (iv) MetLife, solely for purposes of the Mansfield Issues Protocol, the Term Sheet (as defined in the Process Support Agreement) and Section 1, 2, 3 (solely with respect to the Mansfield Issues Protocol and the Term Sheet), 4, 5, 7.01, 8, 9, 10.02, 10.03, and 11; (v) U.S. Bank solely for purposes of the Mansfield Issues Protocol, the Term Sheet (as defined in the Process Support Agreement) and Section 1, 2, 3 (solely with respect to the Mansfield Issues Protocol and the Term Sheet), 4, 5, 7.01, 8, 9, 10.02, 10.03, and 11; and (vi) Wilmington Savings Fund Society, FSB, solely for purposes of the Mansfield Issues Protocol, and which Process Support Agreement was approved by the Bankruptcy Court on May 9, 2018 [Docket No. 509].

244. "Professional" means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professional Order: (i) retained pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services

rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (ii) other than with respect to the Other Professional Fee Claims, awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

245. "Professional Fee Claims" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

246. "Professional Fee Claims Bar Date" means the deadline for Filing final requests for payment of Professional Fee Claims, which shall be 60 days after the Effective Date.

247. "Professional Fee Escrow Account" means an escrow account established and funded pursuant to Article II.A.3(b) of the Plan for Professional Fee Claims.

248. "Professional Fee Escrow Agent" means the escrow agents for the Professional Fee Escrow Account appointed pursuant to Article II.A.3(b) of the Plan and the escrow agreements entered into pursuant thereto.

249. "Professional Fee Reserve Amount" means the total amount of unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.A.3(c).

250. "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

251. "Proof of Interest" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

252. "Rail Claim Settlement" means that certain Settlement Agreement, dated May 1, 2017, by and among FE Corp., FG, BNSF Railway Company and CSX Transportation Inc.

253. "Reallocation Pool" means a pool consisting of $45,750,000 of the aggregate Unsecured Distributable Value from all Debtors otherwise available for distribution to Holders of Unsecured Bondholder Claims, which shall be reallocated to Holders of Single-Box Unsecured Claims against the various Debtors ratably based on the allocation of FE Settlement consideration to such Debtors.

254. "Reinstate," "Reinstated," or "Reinstatement" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

255. "Rejected Executory Contract or Unexpired Lease" means any Executory Contract or Unexpired Lease rejected by order of the Bankruptcy Court or to be rejected pursuant to the Plan, as reflected in the Plan Supplement and as may be further amended or modified by inclusion in the Plan Supplement.

256. "Released Parties" means collectively, the Debtor Released Parties, the FE Non-Debtor Released Parties and the Other Released Parties.

257. "Reorganized" or "Reorganized Debtor" means any Debtor as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including New Holdco.

258. "Reorganized Debtor Registration Rights Agreement" means one or more registration rights agreements, if any, to be entered into (or deemed entered into) by the Reorganized Debtors and the holders of the New Common Stock on the Effective Date that will govern certain matters related to the registration of the New Common Stock, which shall be included in the Plan Supplement.

259. "Reorganized Debtor Stockholders' Agreement" means the one or more stockholders' agreements, if any, to be entered into (or deemed entered into) by the Reorganized Debtors and the holders of the New Common Stock on the Effective Date that will govern certain matters related to the governance of the Reorganized Debtors, which shall be included in the Plan Supplement and shall be reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties.

260. "Requisite Supporting Parties" means Consenting Creditors representing at least 70% of the total aggregate principal and face amount of Unsecured Claims held by the Consenting Creditors, which shall include (i) Consenting Creditors holding at least 33% of the total aggregate principal and face amount of the Mansfield Certificate Claims held by the Consenting Creditors and (ii) (x) to the extent affecting distributions on account of, or economic treatment of, FES Single-Box Unsecured Claims in a manner inconsistent with the Restructuring Support Agreement (except to the extent such inconsistency only results in Pro Rata dilution of New Common Stock), the rights of minority holders of New Common Stock (to the extent inconsistent with the corporate governance term sheet attached to the Restructuring Support Agreement) or release or exculpation provisions relating to the FES Creditor Group, members of the FES Creditor Group holding at least 50% of the total face amount of the FES Single-Box Unsecured Claims and FENOC-FES Unsecured Claims held by the FES Creditor Group and (y) to the extent affecting distributions on account of, or economic treatment of, FENOC-FES Unsecured Claims in a manner inconsistent with the Plan Term Sheet (except to the extent such inconsistency only results in Pro Rata dilution of New Common Stock), members of the FES Creditor Group holding at least 50% of the total face amount of the FENOC-FES Unsecured Claims held by the FES Creditor Group.

261. "Restructuring Support Agreement" means that certain Restructuring Support Agreement dated as of January 23, 2019 by and among the Debtors, the Consenting Creditors and the Committee, as may be amended, supplemented or otherwise modified from time to time in accordance therewith.

262. "Restructuring Transactions" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors, the Consenting Creditors, and except as specifically provided herein, the Committee, reasonably determine to be necessary or desirable to implement the Plan.

263. "SAP System of Record" means the Systems, Applications and Products in Data Processing system maintained and controlled by FESC.

264. "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts or Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

265. "SEC" means the Securities and Exchange Commission.

266. "Secured" means when referring to a Claim: (i) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by

reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (ii) Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a secured claim.

267. "Secured FG PCN Claims" means, collectively, any PCN Claims against FG that are Secured by FG FMBs.

268. "Secured FG PCN Designated Claims" means, collectively, the Secured FG PCN Claims relating to any series of Secured PCN Claims (i) that have matured on or before the Effective Date, or (ii) arise under PCNs listed as CUSIPs 074876HQ9 and 708686EE6.

269. "Secured FG PCN Reinstated Claims" means, collectively, the Secured FG PCN Claims that are not Secured FG PCN Designated Claims.

270. "Secured NG PCN Claims" means, collectively, any PCN Claims against NG that are Secured by NG FMBs.

271. "Secured PCN Claims" means, collectively the Secured FG PCN Claims and Secured NG PCN Claims.

272. "Secured PCN Indenture Trustee" means, as applicable, UMB Bank, National Association, as successor trustee under the applicable PCN Indentures, which entity is also successor trustee under the FG Mortgage and the NG Mortgage.

273. "Securities Act" means the Securities Act of 1933, as amended, codified at 15 U.S.C. § 77a *et seq.*, together with the rules and regulations promulgated thereunder.

274. "Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, codified at 15 U.S.C. §§ 78a *et. seq.*, together with the rules and regulations promulgated thereunder.

275. "Security" or "Securities" has the meaning set forth in section 101(49) of the Bankruptcy Code.

276. "Single-Box Unsecured Claim" means any General Unsecured Claim filed against only one Debtor.

277. "Standstill Agreement" means that certain Amended and Restated Standstill Agreement entered into by and among (i) the Debtors, (ii) members of the Ad Hoc Noteholders Group and the Mansfield Certificateholders Group, (iii) the FE Non-Debtor Parties, and (iv) the Committee, and which Standstill Agreement was approved by the Bankruptcy Court on May 9, 2018 [Docket No. 509], as amended on August 1, 2018 [Docket No. 1084].

278. "Tax Allocation Agreement" means that certain Intercompany Income Tax Allocation Agreement, dated as of January 31, 2017, by and among FE Corp. and each of its subsidiaries, including the Debtors, as the same has been or may be subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto.

18-50757-amk    Doc 3273    FILED 10/16/19    ENTERED 10/16/19 13:56:09    Page 113 of 299

279. "Tax Matters Agreement" means that certain Tax Matters Agreement to be entered into between the Debtors and the FE Non-Debtor Parties prior to the Plan Effective Date which agreement shall be in form and substance reasonably acceptable to the Requisite Supporting Parties.

280. "Transition Working Group" has the meaning ascribed to such term in the Restructuring Support Agreement.

281. "Transition Working Group Management Agreement" means the agreement among the Debtors and the members of the Transition Working Group who are not employees of the Debtors.

282. "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

283. "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

284. "U.S." means the United States of America.

285. "U.S. Bank" means U.S. Bank Trust National Association.

286. "U.S. Trustee" means the Office of the U.S. Trustee for the Northern District of Ohio.

287. "Unsecured Bondholder Cash Pool" means, a pool of cash equal to the aggregate value of New Common Stock distributed on the Effective Date to Holders of Allowed General Unsecured Claims who have an election to receive New Common Stock in lieu of Cash and make such election.

288. "Unsecured Bondholder Claims" means, collectively: (i) FES Notes Claims, (ii) Unsecured PCN Claims, and (iii) Mansfield Certificate Claims.

289. "Unsecured Claim" means any Claim that is not a Secured Claim.

290. "Unsecured Distributable Value" means (i) with respect to FENOC, the FENOC Unsecured Distributable Value, (ii) with respect to FES, the FES Unsecured Distributable Value, (iii) with respect to FG, the FG Unsecured Distributable Value, (iv) with respect to FGMUC, the FGMUC Unsecured Distributable Value, and (v) with respect to NG, the NG Unsecured Distributable Value.

291. "Unsecured FG PCN Claims" means any PCN Claims against FG that are not Secured FG PCN Claims.

292. "Unsecured NG PCN Claims" means any PCN Claims against NG that are not Secured NG PCN Claims.

293. "Unsecured Non-Priority Claims" means any Unsecured Claims that are not Administrative Claims, Priority Tax Claims or Other Priority Claims.

294. "Unsecured PCN Claims" means collectively, the Unsecured FG PCN Claims and the Unsecured NG PCN Claims.

295. "Unsecured PCN/FES Notes Claims" means, collectively: (i) the Unsecured PCN Claims and (ii) the FES Notes Claims.

296. "<u>Unsecured PCN/FES Notes Claims Against FES</u>" means any Unsecured PCN Claims and FES Notes Claims against FES, including Unsecured PCN Claims and FES Notes Claims against FES arising from guarantees.

297. "<u>Unsecured PCN/FES Notes Claims Against FG</u>" means any Unsecured PCN Claims and FES Notes Claims against FG, including Unsecured PCN Claims and FES Notes Claims against FG arising from guarantees.

298. "<u>Unsecured PCN/FES Notes Claims Against NG</u>" means any Unsecured PCN Claims and FES Notes Claims against NG, including Unsecured PCN Claims and FES Notes Claims against NG arising from guarantees.

299. "<u>Unsecured PCN Indenture Trustee</u>" means the Bank of New York Mellon Trust Company, N.A., as trustee under the applicable PCN Indentures.

300. "<u>Vacation Claims</u>" means any claims guaranteed by FE Corp. in that certain Guarantee, dated as of February 21, 2017, in favor of certain employees who (i) participate in the FirstEnergy Time Off Program, (ii) have participated in a predecessor plan on or before December 31, 2008, and (iii) have earned a banked or frozen vacation benefit.

301. "<u>Waived Tax Claims</u>" means any Claim in respect of the FES Tax Overpayment.

302. "<u>Welfare and Benefit Plan Administration Costs</u>" means the costs (other than any indirect costs related to human resources management services pursuant to the Amended Shared Services Agreement) relating to the administration of any Welfare Plan that are incurred with respect to or allocable to the Debtors' Current Employees or the Debtors' Former Employees, from and after the date on which the Debtors cease to participate in any such plan.

303. "<u>Welfare Plans</u>" means the welfare benefit plans or programs sponsored by FE Corp. or FESC.

304. "<u>Worthless Stock Deduction</u>" means any deduction related to FE Corp.'s ownership interest in the Debtors to be claimed pursuant to 26 U.S.C. § 165.

B.    *Rules of Interpretation.*

For the purposes of the Plan:

(1)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(2)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; provided that any such amendment, modification, or supplement is made in accordance with the terms of the Plan and the Restructuring Support Agreement and the terms governing any applicable document, schedule, or exhibit, including any consent right in favor of the Debtors, the Reorganized Debtors, the FE Non-Debtor Parties, the Requisite Supporting Parties, the Mansfield Owner Parties, or the Committee;

(3)     any reference to an Entity as a Holder of a Claim or Interest includes the Entity's successors and assigns;

(4)     unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto;

(5)     unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement;

(6)     unless otherwise specified, the words "herein," "hereof", and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

(7)     captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(8)     unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

(9)     any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be;

(10)     all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

(11)     all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated;

(12)     any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity;

(13)     except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, including a newly created holding company entity or other newly created entities, as applicable, to the extent the context requires.

C.     *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Except as otherwise provided herein or in the Restructuring Support Agreement, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Ohio, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and

implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.    *References to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the U.S., unless otherwise expressly provided.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.

A.    *Administrative Claims.*

1.    <u>General Administrative Claims.</u>

Except as specified in this Article II, and with respect to the FE Non-Debtor Parties, subject to the FE Settlement Agreement, unless the Holder of an Allowed General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either: (i) on the Effective Date; (ii) if the General Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (iii) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.

Requests for payment of General Administrative Claims must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date applicable to the Debtor against whom the General Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date. Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors, the Reorganized Debtors, or their respective property and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date. Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors or further order of the Bankruptcy Court. To the extent this Article II.A.1 conflicts with Article XII.C of the

Plan with respect to fees and expenses payable under section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, Article XII.C of the Plan shall govern.

        2.      <u>Postpetition Inter-Debtor Claims</u>.

Without the need to file or serve any request for payment of a General Administrative Claim, in accordance with the Plan Settlement, the postpetition Inter-Debtor Claims shall be Allowed as follows: (i) the postpetition Inter-Debtor Claim of FG against FES shall be Allowed as super-priority Administrative Claims in an amount equal to $120,291,389; (ii) the postpetition Inter-Debtor Claim of NG against FES shall be Allowed as super-priority Administrative Claims in an amount equal to $238,431,879; (iii) the postpetition Inter-Debtor Claims of FGMUC against FG shall be disallowed in full; (iv) the postpetition Inter-Debtor Claims of FENOC against FES shall be Allowed as a super-priority Administrative Claim in the amount of $2,000,000; and (v) the postpetition Inter-Debtor Claims of FENOC against NG shall be Allowed as super-priority Administrative Claims in the amount of $69,929,041. In lieu of Cash payment or other distribution to the Debtors holding such Inter-Debtor Claims, the distributions on account of such Inter-Debtor Claims may be made to the Holders of Allowed Unsecured Claims against the Debtor holding such Inter-Debtor Claims in accordance with the terms and conditions of this Plan.

        3.      <u>Professional Compensation</u>.

        a.      **Final Fee Applications.**

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be Filed and served on the Debtors or Reorganized Debtors, as applicable, the Committee and the United States Trustee no later than the Professional Fee Claims Bar Date. All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Bankruptcy Court, paid promptly from the Professional Fee Escrow Account in its full Allowed amount. Notwithstanding anything to the contrary herein, the provisions regarding the reimbursement of professional fees and expenses of the Supporting Creditors as set forth in the Process Support Agreement and of the Consenting Creditors as set forth in the Restructuring Support Agreement shall continue through the Effective Date and, for the avoidance of doubt, such professionals shall not be required to file any request for payment of such amounts pursuant to Article II.A.3 of the Plan or otherwise.

        b.      **Professional Fee Escrow Account.**

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.

Upon the establishment of the Professional Fee Escrow Account, the Reorganized Debtors shall select a Professional Fee Escrow Agent for the Professional Fee Escrow Account to administer payments to and from such Professional Fee Escrow Account in accordance with the Plan and shall enter into an escrow agreement providing for administration of such payments in accordance with the Plan.

The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by Final Order.

### c. Professional Fee Reserve Amount.

Professionals shall estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such estimate to the Debtors no later than ten Business Days before the Effective Date; *provided, however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total amount estimated pursuant to this Article II.A.3(c) shall comprise the Professional Fee Reserve Amount.

### d. Post-Effective Date Fees and Expenses.

When all Allowed amounts owing to Professionals have been paid in full from the Professional Fee Escrow Account, any remaining amount in the Professional Fee Escrow Account shall be disbursed to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

If the amount in the Professional Fee Escrow Account is insufficient to fund payment in full of all Allowed amounts owing to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow Account by the Reorganized Debtors.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the applicable Effective Date. The Debtors reserve the right to

assert that the treatment provided to Holders of Claims and Interests pursuant to Article III.B of the Plan renders such Holders Unimpaired.

1.  <u>Class Identification for the Debtors.</u>

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, as applicable, and shall include the classifications set forth below. Subject to Article III.D of the Plan, to the extent that a Class contains Claims or Interests only with respect to one or more particular Debtor, such Class applies solely to such Debtor.

The following charts represent the classification of Claims and Interests for the Debtors pursuant to the Plan.

a.  **FES**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class A1 | Other Secured Claims Against FES | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A2 | Other Priority Claims Against FES | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class A3 | Unsecured PCN/FES Notes Claims Against FES | Impaired | Entitled to Vote |
| Class A4 | Mansfield Certificate Claims Against FES | Impaired | Entitled to Vote |
| Class A5 | FENOC-FES Unsecured Claims | Impaired | Entitled to Vote |
| Class A6 | FES Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class A7 | Mansfield Indemnity Claims | Impaired | Entitled to Vote |
| Class A8 | Convenience Claims | Impaired | Entitled to Vote |
| Class A9 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class A10 | Interests in FES | Impaired | Not Entitled to Vote (Deemed to Reject) |

b.  **FG**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class B1 | Other Secured Claims Against FG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B2 | Other Priority Claims Against FG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B3 | Secured FG PCN Designated Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B4 | Secured FG PCN Reinstated Claims | Impaired | Entitled to Vote |
| Class B5 | Unsecured PCN/FES Notes Claims Against FG | Impaired | Entitled to Vote |
| Class B6 | Mansfield Certificate Claims Against FG | Impaired | Entitled to Vote |

37

| Class B7 | FG Single-Box Unsecured Claims | Impaired | Entitled to Vote |
|---|---|---|---|
| Class B8 | Mansfield Indemnity Claims | Impaired | Entitled to Vote |
| Class B9 | Convenience Claims | Impaired | Entitled to Vote |
| Class B10 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class B11 | Interests in FG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

c.      **NG**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class C1 | Other Secured Claims Against NG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class C2 | Other Priority Claims Against NG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class C3 | Secured NG PCN Claims | Impaired | Entitled to Vote |
| Class C4 | Unsecured PCN/FES Notes Claims Against NG | Impaired | Entitled to Vote |
| Class C5 | Mansfield Certificate Claims Against NG | Impaired | Entitled to Vote |
| Class C6 | NG Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class C7 | NG-FENOC Unsecured Claims against NG | Impaired | Entitled to Vote |
| Class C8 | Convenience Claims | Impaired | Entitled to Vote |
| Class C9 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class C10 | Interests in NG | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

d.      **FENOC**

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class D1 | Other Secured Claims Against FENOC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class D2 | Other Priority Claims Against FENOC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class D3 | FENOC-FES Unsecured Claims against FENOC | Impaired | Entitled to Vote |
| Class D4 | FENOC Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class D5 | NG-FENOC Unsecured Claims against FENOC | Impaired | Entitled to Vote |
| Class D6 | Convenience Claims | Impaired | Entitled to Vote |
| Class D7 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class D8 | Interests in FENOC | Impaired | Not Entitled to Vote (Deemed to Reject) |

### e. FGMUC

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class E1 | Other Secured Claims Against FGMUC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class E2 | Other Priority Claims Against FGMUC | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class E3 | Mansfield Certificate Claims Against FGMUC | Impaired | Entitled to Vote |
| Class E4 | FGMUC Single-Box Unsecured Claims | Impaired | Entitled to Vote |
| Class E5 | Mansfield Indemnity Claims | Impaired | Entitled to Vote |
| Class E6 | Convenience Claims | Impaired | Entitled to Vote |
| Class E7 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class E8 | Interests in FGMUC | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |

### f. FE Aircraft

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class F1 | Other Secured Claims Against FE Aircraft | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class F2 | Other Priority Claims Against FE Aircraft | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class F3 | General Unsecured Claims Against FE Aircraft | Impaired | Entitled to Vote |
| Class F4 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class F5 | Interests in FE Aircraft | Impaired | Not Entitled to Vote (Deemed to Reject) |

### g. Norton

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class G1 | Other Secured Claims Against Norton | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class G2 | Other Priority Claims Against Norton | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class G3 | General Unsecured Claims Against Norton | Impaired | Entitled to Vote |
| Class G4 | Inter-Debtor Claims | Impaired | Shall Not Vote |
| Class G5 | Interests in Norton | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

B.    *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.    <u>Class A1 – Other Secured Claims Against FES</u>.

a.    *Classification*: Class A1 consists of Other Secured Claims against FES.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A1, each such Holder shall receive, at the option of FES, either:

i.    payment in full in Cash;

ii.    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii.    Reinstatement of such Claim; or

iv.    other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class A1 is Unimpaired under the Plan.  Holders of Claims in Class A1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class A2 – Other Priority Claims Against FES</u>.

a.    *Classification*: Class A2 consists of Other Priority Claims against FES.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class A2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class A2, each such Holder shall receive, at the option of FES, either:

i.    payment in full in Cash; or

ii.    other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class A2 is Unimpaired under the Plan.  Holders of Claims in Class A2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3. <u>Class A3 Unsecured PCN/FES Notes Claims Against FES.</u>

a. *Classification*: Class A3 consists of Unsecured PCN/FES Notes Claims against FES.

b. *Allowance*: The Unsecured PCN/FES Notes Claims Against FES shall be Allowed in the aggregate amount of $2,237,912,062, including the FES Notes Claims in the amount of $701,311,411 and the guarantee claims of the Holders of Unsecured FG PCN Claims in the amount of $684,638,378, and Unsecured NG PCN Claims in the amount of $851,962,273.

c. *Treatment*: Except to the extent that a Holder of an Allowed Unsecured PCN/FES Notes Claim Against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured PCN/FES Notes Claim Against FES, each Holder of an Allowed Unsecured PCN/FES Notes Claim Against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims, (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation. The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A3.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Initial Distribution Date or as soon as reasonably practicable thereafter, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims, (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New Common Stock, subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A3.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Unsecured PCN/FES Notes Claim Against FES that received New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d. *Voting*: Class A3 is Impaired under the Plan. Holders of Claims in Class A3 are entitled to vote to accept or reject the Plan.

4. <u>Class A4 – Mansfield Certificate Claims Against FES.</u>

   a. *Classification*: Class A4 consists of Mansfield Certificate Claims against FES.

   b. *Allowance*: The Mansfield Certificate Claims Against FES shall be Allowed in the aggregate amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

   c. *Treatment*: Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim Against FES, each Holder of an Allowed Mansfield Certificate Claim Against FES shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims, and (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and Holders of FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation. The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A4.

   Notwithstanding the foregoing, Electing Bondholders shall receive, on the Initial Distribution Date, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FES Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims, (ii) the FENOC-FES Claim Reallocation to Holders of FES Single-Box Unsecured Claims and the Holders FENOC-FES Unsecured Claims against FES and (iii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New Common Stock, subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FES in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A4.

   In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against FES that received New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

   d. *Voting*: Class A4 is Impaired under the Plan. Holders of Claims in Class A4 are entitled to vote to accept or reject the Plan.

5. <u>Class A5 – FENOC-FES Unsecured Claims Against FES.</u>

    a.    *Classification*:  Class A5 consists of Holders of FENOC-FES Unsecured Claims (solely as to the portion of the claim against FES).

    b.    *Treatment:*  Except to the extent that a Holder of an Allowed FENOC-FES Unsecured Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC-FES Unsecured Claim Against FES, each Holder of an Allowed FENOC-FES Unsecured Claim Against FES shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of (i) the FES Unsecured Distributable Value, and (ii) the FENOC-FES Claim Reallocation, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New Common Stock in equal amount, subject to the Equity Election Conditions, and subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed FENOC-FES Unsecured Claims against FES set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A5.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FENOC-FES Unsecured Claim Against FES that receives New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

    c.    *Voting*: Class A5 is Impaired under the Plan.  Holders of Claims in Class A5 are entitled to vote to accept or reject the Plan.

6. <u>Class A6 – FES Single-Box Unsecured Claims.</u>

    a.    *Classification*:  Class A6 consists of FES Single-Box Unsecured Claims.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed FES Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FES Single-Box Unsecured Claim, each Holder of an Allowed FES Single-Box Unsecured Claim shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of (i) the FES Unsecured Distributable Value, (ii) the portion of the Reallocation Pool allocated to FES, (iii) the FENOC-FES Claim Reallocation, and (iv) the NG Reallocation Pool, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed FES Single-Box Unsecured Claims set forth in clauses (i) through (iv) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class A6.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FES Single-Box Unsecured Claim that receives New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c.   *Voting*: Class A6 is Impaired under the Plan.  Holders of Claims in Class A6 are entitled to vote to accept or reject the Plan.

7.   <u>Class A7 –Mansfield Indemnity Claims Against FES.</u>

a.   *Classification*:  Class A7 consists of the Mansfield TIA Claims against FES and the Mansfield OT Claims against FES.

b.   *Allowance:*  The Mansfield TIA Claims against FES shall be Allowed as Unsecured Claims in the aggregate amount of $182,000,000.00.  The Mansfield OT Claims against FES shall be Allowed as Unsecured Claims in the aggregate amount of $28,882.75.

c.   *Treatment*:  Except to the extent that a Holder of an Allowed Mansfield Indemnity Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Indemnity Claim against FES, each Holder of an Allowed Mansfield Indemnity Claim against FES shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of FES Unsecured Distributable Value.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Indemnity Claims against FES shall be subject to the Distributable Value Adjustment Amount applicable to Class A7.

d.   *Voting*:  Class A7 is Impaired under the Plan.  Holders of Claims in Class A7 are entitled to vote to accept or reject the Plan.

8.   <u>Class A8 – Convenience Claims against FES.</u>

a.   *Classification*: Class A8 consists of all Convenience Claims against FES.

b.   *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FES agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FES, each Holder of an Allowed Convenience Claim against FES that has properly elected to be treated as such on its Ballot shall receive, on the Initial Distribution Date, Cash in an amount equal to 36.4% of the Allowed Convenience Claim.

c.   *Voting*: Class A8 is Impaired under the Plan.  Holders of Claims in Class A8 are entitled to vote to accept or reject the Plan.

9.   <u>Class A9 – Inter-Debtor Claims against FES.</u>

a.   *Classification*: Class A9 consists of prepetition Inter-Debtor Claims against FES.

b.   *Allowance:* The prepetition Inter-Debtor Claims against FES shall be Allowed as follows: (i) the prepetition Inter-Debtor Claims of FG against FES shall be Allowed as Unsecured Claims in the aggregate amount of $1,488,190,630; (ii) the prepetition Inter-Debtor Claims of NG against FES shall be Allowed as Unsecured Claims in the aggregate amount of $1,670,896,976; (iii) the prepetition Inter-Debtor Claims of FENOC against FES shall be Allowed as

Unsecured Claims in the aggregate amount of $28,000,000; and (iv) the prepetition Inter-Debtor Claim of FE Aircraft against FES shall be Allowed as Unsecured Claims in the aggregate amount of $2,322,082.

    c.    *Treatment*:  Each Holder of an Allowed prepetition Inter-Debtor Claim against FES shall receive their Pro Rata share of the FES Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against FES, the distributions on account of such prepetition Inter-Debtor Claims against FES shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FES by including the recovery on such prepetition Inter-Debtor Claims against FES in the calculation of the Unsecured Distributable Value relating to the Debtor holding such Inter-Debtor Claims against FES.

    d.    *Voting*: Class A9 is Impaired under the Plan.  Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FES are insiders whose votes will not be counted.  Accordingly, this class will not vote to accept or reject the Plan.

10.    <u>Class A10 – Interests in FES.</u>

    a.    *Classification*: Class A10 consists of Interests in FES.

    b.    *Treatment*: As of the Effective Date, Interests in FES shall be cancelled and released without any distribution on account of such Interests.

    c.    *Voting*: Class A10 is Impaired under the Plan.  Holders of Claims in Class A10 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

11.    <u>Class B1 – Other Secured Claims against FG.</u>

    a.    *Classification*: Class B1 consists of Other Secured Claims against FG.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B1, each such Holder shall receive, at the option of FG, either:

    i.    payment in full in Cash;

    ii.    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

    iii.    Reinstatement of such Claim; or

    iv.    other treatment rendering such Claim Unimpaired.

c. *Voting*: Class B1 is Unimpaired under the Plan. Holders of Claims in Class B1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

12. Class B2 – Other Priority Claims Against FG.

a. *Classification*: Class B2 consists of Other Priority Claims against FG.

b. *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class B2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class B2, each such Holder shall receive, at the option of FG, either:

i. payment in full in Cash; or

ii. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class B2 is Unimpaired under the Plan. Holders of Claims in Class B2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

13. Class B3 – Secured FG PCN Designated Claims.

a. *Classification*: Class B3 consists of the Secured FG PCN Designated Claims.

b. *Allowance*: The Secured FG PCN Designated Claims shall be Allowed in the aggregate principal amount of $181,260,000, plus accrued and unpaid pre- and postpetition interest (at the prepetition rate) on such principal amount through and including the Effective Date.

c. *Treatment*: Allowed Secured FG PCN Designated Claims shall be paid in full in Cash on the Effective Date or as soon thereafter as practicable.

d. *Voting*: Class B3 is Unimpaired under the Plan. Holders of Claims in Class B3 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

14. Class B4 – Secured FG PCN Reinstated Claims.

a. *Classification:* Class B4 consists of the Secured FG PCN Reinstated Claims against FG.

b. *Allowance*: The Secured FG PCN Reinstated Claims shall be Allowed in the aggregate principal amount of $146,300,000, plus accrued and unpaid pre- and postpetition interest (at the prepetition rate) on such principal amount through and including the Effective Date.

c.      *Treatment*: Allowed Secured FG PCN Reinstated Claims shall be Reinstated in full on the Effective Date or as soon as practicable thereafter, *provided, however*, that any Allowed Secured FG PCN Reinstated Claims relating to accrued and unpaid pre- and postpetition interest on the principal amount of Secured FG PCN Reinstated Claims shall be paid in full in Cash.

The guarantee of FES with respect to such Allowed Secured FG PCN Reinstated Claims shall be reinstated, and on the Effective Date if any assets of FES are transferred to New Holdco pursuant to the Plan then New Holdco shall also provide a new unsecured guarantee with respect to such Allowed Secured FG PCN Reinstated Claims.

d.      *Voting*:  Class B4 is Impaired under the Plan.  Holders of Claims in Class B4 shall be entitled to vote to accept or reject the Plan.

15.      Class B5 – Unsecured PCN/FES Notes Claims Against FG.

a.      *Classification*:  Class B5 consists of Unsecured PCN/FES Notes Claims against FG.

b.      *Allowance*: The Unsecured PCN/FES Notes Claims against FG shall be Allowed in the aggregate amount of $2,237,912,062, which is comprised of the Unsecured FG PCN Claims in the amount of $684,638,378 and the guarantee claims of the Holders of FES Notes Claims in the amount of $701,311,411, and the Unsecured NG PCN Claims in the amount of $851,962,273.

c.      *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured PCN/FES Notes Claim Against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured PCN/FES Notes Claim Against FG, each Holder of an Allowed Unsecured PCN/FES Notes Claim Against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of the FG Unsecured Distributable Value, subject to (i) the reallocation of the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B5.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Initial Distribution Date, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New Common Stock and subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES

Notes Claims Against FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B5.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Unsecured PCN/FES Notes Claim Against FG that received New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d.    *Voting*: Class B5 is Impaired under the Plan.  Holders of Claims in Class B5 are entitled to vote to accept or reject the Plan.

16.    <u>Class B6 – Mansfield Certificate Claims Against FG.</u>

a.    *Classification*:  Class B6 consists of Mansfield Certificate Claims against FG.

b.    *Allowance*: The Mansfield Certificate Claims Against FG shall be Allowed in the aggregate amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

c.    *Treatment*:   Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim Against FG, each Holder of an Allowed Mansfield Certificate Claim Against FG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of the FG Unsecured Distributable Value, subject to (i) the reallocation of the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B6.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Initial Distribution Date, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New Common Stock subject to dilution for the Management Incentive Plan.   The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B6.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against FG that received New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

48

d.    *Voting*: Class B6 is Impaired under the Plan.  Holders of Claims in Class B6 are entitled to vote to accept or reject the Plan.

17.    <u>Class B7 – FG Single-Box Unsecured Claims.</u>

a.    *Classification*: Class B7 consists of FG Single-Box Unsecured Claims.

b.    *Treatment*:  Except to the extent that a Holder of an Allowed FG Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FG Single-Box Unsecured Claim, each Holder of an Allowed FG Single-Box Unsecured Claim shall receive, on the Initial Distribution, cash equal to its Pro Rata share of (i) the FG Unsecured Distributable Value and (ii) the Reallocation Pool allocable to FG, *provided* that such Holders shall have the option to elect to receive their ratable share of New Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed FG Single-Box Unsecured Claims set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class B7.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FG Single-Box Unsecured Claim that receives New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c.    *Voting*: Class B7 is Impaired under the Plan.  Holders of Claims in Class B5 are entitled to vote to accept or reject the Plan.

18.    <u>Class B8 –Mansfield Indemnity Claims against FG.</u>

a.    *Classification*:  Class B8 consists of the Mansfield TIA Claims against FG and the Mansfield OT Claims against FG.

b.    *Allowance:*  The Mansfield TIA Claims against FG shall be Allowed as Unsecured Claims in the aggregate amount of $182,000,000.00.  The Mansfield OT Claims against FG shall be Allowed as Unsecured Claims in the aggregate amount of $28,882.75.

c.    *Treatment*:  Except to the extent that a Holder of an Allowed Mansfield Indemnity Claim against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Indemnity Claim against FG, each Holder of an Allowed Mansfield Indemnity Claim against FG shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of FG Unsecured Distributable Value.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Indemnity Claims against FG shall be subject to the Distributable Value Adjustment Amount applicable to Class B8.

d.    *Voting*: Class B8 is Impaired under the Plan.  Holders of Claims in Class B8 are entitled to vote to accept or reject the Plan.

19. <u>Class B9 -- Convenience Claims against FG.</u>

    a.     *Classification*: Class B9 consists of all Convenience Claims against FG.

    b.     *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FG, each Holder of an Allowed Convenience Claim against FG that has properly elected to be treated as such on its Ballot shall receive, on the Initial Distribution Date, Cash in an amount equal to 22.0% of the Allowed Convenience Claim.

    c.     *Voting*: Class B9 is Impaired under the Plan. Holders of Claims in Class B9 are entitled to vote to accept or reject the Plan.

20. <u>Class B10 – Inter-Debtor Claims against FG.</u>

    a.     *Classification*: Class B10 consists of prepetition Inter-Debtor Claims against FG.

    b.     *Allowance:* The prepetition Inter-Debtor Claims of FGMUC against FG shall be Allowed as Unsecured Claims in the aggregate amount of $901,881,812.

    c.     *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against FG shall receive their Pro Rata share of the FG Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claim against FG, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FG by including the recovery on such prepetition Inter-Debtor Claims against FG in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against FG.

    d.     *Voting*: Class B10 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FG are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

21. <u>Class B11 – Interests in FG.</u>

    a.     *Classification*: Class B11 consists of Interests in FG.

    b.     *Treatment*: Reorganized FES shall retain ownership of all Interests in FG.

    c.     *Voting*: Holders of Interests in Class B11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

22. <u>Class C1 – Other Secured Claims against NG.</u>

    a.     *Classification*: Class C1 consists of Other Secured Claims against NG.

b.  *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C1, each such Holder shall receive, at the option of NG, either:

  i.   payment in full in Cash;

  ii.  delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

  iii. Reinstatement of such Claim; or

  iv.  other treatment rendering such Claim Unimpaired.

c.  *Voting*: Class C1 is Unimpaired under the Plan.  Holders of Claims in Class C1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

23.  Class C2 – Other Priority Claims against NG.

a.  *Classification*: Class C2 consists of Other Priority Claims against NG.

b.  *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class C2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class C2, each such Holder shall receive, at the option of NG, either:

  i.   payment in full in Cash; or

  ii.  other treatment rendering such Claim Unimpaired.

c.  *Voting*: Class C2 is Unimpaired under the Plan.  Holders of Claims in Class C2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

24.  Class C3 – Secured NG PCN Claims.

a.  *Classification*:  Class C3 consists of the Secured NG PCN Claims against NG.

b.  *Allowance*: The Secured NG PCN Claims shall be Allowed in the aggregate principal amount of $284,600,000, plus accrued and unpaid pre- and postpetition interest (at the prepetition rate) on such principal amount through and including the Effective Date.

c.  *Treatment:* Allowed Secured NG PCN Claims shall be Reinstated in full on the Effective Date, or as soon thereafter as practicable, *provided, however*, that any Allowed Secured NG PCN Claims relating to accrued and unpaid pre- and

51

postpetition interest on the principal amount of the Secured NG PCN Claims through and including the Effective Date shall be paid in full in Cash.

The guarantee of FES with respect to such Allowed Secured NG PCN Claims shall be reinstated, and on the Effective Date if any assets of FES are transferred to New Holdco pursuant to the Plan then New Holdco shall also provide a new unsecured guarantee with respect to such Allowed Secured NG PCN Claims that are reinstated.

d.  *Voting*:  Class C3 is Impaired under the Plan.  Holders of Claims in Class C3 are entitled to vote to accept or reject the Plan.

25.  Class C4 –Unsecured PCN/FES Notes Claims against NG.

a.  *Classification*:  Class C4 consists of Unsecured PCN/FES Notes Claims against NG.

b.  *Allowance*:  The Unsecured PCN/FES Notes Claims Against NG shall be Allowed in the aggregate amount of $2,237,912,062, which is comprised of the Unsecured NG PCN Claims in the amount of $851,962,273 and the guarantee claims of the Holders of FES Notes Claims in the amount of $701,311,411 and the Unsecured FG PCN Claims in the amount of $684,638,378.

c.  *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured PCN/FES Notes Claim Against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Unsecured PCN/FES Notes Claim Against NG, each Holder of an Allowed Unsecured PCN/FES Notes Claim Against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C4.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Initial Distribution Date, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New Common Stock subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed Unsecured PCN/FES Notes Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C4.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Unsecured PCN/FES Notes Claim Against NG that received New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d.  *Voting*:  Class C4 is Impaired under the Plan.  Holders of Claims in Class C4 are entitled to vote to accept or reject the Plan.

26.  <u>Class C5 – Mansfield Certificate Claims Against NG.</u>

a.  *Classification*:  Class C5 consists of Mansfield Certificate Claims against NG.

b.  *Allowance*:  The Mansfield Certificate Claims Against NG shall be Allowed in the aggregate amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

c.  *Treatment*:  Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim Against NG, each Holder of an Allowed Mansfield Certificate Claim Against NG shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New Common Stock, subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C5.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Initial Distribution Date, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of NG Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New Common Stock subject to dilution for the Management Incentive Plan.  The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against NG in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class C5.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against NG that received New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d.  *Voting*:  Class C5 is Impaired under the Plan.  Holders of Claims in Class C5 are entitled to vote to accept or reject the Plan.

27. <u>Class C6 –NG Single-Box Unsecured Claims.</u>

    a.     *Classification*: Class C6 consists of NG Single-Box Unsecured Claims.

    b.     *Treatment*: Except to the extent that a Holder of an Allowed NG Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each NG Single-Box Unsecured Claim, each Holder of an Allowed NG Single-Box Unsecured Claim shall receive, on the Initial Distribution Date, cash equal to their Pro Rata share of NG Unsecured Distributable Value, *provided* that such Holders shall have the option to elect to receive their ratable share of New Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed NG Single-Box Unsecured Claims shall be subject to the Distributable Value Adjustment Amount applicable to Class C6.

        In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed NG Single-Box Unsecured Claim that receives New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

    c.     *Voting*: Class C6 is Impaired under the Plan. Holders of Claims in Class C6 are entitled to vote to accept or reject the Plan.

28. <u>Class C7 – NG-FENOC Unsecured Claims against NG.</u>

    a.     *Classification*: Class C7 consists of Holders of NG-FENOC Unsecured Claims (solely as to the portion of the claim against NG).

    b.     *Treatment*: Except to the extent that a Holder of an Allowed NG-FENOC Unsecured Claim against NG agrees to less favorable treatment, in exchange for full and final satisfaction, compromise, settlement, release and discharge of each NG-FENOC Unsecured Claim, each Holder of an Allowed NG-FENOC Unsecured Claim against NG shall receive, on the Initial Distribution, cash equal to their Pro Rata share of NG Unsecured Distributable Value, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New Common Stock in equal amount, subject to the Equity Election Conditions, and subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed NG-FENOC Unsecured Claims against NG shall be subject to the Distributable Value Adjustment Amount applicable to Class C7.

        In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed NG-FENOC Unsecured Claim Against NG that receives New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

    c.     *Voting*: Class C7 is Impaired under the Plan. Holders of Claims in Class C7 are entitled to vote to accept or reject the Plan.

29. Class C8 – Convenience Claims against NG.

    a.    *Classification*: Class C8 consists of all Convenience Claims against NG.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against NG agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against NG, each Holder of an Allowed Convenience Claim against NG that has properly elected to be treated as such on its Ballot shall receive, on the Initial Distribution Date, Cash in an amount equal to 35.7% of the Allowed Convenience Claim.

    c.    *Voting*: Class C8 is Impaired under the Plan. Holders of Claims in Class C8 are entitled to vote to accept or reject the Plan.

30. Class C9 – Inter-Debtor Claims against NG.

    a.    *Classification*: Class C8 consists of prepetition Inter-Debtor Claims against NG.

    b.    *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against NG, if any, shall receive their Pro Rata share of the NG Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against NG, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against NG by including the recovery on such prepetition Inter-Debtor Claims against NG in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against NG.

    c.    *Voting*: Class C9 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against NG are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

31. Class C10 – Interests in NG.

    a.    *Classification*: Class C10 consists of Interests in NG.

    b.    *Treatment*: Reorganized FES shall retain ownership of all of the Interests in NG.

    c.    *Voting*: Holders of Interests in Class C10 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

32. Class D1 – Other Secured Claims against FENOC.

    a.    *Classification*: Class D1 consists of Other Secured Claims against FENOC.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class D1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each

Allowed Claim in Class D1, each such Holder shall receive, at the option of FENOC, either:

i.        payment in full in Cash;

ii.       delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii.      Reinstatement of such Claim; or

iv.     other treatment rendering such Claim Unimpaired.

c.      *Voting*: Class D1 is Unimpaired under the Plan. Holders of Claims in Class D1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

33.    <u>Class D2 – Other Priority Claims against FENOC.</u>

a.      *Classification*: Class D2 consists of Other Priority Claims against FENOC.

b.      *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class D2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class D2, each such Holder shall receive, at the option of FENOC, either:

i.        payment in full in Cash; or

ii.       other treatment rendering such Claim Unimpaired.

c.      *Voting*: Class D2 is Unimpaired under the Plan. Holders of Claims in Class D2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

34.    <u>Class D3 – FENOC-FES Unsecured Claims against FENOC.</u>

a.      *Classification*: Class D3 consists of Holders of FENOC-FES Unsecured Claims (solely as to the portion of the claim against FENOC).

b.      *Treatment*: Except to the extent that a Holder of an Allowed FENOC-FES Unsecured Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC-FES Unsecured Claim against FENOC, each Holder of an Allowed FENOC-FES Unsecured Claim against FENOC shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of FENOC Unsecured Distributable Value, *provided* that such Holders shall have the option to elect to receive their Pro Rata share of New Common Stock in equal amount, subject to the Equity Election Conditions and subject to dilution for the Management Incentive Plan, *provided* however, that such election shall only be

available on account of the portion of the Allowed FENOC-FES Unsecured Claim guaranteed by FES. The aggregate amount of value available for distribution to Holders of Allowed FENOC-FES Unsecured Claims against FENOC shall be subject to the Distributable Value Adjustment Amount applicable to Class D3.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed FENOC-FES Unsecured Claim against FENOC that receives New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

c.    *Voting*: Class D3 is Impaired under the Plan. Holders of Claims in Class D3 are entitled to vote to accept or reject the Plan.

35.    Class D4 – FENOC Single-Box Unsecured Claims against FENOC.

a.    *Classification*: Class D4 consists of FENOC Single-Box Unsecured Claims.

b.    *Treatment:* Except to the extent that a Holder of an Allowed FENOC Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each FENOC Single-Box Unsecured Claims, each Holder of an Allowed FENOC Single-Box Unsecured Claim shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of (i) the FENOC Unsecured Distributable Value and (ii) the portion of the Reallocation Pool allocable to FENOC. The aggregate amount of value available for distribution to Holders of Allowed FENOC Single-Box Unsecured Claims set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class D4.

c.    *Voting*: Class D4 is Impaired under the Plan. Holders of Claims in Class D4 are entitled to vote to accept or reject the Plan.

36.    Class D5 – NG-FENOC Unsecured Claims against FENOC.

a.    *Classification*: Class D5 consists of Holders of NG-FENOC Unsecured Claims (solely as to the portion of the claim against FENOC).

b.    *Treatment*: Except to the extent that a Holder of an Allowed NG-FENOC Unsecured Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each NG-FENOC Unsecured Claim against FENOC, each Holder of an Allowed NG-FENOC Unsecured Claim shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of FENOC Unsecured Distributable Value. The aggregate amount of value available for distribution to Holders of Allowed NG-FENOC Unsecured Claims against FENOC shall be subject to the Distributable Value Adjustment Amount applicable to Class D5.

c.    *Voting*: Class D5 is Impaired under the Plan. Holders of Claims in Class D5 are entitled to vote to accept or reject the Plan.

37. Class D6 – Convenience Claims against FENOC.

    a.    *Classification*: Class D6 consists of all Convenience Claims against FENOC.

    b.    *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FENOC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FENOC, each Holder of an Allowed Convenience Claim against FENOC that has properly elected to be treated as such on its Ballot shall receive, on the Initial Distribution Date, Cash in an amount equal to 24.3% of the Allowed Convenience Claim.

    c.    *Voting*: Class D6 is Impaired under the Plan. Holders of Claims in Class D6 are entitled to vote to accept or reject the Plan.

38. Class D7 – Inter-Debtor Claims against FENOC.

    a.    *Classification*: Class D7 consists of prepetition Inter-Debtor Claims against FENOC.

    b.    *Allowance*: The prepetition Inter-Debtor Claims of FES against FENOC shall be Allowed as Unsecured Claims in the aggregate amount of $32,603,216.

    c.    *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against FENOC shall receive their Pro Rata share of the FENOC Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims, the distributions on account of such prepetition Inter-Debtor Claims against FENOC shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FENOC by including the recovery on such prepetition Inter-Debtor Claims against FENOC in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against FENOC.

    d.    *Voting*: Class D7 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FENOC are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

39. Class D8 – Interests in FENOC.

    a.    *Classification*: Class D8 consists of Interests in FENOC.

    b.    *Treatment*: On the Effective Date, Interests in FENOC shall be cancelled and released without any distribution on account of such Interests. On the Effective Date, shares of new common stock of Reorganized FENOC shall be issued to New Holdco.

    c.    *Voting*: Holders of Interests in Class D8 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

40. <u>Class E1 – Other Secured Claims against FGMUC.</u>

    a.     *Classification*: Class E1 consists of Other Secured Claims against FGMUC.

    b.     *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class E1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class E1, each such Holder shall receive, at the option of FGMUC, either:

        i.     payment in full in Cash;

        ii.     delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        iii.     Reinstatement of such Claim; or

        iv.     other treatment rendering such Claim Unimpaired.

    c.     *Voting*: Class E1 is Unimpaired under the Plan. Holders of Claims in Class E1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

41. <u>Class E2 – Other Priority Claims against FGMUC.</u>

    a.     *Classification*: Class E2 consists of Other Priority Claims against FGMUC.

    b.     *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class E2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class E2, each such Holder shall receive, at the option of FGMUC, either:

        i.     payment in full in Cash; or

        ii.     other treatment rendering such Claim Unimpaired.

    c.     *Voting*: Class E2 is Unimpaired under the Plan. Holders of Claims in Class E2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

42. <u>Class E3 – Mansfield Certificate Claims against FGMUC.</u>

    a.     *Classification*: Class E3 consists of the Mansfield Certificate Claims against FGMUC.

    b.     *Allowance*: The Mansfield Certificate Claims shall be allowed in the amount of $786,763,400 in accordance with the terms of the Mansfield Settlement.

c.　*Treatment*: Except to the extent that a Holder of an Allowed Mansfield Certificate Claim Against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Certificate Claim against FGMUC, each Holder of an Allowed Mansfield Certificate Claim against FGMUC shall receive, on the Effective Date or as soon as reasonably practicable thereafter, New Common Stock subject to dilution for the Management Incentive Plan, in an amount equal to its Pro Rata share of FGMUC Unsecured Distributable Value, subject to (i) the reallocation of the Reallocation Pool to Holders of Single Box Unsecured Claims and (ii) the Mansfield Reallocation. The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FGMUC in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class E3.

Notwithstanding the foregoing, Electing Bondholders shall receive, on the Initial Distribution Date, their Pro Rata share of the Unsecured Bondholder Cash Pool in lieu of New Common Stock, *provided, however* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of FGMUC Unsecured Distributable Value, subject to the reallocation of (i) the Reallocation Pool to Holders of Single-Box Unsecured Claims and (ii) the Mansfield Reallocation, the Electing Bondholders shall receive the remainder of their distribution in New Common Stock subject to dilution for the Management Incentive Plan. The aggregate amount of value available for distribution to Holders of Allowed Mansfield Certificate Claims against FGMUC in accordance with the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class E3.

In addition, to the extent there is an Effective Date Cash Distribution, any Holder of an Allowed Mansfield Certificate Claim Against FGMUC that received New Common Stock in satisfaction of its Claim shall receive its Pro Rata share of the Effective Date Cash Distribution.

d.　*Voting*: Class E3 is Impaired under the Plan. Holders of Claims in Class E3 are entitled to vote to accept or reject the Plan.

43.　Class E4 – FGMUC Single-Box Unsecured Claims.

a.　*Classification*: Class E4 consists of FGMUC Single-Box Unsecured Claims.

b.　*Treatment*: Except to the extent that a Holder of an FGMUC Single-Box Unsecured Claim agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of the FGMUC Single-Box Unsecured Claims, the Holders of FGMUC Single-Box Unsecured Claims shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of (i) the FGMUC Unsecured Distributable Value, and (ii) the portion of the Reallocation Pool allocable to FGMUC. The aggregate amount of value available for distribution to Holders of Allowed FGMUC Single-Box Unsecured Claims set forth in clauses (i) and (ii) of the preceding sentence shall be subject to the Distributable Value Adjustment Amount applicable to Class E4.

c. *Voting*: Class E4 is Impaired under the Plan. Holders of Claims in Class E4 are entitled to vote to accept or reject the Plan.

44. Class E5 – Mansfield Indemnity Claims against FGMUC.

a. *Classification*: Class E5 consists of the Mansfield TIA Claims against FGMUC and the Mansfield OT Claims against FGMUC.

b. *Allowance:* The Mansfield TIA Claims against FGMUC shall be Allowed as Unsecured Claims in the aggregate amount of $182,000,000.00. The Mansfield OT Claims against FGMUC shall be Allowed as Unsecured Claims in the aggregate amount of $28,882.75.

c. *Treatment*: Except to the extent that a Holder of an Allowed Mansfield Indemnity Claim against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each Mansfield Indemnity Claim against FGMUC, each Holder of an Allowed Mansfield Indemnity Claim against FGMUC shall receive, on the Initial Distribution Date, cash equal to its Pro Rata share of the FGMUC Unsecured Distributable Value. The aggregate amount of value available for distribution to Holders of Allowed Mansfield Indemnity Claims against FGMUC shall be subject to the Distributable Value Adjustment Amount applicable to Class E5.

d. *Voting*: Class E5 is Impaired under the Plan. Holders of Claims in Class E5 are entitled to vote to accept or reject the Plan.

45. Class E6 – Convenience Claims against FGMUC.

a. *Classification*: Class E6 consists of all Convenience Claims against FGMUC.

b. *Treatment*: Except to the extent that a Holder of an Allowed Convenience Claim against FGMUC agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Convenience Claim against FGMUC, each Holder of an Allowed Convenience Claim against FGMUC that has properly elected to be treated as such on its Ballot shall receive, on the Initial Distribution Date, Cash in an amount equal to 18.0% of the Allowed Convenience Claim.

c. *Voting*: Class E6 is Impaired under the Plan. Holders of Claims in Class E6 are entitled to vote to accept or reject the Plan.

46. Class E7 – Inter-Debtor Claims against FGMUC.

a. *Classification*: Class E7 consists of prepetition Inter-Debtor Claims against FGMUC.

b. *Allowance:* The prepetition Inter-Debtor Claims against FGMUC shall be Allowed as Unsecured Claims as follows: (i) the prepetition Inter-Debtor Claims of NG against FGMUC shall be Allowed in the amount of $6,555,811; (ii) the prepetition Inter-Debtor Claims of FE Aircraft against FGMUC shall be Allowed

in the amount of $106,785.00; and (iii) the prepetition Inter-Debtor Claims of FES against FGMUC shall be Allowed in the amount of $360,871,968.

c. *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against FGMUC shall receive their Pro Rata share of the FGMUC Unsecured Distributable Value. In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FGMUC against FGMUC by including the recovery on such prepetition Inter-Debtor Claims against FGMUC in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against FGMUC.

d. *Voting*: Class E7 is Impaired under the Plan. Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FGMUC are insiders whose votes will not be counted. Accordingly, this class will not vote to accept or reject the Plan.

47. <u>Class E8 – Interests in FGMUC.</u>

a. *Classification*: Class E8 consists of Interests in FGMUC.

b. *Treatment*: In the discretion of the Debtors, in consultation with the Consenting Creditors and the Committee, Reorganized FG shall continue to own all of the Interests in FGMUC or FGMUC shall be dissolved and all Interests in FGMUC shall be cancelled and released without any distribution on account of such Interests.

c. *Voting*: Holders of Interests in Class E8 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

48. <u>Class F1 – Other Secured Claims against FE Aircraft.</u>

a. *Classification*: Class F1 consists of Other Secured Claims against FE Aircraft.

b. *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class F1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class F1, each such Holder shall receive, at the option of FE Aircraft, either:

    i. payment in full in Cash;

    ii. delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

    iii. Reinstatement of such Claim; or

iv.　　other treatment rendering such Claim Unimpaired.

c.　　*Voting*: Class F1 is Unimpaired under the Plan. Holders of Claims in Class F1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

49.　　<u>Class F2 – Other Priority Claims against FE Aircraft.</u>

a.　　*Classification*: Class F2 consists of Other Priority Claims against FE Aircraft.

b.　　*Treatment*: Except to the extent that a Holder of an Allowed Claim in Class F2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class F2, each such Holder shall receive, at the option of FE Aircraft, either:

i.　　payment in full in Cash; or

ii.　　other treatment rendering such Claim Unimpaired.

c.　　*Voting*: Class F2 is Unimpaired under the Plan. Holders of Claims in Class F2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

50.　　<u>Class F3 – General Unsecured Claims against FE Aircraft.</u>

a.　　*Classification*: Class F3 consists of General Unsecured Claims against FE Aircraft.

b.　　*Treatment*: To the extent there are any General Unsecured Claims Against FE Aircraft, except to the extent that a Holder of an Allowed General Unsecured Claim Against FE Aircraft agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each General Unsecured Claim Against FE Aircraft, each Holder of an Allowed General Unsecured Claim Against FE Aircraft shall receive, on the Initial Distribution Date, its Pro Rata share of the FE Aircraft Cash Distribution Pool.

c.　　*Voting*: Class F3 is Impaired under the Plan. Holders of Claims in Class F3 are entitled to vote to accept or reject the Plan.

51.　　<u>Class F4 – Inter-Debtor Claims against FE Aircraft.</u>

a.　　*Classification*: Class F4 consists of prepetition Inter-Debtor Claims against FE Aircraft.

b.　　*Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against FE Aircraft if any, shall be treated *pari passu* with Unsecured Claims against FE Aircraft and will share in distributions from FE Aircraft. In lieu of Cash payment

or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against FE Aircraft, the distributions on account of such prepetition Inter-Debtor Claims shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against FE Aircraft against FE Aircraft by including the recovery on such prepetition Inter-Debtor Claims against FE Aircraft in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against FE Aircraft.

c.   *Voting*: Class F4 is Impaired under the Plan.  Notwithstanding such Impairment, Holders of prepetition Inter-Debtor Claims against FE Aircraft are insiders whose votes will not be counted.  Accordingly, this class will not vote to accept or reject the Plan.

52.   <u>Class F5 – Interests in FE Aircraft.</u>

a.   *Classification*: Class F5 consists of Interests in FE Aircraft.

b.   *Treatment*:  FE Aircraft shall be dissolved and Interests in FE Aircraft shall be cancelled and released without any distribution on account of such Interests.

c.   *Voting*: Holders of Interests in Class F5 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

53.   <u>Class G1 – Other Secured Claims against Norton.</u>

a.   *Classification*: Class G1 consists of Other Secured Claims against Norton.

b.   *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class G1 agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class G1, each such Holder shall receive, at the option of Norton, either:

i.   payment in full in Cash;

ii.   delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii.   Reinstatement of such Claim; or

iv.   other treatment rendering such Claim Unimpaired.

c.   *Voting*: Class G1 is Unimpaired under the Plan.  Holders of Claims in Class G1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

54.    Class G2 – Other Priority Claims against Norton.

a.    *Classification*: Class G2 consists of Other Priority Claims against Norton.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Claim in Class G2 agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim in Class G2, each such Holder shall receive, at the option of Norton, either:

i.    payment in full in Cash; or

ii.    other treatment rendering such Claim Unimpaired.

c.    *Voting*: Class G2 is Unimpaired under the Plan.  Holders of Claims in Class G2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

55.    Class G3 – General Unsecured Claims against Norton.

a.    *Classification*:  Class G3 consists of General Unsecured Claims against Norton.

b.    *Treatment*:  To the extent there are any General Unsecured Claims Against Norton, except to the extent that a Holder of an Allowed General Unsecured Claim Against Norton agrees to a less favorable treatment, in exchange for and in full and final satisfaction, compromise, settlement, release and discharge of each General Unsecured Claim Against Norton, each Holder of an Allowed General Unsecured Claim Against Norton shall receive, on the Initial Distribution Date, its Pro Rata share of the Norton Cash Distribution Pool.

c.    *Voting*: Class G3 is Impaired under the Plan.  Holders of Claims in Class G3 are entitled to vote to accept or reject the Plan.

56.    Class G4 – Inter-Debtor Claims against Norton.

a.    *Classification*: Class G4 consists of prepetition Inter-Debtor Claims against Norton.

b.    *Treatment*: Each Holder of an Allowed prepetition Inter-Debtor Claim against Norton, if any, shall be treated *pari passu* with General Unsecured Claims Norton and will share in distributions from Norton.  In lieu of Cash payment or other distribution to the Debtors holding such prepetition Inter-Debtor Claims against Norton, the distributions on account of such prepetition Inter-Debtor Claims against Norton shall be made to the Holders of Allowed Unsecured Claims against the Debtor holding such prepetition Inter-Debtor Claims against Norton against Norton by including the recovery on such prepetition Inter-Debtor Claims against Norton in the calculation of the Unsecured Distributable Value relating to the Debtor holding such prepetition Inter-Debtor Claims against Norton.

57.    <u>Class G5 – Interests in Norton.</u>

a.    *Classification*: Class G5 consists of Interests in Norton.

b.    *Treatment*:  Reorganized FG shall retain ownership of all of the Interests in Norton.

c.    *Voting*: Holders of Interests in Class G5 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes pursuant to the Disclosure Statement Order shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

E.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

F.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

G.    *Equity Election Conditions.*

As noted in Article III.B of the Plan and as disclosed on the Bankruptcy Court's public docket in the Notice of the Debtors' Entry into a Restructuring Support Agreement and of the Record Date for Equity Elections under the Debtors' Plan of Reorganization filed with the Bankruptcy Court on January 23, 2019 [Docket No. 1995], Holders of Claims in Classes A5, A6, B7, C6, C7, and D3 have an option on their ballots to accept or reject the Plan to elect to receive a distribution in the form of New Common

Stock instead of a distribution in the form of Cash in satisfaction of their Claims if such Holder certifies on its ballot to accept or reject the Plan, or by such other method acceptable to the Debtors with the consent of the Requisite Supporting Parties (as defined in the Restructuring Support Agreement) and the Committee, that the Holder (i) was the beneficial holder of such Claims as of the applicable Equity Election Record Date and has not sold, transferred, or provided a participation in such Claims, or directly or implicitly agreed to do so following the applicable Equity Election Record Date or (ii) is otherwise a party to the Restructuring Support Agreement and the beneficial holder of such Claims and such Claims were subject to the Restructuring Support Agreement as of the applicable Equity Election Record Date (the "Equity Election Conditions").

Accordingly, any Holder who is not a party to the Restructuring Support Agreement is not permitted to make any equity election applicable to its Claim if it sold such Claims after the Equity Election Record Date. Any Holder who purchased a Claim after the Equity Election Record Date is not permitted to make any equity election applicable to its Claim unless such Claim is subject to the Restructuring Support Agreement because the Holder would be unable to make the certification required by the Equity Election Conditions. For the avoidance of doubt, any Holder of a Claim that arises after the Equity Election Record Date (*e.g.*, a Claim arising from the Debtors' rejection of an executory contract that occurs after the Equity Election Record Date) shall be permitted to make an election to receive Cash or New Common Stock subject to satisfaction of each of the other Equity Election Conditions.

The Plan Administrator and Disbursing Agent are authorized to request from any Holder information supporting a Holder's certification that it has satisfied the Equity Election Conditions. If a Holder fails to provide such information prior to the Effective Date, then the Disbursement Agent may at its discretion make a distribution to such Holder on account of its Claim in the manner required by the Plan as if such Holder did not elect to receive New Common Stock.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Plan Settlement.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of those matters resolved pursuant to the Plan Settlement. The Plan Settlement constitutes a settlement of the potential litigation of issues including, among other things, the validity, enforceability and priority of various Inter-Debtor Claims, the allocation of value between and among the Debtors' Estates, including the allocation of the FE Settlement Value among the Debtors, and incorporates the Mansfield Settlement and the Mansfield Owner Parties' Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the compromises and settlements contemplated herein and comprising the Plan Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Nothing in the Plan Settlement is intended, nor shall be interpreted, to settle, resolve or release any claim of any non-debtor party against any other non-debtor party, except as otherwise set forth in Sections VIII.D and VIII.E of the Plan. Each provision of the Plan, as it pertains to the settlements incorporated herein, shall be deemed non-severable from each other and from the remaining terms of the Plan. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final. As set forth herein, the Plan Settlement will be implemented as follows:

1.      FE Settlement Agreement.

The FE Non-Debtor Parties shall pay the Estates the FE Settlement Value in accordance with the terms of the FE Settlement Agreement and the FE Settlement Order, subject to the Consent and Waiver and the Consent and Waiver Order.  In exchange for the FE Non-Debtor Parties' contributions to the Chapter 11 Cases, including the FE Settlement Value, the FE Non-Debtor Parties shall be entitled to the Party Releases, the Consensual Third Party Releases, the Exculpations and the Injunctions set forth in the Plan, along with the other consideration provided to the FE Non-Debtor Parties under the FE Settlement Agreement.

On the Effective Date, in consideration for the Party Releases, the Consensual Third Party Releases, the Exculpations and the Injunctions set forth in the FE Settlement Agreement (subject to the Consent and Waiver and the Consent and Waiver Order) and the Plan, along with the other consideration provided to the FE Non-Debtor Parties in the FE Settlement Agreement, the FE Non-Debtor Parties shall release any and all prepetition Claims against the Debtors (except for any Claims under the Tax Allocation Agreement on account of tax year 2018), all Employee Related Claims (as defined in the FE Settlement Agreement), except as expressly provided for in the FE Settlement Agreement, and certain postpetition claims as expressly provided in the FE Settlement Agreement.  In addition, on the Effective Date, the FE Non-Debtor Parties will also waive and release the following Claims arising after the Petition Date: (i) any Claims under the FE/FES Revolver including, without limitation, any Claims for postpetition interest; (ii) any Claims related to the Rail Claim Settlement; (iii) any Claims held by AE Supply against FES in respect of the AE Supply/FES Note, including, without limitation, any Claims for postpetition interest; and (iv) any Claims from FE Corp.'s ownership interest in the Mansfield 2007 Trust F including, without limitation, any tax or other indemnity Claims arising from the rejection of the Mansfield Facility Documents.  Because the FE Non-Debtor Parties are releasing any and all prepetition Claims against the Debtors, the FE Non-Debtor Parties shall not vote on the Plan.  To the extent the FE Settlement Agreement is terminated, nothing contained in the Plan shall be deemed to waive or release any Claims held by the FE Non-Debtor Parties under any subsequent plan of reorganization or liquidation.

2.      Allocation of FE Settlement Consideration Among the Estates.

The FE Settlement Value contributed to the Estates as part of the FE Settlement Agreement will be paid to the Estates in accordance with the terms of the Plan, the FE Settlement Agreement, and the FE Settlement Order.  The FE Settlement Direct Consideration will be allocated among the Debtors as follows: (i) FES – 57.5%; (ii) FG – 23.4%; (iii) NG – 15.1%; (iv) FENOC – 2.7%; and (v) FGMUC – 1.3%.

3.      Allocation of FE/FES Revolver Proceeds

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, the Plan shall constitute a good faith settlement of any and all potential or actual Claims or Causes of Action related to the allocation of the proceeds from the FE/FES Revolver.  Such proceeds shall be allocated as follows: (i) FES -- $475,000,000; and (ii) FG -- $25,000,000.

4.      Allocation of Proceeds from Sales of the Bay Shore Power Plant, West Lorain Power Plant and the RE Burger Power Plant.

On the Effective Date, the FG Mortgage Indenture Trustee is authorized and directed to transfer to the Reorganized Debtors (i) FG's allocable share of the proceeds from the sale of the Bay Shore Power

18-50757-amk    Doc 3228    FILED 10/16/19    ENTERED 10/16/19 13:08:09    Page 151 of 299

Plant, (ii) the proceeds from the sale of the West Lorain Power Plant, if any, allocable to assets covered by the FG Mortgage, (iii) proceeds from the RE Burger Power Plant sale, and (iv) any additional proceeds from the sale of other collateral securing the Secured FG PCN Claims.

5.    Allocation of Administrative Expense Claims and Distributable Value Adjustment Amount.

For the purposes of the Plan Settlement, the Allocated Administrative Expenses were allocated among the Debtor entities on a ratable basis based on the estimated amount of Unsecured Non-Priority Claims against each Debtor, taking into account any guarantee claims against such Debtor; *provided* that to the extent an Estimated Administrative Expense was directly attributable to a particular Debtor such claim was allocated to that particular Debtor, *provided that* Allocated Administrative Expenses related to professional fees of the Consenting Creditors allocated to FENOC shall be capped at $100,000 and any additional such amounts shall be reallocated ratably among the other Debtors based on the estimated amount of Unsecured Non-Priority Claims against each Debtor, taking into account any guarantee claims against such Debtor.  Notwithstanding the foregoing, to the extent the aggregate Allowed amount of Administrative Claims, Priority Claims, Other Priority Claims and Other Secured Claims differ from the Estimated Administrative Expenses, such difference, whether positive or negative, shall be allocated among the Classes of General Unsecured Claims and Unsecured Bondholder Claims (other than Inter-Debtor Claims and Convenience Claims) Pro Rata based on their respective Distributable Value Splits. Notwithstanding the foregoing, to the extent there are Allowed Administrative Claims arising from the PPA Appeal Proceeding Contracts, any such Claims shall be directly allocated to FES.

For the purposes of the Plan Settlement, certain components of Distributable Value for the Debtors were fixed.  To the extent the actual amount of Cash in the FES bank accounts, other than the proceeds from the FE/FES Revolver and cash held in restricted escrow accounts, as of the Effective Date, differs from the projected amount of Cash in the FES bank accounts, other than the proceeds from the FE/FES Revolver and cash held in restricted escrow accounts, as of the Effective Date, as reflected in Exhibit A to the Plan Term Sheet, such difference, whether positive or negative, shall be allocated among the Classes of General Unsecured Claims and Unsecured Bondholder Claims (other than Inter-Debtor Claims and Convenience Claims) Pro Rata based on their respective Distributable Value Splits.

Pursuant to the Plan Settlement, the Plan establishes a Distributable Value for each Debtor entity and fixes the Distributable Value Splits in accordance with such value after taking into account the various reallocations embodied in the Plan Settlement.  The reasonableness of the Distributable Value for each Debtor in accordance with the Plan Settlement is supported by the valuation analysis conducted by Lazard Frères & Co., LLC ("Lazard"), the Debtors' investment banker, and attached to the Disclosure Statement as Exhibit E.

Prior to the Effective Date, the Debtors will calculate, in accordance with the terms and conditions of this Plan, (i) the final Distributable Value Splits applicable to the Classes of General Unsecured Claims and Unsecured Bondholder Claims (other than Inter-Debtor Claims and Convenience Claims), (ii) the updated estimated Allowed amount of Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims, and (iii) the Distributable Value Adjustment Amount and the allocation thereof to such Classes.  Prior to the Effective Date, the Debtors shall consult with the advisors to the Committee, the Ad Hoc Noteholders Group, the Mansfield Certificateholders Group, the Consenting Owner Participant, and the FES Creditor Group with respect to such calculations. Additionally, prior to the Effective Date, the Debtors, with the reasonable consent of the Requisite Supporting Parties and the Committee shall determine an amount of cash, if any, necessary to reserve for Administrative Claims that have not been Allowed and remain disputed as of the Effective Date.

6.     <u>Inter-Debtor Claims</u>.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, the Plan shall constitute a good faith settlement of any and all potential or actual objections to the validity or allowance of the Inter-Debtor Claims.  Entry of the Confirmation Order shall constitute approval of the Allowed amount of the Inter-Debtor Claims, as follows: (i) the prepetition Inter-Debtor Claims of FG against FES shall be Allowed as Unsecured Claims in the aggregate amount of $1,488,190,630; (ii) the prepetition Inter-Debtor Claims of NG against FES shall be Allowed as Unsecured Claims in the aggregate amount of $1,670,896,976; (iii) the prepetition Inter-Debtor Claims of FENOC against FES shall be Allowed as Unsecured Claims in the aggregate amount of $28,000,000; (iv) the postpetition Inter-Debtor Claims of FG against FES shall be Allowed as superpriority Administrative Claims in an amount equal to $120,291,389; (v) the postpetition Inter-Debtor Claims of NG against FES shall be Allowed as superpriority Administrative Claims in an amount equal to $238,431,879; (vi) the prepetition Inter-Debtor Claims of FGMUC against FG shall be Allowed as Unsecured Claims in the aggregate amount of $901,881,812; (vii) the postpetition Inter-Debtor Claims of FGMUC against FG shall be disallowed in full; (viii) the postpetition Inter-Debtor Claims of FENOC against FES shall be Allowed as super-priority Administrative Claims in the amount of $2,000,000; (ix) the postpetition Inter-Debtor Claims of FENOC against NG shall be Allowed as super-priority Administrative Claims in the amount of $69,929,041; (x) the prepetition Inter-Debtor Claims of FES against FENOC shall be Allowed as Unsecured Claims in the aggregate amount of $32,603,216; (xi) the prepetition Inter-Debtor Claims of FES against FGMUC shall be Allowed as Unsecured Claims in the aggregate amount of $360,871,968; (xii) the prepetition Inter-Debtor Claims of NG against FGMUC shall be Allowed as Unsecured Claims in the aggregate amount of $6,555,811; (xiii) the prepetition Inter-Debtor Claims of FE Aircraft against FES shall be Allowed as Unsecured Claims in the aggregate amount of $2,322,802; and (xiv) the prepetition Inter-Debtor Claims of FE Aircraft against FGMUC shall be Allowed as Unsecured Claims in the aggregate amount of $106,785.

In connection with the resolution of the FENOC postpetition Inter-Debtor Claim against FES, $12,500,000 of the aggregate value otherwise available for distribution to Holders of Allowed Unsecured Bondholder Claims shall be reallocated to the Holders of Allowed FES Single-Box Unsecured Claims and Allowed FENOC-FES Unsecured Claims.

Notwithstanding anything to the contrary contained in the Plan, including but not limited to the approval of the Allowed amounts of the Inter-Debtor Claims, in lieu of Cash payment or other distribution to the Debtors holding such Inter-Debtor Claims, the value of distributions on account of such Inter-Debtor Claims may be made to the Holders of Allowed Unsecured Claims against the Debtor holding such Inter-Debtor Claims in accordance with the terms and conditions of this Plan.

7.     Settlement of Valuation of the Debtors' Estates and Allocation of Value Among the <u>Debtors' Creditors</u>.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits under the Plan, the Plan shall constitute a good faith settlement of any and all potential claims, disputes, causes of action or objections with respect to the allocation of value of the Debtors' Estates (including the value of the Debtors' generation assets and other businesses) between and among the Debtors and their Creditors.  In addition to the Plan Settlement of potential or actual objections to the validity or allowance of the Inter-Debtor Claims, and as settlement for, among other things, arguments and assertions that the Debtors' Estates should be substantively consolidated, the Reallocation Pool consisting of $45,750,000 of the aggregate value otherwise available for distribution to Holders of Allowed Unsecured Bondholder Claims shall be

reallocated to the Holders of Allowed Single-Box Unsecured Claims against the various Debtors ratably based on the allocation of FE Settlement Value between and among the Debtors; *provided, however*, that the NG Reallocation shall in turn be re-allocated Pro Rata to Holders of Allowed FES Single-Box Unsecured Claims. For the avoidance of doubt, prepetition Inter-Debtor Claims shall not receive a recovery from the Reallocation Pool or any portion of the NG Reallocation Pool.

B.    *Restructuring Transactions.*

1.    Restructuring Transactions, Generally.

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will effectuate the Restructuring Transactions, and will take any actions as may be necessary or advisable to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided herein. The actions to implement the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements, or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan, in each case in form and substance reasonably acceptable to the Requisite Supporting Parties and the Mansfield Owner Parties (solely to the extent provided for in the Restructuring Support Agreement), and except as otherwise specifically provided herein, the Committee.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

2.    Implementation of FE Settlement Agreement.

On the Effective Date, the FE Settlement Agreement shall be implemented in accordance with the terms and conditions of the FE Settlement Agreement and the FE Settlement Order, subject to the Consent and Waiver and the Consent and Waiver Order, without waiving any rights of any of the Debtors, the Reorganized Debtors, or the FE Non-Debtor Parties, as applicable, under the FE Settlement Agreement or FE Settlement Order, subject to the Consent and Waiver and the Consent and Waiver Order. The Debtors shall be authorized to, with the reasonable consent of the Requisite Supporting Parties and the Committee, enter into one or more transactions to monetize the New FE Notes on or as soon as practicable after the Effective Date. The allocation of the FE Settlement Value and all distributions of FE Settlement Value under the Plan are integral parts of the Plan Settlement and the settlements contained therein, including, but not limited to the settlement of Inter-Debtor Claims, the settlement of the valuation of the Debtors' Estates and the settlement of the allocation of value as between the Debtors' Creditors. Therefore, the FE Settlement Agreement and the terms thereof that are reflected in the Plan are non-severable elements of the Plan and necessary conditions to the Confirmation and Consummation of the Plan.

### a. Manner of Debtors' Separation from FE Non-Debtor Parties.

The Debtors shall be separated from the FE Non-Debtor Parties as follows:

1. On the Effective Date, the existing FE Corp. equity Interests in FES and FENOC shall be cancelled and, subject to Article IV.F of the Plan, all of the new common stock of Reorganized FENOC and Reorganized FES shall be contributed or issued to New Holdco; and

2. On the Effective Date, the existing equity Interests in FG and NG shall be contributed to New Holdco; and

3. On the Effective Date, certain assets and liabilities of FES may be transferred to New Holdco; *provided*, that any such transferred assets and liabilities shall not include (a) any Rejected Executory Contract or Unexpired Lease and (b) any liabilities discharged pursuant to the Plan; and

4. On the Effective Date, subject to Article IV.F of the Plan, New Holdco shall issue the New Common Stock.

### b. Tax Matters Agreement.

On the Effective Date, in consideration for the Party Releases, the Consensual Third Party Releases, the Exculpations and the Injunctions set forth in the FE Settlement Agreement and the Plan, along with the other consideration provided to the FE Non-Debtor Parties under the FE Settlement Agreement, the Reorganized Debtors and the FE Non-Debtor Parties shall enter into the Tax Matters Agreement. After the Effective Date, the Tax Matters Agreement shall not be amended or modified in any manner without the written consent of the Reorganized Debtors. The Tax Matters Agreement shall provide for the following: (i) the FE Non-Debtor Parties will, with the Debtors' or Reorganized Debtors', as applicable, review and consultation (beginning for tax year 2018), timely prepare in the ordinary course of business: (a) the U.S. federal income tax returns reflecting the Debtors' membership in the FE Consolidated Tax Group, and (b) any and all state and local income or other tax returns (including, but not limited to, income, franchise, use, property tax returns and other similar returns), in each case, for any tax period ending on or before the Effective Date; *provided, however*, that FE Corp. shall not be required to take any action, or omit to take any action, that would result in an adverse effect on any of the FE Non-Debtor Parties; (ii) FE Corp. shall not take or cause to be taken the Worthless Stock Deduction with effect prior to the Effective Date; (iii) the Debtors and the FE Non-Debtor Parties shall cooperate in developing a strategy for the Debtors to exit from chapter 11 that minimizes adverse tax consequences to the Reorganized Debtors and their stakeholders, *provided, however*, that FE Corp. shall not be required to take any action, or omit to take any action, that would result in an adverse effect on any of the FE Non-Debtor Parties; (iv) FE Corp. shall cooperate with reasonable tax diligence inquiries from the Debtors, the Committee, and the Consenting Creditors regarding historical intercompany tax issues and tax consequences of different chapter 11 exit structures, including in connection with any sale of the Debtors' assets; and (v) the FE Non Debtor Parties and the Debtors or Reorganized Debtors, as applicable, shall agree to reasonably cooperate regarding any audit or tax.

3. <u>Implementation of Mansfield Settlement</u>.

Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the Mansfield Settlement, on the terms set forth herein.

The Mansfield Settlement constitutes a good faith compromise and settlement of the Mansfield Certificate Claims held by the Mansfield Indenture Trustee, and of the potential objections to the amount, priority and availability or applicability of any guarantees related to such Claims. The Plan hereby implements the terms of the Mansfield Settlement by: (i) allowing the Mansfield Certificate Claims in the amount of $786,763,400.00, (ii) allowing the Mansfield Certificate Claims as Unsecured Claims against each of FGMUC, FG, NG and FES in the aforementioned amount, (iii) treating as unencumbered property of the Debtors' estates (a) the Consenting Owner Trustee's portions and the FE Owner Trustee's portion of the aggregate 93.825% undivided interests in Mansfield Unit 1, which interests are the subject of the leveraged sale and leaseback transactions and (b) any and all insurance proceeds recovered on account of Mansfield Unit 1 and any additional value attributable to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee) or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled; (iv) the transfer of a Pro Rata share of any recovery distributed to the Mansfield Indenture Trustee, on behalf of the Holders of Mansfield Certificate Claims, on account of the Mansfield Certificate Claims against FGMUC to the Indenture Trustees for the PCNs and the FES Notes Indenture Trustee, based on the proportion that the Allowed amount of each of the Mansfield Certificate Claims, on the one hand, and Unsecured PCN Claims and FES Notes Claims, on the other hand, in each case against FES, bear to the aggregate Allowed amount of Mansfield Certificate Claims, Unsecured PCN Claims and FES Notes Claims at FES, (v) the transfer to NG of any insurance proceeds recovered on account of Mansfield Unit 1 and any additional value attributable to Mansfield Unit 1, (vi) the Confirmation Order serving as an order authorizing the rejection, *nunc pro tunc* to the Petition Date, of the Mansfield Facility Documents; (vii) $10,000,000 of the aggregate Unsecured Distributable Value from all Debtors otherwise being available for distribution to the Holders of the Mansfield Certificate Claims shall be reallocated to the Holders of the Unsecured PCN/FES Notes Claims and (viii) the release and discharge of all other prepetition Mansfield Certificate Claims held by the Mansfield Indenture Trustee and any Holder of Mansfield Certificate Claims.

The Mansfield Settlement further contemplates that full ownership of Mansfield Unit 1, and any and all insurance proceeds recovered on account of Mansfield Unit 1 to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee) or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled, will be transferred to the Debtors or Reorganized Debtors and authorizes the parties to the Mansfield Settlement to take any actions necessary in furtherance of that transfer, including any necessary regulatory filings or filings with FERC and the execution of the Mansfield Unit 1 Transfer Agreement. The transfer of full ownership of Mansfield Unit 1, and any and all insurance proceeds recovered on account of Mansfield Unit 1 to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee) or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled, shall be free and clear of any and all Liens and encumbrances, and the Debtors, the Mansfield Indenture Trustee, the Mansfield Owner Parties and the FE Owner Trustee are authorized to execute, file and take any steps otherwise necessary to evidence such transfer, including, without limitation, the execution of the Mansfield Unit 1 Transfer Agreement; *provided*, that all classes comprised of Holders of Mansfield Certificate Claims (in that capacity) shall have accepted the Plan in the manner set forth in the immediately succeeding sentence of this paragraph. In that regard, acceptance of the Plan, in accordance with section 1126 of the Bankruptcy Code, by all of the classes comprised of Holders of Mansfield Certificate Claims (in that capacity) shall be deemed to constitute the consent of all Holders of Mansfield Certificate Claims and the Mansfield Indenture Trustee to such transfer as contemplated by the terms of the Mansfield Settlement. In addition, such acceptance of the Plan by all of the classes comprised of Holders of the Mansfield Certificate Claims (in that capacity) shall cause the Plan to be binding on the Mansfield Indenture Trustee, in which event the Mansfield Indenture Trustee, without more, shall be

legally authorized, regardless of any prerequisites, conditions or other provisions in the Mansfield Lease Note Indentures, the Mansfield Pass Through Trust Agreement or any other document or instrument that might otherwise apply, to take any actions reasonably necessary in order to facilitate the Mansfield Settlement, including, without limitation, the execution of the Mansfield Unit 1 Transfer Agreement by the Mansfield Indenture Trustee, consenting to execution of the Mansfield Unit 1 Transfer Agreement by the Consenting Owner Trustee and the FE Owner Trustee, and the execution and delivery or recording of any documents reasonably necessary to evidence the release of the Liens of the Mansfield Lease Note Indentures, including without limitation any such Liens on the undivided interests in Mansfield Unit 1 and the insurance proceeds recovered on account of Mansfield Unit 1, and the Confirmation Order shall so provide. On the Effective Date, the Mansfield Facility Documents shall be deemed rejected as of the Petition Date pursuant to the Mansfield Unit 1 Transfer Agreement.

4.      Implementation of Mansfield Owner Parties' Settlement.

Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the Mansfield Owner Parties' Settlement, on the terms set forth herein. The Mansfield Owner Parties' Settlement constitutes a good faith compromise and settlement of the Mansfield TIA Claims and Mansfield OT Claims held by the Consenting Owner Participant and Consenting Owner Trustee (to the extent not addressed in the Mansfield Settlement), and of the potential objections to the amount, priority and availability or applicability of any guarantees related to such Claims. The Plan hereby implements the terms of the Mansfield Owner Parties' Settlement as set forth herein. Pursuant to the Mansfield Owner Parties' Settlement upon the Effective Date:

   a.   The Mansfield TIA Claims shall be Allowed as Unsecured Claims against FG, FES and FGMUC in the aggregate amount of $182,000,000 to be paid in Cash pursuant to Article III.B of the Plan;

   b.   The Mansfield OT Claims shall be Allowed as Unsecured Claims against FG, FES and FGMUC in the aggregate amount of $28,882.75 to be paid in Cash pursuant to Article III.B of the Plan. Upon the Effective Date, except as specifically Allowed pursuant to the Plan, all Proofs of Claim filed by the Mansfield Owner Trustee in its capacity as owner trustee shall be deemed automatically withdrawn without further notice to or action by the Bankruptcy Court and shall be expunged from the claims register;

   c.   The following property shall be transferred to and be deemed and treated as unencumbered property of the Debtors' Estates or the Reorganized Debtors: (a) the Consenting Owner Trustee's portions and the FE Owner Trustee's portion of the aggregate 93.825% undivided interests in Mansfield Unit 1, which interests are the subject of the Mansfield Sale-Leaseback Transaction and (b) any and all insurance proceeds recovered on account of Mansfield Unit 1 to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee) or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled;

   d.   The Consenting Owner Participant and the Consenting Owner Trustee shall be Released Parties entitled to the benefit of the release, injunction, and exculpation provisions of Article VIII of the Plan as set forth therein and in the Confirmation Order;

18-50757-amk    Doc 3238    FILED 10/16/19    ENTERED 10/16/19 13:06:09    Page 157 of 299

e.   The Consenting Owner Participant and the Consenting Owner Trustee shall be entitled to payment of their and their respective professionals' reasonable and documented fees and expenses without any further notice to, or action, order or approval of the Bankruptcy Court, as set forth in Article IV.R of the Plan and the Confirmation Order; and

f.   Each of the Mansfield Facility Documents shall be a Rejected Executory Contract or Unexpired Lease and shall be deemed rejected and terminated *nunc pro tunc* to the Petition Date pursuant to the Mansfield Unit 1 Transfer Agreement, as authorized by the Confirmation Order.

The Mansfield Owner Parties' Settlement further contemplates that full ownership of Mansfield Unit 1, and any and all insurance proceeds recovered on account of Mansfield Unit 1 to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee), or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled, will be transferred to the Debtors or Reorganized Debtors and authorizes the parties to the Mansfield Owner Parties' Settlement to take any actions necessary in furtherance of that transfer, including any necessary regulatory filings or filings with FERC and the execution of the Mansfield Unit 1 Transfer Agreement. The transfer of full ownership of Mansfield Unit 1, and any and all insurance proceeds recovered on account of Mansfield Unit 1 to which the Consenting Owner Trustee (not in its individual capacity but solely as owner trustee), the FE Owner Trustee (not in its individual capacity but solely as owner trustee) or the Mansfield Indenture Trustee (not in its individual capacity but solely as Mansfield Indenture Trustee) might otherwise be entitled, shall be free and clear of any and all Liens and encumbrances, and the Debtors, the Mansfield Indenture Trustee (as provided in section IV.B.3 above), the Mansfield Owner Parties and the FE Owner Trustee are authorized to execute, file and take any steps otherwise necessary to evidence such transfer, including, without limitation, the execution of the Mansfield Unit 1 Transfer Agreement.

5.   <u>Issuance and Distribution of New Common Stock</u>.

On the Effective Date, or as soon as reasonably practicable thereafter, the New Common Stock shall be distributed in accordance with the Plan. The New Common Stock shall be subject to dilution by any New Common Stock issued pursuant to the Management Incentive Plan. The issuance of the New Common Stock by New Holdco, including options, stock appreciation rights, or other equity awards, if any, contemplated by the Management Incentive Plan, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

The New Common Stock will be issued in global certificate form only and registered to DTC, which interests in the certificate being held through DTC participants, for so long as the shares of New Common Stock are eligible to be held through DTC. Holders must follow specified procedures to designate a direct or indirect DTC participant to receive their shares of New Common Stock.

All of the New Common Stock issued pursuant to the Plan, including the New Common Stock issued pursuant to section 1145 of the Bankruptcy Code and the New Common Stock issued pursuant to other exemptions from registration under the Securities Act, shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, New Holdco and each of the other Reorganized Debtors shall be private companies. As such, upon the Effective Date, (i) the New Common Stock shall not be registered under the Securities Act or the Securities Exchange Act, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors will be a reporting company under the Securities Exchange Act. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Common Stock shall be subject to certain transfer and other restrictions pursuant to the New Organizational Documents and/or the Reorganized Debtor Stockholders' Agreement. Any Holder of New Common Stock who does not execute the Reorganized Debtors' Stockholders' Agreement will be automatically deemed to have accepted the terms of such agreement and to be a party to such agreement without further action.

6. <u>Effective Date Cash Distribution</u>.

The Requisite Supporting Parties and the Debtors, in consultation with the Committee, may agree to distribute Cash, in addition to New Common Stock, to those creditors who will receive distributions of New Common Stock under the Plan, in which case such Cash shall be distributed ratably based on such creditors' holdings of the New Common Stock. For the avoidance of doubt, such Cash distribution shall be funded solely by Cash that would otherwise be transferred to the Reorganized Debtors on the Effective Date and will not increase the value of recoveries to those creditors receiving such Cash distributions.

7. <u>Unsecured Bondholder Cash Pool</u>.

Holders of Allowed Unsecured Bondholder Claims shall have the option to elect to receive, in lieu of New Common Stock, their Pro Rata share (based on the Allowed principal amount of such Claims) of Cash equal to the aggregate value of New Common Stock distributed to Holders of Allowed General Unsecured Claims who have an election to receive New Common Stock and make such an election; *provided* that to the extent the Unsecured Bondholder Cash Pool is insufficient to provide each Electing Bondholder its allocable recovery of Unsecured Distributable Value in accordance with the Plan, Electing Bondholders shall receive the remainder of their distribution in New Common Stock in accordance with the Plan; *provided further*, that to the extent there is surplus Cash in the Unsecured Bondholder Cash Pool after taking into account distributions to the Electing Bondholders on account of their Unsecured Bondholder Claims, such Cash shall revert to the Reorganized Debtors. For the avoidance of doubt, the maximum amount of Cash contributed to the Unsecured Bondholder Cash Pool shall be the amount of Cash that is equal to the aggregate value of New Common Stock distributed to Holders of Allowed General Unsecured Claims who have made an election to receive New Common Stock.

In order to elect to receive their Pro Rata share of the Unsecured Bondholder Cash Pool, an Electing Bondholder will be required to submit a subscription form to their broker, bank, commercial bank, transfer agent, trust company, dealer, or other agent or nominee, or, in the event an Electing Bondholder holds their Unsecured Bondholder Claims directly on the books of the transfer agent in their own name, to Prime Clerk no later than thirty (30) days prior to the Effective Date. Following an election to participate in the Unsecured Bondholder Cash Pool, the related PCNs, FES Notes, or Mansfield Certificates held through DTC will be frozen from trading.

8. <u>Dissolution and Liquidation of Certain Debtor Entities</u>.

FE Aircraft and such other Debtors as may be designated by the Debtors, shall be dissolved and liquidated in accordance with the Plan and applicable law without any further court or corporate action, including the filing of any documents with the Secretary of State for any state in which any such entity is

incorporated or any other jurisdiction, *provided, however*, that the Debtors or Reorganized Debtors, as applicable, shall be permitted to make such filings as they deem reasonable or necessary in their sole discretion. For the avoidance of doubt, none of (i) the Debtors, (ii) the Reorganized Debtors, (iii) the FE Non-Debtor Parties, (iv) the Consenting Creditors, (v) the Committee or its members solely in their capacities as such, or (vi) with respect to each of the foregoing Entities in clauses (i) through (v), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers (including all Independent Directors and Managers), officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agent, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, shall have or incur any liability whatsoever in connection with or as a result of the dissolution or liquidation of any entity, in accordance with the terms of this Article IV.B.7.

C.     *Sources of Consideration for Plan Distributions.*

Distributions under the Plan shall be funded with, as applicable: (i) the New Common Stock, (ii) Cash on hand at the Debtors, and (iii) the FE Settlement Value contributed to the Debtors under the FE Settlement Agreement and the FE Settlement Order. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance of the New Common Stock in connection with the Plan will be exempt from SEC registration to the fullest extent permitted by law.

1.     Cash on Hand at the Debtors.

The Debtors shall use Cash on hand at the Debtors to fund Cash distributions to certain Holders of Claims against the Debtors in accordance with the Plan.

2.     New Common Stock.

New Holdco shall be authorized to issue up to 250,000,000 shares of New Common Stock, subject to dilution by the Management Incentive Plan. New Holdco shall issue all securities, instruments, certificates, and other documents required to be issued for the New Common Stock in respect of New Holdco or the other Reorganized Debtors. All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

3.     FE Settlement Value.

The FE Settlement Value received by the Debtors pursuant to the FE Settlement Agreement and the FE Settlement Order, including the FE Settlement Cash and the proceeds of the New FE Notes may be used to fund Cash distributions to certain Holders of Allowed Claims and Allowed Interests against the Debtors in accordance with the Plan.

D.     *Corporate Existence.*

Except as otherwise provided in the Plan, including as set forth in Article IV.B.8, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction

in which each applicable Debtor is incorporated or formed and pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificates of incorporation and by-laws (or other formation documents) in effect before the Effective Date, except to the extent such certificates of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state or federal law).

E.      *Vesting of Assets in Reorganized Debtors.*

Except as otherwise provided in the Plan, and subject to any transfer of Assets of FENOC as described in Article IV.F, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, Interests, or other encumbrances.  Except as otherwise provided in the Plan, on and after the Effective Date, each of the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Transfer of FES Assets to New Holdco.*

On the Effective Date, FES may transfer certain assets and liabilities to New Holdco; *provided*, that such transferred assets and liabilities shall not include (a) any Rejected Executory Contract or Unexpired Lease and (b) any liabilities discharged pursuant to the Plan.

G.      *Cancellation of Existing Securities and Agreements.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or Plan Supplement, on the Effective Date: (i) the obligations of the Debtors under the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, contract, agreement, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such indentures, certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; *provided, however* that the Indentures evidencing indebtedness or obligations not specifically Reinstated pursuant to the Plan shall continue in effect solely for the purposes of (a) allowing the Holders of Unsecured Bondholder Claims to receive distributions on account of their Claims as provided in the Plan, (b) allowing the Indenture Trustees, as applicable, to make distributions to be made on account of the Unsecured Bondholder Claims, (c) preserving the Indenture Trustee's rights to compensation and indemnity under each of the applicable Indentures as against any money or property distributed or allocable to Holders of Unsecured Bondholder Claims, including the Indenture Trustee's rights to maintain, enforce, and exercise their respective charging liens against such money or property, (d) permitting the Indenture Trustees, as applicable, to enforce any right or obligation owed to them under the Plan, and (e) permitting the Indenture Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the Indentures; (ii) the FE/FES Revolver shall be cancelled as to the Debtors and the Reorganized Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (iii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or

78

other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, indentures, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. For the avoidance of doubt, each of the Indenture Trustees shall be entitled to assert its respective charging liens arising under and in accordance with the applicable Indenture and any ancillary document, instrument, or agreement to obtain payment of its fees and expenses. On and after the Effective Date, all duties and responsibilities of each Indenture Trustee under the applicable Indenture shall be fully discharged except to the extent required in order to effectuate the Plan, including the continued obligations of the Secured PCN Indenture Trustees with respect to the Secured FG PCN Reinstated Claims and the Secured NG PCN Claims that will be Reinstated pursuant to the Plan. Subsequent to the performance by each Indenture Trustee of its obligations pursuant to the Plan and the Confirmation Order, such Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the applicable Indenture.

H.     *Corporate Action/Name Change.*

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (i) implementation of the Restructuring Transactions; (ii) selection of the directors and officers for the Reorganized Debtors; (iii) issuance and distribution of the New Common Stock; and (iv) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the Bankruptcy Court, the Debtors, the Reorganized Debtors, or their respective security holders, directors, managers, or officers. On or before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, and instruments, and take such actions, contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, including the issuance of the New Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing, and all such documents shall be deemed ratified. On or before the Effective Date, each of the Debtors, other than FE Aircraft and Norton shall change their names unless FE Corp. authorizes each such Debtor to continue use of its current legal name. To the extent the Debtors change their names prior to the closing of the Chapter 11 Cases, the Debtors shall change the case captions accordingly. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.     *FERC Approvals.*

On the Effective Date, the FERC-Jurisdictional Debtors, and those Consenting Creditors who are party to the relevant Restructuring Transactions which require such authorization, shall have received FPA 203 Authorization for the Restructuring Transactions. The FERC-Jurisdictional Debtors, and those Consenting Creditors who are party to the relevant Restructuring Transactions, shall cooperate to submit one or more application(s) requesting such FPA 203 Authorization from FERC at least 120 days prior to the Effective Date. FPA 203 Authorization shall be requested for, at a minimum, separation of the FERC-Jurisdictional Debtors from the FE Non-Debtor Parties and the transfer of ownership of the Mansfield Facility to FG.

J.    *New Organizational Documents.*

The New Organizational Documents shall be consistent with the Restructuring Support Agreement and in form and substance reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties.

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation.    Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective state of incorporation and its respective New Organizational Documents.

K.    *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors or managers of the applicable Debtors shall expire, and the New Boards of directors or managers and the officers of each of the Reorganized Debtors shall be appointed in accordance with the Plan and the respective New Organizational Documents.    The New Holdco Board shall consist of no fewer than eight (8) members, who shall initially consist of: (i) one (1) member who shall be the chief executive officer of Reorganized FES; (ii) Mr. John Kiani; (iii) two (2) members designated by Nuveen Asset Management, LLC on behalf of the Nuveen noteholders; *provided*, that one (1) such member (a) shall be independent of any stockholder with nomination rights, including Nuveen Asset Management, LLC and (b) shall be reasonably acceptable to the Mansfield RSA Majority (as defined in the Restructuring Support Agreement); (iv) one (1) member designated by Avenue Capital Management II L.P.; (v) one (1) member designated jointly by the Ad Hoc Noteholder Group and the Mansfield RSA Majority (as defined in the Restructuring Support Agreement) subject to the reasonable consent of the Committee; (vi) an independent director to be designated jointly by the Ad Hoc Noteholder Group, the Mansfield RSA Majority (as such term is defined in the Restructuring Support Agreement), and the Committee, in accordance with the terms of the Restructuring Support Agreement, as amended; and (vii) a director to be designated by the parties to the Restructuring Support Agreement, as amended, in accordance with the same.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors.    To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.

L.    *Section 1146 Exemption.*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan, including without limitation (i) the Restructuring Transactions; (ii) the issuance of the New Common Stock; (iii) the assignment or surrender of any lease or sublease; and (iv) the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer, mortgage recording tax, or other similar tax, and upon

entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

M.      *Director, Officer, Manager, and Employee Liability Insurance.*

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, will obtain sufficient liability insurance policy coverage for the benefit of the Debtors' respective current and former directors, managers (including all Independent Directors and Managers), officers, and employees on terms no less favorable to the directors, managers, officers, and employees than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.   After the Effective Date, none of the Debtors or Reorganized Debtors shall terminate or otherwise reduce the coverage under any director, officer, manager, and employee insurance policies (including the "tail policy") in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, managers (including all Independent Directors and Managers), and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

N.      *Management Incentive Plan.*

Upon the Effective Date, the New Holdco Board shall adopt the Management Incentive Plan providing for the issuance of New Common Stock, which Management Incentive Plan shall not authorize the issuance of in excess of 7.5% of the New Common Stock as of the Effective Date (on a fully diluted basis).   The Management Incentive Plan shall provide for distribution of the Incentive Securities.   Other terms of the Management Incentive Plan will include vesting, apportionment, forfeiture and granting of the Incentive Shares.   The terms of any Management Incentive Plan shall be disclosed in the Plan Supplement (or left to the determination by the New Holdco Board following the Effective Date) and shall be reasonably acceptable to the Debtors, the Committee, and the Requisite Supporting Parties to the extent disclosed in the Plan Supplement.  For the avoidance of doubt, the Management Incentive Plan will be implemented on or after the Effective Date and the Debtors are not seeking the Bankruptcy Court's approval of the terms of the Management Incentive Plan in connection with Confirmation of the Plan.

O.      *Employee Obligations and Management Employment Contracts.*

The Debtors' Incentive and Retention Plans shall be deemed to be assumed by the Reorganized Debtors.   On the Effective Date, the Reorganized Debtors shall enter into the New Management Employment Contracts.

P.      *Transition Working Group Management Agreement.*

The Debtors shall enter into the Transition Working Group Management Agreement which shall provide for the terms of services provided by the members of the Transition Working Group who are not employees of the Debtors and for compensation and reimbursement of expenses for such members.   The Transition Working Group Management Agreement shall be filed as part of the Plan Supplement and shall become effective on the Confirmation Date.

Q.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII, except as otherwise provided in the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action belonging to the Debtors' Estates, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the applicable Effective Date, other than: (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date; (ii) the Causes of Action released by the Debtors pursuant to the FE Settlement Agreement; and (iii) the Causes of Action specifically retained by the Debtors' Estates that are subject to the authority of the Plan Administrator or the Plan Administrator Advisory Board, as applicable.  The Reorganized Debtors may transfer any and all Causes of Action retained by the Reorganized Debtors to the Plan Administrator.

The Reorganized Debtors, or the Plan Administrator with respect to any Causes of Action transferred to the Plan Administrator, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Debtors and/or Reorganized Debtors. **No entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as an indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled herein or in a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the Causes of Action that are vested with the Reorganized Debtors, subject to Article VIII of the Plan, notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  Except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors in accordance with section 1123(b)(3) of the Bankruptcy Code.  The Reorganized Debtors, or the Plan Administrator on behalf of the Debtors, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action that is vested with the Reorganized Debtors and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R.    *Payment of Certain Fees.*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors shall pay on the Effective Date any Other Professional Fee Claims, including, for the avoidance of doubt, the reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by (i) professionals and the Mansfield Indenture Trustee payable under the *Order (i) Authorizing Debtors to Assume (a) the Process Support Agreement and (b) the Standstill Agreement and (ii) Granting Related Relief* [Docket No. 509], (ii) professionals payable pursuant to the Restructuring Support Agreement, including, for the avoidance of doubt, payment of any transaction completion fees to GLC Advisors & Co. as financial advisor to the Ad Hoc Noteholders Group, Guggenheim Securities LLC as financial advisor to the Mansfield Certificateholders Group, Houlihan Lokey Capital, Inc., as financial advisor to the FES Creditor Group and Crestview Capital Advisors Corporation, as financial advisor to

the Consenting Owner Participant, and (iii) the Consenting Owner Trustee, Indenture Trustees and their counsel. The Reorganized Debtors shall indemnify the Indenture Trustees for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan, and any disputes arising in connection therewith.

All amounts distributed and paid pursuant to this Article IV.R shall not be subject to disgorgement, setoff, recoupment, reduction, or reallocation of any kind.

S.   *Plan Administrator.*

   1.   <u>Appointment</u>.

The Plan Administrator shall serve as Plan Administrator for each of the Debtors pursuant to the terms of the Plan Administrator Agreement.

   2.   <u>Authority</u>.

Subject to Article IV.S of the Plan and the terms of the Plan Administrator Agreement, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

   a.   except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors subject to Bankruptcy Court approval; *provided, however*, that where the Debtors have authorization to compromise or settle any Claims against the Debtors under a Final Order including the Confirmation Order, the Plan Administrator shall be authorized to compromise or settle such Claims after the Effective Date, in accordance with and subject to such Final Order and *provided further, however* that the settlement of any Allowed General Unsecured Claim in excess of $10,000,000 or any Administrative Claim or Priority Tax Claim or Other Priority Claim in excess of $1,000,000 (in Allowed amount), shall require notice and an order of the Bankruptcy Court;

   b.   make Distributions to Holders of Allowed Claims in accordance with the Plan;

   c.   prosecute Claims and Causes of Action transferred to the Plan Administrator on behalf of the Debtors, and to elect not to pursue any Claims or Causes of Action transferred to the Plan Administrator and whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Claims or Causes of Action, as set forth in the Plan Administrator Agreement. A list of the Causes of Action to be retained by the Debtors and turned over the Plan Administrator shall be set forth in the Plan Supplement. Recoveries on such Causes of Action shall be (i) in the case of Holders of Allowed Claims against the applicable Debtor or Debtors that own such Causes of Action that received their distribution in Cash, distributed to such Holders on a Pro Rata basis in accordance with such Cash recoveries; and (ii) in the case of Holders of Allowed Claims against the applicable Debtor or Debtors that own such Causes of Action that received their

18-50757-amk    Doc 3228    FILED 10/16/19    ENTERED 10/16/19 13:58:59    Page 166 of 299

distribution under the Plan (or any portion thereof) in the form of New Common Stock distributed in Cash to the Reorganized Debtors;

    d.    make payments to existing Professionals who will continue to perform in their current capacities;

    e.    retain professionals to assist in performing its duties under the Plan;

    f.    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; and

    g.    perform other duties and functions that are consistent with the implementation of the Plan and this provision.

    3.    <u>Indemnification of Plan Administrator</u>.

Subject to the terms of the Plan Administrator Agreement, each of the Debtors shall indemnify and hold harmless the Plan Administrator for any losses incurred in execution of its duties as the Plan Administrator, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct or criminal conduct.

T.    *Environmental Matters*

Nothing in the Plan or the Confirmation Order shall release, discharge, or preclude the enforcement of, (or preclude, release, defeat, or limit the defense under non-bankruptcy law of) any liability or obligation of the applicable Debtors or Reorganized Debtors under the Consent Decrees that is not a Claim, and such liabilities or obligations shall become liabilities or obligations of the applicable Reorganized Debtor(s). All parties' rights and defenses under the Consent Decrees are fully preserved. For the avoidance of doubt, any performance obligation under the applicable Consent Decrees shall not be treated as a Claim for purposes of the Plan.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases of the Debtors, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed to be Assumed Executory Contracts or Unexpired Leases, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (i) previously were assumed or rejected by the Debtors; (ii) are identified on the list of Rejected Executory Contracts or Unexpired Leases filed with the Plan Supplement; (iii) are the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Effective Date; or (iv) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is on or after the Effective Date; *provided, however* that to the extent an Executory Contract or Unexpired Lease is among one or more Debtors and one or more FE Non-Debtor Parties, such Executory Contract or Unexpired Lease is deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease (a) has been previously assumed by the Debtors or (b) is identified on the list of Assumed Executory

Contracts or Unexpired Leases; and *provided, further, however*, to the extent that an Executory Contract or Unexpired Lease is among one or more Debtors and one or more FE Non-Debtor Parties and any such Executory Contract is not an Insurance Policy or a Surety Indemnity Agreement, the Debtor will consult with the applicable FE Non-Debtor Party and obtain the consent of the applicable FE Non-Debtor Party before including such Executory Contract or Unexpired Lease on the list of Assumed Executory Contracts or Unexpired Leases. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and, to the extent applicable, assignments of the Executory Contracts and Unexpired Leases, and the rejection of the Executory Contracts or Unexpired Leases listed on the list of Rejected Executory Contracts and Unexpired Leases filed with the Plan Supplement pursuant to sections 365(a) and 1123 of the Bankruptcy Code, in each case effective as of the Effective Date. To the extent any contract or lease entered into after the Petition Date shall be assigned to New Holdco as of the Effective Date, such assignment shall be noted on the list of Assigned Contracts or Unexpired Leases filed as part of the Plan Supplement. Notwithstanding Article VIII.B, any lien on or security interest in cash held by a customer or third party custodian as collateral or security for a customer contract that is assumed by FES shall be unaffected by the Plan. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable law. The Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the lists of Assumed Executory Contracts or Unexpired Leases and Assigned Contracts or Unexpired Leases and the schedules of Executory Contracts or Unexpired Leases with respect to the Debtors or Reorganized Debtors, as applicable, at any time through and including one (1) business day prior the Effective Date, without the incurrence of any penalty or changing the priority or security of any Claims as a result of such treatment change. For the avoidance of doubt, nothing in this paragraph shall be deemed to apply to any collective bargaining agreement.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed and served upon the Debtors or Reorganized Debtors, as applicable, within 30 days after the later of: (i) notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (ii) the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed and served within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Debtor and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan. In no event shall any counterparty to a Rejected Executory Contract or Unexpired Lease be permitted to exercise any non-monetary contractual remedies under such Executory Contract or Unexpired Lease against the Debtors, the Reorganized Debtors, their Estates or their respective properties. All such remedies shall, as of the Effective Date, be

permanently enjoined. For the avoidance of doubt, nothing in this paragraph shall be deemed to apply to any collective bargaining agreement.

C.    *Cure of Defaults for Assumed Executory Contracts or Unexpired Leases.*

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (i) the amount of any payments to cure such a default, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least 17 days before the Confirmation Hearing, the Debtors will provide for notices of proposed assumption and propose cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount. If the Bankruptcy Court determines that the cure amount for any Executory Contract or Unexpired Lease is greater than the amount set forth in the notice sent by the Debtors, the Debtors may add such Executory Contract or Unexpired Lease to the list of Rejected Executory Contracts or Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption. **Upon the occurrence of the Effective Date and the payment by the Debtors of any cure amount, any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the Executory Contract or Unexpired Lease counterparty or counterparties to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

E.    *Indemnification Obligations.*

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation of any Debtor shall be assumed by the applicable Reorganized Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise. Each such Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or

otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors and Reorganized Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers (including all Independent Directors and Managers), employees, and other professionals of the Debtors, as applicable, in their capacities as such.

Notwithstanding the foregoing, nothing shall impair the ability of the Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for acts or omissions arising after the Effective Date.

F.     *Collective Bargaining Agreement.*

FG and FENOC have reached framework agreements with the unions regarding modifications to their collective bargaining agreements.  On the Effective Date, FG and FENOC will assume their collective bargaining agreements as modified by the framework agreements and any other documents entered into by the parties to the collective bargaining agreements to implement the modifications set forth in the framework agreements.  Notwithstanding any provision of this Section V.F, nothing contained herein shall create an obligation of the FE Non-Debtor Parties to participate in, or contribute (either economically or otherwise) to, any negotiations between the Debtors and the unions that are parties to collective bargaining agreements.

G.     *Insurance Policies.*

Each of the Insurance Policies are treated as Executory Contracts under the Plan.   Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims, and such Insurance Policies shall not be impaired in any way by the Plan or the Confirmation Order, but rather will remain valid and enforceable in accordance with their terms.  For the avoidance of doubt, any claims by an insurer against any Debtor pursuant to the terms of an applicable Insurance Policy where the Debtor is a named insured are not subject to the Consensual Third Party Releases of the Debtor Released Parties set forth in Article VIII.E of the Plan.

H.     *Surety Bonds.*

Notwithstanding any other provision of the Plan or the Confirmation Order, on the Effective Date: (i) any and all surety bonds that are issued on behalf of any of the Debtors, as principal(s) and in force as of the Effective Date (each, a "Surety Bond," and collectively, the "Surety Bonds"), and related indemnification and collateral agreements (collectively, the "Surety Indemnity Agreements") entered into by any of the Debtors in favor of the sureties providing the Surety Bonds (each, "Surety", and collectively, the "Sureties") will be treated as Executory Contracts that have been assumed cum onere by the Reorganized Debtors under the Plan and will survive and remain unaffected and unimpaired by the confirmation of the Plan and entry of the Confirmation Order; provided, that for avoidance of doubt, neither the Plan nor the Confirmation Order shall constitute a finding as to whether any of the Surety Bonds or Surety Indemnity Agreements are "executory contracts" within the meaning of section 365 of the Bankruptcy Code; (ii) any bonded obligation under any Surety Bond shall be unimpaired and a continuing obligation of the Reorganized Debtors; and (iii) any and all collateral held by a Surety shall remain in place to secure the obligations of any of such Surety's indemnitors under all applicable Surety Indemnity Agreements regardless of when such obligations arise.  Upon the Effective Date, and provided

that all amounts then due and owing pursuant to the Surety Bonds and Surety Indemnity Agreements are satisfied, Proofs of Claim filed by a Surety on account of or in respect of any Surety Bond or Surety Indemnity Agreement, or otherwise covered by this paragraph, shall be deemed automatically withdrawn without further notice to or action by the Bankruptcy Court and shall be expunged from the claims register. Nothing in this paragraph shall be deemed to waive any of the Debtors' or the Reorganized Debtors' rights or defenses with respect to any Claims. Nor shall this paragraph be deemed to modify the respective rights and obligations of the Sureties, Debtors, Reorganized Debtors, or any indemnitors, as applicable, under the Surety Bonds, the Surety Indemnity Agreements, or any related collateral agreements.

Notwithstanding any provision of this Plan or the Confirmation Order, including, but not limited to, the release and injunction provisions in Article VIII of the Plan, nothing in the Plan or the Confirmation Order shall be deemed to bar, impair, alter, diminish, or enlarge any of the rights or claims of Liberty Mutual Insurance Company and its affiliates or Westchester Fire Insurance Company and its affiliates against any FE Non-Debtor Party pursuant to the terms of an applicable Surety Indemnity Agreement, and, for the avoidance of doubt, any claims of Liberty Mutual Insurance Company and its affiliates or Westchester Fire Insurance Company and its affiliates against any Debtor or any FE Non-Debtor Party pursuant to the terms of an applicable Surety Indemnity Agreement are not subject to any of the Consensual Third Party Releases set forth in Article VIII.E of the Plan.

FE Corp. agrees that it will continue to be party to those certain indemnity agreements with the applicable surety providers with respect to the surety bonds issued in favor of the Commonwealth of Pennsylvania, Department of Environmental Protection related to Little Blue Run and the Hatfield's Ferry Landfill *provided, however*, that nothing in this Plan or the Confirmation Order shall be deemed to modify, expand, or limit FE Corp.'s rights and obligations thereunder.

I. *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, or restatements thereto or thereof, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority or amount of any Claims arising thereunder.

J. *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on any list of Rejected Executory Contracts or Unexpired Leases or list of Assumed Executory Contracts or Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

K.    *Nonoccurrence of the Effective Date.*

In the event that the Effective Date does not occur with respect to a Debtor, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases with respect to such Debtor pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline has expired.

L.    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Executory Contracts or Unexpired Leases, will be performed by the applicable Debtor, or the applicable Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, any such contracts and leases (including Assumed Executory Contracts or Unexpired Leases) that have not been rejected as of the Confirmation Date shall survive and remain unaffected by entry of the Confirmation Order. To the extent such contracts and leases will be assigned to New Holdco as of the Effective Date, such contracts and leases will be listed on the list of Assigned Contracts or Unexpired Leases as part of the Plan Supplement.

## ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Disbursing Agent.*

All distributions under the Plan shall be made to Holders of Allowed Claims by the applicable Disbursing Agent on the Effective Date, or as soon as reasonably practicable thereafter, in accordance with the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.    *Rights and Powers of Disbursing Agent.*

1.    <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the

Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

    2.    <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent in performing its duties under the Plan on or after the Effective Date (including taxes) shall be paid in Cash by the Reorganized Debtors (and in the case of the Plan Administrator, such fees and expenses shall be paid as set forth in the Plan Administrator Agreement).

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

    1.    <u>Record Date for Distributions</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. The Debtors, the Indenture Trustees and/or the Disbursing Agent shall have no obligation to recognize any transfer of any Claims or Interests occurring on or after the Distribution Record Date. For the avoidance of doubt, the Distribution Record Date shall not apply to any publicly-held securities.

    2.    <u>Delivery of Distributions</u>.

Except as otherwise provided herein, the applicable Disbursing Agent shall make distributions to Holders of Allowed Claims, as applicable, as of the Distribution Record Date at the address for each such Holder indicated on the Debtors' records as of the date of any such distribution. The manner of such distributions shall be determined at the discretion of the applicable Disbursing Agent and the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. For the avoidance of doubt, Distributions to the Holders of Allowed Unsecured Bondholder Claims shall be made to the applicable Indenture Trustees for further distribution to the Holders of Allowed Unsecured Bondholder Claims, subject to the charging lien of the Indenture Trustees.

    3.    <u>No Fractional Distributions</u>.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Applicable Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (i) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (ii) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

    4.    <u>Minimum Distribution</u>.

No Cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of any Allowed Claim.

5. <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder at which time such distribution shall be made to such Holder without interest; *provided, however*, that any distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date. In the event that the Disbursing Agent is unable to effectuate distributions to any Holder due to the Holder's non-compliance with the provisions of this Plan required for distributions (including compliance with tax requirements and/or identifying a DTC participant for the distributions of the New Common Stock), such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date. All unclaimed property or interests in property shall revert to the applicable Reorganized Debtor(s) automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the claim of any Holder to such property shall be fully discharged, released, and forever barred.

6. <u>Allocation of Distributions</u>.

Except as otherwise set forth herein, Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest to the extent Allowed herein.

E. *Manner of Payment.*

Unless as otherwise set forth herein, all distributions of Cash or New Common Stock to the Holders of Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable. At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F. *SEC Registration/Exemption.*

The New Common Stock is or may be a "Security" as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

Pursuant to section 1145 of the Bankruptcy Code, the issuance of the New Common Stock (other than New Common Stock, if any, to be issued pursuant to the Management Incentive Plan) is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities. The New Common Stock issued pursuant to section 1145 of the Bankruptcy Code (i) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (ii) is freely tradeable and transferable by any initial recipient thereof that (a) at the time of the transfer is not an "affiliate" of the Reorganized Debtors, as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (b) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. New Common Stock underlying the Management Incentive Plan will be issued pursuant to other available exemptions from registration under the Securities Act and applicable law.

Notwithstanding any policies, practices, or procedures of DTC or any other applicable clearing system, DTC and all other applicable clearing systems shall cooperate with and take all actions reasonably requested by a Disbursing Agent or an Indenture Trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest. No Disbursing Agent or Indenture Trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

In connection with any ownership of the New Common Stock that will be reflected through the facilities of DTC on or after the Effective Date, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether any of the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit with respect to distributions pursuant to the Plan. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any Governmental Unit including income, withholding, and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such Holder has made an arrangement satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse the Disbursing Agent for such amounts. Notwithstanding any provision herein to the contrary, the Reorganized Debtors and the Disbursing Agent, as applicable, shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, and establishing any other mechanisms they believe are reasonable and appropriate to comply with such requirements. The Disbursing Agent may require, as a condition of receipt of a distribution, that the Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder. If the Holder fails to comply with such a request for six months, such distribution shall be deemed an unclaimed distribution and treated in accordance with Article VI.D of the Plan. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

H.   *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in the Plan or in the Confirmation Order, and notwithstanding any documents that govern the Debtors' prepetition funded indebtedness to the contrary, (i) postpetition and/or default interest shall not accrue or be paid on any Claims and (ii) no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate, as applicable.

I.   *Setoffs and Recoupment.*

The Debtors and Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against the Holder of such Claim.

J.   *Distributions on Account of Obligations of Multiple Debtors.*

Holders of Allowed Claims (other than Secured PCN Claims) may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

K.   *Claims Paid or Payable by Third Parties.*

1.   Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor (other than the Disbursing Agent).  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day period specified above until the amount is repaid.

2.   Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may

be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as otherwise expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein (i) constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers, or (ii) establish, determine, or otherwise imply any liability or obligation, including any coverage obligation, of any insurer.

## ARTICLE VII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.     *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date. This Article VII of the Plan shall not apply to the Secured PCN Claims, the Unsecured PCN Claims, the FES Note Claims, the Mansfield Certificate Claims, or the Inter-Debtor Claims as Allowed in accordance with the Plan Settlement, which Claims shall be Allowed in full and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment (except as provided in this Plan), objection, or any other challenges under any applicable law or regulation by any person or entity.

B.     *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the applicable Reorganized Debtor(s), or the Plan Administrator acting on behalf of the Reorganized Debtor(s) to the extent set forth in the Plan Administrator Agreement, shall have the sole authority: (i) to File, withdraw, or litigate to judgment, objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. A list of the Claims and Causes of Action to be retained by the Debtors and turned over the Plan Administrator or the Reorganized Debtors shall be set forth in the Plan Supplement.

C.     *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, or the Plan Administrator on their behalf, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the

litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim or Interest that has been disallowed by Bankruptcy Court order or expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

D.      *Adjustment to Claims or Interests without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors or the Plan Administrator without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims or Interests.*

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Deadline.

F.      *Disputed Claims Reserve.*

On the Effective Date, the Debtors shall establish the Disputed Claims Reserve for any Disputed Claim (to the extent such Claim is ultimately Allowed) existing as of the Effective Date, which Disputed Claims Reserve shall be administered by the Plan Administrator. The Debtors will also estimate the number of shares of New Common Stock that would be required to satisfy all Disputed Claims (to the extent each such Claim is ultimately Allowed) and will allocate, but not issue, such number of shares of New Common Stock, *provided, however,* that no shares of New Common Stock will be held in the Disputed Claims Reserve. After the Effective Date, the Reorganized Debtors shall hold an amount of Cash in such Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date. To the extent that the Holder of a subsequently Allowed Claim is entitled to make an Equity Election, the Plan Administrator shall provide a written request to New Holdco to issue shares of New Common Stock to such Holder and New Holdco will promptly issue such shares of New Common Stock from the allocated shares of New Common Stock. The Plan Administrator shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the Disputed Claims Reserve.

Disputed Claims that become Allowed, in whole or in part, shall be satisfied exclusively out of the Disputed Claims Reserve. In the event that the Cash remaining in the Disputed Claims Reserve shall be insufficient to satisfy all of the Disputed Claims that have become Allowed and are due to be satisfied with distributions from the Disputed Claims Reserve on any Periodic Distribution Date, such Disputed Claims shall be satisfied Pro Rata from the Disputed Claims Reserve. After all Cash has been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed Claims and the Holders of any such Disputed Claims shall have no recourse in respect of such Claims to the Debtors or the Reorganized Debtors, Holders of Allowed Claims, or their respective assets or properties. Disputed Claims that become Allowed and make an Equity Election shall be satisfied out of the New Common Stock allocation described herein. As shares of New Common Stock are issued on account of Disputed Claims that become Allowed, the number of allocated shares shall be reduced. Once the

95

allocated amount of shares of New Common Stock is reduced to zero, no further shares of New Common Stock shall be issued.

If a Disputed Claim is disallowed, in whole or in part, on the Periodic Distribution Date next following the date of determination of such disallowance, then Cash equal to the amount of Cash that would have been released from the Disputed Claims Reserve to the Holder thereof had such Claim been Allowed in the as-filed or estimated amount, as applicable, of such Claim, or disallowed portion thereof if such Claim is disallowed in part, shall be (x) in the case of Holders of Allowed Claims that received their distribution under the Plan (or any portion thereof) in the form of Cash, distributed in Cash to such Holders on a Pro Rata basis in accordance with such Cash recoveries, and (y) in the case of Holders of Allowed Claims that received their distribution under the Plan (or any portion thereof) in the form of New Common Stock, distributed in Cash to the Reorganized Debtors.

If at any time it is determined by both the Reorganized Debtors and the Plan Administrator that it is not necessary to hold in the Disputed Claims Reserve all of the Cash, if any, the Plan Administrator shall release such Cash as is determined to no longer be necessary for the satisfaction of Disputed Claims, and such Cash shall be (i) in the case of Holders of Allowed Claims against the applicable Debtor or Debtors relating to such Disputed Claims Reserve that received their distribution in Cash, distributed to such Holders on a Pro Rata basis in accordance with such Cash recoveries; and (ii) in the case of Holders of Allowed Claims against the applicable Debtor or Debtors relating to such Disputed Claims Reserve that received their distribution under the Plan (or any portion thereof) in the form of New Common Stock, distributed in Cash to the Reorganized Debtors. To the extent there are shares of New Common Stock that were allocated for satisfaction of Disputed Claims, but were not required to be issued, the remaining allocation will be reduced to zero and such shares of New Common Stock will remain unissued.

G.      *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Proofs of Claim Filed on account of an employee or retiree obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors, or the FE Non-Debtor Parties pursuant to the FE Settlement Agreement, honor such employee or retiree obligation, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Bar Date (excluding amended Proofs of Claim which amend timely Filed Proofs of Claim) shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.**

H.      *Amendments to Proofs of Claim or Interest.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, or the Plan Administrator acting on their behalf, and any such new or amended Proof of Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

I.      *Reimbursement or Contribution.*

In the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Effective Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

J.      *No Distributions Pending Allowance.*

Except as otherwise set forth herein, if an objection to a Claim or portion thereof is Filed as set forth in Article VII.A or VII.B of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  Except as otherwise set forth in the Plan, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under such order or judgment of the Bankruptcy Court.

## ARTICLE VIII.

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date and any Administrative Claims whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in

each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.    *Release of Liens.*

**Except as otherwise specifically provided in the Plan and except for (i) any FG Secured PCN Claims against FG that are Reinstated in accordance with Article III of the Plan, (ii) any NG Secured PCN Claims against NG that are Reinstated in accordance with Article III of the Plan, and (iii) any Other Secured Claims against any Debtor that are Reinstated in accordance with Article III of the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan (or any agent for such Holder) has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors that are reasonably necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

C.    *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, on and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party is deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims or Causes of Action, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties), as applicable, would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or**

the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the PCNs, the FES Notes, any interest in the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, any obligation under any Assumed Executory Contract or Unexpired Lease where an FE Non-Debtor Party is a counterparty, the FE Postpetition Agreements, the FE Settlement Agreement and any related obligations under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the FE Settlement Agreement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan.

D. *Third Party Releases of the FE Non-Debtor Parties by the Consenting Creditors and the Committee.*

On and as of the Effective Date, pursuant to the terms of the FE Settlement Agreement, in exchange for good and valuable consideration, including the contributions of the FE Non-Debtor Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each FE Non-Debtor Released Party is deemed to have been conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the: (i) the Consenting Creditors and (ii) the Committee, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims or Causes of Action, including any derivative claims asserted or assertable by, or on behalf of any of the (i) Consenting Creditors or (ii) the Committee, or their Affiliates, as applicable, that such Entities would have been legally entitled to assert in any of their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the PCNs, the FES Notes, any interest in the Mansfield Facility Documents, the Chapter 11 Cases and related

adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, the FE Settlement Agreement and any related obligations under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

E. *Releases of the Debtor Released Parties, FE Non-Debtor Released Parties and Other Released Parties by Third Parties and Holders or Claims or Interests.*

On and as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Debtor Released Parties, FE Non-Debtor Released Parties and Other Released Parties, to facilitate and implement the Plan, each Holder of a Claim or Interest that (i) votes to accept the Plan or (ii) is deemed to have accepted the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor Released Party, FE Non-Debtor Released Party, and Other Released Party from any and all claims and Causes of Action, including any derivative claims asserted or assertable by or on behalf of any of the Debtors, the Reorganized Debtors, or their Estates or Affiliates (including any FE Non-Debtor Parties), as applicable, that such Entity would have been legally entitled to assert its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from in whole or in part, the Debtors, the Debtors' businesses, the Debtors' property, the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring discussions, intercompany transactions between or among the Debtors and/or their Affiliates (including any FE Non-Debtor Parties), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and Released Party, the FES Notes, any interest in the Mansfield Facility Documents, the Chapter 11 Cases and related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any obligations of any Entity arising after the Effective Date under the Plan, the

100

Confirmation Order, any Restructuring Transaction, the FE Settlement Agreement and any related obligations under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and the FE Settlement Agreement, (ii) any Consenting Owner Participant from its obligations to the Consenting Owner Trustee, in its individual capacity (and its successors, permitted assigns, directors, officers, employees, agents, and servants), under the Mansfield Trust Agreements or (iii) the Consenting Owner Trustee from its obligations under the Mansfield Trust Agreements with respect to periods after the Effective Date.

For the avoidance of doubt, on and as of the Effective Date, each Holder of a Claim or Interest that (i) votes to accept the Plan or (ii) is deemed to have accepted the Plan shall be deemed to provide a full and complete discharge and release to the Debtor Released Parties, the FE Non-Debtor Released Parties, and the Other Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for or sounding in tort, fraud, contract, violations of federal or state securities laws, veil piercing, substantive consolidation, or alter-ego theories of liability, contribution, indemnification, joint or several liability, or otherwise arising from or related in any way to (i) the Debtors, the Reorganized Debtors, their businesses, their property, or any interest in the Mansfield Facility Documents; (ii) any Cause of Action against the FE Non-Debtor Released Parties or their property arising in connection with any intercompany transactions or other matters arising in the conduct of the Debtors' businesses; (iii) the Chapter 11 Cases; (iv) the formulation, preparation, negotiation, dissemination, implementation, administration, Confirmation or Consummation of the Plan, the Plan Supplement, any contract, employee pension or benefit plan instrument, release, or other agreement or document related to any Debtor, the Chapter 11 Cases or the Plan, modified, amended, terminated, or entered into in connection with either the Plan, or any agreement between the Debtors and any FE Non-Debtor Released Party, including the FE Settlement Agreement; or (v) any other act taken or omitted to be taken in connection with the Chapter 11 Cases, including, without limitation, acts or omissions occurring after the Effective Date in connection with distributions made consistent with the terms of the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Consensual Third Party Release, which includes by reference each of the related provisions and definitions contained in this Plan.

For the avoidance of doubt and notwithstanding anything else in the Plan, any Confirmation Order, or any implementing or supplementing plan documents, (i) no Governmental Units shall be deemed to accept the Plan for purposes of Article VIII.E of the Plan and (ii) the United States, Ohio Environmental Protection Agency, Ohio Department of Natural Resources, and Pennsylvania Department of Environmental Protection have agreed not to vote on the Plan and will not be subject to the releases in Article VIII.E of the Plan provided, however, if any agency of the United States or any agency of any state actually votes to accept the Plan, such agency shall be deemed to provide the releases in Article VIII.E of the Plan on the Effective Date for such agency and only for such agency. Additionally, for the avoidance of doubt, the releases contained in Article VIII.C and VIII.D shall not act as a release of any non-derivative claims and causes of action of the United States, Ohio Environmental Protection Agency, Ohio Department of Natural Resources, and Pennsylvania Department of Environmental Protection against any non-debtor parties.

F.   *Exculpation.*

Notwithstanding anything herein to the contrary, and upon entry of the Confirmation Order, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest or to any other Entity, (i) as it pertains to Exculpated Parties that are Estate Fiduciaries, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, and (ii) as it pertains to all Exculpated Parties, including Exculpated Parties that are non-Estate Fiduciaries, for any act or omission in connection with, relating to, or arising out of, the negotiation, documentation and implementation of any agreement, transaction or action approved by the Bankruptcy Court in the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Mansfield Settlement, the Mansfield Owner Parties' Settlement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Process Support Agreement, the Standstill Agreement, the FE Settlement Agreement, the Mansfield Settlement, the Mansfield Owner Parties' Settlement, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan or the distribution of property under the Plan or any other agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, except for Causes of Action related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* nothing herein shall prevent Entities from asserting as a defense that they relied in good faith upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. For the avoidance of doubt, an Exculpated Party will be entitled to the foregoing exculpation of (i) an Estate Fiduciary when acting in such capacity and (ii) a non-Estate Fiduciary when acting in such capacity.

G.   *Injunction.*

In addition to any injunction provided in the FE Settlement Order, upon the occurrence of the Effective Date, except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.C-E of the Plan (collectively, the "<u>Released Claims</u>"), shall be discharged pursuant to Article VIII.A of the Plan (collectively, the "<u>Discharged Claims</u>"), or are subject to exculpation pursuant to Article VIII.F of the Plan (collectively, the "<u>Exculpated Claims</u>"), shall be enjoined from taking any actions to interfere with the implementation of the Plan, and are permanently enjoined and forever barred from taking any actions with respect to the Released Claims, the Discharged Claims, or the Exculpated Claims, including but not limited to: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or respect to the

Released Claims, the Discharged Claims or the Exculpated Claims; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to the Released Claims, the Discharged Claims or the Exculpated Claims; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to the Released Claims, the Discharged Claims, or the Exculpated Claims; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to the Released Claims, the Discharged Claims, or the Exculpated Claims unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims, the Discharged Claims, or the Exculpated claims, except in accordance with the terms of the Plan. For the avoidance of doubt, nothing in this Article VIII.G modifies paragraph 19 of the FE Settlement Order.

H.      *PBGC.*

Notwithstanding anything to the contrary, neither the FirstEnergy Corp. Master Pension Plan nor the Pension Benefit Guaranty Corporation releases any FE Non-Debtor Released Party from any Claim or Cause of Action respecting the FirstEnergy Corp. Master Pension Plan.

I.      *Environmental Liabilities and Governmental Unit Matters.*

Nothing in the Plan or the Confirmation Order shall release, discharge, or preclude the enforcement of, (or preclude release, defeat, or limit the defense under non-bankruptcy law of): (i) any liability to a Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any liability under Environmental Law to a Governmental Unit on the part of any Entity to the extent of such Entity's liability under non-bankruptcy law on account of its status as owner or operator of such property after the Effective Date; or (iv) any Governmental Unit's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtors or the Reorganized Debtors and such rights and defenses are expressly preserved. All parties' rights and defenses under Environmental Law with respect to (i) through (iv) above are fully preserved. Nor shall anything in the Plan Documents or Confirmation Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside of the Bankruptcy Court, any liability described in the preceding sentence. Nothing in the Plan or Confirmation Order shall authorized the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization, or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law. Nothing in the Plan or Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Plan or Confirmation Order or to adjudicate any defense asserted under the Plan or Confirmation Order. Notwithstanding the foregoing, nothing in this Plan or the Confirmation Order terminates or limits the effect of the *Preliminary Injunction Against the Federal Energy Regulatory Commission,* Case No. 18-50757, Adv. Pro. No. 18-5021 (Bankr. N.D. Ohio, May 11, 2018) [Docket No. 114]. For the sake of clarity, any matter not released or discharged pursuant to the foregoing can be enforced by either (a) applicable Governmental Units, or (b) any persons or entities authorized to bring actions under enabling statutes.

Nothing in this Plan shall operate as a waiver by the Federal Energy Regulatory Commission of its arguments in the PPA Appeal Proceedings. In the event that, following final appellate review, the

Bankruptcy Court's preliminary injunction order is overturned in the PPA Appeal Proceedings, nothing in this Plan precludes the Federal Energy Regulatory Commission from exercising its regulatory authority under the Federal Power Act, 16 U.S.C. § 824, *et seq.* with respect to the PPA Appeal Proceeding Contracts in accordance with the terms of any final order in the PPA Appeal Proceedings.

J.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a Debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

K.      *Recoupment.*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Proof of Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.  The Reorganized Debtors will not alter their document retention policy in any manner contrary to applicable state or federal law.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation of a Plan.*

It shall be a condition to Confirmation of the Plan that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order in a manner consistent in all material respects with the Restructuring Support Agreement, the Plan and the FE Settlement Order and in form and substance reasonably satisfactory to the Debtors, the Requisite Supporting Parties, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement) and the Committee;

2.      the Bankruptcy Court shall have entered the Confirmation Order in a manner consistent in all material respects with the Plan and the FE Settlement Order, subject to the Consent and Waiver and the Consent and Waiver Order, and in form and substance reasonably satisfactory to the Debtors, the

Committee, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement) and the Requisite Supporting Parties; and

      3.     the FE Settlement Order and the FE Settlement Agreement shall remain in full force and effect.

B.    *Conditions Precedent to the Effective Date.*

      It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

      1.     the Confirmation Order shall have been duly entered in form and substance reasonably acceptable to the Debtors, the Committee, the FE Non-Debtor Parties (solely to the extent provided in the FE Settlement Agreement) and the Requisite Supporting Parties and the Confirmation Order shall be a Final Order;

      2.     the FE Settlement Order, subject to the Consent and Waiver and the Consent and Waiver Order, shall remain in full force and effect;

      3.     the FE Settlement Agreement, subject to the Consent and Waiver and the Consent and Waiver Order, shall have been consummated including (i) the issuance of the New FE Notes and (ii) the payment of the Settlement Cash;

      4.     all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full and the Professional Fee Escrow Account shall have been established and funded in accordance with Article II.A.3(b);

      5.     all Other Professional Fee Claims shall have been paid in full;

      6.     the Disputed Claims Reserve shall have been established and funded;

      7.     the New Common Stock shall have been issued;

      8.     the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

      9.     if any assets of FES are transferred to New Holdco, New Holdco shall have issued an additional guarantee for the PCNs related to the Secured FG PCN Reinstated Claims and the Secured NG PCN Claims that are being Reinstated in accordance with the Plan;

      10.    all actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied or waived substantially concurrently with the occurrence of the Effective Date); and

      11.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, including from the FERC and NRC, as applicable, rulings or documents that are necessary to consummate the Restructuring Transactions, and all such authorizations, consents and approvals shall remain in full force and effect, including without limitation, the following:

<ol type="a" start="1">
<li>a final order or order(s) from FERC granting any and all authorization(s) (including Section 203 Authorization(s)) required in connection with the Restructuring Transactions;</li>

<li>Allegheny Energy Supply Company, LLC and Reorganized FG shall have received a final order from FERC granting authorization under Federal Power Act Section 203 to transfer the Pleasants Power Plant to a subsidiary of Reorganized FG;</li>

<li>to the extent necessary based on the form of the Restructuring Transactions, at least 90 days prior to the Effective Date, the Debtors shall provide PJM with an informational filing notifying PJM of the transfer of any facilities currently receiving payment in accordance with a FERC-approved reactive power tariff (the same as the informational filing submitted to FERC);</li>

<li>the Reorganized Debtors will register with ReliabilityFirst for the appropriate reliability functions; and</li>

<li>the NRC shall have approved the license transfer or new license application (as determined by the Debtors with the reasonable consent of the Committee and the Requisite Supporting Parties) filed by Reorganized FENOC and Reorganized NG with respect to the change in ownership pursuant to the Plan.</li>
</ol>

C.   *Waiver of Conditions.*

The conditions to Confirmation and the Effective Date set forth in this Article IX may be waived by agreement of all of the following parties (i) the Debtors, (ii) the Requisite Supporting Parties, (iii) the FE Non-Debtor Parties (solely as to the conditions precedent in Article IX.A.1-3 and Article IX.B.1-2 and solely as provided for in the FE Settlement Agreement) and (iv) the Committee, *provided, however*, that with respect to the conditions to the Effective Date set forth in Article IX.B.5 and IX.B.8, such waiver shall not require the consent of any of the foregoing parties to the extent such parties have terminated their participation in the Restructuring Support Agreement and the Restructuring Support Agreement otherwise remains in effect as to the other parties; *provided further, however*, with respect to the conditions to the Effective Date set forth in Article IX.B.5, no party may waive such condition except with respect to the Other Professional Fee Claims incurred on its behalf.

D.   *Effect of Failure of Conditions.*

If the Effective Date does not occur with respect to a particular Debtor, then, as to such particular Debtor: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effective under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.  Notwithstanding the foregoing, for the avoidance of doubt, the failure of Confirmation or Consummation to occur with respect to FE Aircraft or Norton shall not impact the effectiveness of the Settlement embodied in the FE Settlement Agreement and such settlement shall remain in full force and effect in accordance with the terms of the FE Settlement Agreement, or the effectiveness of the Plan Settlement embodied herein as to the other Debtors and the Plan Settlement shall remain in full force and effect.

# ARTICLE X.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Subject to the Restructuring Support Agreement, each of the Debtors reserves the right to modify the Plan, one or more times, before Confirmation, whether such modification is material or immaterial, and to seek Confirmation consistent with the Bankruptcy Code and, as applicable, not resolicit votes on such modified plan.  Subject to certain restrictions and requirements set forth in the Plan and in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, each of the Debtors expressly reserves its respective rights to alter, amend, or modify the Plan, one or more times, after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, including with respect to such modifications.  Any alteration, amendment, or modification to the Plan shall be in accordance with the Restructuring Support Agreement and the FE Settlement Agreement.

B.    *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that each alteration, amendment, or modification to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019; *provided, however*, that each alteration, amendment or modification shall be made in accordance with Article X.A of the Plan and the Restructuring Support Agreement.

C.    *Revocation or Withdrawal of Plan.*

1.    <u>Revocation or Withdrawal of the Plan.</u>

Subject to the Restructuring Support Agreement, and the FE Settlement Agreement, each of the Debtors reserves the right to revoke or withdraw the Plan as it applies to that Debtor before the Confirmation Date and to File subsequent plans for any reason, including to the extent the Debtors receive a higher or otherwise better offer than what is provided for in the Plan, or if pursuing Confirmation of the Plan would be inconsistent with any Debtor's fiduciary duties.

2.    <u>Consequence of Withdrawal of the Plan.</u>

If any of the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects as to such Debtor(s); (ii) any settlement or compromise embodied in the Plan, including the Plan Settlement, and the FE Settlement Agreement (except in accordance with the terms set forth therein and in the FE Settlement Order), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void as to such Debtors; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action as to such Debtors; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, to the extent provided for by 28 U.S.C. § 1334, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, any list of Rejected Executory Contracts or Unexpired Leases, or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

4. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

5. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

6. enter and implement such order as may be necessary to execute, implement, or consummate the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including injunctions or other actions as may be necessary to restrain interference by an Entity with Consummation or enforcement of the Plan;

7. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8. adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

9. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, to the extent such deadline has not passed;

10.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.     resolve any and all disputes arising from or relating to distributions under the Plan, including any cases, controversies, suits, disputes, or Causes of Action relating to the distribution or the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or amounts not timely repaid pursuant to Article VI of the Plan;

13.     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     enter an order or decree concluding or closing the Chapter 11 Cases;

15.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability for a Debtor for any tax incurred during the administration of the Chapter 11 Cases, including any tax liability arising from or relating to the Restructuring Transactions, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Cases;

17.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

18.     except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

19.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

20.     enforce all orders previously entered by the Bankruptcy Court; and

21.     hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the applicable Debtors, the Reorganized Debtors and any and all applicable Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, exculpations, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the applicable Reorganized Debtors (or the Disbursing Agent on behalf of each of the applicable Reorganized Debtors) for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtors is converted, dismissed, or closed, whichever occurs first.  All such fees due and payable prior to the Effective date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Disbursing Agent or the applicable Reorganized Debtor shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until the earliest of the date on which the applicable Chapter 11 Case of the Reorganized Debtors is converted, dismissed, or closed.

D.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases (including the Committee) shall dissolve; *provided, however*, that following the Effective Date the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes (i) Claims and/or applications, and any relief related thereto, for compensation by professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) appeals of the Confirmation Order; and (iii) any pending litigation as to which the Committee is a party.  Upon dissolution of the Committee, the members thereof and their respective officers, employees, counsel, advisors, and agents shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date, except for the limited purposes identified above.

110

E.      *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

F.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor or any Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any other Entity with respect to the Holders of Claims or Interests prior to the Effective Date.

G.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

H.      *Notices.*

All notices, requests, and demands to be effective shall be in writing, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

1.      if to the Debtors, to:

FirstEnergy Solutions Corp.
341 White Pond Drive
Akron, Ohio 44320
Attn; Rick C. Giannantonio, Esq.
Email: giannanr@firstenergycorp.com

—and—

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Ira S. Dizengoff
Lisa G. Beckerman
Brad M. Kahn
Email:  idizengoff@akingump.com; lbeckerman@akingump.com;
bkahn@akingump.com

—and—

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
2001 K Street, NW

Washington, DC 20006
Attn: Scott L. Alberino
Kate Doorley
Email: salberino@akingump.com; kdoorley@akingump.com

2.      if to the Consenting Creditors, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn: Amy Caton
Joseph A. Shifer
Email: acaton@kramerlevin.com; jshifer@kramerlevin.com

—and—

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Attn: George A. Davis
Andrew M. Parlen
Email: george.davis@lw.com, andrew.parlen@lw.com

—and—

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn: Darren S. Klein
Natasha Tsiouris
Email: darren.klein@davispolk.com; natasha.tsiouris@davispolk.com

—and—

Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Attn: Jennifer C. Hagle
Anna Gumport
Email: jhagle@sidley.com; agumport@sidley.com

—and—

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
Attn: Robert J. Gayda
Gregg S. Bateman
Email: gayda@swekis.com; bateman@sewkis.com

3.    if to the Committee, to:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn: Dennis Dunne
Evan Fleck
Parker Milender
Email: ddunne@milbank.com, efleck@milbank.com; pmilender@milbank.com

4.    if to the FE Non-Debtor Parties, to:

FirstEnergy Corp.
76 S. Main Street
Akron, OH 44308
Attn: Robert Reffner
Email: rreffner@firstenergycorp.com

—and—

JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114-1190
Attn: Heather Lennox
Thomas M. Wearsch
T. Daniel Reynolds
Email: hlennox@jonesday.com; twearsch@jonesday.com; tdreynolds@jonesday.com

After the Effective Date, the Reorganized Debtors in their discretion, have authority to send a notice to Entities, which notice shall provide that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors and the Plan Administrator are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

I.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code (subject to any exceptions set forth under section 362 of the Bankruptcy Code, to the extent applicable) or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. From and after the Effective Date, the stay shall remain in full force and effect with respect to any pending action or proceeding where the basis for the pending action or proceeding occurred prior to the Petition Date, the non-Debtor party or parties to the pending action or proceeding received notice of the Bar Date, and the non-Debtor party or parties failed to timely File a Proof of Claim, until such time as the applicable Debtor party or parties is dismissed from the pending action or proceeding. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement.*

Except as otherwise indicated, and except with respect to the FE Settlement Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

K.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/FES or the Bankruptcy Court's website at www.ohnb.uscourts.gov.

L.      *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, except with respect to any term contained in or related to the FE Settlement Agreement (which may not be altered or waived), and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (iii) nonseverable and mutually dependent.

M.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates (including the FE Non-Debtor Parties), agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors shall have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

O.	*Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any agreement or order (other than the Confirmation Order and the FE Settlement Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan or the FE Settlement Agreement, the Plan or the FE Settlement Order, as applicable, shall govern and control; *provided, however*, with respect to any conflict or inconsistency between the Plan and the Confirmation Order or the FE Settlement Order, the Confirmation Order or FE Settlement Order, as applicable shall govern.

[Remainder of the Page Intentionally Left Blank]

Dated: October 14, 2019

Respectfully submitted,

**FIRSTENERGY SOLUTIONS CORP.**

By: _____
Name: Kevin T. Warvell
Title: Chief Financial Officer, Chief
Risk Officer and Corporate Secretary

**FIRSTENERGY NUCLEAR OPERATING
COMPANY**

By: _____
Name: Kevin T. Warvell
Title: Chief Financial Officer, Chief
Risk Officer and Corporate Secretary

**FIRSTENERGY GENERATION, LLC**

By: _____
Name: Kevin T. Warvell
Title: Chief Financial Officer, Chief Risk
Officer and Corporate Secretary

**FIRSTENERGY MANSFIELD UNIT 1 CORP.**

By: _____
Name: Kevin T. Warvell
Title: Chief Financial Officer, Chief Risk
Officer and Corporate Secretary

**NORTON ENERGY STORAGE, LLC**

By: FirstEnergy Generation, LLC, i s sole Member
By: _____
Name: Kevin T. Warvell
Title: Chief Financial Officer, Chief
Risk Officer and Corporate Secretary

**FIRSTENERGY NUCLEAR GENERATION, LLC**

By: _____

Name: Kevin T. Warvell
Title: Chief Financial Officer, Chief Risk Officer and Corporate Secretary

**FIRSTENERGY AIRCRAFT LEASING CORP.**

By: _____

Name: Kevin T. Warvell
Title: Chief Financial Officer, Chief Risk Officer and Corporate Secretary

**Exhibit A**
**Distributable Value Splits**

**Exhibit A - Distributable Value Splits**

| Distributable Value Splits | | |
|---|:---:|---:|
| | **Class** | **Distributable Value Splits** |
| *General Unsecured Claims* | | |
| FES/FENOC Unsecured Claims | A5 | 1.4% |
| FES Single-Box Unsecured Claims | A6 | 7.2% |
| Mansfield TIA Claim | A7 | 1.7% |
| FG Single-Box Unsecured Claims | B7 | 2.4% |
| Mansfield TIA Claim | B8 | 1.0% |
| NG Single-Box Unsecured Claims | C6 | - |
| NG-FENOC Unsecured Claims against NG | C7 | 1.0% |
| FES-FENOC Unsecured Claims against FENOC | D3 | 1.6% |
| FENOC Single-Box Unsecured Claims | D4 | 0.4% |
| NG-FENOC Unsecured Claims against FENOC | D5 | 0.5% |
| FGMUC Single-Box Unsecured Claims | E4 | 0.1% |
| Mansfield TIA Claim | E5 | 0.6% |
| **Total General Unsecured Claims** | | **17.9%** |
| | | |
| *Bondholders* | | |
| Unsecured PCN / FES Note Claims Against FES | A3 | 20.3% |
| Mansfield Certificate Claims Against FES | A4 | 7.1% |
| Unsecured PCN/FES Note Claims Against FG | B5 | 12.0% |
| Mansfield Certificate Claims Against FG | B6 | 3.7% |
| Unsecured PCN/FES Notes Claims Against NG | C4 | 26.8% |
| Mansfield Certificate Claims Against NG | C5 | 9.4% |
| Mansfield Certificate Claims Against FGMUC | E3 | 2.8% |
| **Total Bondholders Claims** | | **82.1%** |
| **Total** | | **100.0%** |

# **Exhibit B**

FE Settlement Agreement

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "<u>Agreement</u>") is made as of August 26, 2018, by and among:  (1) the Debtors;[1] (2) the FE Non-Debtor Parties; (3) the Ad Hoc Noteholders Group; (4) the Bruce Mansfield Certificateholders Group; and (5) the Committee.

## RECITALS

WHEREAS, on the Petition Date, the Debtors commenced voluntary chapter 11 cases under the Bankruptcy Code in the Bankruptcy Court, where they have been consolidated for procedural purposes and are captioned *In re FirstEnergy Solutions Corp., et al.*, Case No. 18-50757 (Bankr. N.D. Ohio) (the "<u>Bankruptcy Cases</u>");

WHEREAS, various allegations have been made regarding Causes of Action against the FE Non-Debtor Released Parties arising in connection with certain intercompany transactions and other matters relating to the conduct of the Debtors' prepetition and postpetition businesses or affairs with the FE Non-Debtor Released Parties;

WHEREAS, in connection with the investigation of such Causes of Action by the Debtors and certain of the other Parties, on March 30, 2018, certain of the Parties entered into the Standstill Agreement;

WHEREAS, on May 7, 2018, the Bankruptcy Court entered an order authorizing the Debtors to assume the Standstill Agreement;

WHEREAS, on April 23, 2018, FE Corp. announced that it had reached an agreement in principle with the Ad Hoc Noteholders Group and the Bruce Mansfield Certificateholders Group to resolve claims and Causes of Action between and among the Debtors, on the one hand, and the FE Non-Debtor Parties, on the other hand (the "<u>Original Intercompany Settlement</u>");

WHEREAS, notwithstanding the Original Intercompany Settlement, pursuant to the terms and conditions of the Standstill Agreement, the Debtors and the Committee continued their investigation of the various Causes of Action against the FE Non-Debtor Parties, including conducting document discovery and taking interviews from a number of persons employed by the Debtors and the FE Non-Debtor Parties;

WHEREAS, the FE Non-Debtor Parties vigorously deny (i) that any of the alleged Causes of Action have any merit; (ii) any wrongdoing or liability with respect to any Causes of Action that the Debtors, Ad Hoc Noteholders Group, the Bruce Mansfield Certificateholders Group, the Committee, and/or any of the Debtors' creditors may or could assert against any of the FE Non-Debtor Released Parties; and (iii) that they have committed any violation of law or contract, breached any fiduciary duties, acted in bad faith, or acted improperly in any way;

WHEREAS, the Parties believe it desirable to settle all outstanding disputes with respect to the claims and Causes of Action among the FE Non-Debtor Released Parties on the one hand

---

[1]    Capitalized terms used herein shall have the meanings given to them in Section 1.1 of this Agreement, or, if undefined in Section 1.1 of this Agreement, the Bankruptcy Code.

and the Debtors, Ad Hoc Noteholders Group, the Bruce Mansfield Certificateholders Group, the Committee, and any and all of the Debtors' creditors on the other hand in order: (i) to avoid the substantial expense, burden and risk of protracted litigation; (ii) to fully and finally resolve any and all claims and Causes of Action against any of the FE Non-Debtor Released Parties that may or could be asserted with respect to the Causes of Action; (iii) to permit the Debtors to operate their businesses on a standalone basis and achieve certain restructuring goals; and (iv) that the Debtors may proceed to develop and confirm a plan of reorganization and emerge successfully from chapter 11;

WHEREAS, as a result of the foregoing, the Parties acknowledge that: (i) the obligations being incurred by the FE Non-Debtor Parties in settlement of claims and Causes of Action pursuant to this Agreement are substantial, essential, integral, and necessary to facilitate the Debtors' reorganization efforts, and will confer a material benefit on, and are in the best interests of, the Debtors, their estates, and all of the Debtors' creditors and other stakeholders; and (ii) the benefits provided by the FE Non-Debtor Parties hereunder are expressly not being paid or provided as any concession as to the validity of any Causes of Action against any of the FE Non-Debtor Parties or the FE Non-Debtor Released Parties;

WHEREAS, notwithstanding anything herein to the contrary, the Debtors have determined that the resolution of the Mansfield IT Claims set forth in the Mansfield Settlement is fair and reasonable and in the best interests of the Debtors' estates to the extent such resolution is incorporated into a broader restructuring agreement acceptable to the Debtors, including, without limitation, a chapter 11 plan for the Debtors that is supported by the Debtors, the Bruce Mansfield Certificateholders Group, and the Ad Hoc Noteholders Group;

WHEREAS, the Debtors have agreed that they shall engage in good faith negotiations with the Bruce Mansfield Certificateholders Group (i) with respect to the resolution of all issues relating to the Mansfield IT Claims and the Mansfield IT's interests Mansfield Unit 1 (other than the allowance of the Mansfield IT Claims), including without limitation, any issues related to operation of the Mansfield Plant and insurance proceeds from the January 2018 fire and (ii) concerning any FES Plans, and a related restructuring support agreement, that incorporate the treatment of the Mansfield IT Claims set forth in the Mansfield Settlement;

WHEREAS, the Debtors and the FE Non-Debtor Parties shall use commercially reasonable efforts to provide certain non-privileged documents that have been identified as the "priority documents" relating to the Mansfield IT Claims to the Committee by August 26, 2018, to assist the Committee in evaluating the reasonableness of the Mansfield Settlement; provided, however, that nothing herein shall prejudice the rights of the Committee or any other party to the Mansfield Protocol to seek production of documents in addition to the priority documents relating to the Mansfield IT Claims, in each case in accordance with the terms of the Mansfield Protocol (to the extent that the Mansfield Protocol applies to such Claims);

WHEREAS, the Bruce Mansfield Certificateholders Group's support for the settlement set forth herein is subject to and conditioned upon the ultimate implementation of the Mansfield Settlement.

- 2 -

18-50757-amk  Doc 3237-2  FILED 10/19/18  ENTERED 10/19/18 06:08:52  Page 205 of 299

NOW THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby consent and agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1 <u>General</u>. As used in this Agreement, the following capitalized terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>2001 Indenture</u>" means that certain Indenture, dated November 15, 2001, between FirstEnergy Corp. and The Bank of New York Mellon, as Trustee.

"<u>2018 Tax Payment</u>" means an amount to be paid by FE Corp. to the Debtors pursuant to the terms of the Tax Allocation Agreement with respect to the 2018 tax year, with such amount not to be less than the NOL Floor.

"<u>2018 Tax Setoff</u>" means the March 16, 2018 setoff by FE Corp. of certain amounts owed to certain Debtors pursuant to the Tax Allocation Agreement against the Money Pool Balance, in the amount of approximately $88 million.

"<u>Ad Hoc Noteholders Group</u>" means the members of the ad hoc group consisting of the holders of the majority in aggregate amount of (a) the PCN Claims and (b) the FES Notes Claims, who are Signatories hereto.

"<u>Adjustment Amount</u>" means, if there is a sale or deactivation of all or any portion of a nuclear or fossil plant, excluding the West Lorain Plant, prior to or on the Plan Effective Date, the amount, if any, of cash paid by the FE Non-Debtor Parties to, and received by, the Debtors, under the Tax Allocation Agreement to the extent such payment exceeds the amount that would have been paid to the Debtors under the Tax Allocation Agreement but for such sale or deactivation of all or any portion of the Debtors' nuclear or fossil plants, excluding the West Lorain Plant, prior to or on the Plan Effective Date, it being understood that no Adjustment Amount exists as of the date of this Agreement.

"<u>Administrative Claim</u>" means a Claim for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under section 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, or the terms of this Agreement, including without limitation, Claims pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business.

"<u>Adverse Ruling</u>" means an order or ruling of the Bankruptcy Court which (i) denies, or has the effect of denying, approval of the Plan Releases set forth in Section 6.3 of this Agreement or (ii) renders it unlikely, in the reasonable judgment of the FE Non-Debtor Parties or the Debtors (in consultation with Committee and the Supporting Parties), that the Plan Releases set forth in Section 6.3 of this Agreement will be approved by the Bankruptcy Court.

"AE Supply" means Allegheny Energy Supply Company LLC, an FE Non-Debtor Party.

"AE Supply/FES Note" means that certain Revolving Credit Note, dated June 29, 2016, by and among FES, as borrower, and AE Supply, as lender, as amended.

"Affiliate" means, when used with respect to a specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, shall mean the possession, directly or indirectly, of the power to direct the management and policies of such Person, through the ownership of voting securities or other interests.

"Amended Separation Agreement" means the amendment of the Separation Agreement entered into between the Debtors, in consultation with the Supporting Parties and the Committee, and the FE Non-Debtor Parties on the Plan Effective Date.

"Amended SSA" means one agreement that amends and restates both the FES Shared Services Agreement and the FENOC Shared Services Agreement.

"Amended SSA Termination Date" means the earlier of (i) 30 days after receipt by the Debtors of a written notice of payment default under the Amended SSA if the Debtors have not cured such default before such date or (ii) June 30, 2020; provided, however, that the Debtors or Reorganized Debtors, as applicable, shall have the right to terminate the Amended SSA on 90 days' prior written notice to FESC.

"ATSI" means American Transmission Systems, Inc.

"Ballots" means the ballots for voting to accept or reject any FES Plan to be sent to those creditor classes entitled to vote on such an FES Plan.

"Bankruptcy Code" means title 11 of the United States Code, as applicable to the Bankruptcy Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Ohio.

"Bankruptcy Rules" means collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

"BCIDA" means Beaver County Industrial Development Authority.

"Beneficial Ownership" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Creditor Claims or the right to acquire such Creditor Claims.

"Bruce Mansfield Certificate Claims" means, collectively, Claims evidenced by, arising under or in connection with the Bruce Mansfield Certificates, the Bruce Mansfield Pass Through Trust Agreement or other agreements related thereto.

- 4 -

"Bruce Mansfield Certificateholders Group" means the members of the ad hoc group consisting of the majority of holders of the Bruce Mansfield Certificate Claims who are Signatories hereto.

"Bruce Mansfield Certificates" means those certain 6.85% pass through certificates issued under the Bruce Mansfield Pass Through Trust Agreement.

"Bruce Mansfield Pass Through Trust Agreement" means that certain Pass Through Trust Agreement, dated as of June 26, 2007, among FG, FES and the Mansfield IT (not in its individual capacity, but solely as Pass Through Trustee for the Bruce Mansfield Unit 1 2007 Pass Through Trust), as the same has been or may be subsequently modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

"Business Separation Committee" means a committee comprised of three representatives of the Debtors and three representatives of the FE Non-Debtor Parties, which, for the avoidance of doubt, may include advisors to the applicable Parties.

"Cause of Action" means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of set-off, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, claims (including, but not limited to, claims arising under theories of substantive consolidation, alter-ego and piercing the corporate veil and claims under chapter 5 of the Bankruptcy Code as well as any claims or rights created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Cases), counterclaims, cross-claims, affirmative defenses, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or arising prior to the Settlement Effective Date (in the case of the Party Releases) or the Plan Effective Date (in the case of any releases granted under an FES Plan), in contract or in tort, in law, in equity, or otherwise in any court, tribunal, forum or proceeding, under any local, state, federal, foreign, statutory, regulatory, or other law or rule, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Bankruptcy Cases, including through the Settlement Effective Date (in the case of the Party Releases) or the Plan Effective Date (in the case of any releases granted under an FES Plan).

"Certain Employee Related Obligations" means the employee related obligations described in Section 2.2(a) of this Agreement.

"Class A Fundamental Default" means the FE Non-Debtor Parties': (a) failure to pay the Settlement Cash when due pursuant to Section 2.1 of this Agreement; (b) failure to issue the New FE Notes when due or to make the Upfront Payment when due pursuant to the terms and conditions set forth in Section 2.4 of this Agreement; or (c) taking of the Worthless Stock Deduction in violation of Section 2.3(a)(iii) of this Agreement.

"Class B Fundamental Default" means the FE Non-Debtor Parties': (a) failure to make any quarterly payment under the Tax Allocation Agreement, calculated consistent with historical

practices pursuant to the Tax Allocation Agreement, including any payment related to the reversal of the 2018 Tax Setoff, or any payment related to the filing of the federal tax return for the tax year 2018 under the Tax Allocation Agreement when obligated for the tax year 2018, and any future tax year, if any, during which a Debtor (or its income and losses) is included on the FE Consolidated Tax Group tax return; (b) failure to substantially perform under the Amended SSA; (c) failure to transfer the rights, title, and interests in the Pleasants Power Plant and related assets to the Debtors' estates due to the FE Non-Debtor Parties' breach of the Pleasants Purchase Agreement, as described in Section 3.1 of this Agreement (including the transfer of the beneficial ownership of the Pleasants Power Plant on the Pleasants Transfer Date through a lease, cost-based power purchase agreement, or other mutually agreed upon arrangement); or (d) the failure to make any payment pursuant to Section 2.2(a) of this Agreement related to the Certain Employee Related Obligations, which failure is in the aggregate amount of $10 million or more.

"Claim" has the meaning given to it in section 101(5) of the Bankruptcy Code.

"COBRA" means Section 4980B of the Internal Revenue Code of 1986 and Part 6 of Subtitle B of Title I of the Employee Retirement Income Security Act of 1974.

"COBRA Costs" means any costs (other than any indirect costs relating to Human Resources management services pursuant to the Amended SSA) borne by the FE Non-Debtor Parties for compliance with COBRA under any group health plan of the FE Non-Debtor Parties related to a Debtors' Current Employee or a Debtors' Former Employee or a dependent of either such person.

"Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases on April 11, 2018, as it may be constituted from time to time.

"Condition Failure Scenario" means the failure to satisfy the conditions set forth in Sections 10.2(b) through (e) of this Agreement.

"Confirmation Order" means an order of the Bankruptcy Court confirming one or more of the FES Plans.

"Creditor Claims" means, collectively, the:  (a) Bruce Mansfield Certificate Claims; (b) FES Notes Claims; and (c) PCN Claims.

"Cure Notice" means the written notice of a breaching Party's proposed cure to any alleged default listed in a Default Notice, delivered pursuant to the Dispute Resolution Procedures.

"Cure Period" means, other than in respect to a Fundamental Default, 30 days.

"Debtors" means, collectively, FES, each of its direct and indirect debtor subsidiaries and FENOC.

"Debtors' Current Employees" means, collectively, any employee that is assigned to a Debtor company code in the SAP System of Record as of the Plan Effective Date.  For the avoidance of doubt, no employee that is assigned to an FE Non-Debtor Party's company code in

18-50757-amk    Doc 3232-4    FILED 10/14/18    ENTERED 10/14/18 06:08:52    Page 209 of 299

the SAP System of Record as of the Plan Effective Date shall be considered a Debtors' Current Employee.

"Debtors' Former Employees" means, collectively, any former employee that was assigned to a Debtor company code in the SAP System of Record prior to but not as of the Plan Effective Date, provided, however, that a person shall not be considered a Debtors' Former Employee if, as of the Plan Effective Date, he or she is assigned to a Debtor or FE Non-Debtor company code in the SAP System of Record, and, provided, further, however, that a person shall only be a Debtors' Former Employee if prior to the Plan Effective Date his or her last assignment of company code in the SAP System of Record was with a Debtor.

"Debtors' Retirees" means, collectively, any of the Debtors' Former Employees who, as of the Settlement Effective Date, has terminated employment from a Debtor after satisfying the age and service requirements for retirement under the applicable employee benefit plan.

"Default Notice" means the written notice of alleged default, including a Fundamental Default, delivered to a Party alleged to be in default of this Agreement pursuant to the Dispute Resolution Procedures.

"Deferred Compensation Claims" means claims related to the participation of the Debtors' Current Employees and Debtors' Former Employees in the Deferred Compensation Plans.

"Deferred Compensation Plans" means, collectively, the: (a) FirstEnergy Corp. Amended and Restated Executive Deferred Compensation Plan, effective as of November 1, 2015 (including with respect to the supplemental pension benefit set forth therein, i.e., the non-qualified pension benefit); (b) FirstEnergy Corp. Supplemental Executive Retirement Plan, amended and restated as of January 1, 2005 and further amended December 31, 2010, as amended by Amendment No. 1 effective as of January 1, 2012; and (c) FirstEnergy Corp. Cash Balance Restoration Plan, effective as of January 1, 2014.

"Disclosure Statement" means a disclosure statement to be filed with the Bankruptcy Court in connection with one or more of the FES Plans, as such may be amended from time to time.

"Disclosure Statement Order" means an order of the Bankruptcy Court approving one or more Disclosure Statements and the various procedures in connection with solicitation of votes with respect to one or more of the FES Plans.

"Dispute Resolution Procedures" mean the procedures set forth in Article XII of this Agreement.

"Distributed New FE Notes" means any New FE Notes that are to be distributed directly or indirectly to creditors of the Debtors pursuant to the FES Plans.

"DTC" means The Depository Trust Company.

"Eastlake Facility" means that certain closed facility located at 10 Erie Rd, Eastlake, OH 44095.

"Effluent Limit Guidelines" means the national regulatory standards for wastewater discharged to surface waters and municipal sewage treatment plants issued by the United States Environmental Protection Agency.

"Employee Related Claims" means all Claims against the Debtors or the Reorganized Debtors with respect to the Certain Employee Related Obligations, the VERO (to the extent such Claims are to be borne by FE Corp. as provided in Section 2.2(b) of this Agreement), the Pension Bridge, the Health Care Runoff Costs, the COBRA Costs, the Welfare and Benefits Plan Administration Costs, and the Miscellaneous Employee Benefits Programs Costs.

"Execution" means the point in time at which this Agreement has been duly executed by one of the Signatories.

"Existing FE Notes" means FE Corp.'s 2.85% senior notes Series A, due 2022, of which $500,000,000 aggregate principal amount is issued and outstanding as of the date hereof.

"FE Aircraft" means FE Aircraft Leasing Corp., a Debtor.

"FE Consolidated Tax Group" means, until the tax year immediately following the Plan Effective Date, the FE Non-Debtor Parties and the Debtors, collectively.

"FE Corp." means FirstEnergy Corp., an FE Non-Debtor Party and the ultimate parent of each of the Debtors.

"FE Non-Debtor Parties" means, collectively, the Debtors' non-Debtor Affiliates, including FE Corp.

"FE Non-Debtor Released Parties" means, collectively, the FE Non-Debtor Parties and each of their respective current and former officers, directors, members, shareholders, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members and professionals), each solely in their capacity as such.

"FE/FES Revolver" means that certain $700 million Credit Agreement, dated December 6, 2016, by and among FE Corp. as lender, FES as borrower, and FG and NG as guarantors, as the same has been or may be subsequently modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto.

"FENOC" means FirstEnergy Nuclear Operating Company, a Debtor.

"FENOC Shared Services Agreement" means that certain Service Agreement, dated June 1, 2003, by and among FESC, FENOC and GPU Nuclear, Inc. as the same has been or may be subsequently modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

"FES" means FirstEnergy Solutions Corp., a Debtor.

"FES Notes" means, collectively, those certain: (a) 6.05% senior notes; and (b) 6.80% senior notes issued under the FES Notes Indenture.

"FES Notes Claims" means, collectively, any Claims evidenced by, arising under, or in connection with the FES Notes Indenture, the FES Notes, or other agreements related thereto.

"FES Notes Indenture" means that certain Indenture, dated as of August 1, 2009, and the First Supplemental Indenture thereto, dated as of August 1, 2009, between FES and the FES Notes IT, as the same has been or may be subsequently modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

"FES Notes IT" means The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the FES Notes Indenture.

"FES Plan" means any plan or joint chapter 11 plan of reorganization, or any plan or joint chapter 11 liquidating plan, for any Debtor or group of Debtors, filed in the Bankruptcy Cases in a form acceptable to each of the Parties, each in their own discretion, and consistent in all respects with the terms of this Agreement. For the avoidance of doubt, nothing in this Agreement precludes the Debtors from filing a single joint chapter 11 plan of reorganization or a joint chapter 11 liquidating plan.

"FES Plan Documents" means, collectively, any Disclosure Statement, any FES Plans, the Ballots, any Disclosure Statement Order, any Confirmation Orders and related notices, and any and all other materials provided to creditors, equity security holders or other parties in interest, or filed with the Bankruptcy Court, in the Bankruptcy Cases in connection with the confirmation of one or more FES Plans.

"FES Shared Services Agreement" means that certain Service Agreement, dated April 25, 2011, by and among FESC, FES, FG on behalf of itself and its subsidiaries, and NG, as the same has been or may be subsequently modified, amended, supplemented, or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

"FES Tax Overpayment" means any overpayment that may have been made to certain of the Debtors by FE Corp. pursuant to the Tax Allocation Agreement for the tax year 2017.

"FESC" means FirstEnergy Service Company, an FE Non-Debtor Party.

"FG" means FirstEnergy Generation, LLC, a Debtor.

"FG Mortgage" means that certain Open-End Mortgage, General Mortgage Indenture and Deed of Trust, dated as of June 19, 2008, as amended and supplemented, by and between FG and UMB Bank, National Association, as successor trustee, under which FG's FMBs are issued and outstanding, including but not limited to $250 million of FMBs supporting the FE/FES Revolver.

18-50757-amk Doc 3283-2 FILED 01/04/19 ENTERED 01/04/19 03:58:59 Page 212 of 299

"Final Order" means an order or judgment of the relevant court of competent jurisdiction as entered on the docket in the relevant cases that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been resolved by the highest court to which the order or judgment was appealed from or from which certiorari was sought; provided, that the possibility that a motion under section 502(j) of the Bankruptcy Code or Bankruptcy Rule 9024, may be (but has not been) filed relating to such order or judgment shall not prevent such order or judgement from being a Final Order.

"FMB" means a first mortgage bond.

"Functional Groups" shall be defined and identified in the Amended SSA and shall include mutually agreed upon groupings of services (e.g., Treasury, Tax, Recruiting, Mobile Maintenance) which may include both direct and indirect billing functions.

"Fundamental Default" means either a Class A Fundamental Default or a Class B Fundamental Default.

"Governmental Entity" means any nation or government, any state, municipality, or other political subdivision thereof and any entity, body, agency, commission, department, board, bureau, or court, whether domestic, foreign, or multinational, exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government and any official thereof.

"Health Care Plans" means the medical and prescription drug benefits provided under the FirstEnergy Corp. Health Care Plan, FirstEnergy Prescription Drug Plan, and any similar plans sponsored by FE Corp.

"Health Care Runoff Costs" means any amounts for incurred but not reported claims or other costs related to participation in the Health Care Plans by a Debtors' Current Employee or a Debtors' Former Employee or a dependent of either such person incurred up to and including the date that the Debtors cease participation in the Health Care Plans.

"Hollow Rock" means that certain residual waste landfill plant located in Stratton, Ohio that services the W.H. Sammis Facility.

"Intercompany Protocol" means that certain Intercompany Protocol attached as Exhibit A to the Standstill Agreement.

"July 2018 Letter Agreement" means that certain letter agreement, dated July 12, 2018, by and among FESC, FE Corp., and FES regarding the sale of the Retail Book Assets.

"Limited Retiree Medical Claims" means claims for Retiree Medical Subsidies payable on behalf of the Debtors' Retirees under the Health Care Plans.

"Limited Union Medical Claims" means claims for any retiree medical or prescription drug benefits or premium subsidies payable on behalf of (a) the Debtors' Retirees under the

collective bargaining agreements as in effect as of the Settlement Effective Date: (i) between FENOC and the International Brotherhood of Electric Workers, Local Union 29; or (ii) among Cleveland Electric Illuminating Company, FESC, FENOC, FG, and Utility Workers Union of America, AFL-CIO, Local Union 270 and (b) for clarity, solely with respect to the collective bargaining agreement as in effect as of the Settlement Effective Date between FENOC and the International Brotherhood of Electric Workers, Local Union 29, the eleven additional retirees who the Debtors believe are eligible for such benefits as of August 26, 2018, but, as of such date, have not made the election to receive such benefits under the applicable union plan, in the event that in the future such Debtors' Former Employees make the election to receive such benefits.

"LTIP" means that certain Long-Term Incentive Program administered by FE Corp., solely for the restricted stock unit awards granted in March 2016 that vest in March 2019.

"LTIP Claims" means Claims related to the participation of the Debtors' Current Employees and the Debtors' Former Employees in the LTIP.

"Mansfield Adversary Proceeding" means an adversary proceeding subject to the terms of the PSA and the Mansfield Protocol, regarding the amount and nature of allowed prepetition Claims of any party to the Mansfield Protocol concerning the Mansfield Facility Agreements or arising out of the rejection of the Mansfield Facility Agreements and any security or other interests connected therewith.

"Mansfield Facility Agreements" means those certain Facility Leases with Mansfield 2007 Trusts A-F relating to an undivided interest in 93.825% of Unit 1 of the Mansfield Plant.

"Mansfield IT" means Wilmington Savings Fund Society, FSB (not in its individual capacity, but solely as Pass Through Trustee for the Bruce Mansfield Unit 1 2007 Pass Through Trust and Lease Indenture Trustee in connection with the Mansfield Facility Agreements).

"Mansfield IT Claims" means any and all Claims that may or could be asserted by the Mansfield IT related to the Mansfield Plant.

"Mansfield Plant" means that certain 2,490 megawatt coal power plant located in Shippingport, Pennsylvania

"Mansfield Protocol" means that certain Joint Stipulation Concerning Rejection of Rejected Operative Documents, Schedule and Protocol for Determination of Claims of Mansfield Parties, and Other Matters Related to Bruce Mansfield Unit 1 attached as Exhibit C to the PSA as amended, modified, and/or supplemented from time to time.

"Mansfield Settlement" means that certain settlement agreement, by and among the Bruce Mansfield Certificateholders Group and the Ad Hoc Noteholders Group, a copy of which is attached hereto as Exhibit A.

"Mansfield Unit 1" means unit 1 at the Mansfield Plant.

"McElroy's Run Impoundment" means that certain coal ash disposal site associated with the Pleasants Power Plant, located near Willow Island, West Virginia.

- 11 -

"<u>Miscellaneous Employee Benefit Programs</u>" means the following FE Corp. programs: (i) the Adoption Assistance Program; (ii) the FirstEnergy Employee Educational Assistance Plan; (iii) the Healthy Living Wellness Program; and (iv) the Work/Life Employee Assistance Program.

"<u>Miscellaneous Employee Benefits Programs Costs</u>" means costs (other than any indirect costs relating to Human Resources management services pursuant to the Amended SSA) relating to a Miscellaneous Employee Benefit Program from and after the date that the Debtors cease to participate in any such program with respect to the Debtors' Current Employees or the Debtors' Former Employees, including any then unpaid amounts relating to the period up to and including the date that the Debtors ceased participation in the applicable Miscellaneous Employee Benefits Program.

"<u>Money Pool Balance</u>" means the Debtors' liability as of the Petition Date, as adjusted by the transactions contemplated by Section 2.3 of this Agreement, under the Non-Utility Money Pool Agreement.

"<u>New FE Notes</u>" means the senior notes due on the New FE Notes Maturity Date to be issued by FE Corp. on the Plan Effective Date.

"<u>New FE Notes Maturity Date</u>" means December 31, 2022.

"<u>NG</u>" means FirstEnergy Nuclear Generation, LLC, a Debtor.

"<u>NOL</u>" means net operating loss as computed under principals of federal income tax laws and regulations and not generally accepted accounting principals.

"<u>NOL Floor</u>" means a cash payment of $66 million under the Tax Allocation Agreement for tax year 2018.

"<u>Non-Distributed New FE Notes</u>" means any New FE Notes that are not to be distributed to creditors of the Debtors pursuant to the FES Plans, provided that, for the avoidance of doubt, (i) such New FE Notes may be distributed to the Debtors pursuant to the FES Plans and (ii) Non-Distributed New FE Notes do not include any New FE Notes that are ultimately distributed in a transaction or transactions that are exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code.

"<u>Non-Utility Money Pool Agreement</u>" means that certain Fifth Amended and Restated Non-Utility Money Pool Agreement, dated as of December 19, 2013 as the same has been or may be subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents, and agreements related thereto.

"<u>North Park Facility</u>" means that certain coal ash impoundment that serves, among others, the Eastlake Facility.

"<u>North Park Permit</u>" means that certain water permit necessary to operate the North Park Facility.

"Norton" means Norton Energy Storage L.L.C., a Debtor.

"Notice of Reduction" means a written notice delivered by the Debtors to FESC, pursuant to Section 2.5(c) of this Agreement, informing FESC of the Debtors' decision to reduce the levels of services provided for under the Amended SSA.

"OE" means Ohio Edison Company, an FE Non-Debtor Party.

"OAQDA" means the Ohio Air Quality Development Authority.

"OWDA" means Ohio Water Development Authority.

"Party" or "Parties" means the Signatories to this Agreement.

"Party Releases" means the releases provided to the FE Non-Debtor Parties pursuant to Section 6.1 of this Agreement.

"PCNs" means, collectively, the following series of notes supporting the pollution control revenue bonds that were issued under the PCN Loan Agreements: (a) the 2.7% pollution control notes due April 1, 2035 issued by NG; (b) the 5.625% pollution control notes due June 1, 2018 issued by FG; (c) the 3.125% pollution control notes due July 1, 2033 issued by NG; (d) the 3.125% pollution control notes due January 1, 2034 issued by NG; (e) the 3.75% pollution control notes due December 1, 2023 issued by FG; (f) the 2.55% pollution control notes due November 1, 2041 issued by FG; (g) the 3.10% pollution control notes due March 1, 2023 issued by FG; (h) the 3.0% pollution control notes due May 15, 2019 issued by FG; (i) the 4.0% pollution control notes due June 1, 2033 issued by NG; (j) the 4.0% pollution control notes due December 1, 2033 issued by NG; (k) the 3.625% pollution control notes due October 1, 2033 issued by NG; (l) the 3.625% pollution control notes due October 1, 2033 issued by NG; (m) the 3.95% pollution control notes due November 1, 2032 issued by NG; (n) the 3.95% pollution control notes due November 1, 2032 issued by NG; (o) the 3.75% pollution control notes due June 1, 2033 issued by NG; (p) the 3.625% pollution control notes due December 1, 2033 issued by NG; (q) the 3.5% pollution control notes due December 1, 2035 issued by NG; (r) the 3.50% pollution control notes due April 1, 2041 issued by FG; (s) the 3.75% pollution control notes due July 1, 2033 issued by NG; (t) the 3.75% pollution control notes due December 1, 2040 issued by FG; (u) the 5.7% pollution control notes due August 1, 2020 issued by FG; (v) the 4.25% pollution control notes due October 1, 2047 issued by FG; (w) the 4.5% pollution control notes due June 1, 2028 issued by FG; (x) the 4.5% pollution control notes due 6/1/28 issued by FG; (y) the 4.0% pollution control notes due January 1, 2034 issued by NG; (z) the 4.0% pollution control notes due January 1, 2035 issued by NG; (aa) the 4.25% pollution control notes due August 1, 2029 issued by FG; (bb) the 4.375% pollution control notes due June 1, 2033 ($54.6 million in principal) issued by NG; (cc) the 4.375% pollution control notes due June 1, 2033 ($62.5 million in principal) issued by NG; (dd) the 4.375% pollution control notes due June 1, 2033 ($107.5 million in principal) issued by NG; and (ee) the 4.375% pollution control notes due January 1, 2035 issued by NG.

"PCN Claims" means, collectively, any Claims evidenced by, arising under or in connection with the PCN Loan Agreements, the PCNs or other agreements related thereto.

- 13 -

"PCN Loan Agreements" mean, collectively, as they may have been subsequently amended, those certain: (a) Air Quality Facilities Loan Agreement, dated as of December 1, 2006, between the OAQDA and FG, relating to $234.5 million of PCNs due 2023; (b) Exempt Facilities Loan Agreement, dated as of November 1, 2006, between PEDFA and FG, relating to $26 million of PCNs due 2041; (c) Exempt Facilities Loan Agreement, dated as of December 1, 2005, between PEDFA and FG, relating to $43 million of PCNs due 2040; (d) Exempt Facilities Loan Agreement, dated as of July 1, 2002, as amended, between PEDFA and FG, relating to $15 million of PCNs due 2028 and certain related FMBs issued and outstanding under the FG Mortgage; (e) Pollution Control Facilities Loan Agreement, dated as of November 1, 2008, as amended, between the BCIDA and FG, relating to $25 million of PCNs due 2028 and certain related FMBs issued and outstanding under the FG Mortgage; (f) Waste Water Facilities Loan Agreement, dated as of April 1, 2006, between the OWDA and FG, relating to $90.1 million of PCNs due 2019; (g) Pollution Control Facilities Loan Agreement, dated as of September 1, 2008, between BCIDA and FG, relating to $46.3 million of PCNs due 2047 and certain related FMBs issued and outstanding under the FG Mortgage; (h) Pollution Control Facilities Loan Agreement, dated as of April 1, 2006 between BCIDA and FG, relating to $56.6 million of PCNs due 2041; (i) Air Quality Facilities Loan Agreement, dated as of August 1, 2009, between OAQDA and FG, relating to $177 million of PCNs due 2020; (j) Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 15, 2010, between OWDA and NG, relating to $54.6 million of PCNs due 2033; (k) Air Quality Facilities Loan Agreement, dated as of June 1, 2009, between OAQDA and FG, relating to $100 million of PCNs due 2029 and certain related FMBs issued and outstanding under the FG Mortgage; (l) Air Quality Facilities Loan Agreement dated as of June 1, 2009, between OAQDA and FG, relating to $141.3 million of PCNs due 2018 and certain related FMBs issued and outstanding under the FG Mortgage; (m) Pollution Control Facilities Loan Agreement, dated as of December 1, 2005, between BCIDA and NG, relating to $72.7 million of PCNs due 2035; (n) Air Quality Facilities Loan Agreement, dated as of December 1, 2005, between OAQDA and NG, relating to $7.2 million of PCNs due 2034; (o) Air Quality Facilities Loan Agreement, dated as of November 1, 2008, between OAQDA and NG, relating to $23 million of PCNs due 2032; (p) Air Quality Facilities Loan Agreement, dated as of September 15, 2010, between OAQDA and NG, relating to $8 million of PCNs due 2033; (q) Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of December 1, 2005, between OWDA and NG, relating to $82.8 million of PCNs due 2034; (r) Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 1, 2008, between OWDA and NG, relating to $33 million of PCNs due 2032; (s) Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of September 15, 2010, between OWDA and NG, relating to $99.1 million of PCNs due 2033; (t) Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of June 1, 2009, between OWDA and NG, relating to $107.5 million of PCNs due 2033 and certain related FMBs issued and outstanding under the NG Mortgage (as defined below); (u) Pollution Control Facilities Loan Agreement, dated as of December 1, 2006, between BCIDA and NG, relating to $164 million of PCNs due 2035; (v) Pollution Control Facilities Loan Agreement, dated as of June 1, 2008, between OAQDA and FG, relating to $50 million of PCNs due 2023; (w) Air Quality Facilities Loan Agreement, dated as of April 1, 2009, between OAQDA and NG, relating to $62.5 million of PCNs due 2033; (x) Pollution Control Facilities Loan Agreement, dated as of April 1, 2006, between BCIDA and NG, relating to $60 million of PCNs due 2035; (y) Pollution Control Facilities Loan Agreement, dated as of June 1, 2008, between BCIDA and NG, relating to $98.9 million of PCNs due 2035; (z) Air Quality

Facilities Loan Agreement, dated as of September 1, 2008, between OAQDA and NG, relating to $9.1 million of PCNs due 2033; (aa) Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated September 1, 2008, between OWDA and NG, relating to $20.45 million of PCNs due 2033; (bb) Air Quality Facilities Loan Agreement, dated as of December 1, 2006, between OAQDA and NG, relating to $15.5 million of PCNs due 2033; (cc) Air Quality Facilities Loan Agreement, dated as of November 15, 2010, between OAQDA and NG, relating to $26 million of PCNs due 2033; (dd) Waste Water Facilities and Solid Waste Facilities Loan Agreement, dated as of November 15, 2010, between OWDA and NG relating to $46.5 million of PCNs due 2033; and (ee) Waste Water Facilities and Solid Waste Facilities Loan Agreement, between OWDA and NG, relating to $135.55 million of PCNs due 2033.

"PEDFA" means the Pennsylvania Economic Development Financing Authority.

"Pension Bridge" means the terms of section B6.5 of the Pension Plan as in effect on the Settlement Effective Date, and as may be amended in the future as contemplated by Section 2.2 of this Agreement, under which an eligible participant who (i) is at least age 50, but not yet age 55, and is credited with at least 10 years of service, at the time of termination of employment, (ii) is terminated because the assets in his or her business unit are sold on or before December 31, 2020 after giving effect to the amendment contemplated by Section 2.2(c) of this Agreement, and (iii) remains employed by the buyer until the participant reaches age 55 or has an earlier qualifying termination of employment, will be eligible to elect to receive early retirement benefits under the Pension Plan as if the participant had remained employed by a participating employer under the Pension Plan until reaching age 55.

"Pension Plan" means the tax-qualified FirstEnergy Corp. Master Pension Plan.

"Pension Plan Claims" means claims arising from or related to the Pension Plan.

"Permitted Transfer" means a Transfer that meets one of the following requirements: (a) the intended transferee is another Supporting Party; or (ii) the Transfer is accompanied by the execution of a Transfer Agreement prior to, or concurrently with, the closing of such Transfer and the transferor provides the fully executed Transfer Agreement to counsel to each Party prior to or concurrently with the closing of such Transfer.

"Permitted Transferee" means a Person who may be the transferee in a Permitted Transfer.

"Person" means any natural person, firm, individual, corporation, business trust, joint venture, association, company, limited liability company, partnership, or other organization or entity, whether incorporated or unincorporated, or any Governmental Entity.

"Petition Date" means March 31, 2018.

"Plan Effective Date" means, for the purposes of this Agreement, the earliest date on which (i) an FES Plan for each Debtor has become effective in accordance with its terms and (ii) all of the conditions to effectiveness set forth in Section 10.2 of this Agreement have been satisfied or waived in writing by the applicable Parties in accordance with Section 10.3 of this Agreement. If an FES Plan for at least one, but not all, of the Debtors has become effective in

accordance with its own terms, the FE Non-Debtor Parties may, in their sole discretion, declare that, solely for the purposes of this Agreement, the Plan Effective Date has occurred.

"Plan Effective Date Notice" means the written notice of the proposed Plan Effective Date that must be delivered in writing by the Debtors to the FE Non-Debtor Parties in accordance with the provisions of Section 2.4 of this Agreement.

"Plan Effective Date Insufficiency Notice" means written notice by the FE Non-Debtor Parties to the other Parties of their belief that any condition of Section 10.2 of this Agreement will not be met by the proposed Plan Effective Date listed in the Plan Effective Date Notice.

"Pleasants Closing Date" means the date on which the Pleasants Power Plant is transferred to the Pleasants Purchaser following the satisfaction of the applicable conditions (or waiver by the party entitled to waive such conditions) to the transfer of ownership of the Pleasants Power Plant to the Pleasants Purchaser set forth in the Pleasants Purchase Agreement.

"Pleasants Outage" means the scheduled November 2018 outage for the Pleasants Power Plant, which outage shall be performed in accordance with merchant generator practice and consistent with past practice.

"Pleasants Power Plant" means the 1,300 megawatt power plant located in Willow Island, West Virginia and currently owned by AE Supply.

"Pleasants Purchase Agreement" means that certain Asset Purchase Agreement, to be executed prior to the Plan Effective Date, among AE Supply, as seller, and the Pleasants Purchaser, as buyer for the Pleasants Power Plant, which agreement shall otherwise be reasonably acceptable to the Parties.

"Pleasants Purchaser" means the entity designated by the Debtors to be the buyer under the Pleasants Purchase Agreement. The Pleasants Purchaser shall either be a: (a) Debtor; (b) Reorganized Debtor; (c) newly created special purpose entity, 100% of the equity of which shall be owned by one or more of the Debtors or the Reorganized Debtors or (d) a third-party purchaser designated by the Debtors, with the consent of the Committee and the Supporting Parties, such consent not to be unreasonably withheld.

"Pleasants Transfer Date" means January 1, 2019, or an earlier date as may be agreed to between the Debtors and AE Supply in the Pleasants Purchase Agreement, subject to approval by any required state or federal governmental entity.

"PSA" means that certain Process Support Agreement, by and among the Debtors and certain creditor and stakeholder parties signatory thereto, dated as of March 30, 2018 (including all exhibits and schedules attached thereto), as the same has been or may be subsequently modified, amended, or supplemented from time to time.

"Qualified Marketmaker" means a Person that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims of the Debtors (or enter with customers into long and short positions in Claims against the Debtors), in its capacity as a dealer or market maker in

Claims against the Debtors and (b) is, in fact, regularly in the business of making a market in Claims against issuers or borrowers (including debt securities or other debt).

"Rail Claim Settlement" means that certain Settlement Agreement, dated May 1, 2017, by and among FE Corp., FG, BNSF Railway Company and CSX Transportation Inc.

"Registration Default" means the failure of FE Corp. to satisfy at least one of the following requirements:

(a)     complete the initial distribution of all of the Distributed New FE Notes on the Plan Effective Date in a transaction or transactions that are exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code in accordance with Section 2.4(e)(ii)(A), pursuant to a valid Registration Statement in accordance with Section 2.4(e)(ii)(B) or pursuant to a valid resale shelf Registration Statement in accordance with Section 2.4(e)(ii)(C);

(b)     (1) file a resale shelf Registration Statement in accordance with Section 2.4(e)(ii)(C) and keep such resale shelf Registration Statement continuously effective, supplemented and amended in accordance with Section 2.4(e)(iii), and (2) comply with all of its obligations under Section 2.4(f); or

(c)     (1) complete an A/B exchange in accordance with Section 2.4(e)(ii)(D), and (2) comply with all of its obligations under Section 2.4(f).

"Registration Statement" means a registration statement of FE Corp., filed with the SEC pursuant to the Securities Act.

"Reorganized Debtors" means the Debtors on and after the Plan Effective Date.

"Requisite Certificateholders" means the holders of a majority of the Bruce Mansfield Certificate Claims.

"Requisite Noteholders" means, collectively, the holders of the majority in aggregate amount of (a) the PCN Claims and (b) the FES Notes Claims.

"Retail Book Assets" means the assets being sold pursuant the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363, 364, 365, and 503 and Fed R. Bankr. P. 2002, 6004, and 6006 for Entry of (I) Order Approving (A) Bid Procedures, (B) Procedures for Assumption and Assignment of Certain Executory Contracts and Related Notices, (C) Notice of Auction and Sale Hearing, and (D) Related Relief and (II) Order (A) Approving the Sale of the Debtors' Retail Power Sales Assets Free and Clear of Liens, Claims, Encumbrances and other Interest, (B) Approving Assumption and Assignment of Certain Executory Contracts, and (C) Granting Related Relief*, filed on the docket of the Bankruptcy Cases at Docket No. 908.

"Retiree Group Life Insurance Claims" means claims of the Debtors' Retirees participating in the Retiree Group Life Insurance Plan as of the Settlement Effective Date, or any of the Debtors' Former Employees who, on or prior to the Plan Effective Date, has terminated employment from a Debtor after satisfying the age and service requirements, if any, under the

- 17 -

Retiree Group Life Insurance Plan, or of the surviving beneficiaries of such retirees, for benefits payable under the Retiree Group Life Insurance Plan.

"Retiree Group Life Insurance Plan" means the FirstEnergy Corp. Group Life Insurance Plan (or similar predecessor plans).

"Retiree Medical Subsidies" means retiree medical and prescription drug benefits or premium subsidies, including opt out payments, but only to the extent that such obligations are specifically provided for under a Health Care Plan.

"SAP System of Record" means the Systems, Applications and Products in Data Processing system maintained and controlled by FESC.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, codified at 15 U.S.C. § 77a et seq.

"Separation Agreement" means the agreement, the terms of which are partially described in Section 5.1 of this Agreement, that will be executed among the Debtors and the applicable FE Non-Debtor Parties in form and substance reasonably acceptable to the FE Non-Debtor Parties and the Debtors. The Debtors will consult with the Supporting Parties and the Committee regarding the terms of the Separation Agreement.

"Settlement Approval Order" means an order of the Bankruptcy Court, in form and substance acceptable to the FE Non-Debtor Parties in their sole discretion and reasonably acceptable to the other Parties approving the Settlement Motion, the terms of this Agreement and granting related relief. A form Settlement Approval Order is attached hereto as Exhibit B.

"Settlement Cash" means the cash settlement payment described in Section 2.1 of this Agreement in an amount equal to $225 million, which amount shall not be subject to any setoff or reduction.

"Settlement Effective Date" means the earliest date on which all of the conditions to effectiveness set forth in Section 10.1 of this Agreement have been satisfied.

"Settlement Motion" means a motion for approval of this Agreement, under, among others, Bankruptcy Rule 9019 and sections 105, 363, 365, and 502 of the Bankruptcy Code, in form and substance acceptable to the FE Non-Debtor Parties and reasonably acceptable to the other Parties.

"Shared Services Agreements" means, collectively, the FES Shared Services Agreement and the FENOC Shared Services Agreement.

"Signatory" means any Party who Executes this Agreement.

"Standstill Agreement" means that certain Standstill Agreement by and among the Debtors, the FE Non-Debtor Parties and certain creditor parties, dated as of March 30, 2018,

(including all exhibits and schedules attached thereto) as it may be amended or supplemented from time to time, the assumption of which was approved by the Bankruptcy Court on May 9, 2018.

"Supporting Parties" means, collectively:  (a) the Ad Hoc Noteholders Group and (b) the Bruce Mansfield Certificateholders Group.

"Suspension Period" means any period contemplated by Section 2.4(e) of this Agreement during which FE Corp. may defer the filing of, or suspend the use of, any Registration Statement required to be filed by this Agreement.

"Tax Allocation Agreement" means that certain Intercompany Income Tax Allocation Agreement, dated as of January 31, 2017, by and among FE Corp. and each of its subsidiaries, including the Debtors, as the same has been or may be subsequently modified, amended, supplemented or otherwise revised from time to time, and together with all instruments, documents and agreements related thereto.

"Tax Matters Agreement" means the agreement, the terms of which are partially described in Section 2.3(d) of this Agreement, that will be executed among the Debtors and the applicable FE Non-Debtor Parties in form and substance reasonably acceptable to the FE Non-Debtor Parties and the Debtors.  The Debtors will consult with the Supporting Parties and the Committee regarding the terms of the Tax Matters Agreement.

"Transfer" means the sale, use, pledge, assignment, transfer, permission of the participation in, or the otherwise disposal of any ownership (including any Beneficial Ownership) in the Creditor Claims; provided, however, that any pledge in favor of a bank or broker dealer at which a Supporting Party maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally shall not be deemed a Transfer for any purposes in this Agreement.

"Transfer Agreement" means an agreement to effectuate a Transfer in a form reasonably acceptable to the Parties under which a Permitted Transferee agrees, among other things, to be bound to the terms of this Agreement.

"Trust F Interest" means the interest of FE Corp. in the Mansfield 2007 Trust F, a Delaware statutory trust that is party to a Mansfield Facility Agreement relating to an undivided interest in 16.885% of Unit 1 of the Mansfield Plant.

"Upfront Payment" means the cash payment, if any, by FE Corp. to the Debtors in an amount equal to the difference, if any, between the principal amount of the New FE Notes and the market price of the New FE Notes as determined per the below calculation (see Exhibit C for illustrative example):

    A.    The stated coupon rate on the New FE Notes will be equal to the interpolated yield on U.S. Treasury securities with a term based on the Plan Effective Date and a maturity date of December 31, 2022. The yield on U.S. Treasury securities will be interpolated by calculating the time-weighted average yield on the two tranches of U.S. Treasury Securities with maturity dates most closely preceding

and following December 31, 2022, with the time-weighting based on the number of days between December 31, 2022, and the respective U.S. Treasury Security maturity dates being referenced.

B.     The cash flows associated with the New FE Notes as determined by the principal amount of $628 million and the calculation of the stated coupon rate detailed in paragraph A will be discounted back to the Plan Effective Date using a discount rate equal to the interpolated yield on FE Corp.'s existing senior unsecured notes. The yield on FE Corp.'s senior unsecured notes will be interpolated by calculating the time-weighted average yield on the two tranches of FE Corp.'s senior unsecured notes with maturity dates most closely preceding and following December 31, 2022, respectively, with the time-weighting based on the number of days between December 31, 2022, and the respective FE. Corp senior unsecured notes maturity dates being referenced.

C.     The Upfront Payment will be equal to $628 million less the result of the present value calculation detailed in paragraph B.

"Vacation Claims" means any claims guaranteed by FE Corp. in that certain Guarantee, dated as of February 21, 2017, in favor of certain employees who (i) participate in the FirstEnergy Time Off Program, (ii) have participated in a predecessor plan on or before December 31, 2008, and (iii) have earned a banked or frozen vacation benefit.

"VERO" means a Voluntary Enhanced Retirement Option (substantially similar to such option offered by FESC to certain employees in 2018) offered by the Debtors during calendar year 2019, but prior to the Plan Effective Date, to any of the Debtors' Current Employees that are at least age 58 by December 31, 2019, in connection with a workforce reduction.

"Waived Tax Claims" means any Claim in respect of the FES Tax Overpayment.

"Welfare and Benefit Plan Administration Costs" means the costs (other than any indirect costs relating to Human Resources management services pursuant to the Amended SSA) relating to the administration of any Welfare Plan that are incurred with respect to or allocable to the Debtors' Current Employees or the Debtors' Former Employees, from and after the date on which the Debtors cease to participate in any such plan.

"Welfare Plans" means the welfare benefit plans or programs sponsored by FE Corp. or FESC.

"West Lorain Plant" means the 545 megawatt power plant located in Lorain, Ohio and currently owned by FG.

"W.H. Sammis Facility" means that certain 2,233 megawatt power plant located in Stratton, Ohio currently owned by FG.

"Worthless Stock Deduction" means any deduction related to FE Corp.'s ownership interest in the Debtors to be claimed pursuant to 26 U.S.C. § 165.

- 20 -

Section 1.2  Interpretation.

(a)  References.  References to any "Appendix," "Article," "Exhibit," "Schedule," or "Section," without more, are to Appendices, Articles, Exhibits, Schedules, and Sections to or of this Agreement.

(b)  Headings.  The section headings contained in this Agreement are for reference only and shall not affect the meaning or interpretation of this Agreement.

(c)  Word Usage.  Except where the context clearly requires to the contrary, (i) instances of gender or entity-specific usage (e.g., "his," "her,", "its," or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (ii) words in the singular shall include the plural and words in the plural shall include the singular; (iii) the word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including, without limitation," and "including, but not limited to"; and (v) accounting terms not defined shall have the meanings assigned to them in accordance with the United States' generally accepted accounting principles.

(d)  Law.  Unless otherwise provided herein, references to laws, regulations, and other governmental rules means such laws, regulations, and rules and any orders, instruments, or official government interpretations made under the relevant laws, regulations, or rules as in effect at the time of determination (taking into account any amendments, extensions, or supplements thereof effective at such time without regard to whether the amendments, extensions, or supplements were enacted or adopted after the date of the Execution of this Agreement) and includes all successor laws, regulations, and rules thereto.

(e)  Currency.  References to "$," "cash," or "dollars" means the lawful currency of the United States.

(f)  Jurisdiction.  The word "federal" refers to laws, agencies, or other attributes of the United States (and not to any State or locality thereof).  The meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States.

(g)  Dates and Time.  References to "days" means calendars days.  All dates and times specified in this Agreement are of the essence and shall be strictly enforced.

## ARTICLE II

## OBLIGATIONS OF THE FE NON-DEBTOR PARTIES

Section 2.1  Settlement Cash.  On the Plan Effective Date, FE Corp. will pay, or will cause to be paid, the Settlement Cash to the Reorganized Debtors, which the Debtors may distribute to their creditors pursuant to any FES Plans.

Section 2.2  Employee Related Items.  Nothing herein is intended to create, or does create, any additional right or claim to coverage, including premium subsidies, or to create any vested right to such benefits for the Debtors' Current Employees, the Debtors' Former Employees, the Debtors' Retirees, or any employees of the FE Non-Debtor Parties under any

employee benefit plan, plan document or collective bargaining agreement that does not otherwise exist on the date of this Agreement. The Debtors' Current Employees and the Debtors' Former Employees will, at all times, be subject to the terms and conditions of the applicable Health Care Plan or Welfare Plan including, per the specific terms of the applicable Health Care Plan or Welfare Plan, the reservation of the right by FE Corp. of complete discretion to amend or terminate such Health Care Plan or Welfare Plan or the access to such Health Care Plan or Welfare Plan.

(a)     Except with respect to the LTIP, from and after the Plan Effective Date, FE Corp. will pay or cause to be paid (including from an applicable trust or other funding vehicle maintained by any FE Non-Debtor Party) all employee-associated Claims and guarantees of the Debtors' Current Employees and the Debtors' Former Employees as and when such obligations become due and payable to the Debtors' Current Employees and Debtors' Former Employees under the applicable plan documents solely for (i) Pension Plan Claims, (ii) Deferred Compensation Claims, (iii) Retiree Group Life Insurance Claims, (iv) Vacation Claims, (v) Limited Retiree Medical Claims with respect to any of the Debtors' Retirees, and (vi) any Limited Union Medical Claims. With respect to the LTIP Claims, FE Corp. will pay to the Debtors' Current Employees and the Debtors' Former Employees participating in the LTIP those amounts that become vested as of March 1, 2019 no later than March 15, 2019.

(b)     Any VERO can be offered in accordance with the terms of this Section 2.2(b) during calendar year 2019 but prior to the Plan Effective Date. To the extent the Debtors elect to undertake a workforce reduction in calendar year 2019 but prior to the Plan Effective Date, other than with respect to employees assigned to the FENOC company code in the SAP System of Record, then, FE Corp. will pay only for the costs of the temporary pension enhancement portion of any VERO offered (capped at, for any employee who elects the VERO, $1,500 per month per employee until age 65 or a minimum of two years) in connection with such VERO and only for the Debtors' Current Employees who: (i) reach age 58 on or before December 31, 2019; and (ii) have completed at least ten or more years of credited services or benefit service by the employee's retirement date under the applicable terms of the plan that governs the employee's accrual of regular pension benefits. For the avoidance of doubt, if any of the Debtors offers a VERO to employees assigned to the FENOC company code in the SAP System of Record, the FE Non-Debtor Parties shall have no obligations related thereto.

(c)     With respect to the Debtors' Current Employees, FE Corp. will amend the Pension Bridge to apply to sales of the assets of a business unit closing on or before December 31, 2020, and clarify that the Pension Bridge covers terminations resulting from the transfer of the assets of a business unit to an entity that is not an Affiliate of FE Corp. (in addition to the sale of the assets of a business unit to an entity that is not an Affiliate of FE Corp.) closing on or before such date. For the avoidance of doubt, any Debtor's emergence from chapter 11 alone shall not constitute a termination event for any of the Debtors' Current Employees for purposes of the Pension Bridge. The requirements of this Section 2.2(c) shall not apply if (i) prohibited by law or regulation or (ii) counsel to FE Corp. determines in its reasonable judgment that any Pension Plan amendment required to effectuate such requirements would jeopardize the Pension Plan's tax qualified status. In

the event the circumstances described in (i) or (ii) in the preceding sentence prevent FE Corp. from expanding the Pension Bridge to "transfers" of a business unit, FE Corp. will extend the Pension Bridge with respect to the Debtors' Current Employees to cover sales closing on or before December 31, 2020.

(d)     With respect to any existing collective bargaining agreement under which a Debtor and a FE Non-Debtor Party are signatory employers, FESC and the applicable FE Non-Debtor Party shall work cooperatively with the Debtors to separate such existing collective bargaining agreement with the applicable union into separate collective bargaining agreements; provided, however, that such cooperation shall be on a commercially reasonable basis, which may include the incurrence of unreimbursed de minimis expenses (or additional costs to the extent reimbursed by the Debtors) by the FE Non-Debtor Parties, and shall not require the FE Non-Debtor Parties to undertake any action that will cause an adverse effect on, or result in a loss of rights without adequate consideration to, the FE Non-Debtor Parties.  Additionally, FESC and the applicable FE Non-Debtor Parties shall work cooperatively with the Debtors in the Debtors' defense of any claims or actions asserted by the PBGC with respect to periods prior to the Plan Effective Date, including by providing any necessary information or documents to the Debtors, provided, however, that such cooperation shall be on a commercially reasonable basis, which may include the incurrence of unreimbursed de minimis expenses (or additional costs to the extent reimbursed by the Debtors) by the FE Non-Debtor Parties, and shall not require the FE Non-Debtor Parties to undertake any action that will cause an adverse effect on, or result in a loss of rights without adequate consideration to, the FE Non-Debtor Parties.

(e)     With respect to cessation of participation by the Debtors:

(i)     The Debtors agree that they shall cease to participate in any Health Care Plan, Welfare Plan, or Miscellaneous Employee Benefit Program on the Plan Effective Date or on such date prior to the Plan Effective Date as the Debtors shall determine.

(ii)     Upon cessation of participation by the Debtors in any Health Care Plan, Welfare Plan, or Miscellaneous Employee Benefit Program on or prior to the Plan Effective Date, FE Corp. also agrees to the following provisions:

(A)     When the Debtors cease to participate in any Health Care Plan, FE Corp. and FESC will not charge the Debtors for any Health Care Runoff Costs under or related to such Health Care Plan.

(B)     When the Debtors cease to participate in any Health Care Plan, FE Corp. and FESC will not charge, except for any indirect costs relating to Human Resources management services pursuant to the Amended SSA, the Debtors for any costs under or related to such Health Care Plan, but shall be able to charge the Debtors' Current Employees or the Debtors' Former Employees or any dependent thereof for any COBRA Costs with respect to such persons.

- 23 -

(C)     When the Debtors cease to participate in any Welfare Plan, FE Corp. and FESC will not charge the Debtors for any Welfare and Benefits Plan Administration Costs under or related to such Welfare Plan.

(D)     When the Debtors cease to participate in any Miscellaneous Employee Benefit Program that is available to generally all employees of FE Non-Debtor Parties and the Debtors, then FE Corp. and FESC will not charge the Debtors for any Miscellaneous Employee Benefits Programs Costs under or related to such Miscellaneous Employee Benefit Program.

Section 2.3   <u>Tax Allocation Agreement</u>.

(a)     The FE Non-Debtor Parties and the Debtors will perform under the Tax Allocation Agreement with respect to all periods or portions thereof ending on or before the Plan Effective Date.

(b)     Under no circumstances shall FE Corp. take any action to terminate or amend to the detriment of the Debtors the Tax Allocation Agreement prior to the Plan Effective Date.  On the Plan Effective Date, in consideration for the releases described in Sections 6.1 and 6.3 of this Agreement, the FE Non-Debtor Parties will reverse the 2018 Tax Setoff and, to the extent not previously satisfied pursuant to the terms of the Tax Allocation Agreement, make the 2018 Tax Payment.

(c)     The FE Non-Debtor Parties and the Debtors will perform under the Tax Allocation Agreement for tax year 2018, including the FE Non-Debtor Parties' pre-payment for the use of the Debtors' NOLs based upon FE Corp.'s projections of the amount of the Debtors' NOLs that the FE Non-Debtors will use in tax year 2018; <u>provided</u>, that notwithstanding anything to the contrary herein or in the Tax Allocation Agreement, the FE Non-Debtor Parties shall guarantee a payment to the Debtors of an amount equal to the NOL Floor for the use of the Debtors' NOLs for tax year 2018.  To the extent that the amount actually paid to the Debtors' under the Tax Allocation Agreement for tax year 2018 is less than the NOL Floor, on the Plan Effective Date the FE Non-Debtor Parties shall promptly pay the Debtors an amount equal to the difference between $66 million and the amount actually paid for tax year 2018 pursuant to the Tax Allocation Agreement.  If the Plan Effective Date occurs prior to the filing of an FE Consolidated Tax Group tax return for a tax year during which a Debtor (or its income and losses) was included on such FE Consolidated Tax Group tax return, to the extent not previously paid, FE Corp. shall pay the Debtors the NOL Floor on the Plan Effective Date, and FE Corp. shall pay the Reorganized Debtors, or the Reorganized Debtors shall pay FE Corp., any amount owing under the Tax Allocation Agreement, consistent with this Agreement, based on the tax return actually filed promptly following the filing of such tax return; <u>provided</u>, <u>however</u>, that if the actual amount owed for the use of the Debtors' NOLs by the FE Non-Debtor Parties is less than the NOL Floor, the Debtors shall only be required to refund the difference between the total amount of pre-payments, including the 2018 Tax Payment, and the NOL Floor.  Notwithstanding anything herein to the contrary, this Section 2.3(c) shall be interpreted consistent with the examples set forth in <u>Exhibit D</u> hereto with respect to the timing of payments, including with respect to the 2018 Tax Setoff.

(d)     FE Corp. shall perform, and shall cause the FE Non-Debtor Parties to perform, under the Tax Allocation Agreement consistent with historical practice and shall not take any action, or refrain from taking any action, with the primary purpose of reducing payments to the Debtors under the Tax Allocation Agreement; provided, however, that the FE Non-Debtor Parties will not be prohibited from taking any action, or refraining from taking any action, necessary to preserve $628 million of value for the Worthless Stock Deduction.  For the avoidance of doubt, the act of taking the Worthless Stock Deduction, pursuant to the terms of this Agreement, shall not be considered an action the primary purpose of which is to reduce the payments to the Debtors under the Tax Allocation Agreement;

(e)     On the Plan Effective Date, and in consideration for the releases described in Sections 6.1 and 6.3 of this Agreement, the Debtors and FE Corp. will enter into the Tax Matters Agreement, which agreement shall be reasonably acceptable to the Parties.  The Tax Matters Agreement shall provide for, among other things, that:

(i)     The FE Non-Debtor Parties will, with the Debtors' review and consultation (beginning for tax year 2018), timely prepare in the ordinary course of business:  (A) the U.S. federal income tax returns reflecting the Debtors' membership in the FE Consolidated Tax Group, and (B) any and all state and local income or other tax returns (including, but not limited to, income, franchise, use, property tax returns and other similar returns), in each case, for any tax period ending on or before the Plan Effective Date; provided, however, that FE Corp. shall not be required to take any action, or omit to take any action, that would result in an adverse effect on any of the FE Non-Debtor Parties;

(ii)     FE Corp. shall not take or cause to be taken the Worthless Stock Deduction with effect prior to the Plan Effective Date;

(iii)     The Parties shall cooperate in developing a strategy for the Debtors to exit from chapter 11 that minimizes adverse tax consequences to the Reorganized Debtors and their stakeholders, provided, however, that FE Corp. shall not be required to take any action, or omit to take any action, that would result in an adverse effect on of the FE Non-Debtor Parties;

(iv)     FE Corp. shall cooperate with reasonable tax diligence inquiries from the Debtors, the Committee and the Supporting Parties regarding historical intercompany tax issues and tax consequences of different chapter 11 exit structures, including in connection with any sale of the Debtors' assets; and

(v)     The Parties shall agree to reasonably cooperate regarding any audit or tax.

(f)     On the Plan Effective Date, the FE Non-Debtor Parties will, in consideration for the releases described in Sections 6.1 and 6.3 of this Agreement, waive any Waived Tax Claims.

(g)     After the Plan Effective Date, if the FE Non-Debtor Parties have fully performed pursuant to Section 2.4 of this Agreement:

(i)     The Debtors shall waive any payment that the Debtors would be entitled to from the FE Non-Debtor Parties under the Tax Allocation Agreement to the extent such payment relates to amounts that would have given rise to an Adjustment Amount had the final tax effect been known as of the Plan Effective Date without regard to payments previously made under the Tax Allocation Agreement that gave rise to the Adjustment Amount on the Plan Effective Date.

(ii)     The FE Non-Debtor Parties shall waive any payment that the FE Non-Debtor Parties would be entitled to from the Debtors under the Tax Allocation Agreement related to the Adjustment Amount.

Section 2.4   New FE Notes and Upfront Payment.

(a)     The Debtors shall provide FE Corp. with the Plan Effective Date Notice at least 40 days prior to the Plan Effective Date.  In the event that the Debtors do not provide the Plan Effective Date Notice at least 40 days prior to the Plan Effective Date, the FE Non-Debtor Parties' obligations under this Section 2.4 shall be tolled an amount of time equal to the difference between 40 days and the amount of days in between the receipt of the Plan Effective Date Notice.

(b)     Subject to the Plan Effective Date Notice, on the Plan Effective Date, FE Corp. shall issue $628 million aggregate principal amount, less the Adjustment Amount, of the New FE Notes to the Debtors.  If the Adjustment Amount is equal to or greater than $628 million, then FE Corp. will not be required to issue any New FE Notes.  The New FE Notes shall be issued in global certificated form only and registered to DTC or its nominee, with interests in the certificates being held through DTC participants.

(c)     The New FE Notes shall (i) bear a fixed interest rate as set forth in the definition of Upfront Payment, and (ii) after October 31, 2022, be redeemable at par, plus accrued but unpaid interest, at any time without premium or penalty.  The New FE Notes shall rank equally and ratably in right of payment with, and may be issued under the 2001 Indenture; provided that if FE Corp. uses a different Indenture it shall be materially identical to the 2001 Indenture and may, among other things, (i) provide for a different  trustee under the 2001 Indenture, which may be one of Citibank, N.A.; Citicorp International Limited; The Bank of New York Mellon; MUFG Union Bank, N.A.; U.S. Bank National Association;, Wells Fargo Bank N.A., or an affiliate of one of the foregoing, or any other trustee that is mutually acceptable to the Debtors and the FE Non-Debtor Parties (in consultation with the Supporting Parties and Committee), (ii)  include changes reasonably required by the trustee, and (iii) include such other changes as FE Corp. shall determine, provided in each case that they are not adverse to the holders of the New FE Notes. The New FE Notes shall include terms consistent with the Existing FE Notes (and other documents governing the Existing FE Notes, including the 2001 Indenture), including, but not limited to:  (1) the covenant not to pledge, mortgage, hypothecate or grant a security interest in, or permit any mortgage, pledge, security interest, or other lien upon, any capital stock of any subsidiary now or hereafter directly owned by FE Corp., to secure

18-50757-amk   Doc 3288-2  FILED 01/14/19   ENTERED 01/14/19 13:05:59   Page 229 of 299

any indebtedness without also equally and ratably securing the New FE Notes, subject to the exceptions included in the Existing FE Notes, including the 2001 Indenture; and (2) the covenant by FE Corp. not to consolidate with or merge into any other entity or convey, sell or otherwise transfer its properties and assets substantially as an entirety to any entity in each case, subject to the express requirements, exceptions and limitations included in the terms of the Existing FE Notes , including the 2001 Indenture.

(d)     Should one or more sales or deactivations of a fossil or nuclear plant occur such that the Adjustment Amount is more than $0, a calculation of the Adjustment Amount, along with supporting work papers, shall be provided to the Parties by the FE Non-Debtor Parties at least fourteen (14) days prior to the Plan Effective Date, or as soon as reasonably practicable in the event the sale closes within fourteen (14) days of the Plan Effective Date.  If the Adjustment Amount or the calculation thereof is not reasonably acceptable to one or more of the Parties, any Party may inform the Parties, in writing, of:  (i) their basis for disagreement with the calculated Adjustment Amount and (b) their proposed amended Adjustment Amount.  If the Parties do not resolve such dispute within five (5) days, the Party who originally objected to the Adjustment Amount may file a motion with the Bankruptcy Court, on not less than five (5) business days' notice, to request that the Bankruptcy Court resolve any such dispute.  The Debtors hereby agree not consummate any sale of a nuclear or operating fossil plant (excluding the West Lorain Plan) within the 40 days prior to the Plan Effective Date, provided, however, that such prohibition shall not apply to any asset sale consummated in the same calendar year as the Plan Effective Date.

(e)     FE Corp. shall use commercially reasonable efforts, at its own expense:

(i)     to cause the New FE Notes at issuance to be assigned a rating by at least two nationally-recognized credit rating agencies, which ratings shall be at the same level or higher than the ratings assigned by such agencies to the Existing FE Notes;

(ii)     to the extent that any or all of the New FE Notes are Distributed New FE Notes, then:

(A)     unless impermissible under applicable law or SEC policy, to cause all of the Distributed New FE Notes to be distributed pursuant to the FES Plans in a transaction or transactions that are exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code;

(B)     in the event that it is not possible to distribute all of the Distributed New FE Notes pursuant to the FES Plans in the manner described in Section 2.4(e)(ii)(A), then unless impermissible under applicable law or SEC policy, to file with the SEC and cause to become effective on the Plan Effective Date one or more Registration Statements, on such form or forms as agreed to by the Parties, that will provide for the registration of the offer and issuance of all Distributed New FE Notes that are not distributed pursuant to the FES Plans in the manner described in Section 2.4(e)(ii)(A) by FE Corp. for distribution pursuant to the FES Plans on the Plan Effective Date and to cause the distribution of such

18-50757-amk    Doc 3283-2    FILED 01/11/19    ENTERED 01/11/19 13:05:59    Page 230 of 299
18-50757-amk    Doc 3283-2    FILED 01/11/19    ENTERED 01/11/19 13:05:59    Page 230 of 299

Distributed New FE Notes pursuant to the FES Plans and such Registration Statement;

(C)     in the event that it is not possible to distribute all of the Distributed New FE Notes pursuant to the FES Plans in the manner described in Sections 2.4(e)(ii)(A) and (e)(ii)(B), then unless impermissible under applicable law or SEC policy to cause the distribution on the Plan Effective Date pursuant to the FES Plans such Distributed New FE Notes that are not distributed pursuant to Sections 2.4(e)(ii)(A) or (e)(ii)(B) in a private placement that is exempt from registration under the Securities Act and register the public offer and sale of the Distributed New FE Notes by the holders thereof on a resale shelf Registration Statement, to become effective on the Plan Effective Date or as promptly as reasonably practicable thereafter (but in no event later than 30 calendar days after the Plan Effective Date), and to use commercially reasonable efforts to cause the removal of any legend on such Distributed New FE Notes stating that the transfer of such New FE Notes are or may be subject to restriction under the Securities Act, in connection with sales thereof pursuant to such Registration Statement or pursuant to Rule 144 under the Securities Act;

(D)     in the event that it is not possible to distribute all of the Distributed New FE Notes pursuant to the FES Plans in the manner described in Sections 2.4(e)(ii)(A), (e)(ii)(B) and (e)(ii)(C), then unless impermissible under applicable law or SEC policy, to cause the distribution on the Plan Effective Date pursuant to the FES Plans such Distributed New FE Notes that are not distributed pursuant to Sections 2.4(e)(ii)(A), (e)(ii)(B) or (e)(ii)(C) in a private placement that is exempt from registration under the Securities Act and as promptly as is reasonably practicable thereafter register an exchange offer of substantially identical securities (other than with respect to transfer restrictions and registration rights under the Securities Act), which will provide for the exchange of the Distributed New FE Notes promptly after the effectiveness of such Registration Statement but, in no event, fewer than 20 business days or more than 40 business days after the effectiveness of such Registration Statement; and

(E)     in the event that it is not possible to distribute all of the Distributed New FE Notes pursuant to the FES Plans in the manner described in Sections 2.4(e)(ii)(A), (e)(ii)(B), (e)(ii)(C), and (e)(ii)(D), without derogation of the rights set forth in Section 2.4(e)(ii)(A)-(D) above, FE Corp. and the Parties shall take such other steps as are necessary in order to effectuate the distribution of the Distributed New FE Notes in accordance with the FES Plans.

(iii)     To keep any Registration Statement filed pursuant to Section 2.4(e)(ii) continuously effective, supplemented and amended until (1) in the case of Section 2.4(e)(ii)(B), the completion of the distribution pursuant to such Registration statement; (2) in the case of Section 2.4(e)(ii)(C), the earlier of (a) the one-year anniversary of the issuance of the Distributed New FE Notes and (b) the date on which all such Distributed New FE Notes have been sold pursuant to such Registration Statement; provided that to the extent that after such one-year anniversary or date on which all such

Distributed New FE Notes have been sold pursuant to such Registration Statement, as applicable, any New FE Notes bear a legend stating that the transfer of such New FE Notes are or may be subject to restriction under the Securities Act, FE Corp. shall (x) continue to keep any such Registration Statement continuously effective, supplemented and amended until such time as all such legends have been removed from the applicable New FE Notes and (y) use commercially reasonable efforts to cause the removal of any such legend; and (3) in the case of section 2.4(e)(ii)(D), the consummation of the exchange offer;

(iv)    in the event that any Distributed New FE Notes are distributed in a private placement, to register or qualify the Distributed New FE Notes required under all applicable state securities or "blue sky" laws unless such distribution of Distributed New FE Notes is exempt from such state securities or "blue sky" laws; and

(v)    to the extent that any or all of the New FE Notes are Non-Distributed New FE Notes, then use commercially reasonable efforts to negotiate and enter into one or more registration rights agreements with the Debtors prior to the Plan Effective Date pursuant to which FE Corp. will agree to registration rights with respect to the Non-Distributed New FE Notes that are substantially similar to the registration rights with respect to the Distributed New FE Notes set forth in this Section 2.4 (including the requirements and limitations set forth in Section 2.4(e)(iii)).

FE Corp. will provide the following rights to holders of New FE Notes included or to be included in any resale Registration Statement:  (i) rights of the representatives of such holders to inspect such FE Corp. information and to have access to such FE Corp. personnel and professionals as they shall reasonably request to perform a reasonable investigation within the meaning of Section 11 of the Securities Act; (ii) rights to reasonable notification with respect to material developments regarding the Registration Statement, including if the same or any related documents becomes materially untrue;  (iii) rights to indemnification, including advancement of reasonable, documented, out of pocket expenses (including expenses of investigation), in any action based upon the Registration Statement being materially untrue or failing to comply with applicable law, other than with respect to information provided by holders of New FE Notes to FE Corp. for inclusion in any Registration Statement; (iv) rights to cause a private transferee of such New FE Notes to be included in the Registration Statement, upon reasonable notice and upon the provision by such transferee to FE Corp. of such information as it reasonably requests; and (v) rights to require FE Corp. to bear all reasonable registration expenses (including expenses of one counsel for all holders of the New FE Notes being registered).

For the avoidance of doubt, in the event that all of the New FE Notes are distributed pursuant to the FES Plans in a transaction or transactions that are exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, FE Corp. shall have no obligation pursuant to any other provision of this Section 2.4(e) to file or maintain the effectiveness of any Registration Statement.

The Parties shall cooperate in obtaining a finding pursuant to a Final Order of the Bankruptcy Court (and any applicable court exercising appellate jurisdiction) that the issuance of the New FE Notes are exempt from the registration requirements of section 5 of the Securities

18-50757-amk   Doc 3288-2   FILED 01/14/19   ENTERED 01/14/19 13:06:59   Page 230 of 299
18-50757-amk   Doc 3422-2   FILED 03/26/19   ENTERED 03/26/19 22:49:25   Page 42 of 95

Act pursuant to section 1145 of the Bankruptcy Code. FE Corp. agrees that for purposes of obtaining such an order that it is an affiliate of the Debtors participating in a joint plan with the Debtors for the purposes of section 1145 of the Bankruptcy Code and that public information with respect to FE Corp., and information with respect to the New FE Notes may be included in any disclosure statement regarding such plan.

(f)     Subject to the last paragraph of this Section 2.4(f) but notwithstanding any other provision of this Section 2.4, FE Corp. shall have the right but not the obligation to defer the filing of (but not the preparation of), or suspend the use of, any Registration Statement pursuant to Section 2.4(e)(ii)(C) or (e)(ii)(D) for a period of up to 90 days:

(i)     if an event occurs as a result of which the Registration Statement and any related prospectus as then supplemented would include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein in the light of the circumstances under which they were made at such time not misleading, or if it is necessary to amend such Registration Statement, file a new Registration Statement or supplement any related prospectus to comply with the Securities Act or the Securities Exchange Act of 1934 or the respective rules thereunder, provided that FE Corp. shall use commercially reasonable efforts to amend such Registration Statement, file such new Registration Statement or supplement any related prospectus, as applicable, as promptly as reasonably practicable;

(ii)     upon issuance by the SEC of a stop order suspending the effectiveness of the Registration Statement or the initiation of legal or administrative proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, provided that FE Corp. shall use commercially reasonable efforts to cause the SEC to rescind such stop order or terminate such legal or administrative proceedings as promptly as reasonably practicable; or

(iii)     if FE Corp. furnishes to the Debtors and the holders of the Distributed New FE Notes a certificate signed by FE Corp.'s chief financial officer stating that in the good faith judgment of FE Corp., FE Corp. believes that the filing of any such Registration Statement or offering (1) should not be undertaken because it would reasonably be expected to materially interfere with any material corporate development or plan of FE Corp. (provided that this exception (1) shall continue to apply only during the time that such filing continues to constitute material interference with any material corporate development or plan) or (2) would require FE Corp. under applicable law, in its reasonable judgment, and upon advice of counsel, which shall not be required to be stated in a formal legal opinion, to make disclosure of material nonpublic information that would not otherwise be required to be disclosed at that time and FE Corp. believes in good faith that such disclosures at that time would affect FE Corp. in a materially adverse manner (provided that this exception (2) shall continue to apply only during the time that such material nonpublic information has not been disclosed and remains material).

In no event shall FE Corp. (i) declare a Suspension Period more than one time for any period of more than 90 days in any twelve month period or (ii) register any securities for its own

account or that of any other holder of FE Corp.'s debt or equity securities or permit the use of any Registration Statement during any Suspension Period. FE Corp. shall give written notice to the Debtors and all holders of the Distributed New FE Notes of its declaration of a Suspension Period and of the expiration of the relevant Suspension Period.

(g)     FE Corp. will not be required to include the New FE Notes held by any holder of New FE Notes on any Registration Statement pursuant to this Section 2.4 unless and until such holder furnishes to FE Corp. in writing such information as FE Corp. may reasonably request for use in connection with any Registration Statement or prospectus or preliminary prospectus included therein. Each Party who is a holder of New FE Notes as to which any Registration Statement is being effected agrees to furnish promptly to FE Corp. all reasonable and customary information required to be disclosed in order to make the information previously furnished to FE Corp. by such holder of New FE Notes true and correct in all material respects and not materially misleading. At least 30 days prior to the first anticipated filing date of any Registration Statement, FE Corp. shall notify the Debtors and each holder of New FE Notes of the information FE Corp. requires from such holder of New FE Notes in the preparation of such Registration Statement; provided, however, that the failure of FE Corp. to provide such 30 days' notice to the Debtors and each holder of New FE Notes shall not obviate any obligation by a holder of Distributed New FE Notes to provide information as a prior condition to FE Corp.'s obligation to include the New FE Notes of such holder in the Registration Statement, provided, further that the delay by any holder of New FE Notes to provide such requested information shall not be deemed a waiver or derogation of any such holder's rights hereunder to have its New FE Notes included in the Registration Statement after it has provided such information.

(h)     On the Plan Effective Date, FE Corp. shall pay the Debtors the Upfront Payment. If the calculation of the Upfront Payment is not acceptable to one or more of the Parties, any Party may enforce its rights pursuant to Section 12.4 of this Agreement.

(i)     In the event any New FE Notes become restricted securities under Rule 144 under the Securities Act on or after the Plan Effective Date and prior to the one-year anniversary of the issuance thereof, the holders of such New FE Notes will be entitled to the registration rights of the Debtors under this Section 2.4 (including, for the avoidance of doubt, the rights set forth in Section 2.4(e)(v)), provided that to the extent that after such one-year anniversary, any New FE Notes bear a legend stating that the transfer of such New FE Notes are or may be subject to restriction under the Securities Act, the holders of the New FE Notes will be entitled to such registration rights until such time as all such legends have been removed from the applicable New FE Notes.

(j)     FE Corp. and the Debtors agree that the New FE Noteholders will suffer damages if a Registration Default occurs, and that it would not be feasible to ascertain the extent of such damages with precision. Accordingly, FE Corp. agrees to pay, jointly and severally, as liquidated damages in connection with a Registration Default, additional interest on the outstanding New FE Notes if a Registration Default occurs. The interest rate on the New FE Notes will be increased by (i) 0.25% per annum for the first 90-day period beginning on the day immediately following such Registration Default and (ii) an additional 0.25% per annum with respect to each subsequent 90-day period, in each case to but excluding the date such Registration Default ends, at which point the interest rate borne by the New FE Notes will

- 31 -

18-50757-amk    Doc 3288-2    FILED 01/14/19    ENTERED 01/14/19 13:53:59    Page 234 of 299
18-50757-amk    Doc 3222-2    FILED 08/28/18    ENTERED 08/28/18 22:45:25    Page 44 of 99

decrease to the original interest rate borne by such New FE Notes. In no event shall any such increase to the interest rate borne by the New FE Notes pursuant to the immediately preceding sentence exceed, in the aggregate, 1.0% per annum. If at any time more than one Registration Default has occurred and is continuing, all such Registration Defaults shall be treated as a single continuing Registration Default beginning on the date that the earliest Registration Default occurred and ending on the date that there is no longer any Registration Default. For the avoidance of doubt, after the date that all legends stating that the transfer of such New FE Notes are or may be subject to restriction under the Securities Act have been removed from all New FE Notes, no additional interest shall accrue and be required to be paid pursuant to this Section 2.4(j) from the time of such removal. Notwithstanding anything to the contrary set forth herein including, for the avoidance of doubt, Article XII, any additional interest with respect to a Registration Default shall be due in accordance with the terms of this Section 2.4(j) and not subject to the provisions of Article XII hereof.

(k)     All documents necessary to effectuate the provisions of this Section 2.4, including any Registration Statement, indenture, and registration rights agreement, and all documents related to the foregoing, shall be in form and substance reasonably satisfactory to the FE Non-Debtor Parties, the Debtors, the Committee, and the Supporting Parties.

Section 2.5  <u>Shared Services Agreements</u>.

(a)     In consideration for the releases provided to the FE Non-Debtor Parties, as described in Sections 6.1 and 6.3 of this Agreement, FESC, FES and FENOC shall enter into the Amended SSA on the Settlement Effective Date.

(b)     The term of the Amended SSA shall commence and be effective upon Settlement Effective Date and shall terminate on the Amended SSA Termination Date. During the term of the Amended SSA, the calculation metrics under the Amended SSA shall be the same calculations that were utilized by FESC in March 2018.

(c)     The Amended SSA will provide that the Debtors may reduce the amount of services provided by FESC under the Amended SSA only upon FESC's receipt of a Notice of Reduction not less than ninety (90) days' prior to the effective date of such reduction. Any reduction of services shall only reduce services by Functional Group as mutually agreed upon in the Amended SSA. The Amended SSA shall provide that the reduction in cost related to the reduction of such services shall not exceed what would have otherwise been calculated for that function utilizing the March 2018 calculation methodology. The Debtors must wait at least 30 days following FESC's receipt of a Notice of Reduction before sending FESC any subsequent Notice of Reduction.

(d)     FESC shall provide the Debtors with a credit in the amount of up to $112.5 million for any amounts due-under monthly invoices, which invoices shall be generated in accordance with historical practices pursuant to the Shared Services Agreements and the Amended SSA, as applicable, for monthly periods from the Petition Date through December 31, 2018. Consistent with historical practices, the Parties agree that gross amounts owed by both the Debtors and FESC under the Shared Services Agreement and Amended SSA shall be netted

when generating the monthly invoices. FESC shall continue providing monthly invoices under the Amended SSA in compliance with historical practice.

(e) On the Plan Effective Date, FESC shall waive any amount owed by the Debtors for amounts due under monthly invoices, which invoices shall be generated in accordance with historical practice pursuant to the Shared Services Agreements for monthly periods through the Petition Date. Consistent with historical practices, the Parties agree that gross amounts owed by both the Debtors and FESC under the Shared Services Agreement and Amended SSA shall be netted when generating the monthly invoices. All other payments under the Amended SSA shall be made in compliance with historical practice, including within thirty (30) days of the receipt of an invoice, by FES and FENOC and not subject to setoff except for the credit in Section 2.5(d) of this Agreement.

(f) None of the FE Non-Debtor Parties agrees to provide any transition services to any third party buyers of the Debtor's assets unless otherwise expressly agreed to in writing by the applicable FE Non-Debtor Party, which may agree or disagree in its sole discretion for any reason.

(g) Concurrently with the execution of the Amended SSA, FESC, FES, and FENOC shall enter into an agreement among themselves regarding the services that FES and FENOC historically have provided to FESC and its non-Debtor affiliates, the term of which shall be the same as the term of the Amended SSA.

Section 2.6 Other Cooperation.

(a) FE Corp, solely as agent of FES, will provide reasonable cooperation and coordination on regulatory and governmental lobbying matters, as requested by the Debtors. The cost of such services shall not be billed back to the Debtors.

(b) FE Corp. and FESC will assist the Debtors as they renegotiate and mitigate unfavorable contract terms and, if requested by the Debtors, will provide reasonable cooperation to the Debtors and the Reorganized Debtors in resolving Claims against the Debtors consistent with the terms of the Amended SSA; provided, however, that the FE Non-Debtor Parties shall not be required to incur any costs or obligations related to such cooperation, renegotiation, or mitigation (other than de minimis costs, which shall not be reimbursed) unless such costs are paid for by the Debtors or the Reorganized Debtors under the terms of the Amended SSA or otherwise agreed to by the FE Corp. and the Debtors or the Reorganized Debtors.

Section 2.7 Claims of the FE Non-Debtor Parties.

(a) On the Plan Effective Date, in consideration for the releases described in Sections 6.1 and 6.3 of this Agreement, each of the FE Non-Debtor Parties will release any and all prepetition Claims against the Debtors except for any Claims under the Tax Allocation Agreement for tax year 2018. In addition, the FE Non-Debtor Parties will also release the following postpetition Claims:

(i)     Any postpetition Claims under the FE/FES Revolver including, without limitation, any Claims for postpetition interest;

(ii)     Any postpetition Claims related to the Rail Claim Settlement;

(iii)     Any postpetition Claims of AE Supply against FES in respect of the AE Supply/FES Note, including, without limitation, any Claims for postpetition interest; and

(iv)     Any postpetition Claims arising from the Trust F Interest including, without limitation, any tax or other indemnity Claims arising from the rejection of the Mansfield Facility Agreements.

(b)     On or before the later of (i) September 15, 2018, and (ii) the date that is ten (10) days prior to the hearing to approve the Settlement Motion, FE Corp. shall provide the Parties with written notice of any postpetition liquidated, non-contingent Claims against the Debtors that (i) are $4,000,000 or more individually, (ii) are outside of the ordinary course of dealings with the Debtors, and (iii) were actually known to the officers of FE Corp. as of July 31, 2018.

(c)     In connection with the Trust F Interest and in furtherance of the waiver of any Claims arising therefrom, the applicable FE Non-Debtor Parties shall (i) cooperate with the relevant Parties with respect to any ancillary transactions (on a commercially reasonable basis, which may include the incurrence of unreimbursed de minimis expenses by the FE Non-Debtor Parties, and shall not require the FE Non-Debtor Parties to undertake any action that will cause an adverse effect on, or result in a loss of rights without adequate consideration to, the FE Non-Debtor Parties taking into account the other terms and conditions of this Agreement) reasonably necessary to consummate the transactions contemplated by the Mansfield Settlement, including transfer of ownership and control over Mansfield Unit 1 to the Debtors (or any other entity to whom the Parties agree to) on the Plan Effective Date, and (ii) assist in obtaining any required consents, waivers or approvals related to such transactions contemplated by the Mansfield Settlement.

(d)     On the Plan Effective Date, the FE Non-Debtor Parties will waive and release all Employee Related Claims, whether arising prepetition, postpetition or post-Plan Effective Date, except as expressly provided for in this Agreement.

(e)     Notwithstanding the entry of an order by the Bankruptcy Court establishing a bar date for filing proofs of Claim applicable to the FE Non-Debtor Parties, the FE Non-Debtor Parties shall not be required to file proofs of Claim by such bar date for any prepetition and/or Administrative Claims being waived and/or released by the FE Non-Debtor Parties under this Agreement unless (i) the Settlement Effective Date does not occur by September 28, 2018 or such other date to which the Debtors and FE Corp. shall agree or (ii) if the Settlement Effective Date occurs, this Agreement is terminated prior to the Plan Effective Date. If either (i) or (ii) in the preceding sentence occurs, the deadline by which the FE Non-Debtor Parties must file proofs of Claim in order for such proofs of Claim to be deemed timely filed shall be thirty (30) days from and after the date of such occurrence.

Section 2.8 <u>Sale Process.</u> Commencing on the Settlement Effective Date, and in consideration for the releases described in Sections 6.1 and 6.3 of this Agreement:

(a) In connection with the sale of the Debtors' Retail Book Assets, FE Corp. and FESC reaffirm each of their commitments contained in the July 2018 Letter Agreement.

(b) The applicable FE Non-Debtor Parties shall reasonably cooperate with the Debtors, or Reorganized Debtors, as applicable, in their efforts to maximize the value realized from any sale process conducted by the Debtors by agreeing, among other things, (i) to participate in any ancillary transactions (on a commercially reasonable basis, which may include the incurrence of unreimbursed <u>de minimis</u> expenses (or additional costs to the extent reimbursed by the Debtors or the applicable purchaser) by the FE Non-Debtor Parties, and shall not require the FE Non-Debtor Parties to undertake any action that will cause an adverse effect on, or result in a loss of rights without adequate consideration to, the FE Non-Debtor Parties) reasonably necessary to consummate the transactions contemplated by the sale processes; (ii) to assist in obtaining any required consents, waivers, or approvals related to the transactions contemplated by the sale processes; and (iii) to make FE Corp. and FESC personnel available to facilitate diligence and as otherwise necessary in furtherance of any sale process and the transactions contemplated thereby.

(c) Notwithstanding the above, the FE Non-Debtor Parties shall not be required to take any action, or omit to take any action, that would violate applicable law or any regulatory obligation then in effect.

## ARTICLE III

## MUTUAL OBLIGATIONS OF THE DEBTORS AND THE FE NON-DEBTOR PARTIES

Section 3.1 <u>Pleasants Power Plant.</u> In consideration for the releases provided to the FE Non-Debtor Parties as described in Sections 6.1 and 6.3 of this Agreement, AE Supply will transfer all of its right, title and interest in the Pleasants Power Plant and related assets (except for McElroy's Run Impoundment) to the Pleasants Purchaser while retaining the liabilities set forth below, in each case subject to the terms and conditions of the Pleasants Purchase Agreement. The Pleasants Purchase Agreement shall contain customary agreed-upon limits for AE Supply's indemnity obligations in favor of the Pleasants Purchaser in both amount and duration; <u>provided</u>, <u>however</u>, that AE Supply's indemnity obligations with respect to McElroy's Run Impoundment shall not be limited in either amount or duration.

(a) If the Pleasants Closing Date does not occur prior to the Pleasants Transfer Date, the Pleasants Purchaser shall accept beneficial ownership (through a lease, cost-based power purchase agreement, or other mutually agreed upon arrangement) of the Pleasants Power Plant as of the Pleasants Transfer Date. The Debtors and AE Supply may agree to a Pleasants Transfer Date that is earlier than January 1, 2019.

(b) Prior to the Plan Effective Date, AE Supply and the Pleasants Purchaser shall enter into the Pleasants Purchase Agreement, which shall contain terms and conditions, including representations, covenants, closing conditions, and indemnities, that are customary for

18-50757-amk    Doc 3288-2   FILED 01/11/19   ENTERED 01/11/19 13:06:58   Page 236 of 299
18-50757-amk    Doc 4222-2   FILED 03/26/19   ENTERED 03/26/19 22:45:25   Page 49 of 95

the purchase and sale of supercritical coal-fired power plants between merchant generators. The obligation of the Debtors to enter into the Pleasants Purchase Agreement is subject to completion of due diligence of the Pleasants Power Plant to the reasonable satisfaction of the Debtors, the Committee, and the Supporting Parties, with such diligence to be completed by not later than August 26, 2018. From the Settlement Effective Date through the Pleasants Closing Date, AE Supply shall give the Debtors, the Committee, and the Supporting Parties and their representatives reasonable access at reasonable times to the Pleasants Power Plant and books, records (including financial and operating records) and personnel of the FE Non-Debtor Parties related thereto and permit the Debtors, the Committee, and the Supporting Parties and their representatives to make such inspections thereof as they may from time to time reasonably request (including any investigation of the environmental condition of the properties, including access and information necessary for environmental site assessments in accordance with relevant ASTM standards). All such access shall be (i) conducted in a manner as not to unreasonably interfere with the operations at the Pleasants Power Plant and (ii) upon reasonable notice to AE Supply and shall be at times and in accordance with procedures to be mutually agreed upon by the Parties (acting reasonably). In the event that the Debtors inform AE Supply that they do not intend to enter into the Pleasants Purchase Agreement on or before August 26, 2018, AE Supply shall use commercially reasonable efforts to sell the Pleasants Power Plant to a third party, with the net proceeds of such sale to be paid over to the Debtors.

(c)     AE Supply shall perform, or cause to be performed, in accordance with merchant generator practice and consistent with past practice, the Pleasants Outage. AE Supply will be responsible for the first $11 million of costs related to the Pleasants Outage incurred after the Settlement Effective Date. To the extent there are costs related to the Pleasants Outage above $11 million, such costs, up to an aggregate of $25 million (inclusive of the $11 million referenced herein) shall be shared equally by the Debtors and AE Supply.

(d)     The Pleasants Purchase Agreement shall provide that AE Supply shall retain all of its liabilities under environmental laws (excluding any post-transfer changes thereto) with respect to its ownership and operation of Pleasants Power Plant to the extent that such liabilities are based on facts or circumstances occurring prior to the Pleasants Transfer Date (and if occurring or arising only in part on or after the Pleasants Transfer Date, only to the extent of such part); provided, however, that such liabilities include the closure and remediation of McElroy's Run Impoundment except to the extent resulting from the Debtors' violation of environmental laws after the Pleasants Transfer Date; provided, further, that such liabilities exclude (i) all liabilities arising on or after the Pleasants Transfer Date to comply with environmental permits and environmental laws (including any post-transfer changes thereto) with respect to the Pleasants Power Plant, including, but not limited to, those with respect to Effluent Limit Guidelines and (ii) any obligation to contribute to post-Pleasants Transfer Date capital expenditures in connection with AE Supply's retained liabilities. The Pleasants Purchase Agreement shall provide that AE Supply shall retain all of its ownership interests in the McElroy's Run Impoundment, and shall include as an exhibit an agreement to provide for the Debtors' access to the McElroy's Run Impoundment, which agreement shall be reasonably acceptable to the Parties.

(e)     The Pleasants Purchase Agreement shall provide that the Pleasants Purchaser shall assume all of the liabilities under environmental laws with respect to the

ownership and operation of Pleasants Power Plant to the extent that such liabilities are based on facts or circumstances occurring on or after the Pleasants Transfer Date; <u>provided</u>, that such liabilities shall include all liabilities arising on or after the Pleasants Transfer Date to comply with environmental permits and environmental laws (including any post-transfer changes thereto) with respect to the Pleasants Power Plant, including, but not limited to, those with respect to Effluent Limit Guidelines.

(f)     The Pleasants Purchase Agreement shall provide that AE Supply shall retain all of its liabilities with respect to coal supply contracts for the Pleasants Power Plant entered into by AE Supply prior to the Pleasants Closing Date; <u>provided</u>, <u>however</u>, that prior to the Pleasants Closing Date, the Debtors shall enter into good faith negotiations with AE Supply's coal supply contract counterparties for the purchase of coal for the Pleasants Power Plant to mitigate any of AE Supply's damages under such coal supply contracts.

(g)     In the event that the Debtors, in consultation with the Committee and the Supporting Parties, decide to pursue a sale of the Pleasants Power Plant to a third party prior to the Pleasants Transfer Date, the FE Non-Debtor Parties agree to cooperate with the Debtors in connection with any such sale, including by transferring ownership of the Pleasants Power Plant and related assets directly to a third party purchaser, <u>provided</u> that the liability of AE Supply and FE Corp. in connection with any such sale is not greater than the liabilities AE Supply and FE Corp. would have incurred in connection with a transfer of the Pleasants Power Plant to the Pleasants Purchaser as contemplated hereby, and <u>provided</u> <u>further</u> that such third party agrees to enter into good faith negotiations with AE Supply's coal supply contract counterparties for the purchase of coal for the Pleasants Power Plant to mitigate any of AE Supply's damages under such coal supply contracts.

(h)     FE Corp. shall: (i) fully guaranty the indemnity obligations of AE Supply to the Pleasants Purchaser under the Pleasants Purchase Agreement with respect to AE Supply's obligations in Section 3.1(d) solely with respect to McElroy's Run Impoundment through the closure and remediation of the McElroy's Run Impoundment; and (ii) provide a guaranty in an amount equal to $15 million with respect to the indemnity obligations of AE Supply to the Pleasants Purchaser under the Pleasants Purchase Agreement with respect to other retained environmental liabilities (excluding the McElroy's Run Impoundment) in Section 3.1(d) until the third anniversary of the Pleasants Transfer Date.  The guarantees contemplated by this Section 3.1(h) shall be in form and substance reasonably acceptable to the Parties and shall be assignable by the Pleasants Purchaser to a subsequent owner of the Pleasants Power Plant.

## ARTICLE IV

## OBLIGATIONS OF THE DEBTORS

Section 4.1  <u>Settlement Approval Order.</u>  On or prior to August 26, 2018, the Debtors shall file the Settlement Motion with the Bankruptcy Court.  The Debtors shall serve notice of the Settlement Motion on all of the Debtors' creditors, equity holders, and any other party in interest who would be required to receive notice of a motion to approve the Disclosure Statement under the Bankruptcy Code and the Bankruptcy Rules.  The Debtors will obtain the Settlement Approval Order on or prior to September 28, 2018.

Section 4.2  <u>FES Plans</u>.

(a)      The Debtors shall incorporate the terms of this Agreement, to the extent applicable, into the FES Plans.  For the avoidance of doubt, Article VI shall be included in any and all FES Plans.

(b)      The Debtors will collaborate in good-faith with the FE Non-Debtor Parties regarding the timing of the Plan Effective Date in order to aid the FE Non-Debtor Parties' performance under this Agreement.

## ARTICLE V

## BUSINESS SEPARATION

Section 5.1  <u>Separation Agreement</u>.  On or prior to the Settlement Effective Date, the Debtors, in consultation with the Committee and the Supporting Parties, and the applicable FE Non-Debtor Parties shall enter into the Separation Agreement.  The Separation Agreement shall, at a minimum, include the following terms:

(a)      FE Corp., FESC and the Debtors, in consultation with the Supporting Parties and the Committee, shall agree to certain parameters with regard to a maintenance agreement, with a mutually agreed upon termination date, pursuant to which FESC will continue to provide the Debtors with those services necessary to maintain plant substations;

(b)      The FE Non-Debtor Parties will agree, subject to applicable regulations and required consents, to assume any leasehold interests and permitting requirements with the State of Ohio with respect to the ATSI breakwater project at the Eastlake Facility <u>provided</u>, <u>however</u>, that the specific identity of the FE Non-Debtor Party who will assume such leasehold interests and permitting requirements shall be determined solely by the FE Non-Debtor Parties;

(c)      On the Plan Effective Date, and subject to applicable regulations and required consents, OE will transfer to FG all properties at Hollow Rock related to the W.H. Sammis Facility that are still in the name of OE;

(d)      If permitted by applicable law and subject to applicable regulations and required consents, on the Plan Effective Date, FG will transfer the North Park Permit to OE;

(e)      The FE Non-Debtor Parties and the Debtors shall enter into good-faith negotiations on the terms and conditions of leases, easements, rights of way or other property rights for any properties necessary for the FE Non-Debtor Parties, the Debtors or Reorganized Debtors, as applicable, to continue to conduct their operations in the ordinary course of business;

(f)      The FE Non-Debtor Parties shall respond to reasonable information requests from the Debtors and in connection with the Debtors' planning activities to operate their businesses on a standalone basis; and

(g)      The FE Non-Debtor Parties will, upon the request of the Debtors, cooperate in good faith and document any other arrangements that the Debtors reasonably

determine are necessary to operate on a standalone basis (such cooperation shall be on a commercially reasonable basis, which may include the incurrence of unreimbursed de minimis expenses (or additional costs to the extent reimbursed by the Debtors) by the FE Non-Debtor Parties, and shall not require the FE Non-Debtor Parties to undertake any action that will cause an adverse effect on, or result in a loss of rights without adequate consideration to, the FE Non-Debtor Parties). The parties to such ancillary agreements will agree upon mutually acceptable consideration for the foregoing, as applicable. The Debtors may consult with the Committee, the Supporting Parties, and their respective professionals regarding such consideration.

Section 5.2 Amended Separation Agreement.

(a) On the Plan Effective Date, the Debtors and the FE Non-Debtor Parties shall enter into the Amended Separation Agreement. The Amended Separation Agreement shall implement the further separation of the Debtors and their businesses from the FE Non-Debtor Parties as the Debtor and FE Non-Debtor Party members of the Business Separation Committee deem mutually advisable and commercially reasonable in their separate discretion.

Section 5.3 Business Separation Committee.

(a) On or prior to the Settlement Effective Date, the Business Separation Committee shall be appointed.

(b) The duties and responsibilities of the Business Separation Committee shall include, without limitation:

(i) determining, reviewing and addressing issues that arise related to the further separation of the Debtors and their operations from the FE Non-Debtor Parties;

(ii) determining, reviewing and addressing any issues related to the terms and conditions of leases, easements, rights of way, or other property rights for any properties necessary for the Debtors, the Reorganized Debtors or the FE Non-Debtor Parties, as applicable, to continue to conduct their operations in the ordinary course of business;

(iii) managing and responding to any reasonable information requests from the Debtors in connection with the Debtors' planning activities to operate their businesses on a standalone basis; and

(iv) implementing the further separation of the Debtors and their businesses from the FE Non-Debtor Parties.

(c) The members of the Business Separation Committee shall work in good faith to effectuate the further separation of the Debtors and their back office operations from the FE Non-Debtor Parties.

(d)     The Debtors shall consult with the advisors to the Committee and the Supporting Parties with respect to the matters addressed by the Business Separation Committee.

# ARTICLE VI

# RELEASES

Section 6.1   Party Releases.

(a)     On the Settlement Effective Date and subject to Sections 12.4 and 12.5 of this Agreement, each of the Parties hereto (other than the FE Non-Debtor Parties) shall release the FE Non-Debtor Released Parties of and from all claims and Causes of Action, that could be asserted against any of the FE Non-Debtor Released Parties by any of the Parties (other than the FE Non-Debtor Released Parties) as of the Settlement Effective Date based on or in any way relating to, or in any manner arising from, in whole or in part, out of (i) any Debtor, their businesses, or their property; (ii) any claims or Causes of Action against the FE Non-Debtor Released Parties or their property arising in connection with any intercompany transactions or other matters arising in or related to the conduct of the Debtors' business; or (iii) the formulation, preparation, negotiation, dissemination, implementation, administration, or consummation of this Agreement, or other agreement or document related to this Agreement or the claims or Causes of Action resolved by this Agreement.

However, for the avoidance of doubt, (i) each member of the Committee in its individual capacity that is not a Signatory hereto shall not be considered a Party to this Agreement that is releasing any liability owed to it by any entity (including, but not limited to, the FE Non-Debtor Parties) and (ii) the Pleasants Purchaser, to the extent not a Party to this Agreement as of the Settlement Effective Date, shall not be considered a party to this Agreement that is releasing any liability owed to it by any entity.  For the avoidance of doubt, to the extent that the Pleasants Purchaser is a Party to this Agreement as of the Settlement Effective Date, or subsequently becomes a Party to this Agreement, the Pleasants Purchaser shall not be deemed to have waived any Claim or Cause of Action against any Party related solely to the Pleasants Purchase Agreement pursuant to this Section 6.1.

(b)     The Party Releases shall:  (i) be subject to Bankruptcy Court approval (solely with respect to the Debtors and the Committee); and (ii) automatically revoked only upon the termination of this Agreement pursuant to Sections 11.1 through 11.7 of this Agreement, provided, however, that a termination pursuant to Section 11.5 of this Agreement shall only revoke the releases provided in Section 6.1(a) as to the Bruce Mansfield Certificateholders Group.

(c)     In the event that either (i) the Plan Effective Date does not occur on or prior to June 30, 2020, or (ii) the Chapter 11 Cases convert to cases under chapter 7 of the Bankruptcy Code, the FE Non-Debtor Parties may complete all remaining performance (except to the extent any performance is tendered by the FE Non-Debtor Parties but not accepted by the Debtors or any successor to the Debtors, in which in case the FE Non-Debtors' applicable obligations not accepted will be deemed satisfied) and, upon doing so, shall be entitled in return to performance due by the other Parties under this Agreement, including the Party Releases.  For

- 40 -

clarification, under the circumstances of either (i) or (ii) above and FE Corp. elects to tender performance pursuant to this Section 6.1(c): (x) FE Corp. shall be required to perform all of its obligations under this Agreement, including the payment of cash and the New FE Notes related obligations hereunder (except to the extent any performance is tendered by the FE Non-Debtor Parties but not accepted by the Debtors or any successor to the Debtors) and (y) for the purposes of subsequent interpretation of this Agreement, the Plan Effective Date shall be considered to have occurred.

Section 6.2 <u>Customary Releases</u>. To the extent permitted by applicable law, any FES Plan shall provide for the release of the (i) Debtors, (ii) the Supporting Parties, (iii) the Committee, and (iv) each of their respective current and former officers, directors, shareholders, members, employees, advisors attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members, and professionals), in each instance solely with respect to the Claims or Causes of Action against them solely in their capacity as such.

Section 6.3 <u>Plan Releases</u>.

(a) Subject to the exception in Section 6.3(b) of this Agreement, any FES Plan will provide the following: without limiting any other applicable provisions of, or releases contained in, this Agreement, or that will be contained in the FES Plans or any Confirmation Orders, as of the Plan Effective Date, in consideration for the obligations of the FE Non-Debtor Parties under this Agreement and the FES Plans and in consideration of the other contracts, instruments, releases, agreements, or documents to be entered into or delivered in connection with this Agreement and the FES Plans, the Debtors, the other Parties and each holder of a Claim against the Debtors will be deemed to forever release, waive and discharge the FE Non-Debtor Released Parties of and from all claims and Causes of Action that could be asserted against, or in any way relating to, or arising out of:

(i) any Debtor, Reorganized Debtor, their businesses, or their property;

(ii) any Causes of Action against the FE Non-Debtor Released Parties or their property arising in connection with any intercompany transactions and other matters arising in the conduct of the Debtors' business;

(iii) the Bankruptcy Cases;

(iv) the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of any of the FES Plans (or the property to be distributed under the FES Plans), the FES Plan Documents, any contract, employee pension or other benefit plan, instrument, release, or other agreement or document related to any Debtor, the Bankruptcy Cases or the FES Plans, modified, amended, terminated, or entered into in connection with either the FES Plans, or any agreement between the Debtors and any FE Non-Debtor Released Party; or

(v) any other act taken or omitted to be taken in connection with the Bankruptcy Cases, including, without limitation, acts or omissions occurring after the

Plan Effective Date in connection with distributions made consistent with the terms of the FES Plans, that such Person has, had, or may have against any FE Non-Debtor Released Party.

(b)     Notwithstanding Section 6.3(a) of this Agreement, the Debtors shall not be required to include the releases described in Section 6.3(a) of this Agreement in an FES Plan related solely to FE Aircraft and / or Norton in the event that FE Aircraft and / or Norton do not have any scheduled, pending, outstanding, or allowed prepetition or Administrative Claims as of June 30, 2019.

Section 6.4   <u>Injunction</u>.  The releases set forth in Section 6.1 of this Agreement shall be supported by an injunction in the Settlement Approval Order and any Confirmation Orders barring the Debtors and all entities who have held, hold, or may hold Claims against the Debtors, from pursuing, commencing, or continuing in any manner any action or other proceeding against the FE Non-Debtor Released Parties on account of, in connection with or with respect to any Claims or Causes of Action that are released pursuant to such Section.  The releases set forth in Section 6.1 and 6.3 of this Agreement shall be supported by an injunction in the Confirmation Orders barring the Debtors and all entities that have held, hold, or may hold Claims against the Debtors, from pursuing, commencing, or continuing in any manner any action or other proceeding against the FE Non-Debtor Released Parties on account of, in connection with or with respect to any claims or Causes of Action that are released pursuant to this Agreement.  For the avoidance of doubt, to the extent this Agreement is terminated pursuant to Sections 11.1 through 11.4, 11.6, and 11.7 of this Agreement, any injunction contained herein shall be of no effect.  If this Agreement is terminated pursuant to Section 11.5 in accordance with Section 11.7, this injunction shall have no effect with respect to the Bruce Mansfield Certificateholders Group.

Section 6.5   <u>Releases and Exculpations in the FES Plans</u>.  In consideration of the FE Non-Debtor Parties' obligations under this Agreement, the Debtors hereby agree to (a) include the FE Non-Debtor Released Parties and the releases and injunctions contained in Sections 6.1 through 6.4 of this Agreement in the FES Plans and any Confirmation Orders and (b) include the FE Non-Debtor Released Parties in any exculpation provision in the FES Plans and any Confirmation Orders to the extent permitted by applicable law.

Section 6.6   <u>Cooperation</u>.  The Debtors and the FE Non-Debtor Parties hereby agree to cooperate to take any actions necessary or appropriate to give effect to the release and injunction provisions contemplated by this Agreement.

Section 6.7   <u>Release Provisions Non-Severable</u>.  Subject to the FE Non-Debtor Parties' waiver right in Section 12.8 of this Agreement, the Parties agree that the releases and injunctions set forth in this Article VI of this Agreement constitute material provisions of this Agreement and are non-severable from the other provisions of this Agreement.

Section 6.8   <u>Plan Documents</u>.  The Debtors hereby agree that the FES Plans shall include a provision that the FES Plan Documents shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Committee and the Supporting Parties.

## ARTICLE VII

## COVENANTS

Section 7.1 <u>Pleadings and Notices; FES Plan Support</u>.

(a) Upon Execution, none of the Parties shall propose or support a plan of reorganization or liquidation in the Bankruptcy Cases that would (i) be inconsistent with terms of this Agreement or breach or alter the terms of this Agreement; or (ii) otherwise would have an adverse impact on the FE Non-Debtor Parties in any material respect.

(b) The Debtors agree that the Parties shall have a reasonable opportunity to review (i) the Settlement Motion and any proposed Settlement Approval Order prior to its submission to the Bankruptcy Court for entry, and (ii) the FES Plan Documents prior to the Debtors' filing or service of such documents. Any modifications to the Settlement Approval Order shall be acceptable to the FE Non-Debtor Parties in their sole discretion.

(c) The FES Plans shall incorporate this Agreement as an Exhibit, and the terms of this Agreement shall be described in the FES Plans as integral to and not severable from the FES Plans. Notwithstanding anything to the contrary herein, nothing in the FES Plans or any Confirmation Orders shall limit or impair any relief granted to, or rights of, the FE Non-Debtor Released Parties pursuant to this Agreement or the Settlement Approval Order. The FES Plans will contain as a condition to their effectiveness the effectiveness of this Agreement.

Section 7.2 <u>Covenant Not to Sue</u>. Upon Execution, the Parties hereby covenant not to sue, and shall forebear from instituting or prosecuting any Causes of Action, suit, hearing, or other proceeding of any kind, nature, or character, at law or in equity, against any of the FE Non-Debtor Released Parties on account of, in connection with, or in any way related to any of the claims or Causes of Action released pursuant to the terms of this Agreement. For the avoidance of doubt, to the extent this Agreement is terminated pursuant to Sections 11.1 through 11.4, 11.6, and 11.7 of this Agreement, any covenant not to sue contained herein shall be of no effect. If this Agreement is terminated pursuant to Section 11.5 in accordance with Section 11.7, any covenant not to sue contained herein shall have no effect with respect to the Bruce Mansfield Certificateholders Group.

Section 7.3 <u>Standstill Agreement and PSA.</u> The Parties reaffirm the extension of the Standstill Agreement and PSA filed on the docket of the Bankruptcy Cases at Docket No. 1084.

Section 7.4 <u>Communications Regarding this Agreement</u>. Upon Execution, the Parties shall coordinate and have an opportunity to review each other's disclosures and press releases regarding this Agreement, and any such disclosures and/or press releases shall be released on a coordinated basis. To the extent any Party to this Agreement is required by applicable law to make any disclosure, such Party will provide the other Parties reasonable advance notice of the content of such disclosure to the extent practicable, and consider any comments to such disclosure in good faith.

Section 7.5 <u>Further Assurances</u>. Each Party shall, at its own expense and upon the reasonable request of another Party, duly execute and deliver, or cause to be duly executed and

delivered, to such Party such further instruments and do and cause to be done such further acts as many be necessary or proper in the reasonable opinion of the requesting Party to carry out the provisions of this Agreement, including the use of reasonable best efforts to obtain the Settlement Approval Order.  To the extent the Debtors, Reorganized Debtors, or the FE Non-Debtor Parties divest any Affiliate such that the relevant entity no longer falls within the definition of "Affiliate" in this Agreement, the Debtors, the Reorganized Debtors, or the FE Non-Debtor Parties, as appropriate, shall require such Affiliate to separately Execute this Agreement prior to any such divestiture so that such Affiliate shall remain bound by the terms of this Agreement.

**ARTICLE VIII**

**TRANSFER OF CLAIMS AND INTERESTS**

Section 8.1  <u>Transfers of Claims and Interests</u>.

(a)  Until the termination of this Agreement, no Supporting Party shall Transfer any Creditor Claims, in whole or in part to any Person, unless such a Transfer is a Permitted Transfer.

(b)  Upon satisfaction of the requirements in Section 8.1(a) of this Agreement, (i) the Permitted Transferee shall be deemed to be a Supporting Party hereunder, and, for the avoidance of doubt, a Permitted Transferee is bound as a Supporting Party under this Agreement with respect to any and all Claims against, or interests in, any of the Debtors, whether held at the time such Permitted Transferee becomes a Party or later acquired by such Permitted Transferee, and (ii) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations, <u>provided</u>, <u>however</u>, that such transferor will not be released from its obligations under Article VI hereof.

(c)  Notwithstanding Section 8.1(a) of this Agreement, a Qualified Marketmaker that acquires any Creditor Claims with the purpose and intent of acting as a Qualified Marketmaker for such Creditor Claims shall not be required to execute and deliver to any of the counsel to the Supporting Parties a Transfer Agreement **or** Joinder Agreement in respect of such Creditor Claims only if (i) such Qualified Marketmaker subsequently transfers such Creditor Claims (by purchase, sale, assignment, participation, or otherwise) within ten (10) business days of its acquisition to a transferee or (ii) the transferee otherwise is a Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement.  To the extent that a Supporting Party is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interest in Creditor Claims that such Supporting Party acquires in its capacity as a Qualified Marketmaker from a holder of Creditor Claims who is not a Supporting Party without regard to the requirements set forth in Section 8.1(a) of this Agreement.

(d)  This Agreement shall in no way be construed to preclude the Supporting Parties from acquiring additional Creditor Claims; <u>provided</u>, <u>however</u>, that (i) any Supporting

18-50757-amk    Doc 3283-2    FILED 01/04/19    ENTERED 01/04/19 21:06:58    Page 475 of 299
18-50757-amk    Doc 1222-4    FILED 08/26/18    ENTERED 08/26/18 22:49:25    Page 57 of 79

Party that acquires additional Creditor Claims, as applicable, after Execution of this Agreement, shall notify counsel to each of the Parties of such acquisition, including the amount of such acquisition, which notice may be deemed to be provided by the filing of a statement with the Bankruptcy Court as required by Rule 2019 of the Bankruptcy Rules, including revised holdings information for such Supporting Party and (ii) such additional Creditor Claims shall automatically and immediately upon acquisition by a Supporting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the respective counsels to the Parties).

(e)       In addition, other than pursuant to a Permitted Transfer, any holder of Creditor Claims shall become a Party, and become obligated as a Supporting Party, if (i) such holder and FE Corp. execute a Joinder Agreement, and shall be deemed a Supporting Party and (ii) such Joinder Agreement is delivered by FE Corp. to counsel to the each of the Parties within three (3) business days following the execution thereof.

(f)       Any Transfer made in violation of this Article VII shall be null and void ab initio.  Any Supporting Party that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

(g)       Notwithstanding anything to the contrary herein, if a Supporting Party effects the Permitted Transfer of all of its Creditor Claims in accordance with this Agreement, such Supporting Party shall cease to be a Party to this Agreement in all respects and shall have no further obligation hereunder.

## ARTICLE IX

## REPRESENTATIONS AND WARRANTIES

Section 9.1   Representations and Warranties of the Debtors.

(a)       The Debtors are duly organized, validly existing, and in good standing under the laws of their jurisdictions of formation.

(b)       Subject to Bankruptcy Court approval, the Debtors possess all requisite power and authority necessary to carry out the transactions contemplated by this Agreement.

(c)       Subject to Bankruptcy Court approval, FES possesses all requisite power and authority necessary to (i) bind itself and each of its subsidiary Debtors to the terms of this Agreement and (ii) enter into this Agreement on behalf of itself and each of its subsidiary Debtors.

(d)       Subject to Bankruptcy Court approval, FENOC possesses all requisite power and authority necessary to (i) bind itself to the terms of this Agreement and (ii) enter into this Agreement on behalf of itself.

(e)     Subject to the entry of the Settlement Agreement Order, this Agreement, when Executed and delivered by the Debtors in accordance with the terms hereof, shall constitute a valid and binding obligation of the Debtors, enforceable in accordance with its terms.

(f)     The Execution, delivery, and performance by the Debtors of this Agreement, and the fulfillment of and compliance with the respective terms hereof by the Debtors, do not and shall not (i) conflict with or result in a breach of the terms, conditions, or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice, or both), (iii) give any third party the right to modify, terminate, or accelerate any obligation under, (iv) result in a violation of, or (v) require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any Governmental Entity (other than such authorization, consent, approval, exemption, or other action the failure to obtain, satisfy, or comply with, as the case may be, which will not affect the validity or enforceability of the Agreement or have a material adverse effect on the Debtors' ability to perform their obligations under this Agreement), with the exception of any authorizations, consents, approvals, exemptions, or other actions by or notice or declaration to, or filing with, any Governmental Entity in connection with any transfer or other transaction related to the Pleasants Power Plant pursuant to (A) the organizational documents of the Debtors, (B) any law to which the Debtors are subject, or (C) any material agreement, instrument, order, judgment, or decree to which the Debtors are subject.

Section 9.2   Representations and Warranties of the FE Non-Debtor Parties.

(a)     FE Corp., FESC, and AE Supply are duly organized, validly existing, and in good standing under the laws of their jurisdictions of formation.

(b)     FE Corp. possesses all requisite power and authority necessary to carry out the transactions contemplated by this Agreement on behalf of itself and its direct and indirect non-Debtor subsidiaries.

(c)     FE Corp. possesses all requisite power and authority necessary to (i) bind each of the FE Non-Debtor Parties to the terms of this Agreement and (ii) enter into this Agreement on behalf of the FE Non-Debtor Parties.

(d)     Subject to the entry of the Settlement Approval Order, this Agreement, when Executed and delivered by FE Corp. in accordance with the terms hereof, shall constitute a valid and binding obligation of the FE Non-Debtor Parties, enforceable in accordance with its terms.

(e)     The Execution, delivery and performance by FE Corp. of this Agreement, and the fulfillment of and compliance with the respective terms hereof by the FE Non-Debtor Parties, do not and shall not (i) conflict with or result in a breach of the terms, conditions, or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice, or both), (iii) give any third party the right to modify, terminate, or accelerate any obligation under, (iv) result in a violation of or (v) require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any Governmental Entity (other than such authorization, consent, approval, exemption, or other

18-50757-amk   Doc 3283-2   FILED 01/14/19   ENTERED 01/14/19 03:08:59   Page 49 of 95
18-50757-amk   Doc 4224-2   FILED 03/26/19   ENTERED 03/26/19 22:49:25   Page 59 of 95

action the failure to obtain, satisfy, or comply with, as the case may be, which will not affect the validity or enforceability of the Agreement or have a material adverse effect on the FE Non-Debtor Parties' ability to perform their obligations under this Agreement), with the exception of any authorizations, consents, approvals, exemptions, or other actions by or notice or declaration to, or filing with, any Governmental Entity in connection with any transfer or other transaction related to the Pleasants Power Plant, pursuant to (A) the organizational documents of the FE Non-Debtor Parties, (B) any law to which the FE Non-Debtor Parties are subject, or (C) any material agreement, instrument, order, judgment, or decree to which the FE Non-Debtor Parties are subject.

Section 9.3 <u>Representations and Warranties of the Ad Hoc Noteholders Group</u>.

(a)     Each member of the Ad Hoc Noteholders Group is duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation.

(b)     Each member of the Ad Hoc Noteholders Group possesses all requisite power and authority necessary to carry out the transactions contemplated by this Agreement.

(c)     The Ad Hoc Noteholders Group will file a notice pursuant to Bankruptcy Rule 2019 disclosing their holdings as of the Execution of this Agreement as soon as is practicable but no later than 14 days after the Execution of this Agreement.

(d)     At the time of Execution, the Ad Hoc Noteholders Group constitutes the Requisite Noteholders.

(e)     Subject to the entry of the Settlement Approval Order, this Agreement, when Executed and delivered by each member of the Ad Hoc Noteholders Group in accordance with the terms hereof, shall constitute a valid and binding obligation of such member of the Ad Hoc Noteholders Group, enforceable in accordance with its terms.

(f)     The Execution, delivery and performance by the members of the Ad Hoc Noteholders Group of this Agreement, and the fulfillment of and compliance with the respective terms hereof by the members of the Ad Hoc Noteholders Group, do not and shall not (i) conflict with or result in a breach of the terms, conditions, or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice, or both), (iii) give any third party the right to modify, terminate, or accelerate any obligation under, (iv) result in a violation of or (v) require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any Governmental Entity pursuant to (A) the organizational documents of the members of the Ad Hoc Noteholders Group, (B) any law to which any of the members of the Ad Hoc Noteholders Group are subject, or (C) any material agreement, instrument, order, judgment, or decree to which any of the members of the Ad Hoc Noteholders Group are subject.

Section 9.4 <u>Representations and Warranties of the Bruce Mansfield Certificateholders Group</u>.

(a)     Each member of the Bruce Mansfield Certificateholders Group is duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation.

(b)     Each member of the Bruce Mansfield Certificateholders Group possesses all requisite power and authority necessary to carry out the transactions contemplated by this Agreement.

(c)     The Bruce Mansfield Certificateholders Group will file a notice pursuant to Bankruptcy Rule 2019 disclosing their holdings as of the Execution of this Agreement as soon as is practicable but no later than 14 days after the Execution of this Agreement.

(d)     At the time of Execution, the Bruce Mansfield Certificateholders Group constitutes the Requisite Certificateholders.

(e)     Subject to the entry of the Settlement Approval Order, this Agreement, when Executed and delivered by each member of the Bruce Mansfield Certificateholders Group in accordance with the terms hereof, shall constitute a valid and binding obligation of such member of the Bruce Mansfield Certificateholders Group, enforceable in accordance with its terms.

(f)     The Execution, delivery and performance by the members of the Bruce Mansfield Certificateholders Group of this Agreement, and the fulfillment of and compliance with the respective terms hereof by the members of the Bruce Mansfield Certificateholders Group, do not and shall not (i) conflict with or result in a breach of the terms, conditions, or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice, or both), (iii) give any third party the right to modify, terminate, or accelerate any obligation under, (iv) result in a violation of or (v) require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any Governmental Entity pursuant to (A) the organizational documents of the members of the Bruce Mansfield Certificateholders Group, (B) any law to which any of the members of the Bruce Mansfield Certificateholders Group are subject, or (C) any material agreement, instrument, order, judgment, or decree to which any of the members of the Bruce Mansfield Certificateholders Group are subject.

Section 9.5   Representations and Warranties of the Committee.

(a)     The Committee possesses all requisite power and authority necessary to carry out the transactions contemplated by this Agreement.

(b)     Subject to the entry of the Settlement Approval Order, this Agreement, when Executed and delivered by the Committee in accordance with the terms hereof, shall constitute a valid and binding obligation of the Committee, enforceable in accordance with its terms.

(c)     The Execution, delivery and performance by the Committee of this Agreement, and the fulfillment of and compliance with the respective terms hereof by the Committee, do not and shall not (i) conflict with or result in a breach of the terms, conditions, or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice, or both), (iii) give any third party the right to modify, terminate, or accelerate any obligation under, (iv) result in a violation of or (v) require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any

Governmental Entity pursuant to (A) the organizational documents of the Committee, (B) any law to which the Committee is subject, or (C) any material agreement, instrument, order, judgment, or decree to which the Committee is subject.

## ARTICLE X

## CONDITIONS TO THE SETTLEMENT
## EFFECTIVE DATE & PLAN EFFECTIVE DATE

Section 10.1 <u>Conditions to the Settlement Effective Date</u>.  The Settlement Effective Date is subject to the satisfaction of each of the following conditions unless waived in accordance with the provisions of Section 10.3:

(a)     The Bankruptcy Court shall have approved the Amended SSA and the Separation Agreement on or prior to September 28, 2018 (the Parties having agreed by execution of this Agreement that the Amended SSA and the Separation Agreement shall be submitted to the Bankruptcy Court no later than ten (10) days prior to the hearing on the Settlement Motion).

(b)     The Bankruptcy Court shall have entered the Settlement Approval Order on the docket of the Bankruptcy Cases on or prior to September 28, 2018, and the Settlement Approval Order shall contain the releases, covenants not to sue, and injunctions required by and consistent with the terms of this Agreement.

(c)     The Debtors and the FE Non-Debtor Parties shall have performed in all material respects the covenants and agreements that are required to be performed by such Party on or prior to the Settlement Effective Date.

(d)     Each of the representations and warranties of each Party in Article IX of this Agreement shall be true and correct on the date this Agreement is Executed, other than inaccuracies that do not materially impair such Party's ability to perform its obligations under this Agreement.

Section 10.2 <u>Conditions to Plan Effective Date</u>.  The Plan Effective Date is subject to the satisfaction of each of the following conditions unless waived in accordance with the provisions of Section 10.3 of this Agreement:

(a)     <u>Reserved.</u>

(b)     The Settlement Approval Order shall be a Final Order.

(c)     Any provisions in the FES Plan Documents that relate to, impact, or reasonably could be expected to impact the Party Releases or the Plan Releases shall be consistent with this Agreement and otherwise in form and substance acceptable to the FE Non-Debtor Parties in their sole discretion.

(d)     Any provisions, other than the provisions discussed in Section 10.2(c) of this Agreement, in the FES Plan Documents that relate to this Agreement shall be consistent with

this Agreement and otherwise in form and substance reasonably acceptable to the FE Non-Debtor Parties and the Debtors.

(e)     Any FES Plan for a Debtor, each consistent in form and substance with the terms of this Agreement, shall include the releases and other provisions set forth in Sections 6.1 through 6.7 of this Agreement and shall have been confirmed by the Bankruptcy Court in a Final Order. Notwithstanding the proceeding sentence, the Debtors shall not be required to include the releases and other provisions set forth in Section 6.3(a) of this Agreement in an FES Plan related solely to FE Aircraft and / or Norton in the event that FE Aircraft and / or Norton do not have any scheduled, pending, outstanding, or allowed prepetition or Administrative Claims as of June 30, 2019.

Section 10.3  Satisfaction and Waiver of the Conditions to the Settlement Effective Date and Plan Effective Date.

(a)     The conditions set forth in Sections 10.2(b), 10.2(c) and 10.2(e) of this Agreement may only be waived upon the written consent of the FE Non-Debtor Parties and no other consent or waiver by any other Party shall be required or effective.

(b)     The conditions set forth in Sections 10.1 and 10.2(d), may be waived upon the written consent of both the FE Non-Debtor Parties and the Debtors (the Debtors shall consult with the Committee and the Supporting Parties); provided, that in the case of the condition set forth in Section 10.1(c) or Section 10.1(d), such condition can be waived without the consent of the breaching Party. Consent to such waiver shall not be required from any other Party.

## ARTICLE XI

## TERMINATION

Section 11.1  Termination Prior to the Plan Effective Date.  Notwithstanding any other provision of this Agreement, this Agreement may be terminated at any time prior to the Plan Effective Date by unanimous written consent of all of the Parties. The consent of the Ad Hoc Noteholders Group and the Bruce Mansfield Certificateholders Group shall be effective upon the written consent of the Requisite Noteholders and the Requisite Certificateholders, respectively.

Section 11.2  Termination by FE Corp.

(a)     Notwithstanding any other provision of this Agreement, this Agreement may be terminated by FE Corp. in accordance with Section 11.7 of this Agreement, in the event FE Corp. elects not to waive any of the following pursuant to Section 12.8 of this Agreement: (a) the failure of the Debtors to obtain the Settlement Approval Order on or prior to September 28, 2018, pursuant to Section 4.1 of this Agreement, (b) a Condition Failure Scenario, or (c) an Adverse Ruling.

(b)     Upon the termination of this Agreement by FE Corp. in accordance with Section 11.7, the Party Releases provided by Section 6.1 shall be automatically revoked and the FE Non-Debtor Parties shall additionally be entitled to reimbursement on a superpriority administrative basis for, and shall have an allowed super-priority Administrative Claim for, the

actual costs of goods and services provided to the Debtors under this Agreement or the Amended SSA. For purposes of this Agreement, "superpriority administrative basis" means payment on a *pari passu* basis with all other superpriority administrative expense claims and senior and prior to any and all other pre-petition and post-petition Claims of whatever nature or kind, including, without limitation, any claims under section 503(b) or 507 of the Bankruptcy Code.

Section 11.3  <u>Termination by the Debtors</u>.

(a)  Notwithstanding any other provision of this Agreement, this Agreement may be terminated by the Debtors in accordance with Section 11.7 of this Agreement upon the occurrence of a Fundamental Default provided that Section 12.4 or 12.5 of this Agreement is satisfied, as applicable.

(b)  Upon the termination of this Agreement by the Debtors in accordance with Sections 11.3(a) and 11.7:  (i) the Party Releases provided by Section 6.1 shall be automatically revoked, (ii) the FE Non-Debtor Parties shall not be provided the allowed superpriority administrative claim described in Section 11.2(b) of this Agreement; and (iii) the FE Non-Debtor Parties shall be permitted to assert any Claim pursuant to the terms of Section 2.7(e) of this Agreement.

Section 11.4  <u>Termination by the Committee and the Supporting Parties</u>.

(a)  Notwithstanding any other provisions of this Agreement, this Agreement may be terminated by the Committee or the Supporting Parties in accordance with Section 11.7 in the event:  (i) the Committee and the Supporting Parties are granted authority to pursue rights and remedies under this Agreement pursuant to Section 12.9 of this Agreement and (ii) as a result of the pursuit of such rights and remedies, the conditions for termination provided by Sections 12.4 or 12.5 of this Agreement are satisfied, <u>provided</u>, <u>however</u>, that any action taken by any of the Supporting Parties under this Section 11.4 may only be taken by the consent of the Requisite Noteholders or Requisite Certificateholders, as applicable.

(b)  Upon the termination of this Agreement by the Committee or the Supporting Parties in accordance with Sections 11.4 (a) and 11.7:  (i) the Party Releases provided by Section 6.1 shall be automatically revoked, (ii) the FE Non-Debtor Parties shall not be provided the allowed superpriority administrative claim described in Section 11.2(b) of this Agreement; and (iii) the FE Non-Debtor Parties shall be permitted to assert any Claim pursuant to the terms of Section 2.7(e) of this Agreement.

Section 11.5  <u>Termination by the Requisite Certificateholders and the Effect Thereof</u>. Notwithstanding any other provision of this Agreement, this Agreement may be terminated, solely as to the Bruce Mansfield Certificateholders Group, by the Requisite Certificateholders, if the Mansfield Settlement shall not have been approved by Final Order of the Bankruptcy Court on or prior to Plan Effective Date.  In such an event:  (a) only the releases provided by the Bruce Mansfield Certificate Holder Group pursuant to Section 6.1 of this Agreement shall be revoked, (b) this Agreement shall not terminate as to the other Parties in any respect, and (c) the releases provided in Section 6.1 of this Agreement, other than those provided by the Bruce Mansfield Certificateholders Group, shall remain in full force and effect.

Section 11.6  <u>Outside Date</u>.  If the Settlement Effective Date has not occurred by March 31, 2019, or if the Plan Effective Date has not occurred by July 31, 2020, any of the Parties may unilaterally terminate the Agreement in accordance with Section 11.7.  Upon the termination of this Agreement by any Party due to the fact that the Plan Effective Date has not occurred by July 31, 2020, the FE Non-Debtor Parties may complete all remaining performance (except to the extent any performance is tendered by the FE Non-Debtor Parties but not accepted by the Debtors or any successor to the Debtors within 30 days of the effect of such termination, in which in case the FE Non-Debtors' applicable obligations not accepted will be deemed satisfied) and, upon doing so, shall be entitled in return to performance due by the other Parties under this Agreement, including the Party Releases.  For clarification, under the circumstances that a Party terminates this Agreement due to the fact that the Plan Effective Date has not occurred by July 31, 2020 and FE Corp. elects to tender performance pursuant to this Section 11.6:  (a) FE Corp. shall be required to perform all of its obligations under this Agreement, including the payment of cash and the New FE Notes related obligations hereunder (except to the extent any performance is tendered by the FE Non-Debtor Parties but not accepted by the Debtors or any successor to the Debtors); and (b) for the purposes of subsequent interpretation of this Agreement, the Plan Effective Date shall be considered to have occurred.

Section 11.7  <u>Method of Termination</u>.  If any Party determines to terminate this Agreement pursuant to its rights provided by Sections 11.2 through 11.6 of this Agreement, such Party shall send written notice of such termination, which shall include any and all bases for such termination, to each of the Parties, and such termination shall be effective five business days after receipt of such written notice except in the case that a right to terminate this Agreement arises in accordance with Section 12.4(c) of this Agreement.  The Parties agree that if any Party seeks relief from the Bankruptcy Court upon receipt of a notice provided pursuant to this Section 11.7, the Parties will agree that such relief will be adjudicated on an expedited basis.

Section 11.8  <u>Effect of Termination</u>.  If this Agreement is terminated in accordance with Section 11.7 (other than as a result of a termination by the Bruce Mansfield Certificateholders Group pursuant to Section 11.5, the effect of which shall be governed by Section 11.5), this Agreement shall forthwith become null and void and of no further force and effect (other than the provisions of this Article XI, all of which shall survive termination of this Agreement), and there shall be no liability on the party of the Parties hereunder except as explicitly set forth herein; <u>provided</u>, <u>however</u>, that nothing herein shall relieve any Party from any liability for any breach of this Agreement prior to such termination.

## ARTICLE XII

## DISPUTE RESOLUTION PROCEDURES

Section 12.1  <u>General</u>.  The Dispute Resolution Procedures in this Article XII shall govern any dispute under this Agreement.  The Parties agree that revocation of the Party Releases shall only occur in the event that a Party terminates this Agreement in accordance with Article XI of this Agreement.

Section 12.2 <u>Notice of, and Opportunity to Cure, a Fundamental Default</u>.

(a)     If any Party believes that the FE Non-Debtor Parties have committed a Fundamental Default, that Party must deliver a Default Notice to each of the other Parties within 14 days of learning of the occurrence of the applicable Fundamental Default.  In the event that such Party fails to deliver a Default Notice to each of the other Parties within 14 days of learning of the occurrence of the Fundamental Default, only such Party shall be deemed to have waived such Fundamental Default.

(b)     A Default Notice must:  (i) identify separately and with specificity each and every Fundamental Default of which the non-defaulting Party is aware; (ii) for each Fundamental Default, identify the date on which the non-defaulting Party learned of the default and (iii) for each Fundamental Default, describe the actions that the Party contends would constitute a cure of the identified Fundamental Default.  No Party may deliver a Default Notice regarding a Fundamental Default previously included in a Default Notice delivered by any Party.

(c)     Upon receipt of a Default Notice regarding an alleged Fundamental Default, the FE Non-Debtor Parties shall have the following amounts of time to cure such a default according to the terms of the Default Notice:

(i)     5 business days to cure the failure to pay the Settlement Cash when due pursuant to Section 2.1 of the Agreement;

(ii)     10 business days to cure the failure to issue the New FE Notes pursuant to the terms and conditions set forth in Section 2.4 of the Agreement; <u>provided</u> that such cure period shall be 5 business days with respect to the failure to make the Upfront Payment pursuant to the terms and conditions set forth in Section 2.4 of this Agreement;

(iii)     10 business days to cure the failure to make any undisputed quarterly payment, including any payment related to the reversal of the 2018 Tax Setoff, or any payment related to the filing of the federal tax return under the Tax Allocation Agreement when obligated for the tax year 2018, and any future tax year, if any, during which a Debtor (or its income and losses) is included on the FE Consolidated Tax Group tax return;

(iv)     10 business days to cure any failure to substantially perform under the Amended SSA;

(v)     30 business days to cure taking of the Worthless Stock Deduction in violation of Section 2.3(a)(iii) of the Agreement, the cure for such default being the filing of an amended tax return and the taking of any other necessary action; and

(vi)     45 business days to cure the failure to transfer the rights, title and interests in the Pleasants Power Plant and related assets to the Debtors' estates due to the FE Non-Debtor Parties' breach of the Pleasants Purchase Agreement, as described in Section 3.1 of this Agreement (including the transfer of the beneficial ownership of the

18-50757-amk    Doc 3288-2    FILED 01/04/19    ENTERED 01/04/19 03:05:59    Page 256 of 299
18-50757-amk    Doc 3122-1    FILED 08/20/18    ENTERED 08/20/18 22:45:25    Page 60 of 99

Pleasants Power Plant on the Pleasants Transfer Date through a lease, cost-based power purchase agreement, or other mutually agreed upon arrangement).

(vii)    30 business days to cure all other Fundamental Defaults.

Section 12.3    <u>Plan Effective Date Insufficiency Notice</u>.

(a)    In the event that, after receipt of a Plan Effective Date Notice, the FE Non-Debtor Parties believe, in their reasonable judgment, that the conditions of Section 10.2 of this Agreement will not be met by the proposed Plan Effective Date listed in the Plan Effective Date Notice, the FE Non-Debtor Parties shall provide the other Parties with a Plan Effective Date Insufficiency Notice no later than:  (i) 14 days prior to the proposed Plan Effective Date listed in the Plan Effective Date Notice; or (ii) as soon as practicable if the FE Non-Debtor Parties reach such judgment less than 14 days prior to the proposed Plan Effective Date listed in the Plan Effective Date Notice.

(b)    The Plan Effective Date Insufficiency Notice shall serve as notice that the FE Non-Debtor Parties reasonably believe that they are not required to tender the performance due on the Plan Effective Date pursuant to this Agreement.

(c)    In the event that the FE Non-Debtor Parties deliver a Plan Effective Date Insufficiency Notice that is disputed by the Debtors:  (i) the Parties agree that the Bankruptcy Court will determine whether the conditions contained in Section 10.2 of this Agreement have been satisfied; (ii) the Parties agree that the hearing regarding whether the conditions contained in Section 10.2 of this Agreement shall be scheduled on an expedited basis; and (iii) the Plan Effective Date may not occur until the Bankruptcy Court holds that the conditions contained in Section 10.2 of this Agreement have been satisfied or if the Parties agree that the conditions have been satisfied, <u>provided</u>, <u>that</u>, if the Bankruptcy Court holds that the conditions of Section 10.2 of this Agreement have been satisfied, the Parties will cooperate to schedule the Plan Effective Date with the goal of allowing each Party to perform its obligations due on the Plan Effective Date.

Section 12.4    <u>Resolution of Class A Fundamental Defaults</u>.

(a)    Subject to the exception discussed in Section 12.4(c) of this Agreement, in the event that: (i) a proper Default Notice alleging a Class A Fundamental Default has been served on the Parties and (ii) such Class A Fundamental Default is not cured within the time frame provided in Section 12.2(c) of this Agreement, any Party may file a motion in the Bankruptcy Cases seeking the Bankruptcy Court's determination regarding whether a Class A Fundamental Default as described in the Default Notice has occurred.  The Parties agree that an evidentiary hearing regarding whether a Class A Fundamental Default has occurred shall be scheduled at the Bankruptcy Court's earliest convenience.

(b)    In the event that a Party files a motion pursuant to Section 12.4(a) of this Agreement and the Bankruptcy Court rules that the FE Non-Debtor Parties have committed a Class A Fundamental Default, the Debtors, in consultation with the Committee and the Supporting Parties, or the Committee and/or the Supporting Parties if granted authority to pursue rights and remedies under this Agreement pursuant to Section 12.9 of this Agreement, may either

18-50757-amk    Doc 3283-2    FILED 01/14/19    ENTERED 01/14/19 13:03:05    Page 257 of 299
18-50757-amk    Doc 4224-2    FILED 08/26/19    ENTERED 08/26/19 22:45:25    Page 57 of 99

(i): terminate this Agreement pursuant to Sections 11.3 and 11.4, as applicable, and 11.7; or (ii) seek specific performance of the Class A Fundamental Default. For the avoidance of doubt, nothing herein shall preclude the Debtors from seeking specific performance or any other remedies against the FE Non-Debtor Parties for a Class A Fundamental Default, provided, however, that if the Debtors elect to receive specific performance, and the FE Non-Debtor Parties perform, the Party Releases shall not be revoked.

(c)     Solely in the event that: (i) a Class A Fundamental Default occurs on the Plan Effective Date; (ii) (A) the FE Non-Debtor Parties did not provide a Plan Effective Date Insufficiency Notice pursuant to Section 12.3 of this Agreement prior to the Plan Effective Date, or, (B) if the FE Non-Debtor Parties did provide such notice, the Bankruptcy Court subsequently ruled that the conditions provided in Section 10.2 of this Agreement have been satisfied, and (iii) the FE Non-Debtor Parties either: (x) in the case of (ii)(A) above, do not cure such Class A Fundamental Default within the applicable time frame provided by Section 12.2(c) of this Agreement or such other time as the Bankruptcy Court may order prior to the expiration of applicable the cure period set forth in Section 12.2(c) or (y) in the case of (ii)(B) above, fail to reasonably cooperate in scheduling the Plan Effective Date pursuant to Section 12.3 of this Agreement or perform its obligations due on the mutually agreed upon Plan Effective Date, the Debtors may declare that a Class A Fundamental Default has occurred and, in consultation with the Committee and the Supporting Parties, immediately terminate this Agreement, notwithstanding the provisions of Section 11.7 of this Agreement.

Section 12.5   Resolution of Class B Fundamental Defaults.

(a)     The Parties agree that if the Bankruptcy Court determines that a Class B Fundamental Default has occurred, the Bankruptcy Court must also determine the actions, or set forth a process for determining, payments, or combination thereof that will cure that default.

(b)     In the event that: (i) a proper Default Notice alleging a Class B Fundamental Default is provided to the Parties and (ii) the FE Non-Debtor Parties do not cure such Class B Fundamental Default pursuant to the Default Notice within the time frames provided by Section 12.2(c) of this Agreement, the Party who provided the Default Notice may file a motion in the Bankruptcy Cases for a determination of: (i) whether a Class B Fundamental Default Occurred and (ii) the proper cure of such Class B Fundamental Default. The Parties agree that an evidentiary hearing regarding whether a Class B Fundamental Default has occurred and the proper cure of such Class B Fundamental Default shall be scheduled on an expedited basis, with the goal of having such hearing within 45 days of the expiration of the cure period provided by Section 12.2(c) of this Agreement.

(c)     In the event that a Party files a motion in the Bankruptcy Court pursuant to Section 12.5(b) of this Agreement and the Bankruptcy Court determines: (i) that a Class B Fundamental Default has occurred; and (ii) the proper cure of such Class B Fundamental Default, the FE Non-Debtor Parties shall have ten business days, or such other time deemed reasonable by the Bankruptcy Court, to comply with the Bankruptcy Court's order. In the event that the FE Non-Debtor Parties do not comply with Bankruptcy Court's order within such time frame, the Debtors, in consultation with the Committee and the Supporting Parties, or the Committee and/or the Supporting Parties if granted authority to pursue rights and remedies under

18-50757-amk    Doc 3222-2    FILED 08/26/19    ENTERED 08/26/19 22:49:25    Page 63 of 69

this Agreement pursuant to Section 12.9 of this Agreement, may terminate this Agreement in accordance with Sections 11.3 and 11.4, as applicable, and 11.7.

Section 12.6  <u>Other Defaults</u>.

(a)  If any Party believes that another Party is in default of its obligations under the Agreement, other than a Fundamental Default, that Party must deliver a Default Notice within 21 days of learning of the occurrence of the applicable default.  The Default Notice must: (i) identify separately and with specificity each and every default of which the non-defaulting Party is aware; and (ii) for each default, identify the date on which the non-defaulting Party learned of the default.  In the event that such Party fails to deliver a Default Notice to each of the other Parties within 21 days of learning of the possible occurrence of a default other than a Fundamental Default, only such Party shall be deemed to have waived such default.

(b)  Upon receipt of a Default Notice, the defaulting Party shall have the Cure Period to cure such default through performance of the applicable obligation or covenant.

(c)  If a default identified in a Default Notice is not cured under Section 12.6(b) of this Agreement within the Cure Period, the defaulting Party, the non-defaulting Party who provided the Default Notice and any other non-defaulting Party who chooses to participate shall, for a period of 10 days, engage in good faith discussions and negotiations in an attempt to resolve the default and any disputes related to the Default Notice.  If, after that 10-day period, the defaulting Party and the non-defaulting Party who provided the Default Notice have been unable to reach a resolution, the Party who provided the Default Notice may file a motion in the Bankruptcy Cases for a determination of whether a default as described in the Default Notice has occurred.

Section 12.7  <u>Resolution of Other Defaults</u>.

(a)  The Parties agree that if the Bankruptcy Court determines that a default (other than a Fundamental Default) under the Agreement has occurred, the Bankruptcy Court must also determine the actions, payments, or combination thereof that the Bankruptcy Court finds will cure that default.

(b)  If the Bankruptcy Court enters an order determining that a Party is in default, but not because of a Fundamental Default, of its obligations under the Agreement, the defaulting Party may, in its sole discretion, perform the actions, payments or combination thereof that the Bankruptcy Court finds in such order will cure that default unless such Party obtains a stay pending the Party's appeal of the decision of the Bankruptcy Court.

Section 12.8  <u>Settlement Effective Date, Condition Failure Scenarios, or Adverse Rulings</u>.  Upon the learning of the occurrence or existence of:  (a) the failure of the Debtors to obtain the Settlement Approval Order on or prior to September 28, 2018, pursuant to Section 4.1 of this Agreement, (b) a Condition Failure Scenario, or (c) an Adverse Ruling, the FE Non-Debtor Parties or the Debtors, as applicable, must promptly provide written notice of such occurrence to the other Parties.  Upon receipt of such written notice by all of the applicable Parties, the FE Non-Debtor Parties shall then have 30 days to determine, in their sole discretion, whether (i) to waive the occurrence described in (a), (b), or (c) in the preceding sentence or (ii) to

terminate this Agreement in accordance with Section 11.2 of this Agreement. In the event that the FE Non-Debtor Parties do not terminate this Agreement in accordance with Section 11.2 within 30 days of the receipt of written notice of such occurrence, such occurrence (including all underlying facts and events) will be deemed waived by the FE Non-Debtor Parties for all purposes hereunder; provided, however, that notwithstanding the expiration of the foregoing 30-day period, the FE Non-Debtor Parties shall not be deemed to waive any rights under Section 11.6. For the purposes of this Section 12.8 the Debtors and the FE Non-Debtor Parties agree that they will not take the position that this Section 12.8 is not binding due to the Settlement Approval Order having not been entered.

Section 12.9 <u>Controlling Party</u>. In the event of any dispute between the FE Non-Debtor Parties, on the one hand, and any of the other Parties, on the other hand, subject to the provisions of this Article XII, the Debtors shall have the sole and exclusive right to act on behalf of all Parties other than the FE Non-Debtor Parties for all purposes under this Article XII, including, for the avoidance of doubt, the exercise of rights and remedies against the FE Non-Debtor Parties as set forth in this Article XII; <u>provided</u>, that the Debtors shall consult with the Committee and the Supporting Parties in connection with any such actions, and <u>provided</u>, <u>further</u>, that the Committee and the Supporting Parties may petition the Bankruptcy Court for the right to pursue rights and remedies to the extent the Committee or the Supporting Parties believes that the Debtors are failing to proceed in a commercially reasonable manner in respect of enforcing any rights or remedies under this Agreement; and <u>provided</u>, <u>further</u>, that the Committee and the Supporting Parties may seek relief against the Debtors under the provisions of this Article XII for any defaults by the Debtors under this Agreement.

## ARTICLE XIII

## MISCELLANEOUS

Section 13.1 <u>Relationship of the Parties</u>.

(a) The Parties agree that in performing their obligations hereunder, each shall be considered an independent party, and not the agent, servant, or employee of any other Party.[2]

(b) Nothing contained in this Agreement shall be construed to constitute or create a joint venture, trust, partnership, fiduciary relationship, or other relationship among the Parties for any purpose (including without limitation for any tax purpose) whereby any Party would be liable for the acts and deeds of any other Party.

(c) Nothing contained in this Agreement, including the FE Non-Debtor Parties' payment obligations under Article II hereof, shall create any third party beneficiary rights in any other Person.

---

[2] To be discussed.

Section 13.2  <u>No Admissions</u>.

(a)  The FE Non-Debtor Released Parties deny all charges of wrongdoing or liability with respect to each and all of the Claims, Causes of Action, contentions that were alleged or that could have been alleged by the Debtors their estates or creditors with respect to the various disputes resolved pursuant to this Agreement, and the claims and Causes of Action released pursuant to the terms of this Agreement.

(b)  This Agreement, the fact of its existence, any documents related hereto, the Settlement Approval Order and the FES Plan Documents shall in no event be deemed a presumption, concession, or admission by the FE Non-Debtor Released Parties of (i) any fault, liability, or wrongdoing as to any facts, Claims or contentions that have been or might be alleged or asserted in connection with the various disputes that are the subject of this Agreement and the released Causes of Action or (ii) any infirmity in the defenses that the FE Non-Debtor Released Parties could have asserted, and shall not be interpreted, construed, deemed, invoked, offered, or received in evidence or otherwise used in any manner by any Person, or in any other action or proceeding, whether civil, criminal, or administrative, for any purpose other than to enforce the terms of this Agreement, and for the FE Non-Debtor Released Parties to argue that it has res judicata, collateral estoppel, or other issue or claim preclusion effect.

Section 13.3  <u>Fees and Expenses</u>.  The Parties shall each be responsible for their respective fees and expenses incurred in connection with the negotiation, Execution, and implementation of this Agreement, except to the extent that the Debtors (a) have contracted to pay any Party's expenses pursuant to a separate agreement or (b) are required to pay such expenses under applicable bankruptcy law.  The Parties reserve all rights to seek attorneys' fees pursuant to the Federal Rules of Civil Procedure or applicable law.

Section 13.4  <u>Privilege</u>.  Notwithstanding the language of this Agreement, nothing herein shall be interpreted to require the Parties to waive or to have effectuated a waiver of any claim of attorney-client privilege, attorney work product, or other applicable privilege that may apply to any document or information.

Section 13.5  <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators, and representatives.

Section 13.6  <u>Governing Law; Jurisdiction</u>.  This Agreement will be governed by the laws of the State of Ohio (or federal law, where applicable), without regard to its conflicts of laws principles that would require the law of another jurisdiction to be applied.  For so long as the Bankruptcy Cases remain open, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to disputes arising in connection with the interpretation, implementation, or enforcement of this Agreement.  Each of the Parties irrevocably (a) submits and consents in advance to the exclusive jurisdiction of the Bankruptcy Court solely for the purposes described in the preceding sentence; and (b) waives any objection that such Party may have based upon lack of personal jurisdiction, improper venue, <u>forum</u> <u>non</u> <u>conveniens</u>, or the Bankruptcy Court's lack of subject matter jurisdiction.  After the close of the Bankruptcy Cases, the United States District Court for the Northern District of Ohio shall have exclusive

- 58 -

jurisdiction of all matters arising out of, and related to, disputes arising in connection with the interpretation, implementation, or enforcement of this Agreement, and each of the Parties irrevocably (a) submits and consents in advance to the exclusive jurisdiction of that court solely for the purposes described in this sentence; and (b) waives any objection that such Party may have based upon lack of personal jurisdiction, improper venue, <u>forum non conveniens</u>, or that court's lack of subject matter jurisdiction.

Section 13.7  <u>Entire Agreement</u>.  This Agreement, the exhibits and schedules hereto, and the Settlement Approval Order constitute the complete and entire agreement among the Parties with respect to the matters contained in this Agreement, and supersede all prior agreements, negotiations, and discussions among the Parties with respect thereto.

Section 13.8  <u>Non-Reliance</u>.  Each of the Signatories acknowledges that, in entering into this Agreement, it is not relying upon any representations or warranties made by anyone other than those representations, warranties, terms and provisions expressly set forth in this Agreement, the exhibits and schedules hereto.

Section 13.9  <u>Notices</u>.  Any notice required or desired to be served, given, or delivered under this Agreement shall be in writing, and shall be deemed to have been validly served, given, or delivered if provided by overnight delivery, personal delivery, or upon receipt of e-mail delivery, as follows:

| | | |
|---|---|---|
| (a) | <u>If to the Debtors:</u> | FirstEnergy Solutions Corp.<br>76 S Main Street<br>Akron, OH  44308<br>Attn: Donald Schneider<br>Attn: Rick Giannantonio<br>rgiannantonio@firstenergycorp.com |
| | with a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>Robert S. Strauss Building<br>1333 New Hampshire Avenue, NW<br>Washington, DC  20036-1564<br>Attn: Scott L. Alberino<br>Email:  salberino@akingump.com |
| (b) | <u>If to the FE Non-Debtor Parties:</u> | FirstEnergy Corp.<br>76 S Main Street<br>Akron, OH  44308<br>Attn: Gary Benz<br>Attn: Robert Reffner<br>Email:  rreffner@firstenergycorp.com |
| | with a copy to: | JONES DAY<br>901 Lakeside Avenue<br>Cleveland, OH  44114-1190 |

Attn: Heather Lennox  
Email: hlennox@jonesday.com

(c)    <u>If to the Ad Hoc Noteholders Group</u>:

                    Kramer Levin Naftalis & Frankel  
                    1177 Avenue of the Americas  
                    New York, NY 10036  
                    Attn: Joshua K. Brody  
                    Email: jbrody@kramerlevin.com

(d)    <u>If to the Bruce Mansfield Certificateholders Group</u>:

                    O'Melveny & Myers LLP  
                    Time Square Tower  
                    7 Times Square  
                    New York, NY 10036  
                    Attn: Andrew Parlen  
                    Email: aparlen@omm.com

                            and

                    Latham & Watkins LLP  
                    885 Third Avenue  
                    New York, NY 10022-4834  
                    Attn: George A. Davis  
                    Email: george.davis@lw.com

(e)    <u>If to the Committee</u>:

                    Milbank, Tweed, Hadley & McCloy LLP  
                    28 Liberty Street  
                    New York, NY 10005-1413  
                    Attn: Evan Fleck  
                    Email: efleck@milbank.com

Section 13.10  <u>Specific Performance</u>.  Each Party acknowledges and agrees that the other Parties would be damaged irreparably if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the FE Non-Debtor Parties or the Debtors, as applicable, will be entitled, including pursuant to Sections 6.1(c) and 12.4(b) of this Agreement, as applicable, to obtain an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court or any other court specified in Section 13.6 without the need to post a bond or other security, <u>provided</u>, <u>however</u>, that incidental, consequential, and punitive damages shall not be an available as damages to any Party.

Section 13.11  <u>Amendment; Waiver</u>.  It is expressly understood and agreed that this Agreement, including without limitation the instant section, may not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a writing duly executed by authorized representatives of each of the Parties, and the Parties further acknowledge and agree

- 60 -

that they will make no claim at any time or place that this Agreement has been orally supplemented, modified, or altered in any respect whatsoever. The agreement of the Ad Hoc Noteholders Group and the Bruce Mansfield Certificateholders Group to any alteration, amendment or modification to this Agreement requiring their consent shall be effective upon the written consent of the Requisite Noteholders and the Requisite Certificateholders, respectively. In addition, no failure on the part of any Party to this Agreement to exercise, and no delay on its part in exercising, any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.

Section 13.12  <u>Representation by Counsel</u>.  Each Signatory acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Signatory with a defense to the enforcement of the terms of this Agreement against such Signatory based upon lack of legal counsel shall have no application and is expressly waived.

Section 13.13  <u>Interpretation</u>.  This Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

Section 13.14  <u>Counterparts</u>.  This Agreement may be Executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an Executed signature page of this Agreement by facsimile or other electronic means shall be as effective as delivery of a manually Executed signature page of this Agreement.

[<i>Remainder of page is intentionally blank</i>]

IN WITNESS WHEREOF, the Signatories hereto have Executed this Agreement on the day and year listed below.

**FirstEnergy Solutions Corp.**, on behalf of itself and its direct and indirect subsidiaries.

By: _____

Its:   VP, FES Chief Financial Officer, Treasurer & Corporate Secretary

Date:  August 24, 2018

**FirstEnergy Nuclear Operating Company**

By: _____

Its:   VP, FES Chief Financial Officer, Treasurer & Corporate Secretary

Date:  August 24, 2018

**FirstEnergy Corp.**, on behalf of itself and its direct and indirect non-Debtor subsidiaries.

By: _____

Its: _____

Date: _____

[*Additional Signature Pages to Follow*]

IN WITNESS WHEREOF, the Signatories hereto have Executed this Agreement on the day and year listed below.

**FirstEnergy Solutions Corp.**, on behalf of itself and its direct and indirect subsidiaries.

By: _____

Its: _____

Date: _____

**FirstEnergy Nuclear Operating Company**

By: _____

Its: _____

Date: _____

**FirstEnergy Corp.**, on behalf of itself and its direct and indirect non-Debtor subsidiaries.

By: _____

Its:     Vice President and Treasurer

Date:   August 24, 2018

[*Additional Signature Pages to Follow*]

ACKNOWLEDGED AND AGREED:

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF FIRSTENERGY SOLUTIONS
CORP. *ET AL.*, by its Co-Chairs

BNSF Railway Company

By: _____

    Name:   Munsoor Hussain
    Title:    Assistant General Tax Counsel


WILMINGTON SAVINGS FUND SOCIETY, FSB,
in its capacity as the indenture trustee for the lessor
notes issued under six indentures with Mansfield
2007 Trusts A-F and its capacity as pass through
trustee under the pass through trust agreement with
FirstEnergy Generation, LLC and FirstEnergy
Solutions Corp. for the pass through certificates
issued in connection with the sale-leaseback
transaction for Unit I of the Bruce Mansfield Plant


By: _____

    Name:  Patrick J. Healy
    Title:   Senior Vice President and Director

ACKNOWLEDGED AND AGREED:


OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF FIRSTENERGY SOLUTIONS
CORP. *ET AL.*, by its Co-Chairs


BNSF Railway Company


By: _____
       Name:    Munsoor Hussain
       Title:     Assistant General Tax Counsel


WILMINGTON SAVINGS FUND SOCIETY, FSB,
in its capacity as the indenture trustee for the lessor
notes issued under six indentures with Mansfield
2007 Trusts A-F and its capacity as pass through
trustee under the pass through trust agreement with
FirstEnergy Generation, LLC and FirstEnergy
Solutions Corp. for the pass through certificates
issued in connection with the sale-leaseback
transaction for Unit I of the Bruce Mansfield Plant


By: _____
    Name: Patrick J. Healy
    Title:  Senior Vice President and Director

Avenue Capital Management II L.P.

BY: its General Partner, Avenue Capital
Management II GenPar, LLC and on
behalf of funds it manages

By: _____
Name:
Title:
Date:

Notice Address:

Attn: Stephen Burnazian
Email: sburnazian@avenuecapital.com

With a copy to:

**FIDELITY ADVISOR SERIES I:  Fidelity Advisor Balanced Fund – High Grade Sub**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _____

Name:  MARCOS SPECTOR

Title:  DEPUTY TREASURER

Notice Address:     245 Summer Street
                              Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIDELITY ADVISOR SERIES II:  Fidelity Advisor Limited Term Bond Fund**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity
as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _____

Name: MARCUS SPECTOR

Title: DEPUTY TREASURER

Notice Address:          245 Summer Street
                         Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIDELITY CENTRAL INVESTMENT PORTFOLIOS II LLC:  Fidelity Investment Grade Bond Central Fund**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _____
Name:  MARCUS SPECTOR
Title:  DEPUTY TREASURER

Notice Address:  245 Summer Street
Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH 03054
christine.ayotte-brennan@fmr.com

**FIDELITY GARRISON STREET TRUST:  Fidelity Variable Insurance Products
Investment Grade Central Fund**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity
as Investment Advisor, Sub –Advisor or as otherwise authorized


By: _____
Name:   MARCUS SPECTOR
Title:   DEPUTY TREASURER


Notice Address:          245 Summer Street
                         Boston, MA 02210


With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIDELITY INCOME FUND: Fidelity Total Bond Fund – High Grade Sub**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _____

Name: MARCUS SPECTOR

Title: DEPUTY TREASURER

Notice Address:     245 Summer Street
Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH 03054
christine.ayotte-brennan@fmr.com

**FIDELITY PURITAN TRUST: Fidelity Balanced Fund – High Grade Sub**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _Marcus Spector_
Name: MARCUS SPECTOR
Title: DEPUTY TREASURER

Notice Address:       245 Summer Street
                      Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIDELITY PURITAN TRUST: Fidelity Puritan Fund – High Grade Sub**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _Marcus Spector_
Name: Marcus Spector
Title: Deputy Treasurer

Notice Address: 245 Summer Street
Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH 03054
christine.ayotte-brennan@fmr.com

**FIDELITY SALEM STREET TRUST: Fidelity Investment Grade Bond Fund**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _____
Name: MARCUS SPECTOR
Title: DEPUTY TREASURER

Notice Address:      245 Summer Street
                          Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIDELITY SALEM STREET TRUST: Fidelity Series Investment Grade Bond Fund –
Investment Grade Subportfolio**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity
as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _____
Name: MARCUS SPECTOR
Title: DEPUTY TREASURER

Notice Address:     245 Summer Street
                    Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIDELITY U.S. BOND INVESTMENT TRUST**

By: FIDELITY INVESTMENTS MONEY MANAGEMENT, INC., solely in its capacity as Investment Advisor, Sub –Advisor or as otherwise authorized

By: _Marcus Spector_
Name: MARCOS SPECTOR
Title: DEPUTY TREASURER

Notice Address:      245 Summer Street
                     Boston, MA 02210

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**ALLIANZ VARIABLE INSURANCE PRODUCTS TRUST – AZL Pyramis Total Bond Fund – Core Sub Account**

By: FIAM LLC, solely in its capacity as Investment Advisor, Sub –Advisor, Attorney-in-Fact or as otherwise authorized

By: _(signature)_
Name: Daniel Campbell
Title: VP

Notice Address:     900 Salem Street
                       Smithfield, RI 02917

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH 03054
christine.ayotte-brennan@fmr.com

**ALLIANZ VARIABLE INSURANCE PRODUCTS TRUST – AZL Pyramis Multi-Strategy Fund – Core Sub Account**

By: FIAM LLC, solely in its capacity as Investment Advisor, Sub –Advisor, Attorney-in-Fact or as otherwise authorized

By: _Dan S_____

Name: Daniel Campbell

Title: VP

Notice Address:      900 Salem Street
                     Smithfield, RI 02917

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIAM BROAD MARKET DURATION FUND, LLC**

By: FIAM LLC, solely in its capacity as Investment Advisor, Sub –Advisor, Attorney-in-Fact or as otherwise authorized


By: _Danl S___
Name: Daniel Campbell
Title: VP


Notice Address:  900 Salem Street
Smithfield, RI 02917


With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH 03054
christine.ayotte-brennan@fmr.com

**FIDELITY RUTLAND SQUARE TRUST II: – Strategic Advisers Core Income Fund –
FIAM Core Investment Grade Subportfolio**

By: FIAM LLC, solely in its capacity as Investment Advisor, Sub –Advisor, Attorney-in-Fact or as otherwise authorized

By: _Daniel Campbell_
Name: Daniel Campbell
Title: VP

Notice Address:          900 Salem Street
                         Smithfield, RI 02917

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

**FIAM GROUP TRUST FOR EMPLOYEE BENEFIT PLANS: – FIAM Broad Market Duration Commingled Pool**

By: FIDELITY INSTITUTIONAL ASSET MANAGEMENT TRUST COMPANY, solely in its capacity as Trustee, Investment Advisor, Attorney-In-Fact or otherwise authorized

By: _____

Name: Daniel Campbell

Title: VP

Notice Address:  900 Salem Street
       Smithfield, RI 02917

With a copy to:
Christine Ayotte-Brennan
Fidelity Investments, Fixed Income Legal
One Spartan Way, TS2T
Merrimack, NH  03054
christine.ayotte-brennan@fmr.com

Nuveen Asset Management, LLC, as
  investment adviser on behalf of certain
  fund/s accounts, severally and not jointly.

By: _____

Name: Stuart J. Cohen
Title: Managing Director + Head of legal
Date: 8/22/18

Notice Address:

Nuveen Asset Management, LLC
333 W Wacker Drive
Chicago IL 60606
Attn: Legal Dept

With a copy to:
Nuveen Asset Management, LLC
333 W Wacker Drive
Chicago IL 60606
Attn: Doug Johnston

FE Settlement Agreement Signature Page

USAA  Asset Management

By: _John P. Tooley_____

Name:   John Tooley
Title:   VP
Date:   08/22/2018

Notice Address:
USAA
A03E
9800 Fredericksburg Rd
San Antonio, TX  78288
Attn:  Hal Candland, Tim Caffrey
Email:  hal.candland@usaa.com, timothy.caffrey@usaa.com

P. Schoenfeld Asset Management LP

BY: P. Schoenfeld Asset Management
LP on behalf of certain funds and
accounts, solely in their capacity
as a holder of Bruce Mansfield
Certificate Claims

By: _____

Name:   Alan Chan
Title:   CCO and Counsel
Date:

| | |
|---|---|
| Notice Address: | P. Schoenfeld Asset Management LP |
| | 1350 Avenue of the Americas, 21st Floor |
| | New York, NY 10013 |
| Attn: | Philip E. Brown |
| Email: | pbrown@psam.com |
| With a copy to: | achan@psam.com |

**THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY** on its own behalf and on behalf of its Group Annuity Separate Account

BY: **THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY**, solely in its capacity as a holder of Bruce Mansfield Certificate Claims

APPROVED
Law Dept.

By: _____
Name:   Ramona Rogers-Windsor
Title:    Authorized Representative
Date:

Notice Address:  720 East Wisconsin Avenue
                 Milwaukee, Wisconsin 53202

Attn:  Ramona Rogers-Windsor
Email:  rrogerswindsor@northwesternmutual.com

With a copy to:  Anne Brower
                 annebrower@northwesternmutual.com

CITADEL EQUITY FUND LTD.

BY: Citadel Advisors LLC, its Portfolio
Manager, solely in its capacity as
a holder of Bruce Mansfield
Certificate Claims

By: _____

Name: MICHAEL WEINER
Title: Authorized Signatory
Date: august 23, 2018

Notice Address: c/o Citadel Enterprise Americas
131 South Dearborn Street
Chicago, Illinois 60603

Attn: Legal Department
Email: CitadelAgreementNotice@citadel.com

LEGAL & GENERAL INVESTMENT
MANAGEMENT AMERICA, INC., on
behalf of certain holders of Bruce Mansfield
Certificate Claims

By: _____

Name: Lawrence J. Griffin
Title: General Counsel / CCO
Date: 08/23/2018

Notice Address:

Legal & General Investment Management America, Inc.
71 S. Wacker Drive
Suite 800
Chicago, Illinois 60606
Attn: Legal Department
Email: legallgima@lgima.com

**LOOMIS, SAYLES & COMPANY, L.P.**, as investment manager,
on behalf of one or more discretionary accounts holding Bruce Mansfield Certificate Claims,
solely in their respective capacities as holders of Bruce Mansfield Certificate Claims

By: Loomis, Sayles & Company, Incorporated
Its General Partner

By: _____

Name:  Thomas H. Day

Title:    Assistant General Counsel

Date:

Notice Address:


Attn: Colin Wilson Murphy
Email: cwilsonmurphy@loomissayles.com

With a copy to:

VR Global Partners, L.P.

BY:   VR Global Partners, L.P., solely in its capacity as a holder
of Bruce Mansfield Certificate Claims

By: _____
Name:Emile du Toit
Title: Authorized signatory
Date: August 23, 2018

Notice Address:

Niddry Lodge, 51 Holland Street, First Floor, London, W8 7JB, UK

Attn: Operations
Email: backoffice@vr-capital.com

Serengeti Asset Management, LP, on
behalf of its managed funds,
solely in their capacity as holders
of Bruce Mansfield Certificate
Claims

By: _____

Name:   Marc Baum
Title:   Director
Date:   August 23, 2018

Notice Address:      Serengeti Asset Management, LP
                     632 Broadway
                     New York, NY 10012


Attn:               Marc Baum
Email:              mbaum@serengeti-am.com

With a copy to:     A.J. Martinez
                    ajmartinez@serengeti-am.com

# EXHIBIT A

## AGREED TERMS OF RESOLUTION OF MANSFIELD IT CLAIMS

The ad hoc group of holders of the 6.85% pass-through certificates (the "Mansfield Certificateholders Group") issued in connection with the Bruce Mansfield Unit 1 leveraged lease transaction (the "Leveraged Lease Transaction") and the ad hoc group of holders of pollution control and corporate notes (the "Ad Hoc Noteholder Group" and, together with the Mansfield Certificateholders Group, the "Parties") hereby agree to support a resolution of Claims (the "Mansfield IT Claims") held by Wilmington Savings Fund Society, FSB in its capacity as lease indenture trustees under the Bruce Mansfield leveraged lease documents (the "Mansfield ITs") on the terms set forth herein, subject to acceptable documentation in definitive agreements. This agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties, and is protected by Federal Rule of Evidence 408 and all other applicable statutes or doctrines protecting the use or disclosure of confidential settlement discussions.

- **Treatment of the Undivided Interest**:  In consideration of the treatment of the Mansfield IT Claims set forth herein, the following property shall be deemed and treated as unencumbered property of the Debtors' estates:  (a) the 93.825% undivided interest in Unit 1 of the Bruce Mansfield Facility that is the subject of the Leveraged Lease Transaction and (b) any and all insurance proceeds to which the Mansfield ITs might otherwise be entitled on account of its rights under the Leveraged Lease Transaction.

- **Claim Amount**:  The Mansfield IT Claims will be allowed in the amount of $786,763,400, i.e., the outstanding amount of principal and accrued interest on the pass-through certificates as of the petition date (the "Allowed Mansfield IT Claims").

- **Liable Debtors and Priority**:  The Allowed Mansfield IT Claims will be allowed as unsecured Claims against each of FirstEnergy Generation Mansfield Unit 1 Corp. ("BMU1C"), FirstEnergy Generation, LLC ("FG"), FirstEnergy Nuclear Generation, LLC ("NG"), and FirstEnergy Solutions Corp. ("FES"), as unsecured Claims.

- **Support Obligations**:  The proposal set forth herein shall be incorporated into a chapter 11 plan and/or settlement pursuant to Bankruptcy Rule 9019, in each case reasonably acceptable to the Parties and the Mansfield ITs (such a plan or settlement, including all exhibits and supplements thereto, an "Acceptable Plan").  The Parties shall use best efforts to negotiate, and cause the Debtors and the Official Committee of Unsecured Creditors (the "UCC") appointed in the Debtors' cases to become party to, a restructuring support agreement (the "RSA") pursuant to which the Parties, the Debtors, and the UCC agree to support confirmation or approval of such Acceptable Plan, subject to the terms and conditions set forth in the RSA.

- **Sharing of BMU1C Recovery**:  The Parties agree that any recovery to the Mansfield ITs on account of the Mansfield IT Claims against BMU1C shall be shared *pro rata* by the Mansfield ITs and the holders of unsecured pollution control notes and FES

corporate bonds, based on the proportion that the allowed amounts of each of the Mansfield IT Claims (as allowed pursuant hereto), on the one hand, and unsecured pollution control notes and FES corporate bonds, on the other, in each case against FES, bear to the aggregate allowed amount of Mansfield IT Claims, unsecured pollution control notes, and FES corporate bonds at FES.

- **Treatment of Secured PCN Claims:** The Parties agree that to the extent that an Acceptable Plan includes a chapter 11 plan of reorganization that includes the continued ownership by the reorganized Debtors of the generating assets of FG and/or NG, the PCNs secured by such assets shall be paid in full (which payment may be in the form of replacement notes or reinstatement of the PCNs). The Parties shall work in good faith to incorporate into an Acceptable Plan mutually agreeable terms consistent with this provision.

- **Litigation Standstill:** The Parties agree that upon the effectiveness of the RSA, the parties thereto shall cease and desist from any and all ongoing litigation activities, including activities contemplated by the Mansfield Issues Protocol, with respect to the allowance and priority status of the Mansfield IT Claims, except to the extent the Mansfield IT Claims are the subject of an objection or other litigation at such time or thereafter.

- **Capital Support**: The Parties agree that any capital or credit support for regulatory obligations required in respect of the nuclear assets owned by NG shall, to the extent not required or used for such purpose, be made available for distribution to the Debtors' existing unsecured creditors (whether or not such distribution occurs prior to, upon, or after the Debtors' emergence from chapter 11). The Parties shall work in good faith to incorporate into an Acceptable Plan mutually agreeable terms consistent with this provision.

- **Coordination**: The Mansfield Certificateholders Group and Ad Hoc Noteholder Group agree to reasonably cooperate and coordinate in negotiations with the Debtors and the Committee on all material issues concerning the Debtors' restructuring, including, without limitation, pursuit of a chapter 11 plan, material asset sales, exit financing, Claims resolution, and valuation matters

## SCHEDULE

| Date | Description |
|---|---|
| June 1, 2018 | Deadline to file Mansfield Parties' proofs of Claims concerning rejection of the Rejected Operative Documents |
| August 24, 2018 | Deadline to substantially complete priority document discovery (it being understood that all Parties will produce responsive materials on a rolling basis in advance of such date as provided in paragraph 12 of this Stipulation and Protocol) |
| September 28, 2018 | Deadline for Debtors to file the Mansfield Adversary Proceeding Complaint, if necessary in light of the Proposed Mansfield IT Claims Settlement<br><br>Deadline to file objection(s) to the Mansfield Parties' proofs of Claim,[3] if necessary in light of the Proposed Mansfield IT Claims Settlement |
| October 12, 2018 | Fact witness depositions commence. Deposition notices or subpoenas to be served not fewer than 14 days before deposition date. |
| December 12, 2018 | Deadline to complete fact discovery |
| February 14, 2019 | Deadline to complete expert discovery.[4] |
| February 15, 2019 | Deadline for commencement of mediation with respect to the Mansfield Claims and the Mansfield Adversary Proceeding. |
| March 15, 2019 | Mediation terminates, subject to reasonable extension by the Mediator |

---

[3] With the exception of MetLife's proofs of Claim, as provided in footnote 3 and Exhibit 4

[4] The Parties shall meet and confer on or before December 31, 2018, and shall work in good faith effort to agree upon a schedule for identification of experts, submission of expert reports, and expert depositions.

| Date | Description |
|------|-------------|
| March 29, 2019, or two weeks after termination of the Mediation, whichever is later. | In the event that mediation does not result in a resolution of the Mansfield Claims and the Mansfield Adversary Proceeding, deadline for the Parties to jointly propose to the Bankruptcy Court a schedule for additional expert discovery, applicable briefing, and hearing.<br><br>In the event that the Parties, after good faith efforts, cannot reach agreement on one or more aspects of the schedule, the Parties shall seek the Bankruptcy Court's assistance via preliminary conference or other mechanism. |

**Exhibit C**
**FE Non-Debtor Parties**

| FE Non-Debtor Parties | |
|---|---|

AE Supply Renaissance Southwest, LLC

AET Path Company, LLC

Allegheny Energy Service Corporation
Allegheny Energy Supply Company, LLC
Allegheny Energy Supply Renaissance, LLC

Allegheny Generating Company

Allegheny Pittsburgh Coal Company

Allegheny Ventures Inc.
American Transmission Systems, Incorporated
Bay Shore Power Company

Buchanan Energy Company of Virginia, LLC

CEI Funding LLC

FELHC, Inc.

FirstEnergy Corp.

FirstEnergy Fiber Holdings Corp.

FirstEnergy Foundation

FirstEnergy Properties, Inc.

FirstEnergy Service Company
FirstEnergy Transmission, LLC
GPU Nuclear, Inc.
Green Valley Hydro, LLC
Imperio, LLC
JCP&L Transition Funding LLC
JCP&L Transition Funding II LLC
Jersey Central Power & Light Company
Metropolitan Edison Company
Mid-Atlantic Interstate Transmission, LLC
Monongahela Power Company
MP Environmental Funding LLC MP Renaissance Funding, LLC

OE Funding LLC

OES Ventures, Incorporated

Ohio Edison Company
PATH - Allegheny Land Acquisition Company
PATH Allegheny Maryland Transmission
   Company, LLC
Path Allegheny Transmission Company, LLC

Path Allegheny Virginia Transmission Corporation

PATH West Virginia Transmission Company, LLC
PE Environmental Funding LLC
PE Renaissance Funding, LLC

Pennsylvania Electric Company

Pennsylvania Power Company

Potomac-Appalachian Transmission Highline, LLC

Suvon, LLC

TE Funding LLC

The Cleveland Electric Illuminating Company

The Potomac Edison Company

The Toledo Edison Company
The Waverly Electric Light and Power Company
The West Virginia Power and Transmission Company
Trans-Allegheny Interstate Line Company
Warrenton River Terminal, Ltd.
West Penn Power Company
West Penn Southwest, LLC

Plan – Ex. C