UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| In re: | Chapter 11 |
| FIRSTENERGY SOLUTIONS CORP., et al.,[1] | Case No. 18-50757 |
| Debtors. | (Jointly Administered) |
| | Hon. Judge Alan M. Koschik |

**USEC'S JOINT BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT BY USEC AND IN OPPOSITION TO PARTIAL SUMMARY JUDGMENT BY THE DEBTORS[2]**

**BRENNAN, MANNA & DIAMOND, LLC**
75 East Market Street
Akron, Ohio 44308

and

**O'MELVENY & MYERS LLP**
400 South Hope Street
Los Angeles, CA 90071-2899

7 Times Square
New York, New York 10036

*Attorneys for United States Enrichment Corporation
and Creditors American Centrifuge Enrichment, LLC*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  FE Aircraft Leasing Corp. (9245), case no. 18-50759; FirstEnergy Generation, LLC (0561), case no. 18-50762; FirstEnergy Generation Mansfield Unit 1 Corp. (5914), case no. 18-50763; FirstEnergy Nuclear Generation, LLC (6394), case no. 18-50760; FirstEnergy Nuclear Operating Company (1483), case no. 18-50761; FirstEnergy Solutions Corp. (0186), case no. 18-50757; and Norton Energy Storage L.L.C. (6928), case no. 18-50764.  The Debtors' address is: 341 White Pond Dr., Akron, OH 44320.

[2]   United States Enrichment Corporation and its affiliate, American Centrifuge Enrichment LLC (collectively "USEC").

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................................. 1

BACKGROUND FACTS ..................................................................................... 5

 I.  The Supply Agreement. .................................................................. 5

 II.  FES and FG issued blanket Guaranties. ........................................ 8

 III. Treatment of the Supply Agreement obligations  in the Debtors' financial statements ................................................................................. 10

ARGUMENT ................................................................................................. 11

 I.  USEC IS ENTITLED TO SUMMARY JUDGMENT BASED ON THE PLAIN MEANING OF THE GUARANTIES AND THE SUPPLY AGREEMENT. ............................................................................ 11

 II.  THE DEBTORS ARE NOT ENTITLED TO SUMMARY JUDGMENT ......... 13

 III. THE GUARANTEED OBLIGATIONS ARE NOT LIMITED  TO "OBLIGATIONS FOR BORROWED MONEY," AND DO  NOT EXCLUDE THE SUPPLY AGREEMENT ....................................... 15

   A.  The Guaranties cover the "deferred purchase price for property or services" separately from "obligations for borrowed money." ............... 15

   B.  A recital cannot modify or supplement the operative  terms of the Guaranties, as Debtors seek to do. ........................................... 19

   C.  In any event, USEC extended credit/financing to the Debtors through the Supply Agreement. ............................................. 21

 IV.  THERE IS NO "DELIVERY/TITLE" CONDITION IN THE GUARANTIES. .......................................................................... 24

   A.  The Guaranties' operative terms contradict the Debtors' delivery/title theory. ................................................................ 24

   B.  The Debtors' proposed test disregards the fact that the Guaranties and the Supply Agreement include services in addition to property (goods). ........................................................... 25

   C.  USEC provided advance benefits to the Debtors in exchange  for deferred payments. ................................................................. 26

 V.  THE SUPPLY AGREEMENT OBLIGATIONS ARE NOT "TRADE ACCOUNTS PAYABLE INCURRED IN THE ORDINARY COURSE OF BUSINESS." .......................................................................... 30

   A.  Accounting and finance concepts establish that USEC's claims under  the Supply Agreement are not "trade accounts payable." ........... 31

   B.  The Debtors ignore USEC's actual claims. ............................ 33

   C.  The Debtors' own financial statements disprove their position .............. 34

# TABLE OF CONTENTS
### (continued)

D.    Purchase orders are ministerial and do not create the underlying obligations..................................................................................... 36

E.    USEC's claims are not ordinary course liabilities. .................................. 37

F.    In the alternative, USEC should be allowed to conduct discovery and present a full record........................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AB Green Gansevoort, LLC v. Peter Scalamandre & Sons, Inc.*,
    102 A.D.3d 425 (N.Y. App. Div. 2013) ................................................. 18

*Abraham Zion Corp. v. Lebow*,
    761 F.2d 93 (2d Cir. 1985) ................................................................... 19

*Andersen v. Weinroth*,
    48 A.D.3d 121 (N.Y. App. Div. 2007) ................................................. 19

*BP Prod. N. Am. Inc. v. Merritt Oil Co.*,
    812 F. Supp. 2d 1297 (S.D. Ala. 2011) ............................................... 17

*BT Commercial Corp. v Blum*,
    175 A.D.2d 43 (N.Y. App. Div. 1991) ................................................. 13

*Cent. Budget Corp. v. Blackett*,
    349 N.Y.S.2d 577 (N.Y. Civ. Ct. 1973) .............................................. 28

*Cheng v. Modansky Leasing Co.*,
    73 N.Y.2d 454 (1989) .......................................................................... 13

*Chevron U.S.A. v. Natural Res. Defense Council, Inc.*,
    467 U.S. 837 (1984) ............................................................................ 25

*County of Columbia v. Continental Ins. Co.*,
    612 N.Y.S. 2d 345 (1994) ................................................................... 14

*Cranesville Block Co. v. Goodyear Tire & Rubber Co.*,
    208 A.D.2d 1157 (N.Y. App. Div. 1994) ............................................. 29

*Credit Lyonnais v. Getty Square Assocs.*,
    876 F. Supp. 517 (S.D.N.Y. 1995) ...................................................... 19

*Ellington v. EMI Music, Inc.*,
    24 N.Y.3d 239 (2014) .......................................................................... 14

*Gen. Hartford, Inc. v. Tax Comm'r*,
    423 A.2d 869 (Conn 1979) .................................................................. 31

*Grand Manor Health Related Facility, Inc. v. Hamilton Equities Inc.*,
    65 A.D.3d 445 (N.Y. App. Div. 2009) ................................................. 19

*Hartford Ins. Co. v. Halt*,
   223 A.D.2d 204 (N.Y. App. Div. 1996) ................................................. 14

*Herbil Holding Co. v. Commonwealth Land Title Ins. Co.*,
   183 A.D.2d 219 (N.Y. App. Div. 1992) ....................................... 13, 20, 30

*IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*,
   170 Misc. 2d 15, 647 N.Y.S.2d 322 (1996) ............................................. 19

*In re S. Side House, LLC*,
   470 B.R. 659 (E.D.N.Y. 2012) ............................................................... 13

*John P. Saad & Sons v. Nashville Thermal Transfer Corp.*,
   1985 Tenn. App. LEXIS 2864 (Tenn. Ct. App. May 8, 1985) ................. 29

*Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*,
   2 N.Y.3d 495 (2004) .............................................................................. 13

*Martin Ankeny Corp. v. CTB Midwest, Inc.*, Civ. No. 14-00516 (SMR) (HCA),
   2015 WL 11112557 (S.D. Iowa Sept. 3, 2015) ..................................... 28

*Mazzola v. Suffolk*,
   143 A.D.2d 734 (N.Y. App. Div. 1988) ................................................. 14

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*,
   30 N.Y.3d 572 (2017) ............................................................................ 24

*R/S Assoc. v. New York Job Dev. Author.*,
   744 N.Y.S. 2d 358 (2002) ...................................................................... 14

*Richner Comm., Inc. v. Tower Ins. Co. of New York*,
   72 A.D.3d 670 (N.Y. App. Div. 2010) ................................................... 14

*Ross v. Ross*,
   233 A.D. 626 (N.Y. App. Div. 1931) ..................................................... 19

*S.E.C. v. Credit Bancorp, Ltd.*,
   109 F. Supp. 2d 142 (S.D.N.Y. 2000) .................................................... 17

*Sayers v. Rochester Tel. Corp. Supplemental Pension Plan*,
   7 F.3d 1091 (2d Cir. 1993) .................................................................... 14

*Sherwin-Williams Co. v. TMZ Enters.*,
   Civ. No. 15-8409 (BRM) (LHG), 2017 U.S. Dist. LEXIS 150917 (D.N.J. Sept. 18, 2017).... 29

18-50757-amk    Doc 3669    FILED 01/31/20    ENTERED 01/31/20 22:46:29    Page 5 of 46

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.,*
    353 F.2d 946 (2d Cir. 1965) ........................................................ 14

*United States v. Eurodif S. A.,*
    555 U.S. 305 (2009) ........................................................ 11, 24

**Statutes**

11 U.S.C. § 365(g)(1) ........................................................ 6

11 U.S.C. § 365(g) ........................................................ 21

NYCL § 2-610(b)-(c) ........................................................ 36

NYCL § 2-703 ........................................................ 24

NYCL § 2-704 ........................................................ 26

NYCL § 2-706(1) ........................................................ 26

NYCL § 2-708(1) ........................................................ 25

NYCL § 2-708(2) ........................................................ 25, 41

NYCL § 2-709(1)(b) ........................................................ 25

NYCL § 2-709(3) ........................................................ 25

NYCL § 2-723(1) ........................................................ 25, 32

NYCL § 2-724 ........................................................ 33

UCC § 2-610 ........................................................ 38

UCC § 2-709(1)(b) ........................................................ 42

**SUMMARY OF ARGUMENT**

1.      In 2009, American Centrifuge Enrichment, LLC ("ACE") entered a long-term Enriched Uranium Supply Agreement (as amended, the "Supply Agreement") with two of the Debtors, FirstEnergy Nuclear Operating Company ("FENOC") and FirstEnergy Nuclear Generation ("NG").  Rights to the Supply Agreement were assigned to ACE's affiliate, United States Enrichment Corporation.[3]  The Debtors rejected the Supply Agreement and USEC filed proofs of claim seeking recovery for the remaining unpaid purchase price for years 2018 through 2027 as rejection damages.

