# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | Case No. 18-50763 (AMK); |
| PLEASANTS CORP., *et al.*, | § | Cases Jointly Administered Under |
| | § | Case No. 18-50757 (AMK) |
| | § | |
| | § | Chapter 11 |
| Debtors. | § | |
| | § | Judge Alan M. Koschik |

## VERIFIED SUPPLEMENTAL DECLARATION OF GEOFFREY K. VERHOFF IN SUPPORT OF THE SIXTH INTERIM AND FINAL APPLICATION OF <u>AKIN GUMP STRAUSS HAUER & FELD LLP</u>

Geoffrey K. Verhoff, pursuant to 28 U.S.C. § 1746, declares and says:

1. I, Geoffrey K. Verhoff, respectfully submit this verified supplemental declaration (the "Declaration") in accordance with the Court's November 24, 2020 order (the "Order") and in response to the questions posed by the Court. I base this Declaration on my personal knowledge.

2. I am over the age of eighteen (18), of sound mind, have not been convicted of a crime of moral turpitude, and am otherwise fully qualified to make this Declaration. All statements of fact contained herein are true and correct and based upon my personal knowledge.

3. I was born and raised in Columbus, Ohio. I moved to Wilmington, Delaware in 1995 where I completed my high school education. I attended Catholic University where I received a Bachelor of Arts Degree in Politics in 2003. I attended George Mason University where I received a Master's Degree in Public Policy in 2007.

4. I joined Akin Gump Strauss Hauer & Feld LLP ("Akin Gump" or the "Firm") in 2005 while earning my master's degree and have been employed by the Firm ever since. I am currently a Senior Policy Advisor in the Firm's Washington, D.C. office in the Public Law and

Policy Group (the "PLP Group"). My practice focuses on advising clients on a wide range of policy matters at the federal, state, and international levels.

5. The PLP Group, which is consistently ranked as one of the top government relations practices in Washington, D.C., consists of approximately 75 professionals. The PLP Group performs a variety of tasks for clients, including developing comprehensive strategic and tactical plans to achieve legislative, policy, or regulatory objectives; organizing and managing lobbying and public affairs matters for business and industry coalitions; drafting, analyzing, and monitoring legislation; direct advocacy with government officials; preparing for legislative hearings and testimony; advising on media strategy; and advising on political contributions (typically on a bipartisan basis).

6. In my experience, corporate contributions to issues-based nonprofit organizations (commonly referred to as 501(c)(4) organizations) are commonplace and elected officials at both the federal and state level regularly have affiliations with such organizations. These 501(c)(4) organizations often engage in advocacy relating to issues being considered by legislative bodies. By way of further example, corporate contributions to political committees (commonly referred to as "527 groups") and legislative campaign committees are also commonplace in my experience.

7. Akin Gump was retained as bankruptcy counsel to FirstEnergy Solutions Corp. ("FES") and its affiliated debtors and debtors-in-possession. In addition to the bankruptcy work for FES, Akin Gump provided public policy advice to FES on a range of issues, including developing an approach for communicating the bankruptcy and the decision to shut down FES' struggling nuclear power plants in Ohio and Pennsylvania to federal and state officials, and pursuing potential legislative and regulatory solutions to keep those power plants online. The members of the PLP Group working on the FES matter (the "PLP Team") were bipartisan, as is often the case for PLP Group teams working on behalf of their clients. The PLP Team was

assisted by Akin Gump attorneys from other groups with expertise in energy matters.

8. The PLP Team pursued both federal and state legislative and regulatory solutions regarding the Ohio and Pennsylvania nuclear plants. While the PLP Group generally, and the PLP Team specifically, has extensive experience in federal legislative and regulatory matters, we do not routinely lobby state governments without local advisors. Accordingly, the PLP Team worked with other Ohio-based (and Pennsylvania-based) legislative consultants who had greater experience and expertise in state government relations and lobbying.

