UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | § § | Case No. 18-50763 (AMK); |
| PLEASANTS CORP., *et al.*,[1] | § § | Cases Jointly Administered Under Case No. 18-50757 (AMK) |
| | § § | Chapter 11 |
| Debtors. | § § § | Judge Alan M. Koschik |

**DECLARATION OF JAMES R. TUCKER JR. IN RESPONSE TO ORDER
AND IN SUPPORT OF THE SIXTH INTERIM AND FINAL
APPLICATION OF AKIN GUMP STRAUSS HAUER & FELD LLP**

Pursuant to 28 U.S.C. § 1746, James R. Tucker Jr. declares as follows:

1. This Declaration is submitted by James R. Tucker Jr. in response to the Court's November 24, 2020 Order Directing Certain of the Debtors' Professionals to Make Sworn Statements in Support of the Sixth Interim and Final Application of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") (Docket No. 4281).

2. I am over the age of eighteen (18), of sound mind, have not been convicted of a crime of moral turpitude, and am otherwise fully qualified to make this Declaration. All statements of fact contained herein are true and correct and based upon my personal knowledge.

3. I am an attorney, a partner at Akin Gump, and a member of Akin Gump's Public Law and Policy ("PLP") section. I have more than 25 years of government relations experience.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Energy Harbor Generation LLC (0561), case no. 18-50762; Pleasants Corp. (5914), case no. 18-50763; Energy Harbor Nuclear Generation LLC (6394), case no. 18-50760; Energy Harbor Nuclear Corp. (1483), case no. 18-50761; and Energy Harbor LLC (0186), case no. 18-50757.

I frequently assist clients in developing and implementing strategies to solve their regulatory and policy challenges, including through the development of policy solutions and multi-faceted strategies to educate and lobby policymakers, stakeholders, and the general public about issues relevant to my clients.

4. In 2018, FirstEnergy Solutions Corp. ("FES") and its related debtors and debtors-in-possession retained Akin Gump to develop and coordinate a messaging strategy for state and federal lawmakers concerning FES' bankruptcy and deactivation of its nuclear power plants in Ohio and Pennsylvania, as well as to develop a government relations strategy and policy solution to provide ongoing support for the plants. We understood that without federal or state legislative or regulatory support, the nuclear power plants were unlikely to remain in business.

5. Akin Gump's government relations strategy involved engagement and communication at the federal and state levels; more focused efforts educating the general public, various stakeholders, and Ohio and Pennsylvania officials; and development of regulatory and legislative proposals. We worked with FES' outside Ohio- and Pennsylvania-based legislative consultants for intelligence, policy development, and on-the-ground lobbying with state legislators and local stakeholders.

6. In Ohio, we identified, reviewed, and analyzed potential legislative solutions used in other states that could aid the effort to help ensure FES' viability; engaged with colleagues, our client, and our client's financial and in-state legislative and political consultants to develop legislative proposals and communications strategies relating to potential legislation; developed a multi-faceted media campaign to promote support for House Bill 6 once it was introduced; identified and coordinated with potential legislative hearing witnesses to promote House Bill 6; developed talking points and other issue advocacy material; and tracked legislators' support for

legislation, including House Bill 6. In addition, as is customary in many policy engagements, we discussed and developed a bipartisan political contribution program for FES.

7. After several months, House Bill 6 passed both houses of the Ohio legislature in July 2019; Governor Mike DeWine then signed the bill into law. After the bill's enactment, the PLP team's role diminished significantly, and we did not play a significant role advising FES in the efforts to fight the subsequent voter referendum.

8. The Court's specific questions and my responses are set forth below.

*a. Describe your role in the 2018 and 2019 contests for the speakership of the Ohio House of Representatives.*

*b. Describe your role in the 2018 general elections for the Ohio legislature.*

9. I communicated with others at Akin Gump, and with FES and its other consultants about the 2018 general election and the races for the speakership of the Ohio House of Representatives because the outcomes of those races bore on FES' legislative strategy. We discussed possible legislative solutions to aid FES' economically unviable nuclear plants and helped develop approaches for how the company could pursue its legislative goals no matter the outcome of the various Ohio elections. In addition, as we often do for clients in advance of elections, members of the Akin Gump PLP team, FES, and FES' outside consultants discussed and developed a bipartisan political contribution strategy.

*c. Describe the nature of your interactions and relationship with Juan Cespedes and the Oxley Group.*

10. I was first introduced to Juan Cespedes and his company, the Oxley Group, in or around March 2018. At the time, we were looking for in-state legislative consultants to help with outreach to policymakers regarding the nuclear power plant deactivation process in Ohio and the announcement of FES' bankruptcy, as well as to assess the likelihood of possible legislative solutions to return the nuclear plants to viability.