2.      Before executing the Supply Agreement, the other two Debtors, FirstEnergy Generation Corp. ("FG") and FirstEnergy Solutions Corp. ("FES") issued public, blanket guaranties of "all obligations" NG incurred for the "deferred purchase price of property or services, excluding trade accounts payable incurred in the ordinary course of business."  Based on the uncontested facts and the plain meaning of the agreements, the Guaranties cover obligations under the Supply Agreement, and USEC is entitled to summary judgment.

3.      To be covered by the Guaranties, the Supply Agreement need only satisfy four requirements.  It must be (i) an <u>obligation</u>**,** (ii) for the <u>deferred purchase price</u>; (iii) of <u>property or services</u>; (iv) that is <u>not a trade account payable</u> incurred in the ordinary course of business.  Each of these tests is easily satisfied by the Supply Agreement.  Upon execution, the Supply Agreement created an "obligation" for the required sums owed for years 2018 through 2027, as reflected in the Supply Agreement and confirmed by the consolidated financial statements filed

---

[3]     Subject to confidentiality agreements, the Supply Agreement and amendments will be submitted separately by the Parties.  References herein to "USEC" shall refer to both ACE and United States Enrichment Corporation.

with the Securities and Exchange Commission ("SEC") by FES and FirstEnergy Corp.[4] It was for "property or services" in the form of enrichment services (also referred to as "SWU") and associated low enriched uranium ("LEU"), as confirmed by the Supply Agreement and United States Supreme Court precedent. Payment of this obligation was "deferred," first to 2015 and then over the life of the contract through 2027, as reflected in the Supply Agreement and confirmed by the financial statements filed by FirstEnergy Corp. and FirstEnergy Solutions Corp. with SEC. The payment obligations underlying the claims asserted by USEC for years 2018 through 2027 are not and were never "trade accounts payable" at any relevant time, measured from the inception of the contract through the petition date.

4.      Notwithstanding the express terms of the Guaranties, the Debtors seek summary judgment on several baseless defenses. The Debtors' defenses contradict multiple provisions of the Guaranties, applicable law, and their own financial statements.

5.      <u>First</u>, the Debtors assert that a disjunctive list of Guaranteed Obligations including "all obligations" for the "deferred purchase price of property or services" is limited to a single item: loans for "borrowed money." But loans for "borrowed money" are an entirely different member of the list. The Debtors attempt to argue that the use of the title "Genco Indebtedness" somehow restricts the Guaranties' coverage to loans for borrowed money. That is wrong, as the Guaranties also expressly cover "all obligations" for the deferred purchase price, and the Debtors' financial statements treat the Supply Agreement as a "firm obligation." Moreover, the

---

[4]     FirstEnergy Corp. is not a debtor in this proceeding. For convenience, the term "Debtors" is used to refer to Debtors individually or together, as the context requires. Because the financial statements of all four of the Debtors, FES, FENOC, FG, and NG are consolidated, references to Debtors in connection with these financial statements herein should be deemed to refer to all four Debtors, while references to Debtors in connection with the Supply Agreement should be deemed to refer to FENOC and NG as obligors, and FES and FG as guarantors.

word "indebtedness" is not defined in the Guaranties and is a synonym for "obligations" in both common usage and throughout the Guaranties. If there were any doubt, it is resolved by Section 2(i)(f) of the Guaranties, which cross-references the entire list of covered items (including "deferred purchase price of property or services") as the "indebtedness <u>or obligations</u>. . . of the kinds referred to above." Thus, being an "obligation" suffices for coverage.

6. <u>Second</u>, the Debtors rely on a recital to assert that the purpose of the Guaranties is to foster "credit" and "financing," but under New York law recitals are not operative provisions, cannot restrict or supplement operative provisions, and may not be considered unless the operative provisions are ambiguous (which is fatal to their motion). And since New York law mandates that any ambiguity must be "most strongly" construed against the Debtors as the sole drafters of the Guaranties, a single recital cannot save them even in the case of ambiguity.

7. But even if the Guaranties required extending "credit," or "financing" as an unstated condition, the Supply Agreement so qualifies by providing multiple economic benefits to the Debtors in advance of payment related to goods (LEU) and services (enrichment and hedging/financial). Because the Supply Agreement locked in rates over the life of the agreement, it is among other things a hedging arrangement known as a "forward contract." It provided the Debtors with an immediate financial benefit by reducing their nuclear fuel commodity exposure. Moreover, the Supply Agreement provided the Debtors with rights to many years' worth of LEU and associated enrichment services. USEC used its own credit to secure these benefits for the Debtors, entering one or more binding contracts with its own third party suppliers, which the Debtors expressly acknowledged in an amendment signed in 2013. This, too, is a form of credit for the Debtors' benefit.

8. <u>Third</u>, the Debtors assert there is no deferred payment obligation unless "goods" have been "delivered" and "title" has passed to the Debtors. Neither of those conditions is included in the Guaranties. And since the Guaranties and the Supply Agreement cover services (not just property), these conditions could never apply since there is no possessory or title interest in services. Adding them to the Guaranties would also contradict the operative terms of the Guaranties by (i) imposing a new condition to the "unconditional" Guaranties, (ii) eliminating "contingent" obligations from coverage (even if title were a contingency), and (iii) requiring that the obligation be "due and payable" even though the Guaranties apply when obligations are "incurred." But even if the counter-party must have given a benefit to the Debtors in advance, USEC did so in the form of hedging benefits as well as securing a supply of LEU for the Debtors using its own credit and bearing the financial risk.

9. <u>Finally</u>, the Debtors claim that the obligations owed to USEC are excluded "trade accounts payable incurred in the ordinary course of business," but cite no relevant authority that supports their position. The Supply Agreement obligations that actually comprise USEC's claims (2018 through 2027) were not "trade accounts payable incurred in the ordinary course of business," from the date they were incurred in 2009 all the way through the petition date. Rather, they are deferred long-term "purchase obligations" under federal regulations. Additionally, the nuclear fuel and associated enrichment services that are the subject of the Supply Agreement are not the type of asset that could generate a "trade account payable" under a common definition of that term. These conclusions are confirmed by the Debtors' own financial statements, expert testimony, and the Wixon Accountants' Handbook (the sole basis for the authority cited by the Debtors). In any event, there is no basis to conclude that USEC's rejection damages claims are "ordinary course" transactions.

10.     USEC is entitled to summary judgment under the plain terms of the Guaranties. USEC meets all four requirements for this relief.  There is (i) an "obligation"; (ii) for the "deferred purchase price"; (iii) of "property or services"; (iv) that is not a "trade account payable incurred in the ordinary course of business."

11.     Under no circumstances may the Debtors' summary judgment motion be granted. At the very least, the terms of the Guaranty are ambiguous and should still be construed against the Debtors.  And even if the Court were to entertain the Debtors' proposed reading of the Guaranties' operative terms, that would only serve to inject a several new factual issues into the dispute related to the character and effect of the Supply Agreement.  On these factual issues, USEC has submitted evidence (including expert testimony) in support of its opposition to the Debtors' Motion showing that it satisfies even the Debtors' contested construction of the Guaranties.  If USEC is not granted summary judgment, it is entitled to discovery and an opportunity to develop its case concerning the applicability of the Guaranties to the Supply Agreement, with a full record to be presented to the Court before deciding these massive claims. To that end, USEC has filed simultaneously with this brief a motion for relief under Federal Rule of Civil procedure 56(d).

## BACKGROUND FACTS

### I.     The Supply Agreement.

12.     United States Enrichment Corporation and its affiliate American Centrifuge Enrichment LLC (collectively, "USEC") are parties to a long-term Enriched Uranium Supply Agreement dated as of June 29, 2009 (the "Supply Agreement") with (i) FENOC acting on its

own behalf and as agent and (ii) NG serving as principal.[5]  The Supply Agreement identifies FENOC as the "Customer" and NG as the "Owner."  Supply Agreement, Preamble at p. 1 and Section 1.30.  NG is a party-obligor to the Supply Agreement for all purposes.  Supply Agreement, Section 8.2(e).

13.    The Supply Agreement included joint obligations by FENOC and NG to acquire LEU for NG's plants operated by FENOC through 2027, under a fixed commitment to pay cash for the enrichment services or "SWU component" of the LEU and supply, or pay USEC for the natural uranium "feed component" of the LEU.  NG and FENOC irrevocably contracted to acquire a fixed SWU component during the term of the agreement.  Supply Agreement at Section 16.1.  The Supply Agreement set the price for SWU over the life of the contract under a pricing formula with a ceiling that established a maximum price that FENOC and NG would pay in each year under the Supply Agreement's term (i.e., through 2027).  Supply Agreement Section 16.3.

14.    The SWU component represented the enrichment deemed to be contained in the LEU, measured by an industry formula called "SWU Calc."[6]  Additionally, the LEU had a feed component, that represented the natural uranium or "Feed Material" deemed to be contained in the LEU, also as measured by SWU Calc.[7]  Debtors were obligated to compensate USEC for the feed component of LEU by delivering a quantity of natural uranium determined by SWU

---

[5]    American Centrifuge Enrichment LLC and USEC are both wholly owned subsidiaries of Centrus Energy Corp. and parties to the Supply Agreement as amended.

[6]    "SWU" is defined in the Supply Agreement to mean "Separative Work Unit" which means "the measure of Enrichment required to produce Enriched Product with a given Assay, and Tails Material with a given Tails Assay, as calculated using SWU Calc."  Supply Agreement, Section 1.35.

[7]    Supply Agreement, Section 1.19 (definition of "Feed Component").  "Feed Material" is defined in the Supply Agreement to mean "natural uranium in the form of UF6, which has been irradiated, enriched or depleted" and meeting certain standard characteristics and industry specifications.  Supply Agreement, Section 1.21.