9. Working with FES' government affairs team, the PLP Team and FES' state-based consultants developed a plan to achieve a legislative solution in both Ohio and Pennsylvania. The PLP Team provided advice on all facets of the proposed legislative effort including the drafting and introduction of the legislation, the messaging to the public and lawmakers on the merits of the legislation, and the engagement with technical experts and consultants. From a lobbying perspective, an important component of that plan was to establish for FES an independent voice and identity that was distinct from FES' corporate parent, FirstEnergy Corp. Another component was to establish relationships on a bipartisan basis with key lawmakers.

10. In connection with the general election for the Ohio legislature, the election for the Governorship, and the elections for the Speakership of the Ohio House of Representatives in 2018 and 2019, the PLP Team as well as other Ohio-based consultants advised FES regarding a possible legislative solution in Ohio, including bipartisan relationship building, messaging, advocacy, and bipartisan political contributions to promote FES' business objectives and consistent with applicable law.

11. I knew of Juan Cespedes through a family member, and I first met Mr. Cespedes in early 2017 before my work for FES began. I knew Mr. Cespedes was a lobbyist in Columbus, Ohio with the Oxley Group and a member of the Ohio Civil Rights Commission. He was also very knowledgeable about Ohio politics. When FES was seeking lobbyists to assist them in Ohio

in 2018, I introduced Mr. Cespedes to the Akin Gump PLP Team and FES. Mr. Cespedes had not done any work for FirstEnergy Corp. and thus we thought he was a good fit for FES.

12. At the outset of the engagement, Mr. Cespedes was hired to assist in building a team of Ohio-based lobbyists, to gather intelligence, and to begin to differentiate FES from the parent in lobbying matters. Over time, Mr. Cespedes began to play a greater role for FES. After the election, he devoted substantial time to working directly with FES in connection with the passage of House Bill 6. During the period between the engagement of Mr. Cespedes until House Bill 6 was signed into law by the Governor, I had almost daily contact with Mr. Cespedes and we developed a friendship during the engagement. While I had regular contact with Mr. Cespedes, I was unaware of the alleged payments that he received from Generation Now that are set forth in the criminal indictment against him. I was also unaware of any illegal activity in connection with House Bill 6. I was saddened to learn of Mr. Cespedes' indictment. I have not had any contact with Mr. Cespedes since his indictment.

13. With regard to my role with respect to the Ohio House vote on House Bill 6 in April 2019 and the Senate vote on House Bill 6 in July 2019, I, along with the rest of the PLP Team, prepared and reviewed various advocacy pieces for legislators and the public and provided advice to FES and to the Ohio-based consultants on messaging, advocacy, and lobbying. There was strenuous opposition to House Bill 6. Accordingly, the PLP Team, FES, and its Ohio-based consultants had almost daily calls to discuss how to respond to the opposition. During the referendum to repeal House Bill 6, FES' level of engagement of the Akin Gump PLP Team became much more limited.

14. I did not advise FES or the other Debtors on the $1,879,457.00 transfer to Generation Now on July 5, 2019, and do not have any personal knowledge of that transfer. Nor am I aware if any other Akin Gump professional was aware of the transfer. I only knew of two contributions made by FES to Generation Now: in October 2018 for $400,000 and $100,000. I

became aware of Generation Now around September 2018. I understood that Generation Now was a 501(c)(4) non-profit organization in Ohio that focused on energy independence and economic development opportunities and that Representative Larry Householder was associated with Generation Now. In my experience, such association by elected officials with 501(c)(4) issue advocacy groups are commonplace. As noted earlier, in the fall of 2018, I, along with others on the PLP Team, provided advice relating to bipartisan political contributions by FES to Generation Now, the Republican Governors Association, the Democratic Governors Association, the Ohio Senate Campaign Committee, and other 501(c)(4) organizations. Based on our research and experience, the contributions FES made were on par with the contributions made by other companies, including in connection with the 2018 election cycle. During that time, I also attended meetings in Columbus, Ohio with representatives of some of these organizations, including Generation Now. Similar meetings are common at the federal level in my experience. I did not observe anything improper at these meetings.

15. I have submitted this verified supplemental declaration for the purpose of responding to the specific questions in the Court's Order. If the Court has any further questions for me, I am prepared to respond as requested.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 1/22/21
Falls Church, VA

Geoffrey K. Verhoff