11. Cespedes also helped to devise the strategy to obtain legislative support from Ohio state legislators. Over time, Cespedes became the principal day-to-day point of contact for FES in Columbus, meeting with Ohio officials and their staff and educating them about the need for the legislative relief being sought. Akin Gump and FES also relied upon Cespedes to report on the likelihood that particular members of the legislature would be supportive of our efforts and the policy considerations that were important to those policymakers.

12. I spoke relatively frequently with Cespedes as part of the effort, both directly and as part of many group conference calls with the client and other consultants, and I met with Cespedes on several occasions. I was not aware of any illegal activity by Cespedes or anyone else in connection with the passage of House Bill 6.

*f. Describe your role in the Ohio House vote on HB 6 in April 2019.*

*g. Describe your role in the Ohio Senate vote on HB 6 in July 2019.*

13. My role in connection with the House and Senate votes on House Bill 6 was essentially the same. I worked with other members of the PLP and client's government relations team and outside consultants to provide strategic advice and to help mobilize public support to pass the bill. For most of the duration of our engagement, we held near-daily working calls to coordinate multiple workstreams. Among other things, we analyzed substantive provisions in the various legislative proposals; developed grassroots outreach, letter-writing campaigns and talking points; prepared witness testimony for state legislative committees; and developed communications strategies to educate legislators, stakeholders and the general public about the benefits of House Bill 6.

***h. To the extent not already answered in response to paragraphs 1f and 1g above, describe your role in the "whip counts" in 2019.***

14. "Whip counts" are a routine part of the matters on which I work and typically consist of a process whereby legislators' support for a bill are ranked. We employed this "whip count" process in connection with our work on behalf of FES, first to identify aspects of potential legislation that were or were not likely to receive support and to track the level of support in relation to the various iterations of House Bill 6. In order to assign and update rankings of the members of the Ohio House and Senate, we relied on the reports we received from FES' lobbyists on the ground in Ohio.

***j. Did you or any other Akin Gump professional advise the Debtors with respect to the $1,879,457.00 electronic transfer to Generation Now on July 5, 2019, as disclosed in the Debtors' operating report for July 2019 (Docket No. 3139), or regarding any other transfer to or for the benefit of Generation Now?***

***k. Were the Akin Gump Ohio statehouse team members aware of existence of Generation Now at any time before February 27, 2020 (the Effective Date of the Debtor's Plan of Reorganization) and did they advise the Debtors with respect to any interaction with Generation Now during that time period?***

15. Beginning in late summer 2018, members of the Akin Gump PLP team along with FES and FES' outside consultants discussed and developed a bipartisan political donation strategy for Ohio and Pennsylvania. In connection with those discussions, I learned that Generation Now was a 501(c)(4) organization addressing energy independence and economic development, and that it was aligned with Larry Householder. Over the course of the next two months, FES' governmental affairs team and I, with input from outside consultants and others at Akin Gump, advised FES in connection with its decision to donate a total of $500,000 to Generation Now in October 2018 as part of its broader, bipartisan contribution strategy, which included donations to the Republican Governors Association, the Democratic Governors Association, the Republican Senate Campaign Committee, and other 501(c)(4) organizations.

16. In or around April 2019, I was informed that FES' Washington, DC–based political consulting firm Dewey Square Group would no longer have primary responsibility for media in support of House Bill 6, and that Ohio-based Generation Now would be leading the media strategy in support of the bill. I recall general discussions about FES making additional contributions to Generation Now in connection with the transition to lead the media strategy. I did not have personal knowledge of the $1,879,457.00 transfer to Generation Now or any other transfers to Generation Now beyond that identified above. I do not know if any other Akin Gump professional has such knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 21, 2021.

_____
James R. Tucker Jr.

*Supplemental paragraph added July 1, 2021, pursuant to 28 U.S.C. § 1746*

17. After executing my declaration on January 21, 2021, I recalled speaking with Dave Griffing at FES at some point in the summer of 2019, after the final passage of House Bill 6. During that conversation, I learned that FES had spent approximately $16 million on the media campaign to help pass House Bill 6. I assumed at the time that some or all of the $16 million had been contributed to Generation Now because Generation Now had primary responsibility for media in support of House Bill 6 beginning in April 2019, but I do not recall that being stated explicitly to me. I did not have personal knowledge that any specific amount had been spent on the media campaign or contributed to Generation Now at the time that it was spent, nor did I have personal knowledge of any other transfers to Generation Now beyond that described in the statement I executed on January 21, 2021. I do not know if any other Akin Gump professional had such knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 1, 2021.

James R. Tucker Jr.