Calc, but if the Debtors did not deliver natural uranium, they had to pay USEC a cash price set in the contract. Supply Agreement Sections 1.37, 20.1(d).

15.     While the Debtors had some discretion within any annual period to decide when to issue orders for the delivery of specific LEU quantities including exact dates and locations for delivery, their obligations to USEC were not dependent upon those purchase orders. Rather, the Debtors were obligated to USEC under the Supply Agreement whether or not they issued purchase orders. Supply Agreement at Section 19.2(a).[8] Nor do the orders determine the annual purchase amount or price, which are fixed in the Supply Agreement. Supply Agreement, Sections 16.1, 16.3.

16.     The Supply Agreement contemplates that USEC can supply LEU and associated enrichment services from others. Supply Agreement, Section 15.7 (authorizing USEC to use contractors or subcontractors). It also expressly acknowledges USEC's Russian supplier as a source of LEU for Debtors under the Supply Agreement. Supply Agreement, Section 21.7.[9] The Debtors were fully aware that USEC both could and in fact had entered binding commitments for the goods and services covered by the contract. *Id.*

---

[8]    "Customer shall place one (1) or more Orders with ACE for delivery in such Year of Enriched Product containing SWU sufficient to satisfy its purchase obligation. ACE may credit to the Product Account, and invoice Customer for, any SWU for which Customer for any reason (other than a reason excluded under Article 5) has failed to submit an Order pursuant to this Section 19.2 in sufficient time to ensure that Customer will meet its purchase obligations in a timely manner under this Agreement."

[9]    "The term "Russian Commercial Enriched Product" shall mean Enriched Product produced in the Russian Federation and delivered to USEC by Joint Stock Company "Technsaexport" ("TENEX") under the terms of the Enriched Uranium Transitional Supply Contract, executed by and between TENEX and ACE's affiliate, USEC, on March 23, 2012." *See* Supply Agreement Section 21.7(c)(ii). Subject to confidentiality agreements, redacted versions of the Tenex Contracts and amendments are attached and may be submitted in un-redacted form by agreement of the Parties with permission of the Russian supplier.

17.     By signing this nearly 20-year agreement, USEC assumed the risk and the obligation to provide NG and FENOC the contracted amount of LEU.  By transferring this risk to USEC in advance, FENOC and NG assured themselves of a long-term supply of LEU, while deferring payment until much later.  USEC effectively became an LEU bank for FENOC and NG through its agreement with the Russian supplier.  In fact, the Supply Agreement expressly refers to some of the rejected obligations as "Banked SWU."  Supply Agreement, 16.1(b).

18.     The Supply Agreement constituted a "forward contract," with a hedging service that fixed quantities and capped prices.  Declaration of Dr. Christopher James ("James Decl.") at ¶¶20–26; Declaration of Edward Kee ("Kee Decl.") at ¶¶ 48–51.  Upon execution of the Supply Agreement in 2009, (i) USEC was obligated to provide the Debtors with enrichment services and associated LEU in agreed annual quantities beginning in 2015, and (ii) the Debtors were obligated to pay USEC each year beginning in 2015, whether they placed an order or not. The forward contract served as a hedge against price swings to which the Debtors would otherwise be exposed.  Steel Declaration ("Steel Decl.") at Ex. D, Debtors 2009 10-K at pp. 85, 109.

19.     The USEC proofs of claim cover the Debtors' obligations for years 2018 through 2027.  They do not include any unpaid pre-petition deliveries, only rejection damages.  *See* Steel Decl. at Exs. I-L, Proofs of Claim Nos. 1088, 1090, 1093 and 1094.

## II.     FES and FG issued blanket Guaranties.

20.     Debtors FG and FES issued blanket guaranties (the "Guaranties") of all qualifying obligations.[10]  The FES Guaranty covered obligations of NG, which were defined as "Genco

---

[10]   *See* Steel Decl. at Exhibit A (FG Guaranty) and Steel Decl. at Exhibit B (FES Guaranty), which were also attached to the Proofs of Claim.

Indebtedness."  "Genco Indebtedness" was also cross-defined under the Guaranties as "Guaranteed Obligations."  Steel Decl. at Exs. A and B, Guaranties Section 1.  The Guaranteed Obligations/Genco Indebtedness included in relevant part the following, "<u>all obligations</u> of the Genco [NG] for borrowed money, <u>or with respect to</u> deposits or advances of any kind, <u>or for</u> the deferred purchase price of property or services, excluding, however, trade accounts payable incurred in the ordinary course of business."  Steel Decl. at Exs. A and B, Guaranties at Section 2(a) (emphasis added).

21.     Guaranteed Obligations are covered, whether "direct or indirect, absolute or contingent, now or hereafter existing or owing, voluntary or involuntary, created or arising by contract, operation of law or otherwise or incurred or payable before or after commencement of any proceedings by or against the Genco [NG] under bankruptcy or insolvency law."  Steel Decl. at Exs. A and B, Guaranties at Section 1.

22.     The Guaranties are "absolute" and "unconditional."  *Id*. at Section 3.

23.     The FG Guaranty covers any obligation guaranteed by FES under the reciprocal FES Guaranty.  *See* Steel Decl. at Ex. A, FG Guaranty at Section 2(i)(f) (The Guaranteed Obligations of FG include "obligations of FES under direct or indirect Guaranties in respect of, and obligations (contingent or otherwise) . . . to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to above.").

24.     The Debtors made the Guaranties public, filing them with the SEC.[11]

---

[11]   *See* FES Guaranty available at
       https://www.sec.gov/Archives/edgar/data/1407702/000095013607005796/file27.htm; *see* FG
       Guaranty, available at
       https://www.sec.gov/Archives/edgar/data/1407702/000095013607005796/file25.htm.

### III. Treatment of the Supply Agreement obligations in the Debtors' financial statements.

25.     The Debtors admitted in their consolidated financial statements that their obligations under fuel supply agreements with fixed or minimum commitments (like the Supply Agreement) were "firm obligations" and that their payments under those firm obligations were deferred over a period of years into the future.  They even scheduled the annual deferred payments that were due.  In doing so, they classified "obligations" under fuel supply agreements together with the other obligations covered by the Guaranties, including long-term debt, interest expense and capital leases.  The following appears in the Steel Decl. at Ex. D, Debtors' Form 10-K dated December 31, 2009 at p. 82:

**CONTRACTUAL OBLIGATIONS**

As of December 31, 2009, our estimated cash payments under existing contractual obligations that we consider **firm obligations** are as follows:

| Contractual Obligations | Total | 2010 | 2011-12 | 2013-14 | Thereafter |
|---|---|---|---|---|---|
| | | | *(In millions)* | | |
| Long-term debt | $ 13,753 | $ 264 | $ 433 | $ 1,084 | $ 11,972 |
| Short-term borrowings | 1,181 | 1,181 | - | - | - |
| Interest on long-term debt (1) | 11,663 | 785 | 1,537 | 1,473 | 7,868 |
| Operating leases (2) | 3,485 | 225 | 442 | 459 | 2,359 |
| **Fuel and purchased power (3)** | **18,422** | **3,217** | **4,753** | **4,245** | **6,207** |
| Capital expenditures | 999 | 335 | 376 | 245 | 43 |
| Pension funding | 972 | - | 63 | 557 | 352 |
| Other (4) | 283 | 232 | 3 | 2 | 46 |
| Total | $ 50,758 | $ 6,239 | $ 7,607 | $ 8,065 | $ 28,847 |

(1)  Interest on variable-rate debt based on rates as of December 31, 2009.
(2)  See Note 7 to the consolidated financial statements.
(3)  **Amounts under contract with fixed or minimum quantities based on estimated annual requirements**.
(4)  Includes amounts for capital leases (see Note 7) and contingent tax liabilities (see Note 10) (emphasis added)

26.     In their financial statements, the Debtors also discussed the use of hedging tools, including "forward contracts" like the Supply Agreement, to address their financial and commodity risk related to nuclear fuel.  *See* Steel Decl. at Ex. D, Debtors' 2009 10-K at p. 109.  The Debtors admit that such contracts manage commodity volatility.  *Id*.  ("FES is exposed to

financial and market risks resulting from the fluctuation of interest rates and commodity prices primarily due to fluctuations in electricity, energy transmission, natural gas, coal, <u>nuclear fuel</u> and emission allowance prices. To manage the volatility relating to these exposures, FES uses a variety of non-derivative and derivative instruments, including <u>forward contracts</u>, options, futures contracts and swaps.") (emphasis added). By locking in prices, these financial arrangements contained the Debtors' risk from fluctuation of nuclear commodity prices. *Id*.

**ARGUMENT**

I.  **USEC IS ENTITLED TO SUMMARY JUDGMENT BASED ON THE PLAIN MEANING OF THE GUARANTIES AND THE SUPPLY AGREEMENT.**

27.    To qualify for coverage under the applicable provisions of the Guaranties, there are four simple requirements: (i) an "obligation"; (ii) for the "deferred purchase price"; (iii) of "property or services"; (iv) that is not a "trade account payable incurred in the ordinary course of business." Steel Decl. at Exs. A and B, Guaranties, Section 2(i)(a). That is all. None of those four issues is ambiguous or subject to legitimate dispute.

28.    <u>Obligation</u>. The Supply Agreement, signed in 2009, created a fixed obligation for USEC to supply and for FENOC and NG to pay for a large quantity of nuclear fuel and associated enrichment services over many years. Supply Agreement Sections 16.1 (setting fixed SWU amounts); 16.3 (setting the price); and 19.2(a) (confirming Debtors' obligation to pay irrespective of the issuance of purchase orders). The Debtors' financial statements confirm that the obligations under fuel contracts with fixed amounts are "firm obligations." Debtors' 2009 10-K at p. 82. So do SEC regulations, defining "purchase obligations" that must be disclosed in an issuer's financial statements as including contracts with fixed minimum amounts. *See* 17 C.F.R. § 229.303(a)(5).

29.    <u>For Property or Services</u>.  The LEU, and associated enrichment and other services, are goods, services or both.  Supply Agreement Section 16.1 and 16.3; *United States v. Eurodif S. A.*, 555 U.S. 305, 318–19 (2009) (explaining that SWU contracts have attributes of both goods and services transactions).

30.    <u>Deferred Purchase Price</u>.  The Debtors' obligation to purchase (and USEC's obligation to supply) was fully incurred on execution of the Supply Agreement in 2009, but was deferred, first to 2015, and then to the years thereafter.  Supply Agreement, Section 16.1.  That deferral was confirmed by the Debtors' financial statements from 2009 to 2017, showing the deferral for fuel contracts with fixed minimums like the Supply Agreement on a year-by-year basis.  Debtors' 2009 10-K at 82; Debtors' 2017 10-K at 85.  That treatment is consistent with SEC regulations for such "purchase obligations," which require issuers to show the deferral of payments to be made over time under contracts with fixed and incurred obligations like the Supply Agreement.  *See* 17 C.F.R. § 229.303(a)(5).

31.    <u>Not a Trade Account Payable</u>.  The payments required to be made to USEC under the nineteen year Supply Agreement were classified by the Debtors as "firm obligations" to be paid over many years.  Again, that treatment is consistent with SEC requirements.  17 C.F.R. § 229.303(a)(5).  These obligations are not accounts payable of any type, "trade" or otherwise. *See infra* ¶¶ 67–80.  Accounts payable are limited to short term "current liabilities."  *See* Steel Decl. at Ex. E, Debtors' 2017 10-K at pp. 122, 126.  The Debtors do not even allege that the obligations for years 2018 through 2027 were actually ever classified or could have been classified as accounts payable of any type.  In any event, using the definition from the Wixon Accounting Handbook that the Debtors cite in their Motion as establishing the accepted meaning of "<u>trade</u> accounts payable," the obligations in the Supply Agreement could never

qualify as such under any set of circumstances. "Trade accounts payable" under that definition are limited to liabilities that are represented by invoices for inventory (merchandise and supplies) only. *See infra* ¶¶ 67–71. Nuclear fuel is not classified by Debtors as inventory, but as property, plant and equipment. *See* Steel Decl. at Ex. E, Debtors' 2017 10-K at 133–34 ("The cost of nuclear fuel is capitalized within the CES segment's Property, plant and equipment and charged to fuel expense using the specific identification method.").

32.     The foregoing are the actual requirements based on the words of the Guaranties. This is all the Court needs to consider to grant USEC summary judgment.

## II.     THE DEBTORS ARE NOT ENTITLED TO SUMMARY JUDGMENT

33.     The Guaranties are governed by New York law. Guaranties at Section 13. "The interpretation of a guaranty is governed by the same principles that govern the interpretation of other forms of contract." *In re S. Side House, LLC*, 470 B.R. 659, 675 (E.D.N.Y. 2012); *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*, 2 N.Y.3d. 495, 500 (2004) ("A guaranty is a contract, and in interpreting it we look first to the words the parties' used."). Relying on the four corners of the document, the Debtors may only prevail if they can prove that their interpretation is the only reasonable one. *Sayers v. Rochester Tel. Corp. Supplemental Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning."). Where contract language is susceptible to different reasonable interpretations, and "where there is relevant extrinsic evidence of the parties' actual intent," then the "meaning of the words" becomes an issue of fact precluding summary judgment. *Seiden Assocs., Inc. v. ANC Holdings, Inc*., 959 F.2d 425, 428 (2d Cir. 1992); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, 643 F. Supp. 2d 1014, 1030 (S.D. Ohio 2009).

34.     The Debtors must show that "the contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is *no reasonable basis* for a difference of opinion.'" *Sayers,* 7 F.3d at 1095 (emphasis added) (citation omitted).  In contrast, "[l]anguage is ambiguous . . . when it may reasonably be construed in more than one sense." *Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.,* 353 F.2d 946, 951 (2d Cir. 1965); *see also Ellington v. EMI Music, Inc.,* 24 N.Y.3d 239, 250 (2014) ("Ambiguity exists when, looking within the four corners of the document, the terms are reasonably susceptible of more than one interpretation.").

35.     Contract language "must be given their plain meaning so as to define the rights of the parties." *Mazzola v. Suffolk*, 143 A.D.2d 734, 735 (N.Y. App. Div. 1988).  To ascertain "the plain and ordinary meaning of words to a contract," courts frequently rely on dictionary definitions.  *Id.*; *see also R/S Assoc. v. New York Job Dev. Author.*, 744 N.Y.S. 2d 358, 360 (2002) (referencing a dictionary definition of a contract term as an example of its "ordinary usage").  Meaning is ascertained by examining the contract as a whole, and interpreting it to give effect and meaning to *every term* of the contract.  "Reasonable effort must be made to harmonize all of the terms of the contract." *Hartford Ins. Co. v. Halt*, 223 A.D.2d 204, 212 (N.Y. App. Div. 1996).  Indeed, a contract "should not be read so that some provisions are rendered meaningless." *County of Columbia v. Continental Ins. Co.*, 612 N.Y.S. 2d 345, 349 (1994); *see also Richner Comm., Inc. v. Tower Ins. Co. of New York*, 72 A.D.3d 670, 671 (N.Y. App. Div. 2010) (same).

36.     Under these standards, the Debtors must prove that USEC's interpretation of the language of the Guaranties is wholly unreasonable.  They cannot meet this burden.  At the very least, the disputed terms of the Guaranty are ambiguous.  But even if there is an ambiguity, it

must be construed strictly against the Debtors as the sole drafters of the Guaranties. *See Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 460 (1989); *BT Commercial Corp. v Blum*, 175 A.D.2d 43, 44 (N.Y. App. Div. 1991) ("It is established that an ambiguity in a contract must be construed against the party who drafted it."); *Herbil Holding Co. v. Commonwealth Land Title Ins. Co.*, 183 A.D.2d 219, 227 (N.Y. App. Div. 1992) ("[A] contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language."). Where only one party prepared the document, as is the case with the Guaranties here, ambiguities must be resolved through the language in the agreement and the presumption against the draftsperson. *See Herbil*, 183 A.D.2d at 227 (stating "intent" related to disputed document drafted by one party alone is resolved through the document's express terms and the "rules of contract construction" including that ambiguities are resolved against the drafter); *see also* New York Jurisprudence (2d. ed. 2018) Guaranty & Suretyship, section 104 ("[A]ny ambiguity in a contract must be construed most strongly against the party who prepared it. . . . Ambiguous guaranty agreements drafted by the guarantor are to be construed against the guarantor.").

## III. THE GUARANTEED OBLIGATIONS ARE NOT LIMITED TO "OBLIGATIONS FOR BORROWED MONEY," AND DO NOT EXCLUDE THE SUPPLY AGREEMENT.

### A. The Guaranties cover the "deferred purchase price for property or services" separately from "obligations for borrowed money."

37. The Debtors contend that the only obligations covered under Section 2(i)(a) of the Guaranties are loans for "borrowed money" and the like. But that section actually includes a disjunctive list of obligations that qualify as Guaranteed Obligations/Genco Indebtedness:

> As used herein, "**Genco Indebtedness**" means . . . (a) **all obligations** of the Genco for borrowed money, **or with respect** to deposits or advances of any kind, **or for** the deferred purchase price of property or services,

excluding however, trade accounts payable incurred in the ordinary course
of business.

Loans for "borrowed money" are only one of the several obligations included in Section 2(i)(a).

38.     The "deferred purchase price for property or services" is distinct from
"obligations for borrowed money."  To make clear that each class is separate and not a subset of
the former, the word "or" is inserted before each of the different covered classes.  The predicate
words "or for" and "or with respect to" are also repeated in the second and third classes of
obligations to avoid any implication these classes are a subset of obligations for "borrowed
money" (the first listed class of obligations).  The Debtors' construction makes this additional
language irrelevant.

39.     The Debtors argue that being on the same list, the subsequent obligations must be
a subclass of the first one listed because of the "company they keep" — *i.e.*, that they are
examples of loans for "borrowed money" because they are on the same list.  Had that been the
case, the separate obligations would not have needed (or used) the additional language that
clearly separates them ("or for" and "or with respect to").  The Guaranties would have said they
covered obligations for borrowed money, "including" the remaining portion of the list.  They
do not.

40.     The Debtors' claim the use of the title "Genco Indebtedness" limits the defined
term to a subset of the listed obligations (*i.e.*, just loans for borrowed money or the like).  This
would mean that even if an "obligation" otherwise satisfies the requirements of Section 2(i), the
title (by using the word "indebtedness") excludes them.  The Debtors' proposed construction is
unreasonable:

41.     First, the Debtors fail to cite any authority that the words "debt" or "indebtedness"
are more restrictive than "obligation" or are limited to loans for borrowed money and the like.

18-50757-amk    Doc 3669    FILED 01/31/20    ENTERED 01/31/20 22:46:29    Page 22 of 46

And there is no definition of the word "indebtedness" in the Guaranties that supports the notion that it is more restrictive than the word "obligations."  If it had been intended to be more restrictive, the Guaranties would have consistently used the word "indebtedness" rather than "obligations" in all of the definitions.  In fact, all of the obligations that constitute "<u>Genco Indebtedness</u>" are also cross-classified as "<u>Guaranteed Obligations</u>."  Guaranties, Section 1.

42.     <u>Second</u>, the words "debt" and "indebtedness" are normally given very broad meanings that cover all obligations and are not limited to loans for borrowed money.  For example, the Bankruptcy Code definition of the word "debt" covers any "liability on a claim." 11 U.S.C. §101(12); *see also* 11 U.S.C. § 101(5)(A) (providing that "claim" means, *inter alia*, "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").  Case law is in accord.  *See e.g., S.E.C. v. Credit Bancorp, Ltd*., 109 F. Supp. 2d 142, 146 (S.D.N.Y. 2000) (stating indebtedness can be for unpaid legal services); *BP Prod. N. Am. Inc. v. Merritt Oil Co*., 812 F. Supp. 2d 1297, 1304 (S.D. Ala. 2011) (holding that guaranty for "indebtedness" covered breach of contract damages for defendant's failure to perform under several agreements for goods and services).  Even the dictionary definition of the word "debt" lists "obligation" as a synonym, and neither word's definition is limited to loans for borrowed money.  *See* Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/debt (last visited January 30, 2020); Oxford English Dictionary Online (December 2019), www.oed.com/view/Entry/47935 (last visited January 27, 2020).

43.     <u>Third</u>, these broad definitions of "debt" and "indebtedness" from statutes, dictionaries, and case law are strikingly similar to the broad language that the Guaranties use to describe the types of obligations they cover, which again are not limited to loans for borrowed

money.  Guaranties, Section 1 ("Guaranteed Obligations" may be "direct, indirect, absolute or contingent, now or hereafter owing, voluntary or involuntary, created or arising under contract, operation of law or otherwise or incurred or payable.").  Many of these terms are entirely inconsistent with loans for borrowed money.  Among other things, how could a loan for borrowed money be "involuntary" or arise "by operation of law"?

44.  <u>Fourth</u>, the title of the defined term cannot modify the specific definition that follows, which expressly states that it covers "<u>all obligations</u>" that are thereafter described. There is nothing ambiguous about the word "all."  *See AB Green Gansevoort, LLC v. Peter Scalamandre & Sons, Inc.*, 102 A.D.3d 425, 427 (N.Y. App. Div. 2013) ("[Plaintiff's] reliance on the title of the policy provision is misplaced as a heading cannot later the effect of the unambiguous language in the body of the clause itself.")  (internal quotation marks omitted). Nor can a title in the Guaranties impose an additional but unstated condition, where the operative terms say the Guaranties are "unconditional."  Steel Decl. at Exs. A and B, Guaranties, Section 3.

45.  <u>Finally</u>, if there was any doubt, it is resolved by Section 2(i)(f), which deals with cross-guaranties of the same types of obligations that are described in the rest of Section 2(i)(a)-(e).  In that section, the Guaranties cross-reference the entire list of covered claims from Section 2(i) as the "<u>indebtedness or obligations</u> of others of the kinds described above."  Guaranties, Section 2(i)(f) (emphasis added).  This obviously includes obligations described in Section 2(i)(a) for the "deferred purchase price of property or services."  Thus, being an "obligation" suffices for purposes of the Guaranties (whatever else may be said about the word "indebtedness").  And there can be no dispute that fuel contracts like the Supply Agreement are

18-50757-amk    Doc 3669    FILED 01/31/20    ENTERED 01/31/20 22:46:29    Page 24 of 46

a "firm obligation" of the Debtors upon execution. Steel Decl. at Ex. D, Debtors' 2009 10-K at p. 82.

**B.     A recital cannot modify or supplement the operative terms of the Guaranties, as Debtors seek to do.**

46.     The Debtors' only remaining basis to assert that the Guaranteed Obligations are limited to borrowed-money loans is premised on selective use of a recital rather than the operative terms. [12] *See* Debtors' Motion at 12. The same is the case with the Debtors' argument that its goal in issuing the Guaranties was to generate better "credit" terms from counterparties. *Id.*

47.     But under New York law, the recitals are not operative terms. They may not vary, restrict, or supplement the operative provisions. And they are not even considered in interpreting the document unless its operative provisions have already been determined to be ambiguous. *See*, *e.g.*, *Andersen v. Weinroth*, 48 A.D.3d 121, 133 (N.Y. App. Div. 2007) ("Also, we note that a recital paragraph in a document is not determinative of the rights and obligations of parties to the agreement."); *Grand Manor Health Related Facility, Inc. v. Hamilton Equities Inc.*, 65 A.D.3d 445, 447 (N.Y. App. Div. 2009) ("Although a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document."); *Credit Lyonnais v.*

---

[12]     The Debtors attempt to make much of the fact that one recital indicates that in exchange for the applicable Guarantee relied upon by USEC, the Guarantor is getting a different guarantee of its own obligations that covers "borrowed money." Debtors' Motion at 12; Steel Decl. at Exs. A and B, Guaranties, Third Recital. But that recital cannot reasonably be interpreted to exclude obligations covered by the operative provisions simply because it does not repeat all of them. Moreover, the Debtors ignore a separate recital that specifically states that the purpose is to guaranty the whole "Genco Indebtedness," not just a guaranty for "borrowed money." Steel Decl. at Exs. A and B, Guaranties, First Recital. Ultimately, the recitals cannot help the Debtors in their motion for summary judgment since that motion is entirely premised on there being no ambiguity in the operative terms of the Guaranties.

*Getty Square Assocs.*, 876 F. Supp. 517, 521 (S.D.N.Y. 1995) ("Indeed, a whereas clause in a document . . . conveys no rights whatsoever."); *Ross v. Ross*, 233 A.D. 626, 635 (N.Y. App. Div. 1931) ("The recitals in a contract form no part thereof, and at most indicate the purposes and motives of the parties."); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103–104 (2d Cir. 1985) ("Although a statement in a 'whereas' clause may be useful in interpreting an ambiguous contract, it cannot create any right beyond those arising from the operative terms of the document.").

48.    Here, the <u>operative terms</u> of the Guaranties are clear that covered obligations are not limited to loans for borrowed money. Under New York law, the recitals cannot change that. And since the Debtors can only prevail if there is no ambiguity in the operative terms, the recitals are irrelevant to their Motion. That the Debtors rely upon them is a tacit admission that the operative terms do not support their position.

49.    And here, the recitals do not even have the very limited importance that they normally might be granted in a contract that had been bilaterally negotiated, since the recitals do not capture mutual intent. Statements of one party's unilateral intent are irrelevant. *IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, 170 Misc. 2d 15, 22, 647 N.Y.S.2d 322 (1996) ("The subjective interpretation of the parties is of no moment when the words of the agreement, viewed in proper context, provide an unmistakable meaning."). The Debtors publicly issued these Guaranties to the world, giving universal notice of their operative provisions. That is why ambiguous contracts drafted by a single party are "most strongly" interpreted against the drafter. *Herbil Holding Co.*, 183 A.D.2d at 227 ("We are guided by the general but well-established precept that in cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its

language."). The Debtors cannot establish such Guaranties with broad operative provisions and then, when faced with claims, purport to walk those obligations back based on a recital.

### C. In any event, USEC extended credit/financing to the Debtors through the Supply Agreement.

50. But even if the Supply Agreement needed to confer an advance economic benefit or "credit" as an advance to the Debtors prior to the deferred payment, the Supply Agreement would still qualify. Kee Decl. at ¶¶ 42, 57–59, 63–68; James Decl. at ¶¶ 18, 27. The Debtors mischaracterize the long-term Supply Agreement as a mere series of prospective purchase orders for goods. The Supply Agreement is far more expansive and complex than that, extending long-term credit and other financial benefits to the Debtors upon execution. Kee Decl. at ¶¶ 8, 21–30, 38–59; James Decl. at ¶¶ 11–18. Likewise, the Supply agreement has the characteristic of "debt" even under the Debtors' proposed definition. Kee Decl. at ¶¶ 63–68;James Decl. at ¶¶ 18–19, 27.

51. The Supply Agreement is a "forward contract" under which the Debtors locked in quantities and rates, including maximum prices, for goods and services to be provided by USEC over an extended period for deferred payments. James Decl. at ¶¶ 20–25; Kee Decl. at ¶¶ 48–51. USEC granted the Debtors that benefit as a form of credit. James Decl. at ¶¶ 20–25; Kee Decl. at ¶¶ 43, 48–51. USEC also secured a long-term supply of LEU and enrichment services for the Debtors' benefit, using its own credit with third party suppliers. That is also a form of financing. James Decl. at ¶¶ 27; Kee Decl. at ¶¶ 8, 41–51, 63–68. This characterization is consistent with the express terms of the Supply Agreement, SEC regulations, and the Debtors' own binding disclosures.

52. The Debtors acknowledge their use of "forward contracts" like the Supply Agreement as a hedging tool with other derivative and non-derivative obligations to address the

commodity volatility otherwise associated with nuclear fuel. *See* Steel Decl. at Ex. D, Debtors'

2009 10-K at p. 109 ("FES is exposed to financial and market risks resulting from the

fluctuation of interest rates and commodity prices primarily due to fluctuations in electricity,

energy transmission, natural gas, coal, <u>nuclear fuel</u>, and emission allowance prices. To manage

the volatility relating to these exposures, FES uses a variety of non-derivative and derivative

instruments, including <u>forward contracts</u>, options, futures contracts and swaps.") (emphasis

added).

      53.     Nor is the hedging element of the Supply Agreement the only reason that it is a

form of financing or credit. SEC disclosure regulations even require supply contracts with

mandatory minimums or fixed amounts, like the Supply Agreement, to be disclosed as an

obligation in an issuer's financials together with long-term debt, capital leases, and other

financing arrangements on a single table. *See* 17 C.F.R. § 229.303(a)(5). The SEC has

designated such deferred fixed obligations as "purchase obligations," using language similar to

that used in the Guaranties, mandating that the incurred payments be listed by the periods to

which they were deferred, along with other obligations that are covered by the Guaranties such

as loans for borrowed money and capital leases. *Id.*[13]

      54.     The Debtors' own financial statements confirm this construction, expressly

classifying obligations under long-term fuel supply agreements as "firm obligations" in a single

table with other obligations like loans for borrowed money. Steel Decl. at Ex. D, Debtors' 2009

10-K at p. 82.

---

[13]   The SEC regulations allow reporting companies to use a title other than "purchase obligation" in
disclosing these obligations. *Id.* In the Debtors' case, they appear to have selected obligations for
"Fuel and purchased power" where "there were" "[a]mounts under contract with fixed or minimum
quantities based on annual requirements." *See* Steel Decl. at Ex. D, Debtors' 2009 10-K at 82.

55.     Because forward contracts imply financing and credit, a central element of

USEC's contract process is the counter-party's credit risk:

> **Concentrations of Credit Risk**
> Credit risk could result from the possibility of a customer failing to
> perform or pay according to the terms of a contract. Extension of credit is
> based on an evaluation of each customer's financial condition. USEC
> regularly monitors credit risk exposure and takes steps to mitigate the
> likelihood of such exposure resulting in a loss.

Steel Decl. at Exhibit H, Centrus/USEC 2012 10-K at 136.

56.     State utility regulations governing procurement of nuclear fuel also designate both

leases and purchases of nuclear fuel as financing.  *See* 52 Pa. Code, § 69.204 ("Financing of

nuclear fuel acquisitions.  (a) A utility should have a written policy setting forth economic and

other conditions under which different methods of financing—leasing or owning—nuclear fuel

should be utilized.").  The following section of the Pennsylvania regulations then establishes

provisions related to nuclear fuel contracts to own nuclear fuel.  *See* 52 Pa. Code, § 69.205(b)

(providing procedures and regulations regarding long-term nuclear supply contracts).

57.     Finally, the Supply Agreement, as amended in 2013, confirms that USEC was

securing the supply of LEU and related enrichment services from its third party supplier and

thereby assuming the risk associated with these purchases for the Debtors' benefit.  In that

respect, too, the Supply Agreement is a form of credit or financing.  James Decl. at ¶¶ 18, 27;

Kee Decl. at ¶¶ 42, 57–59, 63–68.  USEC relied upon the fixed terms of the Supply Agreement

in securing these supplies.  USEC obligated itself to deliver for an extended period and in effect

became the Debtors' nuclear fuel bank.  USEC assumed these risks for the Debtors' benefit in

advance as a form of credit, becoming an obligor to third parties for the Debtors' benefit in

reliance on the deferred purchase price.

18-50757-amk    Doc 3669    FILED 01/31/20    ENTERED 01/31/20 22:46:29    Page 29 of 46

## IV.    THERE IS NO "DELIVERY/TITLE" CONDITION IN THE GUARANTIES.

58.    The Debtors argue that to qualify as a "deferred purchase price of property or services," goods (LEU) must have been physically delivered with title to have passed to the Debtors at the inception of the contract.  This argument fails.  And under no circumstances is the Debtors' reading reasonable.

### A.    The Guaranties' operative terms contradict the Debtors' delivery/title theory.

59.    There is no physical delivery or title transfer requirement in the Guaranties, which expressly disclaim any unstated conditions.  *See* Guaranties, Section 3 ("This Guaranty is . . . an absolute, unconditional and continuing guaranty of payment.").  The Guaranties also make clear that they cover obligations that remain "contingent," rejecting the Debtors' position that full performance must have been executed in advance to be covered.  Guaranties, Section 1.  The Guaranties further provide that obligations are covered without necessarily being "payable."  *Id*. Rather, the covered obligations may have only been "incurred."  *Id*.

60.    The Debtors' alternative concept of "deferral" contradicts the operative provisions of the Guaranties by (i) adding a new condition to the "unconditional" Guaranties for title to pass; (ii) disallowing "contingent" obligations unless the contingencies are resolved (even if title were a contingency); and (iii) requiring that obligation be "payable" even though obligations are covered when "incurred."  Thus, the Debtors' conditions may not be implied into the Guaranties. *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 581 (2017) ("Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements.").

## B. The Debtors' proposed test disregards the fact that the Guaranties and the Supply Agreement include services in addition to property (goods).

61.     The Guaranties cover the deferred purchase price for <u>both</u> goods and services. Guaranties, Section 2(i)(a).  Thus, the Debtors' proposal to add a physical "delivery" and "title" requirement for coverage under the Guaranties is all the more unreasonable.  Transfer of title and possession do not apply to services.  Since both goods and services are covered by the same language in the Guaranties, a different (higher) standard cannot be implied for one versus the other.  As a result, delivery and title and possession cannot be required for "deferral" of either goods or services.  In any event, the Supply Agreement provides both goods and services, so even invoking a different test for goods would not save the Debtors.

62.     Recognizing their weakness on this point, the Debtors previously tried to argue in their Objection that the Supply Agreement was exclusively a goods contract with no services to be provided, citing *United States v. Eurodif S. A.*, 555 U.S. 305, 321 (2009).  Objection ¶ 13. The *Eurodif* case did no such thing.  In *Eurodif*, the Supreme Court actually found that a SWU contract has elements of <u>both</u> a property and a services contract.  *Id.* at 318-19.[14]  The Court then ruled that the nature of the transaction was sufficient so that a federal agency (there, the Commerce Department) could enforce U.S. trade laws against imports of LEU under an SWU

---

[14]     *See Eurodif*, 55 U.S. a 318–19:

> But the line blurs when the facts get more complicated, and SWU contracts exemplify a class of transactions that the Federal Circuit recognized does not fall neatly either into the category of contracts for services or the category of contracts for the sale of goods.  The agreement is not like the laundry ticket, which says that the same shirts are supposed to come back, just minus the dirt around the collar.  And it is not on all fours with the agreement of the chip buyer and the manufacturer, in which it is inescapable that the silicon processors delivered are a separate good from the sand provided.  Section 1673 simply does not speak with the precision necessary to say definitively whether it applies to the LEU and the agreement that gives the utility a right to get it.

(internal quotation marks and citations omitted).

contract given deference to the agency's interpretation of those laws under the *Chevron* doctrine. See *Chevron U.S.A. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984). The Court made clear that it was not holding that SWU contracts are exclusively for goods or that there are no services related elements. *Id.* at 316. ("The issue is not whether . . . the better view is that a SWU contract is one for the sale of services, not goods."). And the Supreme Court did not address issues such as the hedging components or effect of third-party contracts because those issues would not have been relevant to the scope of the Commerce Department's jurisdiction.

63. Consistent with the dual nature of the agreement and as described in the Debtors' own financial statements, the Supply Agreement provides for transactions in property (LEU), including the associated enrichment services, plus hedging, financial and other services. Steel Decl. at Ex. D, Debtors' 2009 10-K at p. 22 ("Enrichment services are contracted for essentially all of the enrichment requirements for nuclear fuel through 2017. A portion of enrichment requirements is also contracted for through 2024."); and p. 109 ("FES is exposed to financial and market risks resulting from the fluctuation of interest rates and commodity prices primarily due to fluctuations in electricity, energy transmission, natural gas, coal, nuclear fuel and emission allowance prices. To manage the volatility relating to these exposures, FES uses a variety of non-derivative and derivative instruments, including forward contracts, options, futures contracts and swaps.").

C. **USEC provided advance benefits to the Debtors in exchange for deferred payments.**

64. There is no title or delivery condition in the Guaranties, but even if USEC was required to give the Debtors an advance benefit to qualify for coverage under the Guaranties, it did so. As noted above, USEC provided hedging services related to the LEU under the forward

contract. USEC also signed contracts with its own suppliers to acquire rights to all of the underlying goods (LEU) and associated services covered by the Supply Agreement, thereby assuming payment and performance risk. Whether that contracted LEU was in Russia or the United States is of no moment, as it served as a secure supply of fuel for the Debtors. In addition to the "goods" element of the contract, all of these activities constitute financial/hedging and nuclear fuel related "services" under contract with the Debtors. James Decl. at ¶¶ 13, 20–26; Kee Decl. at ¶¶ 8, 42, 44–55.

65. USEC's position is supported by applicable federal regulations governing supply contracts with fixed minimums (including purchase obligations and forward contracts) and state regulations governing nuclear fuel contracts. *See supra* ¶ 43, ¶ 46. The Debtors were even obligated to show the deferral of their payments under the Supply Agreement as a matter of federal regulations. 17 C.F.R. § 229.303(a)(5).

66. If there were any doubt, the Debtors' own financial statements resolve them:

67. First, as discussed in detail above, the Debtors classified obligations under fuel agreements as "firm obligations" as of the date they were incurred, together with their similarly covered long-term debt and capital leases. Steel Decl. at Ex. D, Debtors' 2009 10-K at p. 82. They even showed the annual deferral of those firm obligations under fuel contracts over time. *Id*. Second, the Debtors included a separate discussion of their prospective obligations under hedging arrangements related to nuclear fuel in their financial statements, describing their use of "forward contracts" like the Supply Agreement. *Id.* at p. 109. The Supply Agreement is precisely such a financial arrangement, which the Debtors entered to avoid the "financial and market risks resulting from the fluctuation of [] commodity prices." *Id*.

68.     Thus, the Debtors' obligations for the purchase price of property and services under the Supply Agreement are "deferred" by any measure of that term—whether it means deferred from the date when (i) the obligations were incurred by the Debtors to USEC in advance of deferred payment, (ii) USEC first provided benefits to the Debtors in advance of deferred payment; or (iii) USEC first incurred obligations for the Debtors' benefit in advance of deferred payment.

69.     In the face of SEC regulations, nuclear utility regulations and their own financial statements, the Debtors cite a Black's Law Dictionary definition of *land* installment contracts, making the non-sequitur assertion that the Supply Agreement is not one.  In addition to Black's Law Dictionary, the Debtors also cite an unreported case from Iowa that does not define installment contracts but finds that under the agreement's terms, the capital lease was "debt."  *See* Debtors' Motion at 10 (citing *Martin Ankeny Corp. v. CTB Midwest, Inc.*, Civ. No. 14-00516 (SMR) (HCA), 2015 WL 11112557, at *2 (S.D. Iowa Sept. 3, 2015)).  The Debtors then cite a client alert from a law firm that states capital leases are "debt."  The one forty-five-year-old, trial-level case Debtors cite merely addressed an installment contract that included what was described as a "deferred payment price" provision.  *Cent. Budget Corp. v. Blackett*, 349 N.Y.S.2d 577, 577–78 (N.Y. Civ. Ct. 1973).  Finally, they proffer a footnote that discusses tax regulations regarding "deferred payment" contracts, which is even more remote to the question before the Court.

70.     How any of these references is relevant, much less controlling, is unclear.  Certainly none of them provide a controlling and unambiguous meaning.  And none of these cases even suggests that the financial arrangement in the Supply Agreement should be excluded from coverage for "the deferred purchase price for property or services."  The most that can be

said for the *Budget* case the Debtors cite is that a similar, but not identical, term (deferred payment price) has been used by a trial court to describe an installment contract. But there is no suggestion in that case or any other cited by the Debtors, that only installment contracts qualify as contracts for a deferred purchase price. Nor is the case conclusive or even persuasive that a long-term agreement with the characteristics of the Supply Agreement is excluded from the term "all obligations [] for the deferred purchase price of property or services" or even excluded from the terms "financings" or "credit" that they seek to engraft onto the Guaranties.

71.     In any event, while the Guaranties are not limited to and do not even mention the term "installment contracts," the Supply Agreement satisfies the requirements to be an installment contract under applicable law. N.Y. UCC § 2-612 ("An 'installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent."); *see Cranesville Block Co. v. Goodyear Tire & Rubber Co*., 208 A.D.2d 1157, 1159 (N.Y. App. Div. 1994) (holding parties' potential breach of supply agreement raised disputed issues under UCC § 2-612 related to breach of installment contract).[15] The Debtors quote the definition of "<u>land</u> installment contracts" from Black's Law Dictionary, rather than the general definition for "installment contracts" that would presumably cover goods and

---

[15]    While the UCC definition itself is clear enough and the Guaranties are by no means limited to installment contracts, courts hold that supply agreements constitute "installment contracts." *Sherwin-Williams Co. v. TMZ Enters.*, Civ. No. 15-8409 (BRM) (LHG), 2017 U.S. Dist. LEXIS 150917, at *10 (D.N.J. Sept. 18, 2017) ("Under Ohio law, the Supply Agreement is an installment contract because it 'authorizes the delivery of goods in separate lots to be separately accepted.'"); *accord John P. Saad & Sons v. Nashville Thermal Transfer Corp.*, 1985 Tenn. App. LEXIS 2864, *23 (Tenn. Ct. App. May 8, 1985) ("The Waste Oil Supply Agreement at the heart of this case is an installment contract for the sale of goods.").

services.  In the definition of "installment contracts" Black's even cites the above UCC

definition that contradicts the Debtors' position.

72.    But given the advance benefits related to goods and services provided to the

Debtors by USEC, the Supply Agreement even satisfies the Debtors' concept of an installment

contract.  As discussed above, multiple up-front benefits were conferred by USEC in advance of

payment over time, with the characteristics of financing and credit.  James Decl. at ¶¶ 18, 27;

Kee Decl. at ¶¶ 38–52, 57-59, 63–68.

## V.    THE SUPPLY AGREEMENT OBLIGATIONS ARE NOT "TRADE ACCOUNTS PAYABLE INCURRED IN THE ORDINARY COURSE OF BUSINESS."

73.    The Guaranties exclude coverage for "trade accounts payable incurred in the

ordinary course of business," which the obligations under the Supply Agreement are not.  The

Debtors seemed to acknowledge at the scheduling conference that this issue would not be the

basis for their Motion.  But recognizing the weakness of their other arguments, they included

this defense in the Motion with no evidence on the point.  It does not work.

74.    The Debtors acknowledge that they could not find any controlling New York

authority to support their position, claiming there was a dearth of such.  Debtors' Motion at p.

14.  Instead, they cite only a single, one page Connecticut state court case from 1979.  *Id*.  The

Debtors further admit there is no definition in the Guaranties that supports their position.  *Id*.

(stating the term "trade accounts payable" "is not defined in either Guaranty").  These

admissions alone doom their request for summary judgment based on common meaning.[16]

---

[16]    The Debtors attempt to make a virtue of the absence of any textual or even secondary support for
their position, suggesting that it does not exist because their positions are so obviously correct.
Debtors' Motion at 14.  But the absence of support flows from the errors in their position.

75.     In fact, the Debtors' asserted position is not even reasonable.  USEC's claims under the Supply Agreement for years 2018 through 2027 were never actually classified as trade accounts payable, and the Debtors do not even claim that they were.  The Debtors' position contradicts the terms of the Supply Agreement, basic economics concepts, accounting and finance principles, their own admissions in their financial statements, and even the requirements from the Wixon Accountants' Handbook that is the basis of their sole case citation.  Again, even if there is any ambiguity on the point, it must be construed "most strongly" against the Debtors under New York law.  *Herbil Holding Co.*, 183 A.D.2d at 227.

> **A.**     **Accounting and finance concepts establish that USEC's claims under the Supply Agreement are not "trade accounts payable."**

76.     USEC's rights under the Supply Agreement, and particularly the obligations for years 2018 through 2027 that are covered by the proofs of claim, were never accounts payable of any kind.  Kee Decl. at ¶¶ 8, 30–37, 65; Declaration of Dr. Richard Dietrich ("Dietrich Decl.") at ¶¶ 18–25.  The Debtors do not allege that those obligations were ever *actually* accounts payable.  At most, they seem to claim that the obligations might have become accounts payable at some future date if the Supply Agreement not been rejected.  As discussed below, that assertion made with no evidentiary support is both irrelevant and incorrect.

77.     Moreover, a common definition for "trade accounts payable" restricts them to current liabilities that have been invoiced for *inventory*.  Dietrich Decl. at ¶ 20–25; Kee Decl. at ¶¶ 30–38.  The Debtors, like most utilities, appear to have classified nuclear fuel as investments in capital assets.  Steel Decl. at Ex. E, Debtors' 2017 10-K at pp. 133-34.  Investments in capital assets are not treated as inventory.  Dietrich Decl. at ¶¶ 19–25; Kee Decl. at ¶¶ 30–40.  Under this definition, the obligations under the Supply Agreement would not be or become "trade

accounts payable" under any circumstances at any time. Dietrich Decl. at ¶¶ 19–25; Kee Decl. at ¶¶ 33–40.

78.     In fact, the definition of trade creditors' accounts from the accounting handbook cited and relied upon by the sole case cited by the Debtors limits them to current liabilities for inventory. Debtors' Motion at 14, citing *Gen. Hartford, Inc. v. Tax Comm'r,* 423 A.2d 869, 870 (Conn 1979). The *Hartford* case relies exclusively upon the Wixon, Kell & Bedford, Accountants' Handbook (the "Wixon Handbook"), § 20-5 (5th ed. 1970) for its conclusions. *Id.*[17] The *Hartford* case summarized the Wixon Handbook as stating that trade accounts payable are:

> limited to the liabilities created by the purchase of merchandise, supplies, or services used in the carrying on of one's trade or business. Trade accounts payable, as the term is generally understood, refers to amounts owing to trade creditors on accounts usually payable within thirty days and which do not generally call for the payment of interest. *See* Wixon, Kell & Bedford, Accountants' Handbook [§] 20-5 (5th Ed. 1970).

*Id.* (emphasis added).

Since the *Hartford* case was dealing with a very different issue than those raised by the Supply Agreement (whether a construction loan was a trade account payable for state tax purposes), the Connecticut court did not address the following critical definitions and limitations from the Wixon Handbook it relied upon that make clear that the "generally understood" Wixon definition does <u>not</u> apply to the obligations under the Supply Agreement:

79.     The Wixon Accountants' Handbook states that only accounts payable for "merchandise or supplies" that have become "represented by unpaid invoices" are covered by trade creditors' accounts. Steel Decl. at Ex. C, Wixon Handbook at § 20-5, (defining trade

---

[17]     Relevant pages from the Wixon Accountants' Handbook are attached at Steel Decl. at Exhibit C.

creditors' accounts and distinguishing them from general accounts payable: "In some cases the term 'accounts payable' is restricted to trade creditors' accounts, represented by unpaid invoices for the purchase of merchandise or supplies."). The Wixon Handbook defines both "merchandise" and "supplies" as particular types of "inventor[y]." *Id.*, Steel Decl. at Ex. C at § 12-1. "Merchandise held" is a type of inventory that covers "all classes of commodities held by dealers for sale." *Id.* at § 12-1, Ex. C. "Supplies" are another item of "inventory" that is consumed and provides services that "make up finished goods." *Id.* at § 12-1, Ex. C. This is the "generally understood" definition from the Wixon Handbook to which the Connecticut court referred to in *Hartford*.

80.     NG is not in the business of selling nuclear fuel as "merchandise" nor does it incorporate nuclear fuel into "finished goods." *See* Steel Decl. at Ex. D, Debtors' 2009 10-K at p. i, (NG "owns nuclear generating facilities"). The Debtors classify the nuclear fuel they own as a capital investment, which is part of property, plant and equipment. *See* Steel Decl. at Ex. E, Debtors' 2017 10-K at 133-34; Steel Decl. at Ex. D, Debtors' 2009 10-K at p. 13 ("Our capital investments for additional nuclear fuel during 2010 are estimated to be approximately $203 million."). As such, it cannot be one of the specified types of "inventory" that can constitute a trade account payable under the Wixon definition cited in their case. Dietrich Decl. at ¶¶ 19–25; Kee Decl. at ¶¶ 30–38. Nor do the Debtors claim that the Supply Agreement obligations asserted in the proofs of claim for 2018 through 2027 are "represented by unpaid invoices," another unsatisfied requirement from their accounting reference.

**B.     The Debtors ignore USEC's actual claims.**

81.     USEC is not suing for a pre-petition delivery under a purchase order that was invoiced but not paid. Instead, it is seeking recovery for the long-term obligations under the Supply Agreement rejected by Debtors for years 2018 through 2027. The Debtors' argument

conflates USEC's actual claims with an individual "hypothetical" purchase order that was not actually issued by the Debtors for a single shipment. USEC's claim is for all remaining obligations under the entire long-term contract. Whether one focuses on the characterization of the obligations owed under the Supply Agreement when executed, the ten years of remaining unperformed obligations as of rejection, or the damages for breach of those long-term contractual obligations, none of those could be classified or accounted for as an "account payable," much less a "trade accounts payable incurred in the ordinary course of business." Kee Decl. at ¶¶ 8, 30–38; Dietrich Decl. at ¶¶ 19–25.

82.     Ultimately, the Debtors' offer only a strawman argument for their trade account payable defense by claiming that had the Debtors not rejected the Supply Agreement, and had they issued each annual purchase order, and had USEC then issued each invoice and had the Debtors paid them all so these cycles continued through 2027, then there may have been a moment in time over the decade when liabilities might be treated as "accounts payable" on their balance sheet. There is no evidence for any part of this hypothetical, and it assumes a future set of events that have not and <u>cannot even theoretically</u> occur given rejection. The proper test is how the obligations <u>actually</u> covered by the USEC proofs of claim for years 2018 through 2027 were <u>actually</u> classified starting in 2009 through the Petition Date based on the facts that <u>actually</u> occurred. Judged from that reality rather than a hypothetical fantasy, the Debtors' admittedly "firm obligations" to USEC for years 2018 through 2027 are not "trade accounts payable." Kee Decl. at ¶¶ 8, 30–38; Dietrich Decl. at ¶¶ 19–25.

C.     **The Debtors' own financial statements disprove their position.**

83.     The Debtors may not evade their liabilities under the Guaranties by misclassifying them in their own self-serving records. But the Debtors' filings with the SEC are admissions that may be used <u>against</u> them, and the Debtors do not appear to have classified their obligations

under long-term fuel supply agreements with minimum purchase amounts (like the Supply Agreement) as "trade accounts payable" in their financial statements. In fact, the Debtors do not even have a classification for "trade" accounts payable in their financial statements. Dietrich Decl. at ¶¶ 21–22.

84.    Contractual fuel obligations were classified along with the other types of Guaranteed Obligations, such as long-term debt, borrowings, interest expense, and capitalized leases that the Debtors considered to be "firm obligations" as of that date. *See* Steel Decl. at Ex. D, Debtors' 2009 10-K at p. 82 (fuel supply agreements) and p. 109 (forward contracts). All of the different types of Guaranteed Obligations (including the deferred purchase price of fuel under contract as well as long-term debt) are listed together as "Contractual Obligations" in the Debtors' financials. *Id.* None of these obligations is a "trade account payable." The foregoing classification for fuel contracts was in place in 2009 when the Supply Agreement was executed. *See* Steel Decl. at Ex. D, Debtors' 2009 10-K at p. 82. The Debtors continued that same classification all the way through their last filed Form 10-K for 2017. *See* Steel Decl. at Ex. E, Debtors' Form 10-K dated as of December 31, 2017 at p. 85.[18]

85.    As also admitted in the Debtors' financial statements, "accounts payable" are limited to "current liabilities." Steel Decl. at Ex. E, Debtors' 2017 10-K at 122, 126. The obligations under the Supply Agreement that are the basis of USEC's claims (years 2018

---

[18]    Whether the Debtors correctly included the Supply Agreement in "Contractual Obligations" for their financial statements, the classification of fuel contract obligations with minimum purchase amounts together with other long-term debts also disproves the Debtors' current position that obligations under long-term fuel supply agreements are "trade accounts payable incurred in the ordinary course of business." USEC has served discovery regarding the Debtors' treatment of the obligations under the Supply Agreement in their contemporaneous records and financial statements, including whether they classified the deferred payment obligations under the long-term Supply Agreement from its inception as an ordinary course "trade accounts payable" and current liability in their publicly issued financial statements from 2009 through the Petition Date.

through 2027) were not current liabilities, whether assessed when they were incurred or even as of the Petition Date. *Id.*; Kee Decl. at ¶¶ 8, 21–30, 38–59; James Decl. at ¶¶ 11, 14, 17–20.

**D.      Purchase orders are ministerial and do not create the underlying obligations.**

86.      To deflect the deferral of the payment under the Supply Agreement, the Debtors attempt to conflate the incurrence of their obligations under the Supply Agreement with the issuance of purchase orders.  But the Debtors' obligations to USEC were incurred upon execution of the Supply Agreement and they exist whether or not the Debtors ever issue a "purchase order."  *See* Supply Agreement, Sections 16.1, 19.2.  In fact, the issuance of purchase orders was a ministerial act under the contract, as the Supply Agreement expressly provides that the Debtors owed the full amount under the Supply Agreement whether or not they ever issued a purchase order.  *Id.*  Moreover, the purchase orders and invoices will never be issued for years 2018 through 2027, and thus cannot be relevant. [19]

87.      The error in the Debtors' construction is easily illustrated.  Assume that a party takes out a thirty-year mortgage.  The full amount of the mortgage has been "incurred" as an obligation on execution even if it is not then "payable."  Each month, the mortgagee receives a payment coupon with only the monthly amount then due.  If the mortgagee performs, coupons will be issued over thirty years until the entire mortgage has been repaid.  If the mortgagee defaults, the full amount owed is due and no more coupons will be issued.  Applying the Debtors' faulty logic to this scenario, the mortgage would become nothing more than a string of monthly coupons.  There would be no obligation other than the monthly coupons, even though

---

[19]      At most, the Debtors' proposed test based upon the issuance of a purchase order might apply if a purchase order and invoice are already issued prior to rejection.  Even that position is doubtful since the proper time to assess an obligation is when it is incurred and not the ministerial purchase orders.  But no such open pre-rejection purchase orders/invoices were included in the claims that USEC filed for 2018-2027.  Thus, the Court need not reach that issue.

the mortgagee is committed to pay the full amount and it is all due if there is a default. The fact that the mortgagee is committed to pay the full amount would be irrelevant. The entire thirty-year mortgage would have to be treated as a 30-day current liability/account payable from inception, because it would be broken down into 30-day increments represented by the coupons if the mortgagee performs for the entire period. Of course, none of the conclusions flowing from the Debtors' faulty logic is correct.

88.     The Supply Agreement presents a similar set of issues if one replaces the word "coupon" with "invoice" and "mortgage" with "forward contract." The Debtors incurred an obligation to pay the full amount covered by the Supply Agreement on execution. The invoicing and purchase orders reflect the amount owed for executed purchase orders if the Debtors continue to perform, but that does not mean that the Debtors do not owe the long-term, deferred purchase price for the rest of the contracted amount, nor is the obligation to pay those contracted amounts converted into a current "trade account payable."

**E.     USEC's claims are not ordinary course liabilities.**

89.     USEC's claims are for rejection of the Supply Agreement and the Debtors' failure to perform. Debtors' obligations to pay rejection damages are not "ordinary course" obligations either. Rejection of a contract, by definition, is outside the ordinary course of business. 11 U.S.C. § 365(a). That fact is particularly relevant since the Debtors improperly attempt to characterize the obligations under the Supply Agreement based upon future events (hypothetical future invoices and purchase orders) that could only have occurred in the absence of rejection. The obligations for years 2018 through 2027 were indisputably not accounts payable at any time from the inception of the Supply Agreement through the petition date. From that point on, there could be no "ordinary course" incurrence of a trade account payable.

**F.** **In the alternative, USEC should be allowed to conduct discovery and present a full record.**

90.    In the alternative, at the very least, the Court needs to consider evidence as to how the particular obligations that form the basis of USEC's claim for years 2018 through 2027 were actually classified based on the facts as they are known to have occurred.  And USEC is entitled to discovery and additional time to assess the characterization of the obligations under the Supply Agreement, including without limitation through the Debtors' own financial statements and internal documents as well as depositions of their personnel and accountants (to whom USEC has issued subpoenas).

Dated:  January 31, 2020

Respectfully Submitted,

**BRENNAN, MANNA & DIAMOND, LLC**

*/s/ Michael A. Steel*
MICHAEL A. STEEL (OH#0072367)
75 East Market Street
Akron, Ohio 44308
PH:    (330) 374-7471
FX:    (330) 374-7472
masteel@bmdllc.com

**O'MELVENY & MYERS LLP**

*/s/ Steve Warren*
STEVE WARREN (CA#136895)
400 South Hope Street
Los Angeles, CA 90071-2899
PH:    (213) 430-6000
FX:    (213) 430-6407
swarren@omm.com

and

TANCRED V. SCHIAVONI (NY#2261097)
7 Times Square
New York, New York 10036
PH:     (212) 326-2000
FX:     (212) 326-2061
tschiavoni@omm.com

*Attorneys for United States Enrichment Corporation
and Creditors American Centrifuge Enrichment, LLC*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was electronically transmitted on or about this 31st day of January, 2020, to the following: who are listed on the Court's Electronic Mail Notice List.

Via Email:

- Kate M. Bradley, on behalf of Debtor kbradley@brouse.com
- Ira Dizengoff, on behalf of Debtor idizengoff@akingump.com
- Abid Qureshi, on behalf of Debtor aqureshi@aakingump.com
- Joseph L. Sorkin, on behalf of Debtor jsorkin@akingump.com
- Lisa Beckerman, on behalf of Debtor lbeckerman@akingump.com

Via Federal Express:

Abid Qureshi
Joseph L. Sorkin
Akin Gump Strauss Hauer & Feld, LLP
One Bryant Park
New York, NY 10036

*/s/ Michael A. Steel*
Michael A. Steel (#0072367)